No. 25-2077

In the United States Court of Appeals
for the First Circuit

———— ◆ ————

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative of THE COMMONWEALTH OF PUERTO RICO, et al.; IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, As Representative for the Employees Retirement System of the Government of the Commonwealth of Puerto Rico; IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, As Representative for the Puerto Rico Highways and Transportation Authority; IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, As Representative for the Puerto Rico Electric Power Authority (PREPA); IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, As Representative of the Puerto Rico Public Buildings Authority,

*Debtors.*

*(For Continuation of Caption See Inside Cover)*

————————————————

On Appeal from the United States District Court
for the District of Puerto Rico
Case Nos. 17-BK-3283-LTS; 17-BK-4780-LTS, Laura Taylor Swain,
District Judge

**APPELLANTS' APPENDIX**

**(App.1 – App.869)**

LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC,

*Movants-Appellants*

v.

PUERTO RICO DEPARTMENT OF CONSUMER AFFAIRS (DACO); INSTITUTO DE COMPETITIVIDAD Y SOSTENIBILIDAD ECONMICA (ICSE),

*Respondents-Appellees*

_____

David Horniak (Bar No. 1187585)
**DLA PIPER LLP (US)**
500 8th Street, NW
Washington, DC 20004
T: (202) 799-4361
F: (202) 799-4362
david.horniak@us.dlapiper.com

Brett Ingerman (Bar No. 1220681)
Dale K. Cathell (Bar No. 1143481)
**DLA PIPER LLP (US)**
650 S. Exeter Street, Ste. 1100
Baltimore, MD 21202-4576
T: (410) 580.4177
brett.ingerman@us.dlapiper.com
dale.cathell@us.dlapiper.com

Mariana Muñiz Lara (Bar No. 1172817)
**DLA PIPER (PUERTO RICO) LLC**
500 Calle de la Tanca, Suite 401
San Juan, Puerto Rico 00901-1969
T: (787) 945.9106
Mariana.muniz@us.dlapiper.com

*Counsel for Appellants LUMA Energy, LLC, and LUMA Energy Servco, LLC*

# TABLE OF CONTENTS

## Volume I (App.1 – App.488)

Urgent Motion of LUMA to Enforce the Automatic Stay ......................... 1

Urgent Motion of LUMA to Enforce the Automatic Stay, Exhibit A: Proposed Order ...................................................................................... 22

Urgent Motion of LUMA to Enforce the Automatic Stay, Exhibit B: T&D OMA ...................................................................................................... 26

Urgent Motion of LUMA to Enforce the Automatic Stay, Exhibit C: DACO Complaint and Certified Translation .................................................. 363

Urgent Motion of LUMA to Enforce the Automatic Stay, Exhibit D: DACO's Supreme Court Opening Brief and Certified Translation ..... 402

## Volume II (App.489 – App.869)

DACO's Opposition to Urgent Motion to Enforce the Automatic Stay ...................................................................................... 489

DACO's Opposition to Urgent Motion to Enforce the Automatic Stay, Exhibit 1: PREPA's Brief Before the Puerto Rico Supreme Court (Spanish Version) .............................................................................................. 513

DACO's Opposition to Urgent Motion to Enforce the Automatic Stay, Exhibit 2: Puerto Rico Legislative Assembly's (Senate and House) Joint Submission before the Puerto Rico Supreme Court (Spanish Version) ............................................................................................... 532

DACO's Opposition to Urgent Motion to Enforce the Automatic Stay, Exhibit 3: September 18, 2025 Email Thread ..................................... 538

DACO's Opposition to Urgent Motion to Enforce the Automatic Stay, Exhibit 4: PREPA's Procedure for the Analysis, Processing, and Payment of Claims to Third Parties (February 15, 2016) (Spanish Version) ...... 541

Brief of Instituto de Competitividad Y Sostenibilidad Económica de Puerto Rico (ICSE) ..............................................................................566

Omnibus Reply in Support of Urgent Motion of Luma to Enforce the Automatic Stay ....................................................................................583

Omnibus Reply in Support of Urgent Motion of Luma to Enforce the Automatic Stay, Exhibit E: Transcript of October 1, 2025 Radio Interview (Spanish and English Certified Translations) ....................................598

DACO's Sur-Reply ...................................................................................606

ICSE's Surreply to LUMA's Omnibus Reply ......................................617

DACO's Motion Submitting Certified Translations of Exhibits 1, 2, and 4 to its Opposition to LUMA's Urgent Motion to Enforce the Automatic Stay ........................................................................................................625

DACO's Motion Submitting Certified Translations of Exhibits 1, 2, and 4 to its Opposition to LUMA's Urgent Motion to Enforce the Automatic Stay, Exhibit 1: PREPA's Brief before the Puerto Rico Supreme Court (Certified English Translation) ..........................................................627

DACO's Motion Submitting Certified Translations of Exhibits 1, 2, and 4 to its Opposition to LUMA's Urgent Motion to Enforce the Automatic Stay, Exhibit 2: the Puerto Rico Legislative Assembly's (Senate and House) Joint Submission before the Puerto Rico Supreme Court (Certified English Translation) ..............................................................646

DACO's Motion Submitting Certified Translations of Exhibits 1, 2, and 4 to its Opposition to LUMA's Urgent Motion to Enforce the Automatic Stay, Exhibit 4: PREPA's Procedure for the Analysis, Processing, and Payment of Claims to Third Parties (February 15, 2016) (Certified English Translation) ..............................................................................655

Notice of Appeal ....................................................................................681

Resolution and Order .............................................................................704

Extension Letter for the OMA.................................................................759

Puerto    Rico    Supreme    Court    Decision    (Certified    English
Translation) ........................................................................ 762

Puerto Rico Supreme Court Decision (Spanish Version) ..................... 815

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>                Debtor. | PROMESA<br><br>Title III<br><br>No. 17-BK-4780-LTS |

## <u>URGENT MOTION OF LUMA TO ENFORCE THE AUTOMATIC STAY</u>

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("<u>HTA</u>") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("<u>ERS</u>") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("<u>PREPA</u>") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("<u>PBA</u>") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801).  Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** ..................................................................................... 1

**JURISDICTION AND VENUE** .................................................................................... 2

**BACKGROUND** ............................................................................................................. 3

      **A.**     **General Background and History of the T&D OMA** ......................................... 3

      **B.**     **The Commonwealth Court Litigation** ................................................................. 8

**RELIEF REQUESTED** ................................................................................................... 9

**BASIS FOR RELIEF** ...................................................................................................... 9

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Berrios Correa v. MAPFRE*,
 No. 19-cv-2105, 2020 WL 6948159 (D.P.R. Nov. 25, 2020)................................10

*Celotex Corp. v. Edwards*,
 514 U.S. 300 (1995).................................................................................................13

*In re Corporacion de Servicios Medicos Hospitalarios de Fajardo*,
 60 B.R. 920 (D.P.R. 1986), *aff'd sub. nom. In re Coporacion de Servicios
 Medicos Hospitalarios de Fajardo*, 805 F.2d 440 (1st Cir. 1986) .........................11

*In re Fin. Oversight & Mgmt. Bd. For P.R.*,
 494 F. Supp. 3d 95 (D.P.R. 2020)..........................................................................12

*In re Fin. Oversight & Mgmt. Bd. for P.R. v. Commonwealth*,
 No. 17 BK 3283-LTS, 2022 WL 17413011
 (D.P.R. Feb. 7, 2022) ..............................................................1, 10, 11, 12

*I.C.C. v. Holmes Transp., Inc.*,
 931 F.2d 984 (1st Cir. 1991)....................................................................................13

*In re James*,
 940 F.2d 46 (3d Cir. 1991).......................................................................................13

*In re Killmer*,
 501 B.R. 208 (Bankr. S.D.N.Y. 2013)....................................................................10

*MMM Healthcare, Inc. v. Santiago (In re Santiago)*,
 563 B.R. 457 (Bankr. D.P.R. 2017).........................................................................10

*In re Myers*,
 491 F.3d 120 (3d Cir. 2007).....................................................................................14

*Newcomer v. Litton Loan Servicing, L.P. (In re Newcomer)*,
 416 B.R. 166 (Bankr. D. Md. 2009) ..........................................................................9

*In re Soares*,
 107 F.3d 969 (1st Cir. 1997).....................................................................................13

*In re: Tamarack Development Assoc., LLC*,
 611 B.R. 286 (Bankr. W.D. Mich. 2020).................................................................10

*U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*,
 730 F.3d 88 (2d Cir. 2013).......................................................................................10

## Statutes

11 U.S.C. § 105 ..................................................................................................1, 3, 10, 14

11 U.S.C. § 362 ................................................................................................ *passim*

11 U.S.C. § 541 ..............................................................................................................10

48 U.S.C. § 2161 .............................................................................................................3

48 U.S.C. § 2166 .............................................................................................................2

48 U.S.C. § 2167 .............................................................................................................3

PROMESA § 301 ...............................................................................................1, 3, 10

PROMESA § 304 .............................................................................................................5

PROMESA § 306 .............................................................................................................2

PROMESA § 307 .............................................................................................................3

PROMESA § 315 ...........................................................................................................14

PR Laws Ann. Tit. 22 §§ 191-218 (2025) .................................................................3

PR Laws Ann. Tit. 22 §§ 1051-1056 No. 57-2014 (2025) ....................................3

PR Laws Ann. Tit. 22 §§ 1111-1125 No. 120-2018 (2025) ..................................5

PR Laws Ann. Tit. 27 §§ 2601-2623 (2025) ............................................................6

## Other Authorities

*In Re: Review of LUMA's Terms of Service (Liability Waiver)*,
Case No. NEPR-MI-2021-0007 (https://energia.pr.gov/wp-
content/uploads/sites/7/2022/07/Motion-in-Compliance-with-Final-
Resolution-and-Order-and-Request-for-Confidential-Treatment-NEPR-MI-
2021-0007.pdf)....................................................................................................................12

Synapse Energy Associates, *Expert Report* (revised November 23, 2016), filed
before the Puerto Rico Energy Bureau in *In re: Review of Rates of PREPA*,
Matter No. CEPR-AP-2015-0001, *available at* https://energia.pr.gov/wp-
content/uploads/sites/7/2016/11/Expert-Report-Revenue-Requirements-
Fisher-and-Horowitz-Revised-20161123.pdf ...........................................................4

*In re: Review of Rates of PREPA*, Matter No. CEPR-AP-2015-0001, Final
Resolution and Order (January 10, 2017), *available at*
https://energia.pr.gov/wp-content/uploads/sites/7/2017/01/Final-Resolution-
and-Order.pdf..........................................................................................................................4

Kobre & Kim, *The Financial Oversight & Management Board for Puerto Rico
Special Investigation Committee, Independent Investigator's Final
Investigative Report* (August 20, 2018), *available at* FOMB's
https://drive.google.com/file/d/19-lauVo3w9MPS03xYVe0SWhQin-
Q6FEf/view..........................................................................................................................4

**To the Honorable United States District Judge Laura Taylor Swain:**

LUMA Energy, LLC and LUMA Energy Servco, LLC ("LUMA"), by and through their counsel, DLA Piper LLP (US), file this urgent motion and memorandum of law in support thereof, (the "Motion"), pursuant to sections 105(a) and 362 of title 11 of the United States Code (the "Bankruptcy Code"), made applicable to these cases pursuant to PROMESA section 301(a), for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), enforcing the automatic stay and directing the Puerto Rico Department of Consumer Affairs ("DACO", for its Spanish acronym) to withdraw the writ for Intrajurisdictional Certification filed before the Puerto Rico Supreme Court, in the case styled *Departamento de Asuntos del Consumidor v. LUMA Energy, LLC; LUMA Energy Servco, LLC; Negociado de Energía de Puerto Rico; Autoridad de Energía Eléctrica*, Case No. CT-2025-0003, and the complaint filed before the Court of First Instance, San Juan Part, Case No. SJ2025CV06607 (collectively, the "Commonwealth Court Litigation"), ordering DACO to cease its prosecution of the Commonwealth Court Litigation in violation of the automatic stay, and finding that any actions taken in violation of the automatic stay are null and void. In support of this Motion, LUMA respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated June 22, 2020 (as amended and supplemented, the "T&D OMA") is a critical post-petition contract between LUMA, the Puerto Rico Electric Power Authority ("PREPA"), and the Puerto Rico Public-Private Partnerships Authority. This Court has already ruled that the T&D OMA is property of PREPA for purposes of this Title III proceeding. *See In re Fin. Oversight & Mgmt. Bd. for P.R. v. Commonwealth*, No. 17 BK 3283-LTS, 2022 WL 17413011 (D.P.R. Feb. 7, 2022) (the "First Stay Violation Case").

2.      Since execution of the T&D OMA over five years ago, various parts of the Government of Puerto Rico (the "Government") have sought to undermine and undo it.  Indeed, in the First Stay Violation Case, the Senate of Puerto Rico sought to have the entire T&D OMA declared void for allegedly violating the laws of Puerto Rico.  However, this Court determined that the Government's efforts to nullify the T&D OMA violated the automatic stay and were void.

3.      Now, the Government (through DACO) is once again trying to undermine and undo the T&D OMA.  This time, the Government is not attempting to void the entire T&D OMA (presumably recognizing this Court's prior ruling in the First Stay Violation Case).  Instead, the Government now seeks to void one key provision in the T&D OMA, a liability waiver provision, recognizing that this provision is a material part of the T&D OMA and hoping that its removal will trigger a cascading series of events that ultimately will achieve the Government's desired end result – termination of the T&D OMA and insider operation of the T&D System once again.

4.      The Government's new tact seeking to only void a section of the T&D OMA for allegedly violating Puerto Rican law, and not the entire T&D OMA, is a distinction without a difference.  As this Court already ruled in the First Stay Violation Case, the T&D OMA is "property of the debtor," *i.e.*, PREPA, and any effort to void the T&D OMA, including any of its provisions, violates 11 U.S.C. § 362(a)(3) and is *void ab initio*.  LUMA respectfully requests that the Court find DACO in violation of the automatic stay and order DACO to withdraw the Writ for Intrajurisdictional Certification and the Complaint and declare that the Commonwealth Court Litigation is null and void.

## JURISDICTION AND VENUE

5.      The United States District Court for the District of Puerto Rico (the "Court" or "Title III Court") has subject matter jurisdiction over this matter pursuant to PROMESA section 306(a).  *See* 48 U.S.C. § 2166.

6.　　Venue is proper pursuant to PROMESA section 307(a).  *See* 48 U.S.C. § 2167(a).

7.　　The statutory basis for the requested relief is sections 105 and 362 of the Bankruptcy Code, made applicable to these Title III cases by PROMESA section 301(a).  *See* 48 U.S.C. § 2161.

## BACKGROUND

### A.　　General Background and History of the T&D OMA

8.　　PREPA is a public corporation and instrumentality of the Government of Puerto Rico created by Act No. 83 of May 2, 1941, also known as the *Puerto Rico Electric Power Authority Act*, PR Laws Ann. Tit. 22 §§ 191-218 (2025) ("Act 83"). Since the mid-1940s, after PREPA's predecessor, the Puerto Rico Water Resources Authority ("PRWRA"), acquired the two main private electric companies that existed on the island, PRWRA developed into the island-wide government-owned integrated electric utility in Puerto Rico.  That was the beginning of the vertically integrated monopoly that became PREPA.

9.　　PREPA owns an extensive transmission and distribution system with approximately 2,600 miles of transmission and sub-transmission lines (230 kV/115 kV/38 kV), over 16,000 miles of primary voltage distribution lines (13kV, 8kV, 4kV), and roughly 400 utility-owned substations.

10.　　On May 27, 2014, the Legislative Assembly of Puerto Rico enacted the *Puerto Rico Energy Transformation and RELIEF Act*, Act No. 57-2014, PR Laws Ann. Tit. 22 §§ 1051-1056 (2025) ("Act 57").  Act 57 provides the legal and regulatory framework to enforce a thorough reform of the energy sector that promotes the operation and administration of an efficient system at just and reasonable costs, considering that Puerto Rico is an isolated jurisdiction that needs to have a safe and stable electric power grid.  The statute sought to overcome the fact that PREPA

had become a monopoly that regulated itself, set its own rates without actual oversight or clarity in its invoices, and permitted numerous operational, managerial, and administrative deficiencies.

11. For decades, PREPA faced operational, strategic, and financial challenges, allegations of systemic corruption, a deficient energy infrastructure, an aging and deteriorating T&D System, high and volatile fuel prices, high vulnerability to weather conditions, an underfunded pension system, and an eventual loss of access to capital markets. PREPA neglected the T&D System for decades, deferring maintenance and capital investments and thereby leaving the system unreliable and "falling apart quite literally."[1] PREPA, faced with political pressure to not increase rates in response to cost and investment needs, acquiesced to the political realities of its position as a state-run monopoly and sacrificed capital expenditures and preventative maintenance in order to attempt to stay afloat.[2]

12. Many of PREPA's problems stemmed from the fact that PREPA's board, high-level positions, and even some technical and operational positions were political appointees who were replaced each time a new governor took office. That meant that operational and investment decisions were driven by the perceived political needs of the administration in power and not by the long-term best interests and needs of the electric system. Relatedly, the frequent changes in

---

[1] Synapse Energy Associates, *Expert Report* (revised November 23, 2016), filed before the Puerto Rico Energy Bureau in *In re: Review of Rates of PREPA*, Matter No. CEPR-AP-2015-0001, at 18; *see also* at 12–14, 26, *available at* https://energia.pr.gov/wp-content/uploads/sites/7/2016/11/Expert-Report-Revenue-Requirements-Fisher-and-Horowitz-Revised-20161123.pdf.

[2] *See In re: Review of Rates of PREPA*, Matter No. CEPR-AP-2015-0001, Final Resolution and Order (January 10, 2017), at 4, *available at* https://energia.pr.gov/wp-content/uploads/sites/7/2017/01/Final-Resolution-and-Order.pdf.

management led to repeated loss of institutional knowledge and decision-making that was unresponsive to market forces.[3]  It similarly led to a lack of long-term planning.

13.     On July 2, 2017, the Federal Oversight and Management Board for Puerto Rico (the "Oversight Board") filed a voluntary petition for relief for PREPA under PROMESA section 304(a), commencing PREPA's Title III restructuring.

14.     Under PREPA's continued mismanagement, Hurricanes Irma and María in September 2017 led to the longest blackout in U.S. history.[4]

15.     To move Puerto Rico's electric system and economy forward, a complete transformation of the T&D System was needed to bring safe, reliable, and modern electric power services to Puerto Rico.

16.     On June 21, 2018, the Legislative Assembly of Puerto Rico enacted the *Puerto Rico Electric Power System Transformation Act,* Act No. 120-2018, PR Laws Ann. Tit. 22 §§ 1111-1125 (2025) ("Act 120"), which establishes the legal framework for the sale, disposition, and/or transfer of the assets, operations, functions, and services of PREPA, including a transaction under which operations of the T&D System would be assumed by a private manager for a period of time, with ownership remaining at PREPA.

17.     Act 120 also established necessary safeguards to ensure a fair and transparent process for obtaining bids for the private operation and management of the T&D System.  Act 120

---

[3]  *See* Kobre & Kim, *The Financial Oversight & Management Board for Puerto Rico Special Investigation Committee, Independent Investigator's Final Investigative Report* (August 20, 2018), at 113, *available at* FOMB's https://drive.google.com/file/d/19-lauVo3w9MPS03xYVe0SWhQin-Q6FEf/view.

[4]  *See* U.S. Government Accountability Office, *Puerto Rico Electricity Grid Recover: Better Information and Enhanced Coordination Is Needed to Address Challenges* (October 8, 2019), at 2 *available at* https://files.gao.gov/reports/GAO-20-141/index.html?_gl=1*moogba*_ga*NDczNzY4NDM5LjE3NTgxMjU1NTk.*_ga_V393SNS3SR*czE3NTgxMjU1NTkkbzEkZzAkdDE3NTgxMjU1NTkkajYwJGwwJGGgw.

also provided for the applicability of the *Public-Private Partnership Authority Act,* Act No. 29-2009, PR Laws Ann. Tit. 27 §§ 2601-2623 (2025) ("Act 29"), and empowered the Puerto Rico Public-Private Partnerships Authority (the "P3 Authority") to begin the processes related to informal negotiations, market analysis, requests for information, and any other method to collect information for PREPA's transformation.

18.    Act 120 designated the P3 Authority as the government entity responsible for the functions, services, and facilities of public-private partnerships in the electric sector. Working in collaboration with the Oversight Board, on June 5, 2018, the P3 Authority launched a competitive process to award a long-term contract to a qualified operation and maintenance service provider for the T&D System. After a competitive and transparent bidding process, LUMA Energy was selected as the winning bidder based on its experience, qualifications, and terms of its proposal.

19.    On June 22, 2020, the Board of Directors of the P3 Authority, the PREPA Governing Board, and the Governor of Puerto Rico approved the T&D OMA among PREPA, LUMA, and the P3 Authority pursuant to the procedures set forth in Act 29. A true and correct copy of the T&D OMA is attached hereto as **Exhibit B**. The T&D OMA provides for LUMA to assume the operation and management of PREPA's T&D System, while PREPA retains ownership of the T&D assets.

20.    The T&D OMA includes various material provisions including section 4.1(g). Section 4.1(g) provides:

> (g)    <u>Liability Waiver</u>.  In connection with the submission of the Initial Budgets to PREB [the Puerto Rico Energy Bureau], the Parties agree to apply for inclusion in the Rate Order that the associated tariff or terms of service include: (i) a waiver of Owner's, ManagementCo's and ServCo's liability to customers or any Person receiving Power and Electricity for any Losses arising in any way out of or in connection with the operation of the T&D System and the provision of Power and Electricity including any events of interrupted, irregular or defective electric service due to Force Majeure Events, other causes beyond Owner's, ManagementCo's or

ServCo's control or ordinary negligence, gross negligence or willful misconduct of Owner, ManagementCo or ServCo, or their respective employees, agents or contractors; and (ii) a waiver in all cases of responsibility for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by any of Owner's, ManagementCo's or ServCo's ordinary negligence, gross negligence or willful misconduct (collectively the "Liability Waiver").

21.    Given the state of the T&D assets at the time that the T&D OMA was executed and the numerous claims that had already been asserted (and were continuing to be asserted) against PREPA at the time, section 4.1(g) was (and is) a material part of the T&D OMA. All parties at the time of the execution of the T&D OMA recognized that this limitation of liability was critical to both LUMA and PREPA.

22.    Through a *Resolution and Order* dated May 31, 2021, the PREB also approved the *Modified Terms of Service*. LUMA began operating the T&D System on June 1, 2021.

23.    The T&D OMA also includes material indemnification obligations including, among other things, Sections 18.2(a)(vi) and (vii) which provide that PREPA must indemnify LUMA for:

(vi) claims brought against Operator by a T&D Customer in connection with the T&D System or Operator's performance of the O&M services

(vii) claims brought against Operator by a person not party to this Agreement in connection with the T&D System or Operator's performance of the O&M Services for loss of profits or revenues or special, exemplary, punitive, indirect or consequential damages, howsoever or whensoever arising and whether or not caused by the negligence of any Operator Indemnitee

24.    As such, in the event that any party asserts claims against LUMA in connection with the operation of the T&D assets, PREPA is obligated to indemnify LUMA in connection with such claims.

25.     This Court recognized that "PREPA's indemnification obligations [under the T&D OMA] running in favor of LUMA Energy and its affiliates during the Interim Period" would constitute administrative expense claims in the order dated May 3, 2021.  *See Mem. Order Granting Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to Be Paid to LUMA Energy by PREPA During Interim Period Under Supplemental Agreement and the T&D Contract,* Case No. 17 BK 4780-LTS, ECF No. 2473, at 5 (the "Administrative Expense Order").

**B.      The Commonwealth Court Litigation**

26.     On July 22, 2025, DACO filed the Commonwealth Court Litigation against PREPA, LUMA, and the PREB in the San Juan Court of First Instance, Case No. SJ2025CV06607. DACO's Complaint for Declaratory Judgment (the "Complaint") requests that section 4.1(g) of the T&D OMA and the Resolution and Order issued by the PREB on May 31, 2021 be declared null and void and unconstitutional.  Indeed, the Complaint specifically requests that the court "[d]eclare Section 4.1(g) *of the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* signed between LUMA and the Electric Power Authority …null and unconstitutional."  The Complaint also requests that all citizens be allowed to file claims for damages caused by negligence and fluctuations in electrical service with LUMA.  DACO estimates that more than 1,800 claims could be filed.  True and correct copies of the Complaint and a certified translation are attached as **Exhibit C**.

27.     On July 24, 2025, the Senate of Puerto Rico and the House of Representatives of Puerto Rico filed a *Request and Brief of the Senate of Puerto Rico and the House of Representatives of Puerto Rico as Amicus Curiae* supporting, among other things, DACO's efforts to void section 4.1(g) of the T&D OMA.

28.     On August 8, 2025, DACO requested that the Supreme Court of Puerto Rico take the case out of the hands of the lower court by filing a Writ for Intrajurisdictional Certification.

29.     On August 22, 2025, the Supreme Court of Puerto Rico issued the Writ for Intrajurisdictional Certification filed by DACO.

30.     DACO filed its opening brief with the Supreme Court of Puerto Rico on September 9, 2025.  True and correct copies of the brief and a certified translation are attached as **Exhibit D**.

31.     Opposition briefs from PREPA and LUMA are due on September 23, 2025.

32.     On September 18, 2025, counsel for LUMA wrote to counsel for DACO and requested that DACO immediately cease prosecution of the Commonwealth Court Litigation and withdraw the Complaint filed in that action and the Writ for Intrajurisdictional Certification. Counsel for DACO refused.

## RELIEF REQUESTED

33.     By this Motion, LUMA seeks entry of the Proposed Order (i) enforcing the automatic stay against DACO, (ii) ordering DACO to withdraw the Writ for Intrajurisdictional Certification and the Complaint in the Commonwealth Court Litigation, and (iii) finding that any actions taken in connection with the Commonwealth Court Litigation in violation of the automatic stay are null and void.

## BASIS FOR RELIEF

34.     "The stay is intended to protect the interests of creditors as well as debtors, and [t]hose persons whom Congress has designated as beneficiaries of the stay have standing to assert[] its violation." *Newcomer v. Litton Loan Servicing, L.P. (In re Newcomer)*, 416 B.R. 166, 175 (Bankr. D. Md. 2009) (citation omitted).  Parties in interest like LUMA have standing to enforce

the automatic stay and to seek relief for automatic stay violations.[5]  *See In re Killmer*, 501 B.R. 208, 212 (Bankr. S.D.N.Y. 2013) ("Since the automatic stay is meant to prevent creditors from racing to the courthouse to the detriment of other creditors, the Court sees no reason why a creditor who has been harmed by a stay violation should not be able to seek redress for its injury"); s*ee also In re: Tamarack Development Assoc.*, *LLC*, 611 B.R. 286, 298 (Bankr. W.D. Mich. 2020).

35.    DACO's Complaint is just the latest attempt by the Government to interfere with PREPA's property interest in the T&D OMA.  In fact, it is equivalent to the Government's efforts to have the T&D OMA declared null and void in the First Stay Violation Case, which this Court already determined was in violation of the automatic stay.  *See In re Fin. Oversight & Mgmt. Bd. for P.R. v. Commonwealth*, 2022 WL 17413011, at *3.  In the First Stay Violation Case, this Court explained that the automatic stay applies to PREPA's contract rights which "are among the property interests protected by [section 362(a)(3)]."  *Id.*[6]; *see also U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 103 (2d Cir. 2013) ("[I]t is well-established ... that a debtor's contractual rights—including rights arising under post-petition contracts—are included in the property of his estate."); *MMM Healthcare, Inc. v. Santiago (In re Santiago),* 563 B.R. 457, 472 (Bankr. D.P.R. 2017) ("[A] debtor's executory contracts are considered property of the estate").

---

[5]   *See also Order Pursuant to PROMESA Section 301(a) and Bankruptcy Code Sections 105(a), 362(a), 365 and 922 Confirming (I) Application of the Automatic Stay to Government Officers, Agents, and Representatives, (II) Stay of Prepetition Lawsuits, and (III) Application of Contract Protections." In re Fin. Oversight & Mgmt. Bd.,* No. 17-03283-LTS (D.P.R. June 29, 2017), ECF No. 543 (the "Stay Confirmation Order") confirming that the automatic stay extended to PREPA's agents.

[6]   Under PROMESA, the phrase "property of the estate" is replaced with "property of the debtor."  *See* PROMESA § 301(c)(5).  Although PROMESA does not make 11 U.S.C. § 541 applicable to these Title III cases, the First Circuit has clarified that "in the Title III context, the automatic stay applies to any action that implicates property of a Title III debtor, and consequently the reach of the automatic stay is broader in the PROMESA and municipal bankruptcy contexts than it is in the run-of-the-mill bankruptcy case."  *Berrios Correa v. MAPFRE*, No. 19-cv-2105, 2020 WL 6948159 (D.P.R. Nov. 25, 2020) at *2 (quoting *Gracia-Gracia v. Fin. Oversight & Mgmt. Bd.,* 939 F.3d 340, 349 (1st Cir. 2019)).

36.     Once again, the Government is unlawfully interfering with PREPA's property in violation of section 362(a)(3) in the Commonwealth Court Litigation by attempting to void a key provision in the T&D OMA (as opposed to the entire T&D OMA).  As made clear by this Court, PREPA's contract rights "are among the property interests protected by section 362(a)(3) of the Bankruptcy Code" and therefore, the relief sought in the Commonwealth Court Litigation "violates the automatic stay by seeking to 'exercise control over property of the [debtor].'"  *In re Fin. Oversight & Mgmt. Bd. for P.R. v. Commonwealth*, 2022 WL 17413011, at *3.

37.     Under well-established law and this Court's precedent, the automatic stay protects PREPA's interest in its contracts, including the T&D OMA, against interference.  *See In re Fin. Oversight & Mgmt. Bd. for P.R. v. Commonwealth*, 2022 WL 17413011, at *3; *see also In re Corporacion de Servicios Medicos Hospitalarios de Fajardo,* 60 B.R. 920, 932–33 (D.P.R. 1986), *aff'd sub. nom. In re Coporacion de Servicios Medicos Hospitalarios de Fajardo*, 805 F.2d 440 (1st Cir. 1986) (holding that attempt to terminate contract with debtor was barred by automatic stay).

38.     To the extent that DACO argues the automatic stay should not apply to this Complaint because it only seeks a determination about the constitutionality of a contested PREB decision and one specific provision of the T&D OMA, the argument lacks merit.  This Court rejected a similar argument when it was raised by the Government in the First Stay Violation Case when the Government argued that the automatic stay was inapplicable "because the Complaint [wa]s not seeking to control PREPA's property but [wa]s instead seeking to clarify Puerto Rican law and its consequences." *In re Fin. Oversight & Mgmt. Bd. for P.R. v. Commonwealth*, 2022 WL 17413011, at *4.  DACO's and the Government's efforts in the Commonwealth Court Litigation to nullify a provision of the T&D OMA is no different than the Government's efforts in

the First Stay Violation Case to nullify the entire T&D OMA.  Because all of the relief sought in

the Complaint would nullify section 4.1(g) of the T&D OMA, it violates the automatic stay.  *See*

*In re Fin. Oversight & Mgmt. Bd. for P.R. v. Commonwealth*, 2022 WL 17413011, at *4 (rejecting

the Government's argument that it was not seeking control of PREPA's property but instead

seeking a clarification of Puerto Rican law because "all of the relief sought in the Complaint, even

the requested declaratory relief, would invalidate, nullify, and prevent any attempt to protect the

O&M Agreement"); *see also In re Fin. Oversight & Mgmt. Bd. For P.R.*, 494 F. Supp. 3d 95, 103–

04 (D.P.R. 2020).

39.     Section 4.1(g) of the T&D OMA is a material part of the agreement which, if

stricken, could endanger the viability of the T&D OMA and therefore PREPA's entire

restructuring process.  DACO estimates in the Commonwealth Court Litigation that there is a

minimum of 1,800 claims that could be brought against LUMA in its position as the operator of

the T&D System. The aggregate value of these alleged claims, and others identified by LUMA,

potentially could exceed hundreds of millions of dollars.[7]

40.     At the time that the T&D OMA was approved over five years ago, all parties

recognized that limiting liability related to the operation of the T&D System was critical to any

third-party taking over operations, given the deterioration of the T&D System.  Indeed, LUMA

would not have entered into the T&D OMA without this provision, because as soon as LUMA

---

[7]   As stated by the PREB in its *Motion In Compliance of Order* filed on August 15, 2025 with the Supreme Court of
Puerto Rico in the Commonwealth Court Litigation, during the first year of LUMA's operation of the T&D System
(June 1, 2021 to May 31, 2022), the amount of filed judicial and extrajudicial claims related to the operation of
the T&D System exceeded $400 million (which is in addition to the tens of millions of dollars in judicial and
extrajudicial claims previously pending before PREPA). In its appellate filing, PREB also cited the *Motion in
Compliance with Final Resolution and Order and Request for Confidential Treatment* filed by LUMA on June 30,
2022, in the case of *In Re: Review of LUMA's Terms of Service (Liability Waiver)*, Case No. NEPR-MI-2021-0007
(https://energia.pr.gov/wp-content/uploads/sites/7/2022/07/Motion-in-Compliance-with-Final-Resolution-and-
Order-and-Request-for-Confidential-Treatment-NEPR-MI-2021-0007.pdf).

took over control of the system it would become an obvious target of claims given PREPA's insolvency. Indeed, LUMA did not begin operating the T&D System until after the liability waiver was approved. As such, it appears that the Government continues to target the T&D OMA as part of its ongoing campaign to derail the privatization of the operation of PREPA's T&D System and terminate the entire agreement.

41.     In addition to the possible termination risks associated with the material change to the T&D OMA by removing section 4.1(g), nullification of this provision could also derail PREPA's restructuring proceeding. All of these alleged claims would be passed through by LUMA to PREPA as administrative expense claims pursuant to (among other things) PREPA's indemnification obligations under Section 18.2(a)(vii), as confirmed by this Court's Administrative Expense Order. Given the volume and alleged size of these claims, PREPA's entire restructuring process could be placed in jeopardy if PREPA ultimately were required to figure out a way to pay for such claims; PREPA could effectively become administratively insolvent, but since that is not an option for a territorial instrumentality like PREPA, the entire Commonwealth would suffer.

42.     This Court has the power under sections 362(a) and 105(a) of the Bankruptcy Code to enjoin any action taken against a debtor in violation of the automatic stay. *Celotex Corp. v. Edwards*, 514 U.S. 300, 306–07 (1995); *In re James*, 940 F.2d 46, 51 (3d Cir. 1991) ("[A] bankruptcy court generally is considered to possess the power [under section 105(a)] to enjoin a pending state action that violates the automatic stay."). Moreover, under the Bankruptcy Code, actions taken in violation of the stay are void *ab initio*. *See In re Soares*, 107 F.3d 969, 976 (1st Cir. 1997); *I.C.C. v. Holmes Transp., Inc.*, 931 F.2d 984, 987 (1st Cir. 1991) ("Judicial actions and proceedings, as well as extrajudicial acts, in violation of the automatic stay, are generally void and

without legal effect."); *In re Myers*, 491 F.3d 120, 127–28 (3d Cir. 2007). As such, DACO's

attempt to nullify section 4.1(g) of the T&D OMA is null and void.

      43.     The Court should not condone the Government's latest attack on the T&D OMA.

The T&D OMA is property of PREPA protected by the automatic stay. LUMA respectfully

submits that this Court should enter an order under Bankruptcy Code sections 105(a) and 362

compelling DACO to withdraw its Complaint because it is barred by the automatic stay and void

*ab initio.*

      44.     Pursuant to Paragraph I.H of the Case Management Procedures, LUMA hereby

certifies that it has carefully examined the matter and concluded that there is a true need for an

urgent motion; has not created the urgency through any lack of due diligence; has made a bona

fide effort to resolve the matter without a hearing; and has made reasonable, good-faith

communications in an effort to resolve or narrow the issues that are being brought to the Court.

LUMA anticipates that DACO will object to this Motion.

      45.     The Oversight Board, as PREPA's sole Title III representative under section 315(b)

of PROMESA, has informed LUMA of its position that prosecution of the Commonwealth Court

Litigation constitutes a violation of the automatic stay. The Oversight Board has also informed

LUMA that, at this time, it takes no position on the merits of the underlying dispute.

      **WHEREFORE**, LUMA respectfully requests that the Court (i) enter the Proposed Order

granting the requested relief in this Motion, and (ii) grant such other and further relief as the Court

may deem just and proper.

Dated: September 18, 2025          Respectfully submitted,
San Juan, Puerto Rico

                             **DLA PIPER LLP (US)**

                             */s/ Dale K. Cathell*

Brett Ingerman (admitted pro hac vice)
Dale K. Cathell (admitted pro hac vice)
650 S. Exeter Street, Ste. 1100
Baltimore, MD 21202-4576
T: (410) 580.4177
F: (410) 580.3001
brett.ingerman@us.dlapiper.com
dale.cathell@us.dlapiper.com

*/s/ Mariana Muñiz Lara*

Mariana Muñiz Lara (local counsel)
USDC-PR No. 231706
**DLA PIPER (PUERTO RICO) LLC**
500 Calle de la Tanca, Suite 401
San Juan, Puerto Rico 00901-1969
T: (787) 945.9106
F: (787) 945.9102
mariana.muniz@us.dlapiper.com

*Attorneys for LUMA Energy, LLC, and
LUMA Energy Servco, LLC*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case. I further certify that a copy of the foregoing was served by email to the participants of the Commonwealth Court Litigation: Valerie Rodríguez Erazo, Esq., vrodriguez@daco.pr.gov, valeriemrodz@gmail.com, Gadiel Figueroa Robles, Esq., gfigueroa@daco.pr.gov, gadielfigueroa@yahoo.com, and Samuel Silva Rosas, Esq., ssilva@daco.pr.gov, samuelsilva.law@gmail.com; Edgardo L. Rodríguez Cardé, Esq., elrc@rclopr.com and Yarymar González Carrasquillo, Esq., ygc@halspr.com; Juan M. Martínez Nevárez, Esq. jmartinez@gmlex.net, and Mirelis Valle Cancel, Esq., mvalle@vcprlaw.com, mvalle@gmlex.net; Charles Rodríguez Colón, Esq., crodriguez@naleapr.com; Miguel A. Rodríguez Ramos, Esq., miguelrrlaw@gmail.com, mrodriguez@prlegal403.com; Víctor Calderón Cestero, Esq., victor@calderon-law.com; Fernando E. Agrait, Esq., agraitfe@agraitlawpr.com, and José Leonardo Pou Román, Esq., jpouroman@outlook.com.

Dated: September 18, 2025
San Juan, Puerto Rico


*/s/ Mariana Muñiz Lara*
Mariana Muñiz Lara

**<u>Exhibit A</u>**

**Proposed Order**

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br><br>Title III<br><br>No. 17-BK-4780-LTS |

## ORDER GRANTING URGENT MOTION OF LUMA TO ENFORCE THE AUTOMATIC STAY

Upon the motion (the "Motion")[2] filed by LUMA Energy, LLC and LUMA Energy Servco, LLC ("LUMA") for entry of an order (this "Order"), pursuant to sections 105 and 362 of title 11 of the United States Code (the "Bankruptcy Code"), made applicable to this proceeding pursuant

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.

[2] Capitalized terms used but not defined herein have the meaning given to them in the Motion.

to section 301(a) of PROMESA: (i) enforcing the automatic stay against the Puerto Rico Department of Consumer Affairs ("DACO"), and (ii) ordering DACO to cease its prosecution of the Commonwealth Court Litigation in violation of the automatic stay and finding that any actions taken in violation of the automatic stay are null and void, all as more fully set forth in the Motion; and this Court having subject matter jurisdiction over this matter pursuant to PROMESA section 306(a); and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to PROMESA section 307(a), and LUMA's notice of the Motion and opportunity for a hearing were adequate and appropriate under the circumstances and no other or further notice need be provided; and the Court having determined that DACO willfully violated the automatic stay under sections 362(a)(3); and the Court having considered the Motion, any responses thereto, and the evidence admitted and the arguments of counsel at the hearing; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. The Motion is GRANTED as set forth herein.

2. Any and all objections, if any, to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections are hereby overruled on the merits with prejudice.

3. The filing of the Commonwealth Court Litigation violated the automatic stay arising under Bankruptcy Code section 362, as made applicable to these Title III cases by PROMESA section 301(a) (the "Automatic Stay").

4. DACO shall immediately withdraw the Writ for Intrajurisdictional Certification and the Complaint and cease prosecuting the Commonwealth Court Litigation.

5.      If DACO takes any additional actions in violation of the Automatic Stay or this Order, LUMA may petition this Court for an order requiring DACO to appear and show cause why it should not be held in contempt of court.

6.      LUMA is hereby authorized to take all actions it deems necessary or appropriate to effectuate the relief granted in this Order in accordance with the Motion.

7.      This Court retains jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.


SO ORDERED.

Dated: _____, 2025


_____
THE HON. LAURA TAYLOR SWAIN
UNITED STATES DISTRICT JUDGE

**Exhibit B**

**T&D OMA**

PRIVILEGED AND CONFIDENTIAL

*Execution Version*

PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM

OPERATION AND MAINTENANCE AGREEMENT

dated as of

June 22, 2020

by and among

THE PUERTO RICO ELECTRIC POWER AUTHORITY
as Owner,

THE PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY
as Administrator,

LUMA ENERGY, LLC
as ManagementCo,

and

LUMA ENERGY SERVCO, LLC
as ServCo

CONFIDENTIAL

## TABLE OF CONTENTS

**Page**

**ARTICLE 1 DEFINITIONS; INTERPRETATION** ................................................................. **2**

Section 1.1     Definitions ........................................................................................... 2
Section 1.2     Interpretation; Construction .............................................................. 32

**ARTICLE 2 PURPOSE; EFFECTIVE DATE; TERM** ......................................................... **34**

Section 2.1     Purpose ................................................................................................ 34
Section 2.2     Effective Date ..................................................................................... 34
Section 2.3     Term ..................................................................................................... 35

**ARTICLE 3 OWNERSHIP OF THE T&D SYSTEM** ........................................................ **36**

Section 3.1     Ownership ........................................................................................... 36
Section 3.2     Engagement of Operator ................................................................... 36
Section 3.3     Use of T&D System ........................................................................... 36
Section 3.4     Liens .................................................................................................... 36
Section 3.5     Right of Access .................................................................................. 36
Section 3.6     Exclusivity .......................................................................................... 37
Section 3.7     Essential Public Service .................................................................... 37
Section 3.8     Reporting Obligations ....................................................................... 37
Section 3.9     Qualified Management Contract ...................................................... 37

**ARTICLE 4 FRONT-END TRANSITION PERIOD** ........................................................ **40**

Section 4.1     Front-End Transition Period Generally ............................................ 40
Section 4.2     ManagementCo Responsibilities ...................................................... 44
Section 4.3     Owner and Administrator Responsibilities ...................................... 49
Section 4.4     Governmental Approvals and Tax Matters ...................................... 51
Section 4.5     Conditions Precedent to Service Commencement Date ................. 52
Section 4.6     Front-End Transition Period Compensation .................................... 55
Section 4.7     Closing the Front-End Transition Period ......................................... 57
Section 4.8     Failure of Service Commencement Date Conditions ...................... 57
Section 4.9     Subcontractors During the Front-End Transition Period ............... 60

**ARTICLE 5 O&M SERVICES** .............................................................................................. **62**

Section 5.1     Services Generally .............................................................................. 62
Section 5.2     System Contracts ............................................................................... 62
Section 5.3     Billing and Collection ........................................................................ 63
Section 5.4     System Remediation .......................................................................... 64

CONFIDENTIAL

**TABLE OF CONTENTS**
(continued)

Page

Section 5.5      Capital Improvements .................................................................. 64
Section 5.6      System Regulatory Matters ......................................................... 66
Section 5.7      Safety and Security ..................................................................... 68
Section 5.8      Labor and Employment; Employee Benefits ............................... 69
Section 5.9      Procurement and Administration of Federal Funding ................. 69
Section 5.10     Environmental, Health and Safety Matters ................................. 71
Section 5.11     Accounting and Financial Services ............................................. 73
Section 5.12     Legal Matters .............................................................................. 73
Section 5.13     Generation-Related Services ....................................................... 73
Section 5.14     Emergency Action ...................................................................... 75
Section 5.15     Information .................................................................................. 76
Section 5.16     Bill Payments ............................................................................. 77
Section 5.17     Compliance with Obligations ..................................................... 77
Section 5.18     Energy Policy under Act 17 ........................................................ 78
Section 5.19     Acquisition of Easements, Fee Interests and Concession Rights .... 78
Section 5.20     Other Services ............................................................................ 79

ARTICLE 6 RIGHTS AND RESPONSIBILITIES OF OWNER AND
               ADMINISTRATOR ........................................................... 80

Section 6.1      Rights and Responsibilities of Owner ......................................... 80
Section 6.2      Rights and Responsibilities of Administrator .............................. 82
Section 6.3      Reporting; Audits ....................................................................... 83
Section 6.4      Staffing Levels ........................................................................... 84

ARTICLE 7 COMPENSATION; BUDGETS .................................................. 86

Section 7.1      Service Fee .................................................................................. 86
Section 7.2      Pass-Through Expenditures ........................................................ 88
Section 7.3      Budgets ....................................................................................... 88
Section 7.4      Budget Policy .............................................................................. 90
Section 7.5      Service Accounts ........................................................................ 91
Section 7.6      Disallowed Costs ........................................................................ 96
Section 7.7      Unfunded Amounts ..................................................................... 97
Section 7.8      Owner Credit Rating ................................................................... 97
Section 7.9      Owner Payment of Administrator Costs ...................................... 98

ARTICLE 8 CREDIT SUPPORT ................................................................... 99

Section 8.1      Guarantee .................................................................................... 99
Section 8.2      Guarantor Reports ...................................................................... 99

CONFIDENTIAL

## TABLE OF CONTENTS
(continued)

**Page**

**ARTICLE 9 COMPLIANCE WITH APPLICABLE LAW** ................................................. 100

Section 9.1          Compliance Obligations.......................................................... 100
Section 9.2          Anti-Corruption and Sanctions Laws......................................... 100
Section 9.3          Commonwealth Requirements.................................................. 101
Section 9.4          Non-Discrimination Laws........................................................ 101
Section 9.5          Non-Collusion and Acceptance ............................................... 101
Section 9.6          Commonwealth Tax Liabilities................................................ 101
Section 9.7          Certifications Required by Commonwealth Contractor Requirements ....... 101
Section 9.8          Duty to Inform of Criminal Investigations ................................ 101
Section 9.9          Act 120 ............................................................................... 102

**ARTICLE 10 INSURANCE** ................................................................................ 103

Section 10.1         Insurance Generally ............................................................... 103
Section 10.2         Commercial Availability......................................................... 103
Section 10.3         Additional Named Insureds .................................................... 103
Section 10.4         Warranties ........................................................................... 104
Section 10.5         Certificates of Insurance, Policies and Notice .......................... 104

**ARTICLE 11 SUBCONTRACTORS AND CONTRACTORS** ....................................... 105

Section 11.1         Ability to Subcontract and Contract ....................................... 105
Section 11.2         Subcontract and Contract Terms............................................. 106
Section 11.3         Indemnity for Subcontractor Claims........................................ 106

**ARTICLE 12 TAXATION** .................................................................................. 108

Section 12.1         Withholding Tax ................................................................... 108
Section 12.2         Tax Obligations.................................................................... 108

**ARTICLE 13 INTELLECTUAL PROPERTY; PROPRIETARY INFORMATION** ...... 109

Section 13.1         Intellectual Property.............................................................. 109
Section 13.2         Proprietary Information ......................................................... 115
Section 13.3         Data Security........................................................................ 119

**ARTICLE 14 EVENTS OF DEFAULT; REMEDIES** ............................................... 121

Section 14.1         Events of Default by Operator ................................................ 121
Section 14.2         Termination for Operator Event of Default .............................. 122
Section 14.3         Events of Default By Owner ................................................... 123
Section 14.4         Termination for Owner Event of Default................................... 124

CONFIDENTIAL

## TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| Section 14.5 | Additional Termination Rights | 125 |
| Section 14.6 | Remedies Upon Early Termination | 126 |

**ARTICLE 15 DISPUTE RESOLUTION** ................................................................. **129**

| | | |
|---|---|---|
| Section 15.1 | Scope | 129 |
| Section 15.2 | Commencement of the Dispute Resolution Procedure | 129 |
| Section 15.3 | Negotiation | 129 |
| Section 15.4 | Expert Technical Determination Procedure for Technical Disputes | 130 |
| Section 15.5 | Mediation | 131 |
| Section 15.6 | Litigation as a Final Resort | 132 |
| Section 15.7 | Waiver of Jury Trial | 133 |
| Section 15.8 | Provisional Relief | 133 |
| Section 15.9 | Continuing Obligations | 133 |

**ARTICLE 16 BACK-END TRANSITION** ................................................................ **134**

| | | |
|---|---|---|
| Section 16.1 | Successor Operator | 134 |
| Section 16.2 | Back-End Transition Services | 134 |
| Section 16.3 | Transfer Obligation | 137 |
| Section 16.4 | Back-End Transition Period Compensation | 137 |
| Section 16.5 | Surrender of the T&D System | 139 |

**ARTICLE 17 FORCE MAJEURE EVENTS** ......................................................... **140**

| | | |
|---|---|---|
| Section 17.1 | Notice; Mitigation | 140 |
| Section 17.2 | Relief | 140 |

**ARTICLE 18 INDEMNIFICATION** ..................................................................... **142**

| | | |
|---|---|---|
| Section 18.1 | Indemnification by Operator | 142 |
| Section 18.2 | Indemnification by Owner | 143 |
| Section 18.3 | Limitation on Liability | 144 |
| Section 18.4 | Insurance and Other Recovery | 145 |
| Section 18.5 | Liability Limitation for Certain Damages | 146 |
| Section 18.6 | Additional Liability Limitation for Certain Damages | 146 |

**ARTICLE 19 REPRESENTATIONS AND WARRANTIES** ............................... **148**

| | | |
|---|---|---|
| Section 19.1 | Representations and Warranties of Owner | 148 |
| Section 19.2 | Representations and Warranties of Operator | 149 |

CONFIDENTIAL

## TABLE OF CONTENTS
(continued)

Page

**ARTICLE 20 MISCELLANEOUS** ..................................................................................... **153**

Section 20.1      Fees and Expenses ................................................................. 153
Section 20.2      Notices ................................................................................. 153
Section 20.3      Amendments ......................................................................... 154
Section 20.4      Entire Agreement ................................................................. 154
Section 20.5      Relationship of the Parties ................................................. 155
Section 20.6      Assignment and Transfer ..................................................... 155
Section 20.7      Interest on Overdue Obligations ......................................... 156
Section 20.8      Waivers ................................................................................. 156
Section 20.9      Severability .......................................................................... 156
Section 20.10     Survival ................................................................................ 156
Section 20.11     No Third-Party Beneficiaries ............................................... 156
Section 20.12     Remedies .............................................................................. 157
Section 20.13     Counterparts ......................................................................... 157
Section 20.14     Office of the Comptroller .................................................... 157
Section 20.15     Governing Law ..................................................................... 157
Section 20.16     Commonwealth Obligations ................................................ 158
Section 20.17     PREB Authority ................................................................... 158

**ANNEXES**

Annex I Scope of Services
Annex II Front-End Transition Plan
Annex III Back-End Transition Plan
Annex IV Operator Employment Requirements
Annex V Front-End Transition Hourly Fully Allocated Rates
Annex VI GenCo Shared Services
Annex VII ManagementCo Costs
Annex VIII Service Fee
Annex IX Performance Metrics
Annex X Calculation of Incentive Fee
Annex XI T&D Pass-Through Expenditures
Annex XII Insurance Specifications
Annex XIII Operator Termination Fee Multiplier
Annex XIV Operator Marks
Annex XV Owner Marks

**CONFIDENTIAL**

**TABLE OF CONTENTS**
(continued)

<div align="right">**Page**</div>

**EXHIBITS**

Exhibit A Form of Federal Funding Certifications
Exhibit B Form of Commonwealth Certifications
Exhibit C Form of Anti-Corruption Certifications
Exhibit D Form of Guarantee Agreement
Exhibit E Form of Sworn Statement
Exhibit F -1  Form of Tax Opinion – Effective Date
Exhibit F -2  Form of Final Tax Opinion
Exhibit G Form of Reliance Letter
Exhibit H Term Sheet for GridCo-GenCo PPOA

CONFIDENTIAL

### PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM
### OPERATION AND MAINTENANCE AGREEMENT

This PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM OPERATION AND MAINTENANCE AGREEMENT (this "Agreement") is made and entered into as of this 22nd day of June, 2020 by and among: (i) the Puerto Rico Electric Power Authority ("Owner"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941; (ii) the Puerto Rico Public-Private Partnerships Authority ("Administrator"), a public corporation of the Commonwealth of Puerto Rico, created by Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009; (iii) LUMA Energy, LLC ("ManagementCo"), a limited liability company organized under the laws of Puerto Rico; and (iv) LUMA Energy ServCo, LLC ("ServCo" and, together with ManagementCo, "Operator" and, together with Owner, Administrator and ManagementCo, the "Parties" and each a "Party"), a limited liability company organized under the laws of Puerto Rico. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in Article 1 (*Definitions; Interpretation*).

### RECITALS

**WHEREAS**, Owner owns and operates Owner's transmission and distribution system and related facilities, equipment and other assets related to the transmission and distribution system in which Owner has an ownership or leasehold interest (the "T&D System");

**WHEREAS**, pursuant to, and under the terms and conditions contained in, Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009 ("Act 29") and Act No. 120 of the Legislative Assembly of Puerto Rico, enacted on June 21, 2018 ("Act 120"), Owner is authorized to execute and deliver this Agreement, perform its obligations hereunder and enter into the transactions contemplated hereby;

**WHEREAS**, in accordance with Act 120, Owner desires to transform Puerto Rico's energy system into a modern, sustainable, reliable, efficient, cost-effective and resilient system;

**WHEREAS**, Owner desires to engage Operator to provide the O&M Services for the T&D System in accordance with the terms of this Agreement and has designated Administrator as a Representative of Owner for purposes of this Agreement; and

**WHEREAS**, Operator desires to provide the O&M Services for the T&D System in accordance with the terms of this Agreement and ManagementCo has formed ServCo, a subsidiary service company, to provide substantially all of the services required under this Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants, representations, warranties and agreements contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties covenant and agree as follows:

CONFIDENTIAL

# ARTICLE 1
## DEFINITIONS; INTERPRETATION

**Section 1.1    Definitions**. As used in this Agreement, the following capitalized terms have the respective meanings set forth below.

"AAFAF" means the Puerto Rico Fiscal Agency and Financial Advisory Authority.

"Act 2" means Act No. 2 of the Legislative Assembly of Puerto Rico, enacted on January 4, 2018.

"Act 3" means Act No. 3 of the Legislative Assembly of Puerto Rico, enacted on January 23, 2017.

"Act 17" means Act No. 17 of the Legislative Assembly of Puerto Rico, enacted on April 11, 2019.

"Act 26" means Act No. 26 of the Legislative Assembly of Puerto Rico, enacted on January 27, 2017.

"Act 29" has the meaning set forth in the Recitals.

"Act 57" means Act No. 57 of the Legislative Assembly of Puerto Rico, enacted on May 17, 2014.

"Act 66" means Act No. 66 of the Legislative Assembly of Puerto Rico, enacted on June 17, 2014.

"Act 120" has the meaning set forth in the Recitals.

"Act 173" has the meaning set forth in Section 9.3(a) (*Commonwealth Requirements – Practice of Engineering, Architecture and Other Professions in the Commonwealth*).

"Administrative Determination" has the meaning set forth in Section 4.5(t)(i) (*Conditions Precedent to Service Commencement Date – Tax Matters*).

"Administrator" has the meaning set forth in the introductory paragraph.

"Administrator Dispute" has the meaning set forth in Section 6.2(a)(xi) (*Rights and Responsibilities of Administrator – Disputes*).

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly, including through one or more intermediaries, Controls, is Controlled by or is under common Control with such Person; provided, that each Equity Participant and its Affiliates will be deemed "Affiliates" of Operator.

"Agreement" has the meaning set forth in the introductory paragraph.

CONFIDENTIAL

"Anti-Corruption Laws" has the meaning set forth in Section 9.2(a) (*Anti-Corruption and Sanctions Laws – Anti-Corruption*).

"Applicable Law" means any foreign, national, federal, state, Commonwealth, municipal or local law, constitution, treaty, convention, statute, ordinance, code, rule, regulation, common law, case law or other similar requirement enacted, adopted, promulgated or applied by any Governmental Body, including any Environmental Law, PROMESA and any order issued by the Title III Court, in each case applicable to the Parties.

"Audit" means a review with respect to any matter relating to the T&D System, the O&M Services or this Agreement, including compliance with the terms of this Agreement, conducted in accordance with applicable United States audit practices customarily accepted in the electric sector and the terms of this Agreement or as required by Applicable Law.

"Authorized Inspector" has the meaning set forth in Section 6.3(a) (*Reporting; Audits – Generally*).

"Back-End Transition Account" has the meaning set forth in Section 16.4(c)(i) (*Back-End Transition Period Compensation – Funding*).

"Back-End Transition Commencement Date" has the meaning set forth in Section 16.1 (*Successor Operator*).

"Back-End Transition Plan" has the meaning set forth in Section 4.2(i) (*ManagementCo Responsibilities – Back-End Transition Plan*).

"Back-End Transition Service Fee" has the meaning set forth in Section 16.4(b) (*Back-End Transition Period Compensation – Back-End Transition Service Fee*).

"Back-End Transition Service Fee Dispute" has the meaning set forth in Section 16.4(d)(ii) (*Back-End Transition Period Compensation – Invoices*).

"Back-End Transition Service Fee Estimate Dispute" has the meaning set forth in Section 16.4(c)(iii) (*Back-End Transition Period Compensation – Funding*).

"Back-End Transition Services" means services provided under this Agreement in order to complete the transition and handover of the O&M Services, and other rights and responsibilities with respect to the T&D System, back to Owner or to a successor operator upon the expiration or early termination of the Term, including the services contemplated by the Back-End Transition Plan; provided that the Back-End Transition Services shall not be O&M Services.

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. 101 et seq. "Bankruptcy Code" shall also include (i) Title III of PROMESA, (ii) any similar state or Commonwealth law relating to bankruptcy, insolvency, the rights and remedies of creditors, the appointment of receivers or the liquidation of companies and estates that are unable to pay their debts when due and (iii) any similar insolvency or bankruptcy code applicable under the laws of any other jurisdiction.

**C**ONFIDENTIAL

"Baseline Environmental Study" has the meaning set forth in Section 4.5(f) (*Conditions Precedent to Service Commencement Date – Pre-Existing Environmental Conditions*).

"Budget" means each of the Operating Budget, the Capital Budget – Federally Funded, the Capital Budget – Non-Federally Funded and the Generation Budget, and "Budgets" means, collectively, all of them.

"Budget Dispute" has the meaning set forth in Section 7.3(f) (*Budgets – Budget Disputes*).

"Business Day" means any day that is not a Saturday, a Sunday or a day observed as a holiday by either the Commonwealth or the United States federal government.

"Capital Account – Federally Funded" has the meaning set forth in Section 7.5(b)(i) (*Service Accounts – Capital Account – Federally Funded*).

"Capital Account – Non-Federally Funded" has the meaning set forth in Section 7.5(c)(i) (*Service Accounts – Capital Account – Non-Federally Funded*).

"Capital Budget – Federally Funded" means, for any given Contract Year, the capital budget for such Contract Year, together with the projected capital budget for the following two (2) Contract Years, in each case setting forth in detail planned Federally Funded Capital Improvements, including monthly budgets of such expenditures and cash flows, as such budget may be amended or adjusted from time to time in accordance with the terms and conditions of this Agreement, which shall include, among other things: (i) a description of the proposed Federally Funded Capital Improvements; (ii) a schedule for the implementation of such Federally Funded Capital Improvements; (iii) an estimate of the costs for the project to be incurred in each Contract Year in the event the project requires more than a year to complete; (iv) the impact of such Federally Funded Capital Improvements on the T&D System, including rates charged to T&D Customers; (v) an explanation of the relationship to other planned or subsequently required Capital Improvements; (vi) the anticipated useful life of each Federally Funded Capital Improvement; and (vii) the economic and engineering justifications for such project.

"Capital Budget – Non-Federally Funded" means, for any given Contract Year, the capital budget for such Contract Year, together with the projected capital budget for the following two (2) Contract Years, in each case setting forth in detail planned Non-Federally Funded Capital Improvements, including monthly budgets of such expenditures and cash flows, as such budget may be amended or adjusted from time to time in accordance with the terms and conditions of this Agreement, which shall include, among other things: (i) a description of the proposed Non-Federally Funded Capital Improvements; (ii) a schedule for the implementation of such Non-Federally Funded Capital Improvements; (iii) an estimate of the costs for the project to be incurred in each Contract Year in the event the project requires more than a year to complete; (iv) the impact of such Non-Federally Funded Capital Improvements on the T&D System, including rates charged to T&D Customers; (v) an explanation of the relationship to other planned or subsequently required Capital Improvements; (vi) the anticipated useful life of each Non-Federally Funded Capital Improvement; and (vii) the economic and engineering justifications for such project.

**CONFIDENTIAL**

"Capital Budgets" means, for any given Contract Year, collectively, the Capital Budget – Federally Funded and the Capital Budget – Non-Federally Funded.

"Capital Costs" means, collectively, Capital Costs – Federally Funded and Capital Costs – Non-Federally Funded.

"Capital Costs – Federally Funded" has the meaning set forth in Section 7.5(b)(i) (*Service Accounts – Capital Account – Federally Funded*).

"Capital Costs – Non-Federally Funded" has the meaning set forth in Section 7.5(c)(i) (*Service Accounts – Capital Account – Non-Federally Funded*).

"Capital Improvement" means any repair, replacement, improvement, removal and retirement, alteration and addition that (i) constitutes a capital property unit in accordance with the T&D System's capitalization policy, consistently applied (other than any repair, replacement, improvement, removal and retirement, alteration and addition constituting ordinary course repair or maintenance of the T&D System), including all Public Works Improvements that have been approved in accordance with this Agreement, and (ii) have an expected useful service life of more than one (1) year from the date of installation. For the avoidance of doubt, (x) a "capital property unit" shall be understood to mean a capitalizable expenditure that adds to or increases the value of Owner's capital assets and (y) the "T&D System capital policy" shall be understood to refer to the PREPA capitalization policy, adapted as needed and agreed to by Owner and Operator during the Front-End Transition Period.

"Cash Management Agreement" shall mean an agreement reasonably satisfactory to Owner and Operator to be executed by Owner and Operator in lieu of a Servicing Contract at the time that a Servicing Contract would have been required to be entered into hereunder.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 et seq.

"Change in Law" means any of the following events or conditions occurring on or after the Proposal Submission Date that has had, or is reasonably expected to have, a material adverse effect on the performance or the cost of performance by the Parties of their respective obligations under this Agreement (other than payment obligations), or on the operation or maintenance of the T&D System:

      (i)      the adoption, promulgation or issuance of a modification or written change in the Applicable Law or the administrative or judicial interpretation thereof, unless such modification or written change was duly adopted, promulgated or issued in final form prior to the Proposal Submission Date and becomes effective without any further action by any Governmental Body or governmental official having jurisdiction;

      (ii)     any order or judgment of any Governmental Body to the extent such order or judgment is not the result of willful misconduct or negligent action or omission or lack of reasonable diligence of the Party claiming the occurrence of a Change in Law; provided, however, that the contesting in good faith or the failure in good faith to contest any such order or judgment

shall not constitute or be construed as such a willful misconduct or negligent action or omission of, or lack of reasonable diligence by, the Party; or

        (iii)    the denial of an application for, the delay in the review, issuance or renewal of, or the suspension, termination, interruption, imposition of a new condition in connection with the issuance, renewal or the failure of issuance or renewal of any Governmental Approval to the extent that such denial, delay, suspension, termination, interruption, imposition of a new condition or failure (A) interferes with the performance of this Agreement and (B) is not the result of willful misconduct or negligent action or omission or a lack of reasonable diligence of the Party claiming the occurrence of a Change in Law; provided, however, that the contesting in good faith or the failure in good faith to contest any such denial, delay, suspension, termination, interruption, imposition of a new condition or failure shall not be construed as such a willful misconduct or negligent action or omission of, or lack of reasonable diligence by, the Party;

provided that "Change in Law" shall not include (x) the imposition of a Tax, or an increase in Taxes, unless such imposition or increase has a materially disproportionate impact on any of Operator, the T&D System or private operators of transmission and distribution systems in the Commonwealth or Contractors (as defined in Act 29) compared to any other entities that operate in the Power and Electricity sector in the Commonwealth; or (y) the delay or denial of any request to approve a Budget, Rate Order, a change in Performance Metrics or performance relief.

        "Change in Regulatory Law" means any change, amendment or modification to any Commonwealth Applicable Law (and not, for the avoidance of doubt, the Applicable Law of any other jurisdiction) or any adoption of, or change to, any administrative or judicial interpretation (having the force of law) of any Commonwealth Applicable Law or any regulation or regulatory action under any Commonwealth Applicable Law, in each case occurring on or after the Proposal Submission Date, that:

        (i) alters the scope of PREB's statutory oversight over Operator or Owner in a manner that materially and adversely affects Operator's ability to perform its obligations under this Agreement;

        (ii) renders unenforceable or invalid, in whole or in part, any right or privilege granted to Operator under this Agreement, including by invalidating Operator's selection under the RFP;

        (iii) subjects Operator (or any of its Affiliates or Subcontractors that provides O&M Services hereunder) to rate or other substantive regulation by PREB in a manner that materially and adversely affects Operator's ability to perform its obligations under this Agreement to the extent not otherwise mitigated by the terms of this Agreement, or that constitutes a default by the FOMB under the terms of the FOMB Protocol Agreement, provided, that written notice of such default has been given to FOMB by Operator and such default continues unremedied for a period of thirty (30) days following such written notice, provided, further, that any such default by the FOMB shall constitute a Change in Regulatory Law regardless of whether the conditions in the introductory paragraph of this definition are satisfied;

CONFIDENTIAL

(iv) caps or has the effect of capping rates charged to T&D Customers, other than a temporary cap on rates to address an Outage Event; or

(v) rescinds, or in any way amends in a manner materially adverse to Operator, the Liability Waiver.

"Change of Control" means, with respect to Operator, whether accomplished through a single transaction or a series of related transactions and whether accomplished directly or indirectly, (i) a change in ownership resulting in more than 50% of the direct or indirect voting or economic interests in Operator being transferred to another Person or group of Persons acting in concert that did not have such direct or indirect voting or economic interests immediately prior to such transaction or transactions, (ii) the power directly or indirectly to direct or cause the direction of management and policy of Operator, whether through ownership of voting securities, by contract, management agreement or common directors, officers or trustees or otherwise, being transferred to another Person or group of Persons acting in concert that did not have such power immediately prior to such transaction or transactions or (iii) the merger, consolidation, amalgamation, business combination involving Operator or sale of substantially all of the assets of Operator for the purpose of or with the effect contemplated in clauses (i) or (ii) above; provided, however, that, notwithstanding anything to the contrary set forth in this definition, so long as either (x) Operator continues to provide the Guarantee, or (y) Parent Company continues to directly or indirectly own or operate an electric utility (other than the T&D System) serving at least 250,000 customers, none of the following shall constitute a "Change of Control" for the purposes of this Agreement:

(A)      transfers of direct or indirect ownership, voting or economic interests in Operator between or among Persons that are Affiliates of each other or Persons who are under common Control;

(B)      transfers or sales of shares of Operator or the direct or indirect shareholders of Operator pursuant to bona fide open market transactions (including block trades) on the New York Stock Exchange, NASDAQ, London Stock Exchange or comparable United States or foreign securities exchange, including any such transactions involving an initial or "follow on" public offering;

(C)      transfers of direct or indirect ownership interests in Operator by any Equity Participant or its beneficial owner(s) to any Person so long as the Equity Participants or their respective beneficial owner(s) having ownership interests in Operator (as of the later of (1) the Effective Date or (2) the date on which Administrator most recently approved a Change of Control) together retain, in the aggregate, 50% or more of the direct or indirect voting or economic interests in Operator or the power directly or indirectly to direct or cause the direction of management and policy of Operator, through ownership of voting securities or common directors, officers or trustees;

(D)      a transfer of the direct or indirect ownership interest in Operator, including any events contemplated in (i), (ii) and (iii) of this definition above, or any Affiliates of Operator; and

(E)     a transfer of shares of Operator contemplated by Section 16.3 (*Transfer Obligation*).

"<u>Claiming Party</u>" has the meaning set forth in Section 17.1(a) (*Notice; Mitigation – Notice*).

"<u>Commencement Date Governmental Approvals</u>" has the meaning set forth in Section 4.4(a) (*Governmental Approvals and Tax Matters – Generally*).

"<u>Commonwealth</u>" means the Commonwealth of Puerto Rico.

"<u>Commonwealth Court</u>" means the Commonwealth Court of First Instance, San Juan Part.

"<u>Confidential Information</u>" means data or information in any form disclosed by one Party to the other Party by any means, if and for so long as the data and information are protectable as trade secrets by the disclosing Party or are otherwise confidential. As a non-exhaustive list of examples, "Confidential Information" includes non-public information regarding a Party's Intellectual Property, financial condition and financial projections, business and marketing plans, product plans, product and device prototypes, the results of product testing, research data, market intelligence, technical designs and specifications, secret methods, manufacturing processes, source code of proprietary software, the content of unpublished patent applications, customer lists, vendor lists, internal cost data, the terms of contracts with employees and third parties, and information tending to embarrass the disclosing Party or tending to tarnish its reputation or brand. For the avoidance of doubt, information in this list of examples is only considered "Confidential Information" for so long as it has not been made known to the general public by the disclosing Party or through the rightful actions of a third party.

"<u>Contingency Reserve Account</u>" has the meaning set forth in Section 7.5(f) (*Service Accounts – Contingency Reserve Account*).

"<u>Contingency Reserve Amount</u>" means an amount equal to the average anticipated T&D Pass-Through Expenditures for one and a half (1.5) months in the initial Contract Year, as determined based on the initial Operating Budget.

"<u>Contract</u>" means an agreement or purchase order between Operator, as agent for Owner, and a third party, including Contracts as defined in 2 CFR 200.22.

"<u>Contract Nullification or Cancellation</u>" has the meaning set forth in Section 14.6(c)(i) (*Remedies Upon Early Termination – Termination Fee*).

"<u>Contractor</u>" means a party that enters into a Contract with Operator, as agent for Owner, including Contractors as defined in 2 CFR 200.23.

"<u>Contractor Intellectual Property</u>" has the meaning specified in Section 13.1(a) (*Intellectual Property – Operator Intellectual Property, Contractor Intellectual Property and Subcontractor Intellectual Property*)

"Contract Standards" means the terms, conditions, methods, techniques, practices and standards imposed or required by: (i) Applicable Law; (ii) Prudent Utility Practice; (iii) applicable equipment manufacturer's specifications and reasonable recommendations; (iv) applicable insurance requirements under any insurance procured pursuant to this Agreement; (v) the Procurement Manuals, as applicable, and (vi) any other standard, term, condition or requirement specifically contracted in this Agreement to be observed by Operator.

"Contract Year" means the period from July 1 through June 30 for each year during that portion of the Term commencing on the Service Commencement Date; provided, however, that (i) the initial Contract Year shall commence on the Service Commencement Date and (ii) the final Contract Year shall end on the fifteenth (15th) anniversary of the Service Commencement Date. Any computation made on the basis of a Contract Year shall be adjusted on a Pro Rata basis to take into account any Contract Year of less than 365/366 days.

"Control", "Controlled by" and similar expressions mean the power, directly or indirectly, to direct or cause the direction of the management and policies of an entity, whether through the ownership of outstanding share capital (or equivalent interest), by contract or otherwise. Without limiting the foregoing, a Person shall be deemed to control another Person (i) if such Person has directly or indirectly designated a majority of the board of directors (or equivalent governing body) of such other Person or (ii) if such Person has the direct or indirect power whether through ownership of outstanding share capital (or equivalent interest), by contract or otherwise to designate a majority of the board of directors (or equivalent governing body) of such other Person.

"Copyright" means the exclusive legal rights held by the owner of a copyright including the rights to copy, publicly perform, publicly display, distribute, adapt, translate, modify and create derivative works of copyrighted subject matter, including the rights to any registrations and applications therefor, together with all renewals, extensions, translations, adaptations, derivations and combinations therefor, works of authorship, publications, documentation, website content, rights in fonts and typefaces and database rights.

"COR3" means the Central Office for Recovery Reconstruction and Resiliency of Puerto Rico.

"Covered Contract" means any contract: (i) for management, service, or incentive payment arrangement between Owner, Administrator, or Operator and another Person under which such Person provides services involving all, a portion of, or any function of, the T&D System, (ii) for the sale, lease, or use of assets of the T&D System and (iii) to sell electricity if the term of such contract is in excess of three (3) years; provided that "Covered Contract" shall not include any (A) Subcontract in which the compensation to the Subcontractor is paid by Operator solely out of the Service Fee, (B) contract for services that are solely incidental to the primary governmental function or functions of the T&D System (such as contracts for janitorial, tree trimming, equipment repair, bookkeeping, physical security, or similar services), (C) contract for services performed exclusively during the Front-End Transition Period or pursuant to Article 16 (*Back-End Transition*), (D) contract to design, build, rehabilitate or purchase property, assets, equipment or supplies, (E) contract to acquire electric capacity or energy, natural gas, coal or fuel oil, (F) contract for management, service or incentive payment arrangement or for consulting services under which

CONFIDENTIAL

the compensation consists entirely of a fixed fee and/or fees at hourly rates, (G) a negotiated, arm's length contract with a term of less than fifty (50) days, and (H) sales of assets (other than real property) in the ordinary course of business at the end of their expected useful lives.

"CPI Factor" means the amount equal to (i) CPI Value for the calendar year immediately prior to the date of any adjustment *divided by* (ii) the CPI Value for the calendar year two (2) years prior to the date of such adjustment rounded to the fifth decimal place; provided, however, that in no case shall be the CPI Factor for any adjustment period be less than 1.000. For illustrative purposes only, if an amount is to be adjusted for inflation on July 1, 2019, for the one-year period of July 1, 2019 through July 1, 2020, the amount shall be multiplied by a CPI Factor equal to 1.02140 or the CPI Value for calendar year 2018 (which is 257.565) divided by the CPI Value for calendar year 2017 (which is 252.169).

"CPI Value" for any year means the "Annual Value" of such year obtained from "Consumer Price Index—All Urban Consumers—U.S. All Items Less Food and Energy (CUUR0000SA0L1E)" published by the Bureau of Labor Statistics of the United States Department of Labor, which is the calendar year 12-month average rounded to three decimal places; provided, however, that: (i) if such index is changed so that the base year thereof changes, such index shall be converted in accordance with the conversion factor published by the Bureau of Labor Statistics of the United States Department of Labor; (ii) if such index is discontinued or revised during the Term, such other index or computation with which it is replaced shall be used in order to obtain substantially the same result as would be obtained if such index had not been discontinued or revised; and (iii) any such revision shall not result in the retroactive adjustment of any amounts paid or payable pursuant to this Agreement prior to such revision. For illustrative purposes only, the CPI Value for the calendar year 2018 is 257.565, which can be obtained directly as an annual value or computed using monthly values with data from the official website of the Bureau of Labor Statistics of the United States Department of Labor.

"Customer Database" has the meaning set forth in Section 5.15(a) (*Information – System Information and Computer Database*).

"Cybersecurity Breach" means any successful act to gain unauthorized access to, disrupt or misuse an Information System or information stored on such Information System.

"Data Security Plan" has the meaning set forth in Section 4.2(h) (*ManagementCo Responsibilities – Physical Security Plan, Data Security Plan and Vegetation Management Plan*).

"Declared Emergency or Major Disaster" means an event declared as an emergency or major disaster in accordance with the provisions of the Stafford Act.

"Default Budget" has the meaning set forth in Section 7.3(d) (*Budgets – Default Budget*).

"Delay Liquidated Damages" has the meaning set forth in Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*).

CONFIDENTIAL

"Delay Period Date" has the meaning set forth in Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*).

"Designated Person" means each Representative of Operator or Administrator who is designated as such for the purposes of Article 15 (*Dispute Resolution*).

"DHS OIG" means U.S. Department of Homeland Security Office of Inspector General.

"Disallowed Costs" has the meaning set forth in Section 7.6(a) (*Disallowed Costs – Generally*).

"Disallowed Costs Dispute" has the meaning set forth in Section 7.6(b) (*Disallowed Costs – Disallowed Costs Disputes*).

"Dispute" has the meaning set forth in Section 15.1 (*Scope*).

"Dispute Resolution Procedure" has the meaning set forth in Section 15.1 (*Scope*).

"Easement" means those certain real property rights vested or to be vested in Owner or GridCo, whether or not recorded in the Registry of the Property of Puerto Rico, that: (i) encumber land portions or estates for the benefit of the T&D System to permit the ingress to and egress from each T&D System Site to the public road; (ii) grant air rights; (iii) constitute restrictive use and construction covenants (*servidumbres en equidad*) for the operation of the T&D System; and (iv) allow for the construction and installation of above- or below-ground improvements and equipment and for the addition to, or maintenance, repair, restoration, replacement or alteration of, the T&D System or any other service for the T&D System.

"Effective Date" has the meaning set forth in Section 2.2(a) (*Effective Date – Execution of the Agreement*).

"Emergency" or "Emergency Event" means (i) any Outage Event, (ii) any Declared Emergency or Major Disaster and (iii) any other circumstance defined as an Emergency in the Emergency Response Plan to be prepared pursuant to Section 4.2(g) (*ManagementCo Responsibilities – Emergency Response Plan*).

"Emergency Response Plan" has the meaning set forth in Section 4.2(g) (*ManagementCo Responsibilities – Emergency Response Plan*).

"Energy Compliance Certificate" means the certificate issued by the PREB certifying that this Agreement complies with Act 120 and the regulatory framework, including Act 17.

"Environmental Claim and Cleanup Liability" means: (i) any liabilities, costs or expenses arising from or relating to any claim by a Governmental Body or other third-party pursuant to any Environmental Law for personal injury, property damage or damage to natural resources or the environment (whether based on negligent acts or omissions, statutory liability or

CONFIDENTIAL

strict liability without fault or otherwise) in connection with the T&D System or the O&M Services; (ii) any liabilities, costs or expenses arising from or relating to any investigation, study, remediation or abatement of any Release of Hazardous Materials, to the extent required by any Environmental Law or to meet the published cleanup standards of any Governmental Body with jurisdiction over such Release, in connection with the T&D System or the O&M Services; (iii) any fines or penalties assessed for non-compliance with any Environmental Law in connection with the T&D System or the O&M Services; or (iv) any liabilities, costs or expenses necessary to achieve or maintain compliance with any Environmental Law.

"Environmental Law" means (i) any law, statute, ordinance, code, rule, regulation, order, writ, injunction, decree, ruling, determination, award, standard, permit or variance of any Governmental Body, or any binding agreement with any Governmental Body, and (ii) any consent order or decree, settlement agreement or other similar agreement between Owner and the Puerto Rico Department of Natural and Environmental Resources, EPA or other relevant Governmental Body, in each case having the force of law and applicable from time to time, relating to (A) the conservation, protection, pollution, contamination or remediation of the environment or natural resources, (B) any Hazardous Material, including investigation, study, remediation or abatement of such Hazardous Material, (C) the storage, treatment, disposal, recycling or transportation of any Hazardous Material, or (D) human health or safety.

"EPA" means the United States Environmental Protection Agency.

"Equity Participant" means any Person who holds any shares of capital stock or securities of, or units, partnership interests, membership interests or other equity interests in, Operator.

"Event of Default" means an Operator Event of Default or an Owner Event of Default, as the case may be.

"Excess Expenditures" has the meaning set forth in Section 7.3(b) (*Budgets – Flexibility to Overrun*).

"Expert Technical Determination" has the meaning set forth in Section 15.4(a) (*Expert Technical Determination Procedure for Technical Disputes – Generally*).

"Extension Term" has the meaning set forth in Section 2.3(b) (*Term – Extension*).

"Federal Funding" means any funding for the repair, replacement, restoration, improvement, resiliency, construction or hazard mitigation of the T&D System received or to be received by or for the benefit of Owner from any U.S. federal agency, including FEMA and HUD.

"Federal Funding Procurement Manual" has the meaning set forth in Section 4.1(e) (*Front-End Transition Period Generally – Federal Funding Procurement Manual*).

"Federal Funding Requirements" has the meaning set forth in Section 5.5(b) (*Capital Improvements – Federal Funding Eligibility*).

"Federally Funded Capital Improvement" means Capital Improvements that are funded with Federal Funding.

"Fees-and-Costs" means reasonable and documented fees and expenses of attorneys, expert witnesses, engineers and consultants with respect to any Legal Proceeding.

"FEMA" means the U.S. Federal Emergency Management Agency.

"Fixed Fee" has the meaning set forth in Section 7.1(b)(i) (*Service Fee – Fixed Fee*).

"Fitch" means Fitch Ratings, Ltd.

"FOMB" means the Financial Oversight and Management Board for Puerto Rico.

"FOMB Protocol Agreement" means a protocol agreement among Operator, Administrator, Owner, and the FOMB, which shall include provisions governing the FOMB's interaction with the Parties with respect to the respective duties of the FOMB and Owner under PROMESA, which shall apply only during the period the FOMB is in existence and Owner is a covered territorial instrumentality pursuant to PROMESA.[1]

"Force Majeure Event" means any act, event, circumstance or condition (other than lack of finances) whether affecting the T&D System, the System Power Supply, Owner, Operator or any of Owner's Contractors or subcontractors or Operator's Subcontractors that (i) is beyond the reasonable control of and unforeseeable by, or which, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence by, the Party relying on such act, event or condition as justification for not performing an obligation or complying with any condition required of such Party under this Agreement, and (ii) materially interferes with or materially increases the cost of performing such Party's obligations hereunder, to the extent that such act, event, circumstance or condition is not the result of the willful or negligent act, error or omission or breach of this Agreement by such Party; provided, however, that the contesting in good faith or the failure in good faith to contest such action or inaction shall not be construed as a willful or negligent act, error or omission or breach of this Agreement by such Party. Notwithstanding anything to the contrary in the foregoing, the imposition of a Tax or an increase in Taxes that is the result of a revocation of the Tax Assurance or an amendment or other modification of the Tax Assurance that is materially adverse to Operator or its Equity Participants shall be deemed a Force Majeure Event.

Subject to the requirements specified in the foregoing paragraph, Force Majeure Event will include, by way of example and without limitation, the following acts, events or conditions:

(A)    an act of God, Outage Event, landslide, lightning, earthquake, fire, explosion, flood or similar occurrence;

---

[1] Note to Draft: The FOMB Protocol Agreement will have a set of rules for the period during Title III and a separate set of rules triggered by the Title III Exit.

(B) war, armed conflict, invasion, acts of terror, acts of civil or military authority, sabotage or similar occurrence, computer sabotage or virus, acts of a public enemy, acts of a foreign enemy, extortion, blockade, embargo, revolution, interference by military authorities, quarantine, epidemic, insurrection, riot or civil commotion or disturbance or civil disobedience;

(C) to the extent not covered by (A) or (B) above, any event that causes any federal or Commonwealth Governmental Body to declare any portion of the geographic area of the T&D System part of a "disaster zone," "disaster area," "state of emergency" or any similar pronouncement;

(D) a Change in Law;

(E) the failure of any appropriate Governmental Body or private utility having operational jurisdiction in the area in which the T&D System is located to provide and maintain services to any facility comprising part of the T&D System, which services are required for the performance of this Agreement, if such failure results in a delay or curtailment of the performance of any of the O&M Services, the Front-End Transition Services or the Back-End Transition Services;

(F) any failure of title to any portion of the T&D System Sites, any revocation or termination or invalidity of any Easement or other access right, any other failure or restriction of access to the T&D System Sites, or any enforcement of any Lien on the T&D System Sites or on any improvements thereon not consented to in writing by, or arising out of any action or agreement entered into by, the Party adversely affected thereby;

(G) the preemption of materials or services by a Governmental Body in connection with a public emergency or any condemnation or other taking by eminent domain of any portion of the T&D System;

(H) the presence of archeological finds, endangered species or Hazardous Material at the T&D System Sites, except to the extent Operator caused or knew of such presence, or the Release of any reportable quantity, as defined under applicable Environmental Law, of Hazardous Material or of any other Release that could reasonably be expected to result in material Losses to Owner;

(I) strikes, boycotts, work stoppages, lockouts or other labor or employment disputes or disturbances with respect to the employees of ServCo, but only if occurring in the eighteen (18) months immediately following the Service Commencement Date; and

(J) an unanticipated, significant and sustained interruption or curtailment of System Power Supply outside the ordinary course.

It is specifically understood that <u>none</u> of the following acts, events or conditions shall constitute a Force Majeure Event:

(1) reasonably anticipated weather conditions for the geographic area of the T&D System, except to the extent such weather condition otherwise falls under one of the circumstances described in clauses (A) or (C) above;

CONFIDENTIAL

(2)    general economic conditions, interest or inflation rates, increases in wage rates of Operator's employees and Subcontractors, insurance costs, commodity prices or currency fluctuations, exchange rates or PREB-approved changes in T&D Customer rates;

(3)    the financial condition of Owner, Operator, Guarantor(s), any of their Affiliates or any Contractors or Subcontractors;

(4)    any increase for any reason in premiums charged by Operator's insurers or the insurance markets generally for the required insurance that are compensated as T&D Pass-Through Expenditures;

(5)    the failure of Operator to secure Patents or licenses in connection with the technology necessary to perform its obligations under this Agreement, if available on commercially reasonable terms;

(6)    equipment malfunction or failure (unless caused by an event that would otherwise constitute a Force Majeure Event);

(7)    union or labor work rules, requirements or demands relating to Operator's employees which have the effect of increasing the number of employees employed at the T&D System, reducing the operating flexibility of Operator or otherwise increasing the cost to Operator of performing the O&M Services;

(8)    any impact of prevailing wage laws on Operator's operation and maintenance costs with respect to wages and benefits;

(9)    the failure of any Contractor or Subcontractor or supplier to furnish labor, materials, services or equipment for any reason (unless caused by an event that would otherwise constitute a Force Majeure Event); and

(10)    strikes, boycotts, work stoppages, lockouts or other labor or employment disputes or disturbances with respect to the employees of ServCo, but only if occurring from and after the date that is eighteen (18) months immediately following the Service Commencement Date.

"Force Majeure Event Dispute" has the meaning set forth in Section 17.1(c) (*Notice; Mitigation – Burden of Proof*).

"Front-End Subcontractors" has the meaning set forth in Section 4.9(a) (*Subcontractors During the Front-End Transition Period – General*).

"Front-End Transition Account" has the meaning set forth in Section 4.6(c) (*Front-End Transition Period Compensation – Funding*).

"Front-End Transition Period" means the period of time from and including the Effective Date to and excluding the Service Commencement Date.

CONFIDENTIAL

"Front-End Transition Plan" has the meaning set forth in Section 4.1(a) (*Front-End Transition Period Generally – Role of ManagementCo*).

"Front-End Transition Service Fee" has the meaning set forth in Section 4.6(b) (*Front-End Transition Period Compensation – Front-End Transition Service Fee*).

"Front-End Transition Service Fee Dispute" has the meaning set forth in Section 4.6(d)(ii) (*Front-End Transition Period Compensation – Invoices*).

"Front-End Transition Service Fee Estimate Dispute" has the meaning set forth in Section 4.6(c)(ii) (*Front-End Transition Period Compensation – Funding*).

"Front-End Transition Service Fixed Fee" has the meaning set forth in Section 4.6(b) (*Front-End Transition Period Compensation - Front-End Transition Service Fee*).

"Front-End Transition Services" means services provided by ManagementCo under this Agreement prior to the Service Commencement Date in order to complete the transition and handover to Operator of the operation, management and other rights and responsibilities with respect to the T&D System pursuant to this Agreement, including the services contemplated by the Front-End Transition Plan; <u>provided</u> that the Front-End Transition Services shall not be O&M Services.

"Fuel Account" has the meaning set forth in Section 7.5(e)(i) (*Services Accounts – Generation Expenditures Accounts*).

"Funding Shortage" has the meaning set forth in Section 7.5(f)(i) (*Service Accounts – Contingency Reserve Account*).

"GAAP" means generally accepted accounting principles, as in effect in the United States from time to time applied on a consistent basis.

"GenCo" means the entity, which may be directly or indirectly owned by Owner or an Affiliate of Owner, that acquires or obtains ownership of the Legacy Generation Assets after the reorganization of PREPA.

"GenCo Shared Services" means those certain administrative services that Operator shall, on behalf of Owner, provide to GenCo in accordance with the terms and conditions of the Shared Services Agreement and Applicable Law.

"Generation Budget" means, for any given Contract Year, the budget of the Generation Pass-Through Expenditures for such Contract Year, together with the projected budget of the Generation Pass-Through Expenditures for the following two (2) Contract Years, in each case, including monthly budgets of such expenditures and cash flows, as such budget may be amended or adjusted from time to time in accordance with the terms and conditions of the GridCo-GenCo PPOA, the Shared Services Agreement and any Generation Supply Contract.

"Generation Expenditures Accounts" has the meaning set forth in Section 7.5(e)(i) (*Services Accounts – Generation Expenditures Accounts*).

CONFIDENTIAL

"Generation Pass-Through Expenditures" has the meaning set forth in Section 7.2(b) (*Pass-Through Expenditures – Generation Pass-Through Expenditures*).

"Generation Project" means any and all projects or transactions with respect to any function, service or facility of Owner related to the generation of Power and Electricity, including the repair, replacement, improvement, sale, removal and retirement, alteration and addition of any generation asset, and in respect of which Owner or the Government of Puerto Rico may enter into a Partnership Contract (as defined in Act 29).

"Generation Supply Contracts" means any contract between Owner and an IPP relating to the sale and purchase of Power and Electricity, including power purchase agreements.

"Governmental Approvals" means all orders of approval, permits, licenses, authorizations, consents, certifications, exemptions, registrations, rulings and entitlements issued by a Governmental Body of whatever kind and however described that are required under Applicable Law to be obtained or maintained by any Person with respect to the performance of the O&M Services.

"Governmental Body" means any U.S. federal, state, Commonwealth, regional, municipal or local legislative, executive, judicial or other governmental board, agency, authority, commission, bureau, administration, court, instrumentality or other duly authorized body, including PREB and the FOMB (if then in existence), other than Owner and, in its capacity as such under this Agreement, Administrator, or any official thereof having jurisdiction with respect to any subject of this Agreement.

"Grant Manager" means the relevant Governmental Body and any third-parties, in either case, authorized by Owner, and reasonably acceptable to ManagementCo, to act as grant manager to administer Federal Funding.

"GridCo" means the entity, which may be directly or indirectly owned by Owner or an Affiliate of Owner, that acquires or obtains ownership of the T&D System after the reorganization of PREPA.

"GridCo-GenCo PPOA" means the power purchase and operating agreement between GridCo and GenCo providing for expense reimbursement, power delivery and other services related to the generation, sale and purchase of Power and Electricity from the Legacy Generation Assets and the operation and maintenance thereof, which will have terms and conditions substantially consistent with those set forth in Exhibit H (*Term Sheet for GridCo-GenCo PPOA*).

"Guarantee" means the guarantee agreement, dated as of the date hereof, by and between Guarantor(s) and Owner in the form of Exhibit D (*Form of Guarantee Agreement*).

"Guarantor" means each of Quanta Services, Inc., a corporation duly organized and validly existing under the laws of Delaware, and Canadian Utilities Limited, a federal company duly organized and validly existing under the laws of Canada, and, as determined pursuant to the terms and conditions of the Guarantee, any of their respective permitted successors and assigns.

CONFIDENTIAL

"Handover Checklist" means the handover checklist set forth in Annex II (*Front-End Transition Plan*), which details all of the requirements for ManagementCo to complete the Front-End Transition Services by the Target Service Commencement Date.

"Handover Checklist Dispute" has the meaning set forth in Section 4.7(a) (*Closing the Front-End Transition Period – Notice of Service Commencement Date*).

"Hazardous Material" means: (i) any waste, substance, object or material deemed hazardous under Environmental Law, including "hazardous substances" as defined in CERCLA and "hazardous waste" as defined in RCRA and any local counterpart law; (ii) any oil or petroleum product, lead-based paint or polychlorinated biphenyl; and (iii) any other pollutant, contaminant, material, substance or waste that is listed, defined or is subject to regulation under any Environmental Law.

"Hired Former Employees of Owner" has the meaning set forth in Section 4.2(k) (*ManagementCo Responsibilities – Employment Offers*).

"HUD" means the U.S. Department of Housing and Urban Development.

"ICC" has the meaning set forth in Section 15.4(b)(i) (*Expert Technical Determination Procedure for Technical Disputes – Procedures*).

"Incentive Fee" has the meaning set forth in Section 7.1(c)(i) (*Service Fee – Incentive Fee*).

"Incentive Fee Report" has the meaning set forth in Section 7.1(c)(ii) (*Service Fee – Incentive Fee*).

"Indemnifying Party" means (i) in the case of a claim for indemnification by Operator Indemnitee, Owner and (ii) in the case of a claim for indemnification by an Owner Indemnitee, Operator.

"Independent Expert" has the meaning set forth in Section 15.4(a) (*Expert Technical Determination Procedure for Technical Disputes – Generally*).

"Information System" means a discrete set of electronic information resources organized for the collection, processing, maintenance, use, sharing, dissemination or disposition of electronic information, including, such resources organized as any specialized system such as industrial/process controls systems, telephone switching and private branch exchange systems, and environmental control systems, and "Information Systems" means more than one Information System.

"Initial Budgets" means, collectively, the Operating Budget, the Capital Budgets and the Generation Budget, in each case, for the initial Contract Year, and together with the projected budget for the following two (2) Contract Years.

"Initial Term" has the meaning set forth in Section 2.3(a) (*Term – Initial Term*).

CONFIDENTIAL

"Insurance Proceeds Account" has the meaning set forth in Section 10.3 (*Additional Named Insureds*).

"Integrated Resource Plan" means the integrated resource plan contemplated under Act No. 57 of the Legislative Assembly of Puerto Rico, enacted on May 27, 2014.

"Intellectual Property" means all (i) Patents, (ii) Trademarks, (iii) domain names, URLs and any other addresses for use on the Internet or any other computer network or communication system, (iv) Copyrights, (v) rights of publicity, rights of privacy and moral rights, (vi) Know-How, (vii) other intellectual property or similar corresponding or equivalent right to any of the foregoing or other proprietary or contract right relating to any of the foregoing (including remedies against infringements thereof and rights of protection of interest therein under the laws of all jurisdictions) and (viii) copies and tangible embodiments thereof (including Software), in each case whether or not the same are in existence as of the date of this Agreement or developed after such date and in any jurisdiction throughout the world.

"Internal Revenue Code" means the United States Internal Revenue Code of 1986.

"Interview Deadline" has the meaning set forth in Section 4.2(j) (*ManagementCo Responsibilities – Employment Evaluations*).

"IPP" means a producer of electric power that is not owned by Owner, GenCo or any of their respective Affiliates.

"Investment Grade Rating" means a rating of BBB- or higher by S&P, Baa3 or higher by Moody's, BBB- by Fitch, or the equivalent of such global ratings by S&P, Moody's or Fitch.

"Key Performance Metrics" means the "Key Performance Metrics" to be agreed upon during the Front-End Transition Period and set forth in Annex IX (*Performance Metrics*).

"Know-How" means proprietary rights in all, trade secrets, confidential or proprietary information, including confidential or proprietary concepts, ideas, knowledge, rights in research and development, financial, marketing and business data, pricing and cost information, plans (including business and marketing plans), algorithms, formulae, inventions, processes, techniques, technical data, designs, drawings (including engineering and AutoCAD drawings), specifications, databases, blueprints and customer and supplier lists and information, in each case whether patentable or not and whether or not reduced to practice.

"Legacy Generation Assets" means any power plants and any facilities, equipment and other assets related to the generation of Power and Electricity existing as of the date hereof and in which Owner or GenCo has an ownership or leasehold interest.

"Legal Proceeding" means any claim, litigation, action, suit (whether civil, criminal, administrative, judicial or investigative), audit, hearing, investigation, binding arbitration or mediation or proceeding, in each case commenced, brought, conducted, heard before or otherwise involving any Governmental Body, arbitrator or mediator.

CONFIDENTIAL

"Liability Waiver" has the meaning set forth in Section 4.1(g) (*Front-End Transition Period Generally – Liability Waiver*).

"Lien" means any and every lien, pledge, security interest, claim, mortgage, deed of trust, lease, charge, option, right of first refusal, easement or other real estate declaration, covenant, condition, restriction or servitude, transfer restriction under any encumbrance or any other restriction or limitation whatsoever, including mechanics', materialmen's, laborers' and lenders' liens.

"Losses" means any and all actual out-of-pocket (i) losses, damages, costs, expenses, liabilities, interest, deficiencies, awards, judgments, fines, assessments, penalties, forfeitures, obligations, deposits, Taxes, costs, offsets, expenses or other charges of any kind, including Fees-and-Costs, Environmental Claim and Cleanup Liability and costs of enforcing any right to indemnification hereunder or pursuing any insurance providers and (ii) settlements in connection with Section 18.1 (*Indemnification by Operator*) and Section 18.2 (*Indemnification by Owner*), the amount of which either has been agreed by Operator and Administrator or is below a specified amount to be agreed by Operator and Administrator from time to time.

"Major Outage Event" has the meaning set forth in Annex IX (*Performance Metrics*).

"Major Outage Event Performance Metrics" means the "Major Outage Event Performance Metrics" to be agreed upon during the Front-End Transition Period and set forth in Annex IX (*Performance Metrics*).

"ManagementCo" has the meaning set forth in the introductory paragraph.

"ManagementCo Service Commencement Date Conditions" has the meaning set forth in Section 4.5(a) (*Conditions Precedent to Service Commencement Date – ManagementCo Responsibilities*).

"Material Contractor" has the meaning set forth in Section 11.1(b) (*Ability to Subcontract and Contract – Contractors Generally*).

"Material Front-End Subcontractor" has the meaning set forth in Section 4.9(a) (*Subcontractors During the Front-End Transition Period – General*).

"Material Subcontractor" has the meaning set forth in Section 11.1(a) (*Ability to Subcontract and Contract – Subcontractors Generally*).

"Material System Contract" has the meaning set forth in Section 5.2(d) (*System Contracts – Additional System Contracts or Expired System Contracts After Service Commencement Date*).

"Mediation Rules" has the meaning set forth in Section 15.5(b) (*Mediation – Procedures*).

CONFIDENTIAL

"Minimum Performance Threshold" means the "Minimum Performance Level" set forth in Annex IX (*Performance Metrics*) with respect to any Performance Metrics.

"Minimum Performance Threshold Default" has the meaning set forth in Section 14.1(k) (*Events of Default By Operator – Failure to Meet Minimum Performance Threshold*).

"Moody's" means Moody's Investors Services, Inc.

"Negotiation Period" has the meaning set forth in Section 15.3(b)(i) (*Negotiation – Negotiation Period*).

"Non-Federal Funding Procurement Manual" has the meaning set forth in Section 4.1(f) (*Front-End Transition Period Generally – Non-Federal Funding Procurement Manual*).

"Non-Federally Funded Capital Improvements" means all Capital Improvements other than Federally Funded Capital Improvements.

"Notice of Dispute" has the meaning set forth in Section 15.2(a) (*Commencement of the Dispute Resolution Procedure – Notice*).

"Notice of Mediation" has the meaning set forth in Section 15.5(a) (*Mediation – Generally*).

"O&M Services" has the meaning set forth in Section 5.1 (*Services Generally*).

"Obligated" means a definite commitment that creates (i) a legal liability on the part of the government of the United States for the disbursement of Federal Funding or (ii) a legal duty on the part of the government of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the government of the United States.

"Occupational Safety and Health Act" shall mean the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 et seq.

"Operating Account" has the meaning set forth in Section 7.5(a)(i) (*Service Accounts – Operating Account*).

"Operating Budget" means, for any given Contract Year, the budget of the T&D Pass-Through Expenditures required to perform the O&M Services (exclusive of the cost of Capital Improvements and Outage Events) for such Contract Year, together with the projected budget for the following two (2) Contract Years, in each case, including monthly budgets of such expenditures and cash flows, as such budget may be amended or adjusted from time to time in accordance with the terms and conditions of this Agreement.

"Operating Budget Overrun Default" has the meaning set forth in Section 14.5(e) (*Additional Termination Rights – Operating Budget Overrun*).

"Operator" has the meaning set forth in the introductory paragraph.

"Operator Confidential Information" has the meaning set forth in Section 13.2(a) (*Proprietary Information – Confidentiality Obligation*).

"Operator Event of Default" has the meaning set forth in Section 14.1 (*Events of Default By Operator*).

"Operator Indemnitee" has the meaning specified in Section 18.2 (*Indemnification by Owner*).

"Operator Intellectual Property" has the meaning specified in Section 13.1(a) (*Intellectual Property – Operator Intellectual Property and Subcontractor Intellectual Property*).

"Operator Marks" means Operator's Trademarks listed in Annex XIV (*Operator Marks*), as may be revised by Operator from time to time.

"Operator Related Parties" means Operator, Parent Company, Guarantor(s), their Affiliates and any of their respective employees, directors and officers.

"Operator Termination Fee" means an amount equal to (i) the sum of the Fixed Fee and the maximum Incentive Fee (in each case in 2020 Dollars, as defined in Annex VIII (*Service Fee*)) for the Contract Year in which this Agreement is terminated *multiplied by* (ii) the multiplier applicable for such Contract Year as set forth in Annex XIII (*Operator Termination Fee Multiplier*).

"Other Employees" has the meaning set forth in Section 4.2(k) (*ManagementCo Responsibilities – Employment Offers*).

"Outage Event" means an event as a result of which (i) at least twenty thousand five hundred (20,500) T&D Customers are interrupted or (ii) at least one hundred fifty (150) outage jobs for the T&D System are logged, in each case within a twenty-four (24) hour period and due to an act of God or, in case of a storm, a storm that is designated as such by the U.S. National Weather Service, and shall end when a state in which fewer than one thousand (1,000) T&D Customers remain interrupted for a continuous period of eight (8) hours following an Outage Event is achieved.

"Outage Event Costs" has the meaning set forth in Section 7.5(d)(i) (*Service Accounts – Outage Event Reserve Account*).

"Outage Event Reserve Account" has the meaning set forth in Section 7.5(d)(i) (*Service Accounts – Outage Event Reserve Account*).

"Overdue Rate" means the lower of (i) the Prime Rate *plus* two percent (2%) and (ii) the highest rate permitted by Applicable Law.

"Oversight" means, with respect to any matter relating to the T&D System, the O&M Services or this Agreement, the performance of such reviews, investigations, inspections,

CONFIDENTIAL

or examinations relating to such matters as are reasonably necessary in the circumstances, conducted, in each case, in accordance with generally accepted contract administration practices used in the electric utility industry.

"Owner" has the meaning set forth in the introductory paragraph.

"Owner Confidential Information" has the meaning set forth in Section 13.2(a) (*Proprietary Information – Confidentiality Obligation*).

"Owner Employees" has the meaning set forth in Section 4.2(j) (*ManagementCo Responsibilities – Employment Evaluations*).

"Owner Event of Default" has the meaning set forth in Section 14.3 (*Events of Default By Owner*).

"Owner Fault" means (i) any breach (including any breach of any representation and warranty set forth in any Transaction Document), (ii) any failure of compliance or nonperformance by Owner or Administrator with its respective obligations under any Transaction Document or (iii) any negligence, tort or willful misconduct by Owner or Administrator with respect to performance of its respective obligations under any Transaction Document (whether or not attributable to any officer, trustee, member, agent, employee, representative, contractor, subcontractor of any tier or independent contractor of Owner or Administrator other than Operator and its Subcontractors), which has had, or is reasonably expected to have, a material adverse effect on Operator's performance or cost of performance or on Operator's rights or obligations under this Agreement or on the operation or maintenance of the T&D System.

"Owner Indemnitee" has the meaning specified in Section 18.1 (*Indemnification by Operator*).

"Owner Intellectual Property" means any Work Product and other Intellectual Property owned by Owner or its Affiliates.

"Owner Licensed Intellectual Property" means any Intellectual Property licensed by Owner from a third-party not a party to this Agreement.

"Owner Marks" means Owner's Trademarks listed in Annex XV (*Owner Marks*), as may be revised by Owner from time to time.

"Owner Patents" has the meaning set forth in Section 13.1(d)(iv) (*Intellectual Property – Work Product*).

"Owner Personal Information" means any and all personally identifiable information, in any form, collected by or provided to Operator, Operator Related Parties or Subcontractors in connection with the provision of O&M Services or services under this Agreement and that, alone or in combination with other information, uniquely identifies a current, former or prospective director, trustee, officer, employee, elected official, supplier, retiree of Owner, Owner Related Party or a T&D Customer (e.g., names, addresses, telephone numbers, other information in the Customer Database or any other personally identifiable information as

CONFIDENTIAL

otherwise defined under Applicable Law), including (i) copies of such information or materials to the extent containing such information or (ii) such information Owner notifies Operator in advance in writing is subject to a duty of confidentiality that Owner owes to Owner's customers or pursuant to contracts of Owner or Owner Related Parties.

"Owner Related Parties" means Owner, its Affiliates and any of their respective employees, directors, trustees, elected officials and officers.

"Owner Service Commencement Date Conditions" has the meaning set forth in Section 4.5(b) (*Conditions Precedent to Service Commencement Date – Owner and Administrator Responsibilities*).

"Owner Termination Fee" means the following: (a) during Contract Years one (1) through five (5), an amount equal to US$20,000,000 in 2020 Dollars; and (b) during any subsequent Contract Year, an amount equal to US$10,000,000 in 2020 Dollars. For purposes of this definition, the phrase "2020 Dollars" means that the relevant amount will be adjusted to account for inflation, at the start of each Contract Year, by the respective annual CPI Factor(s) to reflect a nominal value for the Contract Year. For illustrative purposes only, if Contract Year four (4) starts in calendar year 2023, then the adjustment for inflation would be as follows: Contract Year four (4)'s Owner Termination Fee (as set forth in this definition, in 2020 Dollars) *multiplied by* the CPI Factor for 2021 *multiplied by* the CPI Factor for 2022 *multiplied by* the CPI Factor for 2023.

"Parent Company" means each of Quanta Services, Inc. and Canadian Utilities Limited and any of their respective successors and assigns.

"Party" has the meaning set forth in the introductory paragraph.

"Patents" means the exclusive legal rights held by the owner of a patent (including utility and design patents) to exclude others from using, making, having made, selling, offering to sell, and importing patented subject matter and to practice patented methods. Patents include all legal rights in any patent applications, PCT filings, patent disclosures, issued patents and all related extensions, continuations, continuations-in-part, divisions, reissues and reexaminations, utility models, certificates of invention and design patents, and all extensions thereto.

"Performance Metrics" has the meaning set forth in Section 7.1(c)(i) (*Service Fee – Incentive Fee*).

"Permitted Liens" means (i) Liens arising by operation of law that are either contested in good faith and for which Operator or any Subcontractor has established adequate reserves or that are discharged promptly, (ii) Liens existing as of the Effective Date, if any, (iii) Liens that result from any act or omission by any Owner Related Party, Administrator or any other Governmental Body, (iv) purchase money Liens or similar Liens securing rental payments under capital lease arrangements, and (v) Liens on System Revenues specified in or permitted under any Title III Plan and its related implementing documents.

CONFIDENTIAL

"Person" means any individual (including the heirs, beneficiaries, executors, legal representatives or administrators thereof), firm, corporation, company, association, partnership, limited partnership, limited liability company, joint stock company, joint venture, trust, business trust, unincorporated organization or other entity or a Governmental Body.

"Physical Security Plan" has the meaning set forth in Section 4.2(h) (*ManagementCo Responsibilities – Physical Security Plan, Data Security Plan and Vegetation Management Plan*).

"Power and Electricity" means the electrical energy, capacity and ancillary services available from the System Power Supply.

"PRDH" means the Puerto Rico Department of Housing, also known as the *Departamento de la Vivienda de Puerto Rico*.

"PREB" means the Puerto Rico Energy Bureau, also known as the *Negociado de Energia de Puerto Rico*, an independent body created by Act No. 57 of the Legislative Assembly of Puerto Rico, enacted on May 27, 2014.

"PREB Actions" has the meaning set forth in Section 3.9(c) (*Qualified Management Contract – PREB Actions*).

"Pre-Existing Environmental Condition" means the presence of Hazardous Materials in environmental media anywhere in, at, from, as a result of, on or under the T&D System or the T&D System Sites on the Service Commencement Date.

"Prime Rate" means a variable per annum rate equal, as of any date of determination, to the rate as of such date published in the "Money Rates" section of The Wall Street Journal as being the "Prime Rate" (or, if more than one rate is published as the "Prime Rate," then the highest of such rates), or a mutually agreeable alternative source of the prime rate if it is no longer published in the "Money Rates" section of The Wall Street Journal or the method of computation thereof is substantially modified.

"PRIRC" means the Internal Revenue Code for a New Puerto Rico of 2011.

"Pro Rata" and similar expressions mean an adjustment to a cost, payment or other amount due over a period of time to account for it accruing over only a portion of such period.

"Procurement Manuals" means the Federal Funding Procurement Manual and the Non-Federal Funding Procurement Manual.

"PROMESA" means the Puerto Rico Oversight, Management and Economic Stability Act enacted on June 30, 2016 (P.L. 114-187).

"Proposal" means the proposal submitted in response to the RFP.

"Proposal Submission Date" means November 25, 2019.

CONFIDENTIAL

"Prudent Utility Practice" means, at any particular time, the practices, methods, techniques, conduct and acts that, at the time they are employed, are generally recognized and accepted by companies operating in the United States electric transmission and distribution business as such practices, methods, techniques, conduct and acts appropriate to the operation, maintenance, repair and replacement of assets, facilities and properties of the type covered by this Agreement. The interpretation of acts (including the practices, methods, techniques, conduct and acts engaged in or approved by a significant portion of the electrical utility industry prior thereto) shall take into account the facts and the characteristics of the T&D System and System Power Supply known at the time the decision was made. Prudent Utility Practice is not intended to be limited to the optimum or minimum practice, method, technique, conduct or act, to the exclusion of all others, but rather to be a spectrum of possible practices, methods, techniques, conduct or acts that a prudent operator would take to accomplish the intended objectives at just and reasonable cost consistent with reliability, safety, expediency and good customer relations.

"Public Information Disclosure Requirements" means any Applicable Law requiring the disclosure of public documents or information.

"Public-Private Partnerships Authority's Ethical Guidelines" means the "Public-Private Partnerships Authority's Guidelines for the Evaluation of Conflicts of Interest and Unfair Advantages in the Procurement of Public-Private Partnership Contracts," promulgated by the Public-Private Partnerships Authority and dated as of December 19, 2009.

"Public Works Improvements" means Capital Improvements performed as a result of requirements or requests of a Governmental Body.

"Purchased Power Account" has the meaning set forth in Section 7.5(e)(i) (*Services Accounts – Generation Expenditures Accounts*).

"Rate Order" has the meaning set forth in Section 5.6(g) (*System Regulatory Matters – PREB Rate Proceedings*).

"Rating Agency" means each of S&P, Moody's and Fitch.

"Rating Downgrade" has the meaning set forth in Section 7.8(b) (*Owner Credit Rating – Reinstatement of Federal Funding*).

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.

"Regulation 6955" means Regulation 6955 of March 18, 2005.

"Release" means any emission, spill, seepage, leak, escape, leaching, discharge, injection, pumping, pouring, emptying, dumping, disposal, migration or release of Hazardous Materials from any source into or upon the environment.

"Reliance Letter" means a letter from tax counsel, substantially in the form set forth in Exhibit G (*Form of Reliance Letter*) that shall accompany a Tax Opinion and shall permit Operator to rely on such Tax Opinion.

CONFIDENTIAL

"Remedial Action" means any investigation, clean-up, removal action, remedial action, restoration, repair, abatement, response action, corrective action, monitoring, sampling and analysis, installation, reclamation, closure or post-closure in connection with the suspected, threatened or actual Release of Hazardous Materials.

"Representative" means, with respect to any Person, any director, officer, employee, official, lender (or any agent or trustee acting on its behalf), partner, member, owner, agent, lawyer, accountant, auditor, professional advisor, consultant, engineer, contractor, Subcontractor, other Person for whom such Person is responsible at law or other representative of such Person and any professional advisor, consultant or engineer designated by such Person as its "Representative."

"Required Insurance" has the meaning set forth in Section 10.1 (*Insurance Generally*).

"Resource Adequacy" means the procurement obligations with regards to electric capacity, energy and ancillary services of load serving entities.

"Revenue Procedure 2017-13" means the revenue procedure issued by the United States Internal Revenue Service that provides safe harbor conditions under which a management contract does not result in private business use under § 141(b) of the Internal Revenue Code or subsequent guidance from the United States Internal Revenue Service.

"RFP" means the Puerto Rico Electric Power Transmission and Distribution System Request for Proposals 2019-2 issued by the Puerto Rico Public-Private Partnerships Authority.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc.

"Sanctioned Country" has the meaning set forth in Section 19.2(h)(iv) (*Representations and Warranties of Operator – Applicable Law Compliance*).

"Sanctioned Person" has the meaning set forth in Section 19.2(h)(iv) (*Representations and Warranties of Operator – Applicable Law Compliance*).

"Sanctions" has the meaning set forth in Section 19.2(h)(iv) (*Representations and Warranties of Operator – Applicable Law Compliance*).

"Securitization SPV" means any entity established by the Government of Puerto Rico to issue secured debt in connection with Owner's Title III Plan and its successors and assigns, as applicable.

"ServCo" has the meaning set forth in the introductory paragraph.

"ServCo Benefit Plans" has the meaning set forth in Section 5.8(a) (*Labor and Employment; Employee Benefits – Employee Plans*).

"ServCo Employees" has the meaning set forth in Section 4.2(k) (*ManagementCo Responsibilities – Employment Offers*).

"Service Accounts" means, collectively, the Operating Account, the Capital Account – Federally Funded, the Capital Account – Non-Federally Funded, the Outage Event Reserve Account, the Generation Expenditures Accounts and the Contingency Reserve Account, each of which is a "Service Account."

"Service Account Dispute" has the meaning set forth in Section 7.5(g) (*Service Accounts – Service Account Disputes*).

"Service Commencement Date" has the meaning set forth in Section 4.7(b) (*Closing the Front-End Transition Period – Establishment of Service Commencement Date*).

"Service Commencement Date Conditions" has the meaning set forth in Section 4.5 (*Conditions Precedent to Service Commencement Date*).

"Service Fee" has the meaning set forth in Section 7.1(a) (*Service Fee – Generally*).

"Service Fee Dispute" has the meaning set forth in Section 7.1(e) (*Service Fee – Service Fee Disputes*).

"Servicing Contract" means any servicing contract by and between Operator and the Securitization SPV, as applicable, in form and substance reasonably acceptable to Operator.

"Shared Services Agreement" has the meaning set forth in Section 4.5(s) (*ManagementCo Responsibilities – Shared Services Agreement*).

"Software" means computer programs, proprietary software, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, operating systems, design documents, website code and specifications, flow-charts, user manuals and training materials relating thereto and any translations thereof.

"Stafford Act" means the Robert T. Stafford Disaster Relief and Recovery Act, enacted on November 23, 1988.

"Subcontract" means an agreement or purchase order by Operator to a Subcontractor or a Subcontractor to Operator, as applicable.

"Subcontractor" means every Person (other than employees of Operator) employed or engaged by Operator or any Person directly or indirectly in privity with Operator for the performance of any portion of the Front-End Transition Services, the O&M Services or the Back-End Transition Services, whether for the furnishing of labor, materials, equipment, supplies, services or otherwise. For the avoidance of doubt: (i) Subcontractors includes personnel from Operator's Affiliates assigned to perform the Front-End Transition Services, the O&M Services or the Back-End Transition Services under this Agreement, and (ii) Subcontractors does not include third parties merely providing commercially available "off-the-shelf" Software or Information Systems to Operator (directly or as a service).

CONFIDENTIAL

"Subcontractor Intellectual Property" has the meaning specified in Section 13.1(a) (*Intellectual Property – Operator Intellectual Property, Contractor Intellectual Property and Subcontractor Intellectual Property*).

"Sworn Statement" means a sworn statement in the form set forth as Exhibit E (*Form of Sworn Statement*).

"System Contracts" means (i) the contracts, leases, licenses, permits and other similar arrangements of all types related to the T&D System that have been entered into by Owner (or pursuant to which Owner otherwise has rights) and remain in effect as of the Service Commencement Date and (ii) any other contracts, leases, licenses, permits and similar arrangements of all types entered into by Owner, or by Operator on behalf and as agent of Owner, related to the T&D System or O&M Services pursuant to Section 4.3(d) (*Owner and Administrator Responsibilities– Additional System Contracts and Generation Supply Contracts Between Effective Date and Service Commencement Date*) and/or Section 5.2(d) (*System Contracts – Additional System Contracts or Expired System Contracts After Service Commencement Date*), including contracts related to:

(A)     the ownership and operation and maintenance of the T&D System (including interconnection and other related agreements);

(B)     the ownership of or access to any T&D System Sites (including all right of way, crossing, access, Easement and other related agreements);

(C)     all information technology hardware and software used to operator or administrate the T&D System;

(D)     vegetation management, fuel for fleet vehicles, fleet vehicles, meters, call centers and engineering, procurement and construction;

(E)     T&D Customers; or

(F)     T&D System operation or ancillary services.

For the avoidance of doubt, System Contracts shall not include (x) any agreements between GenCo and a third party, Generation Supply Contracts, the GridCo-GenCo PPOA or collective bargaining agreements with union labor or (y) any arrangements that would have been considered System Contracts under clauses (i) or (ii) above but which have been rejected by Owner in the Title III Case prior to the Title III Exit.

"System Information" means any and all information relating to the T&D System, including: (i) income statements, balance sheets, statements of cash flow and changes in financial position, details regarding revenues generated by the T&D System (including information regarding the collection thereof), operating income, expenses, capital expenditures and budgeted operating results relating to the O&M Services; (ii) all certificates, correspondence, data (including test data), documents, facts, files, information, investigations, materials, notices, plans, projections, records, reports, requests, samples, schedules, statements, studies, surveys, tests and test results analyzed, categorized, characterized, created, collected, generated, maintained, processed, produced, prepared, provided, recorded, stored or used by Operator or any of its Representatives in connection with the T&D System or the O&M Services; and (iii) books,

CONFIDENTIAL

records, accounts and documents relating to the O&M Services, including any information that is stored electronically or on computer-related media but not including (A) Operator Confidential Information or other information that Operator reasonably believes is subject to attorney-client or other legal privilege, confidentiality restrictions or trade secret protections, (B) personally identifiable information protected by Applicable Law, other than Owner Personal Information, (C) correspondence between employees or other Representatives of Operator, (D) information and records pertaining to the Service Fee, or (E) information or records pertaining to any dispute with Owner or Administrator or their respective Representatives.

"System Operation Principles" has the meaning set forth in Section 4.1(h) (*Front-End Transition Period Generally – System Operation Principles*).

"System Power Supply" means electric capacity, energy and ancillary services from any power supply sources authorized under Applicable Law to operate in the Commonwealth.

"System Remediation Plan" has the meaning set forth in Section 4.1(d)(ii) (*Front-End Transition Period Generally – Transition to Standard of Performance*).

"System Revenues" has the meaning set forth in Section 3.2 (*Engagement of Operator*).

"T&D Customers" means customers of the T&D System.

"T&D Pass-Through Expenditures" has the meaning set forth in Section 7.2(a) (*Pass-Through Expenditures – T&D Pass-Through Expenditures*).

"T&D System" has the meaning set forth in the Recitals.

"T&D System Sites" means the real property and interests therein upon which the components of the T&D System are and will be located.

"Target Service Commencement Date" means (i) January 1, 2021 in the event the Effective Date is on or before February 16, 2020 or (ii) the date that is 320 days after the Effective Date in the event the Effective Date is after February 16, 2020.

"Tax" means all U.S. federal, state, Commonwealth, municipal, local and non-U.S. taxes and similar governmental charges, imposts, levies, fees and assessments, however denominated (including income taxes, business asset taxes, franchise taxes, net worth taxes, capital taxes, estimated taxes, withholding taxes, use taxes, value added tax, gross or net receipt taxes, sales taxes, transfer taxes or fees, excise taxes, real and personal property taxes, ad valorem taxes, payroll related taxes, employment taxes, unemployment insurance, social security taxes, minimum taxes and import duties and other obligations of the same or a similar nature), together with any related liabilities, penalties, fines, additions to tax or interest imposed by a Governmental Body.

"Tax Assurance" has the meaning set forth in Section 4.5(t) (*Conditions Precedent to Service Commencement Date – Tax Matters*).

CONFIDENTIAL

"Tax Opinion" means an opinion, substantially in the form set forth in Exhibit F-1 (*Form of Tax Opinion - Effective Date*) or Exhibit F-2 (*Form of Final Tax Opinion*), as applicable, of Nixon Peabody LLP as counsel to the FOMB or other tax counsel reasonably acceptable to Administrator, rendered in connection with this Agreement and providing that neither this Agreement nor any provision hereof, nor the performance by each Party of its obligations hereunder (including Operator's administration of the System Contracts), adversely affects the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code.

"Tax Return" means any report, return, information return, form, declaration, statement or other information (including any amendments thereto and including any schedule or statement thereto) required to be filed or maintained by Applicable Law in connection with the determination, assessment or collection of any Tax.

"Technical Dispute" has the meaning set forth in Section 15.3(b)(i) (*Negotiation – Negotiation Period*)

"Term" means the Initial Term together with the Extension Term, if any.

"Third-Party Intellectual Property" means Intellectual Property that is licensed to Operator by a third-party that is not an Affiliate of Operator or a Subcontractor and is used in the performance of this Agreement.

"Third-Party Payments" has the meaning set forth in Section 18.4(a) (*Insurance and Other Recovery – Generally*).

"Title III Approvals" means any findings, approvals and protections of the Title III Court or any other applicable court authorizing or approving Owner's entry into and performance of this Agreement and that are otherwise necessary to the Parties' performance of this Agreement.

"Title III Case" means Owner's case under Title III of PROMESA in the U.S. District Court.

"Title III Court" means the U.S. District Court presiding over the Title III Case.

"Title III Exit" means the consummation and effectiveness of a confirmed Title III Plan.

"Title III Plan" means a plan of adjustment in the Title III Case.

"Trademarks" means the exclusive legal rights to use and display any marks, names or symbols in association with businesses, products or services as an indication of ownership, origin, affiliation, or sponsorship, including trademarks, service marks, trade dress, brand names, certification marks, logos, slogans, rights in designs, industrial designs, corporate names, trade names, business names, geographic indications and other designations of source, origin, sponsorship, endorsement or certification, together with the goodwill associated with any of the foregoing, in each case whether registered or unregistered, and all applications and registrations therefor.

CONFIDENTIAL

"Transaction Documents" means this Agreement, the Guarantee, the FOMB Protocol Agreement, any Servicing Contract and any other agreement entered into by Operator, Owner or Administrator from time to time in connection with the transactions contemplated hereby and expressly designated a "Transaction Document" by the parties thereto.

"U.S. District Court" means the United States District Court for the District of Puerto Rico.

"United States" or "U.S." means the United States of America.

"Vegetation Management Plan" has the meaning set forth in Section 4.2(h) (*ManagementCo Responsibilities – Physical Security Plan, Data Security Plan and Vegetation Management Plan*).

"Work Product" has the meaning set forth in Section 13.1(d)(i) (*Intellectual Property – Work Product*).

**Section 1.2     Interpretation; Construction**.

(a)     Headings. The table of contents, articles, titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. Except as otherwise indicated, all references in this Agreement to "Articles", "Sections", "Annexes" and "Exhibits" are intended to refer to Articles and Sections of this Agreement and Annexes and Exhibits to this Agreement.

(b)     Annexes and Exhibits. The Annexes and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. In the event of an irreconcilable conflict, discrepancy, error or omission, the following descending order of precedence will govern: (i) this Agreement, (ii) the Annexes and (iii) the Exhibits.

(c)     Construction. For purposes of this Agreement: (i) "include", "includes" or "including" shall be deemed to be followed by "without limitation"; (ii) "hereof", "herein", "hereby", "hereto" and "hereunder" shall refer to this Agreement as a whole and not to any particular provision of this Agreement; (iii) "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not simply mean "if"; (iv) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including"; (v) "dollars" and "US$" shall mean United States Dollars; (vi) the singular includes the plural and vice versa; (vii) reference to a gender includes the other gender; (viii) "any" shall mean "any and all"; (ix) "or" is used in the inclusive sense of "and/or"; (x) reference to any agreement, document or instrument means such agreement, document or instrument as amended, supplemented and modified in effect from time to time in accordance with its terms; (xi) reference to any Applicable Law means such Applicable Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and (xii) reference to any Person at any time refers to such Person's permitted successors and assigns.

      (d)      <u>Days and Time</u>. All references to days herein are references to calendar days, unless specified as Business Days, and, unless specified otherwise, all statements of or references to a specific time in this Agreement are to Atlantic Standard Time.

      (e)      <u>Accounting Principles</u>. All accounting and financial terms used herein, unless specifically provided to the contrary, shall be interpreted and applied in accordance with then generally accepted accounting principles in the United States, consistently applied.

      (f)      <u>Negotiated Agreement</u>. The Parties have participated jointly in the negotiation and drafting of this Agreement with the benefit of competent legal representation, and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent. In the event that an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions hereof.

      (g)      <u>References to Transmission and Distribution of Power</u>. The phrases "transmit", "transmitted", "transmitting" and "transmission" and any similar phrases herein, when used with respect to Power and Electricity, shall mean and refer to the operation of the T&D System in accordance with this Agreement to transmit Power and Electricity. The phrases "distribute", "distributed", "distributing" and "distribution" and any similar phrases herein, when used with respect to Power and Electricity, shall mean and refer to the operation of the T&D System in accordance with this Agreement to distribute Power and Electricity.

      (h)      <u>Actions Taken Pursuant to Agreement</u>. The Parties acknowledge that this Agreement sets forth procedures and intended results with respect to various circumstances that may arise during the Term. Such circumstances include the "wheeling", "transmission" or "distribution" of Power and Electricity; Changes in Law and Force Majeure Events; the preparation, revision and updating of the Budgets, the Performance Metrics, the System Remediation Plan, the System Operation Principles, the Procurement Manuals and any other such plan, manual, schedule or similar document to be prepared or amended under Article 4 (*Front-End Transition Period*); the provision of the Front-End Transition Services and the Back-End Transition Services; the provision of the O&M Services and additional services; and the assignment and transfer of this Agreement. Unless otherwise agreed to by the Parties, any correspondence, report, submittal, revision update, consent or other document or communication given pursuant to this Agreement on account of such a circumstance shall be considered as among the Parties to be an action taken pursuant to this Agreement and not an amendment hereto.

      (i)      <u>Owner as Applicant</u>. Notwithstanding anything to the contrary in this Agreement, Owner shall remain the applicant for any requests for reimbursement from FEMA, unless formally amended and approved by FEMA.

CONFIDENTIAL

## ARTICLE 2
## PURPOSE; EFFECTIVE DATE; TERM

**Section 2.1    Purpose**. Owner hereby contracts with Operator for the provision of (i) O&M Services, including the services listed in Article 5 (*O&M Services*) and Annex I (*Scope of Services*) commencing on the Service Commencement Date, (ii) the Front-End Transition Services and (iii) the Back-End Transition Services, in each case, subject to the terms and conditions of this Agreement. The Parties acknowledge and agree that (i) this Agreement is a "Partnership Contract" as defined in Act 29, (ii) Operator is a "Contractor" as defined in Act 29, entitled to all of the benefits, rights and protections granted to a "Contractor" thereunder and (iii) Operator is not a "Contractor" as that term is defined in Section 1.1 (*Definitions*).

**Section 2.2    Effective Date**.

(a)    Execution of the Agreement. This Agreement shall become effective on the date that it is executed by the Parties, by which execution the Parties acknowledge and agree that the conditions in Section 2.2(b) (*Effective Date – Conditions to Execution*) have been satisfied (the "Effective Date").

(b)    Conditions to Execution. The following conditions shall have been satisfied prior to the Effective Date:

(i)    receipt by the Parties of an Energy Compliance Certificate issued by PREB;

(ii)    receipt by the Parties of a resolution adopted by the board of directors of Administrator, in form and substance reasonably acceptable to Administrator and ManagementCo, authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(iii)    receipt by the Parties of a resolution adopted by the board of directors of Owner, in form and substance reasonably acceptable to Administrator and ManagementCo, authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(iv)    receipt by the Parties of authorization from the FOMB, in form and substance reasonably acceptable to Administrator and ManagementCo, of the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(v)    receipt by the Parties of approval from the Governor of the Commonwealth or his/her delegate, in form and substance reasonably acceptable to Administrator and ManagementCo, for the execution, delivery and performance of this Agreement and the transactions contemplated hereby;

(vi)    receipt by Owner of the Guarantee;

(vii)    receipt by Owner of a copy of a certificate as to certain matters of Commonwealth law in the form set forth as Exhibit B (*Form of Commonwealth Certifications*), duly executed by Operator;

(viii)    receipt by Owner of a Tax Opinion and receipt by ManagementCo of a Reliance Letter;

(ix)    evidence reasonably satisfactory to Operator that an amount equal to at least four and a half (4.5) months of the estimated Front-End Transition Service Fee has been deposited by Owner in the Front-End Transition Account; and

(x)    receipt by ManagementCo of (A) a list of the project worksheets related to the T&D System prepared by FEMA pursuant to Section 428 of the Stafford Act as of such date or (B) a summary of the costs estimates or preliminary costs estimates for Federally Funded Capital Improvements established as of such date.

(c)    Outside Date. If the Effective Date has not occurred by the date specified in the RFP or such later date as the Parties may mutually agree in writing, the Bid Security (as defined in the RFP) shall be held, drawn or returned as provided in the RFP.

**Section 2.3    Term**.

(a)    Initial Term. This Agreement shall be in effect from the Effective Date through the fifteenth (15th) anniversary of the Service Commencement Date (such period of time, the "Initial Term"), unless extended or earlier terminated in accordance with the terms hereof.

(b)    Extension. Operator and Owner (or Administrator acting on Owner's behalf) may mutually agree to extend the Initial Term for an additional period to be determined at the time and on terms and conditions to be agreed in good faith (the "Extension Term"); provided that (i) the Extension Term shall not exceed the maximum term permitted under Act 29 at the time of such extension, (ii) a Tax Opinion shall have been delivered to Owner and a Reliance Letter shall have been received by ManagementCo in connection with such Extension Term and (iii) to the extent required by Applicable Law, the Extension Term shall not be effective until approved by the PREB.

CONFIDENTIAL

## ARTICLE 3
## OWNERSHIP OF THE T&D SYSTEM

**Section 3.1      Ownership**. The T&D System is and shall be owned by Owner throughout the Term, and Operator shall have no ownership interest therein.

**Section 3.2      Engagement of Operator**. Operator shall perform the O&M Services as an independent contractor and shall not have any legal, equitable, tax, beneficial or other ownership or leasehold interest in the T&D System. The only compensation payable by Owner to Operator for providing the O&M Services for the T&D System shall be the Service Fee. Owner shall also fund the Service Accounts in the manner contemplated hereunder for Operator's payment of T&D Pass-Through Expenditures (including Excess Expenditures), Capital Costs and Outage Event Costs (without limiting Owner's indemnity or other obligations hereunder). All amounts collected by Operator or any Contractor or Subcontractor on behalf of Owner from T&D Customers pursuant to this Agreement or any Servicing Contract (the "System Revenues") shall be the property of Owner (subject only to Liens on System Revenues specified in the Title III Plan and the related disclosure statement) and shall be deposited by Operator daily in such account(s) specified in accordance with the Servicing Contract or, if no Servicing Contract is in effect, pursuant to the account structure as agreed to between Owner and Operator pursuant to Section 4.5(n) (*Conditions Precedent to Service Commencement Date – Account Structure*). In collecting the System Revenues, Operator and any Contractor or Subcontractor shall act solely as an agent for Owner and shall have no right or claim to the System Revenues. Without limiting the generality of the foregoing, Operator and any Contractor or Subcontractor shall have no right to assert a claim of set-off, recoupment, abatement, counterclaim or deduction against System Revenues for any amounts that may be owed to Operator hereunder or with respect to any other matter in dispute hereunder. Operator is unconditionally and absolutely obligated to pay or deposit the System Revenues as directed by Administrator.

**Section 3.3      Use of T&D System**. From the Service Commencement Date and for the remainder of the Term thereafter, Operator, Contractors and its Subcontractors shall have the exclusive right (except as set forth in this Agreement), subject to Section 3.5 (*Right of Access*), to enter upon, occupy and use the T&D System and the T&D System Sites for the sole purpose of performing the O&M Services in accordance with the terms hereof. Owner shall ensure that Operator, Contractors and its Subcontractors are provided with all necessary access to exercise such right.

**Section 3.4      Liens**. From the Service Commencement Date and for the remainder of the Term thereafter, Operator shall keep the T&D System free and clear of any and all Liens (other than Permitted Liens) arising out of or in connection with any acts, omissions or debts of Operator, Guarantor(s) or their Affiliates that are unrelated and independent from the provision of O&M Services hereunder. Nothing in this Agreement shall be deemed to create any Lien in favor of Operator on any asset of Owner, including the T&D System, as security for the obligations of Owner hereunder.

**Section 3.5      Right of Access**. Upon reasonable notice to Operator, at reasonable times during normal business hours and at their own respective cost and risk, each of Owner, Administrator, PREB and their respective Representatives shall have the right to access the T&D

System assets and all System Information for Oversight of Operator's performance of the O&M Services and to otherwise carry out their obligations under Applicable Law; provided that such access shall not interfere with Operator's performance of the O&M Services and may be provided by read-only access where available, or a reasonably equivalent form of access to such information. Owner, Administrator and their respective Representatives shall comply with all of Operator's access, security (including cybersecurity) and safety procedures when exercising such right of access. Owner shall be responsible for the security of all access credentials provided to, and each access made and use and disclosure of System Information by, Owner, Administrator, PREB and their respective Representatives hereunder. At Administrator's request and sole cost and expense, Operator shall provide Administrator with dedicated on-site office space and access to and use of office facilities and equipment located at Operator's facilities in the Commonwealth or another suitable site mutually agreed upon; provided that such space is reasonable and adequate to enable Administrator to exercise its Oversight rights and responsibilities under this Agreement.

**Section 3.6    Exclusivity.** The Parties covenant and agree that Operator, Contractors, Subcontractors and their respective Representatives shall be the sole and exclusive providers of O&M Services with respect to the T&D System and that Operator shall not (a) transmit or distribute Power and Electricity using the T&D System other than Power and Electricity obtained by, on behalf of or with the approval of Owner (or Administrator, if applicable) or PREB in accordance with Applicable Law, or (b) use the T&D System (i) for any purpose other than the purposes contemplated hereby or (ii) to serve or benefit any person other than Owner and T&D Customers.

**Section 3.7    Essential Public Service.** The Parties acknowledge that Owner's provision of the Power and Electricity requirements of the Commonwealth constitutes an essential public service; it being understood that such acknowledgement shall not impose any obligation on the Parties other than those set forth in this Agreement. Owner acknowledges that Operator will rely on (i) the certifications, resolutions, authorizations and approvals referred to in Section 2.2 (*Effective Date*) and (ii) the funding of the Service Accounts by Owner in the manner contemplated hereunder, in each case in order for Operator to (A) perform the O&M Services under this Agreement and (B) have the opportunity to earn the Service Fee in full.

**Section 3.8    Reporting Obligations.** In accordance with Section VI of Annex I (*Scope of Services*) Operator shall provide (i) System Information (both financial and operational), as available, to support Owner's financing activities, including Owner's administration of debt service and Owner's required disclosure and tax requirements, and (ii) assistance to Owner and Administrator in connection with Owner's preparation of reports and other documents to satisfy Owner's reporting requirements.

**Section 3.9    Qualified Management Contract.**

(a)    <u>Generally</u>. The T&D System has been financed with obligations the interest on which is exempt from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code. The Parties intend for this Agreement to constitute a "qualified management contract" under Revenue Procedure 2017-13, such that the provision of O&M Services by Operator under this Agreement does not adversely affect the exclusion from gross income for federal income tax purposes under the Internal Revenue Code of the interest on such

CONFIDENTIAL

obligations. The Tax Opinion and the Reliance Letter delivered as of the Effective Date have been delivered on such basis.

    (b)    <u>Covenants</u>.

    (i)    Operator covenants and agrees that: (A) neither it nor any direct or indirect owner of an equity interest in it is entitled to any U.S. federal income tax benefits relating to the T&D System that are available to an owner or lessor of the T&D System covered by this Agreement; (B) it shall not take any tax position inconsistent with it being a service provider with respect to such T&D System; and (C) it shall not, and shall not permit or enable any direct or indirect owner of any equity interest in it to, claim any depreciation or amortization deduction, investment tax credit or deduction for any payment as rent, with respect to the T&D System.

    (ii)    Owner, Administrator and Operator each covenant and agree that the terms of this Agreement shall be construed so as to comply with the requirements of Revenue Procedure 2017-13. To the extent that this Agreement is determined to fail to comply with Revenue Procedure 2017-13 for any reason or otherwise is determined to result in private business use of the T&D System within the meaning of Section 141 of the Internal Revenue Code, the Parties agree that they shall use reasonable efforts to amend the terms of this Agreement in order to comply with Revenue Procedure 2017-13; <u>provided</u>, <u>however</u>, that if any such amendment shortens or has the effect of shortening the Initial Term, including if any such amendment is required to secure the delivery of the Tax Opinion required by Section 4.5(v) (*Conditions Precedent to Service Commencement Date – Tax Opinion*), then: (A) the Fixed Fee payable to ManagementCo under Annex VIII (*Service Fee*) shall be adjusted by adding US$7,000,000 in 2020 Dollars per month to each month for that number of months equal to the number of months by which the Initial Term is less than fifteen (15) years counting back from the end of the as-amended Initial Term; and (B) the maximum Incentive Fee payable to ManagementCo under Annex VIII (*Service Fee*) shall be adjusted by adding US$1,333,333 in 2020 Dollars per month to each month for that number of months equal to the number of months by which the Initial Term is less than fifteen (15) years counting back from the end of the as-amended Initial Term. By way of illustration only, if the fifteen (15)-year anniversary of the Service Commencement Date is September 1, 2035, but the Parties are required to amend this Agreement such that the Initial Term expires on June 1, 2035, then the adjustments required by the preceding sentence shall be made in each of March, April and May, 2035.

    (iii)    The adjustments to the Fixed Fee and the Incentive Fee provided in subsection (b)(ii) shall not apply if the Initial Term is subsequently extended as provided in this subsection (b)(iii) to the term provided in Section 2.3(a) (*Term - Initial Term*). If the Initial Term has been shortened as provided in subsection (b)(ii), the Initial Term shall automatically be extended to the term provided in Section 2.3(a) (*Term - Initial Term*) upon receipt by the Parties, at the expense of Owner or Administrator, of (A) an opinion of Sargent and Lundy or other nationally recognized engineering firm acceptable to the Parties, which sets forth, among other things, the reasonably expected weighted average economic life of the T&D System as of the date of that opinion, (B) an opinion of Nixon Peabody LLP as counsel to the FOMB or other nationally recognized tax counsel reasonably acceptable to Administrator, providing that the extension of the term of this Agreement to the original Initial Term does not adversely affect the exclusion from gross income of interest on tax-exempt obligations of the Owner, its Affiliates or another

CONFIDENTIAL

Governmental Body for federal income tax purposes under Section 103 of the Internal Revenue Code, and (C) a Reliance Letter from such tax counsel accompanying the opinion described in clause (B).

(c)      PREB Actions. The Parties hereby acknowledge and agree that to the extent PREB (i) is not permitted under Applicable Law to carry out its rights, duties and obligations under this Agreement ("PREB Actions"), all of which PREB is deemed to have acknowledged by delivery of the Energy Compliance Certificate, or (ii) ceases to be an entity of the government of the Commonwealth, the related PREB Actions shall automatically become the rights, duties and obligations of Administrator. In the event that such PREB Actions become the rights, duties and obligations of Administrator, Administrator shall exercise such rights, duties and obligations (x) taking into account the standards, processes and procedures previously used by PREB with respect to the PREB Actions, (y) in a manner that does not adversely affect the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code and (z) taking into account any obligations under Section 10.1 of Act 120, to the extent applicable.

CONFIDENTIAL

# ARTICLE 4
# FRONT-END TRANSITION PERIOD

**Section 4.1    Front-End Transition Period Generally**.

(a)    <u>Role of ManagementCo</u>. Throughout the Front-End Transition Period, ManagementCo shall not provide the O&M Services or otherwise be responsible for the T&D System, but shall, subject to and conditioned upon Owner providing funding pursuant to Section 4.6(b) (*Front-End Transition Period Compensation – Front-End Transition Service Fee*), solely provide the Front-End Transition Services as described in the front-end transition plan set forth in Annex II (*Front-End Transition Plan*) (the "<u>Front-End Transition Plan</u>"). The Front-End Transition Services are intended to ensure an orderly transition of the responsibility for the management, operation, maintenance, repairs, restoration and replacement of the T&D System to Operator by the Target Service Commencement Date, without disruption of customer service and business continuity, and shall be provided in a manner consistent with the Front-End Transition Plan and Applicable Law.

(b)    <u>Owner and Administrator Cooperation</u>. Each of Owner and Administrator shall take all such actions as may be reasonably necessary to enable or assist ManagementCo in providing the Front-End Transition Services, including (i) providing ManagementCo's Representatives with a designated space and facilities at Owner's principal offices for their use throughout the Front-End Transition Period, (ii) allowing access, during normal business or operational hours (as may be applicable and relevant) and at such other times as are required, to Owner's premises for the purpose of providing the Front-End Transition Services, (iii) cooperating with and assisting, and causing its Representatives to cooperate with and assist, ManagementCo in its performance of the Front-End Transition Services and its efforts to timely satisfy the ManagementCo Service Commencement Date Conditions and (iv) encouraging and facilitating a positive and cooperative working relationship with respect to the implementation and completion of the Front-End Transition Plan and the performance of the Front-End Transition Services.

(c)    <u>Administrative Expense Treatment</u>.

(i)    No later than ten (10) Business Days after the Effective Date, Owner shall file a motion with the Title III Court seeking administrative expense treatment for any accrued and unpaid amounts required to be paid by Owner under this Agreement during the Front-End Transition Period, including the Front-End Transition Service Fee.

(ii)    ManagementCo shall have the right to terminate this Agreement upon not less than thirty (30) days' prior written notice to Administrator (with a copy to PREB) (A) if such motion has not been approved by the Title III Court on or before the date that is ninety (90) days following the date on which such motion is filed, which ninety (90) day period may be extended for an additional forty-five (45) days by Administrator at its sole discretion, or such later date as the Administrator and ManagementCo may agree or (B) if such approval has been reversed on appeal.

(iii)    In the event of the termination of this Agreement pursuant to this Section 4.1(c) (*Front-End Transition Period Generally – Administrative Expense Treatment*),

CONFIDENTIAL

ManagementCo shall retain any Front-End Transition Service Fee earned as of the effective date of such termination, and shall within five (5) Business Days of the effective date of such termination, return to Administrator any amounts held in the Front-End Transition Account in excess of any earned Front-End Transition Service Fee. This Agreement (other than with respect to the aforementioned payment obligations and any limitations on liability set out elsewhere in this Agreement, each of which shall continue in effect) shall thereafter become void and have no effect, without any liability on the part of any Party or its Affiliates or Representatives in respect thereof, except that nothing herein shall relieve any party from liability that cannot be waived as a matter of Applicable Law, claims of fraud or intentional breach or misrepresentation; provided that, in any such event, the limitations of liability specified in this Agreement (including Section 14.6(d) (*Remedies Upon Early Termination – Additional Remedies*), Section 18.3(a) (*Limitation on Liability – Operator General Limitations*) and Section 18.3(b) (*Limitation on Liability – Gross Negligence; Willful Misconduct*)) shall, notwithstanding the foregoing, continue to apply. Furthermore, the remedies provided in this Section 4.1(c) (*Front-End Transition Period Generally – Administrative Expense Treatment*) shall be the sole and exclusive remedies of the Parties for any termination of this Agreement pursuant Section 4.1(c) (*Front-End Transition Period Generally – Administrative Expense Treatment*).

(d)      Transition to Standard of Performance.

(i)      The Parties acknowledge and agree that (A) certain components of the T&D System and the manner in which the T&D System is operated do not currently meet the standards of performance required under this Agreement, including the fact that certain matters related to the T&D System or T&D System Sites and certain general operating and administrative practices may not comply with Contract Standards, and (B) a period of review, planning, remediation, repair and replacement will be required to enable Operator to achieve the Contract Standards.

(ii)      In light of such circumstances, promptly (and in any event within thirty (30) days) following the Effective Date, the Parties shall establish a planning team composed of representatives of each of the Parties, and ManagementCo, with input from such team, shall (A) review the current state of the T&D System, including the control, monitoring and information equipment, systems, practices, services (including related hardware, Information Systems and Software) and general operating and administrative practices used in connection therewith, (B) develop a plan (taking into account the Capital Budgets and any Federally Funded Capital Improvements) to remediate, repair, replace and stabilize such equipment, systems, practices and services, as may be needed, to enable Operator to perform the O&M Services in compliance with the Contract Standards as soon as reasonably possible and at a reasonable cost to Owner (such plan, the "System Remediation Plan") and (C) submit such System Remediation Plan to Administrator for its review and approval, acting reasonably. The System Remediation Plan shall detail the scope, resources, timelines, milestones, costs estimates and achievement criteria for each activity or project required to enable Operator to perform the O&M Services in compliance with Contract Standards, including the deadlines by which each such activity or project shall be fully implemented. The Parties acknowledge and agree that any prior studies or reports of Owner relating to the remediation, repair, replacement and stabilization of the T&D System may be considered for purposes of preparing the System Remediation Plan, but the findings of such studies or reports shall not limit the Parties' discretion to develop the System Remediation Plan.

CONFIDENTIAL

(iii)     Within thirty (30) days following its receipt of such proposed System Remediation Plan, Administrator, acting reasonably, shall provide ManagementCo comments on the appropriateness of the proposed System Remediation Plan and recommend any changes or modifications it believes are necessary or appropriate. If Administrator does not respond within such thirty (30) day period, Administrator shall be deemed to have no objection to such proposed System Remediation Plan being submitted by ManagementCo to PREB. The Parties agree that, within thirty (30) days following receipt of Administrator's comments, if any, or the end of Administrator's review period described in the immediately preceding sentence, if Administrator has no comments, Operator shall submit for PREB's review the proposed System Remediation Plan, incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as ManagementCo shall reasonably deem appropriate in its sole discretion. PREB shall review and approve, deny or propose modifications to the proposed System Remediation Plan. Operator shall be required to respond promptly to any changes or modifications from PREB to the System Remediation Plan and submit any updates to the proposed System Remediation Plan to PREB for its approval. If PREB does not respond within ninety (90) days after receipt of the proposed System Remediation Plan or any update thereto, ManagementCo may proceed for purposes of this Agreement as if PREB had approved such System Remediation Plan.

(iv)     The Budgets, including the Initial Budgets, and the Performance Metrics, each as amended and approved from time to time, shall include the costs and expenses required by, and associated with, the preparation and implementation of the System Remediation Plan.

(e)     Federal Funding Procurement Manual.

(i)     Promptly (and in any event within sixty (60) days) following the Effective Date, the Parties shall establish a planning team composed of representatives of each of the Parties and COR3, and ManagementCo, with input from such team, shall prepare a manual that describes (i) the procurement guidelines to be applied to, and contractual provisions to be included in, any contract involving Federal Funding and (ii) procedures for contract administration and oversight, including standards and methods for (A) addressing employee and organization conflicts of interest, (B) avoiding acquisition of unnecessary or duplicative items, (C) granting awards to responsible contractors, (D) maintaining records of procurement history, (E) managing time-and-materials contracts, (F) resolving disputes, (G) selecting transactions for procurement, (H) conducting technical evaluations and (I) if an Emergency Event relates, or could potentially relate, to an event that may be or has been declared a Declared Emergency or Major Disaster, seeking to ensure that any response to such Emergency Event complies with the Federal Funding Requirements (such manual, the "Federal Funding Procurement Manual"). The Parties shall update the Federal Funding Procurement Manual in accordance with Section 5.9(d) (*Procurement and Administration of Federal Funding – Federal Funding Procurement Manual*) to reflect any changes in Applicable Law that affect Federal Funding.

(ii)     Upon ManagementCo finalizing the Federal Funding Procurement Manual, ManagementCo shall submit such Federal Funding Procurement Manual to Administrator. Administrator, acting reasonably, shall provide ManagementCo comments on the appropriateness of the proposed Federal Funding Procurement Manual and recommend any

CONFIDENTIAL

changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Federal Funding Procurement Manual, if Administrator has no comments, ManagementCo shall submit to COR3 for its review and approval the revised Federal Funding Procurement Manual, incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as ManagementCo shall reasonably deem appropriate in its sole discretion.

    (f)    <u>Non-Federal Funding Procurement Manual</u>.

    (i)    Promptly (and in any event within sixty (60) days) following the Effective Date, the Parties shall establish a planning team composed of representatives of each of the Parties, and ManagementCo, with input from such team, shall prepare a manual that describes (i) the procurement guidelines to be applied to, and contractual provisions to be included in, any contract for a Non-Federally Funded Capital Improvement and (ii) procedures for contract administration and oversight, including standards and methods for (A) addressing employee and organization conflicts of interest, (B) avoiding acquisition of unnecessary or duplicative items, (C) granting awards to responsible contractors, (D) maintaining records of procurement history, (E) managing time-and-materials contracts, (F) resolving disputes, (G) selecting transactions for procurement and (H) conducting technical evaluations (such manual, the "<u>Non-Federal Funding Procurement Manual</u>"). The Parties shall update the Non-Federal Funding Procurement Manual as necessary to reflect any changes in Applicable Law that affect Non-Federally Funded Capital Improvements.

    (ii)    Upon ManagementCo finalizing the Non-Federal Funding Procurement Manual, ManagementCo shall submit such Non-Federal Funding Procurement Manual to Administrator for its review and approval. Administrator, acting reasonably, shall provide ManagementCo comments on the appropriateness of the proposed Non-Federal Funding Procurement Manual and recommend any changes or modifications it believes are necessary or appropriate. Within thirty (30) days following receipt of Administrator's comments, if any, or the end of forty-five (45) days following Administrator's receipt of the proposed Non-Federal Funding Procurement Manual, if Administrator has no comments, ManagementCo shall submit to Administrator for its review and approval the revised Non-Federal Funding Procurement Manual, incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as ManagementCo shall reasonably deem appropriate in its sole discretion.

    (g)    <u>Liability Waiver</u>. In connection with the submission of the Initial Budgets to PREB, the Parties agree to apply for inclusion in the Rate Order that the associated tariff or terms of service include: (i) a waiver of Owner's, ManagementCo's and ServCo's liability to customers or any Person receiving Power and Electricity for any Losses arising in any way out of or in connection with the operation of the T&D System and the provision of Power and Electricity including any events of interrupted, irregular or defective electric service due to Force Majeure Events, other causes beyond Owner's, ManagementCo's or ServCo's control or ordinary negligence, gross negligence or willful misconduct of Owner, ManagementCo or ServCo, or their respective employees, agents or contractors; and (ii) a waiver in all cases of responsibility for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential

damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by any of Owner's, ManagementCo's or ServCo's ordinary negligence, gross negligence or willful misconduct (collectively the "Liability Waiver").

      (h)    System Operation Principles. Promptly (and in any event within sixty (60) days) following the Effective Date, the Parties shall establish a planning team composed of representatives of each of the Parties, and ManagementCo, with input from such team, shall (i) prepare principles related to the dispatch of Power and Electricity (such principles, the "System Operation Principles"), which principles shall be generally consistent with those set forth in Schedule 1 (*System Operation Principles*) to Annex I (*Scope of Services*), and (ii) submit such proposed System Operation Principles to Administrator for its review and approval. Within thirty (30) days following its receipt of such proposed System Operation Principles, Administrator, acting reasonably, shall provide ManagementCo comments on the appropriateness of the proposed System Operation Principles and recommend any changes or modifications it believes are necessary or appropriate. If Administrator does not respond within such thirty (30) day period, Administrator shall be deemed to have no objection to such proposed System Operation Principles being submitted by ManagementCo to PREB. The Parties agree that, within thirty (30) days following receipt of Administrator's comments, if any, or the end of Administrator's review period described in the immediately preceding sentence, if Administrator has no comments, Operator shall submit for PREB's review the proposed System Operation Principles, incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as ManagementCo shall reasonably deem appropriate in its sole discretion. PREB shall review and approve, deny or propose modifications to the proposed System Operation Principles. ManagementCo shall be required to respond promptly to any changes or modifications from PREB to the proposed System Operation Principles and submit any updates to the proposed System Operation Principles to PREB for its approval. If PREB does not respond within ninety (90) days after receipt of the proposed System Operation Principles or any update thereto, ManagementCo may proceed for purposes of this Agreement as if PREB had approved such proposed System Operation Principles. The System Operation Principles shall be subject to further review and update pursuant to Section 5.13(c) (*Generation-Related Services – Review of System Operation Principles*).

    **Section 4.2**    **ManagementCo Responsibilities**. As soon as practicable after the Effective Date but in any event prior to the Target Service Commencement Date (subject to Owner and Administrator complying with their obligations set forth in Section 4.3 (*Owner and Administrator Responsibilities*)), ManagementCo shall satisfy the following conditions precedent to (i) Owner's obligations to handover to Operator the O&M Services and other rights and responsibilities with respect to the T&D System pursuant to Section 4.7(b) (*Closing the Front-End Transition Period – Establishment of Service Commencement Date*) and (ii) the occurrence of the Service Commencement Date:

      (a)    Front-End Transition Plan. ManagementCo shall carry out and complete ManagementCo's obligations in the Front-End Transition Plan, and shall provide or Subcontract for all management, technical, administrative, engineering, labor relations and other personnel necessary in connection therewith.

CONFIDENTIAL

(b)    Handover Checklist. On or prior to the tenth (10th) day of each month, ManagementCo shall provide Administrator (with copy to PREB) written monthly reports with respect to ManagementCo's performance of the Front-End Transition Services, including a copy of the Handover Checklist updated to reflect the progress of each item listed therein. From time to time during the Front-End Transition Period, in light of experience developed up to such point in the Front-End Transition Period, the Handover Checklist shall be adjusted, updated or otherwise modified by ManagementCo and Administrator, each acting reasonably, as necessary to reflect such experience.

(c)    Confirmation of Guarantee. ManagementCo shall execute and deliver a confirmation to Administrator that the Guarantee remains in full force and effect.

(d)    Required Insurance. ManagementCo shall submit to Administrator certificates of insurance for all Required Insurance to be effective as of the Service Commencement Date.

(e)    Initial Budgets. As soon as practicable following the Effective Date, ManagementCo shall prepare and submit to Administrator the proposed Initial Budgets; provided that for purposes of the Generation Budget, ManagementCo shall only be required to submit (if received by ManagementCo) the Generation Budget as prepared by Owner and delivered to ManagementCo by Owner. ManagementCo shall have a reasonable time to review such Generation Budget prior to completing and submitting the balance of the Initial Budgets to Administrator hereunder. Within thirty (30) days following its receipt of such proposed Initial Budgets, Administrator, acting reasonably, shall provide ManagementCo comments on the appropriateness of the proposed Initial Budgets and recommend any changes or modifications it believes are necessary or appropriate. If Administrator does not respond within such thirty (30) day period, Administrator shall be deemed to have no objection to such proposed Initial Budgets being submitted by ManagementCo to PREB. The Parties agree that, within thirty (30) days following receipt of Administrator's comments, if any, or the end of Administrator's review period described in the immediately preceding sentence, if Administrator has no comments, Operator shall submit for PREB's review the revised Initial Budgets, incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as ManagementCo shall reasonably deem appropriate in its sole discretion. PREB shall review, and approve, deny or propose modifications to, such proposed Initial Budgets in accordance with Applicable Law. ManagementCo shall be required to respond promptly to any changes or modifications from PREB to the proposed Initial Budgets and submit any updates to the proposed Initial Budgets to PREB for its approval. If PREB does not respond within ninety (90) days after receipt of the proposed Initial Budgets or any update thereto, ManagementCo may proceed for purposes of this Agreement as if PREB had approved such proposed Initial Budgets.

(f)    Performance Metrics. Promptly (and in any event within sixty (60) days) following the Effective Date, the Parties shall establish a planning team composed of representatives of each of the Parties, and ManagementCo, with input from such team, shall prepare a revised Annex IX (Performance Metrics), including (i) proposed baseline, target and minimum performance levels for certain Performance Metrics, (ii) Key Performance Metrics and (iii) Major Outage Event Performance Metrics, together with an explanation of the basis for each

CONFIDENTIAL

of the foregoing. ManagementCo shall submit to Administrator the proposed revised Performance Metrics and, within thirty (30) days following its receipt of such proposed revised Annex IX (*Performance Metrics*), Administrator, acting reasonably, shall provide ManagementCo comments on the appropriateness of the proposed Annex IX (*Performance Metrics*) and recommend any changes or modifications it believes are necessary or appropriate. If Administrator does not respond within such thirty (30) day period, Administrator shall be deemed to have no objection to such proposed revised Annex IX (*Performance Metrics*) being submitted by ManagementCo to PREB. The Parties agree that, within thirty (30) days following receipt of Administrator's comments, if any, or the end of Administrator's review period described in the immediately preceding sentence, if Administrator has no comments, Operator shall submit for PREB's review the proposed revised Annex IX (*Performance Metrics*), incorporating or rejecting any of the modifications or changes suggested by Administrator, together with an explanation of any of Administrator's comments, as ManagementCo shall reasonably deem appropriate in its sole discretion. PREB shall review, and approve, deny or propose modifications to, such proposed revised Annex IX (*Performance Metrics*) in accordance with Applicable Law. ManagementCo shall be required to respond promptly to any changes or modifications from PREB to the proposed revised Annex IX (*Performance Metrics*) and submit any updates to the proposed revised Annex IX (*Performance Metrics*)to PREB for its approval. If PREB does not respond within ninety (90) days after receipt of the proposed revised Annex IX (*Performance Metrics*) or any update thereto, ManagementCo may proceed for purposes of this Agreement as if PREB had approved such proposed revised Annex IX (*Performance Metrics*). The illustrative Performance Metrics, as identified in Annex IX (*Performance Metrics*) shall be revised and replaced accordingly on, or prior to, the Service Commencement Date

       (g)      Emergency Response Plan. Operator shall provide Administrator and PREB, for their information, with a plan of action meeting Contract Standards that takes effect from the Service Commencement Date and outlines the procedures and actions necessary for responding to any emergency affecting or reasonably likely to affect the T&D System after the Service Commencement Date (the "Emergency Response Plan"), including fire, weather, environmental, health, safety and other potential emergency conditions, which Emergency Response Plan shall become effective on the Service Commencement Date. The Emergency Response Plan shall (i) provide for appropriate notice of any such emergency to PREB and all other Governmental Bodies that ManagementCo is notified in writing have jurisdiction over the T&D System, (ii) establish measures that facilitate coordinated emergency response actions by all appropriate Governmental Bodies, (iii) specifically include outage minimization and response measures, and (iv) assure the timely availability of all personnel required to respond to any emergency in accordance with (A) Contract Standards and (B) the Federal Funding Procurement Manual if the Emergency Event relates, or could potentially relate, to an event that may be or has been declared a Declared Emergency or Major Disaster. Such Emergency Response Plan shall be updated by Operator from time to time as necessary or appropriate.

       (h)      Physical Security Plan, Data Security Plan and Vegetation Management Plan. ManagementCo shall develop and provide Administrator and PREB, for their information, with plans of action meeting Contract Standards that outline the procedures and actions necessary for maintaining (i) the physical security of the T&D System after the Service Commencement Date (the "Physical Security Plan"); (ii) data security, cyber security and information security relating

CONFIDENTIAL

to the T&D System (the "<u>Data Security Plan</u>"); and (iii) a comprehensive vegetation management program (the "<u>Vegetation Management Plan</u>"), each of which shall become effective on the Service Commencement Date; <u>provided</u> that as long as each of the Physical Security Plan, Data Security Plan, and Vegetation Management Plan are substantially complete on the Service Commencement Date, their finalization shall not delay the Service Commencement Date from occurring if all other Service Commencement Date Conditions have been satisfied or waived. For the avoidance of doubt, the Data Security Plan shall be subject to the System Remediation Plan, including the approach for implementation outlined in Section 4.1(d) (*Front-End Transition Period Generally – Transition to Standard of Performance*).

(i)      <u>Back-End Transition Plan</u>. ManagementCo shall prepare and submit to Administrator (with copy to PREB), for its information and approval, a detailed back-end transition plan consistent with the back-end transition outline set forth in Annex III (*Back-End Transition Plan*), which plan shall: (i) include reasonably acceptable arrangements relating to the (A) possible hiring of ServCo Employees by a successor operator and (B) the treatment of severance costs associated with any ServCo Employees not hired by a successor operator in connection with the early termination or expiration of this Agreement; and (ii) provide for the transition and handover of the O&M Services and other rights and responsibilities with respect to the T&D System, back to Owner or to a successor operator upon the expiration or early termination of the Term (the "<u>Back-End Transition Plan</u>"), which Back-End Transition Plan shall become effective on the Service Commencement Date. Such Back-End Transition Plan shall be updated by Operator, subject to approval by Administrator, on an annual basis as necessary or appropriate.

(j)      <u>Employment Evaluations</u>. As soon as reasonably practicable following the Effective Date but not less than ninety (90) days prior to the Target Service Commencement Date (the "<u>Interview Deadline</u>"), ManagementCo shall use commercially reasonable efforts to interview and evaluate as candidates for employment at ServCo, effective as of the Service Commencement Date, the regular employees of Owner and its Affiliates (other than Owner's generation employees, including certain administrative and plant operations personnel) who (i) are currently and remain employed by Owner and its Affiliates (other than Owner or its Affiliates generation station employees) as of the Interview Deadline or are hired by Owner or its Affiliates on or after the Effective Date in the ordinary course of business consistent with the past practices of Owner and its Affiliates to replace any existing employee of Owner, and (ii) apply to ServCo in a job category ServCo wishes to fill (collectively, the "<u>Owner Employees</u>"). For the avoidance of doubt, neither ManagementCo nor ServCo shall be liable for severance or other pay or benefits for Owner Employees who are not hired by ServCo, including those to whom an offer of employment is made but who do not accept such offer. Owner and its Affiliates shall waive any non-competition, confidentiality or other obligation arising under any employment contract between Owner or Affiliate and any Owner Employee that may otherwise restrict any of Owner Employee's rights to be employed by ServCo. Owner shall provide ManagementCo with the following information regarding Owner Employees promptly on request: (x) job description for current and any prior positions occupied by such Owner Employee, (y) date of employment and (z) current salary.

(k)      <u>Employment Offers</u>. ServCo shall give priority in hiring to any Owner Employees who meet Operator's stated requirements for employment as set forth in Annex IV (*Operator Employment Requirements*) over other equally qualified and equally evaluated applicants for the same job category that are not Owner Employees, it being understood that (i)

CONFIDENTIAL

ServCo shall not be required to hire all or substantially all of the Owner Employees and (ii) the determination of which Owner Employees to hire shall be made by ServCo in ServCo's sole discretion, acting in good faith. Each Owner Employee who accepts an offer of employment with ServCo pursuant to this Section 4.2(k) (*ManagementCo Responsibilities – Employment Offers*) shall be referred to as a "<u>Hired Former Employee of Owner</u>." On the Service Commencement Date and during the Term, ServCo shall employ such other employees, including any employees of Operator or any of its Affiliates as of the Effective Date hired for the operation of the T&D System ("<u>Other Employees</u>" and, together with the Hired Former Employees of Owner, the "<u>ServCo Employees</u>"), as are necessary to provide the O&M Services. The following initial terms and conditions of employment shall apply to the Hired Former Employees of Owner, but not to any Other Employees:

(i)    Offers of employment shall remain open for a period of ten (10) Business Days. Any such offer which is accepted within such ten (10) Business Day period shall thereafter be irrevocable until the Service Commencement Date.

(ii)    Offers of employment shall provide for employment with ServCo on terms and conditions that are set at ServCo's sole discretion, but shall in all cases provide for (A) a base salary or regular hourly wage rate at least equal to the base salary or wage rate provided by Owner or its Affiliates (as applicable) to the Owner Employee immediately prior to the Service Commencement Date and (B) the employee fringe benefits established in Act 26, and (C) any other benefits required to be offered to Owner Employees pursuant to Act 120, as any such benefits may have been restricted, conditioned, modified or annulled by Act 3, Act 26 and Act 66.

(l)    <u>Periodic Reports</u>.

(i)    ManagementCo shall provide Administrator (with copy to PREB) with detailed weekly, monthly and other periodic reports as Administrator may reasonably request from time to time with respect to ManagementCo's performance of the Front-End Transition Services, including the progress against the Handover Checklist and any other completion schedules and milestones included in the Front-End Transition Plan. In connection therewith, ManagementCo shall provide Administrator (with copy to PREB) with any other information that (A) Administrator may reasonably request, including performance reports related to any of the Front-End Transition Services, and (B) may be reasonably produced from records maintained by ManagementCo in the normal course of business consistent with the provisions of this Agreement relating to document retention.

(ii)    ManagementCo shall promptly advise Administrator (with copy to PREB) of any actual or potential failure or inability to achieve milestones by the dates set forth in the Front-End Transition Plan, and shall promptly report to Administrator (with copy to PREB) any problems encountered in performing the Front-End Transition Services that ManagementCo has been unable to promptly and adequately resolve.

(m)    <u>Representations</u>. The representations of Operator set forth in Section 19.2 (*Representations and Warranties of Operator*) and Guarantor(s) set forth in its Guarantee shall be true and correct in all material respects as of the Service Commencement Date (other than any representations that are expressly made as of an earlier date), as if made on and as of the Service

CONFIDENTIAL

Commencement Date, and both Operator and Guarantor(s) shall deliver to Administrator a certificate of an authorized officer to that effect.

(n)     Notice of Default. ManagementCo shall provide to Administrator, promptly following the receipt thereof, copies of any notice of default, breach or noncompliance received under or in connection with any Governmental Approvals, if any, or Subcontract pertaining to the Front-End Transition Period.

**Section 4.3    Owner and Administrator Responsibilities**. As soon as practicable after the Effective Date but in any event prior to the Target Service Commencement Date and at such time and in such manner as to permit Operator to perform its obligations under Section 4.2 (*ManagementCo Responsibilities*), Owner and Administrator shall, at Owner's sole cost, satisfy the following conditions precedent (i) to Operator's obligations to take over the O&M Services and other rights and responsibilities with respect to the T&D System pursuant to Section 4.7(b) (*Closing the Front-End Transition Period – Establishment of Service Commencement Date*) and (ii) to the occurrence of the Service Commencement Date:

(a)     Representations. The representations of Owner set forth in Section 19.1 (*Representations and Warranties of Owner*) shall be true and correct in all material respects as of the Service Commencement Date as if made on and as of the Service Commencement Date (other than any representations that are expressly made as of an earlier date), and Owner shall deliver to ManagementCo a certificate of an authorized officer to that effect.

(b)     Access. Owner shall provide ManagementCo, its Front-End Subcontractors and their Representatives with access to the T&D System and the T&D System Sites for the sole purpose of performing the Front-End Transition Services in accordance with the terms hereof.

(c)     Identification of System Contracts and Generation Supply Contracts. From and after the Effective Date, but in any event by the date that is one hundred eighty (180) days following the Effective Date, ManagementCo, Administrator and Owner shall together (i) identify all material existing System Contracts and all Generation Supply Contracts and provide ManagementCo and Administrator with copies thereof and (ii) identify which of the material existing System Contracts and Generation Supply Contracts do not comply with the Federal Funding Requirements and provide ManagementCo and Administrator with a list thereof.

(d)     Additional System Contracts and Generation Supply Contracts Between Effective Date and Service Commencement Date. During the Front-End Transition Period, the Parties agree that it is the intent that Owner and Administrator shall not amend or enter into any new System Contracts or Generation Supply Contracts; provided, however, that:

(i)     prior to the date ManagementCo submits the Initial Budgets to PREB for its approval, if Owner and Administrator identify a need to do so, then Administrator shall notify ManagementCo of such need and work with ManagementCo to implement any such amendment or new System Contract or Generation Supply Contract. Following such consultation process, Administrator shall ultimately determine if such amendment or new System Contract or Generation Supply Contract is required;

CONFIDENTIAL

(ii)      after the date ManagementCo submits the Initial Budgets to PREB for its approval, if Owner and Administrator determine that an amendment or new System Contract or Generation Supply Contract is necessary, the Parties shall follow the process in clause (i) above; provided that as part of such consultation process (A) the Parties shall review the impact of any such amendment or new System Contract and Generation Supply Contract on the Initial Budgets and (B) ManagementCo shall, as soon as practicable following receipt of Owner's notice of such requirement, prepare and submit to Administrator any proposed amendment to the Initial Budgets arising therefrom. Following delivery of such proposed amendment, the Parties shall follow the same process for such amendment to the Initial Budget that was followed for the Initial Budgets as set out in Section 4.2(e) (*ManagementCo Responsibilities – Initial Budgets*); and

(iii)      a Tax Opinion and a Reliance Letter shall have been obtained, at the expense of Owner or Administrator, with respect to any System Contract that is a Covered Contract and is entered into, extended or amended after the Effective Date. Owner shall promptly deliver to Operator a copy of each executed System Contract entered into pursuant to clauses (i) and (ii) above.

(e)      Notices with respect to System Contracts and Generation Supply Contracts. Owner shall (i) notify each counterparty to a System Contract and Generation Supply Contract in writing of Owner's delegation of authority to Operator with respect to such System Contract in the manner contemplated by Section 5.2(a) (*System Contracts – Generally*) and with respect to such Generation Supply Contract in the manner contemplated by Section 5.13(a) (*Generation-Related Services – Power Supply Dispatch and Management*) and (ii) have obtained all required consents from such counterparties as may be required thereby in connection with such delegation of authority and (iii) take all such other actions as may be necessary for Operator to be able to comply with its obligations under Section 5.2(a) (*System Contracts – Generally*) and Section 5.13 (*Generation-Related Services*).

(f)      Review of Initial Budgets. Administrator, on behalf of Owner, shall review and, if applicable, provide comments on the Initial Budgets in the manner contemplated by Section 4.2(e) (*ManagementCo Responsibilities – Initial Budgets*).

(g)      Front-End Transition Plan. Owner and Administrator shall perform all obligations of Owner and Administrator specified in the Front-End Transition Plan.

(h)      Labor. Owner and Administrator shall use commercially reasonable efforts to provide Operator the opportunity to hire Owner Employees in a manner consistent with the Proposal submitted by Operator or its Affiliate.

(i)      Service Accounts. Owner shall provide evidence satisfactory to ManagementCo that it has opened the Service Accounts and that each Service Account shall have been funded by such date and in an amount not less than the amount required to be funded in accordance with Section 7.5 (*Service Accounts*).

(j)      Federal Funding and Integrated Resource Plan Uncertainty. Owner acknowledges and agrees that details regarding (i) the nature and scope of Federal Funding potentially available for the T&D System and the availability of such Federal Funding to

CONFIDENTIAL

implement the System Remediation Plan, and (ii) the status of the Integrated Resource Plan and its potential effects on the T&D System or the O&M Services, remain uncertain. In light of such uncertainty, promptly (and in any event within thirty (30) days) following the Effective Date, the Parties shall establish a planning team composed of representatives of each of the Parties and COR3 to: (A) review the current status of the Federal Funding, including project worksheets related to the T&D System prepared by FEMA in connection with or pursuant to Section 428 of the Stafford Act and estimated timing and schedules of Federal Funding to implement the System Remediation Plan and develop a plan (taking into account the System Remediation Plan) to utilize Federal Funding in the most efficient and effective way to enable Operator to perform the O&M Services in compliance with this Agreement, and (B) review the current status of the Integrated Resource Plan and its impact on the T&D System and the O&M Services. ManagementCo, acting reasonably, may request, to the extent permitted under Applicable Law, changes or modifications to the Federal Funding (including modifications to, or reallocations between, the project worksheets related to the T&D System prepared by FEMA pursuant to Section 428 of the Stafford Act) or the Integrated Resource Plan.

(k)      <u>Description and Demarcation of the T&D System and Insurance Specifications</u>. Owner shall prepare and provide Operator a description and demarcation of the T&D System. The Parties will jointly consider any amendments, adjustments and refinements to Annex XII (*Insurance Specifications*) in light of the description and demarcation of the T&D System.

**Section 4.4    Governmental Approvals and Tax Matters**.

(a)      <u>Generally</u>. The Parties intend that all Governmental Approvals shall continue to name Owner as the permittee or applicant and that Operator shall only be a permittee, applicant, co-permittee or co-applicant if and to the extent required by Applicable Law. Promptly following the Effective Date, ManagementCo, Administrator and Owner shall coordinate identifying the Governmental Approvals required for the commencement on the Service Commencement Date of the O&M Services (the "<u>Commencement Date Governmental Approvals</u>"). Once the Parties have identified the Commencement Date Governmental Approvals: (i) (A) ManagementCo shall coordinate with Owner and Administrator to prepare for and support Owner's efforts related to the transfer or assignment, to the extent required by Applicable Law, or the reissuance or assistance with the issuance of the Commencement Date Governmental Approvals, (B) Owner, with Operator's assistance, shall submit complete applications and take all other steps necessary under Applicable Law to obtain and maintain all required Commencement Date Governmental Approvals, and (C) Owner shall provide ManagementCo and Administrator with copies of any such Commencement Date Governmental Approvals; and (ii) ManagementCo and Administrator shall cooperate with Owner in good faith in identifying, preparing, applying for, obtaining and maintaining the Commencement Date Governmental Approvals.

(b)      <u>Tax Assurance</u>. From and after the Effective Date, the Parties agree that (i) Operator shall seek a Tax Assurance and (ii) at Operator's expense, Owner and Administrator shall cooperate with Operator and use their commercially reasonable efforts to support and assist Operator in securing such Tax Assurance.

CONFIDENTIAL

**Section 4.5    Conditions Precedent to Service Commencement Date**. The Service Commencement Date shall not occur, and the obligations of the Parties to proceed with their respective obligations hereunder on, and after, the Service Commencement Date shall not commence, until all of the following conditions precedent (the "Service Commencement Date Conditions") are, unless otherwise mutually agreed between the Parties in writing, either satisfied as determined, or waived in writing, by (i) Administrator, in the case of Section 4.5(a) (*Conditions Precedent to Service Commencement Date – ManagementCo Responsibilities*), (ii) ManagementCo, in the case of Section 4.5(b) (*Conditions Precedent to Service Commencement Date – Owner and Administrator Responsibilities*), or (iii) both Administrator and ManagementCo, in the case of Section 4.5(c) (*Conditions Precedent to Service Commencement Date – Governmental Approvals*), Section 4.5(d) (*Conditions Precedent to Service Commencement Date – Acceptability and Effectiveness of Documents*), Section 4.5(e) (*Conditions Precedent to Service Commencement Date – No Governmental Prohibitions or Injunctions*), Section 4.5(f) (*Conditions Precedent to Service Commencement Date – Pre-Existing Environmental Conditions*), Section 4.5(g) (*Conditions Precedent to Service Commencement Date – Initial Budgets and Rate Order*), Section 4.5(h) (*Conditions Precedent to Service Commencement Date – Performance Metrics*), Section 4.5(i) (*Conditions Precedent to Service Commencement Date – Federal Funding*), Section 4.5(j) (*Conditions Precedent to Service Commencement Date – Federal Funding Procurement Manual*), Section 4.5(k) (*Conditions Precedent to Service Commencement Date – System Remediation Plan*), Section 4.5(l) (*Conditions Precedent to Service Commencement Date – System Operation Principles*), Section 4.5(m) (*Conditions Precedent to Service Commencement Date – Servicing Contract*), Section 4.5(n) (*Conditions Precedent to Service Commencement Date – Account Structure*), Section 4.5(o) (*Conditions Precedent to Service Commencement Date – Title III Approvals*), Section 4.5(p) (*Conditions Precedent to Service Commencement Date – Third Party Claims*), Section 4.5(q) (*Conditions Precedent to Service Commencement Date – PREPA Reorganization*), Section 4.5(s) (*Conditions Precedent to Service Commencement Date – Shared Services Agreement*), Section 4.5(t) (*Conditions Precedent to Service Commencement Date – Tax Matters*), Section 4.5(u) (*Conditions Precedent to Service Commencement Date – FOMB Protocol Agreement*) and Section 4.5(v) (*Conditions Precedent to Service Commencement Date – Tax Opinion*).

(a)    Managementco Responsibilities. ManagementCo shall have fulfilled all of its obligations with respect to the Front-End Transition Period under this Agreement, including Section 4.2 (*ManagementCo Responsibilities*) (the "ManagementCo Service Commencement Date Conditions").

(b)    Owner and Administrator Responsibilities. Owner and Administrator shall have fulfilled all of their respective obligations with respect to the Front-End Transition Period under this Agreement, including Section 4.3 (*Owner and Administrator Responsibilities*) (the "Owner Service Commencement Date Conditions").

(c)    Governmental Approvals. All Commencement Date Governmental Approvals shall have been issued or obtained by the Parties and shall be in full force and effect.

(d)    Acceptability and Effectiveness of Documents. All of the documents and instruments identified in this Article 4 (*Front-End Transition Period*) shall be in form and

CONFIDENTIAL

substance reasonably satisfactory to Administrator and ManagementCo and shall be valid, in full force and effect and enforceable against each party thereto on the Service Commencement Date. No such document, instrument or agreement shall be subject to the satisfaction of any outstanding condition precedent except those expressly waived in writing or to be satisfied after the Service Commencement Date. No party to any such document, instrument or agreement shall have repudiated or be in default thereunder, and each Party shall have received such certificates or other evidence reasonably satisfactory to it of such facts as such Party shall have reasonably requested.

(e)     No Governmental Prohibitions or Injunctions. No Governmental Body shall have enacted, issued, promulgated or enforced any Applicable Law that shall be in effect, and no injunction shall be in effect, which, in each case, would make it illegal for, or otherwise prohibit or enjoin, any Party's performance of its obligations hereunder in accordance with the terms of this Agreement from and after the Service Commencement Date.

(f)     Pre-Existing Environmental Conditions. Owner shall have engaged a qualified environmental consultant, and such consultant shall have prepared and issued a final baseline environmental study reasonably identifying Pre-Existing Environmental Conditions that present a risk of material liability (the "Baseline Environmental Study").

(g)     Initial Budgets and Rate Order. The Initial Budgets (including any amendment thereto pursuant to Section 4.3(d)(ii) (*Owner and Administrator Responsibilities – Additional System Contracts and Generation Supply Contracts Between Effective Date and Service Commencement Date*)) shall have been approved by PREB or otherwise finalized for purposes of this Agreement in accordance with Section 4.2(e) (*ManagementCo Responsibilities – Initial Budgets*) and PREB shall have issued a Rate Order sufficient to fund the Initial Budgets.

(h)     Performance Metrics. The proposed revised Annex IX (*Performance Metrics*) pursuant to Section 4.2(f) (*ManagementCo Responsibilities – Performance Metrics*) shall have been approved by PREB or otherwise finalized for purposes of this Agreement in accordance with Section 4.2(f) (*ManagementCo Responsibilities – Performance Metrics*).

(i)     Federal Funding. Owner shall have, or shall have access to, adequate funding for Capital Costs for the first three (3) years of the Term, as such Capital Costs are detailed in the Initial Budgets approved by the Parties.

(j)     Federal Funding Procurement Manual. The Parties shall have finalized a mutually agreeable Federal Funding Procurement Manual, and COR3 shall have approved the Federal Funding Procurement Manual. The Parties shall have requested review and approval of the Federal Funding Procurement manual from FEMA and DHS OIG.

(k)     System Remediation Plan. The System Remediation Plan shall have been approved by PREB or otherwise finalized for purposes of this Agreement in accordance with Section 4.1(d)(iii) (*Front-End Transition Period Generally – Transition to Standard of Performance*).

CONFIDENTIAL

(l)    <u>System Operation Principles</u>. The System Operation Principles shall have been approved by PREB or otherwise finalized for purposes of this Agreement in accordance with Section 4.1(h) (*Front-End Transition Period Generally – System Operation Principles*).

(m)    <u>Servicing Contract</u>. In the event a Title III Plan has been confirmed providing for the Securitization SPV to issue new secured debt, Owner shall have received a copy of the Servicing Contract, duly executed by Operator.

(n)    <u>Account Structure</u>. Consistent with the terms of either the Cash Management Agreement or the Servicing Contract, as applicable, Owner and Operator shall have agreed on the manner in which System Revenues will be allocated into one or more accounts of Owner to be managed by Operator.

(o)    <u>Title III Approvals</u>. Owner shall have received Title III Approvals from the Title III Court reasonably acceptable to ManagementCo.

(p)    <u>Third Party Claims</u>. A Liability Waiver generally consistent with Section 4.1(g) (*Front-End Transition Period Generally – Liability Waiver*) shall have been approved and implemented by PREB and shall be in full force and effect.

(q)    <u>PREPA Reorganization</u>. A final plan for the reorganization of PREPA into GenCo and GridCo shall have been approved by the applicable Governmental Bodies, and the GridCo-GenCo PPOA shall have become effective.

(r)    [Reserved.]

(s)    <u>Shared Services Agreement</u>. The Parties shall mutually develop and negotiate in good faith a shared services agreement consistent with the provisions set forth in Annex VI (*GenCo Shared Services*) (the "<u>Shared Services Agreement</u>"), which agreement shall provide the terms and conditions pursuant to which Operator, as agent of Owner, shall provide the GenCo Shared Services to GenCo until the Legacy Generation Assets are retired or until certain of GenCo's operations, including the operating, administrative and/or maintenance functions related to the Legacy Generation Assets, are transferred to one or more private partners, the term of which agreement not to exceed three (3) years from its effective date (unless otherwise extended with the consent of Operator).

(t)    <u>Tax Matters</u>. The Puerto Rico Treasury Department shall have issued one of the following (each a "<u>Tax Assurance</u>"):

(i)    Operator and the Secretary of the Puerto Rico Treasury Department shall have entered into a closing agreement in form and substance satisfactory to Operator, acting reasonably, executed pursuant to Section 6051.07 of the PRIRC among Operator, the Equity Participants and the Puerto Rico Treasury Department that (A) incorporates all matters set forth in administrative determination No. 20-06 issued by the Secretary of the Puerto Rico Treasury Department (the "<u>Administrative Determination</u>") that are applicable to Operator and the Equity Participants and (B) provides that (x) the Front-End Transition Service Fixed Fee, the Service Fee and the Back-End Transition Service Fee are treated in the same manner as management fees are

CONFIDENTIAL

treated under Section III(A) of the Administrative Determination and (y) the Operator Termination Fee is treated in the same manner as termination payments are treated under Section III(A) of the Administrative Determination; or

(ii)     Operator shall have received a private letter ruling in form and substance satisfactory to Operator, acting reasonably, from the Puerto Rico Treasury Department that (A) incorporates all matters set forth in the Administrative Determination that are applicable to Operator and the Equity Participants and (B) provides that (x) the Front-End Transition Service Fixed Fee, the Service Fee and the Back-End Transition Service Fee are treated in the same manner as management fees are treated under Section III(A) of the Administrative Determination and (y) the Operator Termination Fee is treated in the same manner as termination payments are treated under Section III(A) of the Administrative Determination.

(u)     FOMB Protocol Agreement. Each of Operator, Owner, Administrator and the FOMB shall have duly executed a FOMB Protocol Agreement in form and substance satisfactory to the Parties.

(v)     Tax Opinion. At the expense of Owner or Administrator, Owner shall have caused (i) Owner to have received a Tax Opinion and (ii) ManagementCo to have received a Reliance Letter, including by having caused all conditions to the delivery of such Tax Opinion and Reliance Letter to have been met.

### Section 4.6     Front-End Transition Period Compensation.

(a)     General. As compensation for the Front-End Transition Services provided by ManagementCo, Owner shall pay ManagementCo the Front-End Transition Service Fee. The Parties acknowledge and agree that Federal Funding shall not be used to pay the Front-End Transition Service Fee. The Front-End Transition Service Fee shall not be subject to any abatement, deduction, counterclaim or set-off of any kind or nature.

(b)     Front-End Transition Service Fee. The "Front-End Transition Service Fee" shall be an aggregate amount equal to: (i) the hourly fully allocated cost rate for each category of ManagementCo employee or Affiliate personnel providing Front-End Transition Services, as set out in Annex V (*Front-End Transition Hourly Fully Allocated Rates*); *multiplied by* (ii) the number of hours worked by each ManagementCo employee or Affiliate personnel in such category providing Front-End Transition Services; *plus* (iii) a fixed fee in the amount of US$60,000,000 (the "Front-End Transition Service Fixed Fee") (payable in monthly installments equal to one-twelfth (1/12) of the Front-End Transition Service Fixed Fee, commencing on the Effective Date, and in the event of a partial month, the monthly installment shall be adjusted on a Pro Rata basis; provided that: (A) in the event the first month is a partial month, then any balance of the Front-End Transition Service Fixed Fee outstanding in the twelfth month shall be paid with the last installment of the Front-End Transition Service Fixed Fee; and (B) if the Service Commencement Date occurs prior to the expiration of the twelfth (12th) month following the Effective Date, then any balance of the Front-End Transition Service Fixed Fee then outstanding shall be paid in full to Operator on the Service Commencement Date); *plus* (iv) all other reasonable and documented costs and expenses incurred by ManagementCo (without markup for profit) that are necessary and reasonable in the course of providing the Front-End Transition Services and satisfying the Service

CONFIDENTIAL

Commencement Date Conditions, including the cost of any Front-End Subcontractors providing Front-End Transition Services.

    (c)    <u>Funding</u>.

    (i)    Owner shall establish one or more accounts from which Owner shall draw funds from time to time to pay Operator the Front-End Transition Service Fee (collectively, the "<u>Front-End Transition Account</u>"). Promptly after the Effective Date (and in any event within five (5) Business Days), Operator shall deliver to Administrator an estimate of the anticipated Front-End Transition Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*). Within ten (10) days of delivery of such estimate, and prior to and as a condition to the commencement of any Front-End Transition Services, Administrator shall provide Operator evidence reasonably satisfactory to Operator that an amount equal to the sum of the anticipated Front-End Transition Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), has been funded in the Front-End Transition Account by Owner. Prior to the end of each month during the Front-End Transition Period, Operator shall deliver to Administrator an estimate of the anticipated Front-End Transition Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*). No later than the tenth (10th) Business Day of each month during the Front-End Transition Period, Owner shall replenish the Front-End Transition Account so as to maintain a balance in the Front-End Transition Account at the end of each calendar month equal to the sum of the anticipated Front-End Transition Service Fee for the subsequent four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), and so on subsequently until the Front-End Transition Services conclude.

    (ii)    In the event a Dispute arises between Operator and Administrator in connection with Operator's estimate of the anticipated Front-End Transition Service Fee, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "<u>Front-End Transition Service Fee Estimate Dispute</u>").

    (d)    <u>Invoices</u>.

    (i)    On or prior to the tenth (10th) day of each month during which Operator is performing the Front-End Transition Services, Operator shall provide Administrator with a monthly invoice describing in reasonable detail the prior calendar month's Front-End Transition Services and the corresponding Front-End Transition Service Fee for such prior calendar month. All invoices shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*).

    (ii)    Operator shall provide promptly to Administrator such additional supporting documentation evidencing the provision of the Front-End Transition Services, if any, and the calculation of the Front-End Transition Service Fee related thereto as Administrator may reasonably request and as may be required by Applicable Law. Administrator shall promptly advise Operator of any disputed invoice amounts, and all such disputes which Operator and Administrator are unable to resolve shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "<u>Front-End Transition Service Fee Dispute</u>").

(iii)    Payments of undisputed amounts under any invoice shall be due within thirty (30) days of Administrator's receipt of such invoice.

(e)    Audits. At any time and from time to time during and until the expiration of six (6) years following the end of the Front-End Transition Period, Administrator may, upon reasonable prior notice, Audit (or cause to be Audited) the books and records of Operator or any Subcontractor in connection with any requests for payment of the Front-End Transition Service Fee, together with the supporting vouchers and statements, and the calculation of the Front-End Transition Service Fee. Subject to the dispute resolution provisions in Article 15 (*Dispute Resolution*), each payment made by Owner hereunder shall be subject to subsequent adjustment. Following the determination that any such payment adjustment is required, the Party required to make payment shall do so within thirty (30) days of the date of such determination.

### Section 4.7    Closing the Front-End Transition Period.

(a)    Notice of Service Commencement Date. ManagementCo shall provide Administrator with prompt written notice (with a copy to PREB), including a completed Handover Checklist, at such time as ManagementCo determines it has satisfactorily completed all items on the Handover Checklist and is therefore ready to perform all O&M Services under this Agreement. Administrator shall respond within ten (10) Business Days whether Administrator confirms or disputes the completion of any item on the Handover Checklist, together with a written statement providing reasonable detail and supporting evidence for the basis of any dispute. In the event Administrator disputes completion of any item(s) on the Handover Checklist, ManagementCo may advise Owner of its disagreement with Administrator's decision. The Parties shall attempt to resolve in good faith any disputed item(s) and, in the event the Parties are unable to resolve such disputed item(s) within thirty (30) days, such disputed item(s) only shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Handover Checklist Dispute").

(b)    Establishment of Service Commencement Date. The "Service Commencement Date" shall be the date on which a handover to Operator of the O&M Services occurs, which shall be (i) the first (1st) Business Day of a calendar month that is at least three (3) Business Days following the date on which Administrator delivers a certificate to Operator confirming that all Service Commencement Date Conditions have been met or (ii) such other date as the Parties may agree. The satisfaction or waiver of all the Service Commencement Date Conditions is required for the achievement of the Service Commencement Date.

### Section 4.8    Failure of Service Commencement Date Conditions.

(a)    Remedy for Delay of Service Commencement Date Conditions. If any of the ManagementCo Service Commencement Date Conditions are not satisfied or waived by Administrator on or before the date that is three (3) months following the Target Service Commencement Date or such later date as Administrator and ManagementCo may agree (such date, the "Delay Period Date"), and the failure to satisfy any outstanding ManagementCo Service Commencement Date Condition(s) is not caused by any Force Majeure Event or Owner Fault, and the other Service Commencement Date Conditions have been or are immediately capable of being satisfied or waived by the Delay Period Date, ManagementCo shall pay to Owner, as Owner's sole

CONFIDENTIAL

and exclusive remedy for all monetary damages, costs, losses and expenses of whatever type or nature arising from or related to such failure of ManagementCo Service Commencement Date Conditions to occur by the Delay Period Date, liquidated damages (the "Delay Liquidated Damages") in the amount of US$769,231 per week for each week (or for any portion of a week on a Pro Rata basis) the Target Service Commencement Date is delayed beyond the Delay Period Date, up to a maximum of US$40,000,000. ManagementCo shall not be required to pay Delay Liquidated Damages after the earlier of (i) the date on which the ManagementCo Service Commencement Date Conditions are satisfied by ManagementCo or waived by Administrator or (ii) the date of termination of this Agreement pursuant to Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*); provided that ManagementCo shall pay any accrued and unpaid Delay Liquidated Damages as of such earlier date. It is understood and agreed by the Parties that if any of the ManagementCo Service Commencement Date Conditions are not satisfied or waived by the Delay Period Date, Owner's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly, the payment provided for in this Section 4.8(a) (*Failure of Service Commencement Date Conditions – Remedy for Delay of Service Commencement Date Conditions*) is a payment of liquidated damages (and not penalties), which is based on the Parties' estimate of damages Owner would suffer or incur. ManagementCo hereby irrevocably waives any right it may have to raise as a defense that the Delay Liquidated Damages are excessive or punitive.

(b) Termination for Failure of Service Commencement Date Conditions.

(i) Administrator shall have the right, subject to approval by PREB, to terminate this Agreement upon not less than thirty (30) days' prior written notice to ManagementCo if all of the Owner Service Commencement Date Conditions are satisfied but any of the ManagementCo Service Commencement Date Conditions are not satisfied by ManagementCo or waived by Administrator (unless such failure to satisfy the ManagementCo Service Commencement Date Conditions is the result of the acts, omissions or breach of Owner) by the date that is six (6) months following the Target Service Commencement Date or such later date as Administrator and ManagementCo may agree.

(ii) ManagementCo shall have the right to terminate this Agreement upon not less than thirty (30) days' prior written notice to Administrator (with copy to PREB) if all of the ManagementCo Service Commencement Date Conditions are satisfied but any of the Owner Service Commencement Date Conditions are not satisfied by Owner or waived by Operator (unless such failure to satisfy the Owner Service Commencement Date Conditions is the result of the acts, omissions or breach of Operator) by the date that is six (6) months following the Target Service Commencement Date or such later date as Administrator and ManagementCo may agree.

(iii) Each of Administrator and ManagementCo shall have the right to terminate this Agreement upon not less than thirty (30) days' prior written notice to Operator or Administrator (with copy to PREB), respectively, if any of the Service Commencement Date Conditions (other than those referred to in Section 4.8(b)(i) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) and Section 4.8(b)(ii) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*)) are not satisfied or waived by each of Administrator

CONFIDENTIAL

and Operator by the date that is nine (9) months following the Target Service Commencement Date or such later date as Administrator and ManagementCo may agree.

(iv)     Notwithstanding anything to the contrary in this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), if the Service Commencement Date Conditions are satisfied or waived prior to any such termination right being exercised, then neither Administrator nor Operator shall have the right to terminate this Agreement pursuant to this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*).

(v)     In the event of the termination of this Agreement pursuant to this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), (A) ManagementCo shall retain any Front-End Transition Service Fee earned as of the effective date of such termination, and shall within five (5) Business Days of the effective date of such termination, return to Administrator any amounts held in the Front-End Transition Account in excess of any earned Front-End Transition Service Fee and (B) ManagementCo shall pay any accrued and unpaid Delay Liquidated Damages as of the effective date of such termination. This Agreement (other than with respect to the aforementioned payment obligations and any limitations on liability set out elsewhere in this Agreement, each of which shall continue in effect) shall thereafter become void and have no effect, without any liability on the part of any Party or its Affiliates or Representatives in respect thereof, except that nothing herein shall relieve any party from liability that cannot be waived as a matter of Applicable Law, claims of fraud or intentional breach or misrepresentation; provided that, in any such event, the limitations of liability specified in this Agreement (including Section 14.6(d) (*Remedies Upon Early Termination – Additional Remedies*), Section 18.3(a) (*Limitation on Liability – Operator General Limitations*) and Section 18.3(b) (*Limitation on Liability – Gross Negligence; Willful Misconduct*)) shall, notwithstanding the foregoing, continue to apply.  Furthermore, the remedies provided in this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) shall be the sole and exclusive remedies of the Parties for any termination of this Agreement pursuant to Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*).

(vi)     In addition to and notwithstanding anything to the contrary in this Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), in the event this Agreement is terminated prior to the Service Commencement Date other than as a result of the acts, omissions or breach of Operator, (A) any balance of the Front-End Transition Service Fixed Fee then outstanding shall be deemed to have been earned and shall be paid in full to ManagementCo and (B) ManagementCo shall be reimbursed for any reasonable and documented costs and expenses incurred by ManagementCo (without markup for profit) that are necessary and reasonable in the course of terminating the activities undertaken in connection with the Front-End Transition Services, including reasonable and documented breakage fees for Front-End Subcontractors providing Front-End Transition Services.

CONFIDENTIAL

(c)       Effect of Force Majeure Events or Owner Fault. The dates in Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) shall each be extended on a day-for-day basis for the period of any Force Majeure Event or any Owner Fault (except in the case of clauses (ii) and (iii) of Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), in which case Owner shall not receive any such extension where the delay is caused by any Owner Fault).

### Section 4.9       Subcontractors During the Front-End Transition Period.

(a)       General. ManagementCo shall have the right to engage Subcontractors to perform certain Front-End Transition Services (the "Front-End Subcontractors"); provided that Subcontracts related to the provision of any Front-End Transition Services that are eligible for reimbursement with Federal Funding, if any, shall comply with the Federal Funding Requirements, including any competitive bidding processes required for the award of any such Subcontracts. Operator shall provide Administrator (with copy to PREB) with a list of Front-End Subcontractors that Operator has engaged or intends to engage for the performance of any of the Front-End Transition Services in excess of US$250,000 (each, a "Material Front-End Subcontractor"). Administrator shall have the right to approve any Material Front-End Subcontractor engaged by ManagementCo, which approval shall not be unreasonably withheld, delayed or conditioned. If Administrator does not respond to Operator within ten (10) Business Days after being notified of Operator's engagement or intention to engage a Front-End Subcontractor, Administrator shall be deemed to have no objection to the engagement of such Front-End Subcontractor.

(b)       Identification. Promptly following the Effective Date, as part of its Subcontractor background checks, ManagementCo shall provide Administrator all information requested by Administrator, to the extent reasonably available to ManagementCo, pertaining to the proposed Front-End Subcontractors in the following areas: (i) any conflicts of interest, (ii) any record of felony criminal convictions or pending felony criminal investigations and (iii) any final judicial or administrative finding or adjudication of non-performance of contracts with Owner or Administrator, in each case, to the knowledge of ManagementCo. In addition, to the extent any conflicts of interest may be identified, ManagementCo, Owner and Administrator shall cooperate in good faith to avoid, mitigate and neutralize any such conflicts.

(c)       Approval. If a proposed Material Front-End Subcontractor is approved for the Front-End Transition Period, such Subcontractor shall be deemed to be approved for the specified categories of potential work for the duration of the Front-End Transition Period, unless Administrator otherwise notifies ManagementCo. Subject to the foregoing, the approval or rejection by Administrator of any proposed Material Front-End Subcontractor shall not create any liability of Owner or Administrator to ManagementCo, such Material Front-End Subcontractor, any third-parties or otherwise. When engaging Front-End Subcontractors, ManagementCo shall not be relieved from its responsibility under this Agreement and liability for any error, fault or inconsistency in the provisions of the Front-End Transition Services hereunder. All such subcontracts shall be subject to Applicable Law and shall be assignable to Owner at Administrator's sole discretion following termination of this Agreement. All Front-End Subcontractors shall be required to furnish a Sworn Statement.

Case: 25-3607 Document: 31 Filed: 09/18/2025 Page: 69 Date Filed: 09/18/2025 Entry Desc: 6770995
Case: 17-04780-LTS Doc#:3584-3 Filed 09/18/25 Entered 09/18/25 26:30:11 Desc

Exhibit B-OMA   Page 69 of 337

     (d)    <u>Affiliate Personnel</u>. ManagementCo shall have the right to use personnel from its Affiliates to perform the Front-End Transition Services at the hourly fully allocated cost rate for each category of Affiliate personnel providing Front-End Transition Services, as set out in Annex V (*Front-End Transition Hourly Fully Allocated Rates*).

CONFIDENTIAL

# ARTICLE 5
## O&M SERVICES

**Section 5.1     Services Generally**. Commencing on the Service Commencement Date, and in exchange for Owner's payment to Operator of all amounts owing to Operator under this Agreement, Operator shall (i) provide management, operation, maintenance, repair, restoration and replacement and other related services for the T&D System, in each case that are customary and appropriate for a utility transmission and distribution system service provider, including the services set forth in this Article 5 (*O&M Services*) (excluding the GenCo Shared Services) and Annex I (*Scope of Services*), and (ii) establish policies, programs and procedures with respect thereto (all such services, the "O&M Services"), in each case, in accordance with the Contract Standards. It is the Parties' intent that except for the rights and responsibilities reserved to Owner and Administrator as set forth in Article 6 (*Rights and Responsibilities of Owner and Administrator*) or as may otherwise be expressly provided in this Agreement, Operator shall (A) be entitled to exercise all of the rights and perform the responsibilities of Owner in providing the O&M Services, and (B) have the autonomy and responsibility to operate and maintain the T&D System and establish the related plans, policies, procedures and programs with respect thereto as provided in this Agreement. The Parties acknowledge that Operator's obligations to provide O&M Services under this Agreement are subject to the System Remediation Plan.

**Section 5.2     System Contracts**.

(a)     <u>Generally</u>. Operator, as agent for and on behalf of Owner, shall administer and perform System Contracts and Owner's payment obligations thereunder, which shall be an expense that is paid by Operator as a T&D Pass-Through Expenditure. Notwithstanding the foregoing, (i) Operator shall administer and perform Owner's rights and obligations under such System Contracts in such a manner so as not to expand or increase the liabilities assumed by Owner thereunder, other than with respect to an amendment, renewal or expansion of existing System Contracts as required to provide the O&M Services hereunder, and in compliance with the requirements described in the Federal Funding Procurement Manual to the extent such System Contract involves Federal Funding, and (ii) Owner shall administer and perform any rights and obligations under such System Contracts to the extent that Applicable Law requires Owner's performance of such functions or Applicable Law or such System Contract prohibits Owner from delegating such functions. Owner hereby authorizes Operator to enforce Owner's rights under any such System Contracts.

(b)     <u>Agent Designation</u>. Owner hereby designates and appoints Operator as its agent, and Operator hereby accepts such designation and appointment, for the purpose of entering into System Contracts on behalf of and for the account of Owner, as may be necessary or appropriate to operate and maintain the T&D System and to make such additions and extensions thereto in accordance with the terms of this Agreement.

(c)     <u>Powers</u>. In such capacity as Owner's designated agent pursuant to Section 5.2(b) (*System Contracts – Agent Designation*), Operator shall have full power and authority to act on Owner's behalf and to legally bind Owner, subject, in each case, to (i) Operator's action in such regard being consistent with Prudent Utility Practice and (ii) Owner's rights and responsibilities provided in Section 6.1 (*Rights and Responsibilities of Owner*) and the

CONFIDENTIAL

other terms of this Agreement. Operator and Owner shall promptly implement such policies and procedures as may be necessary or appropriate to effect the activities contemplated by this Section 5.2 (*System Contracts*) and to separately identify and segregate the equipment, material, supplies and services that Operator is purchasing as agent of Owner from those Operator (or its Affiliates) may be purchasing for its own or another Person's account. Where necessary or required by a Governmental Body or Person, Operator and Owner shall execute and deliver such instruments, agreements, certificates or other evidence confirming Operator's designation, appointment and authority to act as Owner's agent as provide in this Section 5.2 (*System Contracts*).

(d)  Additional System Contracts or Expired System Contracts After Service Commencement Date. After the Service Commencement Date, if any System Contracts are required: (i) for the operation and maintenance of the T&D System, to deliver services to T&D Customers or to comply with the provisions of this Agreement or Contract Standards or (ii) to replace any existing System Contract that has expired or has been terminated, then, in each case, Operator shall be responsible for obtaining such System Contract in Owner's name and on Owner's behalf; provided that any new or replacement System Contract that provides for payments in excess of US$10,000,000 in any Contract Year or US$30,000,000 in the aggregate (each a "Material System Contract") shall be subject to approval by Administrator, such approval not be unreasonably withheld, delayed or conditioned, following which such proposed System Contract shall be executed by Owner; provided further that a Tax Opinion and a Reliance Letter shall have been obtained, at the expense of Owner or Administrator, with respect to any new, extended, amended or replacement System Contract that is a Covered Contract. Operator shall ensure that any System Contract involving Federal Funding and obtained in Owner's name and on Owner's behalf under this Section 5.2(d) (*System Contracts – Additional System Contracts or Expired System Contracts After Service Commencement Date*) complies with the Federal Funding Requirements, including the Federal Funding Procurement Manual.

(e)  Reporting Obligations. Operator shall on or about the fifth (5th) Business Day of each Contract Year provide to Administrator a report documenting each Material System Contract, Material Contractor and Material Subcontractor, which report shall include the name of the third-party, the term, if applicable, of the System Contract, Contract or Subcontract, a description of the services or goods to be procured and the estimated amount payable thereunder.

(f)  Conditions on Term. Any System Contract entered into by Operator on behalf of Owner in connection with the O&M Services, including contracts with Subcontractors, shall, unless otherwise approved in writing by Administrator, such approval not to be unreasonably withheld, delayed or conditioned, either (i) be for a term that is no longer than the Term or (ii) provide that such contract is terminable at will (subject to any notice requirements) without cost or penalty.

## Section 5.3  Billing and Collection.

(a)  Generally. Operator shall perform all billing and collection services for the T&D System in accordance with the Contract Standards, including the requirements set forth in Annex I (*Scope of Services*).

CONFIDENTIAL

(b) <u>Collection of Charges</u>. All funds received by Operator from billing and collection services hereunder shall be deposited on the same day as receipt in one or more bank accounts designated by Administrator. Any funds received after 4:00 p.m. on any given day or on a day that is not a Business Day shall be deposited at the opening of business on the immediately following Business Day. All such funds and any revenues generated by the T&D System are and shall remain the property of Owner at all times (subject only to Liens on System Revenues specified in the Title III Plan and the related disclosure statements).

(c) <u>Enforcement of Collections</u>. Owner and Administrator shall cooperate with Operator and use commercially reasonable efforts to take all actions requested by Operator in all collection matters and, to the extent Applicable Law does not permit delegation thereof to Operator, shall exercise its statutory powers pertaining to any and all remedies granted to it under Applicable Law for purposes of collection, including the imposition of interest and penalties on unpaid charges and the termination of services. Subject to Applicable Law, Operator may suspend or terminate services to any customer of the T&D System who has failed to comply with its obligations to pay the established rates in accordance with their terms, including suspensions provided for under Regulation 8818 of September 27, 2016 (*Reglamento Sobre la Contribucion en Lugar de Impuestos (CELI)*).

(d) <u>Servicing Contract</u>. Operator shall at all times conduct the billing and collection services in compliance with the terms of any Servicing Contract then in effect. In the event of any conflict or issue of interpretation between such Servicing Contract and this Agreement in connection with Operator's obligations for billing and collection services, the Servicing Contract shall prevail over this Agreement.

**Section 5.4 System Remediation**. Operator shall implement the System Remediation Plan in accordance with such plan. All costs associated with the implementation of the System Remediation Plan, and the activities and projects thereunder, shall be T&D Pass-Through Expenditures. Notwithstanding any provision to the contrary herein: (i) Operator shall perform the O&M Services in accordance with Contract Standards, taking into account the implementation of the System Remediation Plan and the characteristics of the T&D System at a particular time, and (ii) under no circumstances shall Operator be held responsible hereunder for the performance of any commercially available third-party control, monitoring or information equipment, systems or services (including, related hardware and Software), to the extent any Losses result from any defect therein. Any amendments to the System Remediation Plan approved by PREB or otherwise finalized in accordance with Section 4.1(d)(iii) (*Front-End Transition Period Generally – Transition to Standard of Performance*) shall be subject to approval by PREB.

**Section 5.5 Capital Improvements**.

(a) <u>Generally</u>. Subject to Section 4.1(c) (*Front-End Transition Period Generally – Transition to Standard of Performance*), Operator shall:

(i) recommend (A) Federally Funded Capital Improvements in compliance with Obligated projects, (B) Non-Federally Funded Capital Improvements and (C) capital projects related to new generation in accordance with the Integrated Resource Plan;

(ii) monitor the approved annual Capital Budget – Federally Funded and Capital Budget – Non-Federally Funded;

(iii) prepare risk assessments and analyses in support of prioritization and planning for Capital Improvements and other capital projects, which shall take into account the Integrated Resource Plan, load and energy forecasts, fuel price and quantity forecasting, long and short range system plans, and proposed annual operating and maintenance plan (and which assessments and analyses PREB may request from time to time);

(iv) prepare long and short range transmission and distribution planning analyses and forecasts to determine the need for Federally Funded Capital Improvements and Non-Federally Funded Capital Improvements, including the introduction of smart grid and other emerging technologies and project management services to ensure the technical performance and reliability of the T&D System, which shall take into account the Integrated Resource Plan to the extent applicable (and which analyses and forecasts PREB may request from time to time);

(v) prepare analyses and forecasts to determine the need for generation-related capital projects, if applicable, in accordance with Section 5.13(d) (*Generation-Related Services – Procurement of Generation Projects and Generation Supply Contracts*) and the Shared Services Agreement, including the need for Owner to enter into new Generation Supply Contracts; and

(vi) perform and supervise Capital Improvements, including engineering and related design and construction management services.

(b) Federal Funding Eligibility. Owner shall notify Operator in writing of any Capital Improvements that may be eligible for Federal Funding. In such case, Owner and Operator shall cooperate with each other to address and comply with federal agency requirements, including any requirements set forth in the Federal Funding Procurement Manual (all such requirements, the "Federal Funding Requirements"), so as not to jeopardize the T&D System's eligibility to receive Federal Funding. Such cooperation shall include Owner (i) providing Operator with such documents and information it requests with respect to the Federal Funding Requirements, (ii) sharing with Operator any specific requirements imposed by the relevant funding agency to maintain eligibility to receive Federal Funding and (iii) making requests to such federal agencies to review Owner and Operator's systems and plans to comply with Federal Funding Requirements.

(c) Capital Asset Control. In each Contract Year, Operator shall conduct a review of the Capital Improvements made in the prior Contract Year. Such review shall measure the accuracy of the plant records, maps and maintenance databases concerning capital assets. Operator shall also conduct a physical inventory of all capital assets from time to time in accordance with the Contract Standards. Operator shall provide the results of each such review to Owner and Administrator promptly following the completion of such reviews.

(d) Option to Propose Operator-Owned Capital Improvements. Operator may from time to time during the Term propose to PREB certain Capital Improvements that would be made, owned and funded by Operator or its designated Affiliate; provided, however, that (i) the costs and expenses relating to any such Capital Improvements shall not be considered, or otherwise

CONFIDENTIAL

treated as, T&D Pass Through Expenditures and (ii) no such Capital Improvements shall be made that would in any manner jeopardize the exclusion from gross income of interest on Owner's or its Affiliates' obligations under the Internal Revenue Code. Operator shall provide PREB, with copy to Administrator, with a description of the Operator-owned Capital Improvement in sufficient detail to enable PREB to make a fully informed assessment and analysis thereof; provided that any such proposal shall contemplate Operator having the opportunity to earn a reasonable rate of return thereon consistent with the returns permitted to be earned by companies operating in the United States electric transmission and distribution business on similar investments. Any such proposed Capital Improvement shall be subject to review, and approval or rejection, by PREB in accordance with Applicable Law and shall be accompanied by an opinion of tax counsel to Administrator providing that such Capital Improvement shall not adversely affect the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code. In reviewing any such proposed Capital Improvement, PREB may request additional information or reports from Operator, and may require that any such proposed Capital Improvement be presented as part of a rate review proceeding. The inclusion of the provisions of this Section 5.5(d) (*Capital Improvements – Option to Propose Operator-Owned Capital Improvements*) shall in no way constitute an obligation by any of PREB, Owner or Administrator to agree to or pursue any Operator-owned Capital Improvement or require Owner or Administrator to pay for or reimburse the cost or expenses of pursuing any proposed Operator-owned Capital Improvement or an obligation of Operator to propose or pursue any Operator-owned Capital Improvement.

**Section 5.6     System Regulatory Matters.**

(a)     General. From the Service Commencement Date and during the duration of the Term thereafter, Operator shall function as agent of Owner, and Owner hereby irrevocably authorizes Operator to (i) represent Owner before PREB with respect to any matter related to the performance of any of the O&M Services provided by Operator under this Agreement, (ii) prepare all related filings and other submissions before PREB and (iii) represent Owner before any Governmental Body and any other similar industry or regulatory institutions or organizations having regulatory jurisdiction.

(b)     Applications and Submittals. Operator, as agent of Owner, shall make all filings and applications and submit all reports necessary to obtain and maintain all Governmental Approvals in the name of Owner or, if required by Applicable Law, Operator. Owner and Administrator shall cooperate with Operator in fulfilling such obligations, including by promptly (and in any event within thirty (30) days) providing any necessary information to Operator and making all such filings and applications and submitting such reports requested by Operator in cases where Applicable Law does not permit Operator to do so. With respect to Governmental Approvals that are obtained or maintained in the name of Owner, Operator shall: (i) prepare the application and develop and furnish all necessary supporting material, data and information that may be required; (ii) familiarize itself with the terms and conditions of such Governmental Approvals; (iii) attend all meetings and hearings required to obtain such approvals; and (iv) take all other action necessary or otherwise reasonably requested by Administrator in order to assist and support Owner in obtaining, maintaining, renewing, extending and complying, as may be relevant, with the terms of such Governmental Approvals. Operator shall agree to be named as a co-permittee on any Governmental Approval if so required by the issuing Governmental Body.

(c)     Data and Information. All data and information required to be supplied and actions required to be taken in connection with the Governmental Approvals required for the O&M Services shall be supplied and taken by Operator on a timely basis considering the requirements of Applicable Law, the System Remediation Plan and the responsibilities of Owner as the legal and beneficial owner of the T&D System. The data and information supplied by Operator (as agent for Owner) to Owner, Administrator and all regulatory agencies in connection therewith shall be correct and complete in all material respects; provided, however, that Operator shall be entitled to rely upon, and shall not be liable for, any such data and information derived from or comprising data and information supplied by or on behalf of Owner or Administrator. For the avoidance of doubt, the requirement that all data and information supplied by Operator be correct shall be subject to the System Remediation Plan, including the process for implementation outlined in Section 4.1(d) (*Front-End Transition Period Generally – Transition to Standard of Performance*); provided that Operator shall nevertheless be required to identify to Owner any known material inaccuracies in the information supplied to Owner at the time such information is provided.

(d)     Non-Compliance and Enforcement. Operator shall, subject to the System Remediation Plan, report to Administrator in writing, as soon as possible upon obtaining actual knowledge thereof (but in no event more than forty-eight (48) hours (or such shorter period within which notice is required to be given to a Governmental Body under Applicable Law) after obtaining such knowledge), all material violations of the terms and conditions of any Governmental Approval.

(e)     Reports to Governmental Bodies. Operator, as agent for Owner and subject to the System Remediation Plan, shall prepare all periodic and annual reports, make all information submittals and provide, on a timely basis, all notices to all Governmental Bodies required by all Governmental Approvals and under Applicable Law with respect to the T&D System; provided, however, that Operator shall be entitled to rely upon, and shall not be liable for, any such data and information derived from or comprising data and information supplied by or on behalf of Owner or Administrator or from errors or omissions in such information. Such reports shall contain all information required by the Governmental Body and may be substantially similar or identical to comparable reports previously prepared for Administrator if such are acceptable to the Governmental Body.

(f)     Integrated Resource Plan. From time to time, or as otherwise required by Applicable Law or ordered by PREB, Operator, as agent for Owner, shall prepare a proposed Integrated Resource Plan for review and approval by PREB. PREB shall review, and approve, deny or propose modifications to, such proposed Integrated Resource Plan. The proposed Integrated Resource Plan shall comply with all Applicable Law requirements. The proposed Integrated Resource Plan shall be designed in accordance with Applicable Law and in a manner to ensure that, if approved by PREB and subject to the assumptions specified therein, Operator is able to provide safe and adequate transmission and distribution service at the lowest reasonable rates consistent with budgetary and T&D System requirements, and with sound fiscal operating practices.

(g)     PREB Rate Proceedings. From time to time, or as otherwise required by Applicable Law or ordered by PREB, Operator may apply to PREB to request that a change in customer rates or charges be made, which, if approved by PREB pursuant to Applicable Law, may

CONFIDENTIAL

result in a change in customer rates or charges consistent with the scope of PREB's approval. Any such application shall be prepared and undertaken in accordance with the relevant requirements set forth under Applicable Law. Each of Owner and Administrator shall support Operator's proposed rate changes to ensure that adequate amounts are available for inclusion in any Budget and provided that the rates are reasonable and customary. Each of Operator, Owner and Administrator shall abide by any rate order reflecting determinations and directives of, and requirements established by, PREB through its review of such application and the rate review proceeding (a "Rate Order"). Any Budget submitted by Operator to Administrator and approved by Administrator in accordance with Section 7.3(a) (*Budgets – Generally*), shall be consistent with any then-current Rate Order.

       (h)      <u>Authority to Adjust Rates</u>. Nothing in this Agreement is intended to, nor shall it in any way, impair or restrict PREB's right to approve final rates and charges to T&D Customers in accordance with Applicable Law.

       (i)      <u>Temporary Rate</u>. In the event that Operator files a rate modification request, PREB shall exercise its discretion in establishing a temporary rate as provided for in Section 6.25(d) of Act 57 or any other Applicable Law.

### Section 5.7    Safety and Security.

       (a)      <u>Safety</u>. Consistent with the Contract Standards, Operator shall: (i) take all reasonable precautions for the health and safety of, and provide all reasonable protection to prevent physical damage, bodily injury or loss as a result of the operation of the T&D System to, (A) all members of the public, including Persons involved in providing the O&M Services, (B) all materials and equipment used in the provision of the O&M Services and under the care, custody or control of Operator and (C) other property constituting part of the T&D System and under the care, custody or control of Operator; (ii) establish and enforce all reasonable applicable safeguards for health and safety and protection, including posting danger signs and other warnings against hazards and promulgating health and safety regulations; (iii) provide all notices and comply with all Applicable Law relating to the health and safety of Persons or property or their protection from physical damage, bodily injury or loss; (iv) designate qualified and responsible employees, in such numbers as Operator shall determine at its sole discretion in accordance with Prudent Utility Practice, whose duty shall be the supervision of health and safety at the T&D System; (v) operate all equipment in a manner consistent with the manufacturer's safety recommendations; (vi) provide for safe and orderly vehicular movement; and (vii) develop and carry out a site-specific health and safety program, including employee training and periodic inspections, designed to implement the requirements of this Section 5.7(a) (*Safety and Security – Safety*).

       (b)      <u>OSHA</u>. Operator shall take all actions which may be required in order to bring the T&D System into and maintain compliance with the applicable Commonwealth and federal requirements in accordance with and related to the Occupational Safety and Health Act.

       (c)      <u>Security</u>. Operator shall implement the Physical Security Plan in accordance with such plan. In accordance with the Physical Security Plan, Operator shall guard against and be responsible for all physical damage to the T&D System caused by trespass, theft, negligence, vandalism, malicious mischief or cyber-attacks of third-parties. For the avoidance of doubt,

Operator's responsibility for physical damage to the T&D System caused by cyber-attacks shall be subject to the System Remediation Plan, including the process for implementation outlined in Section 4.1(d) (*Front-End Transition Period Generally – Transition to Standard of Performance*). Operator shall guard against and be responsible for, in each case to the extent of Operator's negligence, all physical damage to the T&D System caused by trespass, theft, vandalism or malicious mischief of third-parties. Any cost arising therefrom shall be treated as T&D Pass-Through Expenditures hereunder, except to the extent such costs are costs are Disallowed Costs. The Physical Security Plan shall be updated by Operator from time to time as necessary or appropriate.

### Section 5.8    Labor and Employment; Employee Benefits.

(a)    <u>Employee Plans</u>. ServCo shall provide employee benefits to ServCo Employees pursuant to the plans created by ServCo to provide benefits to ServCo Employees (collectively, the "<u>ServCo Benefit Plans</u>"). Operator shall not assume nor shall it be responsible for any obligations or debts of Owner under Owner's retirement plans. ServCo shall, pursuant to Act 29, make any employer contributions it is permitted to make under Applicable Law to Owner's retirement plan with respect to any Hired Former Employee of Owner that elects to continue participating in Owner's defined benefit retirement plan.

(i)    Hired Former Employees of Owner shall not receive credit for their service prior to the Service Commencement Date for purposes of benefit accrual except as otherwise required by Act 120.

(ii)    ServCo shall exercise commercially reasonable efforts to cause the ServCo Benefit Plans to waive all limitations as to pre-existing conditions and actively-at-work exclusions and waiting periods for transitioned employees (and their eligible dependents).

(b)    <u>Exclusivity</u>. Operator shall not, without the prior written approval of Administrator, such approval not to be unreasonably withheld, delayed or conditioned, utilize ServCo or its employees for any purpose other than providing the O&M Services under this Agreement and the GenCo Shared Services to be provided pursuant to the Shared Services Agreement, nor may it hire, for any other business of Operator or an Affiliate, any existing ServCo employees without Owner's prior written consent not to be unreasonably withheld, delayed or conditioned.

(c)    <u>Other</u>. Nothing in this Agreement is intended to amend any employee benefit plan or affect the applicable plan sponsor's right to amend or terminate any employee benefit plan pursuant to the terms of such plan.

### Section 5.9    Procurement and Administration of Federal Funding.

(a)    <u>General</u>. As among the Parties, Owner shall retain the exclusive right to receive amounts from all Federal Funding for the T&D System. Subject to the requirements of Section 5.5 (*Capital Improvements*), Operator shall (i) take steps to ensure that, except for Systems Contracts existing as of the Service Commencement Date, the O&M Services are performed in compliance with the Federal Funding Requirements, (ii) be responsible for contracting for any

CONFIDENTIAL

Capital Improvement financed in full or in part with available Federal Funding, and (iii) ensure that all contracting and work performed by Contractors related to such Capital Improvements the cost of which may be submitted for Federal Funding with the mutual agreement of Operator and Administrator in accordance with Article 7 (*Compensation; Budgets*), is done in compliance with the Federal Funding Requirements to maximize the potential realization of the Federal Funding anticipated or received and ensure such funding is administered in accordance with all such requirements.

(b)    Cooperation and Participation. The Parties shall cooperate and participate with any relevant Governmental Body and any Grant Manager in order to help seek, procure, administer, manage, deploy and apply any Federal Funding for the restoration of the T&D System and related costs. The Parties shall cooperate and participate in any audits or investigations performed by Commonwealth or federal authorities in connection with Federal Funding.

(c)    Compliance with Applicable Law, Regulation and Policy. Operator shall ensure that any work related to the T&D System, the cost of which may, with the mutual agreement of Operator and Administrator in accordance with Article 7 (*Compensation; Budgets*), be submitted for Federal Funding, shall be performed in compliance with (i) Applicable Law, including the procurement rules set forth in 2 C.F.R. Part 200 applicable to Owner, (ii) the provisions set forth in the Federal Funding Procurement Manual, as applicable, and each of (iii) existing and applicable Owner policy, (iv) existing and applicable COR3 policy and (v) existing and applicable PRDH policy, in the case of clauses (iii), (iv) and (v), to the extent Operator has received copies of such policies. Operator shall require any Contractors or Subcontractors engaged to complete work eligible for Federal Funding to execute a certification substantially in the form of Exhibit A (*Form of Federal Funding Certifications*) at the commencement of the Contract or Subcontract. Owner and Operator shall cooperate in good faith and take all steps reasonably required to ensure that Federal Funding Requirements, including the requirements described in the Federal Funding Procurement Manual, are met in relation to the performance of any Federally Funded Capital Improvements.

(d)    Federal Funding Procurement Manual. The Parties shall update the Federal Funding Procurement Manual every three (3) months, or as otherwise deemed necessary by the Parties, to reflect any changes in Applicable Law that affect Federal Funding.

(e)    Acknowledgments. The Parties hereby acknowledge and agree that:

(i)    Owner may, in accordance with Applicable Law, transfer its right to receive amounts from Federal Funding for the T&D System to Administrator or another Governmental Body (provided that any such transferee shall, as part of any such transfer, agree to be bound by Owner's obligations hereunder);

(ii)    Operator shall, with the prior written consent of Administrator and Owner, act as agent of Owner (and any permitted transferee) in connection with any Federal Funding requests related to the T&D System submitted to federal agencies;

(iii)    COR3 is the "Recipient" (as such term is defined in 2 C.F.R. Part 200.86) of all Federal Funding received from FEMA; and

(iv)    PRDH is the "Recipient" (as such term is defined in 2 C.F.R. Part 200.86) of all HUD Community Development Block Grant – Disaster Recovery Federal Funding.

**Section 5.10    Environmental, Health and Safety Matters**.

(a)    <u>Generally</u>. Operator shall perform the following environmental health and safety activities related to the provision of electric service to T&D Customers: (i) managing an environmental, health and safety program for the T&D System in accordance with the Contract Standards; (ii) coordinating, overseeing, ensuring and maintaining compliance of the T&D System with Environmental Law, including documentation thereof; (iii) monitoring emerging federal, state, Commonwealth, municipal and local Environmental Law to ensure future and ongoing compliance and operational efficiencies; (iv) performing analyses of proposed Environmental Law to ensure future compliance thereunder; and (v) providing environmental permitting services to support operations; <u>provided</u>, <u>however</u>, that Operator shall not be responsible for any of the foregoing activities with respect to any Pre-Existing Environmental Condition, all of which shall be obligations of Owner, except to the extent Operator exacerbates a Pre-Existing Environmental Condition and such exacerbation is attributable to Operator's gross negligence or willful misconduct.

(b)    <u>Pre-Existing Environmental Conditions</u>.

(i)    Operator shall perform the O&M Services so as not to exacerbate the effect or costs of any Pre-Existing Environmental Condition disclosed with reasonable specificity by Owner pursuant to Section 4.5(f) (*Conditions Precedent to Service Commencement Date – Pre-Existing Environmental Conditions*). Discovery of a Pre-Existing Environmental Condition by Operator shall not be deemed an exacerbation of such condition. If at any time a Pre-Existing Environmental Condition is determined to exist that (A) requires an action under Applicable Law, (B) materially interferes with the performance of the O&M Services or (C) materially increases the cost of performing the O&M Services, then Administrator shall, as soon as reasonably practicable given the condition in question, after written notice from any Governmental Body or Operator of the presence or existence thereof, commence and diligently prosecute such actions as are required by Applicable Law or to prevent future material interference with the performance of the O&M Services or material increases in costs of performing the O&M Services.

(ii)    Administrator shall have the right to contest any determination of a Pre-Existing Environmental Condition and shall not be required to take any action under this Section 5.10 (*Environmental, Health and Safety Matters*) so long as (A) it is contesting any determination of a Pre-Existing Environmental Condition in good faith by appropriate proceedings conducted with due diligence and (B) Applicable Law permits continued operation of the T&D System pending resolution of the contest. In any contest regarding whether the presence of Hazardous Material is a Pre-Existing Environmental Condition, Administrator (or Owner, as the case may be), if Operator submits a sworn certification that, to the best of its knowledge, after due inquiry (which inquiry shall not require any further Environmental Studies (including any phase I or phase II studies)), the alleged Pre-Existing Condition did not arise from facts, circumstances, conditions, actions or omissions first occurring after the Service Commencement Date, then Owner

CONFIDENTIAL

shall bear the burden of proof by a preponderance of the evidence that the presence of such Hazardous Material is not a Pre-Existing Environmental Condition.

(iii)     Operator shall not be responsible for any Losses resulting from or related to any Pre-Existing Environmental Conditions, except to the extent such Losses are based in whole or in part on Operator's exacerbation of a Pre-Existing Environmental Condition resulting from Operator's gross negligence or willful misconduct with respect to the exacerbation of such Pre-Existing Environmental Condition that was disclosed by Owner or Administrator to Operator hereunder and then only to the extent attributable to such gross negligence or willful misconduct.

(c)     Notice and Remedial Action Requirements.

(i)     Operator shall, promptly upon obtaining knowledge thereof, report to Administrator, on a per occurrence basis, the Release of any reportable quantity, as defined under applicable Environmental Law, of Hazardous Material or of any other Release that could reasonably be expected to result in material Losses to Owner or Operator, and the location at which the Release has occurred, the time, the agencies involved, the damage that has occurred and the Remedial Action alternatives to be considered for decision-making by Administrator. Notice of any such Release, if initially delivered orally, shall be delivered to Administrator in writing promptly following Operator's actual knowledge of such Release. This reporting obligation shall be in addition to any other reporting obligation under Environmental Laws. Upon such notification, Administrator shall promptly propose the Remedial Action to Operator for its consideration. Operator and Administrator shall work in good faith to reach a prompt, written agreement for the pursuit of the Remedial Action, including terms assuring the pre-funding and prompt reimbursement of all of Operator's costs in effectuating the Remedial Action determined by Administrator, which costs shall be treated as T&D Pass-Through Expenditures hereunder, except to the extent such costs are Disallowed Costs. If such an agreement cannot be reached within ten (10) Business Days, or such other time as Administrator and Operator may agree, Administrator (or Owner, as the case may be) may proceed with the Remedial Action at its cost, including at such times and in a manner so as to not materially interfere with the performance of the O&M Services and Operator shall have no responsibility for such Remedial Action. In the event of a Pre-Existing Environmental Condition, Administrator and Operator may also reach an agreement whereby Operator is compensated for effectuating the Remedial Action proposed by Administrator after the presentation of Remedial Action alternatives by Operator for such condition. Subject to Applicable Law, in no event shall ownership of any Hazardous Material, including as stated on manifests, be in the name of Operator, or Operator's employees, contractors, guests or invitees, nor shall Operator be deemed to be arranging for any disposal of any Hazardous Material associated with such Remedial Action or otherwise.

(ii)     With respect to any Release caused by the gross negligence or willful misconduct of Operator or Operator's employees, contractors, guests or invitees in connection with the O&M Services, Operator shall promptly obtain the necessary Governmental Approvals for, and then commence and diligently pursue to completion all Remedial Action necessary to comply with Environmental Law. Operator shall keep Administrator reasonably informed of the progress of such Remedial Action and the schedule for completing it. In addition, in connection with such Remedial Action, Operator shall: (A) provide Administrator with a reasonable opportunity to comment in advance upon any material written communications, filings,

CONFIDENTIAL

reports, correspondence or other writings given to any Governmental Body and consider accurate and timely provided comments in good faith; (B) to the extent practical, provide Administrator with a reasonable opportunity to participate in any meetings with any Governmental Body regarding the Remedial Action; (C) comply with Applicable Law; (D) within five (5) Business Days of sending or receipt, use commercially reasonable efforts to provide to Administrator copies of all non-privileged material written communications, filings, reports, correspondence or other writings, photographs or materials sent by Operator to or received by Operator from any Person (including any Governmental Body) in connection with any such Remedial Action.

(iii)    Operator shall promptly notify Administrator, and any other Governmental Body as may be required by Environmental Law, in writing of its intention to handle, transport or dispose of Hazardous Material, other than in the ordinary course of business. Operator shall cause such Hazardous Material to be handled, transported and disposed of in accordance with Environmental Law.

**Section 5.11    Accounting and Financial Services**. Operator shall provide accounting and financial services in respect of the T&D System, including those services listed in Annex I (*Scope of Services*).

**Section 5.12    Legal Matters**. Operator shall manage Owner's legal matters in respect of the O&M Services, other than with respect to any dispute with, or other legal matters involving, Operator pursuant to this Agreement, and Owner's related reporting obligations, including those services listed in Annex I (*Scope of Services*). In performing this Agreement, nothing shall require, or shall be construed as requiring, Operator to act as legal counsel to, or to provide legal advice or representation to, Owner.

**Section 5.13    Generation-Related Services**.

(a)    <u>Power Supply Dispatch and Management</u>. As further detailed in, and in accordance with, the System Operation Principles, Operator, as agent for Owner, shall: (i) dispatch, schedule and coordinate Power and Electricity from available generation assets and provide related services; (ii) coordinate the scheduling of load requirements and Power and Electricity with IPPs pursuant to their respective Generation Supply Contracts and with GenCo pursuant to the GridCo-GenCo PPOA; (iii) implement and apply, on a continuous basis on the relevant time basis applicable, the System Operation Principles in order to ensure and coordinate the delivery of Power and Electricity; (iv) develop load and energy forecasts (including daily forecasts), scheduling requirements and capacity requirements taking into consideration unit outages; (v) request and consider information with respect to operational constraints; and (vi) perform any other services related to the dispatch, scheduling or coordination of Power and Electricity from existing and future available generation assets.

(b)    <u>Power Supply Information</u>. In connection with Operator's performance of the dispatch, scheduling and coordination of Power and Electricity, Operator shall have the right, with regards to Owner and GenCo, and may request the right from any IPP, as applicable, to reasonable access to information consistent with Prudent Utility Practice required to perform the dispatch and scheduling of Power and Electricity, which includes fuel availability, fuel cost, fuel inventory, unit availability, unit marginal cost, unit outage schedules, electric system reliability

CONFIDENTIAL

requirements, reserve requirements, identification of must-run generation resources and any other information reasonably requested by Operator consistent with Prudent Utility Practice required to perform the dispatch, scheduling and coordination of Power and Electricity.

(c)　　　　Review of System Operation Principles. In connection with Operator's performance of the dispatch, scheduling and coordination of Power and Electricity, Operator and Administrator shall have the right from time to time to review the System Operation Principles, in coordination with Administrator or Operator, as applicable, taking into account Applicable Law, load and energy forecasts, long and short range system plans, proposed annual operating and maintenance plan, any limitation criteria, and the condition of the entire electric system. If Operator and Administrator determine upon review that the System Operation Principles should be revised, Operator shall prepare and submit revised System Operation Principles to PREB. PREB shall have the right to approve, deny or propose modifications to such revised System Operation Principles. Subject to and conditioned on PREB approval, Operator shall perform the services described in Section 5.13(a) (*Generation-Related Services – Power Supply Dispatch and Management*) in accordance with the revised System Operation Principles. In the event of an Emergency Event and on a temporary basis throughout the duration of the relevant emergency, Operator may deviate from the System Operation Principles as required to ensure public safety, employee safety and while minimizing customer outages. In such an Emergency Event, Operator shall notify Administrator ten (10) Business Days prior to submitting revised temporary System Operation Principles that reflect such deviation to PREB for its review. Such notice shall include a draft of the revised temporary System Operation Principles, and PREB shall have the right to approve, deny or propose modifications thereto.

(d)　　　　Procurement of Generation Projects and Generation Supply Contracts. Operator shall maintain Resource Adequacy that may require new generation procurement for Generation Projects or Generation Supply Contracts, which procurement shall be done in accordance with the Integrated Resource Plan and Applicable Law. Any such Generation Project or Generation Supply Contract shall be subject to the applicable procurement processes and approval by PREB in accordance with Applicable Law. With respect to any such procurement, Operator shall:

(i)　　　　prepare risk assessments and analyses in support of Resource Adequacy and Generation Project or Generation Supply Contract procurement prioritization and planning, which shall take into account the Integrated Resource Plan and Applicable Law (and which assessments and analyses PREB may request from time to time);

(ii)　　　　prepare long and short-range transmission and distribution planning analyses and forecasts to determine the need for Generation Project or Generation Supply Contract procurement which shall take into account the Integrated Resource Plan to the extent applicable (and which analyses and forecasts PREB may request from time to time);

(iii)　　　　meet with PREB on an annual basis to review and assess the prepared analyses, demand projections (prepared in accordance with the Integrated Resource Plan), existing System Power Supply, Legacy Generation Assets and generation assets owned by IPPs related to the supply of Power and Electricity, and determine whether additional power supply sources are needed; and

74

(iv)    coordinate any start-up related services required from Owner in connection with any such Generation Project or Generation Supply Contract.

For the avoidance of doubt, in the event that Operator recommends new generation procurement for a Generation Project subject to Act 120, Operator shall undertake (i) through (iv) above, but Administrator (or any other entity required by Applicable Law to undertake such procurement) shall manage all aspects of the procurement process with the support of Operator, as necessary.

(e)    GenCo Shared Services. As requested by GenCo and approved by Administrator in its reasonable discretion, Operator, as agent for Owner, shall provide the GenCo Shared Services listed in Annex VI (*GenCo Shared Services*) pursuant to the Shared Services Agreement. As set forth in Section 4.5(s) (*ManagementCo Responsibilities – Shared Services Agreement*), the Parties shall negotiate in good faith, and enter into, the Shared Services Agreement during the Front-End Transition Period. Subject to the approval of Administrator, any GenCo Shared Service may be terminated or suspended earlier by GenCo for convenience, including as a result of GenCo contracting or engaging a third-party entity to provide such GenCo Shared Service; provided that GenCo Shall provide written notice to Operator at least sixty (60) days prior to the proposed effective date of any termination or suspension of a GenCo Shared Service.

(f)    Powers Under GridCo-GenCo PPOA and Generation Supply Contracts. Owner shall provide Operator with copies of all Generation Supply Contracts and the GridCo-GenCo PPOA. Pursuant to the terms and conditions of each Generation Supply Contract and the GridCo-GenCo PPOA, Operator shall have such power and authority as delegated to it pursuant to the respective agreement; provided that no agreement relating to the supply of Power and Electricity may be terminated, modified or amended without the consent of Administrator in its reasonable discretion, such consent not to be unreasonably withheld, delayed or conditioned, and Owner shall give PREB notice of such termination, modification or amendment ten (10) Business Days before it is effective.

**Section 5.14    Emergency Action**.

(a)    Accidents. Operator shall promptly notify Administrator in writing of any material accident or incident related to the T&D System within twenty-four (24) hours of receiving knowledge of the occurrence thereof and promptly notify Administrator in writing of all material claims made by or against Operator of which Operator has knowledge, or potential material claims that Operator reasonably expects to make against, or to be made against it by, third-parties.

(b)    Emergencies. Operator shall promptly notify Administrator and PREB in writing of all Emergencies related to the T&D System upon receiving knowledge thereof. Notwithstanding anything to the contrary in this Agreement, if at any time Operator determines in good faith that an Emergency Event exists with respect to the T&D System such that immediate action must be taken to (i) protect the safety of the public, Owner's employees and Operator's employees, (ii) protect the safety or integrity of the T&D System or prevent or limit environmental harm, or (iii) mitigate the immediate consequences of such Emergency Event, Operator shall take all such action that it deems in good faith to be reasonable and appropriate under the circumstances in accordance with the Emergency Response Plan. As promptly thereafter as is reasonable,

Operator shall notify Administrator and PREB in writing of Operator's response to such Emergency Event. For so long as the Emergency Event continues, Operator shall provide a weekly written update to Administrator and PREB (provided that PREB may otherwise request more frequent updates in accordance with Applicable Law) specifying the nature of the Emergency Event, the remediation measures being taken by Operator, the expected duration of the Emergency Event and an estimate of any increases in costs resulting therefrom. Operator shall notify Administrator and PREB in writing as soon as the Emergency Event has ended. All costs related to the remediation of the Emergency Event shall be T&D Pass-Through Expenditures and Operator shall be entitled to draw upon any Service Account, except the Capital Account – Federally Funded, to pay for such costs. As soon as practicable following the end of such Emergency Event, all such costs incurred shall be reflected in a proposed amendment to the approved Operating Budget or Capital Budgets, as applicable, subject to the provisions of Section 7.3(e) (*Budgets – Amendments to Budgets*).

**Section 5.15   Information**.

(a)      System Information and Computer Database. Operator shall, subject to the System Remediation Plan, maintain (i) an Information System to record, and to the extent practicable, provide retrieval for Administrator's review and copying of System Information, and (ii) a computer database containing information related to T&D Customers (the "Customer Database") that, at a minimum, shall specify each customer served by the T&D System, the service classification applicable to each customer, payment records and inquiries or complaints from, and any special services requested by or provided to, each customer. Subject to the provisions of Section 13.1 (*Intellectual Property*) and Section 13.2 (*Proprietary Information*), the information and content contained in the System Information and the Customer Database, exclusive of Operator's Confidential Information, Operator Intellectual Property, Subcontractor Intellectual Property and Third-Party Intellectual Property, shall constitute Intellectual Property and Confidential Information of Owner.

(b)      Ownership of Owner Personal Information. Any Owner Personal Information in existence as of the Service Commencement Date of this Agreement shall be considered Confidential Information of Owner and, as among the Parties, shall at all times remain the Intellectual Property of Owner. Any Owner Personal Information created during the Term shall constitute Work Product.

(c)      Information Access.

(i)      Operator shall, subject to the System Remediation Plan, provide Owner with timely read-only access where available, or a reasonably equivalent form of access to all information necessary to (A) maintain, protect and preserve the T&D System assets or (B) carry out any of Owner's responsibilities related to the T&D System under Applicable Law. For the avoidance of doubt, the access to information provided under this Section 5.15(c)(i) (*Information – Information Access*) shall be on the same basis as set out in Section 5.15(c)(ii) (*Information – Information Access*).

(ii)      To the extent necessary for Owner to carry out its responsibilities under this Agreement, Operator shall, subject to the System Remediation Plan, provide

Administrator and its Representatives with (A) unrestricted read-only access where available, or a reasonably equivalent form of access to such information, to all System Information and all Owner Personal Information, in each case contained either in the Customer Database or any other database or system created or managed by Operator hereunder, and (B) to the extent that Operator has developed, compiled, collected, prepared or archived such information in the conduct of its services under this Agreement, full and complete access to such information, subject to confidentiality obligations applicable to Operator Confidential Information and provided that Administrator and its Representatives shall comply with all of Operator's access, security (including cybersecurity) and safety procedures when exercising such right of access. Administrator shall be responsible for the security of all access credentials provided to and each access made and use and disclosure of System Information by Administrator or its Representatives hereunder.

(d)    Restrictions. Operator may not use any System Information or Owner Personal Information for any purpose unrelated to the O&M Services without the prior written consent of Administrator, such approval not to be unreasonably withheld, delayed or conditioned. To the extent such consent is granted, Operator shall comply with all Applicable Law, and otherwise obtain any necessary consents, prior to any such permitted use. Notwithstanding the foregoing, unless required by Applicable Law or by a Governmental Body (in which case Operator shall provide Administrator with such advance notice as is practicable), none of Operator, an Operator Related Party or any Affiliate shall, or shall authorize any third-party to, (i) use the Customer Database or other customer Information Systems of Owner to extract, sort or otherwise use any information related to T&D Customers (including name, address, telephone number and energy usage or any other information contained in the Customer Database) or (ii) use mechanisms for customer access (including meter reading, customer representatives and service call centers), available solely as a result of Operator's role hereunder, to market any services unrelated to the T&D System to T&D Customers. To the extent information related to T&D Customers is available from other sources, neither Operator nor its Affiliates shall be precluded by this Agreement from using in its business such data obtained from other sources.

**Section 5.16   Bill Payments**. Subject to Section 7.5 (*Service Accounts*) and Section 7.7 (*Unfunded Amounts*) and to the extent not prevented from doing so by Owner Fault, Operator shall (i) timely pay all bills related to the T&D System, that are proper, appropriate and not otherwise disputed and (ii) assure that, to the extent within Operator's control, no mechanics' or similar Liens are filed against any portion of the T&D System. In the event that Operator fails to timely pay any such bill, Administrator shall have the right, but not the obligation, to instruct Owner to pay such bill and deduct an administrative fee in an amount of US$500 from the Incentive Fee otherwise due to Operator.

**Section 5.17   Compliance with Obligations**. Each Party shall use reasonable efforts to provide all representations, certifications, records and other documents necessary or appropriate for it and other Parties to comply with any obligations under Applicable Law (including obligations (i) with respect to PREB, (ii) with respect to the FOMB under PROMESA, (iii) related to the federal securities laws and (iv) related to maintaining the exclusion from gross income of interest on Owner's or its Affiliates' obligations for federal income tax purposes) or any of the agreements that Owner or its Affiliates may be party to from time to time that relate to the O&M Services.

**Section 5.18   Energy Policy under Act 17**. As further detailed in Annex I (*Scope of Services*), in accordance with the Budget then in effect, Operator shall coordinate and assist with the services and operations contemplated under Act 17, including services and operations related to microgrids, distributed generation, renewable energy sources, net metering and energy cooperatives.

**Section 5.19   Acquisition of Easements, Fee Interests and Concession Rights**.

(a)   <u>Identification and Constitution of New Easement Areas</u>. Operator shall identify the areas that are required to be encumbered by Easements for the operation, maintenance, repair, restoration, replacements, improvements, additions and alterations of the T&D System. With respect to each Easement constitution, Operator shall: (i) develop all reasonably necessary supporting material, data and information that may be required, including surveys for the corresponding Easement areas that shall benefit the corresponding T&D System Site and the required appraisals under Regulation 6955; (ii) negotiate with fee owners and any lienholder or occupant of the servient tenements the terms and conditions of the instrument that shall constitute the Easement as a first priority lien on the servient tenement and establish the rights, obligations, undertakings and indemnification of the parties; (iii) procure any required Governmental Approvals and attend all meetings and hearings related to their procurement, with Operator named as a co-permittee on any Governmental Approval if legally required by the issuing Governmental Body; (iv) prepare the petition of condemnation to be filed by Owner or GridCo at the Commonwealth Court, if a consensual agreement is not reached and deliver the funds of the award to be deposited at the aforesaid Court, as required by Applicable Law; (v) cause the recordation of the Easements; and (vi) take all other action necessary or otherwise reasonably required to constitute the Easements. Owner shall either exercise or enable Operator to exercise Owner's rights under the Owner's regulations with respect to acquisition and constitution of new easements.

(b)   <u>Enforcement of Easement Rights</u>. Owner hereby authorizes Operator to enforce Owner's rights under the Easements. Operator, to the extent permitted by Applicable Law, may remove any obstruction of any kind or form hindering the area encumbered by an Easement.

(c)   <u>Identification and Acquisition of Target Properties</u>. Operator shall identify real properties or rights that need to be acquired for the O&M Services. With respect to each target property, Operator shall: (i) develop all reasonably necessary supporting material, data and information that may be required, including surveys for the target property and the required appraisals under Regulation 6955; (ii) negotiate with the fee owner or grantee of any real property rights, including leasehold estates, and any lienholder of the target property the terms and conditions of the purchase and sale transaction or assignment of rights and the release or cancellation of any lien or encumbrance affecting the target property or any real property rights, including leasehold estates; (iii) procure any required Governmental Approvals and attend all required meetings and hearings related to their procurement, with Operator being named as a co-permittee on any Governmental Approval if legally required by the issuing Governmental Body; (iv) prepare the petition of condemnation to be filed at the Commonwealth Court by Owner, GridCo, the Commonwealth or the Department of Transportation and Public Works, as the case may be, if a consensual agreement is not reached; (v) cause the recordation of the deed vesting title on Owner or the Commonwealth, as the case may be; and (vi) take all other action necessary

CONFIDENTIAL

or otherwise reasonably required to acquire such fee interests or real property rights, including leasehold estates.

      (d)    <u>Public Domain Real Estate Assets and Procurement of Concession Rights</u>. Operator shall procure the required concession rights permitting the use of real estate assets under the public domain, including submerged lands, wetlands and areas designated as part of the maritime terrestrial zone by the Puerto Rico Department of Natural and Environmental Resources from time to time that are necessary for the operation, maintenance, repair, restoration, replacements, improvements, additions and alterations of the T&D System. With respect to each such real property, Operator shall: (i) develop all reasonably necessary supporting material, data and information that may be required, including surveys for the concession areas; (ii) negotiate with the corresponding Governmental Body the terms and conditions of the concession agreement; (iii) procure any required Governmental Approvals and attend all required meetings and hearings related to their procurement, with Operator being named as a co-permittee on any Governmental Approval if legally required by the issuing Governmental Body; (iv) cause the recordation of the concession over public lands and waterbodies, as the case may be; and (v) take all other action necessary or otherwise reasonably required to secure the grant of a recordable concession, including evaluation of any Pre-Existing Environmental Conditions.

**Section 5.20   Other Services**.

      (a)    <u>Implied Services</u>. If any services, functions or responsibilities not specifically described in this Agreement are reasonably required for the proper performance and provision of the O&M Services in accordance with Contract Standards, they shall be deemed to be implied by and included within the O&M Services, except to the extent they are rights and responsibilities reserved to Owner or Administrator as set forth in Article 6 (*Rights and Responsibilities of Owner and Administrator*) or as otherwise expressly provided in this Agreement.

      (b)    <u>Additional Services</u>. If requested by Administrator, Operator may perform such additional services reasonably related to the T&D System not included within O&M Services, based upon terms and conditions, including price and additional fees payable to Operator, agreed to by Operator and Administrator.

      (c)    <u>Exclusivity</u>. Without the prior approval of Administrator, ServCo may not engage in any other business or activity other than to employ ServCo employees and to provide the O&M Services pursuant to this Agreement and the GenCo Shared Services to be provided pursuant to the Shared Services Agreement.

CONFIDENTIAL

## ARTICLE 6
## RIGHTS AND RESPONSIBILITIES OF OWNER AND ADMINISTRATOR

**Section 6.1      Rights and Responsibilities of Owner**.

(a)        <u>Generally</u>. From and after the Service Commencement Date, Owner shall have the following rights and responsibilities with respect to the operation, management and maintenance of the T&D System:

(i)        grant and assure Operator access to the T&D System for the performance of Operator's obligations hereunder;

(ii)       pay the Service Fee and any other amounts due Operator, and fund the Service Accounts, all in accordance with the terms and conditions of this Agreement;

(iii)      ensure that, to the extent PROMESA requires Owner to submit any budget to the FOMB for approval, such budget provides that Owner is authorized to pay amounts due to Operator under this Agreement and fund the Service Accounts in accordance with Section 7.5 (*Service Accounts*);

(iv)      cooperate with Operator such that the budgets and funds in support of O&M Services are sufficient in amount to enable Operator to meet the Contracts Standards and provide a reasonable opportunity for Operator to achieve the Performance Metrics;

(v)       (A) respond promptly (and in any event within thirty (30) days or shorter period required by this Agreement) to all requests of Operator with respect to all matters requiring the approval, review or consent of Owner (and in each such case, unless otherwise specifically stated in this Agreement, Owner shall not unreasonably withhold, delay or condition any such approval, review or consent) and as to such other matters relating to the obligations of Operator hereunder in respect of which Operator shall reasonably request the response of Owner in accordance with the provisions of this Agreement, (B) provide Operator with such information, data and assistance as may be reasonably necessary or appropriate for Operator to perform its obligations (including with respect to any PREB rate or other proceeding or requirement) hereunder, and (C) from time to time, as and when requested by Operator, execute and deliver, or cause to be executed and delivered, all such documents and instruments and take, or cause to be taken, all such reasonable actions, as may be reasonably necessary for Operator to perform its obligations under this Agreement;

(vi)      except as otherwise contemplated by Section 5.12 (*Legal Matters*), manage Owner's legal matters, including Owner's reporting and related legal compliance;

(vii)     cooperate with Operator and Administrator in obtaining and maintaining all Governmental Approvals;

(viii)    audit Operator's compliance with Federal Funding Requirements; <u>provided</u> that Owner shall reasonably coordinate with Administrator to avoid duplicative audits;

CONFIDENTIAL

(ix)     ensure that Operator, as an independent contractor, remains at all times during the Term a beneficiary to all Easements vested on Owner as provided in Regulation 7282 of January 25, 2007;

(x)     execute and file any condemnation proceeding reasonably requested by Operator to acquire any fee interest, real property right, including leasehold estates, or Easement; provided that (A) Operator shall submit a request to Administrator to approve such condemnation proceeding, including a statement of reasons supporting, and justification of Owner's right to initiate, any such proceeding, and (B) the cost and expense related to such condemnation proceeding shall be included in an amendment to then-current approved Budgets in accordance with Section 7.3(e) (*Budgets – Amendments to Budgets*);

(xi)     take all other actions, and cause its employees and other Representatives to take all other actions, reasonably required or reasonably requested by Operator to permit Operator to perform the O&M Services in compliance with the Contract Standards and this Agreement, including with respect to (A) the constitution of Easements and enforcement of rights thereunder and (B) the acquisition of fee interests or real property rights, including leasehold estates;

(xii)     exercise its statutory powers pertaining to any and all rights and remedies granted to it under Applicable Law, including doing so promptly when requested by Operator;

(xiii)     comply with all Applicable Law;

(xiv)     coordinate any Audits that Owner is entitled to perform hereunder with any Audits being undertaken by Administrator and any other Governmental Body that has the right under Applicable Law to perform an Audit; and

(xv)     to the extent reasonably requested by Operator, and to the extent consistent with Applicable Law, cooperate with Operator in its efforts to obtain and effectuate approvals of any Governmental Body having competent jurisdiction for the establishment of measures to prevent erosion of revenue associated with the T&D System or to enhance System Revenues, including attending meetings with appropriate officials of Governmental Bodies as may be reasonably requested by Operator for such purposes, identifying historical and potential governmental and quasi-governmental measures relevant to such purposes, and providing other cooperation, as may be reasonably requested by Operator, in pursuit of such purposes.

(b)     Authorization of Administrator. Owner hereby assigns and delegates to Administrator the rights and responsibilities under this Agreement necessary for Administrator to administer this Agreement and act as Owner's liaison with Operator in connection with the O&M Services; provided that such assignment and delegation shall not release Owner from any of its obligations set forth herein; and provided, further, that Owner shall be responsible for all acts and omissions of Administrator in connection with this Agreement and the other Transaction Documents, and the transactions contemplated hereby and thereby, in the same manner as if such acts and omissions were those of Owner.

CONFIDENTIAL

### Section 6.2    Rights and Responsibilities of Administrator.

(a)    <u>Generally</u>. Operator shall be entitled to rely on the written directions of Administrator. Administrator shall be responsible for overseeing, in the manner provided for and subject to the terms and conditions of this Agreement, Operator's performance of the O&M Services under this Agreement. Without limiting the generality of the foregoing, from and after the Service Commencement Date, Administrator shall have the following rights and responsibilities with respect to the operation, management and maintenance of the T&D System:

(i)    as set forth in Section 7.3 (*Budgets*), review and approve Budgets, including modifications thereto, to ensure compliance with a Rate Order;

(ii)    review and approve the Incentive Fee payable to ManagementCo for a given Contract Year, including based on Administrator's evaluation of Operator's satisfaction of the Performance Metrics;

(iii)    cooperate with Operator such that the budgets and funds in support of O&M Services are sufficient in amount to enable Operator to meet the Contracts Standards and provide a reasonable opportunity for Operator to achieve the Performance Metrics;

(iv)    exercise Oversight in relation to Operator's compliance with Budgets, including T&D Pass-Through Expenditures and Generation Pass-Through Expenditures, in accordance with the procedures set forth in this Agreement; <u>provided</u> that, Administrator shall (i) reasonably coordinate with Owner to avoid duplicative Oversight and (ii) except to the extent provided under this Agreement, avoid exercising Oversight with respect to items that fall within the scope of PREB's statutory oversight;

(v)    exercise Oversight in relation to Operator's performance of its obligations hereunder, including performance of the O&M Services;

(vi)    exercise Oversight, as agent of Owner, in relation to Operator's compliance with Federal Funding Requirements;

(vii)    respond promptly (and in any event within thirty (30) days or shorter period required by this Agreement) to all requests of Operator with respect to matters requiring the approval, review or consent of Administrator (and in each such case, unless otherwise specifically stated in this Agreement, Administrator shall not unreasonably withhold, delay or condition any such approval, review or consent) and as to such other matters relating to the obligations of Operator hereunder in respect of which Operator shall reasonably request the response of Administrator in accordance with the provisions of this Agreement;

(viii)    (A) cooperate with Operator by providing Operator such information, data and assistance as may be reasonably necessary for Operator to perform its obligations hereunder and (B) from time to time, as and when requested by Owner, execute and deliver, or cause to be executed and delivered, all such documents and instruments and take, or cause to be taken, all such reasonable actions, as necessary for Operator to perform its obligations under this Agreement;

(ix)     declare an Event of Default and exercise remedies under this Agreement, including termination of this Agreement upon the occurrence of an Operator Event of Default in accordance with Section 14.1 (*Events of Default By Operator*);

(x)     coordinate any Audits that Administrator is entitled to perform hereunder with any Audits being undertaken by Owner and any other Governmental Body that has the right under Applicable Law to perform an Audit; and

(xi)     to the extent reasonably requested by Operator, and to the extent consistent with Applicable Law, cooperate with Operator in its efforts to obtain and effectuate approvals of any Governmental Body having competent jurisdiction for the establishment of measures to prevent erosion of revenue associated with the T&D System or to enhance System Revenues, including attending at meetings with appropriate officials of Governmental Bodies as may be reasonably requested by Operator for such purposes, identifying historical and potential governmental and quasi-governmental measures relevant to such purposes, and providing other cooperation, as may be reasonably requested by Operator, in pursuit of such purposes.

(b)     Disputes. In the event of a Dispute among the Parties with respect to clauses (ii) through (xi) of Section 6.2(a) (*Rights and Responsibilities of Administrator – Generally*), such Dispute shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, an "Administrator Dispute").

(c)     Approvals and Consents. When any approval or consent by Owner to an Operator submission, request or report is required pursuant to the terms of this Agreement, the approval or consent shall be given by Administrator in writing, and such writing shall be conclusive evidence of such approval or consent and shall be binding on Owner.

(d)     Consultants. Subject to budgetary requirements and recognizing that priority shall be given to funding the Service Accounts and payment of the Service Fee, Administrator shall have the right, at Owner's or Administrator's sole expense, to engage third-party consultants to advise on its obligations under this Agreement; provided that Administrator shall not have the right to retain a consultant that (i) carries on business as a utility company or company providing utility services, Front-End Transition Services or O&M Services and (ii) may be a competitor to Operator, Operator's Affiliates or any Parent Company that may be a competitor to Operator or any Parent Company.

### Section 6.3     Reporting; Audits.

(a)     Generally. At the reasonable request of Administrator or its relevant consultant (each, an "Authorized Inspector"), at Administrator's sole cost and expense, at reasonable times during normal business hours, Operator shall: (i) make available or cause to be made available to such Authorized Inspector all information related to this Agreement or the T&D System as may be specified in such request and as shall be in the possession or control of Operator or its Representatives; (ii) permit such Authorized Inspector, upon ten (10) Business Days' prior notice to Operator, which notice shall identify the persons such Authorized Inspector requests to be present for an interview and describe with reasonable specificity the subject matter to be raised in the interview, to discuss the obligations of Operator under this Agreement with any of the

CONFIDENTIAL

directors, chief executive officer and chief financial officer of Operator and its Representatives, for the purpose of enabling such Authorized Inspector to determine whether Operator is in compliance with this Agreement; and (iii) otherwise provide such cooperation as may reasonably be required by such Authorized Inspector in connection with any such Audit of the information required to be maintained or delivered by Operator under this Agreement or required by Applicable Law. Such Authorized Inspector shall be entitled to make copies of the information related to the conduct of such Audit and to take extracts therefrom at such Authorized Inspector's sole cost and expense. Absent good cause or as may be required by Applicable Law, audits shall occur no more than once every Contract Year. In the course of performing its Audits hereunder, each Authorized Inspector and its Representatives shall avoid any disruption to Operator's performance of the O&M Services or Operator's rights or responsibilities under this Agreement, having regard to the nature of the Audits being performed, and when accessing the T&D System each Authorized Inspector and its Representatives shall do so at its own risk and shall comply with all of Operator's safety procedures.

(b)  _Testing_. At all reasonable times during normal business hours and subject to Operator's policies and procedures, upon reasonable prior notice, any Authorized Inspector shall, with the prior consent of Operator, be entitled to perform or cause to be performed any test, study or investigation in connection with the T&D System or the O&M Services as such Authorized Inspector may determine to be reasonably necessary under the circumstances and at the sole cost and expense of such Authorized Inspector. Operator shall, and shall cause its Representatives to, furnish such Authorized Inspector or its Representatives with every reasonable assistance in connection with the carrying out of such tests, procedures, studies and investigations. In connection with the foregoing, such Authorized Inspector shall, with the prior written consent of Operator, be entitled to install machines, equipment, systems, monitors, counters and other devices in, on, under, over or adjacent to the T&D System to permit and facilitate any test, study, monitor or Audits of or relating to the T&D System to the extent that the same does not interfere with the O&M Services or damage the T&D System.

(c)  _Additional Audit Rights_. At any time and from time to time, Owner, Administrator, PREB, COR3 or the DHS OIG may conduct a partial or full Audit related to all Federally Funded Capital Improvements and the Parties shall maintain all related records for such amount of time as may be necessary for any such Audit; provided that such records shall be maintained by the Parties for a minimum of at least three (3) years following the transmission of the final expenditure report by COR3 to FEMA pursuant to Public Law 105-124, Section 1216. For the avoidance of doubt, any costs incurred by the Operator in responding to an Audit under this Section 6.3(c) (_Reporting; Audits – Additional Audit Rights_) (including costs of Operator's Contractors' Subcontractors and Affiliates) shall be T&D Pass-Through Expenditures, except to the extent such costs are Disallowed Cost.

(d)  _No Other Audit Rights_. This Agreement does not provide any Governmental Body any rights to undertake any Audit other than those stated herein, and, without restricting the foregoing, this Agreement does not provide any regional, municipal or local body with any rights to perform any Audit in addition to those permitted by Applicable Law.

**Section 6.4  Staffing Levels**. From and after the Service Commencement Date and at all times during the Term, Owner and Administrator, including any of their Subcontracts, shall

CONFIDENTIAL

maintain staffing in connection with the O&M Services only at those levels strictly necessary for Owner and Administrator to timely and efficiently perform their obligations under this Agreement. Before the Service Commencement Date, Owner shall maintain staffing necessary to continue to perform its obligations at the same or higher level than it performed such obligations as of the Proposal Submission Date.

CONFIDENTIAL

# ARTICLE 7
## COMPENSATION; BUDGETS

**Section 7.1     Service Fee**.

(a)     <u>Generally</u>. In addition to Owner's funding or payment of T&D Pass-Through Expenditures, Generation Pass-Through Expenditures, Capital Improvements, Outage Event Costs and any other amounts that become due and owing to Operator hereunder, from and after the Service Commencement Date, as compensation for the performance of the O&M Services, Owner shall, in accordance with this Agreement, pay ManagementCo a management service fee consisting of the Fixed Fee and the Incentive Fee (collectively, the "<u>Service Fee</u>"). The Parties acknowledge and agree that: (i) the following costs and expenses shall be paid by ManagementCo from the Fixed Fee (or otherwise absorbed or paid for by ManagementCo without reimbursement hereunder): (A) the costs and expenses listed in Annex VII (*ManagementCo Costs*), (B) ManagementCo's corporate overhead costs and (C) any subcontract with respect to any service to be provided by ManagementCo between the Service Commencement Date and the expiration or early termination of the Agreement; and (ii) no Federal Funding shall be used to pay the Service Fee. The Service Fee shall not be subject to any abatement, deduction, counterclaim or set-off of any kind or nature.

(b)     <u>Fixed Fee</u>.

(i)     The fixed fee payable to ManagementCo for each Contract Year shall be as set forth in Annex VIII (*Service Fee*), adjusted on a Pro Rata basis for a partial Contract Year (the "<u>Fixed Fee</u>"). Owner and Administrator agree that an amount equal to the maximum amount of the Fixed Fee available in any given Contract Year shall be included in the Operating Budget for such Contract Year.

(ii)     Owner shall pay the Fixed Fee in monthly installments equal to (i) one-twelfth (1/12) of the Fixed Fee for a Contract Year of twelve (12) months or (ii) in the case of any partial Contract Year, an amount equal to one (1) divided by the number of months in such Contract Year. In the event of a partial month, the monthly installment shall be adjusted on a Pro Rata basis.

(iii)     On or prior to the tenth (10th) Business Day of each month of the Term, Operator shall submit to Administrator an invoice for the Fixed Fee payable in respect of the prior month. The invoice shall specify the monthly portion of the Fixed Fee for the relevant month, together with (A) the aggregate portion of the annual Fixed Fee paid through such month and (B) the accumulated payments to the date of such invoice. Owner shall pay the invoice by the last Business Day of the month on which the invoice was submitted. All invoices shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*) hereto.

(c)     <u>Incentive Fee</u>.

(i)     Based on Operator's ability to timely achieve or exceed the performance metrics set forth in Annex IX (*Performance Metrics*) (the "<u>Performance Metrics</u>"),

Operator shall be entitled to earn the incentive fee in any given Contract Year ("Incentive Fee"), which fee shall be set forth in Annex VIII (*Service Fee*), adjusted on a Pro Rata basis for a partial Contract Year and calculated as set forth in Annex X (*Calculation of Incentive Fee*). Owner and Administrator agree that an amount equal to the maximum amount of the Incentive Fee available in any given Contract Year shall be included in the Operating Budget for such Contract Year.

(ii)     No later than sixty (60) days following the end of a Contract Year, Operator shall submit a report (the "Incentive Fee Report") to Administrator (with copy to PREB) with (A) supporting performance data, information and reports evidencing its achievement of one or more of the Performance Metrics and (B) based thereon, its good faith calculation of the proposed Incentive Fee, in each case for such Contract Year. The Incentive Fee Report shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*).

(iii)     Administrator shall have a period of sixty (60) days after receipt to review the Incentive Fee Report. During this period, Operator shall grant to Administrator reasonable access during normal business hours to all relevant personnel, Representatives of Operator, books and records of Operator and other items reasonably requested by Administrator in connection with the review of the Incentive Fee Report.

(iv)     If Administrator delivers to Operator a written statement describing any disagreements with the Incentive Fee Report during such sixty (60) day review period, then Operator and Administrator shall attempt to resolve in good faith any such disagreements. If (A) Administrator does not deliver such statement during such sixty (60) day review period (in which case it shall be deemed to have agreed with the Incentive Fee Report), (B) if Operator and Administrator reach a resolution with respect to such matters or (C) if Administrator has no disagreements with the Incentive Fee Report, then Owner shall pay the Incentive Fee in accordance with Section 7.1(c)(v) (*Service Fee – Incentive Fee*).

(v)     Once determined in accordance with Section 7.1(c)(iv) (*Service Fee – Incentive Fee*), Owner shall pay the Incentive Fee, or any portion thereof that is not subject to a Dispute, for a given Contract Year within ten (10) days of such determination and in any event within six (6) months following the end of the given Contract Year or, in the event of an early termination of this Agreement, six (6) months following the date of such termination.

(vi)     If any Major Outage Event (including, for the avoidance of doubt, a Major Outage Event that is a Force Majeure Event) prevents Operator from achieving one or more of the Performance Metrics, Operator shall be entitled to earn the Incentive Fee for the period that such Major Outage Event continues as long as, and to the extent that, Operator achieves the Major Outage Event Performance Metrics during such period of time.

(vii)     If any Force Majeure Event (other than a Force Majeure Event that is a Major Outage Event) prevents Operator from achieving one or more of the Performance Metrics, Operator shall be entitled to earn the Incentive Fee for the period that such Force Majeure Event continues as long as, and to the extent that, Operator achieves the Key Performance Metrics during such period of time.

(viii)   If any Owner Fault or additional requirement imposed by Owner, Administrator or any other Governmental Body prevents Operator from achieving any Performance Metric, such Performance Metric shall be deemed to have been met for purposes of calculating the Incentive Fee for the applicable period.

(d)   Amendments to Performance Metrics. The Parties acknowledge and agree that PREB and Operator shall have the right to propose amendments to the Performance Metrics from time to time and that the Parties shall consider any proposed amendments in good faith (provided that such amendments do not reduce the likelihood of Operator's earning the Incentive Fee). In the event such an amendment is proposed, Operator shall prepare and submit to PREB proposed amended Performance Metrics, which amendment shall require and be subject to approval by PREB; provided that to the extent a new category of metrics is added or the methodology for calculating a given metric is modified as part of the amendment, a Tax Opinion and a Reliance Letter shall be obtained, at the cost of Owner or Administrator, with respect to any such amendment.

(e)   Service Fee Disputes. The Parties hereby agree that, in the event that a Dispute arises between Operator and Administrator in connection with the Service Fee (including any adjustments thereto as permitted by this Agreement), the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Service Fee Dispute").

### Section 7.2   **Pass-Through Expenditures**.

(a)   T&D Pass-Through Expenditures. For purposes of this Agreement, "T&D Pass-Through Expenditures" shall be the costs and expenses incurred by ServCo in the course of providing O&M Services pursuant to this Agreement (without markup for profit), including the costs and expenses set forth in Annex XI (*T&D Pass-Through Expenditures*); provided that T&D Pass-Through Expenditures shall not include any (i) Disallowed Costs, (ii) Generation Pass-Through Expenditures or (iii) costs payable by ManagementCo from the Fixed Fee pursuant to Section 7.1(a) (*Service Fee – Generally*). Operator shall pay T&D Pass-Through Expenditures in accordance with Section 7.5 (*Service Accounts*).

(b)   Generation Pass-Through Expenditures. For purposes of this Agreement, "Generation Pass-Through Expenditures" shall be the costs and expenses (without markup for profit) incurred by Owner in the course of providing Power and Electricity, including the costs and expenses under the GridCo-GenCo PPOA and Generation Supply Contracts. Subject to and conditioned on the Generation Expenditures Accounts being funded in accordance with Section 7.5(e) (*Service Accounts – Generation Expenditures Accounts*), Operator shall pay Generation Pass-Through Expenditures in accordance with Section 7.5 (*Service Accounts*).

### Section 7.3   **Budgets**.

(a)   Generally. For any Contract Year (other than the initial Contract Year, for which the procedures for the Initial Budgets set forth in Section 4.2(e) (*ManagementCo Responsibilities – Initial Budgets*) shall apply, or a year in which a rate adjustment approved by PREB enters into effect, in which case the Budgets used in connection with obtaining such rate

CONFIDENTIAL

adjustment shall be used), Operator shall, no later than ninety (90) days prior to the commencement of such Contract Year, submit to Administrator the proposed Budgets for such Contract Year; <u>provided</u> that if any proposed Budget requires a rate adjustment to be approved by PREB, Operator shall have the right, at its sole discretion, to submit the proposed Budgets for such Contract Year directly to PREB rather than to Administrator. As promptly as practicable in any Contract Year, and sufficiently in advance to allow Operator to comply with the ninety (90) day period set forth above, Owner shall prepare and deliver to Operator the Generation Budget for consolidation with the Operating Budget and the Capital Budgets submitted to Administrator. Administrator shall, acting reasonably, review such proposed Budgets to ensure compliance with the applicable Rate Order and Section 7.4 (*Budget Policy*). Within forty-five (45) days following its receipt of such Budgets, Administrator shall notify Operator whether the proposed Budgets are compliant with the applicable Rate Order and Section 7.4 (*Budget Policy*), and shall request, acting reasonably, any changes or modifications to the proposed Budgets to conform the proposed Budgets with the applicable Rate Order and Section 7.4 (*Budget Policy*). Administrator and Operator shall collaborate in good faith to resolve any differences with respect to such proposed Budgets as promptly as practicable.

(b)     <u>Flexibility to Overrun</u>. Each Budget shall include up to a maximum of two percent (2%) in excess of the total amount for excess expenditures that may arise in any Contract Year ("<u>Excess Expenditures</u>"); <u>provided</u> that such Excess Expenditures shall at all times be otherwise compliant with the applicable Rate Order. Any Excess Expenditures incurred by Operator during a Contract Year shall be treated as T&D Pass-Through Expenditures and as if initially budgeted for such Contract Year. Each reference herein to a Budget or Default Budget shall be deemed to include such Excess Expenditures to the extent such Excess Expenditures are incurred.

(c)     <u>Flexibility to Reallocate</u>. Operator shall have complete flexibility, subject to compliance with the Contract Standards and prior consultation with, but not subject to approval by, Administrator or PREB, to (i) reallocate, accelerate or postpone expenditures within the approved Operating Budget, (ii) reallocate, accelerate or postpone expenditures within the approved Capital Budget – Federally Funded, subject to the Federal Funding Requirements, and (iii) reallocate, accelerate or postpone expenditures within the approved Capital Budget – Non-Federally Funded, in each case, (x) in order to address changed operational or commercial circumstances or new legal or regulatory requirements and (y) in such a manner that the reallocations do not exceed five percent (5%) of the Budget in which such reallocations are made or the expenditures are not postponed for a period longer than one (1) year. Any such reallocated amounts shall be treated as if initially budgeted in the Budget in which such reallocations are made in all respects, including with respect to the associated Performance Metrics set forth in Annex IX (*Performance Metrics*).

(d)     <u>Default Budget</u>. In the event any Budget for a given Contract Year has not been finalized in accordance with Section 7.3(a) (*Budgets – Generally*) by July 1 of such Contract Year, the applicable approved Budget for the immediately preceding Contract Year (as the same may be amended) as adjusted for inflation based on the CPI Factor (such Budget, a "<u>Default Budget</u>") shall remain in effect until such time as the applicable Budget for such Contract Year is so finalized.

(e)      _Amendments to Budgets_. Operator may, from time to time, propose to amend the approved Operating Budget and Capital Budget for a given Contract Year, including to account for any for Federally Funded Capital Improvements that have been Obligated since the date the Capital Budget – Federally Funded then in effect was approved; _provided_ that any such amendment shall be compliant with the applicable Rate Order. If, during a Contract Year, Operator becomes aware that T&D Pass-Through Expenditures or Generation Pass-Through Expenditures for such Contract Year are expected to exceed a Budget for such Contract Year (taking into account the allowances for Excess Expenditures), then (i) with respect to the Operating Budget and Capital Budget, Operator shall promptly notify PREB and Administrator and prepare and submit to PREB a proposed amended Operating Budget or Capital Budget for such Contract Year, as the case may be, which amendment shall require and be subject to approval by PREB, and (ii) with respect to the Generation Budget, (x) Operator shall notify PREB, Administrator and Owner and (y) Owner shall, as promptly as practical, prepare and submit to PREB a proposed amended Generation Budget, which amendment shall require and be subject to approval by PREB.

(f)      _Budget Disputes_. The Parties hereby agree that, in the event that a dispute arises between Operator, Owner and Administrator in connection with a Budget (including proposed amendments thereto or the need for amendments thereto), the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (_Dispute Resolution_) (any such Dispute, a "Budget Dispute"). The Parties acknowledge and agree that, in connection with a proposed Budget pursuant to Section 7.3(a) (_Budgets - Generally_) or an amended Budget pursuant to Section 7.3(e) (_Budgets – Amendments to Budgets_), Owner, Administrator and Operator shall have the right to present to PREB any Expert Technical Determination pursuant to Section 15.4 (_Expert Technical Determination Procedure for Technical Disputes_) with respect to a Budget Dispute; _provided_ that this shall in no way (i) limit PREB's right to approve, deny or propose modifications to such proposed or amended Budgets or (ii) otherwise affect PREB's statutory rights and responsibilities under Applicable Law.

**Section 7.4      Budget Policy**. The Budgets and the related ServCo staffing levels for each Contract Year shall be designed to be adequate in both scope and amounts to reasonably assure that Operator is able to carry out the related O&M Services in accordance with the Contract Standards and have a reasonable opportunity to earn the Incentive Fee for achieving the Performance Metrics. The Parties further acknowledge and agree that, from time to time, it may be necessary or appropriate to amend or otherwise adjust the Performance Metrics or the Budgets as a result of (i) Force Majeure Events, (ii) Owner Fault, (iii) Outage Events or (iv) additional requirements imposed by Owner, Administrator or any other Governmental Body after approval of the Budgets, in the case of each of clauses (i) to (iv), which (A) have resulted (or are reasonably likely to result) in schedule delays or increased work scope or costs and (B) are not be attributable to Operator's gross negligence or willful misconduct. Operator shall provide notice to Administrator and PREB promptly following the occurrence of an event contemplated above and the Parties shall, in good faith and acting reasonably, consider necessary adjustments to the Performance Metrics or the Budgets that are based on rates that are reasonable and customary.

CONFIDENTIAL

### Section 7.5    Service Accounts.

(a)          Operating Account.

(i)          No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more operating accounts from which Operator shall draw funds from time to time to pay for T&D Pass-Through Expenditures actually incurred by Operator in performing the O&M Services and from which Owner shall pay the Service Fee (collectively, the "Operating Account"). Owner shall pay Operator the Service Fee in accordance with the terms of Section 7.1 (*Service Fee*) from funds available in the Operating Account.

(ii)          No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall fund the Operating Account with an amount equal to the sum of (A) anticipated T&D Pass-Through Expenditures for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), based on the then-currently approved Operating Budget or the relevant Default Budget then in effect *plus* (B) the anticipated Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*). Thereafter, no later than the tenth (10th) Business Day of each month (beginning in the month following that in which the Service Commencement Date occurs), Owner shall replenish the Operating Account so as to maintain a funding level equal to the sum of anticipated T&D Pass-Through Expenditures for the subsequent four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), under the Operating Budget or the relevant Default Budget then in effect and the anticipated Service Fee for the subsequent four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*).

(iii)          In each Contract Year, Operator shall be entitled to withdraw funds from the Operating Account for T&D Pass-Through Expenditures actually incurred under the approved Operating Budget or the relevant Default Budget then in effect; provided, however, that Operator shall notify Administrator in writing at least ten (10) Business Days in advance of any withdrawal related to any Excess Expenditure withdrawal, providing the details thereof and recommendations to mitigate any additional excess costs. Operator shall not withdraw funds from the Operating Account for T&D Pass-Through Expenditures that are not included in the then-currently approved Operating Budget or the relevant Default Budget then in effect; provided that such approval shall not be required in case of: (A) a Force Majeure Event, Owner Fault, Outage Event, Declared Emergency or Major Disaster; and (B) any circumstance, event or condition unforeseeable by Operator or which, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence by Operator, requiring funding in excess of the amounts available for such matter in the then-currently approved Operating Budget or the relevant Default Budget then in effect and for which a prudent Person in the business of operating and managing the T&D System would expend funds prior to the time that the applicable Budget could reasonably be expected to be amended (including, by way of example, removal of trees having fallen on or otherwise damaged T&D System transmission and distribution lines); provided further, however, that Operator shall (x) notify Administrator in writing promptly upon Operator becoming aware of the occurrence of such circumstance, event or condition and (y) provide the details of such circumstance, event or condition and the amount of any withdrawal related thereto that Operator intends to make from the Operating Account.

CONFIDENTIAL

(iv)     Simultaneous with each withdrawal of funds from the Operating Account, Operator shall provide Administrator with written notice of such withdrawal, including a summary of T&D Pass-Through Expenditures being paid. Not later than ten (10) Business Days following each month end, Operator shall furnish Administrator with a full accounting setting forth in reasonable detail the T&D Pass-Through Expenditures actually incurred and paid during the prior month.

(b)     <u>Capital Account – Federally Funded</u>.

(i)     No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more capital accounts from which Owner shall draw funds from time to time, in accordance with the Federal Funding Procurement Manual, to pay Operator, as agent of Owner, for the cost of Federally Funded Capital Improvements ("<u>Capital Costs – Federally Funded</u>") related to the O&M Services (collectively, the "<u>Capital Account – Federally Funded</u>").

(ii)     Owner shall fund the Capital Account – Federally Funded with any or both of (A) Federal Funding received for the T&D System and (B) proceeds from any other financings or funds of Owner the use of which are designated for Capital Costs – Federally Funded.

(iii)     Prior to Operator commencing any Federally Funded Capital Improvement on behalf of Owner: (A) Owner shall ensure that either (x) the Capital Account – Federally Funded contains funds equal to the sum of anticipated Capital Costs – Federally Funded for Federally Funded Capital Improvements that have been Obligated and scheduled as of such date in accordance with the Federal Funding Requirements for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*) based on the then-currently applicable and approved Capital Budget – Federally Funded or the relevant Default Budget then in effect, or (y) a credit facility reasonably acceptable to Operator is available to be drawn for Federally Funded Capital Improvements; and (B) Operator shall ensure that such Federally Funded Capital Improvement is within the approved scope consistent with the Federal Funding Requirements. Thereafter, no later than the tenth (10th) Business Day of each month, Owner shall replenish the Capital Account – Federally Funded so as to maintain a funding level equal to, or ensure the availability of a credit facility in an amount equal to or greater than, the sum of anticipated Capital Costs – Federally Funded for Federally Funded Capital Improvements that have been Obligated and scheduled as of such date in accordance with the Federal Funding Requirements for the subsequent four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), under the Capital Budget – Federally Funded or the relevant Default Budget then in effect.

(iv)     In each Contract Year, Owner shall be entitled to withdraw funds from the Capital Account – Federally Funded to reimburse costs for Capital Costs – Federally Funded actually incurred under the approved Capital Budget – Federally Funded or the relevant Default Budget then in effect. Subject to Section 5.14(b) (*Emergency Action – Emergencies*), without the prior written approval of Administrator, which approval shall not be unreasonably withheld, delayed or conditioned, Owner shall not withdraw funds from the Capital Account – Federally Funded for Capital Costs – Federally Funded that are not included in the then-currently approved Capital Budget – Federally Funded or the relevant Default Budget then in effect.

(v)     Not later than ten (10) Business Days following each month end during which Operator received funds withdrawn from the Capital Account – Federally Funded, Operator shall furnish Administrator with a full accounting setting forth in reasonable detail the Capital Costs – Federally Funded actually incurred and paid during the prior month.

(c)     <u>Capital Account – Non-Federally Funded</u>.

(i)     No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more capital accounts from which Operator shall draw funds, from time to time, to pay for the cost of Non-Federally Funded Capital Improvements ("<u>Capital Costs – Non-Federally Funded</u>") related to the O&M Services (collectively, the "<u>Capital Account – Non-Federally Funded</u>").

(ii)     Owner shall fund the Capital Account – Non-Federally Funded with any or both of (A) proceeds from draws on financing provided by Operator or its Affiliates, on terms to be agreed on by Operator and Owner and (B) proceeds from any other financings or any funds of Owner the use of which are designated for Capital Costs – Non-Federally Funded.

(iii)     Prior to Operator commencing any Non-Federally Funded Capital Improvement, Owner shall ensure that the Capital Account – Non-Federally Funded contains funds equal to the sum of anticipated Capital Costs – Non-Federally Funded for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), based on the then-currently approved Capital Budget – Non-Federally Funded or the relevant Default Budget then in effect. Thereafter, no later than the tenth (10th) Business Day of each month, Owner shall replenish the Capital Account – Non-Federally Funded so as to maintain a funding level equal to the sum of anticipated Capital Costs – Non-Federally Funded for the subsequent four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), under the Capital Budget – Non-Federally Funded or the relevant Default Budget then in effect.

(iv)     In each Contract Year, Operator shall be entitled to withdraw from the Capital Account – Non-Federally Funded funds for Capital Costs – Non-Federally Funded actually incurred under the approved Capital Budget – Non-Federally Funded or the relevant Default Budget then in effect; *provided*, <u>however</u>, that Operator shall notify Administrator in writing at least ten (10) Business Days in advance of any Excess Expenditure withdrawal, together with the details thereof and recommendations for mitigating any additional excess costs. Subject to Section 5.14(b) (*Emergency Action – Emergencies*), without the prior written approval of Administrator, which approval shall not be unreasonably withheld, delayed or conditioned, Operator shall not withdraw from the Capital Account – Non-Federally Funded funds for Capital Costs – Non-Federally Funded that are not included in the then-currently approved Capital Budget – Non-Federally Funded or the relevant Default Budget then in effect.

(v)     Simultaneous with each withdrawal of funds from the Capital Account – Non-Federally Funded, Operator shall provide Administrator with written notice of such withdrawal, including a summary of Capital Costs – Non-Federally Funded being paid. Not later than ten (10) Business Days following each month end during which funds were withdrawn from the Capital Account – Non-Federally Funded, Operator shall furnish Administrator with a

CONFIDENTIAL

full accounting setting forth in reasonable detail the Capital Costs – Non-Federally Funded actually incurred and paid during the prior month.

    (d)    <u>Outage Event Reserve Account</u>.

    (i)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more Outage Event Reserve Accounts from which Operator shall draw funds from time to time to pay for costs in connection with an Outage Event ("<u>Outage Event Costs</u>") incurred by Operator (collectively, the "<u>Outage Event Reserve Account</u>").

    (ii)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall fund the Outage Event Reserve Account with an amount equal to US$30,000,000. Promptly following a withdrawal, Owner shall replenish the Outage Event Reserve Account so as to maintain an amount equal to US$30,000,000.

    (iii)    Subject to the terms of this Section 7.5(d) (*Service Accounts – Outage Event Reserve Account*), Operator shall be entitled to withdraw funds from the Outage Event Reserve Account from time to time as necessary to fund payment for Outage Event Costs. Simultaneous with each such withdrawal, Operator shall provide Administrator with written notice of such withdrawal, including a summary of Outage Event Costs being paid. Not later than ten (10) Business Days following each month end during which funds were withdrawn from the Outage Event Reserve Account, Operator shall furnish Administrator with a full accounting setting forth in reasonable detail the Outage Event Costs actually incurred and paid during the prior month.

    (e)    <u>Generation Expenditures Accounts</u>.

    (i)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish one or more generation expenditures accounts from which Operator shall draw funds from time to time to pay for actual Generation Pass-Through Expenditures, including:

    (A)    a Purchased Power Account from which Operator shall draw funds from time to time to pay for operation and management expenses incurred in connection with the GridCo-GenCo PPOA, any expenses incurred in connection with the Shared Services Agreement and any expenses incurred in connection with the Generation Supply Contracts, as applicable (the "<u>Purchased Power Account</u>"); and

    (B)    a Fuel Account from which Operator shall from time to time pay fuel supply expenses incurred in connection with the GridCo-GenCo PPOA and expenses incurred in connection with any fuel supply arrangement between GridCo and GenCo, as applicable (the "<u>Fuel Account</u>," and together with the Purchased Power Account and any other generation expenditure accounts, the "<u>Generation Expenditures Accounts</u>").

    (ii)    No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall fund the Purchase Power Account with an amount equal to anticipated, applicable Generation Pass-Through Expenditures for the following two (2) months,

CONFIDENTIAL

subject to Section 7.8 (*Owner Credit Rating*), based on the then-currently approved Generation Budget or the relevant Default Budget then in effect. Thereafter, no later than the tenth (10th) Business Day of each month (beginning in the month following that in which the Service Commencement Date occurs), Owner shall replenish the Purchased Power Account so as to maintain a funding level equal to the sum of anticipated, applicable Generation Pass-Through Expenditures for the subsequent two (2) months, subject to Section 7.8 (*Owner Credit Rating*), under the Generation Budget or the relevant Default Budget then in effect. Owner shall fund the Fuel Account with an amount to be determined in accordance with the minimum working capital level set forth under the GridCo-GenCo PPOA and any fuel supply arrangement between GridCo and GenCo, as applicable.

(iii)     In each Contract Year, Operator shall be entitled to withdraw funds from the Generation Expenditures Accounts for Generation Pass-Through Expenditures actually incurred under the approved Generation Budget or the relevant Default Budget then in effect. Operator shall not withdraw funds from the Generation Expenditures Accounts for Generation Pass-Through Expenditures that are not included in the then-currently approved Generation Budget or the relevant Default Budget then in effect; provided that such approval shall not be required in case of any circumstance, event or condition unforeseeable by Operator or which, if foreseeable, could not be avoided in whole or in part by the exercise of due diligence by Operator, requiring funding in excess of the amounts available for such matter in the then-currently approved Generation Budget or the relevant Default Budget then in effect and for which a prudent Person in the business of operating and managing the T&D System would expend funds prior to the time that the applicable Budget could reasonably be expected to be amended; provided further, however, that Operator shall (x) notify Administrator in writing promptly upon Operator becoming aware of the occurrence of such circumstance, event or condition and (y) provide the details of such circumstance, event or condition and the amount of any withdrawal related thereto that Operator intends to make from the Generation Expenditures Account.

(iv)     Simultaneous with each withdrawal of funds from the Generation Expenditures Accounts, Operator shall provide Administrator with written notice of such withdrawal, including a summary of Generation Pass-Through Expenditures being paid. Not later than ten (10) Business Days following each month end, Operator shall furnish Administrator with a full accounting setting forth in reasonable detail the Generation Pass-Through Expenditures actually incurred and paid during the prior month.

(f)     Contingency Reserve Account.

(i)     No later than ten (10) Business Days prior to the Service Commencement Date, Owner shall establish an account (the "Contingency Reserve Account") from which Operator shall be entitled to draw funds from time to time in the event that at any time during the Term there are insufficient funds in the Operating Account, Capital Account – Federally Funded, Capital Account – Non Federally Funded, Outage Event Reserve Account or Generation Expenditures Accounts to pay for T&D Pass-Through Expenditures, Capital Costs, Outage Event Costs or Generation Pass-Through Expenditures (any such event, a "Funding Shortage")

(ii)     No later than the tenth (10th) Business Day of each month (beginning in the month in which the Service Commencement Date occurs) Owner shall fund the Contingency

CONFIDENTIAL

Reserve Account in an amount equal to 1/24 of the Contingency Reserve Amount, until such time as the Contingency Reserve Account is funded to the level of the Contingency Reserve Amount; provided that if, in any given month, Owner does not have sufficient funds to fund the Contingency Reserve Account in the required amount, the failure to so fund shall not constitute a default hereunder if Owner promptly funds the Contingency Reserve Account to the level that would have been maintained in the Contingency Reserve Account had no such insufficiencies occurred as soon as Owner has sufficient funds to do so.

(iii) From time to time, Operator shall be entitled to withdraw such amounts of funds from the Contingency Reserve Account as is necessary to address a Funding Shortage; provided, however, that Operator shall (A) notify Administrator in writing immediately upon Operator becoming aware of a Funding Shortage and (B) provide the details of such Funding Shortage and the amount of any withdrawal that Operator intends to make from the Contingency Reserve Account.

(iv) Following a withdrawal from the Contingency Reserve Account, Owner shall replenish the Contingency Reserve Account by depositing no later than the tenth (10th) Business Day of each month (beginning in the month following that in which the withdrawal occurred) an amount equal to 1/24 of the Contingency Reserve Amount until such time as the Contingency Reserve Account is funded to the level of the Contingency Reserve Amount; provided that if, in any given month, Owner does not have sufficient funds to fund the Contingency Reserve Account in the required amount, the failure to so fund shall not constitute a default hereunder so long as the Contingency Reserve Account is topped up to the level at which it should be in at any given point as soon as Owner has sufficient funds to do so.

(g) Service Account Disputes. The Parties hereby agree that, in the event that a dispute arises in connection with a Service Account, the Front-End Transition Account or the Back-End Transition Account, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "Service Account Dispute").

(h) Withdrawals by Owner. Owner shall not withdraw funds held in (i) any Service Account (other than from the Operating Account for payment of the Service Fee due to Operator), (ii) the Front-End Transition Account (other than for payment of the Front-End Transition Service Fee due to Operator) or (iii) the Back-End Transition Account (other than for payment of the Back-End Transition Service Fee due to Operator), in each case without Administrator's and Operator's prior written approval.

**Section 7.6   Disallowed Costs**.

(a) Generally. Subject to the limitations on liability in Section 18.3 (*Limitation on Liability*), none of the following shall be treated as T&D Pass-Through Expenditures for purposes of payment from Owner to Operator, and each shall be the sole responsibility of Operator (collectively, "Disallowed Costs"):

(i) any and all T&D Pass-Through Expenditures, Capital Costs, Outage Event Costs or Excess Expenditures incurred as a result of Operator's negligence (including gross negligence) or willful misconduct, except in connection with Section 5.10 (*Environmental, Health*

*and Safety Matters*) where the applicable standard shall be gross negligence or willful misconduct to the extent provided therein;

(ii) any and all fines, penalties or other similar payments or charges imposed by PREB on Operator, except to the extent Operator is performing its obligations under this Agreement in accordance with this Agreement; and

(iii) other than as a result of Owner Fault, any and all Losses resulting from a denial by FEMA, HUD or a similar Governmental Body (such as COR3 or PRDH) of reimbursement of all or a portion of Capital Costs – Federally Funded on the grounds that actions taken by Operator were in violation of any Federal Funding Requirements, which denial becomes final, except that any Capital Costs – Federally Funded that were incurred in accordance with the Federal Funding Procurement Manual or approved by FEMA shall not be treated as a Disallowed Cost.

(b) <u>Disallowed Costs Disputes</u>. The Parties hereby agree that, in the event that a dispute arises in connection with Disallowed Costs, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "<u>Disallowed Costs Dispute</u>"). In such event, Operator may continue to withdraw such T&D Pass-Through Expenditures from the applicable Service Account; <u>provided</u> Operator shall be responsible to reimburse Owner promptly (and in any event within five (5) Business Days) any T&D Pass-Through Expenditures that are determined to be Disallowed Costs pursuant to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*).

**Section 7.7   Unfunded Amounts**. Notwithstanding anything contained in this Agreement to the contrary, the Parties acknowledge and agree that Operator shall have no obligation or responsibility to incur or pay any costs or make expenditures in providing the O&M Services hereunder (other than Disallowed Costs) to the extent any of the Service Accounts do not contain sufficient funds to pay such costs and expenditures. Without limiting Operator's termination rights hereunder, and except to the extent Operator exercises its rights to cease providing the O&M Services pursuant to Section 14.4 (*Termination for Owner Event of Default*), to the extent sufficient funds are not available for withdrawal by Operator from the Service Accounts, the Front-End Transition Account or the Back-End Transition Account, as applicable, Operator shall take reasonable measures to maintain the continuity of the O&M Services in accordance with the Contract Standards to the extent possible in the absence of its receipt of such sufficient funding.

**Section 7.8   Owner Credit Rating**.

(a) <u>Investment Grade Rating</u>. Notwithstanding anything contained in this Agreement to the contrary, the Parties acknowledge and agree that to the extent (i) any direct obligations of any Owner or any of its Affiliates or successors secured by System Revenues are assigned an Investment Grade Rating or (ii) any direct obligations of the Securitization SPV secured by System Revenues are assigned a rating of AA or the equivalent, in each case by two or more of the Rating Agencies, then (A) the level of pre-funding required pursuant to Section 4.6(c)(i) (*Front-End Transition Period Compensation – Funding*), Section 7.5(a)(ii) (*Service Account – Operating Account*), Section 7.5(b)(iii) (*Service Account – Capital Account –*

CONFIDENTIAL

*Federally Funded*), Section 7.5(c)(iii) (*Service Account – Capital Account – Non-Federally Funded*), Section 7.5(e)(ii) (*Service Account – Generation Expenditures Accounts*) and Section 16.4(c)(ii) (*Back-End Transition Period Compensation – Funding*) shall be reduced from four and a half (4.5) months to three (3) months and (B) there shall be no further obligation to deposit funds into the Contingency Reserve Account. Any funds that are released from any Service Account as a result of the operation of this Section 7.8(a) (*Owner Credit Rating – Investment Grade Rating*) shall, at Owner's sole discretion, be used for the repayment of existing debt of Owner, refunds to T&D Customers or other similar purposes.

(b) <u>Reinstatement of Pre-Funding</u>. If at any time, (i) any direct obligations of any Owner or any of its Affiliates or successors secured by System Revenues are downgraded from an Investment Grade Rating by any Rating Agency that had provided an Investment Grade Rating or (ii) any direct obligations of the Securitization SPV secured by System Revenues are downgraded from a rating of AA or the equivalent by any Rating Agency that had provided such rating (in each case, a "<u>Rating Downgrade</u>"), then (A) the level of pre-funding required pursuant to Section 4.6(c)(i) (*Front-End Transition Period Compensation – Funding*), Section 7.5(a)(ii) (*Service Account – Operating Account*), Section 7.5(b)(iii) (*Service Account – Capital Account – Federally Funded*), Section 7.5(c)(iii) (*Service Account – Capital Account – Non-Federally Funded*), Section 7.5(e)(ii) (*Service Account – Generation Expenditures Accounts*) and Section 16.4(c)(ii) (*Back-End Transition Period Compensation – Funding*) shall be increased from three (3) months to four and a half (4.5) months and (B) the obligation to deposit funds into the Contingency Reserve Account pursuant to Section 7.5(f) (*Service Accounts – Contingency Reserve Account*) shall be reinstated; <u>provided</u> that if Owner does not have sufficient funds to fund Front-End Transition Account, the Service Accounts or the Back-End Transition Account in the required amount, the failure to so fund shall not constitute a default hereunder so long as the Front-End Transition Account, the Service Accounts and the Back-End Transition Account are topped up to the level at which it should be at any given point as soon as Owner has sufficient funds to do so and in any event within six (6) months of the date of the Rating Downgrade.

 **Section 7.9 Owner Payment of Administrator Costs**. Owner shall be solely responsible for all costs and expenses of Administrator in connection with the performance of Administrator's obligations under this Agreement, and shall pay or reimburse Administrator promptly for any out-of-pocket or third-party costs and expenses.

CONFIDENTIAL

# ARTICLE 8
# CREDIT SUPPORT

**Section 8.1     Guarantee**. Operator shall cause the Guarantee to be provided on or prior to the Effective Date and maintained thereafter throughout the Term.

**Section 8.2     Guarantor Reports**. While any Guarantee is outstanding, Operator shall deliver to Administrator (with copy to PREB): (i) within sixty (60) days after the end of the second quarter of a Guarantor's fiscal year, a copy of the unaudited balance sheets of such Guarantor at the end of each such period and the related unaudited statements of income, changes in equity and cash flows for each such period, in a manner and containing information consistent with such Guarantor's current practices; and (ii) within one hundred twenty (120) days after the end of such Guarantor's fiscal year, a copy of the audited balance sheets of such Guarantor at the end of each such fiscal year, and the related audited statements of income, changes in equity and cash flows for such fiscal year, including, in each case, the notes thereto, in each case prepared in accordance with generally accepted accounting principles consistently applied in the United States (or the equivalent jurisdiction of such Guarantor), together with a certificate from such Guarantor's chief financial officer that such financial statements fairly present, in all material respects, the financial condition and the results of operations, changes in equity and cash flows of such Guarantor as at the respective dates of and for the periods referred to in such financial statements, all in accordance with generally accepted accounting principles in the United States (or the equivalent jurisdiction of such Guarantor) consistently applied. Such financial statements shall reflect the consistent application of such accounting principles throughout the periods involved, except as disclosed in the notes to such financial statements. In addition to the foregoing, Operator shall provide an opinion thereon of an independent public accountant of national stature in the United States (or the equivalent jurisdiction of such Guarantor) engaged by such Guarantor. If applicable, Operator shall also furnish Administrator copies of the quarterly and annual reports of Guarantor(s) filed with the U.S. Securities and Exchange Commission or with any other comparable international securities regulatory agency.

CONFIDENTIAL

# ARTICLE 9
## COMPLIANCE WITH APPLICABLE LAW

**Section 9.1    Compliance Obligations**. Operator shall perform, and shall cause all Contractors and Subcontractors to perform, the O&M Services in accordance with the Contract Standards and Applicable Law.

**Section 9.2    Anti-Corruption and Sanctions Laws**.

(a)       Anti-Corruption. Neither Operator, its subsidiaries, nor, when acting on behalf of Operator or its subsidiaries, any director or officer or employee of Operator or its subsidiaries, nor, in connection with this Agreement or the O&M Services, any Affiliates of Operator shall violate, conspire to violate, aid and abet the violation of any anti-bribery, anti-corruption or anti-money laundering law or regulation, including Act 2 and any other laws or regulation related to political activity, conflicts of interest, embezzlement, the misuse of public funds, or property or bidding on or otherwise seeking government contracts (collectively, the "Anti-Corruption Laws"). No funds transferred by Owner to Operator shall be transferred by Operator, directly or indirectly, in violation of any Anti-Corruption Laws. Operator acknowledges and agrees that it shall be subject to Title III of Act 2, known as the Code of Ethics for Subcontractors, Suppliers and Applicants for Economic Incentives of the Government of Puerto Rico.

(b)       Sanctions. Neither Operator, its subsidiaries or Parent Company, nor any director or officer of Operator, its subsidiaries or Parent Company are Sanctioned Persons or are located, organized or resident in a Sanctioned Country. Neither Operator nor its subsidiaries, nor any director, or officer or employee of Operator, its subsidiaries (when acting on behalf of Operator or its subsidiaries), shall directly or, knowingly, indirectly, engage in any transactions or business activity of any kind with a Sanctioned Person or a Person located, organized or resident in a Sanctioned Country. No funds transferred by Owner to Operator or its subsidiaries shall be transferred by Operator or its subsidiaries, directly or indirectly, to a Sanctioned Person, a Person located, organized or resident in a Sanctioned Country, or in violation of Sanctions.

(c)       Policies and Procedures. Operator and its subsidiaries shall maintain and implement policies, procedures and controls reasonably designed to ensure compliance by Operator and its subsidiaries with the Anti-Corruption Laws and Sanctions. Operator shall include in all invoices to Administrator a written certification substantially in the form of Exhibit C (*Form of Anti-Corruption Certification*), and acknowledges that any invoice not including such certification shall not be accepted by Administrator. Operator shall require any Contractors and Subcontractors engaged by Operator to execute at the commencement of the Contract or Subcontract (i) a Sworn Statement and (ii) a certification substantially in the form of Exhibit C (*Form of Anti-Corruption Certification*).

(d)       Notice. Operator shall promptly notify Administrator in writing in accordance with Section 20.2 (*Notices*) if, to Operator's knowledge, Operator, its subsidiaries, any director, officer or employee of Operator or its subsidiaries, or, in connection with this Agreement or the O&M Services, any Affiliates of Operator becomes subject to any investigation by law enforcement or regulatory authorities in connection with the Anti-Corruption Laws or Sanctions.

CONFIDENTIAL

**Section 9.3     Commonwealth Requirements**.

(a)     <u>Practice of Engineering, Architecture and Other Professions in the Commonwealth</u>. To the extent that performance of the O&M Services involves performance of architectural, engineering, land surveying and landscape architecture services governed by Act No. 173 of the Legislative Assembly of Puerto Rico, enacted on August 12, 1988 ("<u>Act 173</u>"), then (i) Operator shall comply (and shall require Contractors and Subcontractors or agents, if any, to comply) with Act 173 and (ii) Operator shall require that its Subcontractors and agents comply with Act 173.

(b)     <u>Contractor and Supplier Contracts</u>. To the extent permitted by Applicable Law, Operator shall include the provisions of this Article 9 (*Compliance with Applicable Law*) and Exhibit B (*Form of Commonwealth Certifications*) in every Contract, Subcontract and supply contract in order for such provisions to be binding on each Contractor, Subcontractor or supplier.

(c)     <u>Local Goods and Services</u>. As required by Article 10 of Act No. 14 of the Legislative Assembly of Puerto Rico, enacted on January 8, 2004, Operator shall use commercially reasonable efforts to use, to the extent available and applicable to the services provided hereunder, and to the extent permitted by Applicable Law and the Federal Funding Requirements, goods extracted, produced, assembled, packaged, bottled or distributed in the Commonwealth by businesses operating in the Commonwealth or distributed by agents established in the Commonwealth.

**Section 9.4     Non-Discrimination Laws**. Operator shall comply with all Applicable Law regarding non-discrimination.

**Section 9.5     Non-Collusion and Acceptance**. Operator attests, subject to the penalties for perjury, that no Representative of Operator, directly or indirectly, to the best of Operator's knowledge, entered into or offered to enter into any combination, conspiracy, collusion or agreement to receive or pay any sum of money or other consideration for the execution of this Agreement other than that which is expressly set forth in this Agreement.

**Section 9.6     Commonwealth Tax Liabilities**. Operator shall inform Administrator if, at any time during the Term, there are any material tax disputes with any Governmental Body of the Commonwealth (other than Commonwealth Tax liabilities for which Operator is not responsible under this Agreement, if any).

**Section 9.7     Certifications Required by Commonwealth Contractor Requirements**. Operator has (i) certified that it has complied and is in compliance with the provisions of the Public-Private Partnerships Authority's Ethical Guidelines and (ii) delivered the Sworn Statement upon execution hereof.

**Section 9.8     Duty to Inform of Criminal Investigations**. Operator shall inform Administrator if, at any time during the Term, it becomes aware that it is subject to investigation in connection with criminal charges related to acts of corruption, the public treasury, the public trust, a public function or charges involving public funds or property.

CONFIDENTIAL

**Section 9.9    Act 120**. Pursuant to Section 5(f) of Act 120 and subject to the provisions of this Agreement, Operator shall at all times comply with the public policy and regulatory framework applicable to the T&D System.

CONFIDENTIAL

# ARTICLE 10
# INSURANCE

**Section 10.1   Insurance Generally**. From the Service Commencement Date and for the remainder of the Term thereafter, and for such additional periods as may be specified, Operator shall maintain in effect, and cause any Contractor and Subcontractor performing any of the O&M Services to maintain in effect, for the benefit of Owner and Operator, as applicable, the insurance policies and limits of coverage specified in Annex XII (*Insurance Specifications*), and such additional coverage (i) as may be required by Applicable Law and (ii) that a prudent Person in the business of operating and managing the T&D System would maintain (the "Required Insurance"), and shall provide insurance management services, including placing insurance with carriers, and claims management and processing, as more fully described in Annex I (*Scope of Services*). All Required Insurance shall be in a form reasonably acceptable to Administrator and shall only be issued by generally recognized financially responsible insurers that (x) are authorized to do business in the Commonwealth or are otherwise authorized or permitted by the Office of the Commissioner of Insurance of Puerto Rico and (y) at a minimum have a rating of A(VIII) or better by A.M. Best Company or an equivalent rating by another similarly recognized insurance rating agency (unless Administrator consents to waive this requirement). All premiums, deductibles, and other fees, costs and expenses (including uninsured Losses that are not Disallowed Costs and losses in excess of insurance) shall be T&D Pass-Through Expenditures.

**Section 10.2   Commercial Availability**. Notwithstanding anything to the contrary herein, if any Required Insurance policy shall not be available at commercially reasonable rates, Operator shall promptly notify Administrator, in writing, but in no event less than sixty (60) days prior to the expiration of any Required Insurance and Operator shall have the right to request that Administrator consent to waive such requirement, which consent shall not be unreasonably withheld, delayed or conditioned. In the event that any Required Insurance policy is not available at commercially reasonable rates, as reasonably determined by Administrator, and Administrator consents to waive such requirement, any such waiver shall be effective only for so long as such insurance shall not be available at commercially reasonable rates; provided that during the period of such waiver, (i) Operator shall maintain the maximum amount of such insurance otherwise available at commercially reasonable rates and (ii) Administrator shall have the right to seek alternative coverage acceptable to Administrator. During the period of any such waiver, any loss that would otherwise have been insured shall be treated as a T&D Pass-Through Expenditure, and the Parties shall consider appropriate adjustments to the Budgets in accordance with Section 7.4 (*Budget Policy*). If Administrator elects to purchase alternative coverage for the period of such waiver (x) Operator shall use its commercially reasonable efforts to ensure that Administrator is able to timely obtain such coverage and (y) any excess cost of such alternative coverage shall be treated as a T&D Pass-Through Expenditure.

**Section 10.3   Additional Named Insureds**. Operator, Operator Indemnitees and Owner shall be included as additional named insureds, where commercially applicable and pertinent to the coverage, including as provided in Annex XII (*Insurance Specifications*), along with waivers of subrogation, breach of warranties or separation of insureds and contractual liability endorsements on any Required Insurance policies, which policies shall require thirty (30) days prior written notice to Administrator by Operator prior to the effective date of any change in or non-renewal or cancellation of such policies. Insurance coverage required pursuant to this

Section 10.3 (*Additional Named Insureds*) shall be maintained with generally recognized financially responsible insurers that (i) are authorized to do business in the Commonwealth or are otherwise authorized or permitted by the Office of the Commissioner of Insurance of Puerto Rico and (ii) at a minimum have a rating of A(VIII) or better by A.M. Best Company or an equivalent rating by another similarly recognized insurance rating agency (unless Administrator consents to waive this requirement). In addition, Operator shall be named as a "loss payee" for each of the policies of insurance contemplated herein and shall be entitled to receive all proceeds of the Required Insurance. In the event of a Loss relating to the O&M Services, the T&D System or any T&D System Site, Owner shall open an account in which to deposit any proceeds of insurance for any such Losses (the "Insurance Proceeds Account"). If Operator receives any proceeds of insurance for any Losses relating to the O&M Services, the T&D System or any T&D System Site, Operator shall deposit such amounts into the Insurance Proceeds Account within three (3) Business Days of receipt of such proceeds. If Owner receives any proceeds of insurance for any Losses relating to the O&M Services, the T&D System or any T&D System Site, Owner shall hold such amounts in trust, for the benefit of Operator, and Owner shall deposit such amounts in the Insurance Proceeds Account within three (3) Business Days following the request of Operator. Funds in the Insurance Proceeds Account shall be used to remediate the T&D System in a manner consistent with Prudent Utility Practice and reasonably approved by Administrator.

**Section 10.4    Warranties**. Operator shall maintain and enforce any warranties or guarantees on any facilities, vehicles, equipment or other items owned or leased by Owner (to the extent made known to Operator), or purchased or leased on behalf of Owner and used by Operator in performing O&M Services under this Agreement. Operator shall not, by act or omission, negligently or knowingly invalidate in whole or part such warranties or guarantees without the prior approval of Administrator, such approval not to be unreasonably withheld, delayed or conditioned.

**Section 10.5    Certificates of Insurance, Policies and Notice**. Operator shall supply Administrator with copies of certificates of insurance promptly following issuance by the insurers. Not later than sixty (60) days prior to the beginning of each Contract Year following the Service Commencement Date and for the remainder of the Term thereafter, Operator shall furnish certificates of insurance to Administrator to confirm the continued effectiveness of the Required Insurance. Whenever a Contractor or Subcontractor is utilized, Operator shall either obtain and maintain on behalf of the Contractor or Subcontractor, or require the Contractor or Subcontractor to obtain and maintain, insurance in accordance with the applicable requirements of Annex XII (*Insurance Specifications*). Administrator's receipt of certificates that do not comply with the requirements stated herein, or Operator's failure to provide certificates, shall not limit or relieve Operator of the duties and responsibility of maintaining insurance in compliance with the requirements in this Article 10 (*Insurance*) and shall not constitute a waiver of any of the requirements in this Article 10 (*Insurance*).

CONFIDENTIAL

# ARTICLE 11
## SUBCONTRACTORS AND CONTRACTORS

**Section 11.1    Ability to Subcontract and Contract**.

(a)    <u>Subcontractors Generally</u>. Operator shall have the right, but not the obligation, to engage Subcontractors to perform the O&M Services, subject to Section 11.1(c) (*Ability to Subcontract and Contract – Federally Funded Capital Improvements*) in the case of Federally Funded Capital Improvements. Operator's payment obligations under any Subcontract shall be a T&D Pass-Through Expenditure (except to the extent Operator elects to subcontract any service to be provided by ManagementCo between the Service Commencement Date and the expiration or early termination of this Agreement, in which case any such payment obligation shall be paid by ManagementCo from the Fixed Fee). Operator shall provide Administrator (with copy to PREB) with a list of Subcontractors that Operator has engaged or intends to engage for the performance of any of the O&M Services the cost of which is expected to exceed US$10,000,000 per year or US$30,000,000 in the aggregate (each a "<u>Material Subcontractor</u>"). Administrator shall have the right to approve any Material Subcontractor engaged by Operator to perform any O&M Services, which approval shall not be unreasonably withheld, delayed or conditioned. ServCo shall be required to update such list on or about the fifth (5th) Business Day of each Contract Year. Operator shall ensure that: (i) any Subcontractor engaged by it exercises due diligence in the performance of the services subcontracted to such Subcontractor; (ii) any Subcontractor performing O&M Services shall be a licensed professional with experience in the performance of the work subcontracted to it; and (iii) Administrator receives any information that it reasonably requests in respect of any Subcontractor.

(b)    <u>Contractors Generally</u>. Operator shall have the right, but not the obligation, to engage Contractors as agent for Owner to perform the O&M Services, subject to Section 11.1(c) (*Ability to Subcontract and Contract – Federally Funded Capital Improvements*) in the case of Federally Funded Capital Improvements. Owner's payment obligations under any Contract shall be a T&D Pass-Through Expenditure. Operator shall provide Administrator (with copy to PREB) with a list of Contractors that Operator has engaged or intends to engage for the performance of any of the O&M Services the cost of which is expected to exceed US$10,000,000 per year or US$30,000,000 in the aggregate ("<u>Material Contractor</u>"). Administrator shall have the right to approve any Material Contractor engaged by Operator to perform any O&M Services, which approval shall not be unreasonably withheld, delayed or conditioned. ServCo shall be required to update such list on or about the fifth (5th) Business Day of each Contract Year. Operator shall ensure that: (i) any Contractor engaged by it exercises due diligence in the performance of the services subcontracted to such Subcontractor; (ii) any Contractor performing O&M Services shall be a licensed professional with experience in the performance of the work subcontracted to it; and (iii) Administrator receives any information that it reasonably requests in respect of any Contractor. Operator agrees that any Contractors engaged to perform O&M Services shall be required to comply with the applicable provisions of the Federal Funding Procurement Manual or Non-Federal Funding Procurement Manual, as applicable. For the avoidance of doubt, as permitted by Section 6(d)(ii) of Act 120, Operator, as agent for Owner, may engage Contractors to perform the O&M Services in a manner consistent with the Procurement Manuals notwithstanding any procurement requirements that would otherwise be applicable to Owner under Act No. 83 of May 2, 1941 (including any rules or regulations issued thereunder).

(c)  Federally Funded Capital Improvements. Owner acknowledges and agrees that Operator may hire Contractors, as agent for and on behalf of Owner, to perform any Federally Funded Capital Improvements; provided that any Contracts related to the performance of any Federally Funded Capital Improvement shall comply with the Federal Funding Requirements, including the requirements described in the Federal Funding Procurement Manual and any competitive bidding processes required for the award of any such Contracts.

(d)  Non-Federally Funded Capital Improvements. Owner acknowledges and agrees that Operator may hire Contractors, as agent for and on behalf of Owner, to perform any Non-Federally Funded Capital Improvements; provided that any Contracts related to the performance of any Non-Federally Funded Capital Improvement shall comply with the Non-Federal Funding Procurement Manual.

**Section 11.2  Subcontract and Contract Terms**. A Tax Opinion and a Reliance Letter shall be obtained, at the expense of Owner or Administrator, with respect to any Subcontract or Contract that is entered into, extended or amended and is a Covered Contract. Operator shall use commercially reasonable efforts to ensure that all agreements with third-parties entered into after the Service Commencement Date in its own name or as agent for Owner that are material to Operator's performance of its obligations hereunder grant Owner or a Person designated by Administrator the right to own or license the goods and services to be provided thereunder. All contracts entered into with Subcontractors by Operator or with Contractors by Operator as agent for Owner, and all warranties and other rights related thereto, with respect to the T&D System shall be assignable to Administrator or a Person designated by Administrator, solely at Administrator's election and without cost or penalty, at the end of the Term or upon early termination of this Agreement, and each Subcontractor and Contractor shall acknowledge in writing the rights of Administrator to take such assignments. Operator shall be responsible for settling and resolving with all Subcontractors and Contractors any claims arising out of delay, disruption, interference, hindrance or schedule extension caused by Operator or inflicted on Operator or a Subcontractor or a Contractor by the actions of another Subcontractor or Contractor.

**Section 11.3  Indemnity for Subcontractor Claims**. Operator shall retain full responsibility to Owner and Administrator under this Agreement for all matters related to the O&M Services notwithstanding the execution or terms and conditions of any Subcontract. Subject to the limitations on liability set forth in Section 18.3 (*Limitation on Liability*), no failure of any Subcontractor used by Operator in connection with the provision of the O&M Services shall relieve Operator from its respective obligations hereunder to perform the O&M Services. Subject to Section 7.6 (*Disallowed Costs*) and Section 7.7 (*Unfunded Amounts*), Operator shall pay when due all undisputed claims and demands of Subcontractors, mechanics, materialmen, laborers and others for any work performed on, or materials delivered for incorporation into any part of, the T&D System by or on behalf of Operator, and shall promptly discharge all mechanics', materialmen's and other construction Liens registered against the T&D System. All such costs (other than Disallowed Costs) shall be treated as T&D Pass-Through Expenditures. No Subcontractor shall have any right against Owner or Administrator for labor, services, materials or equipment furnished after the Service Commencement Date for the O&M Services. Operator acknowledges that its indemnity obligations under Section 18.1 (*Indemnification by Operator*) shall extend to all claims for payment or damages by any Subcontractor that furnishes or claims to

CONFIDENTIAL

have furnished any labor, services, materials or equipment in connection with the O&M Services after the Service Commencement Date.

CONFIDENTIAL

## ARTICLE 12
## TAXATION

**Section 12.1  Withholding Tax**. Owner shall be entitled to (i) deduct and withhold (or cause to be deducted or withheld) from any consideration payable or otherwise deliverable pursuant to this Agreement, such amounts as may be required to be deducted or withheld therefrom under any provision of the U.S. federal, state, Commonwealth, municipal, local or non-U.S. Tax law or under any applicable legal requirement and (ii) request any necessary Tax forms or information, from Operator or any other Person to whom a payment is required to be made pursuant to this Agreement. To the extent such amounts are so deducted or withheld and paid to the applicable taxing authority, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid. The Parties agree to cooperate in good faith to reduce or eliminate the amount of any applicable withholding Taxes. In the event any withholding Taxes are paid by Owner in respect of amounts payable to Operator, Owner shall use commercially reasonable efforts to provide Operator (x) receipts or other evidence of payment of such withholding taxes and (y) all informative statements required by Applicable Law.

**Section 12.2  Tax Obligations**.

(a)  <u>Payment of Taxes</u>. Operator and each of its subsidiaries shall prepare and timely file, or cause to be prepared and filed at its cost, all Tax Returns required to be filed by it under any Applicable Law and shall pay any Taxes required to be paid by it under Applicable Law (whether or not shown as due on such Tax Returns). Such Tax Returns shall be true, correct and complete in all material respects.

(b)  <u>Exemption from Taxes</u>. During the Term, Operator shall not be responsible for, and Operator and the T&D System shall not be subject to, (i) any real property Tax imposed on or measured by the value of the T&D System (including any real property constituting part of the T&D System) that is imposed by any Governmental Body of the Commonwealth or that is imposed on the "owner" of the T&D System (including relating to future expenditures for real property) or (ii) any personal property tax that is imposed by any Governmental Body of the Commonwealth on property owned by Owner and used by Operator exclusively for the T&D System or for the services or functions subject to this Agreement, all of which shall be obligations of Owner, if and to the extent any such Taxes are payable.

(c)  <u>Tax Deductions</u>. Operator and each of its subsidiaries shall comply with all applicable withholding, employment, social security and similar provisions of applicable U.S. federal, state, Commonwealth, municipal, local and foreign laws, and timely withhold and pay all Taxes that it is required to withhold and pay from any Person, including its employees and independent contractors. Owner shall not make any such withholdings or deductions on behalf of Operator.

CONFIDENTIAL

# ARTICLE 13
## INTELLECTUAL PROPERTY; PROPRIETARY INFORMATION

### Section 13.1   Intellectual Property.

(a)        <u>Operator Intellectual Property, Contractor Intellectual Property and Subcontractor Intellectual Property</u>. Any Intellectual Property owned by or licensed to Operator, its Affiliates, a Contractor or a Subcontractor, that is (i) used in the performance of the O&M Services or in connection with the T&D System and (ii) is embedded in or otherwise necessary for the use of the Work Product (as defined herein) or for the operation of the T&D System, but which does not constitute "Work Product," shall remain the Intellectual Property of the owner thereof, and shall be referred to, as the case may be, as "<u>Operator Intellectual Property</u>" (if owned by, or licensed to, Operator or its Affiliates), "<u>Contractor Intellectual Property</u>" (if owned by, or licensed to, a Contractor) or "<u>Subcontractor Intellectual Property</u>" (if owned by, or licensed to, Subcontractor). Operator Intellectual Property and Subcontractor Intellectual Property include all derivatives and improvements thereto or therein (other than those constituting Work Product). For the sake of clarity, "improvements" means all developments and improvements Operator, its Affiliates or Subcontractors may make with respect to their Intellectual Property, respectively, and "derivatives" means any work based on or derived from one or more already existing works. Notwithstanding the foregoing, for certainty, Operator Intellectual Property, Contractor Intellectual Property and Subcontractor Intellectual Property do not include Third-Party Intellectual Property.

(b)        <u>License of Operator Intellectual Property, Contractor Intellectual Property, and Subcontractor Intellectual Property</u>. Except as Administrator and Operator may otherwise mutually agree, Operator and its Affiliates hereby grant to Owner, and shall cause its Affiliates to grant to Owner, a perpetual, non-exclusive, fully paid-up, royalty-free license and sublicense, under Operator Intellectual Property, Subcontractor Intellectual Property and Contractor Intellectual Property (as the case may be) solely in connection with the T&D System and related facilities and their related operations (including the O&M Services) by or on behalf of Owner or any successors or operators thereto to (i) make, have made, use, sell, offer for sale, export or import any product, service or apparatus and practice any method, and (ii) use, reproduce, distribute, perform, display, execute and create derivative works in any medium or format, whether now known or later developed, in connection with any of the foregoing. Owner shall not and shall ensure that its Affiliates do not sublicense, rent, lease, distribute or otherwise authorize the use of Operator Intellectual Property, Contractor Intellectual Property or Subcontractor Intellectual Property to, by or on behalf of anyone other than Owner and its Affiliates, any successors or operators thereto or any other third-party with whom Owner, its Affiliates or any successors or operators thereto contract solely for purposes of operating the T&D system and related facilities. Operator Intellectual Property and Subcontractor Intellectual Property are Operator Confidential Information to the extent disclosed to Owner and for so long as they are protectable as trade secrets or are otherwise confidential. Contractor Intellectual Property is Owner Confidential Information for so long as the information is protectable as trade secrets or are otherwise confidential.

(c)        <u>Third-Party Intellectual Property</u>. Operator shall use commercially reasonable efforts to ensure that any Third-Party Intellectual Property is sublicensable to Owner under terms substantially similar to those obtained by Operator for the use thereof in connection

CONFIDENTIAL

with the T&D System and related facilities and their related operations. The use of Third-Party Intellectual Property shall be subject to the license terms governing the use of such Intellectual Property. To the extent Operator wishes to use any non-commercially available Intellectual Property of any third-party in the provision of the O&M Services, the Front-End Transition Services or the Back-End Transition Services, Operator shall identify to Administrator, in writing in advance of any use of any such Intellectual Property, whether or not Operator has a right to sublicense same to Owner under the same terms as those of the foregoing license requirements.

(i)     If, despite using commercially reasonable efforts, Operator cannot secure such license or sublicense rights, then Operator shall (A) assist Owner in obtaining any necessary license directly from such third-party or (B) pursue licensing of a non-infringing alternative capable of accomplishing the same purpose in substantially the same manner, and, in the case of clause (A) and (B), Operator shall not use such Third-Party Intellectual Property or such alternative prior to Owner obtaining a sufficient license thereto.

(ii)     In no event shall Operator's inability to obtain a right to license or sublicense any non-commercially available Intellectual Property of any third-party excuse Operator's inability to perform or meet any deadline under this Agreement. Any applicable license of Operator or its Affiliates in connection with any non-commercially available third-party Intellectual Property relevant to the provision of the O&M Services, the Front-End Transition Services or the Back-End Transition Services hereunder shall be subject to Administrator's prior approval; *provided* that such approval shall not be unreasonably withheld, delayed or conditioned, and a complete copy of such licenses shall be provided to Administrator. Operator shall be excused for performance hereunder only to the extent such performance is impacted by Administrator's unreasonable withholding, conditioning or delaying of such approval. For the avoidance of doubt, nothing in this Section 13.2(c)(ii) (*Intellectual Property – Third Party Intellectual Property*) shall be interpreted to require Operator to infringe any Third-Party Intellectual Property.

(d)     Work Product.

(i)     The Parties hereby acknowledge and agree that, as between them, Owner shall own all right, title and interest in and to (A) all Intellectual Property, and derivatives thereof, regardless of format, created or produced in the performance of the O&M Services, the Front-End Transition Services or the Back-End Transition Services by Operator and its Affiliates if the cost of such creation or development is a T&D Pass-Through Expenditure and (B) to the extent the applicable third-party contracts so provide, any such Intellectual Property created by any of their Contractors or Subcontractors in connection therewith (collectively, "Work Product"), all of which shall, to the fullest extent under Copyright law, be considered works made for hire. For the avoidance of doubt, Work Product shall not include: (x) any Intellectual Property created or produced (A) prior to the Effective Date, (B) outside the performance of the O&M Services, the Front-End Transition Services or the Back-End Transition Services or (C) if the cost of such creation or development is not a T&D Pass-Through Expenditure; and (y) Operator Intellectual Property, Subcontractor Intellectual Property Contractor Intellectual Property or Third-Party Intellectual Property (which for certainty, includes all derivatives or improvements thereto or therein the cost of which is not a T&D Pass-Through Expenditure).

(ii)     Unless otherwise agreed by the Parties, to the extent that ownership in any Work Product does not automatically vest in Owner, Operator shall transfer and assign, and shall cause its Affiliates to transfer and assign, and shall use commercially reasonable efforts to cause any Contractors or any of its or their Subcontractors to transfer and assign, and Operator does hereby assign all right, title and interest (including all Intellectual Property) in and to such Work Product to Owner. Operator shall, and shall cause its Affiliates and shall use commercially reasonable efforts to cause any applicable Contractors or Subcontractors to, execute all documents and take all actions requested by Administrator to transfer such ownership and otherwise assist Owner to register, patent and otherwise maintain and protect Owner's Intellectual Property rights in and to such Work Product anywhere in the world.

(iii)     Operator shall (A) use commercially reasonable efforts to ensure that relevant contracts with Contractors or Subcontractors properly reflect Owner's ownership of Work Product, and (B) in any event, ensure that contracts with Contractors or Subcontractors properly reflect the grant of licenses from such Contractors or Subcontractors (and Operator's right to sublicense) pursuant to Section 13.1(b) (*Intellectual Property – License of Operator Intellectual Property, Contractor Intellectual Property or Subcontractor Intellectual Property*) or, where Operator is not a party to the agreement with the respective Contractor, use commercially reasonable efforts to ensure where relevant that the contract between Owner and the Contractor includes a license from the Contractor to Owner of a scope consistent with the license granted in Section 13.1(b) (*Intellectual Property – License of Operator Intellectual Property, Contractor Intellectual Property or Subcontractor Intellectual Property*). For the avoidance of doubt, to the extent Operator arranges for a Contractor to perform any of its obligations under this Agreement, Operator shall negotiate terms of such contract that comply with, and are in accordance with, the terms of this paragraph. If any Contractor or Subcontractor refuses to include such a provision in a relevant contract, Operator shall notify Administrator in writing and, at Administrator's request, provided such request does not contravene Federal Funding Requirements, Operator shall not use such Contractor or Subcontractor for the provision of the O&M Services, the Front-End Transition Services or the Back-End Transition Services; provided that any increase in costs arising therefrom shall be deemed approved by Owner and Administrator as a T&D Pass-Through Expenditure so long as Operator uses commercially reasonable efforts to minimize such increase in costs.

(iv)     Operator shall promptly and fully disclose in writing to Owner all patentable Work Product and shall deliver to Owner all other Work Product created during the Term. Upon notification, Owner shall have the right, at its sole discretion and sole cost and expense, to patent such Work Product (the resulting Patents shall be "Owner Patents"); provided that such patenting shall not result in a disclosure of any of Operator, Contractor or Subcontractor's Confidential Information. Pursuant to this Section 13.1(d) (*Intellectual Property – Work Product*), Operator shall provide all necessary assistance for Owner to obtain, sustain and, from time to time, enforce such Owner Patents. The cost of such assistance shall be a T&D Pass-Through Expenditure.

(v)     Notwithstanding the foregoing, Owner acknowledges that nothing in this Agreement is intended to prevent Operator from developing, researching, or distributing any products or offerings similar to, and separate from, any Work Product developed for Owner. To the extent required to avoid Operator being prevented from using such Intellectual Property, Owner hereby grants to Operator a royalty-free, paid-up, non-exclusive, irrevocable, perpetual

CONFIDENTIAL

license to (A) use, make, have made, sell, offer to sell, import, and further sublicense such Intellectual Property, and (B) reproduce, distribute, create derivative works of, publicly perform and publicly display such Intellectual Property in any medium or format, whether now known or later developed, solely provided that Owner shall not be required under this Section to deliver to Operator any such Intellectual Property that is not Work Product. Operator acknowledges that nothing in this Agreement is intended to prevent Owner from developing, researching, or distributing any products or offerings similar to any such items developed by Operator.

(e)    License of Owner Intellectual Property. Subject to the terms and conditions of this Agreement, Owner hereby grants, and shall cause its Affiliates to grant, to Operator and its Affiliates a fully paid-up, royalty-free, nonexclusive, non-transferable, sub-licensable (only to Subcontractors), limited license and sublicense, under the Owner Intellectual Property and, to the extent sub-licensable, Owner Licensed Intellectual Property, during the Term, to: (i) use, sell, offer for sale, export or import any product, service or apparatus and practice any method, and (ii) use, reproduce, distribute, perform, display, execute and create derivative works, in the case of each of clause (i) and (ii), solely as necessary for Operator and its Affiliates to perform their obligations pursuant to this Agreement. The use of Owner Licensed Intellectual Property shall be subject to the license terms governing the use of such Intellectual Property. To the extent any Owner Licensed Intellectual Property cannot be licensed to Operator or its Affiliates, their Subcontractors or any Contractors for any reason, and where such Owner Licensed Intellectual Property is reasonably required for the performance of this Agreement, then Operator or its Affiliates, their Subcontractors or any Contractors shall promptly obtain their own third-party license for the relevant Intellectual Property at Owner's sole cost and expense.

(i)    Operator shall not and shall ensure that its Affiliates do not sublicense, rent, lease, distribute or otherwise authorize the use of Owner Intellectual Property or Owner Licensed Intellectual Property to, by or on behalf of anyone other than Operator and its Affiliates and Subcontractors or any Contractors, for the sole purpose of this Agreement, and otherwise shall not use Owner Intellectual Property or Owner Licensed Intellectual Property for any other purpose.

(ii)    Any sublicensee of Operator or any of its Affiliates with respect to Owner Intellectual Property or Owner Licensed Intellectual Property shall be approved in advance in writing by Administrator, such approval shall not be unreasonably withheld, delayed or conditioned. Unless Administrator otherwise agrees, sublicensee shall expressly agree in writing to be bound by any applicable terms of this Agreement. Operator shall be responsible for compliance by all of its Affiliates, and shall take commercially reasonable steps to ensure the Contractors' and Subcontractors' compliance, with the terms and conditions of this Section 13.1 (*Intellectual Property*) as if undertaken by Operator.

(iii)    Operator agrees to use commercially reasonable efforts to enforce, and shall cause all of its Affiliates to enforce, the terms of any sublicense agreement with respect to Owner Intellectual Property or Owner Licensed Intellectual Property against the sublicensee. It is understood and agreed, however, that Owner shall be a third-party beneficiary of all sublicense agreements relating to Owner Intellectual Property and Owner Licensed Intellectual Property, with the power to enforce relevant terms directly against any sublicensee. Each sublicense shall include

CONFIDENTIAL

a provision that, in the event this Agreement terminates, at Administrator's option, the sublicense shall become a direct license with Owner or Owner's designees.

(iv)   If Operator or any of its Affiliates becomes aware of any infringement or unauthorized use of Owner Intellectual Property or Owner Licensed Intellectual Property, then Operator shall promptly notify and shall cause its Affiliates to promptly notify Administrator thereof in writing and shall provide commercially reasonable assistance and cooperation as may be requested by Administrator, but at Owner's sole cost and expense. Any sublicense entered into between Operator or any of its Affiliates and a Contractor or Subcontractor pursuant to this Agreement with respect to Owner Intellectual Property or Owner Licensed Intellectual Property shall contain a notification provision consistent with the foregoing.

(v)   <u>Reverse Engineering and Other Restrictions</u>. Each Party shall not, and shall ensure that its Affiliates do not, and shall take commercially reasonable efforts to ensure that the Contractors and Subcontractors do not: (A) decompile, disassemble, decrypt or reverse engineer or attempt to reconstruct or discover any source code or underlying ideas or algorithms of any Software that is part of any Intellectual Property owned or licensed by the other Party, or provide any third-party with access to any such Software (including any source code therein) without the other Party's advance written consent, which may be withheld, delayed or conditioned in such Party's sole discretion; (B) except to the extent permitted under this Agreement or by Applicable Law, remove, alter or obscure any product identification, copyright or other intellectual property notices embedded within or on the Intellectual Property; or (C) publish, disclose, sell, rent, lease, lend, distribute, sublicense or provide Intellectual Property of the other Party to any third party, except as expressly permitted herein.

(f)   <u>Owner Trademark License Grant</u>. Notwithstanding the terms and conditions of Section 13.1(g) (*Intellectual Property – Branding; Customer and Public Communications*), and subject to the other terms and conditions of this Agreement, Owner hereby grants to Operator a fully paid-up, royalty-free, nonexclusive, non-transferable, sub-licensable (to Affiliates and Subcontractors of Operator or any Contractors), limited license for a period of one hundred and eighty (180) days following the Service Commencement Date of this Agreement (<u>provided</u> that, upon Operator's request, Owner shall not unreasonably withhold its consent to extend such 180-day period if Operator requires such extension for purposes of the rebranding described below) to use the Owner Marks to perform its obligations hereunder in accordance with the terms and conditions of this Agreement; <u>provided</u> that Operator rebrands the O&M Services to a mark that is not confusingly similar to any of the Owner Marks. Such license shall be subject to the following:

(i)   The Owner Marks are owned solely and exclusively by Owner, and all use of the Owner Marks by Operator, its Affiliates and any Contractor or Subcontractor, and all goodwill associated with the Owner Marks, shall inure to the benefit of Owner.

(ii)   Operator shall adhere, and shall use commercially reasonable efforts to cause its Affiliates and Subcontractors and any Contractors to adhere, to all quality control standards and trademark usage guidelines as established from time to time by Owner and Administrator, including as relating to the review and approval of any proposed new uses of the Owner Marks by Operator in connection with the O&M Services, the Front-End Transition

Services or the Back-End Transition Services (such as any advertising or marketing campaigns). Subject to the System Remediation Plan, Operator shall and shall use commercially reasonable efforts to cause its Affiliates and Subcontractors and any Contractors to: (A) comply with Applicable Law in performing the services under the Owner Marks; (B) refrain from any actions that would harm the reputation of Owner or otherwise cause Owner or its Affiliates to fall into disrepute; and (C) not modify the Owner Marks, or file for any registration or application (including domain names or social media handles) using, incorporating or confusingly similar to any Owner Marks, other than with the prior consent of Owner (in which case any such registrations or applications shall be deemed Work Product hereunder and be deemed used solely under license from and under permission by Administrator during the term of this Agreement).

(iii)    Operator shall, and shall cause its Affiliates to, police any permitted sublicensee's use of the Owner Marks, promptly notify Administrator in writing of any noncompliance, and enforce the terms of the sublicense agreement relating to the Owner Marks against such sublicensee at Operator's own expense. It is understood and agreed, however, that Owner shall be a third-party beneficiary of all sublicense agreements relating to the Owner Marks, with the power to enforce the terms of this Section 13.1(f) (*Intellectual Property – Owner Trademark License Grant*) directly against any sublicensee.

(iv)    If Operator or any of its Affiliates learns of any infringement or unauthorized use of the Owner Marks, then Operator shall promptly notify Administrator in writing and shall provide commercially reasonable assistance and cooperation as may be requested by Administrator, at Owner's cost and expense.

(g)    Branding; Customer and Public Communications.

(i)    Commencing no later than the Service Commencement Date, the Operator and its management shall become publicly associated with the T&D System for the Term. To that end, the Operator Marks shall within one hundred and eighty (180) days of the Service Commencement Date, and for the duration of the Term, replace the Owner Marks, including on all signage, customer bills, vehicles, equipment, uniforms, letterhead, and on utility-related communications, advertisements, public announcements, websites and similar areas and the Operator shall have full authority to determine policies and procedures with respect to the use of the Operator Marks. Upon the expiration or earlier termination of this Agreement, the Operator Marks shall, as promptly as practicable and in any event within one hundred and eighty (180) days, be removed from the aforementioned areas, and all rights to the Operator Marks granted by the Operator to Owner (or to any entity other than the Operator and its Affiliates) under this Agreement, including any licenses or sublicenses with respect thereto, subject to the foregoing phase-out period, shall terminate, in each case unless otherwise agreed to in writing by the Operator.

(ii)    The Operator shall have direct responsibility for media and other public communications on all utility related matters, including communications with public officials and local municipalities and counties regarding storm preparation, management, coordination and response, customer communications, programs and complaints and related matters. Accordingly, the Operator shall have authority to determine communications policies and procedures relating to its provision of O&M Services under this Agreement; provided that

CONFIDENTIAL

Administrator may elect to review and approve (i) official press releases and (ii) statements to the media concerning Owner or any of its employees.

(iii)     Operator shall use the Operator Marks to perform its obligations hereunder in accordance with the terms and conditions of this Agreement, including with respect to the O&M Services, the Front-End Transition Services or the Back-End Transition Services (including any advertising or marketing campaigns).

(iv)     The Operator Marks are owned solely and exclusively by Operator. None of Owner, Administrator or any of their respective Affiliates shall use any of the Operator Marks without the written agreement of Operator. Upon request of Administrator, prior to the expiration or early termination of this Agreement, Operator shall be responsible for re-branding the T&D System to an Owner Mark or another trademark designated by Administrator, as part of the Back-End Transition Services.

(h)     _Other_. Notwithstanding anything to the contrary in this Agreement, any non-compliance, error or mistake of any Party with respect to any of its obligations under Section 5.15 (_Information_) or this Section 13.1 (_Intellectual Property_) shall not constitute an event of default or a breach under this Agreement if such non-compliance, error or mistake is (i) inadvertent, (ii) does not have, or would not reasonably be expected to have, a material and adverse effect on the performance by any Party of its obligations under this Agreement and (iii) is cured within thirty (30) days of such Party becoming aware of such non-compliance, error or mistake, or such longer period as may be required in light of the System Remediation Plan.

(i)     _Feedback_. Each Party may from time to time provide suggestions, comments or other feedback ("Feedback") to the other Party regarding the Intellectual Property of the Party receiving the Feedback. Each Party agrees that all Feedback is and shall be given entirely voluntarily. Feedback, even if designated as confidential by the Party offering Feedback, shall not, absent a separate written agreement, create any confidentiality obligation for the receiver of the Feedback. Furthermore, except as otherwise provided in a separate subsequent written agreement between the Parties, the receiver of the Feedback shall be free to use, disclose, reproduce, license or otherwise distribute, and exploit the Feedback provided to it, royalty free, entirely without obligation or restriction of any kind on account of intellectual property rights or otherwise.

### Section 13.2     Proprietary Information.

(a)     _Confidentiality Obligation_.

(i)     Subject to the remainder of this Section 13.2 (_Proprietary Information_), any and all written, recorded or oral System Information furnished or made available in connection with this Agreement, or that constitutes Work Product, shall be deemed "Owner Confidential Information". Work Product shall be deemed Owner Confidential Information with respect to which Operator shall be deemed to be the receiving Party and Owner shall be deemed to be the disclosing Party. "Operator Confidential Information" includes Confidential Information pertaining to Operator Intellectual Property, Contractor Intellectual Property or Subcontractor Intellectual Property, or to Operator's policies and strategies. Confidential Information shall not include any of the foregoing that: (A) is when furnished, or thereafter becomes, available to the

public other than as a result of a disclosure by the receiving Party or its Representatives; (B) is already in the possession of or become available to the receiving Party or its Representatives on a non-confidential basis from a source other than the disclosing Party or its Representatives; provided, that to the actual knowledge of the receiving Party or its Representatives, as the case may be, such source is not and was not bound by an obligation of confidentiality to the disclosing Party or its Representatives; or (C) the receiving Party or its Representatives can demonstrate has been independently developed without a violation of this Agreement.

(ii)    Subject to the remainder of this Section 13.2 (*Proprietary Information*), each receiving Party shall, and shall cause its Representatives to, (A) keep strictly confidential and take reasonable precautions to protect against the disclosure of all Confidential Information of the disclosing Party, and (B) use all Confidential Information of the disclosing Party solely for the purposes of performing its obligations under the Transaction Documents and not for any other purpose; provided, that:

(A)    a receiving Party may disclose Confidential Information of the disclosing Party to those of its Representatives who need to know such information for the purposes of performing the receiving Party's obligations under this Agreement if, but only if, prior to being given access to such Confidential Information, such Representatives are informed of the confidentiality thereof and the requirements of this Agreement and are obligated to comply with the requirements of this Agreement;

(B)    the foregoing shall not limit any rights or licenses granted under Article 13 (*Intellectual Property; Proprietary Information*); provided that the licensee shall treat any Confidential Information included in such license in a manner consistent with this Section 13.2 (*Proprietary Information*) and in any event with the same care as it would treat its own comparable information, acting reasonably; and

(C)    each Party shall be responsible for any breach of this Agreement by its Representatives.

(iii)    Operator may designate conspicuously any documents or other materials that it believes contain privileged, trade secret, commercially sensitive or other information that may be exempted from disclosure in response to a public records request under applicable Public Information Disclosure Requirements by placing "CONFIDENTIAL" in the header or footer of such page or record affected.

(b)    Permitted Disclosures.

(i)    Subject to the terms of this Section 13.2 (*Proprietary Information*), each receiving Party may disclose Confidential Information of the disclosing Party to a duly authorized Governmental Body where required to do so by Applicable Law. None of the Parties shall have any liability whatsoever to the other Party in the event of any unauthorized use or disclosure by a Governmental Body of any Confidential Information of another Party to the extent such disclosure was required by Applicable Law and was in accordance with the requirements of this Section 13.2 (*Proprietary Information*).

**CONFIDENTIAL**

(ii)     Subject to the terms of this Section 13.2 (*Proprietary Information*), each Party may disclose Confidential Information of the other Party to the extent necessary to comply with any subpoena or order of any Commonwealth Court or other judicial entity having jurisdiction over the receiving Party, or in connection with a discovery or data request of a party to any proceeding before any of the foregoing.

(iii)     For the avoidance of doubt, nothing is this Agreement shall prevent Administrator from disclosing Owner Confidential Information in its sole discretion; provided that Administrator shall not disclose Operator Intellectual Property, to the extent constituting Confidential Information, unless specifically authorized under this Section 13.2 (*Proprietary Information*). Additionally, nothing is this Agreement shall prevent Operator from disclosing Operator Confidential Information in its sole discretion; provided that Operator shall not disclose any Confidential Information derived from or embodying Owner Intellectual Property, to the extent confidential, unless specifically authorized under this Section 13.2 (*Proprietary Information*).

(c)     Duty to Seek Protection. To the extent permitted under Applicable Law:

(i)     if a request is made for disclosure of any document or other materials (A) that have been designated by Operator as "CONFIDENTIAL" or (B) which Owner, in exercising reasonable judgment, determines is likely to contain privileged, trade secret, commercially sensitive or other information of Operator, its Affiliate or Subcontractors or any Contractors then Owner shall notify Operator if it intends to disclose any such documents in accordance with Applicable Law, including any applicable Public Information Disclosure Requirements;

(ii)     in connection with requests or orders to produce Confidential Information protected by this Agreement in the circumstances provided in Section 13.2(b) (*Proprietary Information – Permitted Disclosures*)*,* each Party receiving such a request or order (A) shall promptly notify the disclosing Party of the existence, terms and circumstances of such requirement(s) so that the disclosing Party may seek an appropriate protective order or waive compliance with the provisions of this Agreement, and (B) shall, and shall cause its Representatives to, cooperate fully with the disclosing Party in seeking to limit or prevent such disclosure of such Confidential Information; and

(iii)     if a receiving Party or its Representatives are, in the written opinion of its legal counsel, and notwithstanding compliance with Section 13.2(c)(i) (*Proprietary Information – Duty to Seek Protection*) compelled to make disclosure of Confidential Information of a disclosing Party in response to a requirement described in Section 13.2(c)(i) (*Proprietary Information – Duty to Seek Protection*) or stand liable for contempt or suffer other penalty, the compelled Person may disclose only that portion of such Confidential Information that it is legally required to disclose and shall exercise its best efforts to obtain reliable assurance that confidential treatment shall be accorded to such Confidential Information.

(d)     Ownership and Return of Information. Subject to the remainder of this Section 13.2 (*Proprietary Information*), Confidential Information shall be and remain the property of the Party disclosing it. Nothing in this Agreement shall be construed as granting any rights in

or to Confidential Information to the Party or Representatives receiving it, except the right to use it in accordance with the terms of this Agreement. Notwithstanding the foregoing, the Parties and Administrator shall have the right to retain copies of Confidential Information, subject to the confidentiality obligations in this Section 13.2 (*Proprietary Information*).

    (e)    <u>Public Information Disclosure Requirements-Related Obligations</u>.

    (i)    Operator acknowledges and agrees that any documents or other materials relating to this Agreement in Owner's possession may be considered public information subject to disclosure in accordance with applicable Public Information Disclosure Requirements. Operator shall then have the opportunity to either consent to the disclosure or assert its basis for non-disclosure and claimed exception under Applicable Law to Owner within the time period specified in the notice issued by Owner. Notwithstanding the foregoing, it is the responsibility of Operator to monitor requests for disclosure issued by Owner and related proceedings and make timely filings. Owner may make filings of its own concerning possible disclosure; <u>provided, however</u>, Owner shall be under no obligation to support Operator's positions.

    (A)    By entering this Agreement, Operator consents to, and expressly waives any right to contest, the provision by Owner to Owner's counsel of all or any part of any documents or materials in Owner's possession in accordance with the Public Information Disclosure Requirements. Owner shall have no responsibility or obligation for Operator's failure to respond or to respond timely to any request for disclosure in accordance with the Public Information Disclosure Requirements, and other than the obligations of Owner expressly stated hereunder, Owner shall not be required, except where required under Applicable Law, to wait for a response before making a disclosure or otherwise taking action under the Public Information Disclosure Requirements.

    (B)    Under no other circumstances shall Owner be responsible or liable to Operator or any other party as a result of disclosing any such documents or materials, including materials marked "CONFIDENTIAL", where the disclosure is required by Applicable Law or by an order of court.

    (ii)    Nothing contained in this Section 13.2(e) (*Proprietary Information – Public Information Disclosure Requirements-Related Obligations*) shall modify or amend requirements and obligations imposed on Owner by the Public Information Disclosure Requirements, and the provisions of the Public Information Disclosure Requirements shall control to the extent of a conflict with the procedures under this Agreement or Owner's obligations with respect to Confidential Information. Owner shall not advise a submitting party or Operator as to the nature or content of documents or materials that may be entitled to protection from disclosure under the Public Information Disclosure Requirements, as to the interpretation thereof, or as to relevant definition (e.g., "trade secret").

    (iii)    In the event of any proceeding or litigation concerning the disclosure of any documents or other materials in accordance with the Public Information Disclosure Requirements to third-parties, Owner's sole involvement shall be as a stakeholder retaining the material until otherwise ordered by a Commonwealth Court or other court or authority having jurisdiction. Operator shall be responsible for prosecuting or defending any action, acting on its

own behalf, concerning such documents or materials at its sole expense and risk; provided, however, that Owner may intervene or participate in the litigation in such manner as it deems necessary or desirable.

(f)     Customer Information. Notwithstanding anything contained in this Section 13.2 (*Proprietary Information*) or otherwise in this Agreement to the contrary, the Parties agree that Operator shall not, and shall ensure that Operator Related Parties do not, use or disclose any Owner Personal Information except as required in the performance of this Agreement or as otherwise directed by Administrator in accordance with Applicable Law or as may be required by Applicable Law.

(g)     Owner Confidential Information. Notwithstanding anything to the contrary in this Agreement, System Information shall be deemed Confidential Information of Owner. For certainty, such information shall not include any information comprising Operator Intellectual Property, Contractor Intellectual Property, Subcontractor Intellectual Property or Third-Party Intellectual Property.

(h)     Independent Development; Residuals. The disclosing Party acknowledges that the receiving Party may currently or in the future be developing information independently, or receiving information from other parties, that is similar or identical to the Confidential Information provided by the disclosing Party. Accordingly, nothing in this Agreement shall be construed as a representation or agreement that the receiving Party shall not develop or have developed for itself products, concepts, systems or techniques that are similar to or compete with the products, concepts, systems or techniques contemplated by or embodied in the Confidential Information, provided that the receiving Party does not violate any of its obligations under this Agreement in connection with such development. Additionally, Operator shall be free to use the residuals resulting from access to or work with Owner's Confidential Information for any purpose, provided that Operator shall not disclose Confidential Information (which excludes, for clarity, residuals) except as permitted pursuant to the terms of this Agreement, and Owner shall be free to use the residuals resulting from access to or work with Operator's Confidential Information for any purpose, provided that Owner shall not disclose Confidential Information (which excludes, for clarity, residuals) except as permitted pursuant to the terms of this Agreement. The term "residuals" means information retained in the unaided memory of persons employed or retained by either Party who have had access to or worked with the Confidential Information, including ideas, concepts, Know-How or techniques contained therein. Neither Party shall have any obligation to limit or restrict the assignment of such persons.

### Section 13.3   Data Security.

(a)     Cybersecurity Breaches. Subject to Section 4.1(c) (*Front-End Transition Period Generally – Transition to Standard of Performance*) and the System Remediation Plan, Operator shall comply with, and shall use commercially reasonable efforts to ensure that all Operator Related Parties and all Contractors and Subcontractors comply with the Data Security Plan, any other Contract Standards and all requirements of Applicable Law regarding data security, cyber security and information security in respect of the System Information and related Information Systems. Operator shall promptly notify, and shall use commercially reasonable measures to ensure that all Operator Related Parties, Contractors and Subcontractors promptly

Cᴏɴꜰɪᴅᴇɴᴛɪᴀʟ

notify, Administrator and PREB (if possible, in writing) of any material Cybersecurity Breaches or any other material losses or theft of any data of which it has knowledge. At Administrator's direction, Operator shall (i) perform an analysis of the cause, (ii) remedy any Cybersecurity Breach including notification of consumers or government entities when required by Applicable Law, and (iii) cooperate fully with any civil or criminal authority in any investigation or action relating to such breach or attempted breach.

(b)      Cybersecurity Program. Without limiting the foregoing and subject to Section 4.1(c) (*Front-End Transition Period Generally – Transition to Standard of Performance*) and the System Remediation Plan, Operator shall update the Data Security Plan from time to time to be consistent with industry standards and such that the Data Security Plan: (A) incorporates reasonable and appropriate organizational, administrative, physical and technical measures in place to maintain the security of and to protect the internal and external integrity of the System Information and related Information Systems against any unlawful or unauthorized use, processing, destruction, loss, alteration, disclosure, theft or access (including to any data or information contained in or stored on such systems); (B) establishes and maintains backup, security and disaster recovery measures to safeguard the System Information and related Information Systems; (C) limits the risk of introducing or knowingly permitting the introduction of any virus, worm, bomb, Trojan horse, trap door, stop code or other harmful code, timer, clock, counter or other limiting design, instruction or routine, device, feature or function into the System Information and related Information Systems; and (D) requires security audits, at a frequency consistent with industry standards, to assess and confirm compliance with Section 13.3 (*Data Security*), (including using reputable third-party vendors to perform, penetration testing, cybersecurity audits and vulnerability assessments) and requires taking prompt measures to remedy any gaps that may be identified. Operator shall provide a summary of the security program as well as a copy of any written audit reports and remedial measures to Administrator. Any security audit information is Confidential Information of Owner, and neither Party shall disclose such security audit information without the consent of the other Party.

CONFIDENTIAL

# ARTICLE 14
## EVENTS OF DEFAULT; REMEDIES

**Section 14.1   Events of Default by Operator**. Each of the following shall constitute an event of default by Operator (an "Operator Event of Default"):

(a)        Involuntary Bankruptcy. An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Operator or Guarantor(s) or its debts, or of a substantial portion of its respective assets, under the Bankruptcy Code or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Operator or Guarantor(s) or for a substantial portion of its assets, and, in any such case, such proceeding or petition shall continue undismissed for a period of sixty (60) or more days or an order or decree approving or ordering any of the foregoing shall be entered;

(b)        Voluntary Bankruptcy. Operator or Guarantor(s) shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under the Bankruptcy Code, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 14.1(a) (*Events of Default by Operator – Involuntary Bankruptcy*), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Operator or Guarantor(s) or for a substantial portion of its respective assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(c)        Failure to Provide or Maintain the Guarantee. Operator shall fail to provide or maintain in full force and effect the Guarantee, which failure shall not be cured in a manner acceptable to Administrator within five (5) Business Days following receipt of written notice thereof;

(d)        Failure to Perform a Material Obligation. Operator shall fail to perform any material obligation, covenant, term or condition under this Agreement or Guarantor(s) shall fail to perform any material obligation, covenant, term or condition under the Guarantee (in each case other than a payment obligation as provided in Section 14.1(e) (*Events of Default By Operator – Failure to Pay*)), which failure shall not be cured within sixty (60) days following receipt of written notice thereof by Administrator; provided, however, that as long as Operator or such Guarantor, as the case may be, is diligently attempting in good faith to cure such failure and it is reasonably expected that such failure is curable, then Operator or such Guarantor, as the case may be, shall have an additional thirty (30) days to cure such default; provided, further, that any failure to perform which is not curable shall not be deemed an Operator Event of Default if (i) within sixty (60) days following receipt of written notice thereof, Operator or such Guarantor shall have diligently and in good faith taken measures to prevent such failure to perform from recurring and (ii) such failure to perform which is not curable is not a recurring failure for the same issue as a prior failure to perform that has previously (A) occurred and (B) not been deemed an Operator Event of Default;

(e)        Failure to Pay. Operator or Guarantor(s) shall fail to pay any undisputed amount required to be paid by Operator under this Agreement or by Guarantor(s) under the

CONFIDENTIAL

Guarantee, which failure shall not be cured within sixty (60) days following written notice thereof by Administrator; provided that if such payment relates to a T&D Pass-Through Expenditure (including any Excess Expenditures), Capital Cost or Outage Event Costs, an Operator Event of Default shall not be deemed to have occurred if sufficient funds for such payment are not available in the relevant Service Account;

(f)        False or Inaccurate Representation or Warranty. Any representation or warranty of Operator under this Agreement or any other document delivered in connection herewith or of Guarantor(s) under the Guarantee shall prove to have been false, inaccurate or misleading in any material respect when made, and the legality of this Agreement or such Guarantee or the ability of Operator or Guarantor(s) to carry out its obligations hereunder or thereunder shall thereby be materially and adversely affected, which condition shall not be cured within thirty (30) days following written notice thereof by Administrator;

(g)        Failure to Obtain or Maintain Insurance. Operator shall fail to obtain or maintain the Required Insurance, unless such failure is due to carrier insolvency or the fact that the Required Insurance is not available at commercially reasonable rates but only for such period of time and to the extent specified in Section 10.2 (*Commercial Availability*) (in which case no failure shall be understood to have occurred), which failure shall not be cured within ten (10) Business Days following written notice thereof by Administrator;

(h)        Change of Control. A Change of Control of Operator that is not permitted by this Agreement shall occur on or after the Effective Date;

(i)        Illegal Transfer. Operator shall enter into an agreement to, or shall assign, transfer, convey, lease, encumber or otherwise dispose of all or any portion of its rights or obligations under this Agreement other than (i) in accordance with the express terms of this Agreement or (ii) with the consent of Administrator and PREB;

(j)        Violation of Law. A court of competent jurisdiction shall have determined that Operator shall have violated any of the provisions of Article 3.2 of Act 2 or Operator shall be convicted by a court of competent jurisdiction, or shall enter a plea of *nolo contendere* with such court, with respect to any of the crimes listed in Section 19.2(h)(i)(B) (*Representations and Warranties of Operator – Applicable Law Compliance*); or

(k)        Failure to Meet Minimum Performance Threshold. Operator shall fail to meet the Minimum Performance Threshold for any three (3) Key Performance Metrics during three (3) or more consecutive Contract Years and no such failure shall have been excused by a Force Majeure Event, an Outage Event or Owner Fault (a "Minimum Performance Threshold Default").

### Section 14.2    Termination for Operator Event of Default

(a)        Termination for Involuntary Bankruptcy, Voluntary Bankruptcy or Violation of Law. Upon the occurrence of an Operator Event of Default under Section 14.1(a) (*Events of Default By Operator – Involuntary Bankruptcy*), Section 14.1(b) (*Events of Default By Operator – Voluntary Bankruptcy*) or Section 14.1(j) (*Events of Default By Operator – Violation*

CONFIDENTIAL

*of Law*), this Agreement shall immediately terminate without further action by Administrator, without need for a court decision or arbitral award confirming Administrator's right to terminate.

(b)  Termination for Other Operator Event of Default. Upon the occurrence of any other Operator Event of Default, Administrator may terminate this Agreement upon not less than one hundred twenty (120) days prior written notice to Operator, subject, to the extent required by Applicable Law, to the prior approval of PREB or the FOMB (if then in existence), without need for a court decision or arbitral award confirming Administrator's right to terminate; provided, however, that any such notice of termination with respect to an Operator Event of Default under Section 14.1(h) (*Events of Default By Operator – Change of Control*) must be given no later than thirty (30) days following Administrator's receipt of written notice from Operator of the occurrence of such Change of Control. If Administrator fails to give such notice to Operator within such thirty (30) day period, Administrator shall be deemed to have waived the Operator Event of Default with respect to such Change of Control and its termination rights with respect thereto (but not with respect to any subsequent Change of Control) shall expire and be of no further force or effect. For the avoidance of doubt, nothing in this Section 14.2 (*Termination for Operator Event of Default*) shall limit Operator's right to contest, pursuant to Article 15 (*Dispute Resolution*), whether an Operator Event of Default has occurred, or any of its other rights herein.

**Section 14.3  Events of Default By Owner**. Each of the following shall constitute an event of default by Owner (an "Owner Event of Default"):

(a)  Involuntary Bankruptcy. An involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of Owner or its debts, or of a substantial portion of its respective assets, under the Bankruptcy Code or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Owner or for a substantial portion of its assets, and, in any such case, such proceeding or petition shall continue undismissed for a period of sixty (60) or more days or an order or decree approving or ordering any of the foregoing shall be entered; provided, however, that the pursuit by creditors of Owner of relief from the automatic stay extant pursuant to section 362(a) of the Bankruptcy Code in the current Title III Case for the purpose of seeking appointment of a receiver under applicable law shall not constitute an Owner Event of Default unless and until any such receiver is duly appointed;

(b)  Voluntary Bankruptcy. Owner shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under the Bankruptcy Code  (other than the current Title III Case), (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in Section 14.3(a) (*Events of Default By Owner – Involuntary Bankruptcy*), (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for Owner or for a substantial portion of its respective assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(c)  Failure to Perform a Material Obligation. Owner shall fail to perform any material obligation, covenant, term or condition under this Agreement (other than a payment obligation as provided in Section 14.3(d) (*Events of Default By Owner – Failure to Pay Service*

CONFIDENTIAL

Fee) or Section 14.3(e) (*Events of Default By Owner – Failure to Pay Other Undisputed Amount*) or a failure to fund the Front-End Transition Account or Service Account, or as provided in Section 14.3(f)) (*Events of Default By Owner – Failure to Fund Front-End Transition Account or Service Account*)), including the obligation to keep System Revenues free and clear of Liens other than Liens specified in the Title III Plan and the related disclosure statement, which failure shall not be cured within sixty (60) days following written notice thereof by Operator; <u>provided, however</u>, that as long as Owner is diligently attempting in good faith to cure such failure and it is reasonably expected that such failure is curable, then Owner shall have an additional thirty (30) days to cure such default; <u>provided, further</u>, that any failure to perform which is not curable shall not be deemed an Owner Event of Default if (i) within sixty (60) days following receipt of written notice thereof, Owner shall have diligently and in good faith taken measures to prevent such failure to perform from recurring and (ii) such failure to perform which is not curable is not a recurring failure for the same issue as a prior failure to perform that has previously (A) occurred and (B) not been deemed an Owner Event of Default;

(d) <u>Failure to Pay Service Fee</u>. Owner shall fail to pay any undisputed Service Fees to be paid to Operator under this Agreement, which failure shall continue for thirty (30) days following written notice thereof by Operator;

(e) <u>Failure to Pay Other Undisputed Amount</u>. Owner shall fail to pay any other undisputed amount required to be paid by Owner to Operator under this Agreement (other than as provided in Section 14.3(d) (*Events of Default By Owner – Failure to Pay Service Fee*)), which failure shall not be cured within sixty (60) days following written notice thereof by Operator;

(f) <u>Failure to Fund Front-End Transition Account or Service Account</u>. Owner shall fail to fund the Front-End Transition Account or any Service Account in an amount equal to at least two-thirds (2/3) of the requisite funding for such Front-End Transition Account or Service Account, which failure shall not be cured within five (5) Business Days following written notice thereof by Operator; or

(g) <u>False or Inaccurate Representation or Warranty</u>. Any representation or warranty of Owner under this Agreement or any other document delivered in connection herewith shall prove to have been false, inaccurate or misleading in any material respect when made, and the legality of this Agreement or the ability of Operator to carry out its obligations hereunder shall thereby be materially and adversely affected, which condition shall not be cured within thirty (30) days following written notice thereof by Operator.

**Section 14.4  Termination for Owner Event of Default**. Upon the occurrence of an Owner Event of Default under Section 14.3 (*Events of Default By Owner*), Operator may terminate this Agreement upon not less than one hundred twenty (120) days prior written notice to Administrator, without need for a court decision or arbitral award confirming Operator's right to terminate; <u>provided</u> that upon the occurrence of an Owner Event of Default under Section 14.3(f) (*Events of Default By Owner – Failure to Fund Front-End Transition Account or Service Account*) relating to funding of the Front-End Transition Account or the Operating Account, the Agreement shall terminate and, subject to Article 16 (*Back-End Transition*), Operator's obligation to perform the Front-End Transition Services or the O&M Services, as applicable, shall cease, upon the earlier of (i) the date that is one hundred twenty (120) days following the date on which Administrator

CONFIDENTIAL

receives written notice from Operator or (ii) the date on which there is no funding in the Front-End Transition Account or the Operating Account, as applicable, in each case without need for a court decision or arbitral award confirming Operator's right to terminate. For the avoidance of doubt, nothing in this Section 14.4 (*Termination for Owner Event of Default*) shall limit Owner's right to contest, pursuant to Article 15 (*Dispute Resolution*), whether an Owner Event of Default has occurred, or any of its other rights herein. Owner agrees the automatic stay extant in the Title III Case pursuant to section 362(a) of the Bankruptcy Code shall not apply to the exercise by Operator of its termination rights or other remedies under this Section 14.4 (*Termination for Owner Event of Default*), Section 14.5 (*Additional Termination Rights*) or Section 14.6 (*Remedies Upon Early Termination*).

### Section 14.5    Additional Termination Rights.

(a)        T&D System Sale. Each of Administrator and Operator shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Operator or Administrator, respectively, in the event ownership of the T&D System is sold, transferred or assigned, in whole or in part, to a private entity.

(b)        Failure of Service Commencement Date Conditions. As set forth in Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*), each of Administrator and Operator shall have the right to terminate this Agreement for failure to satisfy the Service Commencement Date Conditions, in accordance with and subject to the terms set forth in Section 4.8(b) (*Failure of Service Commencement Date Conditions – Termination for Failure of Service Commencement Date Conditions*) in all respects.

(c)        Extended Force Majeure Event. Each of Administrator and Operator shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Operator or Administrator, respectively, in the event that a Force Majeure Event continues for a period in excess of eighteen (18) consecutive months and materially interferes with, delays or increases the cost of the Front-End Transition Services or the O&M Services.

(d)        Failure to Agree on Budget. Each of Administrator and Operator shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Operator or Administrator, respectively, if (i) Operator has performed the O&M Services under a Default Budget with respect to an Operating Budget during three (3) or more consecutive Contract Years or (ii) Administrator and Operator shall fail to agree on the Operating Budget, and such failure results in an Budget Dispute, during three (3) or more consecutive Contract Years.

(e)        Operating Budget Overrun. Owner shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Operator if Operator shall exceed, during three (3) or more consecutive Contract Years, the Operating Budget initially approved for a given Contract Year pursuant to Section 7.3(a) (*Budgets – Generally*), other than as a result of (i) Force Majeure Events, (ii) Owner Fault, (iii) Outage Events or (iv) additional requirements imposed by Owner, Administrator or any other Governmental Body after approval of the Budget, in each case, which (A) have resulted in schedule delays or increased work

CONFIDENTIAL

scope or costs and (B) are not attributable to Operator's gross negligence or willful misconduct (an "Operating Budget Overrun Default").

(f)     Change in Regulatory Law. Operator shall have the right to terminate this Agreement upon not less than one hundred twenty (120) days' prior written notice to Administrator in the event of a Change in Regulatory Law.

### Section 14.6    Remedies Upon Early Termination.

(a)     Accrued and Unpaid Amounts. In the event of an early termination of this Agreement for any reason, Owner shall pay Operator any accrued and unpaid amounts required to be paid by Owner under this Agreement, including the Front-End Transition Service Fee, the T&D Pass-Through Expenditures, the Generation Pass-Through Expenditures, any Capital Costs, any Outage Event Costs, the Fixed Fee and the Incentive Fee, in each case, as of the effective date of such termination.

(b)     Back-End Transition Service Fee. In the event of an early termination of this Agreement pursuant to Section 14.2, (*Termination for Operator Event of Default*), Section 14.4 (*Termination for Owner Event of Default*) or Section 14.5, (*Additional Termination Rights*), and if Operator is performing the Back-End Transition Services, Owner shall be responsible for payment of the Back-End Transition Service Fee.

(c)     Termination Fee.

(i)     In the event this Agreement is (A) terminated, revoked, nullified, cancelled or otherwise rendered invalid by any duly enacted law of the Commonwealth, as determined by a final non-appealable judgment by a court of competent jurisdiction (a "Contract Nullification or Cancellation"), (B) terminated by Operator or Administrator pursuant to Section 14.5(a) (*Additional Termination Rights – T&D System Sale*) or (C) terminated by Operator pursuant to Section 14.5(f) (*Additional Termination Rights – Change in Regulatory Law*), but only if such termination is as a result of the circumstances described in clauses (ii), (iii) or (iv) of the definition of "Change in Regulatory Law", Owner shall pay Operator the Operator Termination Fee. For the avoidance of doubt, Owner shall have no obligation to pay the Operator Termination Fee other than in the circumstances described in clauses (A), (B) and (C) of the preceding sentence.

(ii)     In the event of an early termination of this Agreement by Administrator due to either (A) a Minimum Performance Threshold Default or (B) an Operating Budget Overrun Default, Operator shall pay Owner the Owner Termination Fee. For the avoidance of doubt, Operator shall have no obligation to pay the Owner Termination Fee other than in the event of an early termination of this Agreement by Administrator due to a Minimum Performance Threshold Default or an Operating Budget Overrun Default.

(iii)     The Parties hereby acknowledge and agree that, notwithstanding anything to the contrary in this Agreement:

(A)     if this Agreement is (1) terminated due to a Contract Nullification or Cancellation, (2) terminated by Operator pursuant to Section 14.5(a) (*Additional*

CONFIDENTIAL

*Termination Rights – T&D System Sale*) or (3) terminated by Operator pursuant to Section 14.5(f) (*Additional Termination Rights – Change in Regulatory Law*) (but only if such termination is as a result of the circumstances described in clauses (ii), (iii) or (iv) of the definition of "Change in Regulatory Law"), Operator's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly, the payment to Operator of the Operator Termination Fee (x) is a payment of liquidated damages (and not penalties), which is based on the Parties' estimate of damages Operator would suffer or incur, and (y) shall constitute Operator's sole and exclusive remedy for all monetary damages, costs, losses and expenses of whatever type or nature arising from or related to this Agreement due to the events described in clauses (1), (2), and (3) of this sentence; and

(B)     if this Agreement is terminated by Administrator due to a Minimum Performance Threshold Default or an Operating Budget Overrun Default, Owner's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly, the payment to Owner of the Owner Termination Fee (x) is a payment of liquidated damages (and not penalties), which is based on the Parties' estimate of damages Owner would suffer or incur, and (y) shall constitute Owner's sole and exclusive remedy for all monetary damages, costs, losses and expenses of whatever type or nature arising from or related to termination of this Agreement due to a Minimum Performance Threshold Default or an Operating Budget Overrun Default.

(iv)     Each of Operator and Owner hereby irrevocably waives any right it may have to raise as a defense that the Owner Termination Fee and Operator Termination Fee, respectively, are excessive or punitive.

(d)     Additional Remedies. The Parties agree that, except as otherwise provided in this Agreement (including the sole and exclusive remedies set forth in Section 4.1(c) (*Front-End Transition Period Generally – Administrative Expense Treatment*), Section 4.8 (*Failure of Service Commencement Date Conditions*) and Section 14.6(c) (*Remedies Upon Early Termination – Termination Fee*)) in which cases the remedy specified in such provision shall be the sole remedy available, in the event that the Agreement is terminated early due to an Event of Default in accordance with the terms hereof, any other Party may exercise any rights it has under this Agreement and under Applicable Law to recover damages, secure specific performance or obtain injunctive relief. Notwithstanding anything to the contrary herein, including any Party's rights otherwise available under this Agreement or Applicable Law:

(i)     except as specified in Section 18.3(a) (*Limitation on Liability – Operator General Limitations*) and Section 18.3(b) (*Limitation on Liability – Gross Negligence, Willful Misconduct*) for the Losses specified in each such provision, in which event the caps specified in Section 18.3(a) (*Limitation on Liability – Operator General Limitations*) and Section 18.3(b) (*Limitation on Liability – Gross Negligence, Willful Misconduct*), respectively, shall apply regardless of how or when any such Losses arise or occur, and except for the exclusive remedies set forth in the first sentence of this Section 14.6(d) (*Remedies Upon Early Termination – Additional Remedies*), any Losses payable by Operator to Owner howsoever and whensoever arising pursuant to this Agreement, including whether for breach of contract or otherwise, shall be limited to US$10,000,000; and

(ii)    any Losses payable by Owner to Operator howsoever and whensoever arising pursuant to this Agreement, including whether for breach of contract or otherwise, shall be limited to the amount equal to the lesser of (A) the Fixed Fee paid to Operator in the immediately preceding Contract Year *plus* the Incentive Fee earned by Operator in the immediately preceding Contract Year and (B) an amount equal to the net present value of the Fixed Fee payable over the remainder of the Term discounted at a rate of six percent (6%) *plus* the Incentive Fee earned by Operator in the immediately preceding Contract Year, except for Losses related to gross negligence or willful misconduct of the Owner Indemnitees, which shall not be subject to any cap.

(e)    <u>Debarment</u>. Upon the termination of this Agreement pursuant to Section 14.2 (*Termination for Operator Event of Default*), Operator shall be disqualified from contracting with any Commonwealth Governmental Body for ten (10) years in accordance with Section 10(a)(15)(c) of Act 29.

CONFIDENTIAL

## ARTICLE 15
## DISPUTE RESOLUTION

**Section 15.1   Scope.** Except as otherwise expressly provided in this Agreement, any dispute among the Parties arising out of, relating to or in connection with this Agreement or the existence, interpretation, breach, termination or validity thereof (a "Dispute") shall be resolved in accordance with the procedures set forth in this Article 15 (*Dispute Resolution*), which shall constitute the sole and exclusive procedures for the resolution of such Disputes (the "Dispute Resolution Procedure"), including as to the validity of any termination or effective date of any termination. Operator acknowledges and agrees that Administrator (or any Designated Person appointed by Administrator) shall be authorized to participate in or act for and on behalf of Owner in any Dispute Resolution Procedure contemplated by this Article 15 (*Dispute Resolution*). For the avoidance of doubt, the Dispute Resolution Procedures set forth in this Agreement shall not apply to any dispute between a Party and PREB, which disputes shall be subject to resolution in accordance with Applicable Law. Notwithstanding anything to the contrary herein, in the event that Operator disagrees with a decision of PREB, nothing shall prejudice, limit or otherwise impair Operator's right to exercise its rights pursuant to Act No. 38 of June 30, 2017 and Section 6.5(c) of Act 57.

**Section 15.2   Commencement of the Dispute Resolution Procedure.**

(a)      Notice. If a Dispute arises, any Party may initiate the Dispute Resolution Procedure by giving a written notice of the Dispute to the other Party (a "Notice of Dispute"). The Notice of Dispute shall contain a brief statement of the nature of the Dispute, set out the relief requested and request that the Dispute Resolution Procedure of this Article 15 (*Dispute Resolution*) be commenced.

(b)      Tolling. Any limitation period imposed by this Agreement or by Applicable Law in respect of a Dispute shall be tolled upon the delivery of a Notice of Dispute pursuant to this Section 15.2 (*Commencement of the Dispute Resolution Procedure*) for the duration of any Dispute Resolution Procedure pursuant to this Article 15 (*Dispute Resolution*).

**Section 15.3   Negotiation.**

(a)      Generally. Upon receipt of a Notice of Dispute from a Party, the Parties shall refer the dispute to the Designated Person of each Party. The Designated Persons shall negotiate in good faith and attempt to resolve the Dispute within thirty (30) days after the date on which the Notice of Dispute was issued, or such longer period as the Designated Persons may otherwise agree. All communications, negotiations and discussions pursuant to this Section 15.3 (*Negotiation*) shall be (i) confidential, (ii) without prejudice privileged, (iii) treated as compromise settlement discussions and negotiations and (iv) not used, offered or admissible as evidence in any subsequent proceeding without the mutual consent of the Parties.

(b)      Negotiation Period.

(i)      If the Dispute remains unresolved thirty (30) days after the Notice of Dispute is issued (or such longer period as Operator and Administrator may mutually agree in

CONFIDENTIAL

writing) (the "Negotiation Period"), then any Front-End Transition Service Fee Estimate Dispute, Front-End Transition Service Fee Dispute, Back-End Transition Service Fee Estimate Dispute, Back-End Transition Service Fee Dispute, Handover Checklist Dispute, Administrator Dispute, Service Fee Dispute, Budget Dispute, Service Account Dispute, Disallowed Costs Dispute or Force Majeure Event Dispute (each a "Technical Dispute"), or any engineering or technical dispute Operator and Administrator mutually agree in writing is a Technical Dispute shall be referred to the Expert Technical Determination procedure set forth in Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*) for a final and binding determination.

(ii)    If the Dispute, other than a Technical Dispute, remains unresolved after the end of the Negotiation Period, then the Dispute shall proceed to mediation pursuant to Section 15.5 (*Mediation*), and if necessary, litigation pursuant to Section 15.6 (*Litigation as a Final Resort*), for a final and binding determination.

**Section 15.4    Expert Technical Determination Procedure for Technical Disputes**.

(a)    Generally. Any Technical Disputes unresolved within the Negotiation Period shall be referred to an independent expert (the "Independent Expert") for a final and binding expert determination ("Expert Technical Determination").

(b)    Procedures.

(i)    For the purposes of this Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*), the Independent Expert shall be a reputable Person or Persons possessing expert knowledge and experience for the Expert Technical Determination of the Technical Dispute in question and shall be independent of and impartial as among the Parties. Operator and Administrator shall, in the first instance, attempt to agree on an Independent Expert through their respective Designated Persons. If Operator and Administrator cannot so agree within ten (10) days after the end of the Negotiation Period, the Parties shall promptly (and in any event within five (5) Business Days) apply to the ICC International Centre for ADR (the "ICC") for the appointment of an Independent Expert in accordance with the ICC Rules for the Appointment of Experts and Neutrals.

(ii)    Once selected by Operator and Administrator, neither Party shall communicate independently with the expert, and all communications the Parties make with the Independent Expert must be simultaneously copied to all other Parties.

(iii)    The Independent Expert shall, in consultation with the parties, determine the procedure to be undertaken in the Expert Technical Determination. The Independent Expert shall determine the Technical Dispute within sixty (60) days after his or her appointment or as otherwise agreed by the Parties. This sixty (60) day time period may be extended by the Independent Expert or by the agreement of the Parties. A failure to determine the matter within sixty (60) days shall not be a ground to challenge any award or determination by the Independent Expert.

(iv)    The determination by the Independent Expert on any Technical Dispute shall be final and binding on the Parties hereto. The costs of the Independent Expert shall

be borne by Operator (and, for the avoidance of doubt, shall not be a T&D Pass-Through Expenditure), to the extent that the Independent Expert resolves any dispute in Owner's favor, and by Owner, to the extent that the Independent Expert resolves any dispute in Operator's favor, or as determined by the Independent Expert if the dispute is not resolved entirely in favor of Owner or Operator. Notwithstanding any other provisions of this Article 15 (*Dispute Resolution*), enforcement of any determination of an Independent Expert may be sought by either of the Parties before any court of competent jurisdiction. To the extent permitted by law, any rights to appeal from or cause a review of any such determination by any Independent Expert are hereby waived by the Parties.

(c)     Not an Arbitrator. The Independent Expert is not an arbitrator and shall not be deemed to be acting in an arbitral capacity.

(d)     Confidentiality. The Parties agree that any Expert Technical Determination carried out pursuant to this Section 15.4 (*Expert Technical Determination Procedure for Technical Disputes*) shall be kept private and confidential, and that the existence of the Expert Technical Determination and any element of it (including the identity of the Parties, the identity of all witnesses and experts who may be called upon in the Expert Technical Determination, all materials created for the purposes of the Expert Technical Determination, all testimony or other oral submissions in the Expert Technical Determination, and all documents produced by a Party in connection with an Expert Technical Determination that were not already in the possession of the other Party) shall be kept confidential, except (i) with the consent of the Parties, (ii) to the extent disclosure may be lawfully required in *bona fide* judicial proceedings relating to the Expert Technical Determination, (iii) where disclosure is lawfully required by a legal duty, and (iv) where such information is already in the public domain other than as a result of a breach of this clause. The Parties also agree not to use any information disclosed to them during the Technical Dispute for any purpose other than in connection with the Expert Technical Determination.

## Section 15.5   Mediation.

(a)     Generally. If a Dispute, other than a Technical Dispute, remains unresolved after the Negotiation Period, either Operator or Administrator may refer the Dispute to mediation through a written notice of mediation (the "Notice of Mediation"). Each Party to this Agreement agrees that it may not initiate a civil action as provided in Section 15.6 (*Litigation as a Final Resort*) (other than for provisional relief sought on an expedited basis) unless (i) the matter in question has first been submitted to mediation in accordance with the provisions of this Section 15.5(a) (*Mediation – Generally*) or (ii) such Party would be barred from asserting its claim in a civil action if it were required to submit to mediation pursuant to Section 15.3 (*Negotiation*).

(b)     Procedures.

(i)     The Parties shall, in the first instance, attempt to agree on a mediator through their respective Designated Persons. If the Parties cannot so agree within thirty (30) days after the Notice of Mediation is sent, either of the Parties may promptly apply to the ICC for appointment of a single mediator in accordance with the Mediation Rules of the International Chamber of Commerce (the "Mediation Rules"). Absent any written agreement to the contrary by the Parties, the mediator shall be an attorney or mediator authorized to practice law in the United

CONFIDENTIAL

States or the Commonwealth of Puerto Rico. The mediator shall be paid for the mediation services, and shall be reimbursed for all reasonable and documented out-of-pocket costs incurred in carrying out the mediation duties hereunder, including the costs of consultants. All Fees-and-Costs of the mediation shall be shared equally by the Parties (and, for the avoidance of doubt, shall not be a T&D Pass-Through Expenditure). The Parties shall request that the mediator schedule the mediation within thirty (30) days of the mediator's appointment, and shall comply with all procedures the mediator establishes for the conduct of the mediation. Absent any written agreement to the contrary by the Parties, if the Dispute is not resolved within ninety (90) days of the Notice of Mediation, the mediation shall be terminated.

(ii)    For the avoidance of doubt, absent the written agreement of the Parties, the Mediation Rules shall not apply to any mediation carried out pursuant to this Section 15.5(b) (*Mediation – Procedures*). Rather, the reference to the ICC and the Mediation Rules above should be understood as referring solely to the designation of the ICC as an appointing authority to appoint a mediator pursuant to the procedures set forth in the Mediation Rules in the event the Parties are unable to agree on a mediator within the timeframe specified.

(c)    <u>Confidentiality</u>. The Parties agree that any mediation carried out pursuant to this Section 15.5(b) (*Mediation – Procedures*) shall be kept private and confidential, and that the existence of the mediation and any element of it (including the identity of the Parties, the identity of all witnesses and experts who may be called upon at the mediation, all materials created for the purposes of the mediation, all testimony or other oral submissions at the mediation, and all documents produced by a Party in connection with a mediation that were not already in the possession of the other Party) shall be kept confidential, except (i) with the consent of the Parties, (ii) to the extent disclosure may be lawfully required in *bona fide* judicial proceedings relating to the mediation, (iii) where disclosure is lawfully required by a legal duty and (iv) where such information is already in the public domain other than as a result of a breach of this clause. The Parties also agree not to use any information disclosed to them during the mediation for any purpose other than in connection with the mediation.

**Section 15.6   Litigation as a Final Resort**.

(a)    <u>Civil Action</u>. In the event that the Parties fail to resolve any Dispute, other than a Technical Dispute, within ninety (90) days after the date the mediator is selected pursuant to the procedures set forth in Section 15.5(b) (*Mediation – Procedures*) (or such longer period as the Parties may mutually agree), either Party may initiate a civil action in the Commonwealth Court and in accordance with all applicable rules of civil procedure. The Parties acknowledge and understand that, to resolve any and all claims arising out of this Agreement (other than any Technical Dispute), they may file a civil action, including actions in equity, in the Commonwealth Court. Owner and Operator each irrevocably consents to the exclusive jurisdiction of such courts in any such actions or proceedings, waives any objection it may have to the jurisdiction of any such action or proceeding, as well as objections or defenses based on sovereign immunity. The Parties acknowledge and agree that the terms and conditions of this Agreement have been freely, fairly and thoroughly negotiated.

(b)    <u>Costs and Expenses</u>. Except as required by Operator's indemnity obligations under Section 18.1 (*Indemnification by Operator*), each Party shall bear its own costs

CONFIDENTIAL

and expenses in any Legal Proceeding where it is the named defendant or in any Legal Proceeding among the Parties (and, for the avoidance of doubt, such costs and expenses shall not be a T&D Pass-Through Expenditure). Notwithstanding the foregoing, each Party retains its rights to bring any Legal Proceeding or to implead the other Party as to any matter arising hereunder.

**Section 15.7   Waiver of Jury Trial**. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING BROUGHT UNDER THIS AGREEMENT. Each Party (i) certifies that no representative of any other Party has represented, expressly or otherwise, that such other Party would not, in the event of litigation, seek to enforce the foregoing waiver, and (ii) acknowledges that it and each other Party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Agreement.

**Section 15.8   Provisional Relief**. Notwithstanding any other provision in this Agreement, no Party shall be precluded from initiating a proceeding in the Commonwealth Court for the purpose of obtaining any emergency or provisional remedy to protect its rights that may be necessary and that is not otherwise available under this Agreement, including temporary and preliminary injunctive relief, restraining orders and other remedies to avoid imminent irreparable harm, provide uninterrupted electrical and other services or preserve the status quo pending the conclusion of such negotiation, mediation or litigation. The commencement of or participation in an action for provisional relief with regard to Technical Disputes shall not constitute a waiver of the requirements or procedures of Section 15.5 (*Mediation*).

**Section 15.9   Continuing Obligations**. The Parties agree that during the resolution of a Dispute pursuant to the Dispute Resolution Procedure, the Parties shall continue to perform their obligations under this Agreement; <u>provided</u> that such performance shall (i) be without prejudice to the rights and remedies of any of the Parties and (ii) not be read or construed as a waiver of a Party's right to claim for recovery of any loss, costs, expenses or damages suffered as a result of the continued performance of this Agreement.

CONFIDENTIAL

## ARTICLE 16
## BACK-END TRANSITION

**Section 16.1  Successor Operator**. After the Service Commencement Date, upon (i) Operator's receipt of a termination notice from Owner or Administrator's receipt of a termination notice from Operator, in each case under Article 14 (*Events of Default; Remedies*) or (ii) twelve (12) months prior to the expiry of the later of (A) the Initial Term or (B) the Extension Term (such date, the "Back-End Transition Commencement Date"), Administrator, on behalf of Owner, shall initiate efforts, including such procurement process as may be required, to identify and select a successor operator as promptly as practicable. Operator shall have the right to submit a proposal in such procurement on the same basis as other proponents. For the avoidance of doubt, if this Agreement is terminated prior to the Service Commencement Date, the Back-End Transition Commencement Date shall not occur.

**Section 16.2  Back-End Transition Services**.

(a)      Generally. Subject to Section 16.2(c) (*Back-End Transition Services – Transition Expiry Date*) and Section 16.4(c)(ii) (*Back-End Transition Period Compensation – Funding*), upon the occurrence of the Back-End Transition Commencement Date, Operator, in addition to providing the O&M Services, shall (i) perform the Back-End Transition Services specified in the Back-End Transition Plan, (ii) comply with the obligations set forth in Section 16.2(b) (*Back-End Transition Services – Certain Obligations*), (iii) reasonably cooperate with Administrator during any procurement process to identify a successor operator and (iv) commence preparations for an orderly transition of ServCo and the T&D System to Owner or Administrator (or their designee); provided that to the extent the Back-End Transition Services include performance of O&M Services after the Initial Term or, if applicable, the Extension Term, a Tax Opinion and a Reliance Letter shall be obtained, at the cost of Owner or Administrator, with respect to any such Back-End Transition Services.

(b)      Certain Obligations. Without limiting the generality of the Back-End Transition Services specified in the Back-End Transition Plan, Operator shall, in addition to or as part of the Back-End Transition Services:

(i)      subject to, and except as provided in Section 14.4 (*Termination for Owner Event of Default*), cease to perform the O&M Services on the date and to the extent specified by Administrator;

(ii)      collect all documentation and materials in Operator's care, custody or control associated with work in progress and provide a reasonably detailed status report on each such item to Administrator;

(iii)      sell at fair market value all existing materials and supplies utilized by Operator in the operation and maintenance of the T&D System (to the extent not owned by Owner or paid for as a T&D Pass-Through Expenditure) to Owner or the successor operator, as Administrator shall direct, if any;

Case: 25-2637   Document: 00368194-2   Filed: 09/18/25   Entered: 09/18/25 08:30:16   Desc:6770995
Exhibit B-OMA   Page 143 of 337

CONFIDENTIAL

(iv)     in accordance with Prudent Utility Practice, promptly take all action as reasonably necessary to protect and preserve all materials, equipment, tools, facilities and other property at the T&D System Sites;

(v)     remove from the T&D System Sites all equipment, implements, machinery, tools, temporary facilities of any kind and other property owned or leased by Operator, if any, which are not to be transferred to Owner or any successor operator, and reasonably repair any damage caused by such removal;

(vi)     in accordance with Prudent Utility Practice, leave the T&D System Sites in a neat, safe, orderly and fully operational condition, subject to reasonable wear and tear;

(vii)     leave the T&D System Sites with consumables and spare parts in quantities consistent with Prudent Utility Practice and return to Owner any non-fixed assets in good working order and condition, subject to reasonable wear and tear;

(viii)     remove all employees of ManagementCo or its Affiliates (excluding ServCo) and any Subcontractors from the T&D System Sites;

(ix)     with respect to any ongoing Capital Improvements, promptly deliver to Administrator a list of all material supplies, materials, machinery, equipment, property and special order items previously delivered or fabricated by Operator or any Contractor or Subcontractor but not yet incorporated in the T&D System Sites;

(x)     deliver to Administrator all computer programs used at the T&D System Sites in the performance of O&M Services under the care, custody or control of Operator, including all revisions and updates thereto;

(xi)     deliver to Administrator a list of all books, records, customer lists, account information, personnel information, drawings, reports, plans and other data in Operator's possession or control relating to the performance of the O&M Services and copies thereof;

(xii)     deliver to Administrator copies of current maps of the T&D System in the custody of Operator;

(xiii)     provide Administrator with a list of all files, and access and security codes under Operator's care, custody or control with instructions and demonstrations which show how to open and change such codes;

(xiv)     promptly deliver to Administrator copies of all Contracts and Subcontracts, together with a statement of (A) the items ordered and not yet delivered pursuant to each such Contract or Subcontract, (B) the expected delivery date of all such items, (C) the total cost of each agreement and the terms of payment, and (D) the estimated cost of canceling each Contract or Subcontract;

(xv)     as Administrator shall direct, terminate or assign to Owner all Contracts and Subcontracts and make no additional agreements with Contractors or Subcontractors with respect to the T&D System without the prior written approval of Administrator;

CONFIDENTIAL

(xvi)   advise Administrator promptly of any special circumstances that might limit or prohibit cancellation of any System Contract, Contract or Subcontract;

(xvii)   as reasonably directed by Administrator, transfer to Owner by appropriate instruments of title, and deliver to the T&D System Sites (or such other place as Administrator may specify), all special order items pursuant to this Agreement for which Owner has made or is obligated to make payment;

(xviii)   as directed by Administrator, transfer or assign to Owner all warranties given by any manufacturer, Contractor or Subcontractor with respect to particular components of the O&M Services;

(xix)   notify Administrator in writing of any legal proceedings against Operator by any Contractor, Subcontractor or other third-parties relating to the termination of the O&M Services or any Contracts or Subcontracts;

(xx)   as directed by Administrator, provide written notice of termination, effective as of the date of termination of this Agreement, under each policy of Required Insurance (with a copy of each such notice to Owner and Administrator); provided that if Administrator elects to continue such policies in force thereafter for Owner and at Owner's expense, Operator shall use its commercially reasonable efforts to ensure that Administrator is able to do so;

(xxi)   to the extent requested by Administrator, and at the sole cost and expense of Owner, retain any or all senior management employees and make them available, for up to six (6) months following expiration or earlier termination of the Term, to provide on-site, real time consulting advice to a successor operator for the T&D System or Owner;

(xxii)   provide Owner, Administrator and, at Administrator's discretion, successor operator with copies of and access to all System Information, Customer Databases and other Work Product or tangible embodiments of Intellectual Property of Owner in Operator's care, custody or control in a form and medium that is reasonably acceptable to the successor operator and in a manner that such information and material may be accessed and used on same basis by the successor operator that it was used and accessed by Operator;

(xxiii)   provide reasonable technological and design advice and support, for up to six (6) months following expiration or earlier termination of the Term, and deliver any plans, drawings, renderings, blueprints, operating and training manuals, computer programs, spare parts or other information in ManagementCo's care, custody or control useful or necessary for Owner or any successor operator to perform the O&M Services; and

(xxiv)   take such other actions, and execute such other documents as may be necessary to effectuate and confirm the foregoing matters, or as may be otherwise necessary or desirable to provide for a safe, effective and efficient transition of the O&M Services to Owner or a successor operator, minimize Owner's costs, and take no action which shall increase any amount payable to Owner under this Agreement.

(c)     <u>Transition Expiry Date</u>. Operator shall have no obligation to continue performing any Back-End Transition Services as of the earlier of (i) the date which is twelve (12) months following the expiration or early termination of the Term and (ii) the date on which there are no funds available in the Back-End Transition Account, without need for a court decision or arbitral award confirming Operator's right to terminate.

**Section 16.3   Transfer Obligation**. Immediately upon the expiration or earlier termination of this Agreement, at Administrator's election, in its sole discretion, ManagementCo shall transfer all the ownership interests in ServCo and all ServCo corporate books and records to Owner or, at Administrator's direction, its designee free and clear of all Liens and Administrator shall accept such transfer at no cost to Owner, Administrator or their designees. If Administrator elects such a transfer, the Parties shall mutually agree upon such instruments, agreements and other documents as may be reasonably necessary to effect such transfer. Following such transfer of the ServCo ownership interests, ManagementCo shall have no further legal or financial responsibility with respect to the performance of any contracts, leases or licenses held by or in the name of ServCo, or in relation to any pension, "other post-employment benefits" and other employee and vendor obligations, other than for liabilities or obligations which ManagementCo (distinguished from ServCo) may have specifically assumed for periods prior to such transfer that remain outstanding. In addition to and notwithstanding anything to the contrary in the foregoing, the Parties shall, immediately upon the expiration or earlier termination of this Agreement, implement any arrangements contemplated by the Back-End Transition Plan, including arrangements relating to (i) the possible hiring of ServCo Employees by a successor operator and (ii) the treatment of severance costs associated with any ServCo Employees not hired by a successor operator. For the avoidance of doubt, any properly incurred and ordinary course costs related to ServCo Employees that are (x) incurred up to the date of early termination or expiration of this Agreement and (y) reflected in then-currently approved Budget shall be T&D Pass-Through Expenditures in accordance with Section 7.2 (*Pass-Through Expenditures*) and Section 7.3 (*Budgets*).

**Section 16.4   Back-End Transition Period Compensation**.

(a)     <u>General</u>. As compensation for the Back-End Transition Services provided by Operator, Owner shall pay Operator the Back-End Transition Service Fee. The Parties acknowledge and agree that Federal Funding shall not be used to pay the Back-End Transition Service Fee. The Back-End Transition Service Fee shall not be subject to any abatement, deduction, counterclaim or set-off of any kind or nature.

(b)     <u>Back-End Transition Service Fee</u>. The "<u>Back-End Transition Service Fee</u>" shall be an aggregate amount equal to (i) the hourly fully allocated cost rate for each category of Operator employee or Affiliate personnel providing Back-End Transition Services *multiplied by* (ii) the number of hours worked by each Operator employee or Affiliate personnel in such category providing Back-End Transition Services *plus* (iii) ten percent (10%)of the product of (i) and (ii), *plus* (iv) all other reasonable and documented costs and expenses incurred by Operator (without markup for profit) that are necessary and reasonable in the course of providing the Back-End Transition Services, including the cost of any Subcontractors providing Back-End Transition Services.

**CONFIDENTIAL**

    (c)    <u>Funding</u>.

    (i)    Owner shall establish one or more accounts from which Owner shall draw funds from time to time to pay Operator the Back-End Transition Service Fee (collectively, the "<u>Back-End Transition Account</u>").

    (ii)    Promptly after the Back-End Transition Commencement Date (and in any event within five (5) Business Days), Operator shall deliver to Administrator an estimate of the anticipated Back-End Transition Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*). Within ten (10) days of delivery of such estimate, and prior to and as a condition to the commencement of any Back-End Transition Services, Administrator shall provide Operator evidence reasonably satisfactory to Operator that an amount equal to the sum of the anticipated Back-End Transition Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), has been funded in the Back-End Transition Account by Owner. Prior to the end of each month during the period in which Operator performs the Back-End Transition Services, Operator shall deliver to Administrator an estimate of the anticipated Back-End Transition Service Fee for the following four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*). No later than the tenth (10th) Business Day of each month during the period in which Operator performs the Back-End Transition Services, Owner shall replenish the Back-End Transition Account so as to maintain a balance in the Back-End Transition Account at the end of each calendar month equal to the sum of the anticipated Back-End Transition Service Fee for the subsequent four and a half (4.5) months, subject to Section 7.8 (*Owner Credit Rating*), and so on subsequently until the Back-End Transition Services conclude.

    (iii)    In the event a Dispute arises between Operator and Administrator in connection with Operator's estimate of the anticipated Back-End Transition Service Fee, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "<u>Back-End Transition Service Fee Estimate Dispute</u>").

    (d)    <u>Invoices</u>.

    (i)    On or prior to the tenth (10th) day of each month during which Operator is performing the Back-End Transition Services, Operator shall provide Administrator with a monthly invoice describing in reasonable detail the prior calendar month's Back-End Transition Services and the corresponding Back-End Transition Service Fee for such prior calendar month. All invoices shall comply with the requirements set forth in Section 9.2(c) (*Anti-Corruption and Sanctions Laws – Policies and Procedures*).

    (ii)    Operator shall provide promptly to Administrator such additional supporting documentation evidencing the provision of the Back-End Transition Services, if any, and the calculation of the Back-End Transition Service Fee related thereto, as Administrator may reasonably request and as may be required by Applicable Law. Administrator shall promptly advise Operator of any disputed invoice amounts, and all such disputes which Operator and Administrator are unable to resolve shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "<u>Back-End Transition Service Fee Dispute</u>").

CONFIDENTIAL

(iii)  Payments of undisputed amounts under any invoice shall be due within thirty (30) days of Administrator's receipt of such invoice.

(e)  Audits. At any time and from time to time during and until the expiration of six (6) years following the end of the period during which Operator performs the Back-End Transition Services, Administrator may, upon reasonable prior notice, Audit (or cause to be Audited) the books and records of Operator or any Subcontractor in connection with any requests for payment of the Back-End Transition Service Fee, together with the supporting vouchers and statements, and the calculation of the Back-End Transition Service Fee. Subject to the dispute resolution provisions in Article 15 (*Dispute Resolution*), each payment made by Owner hereunder shall be subject to subsequent adjustment. Following the determination that any such payment adjustment is required, the Party required to make payment shall do so within thirty (30) days of the date of such determination.

**Section 16.5  Surrender of the T&D System**. Upon completion or the earlier expiration of the obligation to provide the Back-End Transition Services in accordance with this Article 16 (*Back-End Transition*), Operator and, if and to the extent Administrator requests, its Contractors and Subcontractors shall peaceably leave and surrender the T&D System to Owner or its designee in a condition consistent with Operator's responsibilities hereunder.

CONFIDENTIAL

# ARTICLE 17
## FORCE MAJEURE EVENTS

**Section 17.1    Notice; Mitigation**.

(a)       <u>Notice</u>. The Party claiming a Force Majeure Event (the "<u>Claiming Party</u>") shall notify the other Party in writing, on or promptly after the date it first becomes aware of such Force Majeure Event, followed within five (5) Business Days by a written description of (i) the Force Majeure Event and the cause thereof (to the extent known), (ii) the date the Force Majeure Event began and its estimated duration, (iii) the manner in which and the estimated time during which the performance of the Claiming Party's obligations hereunder will be affected, and the impact, if any, on any scheduled completion dates for Capital Improvements, and (iv) mitigating actions that the Claiming Party plans to take in order to reduce the impact of the Force Majeure Event; <u>provided</u> that the Claiming Party's failure to promptly notify the other Party shall not preclude the Claiming Party from obtaining relief with respect to the Force Majeure Event if the other Party has not been prejudiced by the Claiming Party's delay to provide prompt notice.

(b)       <u>Mitigation</u>. Whenever a Force Majeure Event shall occur, the Claiming Party shall, as promptly as reasonably possible, use commercially reasonable efforts to mitigate or eliminate the cause therefor, reduce costs resulting therefrom, mitigate and limit damage to the other Party and resume full performance under this Agreement.

(c)       <u>Burden of Proof</u>. The Claiming Party shall bear the burden of proof as to the existence and impact of the Force Majeure Event, and shall furnish promptly in writing (if and to the extent available to it) any additional documents or other information relating to the Force Majeure Event reasonably requested by the other Party. While the Force Majeure Event continues, the Claiming Party shall give notice to the other Party before the first day of each succeeding month updating the information previously submitted with respect to the nature, cause, impact and potential duration of the Force Majeure Event pursuant to this Section 17.1 (*Notice; Mitigation*). The Parties hereby agree that, in the event that a Dispute arises between the Parties in connection with whether and to the extent an event, circumstance or condition constitutes a Force Majeure Event, or whether such Force Majeure Event continues, the matter shall be subject to resolution as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) (any such Dispute, a "<u>Force Majeure Event Dispute</u>").

(d)       <u>Notice of Cessation of Force Majeure Event</u>. Upon the cessation of a Force Majeure Event, including a determination by the Independent Expert that a Force Majeure Event no longer exists, the Claiming Party shall (i) promptly (but in any event within five (5) Business Days) provide notice to the other Party and (ii) promptly thereafter resume compliance with this Agreement.

**Section 17.2    Relief**.

(a)       <u>Generally</u>. If and to the extent a Force Majeure Event interferes with, delays or increases the cost of, a Party's performance of its obligations under this Agreement, and such Party has given timely notice and description as required by Section 17.1 (*Notice; Mitigation*), such Party shall be excused from performance and any associated Events of Default except to the

CONFIDENTIAL

extent contemplated in Section 17.2(c) (*Relief – Extended Event*). In the event Operator is the party claiming the Force Majeure Event, Operator shall be (i) excused with respect to the achievement of any Performance Metrics affected by the Force Majeure Event and (ii) entitled to request appropriate adjustments to the Budgets or the Performance Metrics in accordance with Section 7.4 (*Budget Policy*).

(b)     Limitations. The occurrence of Force Majeure Event shall not excuse or delay the performance of (i) a Party's obligation to pay amounts previously accrued and owing under this Agreement, including any earned but unpaid Service Fees, (ii) Owner's obligation to continue to pay the Fixed Fee and to deposit and make funds available for Operator's use in the Service Accounts in accordance with Article 7 (*Compensation; Budgets*) and (iii) any obligation hereunder not affected by the occurrence of the Force Majeure Event.

(c)     Extended Event. In addition to all other relief pursuant to this Agreement, including under Section 4.1(f) (*Front-End Transition Period Generally – Liability Waiver*), Section 4.8(c) (*Failure of Service Commencement Conditions – Effect of Force Majeure Events or Owner Fault*) and Section 7.4 (*Budget Policy*), if and to the extent a Force Majeure Event continues for a period in excess of one hundred twenty (120) consecutive days and materially interferes with, delays or increases the cost of the O&M Services in accordance herewith, and a Party has given timely notice and description as required by Section 17.1 (*Notice; Mitigation*), Administrator and Operator shall negotiate in good faith to determine whether modifications to the Service Fee, Term or other provisions of this Agreement are appropriate under the circumstances; provided any such modification (i) shall not be effective until Administrator has obtained, at the cost of Owner or Administrator, a Tax Opinion and a Reliance Letter with respect to any such modification and (ii) shall be subject to approval by PREB in accordance with Applicable Law.

CONFIDENTIAL

## ARTICLE 18
## INDEMNIFICATION

**Section 18.1    Indemnification by Operator**.

(a)        <u>Generally</u>. Subject to the limitations on liability set forth in this Section 18.1 (*Indemnification by Operator*), Section 18.3 (*Limitation on Liability*), Section 18.4 (*Insurance and Other Recovery*), Section 18.5 (*Liability Limitation for Certain Damages*) and Section 18.6 (*Additional Liability Limitation for Certain Damages*), Operator shall indemnify, defend and hold harmless Owner, Administrator and their respective Affiliates and Representatives (each, including Owner, an "<u>Owner Indemnitee</u>"), from and against (and pay the full amount of) any and all Losses incurred by an Owner Indemnitee to the extent arising or resulting from, in each case, as determined by a final and non-appealable judgment by a court of competent jurisdiction: (i) any breach by Operator of any representation or warranty of Operator in this Agreement that has a material adverse effect on the T&D System or on the performance or the cost of performance by any Party of its respective obligations under this Agreement; or (ii) the negligence (including gross negligence) or willful misconduct of Operator Indemnitees in connection with the performance of Operator's obligations under this Agreement, except in connection with Section 5.10 (*Environmental Health and Safety Matters*) where the applicable standard shall be gross negligence or willful misconduct to the extent provided therein. Operator's indemnification obligations hereunder shall not be limited by any coverage exclusions or other provisions in any insurance policy maintained by Operator which is intended to respond to such events.

(b)        <u>Limitations</u>. Notwithstanding the foregoing, Operator shall not be required to reimburse or indemnify any Owner Indemnitee for any Losses to the extent caused by or due to (i) Owner Fault, (ii) a Force Majeure Event, other than to the extent caused by the gross negligence or willful misconduct of any Operator Indemnitee in responding to such Force Majeure Event, (iii) the negligence (including gross negligence) or willful misconduct of any Owner Indemnitee), (iv) any matter for which Owner expressly indemnifies Operator pursuant to Section 18.2 (*Indemnification by Owner*), or (v) events or circumstances arising prior to the Service Commencement Date, in each case as determined by a final and non-appealable judgment by a court of competent jurisdiction.

(c)        <u>Notice, Defense and Survival</u>. An Owner Indemnitee shall promptly notify Operator in writing pursuant to Section 20.2 (*Notices*) of this Agreement of the assertion of any claim against it for which it is entitled to be indemnified hereunder, and Operator shall have the right to assume the defense of the claim in any Legal Proceeding and to approve any settlement of the claim, such approval not to be unreasonably withheld, delayed or conditioned. For the avoidance of doubt, any Fees-and-Costs associated with Operator defending Owner Indemnitees pursuant to this Section 18.1 (*Indemnification by Operator*) shall be T&D Pass-Through Expenditures, except to the extent Operator's liability to pay such Fees-and-Costs is determined by a final and non-appealable judgment by a court of competent jurisdiction. The indemnification provisions in this Section 18.1 (*Indemnification by Operator*) are (i) for the protection of Owner Indemnitees only and shall not establish, of themselves, any liability to any Person not party to this Agreement and (ii) shall survive termination of this Agreement.

CONFIDENTIAL

### Section 18.2   Indemnification by Owner.

(a)      Generally. Subject to the limitations on liability set forth in this Section 18.2 (*Indemnification by Owner*), Section 18.3 (*Limitation on Liability*), Section 18.4 (*Insurance and Other Recovery*), Section 18.5 (*Liability Limitation for Certain Damages*) and Section 18.6 (*Additional Liability Limitation for Certain Damages*), Owner shall indemnify, defend and hold harmless Operator and the Equity Participants and its and their respective Affiliates and Representatives (each, including Operator, an "Operator Indemnitee"), from and against (and pay the full amount of) any and all Losses incurred by an Operator Indemnitee to the extent arising or resulting from, in each case, as determined by a final and non-appealable judgment by a court of competent jurisdiction: (i) any breach by Owner or Administrator of any of its respective representations or warranties in this Agreement that has a material adverse effect on the T&D System or on the performance or the cost of performance by any Party of its respective obligations under this Agreement; (ii) any failure by Owner or Administrator to perform its obligations under this Agreement or resulting from any Owner Fault; (iii) claims of any nature relating to the T&D System, Owner's operation thereof or any matter in the nature of the services to be provided by, or any other obligations imposed on, Operator hereunder, in each case based on events or circumstances to the extent arising prior to the Service Commencement Date or relating to Legacy Generation Assets, or any fiber optic cable infrastructure or other facilities, equipment and other assets related to telecommunications in which Owner or PREPA Networks, LLC has an ownership or leasehold interest (other than in connection with Operator's obligations under Section I.A(6) of Annex I (*Scope of Services*)); (iv) the negligence (including gross negligence) or willful misconduct of Owner Indemnitees in connection with this Agreement; (v) claims brought by Owner employees or former employees with respect to the non-payment or underfunding of benefits under Owner's pension or other employee benefit plans; (vi) claims brought against Operator by a T&D Customer in connection with the T&D System or Operator's performance of the O&M Services; (vii) claims brought against Operator by a Person not party to this Agreement in connection with the T&D System or Operator's performance of the O&M Services for loss of profits or revenues or special, exemplary, punitive, indirect or consequential damages, howsoever or whensoever arising and whether or not caused by the negligence of any Operator Indemnitee; or (viii) Pre-Existing Environmental Conditions, other than an exacerbation of such Pre-Existing Environmental Conditions to the extent caused by the gross negligence or willful misconduct of any Operator Indemnitee.

(b)      Limitations. Owner's indemnification obligations hereunder shall not be limited by any coverage exclusions or other provisions in any insurance policy maintained by Owner which is intended to respond to such events. Notwithstanding the foregoing, other than with respect clauses (vii) and (viii) of Section 18.2(a) (*Indemnification by Owner – Generally*), to which the following statement shall not apply, Owner shall not be required to reimburse or indemnify any Operator Indemnitee for any Losses to the extent caused by or due to: (i) a Force Majeure Event, other than to the extent caused by the gross negligence or willful misconduct of any Owner Indemnitee in responding to such Force Majeure Event; (ii) the negligence (including gross negligence) or willful misconduct of any Operator Indemnitee; or (iii) any matter for which Operator expressly indemnifies Owner pursuant to Section 18.1 (*Indemnification by Operator*), in each case as determined by a final and non-appealable judgment by a court of competent jurisdiction.

CONFIDENTIAL

(c)    Notice, Defense and Survival. An Operator Indemnitee shall promptly notify Owner in writing pursuant to Section 20.2 (*Notices*) of this Agreement of the assertion of any claim against it for which it is entitled to be indemnified hereunder, and Owner shall have the right to assume the defense of the claim in any Legal Proceeding and to approve any settlement of the claim, such approval not to be unreasonably withheld, delayed or conditioned. Any amount payable by Owner to any Operator Indemnitee pursuant to this Section 18.2 (*Indemnification by Owner*) that remains unsatisfied for a period of sixty (60) days shall be treated as a T&D Pass-Through Expenditure; provided, however, that the foregoing shall not limit Owner's ability to contest whether such payment is due. The provisions in this Section 18.2 (*Indemnification by Owner*) (i) are for the protection of Operator Indemnitees only and shall not establish, of themselves, any liability to any Person not party to this Agreement and (ii) shall survive termination of this Agreement.

**Section 18.3    Limitation on Liability**. Notwithstanding anything contained in this Agreement to the contrary:

(a)    Operator General Limitations.

(i)    Except as set forth in Section 18.3(b) (*Limitation on Liability – Gross Negligence; Willful Misconduct*), Operator's liability to Owner Indemnitees under Section 18.1 (*Indemnification by Operator*), including Disallowed Costs, shall be limited to US$35,000,000 in the aggregate for Losses occurring in any Contract Year; and US$105,000,000 in the aggregate for all Losses during the Term.

(ii)    From the Effective Date until the end of the second (2nd) Contract Year, Operator shall not be liable for any Loss incurred by an Owner Indemnitee pursuant to Section 18.1 (*Indemnification by Operator*) unless and until the aggregate amount of such Losses in such Contract Year exceeds US$5,000,000 (as adjusted on a Pro Rata basis for a partial Contract Year), in which event Operator shall then be liable for all Losses in excess of US$5,000,000 (as adjusted on a Pro Rata basis for a partial Contract Year), subject to the limitation on liability set forth in Section 18.3(a) (*Limitations on Liability – Operator General Limitations*).

(iii)    From the beginning of the third (3rd) Contract Year until the end of the Term, Operator shall not be liable for any Loss incurred by an Owner Indemnitee pursuant to Section 18.1 (*Indemnification by Operator*) unless and until the aggregate amount of such Losses in such Contract Year exceeds US$2,500,000 (as adjusted on a Pro Rata basis for a partial Contract Year), in which event Operator shall then be liable for all Losses in excess of US$2,500,000 (as adjusted on a Pro Rata basis for a partial Contract Year), subject to the limitation on liability set forth in Section 18.3(a) (*Limitations on Liability – Operator General Limitations*).

(iv)    For the avoidance of doubt, Operator shall not be liable to Owner Indemnitees to the extent Owner is determined, by a final and non-appealable judgment by a court of competent jurisdiction, to have acted or refrained from acting in accordance with the terms of this Agreement.

(b)    Gross Negligence; Willful Misconduct.

CONFIDENTIAL

   (i) Operator's liability to Owner Indemnitees for any Losses attributable to any Operator Indemnitee's gross negligence or willful misconduct under this Agreement, including under Section 18.1 (*Indemnification by Operator*) and any Disallowed Costs attributable to Operator Indemnitees' gross negligence or willful misconduct, shall be limited to:

   (A) US$35,000,000 for all Losses occurring in each Contract Year for each of the first five (5) Contract Years;

   (B) US$52,500,000 for all Losses occurring in each Contract Year for each subsequent Contract Year, and

   (C) a total maximum of US$105,000,000 in the aggregate for all Losses during the Term.

   (ii) If any liability for Losses is attributable in part to gross negligence and in part to negligence, then such liability shall be apportioned such that the portion of the Loss attributable to negligence shall be subject to the limitation on liability set forth in set forth in Section 18.3(a)(i) (*Limitations on Liability – Operator General Limitations*).

   (c) <u>No Administrator Liability</u>. Administrator shall not be liable to Operator Indemnitees under this Agreement.

### Section 18.4 Insurance and Other Recovery.

   (a) <u>Generally</u>. The amount of any Losses that are subject to indemnification, compensation or reimbursement under this Agreement shall be reduced by the amount of any insurance proceeds and any indemnity, contribution or other similar payment actually received by Owner Indemnitee or Operator Indemnitee, as applicable, in respect of such Losses or any of the events, conditions, facts or circumstances resulting in or relating to such Losses ("<u>Third-Party Payments</u>"). If an Owner Indemnitee or Operator Indemnitee, as applicable, receives any Third-Party Payment with respect to any Losses for which it has previously been indemnified (directly or indirectly) by an Indemnifying Party, Owner Indemnitee or Operator Indemnitee, as applicable, shall promptly (and in any event within five (5) Business Days after receiving such Third-Party Payment) pay to the Indemnifying Party an amount equal to such Third-Party Payment or, if it is a lesser amount, the amount of such previously indemnified Losses. Owner Indemnitee or Operator Indemnitee, as applicable, shall use commercially reasonable efforts to recover under insurance policies or indemnity, contribution or other similar agreements other than this Agreement for any Losses to the same extent such Party would if such Losses were not subject to indemnification, compensation or reimbursement hereunder.

   (b) <u>Subrogation of Claims</u>. If a Party makes any indemnity payment for any Losses suffered or incurred by an Owner Indemnitee or Operator Indemnitee, as applicable, pursuant to the provisions of this Article 18 (*Indemnification*), such indemnifying Party shall be subrogated, to the extent of such payment, to all rights and remedies of the Owner Indemnitee or Operator Indemnitee, as applicable, to any insurance benefits or other claims of the Owner Indemnitee or Operator Indemnitee, as applicable, with respect to such Losses and with respect to the matter giving rise to such Losses.

CONFIDENTIAL

**Section 18.5   Liability Limitation for Certain Damages**. TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER OPERATOR INDEMNITEES NOR OWNER INDEMNITEES SHALL BE LIABLE, WHETHER IN CONTRACT, INDEMNITY, TORT (INCLUDING NEGLIGENCE, GROSS NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE, FOR ANY LOSS OF PROFITS OR REVENUES (OTHER THAN COMPENSATION DUE BY OWNER TO OPERATOR UNDER THIS AGREEMENT), OR ANY SPECIAL, EXEMPLARY, PUNITIVE, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHICH ARISE FROM, RELATE TO OR ARE CONNECTED WITH THIS AGREEMENT OR THE PERFORMANCE OF OR FAILURE TO PERFORM THEIR RESPECTIVE OBLIGATIONS HEREUNDER EXCEPT FOR CLAIMS OF FRAUD OR INTENTIONAL MISREPRESENTATION.

**Section 18.6   Additional Liability Limitation for Certain Damages**.

(a)   OWNER AND ADMINISTRATOR UNDERSTAND THAT OPERATOR MAY BE PROVIDING O&M SERVICES THAT:

(i)   AS OF THE SERVICE COMMENCEMENT DATE, INCORPORATE OR ARE RELIANT UPON ASSETS (INCLUDING THE T&D SYSTEM) THAT ARE IN A CONDITION REQUIRING REPAIRS OR IMPROVEMENTS; AND

(ii)   INCORPORATE OR ARE RELIANT UPON INFORMATION, SYSTEMS, DATA OR INSTRUCTIONS THAT HAVE BEEN, ARE OR ARE TO BE PROVIDED BY OWNER OR THIRD-PARTIES.

(b)   AS SUCH, OWNER AND ADMINISTRATOR ACKNOWLEDGE AND AGREE THAT, EXCEPT TO THE EXTENT ARISING OR RESULTING FROM THE NEGLIGENCE (INCLUDING GROSS NEGLIGENCE) OR WILLFUL MISCONDUCT OF OPERATOR INDEMNITEES IN CONNECTION WITH THIS AGREEMENT, OPERATOR INDEMNITEES:

(i)   SHALL HAVE NO RESPONSIBILITY OR LIABILITY FOR ANY MATTER THAT IS THE SUBJECT OF THE SYSTEM REMEDIATION PLAN DURING THE PERIOD OPERATOR IS REPAIRING OR IMPROVING THE T&D SYSTEM ASSETS, BUSINESS PROCESS OR CONTROLS, WHETHER FORMAL OR INFORMAL, INCLUDING ACCOUNTING, INFORMATION, TECHNOLOGY AND ADMINISTRATIVE FUNCTIONS, IN EACH CASE RELATED TO SUCH MATTER IN ACCORDANCE WITH THE SYSTEM REMEDIATION PLAN (FOR THE AVOIDANCE OF DOUBT, OPERATOR SHALL NOT BE LIABLE FOR DAMAGES ARISING FROM CYBERSECURITY BREACHES OCCURING DURING THE PERIOD OPERATOR IS REPAIRING OR IMPROVING THE T&D SYSTEM ASSETS, BUSINESS PROCESS OR CONTROLS, WHETHER FORMAL OR INFORMAL, IN ACCORDANCE WITH THE IMPLEMENTATION OF THE SYSTEM REMEDIATION PLAN IN SECTION 4.1(D)   (*FRONT-END TRANSITION PERIOD GENERALLY – TRANSITION TO STANDARD OF PERFORMANCE*).); AND

(ii)   SHALL HAVE NO LIABILITY HEREUNDER FOR ANY DEFECT, ERROR, DEFAULT, DELAY OR LOSSES ARISING AS A RESULT OF ANY

CONFIDENTIAL

PROCESSING DEFICIENCY, INACCURACY, ERROR OR OMISSION TO THE EXTENT CAUSED BY A THIRD-PARTY OR BY INFORMATION, SYSTEMS, DATA OR INSTRUCTIONS PROVIDED BY A THIRD-PARTY, OWNER, ADMINISTRATOR OR THEIR RESPECTIVE REPRESENTATIVES.

CONFIDENTIAL

# ARTICLE 19
# REPRESENTATIONS AND WARRANTIES

**Section 19.1    Representations and Warranties of Owner**. Owner hereby represents and warrants to Operator that:

(a)    <u>Existence and Powers</u>. Owner is a public corporation and instrumentality of the Commonwealth duly organized, validly existing and in good standing under the laws of the Commonwealth. Owner has the required corporate power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby. Administrator has the required corporate power and authority to carry out its obligations under this Agreement and on behalf of Owner, including the power and authority to bind Owner with respect to any matter contemplated under this Agreement.

(b)    <u>Due Authorization and Binding Obligation</u>. The execution and delivery by Owner of this Agreement, the performance by Owner of its obligations hereunder and the consummation by Owner of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Owner. This Agreement has been duly and validly executed and delivered by Owner, and (assuming due authorization, execution and delivery by Operator) this Agreement constitutes a legal, valid and binding obligation of Owner enforceable against Owner in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)    <u>No Conflicts</u>. Neither the execution, delivery or performance by Owner of this Agreement, nor the consummation of the transactions contemplated hereby will: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Owner; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Owner; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Owner is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Owner.

(d)    <u>No Consents</u>. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Owner in connection with (i) the execution and delivery of this Agreement or (ii) the performance by Owner of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Service Commencement Date.

(e)    <u>No Litigation</u>. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Owner or, to Owner's knowledge, threatened against Owner, which if determined adversely against Owner would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Agreement or (ii) the performance by Owner or Operator of their respective obligations hereunder.

(f)       <u>No Legal Prohibition</u>. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Owner of this Agreement and the transactions contemplated hereby.

(g)       <u>Title III Approval</u>. No approval of the Title III Court is required for Owner to enter into this Agreement. Owner's entry into, and the Parties' performance of, this Agreement, constitutes use or enjoyment by Owner of its revenue-producing property within the meaning of section 305(3) of PROMESA.

(h)       <u>Charges</u>. As of the Service Commencement Date, there will be no Liens on the System Revenues other than those specified in or permitted under any Title III Plan and its related implementing documents.

(i)       <u>Intellectual Property</u>. Owner has the right to grant the Intellectual Property licenses that are granted and conveyed to Operator in this Agreement, and Operator's exercise of the rights granted to it in this Agreement as contemplated in this Agreement will not infringe, violate or misappropriate the Intellectual Property of any third party. There are no suits or other legal actions pending or, to Owner's knowledge, threatened in writing against Owner alleging infringement, violation or misappropriation of any Owner Intellectual Property.

(j)       <u>System Contracts</u>. To Owner's knowledge and except as otherwise disclosed to Operator, (i) each material System Contract is in full force and effect and was procured in accordance with applicable Commonwealth law, (ii) there are no pending claims by or against any counterparty to a material System Contract, (iii) neither Owner nor any counterparty to a material System Contract is in default of its obligations under any material System Contract and (iv) Operator is permitted to administer and perform Owner's obligations under each material System Contract on Owner's behalf.

(k)       <u>Operation of T&D System</u>. Without limiting any other representations or warranties set out herein, from the Effective Date to the Service Commencement Date, Owner has, except as otherwise permitted by this Agreement or required by Applicable Law (including requirements related to the Title III Case), operated the T&D System in the ordinary course.

(l)       <u>Pre-Existing Environmental Conditions</u>. As of the Service Commencement Date, after commercially reasonable inquiry, Owner is not aware of any Pre-Existing Environmental Conditions on or at the T&D System Site which has not been disclosed to Operator pursuant to the Baseline Environmental Study.

**Section 19.2 Representations and Warranties of Operator**. Operator hereby represents and warrants to Owner that:

(a)       <u>Existence and Powers</u>. ManagementCo is a limited liability company duly organized, validly existing and in good standing under the laws of Puerto Rico, and is qualified to do business and in good standing in the Commonwealth. ServCo is a limited liability company duly organized, validly existing and in good standing under the laws of Puerto Rico, and is qualified to do business and in good standing in the Commonwealth. Each of ManagementCo and

CONFIDENTIAL

ServCo has the required corporate power and authority to enter into this Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby.

(b)     Due Authorization and Binding Obligation. The execution and delivery by Operator of this Agreement, the performance by Operator of its obligations hereunder and the consummation by Operator of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Operator. This Agreement has been duly and validly executed and delivered by Operator, and (assuming due authorization, execution and delivery by Owner) this Agreement constitutes a legal, valid and binding obligation of Operator enforceable against Operator in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)     No Conflicts. Neither the execution, delivery or performance by Operator of this Agreement, nor the consummation of the transactions contemplated hereby will: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Operator; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Operator; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Operator is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Operator.

(d)     No Consents. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Operator in connection with (i) the execution and delivery of this Agreement or (ii) the performance by Operator of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Service Commencement Date.

(e)     No Litigation. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Operator or, to Operator's knowledge, threatened against Operator, which if determined adversely against Operator would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Agreement or (ii) the performance by Operator or Owner of their respective obligations hereunder.

(f)     No Legal Prohibition. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Operator of this Agreement and the transactions contemplated hereby.

(g)     Intellectual Property. Operator has the right to grant the Intellectual Property licenses that are granted and conveyed to Owner in this Agreement, and Owner's exercise of the rights granted to it in this Agreement as contemplated in this Agreement will not infringe, violate or misappropriate the Intellectual Property of any third party. There are no suits or other legal actions pending or, to Operator's knowledge, threatened in writing against Operator alleging infringement, violation or misappropriation of any Operator Intellectual Property.

CONFIDENTIAL

(h)     Applicable Law Compliance.

(i)     None of Operator or its subsidiaries or, when acting on behalf of Operator or its subsidiaries, any director, officer, manager, administrator or employee of Operator or its subsidiaries or, in connection with this Agreement or the O&M Services, any Affiliates of Operator has:

(A)     violated, conspired to violate, aided and abetted the violation of any Anti-Corruption Laws or committed any felonies or misdemeanors under Articles 4.2, 4.3 or 5.7 of Act No. 1-2012, known as the Organic Act of the Office of Government Ethics of Puerto Rico, any of the crimes listed in Articles 250 through 266 of Act 146-2012, known as the Puerto Rico Penal Code, any of the crimes typified in Act 2, or any other felony that involves misuse of public funds or property, including the crimes mentioned in Article 6.8 of Act 8-2017, known as the Act for the Administration and Transformation of Human Resources in the Government of Puerto Rico;

(B)     failed to comply at any time with the Anti-Corruption Laws and any other Applicable Law that prohibit corruption and regulate criminal acts involving public functions or public funds applicable to Operator under state, Commonwealth or federal law, or solely with respect to Operator, failed to furnish a Sworn Statement; or

(C)     been convicted of offenses against public integrity, as defined in the Puerto Rico Penal Code, or of embezzlement of public funds, or has been found guilty of any such type of offense in the courts of the Commonwealth, the courts of the United States or any court of any jurisdiction.

(ii)     Operator has not, directly or indirectly, made or received, and will not make or receive, any payments in connection with this Agreement or the O&M Services in order to illegally or improperly to obtain business or other rights.

(iii)     Operator is not aware that it is being investigated as part of a criminal or civil process by any law enforcement or regulatory authority in connection in any way with the Anti-Corruption Laws or any criminal laws or regulations.

(iv)     None of Operator, its subsidiaries, Parent Company or any directors, officers or employees of any thereof is (A) a Person, or is a Person owned or controlled by a Person (a "Sanctioned Person"), with whom dealings are restricted or prohibited by, or are sanctionable under, any economic sanctions or trade restrictions administered or enforced by the U.S. government (including the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State or the Bureau of Industry and Security of the U.S. Department of Commerce), the United Nations Security Council, the European Union or Her Majesty's Treasury or any other authority with jurisdiction over Operator, its subsidiaries or its Affiliates (collectively, "Sanctions") or (B) located, organized or resident in a country or territory with which dealings are broadly restricted, prohibited or made sanctionable under any Sanctions (currently, the Crimea, Cuba, Iran, North Korea and Syria) (each, a "Sanctioned Country"). Operator and its subsidiaries have not violated and have not engaged in any conduct sanctionable under Sanctions. There are not now, nor have there been within the past five (5) years, any formal

or informal proceedings, allegations, investigations or inquiries pending, expected or, to the knowledge of the Parent Company, threatened against the Parent Company, Operator, its subsidiaries, or any of their respective officers or directors concerning violations or potential violations of, or conduct sanctionable under, any Sanctions.

(v)     No official or employee of Owner has a direct or indirect economic interest in Operator's rights under this Agreement in accordance with the provisions of Act 2, which Operator herein certifies it has received a copy of, read, understood and complied with at all times prior to the execution of this Agreement and will subsequently comply with it in its entirety.

(vi)     Operator does not represent particular interests in cases or matters that imply conflicts of interest, or of public policy, between Owner and the particular interests it represents.

(i)     <u>Accuracy of Information</u>. All of the information relating to Operator or any of its Affiliates delivered by or on behalf of Operator to Owner and Administrator in connection with the execution of this Agreement was true, accurate and complete in all material respects when delivered.

(j)     <u>Ability to Perform Obligations</u>. Operator has the required authority, ability, skills, access to funds, technical support and capacity to perform all its obligations with respect to the O&M Services and all of its other obligations under this Agreement, all in accordance with the Transaction Documents.

(k)     <u>Knowledge of Requirements</u>. Operator has knowledge in all material respects of all legal requirements and business and engineering practices that must be followed in performing its obligations under this Agreement.

(l)     <u>No Litigation with Owner</u>. Neither Operator nor any of its shareholders or its or their Affiliates are involved in any litigation, arbitration or claim against Owner, Administrator, AAFAF or the FOMB.

CONFIDENTIAL

## ARTICLE 20
## MISCELLANEOUS

**Section 20.1   Fees and Expenses**. Except as otherwise expressly provided in this Agreement, all costs and expenses incurred, including fees and disbursements of counsel, financial advisors and accountants, in connection with the negotiation and execution of this Agreement shall be borne by the Party incurring such costs and expenses; provided, however, that, in the event this Agreement is terminated in accordance with its terms, the obligation of each Party to bear its own costs and expenses shall be subject to any rights of such Party arising from a breach of this Agreement by the other Party prior to such termination.

**Section 20.2   Notices**. All notices or other communications to be delivered in connection with this Agreement shall be in writing and shall be deemed to have been properly delivered, given and received (a) on the date of delivery if delivered by hand during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, (b) on the date of successful transmission if sent via email (with return receipt) during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, or (c) on the date of receipt by the addressee if sent by a nationally recognized overnight courier or by registered or certified mail, return receipt requested, if received on a Business Day, otherwise on the next Business Day. Such notices or other communications must be sent to each respective Party at the address, email address set forth below (or at such other address, email address as shall be specified by a Party in a notice given in accordance with this Section 20.2 (*Notices*)):

| | |
|---|---|
| If to Owner: | Puerto Rico Electric Power Authority |
| | PO BOX 364267 |
| | San Juan, Puerto Rico 00936-4267 |
| | Attention: Chief Executive Officer – José F. Ortiz Vázquez |
| | Telephone: (787) 521-4666 |
| | Email: Jose.Ortiz@prepa.com |
| | |
| | with copies to: |
| | Administrator |
| | PO BOX 42001 |
| | San Juan, Puerto Rico 00940-2001 |
| | Attention: Executive Director – Fermín E. Fontanés Gómez |
| | Telephone: (787) 722-2525 Ext. 15330 |
| | Email: Fermin.Fontanes@p3.pr.gov and Administrator@p3.pr.gov |
| | *and* |
| | PREB |
| | 268 Avenida Muñoz Rivera |
| | Edificio World Plaza |
| | Piso 7, Suite 704 |
| | Hato Rey, Puerto Rico 00918 |
| | Attention: President - Edison Avilés Deliz |

CONFIDENTIAL

|  | Telephone: (787) 523-6262 |
|  | Email: eavilesdeliz@energia.pr.gov |

| If to Administrator: | Administrator |
|  | PO BOX 42001 |
|  | San Juan, Puerto Rico 00940-2001 |
|  | Attention: Executive Director – Fermín E. Fontanés Gómez |
|  | Telephone: (787) 722-2525 Ext. 15330 |
|  | Email: Fermin.Fontanes@p3.pr.gov and Administrator@p3.pr.gov |

| If to Operator: | LUMA Energy, LLC |
|  | 644 Fernandez Juncos Ave., Suite 301 |
|  | San Juan, Puerto Rico 00907 |
|  | Attention: General Counsel |
|  | Email: Legal@lumamc.com |
|  | |
|  | with copies to: |
|  | LUMA Energy, LLC |
|  | 644 Fernandez Juncos Ave., Suite 301 |
|  | San Juan, Puerto Rico 00907 |
|  | Attention: President/CEO |

**Section 20.3  Amendments**. Neither this Agreement nor any provision hereof may be changed, modified, amended or waived, except by written agreement duly executed by the Parties. Any such amendment shall not be effective until (i) to the extent required by Applicable Law, approved by PREB and the FOMB (if then in existence) and (ii) Administrator has obtained a Tax Opinion and a Reliance Letter, at the cost of Owner or Administrator, with respect to any such amendment. Wherever this Agreement requires the Parties to use good faith, reasonable, commercially reasonable or other efforts to amend the terms of this Agreement, Operator shall not be deemed to be in breach of such requirement as a result of its insistence that such amendment not adversely affect Operator's compensation under, or its return on investment or other economic interests with respect to, this Agreement, except to the extent such adverse effect results solely from inflation or the imposition of a Tax or an increase in Taxes of general application.

**Section 20.4  Entire Agreement**. This Agreement, together with the Annexes and Exhibits attached hereto, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements, understandings, proposals, representations or warranties relating to this Agreement. Without limiting the generality of the foregoing, this Agreement shall completely and fully supersede all other understandings and agreements among the Parties with respect to such transactions, including those contained in the RFP, the Proposal by Operator or its Affiliate and any amendments or supplements to the RFP or the Proposal.

CONFIDENTIAL

**Section 20.5  Relationship of the Parties**. Nothing in this Agreement is intended to create, or shall be deemed or construed as creating, any partnership, joint venture or other legal entity, or give rise to any fiduciary duty, among the Parties. Except as otherwise expressly provided in this Agreement, no Party shall have the authority or right, or hold itself out as having the authority or right, to assume, create or undertake any obligation of any kind whatsoever, express or implied, on behalf of or in the name of any other Party, except as expressly provided herein. No provision in this Agreement shall result in Operator or any of its employees, Subcontractors, agents or Representatives being considered an employee, contractor or Representative of Owner. Operator shall be an independent contractor and shall be responsible for and have control over the performance of the O&M Services hereunder, subject to the standards set forth in this Agreement. Nothing in this Agreement shall be interpreted to create a relationship of co-employer between Owner and Operator or Administrator and Operator as to the employees of Operator or any of its respective subcontractors, nor to make Operator an alter ego or a successor employer of Owner.

**Section 20.6  Assignment and Transfer**.

(a)      <u>By Operator</u>. Except as provided in Section 16.3 (*Transfer Obligation*), Operator shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Agreement or related to the O&M Services without the prior written consent of Administrator, which consent shall not be unreasonably withheld, delayed or conditioned, and to the extent required by Applicable Law, PREB; <u>provided</u>, <u>however</u>, that Operator may, without the prior written consent of Administrator, assign or otherwise dispose of any of its rights and obligations hereunder to an Affiliate of Operator so long as: (i) such Affiliate is (A) a Controlled direct or indirect subsidiary of the Parent Company, (B) reasonably capable of discharging the duties and obligations of Operator hereunder and (C) assumes in writing all of Operator's obligations hereunder; and (ii) such assignment is otherwise permitted under, and in compliance with, Applicable Law. Any such consent given in one instance shall not relieve Operator of its obligation to obtain the prior written consent of Administrator to any further assignment. Any assignment of this Agreement that is approved by Administrator shall require the assignee of Operator to assume the performance of and observe all obligations, representations and warranties of Operator under this Agreement, and no such assignment shall relieve Guarantor(s) of any of its obligations under the Guarantee. The consent to any assignment, transfer or conveyance shall not operate to release Operator in any way from any of its obligations under this Agreement unless such consent specifically provides otherwise. Any amendments to this Agreement requested by a potential assignee or transferee of Operator shall be submitted to and approved by the board of directors of Administrator pursuant to Section 10(a)(19) of Act 29.

(b)      <u>By Owner</u>. Owner shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Agreement without the prior written consent of Operator; <u>provided</u>, <u>however</u>, that Owner may, without the prior written consent of Operator, assign or otherwise dispose of any of its rights and obligations hereunder: (i) to Administrator; or (ii) with prior approval of the FOMB (if then in existence and to the extent such approval is required by Applicable Law), to another Governmental Body if such assignee assumes, and is reasonably and legally, operationally and financially capable of discharging, the duties and obligations of Owner hereunder.

CONFIDENTIAL

**Section 20.7   Interest on Overdue Obligations**. Except as otherwise provided herein, all amounts due hereunder, whether as fees, damages, credits, revenue, charges or reimbursements, that are not paid when due shall bear interest at the Overdue Rate, on the amount outstanding from time to time, and all such interest accrued at any time shall, to the extent permitted by Applicable Law, be deemed added to the amount due, as accrued.

**Section 20.8   Waivers**. Either Operator or Administrator may, at any time, (i) extend the time for the performance of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties of the other Party contained herein or (iii) waive compliance by the other Party with any of the agreements or conditions contained herein. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in a written instrument executed and delivered by the Party so waiving. No waiver by any Party of any breach of this Agreement shall operate or be construed as a waiver of any preceding or subsequent breach, whether of a similar or different character, unless expressly set forth in such written waiver. Neither any course of conduct or failure or delay of any Party in exercising or enforcing any right, remedy or power hereunder shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy or power hereunder, or any abandonment or discontinuance of steps to enforce such right, remedy or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right, remedy or power.

**Section 20.9   Severability**. If any term or provision of this Agreement is invalid, illegal or incapable of being enforced in any situation or in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other term or provision hereof or the offending term or provision in any other situation or any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

**Section 20.10 Survival**. The rights and obligations of the Parties pursuant to this Section 20.10 (*Survival*), Article 13 (*Intellectual Property; Proprietary Information*), Article 15 (*Dispute Resolution*), Article 16 (*Back-End Transition*), Article 18 (*Indemnification*), Section 20.2 (*Notices*) and Section 20.15 (*Governing Law*) shall survive the expiration or termination of this Agreement. No expiration or early termination of this Agreement shall (i) limit or otherwise affect the respective rights and obligations of the Parties accrued prior to the date of such termination or (ii) preclude any Party from impleading any other Party in any Legal Proceeding originated by a third-party as to any matter occurring during the Term.

**Section 20.11   No Third-Party Beneficiaries**. Unless specifically set forth herein, this Agreement is exclusively for the benefit of the Parties and shall not provide any third-parties with any remedy, claim, liability, reimbursement, cause of action or other rights.

CONFIDENTIAL

**Section 20.12 Remedies**.

      (a)    <u>Cumulative and Non-Exclusive Remedies</u>. Except as otherwise provided in this Agreement, any and all remedies herein expressly conferred upon a Party shall be deemed cumulative with and not exclusive of any other remedy expressly conferred hereby, and the exercise by a Party of any one such remedy shall not preclude the exercise of any other such remedy.

      (b)    <u>Irreparable Damage and Harm</u>. The Parties agree that irreparable damage and harm would occur in the event that any provision of this Agreement were not performed in accordance with its terms and that, although monetary damages may be available for such a breach, monetary damages would be an inadequate remedy therefor. Accordingly, each of the Parties agrees that, in the event of any breach or threatened breach of any provision of this Agreement by such Party, the other Party shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent or restrain breaches or threatened breaches hereof and to specifically enforce the terms and provisions hereof. A Party seeking an order or injunction to prevent breaches of this Agreement or to enforce specifically the terms and provisions hereof shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such order or injunction, and each Party hereby irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security. In the event that any Legal Proceeding should be brought in equity to enforce the provisions of this Agreement, each Party agrees that it shall not allege, and each Party hereby waives the defense, that there is an adequate remedy available at law.

    **Section 20.13 Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Agreement transmitted by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Agreement for all purposes.

    **Section 20.14 Office of the Comptroller**. Owner agrees to file this Agreement with the Comptroller of the Commonwealth promptly after its execution and to provide Operator with evidence of its filing within fifteen (15) days following the Effective Date. The Parties acknowledge and agree that the obligations and considerations under this Agreement shall not be enforceable until this Agreement shall have been registered with the Office of the Comptroller of the Commonwealth as provided by Act No. 18 of the Legislative Assembly of Puerto Rico, enacted on October 30, 1975.

    **Section 20.15 Governing Law**. This Agreement and all matters, claims, controversies, disputes, suits, actions or proceedings arising out of or relating to this Agreement and the negotiation, execution or performance of this Agreement or any of the transactions contemplated hereby, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise) in connection therewith, shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the internal laws of the Commonwealth

(excluding any conflict of laws rule or principle which might refer such interpretation to the laws of another jurisdiction), except where the federal supremacy clause requires otherwise.

**Section 20.16 Commonwealth Obligations**. THE OBLIGATIONS OF OWNER AND ADMINISTRATOR UNDER THIS AGREEMENT SHALL NOT BE DEEMED OBLIGATIONS OF THE COMMONWEALTH OR ANY INSTRUMENTALITY OF THE COMMONWEALTH OTHER THAN OWNER AND ADMINISTRATOR.

**Section 20.17 PREB Authority**. Notwithstanding anything to the contrary herein, no provision of this Agreement shall be interpreted, construed or deemed to limit, restrict, supersede, supplant or otherwise affect, in each case in any way, the rights, responsibilities or authority granted to PREB under Applicable Law with respect to the T&D System, Owner or Operator.

*[Signature page follows]*

CONFIDENTIAL

**IN WITNESS WHEREOF**, Owner, Administrator, ManagementCo and ServCo each has caused this Agreement to be duly executed as of the day and year first above written.

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By: _____

Name: _____

Title: _____

**PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY, solely in its capacity as ADMINISTRATOR**

By: _____

Name: _____

Title: _____

*[Signature Page to Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement]*

**App.192**

CONFIDENTIAL

**LUMA ENERGY, LLC**

By:

Name: *Wayne Stensby*

Title: *President & CEO*


By:

Name: *Gerald A Ducey Jr*

Title: *Senior Vice President*

*[Signature Page to Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement]*

CONFIDENTIAL

**LUMA ENERGY SERVCO, LLC**

By:
Name:     *President & CEO*
Title:     *Wayne Stensby*


By:
Name:     *Gerald A Ducg Jr*
Title:     *Senior Vice President*

*[Signature Page to Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement]*

**App.194**

CONFIDENTIAL

## Annex I

## Scope of Services

*This Annex I (Scope of Services) is designed to set forth certain O&M Services in addition to those contained in Article 5 (O&M Services) to the Agreement. This Annex I (Scope of Services) is not intended, nor should it be deemed, to be an exclusive list of O&M Services. However, the Agreement, including this Annex I (Scope of Services), absent subsequent changes agreed to by the Parties, sets forth the entire scope of O&M Services to be provided by pursuant to the Agreement. Capitalized terms used but not defined in this Annex I (Scope of Services) have the respective meanings set forth in the Agreement. All obligations of Operator set forth herein shall be performed in accordance with and are subject to the requirements of the main body of the Agreement.*

I.    <u>T&D System Operation Services</u>.

   A.    <u>General</u>. Operator shall be responsible for all electric transmission, distribution, load serving and related activities for the safe and reliable operation and maintenance of the T&D System, subject to the terms and conditions of the main body of the Agreement, including (1) expansions and replacements to meet the Contract Standards, including fleet, asset management, asset acquisition/procurement, IT infrastructure, as further provided in this document and preparation and implementation of required components of the Integrated Resource Plan, while prioritizing expansion and replacement projects that improve the safe, reliable and economic dispatch of the T&D System's connected generating units; (2) management and performance of construction of improvements thereto, including compliance with approved FEMA scope of work for projects that are eligible for Federal Funding and required maintenance; (3) delivery of electricity to customers, including the implementation of the activities set forth in Sections II.A and II.B of this Annex I (*Scope of Services*); (4) billing and collections implementation and optimization; (5) maintenance and improvement of public lighting system; (6) maintenance of fiber optic cable structure infrastructure, as set forth in lease agreement between Owner and PREPA Networks, LLC, a wholly-owned subsidiary of Owner incorporated in April 2004 to execute the Optical Telecommunications Infrastructure Lease Agreement for dedicated provision of local wholesale telecommunication services (for the avoidance of doubt, the Parties acknowledge and agree that, except as specified in this item (6), Operator shall have no other responsibility relating to PREPA Networks, LLC); (7) compliance with interconnection of renewables in accordance with Applicable Law; (8) management of the System Operation Principles to meet safe and reliable system operations in accordance with Prudent Utility Practices and the System Operation Principles; and (9) recordkeeping and reporting in accordance with Applicable Law or Prudent Utility Practices.

   B.    <u>Day-to-Day Operation</u>. Operator shall be responsible for the day-to-day operation of the T&D System, including: (1) maintaining, improving and developing a culture of safety; (2) management of all aspects of customer relationships, as required under Contract Standards and Applicable Law; (3) physical operation and maintenance of the T&D System; (4) maintaining T&D System reliable electric service (including any changes thereto as a result of reconstruction of any section thereof to address reliability, resiliency, efficiency and/or compliance with Applicable Law); (5) maintenance of applicable communications equipment and protocols with

generating units and contracted power plants as needed; (6) operating within the Contract Standards while operating to improve: reliability, cost of electricity to end users, cost and impact of planned maintenance and use of load shedding if required; (7) producing, reviewing and maintaining all operating logs and maintenance records to meet regulatory and contractual requirements; (8) all human resources functions, including hiring and training employees; and (9) maintaining and improving information technology systems that satisfies the needs of the business in accordance with the requirements of the Agreement.

C.     System Operator Activities. Operator shall serve the role of T&D System operator, including (1) managing control center operations, including generation scheduling and economic/reliable T&D System dispatch; (2) balancing the supply and demand of electricity, including reacting to changes in demand in real time, adjusting generation dispatch to be in balance with demand and maintaining the T&D System at safe operating levels in accordance with Prudent Utility Practices and System Operation Principles; (3) conduct T&D System planning activities; (4) develop and implement reliability standards appropriate for the conditions in Puerto Rico; and (5) manage a transparent, equitable and open generator interconnection process.

D.     Engineering Activities. Operator shall be responsible for all engineering activities related to the operation of the T&D System, including: (1) analyses related to, and maintenance of records and standards for design and engineering, design standards, construction standards, system mapping and related information, system performance, reliability, root cause analysis, equipment ratings, customer contact and needs assessment; (2) administration of customer contribution in aid of construction; (3) managing an effective environmental, health and safety program; (4) maintenance of environmental, health, safety, regulatory and other compliance and the documentation thereof; (5) process to serve (evaluate and approve) new customers (distribution engineering); and (6) expansions and replacements to meet the Contract Standards and Owner's then applicable Integrated Resource Plan, prioritizing expansion or replacement projects that are identified by Owner that will reduce System Power Supply costs by improving the economic/reliable dispatch of all generating units connected to the T&D System.

E.     Maintenance of Technical Documentation. Operator shall be responsible for the improvement of existing, or development of additional/new, and the on-going maintenance of revisions to all T&D System drawings, specifications, construction manuals, equipment diagrams and other technical documentation, including: (1) management of T&D System generation interconnection applications and processing thereof (including negotiation and administration of generation interconnection agreements of any voltage class connected to the T&D System); and (2) preparing capital project close-out reports.

F.     Energy Efficiency Activities. Operator shall be responsible for promoting, administering, planning, developing and implementing energy efficiency, demand response, load management and renewable energy programs and policies for the T&D System as required under Applicable Law, regulation or the Owner's then applicable Integrated Resource Plan, including:

1.     research and demonstration projects for the T&D System and Owner's customers, coordination with third parties or other resources necessary or desirable to develop and implement such programs and responding to customer inquiries with respect to such programs or service; and

CONFIDENTIAL

2.      implementing the customer energy efficiency programs and customer-sited renewable energy programs, as well as any other customer incentive programs that are intended to promote (a) customer adoption of energy and/or capacity saving measures; and/or (b) customer-sited green and/or alternative generation or storage technologies (the "Energy Efficiency Programs") pursuant thereto.

G.      Planning, Environmental and Regulatory. Operator shall be responsible for (1) preparing, presenting, defending current or future Integrated Resource Plans, rate cases or other regulatory or legal matters as they relate to the Agreement, as the Owner's representative before the PREB and any other local, state or federal government agencies, (2) environmental compliance, maintenance of documentation and acquisition of permitting and Easements as required for the T&D System operations, (3) compliance with applicable regulatory and legislative requirements such as energy efficiency mandates and renewable portfolio standards subject to operating constraints and Prudent Utility Practice, and (4) any allocated management obligations of existing power purchase agreements, including the coordination with and support of the Puerto Rico Public-Private Partnerships Authority procurement activities for new power purchases. In performing these services and any other services under the Agreement, nothing shall require, or shall be construed as requiring, Operator to act as legal counsel to, or to provide legal advice or representation to, Owner.

H.      Legal Services. Operator shall be responsible for (1) day-to-day legal responsibilities relating to the O&M Services, in coordination with Owner and Administrator in accordance with processes set forth in this Annex I (*Scope of Services*), and (2) preparing, presenting, defending current or future Integrated Resource Plan, rate cases, or other regulatory or legal matters as they relate to the Agreement, as the Owner's representative before the PREB and any other local, state or federal government agencies, as well as preparing, presenting, and defending any non-compliance with local legislative requirements such as energy efficiency mandates. In performing these services and any other services under this Agreement, nothing shall require, or shall be construed as requiring, Operator to act as legal counsel to, or to provide legal advice or representation to, Owner.

I.      Insurance and Claims. Operator shall maintain the appropriate level of insurance as to cover claims that arise after executing the Agreement and following the Service Commencement Date, consistent with Prudent Utility Practices and with the requirements of the Agreement. As part of the Front-End Transition Plan, Operator shall develop a comprehensive insurance program, to be reviewed and approved by Administrator, which approval shall not be unreasonable withheld, delayed or conditioned. The insurance program shall be provided to PREB for its knowledge. Operator shall be responsible for preparing and submitting insurance claims (including claims that may have arisen prior to the Effective Date and/or the Service Commencement Date) on behalf of Owner as well as keeping Administrator timely informed of such claims processes.

J.      Outsourcing. Operator shall evaluate opportunities for the outsourcing of any specific activities associated with this Annex I (*Scope of Services*) that will provide greater efficiencies and value to customers and the T&D System's operation and seek to implement such activities within budget and regulatory constraints (e.g., fleet management, vegetation management and/or customer service call center).

CONFIDENTIAL

K.    <u>Other</u>. Operator shall be responsible for other activities necessary, appropriate or advisable, including research and development, to operate and maintain the T&D System in accordance with the Contract Standards, including cooperation, as specified in the Agreement, of Operator's performance of the O&M Services under the Agreement, with third parties providing services to Owner with respect to Owner's provision of electric service, provided Owner shall impose similar obligations on such third parties to also cooperate with Operator.

II.    <u>Asset Management and Maintenance Services</u>.

A.    <u>General</u>. Operator shall be responsible for managing and maintaining all assets of the T&D System, including machinery, equipment, structures, improvements and condition assessment of the electrical system components, in accordance with the Contract Standards, including the following: (1) development and implementation of asset management strategies and risk optimization for combined technical performance, life cycle cost, safety, customer satisfaction and regulatory compliance; (2) real estate management, Easements, leases and agreements, pole attachments (including billing and collection for pole attachment fees, as well as maintaining a complete inventory of type and location of each attachment and plans for revenue optimization), joint use agreements and telecommunications for the provision of electric service, including cybersecurity in the manner specified and subject to the provisions set forth in the main body of the Agreement; (3) meter strategy development, maintenance or replacement; (4) fleet management, including evaluation of potential outsourcing; (5) materials and services procurement and inventory management; (6) T&D System security in accordance with Applicable Law and to protect the T&D System from vandalism, terrorism or other acts; (7) emergency preparedness and planning; (8) warehousing; (9) maintenance of the PREPA fiber optic infrastructure; (10) vegetation management in accordance with Prudent Utility Practice and Applicable Law; and (11) preparation of T&D condition assessment report.

B.    <u>Inventory Control</u>. Operator shall, consistent with the Contract Standards, the Agreement and this Annex I (*Scope of Services*): (1) maintain an inventory of equipment, spare parts, materials and supplies (appropriate for day-to-day operations and Emergencies), and shall maintain and document an inventory control program; (2) comply with the inventory policy provided in this Annex I (*Scope of Services*); (3) purchase, maintain and store inventory in a manner also consistent with the T&D System policies and procedures adopted from time to time by Operator in accordance with Prudent Utility Practice and provided in writing to Owner and Administrator and the Emergency Response Plan, and/or the Federal Funding Procurement Manual as applicable and agreed to between Operator and Owner and/or approved by FEMA; and (4) complete, on an agreed-upon cycle count basis, a physical inventory and a condition assessment of the equipment, spare parts, materials and supplies and reconcile the same with the inventory assets carried on the balance sheet and provide the information to Owner and Administrator, in accordance with its reporting obligations set forth in Section 6.3 (*Reporting: Audits*) of the main body of the Agreement.

C.    <u>Fleet Management; Refueling</u>. Operator shall, consistent with the Contract Standards, the Agreement and this Annex I (*Scope of Services*), provide fleet management and vehicle refueling operations, including scheduling of vehicle replacements, specification of technical requirements, compliance with Commonwealth and federal alternative fuel

CONFIDENTIAL

environmental compliance programs, performance of maintenance activities, maintenance of vehicle signage and other similar functions.

       D.    <u>Necessary Equipment and Systems</u>. Operator shall, consistent with the Contract Standards, the Agreement and this Annex I (*Scope of Services*), determine, acquire, deploy and maintain tools, equipment and Information Systems necessary to perform all O&M Services under the Agreement.

       E.    <u>Information Technology</u>. Operator shall, consistent with the Contract Standards, the Agreement and this Annex I (*Scope of Services*), be responsible for providing information technology systems maintenance support and improvements in accordance with (1) strategic goals of achieving interoperability and flexibility of open design and standard-based data architecture and in compliance with requirements for applicable technical architecture, data modeling and software development life cycle; and safeguarding the system software and data; (2) cybersecurity requirements that support network and day-to-day activities; and (3) developing and maintaining a business continuity plan in the event of natural, man-made or cyber-attack incidents. Operator shall periodically provide Administrator (with copy to PREB) the most current versions of the business continuity plan.

       F.    <u>Public Lighting</u>. Operator shall be responsible for operating and maintaining the public lighting system, as well as pursuing the installation of highly efficient Light-Emitting Diode (LED) technology in accordance with Prudent Utility Practices and Applicable Law.

       G.    <u>Generator Interconnection</u>. Operator shall be responsible for the furtherance or development of (1) necessary generator interconnection agreements for new generation or in the event of the sale of an Owner generating unit, (2) appropriate points of generator interconnections demarcation points, where the point is not clearly defined, and (3) a work plan to delineate the generator interconnection points as part of the Front-End Transition Plan.

III.    <u>Continuous Improvement Services</u>. Operator shall be responsible for continuous improvement of the T&D System, including the implementation of the following activities: (A) development and administration of research and development, the goal of which is to increase operational efficiency and effectiveness, reduction of line losses (technical and non-technical losses), prevention of congestion and improvement of maintenance practices in accordance with Prudent Utility Practices; (B) establishing and conducting a continuous improvement program designed to enhance Operator's performance, operational efficiency and the cost-effective delivery of services to customers; and (C) monitoring industry advancements and technological changes in the operation, maintenance, repair and expansion of transmission and distribution systems, including customer care and related services, by electric utilities.

IV.    <u>Government, Community and Media Relations</u>.

       A.    <u>General</u>. Operator shall be responsible for (1) conducting government, community and media relations with respect to the management, operation and maintenance of the T&D System in accordance with such policies and procedures as Operator may from time to time adopt in accordance with Applicable Law; and (2) staffing public events and presenting workshops, seminars and similar activities during normal business hours, evenings, weekends and holidays.

B.     <u>Communications</u>. It is the Parties' intention that, to enable Operator to effectively communicate with the customers and government officials regarding T&D System matters, Operator shall have direct responsibility for media and other public communications on all T&D utility-related matters, including communications with public officials, regulators and local municipalities and counties regarding storm preparation, management, coordination and response, customer communications, programs and complaints and related matters. Accordingly, Operator shall have full authority to determine all communications policies and procedures relating to its provision of O&M Services under the Agreement. Nevertheless, Operator agrees that (i) during Emergency Operating Conditions as defined and described in the System Operation Principles inclusive of major events (e.g., Outage Events and Declared Emergency or Major Disaster) or (ii) if it takes actions in Operator's capacity as Operator, that could be reasonably be expected to have broader impacts on public safety and/or public health, Operator will endeavor to keep Owner and Administrator, and, as appropriate, other local, state, and federal government entities, informed and act in consultation with Owner and Administrator. These communications will be made in accordance with the System Operation Principles.

C.     <u>Government Relations</u>. Operator shall be responsible for coordinating, conducting and formulating communications with municipal, local, state and federal representatives and organizations relating to operation and maintenance of the T&D System and provision of utility-related services by Operator, in accordance with such policies and procedures as Operator may from time to time adopt in its sole and absolute discretion.

D.     <u>Community and Media Relations</u>. Operator shall be responsible for the performance of customer service functions related to the provision of electric service, except as otherwise provided in the Agreement or herein, including the following: (1) achieving a high level of customer satisfaction, as defined in the relevant Performance Metrics; (2) maintaining customer contact; (3) marketing and sales for retail system expansion, retail customer retention, and customer care and service programs; and (4) performing other activities necessary, appropriate or advisable to implement customer service programs in accordance with Sections IV.E of this Annex I (*Scope of Services*), the Contract Standards or as Applicable Law may require.

E.     <u>Customer Contact</u>. Operator shall be responsible for establishing and maintaining customer contact by performing the following customer service functions at minimum:

1.     maintaining customer contact through call centers with toll free service numbers, customer offices, authorized payment centers; this customer contact should include maintaining a phone line for outage calls, until there is an alternative communication system or technology that makes this information otherwise available. The information provided by the customer will be necessary to verify that the outage/emergency has been corrected and power restored;

2.     maintaining and overseeing a customer online and mobile website, mobile applications including iPhone and Android, and other electronic media, inbound and outbound customer communication systems;

       3.     management of customer loyalty and satisfaction programs, customer services field operations and customer care and institutional communications and responding to customer inquiries regarding services;

       4.     marketing and sales for retail system expansion, retail customer retention and customer care and service programs, including all aspects of marketing planning and implementation activities, promotion and communications; market research; account relationship management; economic development; field sales; trade ally relations; and demand response, renewable and Energy Efficiency Programs;

       5.     developing and maintaining customer education programs for customer programs, including cost of service, demand side management, net energy metering, etc.; and

       6.     development of plan to enhance the existing outage management system that connects to the customer service interface so customers can be kept apprised of system status and individual service orders in real-time.

V.     <u>Testing, Reports and Records</u>. Operator shall be responsible for (A) preparing a monthly operations report; (B) producing and delivering to Administrator information as Administrator may reasonably request to determine Operator's performance under the Agreement; and (C) developing and maintaining a comprehensive document management program with records storage, retention and destruction guidelines and procedures, in accordance with applicable Commonwealth and federal guidelines and regulations, and as otherwise provided for under the Agreement.

VI.     <u>Finance and Accounting Services</u>.

       A.     <u>General</u>. Operator shall be responsible for all finance, accounting, budgeting, longer-term financial forecasting and treasury operations related to the T&D System, including the implementation of the activities set forth in Sections VI.A through VI.F of this Annex I (*Scope of Services*). In the exercise of the responsibilities described in this Section **VI** of this Annex I (*Scope of Services*), the Operator may utilize Owner's existing accounting system.

       B.     <u>Accounting and Reporting</u>. Operator shall be responsible for accounting and reporting operations including the following activities:

       1.     maintenance of a complete and separate set of financial and accounting records relating to the O&M Services, in accordance with GAAP and other applicable standards (including with FERC's Uniformed System of Accounts, the 1974 Puerto Rico Electric Power Authority Trust Agreement and other accounting best practices);

       2.     maintenance of a general ledger and all subledgers in accordance with Applicable Law regarding accounts necessary to support the preparation of monthly financial statements and management reports for Operator;

       3.     on a monthly basis, provision of (i) a balance sheet, an income statement (including a revenue analysis) and a cash flow statement for Operator, and (ii) budget to actuals analyses to explain the month's results with explanations; in each case not later than five (5)

CONFIDENTIAL

Business Days following Operator's receipt thereof from Administrator until the expiration or earlier termination of the Front-End Transition Period;

4.      year-end and interim unaudited financial statements for Operator within one hundred twenty (120) days after the end of each fiscal year and forty-five (45) days after the end of each fiscal quarter;

5.      analysis of all accounts, providing variance analysis of and explanations for both actual period-to-period variances (on a quarterly basis) and budget versus actual variances (on a monthly basis) to the extent reasonably requested by Administrator;

6.      (i) performance of all accounting and reporting functions necessary to support the T&D System operations, (ii) performance of federal and commonwealth tax and Contribution in Lieu of Taxes ("CILT"), subsidies and public lighting reporting functions, provision of information to Owner and Administrator in connection with Owner's contesting of CILT-related assessments and (iii) the maintenance of the fixed assets records in accordance with PREB and other applicable regulatory or accounting requirements;

7.      separate accounting and reporting that may be required from time to time for any federal and Commonwealth grants received by Owner to the extent reasonable prior notice of any such grants obtained is provided to Operator;

8.      development and management of billing, tracking, reporting, managing and collecting of all attachment fees, rents and other "non-product" revenues due to Owner associated with services provided or related to lighting, telecommunications and other equipment attached to or located on the T&D System sites and structures/infrastructure for which Operator has responsibilities pursuant to this Agreement;

9.      provision of accounting memorandum documenting procedures used in creating journal entries related to the T&D System;

10.      accounting for and documenting the costs and revenues resulting from Operator's performance under the Agreement in accordance with GAAP and any other applicable accounting requirements as determined necessary by Administrator (including in accordance with FERC's Uniformed System of Accounts, the 1974 Puerto Rico Electric Power Authority Trust Agreement, and other accounting best practices, as applicable) in compliance with Section 6.3 (*Reporting: Audits*) of the main body of the Agreement;

11.      reconciliations (including bank account reconciliations), which will be performed monthly, quarterly or annually based on the risk associated with the account being reconciled, in each case (i) if the month in which the reconciliation is being performed is a quarter-ending month (other than December), by the end of the subsequent month or (ii) if the month in which the reconciliation is being performed is a non-quarter ending month or December, within forty-five (45) days after the end of such month; and

12.      preparation from time to time as requested by PREB, but no less frequently than every three (3) years, of a depreciation study, the goal of which is to determine consolidated

annual depreciation accrual rates for preparation of financial statements and factors that relate to the fair and timely recovery of capital invested in the assets of Owner, including the T&D System.

      C.    <u>Budgeting and Financial Forecasting</u>. Operator shall be responsible for budgeting and longer-term financial forecasting operations, including the following activities:

      1.    preparing and monthly monitoring of budgets necessary for both capital and operating expenses for the services provided by Operator under the Agreement;

      2.    analyzing monthly and year-to-date budget to actual variances, and explanations thereof and formulating financial projections based on the variance analyses;

      3.    analyzing revenue and expenditure projections for the annual or multi-year period beyond the period of actual results;

      4.    preparing and delivering sales, revenues and costs budget input data for the annual budgeting processes, the Integrated Resource Plan and Owner's and Administrator's other long-range financial planning processes; and

      5.    risk management operations consistent with Parent Company enterprise risk management practices covering the potential risks involved in the conduct of the O&M Services, including the following activities: (i) managing counterparty credit risk, (ii) managing commodity market risk, and (iii) conducting a risk management program.

      D.    <u>Auditing</u>. Operator shall be responsible for auditing operations, including the following activities:

      1.    auditing of third-party pole-attachment rents and other revenues due to Owner associated with services provided on or related to public lighting, telecommunications and other equipment attached to or located on the T&D System Site;

      2.    internal audit function to perform annual risk assessment related to the T&D System for the purpose of developing the appropriate risk-based audit universe and associated annual audit plan as well as performing financial, regulatory and third-party contract compliance and operational audits and reviews, including review of the associated internal controls, based on the results of the annual risk assessment and associated annual audit plan;

      3.    provision of all necessary information and assistance to Owner's external auditors in connection with their audit of the financial statements and underlying financial records maintained by Operator related to the services provided under the Agreement; and

      4.    provision of copies of, and reasonable access to, the risk based audit universe and associated annual audit plan referenced in Section VI.D.2 of this Annex I (*Scope of Services*); and the right of Administrator to inspect, during normal business hours and upon reasonable prior notice, internal audit reports and recommendations of Operator and management responses thereto; it being agreed, however, that the foregoing information shall be deemed to be confidential and shall therefore not be used by Owner or Administrator except with respect to any fraudulent conduct or willful misconduct identified in such reports and recommendations.

E.     <u>Treasury</u>. Operator shall be responsible for treasury operations, including the following activities:

1.     timely and accurate collection of customer remittances and other "non-product" revenue on Owner's behalf through lockbox operations, customer centers and other sources, and transfer of funds as required for operations and other necessary payments;

2.     timely and accurate payment of vendor invoices, including power purchase agreements and technical and professional outsourced services, and acting as servicer to collect and deposit transition charges, as may be required to satisfy legacy obligations for bonded debt and unfunded pension liability;

3.     monthly or as requested cash flow projections (including daily, weekly and monthly forecasts of customer cash receipts) and cash management services; and

4.     monthly reconciliations of Owner bank accounts that are managed on behalf of Owner by Operator for the provision of O&M Services.

F.     <u>Other</u>. any other accounting and finance related activities necessary or advisable to support the operations of a stand-alone electric transmission and distribution business as Administrator may request from time to time, including:

1.     provision of information and data (both financial and operational) to support Owner's financing activities and the administration of Owner's and its Affiliates' debt service and required disclosure requirements;

2.     provision of assistance (including provision of information and data (both financial and operational)) to Owner and Administrator in connection with the preparation of reports and other documents to satisfy Owner's reporting requirements including: quarterly and annual (year-end) financial reporting; monthly and annual federal agency reporting requirements; PREB reporting requirements, Budget Reconciliation Act of 2017 and other federal and Commonwealth stimulus or funding program reporting requirements; Department of Energy reporting requirements; and filings relating to O&M Services in compliance with Applicable Law, and in accordance with Section 6.3 (*Reporting: Audits*) of the main body of the Agreement; and

3.     record keeping in compliance with Applicable Law.

VII.     <u>Emergency Response</u>.

A.     <u>Curtailments and Shutdowns</u>. If delivery of electricity through the T&D System is temporarily reduced, curtailed or shut down for any reason, including due to an Emergency including storms, Operator shall, with due consideration of its responsibility for safety and system reliability, as promptly as possible, advise Owner and Administrator (and other Stakeholders as defined in the Emergency Response Plan) as to the nature, reason and probable duration thereof and the expected effect thereof on the operation of the T&D System. Such notices shall be given as provided in this Annex I (*Scope of Services*). Any announcement concerning such events made to the public or the media shall be made by Operator in accordance with the provisions of the Emergency Response Plan and Section IV of this Annex I (*Scope of Services*).

CONFIDENTIAL

B. <u>Implementation of the Emergency Response Plan</u>. Operator will be responsible for developing (in consultation with Administrator) and implementing an Emergency Response Plan that addresses, disaster recovery and emergency response and restoration, and all necessary emergency response, business continuity, reporting and communication functions relating to the T&D System, and coordinating such plans with the plans of Owner and Administrator's other service providers for business continuity and disaster recovery, including response, reporting and public communications relating to storms, other unusual weather occurrences and other Emergencies as follows, including the following activities:

1. (i) timely reporting to such Governmental Bodies as may be necessary, appropriate or advisable of such emergency conditions including timely regular updates as to the courses of action taken in response thereto or in anticipation thereof and progress made in responding to such emergency conditions and (ii) periodic reporting to Administrator of such emergency conditions as necessary or appropriate to permit Administrator to exercise proper Oversight of Operator's response to emergency conditions;

2. storm monitoring and mobilization of Operator or Subcontractor's workforce (including workforce available under any Mutual Assistance Agreements) in connection with anticipated storms and other electrical system emergencies. Operator shall have the responsibility to negotiate Mutual Assistance Agreements with the US Mainland's Regional Mutual Assistance Groups (RMAG's). The closest RMAG's being Southeastern Electric Exchange (SEE), North Atlantic Mutual Assistance (NAMA) or the Texas Mutual Assistance Group (TMAG);

3. media, fire, police and government coordination (municipal, state and federal);

4. customer communications, including all inbound and outbound customer communication systems;

5. system condition monitoring;

6. repair and replacement of damaged components of the T&D System, including due to Outage Events or Declared Emergencies or Major Disasters;

7. public safety activities;

8. restoration of the T&D System to pre-emergency conditions;

9. conducting periodic drills, including as required by Applicable Law; at a minimum, Operator shall conduct at least one system wide test of the Emergency Response Plan processes and procedures, technical and communications equipment, and personnel readiness (a "Emergency Mock Drill") per year, which shall take place three (3) months prior to the commencement of the Atlantic Hurricane Season[2]. The Emergency Mock Drill taking place before the Atlantic Hurricane Season will replicate a Category 5 Hurricane with a planned direct hit to

---

[2] June 1 through November 30.

CONFIDENTIAL

Puerto Rico. Senior management of Operator and Owner, as well as many office employees and relevant outside observers, will participate and simulate the necessary actions that will be taken, and the appropriate internal and external communications needed. Operator will document all issues observed and follow-up on all measures and steps to remedy identified deficiencies that should be completed in advance of future events. This will test the validity of the Emergency Response Plan. Operator will also conduct post-event analysis and incorporate lessons learned from all drills and actual events to improve the overall state of readiness, including periodic drills with federal, state, Commonwealth, municipal, local and private critical load stakeholders (including hospital, police, telecommunication, water and sewer and critical manufacturing operations); and

10.     preparing and analyzing all information and data required to support qualification for, and/or claims for reimbursement from, FEMA, CDBG (HUD), and similar federal funds, for costs incurred due to Outage Events (including funds for emergency response and/or permanent work). This preparation should be completed within ninety (90) days of total restoration.

VIII.   <u>Maintenance</u>.

A.     <u>Generally</u>. Operator shall perform all normal and ordinary maintenance of all property constituting the T&D System, including machinery, structures, improvements and electrical system components, keep the T&D System in operational condition and repair, in a neat and orderly condition and in accordance with the Contract Standards. This provision includes the entire fleet of T&D System vehicles and machinery/tools used for the daily operation of the electric utility. Operator shall provide or make provisions for all labor, materials, supplies, equipment, spare parts, consumables and services that are necessary for the normal and ordinary maintenance of the T&D System consistent with Contract Standards and Prudent Utility Practice and its vehicle/machinery assets and conduct predictive, preventive and corrective maintenance of the T&D System as required by the Contract Standards. Operator shall consider the adoption and implementation of the Electric Power Research Institute's (EPRI) Reliability Center Maintenance (RCM) principles, as relevant and applicable.

B.     <u>Maintenance Logs</u>. Operator shall keep maintenance logs in accordance with the Contract Standards.

C.     <u>Safety and Security</u>. Operator shall maintain the T&D System with due regard for public health and safety and at a safe level at least consistent with Contract Standards, including the following:

1.     establishing and prioritizing workplace safety initiatives to bring the current T&D System up to Prudent Utility Practices, by systematically evaluating all T&D System sites to address immediate safety issues, including grounding, tripping hazards and lighting;

2.     taking reasonable precautions in the performance of the O&M Services for the health and safety of all persons working at the T&D System, to prevent damage, injury or loss to the T&D System and to other T&D System property;

CONFIDENTIAL

    3. establishing and enforcing all reasonable safeguards for health and safety and protection, including fencing, posting danger signs and other warnings against hazards and promulgating safety regulations;

    4. giving all notices and complying with all Applicable Law relating to the health and safety of persons or property or their protection from damage, injury or loss;

    5. designating qualified and responsible employees whose duty shall be the supervision of T&D health and safety, the prevention of fires and accidents and the coordination of such activities as shall be necessary with federal and local officials;

    6. designing and implementing cybersecurity measures in accordance with Contract Standards and in the manner specified and subject to the provisions set forth in the main body of the Agreement; and

    7. developing and maintaining a physical security program in accordance with Prudent Utility Practice and other application regulations/law for the protection of the T&D System critical infrastructure, other assets and persons.

IX. <u>Customer Service</u>.

  A. <u>Generally</u>. Operator shall provide customer service for the T&D System in compliance with the requirements of Section IX of this Annex I (*Scope of Services*). Operator shall update and implement the customer service manual which shall be consistent with the Contract Standards, as well as this Annex I (*Scope of Services*) and Annex IX (*Performance Metrics*) within one hundred eighty (180) days after the Service Commencement Date and shall deliver a certificate to Administrator to the effect that such customer service manual has been so updated. The manual shall be revised as necessary or appropriate from time to time.

  B. <u>Customer Service Requirements</u>. Operator shall perform the customer services in accordance with the following minimum requirements, in accordance with the Contract Standards:

    1. Operator shall maintain a staff dedicated to assisting customers. The customer service staff shall be trained, as needed, to answer questions related to the T&D System and customer bills, based on having appropriate visibility into the T&D System to address customer questions and complaints.

    2. Operator shall establish and maintain toll-free customer service hotlines to allow customers to ask questions, raise issues and lodge complaints.

    3. Operator shall establish and maintain a twenty-four (24) hour per day toll-free hotline, with adequate capacity and personnel (personnel that Operator deems qualified for customer service), that will be answered at all times by a Person and not a voicemail or other automated recorder, for the receipt of reports of emergencies relating to the T&D System.

    4. Operator shall establish and maintain a website that is capable of receiving customer inquiries and complaints.

5.      Operator shall respond to customer questions and complaints that Operator receives (however received) pertaining to its Scope of Services.

6.      Operator shall respond to emergencies in the T&D System, including temporary reductions, curtailments or shut downs of deliveries of electricity for any reason, including due to an Outage Event.

7.      Operator shall develop and update a customer service manual explaining processes and procedures followed in the performance of customer services, in accordance with Prudent Utility Practice.

C.      <u>Reports</u>. Operator shall submit as part of its reports delivered pursuant to Section IV of this Annex I (*Scope of Services*), and the information required with respect to the public outreach education campaign.

D.      <u>Public Outreach and Education Campaign</u>. Operator shall develop public outreach and education campaigns designed to inform customers generally and first responders specifically, about the scope, nature and extent of the T&D System programs and operations as required by the PREB or Administrator.

E.      <u>Customer Service Surveys</u>. No later than three (3) months following the Service Commencement Date, Operator, on behalf of Owner, will engage the services of an independent, qualified professional survey firm selected mutually by Administrator and Operator to develop and implement a customer satisfaction survey. If the Parties are not able to agree on a survey firm, either Party may refer the matter to an Independent Expert as a Technical Dispute in accordance with Article 15 (*Dispute Resolution*) in the main body of the Agreement. The initial customer satisfaction survey shall be used to develop an overall customer satisfaction rating, which shall provide the basis for evaluating and measuring Operator's performance of its customer service obligations. Operator is required to perform its customer service obligations in a manner that improves the overall customer satisfaction rating determined each Contract Year through subsequent annual customer service satisfaction surveys conducted by the independent, qualified professional survey firm.

F.      <u>Customer Satisfaction</u>. Operator shall be responsible for achieving a level of customer satisfaction consistent with the agreed to Performance Metrics by performing the following customer service functions at minimum:

1.      determining the approach and methodology for measuring, monitoring and optimizing customer satisfaction;

2.      monitoring customer satisfaction results;

3.      overseeing the performance of perception-based and transactional-based customer satisfaction surveys for other service providers; and

4.      interpreting and communicating the results of customer surveys; and coordinating initiatives aimed at improving the product portfolio, service delivery mechanisms and overall customer satisfaction across the full spectrum of services provided, such as system

operations and electronic transaction and self-help options, customer interactions and back-office functions.

G.    <u>Meter-Related Services</u>. Operator shall perform all residential and commercial customer meter reading, installation, replacement and maintenance functions, including checking for open meter bypasses within the T&D System, in accordance with the requirements of Section IX of this Annex I (*Scope of Services*). Operator shall, within one hundred eighty (180) days of the Service Commencement Date, develop a quality assurance program for meter functions as part of the manuals and related computer programs developed by Operator in accordance with Contract Standards which shall (i) provide a detailed description of the means and methods of properly operating and managing the applicable managed asset and all sampling, testing and measurement procedures; (ii) document predictive, preventive and corrective maintenance procedures, practices and schedules for the managed assets; and (iii) be reviewed and approved by any relevant Governmental Body, in accordance with Applicable Law and shall provide a certificate to Administrator as to the existence of such program. Such program shall also include the planned meter replacement program. The quality assurance program shall be revised as necessary from time to time.

1.    <u>Meter-Related Requirements</u>. Operator shall perform existing and future metering system-related services in accordance with, and the quality assurance program shall address, the following minimum requirements:

(a)    To the extent Operator uses meter readers, Operator shall establish and maintain a staff dedicated to reading meters. All such employees shall be skilled in reading meters, and in performing meter reading services, and shall always carry proper identification.

(b)    Operator shall read residential meters on a monthly basis or such other frequency as mutually agreed by the Parties during the Term.

(c)    Operator shall read commercial, industrial and government accounts meters on a monthly basis.

(d)    Operator shall, upon request and reasonable notice, obtain final meter readings and render closing bills for property title transfers.

(e)    Operator shall, upon request and reasonable notice, obtain re-readings for residential and commercial customers.

(f)    Operator shall provide the meter readings in an electronic format compatible with the billing system for the T&D System.

(g)    Operator shall be responsible for all repairs and services required to maintain the proper operation and accurate reporting of all new and existing meters, meter reading systems and associated components.

CONFIDENTIAL

(h)  For both existing and new meters installed by Operator, Operator shall maintain, repair, replace or otherwise take action to resume proper meter operation as soon as practicable but not later than the requirements of Annex IX (*Performance Metrics*).

(i)  Operator shall maintain a sufficient supply of spare parts for meter and all ancillary components.

(j)  Operator shall inspect all meters upon receipt of meter data that indicates unusually high or low energy usage compared to historical usage to ensure proper calibration of all components of the meter system, as well as reduce the amount of non-technical losses (e.g., theft).

(k)  Operator shall develop a practice that assures new meters are within the established tolerance level for accuracy.

(l)  Operator shall agree a plan with Administrator for the periodic inspection of commercial and industrial meter installations to check proper operation and to check that devices to prevent tampering of a meter or bypassing of a meter are intact and shall maintain all records and provide a Certificate to Administrator that such inspection has been completed.

(m)  Operator shall, as part of the overall meter related services, maintain and train its crews to be able to detect and prosecute infrastructure misuse, and shall keep records of and remedy any meter that has not been measuring the correct energy usage because of unauthorized or willfully intended damage, defacing or tampering with any meter component. Such cases shall also be timely processed by Operator for the corresponding enforcement action in accordance with Applicable Law.

(n)  Operator shall, upon request by customers and reasonable notice, disconnect and reconnect meters.

H.  <u>Repair and Replacement of Meters</u>. Operator shall be responsible for all repairs, replacements, upgrades and maintenance of the meters, transmitters and appurtenant wiring, computer system and software necessary to ensure the proper operation and accurate reporting of the meters, transmitters, computer system and remote reading equipment during the Term, following the Service Commencement Date.

CONFIDENTIAL

## Schedule 1 to Annex I

## System Operation Principles

**Definitions**.

"<u>Agreed Operating Procedures</u>" means detailed written operating procedures that are established between the Operator and Generating Facility Operators to facilitate dispatch operations.

"<u>Dependable Generation Capacity</u>" means the net electrical generating capacity of the generating facility (gross electric generating capacity less station use) expressed in kilowatts as determined pursuant to testing (as may be conducted from time to time by the generating facility) and made available from the generating facility at the interconnection point.

"<u>Economic Dispatch</u>" means the distribution of available supply sources to meet the total electricity demand in consideration of total, average and marginal per-unit generation costs, generator capabilities and constraints, and the operational limits of the T&D System.

"<u>Energy Control Center</u>" means the central control center for the power system.

"<u>Emergency Operating Conditions</u>" means a condition or situation which in the sole judgement of the Operator is likely to result in imminent significant disruption of service to a significant number of customers or is imminently likely to endanger life or property.

"<u>Energy Management System</u>" means supervisory and data acquisition system that is used to balance and operate the power system.

"<u>Forced Outage</u>" means unplanned disconnection or stoppage of a generating unit due to failure or defect of the unit, its equipment or other event.

"<u>Frequency Response</u>" means services provided to restore grid frequency when there is a mismatch in the energy added to the electrical supply system by generators and the energy withdrawn from the electrical supply system by consumers.

"<u>Generating Facility Operators</u>" means either the operator(s) of Legacy Generation Assets or IPP-Owned Generation Assets connected to the electricity supply system.

"<u>Integrated Resource Plan</u>" or "<u>IRP</u>" means the 20-year long range plan for the Puerto Rico power system and supporting infrastructure.

"<u>IPP-Owned Generation Assets</u>" means any existing or future generation assets and generation facilities in which Owner, GenCo or their respective affiliates have no ownership interest.

"<u>Load Shed</u>" means the controlled reduction of load by shutting off non-critical demand areas.

"Net Electrical Output" means the net electricity energy output (expressed in kWh) from a generating facility measured at the interconnection point.

"Non-Scheduled Outage" means an interruption of all or a portion of the electrical output of a generating facility that is required for any purpose including inspection, preventative maintenance or corrective maintenance and which has not been designated as a Scheduled Outage.

"Operating Reserves" means available generating capacity available to supply electricity or reactive power services on short notice and includes the following:

- "Synchronized Spinning Reserve" means the capacity of online spinning reserve that is synchronized with the electrical supply system and ready to meet the demand in a period no longer than ten minutes of an interruption.

-  "Supplemental Reserves" means the non-spinning and non-synchronized reserve capacity that is obtained using units that are not online but that can enter service and reach their available power in less than ten minutes.

"Power Purchase and Operating Agreements" or "PPOA" means any contract relating to the generation, sale and purchase of Power and Electricity by, and operation of, IPP-Owned Generation Assets or Legacy Generation Assets.

"Puerto Rico Energy Board" or "PREB" means the regulator that provides oversight of all of the Puerto Rico power system to ensure compliance with policy and regulations.

"Reactive Power" means the capacity of generating facilities available to provide voltage support to maintain a constant voltage level and ensure system stability.

"Reliability Target" means the power system is operated with a N-1 contingency. The electrical supply system is to be operated to withstand the loss of the largest unit that is running.

"Scheduled Outage" means a planned interruption of the Net Electrical Output of a generating facility that has been coordinated in advance with the Operator with a mutually agreed start and duration.

"Target System Frequency" means 60Hz, managed within 59.8 Hz - 60.2 Hz (+/-0.2 Hz).

"Operator" means the third-party transmission and distribution operator selected by Administrator who will provide planning, operations and communication services on behalf of PREPA to the people of Puerto Rico, pursuant to this Agreement. The Operator will control the day-to-day dispatch and transmission of electricity throughout Puerto Rico and will be responsible for ensuring that the T&D System and all IPP-Owned Assets and Legacy Generation Assets operate in a reliable and economic fashion, and that sufficient generation capacity is available and maintained to meet resource adequacy goals.

CONFIDENTIAL

**Introduction**.

The Operator will operate the electricity supply system in a safe and reliable manner. It will also use Economic Dispatch principles and Prudent Utility Practices to operate the electricity supply system as economically as possible in consideration of the electricity supply system constraints and PPOA obligations.

The Operator will be expected to balance electricity supply from available generating facilities and coordinate and communicate with Generating Facility Operators in regards to the system planning and operations functions outlined below.

During the Front-End Transition Period, the Parties shall prepare and agree to System Operation principles, which shall be generally consistent with this Schedule I (*System Operation Principles*) to Annex I (*Scope of Services*). Such System Operation Principles shall be subject to the review and approval of Administrator and PREB. The System Operation Principles shall be subject to further review and update pursuant to Section 5.13(c) (*Generation-Related Services – Review of System Operation Principle* of the Agreement.

**System Planning**.

The Operator will be responsible for short and long-term supply and demand forecasting, reliability planning studies, the economic and technical assessment of new projects, deactivation studies for generating facilities and other assets, and other studies and evaluations that identify and address the reliability needs of the electricity supply system, and the current and future state of the Puerto Rico electricity supply system.

The Operator will manage the new interconnection process and implement procedures as required for large and small generators, and will periodically update the Integrated Resource Plan, all of the aforementioned as required by the PREB.

**Agreed Operating Procedures**.

The Operator and Generating Facility Operators shall maintain detailed written operating procedures based on the Operator's standard operating procedures, taking into consideration the design of each generating facility and its interconnection to the electricity supply system. These written operating procedures shall also take into account security-constrained economic dispatch, ensuring non-discriminatory treatment of resources. The Agreed Operating Procedures shall define the procedures to be used to integrate the generating facility's output into the electricity supply system. Topics shall include, but not be limited to:

1. A method of day-to-day and real-time communications;

2. Clearances and switching practices;

3. Outage scheduling;

4. Daily available energy reports;

CONFIDENTIAL

5.   Economic Dispatch of Dependable Capacity, Spinning Reserve Capacity and Excess Capacity;

6.   The generating facility's operating log;

7.   Reactive power support;

8.   Voltage scheduling; and

9.   Emergency procedures.

The Agreed Operating procedures may be modified only with the written consent of both the Operator and Generation Facility Operators.

**Generating Unit Scheduling**.

The Operator and Generating Facility Operators shall coordinate on the availability of and need for each generating facility's Net Electric Output. Planning shall include target dispatch levels (annual basis), daily dispatch scheduling (monthly basis) and hourly dispatch scheduling (weekly basis). The Operator will record Non-Scheduled Outages for purposes of calculating compensation and will coordinate Scheduled Outages with the Generating Facility Operators to allow for maintenance and repairs, according to each party's respective PPOA. The Operator shall also receive from each generating facility a weekly fuel availability report specifying the existing and planned fuel inventory.

**Dispatch Operations**.

The Operator shall utilize the Agreed Operating Procedures and other operational principles to ensure that the Dependable Generating Capacity is sufficient to cover the hourly demand for electricity.

The Operator will determine the appropriate level of dispatch for each generating facility by means of its AGC system and the use of Prudent Utility Practices.

The Operator shall, using AGC, or by directing the Generating Facility Operator on a manual basis, adjust the Reactive Power generation and/or the terminal voltage of generating facilities, as well as obtain Frequency Response services to maintain the Target System Frequency. These ancillary services will be in consideration of generating facility design limits and PPOA contractual terms.

**Reserve Operations**.

The Operator shall operate the electricity supply system with a level of Operating Reserves above the scheduled load that is sufficient to protect the power system against the uncertain occurrence of operating events that include unplanned loss of generation or load forecasting errors. Operating Reserves shall include both Synchronized Spinning Reserves and Supplemental Reserves (non-synchronized and non-spinning).

The level of Synchronized Spinning Reserves and Supplemental Reserves shall be determined daily by the Energy Control Center as a function of:

1. The availability of generating units;

2. Agreed upon Operating Reserve availability specified in PPOAs;

3. Energy not supplied due to capacity limitations;

4. Deviations from the forecasted demand;

5. The schedule planned environmental inspections;

6. The level of fuel inventory in the different generating stations;

7. Compliance with the Mercury and Toxics Emission Standards ("<u>MATS</u>"); and

8. Any other material considerations.

During Normal Operating Conditions, the minimum target level of Synchronized Spinning Reserves shall be equal to the generating unit with the highest dispatched capacity in order to cover the potential s electricity supply system outage in the event of a forced outage of the largest generator running on the electricity supply system.

During periods in which the reliability of the electricity supply system is compromised by operational issues with generating units, substations, transmission lines, and/or distribution, the Synchronized Spinning Reserve may be increased to more than the capacity of the generating unit with the highest dispatched capacity.

Synchronized Spinning Reserves and Supplemental Reserves shall be established and maintained in consideration of Economic Dispatch principals and Prudent Utility Practices.

**<u>Communications</u>**.

The Generating Facility Operator shall supply and maintain at all times appropriate radio, voice and data communication facilities linking the generating facility with the Operator for the purpose of planning, telemetering, data acquisition, AGC, Remote Terminal Unit communication, emergency response and other exchanges of information.

During Emergency Operating Conditions, the Operator shall implement the Emergency Response Plan per established protocols. After Emergency Operating Conditions have passed, the Operator shall conduct post-event reviews with stakeholders, gather and analyze data from the Energy Management System to determine appropriateness of actions taken during the Emergency Event, and communicate and implement lessons learned.

The Operator shall maintain and enhance the customer outage data and information on the Operator managed web page and in other communication channels consistent with the Emergency Response Plan.

CONFIDENTIAL

The Operator will develop a plan as part of the System Remediation Plan designed to attain cybersecurity compliance with appropriate NERC Critical Infrastructure Protection ("CIP") standards, including reporting as required by NERC, and implement said plan to the extent this can be achieved taking into consideration the time and Budget constraints and other adjustments being made to the electricity supply system.

The Operator will collect and analyze NERC Generating Availability Data System ("GADS") and Transmission Availability Distribution System data in order to support and report on the state of the electricity supply system and generator reliability trends.

CONFIDENTIAL

## Annex II

## Front-End Transition Plan

**INTRODUCTION**

Operator acknowledges the goal to complete the Front-End Transition Services in a timely manner and as soon as practical. Operator's schedule achieves a January 1, 2021 Service Commencement Date, based on:

- An Effective Date of February 16, 2020, corresponding to Operator's scheduled completion of the Front-End Transition Services by December 3, 2020; and
- Meaningful participation by existing Owner and Administrator employees and/or contractors, as applicable, including Owner and Administrator management, all of whom will be required to dedicate significant time and resources during the Front-End Transition period.

The Front- End Transition Plan is as follows:

- Developing a post-commencement strategy that appropriately balances near- and longer-term initiatives;
- Immediately addressing the urgent issues of storm response planning as well as critical safety and operational deficiencies;
- Working towards accelerating (where reasonably practical) the timing for completion of the various work streams set out herein by drawing upon Operator's equity holders to supplement (under appropriate Subcontracts) the transition team during the initial months;
- Drawing upon Operator's equity holders' (under appropriate Subcontracts):
  - proven internal processes that have been employed to support such equity holders respective acquisition strategy, and
  - collaborative, proven P3 model;
- Working to developing an internal culture around project management skills, accountability, elevating issues as they occur, developing work-around solutions and communicating frequent status updates to internal and external stakeholders; and
- Developing a communication plan that works to create a well-orchestrated and consistent message to Operator's employees regarding expectations.

All of Operator's obligations herein are subject to terms of the main body of the O&M Agreement including Section 2.2 (Effective Date) and Section 4.6 (Front-End Transition Period Compensation).

CONFIDENTIAL

**Mobilization**

Following the Effective Date and Owner's compliance with Section 4.6(c) (*Front-End Transition Period Compensation – Funding*), the Operator's transition teams will commence their work in order to complete the critical path activities identified in this Annex II. Team leaders will be drawn from Operator's pool of experienced managers. A number of these professionals will also be designated to serve as senior leadership for the Operator after the Service Commencement Date and will be moving to Puerto Rico on a permanent basis.

The manhour budgets assigned to each team reflect the level of change management associated with most of the workstreams. These are illustrated in the Figure 1 below:



*Figure 1: Transition Estimate by Workstream*

The overall Front-End Transition Plan has been divided into three primary phases:

1. Assess,
2. Analyze,
3. Act.

These are not distinct phases with clear separation between them, but rather they indicate the general focus of activities that will gradually evolve as Operator arrives on site in Puerto Rico following commencement of the Front-End Transition Services. Operator will work toward completing our assessments and work with the Owner's and Administrator's respective employees to develop our improvement initiatives.

This approach is summarized in Table 1 below.

*Table 1: Mobilization Phases*

| 1.0 | | 2.0 PHASE 1 | 3.0 PHASE 2 | 4.0 PHASE 3 |
|---|---|---|---|---|
| **5.0** | | **6.0 ASSESS** | **7.0 ANALYZE** | **8.0 ACT** |
| **9.0** | **Tasks** | ▪ Detailed data review<br>▪ Interview Owner rank & file<br>▪ Assess performance trends & issues<br>▪ Confirm or modify hypotheses | ▪ Understand root causes of performance issues<br>▪ Identify potential solutions<br>▪ Work with employees to understand constraints & implementation challenges | ▪ Consolidate solutions into initiatives<br>▪ Quantify costs and benefits of solutions<br>▪ Prioritize initiatives into near– and longer-term schedule |
| **10.0** | **Major Attributes of Each Phase** | ▪ Large team supplemented from Operator affiliate<br>▪ Compile performance data on consistent basis for future<br>▪ Set expectation that how business is conducted is being transformed<br>▪ Identify internal champions & leaders | ▪ Invest time to understand local constraints, but always driving schedule progress<br>▪ Catalog potential issues & initiatives<br>▪ Start work in collaborative teams with rank & file; internal champions emerge and assume more active roles<br>▪ Business process re-engineering requirements being identified | ▪ Internal champions take leadership roles as new attitude becomes understood<br>▪ Develop implementation plans that cut across organization for efficiency<br>▪ Gather input and perspective from broad set of internal & external stakeholders |

Operator's staffing ramp-up plan recognizes the phased approach and is designed to coordinate staff resources, logistics, and to interface with Administrator and Owner (and their respective employees) to support the required deliverables.

The time to receive regulatory approvals creates a schedule where most workstreams of both Operator and each of Administrator and Owner will quickly ramp up to full resource loading, and thereafter involve work on full-time basis to achieve the mid-year milestones identified herein. While there is a critical path to completion, there are several other secondary and tertiary critical paths that are to be addressed as well. While, when viewed on a roll-up basis by consolidating major activities, it can look as if each workstream is running full-out to completion

CONFIDENTIAL

(because activity scheduling is done on a "finish as early as possible" basis) there are a number of key activities that will drive the overall timeline. These key activities are:

- Mobilization of transition team members after commencement of Front-End Transition Services (which will depend on scheduled date for Effective Date and satisfaction of requirements of Section 4.6 (Front-End Transition Period Compensation) being met (i.e. to permit early kick-off).
- Several IT-related system development tasks, but most critically, the path to implement and stand up the new payroll module;
- In accordance with the terms of the Agreement development of the following as contemplated in Article IV of the main body of the Agreement:
  - Emergency Response Plan;
  - Physical Security Plan;
  - Data Security Plan; and
  - Vegetation Management Plan;
- In accordance with the terms of the Agreement development of, and work towards obtaining the requisite approvals as per main body of the Agreement for the items specified in Article IV of the main body of the Agreement including:
  - the System Remediation Plan;
  - the Federal Funding Procurement Manual and Non-Federal Funding Procurement Manual;
  - the Systems Operation Principles;
  - Initial Budgets;
  - Performance Metrics matters as contemplated by Section 4.2(f) of the main body of the Agreement;
  - Liability Waiver,
  - Governmental Approvals, and
  - Back-End Transition Plan.

**Views on Feasibility of 2020 Target Commencement**

The overarching indicative schedule for completion of the Front-End Transition Services set out herein in Appendix 1 (herein the "Schedule") for completion of the Front-End Transition Services will depend on the full, timely and complete support of Administrator and Owner, and on the assumption that this same support will also be obtained from PREB, all in accordance with the requirements of the Agreement as a whole. Operator will collaborate to obtain alignment from Administrator, Owner and PREB in order to not adversely impact Operator's ability to meet the proposed Schedule. In addition, predecessor and successor activities have

CONFIDENTIAL

been identified and a critical path analysis has been conducted to ensure the robustness of the overall Schedule.

**Transition Communications Plan**

A robust communications plan (the "Transition Communications Plan") will be developed and implemented early following commencement of Front-End Transition Services. A well-designed communications plan, which will deliver communications in Spanish and English, will help meet the goal of ensuring the Front-End Transition Services can be performed efficiently and will help prepare both Owner's employees who may be hired by Operator and the public at large for the transition to Operator performing the O&M Services as contemplated in the Agreement once Service Commencement Date is achieved.

Key milestones in the Front-End Transition period will be identified by Operator as the provision of the Front-End Transition Services progresses and targeted messages will be delivered by Operator to coincide with those milestones. At a very high level, these messages will include introductory materials, periodic status updates and a report on transition period achievements that includes a plan for the future.

The Transition Communications Plan will also define our management vision and expectations, mission statement and core values. We will seek input from Administrator and Owner in developing this Transition Communications Plan. Generally the Transition Communications Plan is intended to feature the following:

- A commitment from the Operator's senior leadership to communicate with its current and prospective employees transparently and frequently. Communications will work to express empathy for these employees in the face of the uncertainty arising from the changes. The Operator will also communicate plans for increased on-going dialogue with employees to keep them motivated and productive in the provision of the O&M Services.
- The use of multiple communication channels to reinforce our key messages. This will include townhall meetings, one-on-one meetings with prospective employees, group sessions, intranet updates and posting of frequently asked questions (FAQs), memos and other forms of media to communicate applicable information.
- The development of an employee value proposition that defines why prospective employees will want to work for ServCo if offered employment.

To enhance communications, we will include the following meetings and status reporting:

- Daily meetings between transition team leaders and the transition program manager to identify and resolve any emergent items and assist with other teams' data, analytical or other issues

CONFIDENTIAL

- Bi-weekly progress meetings between the Operator and the Administrator's and Owner leads involved with the transition program. These meetings will be action oriented, with summary progress reported. Materials widely reported may be edited to protect Operator's confidential information.

- Monthly progress meetings with Administrator and Owner and the Operator's transition program leadership

- Supplemental progress meetings with Administrator and Owner executives as appropriate

- General public progress reporting updates every three months with other stakeholders as determined following consultation with Administrator and Owner (and potentially PREB and interested political leaders as deemed appropriate by Operator)

Figure 2 below shows the structure, purpose and proposed frequency of transition program meetings.



*Figure 2: Transition Program Meetings*

CONFIDENTIAL

## Management Transition Plan

To set a new management tone, and to increase expectations of how the Operator will operate in the future, Operator's management transition plan reflects Operator's philosophy, approach and major themes. Based on Operator's understanding of the drivers behind Owner's operating track record, Operator is not looking to focus on prior faults. Instead Operator's focus, as a new permanent organization, will be towards improving service and rebuilding the system together with Owner.

As part of the transition towards Operator providing O&M Services, Operator intends to tap into the institutional knowledge of Owner's employees that it ultimately hires to help increase overall buy-in. The transformation of the T&D System operations will depend on further developing the talents and resourcefulness of these Owner employees that are offered positions with and that choose to join the Operator. Operator will work to improve the employee experience in order to stem the rate of attrition and increase employee morale.

## Approach to Interacting with Spanish-Speaking Workforce

Operator's transition team has a number of fluent Spanish speakers, including several senior members who have lived and managed businesses in several different Latin American countries. It is envisioned that these bilingual senior team members should be able to handle most interactions with senior officials, regulators, politicians, or members of the media where important internal employee messaging in the Spanish language would be more productive. Operator anticipates that those meetings could be led by our native-speaking or fluent non-native senior team members as necessary.

Interacting with the broader Owner employee workforce does represent some potential challenges, but Operator anticipates these can be overcome in several ways. Operator's plan to do so will include mandatory internal training sessions for all transition members regarding personal and professional manners and expectations, an orientation on Puerto Rico's history and culture, and sensitivity to language issues.

## Handover Check List

Operator's plan to manage the Handover Checklist is to continually maintain a checklist and submit updates on or before the 10th of every month to the Administrator. These updates will include reporting checklist items that have been completed, as well as identifying any checklist items that might have emergent issues or problems that need to be escalated for resolution. In addition, if any new emergent items are identified that are not currently known, they will be proposed to be added to the handover checklist to be reviewed with Administrator.

CONFIDENTIAL

The current handover checklist is shown in Table 2 below. During the course of the Front-End Transition Period, the Handover Checklist may be adjusted or otherwise modified by mutual agreement of ManagementCo and Administrator.

*Table 2: Handover Checklist*

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR COMMENCEMENT? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | **I.    General & Transition Management** | | |
| ☐ | 1.    Government Approvals | | |
| ☐ | 2.    Plan to Address Gaps in Assets, Technology, Processes, etc. (plan to include cost estimates) | | |
| ☐ | 3.    PREB Rate Order Filing (Initial Budgets and Liability Waiver approvals) | | |
| ☐ | **II.   T&D Services Milestones** | | |
| ☐ | 1.    Development and Implementation of an Operations Takeover Plan for Transmission and Sub-Transmission Inside and Outside of the Plant | | |
| ☐ | 2.    Development and Implementation of an Operational Takeover Plan for the Electric Distribution System | | |
| ☐ | 3.    Development and Implementation of Additional Takeover plans | | |
| ☐ | A.  Transition Plan for T&D Control Centers | | |
| ☐ | B.  Transition Plan for Operations and Maintenance (O&M) Activities | | |
| ☐ | C.  Emergency Response/Disaster Recovery/Business Continuity Plans | | |
| ☐ | D.  Fleet Management Plan | | |
| ☐ | E.  Asset Management (included in 8. Engineering and Asset Management) | | |

Case: 25-3717 Document: 00280568492 Filed: 09/18/25 Date Filed: 09/18/2025 Entry Desc:6770995
Exhibit B-OMA Page 200 of 337

CONFIDENTIAL

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR COMMENCEMENT? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | F. Workforce Management & Training Plan | | |
| ☐ | G. Safety Management Plan | | |
| ☐ | H. Engineering and Asset Management | | |
| ☐ | I. Identification of Real Estate | | |
| ☐ | J. Materials Management & Warehouse Plan | | |
| ☐ | K. System Operations Plan | | |
| ☐ | L. Vegetation Management Plan | | |
| ☐ | 4. Update Emergency Operations Manual and Business Continuity/Disaster Recovery Plan | | |
| ☐ | 5. Environmental Exposure Management Plan | | |
| ☐ | **III. System Remediation Plan Milestones** | | |
| ☐ | 1. Remediation Plan Proposal | | |
| ☐ | 2. Development of Improvement Initiatives | | |
| ☐ | 3. Consolidate Plans from All Areas | | |
| ☐ | 4. Development of System Remediation Plan | | |
| ☐ | 5. Approval of System Remediation Plan | | |
| ☐ | **IV. Customer Services** | | |
| ☐ | 1. Evaluating Customer Service Facilities and Assets | | |
| ☐ | 2. Evaluating and Updating Customer Service Policies and Procedures | | |
| ☐ | 3. Development of a Meter Reading Plan | | |
| ☐ | 4. Development of a Customer Service Transition Plan | | |
| ☐ | 5. Development and Implementation of a Service Start and Shut-Off Plan | | |

CONFIDENTIAL

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR COMMENCEMENT? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | 6. Development of a Meter Asset Management (MAM) Plan | | |
| ☐ | 7. Development and Implementation of a Customer Service Technology | | |
| ☐ | 8. Develop and Implement a Non-Technical Energy Loss Reduction Plan | | |
| ☐ | 9. Establish Integration Between Customer Services & T&D Ops | | |
| ☐ | **V. IT** | | |
| ☐ | 1. Development of IT/OT Communication Plan and Acceptance Criteria | | |
| ☐ | 2. Identification and Gap Analysis | | |
| ☐ | 3. Evaluating IT/OT Applications and Infrastructure | | |
| ☐ | 4. Development of Cyber Security and Business Continuity Plan | | |
| ☐ | 5. Development of an IT Asset Management Program | | |
| ☐ | 6. Development of an IT/OT Transition Plan and Schedule | | |
| ☐ | 7. Commencement Cutover Planning | | |
| ☐ | 8. Training and Communication Plan | | |
| ☐ | **VI. Financial Management** | | |
| ☐ | 1. Detailed Description of Approach to Budgeting and Reporting | | |
| ☐ | 2. Description of Approach to Complying with Initial Budget Obligations | | |
| ☐ | 3. Approach to Formalizing Changes to Control Processes | | |
| ☐ | 4. Establishing a Financial Accounting System and Account Structure | | |

CONFIDENTIAL

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR COMMENCEMENT? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | 5. Preparing Initial Budgets and Other Financial Forecasts | | |
| ☐ | 6. Establishing Bank Accounts | | |
| ☐ | 7. Evaluating and Updating Payroll and Labor Cost Reporting systems | | |
| ☐ | 8. Establishing a Delegation of Authority Matrix and Process | | |
| ☐ | 9. Processes & Procedures and Overall Internal Controls | | |
| ☐ | **VII. FEMA Funds and Federal Funding Procurement Manual** | | |
| ☐ | 1. Set Up Governance Framework | | |
| ☐ | 2. Policies and Procedures | | |
| ☐ | 3. Staffing Plan | | |
| ☐ | 4. Surge Staffing | | |
| ☐ | 5. Project Worksheet Assessment (also covered under Section 4.3) | | |
| ☐ | 6. Handoff of Project Worksheet Activity from COR[3] and Vendors | | |
| ☐ | 7. Project Procurement Planning | | |
| ☐ | 8. Drafting, Revising and Finalizing Federal Funding Procurement Manual | | |
| ☐ | **VIII. Staffing for Front-End Transition Period** | | |
| ☐ | 1. Draft, Revise and Finalize Operator Employment Requirements | | |
| ☐ | 2. Recruiting and Staffing | | |
| ☐ | 3. Redesign and Staff New Organization | | |
| ☐ | 4. Proposed Recruitment and Staffing Plan | | |
| ☐ | 5. Stand Up Human Capital Management (HCM) System | | |

CONFIDENTIAL

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR COMMENCEMENT? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | 6.    Communication Plan | | |
| ☐ | 7.    Training (Workforce Development) Plan | | |
| ☐ | 8.    Develop Employee Retirement Plan | | |
| ☐ | 9.    Occupational Health and Wellness | | |
| ☐ | 10.   Compliance Plan | | |
| ☐ | 11.   Engagement Plan | | |
| ☐ | 12.   Develop a Community Investment Plan | | |
| ☐ | **IX.    Additional Front-End Transition Period Activities** | | |
| ☐ | 1.    Genco Shared Services Agreement Approval | | |
| ☐ | 2.    Emergency Response Plan Approval | | |
| ☐ | 3.    Non-Federal Funding Procurement Manual Approval | | |
| ☐ | 4.    Physical Security Plan Approval | | |
| ☐ | 5.    Data Security Plan Approval | | |
| ☐ | 6.    Vegetation Management Plan Approval | | |
| ☐ | 7.    System Operation Principles Regulatory Approval | | |
| ☐ | **X.    Asset Acquisition (Supply Chain)** | | |
| ☐ | 1.    Evaluating Existing Procurement and Subcontracting Policies, Procedures and Systems | | |
| ☐ | 2.    Assuming Responsibility for Securing Use of Assets, Facilities, IT / OT, etc. | | |
| ☐ | 3.    Assuming Existing Subcontracts | | |
| ☐ | **XI. Back-End Transition Plan** | | |
| ☐ | 1.    Develop Back-End Transition Plan | | |

CONFIDENTIAL

| | PRELIMINARY HANDOVER CHECKLIST ITEM | REQUIRED FOR COMMENCEMENT? (Y/N) | COMPLETED? (Y/N) |
|---|---|---|---|
| ☐ | **XII. Front-End Transition Plan (Additional Requirements)** | | |
| ☐ | 1.  Confirmation of Acceptable Operator Security | | |
| ☐ | 2.  Required Insurance | | |
| ☐ | 3.  Baseline Performance Levels | | |
| ☐ | 4.  Back-End Transition Plan | | |
| ☐ | 5.  Representations | | |
| ☐ | 6.  Operator Representations and Warranties | | |
| ☐ | 7.  Section 4.3: Owner and Administrator Responsibilities | | |
| ☐ | 8.  Owner Representations and Warranties | | |
| | 9.  Section 4.4 Governmental Approvals | | |
| ☐ | 10.  Section 4.5: Conditions Precedent to Service Commencement Date | | |
| ☐ | 11.  Section 4.7: Closing the Front-End Transition Period | | |
| ☐ | 12.  Service Commencement Begins | | |

## I.     General Transition Management

The General Transition Management activities are comprised of the contents of this Annex.

## II.     T&D Services Milestones

The T&D group will be one of the largest teams during the Front-End Transition period in terms of the number of people involved and sites and facilities visited. The primary critical path

activities that determine the portion of the Schedule applicable to this process for the T&D transition program are as follows:

- Logistical requirements to visit and assess the large number of physical sites and assets throughout Puerto Rico;
- Time required to interview and assess the large Owner employee base currently working for Owner in relation to the T&D System and to reorganize and staff the new T&D organization within Operator;
- Time required to conduct a thorough assessment of all capital and O&M work requirements and to identify, quantify and prioritize improvement initiatives; and
- Completion of key work products needed to ensure no impact to reliability or resiliency after Service Commencement Date (such as the Emergency Response Plan).

Within this section (T&D services), Operator has developed a comprehensive operational takeover plan for all the identified items. Operator's fundamental approach is to assemble its team to finalize the necessary due diligence, identify any gaps, and develop a robust plan to ensure continuity of service to the business, employees and our customers. The Front-End Transition Project Office established by Operator will work to implement controls to deal with the expected large volume of activity occurring from workstream to workstream that will be seeking similar information with the goal of reducing the burdens and additional costs this might otherwise create.

### III.    System Remediation Plan Milestones

The current state of the T&D System as viewed through site visits and our review of information in the data room and the Q&A log during the RFP process is that the current T&D System consists of aging infrastructure that has been poorly maintained due to lack of funding and inconsistent maintenance practices that are largely undocumented. The control, monitoring and information equipment is aged, underutilized and in some cases obsolete. Hardware, Information Systems and software are underutilized, fragmented and unsupported. Therefore, these systems lack the ability to provide the required visibility of the system and implement programs such as Distribution Automation (DA), condition monitoring/analytics and situational awareness regarding outage management. Strategies to manage assets over their life cycle have not been developed. System Planning tools to effectively model the system, which is an industry best practice, are not being used due to a lack of confidence in their accuracy.

Operator's approach to developing the System Remediation Plan will be a collaborative effort with key stakeholders generally but also including the Administrator and Owner. The plan should align with various reports such as the GridMod Plan, the IRP, Sargent & Lundy's Capital Plan, Build Back Better, and the Energy Resiliency Solutions for the Puerto Rico Grid (from the Department of Energy).

## IV. Customer Service Milestones

Operator views Customer Service as an integral component in the Operator's transformation of the T&D System. The Front-End Transition period will be used by Operator to thoroughly assess the existing T&D Customer service organization of Owner, with a focus on customer experience quality and operational efficiency. Operator will take the opportunity during the Front-End Transition period to help it implement quick "wins" following the Service Commencement Date that will enable T&D Customers to see and feel post-commencement improvements in the customer experience. These quick "wins" will act as a catalyst for T&D Customer engagement and the launch of the Voice of the Customer program.

In addition to assessing Owner's existing operations and identifying opportunities for improvement, Operator's Customer Service group will be fundamentally transforming the manner in which the Operator will deliver the customer experience. Operator will need time to communicate the changes and train the workforce on how things will be different. It is critically important to make T&D Customers aware immediately after commencement that a new priority has been established to improve their interactions with the Operator.

The primary critical path activities that determine the schedule for the proposed T&D Customer service transition program are as follows:

- Visit and assess the large number of physical sites and assets throughout Puerto Rico.
- Interview Owner's current T&D Customer service employees to identify key leaders who can implement the transformed customer service vision and reorganize and staff the new organization as required.
- Work to instill the culture and values of the transformed T&D Customer Service group throughout the workforce.
- Ensure a consistent message is communicated to T&D Customers beginning on the first day of Service Commencement Date.

## V. Information Technology (IT)/Operation Technology (OT) Systems

The scope and schedule of Operator's IT group are driven by the need to begin defining new requirements for a large number of critical systems and processes. These new systems and processes will represent a massive degree of change in how every employee performs his or her daily job.

This level of change requires a structured, well-defined multi-year time frame for implementation. The primary critical path activities that determine the schedule for the IT transition program are as follows:

- A comprehensive assessment and due diligence review of over 15 major systems, which begins on immediately on commencement of the Front-End Transition Services and

CONFIDENTIAL

includes each team (including Owner's and Administrator's) running full out for the first three months following start of the Front-End Transition Services.

- A high degree of coordination between the IT team and other functional area teams (both within Operator and by Owner and Administrator's teams as well) to ensure the future owners of these new systems within Operator have the chance to fully define their requirements.
- A thorough workforce assessment to identify any skill gaps that must be addressed to meet the organization's strategic objectives.
- A concentrated focus on the large number of system cutovers that will be required to support the transfer after commencement. It is essential that these cutovers be well planned and executed.


## VI.    Financial Management Milestones

The Financial Management group's scope and schedule are driven by assessing and improving risk management, the internal control environment and underlying business processes. This is critical to setting the overall financial foundation, evaluating the integrity of the financial compilation and reporting processes, mitigation of fraud and other risks, and the transition, design and implementation of the capital and operating budgets for the organization.

The primary critical path activities that determine the schedule are as follows:

- Redesign the budgeting process and have each functional team restructure its operational areas and adjust staffing size. Roll these inputs into a new approved budget, including the Initial Budgets;
- Beginning immediately on commencement of the Front-End Transition Services and running full-out for the first three months, perform a comprehensive assessment and due diligence review of all major systems; and
- Recognize the high degree of coordination that will be required from the IT team and the other functional area teams (both within Operator and by Owner and Administrator's teams as well) to ensure that owners of these new systems within Operator have the chance to fully define their requirements.

The Operator's approach to financial management during the front-end transition will continue to evolve as we gain a deeper understanding of Owner's administrative and operational routines. Our efforts will be focused on understanding and evaluating Owner's:

- Significant financial risks;
- Management and operational reporting;
- Regulatory reporting and compliance requirements;
- Business processes; and
- Resources for matters that could affect the seamless transition of services at commencement.

CONFIDENTIAL

Our plan will leverage current Owner management and financial personnel to analyze the existing state of department processing and output, transition risks and stakeholder needs (customers, operations, regulators) in the following major areas:

- All significant financial statement accounts and assertions;
- All significant accounting and reporting processes, including:
- Cash management and controls;
- Payroll and benefits;
- Transaction processing;
- Fixed asset management;
- Job costing for projects;
- Debt/credit management;
- Accounting close;
- Management; and
- Regulatory reporting

### VII.    FEMA Funds and Federal Funding Procurement Manual

Operator will engage and be working with IEM (as its Subcontractor) to deal with federal funds management. The Operator's first step following commencement of the Front-End Transition Services is to ensure a proper governance framework is established before it can manage a long-term recovery using federal funding on behalf of the Owner. The IEM team is best suited to ensure that the Operator is operating under a federal funds management framework with an effective procurement policy that is inclusive of all federal, territorial, and COR3 requirements that also emphasizes performance. Further, IEM's own monitoring and internal controls included in the newly created Owner Disaster Recovery Federal Funds Management Guide (Operator DRFFMG) will ensure that the procurement policy is not merely aspirational but in fact is used for procurement and for the management and monitoring of the Operator's contractors.

### VIII.   Staffing for Front-End Transition Period Milestones

Operator's current organization chart for its transition team is shown in the Figure 3 below.



*Figure 3: Front End Transition Organization Chart*

## IX. Additional Front-End Transition Period Milestones

As requested by the Administrator, Operator will create specific teams to provide an extra focus on seven key items that are important to a successful transition which are:

- GenCo Shared Services
- Emergency Response Plan
- Non-Federal Funding Procurement Manual
- Physical Security Plan
- Data Security
- Vegetation Management Plan
- System Operation Principles.

## X. Asset Acquisition

Operator's procurement team will review existing procurement and subcontracting policies, procedures and systems governing and implemented by Owner. Once Operator is able to execute a more granular review of the contracts (including System Contracts), procedures and systems that Owner has in place, Operator will develop a more robust plan and recommendation for

enhancements or improvements. Upon completion of procurement procedure documentation for goods and services, a training plan will be established for procurement staff as required. Subsequently, documentation will be integrated into the compliance strategy and procurement procedure manuals.

The Operator will collaborate with Owner to identify assets related to the facilities, furnishings, material, supplies, equipment and IT systems required for T&D System operations. Upon completion of asset identification, the Operator, by performing due diligence in each functional area, plans on identifying and documenting these assets (with the assistance and reliance on Owner for appropriate information) and develop a detailed plan and recommendation for securing them. The plan will be submitted to the Owner and Administrator for review and approval as required by the Agreement. Operator will coordinate with the Owner on executing the approved plan. The completion of the Front-End Transition Services is dependent on timely alignment between the Operator and each of the Administrator and the Owner on the assets required to run the operation.

Upon completion of the identification and assumption of responsibility for Owner's existing contracts, including System Contracts and subcontracts, the Operator will work to evaluate Owner's identified contractors, subcontractors and vendors and perform outreach and evaluation. Operator will work with Owner and the applicable Operator functional areas to determine which contracts and subcontracts should be continued and assumed by the Operator or provided by other means. The Operator's procurement team will develop a plan and recommendation for assuming responsibilities for Owner's existing contracts and subcontracts and submit the plan for Owner and Administrator review and approval as required by the Agreement. Upon approval, the Operator's procurement team will assume the applicable existing contracts and subcontracts with appropriate assignment from Owner and further develop the Operator approval process for contractors and subcontractors.

## XI.    Back-End Transition Plan

A key component of the Agreement is the development and execution of a Back-End Transition Plan (the "BET Plan"). The BET Plan will enable the seamless, safe and effective transfer of the management of the T&D System and O&M Services either back to the Owner or to a successor operator at the expiration of the Agreement or, under certain conditions, an earlier time.

We have identified the members of the team, our approach and implementation, and proposed a detailed outline of the plan. This BET Plan outline in its entirety can be viewed in Annex III of the Agreement.

CONFIDENTIAL

# APPENDIX 1

Indicative schedule of activity listing is contained on following pages.

Front End Transition Plan Schedule*

**CONFIDENTIAL**

| ID | Task Name | Duration | M1 M2 M4 M6 M8 M10 M12 |
|---|---|---|---|
| 7 | *Transition Starts - Effective Date Occurs* | *0 days* | |
| 8 | **Front-End Transition Plan** | **249 days** | |
| 9 | 1. General and Transition Management | 249 days | |
| 10 | 1.c Mobilization of Transition Team | 24 days | |
| 58 | 1.i  Governmental Approvals | 163 days | |
| 76 | 1.j  System and Generation Contracts | 124 days | |
| 81 | 1.k Plan to Address Gaps in Assets, Technology, Processes, etc. (plan to include estimates of cost) | 249 days | |
| 175 | 1.l Handover Checklist | 65 days | |
| 178 | 1.m PREB Rate Order Filing | 186 days | |
| 203 | **2. T&D Services Milestones** | **244 days** | |
| 204 | 2.a  Development and Implementation of an Operations Takeover Plan for Transmission and Sub-Transmission Inside and Outside of the Plant | 180 days | |
| 228 | 2.b  Development and Implementation of an Operational Takeover Plan for the Electric Distribution System | 55 days | |
| 250 | 2.c  Development and Implementation of Additional Take-over plans | 244 days | |
| 251 | 2.c.i  Transition Plan for T&D Control Centers | 151 days | |
| 267 | 2.c.ii  Transition Plan for Operations and Maintenance (O&M) Activities | 40 days | |
| 270 | 2.c.iii  Emergency Response / Disaster Recovery / Business Continuity Plans | 69 days | |
| 277 | 2.c.iv  Fleet Management Plan | 105 days | |
| 288 | 2.c.v  Asset Management (included in (viii) Engineering and Asset Management) | 1 day | |
| 290 | 2.c.vi  Workforce Management and Training Plan | 244 days | |
| 321 | 2.c.vii  Safety Management Plan | 125 days | |
| 336 | 2.c.viii  Engineering and Asset Management | 137 days | |
| 366 | 2.c.ix  Identification of real estate | 40 days | |
| 367 | 2.c.x  Materials Management and Warehouse Plan | 211 days | |
| 416 | 2.c.xi  System Operations Plan | 40 days | |
| 420 | 2.c.xii  Vegetation Management Plan | 24 days | |
| 426 | 2.d  Update Emergency Operations Manual  and Business Continuity / Disaster Recovery Plan | 45 days | |
| 432 | 2.e  Environmental Exposure Management Plan | 174 days | |
| 480 | Asset-Based Assessment Report | 15 days | |
| 483 | **3.  System Remediation Plan Milestones** | **201 days** | |
| 484 | Remediation Plan Proposal | 11 days | |
| 488 | Transition Teams Review of the Current State of the T&D System Perform Gap Analysis | 35 days | |
| 492 | Development of Improvement Initiatives | 34 days | |
| 504 | Consolidate Plans from All Areas | 34 days | |
| 516 | Development of Roadmap(s) | 18 days | |

Case: 25-2077    Document: 00118376456    Page: 242    Date Filed: 12/08/2025    Entry ID: 6770995

| ID | Task Name | Duration | M1 | M2 | M4 | M6 | M8 | M10 | M12 |
|----|-----------|----------|----|----|----|----|----|-----|-----|
| 521 | Development of System Remediation Plan | 27 days | | | | | | | |
| 525 | Approval of System Remediation Plan | 99 days | | | | | | | |
| 543 | **4.  Customer Service** | **146 days** | | | | | | | |
| 544 | Evaluating Customer Service Facilities and Assets | 65 days | | | | | | | |
| 548 | Evaluating and Updating Customer Service Policies and Procedures | 120 days | | | | | | | |
| 552 | Development of a Meter Reading Plan | 90 days | | | | | | | |
| 555 | Identification and Analysis of Gaps | 122 days | | | | | | | |
| 565 | Develop a Customer Service Transition Plan | 70 days | | | | | | | |
| 570 | Approach to the Acquisition and Replacement of Customer Service Assets | 120 days | | | | | | | |
| 573 | Development and Implementation of a Service Start and Shut-Off Plan | 134 days | | | | | | | |
| 579 | Develop a Meter Asset Management (MAM) Plan | 95 days | | | | | | | |
| 585 | Development and Implementation of a Customer Service Technology | 120 days | | | | | | | |
| 591 | Develop and Implement an Non Technical Energy Loss Reduction Plan | 60 days | | | | | | | |
| 598 | Develop a Quality Culture Integration Plan | 120 days | | | | | | | |
| 604 | Establish Integration Between Customer Services & T&D Ops | 100 days | | | | | | | |
| 608 | **5.  IT** | **214 days** | | | | | | | |
| 609 | Pre-Landing Technology Configuration | 20 days | | | | | | | |
| 610 | 5.a  Development of an IT/OT communication plan and acceptance criteria | 80 days | | | | | | | |
| 619 | 5.b  Identification and analysis of gaps | 10 days | | | | | | | |
| 620 | 5.c  Evaluating IT/OT Applications and Infrastructure | 60 days | | | | | | | |
| 647 | 5.d  Development of Cyber Security and Business Continuity Plan | 80 days | | | | | | | |
| 652 | 5.e  Development of an IT Asset Management program | 60 days | | | | | | | |
| 653 | 5.f  Development of an IT/ OT Transition plan and schedule | 60 days | | | | | | | |
| 656 | Implement IT Systems (GL & Payroll) - Transition Period | 180 days | | | | | | | |
| 662 | Commencement Cutover Planning | 60 days | | | | | | | |
| 665 | Training and Communication Plan | 40 days | | | | | | | |
| 668 | External Reporting | 40 days | | | | | | | |
| 671 | Organizational Review | 80 days | | | | | | | |
| 674 | Talent Management | 120 days | | | | | | | |
| 679 | IT Budget Review | 80 days | | | | | | | |
| 682 | IT Projects Review | 82 days | | | | | | | |
| 688 | **6.  Financial Management** | **234 days** | | | | | | | |
| 689 | 6.a  Detailed Description of Approach to Budgeting and Reporting | 10 days | | | | | | | |
| 690 | 6.b  Description of Approach to Complying with Initial Budget Obligations | 10 days | | | | | | | |
| 691 | 6.c  Approach to formalizing changes to control processes | 10 days | | | | | | | |

**CONFIDENTIAL**

| ID | Task Name | Duration | M1 | M2 | M4 | M6 | M8 | M10 | M12 |
|---|---|---|---|---|---|---|---|---|---|
| 692 | 6.d  Identifying and evaluating business processes | 20 days | | | | | | | |
| 693 | 6.e  Establishing a financial accounting system and account structure | 10 days | | | | | | | |
| 694 | 6.f  Preparing Initial Budgets and other Financial Forecasts | 210 days | | | | | | | |
| 695 | Initial Budgets | 210 days | | | | | | | |
| 725 | 6.g  Establishing bank accounts | 20 days | | | | | | | |
| 726 | 6.h  Evaluating and updating payroll and labor cost reporting systems | 10 days | | | | | | | |
| 727 | 6.i  Establishing a delegation of authority matrix and process | 10 days | | | | | | | |
| 728 | Processes & Procedures and Overall Internal Controls | 160 days | | | | | | | |
| 741 | Financial Status and Account Structure | 60 days | | | | | | | |
| 746 | **7.  FEMA Funds and Federal Funding Procurement Manual** | **161 days** | | | | | | | |
| 747 | Federal Funds Management | 120 days | | | | | | | |
| 748 | Set up Governance Framework | 30 days | | | | | | | |
| 750 | Policies and Procedures | 45 days | | | | | | | |
| 752 | Staffing Plan | 40 days | | | | | | | |
| 754 | Surge Staffing | 60 days | | | | | | | |
| 758 | Project Worksheet Assessment (Also covered under Section 4.3.j) | 100 days | | | | | | | |
| 761 | Recovery Project Sequencing | 30 days | | | | | | | |
| 765 | Handoff of Project Worksheet Activity from COR3 and Vendors | 120 days | | | | | | | |
| 768 | Project Procurement Planning | 60 days | | | | | | | |
| 770 | 7.d  Drafting, revising and finalizing Federal Funding Procurement Manual | 161 days | | | | | | | |
| 788 | **8.  Staffing for Front-End Transition Period** | **184 days** | | | | | | | |
| 789 | 8.d  Draft, revise and finalize Operator Employment Requirements | 184 days | | | | | | | |
| 790 | Recruiting and Staffing | 184 days | | | | | | | |
| 895 | **9.  Additional Front-End Transition Period Activities** | **194 days** | | | | | | | |
| 896 | 9.c  Regulatory Approvals and Coordinating Subsequent Implementation | 194 days | | | | | | | |
| 897 | Meet with PREB to better understand their priorities and approval processes for plans under 9.c | 1 day | | | | | | | |
| 898 | 9.c.i  Genco Shared Services and the related Shared Services Agreement | 121 days | | | | | | | |
| 945 | 9.c.ii  Emergency Response Plan Approval | 13 days | | | | | | | |
| 955 | 9.c.iii  Non-Federal Funding Procurement Manual Approval | 101 days | | | | | | | |
| 969 | 9.c.iv  Physical Security Plan | 83 days | | | | | | | |
| 987 | 9.c.v  Data Security Plan | 17 days | | | | | | | |
| 997 | 9.c.vi  Vegetation Management Plan | 52 days | | | | | | | |
| 1007 | 9.c.vii  System Operation Principles | 169 days | | | | | | | |
| 1031 | **10.  Asset Acquisition (Supply Chain)** | **120 days** | | | | | | | |
| 1032 | 10.a  Evaluating Existing Procurement and Subcontracting Policies, Procedures and Syst | 120 days | | | | | | | |
| 1044 | 10.b  Assuming Responsibility for Securing Use of Assets, Facilities, IT / OT, etc. | 120 days | | | | | | | |
| 1067 | 10.c  Assuming Existing Subcontracts | 120 days | | | | | | | |

**CONFIDENTIAL**

| ID | Task Name | Duration | M1 | M2 | M4 | M6 | M8 | M10 | M12 |
|---|---|---|---|---|---|---|---|---|---|
| 1084 | **11.  Back-End Transition Plan** | **65 days** | | | | | | | |
| 1085 | Back End Transition Plan | **65 days** | | | | | | | |
| 1093 | **Performance Metrics** | **158 days** | | | | | | | |
| 1094 | Initial Analysis | **59 days** | | | | | | | |
| 1101 | Approval of Performance Metrics | **139 days** | | | | | | | |
| 1119 | **Front End Transition Period (Additional Requirements in Agreement)** | **191 days** | | | | | | | |
| 1120 | Operator Responsibilities | **157 days** | | | | | | | |
| 1121 | Handover Checklist (Prior to the 10th of every month) | **191 days** | | | | | | | |
| 1122 | Obtain Updates and Additions (if any) to Checklist from Transition Working Teams | **191 days** | | | | | | | |
| 1134 | Confirmation of Acceptable Operator Security | **2 days** | | | | | | | |
| 1137 | Required Insurance | **96 days** | | | | | | | |
| 1142 | Employment Interviews (See Recruitment and Staffing Plan Project for Activity details) | **66 days** | | | | | | | |
| 1146 | Employment Offers | **158 days** | | | | | | | |
| 1151 | Representations | **107 days** | | | | | | | |
| 1152 | Operator Representations and Warranties | **1 day** | | | | | | | |
| 1164 | SECTION 4.3 Owner and Administrator Responsibilities | **1 day** | | | | | | | |
| 1178 | SECTION 4.4 Governmental Approvals | **107 days** | | | | | | | |
| 1184 | **SECTION 4.5 Conditions Precedent to Service Commencement Date** | **225 days** | | | | | | | |
| 1214 | **SECTION 4.7 Closing the Front-End Transition Period** | **17 days** | | | | | | | |
| 1222 | ***Transition Ends*** | ***1 day*** | | | | | | | |
| 1223 | Establishment of Service Commencement Date | **1 day** | | | | | | | |
| 1226 | ***Service Commencement Begins*** | ***11 days*** | | | | | | | |

\* - Indicative Gantt chart of total workdays based on Operator Proposal (which is equivalent to 320 days).

CONFIDENTIAL

**Annex III**

**Back-End Transition Plan**

The Back-End Transition Services shall include any of the following.

*Owner Rights*

- Audit
- Engagement of Subcontractors

*Operator Rights*

- Baseline Environmental Study
- Engagement of Subcontractors
- Use of Affiliate Personnel

*Owner Responsibilities*

- Access to Office Space, Facilities
- Cooperation with Operator
- Establishment of New Bank Accounts
- Notification of Customers to New Payment Accounts
- Timely Payment of Back-End Transition Fees

*Operator Responsibilities*

- Safety
  - Review of Overall Safety Program
- T&D Operations
  - Review of Current State of System
  - Review of System Operator Principles and Emergency Response Plans
  - Review of Vegetation Management Plan and Physical Security Plan
  - Review of Integrated Resource Plan
  - Delivery of List of Fleet Vehicles
  - Review of System Remediation Plan (if Applicable)
  - Sale of Materials and Supplies
  - Preservation of Materials, Tools and Equipment
  - Removal of Equipment and Tools from T&D System Sites
  - Maintenance of Consumable and Spare Part Inventory at Sites
  - Removal of Operator Employees from T&D Sites upon Exit
  - Condition of T&D Sites Upon Exit
  - Delivery of Current Maps of the T&D System

CONFIDENTIAL

- ▪ Provision of Technological and Design Support
- ● Regulatory
  - ▪ Review of any Regulatory Reporting and Compliance Requirements and Open Discussions with PREB
  - ▪ Review of Regulatory Filing Priorities and Timeline
- ● Customer Service
  - ▪ Review of Policies, Processes and Procedures Captured Under the Document and Record Control Register
- ● Human Resources
  - ▪ Delivery of Information Regarding Staffing, Benefits and Labor Contracts
  - ▪ Retention of Senior Management for Six Month Period
  - ▪ Stability of ServCo employees - fair and appropriate treatment of the ServCo employees, including possible sale of ServCo to facilitate stability
  - ▪ Evaluate circumstances and consider other appropriate options to facilitate employee stability in transition
- ● Capital Projects
  - ▪ Delivery of List of Materials and Equipment Delivered to Work Sites
  - ▪ Status of Federally Funded Projects
- ● Information Technology
  - ▪ Review of the Data Security Plan
  - ▪ Delivery of all Computer Programs used at T&D Sites
  - ▪ List of Files, Access and Security Codes
  - ▪ Delivery of System Information and Customer Databases
  - ▪ Delivery of a Document Management Program
- ● Finance
  - ▪ Estimate of Back-End Transition Service fee for 4.5 Months
  - ▪ Monthly Invoice for Back-End Transition Services
  - ▪ Review of Current Budgets
- ● Risk Management
  - ▪ Notice of Termination of Insurance Policies
- ● Environmental
  - ▪ Review of Status of Environmental Work
  - ▪ Review of Pending Permitting and Reporting
- ● Legal
  - ▪ List of Legal Proceedings Involving Contractors or Subcontractors
  - ▪ Provision of Work Product and Owner Intellectual Property
- ● Supply Chain
  - ▪ Review of Procurement Manuals
  - ▪ Delivery of Copies of All Contracts and Subcontracts
  - ▪ Termination or Assignment of Contracts and Subcontracts
  - ▪ Cessation of Entering into New Contracts

- ▪ Transfer of Title to Special Order items
- ▪ Transfer of Warranties
- Administrative
  - ▪ Removal of Branding
  - ▪ Termination of Shared Service Agreements (if Applicable)
  - ▪ Milestone Reporting
  - ▪ Delivery of all Books, Records, Customer Lists and Other Information
  - ▪ Delivery of List of all Facilities
  - ▪ Develop and Execute a Handover Checklist

CONFIDENTIAL

## Annex IV

### Operator Employment Requirements

To be eligible for employment, all applicants must:

- Be legally authorized to work in the United States;
- Be at least 18 years of age (some positions may have other age requirements);
- Be able to pass a thorough background check (including criminal history record checks, previous employment verifications and references);
- Be able to pass a drug screening and medical assessment (where necessary); and
- Have a safe driving record (if applicable to the position).

In addition to the above list, a comprehensive list of individual job requirements will be listed on each job description. A preliminary listing of job descriptions for core, strategic, and support jobs has been developed. These job descriptions have been assembled to reflect the needs of the business.

Although these job descriptions are industry standard and reflective of the roles outlined, Operator intends to finalize all individual job descriptions as early as practical during the Front-End Transition Period.

CONFIDENTIAL

## Annex V

## Front-End Transition Hourly Fully Allocated Rates

| Employee Category | Hourly Rates (US$) |
|---|---|
| Vice President | 325 |
| Sr. Director | 300 |
| Director | 275 |
| Senior Manager | 210 |
| Field Crew Leader | 205 |
| Trainer | 200 |
| Manager | 200 |
| Field Technician | 195 |
| Senior Analyst | 160 |
| Engineer / Field Supervisor | 160 |
| Analyst | 125 |
| Administrative Support | 50 |

CONFIDENTIAL

## Annex VI

## GenCo Shared Services

I.     Current Owner Services.

In addition to the power supply dispatch, scheduling and coordination currently performed by the Puerto Rico Electric Power Authority ("PREPA"), PREPA performs certain administrative, managerial and operational services in connection with the operation and management of the Legacy Generation Assets and their delivery of Power and Electricity, and certain fuel supply and procurement functions.

II.    PREPA Reorganization.

Prior to the Service Commencement Date, PREPA shall be reorganized into two entities: (1) GenCo, acquiring or obtaining ownership of the Legacy Generation Assets, and (2) GridCo, acquiring or obtaining ownership of the T&D System. GenCo may eventually transfer to one or more private partners certain of GenCo's operations, including the operating, administrative and/or maintenance functions in connection with the Legacy Generation Assets prior to the end of their remaining useful life. The period prior to such transfer is referred to as the "Shared Services Period." During the Shared Services Period, Operator shall, on behalf of Owner, provide certain administrative, managerial and operational services (the "Shared Services") to GenCo, which were historically provided by PREPA. The Shared Services shall be performed according to the standards set forth in the Shared Services Agreement (as defined below), thereby ensuring the continuity of operations by GenCo and complying with the Contract Standards and Prudent Utility Practice as defined in the Agreement.

III.   Shared Services Agreement.

Prior to the Service Commencement Date, Operator shall be required to enter into a shared services agreement consistent with the terms and conditions summarized in this Annex VI (*GenCo Shared Services*) and reasonably acceptable to Operator (the "Shared Services Agreement" or "SSA") to provide the Shared Services to GenCo, on behalf of Owner, and in accordance with the Contract Standards, utilizing GridCo assets as necessary, and throughout the term of the SSA, which term shall not exceed three (3) years from the effective date of the SSA (unless otherwise extended with the consent of the Operator); provided that any Shared Service may be terminated or suspended earlier by GenCo for convenience following at least sixty (60) days prior written notice to Operator.

A.     Shared Services. Pursuant to the Shared Services Agreement, Operator shall provide the Shared Services to GenCo in a manner, amount and quality substantially consistent with the manner, amount or quality of the Shared Services currently provided by PREPA or otherwise in accordance with Prudent Utility Practice, unless otherwise specified in the Shared Services Agreement. Operator and GenCo shall cooperate in good faith with each other on all matters relating to the provision and receipt of the Shared Services. Operator shall cause its employees, or the employees of Owner, as the case may be, to devote such time and effort to the business of GenCo as shall be reasonably necessary to perform the Shared Services; provided that

CONFIDENTIAL

the employees shall not be precluded from engaging in other business activities for or on behalf of Operator, Owner or their affiliates and no Shared Services will be provided in contravention of Applicable Law.

The Shared Services may include any of the following:

1. Administrative
   a. Human Resources
      i. Recruiting
      ii. Labor Relations
      iii. Payroll and Benefits Administration

2. Regulatory and Public Affairs
   a. File, execute and prosecute applications with Governmental Authorities for the acquisition, construction, ownership and operation of power generation facilities
   b. Provide or cause to be provided services for governmental and public affairs, including, but not limited to press releases, community events, contacts with county, state and federal officials, and communications with landowners

3. Finance and Accounting
   a. Internal Audit and Tax
   b. Risk Management (including financial risk management and enterprise risk management)
   c. Treasury and Controller
   d. Insurance Renewals and Claims
   e. Loss Control Inspections
   f. Vendor payments and Contract Administration
   g. Insurance

4. Information Technology
   a. Communications
   b. Hardware/Software/Licensing Support
   c. Cyber-Security

5. Legal

6. Bookkeeping

7. Environmental
   a. Permitting and Reporting
   b. Mitigation
   c. Compliance

8. Procurement and Supply Chain

CONFIDENTIAL

9.  Outage Support

10. Fleet Vehicle Services

11. Capital Improvements Analysis and Determination

12. Real Estate
   a.  Bidding/ Selling Property
   b.  Lease Management
   c.  Portfolio Optimization

13. Facilities
   a.  Facilities and Property Administration/ Management/ Maintenance
   b.  Food / Mail Services

14. Physical Security

The parties may agree to modify the terms and conditions of Operator's performance of any Shared Service in order to reflect new procedures, processes or other methods of providing such service. The parties shall negotiate in good faith the terms and conditions upon which Operator would be willing to implement such change.

B.    <u>Additional, Reduced or Modified Services</u>. In the event that GenCo requests an increase or decrease in the manner, amount or quality of any Shared Service, GenCo shall notify Operator and request such modification of service, and Operator shall (x) in the case of a decrease, following the expiration of the relevant notice period, decrease the manner, amount or quality of such Shared Service and (y) in the case of an increase, consider GenCo's request, in accordance with terms to be set forth in the Shared Services Agreement.

C.    <u>Liability</u>. Operator shall not have any liability, whether direct or indirect, to GenCo for or in connection with the Shared Services or any other services provided or to be provided by Operator pursuant to the Shared Services Agreement except to the extent of (i) any negligence or willful misconduct of Operator or any of its Affiliates, or any of their employees, representatives, agents, contractors, subcontractors or suppliers or (ii) any failure to comply with the Shared Services Agreement (including a failure to deliver such Shared Servces in accordance with the Contract Standards).

IV.    <u>Compensation; Set-off</u>.

As compensation for the performance of the Shared Services, GenCo shall pay a shared service fee (without markup for profit) to be determined in, and in accordance with, the allocation methodology of the Shared Services Agreement; <u>provided</u> that payments of the service fee to the Operator may, at the request of GenCo or the Administrator at any time and from time to time, be reduced by amounts owed by GridCo to GenCo consisting of Generation Pass-Through Expenditures and applied by Operator in accordance with the allocation methodology. The allocation methodology shall seek to reflect the amount of Shared Services actually provided to GenCo (as opposed to GridCo or other parties) and may be (i) based on the following approaches, (ii) assigned, distributed or allocated on a service-by-service basis, and (iii) further developed and determined subsequent to input from the relevant Owner or GenCo personnel and Operator:

CONFIDENTIAL

    A.  internal resource time allocation, e.g., full-time equivalent or employee hours;

    B.  employee count (considering pending retirements and anticipated recruiting); and

    C.  equipment, data or inventory volume, e.g., number of workstations, vehicles or gigabytes used.

Allocators may be based on either budget or historical data, which shall be assessed and determined with inputs from PREPA personnel and Operator.

CONFIDENTIAL

## Annex VII

### ManagementCo Costs

The costs listed below shall be paid by ManagementCo from the Fixed Fee (or otherwise absorbed or paid for by ManagementCo without reimbursement hereunder) as set forth in Section 7.1(a) (*Service Fee – Generally*) of the main body of the Agreement. Capitalized terms used but not defined in this Annex VII (*ManagementCo Costs*) have the respective meanings set forth in the Agreement. For the avoidance of doubt, these costs shall be the sole responsibility of ManagementCo and shall not be treated as T&D Pass-Through Expenditures or as Generation Pass-Through Expenditures.

1.      Wages, salaries, bonuses, employer contributions to pension and employee medical plans, any mandatory employment related insurance and taxes, vacation, sick leaves and other mandatory leaves with pay, overtime compensation and associated benefits and other post-employment benefits incurred in connection with the following roles (or any substantially similar role or position): (i) Chief Executive Officer, (ii) Chief Financial Officer, (iii) Head of Human Resources, (iv) Head of Capital Programs, (v) Head of Information Technology and (vi) Head of Customer Service.

2.      Establishment and maintenance of a ManagementCo Board of Directors to provide strategy and oversight.

3.      Costs incurred with any third party advisors hired by ManagementCo for the purposes of fulfilling ManagementCo's responsibilities set forth in this Agreement.

4.      Any costs relating to the Puerto Rico Lineworkers College.

5.      Administration of ManagementCo, including bookkeeping, contract administration, filings, financial / operational audits, etc.

CONFIDENTIAL

## Annex VIII

## Service Fee

| Contract Year | Fixed Fee |
|:---:|:---:|
| 1 | US$70,000,000 |
| 2 | US$90,000,000 |
| 3 | US$100,000,000 |
| 4 | US$105,000,000 |
| 5 | US$105,000,000 |
| 6 | US$105,000,000 |
| 7 | US$105,000,000 |
| 8 | US$105,000,000 |
| 9 | US$105,000,000 |
| 10 | US$105,000,000 |
| 11 | US$105,000,000 |
| 12 | US$105,000,000 |
| 13 | US$105,000,000 |
| 14 | US$105,000,000 |
| 15 | US$105,000,000 |
| 16 | US$105,000,000 |

| Contract Year | Incentive Fee |
|:---:|:---:|
| 1 | US$13,000,000 |
| 2 | US$17,000,000 |
| 3 | US$19,000,000 |
| 4 | US$20,000,000 |
| 5 | US$20,000,000 |
| 6 | US$20,000,000 |
| 7 | US$20,000,000 |
| 8 | US$20,000,000 |
| 9 | US$20,000,000 |
| 10 | US$20,000,000 |
| 11 | US$20,000,000 |
| 12 | US$20,000,000 |
| 13 | US$20,000,000 |
| 14 | US$20,000,000 |
| 15 | US$20,000,000 |
| 16 | US$20,000,000 |

- The amounts set forth above are in 2020 Dollars. For purposes of this Annex VIII, the phrase "2020 Dollars" means that the relevant amount will be adjusted to account for inflation, at the start of each Contract Year, by the respective annual CPI Factor(s) to reflect a nominal value for the Contract Year. For illustrative purposes only, if Contract Year four (4) starts in calendar year 2023, then the adjustment for inflation to yield the Fixed Fee for Contract Year four (4) would be as follows: Contract Year four (4)'s Fixed Fee or Incentive Fee, as applicable (as set forth in this Annex VIII, in 2020 Dollars), *multiplied by* the CPI Factor for 2021 *multiplied by* the CPI Factor for 2022 *multiplied by* the CPI Factor for 2023.

VIII-1

CONFIDENTIAL

## Annex IX

## Performance Metrics

I.    <u>General</u>.

For each Contract Year, the Operator shall be eligible to receive financial incentive compensation ("<u>Incentive Fee</u>") based on the Operator's performance during the Contract Year as measured against the performance goals set forth by the Performance Metrics as described in this Annex IX (*Performance Metrics*). The Incentive Fee calculation is described in Annex X (*Calculation of Incentive Fee*) with a maximum amount that can be earned (the "<u>Incentive Compensation Pool</u>").

II.   <u>Performance Categories</u>.

To ensure that all performance goals are met, the Operator will be evaluated in three major Performance Categories: (i) Customer Satisfaction, (ii) Technical, Safety and Regulatory, and (iii) Financial Performance. Likewise, the Incentive Compensation Pool will be allocated across the Performance Categories in such a way as to align the Operator's incentive compensation with the performance goals.

### Table 1. Summary of Performance Categories

| Performance Category | Performance Goal | Allocation of Incentive Compensation Pool |
|---|---|---|
| 1.  Customer Satisfaction | Achieve a high-level of customer satisfaction across all customer classes. | 25% |
| 2.  Technical, Safety and Regulatory | Operate a safe, reliable electric grid while remaining complaint with applicable safety, environmental and other regulations. | 50% |
| 3.  Financial Performance | Meet the approved Operating Budget, Capital Budget – Federally Funded and Capital Budget – Non-Federally Funded. | 25% |

CONFIDENTIAL

III.   In Compliance with Docket NEPR – MI – 2019 – 0014.

A.      For each Contract Year, the level of performance in each Performance Category shall be measured based on actual results achieved for the Contract Year. Levels of performance and achievement of results will be adjusted proportionately during the initial Contract Year commencing on the Service Commencement Date and ending on the following June 30. For this purpose, one or more Performance Metrics shall be associated with each Performance Category.

B.      For all Performance Categories the Operator performance shall be determined by the level of achievement of the Performance Objective for each Performance Metric under a Performance Category as described in Section V. Such level of achievement will determine the portion of the allocated Incentive Compensation Pool earned by the Operator as described in Annex X (*Calculation of Incentive Fee*).

C.      Each Performance Metric will have an assigned point weighting ("Base Points"). For all Performance Metrics except for the Binary Metrics as described in Section III(D), a baseline performance level will be established prior to the beginning of the first Contract Year (the "Baseline Performance Level"). The Baseline Performance Level will be based on either historical operating data confirmed during the Front-End Transition Period, performance during the Front-End Transition Period, or through independent analysis. The initial baseline levels will be agreed upon by the Operator and PREB in the manner set forth in the main body of the Agreement. The Baseline Performance Level sets the starting point for each metric relative to the target performance level to be achieved in the fifth Contract Year (the "Target Performance Level"). The baseline target over the initial five-year period is determined by a straight line between the Baseline Performance Level and the Target Performance Level. The Minimum Performance Level set for each Performance Metric establishes the value that must be exceeded to qualify for Base Points and is established as the straight line between the Baseline Performance Level and achieving the Target Performance Level in the tenth Contract Year. In Contract Years where the Minimum Performance Level is exceeded, the Operator has the ability of earning 25%, 50%, 100%, 125% or 150% (the "Base Point Multipliers") of the Base Points depending on the metric result relative to the established baseline for the Contract Year. That is, for a result between the Minimum Performance Level and the 25% tier, the Operator would receive points equal to 25% of the Base Points, for a result between the 25% threshold and the 50% threshold, the Operator would receive points equal to 50% of the Base Points, etc.

D.      Performance ranges for determination of Base Points earned shall be based on achieving performance improvement from the Baseline Performance Level to the Target Performance Level over the initial five-year period.

**CONFIDENTIAL**

**Chart 1. Example of Performance Metric Mechanism**



D.    Several Performance Metrics are evaluated differently than the mechanism outlined above either because there is a binary nature to the result or because the baseline is independent year to year (the "Binary Metrics"). For the Occupational Safety and Health Administration ("OSHA") Fatalities and OSHA Severe Injuries metrics, a value of zero results in full Base Points and a value other than zero results in no points. For the three approved budget-related metrics, Operating Budget, Capital Budget – Federally Funded and Capital Budget – Non-Federally Funded, exceeding 102% of the applicable Budget results in no points while spending less than or equal to 100% of the applicable Budget results in awarding full Base Points. The Operator can earn full Base Points by spending up to 102% of the budget, pending Administrator approval.

IV.    Summary of Performance Metrics.

The Performance Metrics that form the basis for the Incentive Compensation Pool are summarized in Table 2. Details of these Performance Metrics are described in the text following Table 2.

## Table 2. Summary of Performance Metrics

*Note: Any Baseline Performance Level set using PREPA historical data will be subject to confirmation during the Front-End Transition Period.*

| Performance Metric | Description | Baseline Performance Level Derivation | Base Points | Effective Weight |
|---|---|---|---|---|
| **A. Customer Satisfaction** | | | | |
| 1. J.D. Power Customer Satisfaction Survey (Residential Customers) | 3rd party measure of customer satisfaction | Set during Front-End Transition Period | 5.0 | 4% |
| 2. J.D. Power Customer Satisfaction Survey (Business Customers) | 3rd party measure of customer satisfaction | Set during Front-End Transition Period | 5.0 | 4% |
| 3. Average Speed of Answer (minutes)* | Time it takes on phone to reach an agent | PREPA historical data verified during Front-End Transition Period | 5.0 | 4% |
| 4. Customer Complaint Rate | Total monthly complaints registered with PREB | PREPA historical data verified during Front-End Transition Period | 5.0 | 4% |
| 5. First Call Resolution* | % of calls with issues that are escalated | Set during Front-End Transition Period | 5.0 | 4% |
| 6. Abandonment Rate | # of abandoned calls per calls received | PREPA historical data verified during Front-End Transition Period | 5.0 | 4% |
| **B. Technical, Safety & Regulatory** | | | | |
| 1. OSHA Recordable Incidence Rate | # of work-related OSHA recordable injury cases | PREPA historical data verified during Front-End Transition Period | 5.0 | 6% |
| 2. OSHA Fatalities* | # of work-related fatalities | Industry standard specified herein | 5.0 | 6% |
| 3. OSHA Severe Injuries* | # of total work-related injury cases with severity days | Set during the Front-End Transition Period | 5.0 | 6% |
| 4. OSHA DART Rate | # of work-related injury cases incidents resulting in 1 or more lost days | Set during Front-End Transition Period | 5.0 | 6% |
| 5. System Average Interruption Frequency Index (SAIFI)* | Measures avg. outage frequency | PREPA historical data verified during Front-End Transition Period | 5.0 | 6% |
| 6. Customer Average Interruption Duration Index (CAIDI)* | Measures avg. restoration time | PREPA historical data verified during Front-End Transition Period | 5.0 | 6% |
| 7. System Average Interruption Duration Index (SAIDI)* | Measures avg. outage duration | PREPA historical data verified during Front-End Transition Period | 5.0 | 6% |

**CONFIDENTIAL**

| Performance Metric | Description | Baseline Performance Level Derivation | Base Points | Effective Weight |
|---|---|---|---|---|
| 8. Customers Experiencing Multiple Interruptions (CEMI) | Measures multiple outages in a given period | Set during Front-End Transition Period | 5.0 | 6% |
| 9. Momentary Average Interruption Frequency Index (MAIFI) | Measures avg. # of momentary interruptions | PREPA historical data verified during Front-End Transition Period | 5.0 | 6% |
| **C. Financial Performance** | | | | |
| 1. Operating Budget* | Measures ability to stay within budget | Budget agreed by PREB, P3A and Operator | 7.5 | 5% |
| 2. Capital Budget – Federally Funded* | Measures ability to stay within budget | Budget agreed by PREB, P3A and Operator | 7.5 | 5% |
| 3. Capital Budget – Non-Federally Funded* | Measures ability to stay within budget | Budget agreed by PREB, P3A and Operator | 7.5 | 5% |
| 4. Days Sales Outstanding | Measures ability to collect bills | PREPA historical data verified during Front-End Transition Period | 5.5 | 4% |
| 5. Reduction in Network Line Losses | Measures ability to reduce electric losses | Set during Front-End Transition Period | 5.0 | 3% |
| 6. Overtime | Measures ability to manage salary expense | Set during Front-End Transition Period | 5.0 | 3% |

*These Performance Metrics are also Key Performance Metrics (as defined below).*

V.     Performance Metrics.

      A.     Customer[3] Satisfaction

1.     J.D. Power Customer Satisfaction Survey (Residential)

Performance Objective: To incentivize sufficient customer service.

Description: The metric measures customer satisfaction through a third-party survey that examines six (6) factors (power quality and reliability, price, billing and payment, corporate citizenship, communications and customer service). The Baseline Performance Level will be set during the Front-End Transition Period. The Target Performance Level has been set as the "South Large Utility" average, as defined by J.D. Power.

Points Assigned: 5

---

[3] A customer is a metered electrical service point for which an active bill account is established at a specific location, per IEEE 1366-2012.

CONFIDENTIAL

Baseline Performance Level: TBD.

Target Performance Level: J.D. Power Residential Score of 714.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: Third party survey that examines six (6) factors (power quality and reliability, price, billing and payment, corporate citizenship, communications and customer service).

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | 714 | TBD | TBD | TBD | 714 | TBD | TBD |

2. J.D. Power Customer Satisfaction Survey (Business)

Performance Objective: To incentivize sufficient customer service.

Description: The metric measures customer satisfaction through third party survey that examines six (6) factors (power quality and reliability, price, billing and payment, corporate citizenship, communications and customer service). The Baseline Performance Level will be set during the Front-End Transition Period. The Target Performance Level has been set as the "South Large Utility" average.

Points Assigned: 5

Baseline Performance Level: TBD.

Target Performance Level: J.D. Power Business Score of 760.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: Third party survey that examines six factors (power quality and reliability, price, billing and payment, corporate citizenship, communications and customer service).

CONFIDENTIAL

Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | 760 | TBD | TBD | TBD | 760 | TBD | TBD |

3. Average Speed of Answer (minutes)

Performance Objective: To incentivize efficient call center service.

Description: The average speed of answer is measured as a combination of those customers who have their question or issue resolved via the automated Integrated Voice Response system ("IVR") and those customers who opt out of the IVR and wait to speak with a customer. The Baseline Performance Level has been set using PREPA historical data subject to confirmation during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: Average of 10.0 minutes.

Target Performance Level: Average of 1.0 minutes.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: Average number of minutes from when the customer goes through the integrated voice response system until reaching an agent.

CONFIDENTIAL

Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 10.0 | 10.0 | N/A | N/A | 10.0 | N/A | N/A |
| Year 1 | 10.0 | 10.0 | N/A | N/A | 10.0 | N/A | N/A |
| Year 2 | 8.5 | 9.1 | 4.0 | 6.3 | 8.5 | 8.8 | 9.0 |
| Year 3 | 7.5 | 8.2 | 2.5 | 5.0 | 7.5 | 7.8 | 8.0 |
| Year 4 | 5.0 | 7.3 | 1.0 | 3.0 | 5.0 | 6.0 | 7.0 |
| Year 5 | 2.5 | 6.4 | 0.5 | 1.5 | 2.5 | 4.3 | 6.0 |

4. Customer Complaint Rate

Performance Objective: To incentivize enough customer service.

Description: This metric measures the total number of initial customer complaints registered with the Puerto Rico Energy Bureau ("PREB"). The Baseline Performance Level will be set based on PREPA historical data subject to confirmation during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: 11.3% complaint rate.

Target Performance Level: 2.5% complaint rate.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: The monthly value is calculated by taking the total number of initial complaints divided by the total utility customer population and then multiplying by 100,000.

CONFIDENTIAL

Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 11.3% | 11.3% | N/A | N/A | 11.3% | N/A | N/A |
| Year 1 | 11.3% | 11.3% | N/A | N/A | 11.3% | N/A | N/A |
| Year 2 | 10.7% | 10.4% | 5.0% | 7.8% | 10.7% | 10.3% | 10.0% |
| Year 3 | 10.0% | 9.5% | 4.0% | 7.0% | 10.0% | 9.5% | 9.0% |
| Year 4 | 7.5% | 8.7% | 3.0% | 5.3% | 7.5% | 7.8% | 8.0% |
| Year 5 | 5.0% | 7.8% | 2.0% | 3.5% | 5.0% | 6.0% | 7.0% |

CONFIDENTIAL

5.  First Call Resolution

Performance Objective: To incentivize efficient call center service.

Description: This metric is a measure of efficiency of the call center. It also impacts customer satisfaction because the customer will notice a difference in how they are treated while on the call and the company's willingness to address their questions/concerns quickly and without escalation. The Baseline Performance Level will be set during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: To be determined ("TBD").

Target Performance Level: 15% first calls resolved.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: The metric is calculated as the percentage of calls with issues that are escalated.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | 15.0% | TBD | TBD | TBD | 15.0% | TBD | TBD |

6.  Abandonment Rate

Performance Objective: To incentivize efficient call center service.

Description: Abandoned calls occur when customers waiting for service on the phone, after opting to speak with a person, hang up before receiving service. The Baseline Performance Level has been set using PREPA historical data and the S&L report. The Target Performance Level has been set using the S&L report recommendations.

Points Assigned: 5

Baseline Performance Level: 50% calls abandoned.

Target Performance Level: 25% calls abandoned.

CONFIDENTIAL

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: The metric is calculated as abandoned calls divided by calls received.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 50.0% | 50.0% | N/A | N/A | 50.0% | N/A | N/A |
| Year 1 | 50.0% | 50.0% | N/A | N/A | 50.0% | N/A | N/A |
| Year 2 | 45.0% | 47.5% | 25.0% | 35.0% | 45.0% | 46.0% | 47.0% |
| Year 3 | 40.0% | 45.0% | 20.0% | 30.0% | 40.0% | 42.0% | 44.0% |
| Year 4 | 35.0% | 42.5% | 15.0% | 25.0% | 35.0% | 37.5% | 40.0% |
| Year 5 | 30.0% | 40.0% | 12.5% | 21.3% | 30.0% | 33.8% | 37.5% |

B.      Technical, Safety & Regulatory

The Technical Performance Metrics will be measured and calculated in accordance with IEEE 1366-2012, including the terms as defined therein. The calculation of Technical Performance Metrics excludes (i) interruptions associated with Outage Event days using the IEEE 2.5 Beta Method, (ii) planned interruptions and (iii) interruptions caused by generation events.

1.  OSHA Recordable Incident Rate ("OSHA IR")[4]

Performance Objective: To incentivize employee safety.

Description: OSHA requires Recordable Incident Rate be reported to OSHA on a yearly basis. An OSHA recordable incident is a work-related injury or illness that results in one of more of the following: death, days away from work, restricted work or transfer to another job, medical treatment beyond first aid, loss of consciousness, a significant injury or illness diagnosed by a physician or other licensed health care professional. The Baseline Performance Level has been set using PREPA historical data subject to confirmation during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: OSHA IR of 11.3.

Target Performance Level: OSHA IR of 6.28.

---

[4] As defined by OSHA.

CONFIDENTIAL

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: The metric is calculated as the total number of recordable incident cases over a set time period multiplied by a scaling factor and divided by the total number of labor hours the company recorded during that time period (OSHA uses 200,00 as a scaling factor, which equates to one hundred (100) employees working forty (40) hours per week, fifty (50) weeks of the year).

Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 11.30 | 11.30 | N/A | N/A | 11.30 | N/A | N/A |
| Year 1 | 10.68 | 10.80 | 7.00 | 8.84 | 10.68 | 10.59 | 10.50 |
| Year 2 | 10.05 | 10.30 | 6.00 | 8.03 | 10.05 | 10.03 | 10.00 |
| Year 3 | 8.79 | 9.79 | 5.00 | 6.90 | 8.79 | 9.15 | 9.50 |
| Year 4 | 7.34 | 9.29 | 4.00 | 5.67 | 7.34 | 8.04 | 8.75 |
| Year 5 | 6.28 | 8.79 | 3.00 | 4.64 | 6.28 | 7.14 | 8.00 |

2. OSHA Fatalities[5]

Performance Objective: To incentivize employee safety.

Description: OSHA requires all work-related fatalities be reported to OSHA within eight (8) hours. The industry standard target is 0 fatalities, which has determined the Baseline and Target Performance Levels.

Points Assigned: 5

Baseline Performance Level: 0 fatalities.

Target Performance Level: 0 fatalities.

Minimum Performance Level: 0 fatalities.

Calculation: This metric measures the number of OSHA-reportable fatalities (i.e. employee fatalities that occur on the job within OSHA jurisdictions).

---

[5] As defined by OSHA.

CONFIDENTIAL

Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 0 | 0 | N/A | N/A | 0 | N/A | N/A |
| Year 1 | 0 | 0 | N/A | N/A | 0 | N/A | N/A |
| Year 2 | 0 | 0 | N/A | N/A | 0 | N/A | N/A |
| Year 3 | 0 | 0 | N/A | N/A | 0 | N/A | N/A |
| Year 4 | 0 | 0 | N/A | N/A | 0 | N/A | N/A |
| Year 5 | 0 | 0 | N/A | N/A | 0 | N/A | N/A |

3. OSHA Severity Rate[6]

   Performance Objective: To incentivize employee safety

   Description: Utilized as a metric to measure the severity of workplace injuries, the OSHA Severity Rate is commonly used to measure safety performance across the utility industry. The Severity Rate takes into account the total number of restricted and lost time days incurred as a result of a work-related injury. The Baseline and Target Performance Levels will be set during the Front-End Transition Period.

   Points Assigned: 5

   Baseline Performance Level: TBD

   Target Performance Level: TBD

   Minimum Performance Level: TBD

   Calculation: This metric is calculated by dividing the product of the total number of severity days (both restricted and lost time days) and 200,000 (OSHA scaling factor) by the total number of work hours.

   Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

---

[6] As defined by OSHA.

Case: 25-3717  Document: 00136781952  Filed: 09/18/25  Page: 240 of 337

Case: 25-3717 04780-LTS  Doc #: 58145-2  Filed: 09/18/25  Entered: 09/18/25 08:30:15  Desc: 6770995
Exhibit B-OMA  Page 240 of 337

CONFIDENTIAL

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

4. OSHA Days Away Rate (Severity) ("DART")[7]

Performance Objective: To incentivize employee safety.

Description: Utilized as a metric to measure the severity of workplace injuries, the OSHA DART Rate is commonly used to measure safety performance across the utility industry. The DART Rate takes into account the total number of injury cases that resulted in either lost time, restricted time, or a transfer from the employee's regular job. The Baseline Performance Level will be set during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: TBD

Target Performance Level: DART of 4.0.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated by dividing the product of the total number of DART Cases (OSHA injury cases with either lost time days, restricted days, or results in a job transfer) and 200,000 (OSHA scaling factor) and the total number of work hours.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | 4.0 | TBD | TBD | TBD | 4.0 | TBD | TBD |

---

[7] As defined by OSHA.

CONFIDENTIAL

5. System Average Interruption Frequency Index ("SAIFI")[8]

Performance Objective: To incentivize system reliability.

Description: This metric indicates how often the average customer experiences a sustained interruption over a predefined period of time. The baseline target level has been set using PREPA historical data subject to confirmation during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: 4.6 outages per year.

Target Performance Level: 1.89 outages per year.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated by dividing the total number of customers interrupted by the total number of customers served. Each sustained interruption experienced by a specific customer counts towards the total in the numerator. A sustained interruption is defined as "Any interruption not classified as a part of a momentary event. That is, any interruption that lasts more than five minutes."

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 4.60 | 4.60 | N/A | N/A | 4.60 | N/A | N/A |
| Year 1 | 4.19 | 4.33 | 2.00 | 3.09 | 4.19 | 4.24 | 4.30 |
| Year 2 | 3.77 | 4.06 | 1.75 | 2.76 | 3.77 | 3.89 | 4.00 |
| Year 3 | 2.94 | 3.79 | 1.50 | 2.22 | 2.94 | 3.32 | 3.70 |
| Year 4 | 2.42 | 3.52 | 1.25 | 1.84 | 2.42 | 2.84 | 3.25 |
| Year 5 | 1.89 | 3.25 | 1.00 | 1.45 | 1.89 | 2.45 | 3.00 |

6. Customer Average Interruption Duration Index ("CAIDI")[9]

Performance Objective: To incentivize system reliability.

[8] As defined in *IEEE Guide for Electric Power Distribution Reliability Indices, IEEE P1366-2012.*

[9] As defined in *IEEE Guide for Electric Power Distribution Reliability Indices, IEEE P1366-2012.*

CONFIDENTIAL

Description: This metric measures the average restoration time a customer may experience. The Baseline Performance Level has been set using PREPA historical data subject to confirmation during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: 147 minutes.

Target Performance Level: 147 minutes.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated by summing the product of the length of each interruption and the number of customers impacted by that interruption for all sustained interruptions during the measurement period then dividing by the total number of customers interrupted. Note that each interruption experienced by a specific customer counts towards the total in the denominator.

This is a sustained interruption index. A sustained interruption is defined as "Any interruption not classified as a part of a momentary event. That is, any interruption that lasts more than five minutes." It also represents SAIDI divided by SAIFI.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 147 | 147 | N/A | N/A | 147 | N/A | N/A |
| Year 1 | 147 | 147 | 120 | 134 | 147 | N/A | N/A |
| Year 2 | 147 | 147 | 115 | 131 | 147 | N/A | N/A |
| Year 3 | 147 | 147 | 110 | 129 | 147 | N/A | N/A |
| Year 4 | 147 | 147 | 105 | 126 | 147 | N/A | N/A |
| Year 5 | 147 | 147 | 100 | 124 | 147 | N/A | N/A |

7. System Average Interruption Duration Index ("SAIDI")[10]

Performance Objective: To incentivize system reliability

Description: This metric indicates the total duration of interruption for the average customer. The Baseline Performance Level has been set using PREPA historical data.

Points Assigned: 5

---

[10] As defined in *IEEE Guide for Electric Power Distribution Reliability Indices, IEEE P1366-2012.*

CONFIDENTIAL

Baseline Performance Level: 675 minutes.

Target Performance Level: 277 minutes.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated by summing of the of each interruption and the number of customers impacted by that interruption divided by the total number of customers served. Each interruption experienced by a specific customer counts towards the total in the denominator. This is a sustained interruption index. A sustained interruption is defined as any interruption not classified as a part of a momentary event. That is any interruption that lasts more than five minutes.

Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 675 | 675 | N/A | N/A | 675 | N/A | N/A |
| Year 1 | 615 | 635 | 550 | 582 | 615 | 622 | 630 |
| Year 2 | 554 | 595 | 450 | 502 | 554 | 570 | 585 |
| Year 3 | 432 | 556 | 375 | 404 | 432 | 466 | 500 |
| Year 4 | 355 | 516 | 250 | 303 | 355 | 403 | 450 |
| Year 5 | 277 | 476 | 150 | 214 | 277 | 339 | 400 |

8. Customers Experiencing Multiple Interruptions ("CEMI")[11]

Performance Objective: To incentivize system reliability.

Description: This metric indicated the ratio of individual customers experiencing one or more sustained interruptions to the total number of customers served. The Baseline Performance Level will be set during Year 3. It is anticipated that the number of interruptions to be tracked are three (3), five (5) and eight (8) interruptions (i.e., CEMI-3, CEMI-5 and CEMI-8).

Points Assigned: 6

Baseline Performance Level: TBD.

Target Performance Level: TBD

---

[11] As defined in *IEEE Guide for Electric Power Distribution Reliability Indices, IEEE P1366-2012.*

CONFIDENTIAL

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated by dividing the total number of customers that have experienced some number of outages more sustained interruptions by the total number of customers served. This is sustained interruption index. A sustained interruption is defined as any interruption not classified as a part of a momentary event. That is, any interruption that lasts more than five minutes.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

9. Momentary Average Interruption Frequency Index ("MAIFI")[12]

Performance Objective: To incentivize system reliability.

Description: This metric indicates the average frequency of momentary interruptions experienced by the average customer. It is calculated from customer level data but it is not a customer specific index – it is a system level index. MAIFI is typically caused by natural causes such as animal contacts, lightning strikes, or vegetation temporarily contacting a power line. The Minimum Performance Level and Target Performance Level will be set in Year 3.

Points Assigned: 5

Baseline Performance Level: 6 events per year.

Target Performance Level: 2 events per year.

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated by dividing the total number of customer interruptions, which last less than a set amount of time, by the total number of customers served. This is

---

[12] As defined in *IEEE Guide for Electric Power Distribution Reliability Indices, IEEE P1366-2012.*

CONFIDENTIAL

momentary interruption index. A momentary interruption is an interruption of duration limited to the period required to restore service by an interrupting device. Such switching operations must be completed within a specified time of five minutes or less. This definition includes all reclosing operations that occur within five minutes of the first interruption. If a recloser or circuit breaker operates two, three, or four times and then holds (within five minutes of the first operation), those momentary interruptions shall be considered one momentary interruption event.

Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 6.00 | 6.00 | N/A | N/A | 6.00 | N/A | N/A |
| Year 1 | 5.50 | 5.60 | 4.50 | 5.00 | 5.50 | 5.53 | 5.55 |
| Year 2 | 5.00 | 5.20 | 4.00 | 4.50 | 5.00 | 5.08 | 5.15 |
| Year 3 | 4.00 | 4.80 | 3.00 | 3.50 | 4.00 | 4.25 | 4.50 |
| Year 4 | 3.00 | 4.40 | 2.00 | 2.50 | 3.00 | 3.50 | 4.00 |
| Year 5 | 2.00 | 4.00 | 1.00 | 1.50 | 2.00 | 2.75 | 3.50 |

    C.      Financial Performance

1.  Operating Budget

Performance Objective: To incentivize accurate cost management.

Description: This metric measures the utility's ability to stay within its Operating Budget initially approved at the start of the Contract Year. The Baseline and Target Performance Levels have been set at 100% of the approved Operating Budget.

Points Assigned: 7.5

Baseline Performance Level: 100% of Operating Budget.

Target Performance Level: 100% of Operating Budget.

Minimum Performance Level: 100% of Operating Budget.[13]

Calculation: This metric will be evaluated as actual operating spend divided by Operating Budget.

Metric Schedule:

---

[13] **The Operator can earn 100% of Base Points by spending up to 102% of the Operating Budget pending Administrator approval.**

**CONFIDENTIAL**

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 1 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 2 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 3 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 4 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 5 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |

2. Capital Budget – Federally Funded

Performance Objective: To incentivize accurate cost management.

Description: This metric measures the utility's ability to stay within its Capital Budget – Federally Funded initially approved at the start of the Contract Year. The Baseline and Target Performance Levels have been set at 100% of the approved Capital Budget – Federally Funded.

Points Assigned: 7.5

Baseline Performance Level: 100% of Capital Budget – Federally Funded.

Target Performance Level: 100% of Capital Budget – Federally Funded.

Minimum Performance Level: 100% of Capital Budget – Federally Funded.[14]

Calculation: This metric will be evaluated as actual operating spend divided by Capital Budget – Federally Funded.

Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 1 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 2 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 3 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 4 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 5 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |

---

[14] The Operator can earn 100% of Base Points by spending up to 102% of the Capital Budget – Federally Funded pending Administrator approval.

CONFIDENTIAL

3. Capital Budget – Non-Federally Funded

Performance Objective: To incentivize accurate cost management.

Description: This metric measures the utility's ability to stay within its Capital Budget – Non-Federally Funded initially approved at the start of the Contract Year. The Baseline and Target Performance Levels have been set at 100% of the Capital Budget – Non-Federally Funded.

Points Assigned: 7.5

Baseline Performance Level: 100% of Capital Budget – Non-Federally Funded.

Target Performance Level: 100% of Capital Budget – Non-Federally Funded.

Minimum Performance Level: 102% of Capital Budget – Non-Federally Funded.[15]

Calculation: This metric will be evaluated as actual operating spend divided by Capital Budget – Non-Federally Funded.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 1 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 2 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 3 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 4 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |
| Year 5 | 100% | 100% | N/A | N/A | 100% | N/A | N/A |

4. Days Sales Outstanding[16]

Performance Objective: To incentivize accurate cash management.

Description: This metric is a measure of the average number of days that it takes a company to collect payment after a sale has been made. It is a measure of cash management. The Baseline Performance Level has been set using PREPA historical data subject to confirmation during the Front-End Transition Period. The Target Performance Level has been set at an appropriate level for adequate cash management.

---

[15] The Operator can earn 100% of Base Points by spending up to 102% of the Capital Budget – Non-Federally Funded pending Administrator approval.

[16] This metric will reflect the impact of government collections, including critical service installations as defined in Law 57-2014, as amended by Law 17-2019, and CILT organizations.

CONFIDENTIAL

Points Assigned: 5.5

Baseline Performance Level: 150 days

Target Performance Level: 50 days

Minimum Performance Level: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

Calculation: This metric is calculated as average annual Accounts Receivable divided by average annual Total Credit Sales, multiplied by 365.

Metric Schedule:

|  | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | 150.00 | 150.00 | N/A | N/A | 150.00 | N/A | N/A |
| Year 1 | 137.50 | 140.00 | 125.00 | 131.25 | 137.50 | 138.25 | 139.00 |
| Year 2 | 125.00 | 130.00 | 100.00 | 112.50 | 125.00 | 125.38 | 125.75 |
| Year 3 | 100.00 | 120.00 | 75.00 | 87.50 | 100.00 | 107.50 | 115.00 |
| Year 4 | 75.00 | 110.00 | 65.00 | 70.00 | 75.00 | 87.50 | 100.00 |
| Year 5 | 50.00 | 100.00 | 50.00 | 50.00 | 50.00 | 62.50 | 75.00 |

5. Reduction in Network Line Losses

Performance Objective: To incentivize efficient line usage.

Description: This metric measures the utility's ability to reduce line losses, which occur due to resistance along the electrical lines. The baseline and target performance metrics will be set during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: TBD.

Target Performance Level: TBD.

Minimum Performance Level: TBD.

Calculation: Set as a straight-line calculation using the Baseline Performance Level in Year 0 and assuming the Target Performance Level is met in Year 10 instead of Year 5.

CONFIDENTIAL

Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

6.  Overtime

Performance Objective: To incentivize efficient payroll expense.

Description: This metric measures the utility's ability to manage salary expense. The Baseline and Target Performance Levels will be set during the Front-End Transition Period.

Points Assigned: 5

Baseline Performance Level: TBD.

Target Performance Level: TBD.

Minimum Performance Level: TBD.

Calculation: The sum of all hours worked beyond scheduled hours in a given period.

Metric Schedule:

| | Target Threshold | Minimum Performance Level | 150% | 125% | 100% | 50% | 25% |
|---|---|---|---|---|---|---|---|
| Baseline | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 1 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 2 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 3 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 4 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |
| Year 5 | TBD | TBD | TBD | TBD | TBD | TBD | TBD |

VI.  <u>Operator Event of Default</u>.

Section 14.1(k) (*Events of Default by Operator – Failure to Meet Minimum Performance Threshold*) of the Agreement provides for an Operator Event of Default if, during three (3) or more consecutive Contract Years, Operator fails to meet the Minimum Performance Level for any three

CONFIDENTIAL

(3) of the following Performance Metrics and no such failure has been excused by a Force Majeure Event, Outage Event or Owner Fault: (i) Average Speed of Answer; (ii) First Call Resolution; (iii) OSHA Fatalities; (iv) OSHA Severe Injuries; (v) System Average Interruption Frequency Index (SAIFI); (vi) System Average Interruption Duration Index (SAIDI); (vii) Customer Average Interruption Duration Index (CAIDI); (viii) Operating Budget; (ix) Capital Budget – Federally Funded; and (x) Capital Budget – Non-Federally Funded (each a "Key Performance Metric" and together the "Key Performance Metrics").

Section 7.1(c)(vii) (*Service Fee – Incentive Fee*) provides that if any Force Majeure Event (other than a Force Majeure Event that is a Major Outage Event) prevents Operator from achieving one or more of the Performance Metrics, Operator shall be entitled to earn the Incentive Fee for the period that such Force Majeure Event continues as long as, and to the extent that, Operator achieves the Key Performance Metrics during such period of time.

VII.   Operating Budget Overrun Default.

Section 14.5(e) (*Additional Termination Rights – Operating Budget Overrun*) of the Agreement provides Owner with an additional termination right in the event of an Operating Budget Overrun Default.

VIII.   Major Outage Event Performance Metrics

"Major Outage Event" means an event as a result of which (i) at least two hundred and five thousand (205,000) T&D Customers are interrupted or (ii) at least one thousand five hundred (1,500) outage jobs for the T&D System are logged, in each case within a twenty-four (24) hour period and due to an act of God or, in case of a storm, a storm that is designated as such by the U.S. National Weather Service, and shall end when a state in which fewer than ten thousand (10,000) T&D Customers remain interrupted for a continuous period of eight (8) hours following a Major Outage Event is achieved.

Section 7.1(c)(vi) (*Service Fee – Incentive Fee*) of the Agreement provides that if any Major Outage Event (including, for the avoidance of doubt, a Major Outage Event that is a Force Majeure Event) prevents Operator from achieving one or more of the Performance Metrics, Operator shall be entitled to earn the Incentive Fee for the period that such Major Outage Event continues as long as, and to the extent that, Operator achieves certain performance metrics to be agreed upon during the Front-End Transition Period and set forth below (the "Major Outage Event Performance Metrics") during such period of time.

The Major Outage Event Performance Metrics that form the basis for the Incentive Compensation Pool in such circumstances are summarized in Table 3.

### Table 3. Summary of Major Outage Event Performance Metrics

*Note: The Major Outage Event Performance Metrics will be subject to confirmation during the Front-End Transition Period and review and approval by PREB.*

CONFIDENTIAL

| Major Outage Event Performance Metric | Description | Base Points | Effective Weight |
|---|---|---|---|
| 1. Event Application | Completion of steps to provide timely and accurate emergency event preparation following an alert from U.S. National Weather Service or the company's private weather service, in accordance with the Emergency Response Plan, for an event expected to impact the company's service territory. | TBD | TBD |
| 2. Down Wires | Response to downed wires reported by municipal public officials. | TBD | TBD |
| 3. Preliminary Damage Assessment | Completion of preliminary damage assessment. | TBD | TBD |
| 4. Crewing | 80% of the forecast crewing committed to the utility. | TBD | TBD |
| 5. Estimated Time of Restoration (made available by utility on web, IVR, to CSR's, etc.) | Publication of regional ETRs in accordance with guidelines.<br><br>Publication of municipal ETRs in accordance with guidelines. | TBD | TBD |
| 6. ETR Accuracy | Regional ETR accuracy as published in accordance with ETR requirement time.<br><br>Municipal ETR accuracy as published in accordance with ETR requirement time. | TBD | TBD |
| 7. Municipality Coordination | Coordination with municipalities regarding road clearing, down wires, critical customers, etc. | TBD | TBD |
| 8. Municipal EOC Coordination | Coordination with municipal EOCs. | TBD | TBD |
| 9. Utility Coordination | Coordination with other utilities (communications, water, etc.). | TBD | TBD |
| 10. Safety | Measure of any employee or contractor injured doing hazard work during storm/outage and restoration. | TBD | TBD |
| 11. Mutual Assistance | Crew requests made through all sources of mutual assistance. | TBD | TBD |

CONFIDENTIAL

| Major Outage Event Performance Metric | Description | Base Points | Effective Weight |
|---|---|---|---|
| 12. Call Answer Rates | Customer calls answered by properly staffing call centers (use of IVR and other technology is an acceptable answer). | TBD | TBD |
| 13. Municipal Calls | Municipal call must be properly managed and provide, at minimum, baseline information (outages, ETRs, contact information, etc.), road clearing activities, and allow for Q&A. | TBD | TBD |
| 14. Web Availability | Company's web site, specifically the section pertaining to outage impact and restoration, must be available around the clock during a major storm event and information must be updated hourly until final restoration. In the event no new information is available, the web site must display the last time and date that information was updated. The web site and/or section pertaining to outage impact and restoration may be taken offline for a short period during off peak hours to perform system maintenance. | TBD | TBD |
| 15. PREB and Administrator Reporting | Provide storm event information to PREB and Administrator in accordance with Electric Outage Reporting System (EORS) guideline requirements. | TBD | TBD |
| 16. Customer Communications | Press releases, text messaging, email and social media. | TBD | TBD |
| 17. Outgoing message on telephone line | Recorded message providing callers with outage information is updated within two hours of communication of press releases. | TBD | TBD |
| 18. PREB and Administrator Complaints | Number of storm/outage related PREB and Administrator complaints received. | TBD | TBD |

IX.   Monitoring.

The set of Performance Metrics and the Target Performance Levels for the sixth Contract Year will be evaluated during the fifth Contract Year collectively by the Operator and Administrator to determine reasonability for subsequent years. Beginning in the sixth Contract Year Performance Metrics and the Target Performance Levels will be reevaluated on an annual basis. At this time, it will be determined whether additional metrics should be included, Base Points

CONFIDENTIAL

reallocated, and Target Performance Levels modified. The Operator and PREB may also consider whether adjustments to the Performance Metrics are appropriate prior to the fifth Contract Year based on business, operational or other considerations. Any adjustments will be dealt with in accordance with Section 7.1(c)(vi) (*Service Fee – Amendments to Performance Metrics*).

CONFIDENTIAL

## Annex X

## Calculation of Incentive Fee

I.      <u>General</u>.

For each Contract Year, the Operator shall be eligible to receive an Incentive Compensation Pool based on the Operator's performance during the Contract Year as measured against the performance goals set forth by the Performance Metrics.

II.     <u>Performance Categories</u>.

The Incentive Compensation Pool will be allocated across the three Performance Categories in such a way as to align the Operator's incentive compensation with the performance goals.

### Table 1. Summary of Performance Categories

| Performance Category | Performance Goal | Allocation of Incentive Compensation Pool |
|---|---|---|
| 1.   Customer Satisfaction | Achieve a high-level of customer satisfaction across all customer classes. | 25% |
| 2.   Technical, Safety and Regulatory | Operate a safe, reliable electric grid while remaining complaint with applicable safety, environmental and other regulations. | 50% |
| 3.   Financial Performance | Meet the approved Operating Budget, Capital Budget – Federally Funded and Capital Budget – Non-Federally Funded. | 25% |

III.    <u>Calculation Methodology</u>.

A.      Each Performance Metric is assigned a Base Point level with the sum of Base Points of all Performance Metrics within a Performance Category representing the maximum number of Base Points the Operator can earn within a single Performance Category. As described in Annex IX (*Performance Metrics*), except for the Binary Metrics, assuming the Operator reaches the Minimum Performance Level it has the potential to earn either 25%, 50%, 100%, 125% or 150% of the Base Points for each Performance Metric. If the sum of the points awarded in a Performance Category meets or exceeds the sum of the Base Points, the Operator will receive 100% of the Incentive Pool Allocation for that Performance Category. In the event the Operator is awarded points less than the sum of the possible Base Points, the Operator would receive a Pro Rata portion of the Incentive Pool Allocation equal to the ratio of actual points received by the Operator to the total Base Points in the Performance Category.

CONFIDENTIAL

IV.    <u>Incentive Fee Calculation Example</u>.

A.     The table below includes an illustrative example of how the incentive compensation mechanism works. The metrics, base points and weightings are consistent with Annex IX (*Performance Metrics*), but the dollar values included in the table are for example only and are <u>not</u> meant to represent actual magnitude of payments or Operator scoring in any Contract Year.

**CONFIDENTIAL**

## Table 2. Incentive Fee Calculation Example

*Note: The example below assumes an illustrative total Incentive Compensation Pool of US$10M.*

| $ in millions | | | Scenario 1: Top Performance | | Scenario 2: Selective Performance | | Scenario 3: Poor Performance | |
|---|---|---|---|---|---|---|---|---|
| **Performance Metrics** | **Base Points** | **% Achieved** | **Points Awarded** | **% Achieved** | **Points Awarded** | **% Achieved** | **Points Awarded** | |
| **Customer Satisfaction** | | | | | | | | |
| JD Power Customer Satisfaction Survey (Residential) | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 | |
| JD Power Customer Satisfaction Survey (Business) | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 | |
| Average Speed of Answer (minutes) | 5.0 | 150% | 7.5 | 0% | 0.0 | 50% | 2.5 | |
| Customer Complaint Rate | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 | |
| First Call Resolution | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 | |
| Abandonment Rate | 5.0 | 150% | 7.5 | 0% | 0.0 | 50% | 2.5 | |
| **Customer Satisfaction Points Available** | **30.0** | **150%** | **45.0** | **100%** | **30.0** | **50%** | **15.0** | |
| | | | | | | | | |
| **Technical, Safety & Regulatory** | | | | | | | | |
| OSHA Recordable Incidence Rate | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 | |
| OSHA Fatalities | 5.0 | 100% | 5.0 | 100% | 5.0 | 0% | 0.0 | |
| OSHA Severe Injuries | 5.0 | 100% | 5.0 | 100% | 5.0 | 0% | 0.0 | |
| OSHA Days Away Rate (Severity) | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 | |
| System Average Interruption Frequency | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 | |
| Customer Average Interruption Duration | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 | |
| System Average Interruption Duration | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 | |
| Customers Experiencing Multiple Interruptions (CEMI) | 5.0 | 150% | 7.5 | 50% | 2.5 | 50% | 2.5 | |
| Momentary Average Interruption | 5.0 | 150% | 7.5 | 0% | 0.0 | 50% | 2.5 | |
| **Technical, Safety & Regulatory Subtotal** | **45.0** | **139%** | **62.5** | **111%** | **50.0** | **39%** | **17.5** | |
| | | | | | | | | |
| **Financial Performance** | | | | | | | | |
| Operating Budget | 7.5 | 100% | 7.5 | 0% | 0.0 | 0% | 0.0 | |
| Capital Budget - Federally Funded | 7.5 | 100% | 7.5 | 100% | 7.5 | 0% | 0.0 | |
| Capital Budget - Non-Federally Funded | 7.5 | 100% | 7.5 | 100% | 7.5 | 100% | 7.5 | |
| Days Sales Outstanding | 5.5 | 150% | 8.3 | 150% | 8.3 | 50% | 2.8 | |
| Reduction in Network Losses | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 | |
| Overtime | 5.0 | 150% | 7.5 | 150% | 7.5 | 50% | 2.5 | |
| **Financial Performance Subtotal** | **38.0** | **120%** | **45.8** | **101%** | **38.3** | **40%** | **15.3** | |
| **Total** | **113.0** | | **153.3** | | **118.3** | | **47.8** | |

| Performance Category ( $ in millions ) | Available Incentive Compensation | Base Points | Scenario 1: Top Performance | | Scenario 2: Selective Performance | | Scenario 3: Poor Performance | |
|---|---|---|---|---|---|---|---|---|
| | | | Points Awarded | Incentive Compensation Awarded | Points Awarded | Incentive Compensation Awarded | Points Awarded | Incentive Compensation Awarded |
| Customer Satisfaction | $2.50 | 30.0 | 45.0 | $2.50 | 30.0 | $2.50 | 15.0 | $1.25 |
| Technical, Safety and Regulatory | 5.00 | 45.0 | 62.5 | 5.00 | 50.0 | 5.00 | 17.5 | 1.94 |
| Financial Performance | 2.50 | 38.0 | 45.8 | 2.50 | 38.3 | 2.50 | 15.3 | 1.00 |

| **Illustrative Total Incentive Compensation - Sample Year** | | | | **$10.00** | | **$10.00** | | **$4.20** |
|---|---|---|---|---|---|---|---|---|

CONFIDENTIAL

## Annex XI

### T&D Pass-Through Expenditures

T&D Pass-Through Expenditures shall be the types of costs and expenses incurred by ServCo in the course of providing O&M Services (without markup for profit and shall include all such costs except to the extent any such costs are determined to be Disallowed Costs in the manner set forth in Section 7.6 (*Disallowed Costs*) of the main body of the Agreement. Capitalized terms used but not defined in this Annex XI (*T&D Pass-Through Expenditures*) have the respective meanings set forth in the Agreement. Except as otherwise provided in the Agreement, T&D Pass-Through Expenditures shall include but are not limited to, the following items:

1.      wages, salaries, bonuses, employer contributions to pension and employee medical plans (including employer contributions for Hired Former Employees of Owner that elect to continue participating in Owner's defined benefit retirement plan), employer contributions to workmen's compensation, non-occupational disability and other mandatory employment related insurance and taxes, vacation, sick leaves and other mandatory leaves with pay, overtime and meal period compensation and associated benefits and other post-employment benefits incurred by ServCo in performing the O&M Services, including Capital Improvements, but excluding all costs resulting from noncompliance by ServCo with wage and hour, discrimination, wrongful dismissal or with any other applicable labor or employment related legislation, as well as the costs of defending such claims if such claims are found to be true by a final non-appealable judgment or administrative determination by a court of competent jurisdiction or other Governmental Body (including costs arising out of or related to additional compensation, damages, penalties, court costs and attorney's fees but excluding, for the avoidance of doubt, any costs incurred by Operator, including defense related costs, which are incurred at the direction or with the consent of Administrator);

2.      costs incurred by ServCo in performing the O&M Services, including costs of all subcontracted and seconded employees, all goods and services (including all materials, supplies, spare parts, vehicles and mileage, equipment rental, other transportation, freight, purchased services, training, Subcontractor costs, employee per diems, administrative costs such as dues, subscriptions, meals and entertainment, office supplies, postage, rent and travel communications, utilities and other costs), repair and maintenance costs, and the costs (including fees) incurred or payable with respect to banking services and accounts, cash management, leases, equipment rentals, easements, licenses, permits, consents and similar instruments;

3.      costs related to Capital Improvements to the system, including project management costs incurred by ServCo Employees and the cost of debt for long-lived assets and all other costs associated with funding these improvements, except for Capital Improvements owned by Operator as contemplated by Section 5.5(d) (*Capital Improvements – Option to Propose Operator-Owned Capital Improvements*) of the main body of the Agreement;

4.      costs incurred with respect to professional services, including legal, engineering, accounting, financial, auditing, information technology, telecommunication and other contracted services;

CONFIDENTIAL

5.      costs incurred with respect to the security of physical assets, information technology, operational technology and processes;

6.      claims, lawsuits, litigations, losses, fines, penalties, costs and expenses, judgments, liens, settlements, appeals, disbursements and similar expense (including reasonable and documented fees of external counsel; provided that ServCo shall not be required to provide documentation that would waive any privilege between ServCo and its external counsel), incurred in connection with the performance of the O&M Services;

7.      costs related to Outage Events;

8.      costs associated with the System Remediation Plan, the Emergency Operations Plan, and the other plans required under the Agreement;

9.      any Tax related to Owner-owned, leased or licensed assets or revenues, and costs incurred in connection with any tax audits of Owner;

10.     any Commonwealth sales or use taxes (including the additional taxes of Sections 4210.01 and 4210.02 of the Puerto Rico Internal Revenue Code of 2011, as amended (PRIRC)), municipal sales or use taxes, Commonwealth excise taxes, municipal license taxes, municipal excise taxes and any other taxes imposed by the Commonwealth, a municipality or any other Governmental Body on Owner or ServCo, if ServCo is acting on behalf of Owner pursuant to the Agreement, to the extent that Owner ever becomes subject to the payment of such taxes; provided that any (i) income taxes imposed on Operator by the PRIRC or Act 29, or (ii) other taxes imposed on Operator as a result of the establishment of its operations in the Commonwealth or the continuation thereof (including sales and use taxes and excise taxes on goods or services that are not required to be acquired by Operator on behalf of Owner for the performance of the O&M Services under the Agreement) shall not be T&D Pass-Through Expenditures;

11.     any municipal construction excise taxes related to construction work performed by ServCo in connection with the O&M Services;

12.     refunds to T&D Customers;

13.     costs to obtain and maintain in effect Required Insurance, including premium, claims and deductible payments;

14.     costs incurred in connection with Intellectual Property, including licensing of Intellectual Property for use in connection with this agreement, registration or maintenance fees, costs and expenses incurred in the enforcement or defense of Owner Intellectual Property but excluding any costs associated with developing, registering, enforcing, defending or maintaining Operator Intellectual Property (including Operator Marks), Subcontractor Intellectual Property or Third-Party Intellectual Property;

15.     costs incurred in connection with data security, including the implementation, operation and maintenance of a cybersecurity program;

16.     costs incurred in connection with ServCo's performance serving in the role of the T&D System operator, including the services set forth in Section I.C of Annex I (*Scope of Services*) to the Agreement;

17.     costs incurred in connection with ServCo's performance of the Back-End Transition Services;

18.     the costs of compliance with PREB or other regulatory requirements to which Owner or Operator is subject, including programmatic energy efficiency initiatives and demand response requirements mandated and approved by PREB;

19.     initial and ongoing costs necessary to achieve cost reductions, performance improvements, or operating initiatives for the benefit of T&D Customers, including the services set forth in Section VIII.C of Annex I (*Scope of Services*) to the Agreement;

20.     costs incurred in connection with branding and customer and public communications;

21.     costs incurred in connection with Owner's community service programs and community engagement; and

22.     costs incurred in connection with the administration and performance of the System Contracts including as required by Section 5.2 (*System Contracts*) in the main body of the Agreement.

For the avoidance of doubt, in no event shall Operator be responsible for any cost or expense related to the Title III Case.

CONFIDENTIAL

## Annex XII

### Insurance Specifications

I.      Operator shall purchase and maintain, on Owner's behalf, the following insurance coverage for the benefit of Owner from the Service Commencement Date and for the remainder of the Term thereafter, without limitation:

   A.      property damage, business interruption coverage and extra expense coverage for the T&D System covering direct damage from all perils (excluding overhead transmission and distribution lines), which shall, among other things, (i) comply with any requirements resulting from the T&D System's receipt of Federal Funding and (ii) provide at least US$550 million in coverage or the minimum amount of property and casualty insurance coverage required in connection with the T&D System's receipt of Federal Funding, whichever is greater; provided that coverage shall have no more than a US$2 million per occurrence deductible;

   B.      primary general liability insurance with limits of not less than US$10 million per occurrence and US$10 million aggregate, and a deductible/self-insured retention no greater than US$1 million;

   C.      excess general liability insurance with limits of not less than US$65 million in excess liability insurance;

   D.      cyber insurance with limits of not less than US$20 million, and a deductible or self-insured retention of no more than US$1 million, for first and third-party losses, liabilities, judgments, settlements, lawsuits, regulatory actions, remediation and other costs or damages arising out of or resulting from any Cybersecurity Breach relating to the operation of the T&D system or non-compliance with Applicable Law relating to privacy or data protection, including coverage for breach response costs, PCI-DDS assessments, ransomware and denial of service, property damage and business interruption, and extra expense, as well as third-party claims and investigations arising out cyber incidents, including any negligent or otherwise wrongful acts or omissions by Operator or any employee or agent thereof;

   E.      pollution legal liability insurance covering third-party bodily injury, property damage and other losses caused by pollution during the Term with limits of not less than US$5 million per occurrence and US$25 million in aggregate; provided that coverage shall include environmental cleanup, remediation, transportation and disposal;

   F.      boiler and machinery insurance with at least US$200 million in limits per accident, with repair and/or replacement included; at least US$10 million in debris removal limits; and at least US$5 million in additional extra expense limits; provided that coverage shall (i) be comprehensive and (ii) cover boilers, pressure vessels, electrical machines including air conditioning, refrigeration equipment, electrical apparatus and electronic data processing equipment including production machines;

CONFIDENTIAL

G.      commercial auto insurance, providing at least US$15,000 in coverage per accident for liability, medical payments, and physical damage;

H.      (i) aviation liability and physical damage insurance, including liability coverage of at least US$100 million per occurrence and US$250,000 per passenger/crewmember, (ii) replacement cost coverage for physical damage to each scheduled aircraft, (iii) at least US$2.2 million in coverage for physical damage to spare engines and/or spare parts not attached to or forming a part of any aircraft and being property of others for which the named insured is legally liable and (iv) rental expense coverage of at least US$50,000 per accident;

I.      crime insurance providing limits of at least US$10 million in coverage per incident and in the aggregate, and covering employee dishonesty, forgery or alteration, dissolution of assets, computer fraud fund transfer, theft of client property, and credit card coverage;

J.      builder's risk/installation floater insurance covering losses arising out of Operator's and or Operator's subcontractors' construction, maintenance or repairs to T&D and fiber optic infrastructure, including improvements and betterments pursuant to the Agreement; provided that limits for such coverage for each project shall be in amounts consistent with market practice and the magnitude of each construction project;

K.      protective liability insurance for Owner's contractors with a limit of not less than US$2 million per occurrence, including coverage for bodily injury and/or property damage claims arising out of negligent acts or omissions of independent contractors or subcontractors of Operator;

L.      management liability/EPL/fiduciary liability coverage, including at least US$65 million in wrongful acts coverage for Owner and directors and officers of Owner, and US$5 million in fiduciary liability and employment practices liability coverage; and

M.      business travel accident insurance, providing at least US$150,000 in coverage per accident and at least US$3 million in aggregate limits.

Operator shall be listed as an additional insured on all aforementioned coverages, and Operator shall provide evidence of coverage through additional insured endorsements on or before the Service Commencement Date. Moreover, all the aforementioned coverages shall apply on a primary and non-contributory basis.

II.      In addition to and separate from the foregoing, Operator shall maintain, on its own behalf, the following insurance coverage from the Service Commencement Date and for the remainder of the Term thereafter, without limitation:

A.      Commonwealth of Puerto Rico's Workmen's Compensation Insurance (as required by the Workmen's Compensation Act 45-1935 of the Commonwealth of Puerto Rico), employer's liability insurance and all other employee required insurance; and

B.      fiduciary liability insurance, providing limits not less than US$5 million per claim and in the aggregate; and

CONFIDENTIAL

C.      professional liability insurance, with limits of not less than US$5 million per occurrence and US$5 million in the aggregate, covering work performed by any architects, engineers, project managers, construction managers or other professional consultants pursuant to the Agreement. In addition, any architects, engineers or other consultants engaged by Operator with respect to any construction project undertaken by Operator pursuant to the Agreement shall maintain separate coverage with limits of not less than the completion cost of the construction project undertaken. When any policies purchased pursuant to this paragraph are renewed or replaced, the retroactive date in any new or replacement policy shall coincide with or precede the start of work in connection with the Agreement and any claims-made policy that is not renewed shall have an extended reporting period of at least six years.

CONFIDENTIAL

## Annex XIII

### Operator Termination Fee Multiplier

| Contract Year | Multiplier |
|:---:|:---:|
| 1 | 1.00x |
| 2 | 1.00x |
| 3 | 1.00x |
| 4 | 1.00x |
| 5 | 1.00x |
| 6 | 1.00x |
| 7 | 0.95x |
| 8 | 0.90x |
| 9 | 0.85x |
| 10 | 0.80x |
| 11 | 0.75x |
| 12 | 0.70x |
| 13 | 0.65x |
| 14 | 0.60x |
| 15 | 0.55x |
| 16 | 0.50x |

XIII-1

**CONFIDENTIAL**

## Annex XIV

## Operator Marks

LUMA

LUMA ENERGY



**CONFIDENTIAL**

## Annex XV

## Owner Marks


Name (Spanish):    Autoridad de Energía Eléctrica de Puerto Rico

    Autoridad de Energía Eléctrica

    AEE

Name (English):    Puerto Rico Electric Power Authority

    PREPA

Logo:

Letterhead:



Webpage:    https://aeepr.com

Email:    FirstName.LastName@prepa.com

Facebook:    @aeepronline

Twitter:    @aeeonline

Instagram:    aeeonline

YouTube:    aeeonline

## Exhibit A

## Form of Federal Funding Certifications

To the extent Owner and Operator determine to submit any of the costs incurred by Contractors or Subcontractors under the Agreement for Federal Funding reimbursement, such Contractors and Subcontractors will be required to comply with all applicable federal certifications and requirements, including the execution by Contractors and Subcontractors of these two (2) certifications. Contractors and Subcontractors shall be required to apply these certifications and requirements to any federally funded lower-tier contracts and subcontracts. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated _____.

### CERTIFICATION REGARDING DEBARMENT, SUSPENSION AND OTHER RESPONSIBILITY MATTERS

#### INSTRUCTIONS FOR CERTIFICATION

1.  By executing the Agreement, [Contractor or Subcontractor] (referred to herein as the "prospective lower tier participant") is providing the certification set out below.

2.  The certification in this Exhibit A (*Form of Federal Funding Certifications*) is a material representation of fact upon which reliance was placed when this transaction was entered into. If it is later determined that the prospective lower tier participant knowingly rendered an erroneous certification, in addition to other remedies available to the United States federal government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

3.  The prospective lower tier participant shall provide immediate written notice to the person to which this proposal is submitted if, at any time, the prospective lower tier participant learns that its certification was erroneous when submitted or had become erroneous by reason of changed circumstances.

4.  The terms covered transaction, debarred, suspended, ineligible, lower tier covered transaction, participant, person, primary covered transaction, principal, Agreement and voluntarily excluded, as used in this Exhibit A (*Form of Federal Funding Certifications*), have the respective meanings set out in the Definitions and Coverage sections of rules implementing Executive Order 12549.

5.  The prospective lower tier participant agrees by executing the Agreement that, should the proposed covered transaction be entered into, it shall not knowingly enter into any lower tier covered transaction with a person who is proposed for debarment under 48 CFR part 9, subpart 9.4, debarred, suspended, declared ineligible or voluntarily excluded from participation in this covered transaction, unless authorized by the department or agency with which this transaction originated.

A-1

CONFIDENTIAL

6. The prospective lower tier participant further agrees by executing the Agreement that it will include this clause titled "Certification Regarding Debarment, Suspension, Ineligibility and Voluntary Exclusion-Lower Tier Covered Transaction," without modification, in all lower tier covered transactions and in all solicitations for lower tier covered transactions.

7. A participant in a covered transaction may rely upon a certification of a prospective participant in a lower tier covered transaction that it is not proposed for debarment under 48 CFR part 9, subpart 9.4, debarred, suspended, ineligible or voluntarily excluded from covered transactions, unless it knows that the certification is erroneous. A participant may decide the method and frequency by which it determines the eligibility of its principals. Each participant may, but is not required to, check the List of Parties Excluded from Federal Procurement and Non-procurement Programs.

8. Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render in good faith the certification required by this clause. The knowledge and information of a participant is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

9. Except for transactions authorized under paragraph 5 of these instructions, if a participant in a covered transaction knowingly enters into a lower tier covered transaction with a person who is proposed for debarment under 48 CFR part 9, subpart 9.4, suspended, debarred, ineligible or voluntarily excluded from participation in this transaction, in addition to other remedies available to the United States federal government, the department or agency with which this transaction originated may pursue available remedies, including suspension and/or debarment.

### CERTIFICATION REGARDING DEBARMENT, SUSPENSION, INELIGIBILITY AND VOLUNTARY EXCLUSION LOWER TIER COVERED TRANSACTIONS

(1) The prospective lower tier participant certifies, by execution of the Agreement, that neither it, nor its principals, is presently debarred, suspended, proposed for debarment, declared ineligible or voluntarily excluded from participation in this transaction by any Federal department or agency.

(2) Where the prospective lower tier participant is unable to certify to any of the statements in this certification, such prospective participant shall attach an explanation to the Agreement.

_____        _____
[CONTRACTOR OR SUBCONTRACTOR]        Contract Number
Company Name

_____
Name of [Contractor or Subcontractor's]
Authorized Official

_____
Title

CONFIDENTIAL

_____          _____
Signature of [Contractor or Subcontractor's]          Date
Authorized Official

## CERTIFICATION REGARDING LOBBYING FOR
## CONTRACTS, GRANTS, LOANS AND COOPERATIVE AGREEMENTS

The undersigned [Contractor or Subcontractor] certifies, to the best of its knowledge and belief, that:

1.  No Federal appropriated funds have been paid or will be paid, by or on behalf of [Contractor or Subcontractor] or any Affiliate, to any person for influencing or attempting to influence an officer or employee of an agency, a member of the United States Congress, an officer or employee of the United States Congress, or an employee of a member of the United States Congress in connection with the awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement and the extension, continuation, renewal, amendment or modification of any Federal contract, grant, loan or cooperative agreement.

2.  If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a member of the United States Congress, an officer or employee of the United States Congress, or an employee of a member of the United States Congress in connection with this Federal contract, grant, loan or cooperative agreement, the undersigned shall complete and submit Standard Form- LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

3.  The undersigned shall require that the language of this certification be included in the award documents for all subawards at all tiers (including subcontracts, subgrants and contracts under grants, loans and cooperative agreements) and that all subrecipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by 31 U.S.C. § 1352 (as amended by the Lobbying Disclosure Act of 1995). Any person who fails to file the required certification shall be subject to a civil penalty of not less than US$10,000 and not more than US$100,000 for each such failure.

[CONTRACTOR OR SUBCONTRACTOR] certifies or affirms the truthfulness and accuracy of each statement of its certification and disclosure, if any. In addition, [CONTRACTOR OR

CONFIDENTIAL

SUBCONTRACTOR] understands and agrees that the provisions of 31U.S.C. § 3801 et seq., apply to this certification and disclosure, if any.

_____
[CONTRACTOR OR SUBCONTRACTOR] Name

_____
Signature of [Contractor or Subcontractor's]
Authorized Official

_____          _____
Name and Title of [Contractor or Subcontractor's]          Date
Authorized Official

CONFIDENTIAL

## Exhibit B

### Form of Commonwealth Certifications

Operator, for itself and Parent Company (if Operator is a partnership under the Puerto Rico Internal Revenue Code), represents that as of the Effective Date (i) neither it nor Parent Company has any outstanding debts for unemployment insurance, temporary disability (workmen's compensation), or chauffeur's social security with the Department of Labor and Human Resources of the Commonwealth, income taxes with the Department of Treasury of the Commonwealth or real or personal property taxes with the Municipal Revenues Collection Center ("CRIM") or (ii) it or Parent Company have a payment plan in place with respect to any outstanding debt for the foregoing items and have complied therewith.

Operator shall deliver to Owner prior to the Effective Date a copy of its Certificate of Incorporation, Certificate of Organization and Certificate of Authorization to do Business in Puerto Rico issued by the Puerto Rico Department of State, as applicable.

Operator shall also obtain and deliver to Owner, in each case dated no earlier than sixty (60) days prior to the Effective Date, the following:

(i)     a copy of Operator's Merchant's Registration Certificate (Form SC 2918);

(ii)     a Certificate of Good Standing issued by the Puerto Rico Department of State;

(iii)     a certification issued by the Puerto Rico Treasury Department indicating that Operator and Parent Company (if Operator is a Partnership under the Puerto Rico Internal Revenue Code) do not have any debts under any concept, including income tax, with the Commonwealth (Form SC 6096);

(iv)     a Puerto Rico Sales and Use Tax Filing Certification issued by the Puerto Rico Treasury Department reflecting that Operator has filed its Puerto Rico Sales and Use Tax returns for the last sixty (60) tax periods (Form SC 2942);

(v)     an all concepts debt certification issued by CRIM reflecting that Operator does not owe any taxes to CRIM with respect to real or personal property; and

(vi)     a certification issued by the Puerto Rico Child Support Administration for Operator reflecting that Operator is in compliance with the withholdings required to be made by employers under Applicable Law.

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated _____.

By: _____
Name: 
Title:

CONFIDENTIAL

**Exhibit C**

**Form of Anti-Corruption Certifications**

We certify under penalty of nullity that no public servant of Owner will derive or obtain any benefit or profit of any kind from the contractual relationship which is the basis of this invoice. If such benefit or profit exists, the required waiver has been obtained prior to entering into the Agreement. The only consideration to be received in exchange for the delivery of goods or for the O&M Services provided is the agreed-upon price that has been negotiated with Owner or its Representatives. The total amount shown on this invoice is true and correct. The O&M Services have been rendered, and no payment has been received.

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated _____.


By:_____
Name:
Title:

CONFIDENTIAL

## Exhibit D

## Form of Guarantee Agreement

THIS GUARANTEE AGREEMENT (the "Guarantee") is made and entered into as of this [•] day of [•], 2020 by and among: (i) [•] ("Guarantor"), a [•] organized under the laws of [•]; and (ii) the Puerto Rico Electric Power Authority ("Owner" and, together with Guarantor, the "Parties" and each a "Party"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941.

## RECITALS

WHEREAS, Owner, the Puerto Rico Public-Private Partnerships Authority ("Administrator"), a public corporation of the Commonwealth of Puerto Rico, created by Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009, LUMA Energy, LLC ("ManagementCo"), a limited liability company organized under the laws of Puerto Rico, and LUMA Energy ServCo, LLC ("ServCo" and, together with ManagementCo, "Operator") a limited liability company organized under the laws of Puerto Rico, have entered into the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement (as amended, modified or supplemented from time to time in accordance with its terms, the "O&M Agreement"), whereby Operator has agreed to provide the O&M Services for the T&D System in accordance with the terms of the O&M Agreement;

WHEREAS, Guarantor [indirectly] owns [•]% of the equity interests of each of ManagementCo and ServCo; and

WHEREAS, Owner and Administrator will enter into the O&M Agreement only if Guarantor guarantees the performance by Operator of all of Operator's responsibilities and obligations, including amounts payable by, and the covenants and agreements of, Operator under the O&M Agreement, but in all cases subject to the limitations set forth herein, including Section 3.10 (*Limitation on Liability*) (all such obligations and responsibilities, the "Obligations") as set forth in this Guarantee.

NOW THEREFORE, in order to induce the execution and delivery of the O&M Agreement by Owner and Administrator and in consideration thereof, Guarantor agrees as follows:

D-1

CONFIDENTIAL

# ARTICLE 1
## DEFINITIONS; INTERPRETATION

**Section 1.1      Definitions**. Capitalized terms used but not defined herein shall have the respective meanings set forth in the O&M Agreement.

**Section 1.2      Interpretation; Construction**.

(a)      Headings. Articles, titles and headings to sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Guarantee. Except as otherwise indicated, all references in this Guarantee to "Articles" and "Sections" are intended to refer to Articles and Sections of this Guarantee.

(b)      Construction. For purposes of this Guarantee: (i) "include", "includes" or "including" shall be deemed to be followed by "without limitation"; (ii) "hereof", "herein", "hereby", "hereto" and "hereunder" shall refer to this Guarantee as a whole and not to any particular provision of this Guarantee; (iii) "extent" in the phrase "to the extent" shall mean the degree to which a subject or other item extends and shall not simply mean "if"; (iv) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including"; (v) "dollars" and "US$" shall mean United States Dollars; (vi) the singular includes the plural and vice versa; (vii) reference to a gender includes the other gender; (viii) "any" shall mean "any and all"; (ix) "or" is used in the inclusive sense of "and/or"; (x) reference to any agreement, document or instrument means such agreement, document or instrument as amended, supplemented and modified in effect from time to time in accordance with its terms; (xi) reference to any Applicable Law means such Applicable Law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and (xii) reference to any Person at any time refers to such Person's permitted successors and assigns.

(c)      Days and Time. All references to days herein are references to calendar days, unless specified as Business Days, and, unless specified otherwise, all statements of or references to a specific time in this Guarantee are to Atlantic Standard Time.

(d)      Accounting Principles. All accounting and financial terms used herein, unless specifically provided to the contrary, shall be interpreted and applied in accordance with then generally accepted accounting principles in the United States, consistently applied.

(e)      Negotiated Agreement. The Parties have participated jointly in the negotiation and drafting of this Guarantee with the benefit of competent legal representation, and the language used in this Guarantee shall be deemed to be the language chosen by the Parties to express their mutual intent. In the event that an ambiguity or question of intent or interpretation arises, this Guarantee shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions hereof.

D-2

CONFIDENTIAL

   (f) <u>Payments</u>. All payments required to be made by Guarantor hereunder shall be made in dollars.

CONFIDENTIAL

## ARTICLE 2
## REPRESENTATIONS AND WARRANTIES

**Section 2.1    Representations and Warranties of Guarantor.** Guarantor hereby represents and warrants that:

(a)    <u>Existence and Powers</u>. Guarantor is a [●] duly organized, validly existing and in good standing under the laws of [●]. Guarantor has the required corporate power and authority to enter into this Guarantee, carry out its obligations hereunder and consummate the transactions contemplated hereby.

(b)    <u>Due Authorization and Binding Obligation</u>. The execution and delivery by Guarantor of this Guarantee, the performance by Guarantor of its obligations hereunder and the consummation by Guarantor of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Guarantor. This Agreement has been duly and validly executed and delivered by Guarantor, and (assuming due authorization, execution and delivery by Owner) this Guarantee constitutes a legal, valid and binding obligation of Guarantor enforceable against Guarantor in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)    <u>No Conflicts</u>. Neither the execution, delivery or performance by Guarantor of this Guarantee, nor the consummation of the transactions contemplated hereby will: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Guarantor; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Guarantor; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Guarantor is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Guarantor.

(d)    <u>No Consents</u>. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Guarantor in connection with (i) the execution and delivery of this Guarantee or (ii) the performance by Guarantor of its payment or other obligations hereunder, except such as have been duly obtained or made.

(e)    <u>No Litigation</u>. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Guarantor or, to Guarantor's knowledge, threatened against Guarantor, which if determined adversely against Guarantor would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Guarantee or (ii) the performance by Guarantor of its respective obligations hereunder.

CONFIDENTIAL

      (f)    <u>No Legal Prohibition</u>. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Guarantor of this Guarantee and the transactions contemplated hereby.

      (g)    <u>Consent to Agreements</u>. Guarantor is fully aware of the terms and conditions of the O&M Agreement.

      (h)    <u>Consideration</u>. The Guarantee is made in furtherance of the purposes for which Guarantor has been organized, and the assumption by Guarantor of its obligations hereunder will result in a material benefit to Guarantor.

CONFIDENTIAL

## ARTICLE 3
## GUARANTEE COVENANTS

**Section 3.1    Guarantee to Owner**. Subject to Section 3.10 (*Limitation on Liability*), Guarantor hereby absolutely, presently, irrevocably and unconditionally guarantees to Owner: (i) the full and prompt payment when due of each and all of the payments required to be credited or made by Operator under the O&M Agreement to, or for the account of, Owner, as the case may be, when the same shall become due and payable pursuant to this Guarantee; and (ii) the full and prompt performance and observance of each and all of the Obligations. Notwithstanding the unconditional nature of Guarantor's obligations as set forth herein, Guarantor shall have the right to assert the defenses provided in Section 3.4 (*Defenses, Set-Offs and Counterclaims*) against claims made under this Guarantee.

**Section 3.2    Right of Owner to Proceed Against Guarantor.**

(a)    <u>Generally</u>. This Guarantee shall constitute a guarantee of payment and of performance and not of collection, and Guarantor specifically agrees that in the event of a failure by Operator to pay or perform any Obligation guaranteed hereunder, subject to any notice and cure periods under the O&M Agreement, Owner shall have the right to proceed first and directly against Guarantor under this Guarantee and without proceeding against Operator or exhausting any other remedies against Operator which Owner may have.

(b)    <u>No Conditions for Enforcement</u>. Without limiting the foregoing, Guarantor agrees that it shall not be necessary, and that Guarantor shall not be entitled to require, as a condition of enforcing the liability of Guarantor hereunder, that Owner:

(i)    file suit or proceed to obtain a personal judgment against Operator or any other person that may be liable for the Obligations or any part of the Obligations;

(ii)    make any other effort to obtain payment or performance of the Obligations from Operator other than providing Operator with any notice of such payment or performance as may be required by the terms of the O&M Agreement or required to be given to Operator under Applicable Law;

(iii)    foreclose against or seek to realize upon any security for the Obligations; or

(iv)    exercise any other right or remedy to which Owner or Administrator is or may be entitled in connection with the Obligations or any security therefor or any other guarantee thereof, except to the extent that any such exercise of such other right or remedy may be a condition to the Obligations of Operator or to the enforcement of remedies under the O&M Agreement.

(c)    <u>Unexcused Failure; Single Full Performance</u>. Upon any unexcused failure by Operator in the payment or performance of any Obligation and the giving of such notice or demand, if any, to Operator and Guarantor as may be required in connection with such Obligation

D-6

CONFIDENTIAL

and this Guarantee, the liability of Guarantor shall be effective and shall immediately be paid or performed. Notwithstanding Owner's right to proceed directly against Guarantor and subject to Section 3.10 (*Limitation on Liability*), Owner (or any successor) shall not be entitled to more than a single full performance of the Obligations in regard to any breach or non-performance thereof.

### Section 3.3    Guarantee Absolute and Unconditional.

(a)    <u>Generally</u>. The obligations of Guarantor hereunder are absolute, present, irrevocable and unconditional and shall remain in full force and effect until Operator shall have fully discharged the Obligations in accordance with their respective terms and conditions and, except as provided in Section 3.4 (*Defenses, Set-Offs and Counterclaims*), shall not be subject to any counterclaim, set-off, deduction or defense (other than full and strict compliance with, or release, discharge or satisfaction of, such Obligations) based on any claim that Guarantor may have against Operator, Owner, Administrator or any other person. Without limiting the foregoing, the obligations of Guarantor hereunder shall not be released, discharged or in any way modified by reason of any of the following (whether with or without notice to, knowledge by, or further consent of, Guarantor):

(i)    the extension or renewal of this Guarantee or the O&M Agreement up to the specified term of each agreement;

(ii)    any exercise or failure, omission or delay by Owner or Administrator in the exercise of any right, power or remedy conferred on Owner or Administrator, as the case may be, with respect to this Guarantee or the O&M Agreement except to the extent such failure, omission or delay gives rise to an applicable statute of limitations defense with respect to a specific claim;

(iii)    any permitted transfer or assignment of rights or obligations under the O&M Agreement or under any other Transaction Document by any party thereto, or any permitted assignment, conveyance or other transfer of any of their respective interests in the O&M Agreement or in, to or under any of the Transaction Documents;

(iv)    any permitted assignment for the purpose of creating a security interest or mortgage of all or any part of the respective interests of Owner or any other person in any Transaction Document or in the T&D System;

(v)    any renewal, amendment, change or modification in respect of any of the Obligations or terms or conditions of any Transaction Document;

(vi)    any failure of title with respect to all or any part of the respective interests of any person in the T&D System;

(vii)    the voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshaling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, moratorium,

CONFIDENTIAL

arrangement, composition with creditors or readjustment of, or other similar proceedings against or affecting Operator or Guarantor, or any of the property of either of them, or any allegation or contest of the validity of this Guarantee or the O&M Agreement in any such proceeding (it being specifically understood, consented and agreed to that, to the extent permitted by Applicable Law, this Guarantee shall remain and continue in full force and effect and shall be enforceable against Guarantor to the same extent and with the same force and effect as if any such proceeding had not been instituted and as if no rejection, stay, termination, assumption or modification has occurred as a result thereof, it being the intent and purpose of this Guarantee that Guarantor shall and does hereby waive all rights and benefits which might accrue to it by reason of any such proceeding);

(viii)   except as permitted by Section 4.1 (*Maintenance Of Corporate Existence*), Section 4.2 (*Guarantor Reports*) or the O&M Agreement, any sale or other transfer by Guarantor or any Affiliate of any of the capital stock or other interest of Guarantor or any Affiliate in Operator now or hereafter owned, directly or indirectly, by Guarantor or any Affiliate, or any change in composition of the interests in Operator;

(ix)   any failure on the part of Operator for any reason to perform or comply with any agreement with Guarantor;

(x)   the failure on the part of Owner to provide any notice to Guarantor which is not required to be given to Guarantor pursuant to this Guarantee and to Operator as a condition to the enforcement of Obligations pursuant to the O&M Agreement;

(xi)   any failure of any party to the O&M Agreement to mitigate damages resulting from any default by Operator or Guarantor under the O&M Agreement;

(xii)   the merger, consolidation or amalgamation of any party to the O&M Agreement into or with any other person, or any sale, lease, transfer, abandonment or other disposition of any or all of the property of any of the foregoing to any person;

(xiii)   any legal disability or incapacity of Operator or Guarantor with respect to the O&M Agreement; or

(xiv)   the fact that entering into the O&M Agreement by Operator or Guarantor was invalid or in excess of the powers of such party.

(b)   <u>Recovery of Money Due or Owing</u>. Should any money due or owing under this Guarantee not be recoverable from Guarantor due to any of the matters specified in Section 3.3(a) (*Guarantee Absolute and Unconditional - Generally*), then, in any such case, such money, together with all additional sums due hereunder, shall nevertheless be recoverable from Guarantor as though Guarantor were principal obligor in place of Operator pursuant to the terms of the O&M Agreement and not merely a guarantor and shall be paid by Guarantor forthwith subject to the terms of this Guarantee.

CONFIDENTIAL

   (c) Scope. Notwithstanding anything to the contrary expressed in this Guarantee, nothing in this Guarantee shall be deemed to amend, modify, clarify, expand or reduce Operator's rights, benefits, duties or obligations under the O&M Agreement.

  **Section 3.4** **Defenses, Set-Offs and Counterclaims**. Notwithstanding any provision contained herein to the contrary, Guarantor shall be entitled to exercise or assert any and all legal or equitable rights or defenses which Operator may have under the O&M Agreement or under Applicable Law (other than bankruptcy or insolvency of Operator and other than any defense which Operator has expressly waived in the O&M Agreement or Guarantor has expressly waived in Section 3.5 (*Waivers by Guarantor*) or elsewhere hereunder), and the obligations of Guarantor hereunder are subject to such counterclaims, set-offs or deductions which Operator is permitted to assert pursuant to the O&M Agreement, if any.

  **Section 3.5** **Waivers by Guarantor**. Guarantor hereby unconditionally and irrevocably waives:

   (a) notice from Owner of its acceptance of this Guarantee;

   (b) notice of any of the events referred to in Section 3.3 (*Guarantee Absolute and Unconditional*), except to the extent that notice is required to be given as a condition to the Obligations or the enforcement of remedies under the O&M Agreement;

   (c) to the fullest extent lawfully possible, all notices that may be required by statute, rule of law or otherwise to preserve intact any rights against Guarantor, except any notice to Operator required pursuant to the O&M Agreement or Applicable Law as a condition to any Obligation or the enforcement of remedies under the O&M Agreement;

   (d) to the fullest extent lawfully possible, any statute of limitations defense based on a statute of limitations period which may be applicable to guarantors (or parties in similar relationships) which would be shorter than the applicable statute of limitations period for the underlying claim;

   (e) any right to require a proceeding first against Operator;

   (f) any right to require a proceeding first against any person or the security provided by or under the O&M Agreement, except to the extent the O&M Agreement specifically requires a proceeding first against any person (except Operator) or security;

   (g) any requirement that Operator be joined as a party to any proceeding for the enforcement of any term of the O&M Agreement;

   (h) the requirement of, or the notice of, the filing of claims by Owner or Administrator in the event of the receivership or bankruptcy of Operator; and

   (i) all demands upon Operator or any other person and all other formalities the omission of any of which, or delay in performance of which, might, but for the provisions of

D-9

CONFIDENTIAL

this Section 3.5 (*Waivers by Guarantor*), by rule of law or otherwise, constitute grounds for relieving or discharging Guarantor in whole or in part from its absolute, present, irrevocable, unconditional and continuing obligations hereunder.

Section 3.6    **Payment of Costs and Expenses**. Guarantor agrees to pay Owner and Administrator on demand all Fees-and-Costs incurred by or on behalf of Owner in successfully enforcing by Legal Proceeding observance of the covenants, agreements and obligations contained in this Guarantee against Guarantor, other than the Fees-and-Costs that Owner or Administrator incurs in performing any of its obligations under the O&M Agreement where such obligations are a condition to performance by Operator of its Obligations.

Section 3.7    **Subordination of Rights**. Guarantor agrees that any right of subrogation or contribution which it may have against Operator as a result of any payment or performance hereunder is hereby fully subordinated to the rights of Owner and Administrator hereunder and under the O&M Agreement and that Guarantor shall not recover or seek to recover any payment made by it hereunder from Operator until Operator and Guarantor shall have fully and satisfactorily paid or performed and discharged the Obligations giving rise to a claim under this Guarantee.

Section 3.8    **Separate Obligations; Reinstatement.**

(a)    Separate Obligations. The obligations of Guarantor to make any payment or to perform and discharge any other duties, agreements, covenants, undertakings or obligations hereunder shall: (i) to the extent permitted by Applicable Law, constitute separate and independent obligations of Guarantor from its other obligations under this Guarantee; (ii) give rise to separate and independent causes of action against Guarantor; and (iii) apply irrespective of any indulgence granted from time to time by Owner.

(b)    Reinstatement. Guarantor agrees that this Guarantee shall be automatically reinstated if and to the extent that for any reason any payment or performance by or on behalf of Operator is rescinded or must be otherwise restored by Owner, whether as a result of any proceedings in bankruptcy, reorganization or similar proceeding, unless such rescission or restoration is pursuant to the terms of the O&M Agreement or Operator's enforcement of such terms under Applicable Law.

Section 3.9    **Term**. This Guarantee shall remain in full force and effect from the date of execution and delivery hereof until all of the Obligations of Operator have been fully paid and performed.

Section 3.10   **Limitation on Liability**. Notwithstanding anything herein or otherwise to the contrary, the aggregate liability of Guarantor under or with respect to this Guarantee with respect to all matters whatsoever or howsoever arising, including where arising from gross negligence and willful misconduct of Operator, any Operator Indemnitee or Guarantor, and regardless of any other rights and remedies that Owner or Administrator may have against Operator under the O&M Agreement, under Applicable Law or otherwise, shall in no event exceed, when added to the aggregate liability of any other guarantor of the Obligations, US$105,000,000. Without limiting the foregoing, to the fullest extent permitted by law, in no event

D-10

**CONFIDENTIAL**

shall Guarantor be liable, whether in contract, indemnity, tort (including negligence, gross negligence and strict liability) or otherwise, for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages which arise from, relate to or are connected with this Guarantee or the performance of or failure to perform the Obligations except for claims of fraud or intentional misrepresentation.

CONFIDENTIAL

# ARTICLE 4
# GENERAL COVENANTS

### Section 4.1    Maintenance Of Corporate Existence

(a)    <u>Consolidation, Amalgamation, Merger, Sale or Transfer</u>. Guarantor covenants that during the term of this Guarantee it will maintain its corporate existence, will not dissolve or otherwise dispose of all or substantially all of its assets and will not consolidate or amalgamate with or merge into another entity or permit one or more other entities to consolidate or amalgamate with or merge into it unless the successor is Guarantor; <u>provided</u>, <u>however</u>, that Guarantor may consolidate or amalgamate with or merge into another entity, or permit one or more other entities to consolidate or amalgamate with or merge into it, or sell or otherwise transfer to another entity all or substantially all of its assets as an entirety and thereafter dissolve if the successor entity (if other than Guarantor) (i) is acceptable to Owner, acting reasonably, (ii) assumes in writing all the obligations of Guarantor hereunder and (iii) delivers to Owner an opinion of counsel to the effect that its obligations under the Guarantee are legal, valid, binding and enforceable subject to applicable bankruptcy and similar insolvency or moratorium laws.

(b)    <u>Continuance of Obligations</u>. If a consolidation, amalgamation, merger or sale or other transfer is made as permitted by this Section 4.1 (*Maintenance Of Corporate Existence*), the provisions of this Section 4.1 (*Maintenance Of Corporate Existence*) shall continue in full force and effect and no further consolidation, amalgamation, merger or sale or other transfer shall be made except in compliance with the provisions of this Section 4.1 (*Maintenance Of Corporate Existence*). No such consolidation, amalgamation, merger or sale or other transfer shall have the effect of releasing the initial Guarantor from its liability hereunder unless a successor entity has assumed responsibility for this Guarantee in accordance with this Section 4.1 (*Maintenance Of Corporate Existence*).

### Section 4.2    Guarantor Reports. While this Guarantee is outstanding, Guarantor shall assist Operator in delivering to Administrator the reports required pursuant to Section 8.2 (*Guarantor Reports*) of the O&M Agreement.

### Section 4.3    Assignment. Except as permitted pursuant to Section 4.1 (*Maintenance Of Corporate Existence*), Guarantor shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Guarantee without the prior written consent of Administrator, which consent shall not be unreasonably withheld, delayed or conditioned.

CONFIDENTIAL

## ARTICLE 5
## MISCELLANEOUS

**Section 5.1    Consent to Jurisdiction**. Any dispute between the Parties arising out of, relating to or in connection with this Guarantee or the existence, interpretation, breach, termination or validity thereof shall be resolved in accordance with the procedures set forth in Article 15 (*Dispute Resolution*) of the O&M Agreement as if it were a Dispute, *mutatis mutandis*; <u>provided</u> that, for the avoidance of doubt, Guarantor hereby irrevocably: (i) agrees that any Legal Proceeding related to this Guarantee or to any rights or relationship between the Parties arising therefrom (other than any negotiation between the Parties in accordance with Section 15.3 (*Negotiation*) of the O&M Agreement) shall be solely and exclusively initiated and maintained in the Commonwealth Court; (ii) consents to the jurisdiction of the Commonwealth Court in any such Legal Proceeding; (iii) waives any objection which it may have to the laying of the jurisdiction of any such Legal Proceeding in the Commonwealth Court; and (iv) waives its right to a trial by jury in any Legal Proceeding in the Commonwealth Court.

**Section 5.2    Notices**. All notices or other communications to be delivered in connection with the Guarantee shall be in writing and shall be deemed to have been properly delivered, given and received (i) on the date of delivery if delivered by hand during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, (ii) on the date of successful transmission if sent via email (with return receipt) during normal business hours of the recipient during a Business Day, otherwise on the next Business Day, or (iii) on the date of receipt by the addressee if sent by a nationally recognized overnight courier or by registered or certified mail, return receipt requested, if received on a Business Day, otherwise on the next Business Day. Such notices or other communications must be sent to each respective Party at the address, email address set forth below (or at such other address, email address as shall be specified by a Party in a notice given in accordance with this Section 5.2 (*Notices*)):

| | |
|---|---|
| If to Owner: | Puerto Rico Electric Power Authority |
| | |
| | [●] |
| | [●] |
| | Attention: [●] |
| | Telephone: [●] |
| | Email: [●] |
| | |
| | with a copy to: |
| | Administrator |
| | [●] |
| | [●] |
| | Attention: [●] |
| | Telephone: [●] |
| | Email: [●] |

D-13

CONFIDENTIAL

If to Guarantor:                        [●]
                                        [●]
                                        [●]
                                        Attention: [●]
                                        Telephone: [●]
                                        Email: [●]


      **Section 5.3      Amendments**. Neither this Guarantee nor any provision hereof may be changed, modified, amended or waived except by written agreement duly executed by the Parties. To the extent required by Applicable Law, any such amendment shall not be effective until approved by the FOMB (if then in existence) and PREB.

      **Section 5.4      Entire Agreement**. This Guarantee constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements, understandings, proposals, representations or warranties relating to this Guarantee. Without limiting the generality of the foregoing, this Guarantee shall completely and fully supersede all other understandings and agreements among the Parties with respect to such transactions, including those contained in the RFP, the Proposal by Operator or its Affiliate and any amendments or supplements to the RFP or the Proposal.

      **Section 5.5      Interest on Overdue Obligations**. Except as otherwise provided herein, all amounts due hereunder, whether as fees, damages, credits, revenue, charges or reimbursements, that are not paid when due shall bear interest at the Overdue Rate, on the amount outstanding from time to time, and all such interest accrued at any time shall, to the extent permitted by Applicable Law, be deemed added to the amount due, as accrued.

      **Section 5.6      Waivers**. Either Guarantor or Owner may, at any time, (a) extend the time for the performance of any of the obligations or other acts of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party contained herein or (c) waive compliance by the other Party with any of the agreements or conditions contained herein. No waiver by any Party of any of the provisions hereof shall be effective unless explicitly set forth in a written instrument executed and delivered by the Party so waiving. No waiver by any Party of any breach of this Guarantee shall operate or be construed as a waiver of any preceding or subsequent breach, whether of a similar or different character, unless expressly set forth in such written waiver. Neither any course of conduct or failure or delay of any Party in exercising or enforcing any right, remedy or power hereunder shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy or power hereunder, or any abandonment or discontinuance of steps to enforce such right, remedy or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right, remedy or power.

      **Section 5.7      Survival**. The rights and obligations of the Parties pursuant to Section 5.1 (*Consent to Jurisdiction*), Section 5.2 (*Notices*) and Section 5.12 (*Governing Law*) shall survive the expiration or termination of this Guarantee. No expiration or early termination of this

CONFIDENTIAL

Guarantee shall (i) limit or otherwise affect the respective rights and obligations of the Parties accrued prior to the date of such termination or (ii) preclude any Party from impleading any other Party in any Legal Proceeding originated by a third-party as to any matter occurring during the term of this Guarantee.

Section 5.8     **Severability**. If any term or provision of this Guarantee is invalid, illegal or incapable of being enforced in any situation or in any jurisdiction, such invalidity, illegality or unenforceability shall not affect the validity, legality or enforceability of any other term or provision hereof or the offending term or provision in any other situation or any other jurisdiction, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon any such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Guarantee so as to effect the original intent of the Parties as closely as possible, in a mutually acceptable manner, in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

**Section 5.9     Remedies**

(a)     Cumulative and Non-Exclusive Remedies. Except as otherwise provided in this Guarantee, any and all remedies herein expressly conferred upon a Party shall be deemed cumulative with and not exclusive of any other remedy expressly conferred hereby, and the exercise by a Party of any one such remedy shall not preclude the exercise of any other such remedy.

(b)     Irreparable Damage and Harm. The Parties agree that irreparable damage and harm would occur in the event that any provision of this Guarantee were not performed in accordance with its terms and that, although monetary damages may be available for such a breach, monetary damages would be an inadequate remedy therefor. Accordingly, each of the Parties agrees that, in the event of any breach or threatened breach of any provision of this Guarantee by such Party, the other Party shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent or restrain breaches or threatened breaches hereof and to specifically enforce the terms and provisions hereof. A Party seeking an order or injunction to prevent breaches of this Guarantee or to enforce specifically the terms and provisions hereof shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such order or injunction, and each Party hereby irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security. In the event that any Legal Proceeding should be brought in equity to enforce the provisions of this Guarantee, each Party agrees that it shall not allege, and each Party hereby waives the defense, that there is an adequate remedy available at law.

Section 5.10   **Counterparts**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to be one and the same agreement or document. A signed copy of this Guarantee transmitted by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original executed copy of this Guarantee for all purposes.

CONFIDENTIAL

**Section 5.11    Office of the Comptroller**. Owner agrees to file this Guarantee with the Comptroller of the Commonwealth promptly after its execution and to provide Guarantor with evidence of its filing within fifteen (15) days following the execution of this Guarantee. The Parties acknowledge and agree that the obligations and considerations under this Guarantee shall not be enforceable until this Guarantee shall have been registered with the Office of the Comptroller of the Commonwealth as provided by Act No. 18 of the Legislative Assembly of Puerto Rico, enacted on October 30, 1975.

**Section 5.12    Governing Law**. This Agreement and all matters, claims, controversies, disputes, suits, actions or proceedings arising out of or relating to this Guarantee and the negotiation, execution or performance of this Guarantee or any of the transactions contemplated hereby, including all rights of the Parties (whether sounding in contract, tort, common or statutory law, equity or otherwise) in connection therewith, shall be interpreted, construed and governed by and in accordance with, and enforced pursuant to, the internal laws of the Commonwealth (excluding any conflict of laws rule or principle which might refer such interpretation to the laws of another jurisdiction), except where the federal supremacy clause requires otherwise.

**Section 5.13    COMMONWEALTH OBLIGATIONS**. THE OBLIGATIONS OF OWNER UNDER THIS AGREEMENT SHALL NOT BE DEEMED OBLIGATIONS OF THE COMMONWEALTH OR ANY INSTRUMENTALITY OF THE COMMONWEALTH OTHER THAN OWNER.

CONFIDENTIAL

**IN WITNESS WHEREOF,** Guarantor has caused this Guarantee to be duly executed as of the day and year first above written.

[*GUARANTOR*]

By: _____

Name: _____

Title: _____

Accepted and agreed to by:

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By: _____

Name: _____

Title: _____

D-17

CONFIDENTIAL

## Exhibit E

## Form of Sworn Statement

## SWORN STATEMENT

## ACT 2-2018

I, _____, of legal age, single/married, _____ and resident of the _____, hereby solemnly swear:

1.      That my personal status is the one stated above.

2.      That I hold the position of _____ _____ (hereinafter referred to as the "Company") organized as a _____ under the laws of _____ with the Federal Identification No. _____.

3.      That I am authorized to represent the Company and all of its partners and owners for purposes of this affidavit.

4.      That neither the Company nor any of its presidents, vice-presidents, directors, managers, executive directors or members of its Board of Directors, or persons that fulfil similar tasks, have been convicted of, nor have they pleaded guilty to, any of the crimes in Article 6.8 of Puerto Rico Act No. 8-2017, as amended, known as the "Act for the Management and Transformation of the Human Resources of the Government of Puerto Rico" or for any of the crimes listed in Puerto Rico Act No. 2-2018, known as the "Anti-Corruption Code for a New Puerto Rico".

5.      No commissions or bonuses have been paid, in cash or in kind, and there is not commitment for the future payment of any such commissions or bonuses to any public official, employee or any former public official that participated in the negotiations and transactions contemplated by the Company's agreement with _____ while working for the Government of Puerto Rico.

6.      That everything stated above is true to the best of my knowledge, information and belief and thus, to make it public I sign this declaration in _____, this _____ day of _____, 20____.

By:_____
Name:
Title:

Affidavit No. _____

E-1

CONFIDENTIAL

Sworn and subscribed before me by _____, of the personal circumstances stated above, in his/her capacity as _____ of _____; who is personally known to me or whom I have identified pursuant the following form of identification: _____, this ____ day of _____, 20____.

CONFIDENTIAL

**Exhibit F-1**

**Form of Tax Opinion – Effective Date**

_____, 202\_

Ladies and Gentlemen:

We have served as tax counsel to the Federal Oversight and Management Board for Puerto Rico ("FOMB") with respect to the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated as of \_\_\_\_, 2020 (the "Agreement") by and among the Puerto Rico Electric Power Authority (the "Authority"), as owner, the Puerto Rico Public-Private Partnerships Authority, as administrator (the "Administrator"), LUMA Energy, LLC ("ManagementCo"), and LUMA Energy ServCo, LLC ("ServCo" and, together with ManagementCo, the "Operator" and, together with Authority, Administrator and ManagementCo, the "Parties").  Pursuant to the terms of the Agreement, the Operator will provide management, operation, maintenance, repair, restoration and replacement and other related services for the Authority's transmission and distribution system (the "T&D System"). In addition, pursuant to the Puerto Rico Transmission and Distribution System Supplemental Terms Agreement dated as of \_\_\_\_, 2020 (the "Supplemental Agreement") by and among the Parties, the Operator will provide the O&M Services prior to the Service Commencement Date.  The Authority, its Affiliates, and other Governmental Bodies currently have outstanding obligations the interest on which is excluded from gross income for federal income tax purposes (the "Existing Bonds").  On the date of issuance of each of the bond issues comprising the Existing Bonds, the respective bond counsel for each such issuance delivered an opinion (each an "Approving Opinion") that interest on the related Existing Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code (the "Code").  Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

Pursuant to Section 4.5 of the Agreement, the handover to the Operator of the O&M Services shall not occur until all of the conditions precedent listed therein (the "Service Commencement Date Conditions") have been satisfied as specified in the Agreement.  Among the Service Commencement Date Conditions set forth in Section 4.5 of the Agreement are the following: all Commencement Date Governmental Approvals have been issued, no Governmental Body shall have enacted any Applicable Law that would make it illegal, or otherwise prohibit, the Parties' performance of their obligations from or after the Service Commencement Date, the Authority shall have received Title III Approvals from the Title III Court reasonably acceptable to the Operator, PREB shall have approved a Rate Order within the parameters detailed therein, and the Puerto Rico Treasury Department shall have issued certain tax assurances, among others. Under Section 4.7 of the Agreement, the satisfaction or waiver of the Service Commencement Date Conditions is required for the achievement of the Service Commencement Date.  In addition, the Supplemental Agreement requires that the Operator commence the O&M Services even if the Authority has not exited the Title III Case and to agree to other changes to the form of the Agreement.  Accordingly, pursuant to Section 2.2 thereof, the Supplemental Agreement shall automatically become effective, on the date on which all the Service Commencement Date Conditions shall have been satisfied or waived in accordance with the requirements of the Agreement, except that the Title III Exit shall have not yet occurred and the Tax Opinion and

CONFIDENTIAL

Reliance Letter required by Section 4.5(v) of the Agreement shall have not yet been delivered. As a result, our final opinions with respect to the Agreement and the Supplemental Agreement cannot be delivered until, in the case of the Agreement, the Service Commencement Date Conditions are fully satisfied or waived and, in the case of the Supplemental Agreement, the conditions set forth in the preceding sentence are satisfied and the Supplemental Agreement becomes automatically effective, and this opinion is subject to certain caveats described below.

This opinion is being delivered in accordance with Section 2.2(b)(viii) of the Agreement.

In rendering the opinion set forth herein, we have reviewed (i) the Agreement, including the exhibits thereto, (ii) the Supplemental Agreement, (iii) the System Contracts in effect as of the date hereof, (iv) the opinion of Sargent and Lundy or another nationally recognized engineering firm acceptable to the Parties, dated _____, 202_, which sets forth, among other things, the reasonably expected weighted average economic life of the T&D System, and (v) such other opinions, certificates and documents as have been provided to us by the Authority and others in connection with the Agreement. We have also relied upon the facts set forth in the representations made by the Parties to the Agreement and such other documents and opinions to the extent we deemed necessary to render the opinions set forth herein. We have not undertaken an independent audit or investigation of the matters set forth in any of the foregoing and our opinion assumes the accuracy of the information and any conclusions set forth therein and compliance with any covenants and directions set forth in said documents, including the Agreement and the Supplemental Agreement.

In addition, the Code and the Revenue Procedure (as defined below), impose certain requirements that must be met subsequent to the issuance and delivery of the Existing Bonds and subsequent to the execution of the Agreement and the Supplemental Agreement for interest on the Existing Bonds thereon to be and remain excluded from gross income for federal income tax purposes. Noncompliance with such requirements could cause the interest on the Existing Bonds to be included in gross income for federal income tax purposes retroactive to the date of issue of each issue of the Existing Bonds.

Section 103 of the Code provides generally that interest on a "<u>private activity bond</u>" is not excluded from gross income. Section 141 of the Code, in part, provides that a private activity bond is an obligation issued as part of an issue that meets the private business tests. Under the private business tests, bonds are treated as private activity bonds if the issue of which those bonds are a part satisfy both the private business use test and the private security or payment test. The private business use test is met if more than 10 percent of the proceeds of an issue are used in the trade or business of a nongovernmental person ("<u>private business use</u>"). Under Treasury regulation section 1.141-3, private business use can result from the use of the facilities financed by the issue, including as a result of a lease of such property to a nongovernmental person or a management contract with respect to such property. The private security or payment test is generally met if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of an issue is (under the terms of such issue or any underlying arrangement) directly or indirectly: (A) secured by any interest in property used or to be used for a private business use, or payments in respect of such property, or (B) to be derived from payments (whether or not to the issuer) in respect of property, or borrowed money, used or to be used for a private business use.

CONFIDENTIAL

Under Treasury regulation section 1.141-3(b)(4), a management contract with respect to financed property may result in private business use of that property, based on all of the facts and circumstances. The regulations provide that a management contract with respect to financed property generally results in private business use of that property if the contract provides for compensation for services rendered with compensation based, in whole or in part, on a share of net profits from the operation of the facility, or if the service provider is treated as the lessee or owner of financed property for federal income tax purposes.

Treasury regulation section 1.141-3 defines a management contract as a management, service, or incentive payment contract between a governmental person and a service provider under which the service provider provides services involving all, a portion of, or any function of, a facility. For example, a contract for the provision of management services for an entire hospital, a contract for management services for a specific department of a hospital, and an incentive payment contract for physician services to patients of a hospital are each treated as a management contract.

In Revenue Procedure 2017-13 (the "Revenue Procedure") the Internal Revenue Service provided a safe harbor under which a management contract can be treated as not resulting in private business use. The Revenue Procedure refers to the governmental owner of the related facilities as the "qualified user" and the manager or operator as the "service provider." Under the Revenue Procedure, a management contract that satisfies the following conditions will not be treated as resulting in private business use:

(1) The payments to the service provider under the contract must be reasonable compensation for services rendered during the term of the contract. "Compensation" includes payments to reimburse actual and direct expenses paid by the service provider and related administrative overhead expenses of the service provider.

(2) The contract must not provide to the service provider a share of net profits from the operation of the managed property. Compensation to the service provider will not be treated as providing a share of net profits if no element of the compensation takes into account, or is contingent upon, either the managed property's net profits or both the managed property's revenues and expenses (other than any reimbursements of direct and actual expenses paid by the service provider to unrelated third parties) for any fiscal period. For this purpose, the elements of the compensation are the eligibility for, the amount of, and the timing of the payment of the compensation. Incentive compensation is not treated as providing a share of net profits if eligibility is determined by the service provider's performance in meeting one or more standards that measure quality of services, performance or productivity.

(3) The contract must not, in substance, impose upon the service provider the burden of bearing any share of net losses from the operation of the managed property.

(4) The term of the contract, as of the beginning of the term of the contract, including all renewal options must not be greater than the lesser of 30 years or 80 percent of the weighted average reasonably expected economic life of the managed property.

CONFIDENTIAL

(5) The qualified user must exercise a significant degree of control over the use of the managed property. This control requirement is met if the contract requires the qualified user to approve the annual budget of the managed property, capital expenditures with respect to the managed property, each disposition of property that is part of the managed property, rates charged for the use of the managed property, and the general nature and type of use of the managed property (for example, the type of services).

(6) The qualified user must bear the risk of loss upon damage or destruction of the managed property (for example, due to force majeure).

(7) The service provider must agree that it is not entitled to and will not take any tax position that is inconsistent with being a service provider to the qualified user with respect to the managed property. For example, the service provider must agree not to claim any depreciation or amortization deduction, investment tax credit, or deduction for any payment as rent with respect to the managed property.

(8) The service provider must not have any role or relationship with the qualified user that, in effect, substantially limits the qualified user's ability to exercise its rights under the contract, based on all the facts and circumstances. A service provider will not be treated as having a role or relationship prohibited by this provision if: (a) no more than 20 percent of the voting power of the governing body of the qualified user is vested in the directors, officers, shareholders, partners, members, and employees of the service provider, in the aggregate; (b) the governing body of the qualified user does not include the chief executive officer of the service provider or the chairperson (or equivalent executive) of the service provider's governing body; and (c) the chief executive officer of the service provider is not the chief executive officer of the qualified user or any of the qualified user's related parties.

Based upon our review of the foregoing documents, and assuming the accuracy of the information and certifications, and compliance with the covenants, representations, and directions set forth therein, and assuming compliance with the terms of the Agreement and the Supplemental Agreement, but subject to the conditions provided in the following sentence, we are of the opinion that neither the Agreement nor the Supplemental Agreement nor any provision thereof, nor the performance by each Party to the Agreement and the Supplemental Agreement of its respective obligations thereunder (including Operator's administration of the System Contracts), adversely affects the exclusion from gross income of interest on the Existing Bonds of the Authority, its Affiliates or another Governmental Body for federal income tax purposes under Section 103 of the Code. This opinion is not final and is subject to the following conditions to be determined as of the Service Commencement Date that: (1) there have been no amendments to the Agreement or the Supplemental Agreement that would adversely affect the exclusion from gross income of interest on the Existing Bonds of the Authority, its Affiliates or another Governmental Body for federal income tax purposes under Section 103 of the Code, (2) there have been no changes in federal income tax law that apply to the Agreement or the Supplemental Agreement, (3) there has been no breach of any provision of the Agreement or the Supplemental Agreement that would adversely affect the exclusion from gross income of interest on the Existing Bonds of the Authority, its Affiliates or another Governmental Body for federal income tax purposes under Section 103 of the Code, in particular, but not limited to, the provisions relating to the Service

CONFIDENTIAL

Commencement Date Conditions, and (4) Sargent and Lundy or another nationally recognized engineering firm acceptable to the Parties has confirmed as of the Service Commencement Date that the reasonably expected weighted average economic life of the T&D System is at least 19 years. Accordingly, this opinion will be redelivered in final form as of the Service Commencement Date taking into account the foregoing conditions.

This opinion is limited to the specific matter addressed herein and shall not be construed as confirming or restating the Approving Opinions. We have not been engaged to, nor have we undertaken to, determine whether the interest on the Existing Bonds continues to qualify as of this date for exclusion from gross income for federal income tax purposes. Accordingly, we express no opinion on such matter.

This opinion is delivered as of the date hereof and relates solely to the Internal Revenue Code and Treasury regulations as in effect on the date hereof. We disclaim any obligation to advise you or any other person of developments of law or fact covered by this opinion that may occur after the date hereof, including any amendments made subsequent to the date hereof to the documents described above. Furthermore, we express no opinion as to any federal, state or local tax law consequences with respect to the Existing Bonds, or the interest thereon, if any action is taken with respect to the Agreement or the Supplemental Agreement or the proceeds thereof upon the advice or approval of other counsel.

CONFIDENTIAL

This opinion is being delivered by us as tax counsel to the FOMB in connection with the Agreement or the Supplemental Agreement and may not be relied upon by any other person, or used or reproduced for any other purpose, without our prior written consent.


Sincerely,


Nixon Peabody LLP

CONFIDENTIAL

**Exhibit F-2**

**Form of Final Tax Opinion**

_____, 202\_

Ladies and Gentlemen:

We have served as tax counsel to the Federal Oversight and Management Board ("FOMB") with respect to the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated as of \_\_\_\_, 2020 (the "Agreement") by and among the Puerto Rico Electric Power Authority (the "Authority"), as owner, the Puerto Rico Public-Private Partnerships Authority, as administrator (the "Administrator"), _____ ("ManagementCo"), and _____ ("ServCo" and, together with ManagementCo, the "Operator" and, collectively with the Authority and the Administrator, the "Parties"). Pursuant to the terms of the Agreement, the Operator will provide operation and management services relating to the Authority's transmission and distribution system (the "T&D System"). The Authority, its Affiliates, and other Governmental Bodies currently have outstanding obligations the interest on which is excluded from gross income for federal income tax purposes (the "Existing Bonds"). On the date of issuance of each of the bond issues comprising the Existing Bonds, the respective bond counsel for each such issuance delivered an opinion (each an "Approving Opinion") that interest on the related Existing Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code (the "Code"). Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

This opinion is being delivered in accordance with Section 4.5(v) of the Agreement.

In rendering the opinion set forth herein, we have reviewed (i) the Agreement, including the exhibits thereto, (ii) the Puerto Rico Transmission and Distribution System Supplemental Terms Agreement dated as of \_\_\_\_, 202\_ (the "Supplemental Agreement") by and among the Parties, (iii) the System Contracts in effect as of the date hereof, (iv) the opinion of Sargent and Lundy or another nationally recognized engineering firm acceptable to the Parties, dated \_\_\_\_, 202\_, which sets forth, among other things, the reasonably expected weighted average economic life of the T&D System, and (v) such other opinions, certificates and documents as have been provided to us by the Authority and others in connection with the Agreement. We have also relied upon the facts set forth in the representations made by the Parties to the Agreement and such other documents and opinions to the extent we deemed necessary to render the opinions set forth herein. We have not undertaken an independent audit or investigation of the matters set forth in any of the foregoing and our opinion assumes the accuracy of the information and any conclusions set forth therein and compliance with any covenants and directions set forth in said documents, including the Agreement.

In addition, the Code and the Revenue Procedure (as defined below), impose certain requirements that must be met subsequent to the issuance and delivery of the Existing Bonds and subsequent to the execution of the Agreement for interest on the Existing Bonds thereon to be and remain excluded from gross income for federal income tax purposes. Noncompliance with such

CONFIDENTIAL

requirements could cause the interest on the Existing Bonds to be included in gross income for federal income tax purposes retroactive to the date of issue of each issue of the Existing Bonds.

Section 103 of the Code provides generally that interest on a "private activity bond" is not excluded from gross income. Section 141 of the Code, in part, provides that a private activity bond is an obligation issued as part of an issue that meets the private business tests. Under the private business tests, bonds are treated as private activity bonds if the issue of which those bonds are a part satisfy both the private business use test and the private security or payment test. The private business use test is met if more than 10 percent of the proceeds of an issue are used in the trade or business of a nongovernmental person ("private business use"). Under Treasury regulation section 1.141-3, private business use can result from the use of the facilities financed by the issue, including as a result of a lease of such property to a nongovernmental person or a management contract with respect to such property. The private security or payment test is generally met if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of an issue are (under the terms of such issue or any underlying arrangement) directly or indirectly: (A) secured by any interest in property used or to be used for a private business use, or payments in respect of such property, or (B) to be derived from payments (whether or not to the issuer) in respect of property, or borrowed money, used or to be used for a private business use.

Under Treasury regulation section 1.141-3(b)(4), a management contract with respect to financed property may result in private business use of that property, based on all of the facts and circumstances. The regulations provide that a management contract with respect to financed property generally results in private business use of that property if the contract provides for compensation for services rendered with compensation based, in whole or in part, on a share of net profits from the operation of the facility, or if the service provider is treated as the lessee or owner of financed property for federal income tax purposes.

Treasury regulation section 1.141-3 defines a management contract as a management, service, or incentive payment contract between a governmental person and a service provider under which the service provider provides services involving all, a portion of, or any function of, a facility. For example, a contract for the provision of management services for an entire hospital, a contract for management services for a specific department of a hospital, and an incentive payment contract for physician services to patients of a hospital are each treated as a management contract.

In Revenue Procedure 2017-13 (the "Revenue Procedure") the Internal Revenue Service provided a safe harbor under which a management contract can be treated as not resulting in private business use. The Revenue Procedure refers to the governmental owner of the related facilities as the "qualified user" and the manager or operator as the "service provider." Under the Revenue Procedure, a management contract that satisfies the following conditions will not be treated as resulting in private business use:

(1) The payments to the service provider under the contract must be reasonable compensation for services rendered during the term of the contract. "Compensation" includes payments to reimburse actual and direct expenses paid by the service provider and related administrative overhead expenses of the service provider.

CONFIDENTIAL

(2)   The contract must not provide to the service provider a share of net profits from the operation of the managed property. Compensation to the service provider will not be treated as providing a share of net profits if no element of the compensation takes into account, or is contingent upon, either the managed property's net profits or both the managed property's revenues and expenses (other than any reimbursements of direct and actual expenses paid by the service provider to unrelated third parties) for any fiscal period. For this purpose, the elements of the compensation are the eligibility for, the amount of, and the timing of the payment of the compensation. Incentive compensation is not treated as providing a share of net profits if eligibility is determined by the service provider's performance in meeting one or more standards that measure quality of services, performance or productivity.

(3)   The contract must not, in substance, impose upon the service provider the burden of bearing any share of net losses from the operation of the managed property.

(4)   The term of the contract, as of the beginning of the term of the contract, including all renewal options must not be greater than the lesser of 30 years or 80 percent of the weighted average reasonably expected economic life of the managed property.

(5)   The qualified user must exercise a significant degree of control over the use of the managed property. This control requirement is met if the contract requires the qualified user to approve the annual budget of the managed property, capital expenditures with respect to the managed property, each disposition of property that is part of the managed property, rates charged for the use of the managed property, and the general nature and type of use of the managed property (for example, the type of services).

(6)   The qualified user must bear the risk of loss upon damage or destruction of the managed property (for example, due to force majeure).

(7)   The service provider must agree that it is not entitled to and will not take any tax position that is inconsistent with being a service provider to the qualified user with respect to the managed property. For example, the service provider must agree not to claim any depreciation or amortization deduction, investment tax credit, or deduction for any payment as rent with respect to the managed property.

(8)   The service provider must not have any role or relationship with the qualified user that, in effect, substantially limits the qualified user's ability to exercise its rights under the contract, based on all the facts and circumstances. A service provider will not be treated as having a role or relationship prohibited by this provision if: (a) no more than 20 percent of the voting power of the governing body of the qualified user is vested in the directors, officers, shareholders, partners, members, and employees of the service provider, in the aggregate; (b) the governing body of the qualified user does not include the chief executive officer of the service provider or the chairperson (or equivalent executive) of the service provider's governing body; and (c) the chief executive officer of the service provider is not the chief executive officer of the qualified user or any of the qualified user's related parties.

Based upon our review of the foregoing documents, and assuming the accuracy of the information and certifications, and compliance with the covenants, representations, and directions set forth therein, and assuming compliance with the terms of the Agreement, we are of the opinion that neither the Agreement nor any provision thereof, nor the performance by each Party to the Agreement of its respective obligations thereunder (including Operator's administration of the System Contracts), adversely affects the exclusion from gross income of interest on the Existing Bonds of the Authority, its Affiliates or another Governmental Body for federal income tax purposes under Section 103 of the Code.

This opinion is limited to the specific matter addressed herein and shall not be construed as confirming or restating the Approving Opinions. We have not been engaged to, nor have we undertaken to, determine whether the interest on the Existing Bonds continues to qualify as of this date for exclusion from gross income for federal income tax purposes. Accordingly, we express no opinion on such matter.

This opinion is delivered as of the date hereof and relates solely to the Internal Revenue Code and Treasury regulations as in effect on the date hereof. We disclaim any obligation to advise you or any other person of developments of law or fact covered by this opinion that may occur after the date hereof, including any amendments made subsequent to the date hereof to the documents described above. Furthermore, we express no opinion as to any federal, state or local tax law consequences with respect to the Existing Bonds, or the interest thereon, if any action is taken with respect to the Agreement or the proceeds thereof upon the advice or approval of other counsel.

CONFIDENTIAL

This opinion is being delivered by us as tax counsel to the FOMB in connection with the Agreement and may not be relied upon by any other person, or used or reproduced for any other purpose, without our prior written consent.


Sincerely,


Nixon Peabody LLP

CONFIDENTIAL

**Exhibit G**

**Form of Reliance Letter**


_____, 2020




Puerto Rico Transmission and Distribution System Operation and
Maintenance Agreement dated as of _____, 2020



Ladies and Gentlemen:

In connection with the execution of the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated as of _____, 2020 by and among the Puerto Rico Electric Power Authority, the Puerto Rico Public-Private Partnerships Authority, _____, and _____ (the "Agreement") we have delivered our [final] legal opinion relating to the impact of the Agreement on the federal income tax status of interest on bonds issued by the Authority, its Affiliates, and other Governmental Bodies (the "Bonds"), dated the date hereof and addressed to the Federal Oversight and Management Board. Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

CONFIDENTIAL

You may rely on said opinion as though the same were addressed to you. No attorney-client relationship has existed or exists between any addressee of this letter and our firm in connection with the Agreement or the Bonds or by virtue of this letter.


Very truly yours,

CONFIDENTIAL

# Exhibit H

## Term Sheet for GridCo-GenCo PPOA

### TERM SHEET FOR
### GRIDCO-GENCO POWER PURCHASE & OPERATING AGREEMENT

*The summary of terms and conditions is provided for discussion purposes only and is not a commitment to enter into a power purchase and operating agreement (the "**PPOA**"). The terms and conditions contained below are an indication of the terms and conditions that the Puerto Rico Public-Private Partnerships Authority (the "**Authority**") and the Puerto Rico Electric Power Authority ("**PREPA**") believe should be included in any negotiated PPOA for capacity and energy purchased from PREPA's legacy generation assets. It is the intention to use the terms and conditions below as the basis for a definitive PPOA; provided, however, that the terms and conditions set forth below are subject to change.*

*Neither this term sheet (the "**Term Sheet**") nor any of its contents may be used for any other purpose without the prior written consent of the Authority. No legal obligation or liability shall arise between the parties with respect to the subject matter hereof unless and until the PPOA shall have been finalized in mutually acceptable form, approved by the parties' respective governing bodies and by the relevant Puerto Rico governmental authorities and executed by both parties, and then only in accordance with the terms and conditions thereof.*

| 1. | GENERAL | |
|---|---|---|
| 1.1. | **Parties:** | The owner of the transmission and distribution system ("**GridCo**"), as buyer, [the owner of PREPA's legacy generation assets ("**GenCo**")][17], as seller, the Authority, as contract administrator (the "**Administrator**"), and the operator of the T&D System (the "**T&D Operator**"), as agent of GridCo and dispatch manager (together, the "**Parties**"). |
| 1.2. | **Proposed Project:** | Pursuant to the PPOA, GenCo agrees to sell and GridCo agrees to accept delivery of and purchase the Energy and/or Dependable Capacity of the Generating Facilities (as defined below), which shall not be reduced except as provided by the PPOA. |
| 1.3. | **Term:** | The PPOA shall become effective on the date on which it is executed and the Conditions to Effectiveness (as defined below) have been satisfied (the "**Effective Date**"),[18] and shall remain in full force and effect for the remaining useful life of the Generating Facilities, unless earlier terminated[19] in accordance with the terms of the PPOA (the "**Term**"). |
| 1.4. | **Conditions to Effectiveness:** | The PPOA shall come into full force and effect upon receipt of approvals from the board of directors of each of GridCo and GenCo; the applicable regulatory bodies; and all other relevant governmental authorities under applicable law |

---

[17] **The creation of one or more GenCo entities subject to PR law provisions currently under analysis.**

[18] **The PPOA contemplates becoming effective the same date as the T&D O&M Agreement.**

[19] **Early termination provisions expected to consider, among others, the retirement, decommissioning, sale or concession of the Generating Facilities as part of PPP or other transactions, or if required by the Puerto Rico Energy Bureau ("PREB") or for purposes of complying with the Integrated Resource Plan ("IRP").**

CONFIDENTIAL

(including the Fiscal Oversight and Management Board) (the "**Conditions to Effectiveness**").

| | | |
|---|---|---|
| **1.5.** | **Generating Facilities** | For purposes of the PPOA, "**Generating Facilities**" means the electric generating facilities owned and operated by GenCo listed below: |

- [*List of generating facilities subject to this PPOA to be included*].

The Generating Facilities shall include: (a) all systems, structures, equipment and appurtenances associated with each Generating Facility's operation and forming a part thereof; (b) permanent administrative offices and building structures housing Generating Facilities equipment; (c) the land on which each Generating Facility is located and all site improvements such as roads, drainage, fencing and landscaping therein; and (d) structures, pipelines and equipment for: (i) the delivery of fuel from the fuel delivery point to the Generating Facility; (ii) the transport of water, waste water and other waste disposal; and (iii) other materials, supplies and commodities required to operate the Generating Facilities.

| | | |
|---|---|---|
| **1.6.** | **Products and Quantities** | Each Generating Facility will be assigned a "**Dependable Capacity**" which is the net electric generating capacity (gross electric generating capacity less station use) in kW, as determined by testing to be performed from time to time pursuant to the PPOA, which shall also determine the optimal output to meet system load requirements at the lowest possible cost to reliably service customers while recognizing the operational limits of the generation facilities, and made available from each Generating Facility to GridCo at their applicable interconnection point; provided that any excused or unexcused failure by GenCo to the make available the contractually-required quantity of Dependable Capacity shall be promptly notified in writing to GridCo, the Authority, the T&D Operator and PREB, which notice shall be for administrative purposes only, and shall not give rise to any rights or obligations. |

Upon the retirement or decommissioning or ramp-down of any Generating Facility, or unit within a Generating Facility, the Dependable Capacity relating to such Generating Facility will be automatically adjusted as necessary and removed for all purposes from the PPOA.

"**Energy**", defined as the net electrical output of each Generating Facility measured in kWh at the interconnection point, in amounts up to the Dependable Capacity of each Generating Facility.

GenCo will also provide ancillary services as required by GridCo, consistent with Prudent Utility Standards and within each Generating Facility's operational limits.

## 2. BUDGETS AND PAYMENTS

| | | |
|---|---|---|
| **2.1.** | **Budgets** | General |

CONFIDENTIAL

For any contract year[20] (other than the first contract year, or a year in which a rate adjustment approved by PREB[21] enters into effect, in which case the Budgets used in connection with obtaining such rate adjustment shall be used), GenCo shall prepare and deliver to the T&D Operator (with copy to GridCo), not less than one hundred (100) days prior to the commencement of such contract year and sufficiently in advance to allow the T&D Operator to comply with the applicable budget delivery requirements under the T&D O&M Agreement, its proposed operations and maintenance budget (the "**Operating Budget**") and proposed capital budget (the "**Capital Budget**", together with the Operating Budget, the "**Budgets**") for such year, together with financial forecasting for the following two (2) contract years.

Promptly following the Effective Date, GenCo shall prepare and deliver to the T&D Operator (with copy to GridCo), the proposed Budgets for the initial contract year.

The T&D Operator and the Administrator, as applicable, shall promptly notify GenCo of any changes needed to make the proposed Operating Budget and proposed Capital Budget compliant with the applicable rate order. GenCo shall cooperate with the T&D Operator and Administrator to resolve any differences with respect to the proposed budgets.

<u>Operating Budget</u>

The Operating Budget for any contract year shall include a month-by-month estimate of (i) the working capital reasonably determined by GenCo to be needed for the day-to-day operation of GenCo, (ii) fixed and variable operations and maintenance costs and (iii) costs and expenses associated with fuel purchases (including a two percent (2%) in excess of the total amount for excess expenditures that may arise in any contract year), in each case for the following contract year. Within forty-five (45) days following its receipt of such Operating Budget, Administrator shall notify GenCo (with copy to GridCo) whether the proposed Operating Budget is compliant with the applicable rate order.

GenCo shall be entitled to supplement or adjust any month of the Operating Budget by delivering to the T&D Operator (with copy to GridCo) revisions to the Operating Budget at least 30 days prior to the beginning of such monthly period; *provided* that such revisions will be subject to approval by the Administrator acting reasonably, or, if such adjustment or supplement would cause the Operating Budget to not comply with the applicable rate order, PREB. Such revisions may include any additional working capital or fuel

---

[20] **A contract year shall means the period from July 1 through June 30 for each year during that portion of the Term commencing on the Effective Date. The initial contract year shall be a partial contract year commencing on the Effective Date and ending on the following June 30.**

[21] **As discussed in Section 5.6(g) of the T&D O&M Agreement, a rate adjustment approved by PREB constitutes a change in customer rates or charges as required by Applicable Law or proposed by the Operator. If approved by PREB pursuant to Applicable Law, it may result in a change in customer rates or charges consistent with the scope of PREB's approval. Any Budget prepared by GenCo and submitted by the T&D Operator to the Authority and approved by the Authority shall be consistent with the determinations, directives and requirements established by PREB through a rate review proceeding.**

CONFIDENTIAL

charges that may be necessary, as well as adjustments on account of the ramp down or retirement of units and/or Generating Facilities.

Capital Budget

The Capital Budget for any contract year shall include a month-by-month estimate of the capital expenditures and working capital needed to maintain the Generating Facilities and justify how each expenditure is required to maintain legal and regulatory compliance, personnel and public safety, electric system or Generating Facility reliability, to improve plant efficiency or to retire or demolish a Generating Facility, and associated facilities, which is selected for decommissioning (in accordance with the IRP or as otherwise approved by PREB) and remediate and restore the related site in accordance with the directions of the Administrator or otherwise in accordance with applicable law and the IRP.

The Parties intend that the amounts provided in each approved Capital Budget for capital expenditures will be sufficient to enable GenCo to continue providing Dependable Capacity and to otherwise maintain the Generating Facilities in good working order consistent with Prudent Utility Practice. However, GenCo will promptly notify Administrator and GridCo when an unplanned event occurs, or is anticipated to occur, which would result in any required unbudgeted expenditures.

2.2.    **Fuel Charges**[22]    During the Term, GenCo shall (directly or through one or more agents or managers appointed by it) be responsible for managing, procuring, nominating, scheduling, and coordinating the transportation and delivery of all the fuel requirements of each Generating Facility. GridCo shall pay for all fuel purchases after GenCo certifies receipt and quality, and authorizes payment.

All charges in connection with the foregoing shall be "**Fuel Charges**", which shall be payable on a monthly basis in arrears.

On or before the first day of the Term, GridCo will advance to GenCo an amount equal to [US$[●] million][23] to finance GenCo fuel purchases for the first month of the Term, which shall be deposited in an account specifically created or designated by GenCo for such purpose (which may be increased as reasonably requested by GenCo). Excess or unused amounts shall be credited to the following Billing Period's Fuel Charges.

2.3.    **Generation Charges**    GridCo shall pay GenCo a monthly amount based on the approved budgets, including any costs and expenses for approved capital improvements relating to the Generating Facilities and related supplemental working capital and all costs and expenses associated with the operation and maintenance of a ramped

---

[22] **Although subject to further discussions and analysis by the P3 advisory team, fuel supply and procurement responsibilities may continue through PREPA's existing fuel procurement and supply office assumed by GenCo (*e.g.*, FuelCo). Upon dissolution of GenCo (*i.e.*, legacy generation assets are sold, retired or useful life runs out), only FuelCo operations remain procuring and selling fuel to GridCo. To the extent PREPA's reorganization includes the formation of multiple GenCo entities, fuel procurement and supply functions may need to be channeled through an independent FuelCo, or transferred to a private partner, and the payment of fuel charges under the PPOA may need to be modified accordingly.**

[23] **Amount should reflect estimated non-fuel working capital costs for the first four months of the Term.**

CONFIDENTIAL

down unit and/or Generating Facility (the "**Monthly Generation O&M Charge**"). The Monthly Generation O&M Charge will be determined based on the approved Operating Budget and Capital Budget, in each case as adjusted or revised pursuant to the PPOA.

Variable costs and expenses of the Generating Facilities that vary according to the dispatched output of Energy and any interim adjustments to the Monthly Generation O&M Charge and rates due to emergency and unforeseen expenses will be made as directed by the Administrator and included as an adjustment charge ("**Monthly O&M Adjustment Charge**") in the invoice delivered for the following Billing Period.

Any reconciliation of actual payments and actual costs will be performed as directed by the Administrator pursuant to the terms of the PPOA.

**2.4.** **Working Capital**
No later than ninety (90) days before the Effective Date, GridCo will advance to GenCo an amount equal to the estimated non-fuel working capital costs for the first twelve (12) months of the Term, of which the first month of working capital shall be deposited in an account specifically created or designated by GenCo for such purpose (the "**Operating Account**") and the remaining amounts intended to cover the rest of months shall be deposited in a separate operating reserve account (the "**Operating Reserve Account**").

On the last day of each calendar month after the first calendar year of the Term, GridCo shall deposit in the Operating Account an amount of "working capital" equal to (x) the following calendar month's estimated working capital as set forth in the Budgets less (y) the sum of (A) the Monthly Generation O&M Charge, Monthly O&M Adjustment Charge (if any) and Fuel Charge and (z) any funds remaining in the Operating Account on such date.

**2.5.** **Invoices**
Invoices for the Monthly Generation O&M Charge, Fuel Charge and the Monthly O&M Adjustment Charge (if any), shall be delivered by GenCo to GridCo no more than 15 days after the conclusion of each Billing Period, and GridCo shall pay such charges no later than the last day of the month following such monthly period. GridCo shall have no obligation to verify any invoice submitted by GenCo.

## 3. OPERATING PROVISIONS

**3.1.** **Dispatching**
The T&D Operator, as agent of GridCo and dispatch manager, shall at its sole discretion have the right to dispatch the units at the Generating Facilities within their operational limits and in accordance with the principles related to the dispatch of power and electricity set forth in Schedule 1 to Annex I (*Scope of Services*) of the T&D O&M Agreement.

GridCo's operations center will determine the appropriate level of dispatch by means of its automatic generation control ("**AGC**") system and the use of Prudent Utility Practices. GenCo will give the dispatcher a status report every eight (8) hours regarding each Generating Facility's conditions, including any Generating Facility restrictions and the hourly integrated net generation. GenCo shall notify the dispatcher immediately if there is any significant change in the Facility's status. GenCo shall make available through the

CONFIDENTIAL

Facility's Remote Terminal Unit (RTU) the actual Facility load limit adjustment.

By the Friday of each week, T&D Operator, as agent of GridCo and dispatch manager, shall provide GenCo with an estimated schedule of operations for the succeeding week. The actual schedule shall be determined by the requirements for operation in accordance with "economic dispatch" principles or GridCo's AGC system, which may be substantially different than the estimated schedule previously provided for such week.

If the cost of the Energy from the Generating Facilities becomes more costly on an incremental basis than other sources available to GridCo, the output from the Generating Facilities shall be reduced to zero, if GridCo so requests, and the Budgets shall be adjusted accordingly to account for the effect for this reduced output; provided that such output reduction shall not affect the payment of charges (as adjusted pursuant to the revised Budgets) as described above except as it relates to any variable component tied to making such output available.

| 3.2. | Agreed Operating Procedures[24] | The Parties shall mutually develop written operating procedures (the "**Agreed Operating Procedures**"). Topics covered shall include, but not necessarily be limited to, method of day-to-day communications, key personnel lists for both GenCo and GridCo's dispatching centers, clearances and switching practices, outage scheduling, daily available capacity and energy reports, Generating Facility operations log, reactive power support, operation of the ACG system, economic dispatch practices and emergency procedures. The Parties shall jointly establish plans for operating the Generating Facilities during an emergency. |
|---|---|---|

The Agreed Operating Procedures shall be consistent with the principles related to the dispatch of power and electricity set forth in the System Operation Principles (as defined in the T&D O&M Agreement).

| 3.3. | Interconnection Facilities | The Parties shall take such actions and execute such agreements and other documents as may be necessary or appropriate to provide for the continued interconnection of the Generating Facilities to the T&D System. |
|---|---|---|
| 3.4. | Maintenance | GenCo shall inspect, maintain and repair the Generating Facilities in accordance with Prudent Utility Practices. GenCo shall maintain, and deliver to GridCo upon request, maintenance and repair records of the Generating Facilities. |
| 3.5. | Records | Each Party shall keep complete and accurate records and all other data required by each of them for the purposes of proper administration of the PPOA. Such records shall be maintained until the expiration of the Term. Either Party shall have the right from time to time, upon written notice to the other Party and during regular business hours, to examine the relevant records and data of the other Party. |

---

[24] **The Agreed Operating Procedures are expected to largely track analogous procedures included in the AES and EcoElectrica PPOAs, on which PREPA's system operations currently relies.**

**3.6.  Outages**   GenCo shall, at least thirty (30) Days prior to the Effective Date, submit a written scheduled outage program (the "**Scheduled Outage Program**") for the remaining portion of the first year of each Generating Facility's operations, and by September 1 of each year, its desired Scheduled Outage Program for the next year. If GridCo cannot accept any of the requested scheduled outage periods in the Scheduled Outage Program, GridCo shall advise GenCo of the time period closest to the requested period when the outage can be scheduled. GenCo shall use all reasonable efforts to comply with the Scheduled Outage Program.

GenCo shall use reasonable efforts to notify GridCo of and coordinate all non-scheduled outages with GridCo. To the extent possible, GenCo shall use reasonable efforts to have such non-scheduled outages occur during times when the applicable Generating Facility is not projected to be dispatched, during scheduled outages or at such other times as will minimize any adverse effect on the operation of GridCo's electric system. Should a forced outage occur at any of the Generating Facilities, GenCo shall use commercially reasonable efforts to notify GridCo of the forced outage, the cause of the outage, and provide a schedule to make the applicable Generating Facility available for dispatch.

**3.7.  Metering**   All Energy and Capacity delivered by GenCo and supplied to GridCo shall be measured by meters, which shall be used for administrative purposes only. GenCo may also install meters and metering devices on each Generating Facility site for backup purposes; <u>provided</u> that such meters and metering devices shall be subject to GridCo's approval. GridCo shall own and maintain all meters and metering devices.

Unless otherwise specified, all meters and metering devices shall be located at the interconnection point of each Generating Facility and GridCo shall reimburse GenCo for all reasonable expenses incurred by the GenCo for the installation and testing of meters and metering devices; <u>provided</u> that GenCo shall relocate to the applicable interconnection point of each Generating Facility the meters and metering devices not otherwise located therein as of the Effective Date.

At least once a year at GridCo's cost and, in addition, from time to time upon two (2) weeks prior written notice by GenCo, at GenCo's cost, GridCo will test and calibrate the meter(s), including any backup meters, in accordance with the provisions for meter testing as established in American National Standards Institute (ANSI) Code for Electricity Metering Standard. GridCo shall read the meters monthly to determine the amount of Energy delivered to GridCo during the prior month (the "**Billing Period**"). GenCo may be present, at its option, during all meter readings.

**3.8.  Billing**   Following each meter reading, and continuing through and including the first month following the end of the Term, GenCo shall provide to GridCo a report covering the actual Energy and Capacity delivered, and actual Fuel Charges incurred, during the prior month (the "**Billing Period**").

CONFIDENTIAL

| 3.9. | **Capacity Ramp Down** | During the Term, GridCo shall have the right, subject to the IRP, to reduce all or any portion of Generating Facility capacity which GridCo accepts from GenCo pursuant to the terms of the PPOA ("**Ramp Down**"). |
| --- | --- | --- |
| | | Following the receipt of a Ramp Down notice from GridCo, GenCo shall provide written notice to GridCo on whether it will continue operating or otherwise retire the applicable Generating Facility. |
| | | Costs and expenses associated with the operation and maintenance of a ramped down unit and/or Generating Facility shall be included in the Operating Budget, which shall be modified or adjusted as necessary to account for ramped down units and/or Generating Facilities. |
| 3.10. | **Retirements, Decommissioning, Sales or Transfers of Generating Facilities** | GenCo shall notify GridCo, the Authority, the T&D Operator and the PREB of its intent to retire, decommission, sell or transfer to an private operator all or certain units of a Generating Facility, including due to catastrophic failures and/or legal and regulatory compliance requirements. |

## 4. TERMINATION

| 4.1. | **Termination of Agreement** | Termination of the PPOA shall only occur upon the expiration of the Term (subject to early termination) or the mutual written consent of the Parties. |
| --- | --- | --- |

## 5. INDEMNIFICATION AND FORCE MAJEURE

| 5.1. | **Indemnification Generally** | As of the Effective Date and for the Term (subject to the survival provisions), each Party shall indemnify and hold harmless the other Party and each of its affiliates and each of their respective directors, officers, shareholders, partners, employees, agents and representatives and each of their respective heirs, successors and assigns from and against any and all damages, claims, losses, liabilities, actions, causes of action, costs, expenses and obligations (including, without limitation, all reasonable attorneys' fees) whether arising in contract, tort or otherwise to third parties for or on account of injury, bodily or otherwise, to or death of persons or for damage to or destruction of property, in each case resulting from, arising out of or in connection with such indemnifying Party's negligent performance or failure to perform under the PPOA. |
| --- | --- | --- |
| 5.2. | **Environmental Compliance** | GenCo shall comply in all material respects with all applicable environmental laws including all applicable laws regulating or affecting any spill, discharge, or release of any hazardous substances. |
| 5.3. | **No Consequential or Punitive Damages** | In no event shall any Party or any affiliate thereof or any of their respective directors, officers, agents, or employees be liable to any other Party or any affiliate thereof or any of their respective directors, officers, agents, or employees for any indirect, consequential, punitive, special, incidental or exemplary losses or damages (including without limitation lost profits or lost business opportunity), whether such liability arises in contract, tort or otherwise. |

| 5.4. | **Force Majeure Event** | A Force Majeure Event shall excuse the performance of the Party claiming a Force Majeure Event if such event causes the non-performance or inability to perform. The burden of proof as to whether a Force Majeure Event has caused a non-performance or inability to perform shall be on the Party claiming the Force Majeure Event. The Parties shall be excused from performing under the PPOA and shall not be liable in damages or otherwise to the extent the non-performance or inability to perform is due to a Force Majeure Event. |
|---|---|---|
| | | "**Force Majeure Event**" means any event or circumstance to the extent beyond the control of, and not the result of the negligence of, or caused by, the Party seeking to have its performance obligation excused thereby, which by the exercise of due diligence such Party could not reasonably have been expected to avoid and which by exercise of due diligence it has been unable to overcome. |

## 6. MISCELLANEOUS

| 6.1. | **GridCo Representations and Warranties** | GridCo (for the sake of clarity, GridCo for itself and not T&D Operator acting as GridCo's agent) shall provide representations and warranties covering the following matters (among others), as shall be further specified in the PPOA: |
|---|---|---|

- organization, power and authority;
- enforceability of the PPOA;
- compliance with law; and
- no adverse legal proceedings.

| 6.2. | **GenCo Representations and Warranties** | GenCo shall provide representations and warranties covering the following matters (among others), as shall be further specified in the PPOA: |
|---|---|---|

- organization, power and authority;
- enforceability of the PPOA;
- compliance with law;
- no adverse legal proceedings; and
- contractual commitments for or access to a reliable supply of fuel.

| 6.3. | **Insurance** | GenCo shall maintain, from a reputable insurance company or other providers reasonably acceptable to GridCo, policies of insurance as set forth in the PPOA, including, without limitation: |
|---|---|---|

- workmen's compensation insurance;
- comprehensive or commercial general liability insurance;
- excess liability insurance;
- all risk physical damage insurance;
- marine cargo insurance; and
- pollution legal liability insurance.

| | | |
|---|---|---|
| **6.4.** | **Assignment** | GenCo shall not assign or transfer its rights and obligations under the PPOA without the prior written consent of GridCo and the Administrator. Any attempt by GenCo to assign its rights or obligations under the PPOA without the prior written consent of the corresponding Party shall be void. Notwithstanding the foregoing, GridCo may assign, without the consent of GenCo, its rights, duties, obligations and benefits, in their entirety to any entity that is designated or approved as the lawful operator of an electricity transmission and/or distribution system in the Commonwealth of Puerto Rico. |
| **6.5.** | **Governing Law** | The PPOA shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Puerto Rico and, to the extent applicable, the laws of the United States of America, in each case without regard to the principles of conflicts of law. |
| **6.6.** | **Severability** | If a court of competent jurisdiction declares any of the provisions of the PPOA as invalid, illegal or unenforceable, such holding will not affect the validity, effectiveness or enforceability of the remaining provisions of the PPOA. |
| **6.7.** | **Survival** | All indemnification rights shall survive the end of the Term for an additional twelve (12) months and all post-closing obligations shall survive the end of the Term. |

CONFIDENTIAL

*Execution Version*

## PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM SUPPLEMENTAL TERMS AGREEMENT

This PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM SUPPLEMENTAL TERMS AGREEMENT (this "Supplemental Agreement") is made and entered into as of this 22nd day of June, 2020 by and among: (i) the Puerto Rico Electric Power Authority ("Owner"), a public corporation and governmental instrumentality of the Commonwealth of Puerto Rico, created by Act No. 83 of the Legislative Assembly of Puerto Rico, enacted on May 2, 1941; (ii) the Puerto Rico Public-Private Partnerships Authority ("Administrator"), a public corporation of the Commonwealth of Puerto Rico, created by Act No. 29 of the Legislative Assembly of Puerto Rico, enacted on June 8, 2009; (iii) LUMA Energy, LLC ("ManagementCo"), a limited liability company organized under the laws of Puerto Rico; and (iv) LUMA Energy ServCo, LLC ("ServCo" and, together with ManagementCo, "Operator" and, together with Owner, Administrator and ManagementCo, the "Parties" and each a "Party"), a limited liability company organized under the laws of Puerto Rico. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in Article 1 (*Definitions; Interpretation*), and any such capitalized terms used herein but not defined herein shall have the respective meanings ascribed to them in the O&M Agreement, as the same may be amended or supplemented by this Supplemental Agreement.

### RECITALS

WHEREAS, the Parties are party to that certain Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement, dated as of the date hereof (as amended, supplemented or restated from time to time in accordance with its terms, the "O&M Agreement");

WHEREAS, the Parties have agreed to enter into this Supplemental Agreement, which shall be applicable to the Parties only upon the Supplemental Agreement Effective Date and for the duration of the Interim Period, including through the date of any termination of the O&M Agreement during the Interim Period pursuant to the terms of this Supplemental Agreement;

WHEREAS, all conditions to the Effective Date of the O&M Agreement have been satisfied as of the date hereof; and

WHEREAS, the Parties' execution, delivery and performance of this Supplemental Agreement have been authorized and/or approved by all Governmental Bodies required to have authorized and/or approved the Parties' execution, delivery and performance of the O&M Agreement as a condition to the Effective Date, including by the FOMB.

NOW THEREFORE, in consideration of the mutual covenants, representations, warranties and agreements contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties covenant and agree as follows:

CONFIDENTIAL

## ARTICLE 1
## DEFINITIONS; INTERPRETATION

**Section 1.1    Definitions**. As used in this Supplemental Agreement, the following capitalized terms have the respective meanings set forth below.

"Administrator" has the meaning set forth in the introductory paragraph.

"Interim Costs and Expenses" has the meaning set forth in Section 3.4 (*Operator's Title III Costs and Expenses*).

"Interim Period" has the meaning set forth in Section 2.4 (*Term*).

"Interim Period Service Commencement Date" has the meaning set forth in Section 2.3 (*Interim Period Service Commencement Date*).

"Interim Period Service Fee" has the meaning set forth in Section 3.3 (*Operator's Compensation*).

"Interim Period Services" has the meaning set forth in Section 3.1 (*Operator's Services During Interim Period*).

"Interim Period Termination Date" has the meaning set forth in Section 7.1(a) (*Additional Termination Events – Interim Period Termination Date*).

"ManagementCo" has the meaning set forth in the introductory paragraph.

"O&M Agreement" has the meaning set forth in the Recitals.

"Operator" has the meaning set forth in the introductory paragraph.

"Owner" has the meaning set forth in the introductory paragraph.

"Party" has the meaning set forth in the introductory paragraph.

"ServCo" has the meaning set forth in the introductory paragraph.

"Service Fee" has the meaning set forth in Section 3.3 (*Operator's Compensation*).

"Supplemental Agreement" has the meaning set forth in the introductory paragraph.

"Supplemental Agreement Effective Date" has the meaning set forth in Section 2.2 (*Effectiveness*).

"Supplemental Agreement Reliance Letter" means a letter from tax counsel, substantially in the form set forth in Exhibit B hereto (*Form of Supplemental Agreement Reliance Letter*) that shall accompany a Supplemental Agreement Tax Opinion and shall permit Operator to rely on such Supplemental Agreement Tax Opinion.

CONFIDENTIAL

"Supplemental Agreement Tax Opinion" means an opinion, substantially in the form set forth in Exhibit A hereto (*Form of Supplemental Agreement Tax Opinion*), of Nixon Peabody LLP as counsel to the FOMB or other tax counsel reasonably acceptable to Administrator, rendered in connection with this Supplemental Agreement and providing that neither this Supplemental Agreement nor any provision hereof, nor the O&M Agreement nor any provision thereof, nor the performance by each Party of its obligations hereunder and thereunder during the Interim Period (including Operator's administration of the System Contracts), adversely affects the exclusion from gross income of interest on obligations of Owner, its Affiliates or another Governmental Body for federal income tax purposes under the Internal Revenue Code.

**Section 1.2    Interpretation; Construction**. Section 1.2 (*Interpretation; Construction*) of the O&M Agreement is incorporated herein by reference, *mutatis mutandis*.

## ARTICLE 2
## EFFECT OF AGREEMENT; EFFECTIVENESS; TERM

**Section 2.1    Effect of this Supplemental Agreement**. This Supplemental Agreement constitutes an integral part of the O&M Agreement. On and after the Supplemental Agreement Effective Date, each reference in the O&M Agreement to "this Agreement," "hereunder," "hereof" or "herein" shall mean and be a reference to the O&M Agreement, as supplemented and amended by this Supplemental Agreement, unless the context otherwise requires. The Parties hereby agree that this Supplemental Agreement constitutes an amendment to the O&M Agreement and constitutes and shall be deemed a Transaction Document. The O&M Agreement, except as supplemented and amended by this Supplemental Agreement, is in full force and effect and is in all respects hereby ratified and confirmed. In the event of any conflict during the Interim Period between a provision of the O&M Agreement and a provision of this Supplemental Agreement, the provisions of this Supplemental Agreement shall control.

**Section 2.2    Supplemental Agreement Effective Date; Agreement Regarding Service Commencement Date**. This Supplemental Agreement shall automatically become effective, without further action by the Parties, on the date on which all Service Commencement Date Conditions shall have been satisfied or waived in accordance with the requirements of the O&M Agreement, except that the Title III Exit shall have not yet occurred and the Tax Opinion and Reliance Letter required by Section 4.5(v) (*Conditions Precedent to Service Commencement Date – Tax Opinion*) of the O&M Agreement shall have not yet been delivered (such date, if it occurs, the "Supplemental Agreement Effective Date"). If the Supplemental Agreement Effective Date does not occur, this Supplemental Agreement shall not become effective and shall be deemed void *ab initio* and terminated automatically without any further action by the Parties. Upon the occurrence of the Supplemental Agreement Effective Date, notwithstanding anything to the contrary in the O&M Agreement, the Parties agree that the Service Commencement Date shall not be deemed to have occurred and that this Supplemental Agreement shall govern the process for determining whether the Service Commencement Date has occurred.

**Section 2.3    Interim Period Service Commencement Date**. The "Interim Period Service Commencement Date" shall be the first (1st) Business Day of a calendar month that is at least three (3) Business Days following the date on which the Administrator delivers a certificate

CONFIDENTIAL

to Operator confirming that the following conditions have been met to the satisfaction of each of Operator and Administrator:

       (a)     the O&M Agreement shall remain in full force and effect, subject to this Supplemental Agreement;

       (b)     the Title III Court shall have entered, on a final and non-appealable basis, an order or orders (i) to the extent required by Applicable Law, authorizing Owner's entry into and performance of this Supplemental Agreement, and (ii) granting administrative expense treatment for any amounts required to be paid by Owner under this Supplemental Agreement and the O&M Agreement during the Interim Period, and in the case of each of (i) and (ii), such approvals and orders shall be reasonably acceptable to Operator;

       (c)     a number of Owner Employees and Other Employees necessary for Operator to perform the Interim Period Services shall have accepted offers to commence employment as ServCo Employees beginning on the Interim Period Service Commencement Date and, without limiting the generality of the foregoing, Owner shall have provided communications to all Owner Employees regarding Owner's pension obligations going forward reasonably acceptable to Owner and Operator;

       (d)     Owner shall have provided Operator with written notice of the System Contracts and Generation Supply Contracts that have been assumed and those that have been rejected as at the Interim Period Service Commencement Date;

       (e)     all Service Accounts shall have been established, and all Service Accounts other than the Contingency Reserve Account shall have been funded, in each case as required by Section 4.7 (*Establishment and Funding of Service Accounts*);

       (f)     Owner shall have received a Supplemental Agreement Tax Opinion and ManagementCo shall have received a Supplemental Agreement Reliance Letter, at the expense of Owner or Administrator; and

       (g)     all Service Commencement Date Conditions, other than delivery of the Tax Opinion and Reliance Letter required by Section 4.5(v) (*Conditions Precedent to Service Commencement Date – Tax Opinion*) of the O&M Agreement, shall have been satisfied after giving effect to the amendments to the O&M Agreement set forth herein.

    **Section 2.4**    **Term**. This Supplemental Agreement shall be in effect from the Supplemental Agreement Effective Date through the earlier of (a) the Service Commencement Date and (b) the Interim Period Termination Date (such period of time, the "<u>Interim Period</u>"), unless earlier terminated in accordance with the terms hereof. Notwithstanding anything to the contrary herein or in the Transaction Documents, the occurrence of the Interim Period shall not in any way reduce or be applied against the Initial Term.

# ARTICLE 3
## INTERIM PERIOD SERVICES; COMPENSATION; COSTS AND EXPENSES

**Section 3.1     Operator's Services During Interim Period**. Commencing on the Interim Period Service Commencement Date and for the duration of the Interim Period thereafter, subject to the terms and conditions of this Supplemental Agreement and for the compensation described herein, Operator shall perform all services with respect to the T&D System constituting O&M Services under the O&M Agreement (the "<u>Interim Period Services</u>"), notwithstanding the fact that the Service Commencement Date has not yet occurred. Operator shall perform the Interim Period Services subject to the terms and conditions of the O&M Agreement, except as the same may be amended or supplemented by this Supplemental Agreement. For purposes of the foregoing sentence, each term and condition with respect to the O&M Services referring to "during each Contract Year," "after the Service Commencement Date" or any similar term, shall be read to refer to the Interim Period and Interim Period Service Commencement Date, as applicable, with respect to the Interim Period Services.

**Section 3.2     System Contracts and Generation Supply Contracts**. During the Interim Period, Sections 4.3(d) (*Owner and Administrator Responsibilities – Additional System Contracts and Generation Supply Contracts*) and 4.3(e) (*Owner and Administrator Responsibilities – Notices with respect to System Contracts and Generation Supply Contracts*) of the O&M Agreement shall continue to apply to System Contracts and Generation Supply Contracts that have not yet been assumed or rejected in the Title III Case.

**Section 3.3     Operator's Compensation**. In addition to Owner's funding or payment of T&D Pass-Through Expenditures, Generation Pass-Through Expenditures, Capital Improvements, Outage Event Costs and any other amounts that become due and owing to Operator hereunder and under the O&M Agreement (other than the Service Fee, as defined in the O&M Agreement), as compensation for Operator's performance of the Interim Period Services, and solely for the duration of the Interim Period, Owner shall pay ManagementCo an annual fixed management service fee  equal to One Hundred Fifteen Million Dollars (US$115,000,000.00) in 2020 Dollars, such amount to be adjusted for inflation in the manner set forth in Annex VIII (Service Fee) to the O&M Agreement on the Interim Period Service Commencement Date and each twelve (12) month anniversary of the Interim Period Service Commencement Date thereafter (such fee, as adjusted, the "<u>Interim Period Service Fee</u>").  The Interim Period Service Fee shall be invoiced and paid on the same terms as the Fixed Fee as set forth in the O&M Agreement, <u>provided</u> that notwithstanding anything to the contrary in the O&M Agreement, the Interim Period Service Fee shall be paid in monthly installments, each due and payable by Owner monthly in advance on the first Business Day of each month following the month in which Operator has submitted an invoice pursuant to Section 7.1(b)(iii) (*Service Fee – Fixed Fee*) of the O&M Agreement, which invoice shall specify the monthly portion of the Interim Period Service Fee for the next succeeding month.

**Section 3.4     Operator's Title III Costs and Expenses**. Without limitation or duplication of Owner's indemnification obligation in Section 18.2(a)(ix) (*Indemnification by Owner – Generally*) of the O&M Agreement, during the Interim Period, all of the following (without duplication) shall be considered T&D Pass-Through Expenditures and shall be deemed administrative expenses of Owner: all costs and expenses, including Fees-and-Costs, arising from, related to or in connection with any participation by Operator in, or any other action taken by

CONFIDENTIAL

Operator in connection with, PROMESA, the Title III Case or any other Legal Proceeding related thereto ("Interim Costs and Expenses"). Notwithstanding anything to the contrary herein or in the O&M Agreement, (a) Operator's inclusion in any applicable Operating Budget of any line item related to the Interim Costs and Expenses shall not be held against Operator for purposes of determining whether an Operator Event of Default has occurred, (b) any Interim Costs and Expenses in excess of the applicable Operating Budget line item shall not be counted against any limitation on Excess Expenditures and (c) all Interim Costs and Expenses shall be deemed to be included in the applicable Operating Budget regardless of whether such Interim Costs and Expenses are delineated in such Operating Budget.

**Section 3.5    Administrative Expense Treatment**. All amounts payable by Owner to Operator hereunder and under the O&M Agreement during the Interim Period shall be deemed to be administrative expenses of Owner.

**Section 3.6    Contract Principles**. Each of the Parties hereby agrees, during the Interim Period, to uphold the principles of good faith and fair dealing in performing their obligations throughout the term of and under this Supplemental Agreement, and that any dispute with respect to the interpretation of this Supplemental Agreement or the O&M Agreement shall be determined consistent with the foregoing.

# ARTICLE 4
# ADJUSTMENTS TO O&M AGREEMENT

**Section 4.1    Effect of Amendments and Modifications**. Any amendments or supplements to the O&M Agreement made herein shall be effective only during the Interim Period, underlined provided that such amendments or supplements shall survive if the O&M Agreement is terminated during the Interim Period pursuant to the terms of this Supplemental Agreement.

**Section 4.2    Defined Terms**. Section 1.1 (*Definitions*) of the O&M Agreement is amended by making the changes below.

(a)    Additional Defined Terms. The following defined terms are added to Section 1.1 (*Definitions*) of the O&M Agreement in the appropriate alphabetical order:

"Interim Costs and Expenses" has the meaning set forth in the Supplemental Agreement.

"Interim Period" has the meaning set forth in the Supplemental Agreement.

"Interim Period Service Commencement Date" has the meaning set forth in the Supplemental Agreement.

"Interim Period Service Fee" has the meaning set forth in the Supplemental Agreement.

"Material Adverse Effect" means a material adverse effect on (i) the ability of Operator or Owner, as applicable, to perform its obligations under the Supplemental Agreement and/or this Agreement or (ii) the rights of

CONFIDENTIAL

Operator or Owner, as applicable, under the Supplemental Agreement and/or this Agreement.

"<u>Postpetition Financing</u>" means any financing facility entered into by Owner during the administration of the Title III Case pursuant to section 364 of the Bankruptcy Code, provided that any Liens or priority payment terms granted under such facility under section 364(c) or (d) of the Bankruptcy Code shall be subject and subordinate to any amounts required to be paid by Owner under this Agreement.

"<u>Supplemental Agreement</u>" means that certain Supplemental Terms Agreement among the Parties, dated as of the Effective Date.

(b)    <u>Change in Law</u>. The definition of "Change in Law" is amended by:

(i)    adding the following text as a new clause (iv):

"any event or circumstance, or order or judgment of any Governmental Body, requiring Operator or any Operator Related Parties to become a party to any Legal Proceeding related to the Title III Case or if Operator commences or becomes a party to any action or contested matter in the Title III Case in order to protect its rights under the Supplemental Agreement."; and

(ii)    inserting the following text immediately preceding the period at the end of the proviso:

", except where arising out of the Title III Case".

(c)    <u>Force Majeure Event</u>. The definition of "Force Majeure Event" is amended by:

(i)    deleting and restating the text of clause (I) as follows:

"strikes, boycotts, work stoppages, lockouts or other labor or employment disputes or disturbances with respect to the employees of ServCo occurring during the Interim Period; and"

(ii)    deleting the text "increases in wage rates of Operator's employees and Subcontractors, insurance costs," in clause (2);

(iii)    adding the word "and" to the end of clause (8);

(iv)    deleting the text "; and" at the end of clause (9) and replacing it with "."; and

(v)    deleting clause (10).

(d)    Operator Termination Fee. The definition of "Operator Termination Fee" is amended by adding the following text immediately preceding the period at the end of such definition:

> "provided, that during the Interim Period, the Operator Termination Fee shall equal the Interim Period Service Fee".

(e)    Permitted Liens. The definition of "Permitted Liens" is amended by deleting and restating the text thereof as follows:

> ""Permitted Liens" means (i) Liens arising by operation of law that are either contested in good faith and for which Operator or any Subcontractor has established adequate reserves or that are discharged promptly, (ii) Liens existing as of the Effective Date, if any, (iii) Liens that result from any act or omission by any Owner Related Party, Administrator or any other Governmental Body, (iv) purchase money Liens or similar Liens securing rental payments under capital lease arrangements, (v) Liens to secure Postpetition Financing, and (vi) Liens on System Revenues specified in or permitted under any Title III Plan and its related implementing documents, provided that in the case of each of clauses (v) and (vi), such Permitted Liens would not reasonably be expected to have a Material Adverse Effect on the rights of Operator hereunder or the ability of Owner or Operator to perform their respective obligations under this Agreement.".

(f)    Service Fee. The definition of "Service Fee" is amended by adding the following text immediately preceding the period at the end of such definition:

> "provided, that during the Interim Period, no Service Fee shall be payable hereunder and, in lieu thereof, the Interim Period Service Fee shall be payable, subject to the terms and conditions of the Supplemental Agreement.

(g)    Transaction Documents. The definition of "Transaction Documents" is amended by adding the following text after the words "means this Agreement,":

> "the Supplemental Agreement,".

**Section 4.3    Ownership of System Revenues**. Section 3.2 (*Engagement of Operator*) of the O&M Agreement is amended by deleting the text reading "(subject only to Liens on System Revenues specified in the Title III Plan and the related disclosure statement)" and replacing it with the following text:

> "(subject only to Permitted Liens)".

**Section 4.4    Tax Assurance**. Section 4.5(t) (*Conditions Precedent to Service Commencement Date - Tax Matters*) of the O&M Agreement is amended by adding the following text after the words "the Service Fee" in each of clauses (i) and (ii):

CONFIDENTIAL

"(including the Interim Period Service Fee)".

**Section 4.5      Front-End Transition Service Fixed Fee**. Section 4.6(b) (*Front-End Transition Period Compensation - Front-End Transition Service Fee*) is amended by deleting the text "Service Commencement Date" in the two places where it appears in clause (iii)(B) and replacing it with the following text:

"Interim Period Service Commencement Date".

**Section 4.6      Collection of Charges**. Section 5.3(b) (*Billing and Collection – Collection of Charges*) of the O&M Agreement is amended by deleting the text reading "(subject only to Liens on System Revenues specified in the Title III Plan and the related disclosure statement)" and replacing it with the following text:

"(subject only to Permitted Liens)".

**Section 4.7      Establishment and Funding of Service Accounts**.

(a)      Contingency Reserve Account.  Notwithstanding anything to the contrary in the O&M Agreement, Owner shall (i) establish the Contingency Reserve Account not less than ten (10) Business Days prior to the Interim Period Service Commencement Date, (ii) no later than the tenth (10th) Business Day of each month during the Interim Period (beginning in the month in which the Interim Period Service Commencement Date occurs) Owner shall fund the Contingency Reserve Account in an amount equal to 1/24 of the Contingency Reserve Amount, (iii) following any withdrawal from the Contingency Reserve Account during the Interim Period, Owner shall replenish the Contingency Reserve Account by depositing no later than the tenth (10th) Business Day of each month (beginning in the month following that in which the withdrawal occurred) the amount withdrawn, which shall be in addition to the funding required by the preceding clause (ii), and (iv) the failure to fund and replenish the Contingency Reserve Account as required by this Section shall constitute an Owner Event of Default. For the avoidance of doubt, except as amended by this Section, the provisions of Section 7.5(f) (*Service Accounts - Contingency Reserve Account*) of the O&M Agreement continue to apply.

(b)      All Other Service Accounts. Notwithstanding anything to the contrary in the O&M Agreement, Owner shall establish each Service Account other than the Contingency Reserve Account, and shall fund each such Service Account other than the Contingency Reserve Account, in the full amount required by the O&M Agreement to be in place as of the Service Commencement Date, in each case not less than ten (10) Business Days prior to the Interim Period Service Commencement Date.

**Section 4.8      Owner Event of Default**. Section 14.3(c) (*Events of Default by Owner – Failure to Perform a Material Obligation*) of the O&M Agreement is amended by deleting the text reading "including the obligation to keep System Revenues free and clear of Liens other than Liens specified in the Title III Plan and the related disclosure statement" and replacing it with the following text:

"including the obligation to keep System Revenues free and clear of Liens other than Permitted Liens".

CONFIDENTIAL

>Section 4.9    **Back-End Transition Services**.

>>(a)    Specific Amendments to O&M Agreement.

>>>(i)    In Section 14.6(b) (*Remedies Upon Early Termination – Back-End Transition Service Fee*) of the O&M Agreement, prior to the words "Section 14.2", the following words are inserted: "the Supplemental Agreement,".

>>>(ii)    In Section 16.1 (*Successor Operator*) of the O&M Agreement: (A) the words "Interim Period" should be added before the words "Service Commencement Date" in two places; and (B) after the words "Article 14 (*Events of Default; Remedies*)" in clause (i) thereof, the following words are inserted:  ", or Administrator's receipt of a termination notice from Operator under the Supplemental Agreement (or upon the automatic termination of this Agreement pursuant to the terms of the Supplemental Agreement),".

>>(b)    Back-End Transition Period Compensation. If the Back-End Transition Commencement Date occurs as a result of the termination of the O&M Agreement pursuant to this Supplemental Agreement, then notwithstanding anything to the contrary in the O&M Agreement, Operator shall invoice Owner on or prior to the tenth (10th) day of each month for both (i) the prior calendar month's or months' Back-End Transition Services and the corresponding Back-End Transition Service Fee, as applicable, to the extent not previously paid, and (ii) the next succeeding month's anticipated Back-End Transition Services and the corresponding Back-End Transition Service Fee. Owner shall pay the Back-End Transition Service Fee monthly in advance on the first Business Day of each calendar month, subject to deduction by the amount of any overage in the Back-End Transition Service Fee paid by Owner in the previous month.  The Back-End Transition Service Fee shall be prorated for any partial monthly period during the Back-End Transition Period.

>Section 4.10    **Indemnification**. Section 18.2(a) (*Indemnification by Owner – Generally*) of the O&M Agreement is amended to delete the word "or" immediately preceding clause (viii), and to insert the following text immediately preceding the period at the end of such section:

>>"; or (ix) all claims brought against Operator after the Interim Period Service Commencement Date by any creditor or other Person (A) in connection with or related to the Title III Case or (B) in connection with or arising out of the negotiation and execution of the Supplemental Agreement.".

>Section 4.11    **Representations and Warranties of Owner**. Section 19.1(h) (*Charges*) of the O&M Agreement is amended by deleting the text reading "other than those specified in or permitted under any Title III Plan and its related implementing documents" and replacing it with the following text:

>>"other than Permitted Liens".

## ARTICLE 5
## RESPONSIBILITIES OF OWNER AND ADMINISTRATOR

**Section 5.1     Responsibilities of Owner and Administrator**. In addition to and not in limitation of their respective responsibilities set forth in the O&M Agreement, each of Owner and Administrator, as applicable, shall (a) exercise all reasonable efforts to cause the Title III Exit to occur as promptly as possible after the Supplemental Agreement Effective Date, (b) keep Operator informed with respect to the Title III Case, (c) provide Operator with copies of all of Owner's financial statements and reports concurrently with its provision of same to the Title III Court or any creditors, (d) agree to Operator's assertion of standing and appearance in the Title III Case and (e) allow Operator to speak on behalf of Owner with respect to the Interim Period Services. Neither Owner nor Administrator shall take any steps to appoint Operator or any Affiliate of Operator as a receiver in the Title III Case without the prior written consent of Operator in its sole and absolute discretion, and notwithstanding anything to the contrary in the O&M Agreement, any other Transaction Document or any other document, neither Operator nor any Affiliate of Operator shall have any obligation to act as a receiver in the Title III Case without its prior written consent in its sole and absolute discretion.

## ARTICLE 6
## CLOSING THE INTERIM PERIOD

**Section 6.1     Confirming Service Commencement Date**. The Parties agree that, notwithstanding anything to the contrary in the O&M Agreement, in order for the Service Commencement Date to occur, all Service Commencement Date Conditions must be satisfied or waived in accordance with their terms and for purposes of the foregoing, in addition to the Service Commencement Date Conditions set forth in the O&M Agreement, it shall be a Service Commencement Date Condition that the Title III Exit shall have occurred and that the Title III Plan and order of the Title III Court confirming same shall be reasonably acceptable to Operator. The Parties shall follow the process set forth in the O&M Agreement for establishing the Service Commencement Date, upon which date this Supplemental Agreement shall terminate and be null and void.

## ARTICLE 7
## TERMINATION

**Section 7.1     Additional Termination Events and Rights**.

(a)     Interim Period Termination Date. This Supplemental Agreement and the O&M Agreement shall automatically terminate without further action by Operator, and without need for a court decision or arbitral award confirming such termination, in the event that the Service Commencement Date does not occur on or prior to the date that is eighteen (18) months after the Supplemental Agreement Effective Date (such date, the "Interim Period Termination Date"), which Interim Period Termination Date may, if requested by Administrator, be extended by the mutual agreement of the Parties prior to the then-current Interim Period Termination Date.

(b)     Operator Termination Right Due to Material Adverse Effect. In addition to Operator's termination rights set forth in the O&M Agreement, which shall continue to apply,

CONFIDENTIAL

Operator may terminate this Supplemental Agreement and the O&M Agreement during the Interim Period upon the occurrence of a Material Adverse Effect arising out of the Title III Case as a result of a filing in the Title III Case or a ruling or order of the Title III Court, upon not less than one hundred twenty (120) days prior written notice to Administrator, without need for a court decision or arbitral award confirming Operator's right to terminate.

(c)     Cross-Termination. In the event that, during the Interim Period, either Operator or Administrator exercises its rights to terminate the O&M Agreement pursuant to the terms thereof, this Supplemental Agreement shall terminate concurrently with the termination of the O&M Agreement.

(d)     No Termination or Liquidated Damages Under O&M Agreement for Failure of Service Commencement Date Conditions. From and after the Interim Period Service Commencement Date and continuing after the Service Commencement Date, each Party hereby permanently waives its rights and remedies set forth in Section 4.8 (*Failure of Service Commencement Date Conditions*) of the O&M Agreement, except that any Delay Liquidated Damages that may have accrued and become payable thereunder prior to the Interim Period Service Commencement Date shall continue to be payable and shall be paid pursuant to the terms thereof.

## Section 7.2    Remedies Upon Early Termination.

(a)     Accrued and Unpaid Amounts. In addition to the payment of all accrued and unpaid amounts required to be paid by Owner under the O&M Agreement, in the event of an early termination of this Supplemental Agreement and the O&M Agreement, Owner shall indefeasibly pay any accrued and unpaid amounts required to be paid to Operator pursuant to this Supplemental Agreement, including the Interim Period Service Fee, in each case, as of the effective date of such termination.

(b)     Back-End Transition Service Fee. In the event of an early termination of this Supplemental Agreement and the O&M Agreement pursuant to Section 7.1 of this Supplemental Agreement (*Additional Termination Events and Rights*), and if Operator is performing the Back-End Transition Services, Owner shall be responsible for payment of the Back-End Transition Service Fee, which shall be deemed to be an administrative expense of Owner.

(c)     Termination Fee.

(i)     Notwithstanding anything to the contrary in the O&M Agreement, in the event this Supplemental Agreement and the O&M Agreement are terminated pursuant to Section 7.1(a) of this Supplemental Agreement (*Additional Termination Events and Rights – Interim Period Termination Date*), Owner shall pay Operator the Operator Termination Fee, which shall be deemed to be an administrative expense of Owner.

(ii)     The Parties hereby acknowledge and agree that, notwithstanding anything to the contrary in this Supplemental Agreement or the O&M Agreement, in the event this Supplemental Agreement and the O&M Agreement are terminated pursuant to Section 7.1(a) (*Additional Termination Events and Rights – Interim Period Termination Date*), Operator's damages would be difficult or impossible to quantify with reasonable certainty, and accordingly,

CONFIDENTIAL

the payment to Operator of the Operator Termination Fee (x) is a payment of liquidated damages (and not penalties), which is based on the Parties' best estimate of damages Operator would suffer or incur, and (y) shall constitute Operator's sole and exclusive remedy for all monetary damages, costs, losses and expenses of whatever type or nature arising from or related to this Supplemental Agreement due to the events described in this sentence, with any and all other rights and remedies hereunder, at law, in equity or otherwise, being herein irrevocably waived by the Operator.

(iii)     Each of Administrator and Owner hereby irrevocably waives any right it may have to raise as a defense that the Operator Termination Fee is excessive or punitive.

## ARTICLE 8
## REPRESENTATIONS AND WARRANTIES

**Section 8.1     Representations and Warranties of Owner**. Owner hereby represents and warrants to Operator that:

(a)     Existence and Powers. Owner is a public corporation and instrumentality of the Commonwealth duly organized, validly existing and in good standing under the laws of the Commonwealth. Owner has the required corporate power and authority to enter into this Supplemental Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby. Administrator has the required corporate power and authority to carry out its obligations under this Supplemental Agreement and on behalf of Owner, including the power and authority to bind Owner with respect to any matter contemplated under this Supplemental Agreement.

(b)     Due Authorization and Binding Obligation. The execution and delivery by Owner of this Supplemental Agreement, the performance by Owner of its obligations hereunder and the consummation by Owner of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Owner. This Supplemental Agreement has been duly and validly executed and delivered by Owner, and (assuming due authorization, execution and delivery by Operator) this Supplemental Agreement constitutes a legal, valid and binding obligation of Owner enforceable against Owner in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)     No Conflicts. Neither the execution, delivery or performance by Owner of this Supplemental Agreement, nor the consummation of the transactions contemplated hereby will: (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Owner; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Owner; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or (D) require the consent of any other Person under, any material contract to which Owner is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Owner.

CONFIDENTIAL

(d)  <u>No Consents</u>. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Owner in connection with (i) the execution and delivery of this Supplemental Agreement or (ii) the performance by Owner of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Interim Period Service Commencement Date.

(e)  <u>No Litigation</u>. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Owner or, to Owner's knowledge, threatened against Owner, which if determined adversely against Owner would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Supplemental Agreement or (ii) the performance by Owner or Operator of their respective obligations hereunder.

(f)  <u>No Legal Prohibition</u>. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Owner of this Supplemental Agreement and the transactions contemplated hereby.

**Section 8.2  Representations and Warranties of Operator**. Operator hereby represents and warrants to Owner that:

(a)  <u>Existence and Powers</u>. ManagementCo is a limited liability company duly organized, validly existing and in good standing under the laws of Puerto Rico, and is qualified to do business and in good standing in the Commonwealth. ServCo is a limited liability company duly organized, validly existing and in good standing under the laws of Puerto Rico, and is qualified to do business and in good standing in the Commonwealth. Each of ManagementCo and ServCo has the required corporate power and authority to enter into this Supplemental Agreement, carry out its obligations hereunder and consummate the transactions contemplated hereby.

(b)  <u>Due Authorization and Binding Obligation</u>. The execution and delivery by Operator of this Supplemental Agreement, the performance by Operator of its obligations hereunder and the consummation by Operator of the transactions contemplated hereby have been duly and validly authorized and approved by the required corporate or other similar action on the part of Operator. This Supplemental Agreement has been duly and validly executed and delivered by Operator, and (assuming due authorization, execution and delivery by Owner) this Supplemental Agreement constitutes a legal, valid and binding obligation of Operator enforceable against Operator in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium or similar Applicable Law affecting creditors' rights generally and by general equity principles.

(c)  <u>No Conflicts</u>. Neither the execution, delivery or performance by Operator of this Supplemental Agreement, nor the consummation of the transactions contemplated hereby will:  (i) result in a material violation or breach of, or material default under, any provision of the organizational documents of Operator; (ii) result in a violation of, or give any Governmental Body the right to challenge any of the transactions contemplated hereby under, any Applicable Law applicable to Operator; (iii) (A) result in a violation or breach of, (B) constitute a default under, (C) result in the acceleration of or create in any party the right to accelerate, terminate or cancel or

CONFIDENTIAL

(D) require the consent of any other Person under, any material contract to which Operator is a party; or (iv) result in the creation or imposition of any Lien on any properties or assets of Operator.

(d)  <u>No Consents</u>. No consent, declaration or filing with, or notice to, any Governmental Body is required by or with respect to Operator in connection with (i) the execution and delivery of this Supplemental Agreement or (ii) the performance by Operator of its obligations hereunder, except (A) such as have been duly obtained or made and (B) in the case of clause (ii), for those Governmental Approvals to be obtained after the Effective Date but before the Interim Period Service Commencement Date.

(e)  <u>No Litigation</u>. There is no action, suit or other proceeding, at law or in equity, before or by any court or Governmental Body pending against Operator or, to Operator's knowledge, threatened against Operator, which if determined adversely against Operator would reasonably be expected to materially and adversely affect (i) the validity or enforceability of this Supplemental Agreement or (ii) the performance by Operator or Owner of their respective obligations hereunder.

(f)  <u>No Legal Prohibition</u>. There is no Applicable Law in effect on the date hereof that would prohibit the execution, delivery or performance by Operator of this Supplemental Agreement and the transactions contemplated hereby.

## ARTICLE 9
## DISPUTE RESOLUTION

**Section 9.1  Disputes**. Any dispute among the Parties arising out of, relating to or in connection with this Supplemental Agreement or the existence, interpretation, breach, termination or validity thereof shall constitute a Dispute and shall be resolved pursuant to the Dispute Resolution Procedure.

## ARTICLE 10
## MISCELLANEOUS

**Section 10.1  Fees and Expenses; Notices; Amendments; Relationship of the Parties**. Sections 20.1 (*Fees and Expenses*), 20.2 (*Notices*), 20.3 (*Amendments*) and 20.5 (*Relationship of the Parties*) of the O&M Agreement are incorporated herein by reference, *mutatis mutandis*.

**Section 10.2  Entire Agreement**. This Supplemental Agreement, together with the O&M Agreement, constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes any and all prior oral or written agreements, understandings, proposals, representations or warranties relating to this Supplemental Agreement. Without limiting the generality of the foregoing, this Supplemental Agreement taken together with the O&M Agreement shall completely and fully supersede all other understandings and agreements among the Parties with respect to such transactions, including those contained in the RFP, the Proposal by Operator or its Affiliate and any amendments or supplements to the RFP or the Proposal. If this Supplemental Agreement does not become effective pursuant to its terms, then this Supplemental Agreement shall not be deemed to amend or supplement the O&M Agreement and shall not be consulted or used by the Parties to interpret any terms or conditions of the O&M Agreement.

CONFIDENTIAL

**Section 10.3   Assignment and Transfer**.

      (a)     <u>By Operator</u>. Operator shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Supplemental Agreement except to the same Person or Persons to which it assigns, transfers, conveys, leases, encumbers or otherwise disposes of its rights or obligations under the O&M Agreement, provided such action is permitted by the O&M Agreement.

      (b)     <u>By Owner</u>. Owner shall not assign, transfer, convey, lease, encumber or otherwise dispose of its rights or obligations under this Supplemental Agreement except to the same Person or Persons to which it assigns, transfers, conveys, leases, encumbers or otherwise disposes of its rights or obligations under the O&M Agreement, provided such action is permitted by the O&M Agreement.

**Section 10.4   Interest on Overdue Obligations; Waivers; Severability; Survival; No Third Party Beneficiaries; Remedies; Counterparts; Office of the Comptroller; Governing Law; Commonwealth Obligations**. Sections 20.7 (*Interest on Overdue Obligations*), 20.8 (*Waivers*), 20.9 (*Severability*), 20.10 (*Survival*), 20.11 (*No Third Party Beneficiaries*), 20.12 (*Remedies*), 20.13 (*Counterparts*), 20.14 (*Office of the Comptroller*), 20.15 (*Governing Law*) and 20.16 (Commonwealth Obligations) of the O&M Agreement are incorporated herein by reference, *mutatis mutandis*.

*[Signatures follow on next page]*

CONFIDENTIAL

**IN WITNESS WHEREOF**, Owner, Administrator, ManagementCo and ServCo each has caused this Supplemental Agreement to be duly executed as of the day and year first above written.

**PUERTO RICO ELECTRIC POWER AUTHORITY**

By:
Name: Jose Ortiz
Title: CEO

**PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY, solely in its capacity as ADMINISTRATOR**

By:
Name: Fermin Fontanés Gomez
Title: Executive Director

**LUMA ENERGY, LLC**

By:
Name: Wayne Stensby
Title: President & CEO

By:
Name: Gerald H Dukey
Title: Senior Vice President

**LUMA ENERGY SERVCO, LLC**

By:
Name: Wayne Stensby
Title: President & CEO

By:
Name: Gerald A Dukey Jr
Title: Senior Vice President

*[Signature Page to Puerto Rico Transmission and Distribution System Supplemental Terms Agreement]*

App.355

CONFIDENTIAL

**Exhibit A**

**Form of Supplemental Agreement Tax Opinion**

_____, 202_

Ladies and Gentlemen:

We have served as tax counsel to the Federal Oversight and Management Board ("FOMB") with respect to the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement dated as of _____, 2020 (the "Agreement") by and among the Puerto Rico Electric Power Authority (the "Authority"), as owner, the Puerto Rico Public-Private Partnerships Authority, as administrator (the "Administrator"), _____ ("ManagementCo"), and _____ ("ServCo" and, together with ManagementCo, the "Operator" and, collectively with the Authority and the Administrator, the "Parties"). Pursuant to the terms of the Agreement, the Operator will provide operation and management services relating to the Authority's transmission and distribution system (the "T&D System"). In addition, pursuant to the Puerto Rico Transmission and Distribution System Supplemental Terms Agreement dated as of _____, 2020 (the "Supplemental Agreement") by and among the Parties, the Operator is commencing the O&M Services as of the date hereof, although the Service Commencement Date has not occurred. The Authority, its Affiliates, and other Governmental Bodies currently have outstanding obligations the interest on which is excluded from gross income for federal income tax purposes (the "Existing Bonds"). On the date of issuance of each of the bond issues comprising the Existing Bonds, the respective bond counsel for each such issuance delivered an opinion (each an "Approving Opinion") that interest on the related Existing Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code (the "Code"). Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Agreement.

This opinion is being delivered in accordance with Section 2.3(f) of the Supplemental Agreement.

In rendering the opinion set forth herein, we have reviewed (i) the Agreement, including the exhibits thereto, (ii) the Supplemental Agreement, (iii) the System Contracts in effect as of the date hereof, (iv) the opinion of Sargent and Lundy or another nationally recognized engineering firm acceptable to the Parties, dated _____, 202_, which sets forth, among other things, the reasonably expected weighted average economic life of the T&D System, and (v) such other opinions, certificates and documents as have been provided to us by the Authority and others in connection with the Agreement. We have also relied upon the facts set forth in the representations made by the Parties to the Agreement and such other documents and opinions to the extent we deemed necessary to render the opinions set forth herein. We have not undertaken an independent audit or investigation of the matters set forth in any of the foregoing and our opinion assumes the accuracy of the information and any conclusions set forth therein and compliance with any covenants and directions set forth in said documents, including the Agreement.

CONFIDENTIAL

In addition, the Code and the Revenue Procedure (as defined below), impose certain requirements that must be met subsequent to the issuance and delivery of the Existing Bonds and subsequent to the execution of the Agreement for interest on the Existing Bonds thereon to be and remain excluded from gross income for federal income tax purposes. Noncompliance with such requirements could cause the interest on the Existing Bonds to be included in gross income for federal income tax purposes retroactive to the date of issue of each issue of the Existing Bonds.

Section 103 of the Code provides generally that interest on a "private activity bond" is not excluded from gross income. Section 141 of the Code, in part, provides that a private activity bond is an obligation issued as part of an issue that meets the private business tests. Under the private business tests, bonds are treated as private activity bonds if the issue of which those bonds are a part satisfy both the private business use test and the private security or payment test. The private business use test is met if more than 10 percent of the proceeds of an issue are used in the trade or business of a nongovernmental person ("private business use"). Under Treasury regulation section 1.141-3, private business use can result from the use of the facilities financed by the issue, including as a result of a lease of such property to a nongovernmental person or a management contract with respect to such property. The private security or payment test is generally met if the payment of the principal of, or the interest on, more than 10 percent of the proceeds of an issue is (under the terms of such issue or any underlying arrangement) directly or indirectly: (A) secured by any interest in property used or to be used for a private business use, or payments in respect of such property, or (B) to be derived from payments (whether or not to the issuer) in respect of property, or borrowed money, used or to be used for a private business use.

Under Treasury regulation section 1.141-3(b)(4), a management contract with respect to financed property may result in private business use of that property, based on all of the facts and circumstances. The regulations provide that a management contract with respect to financed property generally results in private business use of that property if the contract provides for compensation for services rendered with compensation based, in whole or in part, on a share of net profits from the operation of the facility, or if the service provider is treated as the lessee or owner of financed property for federal income tax purposes.

Treasury regulation section 1.141-3 defines a management contract as a management, service, or incentive payment contract between a governmental person and a service provider under which the service provider provides services involving all, a portion of, or any function of, a facility. For example, a contract for the provision of management services for an entire hospital, a contract for management services for a specific department of a hospital, and an incentive payment contract for physician services to patients of a hospital are each treated as a management contract.

In Revenue Procedure 2017-13 (the "Revenue Procedure") the Internal Revenue Service provided a safe harbor under which a management contract can be treated as not resulting in private business use. The Revenue Procedure refers to the governmental owner of the related facilities as the "qualified user" and the manager or operator as the "service provider." Under the Revenue Procedure, a management contract that satisfies the following conditions will not be treated as resulting in private business use:

CONFIDENTIAL

(1) The payments to the service provider under the contract must be reasonable compensation for services rendered during the term of the contract. "Compensation" includes payments to reimburse actual and direct expenses paid by the service provider and related administrative overhead expenses of the service provider.

(2) The contract must not provide to the service provider a share of net profits from the operation of the managed property. Compensation to the service provider will not be treated as providing a share of net profits if no element of the compensation takes into account, or is contingent upon, either the managed property's net profits or both the managed property's revenues and expenses (other than any reimbursements of direct and actual expenses paid by the service provider to unrelated third parties) for any fiscal period. For this purpose, the elements of the compensation are the eligibility for, the amount of, and the timing of the payment of the compensation. Incentive compensation is not treated as providing a share of net profits if eligibility is determined by the service provider's performance in meeting one or more standards that measure quality of services, performance or productivity.

(3) The contract must not, in substance, impose upon the service provider the burden of bearing any share of net losses from the operation of the managed property.

(4) The term of the contract, as of the beginning of the term of the contract, including all renewal options must not be greater than the lesser of 30 years or 80 percent of the weighted average reasonably expected economic life of the managed property.

(5) The qualified user must exercise a significant degree of control over the use of the managed property. This control requirement is met if the contract requires the qualified user to approve the annual budget of the managed property, capital expenditures with respect to the managed property, each disposition of property that is part of the managed property, rates charged for the use of the managed property, and the general nature and type of use of the managed property (for example, the type of services).

(6) The qualified user must bear the risk of loss upon damage or destruction of the managed property (for example, due to force majeure).

(7) The service provider must agree that it is not entitled to and will not take any tax position that is inconsistent with being a service provider to the qualified user with respect to the managed property. For example, the service provider must agree not to claim any depreciation or amortization deduction, investment tax credit, or deduction for any payment as rent with respect to the managed property.

(8) The service provider must not have any role or relationship with the qualified user that, in effect, substantially limits the qualified user's ability to exercise its rights under the contract, based on all the facts and circumstances. A service provider will not be treated as having a role or relationship prohibited by this provision if: (a) no more than 20 percent of the voting power of the governing body of the qualified user is vested in the directors, officers, shareholders, partners, members, and employees of the service provider, in the aggregate; (b) the governing body of the qualified user does not include

the chief executive officer of the service provider or the chairperson (or equivalent executive) of the service provider's governing body; and (c) the chief executive officer of the service provider is not the chief executive officer of the qualified user or any of the qualified user's related parties.

Based upon our review of the foregoing documents, and assuming the accuracy of the information and certifications, and compliance with the covenants, representations, and directions set forth therein, and assuming compliance with the terms of the Supplemental Agreement, we are of the opinion that neither the Supplemental Agreement nor any provision thereof, nor the performance by each Party to the Supplemental Agreement of its respective obligations thereunder (including Operator's administration of the System Contracts), adversely affects the exclusion from gross income of interest on the Existing Bonds of the Authority, its Affiliates or another Governmental Body for federal income tax purposes under Section 103 of the Code.

This opinion is limited to the specific matter addressed herein and shall not be construed as confirming or restating the Approving Opinions. We have not been engaged to, nor have we undertaken to, determine whether the interest on the Existing Bonds continues to qualify as of this date for exclusion from gross income for federal income tax purposes. Accordingly, we express no opinion on such matter.

This opinion is delivered as of the date hereof and relates solely to the Internal Revenue Code and Treasury regulations as in effect on the date hereof.  We disclaim any obligation to advise you or any other person of developments of law or fact covered by this opinion that may occur after the date hereof, including any amendments made subsequent to the date hereof to the documents described above.  Furthermore, we express no opinion as to any federal, state or local tax law consequences with respect to the Existing Bonds, or the interest thereon, if any action is taken with respect to the Supplemental Agreement or the proceeds thereof upon the advice or approval of other counsel.

CONFIDENTIAL

This opinion is being delivered by us as tax counsel to the FOMB in connection with the Supplemental Agreement and may not be relied upon by any other person, or used or reproduced for any other purpose, without our prior written consent.


Sincerely,


Nixon Peabody LLP

CONFIDENTIAL

**Exhibit B**

**Form of Supplemental Agreement Reliance Letter**


\_\_\_\_\_, 2020


Puerto Rico Transmission and Distribution System Supplemental Terms
Agreement dated as of \_\_\_\_, 202\_


Ladies and Gentlemen:

    In connection with the execution of the Puerto Rico Transmission and Distribution System Supplemental Terms Agreement dated as of \_\_\_\_, 202\_ by and among the Puerto Rico Electric Power Authority, the Puerto Rico Public-Private Partnerships Authority, _____, and _____ (the "Supplemental Agreement") we have delivered our final legal opinion relating to the impact of the Supplemental Agreement on the federal income tax status of interest on bonds issued by the Authority, its Affiliates, and other Governmental Bodies (the "Bonds"), dated the date hereof and addressed to the Federal Oversight and Management Board. Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Supplemental Agreement.

CONFIDENTIAL

You may rely on said opinion as though the same were addressed to you. No attorney-client relationship has existed or exists between any addressee of this letter and our firm in connection with the Supplemental Agreement or the Bonds or by virtue of this letter.


Very truly yours,

**Exhibit C**

**DACO Complaint and Certified Translation**

Form OAT 1721
(Rev. August 2023)

Page 1 of 3

Commonwealth of Puerto Rico
GENERAL COURT OF JUSTICE
**Court of First Instance**
☒ Municipal Superior Court ☐ of San Juan

| | |
|---|---|
| DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR [Consumer Affairs Department] | Case No. [stamp:] **SJ 2025 CV** [hw:] *06607* |
| Complainant Party<br>V.<br>LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO [Puerto Rico Energy Bureau]; AUTORIDAD DE ENERGÍA ELÉCTRICA [Electric Power Authority]<br>Respondent Party | Court No. _____ [hw:] *901*<br><br>Civil Action of: Declaratory Judgment<br>Subject Matter or Issue |

[stamp:]
LUMA ENERGY SERVCO, LLC
LEGAL DIVISION
JUL 23, 2025
Time: _____

**RECEIVED**

**SUMMONS**

UNITED STATES OF AMERICA, SS
THE PRESIDENT OF THE UNITED STATES
THE COMMONWEALTH OF PUERTO RICO

To: LUMA ENERGY, LLC
_____
Name of the respondent being summoned
1110 Ave. Ponce de León, Entry 16 1/2, NEOS Bldg. — Office 607, San Juan, PR, 00907
_____
Address of the respondent being summoned

YOU ARE HEREBY summoned to file your response with the court within 30 days of the service of this summons, excluding the day of service. You must submit your response via the Sistema Unificado de Manejo y Administración de Casos [Unified Case Management and Administration System — SUMAC], which you can access at the following web address: https://www.poderjudicial.pr/index.php/tribunal-electronico/, unless the case is a physical file or you are representing yourself, in which case you must submit your response to the Office of the Clerk of the Court and provide a copy thereof to the complainant party's attorney or to the complainant if they do not have legal representation. If you fail to file your response within the aforementioned period, the court may render a default judgment against you and grant the relief sought in the complaint, or any other relief, should the court, in its sound discretion, deems it appropriate. Furthermore, you are hereby advised that, in cases covered by Law No. 57-2023, titled Ley para la Prevención del Maltrato, Preservación de la Unidad Familiar y para la Seguridad, Bienestar y Protección de los Menores [Law for the Prevention of Abuse, Preservation of Family Unity and for the Safety, Welfare and Protection of Minors], the remedies that the Court may grant include the permanent placement of a minor outside of their home, the initiation of proceedings for the deprivation of parental rights, and any other measure in the best interests of the minor. (*Article 33, subsections b and f of Law No. 57-2023.*) You are advised of your right to appear accompanied by an attorney in the appropriate cases.

Ms. Valerie Rodríguez Erazo (Atty.); Mr. Gadiel Figueroa (Atty.); Mr. Samuel Silva (Atty.)
_____
Name of the complainant party's attorney,
or of the party, if not represented by legal counsel
16,861; 18,687; 7883
_____
Number before the Supreme Court (RUA [Registro Único de Abogados y Abogadas — Unique Attorney Register]), in the case of an attorney
Box 41059, Minillas Station Santurce, P.R. 00940-1059
_____
Address
(787) 722-7555
_____
Phone number; fax number
vrodriguez@daco.pr.gov; afigueroa@daco.pr.gov; ssilva@daco.pr.gov
_____
Email

Issued under my signature and the seal of the Court, on _____ [stamp:] JUL 22 2025 of __

By: _____

| | |
|---|---|
| Name of the<br>Regional Clerk of the Court<br>[stamp:]<br>COMMONWEALTH OF PUERTO RICO<br>GENERAL COURT OF JUSTICE<br>COURT OF FIRST INSTANCE<br>SUPERIOR COURT OF SAN JUAN<br>K027 [signature] | Name of the<br>[illegible]<br>*Regional Clerk the Court*<br>[signature]<br>*Maria Ocasio Rodriguez*<br>Signature of Assistant Clerk of the Court<br>Assistant Clerk of the Court |

Form OAT 1721                                                                    Page 2 of 3
(Rev. August 2023)

Case No. _____

## CERTIFICATE OF SERVICE BY THE OFFICER OF THE COURT

I, _____ the Officer of the Court of First Instance of Puerto
Rico, Superior Court of San Juan,_____
Hereby CERTIFY that the service of the summons and complaint in the above-referenced case was performed
by me on_____, _____at _____ ☐ a.m.☐ p.m., as
follows:

☐ Via personal service to the respondent at the following physical address:
_____

☐ By making it accessible in the immediate presence of the respondent party at the following physical
address:
_____

☐ By leaving a copy of the documents with an agent authorized by the respondent party or designated in law
to receive summonses at the following physical address:
_____

☐ The summons could not be personally served because:
_____
_____

At _____, Puerto Rico, on _____, _____.

| Name of the Regional Officer of the Court | Name of the Officer the Court of First Instance and Badge Number |
|---|---|
|  | Signature of the Officer of the Court of First Instance |

## SERVICE OF SUMMONS BY INDIVIDUAL

I, [hw:] *[illegible]*_____declare that I have legal capacity pursuant to Rule 4.3 of the Code of Civil
Procedure of Puerto Rico, and certify that the service of the summons and of the claim in the above-
referenced case was performed by me on  23 [hw:] *July* of [hw:] *[2025]*
as follows:

☐ Via personal service to the respondent at the following physical address:
[hw:] *Luma Energy LLC P/C [illegbilbe] legal department*

☐ By making it accessible in the immediate presence of the respondent party at the following physical
address:
_____

☐ By leaving a copy of the documents with an agent authorized by the respondent party or designated in law
to receive summonses at the following physical address:
[hw:] *1110 Ponce De Leon*

☐ The summons could not be personally served because:
_____

COSTS OF SERVICE: $_____

## DECLARATION OF THE PROCESS SERVER

I declare under penalty of perjury, under the laws of the Commonwealth of Puerto Rico, that the information
provided in the service of the summons is true and correct.
IN WITNESS WHEREOF, I sign this document at __[hw:] *[illegible]* Puerto Rico, on [hw:] [illegible]23,
*July ,* [hw:] *2025*

| [signature] | [hw:] *[illegible]* |
|---|---|
| Signature of the process server | Address of the process server |

AFFIDAVIT NO. _____[if sworn to before a notary]
Guages
     Sworn and subscribed before me by _____,
having the aforementioned personal information, whom I attest to know
_____
(personal knowledge or, failing that, accreditation of the supplementary means provided for in the Ley Notarial [Notarial Law])
At _____Puerto Rico, on _____,
                                                              By: _____

| Name of the Notary or Regional Clerk of the Court | Name of the Assistant Clerk of the Court |
|---|---|
|  | Signature of the Assistant Clerk of the Court |

Form OAT 1721                                                                                     Page 3 of 3
(Rev. August 2023)

Case No. _____

## SERVICE OF PROCESS UNDER LAW NO. 57-2023

I, _____, hereby certify that the service of the summons and
complaint in the above-referenced case was performed by me, on _____,
_____ in the following manner:

☐ Via email to the respondent party at the following address:

_____

☐ Via regular mail to the respondent party at the following address:

_____

## DECLARATION OF THE PROCESS SERVER

I declare under penalty of perjury, under the laws of the Commonwealth of Puerto Rico, that the information
provided in the service of the summons is true and correct.
IN WITNESS WHEREOF, I sign this document at _____, Puerto Rico, on _____
_____, ____

_____                 _____
Signature of the process server
                                                      Address of the process server

AFFIDAVIT NO. _____[if sworn to before a notary]
        Sworn and subscribed before me by _____,
having the aforementioned personal information, whom I attest to know

_____
        (personal knowledge or, failing that, accreditation of the supplementary means provided for in the Notarial Law)

In _____Puerto Rico, on _____,

                                                      By: _____
_____                           Name of the
Name of the Notary or Regional                        Assistant Clerk of the Court
Clerk of the Court
                                                      _____
                                                      Name of the
                                                      Assistant Clerk of the Court

                                                      _____
                                                      Signature of the
                                                      Assistant Clerk of the Court

GOVERNMENT OF PUERTO RICO
GENERAL COURT OF JUSTICE
SUPERIOR COURT OF SAN JUAN

| | |
|---|---|
| **CONSUMER AFFAIRS DEPARTMENT**<br>Complainant<br><br>vs.<br><br>**LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA**<br>Respondents | **CIVIL NO.**<br><br>COURT NO.:<br><br>RE.: DECLARATORY JUDGMENT |

**PETITION FOR DECLARATORY JUDGMENT TO DECLARE SECTION 4.1(g) OF THE PUERTO RICO TRANSMISSION AND DISTRIBUTION SYSTEM UNCONSTITUTIONAL**
**OPERATION AND MAINTENANCE AGREEMENT**

**TO THE HONORABLE COURT:**

The Department of Consumer Affairs (hereinafter "DACO") appears via its undersigned legal representative, who respectfully **STATES, ALLEGES AND REQUESTS** as follows:

I. Introduction

The case referred to in caption does <u>not</u> seek in any way to interfere with the powers granted by law to the Puerto Rico Energy Bureau (hereinafter "NEPR") to establish public energy policy, nor with its role in approving electricity rates. What it <u>does</u> seek to do is to enforce consumer rights in the face of inefficiency and lack of adequate service on the part of the operator LUMA Energy, LLC and its subsidiary LUMA Energy Servco, LLC (hereinafter "LUMA"). In summary, in the process of approving the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement (hereinafter "the Agreement"), the NEPR granted LUMA <u>almost absolute</u> immunity from consumer claims for damages caused by the company's negligence in the performance of its duties.

In other words, in 2021, the NEPR approved, by contractual and administrative fiat and without the intervention of the Legislative Assembly, a blank check for LUMA to act negligently,

leaving energy subscribers, the general public, and anyone who may suffer harm from the negligence of LUMA, its directors, officers, employees, agents and contractors in a state of total defenselessness. In short, the NEPR usurped legislative power to eliminate acquired rights, with the excuse that it acted within its regulatory power.

What has been the result? In recent weeks, LUMA admitted in a public hearing that it **has denied 1,828 claims filed by consumers affected by negligence and energy fluctuations, availing itself of that contractual relief that grants virtually unconditional immunity to a private entity, without the endorsement of the legislature.**

The public policy of current Governor Jenniffer González Colón is to confront LUMA's practices that affect the well-being of all Puerto Ricans. The Instituto de Competitividad y Sostenibilidad Económica [Institute for Competitiveness and Economic Sustainability — ICSE] and the Oficina Independiente de Protección al Consumidor [Independent Consumer Protection Office — OIPC][1] have raised the alarm about the harmful effects of this type of immunity on consumers. The courts, however, have not recognized their standing to bring this type of claim. DACO, however, is the agency called upon by law to enforce consumer rights and has the authority to file this lawsuit on behalf of each and every Puerto Rican. Therefore, and by virtue of the facts detailed below, we simply request that Section 4.1(g) of the LUMA Agreement and the Resolution of May 31, 2021, on the release of liability, as approved by the NEPR, be declared null and void because: (1) the granting of broad immunity to LUMA via an administrative contract violates the principle of legal reservation, as it was not the product of the legislative process nor endorsed as law; (2) it leaves consumers and non-contracting third parties defenseless, who now lack remedies for negligent damages; (3) the State cannot confer quasi-sovereign immunity to a private company by administrative and contractual fiat without this being evaluated by the Legislative Assembly; and (4) the NEPR's attempt to limit or suppress non-contractual claims to the detriment of third parties without their participation or legislative endorsement constitutes an usurpation of legislative power and an attack on the doctrine of separation of powers. *Let's take a closer look.*

II. Parties

---

[1] The Institute for Competitiveness and Economic Sustainability (ICSE) and the Independent Consumer Protection Office (OIPC) are entities created and registered in the Department of State of Puerto Rico. Both entities have spoken publicly about the impact of LUMA's actions on consumers. The ICSE promotes sustainable economic development, while the OIPC protects the rights of electricity system subscribers.

2

1. The complainant party, DACO, is an agency created under Law No. 5 of April 23, 1973. Article 6 (f) of the aforementioned statute, 3 L.P.R.A. § 341e, authorizes the agency to appear for and on behalf of consumers before any court, board or commission, administrative body, department, office or agency of the Commonwealth of Puerto Rico and/or the United States government in any hearing, proceeding or matter that affects or may affect the interests of consumers in general, consumer groups or any particular consumer. Its physical address is Ave. José de Diego, Entry 22, Centro Gubernamental Minillas, Edificio Torre Norte, Floor 8, San Juan, P.R. 00940.

2. The co-respondent Autoridad de Energía Eléctrica [Electric Power Authority — PREPA], is a public corporation created pursuant to Law No. 83 of May 2, 1941. Under Section 5(d) of its enabling law, it has the capacity to sue and be sued. It's physical address is 1110 Ave. Ponce de León, Edificio Neos, Floor 8 Office 801. The PREPA is the entity that signed the Agreement with LUMA that forms the subject of this appeal.

3. The co-respondent NEPR was created under Law 57-2014. Pursuant to the provisions set forth in article 6.3 of the aforementioned Law, 22 L.P.R.A § 1054b, the NEPR has the capacity to sue and be sued. Its physical address is 268 Av. Luis Muñoz Rivera, San Juan, 00918.

4. The co-respondent LUMA Energy, LLC, is a limited liability company, organized under the laws of the Government of Puerto Rico, holder of Department of State registration number 439372. Its physical address is 1110 Ave. Ponce de León, Entry 16 1/2, NEOS Bldg. — Office 607, San Juan, PR, 00907.

5. The co-respondent LUMA Energy Servco, LLC, is a limited liability company organized under the laws of the Government of Puerto Rico, holder of Department of State registration number 439373. Its physical address is 1110 Ave. Ponce de León, Entry 16 1/2, NEOS Bldg. — Office 607, San Juan, PR, 00907.

III. <u>Relevant Facts</u>

3

6. On February 24, 2021, during the administration of former Governor the Hon. Pedro Pierluisi, LUMA Energy, LLC and LUMA Energy ServCo. (LUMA) submitted a document for review and approval by the Puerto Rico Energy Bureau (NEPR) titled Request for Approval of Terms of Service and Memorandum of Law in Support.

7. With regard to the instant controversy, LUMA requested that the NEPR approve Article 4.1(g) of the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement signed between LUMA and the Electric Power Authority. **(See Annex 1.)**

8. Article 4.1(g) of the Agreement reads as follows:

> Liability Waiver. In connection with the submission of the Initial Budgets to PREB, the Parties agree to apply for inclusion in the Rate Order that the associated tariff or terms of service include: (i) a waiver of Owner's, ManagementCo's and ServCo's liability to customers or any Person receiving Power and Electricity for any Losses arising in any way out of or in connection with the operation of the T&D System and the provision of Power and Electricity including any events of interrupted, irregular or defective electric service due to Force Majeure Events, other causes beyond Owner's, ManagementCo's or ServCo's control or ordinary negligence, gross negligence or willful misconduct of Owner, ManagementCo or ServCo, or their respective employees, agents or contractors; and (ii) a waiver in all cases of responsibility for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by any of Owner's, ManagementCo's or ServCo's ordinary negligence, gross negligence or willful misconduct (collectively the "Liability Waiver"). **(See Annex 1, pp. 50–51)[2]**

9. That is, pursuant to the provisions set forth in article 4.1(g), the Electric Power Authority and LUMA would request from the NEPR a <u>total release</u> for said operator and all of its employees, officers and contractors from consumer claims for damages caused by negligent acts or fluctuations in electrical service.

---

[2] The pages in the annexes are identified based on the total number of pages in the document and not according to the page number appearing at the bottom of the document.

4

10. Prior to the signing of the Agreement between LUMA and the Electric Power Authority, the public corporation had a mechanism in place for consumers to file claims for damages caused by negligence or fluctuations in electrical service. **In other words, the Electric Power Authority, even though it was a public corporation, did not enjoy the immunity from consumer claims that LUMA now enjoys.**

11. On May 4, 2021, the Bureau issued a Resolution and Order opening the proceeding In Re: *Review of LUMA's Terms of Service (Liability Waiver)*[3]. In it, it ordered LUMA to provide supplementary information for the evaluation of the proposed terms of service and established the procedural calendar.

12. On May 12, 2021, via a notice titled Notice Concerning Public Hearings, Review of LUMA's Terms of Service, published in a widely circulated newspaper, the Bureau announced that a virtual public hearing would be held in connection with the Petition filed by LUMA on May 25, 2021, from 9:00 a.m. to 5:30 p.m.

13. On May 18, 2021, the NEPR held a Technical Conference for the purpose of discussing the Petition with LUMA and PREPA staff.

14. On May 21, 2021, the OIPC filed a Notice of Intervention by the OIPC. It based its request for intervention on Art. 6.42 of the Energy Transformation and Relief Act, Law No. 57-2014, that allowed it to intervene in any matter that could affect consumers in its capacity as their spokesperson and advocate, including matters relating to power service rates and charges, quality, and the services provided by power utilities companies.

15. On May 25, 2021, the Bureau held a hearing to listen to the opinions of the general public regarding the proposed terms of service.

16. OIPC representatives reiterated their opposition to LUMA's request for approval of the terms of service. On the same date, the ICSE filed a document titled Motion Requesting Extension of Time to File Comments. In its brief, the ICSE indicated that the procedure would require a complex analysis, so it needed more time to be able to submit comments responsibly. They explained that they were consulting with experts in the United States in order to analyze the legal implications of the matter.

---

[3] NEPR-MI-2021-0007

17. On May 27, 2021, LUMA submitted a document titled *Responsen* Opposition to ICSE's Motion Requesting an Extension of Time to File Comments. It held that, 1) the extension requested by the ICSE was tardy and did not provide a reasonable justification or just cause to explain why it did not submit its comments within the time frame set forth in the procedural calendar established in the proceeding; 2) the NEPR granted time for the interested parties and the general public to participate in a virtual public hearing and submit their briefs; and 3) the ICSE did not appear at the virtual public hearing or submit comments, even though the documents submitted in the proceedings were available to the general public.

18. On May 28, 2021, via Resolution and Order, the NEPR denied the OIPC's Request for Intervention, although it allowed it to submit written comments, provide testimony at the hearings held on LUMA's Petition, question witnesses, and have access to confidential documents.

19. After the public hearings were held, on May 31, 2021, NEPR issued a Resolution and Order on the release of liability requested by LUMA and the Electric Power Authority. (**See Annex 2**)

20. Regarding the release of liability requested by LUMA, the NEPR determined the following:

<div style="text-align: center">Modified Terms of Service</div>

Effective on June 1st, 2021, the following terms of service shall be incorporated and made part of the Puerto Rico Electric Power Authority Tariff Book approved on May 28, 2019. These terms of service shall modify and complement the terms of service included in the Puerto Rico Electric Power Authority Regulation No. 7982, dated January 14, 2010, known as General Terms and Conditions Regulations for the Supply of Electric Power ("Regulation 7982"). In the event of any conflict or issue of interpretation between the following terms of service and Regulation 7982, these terms of service will prevail over Regulation 7982.

<div style="text-align: center">Modified Terms of Service</div>

1. It is recognized that certain components of the Puerto Rico Electric Power Authority's ("PREPA") electric power system (including, the Transmission and Distribution System ("T&D System"), as well as the Generation Facilities) currently do not meet the standards of performance generally accepted in the electric utility industry. The whole system needs significant repairs, improvements, and modernization to achieve acceptable standards of service. Further, certain components of the T&D System and the manner in which the T&D System is operated do not currently meet acceptable standards of performance, including the fact that certain general operating and administrative practices may not comply with acceptable industry standards and practices. Therefore, a period of review, planning, remediation, reconstruction, repair, and replacement will be required to enable LUMA Energy, LLC, LUMA Energy Servco, LLC ("LUMA")

6

standards. In light of the foregoing, PREPA and LUMA, with the cooperation of other governmental entities developed a plan, taking into account expected funds availability, particularly from the Federal Emergency Management Agency (FEMA), to remediate, repair, reconstruct, replace and stabilize such equipment, systems, practices and services, as needed, to enable LUMA to perform the operation and maintenance services contracted in compliance with the applicable standards as soon as reasonably possible and at a reasonable cost to PREPA ("System Remediation Plan"). The System Remediation Plan shall be review and approved by the Energy Bureau of the Puerto Rico Public Service Regulatory Board ("Energy Bureau").

2. Taking in consideration the circumstances described in the preceding paragraph, and other generally known, PREPA and LUMA shall make all reasonable efforts to provide an efficient and reliable service to its customers and users. A user is a natural or legal person) who receives and uses power and electricity at a certain location and whose consumption is recorded and invoiced in the name of another person.

3. PREPA and LUMA shall make all reasonable efforts to maintain continuity of service, but PREPA and LUMA cannot guarantee an uninterrupted electricity supply to its customers and users.

4. Without liability of any kind to PREPA and/or LUMA, PREPA and/or LUMA shall have the right to disconnect or otherwise curtail, interrupt or reduce service to customers and users: (a) whenever PREPA and/or LUMA reasonably determines it is necessary to facilitate construction, installation, maintenance, repairs, replacement or inspection of any of PREPA's facilities, or to permit the connection or disconnection of other customers; (b) to maintain the safety and reliability of PREPA's electric system (including without limitation, transmission, distribution and generation facilities); or (c) due to any other reason attributable to third parties or related to dangerous or hazardous circumstances, including without limitation, emergencies, forced outages, potential overloading of PREPA's transmission and/or distribution system, sabotage, strikes, unauthorized acts by employees or Force Majeure. Notwithstanding the foregoing, PREPA and/or LUMA shall use reasonable efforts to minimize any scheduled curtailment, interruption, or reduction to the extent reasonably practicable under the circumstances, to provide the customer (and not to the user, because is not a registered customer) with prior notification of any such curtailment, interruption, or reduction to the extent reasonably practicable, and to resume the customer's service connection as promptly as reasonably practicable.

5. **Notwithstanding anything to the contrary in these Modified Terms of Service and Regulation 7982, PREPARE, its directors, officers, employees, agents and contractors (including LUMA Energy, LLC, LUMA Energy Servco, LLC, their directors, officers, employees, agents and contractors) (the "Released Parties") shall not be liable contractually or extra-contractually, to customers, or any user receiving power or electricity from PREPA and/or LUMA for any losses arising in any way out of or in connection with the operation of the T&D System and the provision of power and electricity including any events of interrupted, irregular or defective electric service due to Force Majeure events or from pre-existing deteriorated electric system conditions, other causes beyond the control of the Released Parties, unauthorized acts by employees, sabotage, strikes or due to ordinary negligence (excluding gross**

7

Parties or their respective employees, agents or contractors. **In any event that the Released Parties are found responsible howsoever and whensoever in connection with the provision of service to customers or users receiving power or electricity from PREPA and/or LUMA, customers or users will only recover direct damages (including direct physical loss, injury or damage to a customer or customer's property). For the foregoing and without otherwise restricting the generality thereof, "direct physical loss, injury or damage" <u>shall not include any loss of profits or revenues, special, exemplary, punitive, indirect, incidental, or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms.</u>**

6. Notwithstanding anything to the contrary contained in these Modified Terms of Service, PREPA and LUMA will remain fully accountable and liable to the Energy Bureau for compliance with the Puerto Rico energy public policy as well as all legal and regulatory requirements applicable to electric service companies, and, particularly to LUMA as operator of the T&D System. Nothing in these Modified Terms of Service shall have the effect of releasing or waiving PREPA and/or LUMA from any penalty, fine or obligation imposed by the Energy Bureau for whatever reason whatsoever. **(See Annex 2, pp. 41–43)** (Emphasis supplied)

21. Thus, in evaluating the provisions of Article 4.1(g) of the Agreement, the NEPR merely excluded cases of gross negligence[4] on the part of LUMA, but did grant release of liability, as requested, in response to consumer claims for damages caused by negligent acts, service interruptions and fluctuations in electrical service.

22. **It should be noted that this immunity was granted via an administrative and contractual process. At no time was the Legislative Assembly consulted, nor was any legislation presented to extend immunity from these claims to LUMA, <u>a private operator</u>.**

---

[4] The Supreme Court of Puerto Rico adopted the definition of gross negligence established in U.S. case law. It therefore defined it as a complete lack of care, or the exercise of such a small degree of diligence, as to justify the belief that there is complete indifference to the interests and well-being of others. Pueblo v. Telmaín Escalera, 45 DPR 447, 453 (1933); Elías, et al., v. Chenet, et al., 147 DPR 507, 521 (1999).

8

23. On June 9, 2021, ICSE filed a Motion for Reconsideration. In it, they set forth legal reasons why the NEPR should reject such a request outright without accepting any immunity for LUMA.

24. The NEPR did not comment on ICSE's request.

25. Dissatisfied, ICSE came before the Court of Appeals through an administrative review appeal. The aforementioned court, buyer a divided rulling issued on March 9, 2022, Case No. KLRA202100406[5], determined that ISCE lacked standing to file the appeal on behalf of consumers.

26. However, as mentioned in the introduction to this brief, DACO, pursuant to Section 6(f) of its organic law, *supra*, **does have the capacity to bring lawsuits before the courts in protection of consumers.**

27. On May 27, 2025, during a public hearing before the members of the House of Representatives' Consumer Affairs Committee, LUMA admitted that it has denied all 1,828 claims it has received from consumers for damage to electrical appliances due to failures in the electrical system, invoking the immunity requested under section 4.1 (g) of the Agreement, which was endorsed practically in its entirety by the NEPR via the resolution of May 31, 2021.

28. The Secretary of Consumer Affairs participated in the aforementioned hearing, gaining personal knowledge of the defenselessness of consumers in the face of LUMA's negligent actions.

29. The current contractual status, without any intervention by the Legislative Assembly, has therefore granted LUMA **almost absolute release of liability** in the face of claims for damages by consumers caused by the actions of that entity. **In other words, LUMA, a private entity, enjoys an immunity that was never granted to the Electric Power Authority, which is a public corporation.**

---

5 Pursuant to Rule 201 of the Rules of Evidence, 32 L.P.R.A. App. VI, R. 201, this Honorable Court may take judicial notice of the facts that were adjudicated by the Court of Appeals in case KLRA202100406 and that are included in this Complaint.

9

Case: 25-3717  Document: 00118873963  Page: 14  Date Filed: 09/18/2025  Entry ID: 6770995

Case 3:17-04780-LTS  Doc 660-4  Filed 03/08/22  Entered 03/08/22 11:30:15  Desc
Exhibit C-COMPLAINT AND TRANSLATION  Page 14 of 39

## IV. Applicable Law

   a.  The Declaratory Judgment

30. Rule 59.1 of Civil Procedure, 32 LPRA App. V, R. 59.1, provides as follows:

> The Court of First Instance shall have authority to declare rights, statuses and other legal relationships, even if another remedy is sought or may be sought. The request for a declaratory judgment or ruling shall not be considered sufficient grounds for challenging a proceeding or action. The declaration may be affirmative or negative in form and effect and shall have the effectiveness and force of final judgments or rulings. Notwithstanding the provisions of Rule 37, the court may order a speedy hearing of a declaratory judgment action, giving it preference on the calendar.

31. Thus, the Declaratory Judgment is a remedial and prophylactic mechanism that allows for the early clarification of the merits of any claim before the courts, provided that there is a potential danger to the party requesting it. Sánchez et al. v. Srio. de Justicia et al., 157 DPR 360, 383–384 (2002). Therefore, declaratory judgments are appropriate for declaring rights, statuses and other relationships of an independent legal nature where other remedies exist. In particular, declaratory judgments allow for the clarification of any differences in the interpretation of a statute "when there is a substantial dispute between parties with adverse legal interests […]". Mun. Fajardo v. Srio. Justice et al., 187 DPR 245, 254–255 (2012).

32. In addition, Rule 59.2 of Civil Procedure, 32 L.P.R.A. App. IV R 59.2, states that "everyone interested in a deed, a will, a written contract or other documents constituting a contract, or whose rights, status or other legal relationships are affected by a statute, a municipal ordinance, a contract or a franchise, may request a decision on any divergence in the interpretation or validity of such statutes, ordinances, contract or franchise, aside from the issue of a declaration of rights, statuses or other legal relationships derived from them. A contract may be interpreted before or after it has been violated." Thus, by virtue of the powers granted to the DACO and in light of the applicable law, the Declaratory Judgment mechanism is the appropriate mechanism to address the captioned claim.

10

b.  Contractual and non-contractual damages; the right of immunity and the doctrine of the separation of powers

33. Within the scope of LUMA's relationship with the consumer, claims for damages operate dually, at the contractual level due to the power service contract signed between the citizen and the administrative entity and at the non-contractual level for those actions that lie outside of the non-contractual relationship between the parties.

34. Our Civil Code recognizes two categories of harmful acts that give rise to different types of liability, contractual and non-contractual. The first of these emanates from a "breach of duty arising from an express or implicit contract." Soc. de Gananciales v. Vélez & Asoc., 145 DPR 508, 521 (1998).

35. On the same subject, for "contractual liability to apply … it is not enough for there to be a contract between the parties; rather, an act must be performed within the strict scope of what was agreed and as a development of the negotiated content." Maderas Tratadas v. Sun Alliance, 185 DPR 880 (2012). Therefore, "the purpose of actions arising from contracts is to enforce the contractual promises to which the parties to a contract have given their consent." Santiago Nieves v. ACAA, 119 DPR 711, 716 (1987).

36. On the other hand, non-contractual liability deals with "compensation for damages occurring as a result of the breach of the general principle of social coexistence, which implies not causing harm to others." Rivera Sanfeliz et al. v. Jta. Dir. FirstBank 193 DPR 38, 57 (2015).

37. In matters of tort law, the legislature established, in Article 1536 of the Civil Code of 2020, the right to bring a cause of action for damages caused by negligent acts and omissions. This right was also established in Article 1802 of the Civil Code of 1930.

38. The constitutional principle of the separation of powers prevents the legislative branch from delegating its essential functions without defined criteria. This doctrine has been recognized in both federal and Puerto Rican case law. In the case of A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495 (1935), the United States Supreme Court invalidated a law that allowed the Executive to impose regulations prepared by private parties without clear standards, as it relates to an unconstitutional delegation.

39. In Puerto Rico, the doctrine of separation of powers emanates from Sec. 2 of Art. I of the Constitution, LPRA, Volume 1, which establishes the republican form of government. Misión Ind. P.R. v. J.P., 146 DPR 64, 88–89 (1998). The concept

11

behind the principle is equally clear: only the Legislative Assembly can limit the scope of non-contractual liability by means of a duly approved law. <u>Rivera Sanfeliz</u> v. <u>Junta Dir. FirstBank</u>, *supra*.

40. The constitutional system of Puerto Rico clearly establishes that the design and delimitation of the non-contractual liability of the State and private entities is not a prerogative of the Executive or of the regulatory entities, but an exclusive function of the Legislative Assembly, in accordance with the principle of the separation of powers enshrined in Article I, Section 2 of the Constitution of the Commonwealth of Puerto Rico. As reasserted in <u>Misión Industrial</u> v. <u>J.P.</u> *Supra*.

41. The Legislative Assembly, in the exercise of its powers, has limited the scope of responsibility of government entities to citizens. For example, Act No. 104 of June 29, 1955, known as the "Ley de Reclamaciones y Demandas contra el Estado" [Law on Claims and Lawsuits against the State], limits the amount a citizen can claim in damages against an agency of the Government of Puerto Rico and/or its officials for negligent acts. This law represents a deliberate act of balancing the public interest and the protection of individual rights, and requires legislative enactment and executive approval.

42. Specifically relevant to the dispute in question, the United States Supreme Court ruled, in the landmark case of <u>United States Trust Co</u>. v. <u>New Jersey</u>, 431 U.S. 1 (1977), that not even **law enforcement public contracts can eliminate fundamental rights without compelling justification and legislative scrutiny.** Even more forceful is <u>Perry</u> v. <u>United States,</u> 294 U.S. 330 (1935), that reaffirms that **state contracts cannot override the Constitution or suspend substantive rights by contractual means**. Even more directly, in <u>Carter</u> v. <u>Carter</u>

12

Coal Co., 298 U.S. 238 (1936), the Supreme Court stated that: **Delegating the power to legislate coal producers and employees, i.e., to private stakeholders, without any legislative guidance, is the constitutional government's very antithesis."**

43. Through its actions, the NEPR gave LUMA a blank check to engage in negligent acts to the detriment of consumers who were not party to the negotiation of the Agreement. **Not even the Central Government enjoys this type of immunity under the Law on Claims and Lawsuits against the State**.

44. Allowing the NEPR to limit or eliminate that right at the contractual level to the detriment of a third party not only constitutes an usurpation of legislative power and an attack on the separation of powers, but also leaves consumers defenseless and without recourse, granting an entity, by administrative and contractual fiat, unprecedented immunity from claims by third parties who did not participate in the negotiation and who did not have the endorsement of the legislative assembly.

45. Furthermore, granting LUMA — a private company — immunity from third parties for acts of negligence without said provision having gone through the legislative process constitutes an usurpation of legislative power and a direct violation of the republican principle of government. Similarly, it deprives citizens of their right to access judicial remedies for damages suffered in their capacity as consumers, which contravenes the principle of access to justice and the state's duty to protect citizens from harmful conduct.

46. In short, attempting to create a regime of immunity via an administrative contract between the executive branch and a private company such as LUMA circumvents these democratic processes and undermines the constitutional architecture of the state.

47. The DACO, in compliance with the duties established in its organic law and the public policy of this Administration, aims to protect consumers from arbitrary, unfair and inequitable practices that place them in a state ofdefenselessness, depriving them of the right to file claims for damages against those responsible for providing a reliable and safe electricity service.

13

48. Almost four years after taking over the operation of the electricity transmission and distribution system, and after receiving billions of dollars in public funds, **it is time for LUMA to be fully accountable to Puerto Rican consumers.** It is unacceptable that, despite its essential role and the volume of resources invested, the company continues to be protected by an immunity scheme that exempts it from liability for acts of negligence that cause real harm to citizens.

49. **Sovereign immunity only applies to public entities**. Some states protect their own public corporations or state agencies under partial immunity, but **this does not apply to private companies such as LUMA.**

50. Unlike in Puerto Rico, no state in the United States has granted general immunity for acts of negligence to a private electric power company that provides transmission or distribution services to citizens. This makes the case of LUMA in Puerto Rico unprecedented and exceptional. In other words, no other jurisdiction in the United States grants general immunity to private energy companies. Utility distributors or contractors can be sued for negligent acts, including service interruptions that cause damage to persons or property.

51. Thus, the decision by the Government of Puerto Rico and its regulatory agency in 2021 to grant LUMA immunity for acts of ordinary negligence is unparalleled in the United States. This action limits the remedies available to Puerto Rican consumers and sets a precedent that finds no legal or political justification within the U.S. regulatory framework.

52. Therefore, it is appropriate to declare Section 4.1 (g) of the Agreement and the NEPR Resolution of May 31, 2021, endorsing almost all the provisions of that section, unconstitutional and therefore null and void, as it is clearly at odds with our constitution and the doctrine of the separation of powers, the cornerstone of a republican system of government.

14

## V. PETITION

**NOW, THEREFORE**, the Department of Consumer Affairs requests that this Honorable Court grant the Request for Declaratory Judgment in the following terms:

1. Declare Section 4.1(g) *of the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* signed between LUMA and the Electric Power Authority and the May 31, 2021, and the Resolution of the NEPR endorsing almost all of the provisions of said Agreement null and unconstitutional;

2. Allow all citizens to file claims for damages caused by negligence and fluctuations in the electric power service before LUMA; and

3. Grant the complainant any other remedy to which it is entitled.


**RESPECTFULLY SUBMITTED.**

At San Juan, Puerto Rico on July 22, 2025.

signed/Ms. Valerie Rodríguez Erazo
RUA No. 16,861
Box 41059
Minillas Station
Santurce, P.R. 00940-1059
(787) 722-7555
vrodriguez@daco.pr.gov

signed/Mr. Gadiel Figueroa Robles
RUA No. 18,687
Box 41059
Minillas Station
Santurce, P.R. 00940-1059
(787) 722-7555
gfigueroa@daco.pr.gov

signed/Mr. Samuel Silva Rosas
RUA No. 7883
Box 41059
Minillas Station
Santurce, P.R. 00940-1059
(787) 722-7555
ssilva@daco.pr.gov

15

## DECLARATION AND CERTIFICATION

I BRUCE TAYLOR declare that I am a Certified Translator registered with the American Translators Association.

I am certified to translate from the Spanish language to the English language. My certification number is: 503180.

I declare, to the best of my abilities and belief, that the following text is an accurate translation of the Spanish language text of "Solicitud de Sentencia Declaratoria Para Declarar Inconstitucional La Sección 4.1(g) del Puerto Rico Transmission and Distribution System Operation Maintenance Agreement, filed July 22, 2025, Departamento de Asuntos del Consumidor v. Luma Energy, et al., No. SJ2025CV06607, Gobierno De Puerto Rico, Tribunal General De Justicia, Sala Superior de San Juan".

This declaration signed this 15th day of September, 2025, at Los Angeles, California.

Signature of Certified Translator registered with the American Translators Association:

BRUCE TAYLOR

* See attached document

**CALIFORNIA ACKNOWLEDGMENT**

CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _L O S A N G E L E S_ }

On _SEP. 15 · 2025_ before me, _LILLY TAHERI (NOTARY PUBLIC)_
Date                        Here Insert Name and Title of the Officer

personally appeared _BRUCE TAYLOR_
Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

LILLY TAHERI
Notary Public · California
Los Angeles County
Commission # 2393980
My Comm. Expires Feb 14, 2026

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                Signature of Notary Public

*Place Notary Seal and/or Stamp Above*

───── **OPTIONAL** ─────

*Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: _Declaration and Certification_

Document Date: _Sep. 15. 2025_                Number of Pages: _( 1 )_

Signer(s) Other Than Named Above: _NA_

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _BRUCE TAYLOR_
☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General
☐ Individual      ☐ Attorney in Fact
☐ Trustee         ☐ Guardian or Conservator
☐ Other: _____
Signer is Representing: _____

Signer's Name: _____
☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General
☐ Individual      ☐ Attorney in Fact
☐ Trustee         ☐ Guardian or Conservator
☐ Other: _____
Signer is Representing: _____

©2019 National Notary Association

Formulario OAT 1721
(Rev. Agosto 2023)

Página 1 de 3

Estado Libre Asociado de Puerto Rico
TRIBUNAL GENERAL DE JUSTICIA
**Tribunal de Primera Instancia**
Sala ☒ Superior ☐ Municipal de S a n   J u a n

| | |
|---|---|
| DEPARTAMENTO DE ASUNTOS DEL CONSUMDOR | Caso Núm. **S J 2 0 2 5 C V** 06607 |
| Parte Demandante | Salón Núm. 901 |
| v. | |
| LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA | Acción Civil de: Sentencia Declaratoria |
| Parte Demandada | Materia o Asunto |

ENERGY SERVCO, LLC
DIVISIÓN LEGAL

JUL 2 3 2025

Hora:

RECIBIDO

**EMPLAZAMIENTO**

ESTADOS UNIDOS DE AMERICA, SS
EL PRESIDENTE DE LOS ESTADOS UNIDOS
EL ESTADO LIBRE ASOCIADO DE PUERTO RICO

A: L U M A   E N E R G Y ,   L L C
_____
Nombre de la parte demandada que se emplaza
1110 Ave. Ponce de León, Pda. 16 1/2, Edif. NEOS - Ofic. 607, San Juan, PR. 00907
_____
_____

Dirección de la parte demandada que se emplaza

POR LA PRESENTE se le emplaza para que presente al tribunal su alegación responsiva dentro de los _____30_____ días de haber sido diligenciado este emplazamiento, excluyéndose el día del diligenciamiento. Usted deberá presentar su alegación responsiva a través del Sistema Unificado de Manejo y Administración de Casos (SUMAC), al cual puede acceder utilizando la siguiente dirección electrónica: https://www.poderjudicial.pr/index.php/tribunal-electronico/, salvo que el caso sea de un expediente físico o que se represente por derecho propio, en cuyo caso deberá presentar su alegación responsiva en la Secretaría del Tribunal y notificar copia de la misma al (a la) abogado(a) de la parte demandante o a ésta, de no tener representación legal. Si usted deja de presentar su alegación responsiva dentro del referido término, el tribunal podrá dictar sentencia en rebeldía en su contra y conceder el remedio solicitado en la demanda, o cualquier otro, si el tribunal, en el ejercicio de su sana discreción, lo entiende procedente. Además, se le apercibe que, en los casos al amparo de la Ley Núm. 57-2023, titulada *Ley para la Prevención del Maltrato, Preservación de la Unidad Familiar y para la Seguridad, Bienestar y Protección de los Menores*, entre los remedios que el Tribunal podrá conceder se incluyen la ubicación permanente de un (una) menor fuera de su hogar, el inicio de procesos para la privación de patria potestad, y cualquier otra medida en el mejor interés del (de la) menor. *(Artículo 33, incisos b y f de la Ley Núm. 57-2023)*. Se le advierte de su derecho a comparecer acompañado(a) de abogado(a) en los casos que proceda.

Lcda. Valerie Rodríguez Erazo; Lcdo. Gadiel Figueroa; Lcdo. Samuel Silva
_____
Nombre del (de la) abogado(a) de la parte demandante,
o de la parte, si no tiene representación legal
16, 861; 18,687; 7883
_____
Número ante el Tribunal Supremo (RUA), si es abogado(a)
Box 41059, Minillas Station Santurce, P.R.  00940-1059
_____
Dirección
(787) 722-7555
_____
Número de teléfono; número de fax
vrodriguez@daco.pr.gov; gfigueroa@daco.pr.gov; ssilva@daco.pr.gov
_____
Correo electrónico

Expedido bajo mi firma y sello del Tribunal, el _____ de JUL 22 2025 de _____.

Por: _____
Nombre del (de la)
Secretario(a) Auxiliar del Tribunal
*Cristina Roldán del Toro*
*Secretaria Regional*
*María Ocasio Rodríguez*
Firma del Secretaria Auxiliar
Secretario(a) Auxiliar del Tribunal

Nombre del (de la)
Secretario(a) Regional

TRIBUNAL DE PRIMERA INSTANCIA SALA SUPERIOR DE SAN JUAN
TRIBUNAL GENERAL
ESTADO LIBRE ASOCIADO DE PUERTO RICO
K027

SJ2025CV06607  22/07/2025 08:09 am Entrada Núm. 1 Página 2 de 3

Formulario OAT 1721                                                                        Página 2 de 3
(Rev. Agosto 2023)

Caso Núm. _____

CERTIFICADO DE DILIGENCIAMIENTO POR EL (LA) ALGUACIL

Yo, _____ Alguacil del Tribunal de Primera Instancia de Puerto
Rico, Sala de _____ .
CERTIFICO que el diligenciamiento del emplazamiento y de la demanda del caso de referencia fue
realizada por mí, el _____ de _____ de _____, a las _____ □ a.m. □ p.m., de la
siguiente forma:

☐   Mediante entrega personal a la parte demandada en la siguiente dirección física:
    _____

☐   Accesible en la inmediata presencia de la parte demandada en la siguiente dirección física:
    _____

☐   Dejando copia de los documentos a un(a) agente autorizado(a) por la parte demandada o
    designada por ley para recibir emplazamientos en la siguiente dirección física:
    _____

☐   No se pudo diligenciar el emplazamiento personalmente debido a que:
    _____
    _____

En _____, Puerto Rico, el _____ de _____ de _____ .

_____                    _____
Nombre del (de la) Alguacil Regional            Nombre del (de la) Alguacil de Primera Instancia
                                                         y Número de Placa

                                                _____
                                                Firma del (de la) Alguacil de Primera Instancia

DILIGENCIAMIENTO DEL EMPLAZAMIENTO POR PERSONA PARTICULAR

Yo, _Jail Rivera_____ , declaro tener capacidad legal conforme la Regla 4.3
de Procedimiento Civil de Puerto Rico, y certifico que el diligenciamiento del emplazamiento y de la
demanda del caso de referencia fue realizado por mí, el _23_ de _julio_ de _2025_,
de la siguiente forma:

☑   Mediante entrega personal a la parte demandada en la siguiente dirección física:
    Luma Energy, LLC  Ple  Maneli Gonzales, Asst Ejecutiva, Dpto Legal

☐   Accesible en la inmediata presencia de la parte demandada en la siguiente dirección física:
    _____

☑   Dejando copia de los documentos a un(a) agente autorizado(a) por la parte demanda o
    designada por ley para recibir emplazamientos en la siguiente dirección física:
    1110 Ponce De Leon, 5 ½

☐   No se pudo diligenciar el emplazamiento personalmente debido a que:
    _____
    _____

COSTOS DEL DILIGENCIAMIENTO: $ _____

DECLARACIÓN DEL (DE LA) EMPLAZADOR(A)

Declaro bajo pena de perjurio, conforme a las leyes del Estado Libre Asociado de Puerto Rico, que
la información provista en el diligenciamiento del emplazamiento es verdadera y correcta.
Y PARA QUE ASÍ CONSTE, suscribo la presente en _Sto_____ , Puerto Rico, el _23_
de _julio_ de _2025_ .

_____                    _____
Firma del (de la) emplazador(a)                 Guayres
                                                Dirección del (de la) emplazador(a)

AFFIDÁVIT NÚM. _____ [en caso de ser juramentado ante un(a) notario(a)]

       Jurado(a) y suscrito(a) ante mí por _____ ,
de las circunstancias personales anteriormente mencionadas, a quien doy fe de conocer

       (conocimiento personal o, en su defecto, la acreditación del medio supletorio provisto por la Ley Notarial)
En _____ , Puerto Rico, el _____ de _____ de _____ .

                                                Por: _____
_____                    Nombre del (de la)
Nombre del (de la) Notario(a) o                 Secretario(a) Auxiliar del Tribunal
Secretario(a) Regional

                                                _____
                                                Firma del (de la)
                                                Secretario(a) Auxiliar del Tribunal

Formulario OAT 1721
(Rev. Agosto 2023)

Página 3 de 3

Caso Núm. _____

### DILIGENCIAMIENTO BAJO LEY NÚM. 57-2023

Yo, _____, certifico que el diligenciamiento del emplazamiento y de la demanda del caso de referencia fue realizado por mí, el ____ de _____ de _____, de la siguiente forma:

☐ Mediante envío a la parte demandada por correo electrónico a la siguiente dirección:
_____

☐ Mediante envío a la parte demandada por correo regular a la siguiente dirección:
_____

### DECLARACIÓN DEL (DE LA) EMPLAZADOR(A)

Declaro bajo pena de perjurio, conforme a las leyes del Estado Libre Asociado de Puerto Rico, que la información provista en el diligenciamiento del emplazamiento es verdadera y correcta.
Y PARA QUE ASÍ CONSTE, suscribo el presente en _____, Puerto Rico, el ___ de _____ de _____ .

_____        _____
Firma del (de la) emplazador(a)               Dirección del (de la) emplazador(a)

AFFIDÁVIT NÚM. _____ [en caso de ser juramentado ante un(a) notario(a)]

Jurado(a) y suscrito(a) ante mí por _____ ,
de las circunstancias personales anteriormente mencionadas, a quien doy fe de conocer

_____
(conocimiento personal o, en su defecto, la acreditación del medio supletorio provisto por la Ley Notarial)
En _____ , Puerto Rico, el _____ de _____ de _____ .

Por: _____
_____                    Nombre del (de la)
Nombre del (de la) Notario(a) o           Secretario(a) Auxiliar del Tribunal
Secretario(a) Regional

_____
Firma del (de la)
Secretario(a) Auxiliar del Tribunal

**GOBIERNO DE PUERTO RICO**
**TRIBUNAL GENERAL DE JUSTICIA**
**SALA SUPERIOR DE SAN JUAN**

| | |
|---|---|
| **DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR**<br>Demandante | **CIVIL NÚM.**<br><br>SALA NÚM:<br><br>SOBRE:        SENTENCIA<br>DECLARATORIA |
| **vs.** | |
| **LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA**<br>Demandados | |

**SOLICITUD DE SENTENCIA DECLARATORIA PARA DECLARAR**
**INCONSTITUCIONAL LA SECCIÓN 4.1(g) del PUERTO RICO TRANSMISSION AND**
**DISTRIBUTION SYSTEM**
**OPERATION AND MAINTENANCE AGREEMENT**

**AL HONORABLE TRIBUNAL:**

Comparece el Departamento de Asuntos del Consumidor, (en adelante "DACO"), a través de la representación legal que suscribe, quien muy respetuosamente **EXPONE, ALEGA Y SOLICITA** lo siguiente:

<div align="center">I.     <u>Introducción</u></div>

El caso de epígrafe <u>no</u> busca de forma alguna inmiscuirse en los poderes otorgados por virtud de ley al Negociado de Energía de Puerto Rico (en adelante "NEPR") para establecer la política pública energética ni tampoco en su rol en la aprobación de las tarifas del servicio eléctrico. Lo que <u>sí</u> busca el presente recurso es hacer valer los derechos de los consumidores ante la ineficiencia y la falta de un servicio adecuado por parte del operador LUMA Energy, LLC y su filial LUMA Energy Servco, LLC (en adelante "LUMA"). En síntesis, en el proceso de aprobación del *Puerto Rico Transmission And Distribution System Operation And Maintenance Agreement* (en adelante "el Acuerdo"), el NEPR otorgó una inmunidad <u>casi absoluta</u> a LUMA frente a reclamaciones de consumidores por daños causados por la negligencia de dicha compañía en el descargue de sus funciones.

Es decir, en el 2021 el NEPR aprobó por *fiat* contractual y administrativo y sin la intervención de la Asamblea Legislativa, un cheque en blanco a LUMA para actuar

negligentemente, dejando en un estado total de indefensión a los abonados de energía, a la ciudadanía en general y a cualquier persona que pueda sufrir daño por la negligencia de LUMA, sus directores, oficiales, empleados, agentes y contratistas. En síntesis, el NEPR usurpó el poder legislativo para eliminar derechos adquiridos, con la excusa de que obró en función de su poder reglamentario.

¿Cuál ha sido el resultado? En las pasadas semanas LUMA admitió en una vista pública que **ha denegado 1,828 reclamaciones presentadas por los consumidores afectados por la negligencia y los vaivenes energéticos, valiéndose de ese relevo contractual que otorga una inmunidad prácticamente incondicional a un ente privado, sin el aval de la legislatura**.

La política pública de la actual Gobernadora Jenniffer González Colón es hacerles frente a las prácticas de LUMA que afecten el bienestar de todos los puertorriqueños. El Instituto de Competitividad y Sostenibilidad Económica (ICSE) y la Oficina Independiente de Protección al Consumidor (OIPC)[1] han levantado la voz de alerta sobre el efecto nefasto para el consumidor de este tipo de relevo. Los Tribunales, sin embargo, no le han reconocido legitimación para llevar este tipo de reclamo. El DACO, sin embargo, es la agencia llamada en ley para hacer valer los derechos de los consumidores y es quien tiene la potestad para presentar esta causa de acción a nombre de todos y cada uno de los puertorriqueños. Por tanto, y en virtud de los hechos que se detallan a continuación, se solicita sin más que se declare nula la Sección 4.1(g) del Acuerdo de LUMA y la Resolución del 31 de mayo de 2021 sobre el relevo de responsabilidad, según fue aprobada por el NEPR, debido a que: (1) el otorgamiento de inmunidad amplia a LUMA mediante un contrato administrativo viola el principio de reserva de ley, porque no fue producto del proceso legislativo ni refrendado como ley; (2) deja indefensos a los consumidores, terceros no contratantes, que ahora carecen de remedios por daños negligentes; (3) el Estado no puede conferir, por *fiat* administrativo y contractual, una inmunidad cuasi soberana a una empresa privada sin que ello sea evaluado por la Asamblea Legislativa; y (4) el intento del NEPR de limitar o suprimir las reclamaciones

---

[1] El Instituto de Competitividad y Sostenibilidad Económica (ICSE) y la Oficina Independiente de Protección al Consumidor (OIPC) son entidades creadas y registradas en el Departamento de Estado de Puerto Rico. Ambas entidades se han expresado públicamente sobre el impacto de las acciones de LUMA en los consumidores. El ICSE promueve el desarrollo económico sostenible, mientras que la OIPC vela por los derechos de los abonados del sistema eléctrico.

2

extracontractuales en perjuicio de terceros sin su participación ni aval legislativo constituye una usurpación del poder legislativo y un atentado contra la doctrina de separación de poderes. *Veamos*

## II.   Partes

1. La parte demandante, el DACO, es una agencia creada en virtud de la Ley Núm. 5 del 23 de abril de 1973. El artículo 6 (f) del antes mencionado estatuto, 3 L.P.R.A. § 341e, autoriza a la agencia a comparecer por y en representación de los consumidores ante cualquier tribunal, junta o comisión, organismo administrativo, departamento, oficina o agencia del Estado Libre Asociado de Puerto Rico y/o del gobierno de los Estados Unidos en cualquier vista, procedimiento o asunto que afecte o pueda afectar los intereses del consumidor en general, de grupos de consumidores o de cualquier consumidor en particular. Su dirección física es Ave. José De Diego, Pda. 22, Centro Gubernamental Minillas, Edificio Torre Norte, Piso 8, San Juan, P.R. 00940.

2. La codemandada Autoridad de Energía Eléctrica (AEE), es una corporación pública creada en virtud de la Ley Núm. 83 del 2 de mayo de 1941. En virtud de la Sección 5 (d) de su ley habilitadora, tiene la capacidad para demandar y ser demandada. Su dirección física es 1110 Ave. Ponce de León, Edificio Neos, Piso 8 Ofic. 801. La AEE es la entidad que firma el Acuerdo objeto de este recurso con LUMA.

3. El codemandado NEPR fue creado en virtud de la Ley 57-2014. En virtud del artículo 6.3 de la antes mencionada Ley, 22 L.P.R.A § 1054b, el NEPR tiene la capacidad de demandar y ser demandada. Su dirección física es 268 Av. Luis Muñoz Rivera, San Juan, 00918.

4. La codemandada LUMA Energy, LLC, es una compañía de responsabilidad limitada, organizada bajo las leyes del Gobierno de Puerto Rico, con el número de registro en el Departamento de Estado 439372. Su dirección física es 1110 Ave. Ponce de León, Pda. 16 1/2, Edif. NEOS - Ofic. 607, San Juan, PR, 00907.

5. La codemandada LUMA Energy Servco, LLC, es una compañía de responsabilidad limitada organizada bajos las leyes del Gobierno de Puerto Rico, con el número de registro en el Departamento de Estado 439373. Su dirección física es 1110 Ave. Ponce de León, Pda. 16 1/2, Edif. NEOS - Ofic. 607, San Juan, PR, 00907.

3

III.    Hechos Relevantes

6. El 24 de febrero de 2021, bajo la administración del exgobernador Hon. Pedro

   Pierluisi, LUMA Energy, LLC y LUMA Energy ServCo. (LUMA), sometieron para

   revisión y aprobación del Negociado de Energía de Puerto Rico (NEPR), un

   documento intitulado *Request for Approval of Terms of Service and Memorandum of*

   *Law in Support* ante el NEPR.

7. En lo relevante a la controversia que nos ocupa, LUMA solicitó que el NEPR aprobará

   el artículo 4.1(g) del *Puerto Rico Transmission And Distribution System Operation*

   *And Maintenance Agreement* firmado entre LUMA y la Autoridad de Energía Eléctrica.

   **(Véase Anejo 1).**

8. El artículo 4.1(g) del Acuerdo lee como sigue:

   > Liability Waiver. In connection with the submission of the Initial
   > Budgets to PREB, the Parties agree to apply for inclusion in the Rate
   > Order that the associated tariff or terms of service include: (i) a
   > waiver of Owner's, ManagementCo's and ServCo's liability to
   > customers or any Person receiving Power and Electricity for any
   > Losses arising in any way out of or in connection with the operation
   > of the T&D System and the provision of Power and Electricity
   > including any events of interrupted, irregular or defective electric
   > service due to Force Majeure Events, other causes beyond Owner's,
   > ManagementCo's or ServCo's control or ordinary negligence, gross
   > negligence or willful misconduct of Owner, ManagementCo or
   > ServCo, or their respective employees, agents or contractors; and
   > (ii) a waiver in all cases of responsibility for any loss of profits or
   > revenues, special, exemplary, punitive, indirect, incidental or
   > consequential damages, including loss of revenue, loss of use of
   > equipment, cost of capital, cost of temporary equipment, overtime,
   > business interruption, spoilage of goods, claims of customers of
   > electric customers or other economic harms, in each case
   > howsoever and whensoever arising, including where caused by any
   > of Owner's, ManagementCo's or ServCo's ordinary negligence,
   > gross negligence or willful misconduct (collectively the "Liability
   > Waiver"). **(Véase Anejo 1, pág. 50-51)[2]**

9. Es decir, en virtud del artículo 4.1(g), la Autoridad de Energía Eléctrica y LUMA

   solicitarían ante el NEPR, un relevo total para dicho operador y todos sus empleados,

   oficiales y contratistas ante reclamaciones de los consumidores por daños causados

   por actos negligentes o por fluctuaciones en el servicio eléctrico.

---

[2] Las páginas de los ajenos se identifican a tenor con el número de páginas del documento en su totalidad y no con el
número de página que aparece en la parte inferior de éste.

4

10. Previo a la firma del Acuerdo entre LUMA y la Autoridad de Energía Eléctrica, la corporación pública contaba con un mecanismo para que los consumidores presentaran sus reclamos por daños causados por negligencias o fluctuaciones en el servicio eléctrico. **Es decir, la Autoridad de Energía Eléctrica, aún siendo una corporación pública, no gozaba de la inmunidad que hoy día goza LUMA ante reclamaciones de los consumidores.**

11. El 4 de mayo de 2021 el Negociado notificó una Resolución y Orden en la que abrió el procedimiento *In Re: Review of LUMA´s Terms of Service (Liability Waiver)*[3]. En la misma ordenó a LUMA a que proporcionara información suplementaria para la evaluación de los términos de servicios propuestos y estableció el calendario procesal.

12. El 12 de mayo de 2021, a través de un aviso titulado *Notice Concerning Public Hearings, Review of LUMA´s Terms of Service*, divulgado en un periódico de circulación general, el Negociado informó que, el 25 de mayo de 2021 de 9:00am a 5:30pm, se estaría llevando a cabo una vista pública virtual en relación con la Petición presentada por LUMA.

13. El 18 de mayo de 2021 el NEPR llevó a cabo una Conferencia Técnica con el propósito de discutir la Petición con el personal de LUMA y de la AEE.

14. El 21 de mayo de 2021, la OIPC, presentó un Escrito Notificando Intervención de la OIPC. Sustentó su solicitud de intervención con el Art. 6.42 de la Ley de Transformación y ALIVIO Energético, Ley Núm. 57-2014, que le permitía intervenir en cualquier asunto que pudiera afectar a los consumidores en su capacidad como portavoz y defensora de estos, incluyendo los asuntos relacionados con las tarifas y cargos de servicio eléctrico, calidad y los servicios de las compañías del servicio eléctrico.

15. El 25 de mayo de 2021 el Negociado celebró una vista con el propósito de escuchar al público en general en relación con los términos de servicio propuesto.

16. Los representantes de la OIPC reiteraron su oposición a la petición de aprobación de los términos del servicio solicitado por LUMA. En esa misma fecha, el ICSE, radicó un documento titulado *Motion Requesting Extension of Time to File Comments*. En su

---

[3] NEPR-MI-2021-0007

5

escrito, el ICSE indicó que el procedimiento requería un análisis complejo, por lo que necesitaba más tiempo para poder someter comentarios responsablemente. Explicaron que se encontraban consultando con expertos en los Estados Unidos con el fin de poder hacer un análisis de las implicaciones legales del asunto.

17. El 27 de mayo de 2021, LUMA presentó un documento titulado *Response in Opposition to ICSE´s Motion Requesting an Extension of Time to File Comments*. Sostuvo que, 1) la prórroga solicitada por ICSE era tardía y no adelantaba una justificación razonable o justa causa para explicar el por qué no presentaron sus comentarios dentro del plazo dispuesto en el calendario procesal establecido en el procedimiento; 2) el NEPR concedió tiempo para que las partes interesadas y el público en general participaran en una vista pública virtual y presentaran sus escritos; y, 3) ICSE no compareció a la vista pública virtual ni presentó comentarios, a pesar de que los documentos sometidos en el procedimiento estuvieron disponible al público en general.

18. El 28 de mayo de 2021, mediante Resolución y Orden, el NEPR denegó la Solicitud de Intervención de la OIPC, aunque le permitió someter comentarios por escrito, proveer testimonio en las vistas celebradas sobre la Petición de LUMA, hacerles preguntas a los testigos y tener acceso a documentos confidenciales.

19. Luego de celebradas las vistas públicas, el 31 de mayo de 2021, NEPR emitió una Resolución y Orden sobre el relevo de responsabilidad solicitado por LUMA y la Autoridad de Energía Eléctrica. **(Véase Anejo 2)**

20. En cuanto a relevo de responsabilidad solicitado por LUMA, el NEPR determinó lo siguiente:

<u>Modified Terms of Service</u>
Effective on June 1st, 2021, the following terms of service shall be incorporated and made part of the Puerto Rico Electric Power Authority Tariff Book approved on May 28, 2019. These terms of service shall modify and complement the terms of service included in the Puerto Rico Electric Power Authority Regulation No. 7982, dated January 14, 2010, known as Reglamento de Términos y Condiciones Generales para el Suministro de Energía Eléctrica ("Regulation 7982"). In the event of any conflict or issue of interpretation between the following terms of service and Regulation 7982, these terms of service shall prevail over Regulation 7982.

<u>Modified Terms of Service</u>
1. It is recognized that certain components of the Puerto Rico Electric Power Authority's ("PREPA") electric power system (including, the Transmission and Distribution System ("T&D System"), as well as

6

the Generation Facilities) currently do not meet the standards of performance generally accepted in the electric utility industry. The whole system needs significant repairs, improvements, and modernization to achieve acceptable standards of service. Furthermore, certain components of the T&D System and the manner in which the T&D System is operated do not currently meet acceptable standards of performance, including the fact that certain general operating and administrative practices may not comply with acceptable industry standards and practices. Therefore, a period of review, planning, remediation, reconstruction, repair, and replacement will be required to enable LUMA Energy, LLC, LUMA Energy Servco, LLC (together, "LUMA") and PREPA to operate the electric system according to acceptable standards. In light of the foregoing, PREPA and LUMA, with the cooperation of other governmental entities developed a plan, taking into account expected funds availability, particularly from the Federal Emergency Management Agency (FEMA), to remediate, repair, reconstruct, replace and stabilize such equipment, systems, practices and services, as needed, to enable LUMA to perform the operation and maintenance services contracted in compliance with the applicable standards as soon as reasonably possible and at a reasonable cost to PREPA ("System Remediation Plan"). The System Remediation Plan shall be review and approved by the Energy Bureau of the Puerto Rico Public Service Regulatory Board ("Energy Bureau").

2. Taking in consideration the circumstances described in the preceding paragraph, and other generally known, PREPA and LUMA shall make all reasonable efforts to provide an efficient and reliable service to its customers and users. A user is a person natural or legal) who receives and uses power and electricity at a certain location and whose consumption is recorded and invoiced in the name of another person.

3. PREPA and LUMA shall make all reasonable efforts to maintain continuity of service, but PREPA and LUMA cannot guarantee an uninterrupted electricity supply to its customers and users.
4. Without liability of any kind to PREPA and/or LUMA, PREPA and/or LUMA shall have the right to disconnect or otherwise curtail, interrupt or reduce service to customers and users: (a) whenever PREPA and/or LUMA reasonably determines it is necessary to facilitate construction, installation, maintenance, repairs, replacement or inspection of any of PREPA's facilities, or to permit the connection or disconnection of other customers; (b) to maintain the safety and reliability of PREPA's electric system (including without limitation, transmission, distribution and generation facilities); or (c) due to any other reason attributable to third parties or related to dangerous or hazardous circumstances, including without limitation, emergencies, forced outages, potential overloading of PREPA's transmission and/or distribution system, sabotage, strikes, unauthorized acts by employees or Force Majeure. Notwithstanding the foregoing, PREPA and/or LUMA shall use reasonable efforts to minimize any scheduled curtailment, interruption, or reduction to the extent reasonably practicable under the circumstances, to provide the customer (and not to the user, because is not a registered customer) with prior notification of any such curtailment, interruption, or reduction to the extent reasonably practicable, and to resume the customer's service connection as promptly as reasonably practicable.

5. **Notwithstanding anything to the contrary in these Modified Terms of Service and Regulation 7982, PREPA, its directors, officers, employees, agents and contractors (including LUMA**

7

**Energy, LLC, LUMA Energy Servco, LLC, their directors, officers, employees, agents and contractors) (the "Released Parties") shall not be liable contractually or extra-contractually, to customers, or any user receiving power or electricity from PREPA and/or LUMA for any losses arising in any way out of or in connection with the operation of the T&D System and the provision of power and electricity including any events of interrupted, irregular or defective electric service due to Force Majeure events or from pre-existing deteriorated electric system conditions, other causes beyond the control of the Released Parties, unauthorized acts by employees, sabotage, strikes or due to ordinary negligence (excluding gross negligence, willful misconduct or dolo) of the Released Parties or their respective employees, agents or contractors. In any event that the Released Parties are found responsible howsoever and whensoever in connection with the provision of service to customers or users receiving power or electricity from PREPA and/or LUMA, customers or users shall only recover direct damages (including direct physical loss, injury or damage to a customer or customer's property). For the foregoing and without otherwise restricting the generality thereof, "direct physical loss, injury or damage" <u>shall not include any loss of profits or revenues, special, exemplary, punitive, indirect, incidental, or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms.</u>**

**6.** Notwithstanding anything to the contrary contained in these Modified Terms of Service, PREPA and LUMA will remain fully accountable and liable to the Energy Bureau for compliance with the Puerto Rico energy public policy as well as all legal and regulatory requirements applicable to electric service companies, and, particularly to LUMA as operator of the T&D System. Nothing in these Modified Terms of Service shall have the effect of releasing or waiving PREPA and/or LUMA from any penalty, fine or obligation imposed by the Energy Bureau for whatever reason whatsoever. **(Véase Anejo 2, págs. 41-43)** (Énfasis Suplido)

21. Así, el NEPR, al evaluar las disposiciones de artículo 4.1(g) del Acuerdo, lo único que hizo fue dejar fuera los casos de negligencia crasa[4] por parte de LUMA, pero sí otorgó un relevo de responsabilidad, como fue solicitado, frente a reclamaciones de los consumidores por daños causados por actos negligentes, interrupciones del servicio y fluctuaciones en el servicio eléctrico.

22. Cabe señalar que dicha inmunidad fue concedida mediante un proceso administrativo y contractual, en ningún momento se consultó a la Asamblea Legislativa ni se presentó legislación alguna para extender a LUMA, <u>un operador privado</u>, una inmunidad ante estas reclamaciones.

---

[4] El Tribunal Supremo de Puerto Rico adoptó la definición de negligencia crasa establecida en la jurisprudencia norteamericana. Así, la definió como la falta completa de cuidado, o el ejercicio de un grado tan pequeño de diligencia, que justifique la creencia de que hay una completa indiferencia respecto del interés y el bienestar de los demás. <u>Pueblo v. Telmaín Escalera</u>, 45 DPR 447, 453 (1933); <u>Elías, et al.</u>, v. <u>Chenet, et al.</u>, 147 DPR 507, 521 (1999).

8

23. Oportunamente, el 9 de junio de 2021, ICSE presentó una Moción de Reconsideración. En este, adujeron razones jurídicas por las que el NEPR debía rechazar de plano tal petición sin aceptar inmunidad alguna de LUMA.

24. El NEPR no se expresó sobre la solicitud de ICSE.

25. Inconforme, el ICSE acudió ante el Tribunal de Apelaciones mediante recurso de revisión administrativa. El antes mencionado foro, mediante Sentencia dividida emitida el 9 de marzo de 2022, Caso Núm. KLRA202100406[5] determinó que ISCE carecía de legitimación activa para presentar el recurso a nombre de los consumidores.

26. No obstante, tal y como se mencionó en la introducción de este escrito, el DACO, en virtud del artículo 6(f) de su ley orgánica, *supra,* **sí tiene la capacidad de llevar pleitos ante los tribunales en protección de los consumidores.**

27. El pasado 27 de mayo de 2025, mediante una Vista pública ante los miembros de la Comisión de Asuntos del Consumidor de la Cámara de Representantes, LUMA admitió que ha denegado todas las 1,828 reclamaciones que ha recibido por parte de los consumidores por daños a electrodomésticos por fallas en el sistema eléctrico haciéndose valer de la inmunidad solicitada en virtud de la sección 4.1 (g) del Acuerdo, el cual fue refrendado casi en su totalidad por el NEPR mediante la resolución del 31 de mayo de 2021.

28. La Secretaria de Asuntos del Consumidor participó de la antes mencionada vista, adquiriendo conocimiento personal sobre el estado de indefensión de los consumidores ante acciones negligentes de LUMA.

29. Así, el estado contractual actual, sin intervención alguna de la Asamblea Legislativa, ha concedido un **relevo de responsabilidad casi absoluto** a LUMA ante reclamaciones en daños por parte de los consumidores causados por las actuaciones de dicha entidad. **Es decir, LUMA, un ente privado, goza de una inmunidad que nunca se le concedió a la Autoridad de Energía Eléctrica siendo ésta una corporación pública.**

---

[5] En virtud de la Regla 201 de Reglas de Evidencia, 32 L.P.R.A. Ap VI, R. 201, este Honorable Tribunal puede tomar conocimiento judicial de los hechos que fueron adjudicados por el Tribunal de Apelaciones en el caso KLRA202100406 y que se incluyen en esta Demanda.

9

IV.    Derecho Aplicable

a. La Sentencia Declaratoria

30. La Regla 59.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 59.1, dispone lo siguiente:

> El Tribunal de Primera Instancia tendrá autoridad para declarar derechos, estados y otras relaciones jurídicas, aunque se inste o pueda instarse otro remedio. No se estimará como motivo suficiente para atacar un procedimiento o una acción el que se solicite una resolución o sentencia declaratoria. La declaración podrá ser en su forma y efectos, afirmativa o negativa, y tendrá la eficacia y el vigor de las sentencias o resoluciones definitivas. Independientemente de lo dispuesto en la Regla 37, el tribunal podrá ordenar una vista rápida de un pleito de sentencia declaratoria, dándole preferencia en el calendario.

31. Así, la Sentencia Declaratoria es un mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra quien la solicita. Sánchez et al. v. Srio. de Justicia et al., 157 DPR 360, 383-384 (2002). Por tanto, la sentencia declaratoria es adecuada para declarar derechos, estados y otras relaciones de naturaleza jurídica independiente a que existan otros remedios. Particularmente, la sentencia declaratoria permite dilucidar cualquier divergencia de criterio en la interpretación de un estatuto "cuando existe una controversia sustancial entre partes con intereses legales adversos [...]". Mun. Fajardo v. Srio. Justicia et al., 187 DPR 245, 254-255 (2012).

32. Adicionalmente, la Regla 59.2 de Procedimiento Civil, 32 L.P.R.A. Ap. IV R 59.2, dispone que "toda persona interesada en una escritura, un testamento, un contrato escrito u otros documentos constitutivos de contrato, o cuyos derechos, estado u otras relaciones jurídicas fuesen afectados por un estatuto, una ordenanza municipal, un contrato o una franquicia, podrá solicitar una decisión sobre cualquier divergencia en la interpretación o validez de dichos estatutos, ordenanzas, contrato o franquicia, y además que se dicte una declaración de los derechos, estados u otras relaciones jurídicas que de aquéllos se deriven. Un contrato podrá ser interpretado antes o después de haber sido infringido." Así, en virtud de los poderes otorgados al DACO y a la luz del derecho aplicable, el mecanismo de Sentencia Declaratoria es el mecanismo adecuado para atender la reclamación de epígrafe.

10

  b. <u>Los daños contractuales y extracontractuales, el derecho de inmunidad y la doctrina de separación de poderes</u>

33. <u>El ámbito de la relación de LUMA con el consumidor, las reclamaciones en concepto de daños opera de forma dual</u>, a nivel contractual debido al contrato de servicio eléctrico suscrito entre el ciudadano y la entidad administradora y a nivel extracontractual por aquellas acciones que están al margen de la relación extracontractual entre las partes.

34. Nuestro Código Civil reconoce dos categorías de actos perjudiciales que dan lugar a distintos tipos de responsabilidad, la contractual y la extracontractual. La primera de estas emana del "quebrantamiento de un deber que surge de un contrato expreso o implícito". <u>Soc. de Gananciales</u> v. <u>Vélez & Asoc.</u>, 145 DPR 508, 521 (1998).

35. Sobre lo mismo, para "que opere la responsabilidad contractual... no basta que haya un contrato entre las partes, sino que se requiere la realización de un hecho dentro de la rigurosa órbita de lo pactado y como desarrollo del contenido negociado". <u>Maderas Tratadas</u> v. <u>Sun Alliance</u>, 185 DPR 880 (2012). Por lo tanto, "las acciones derivadas de contratos tienen por objeto que se cumplan las promesas contractuales sobre las que las partes de un contrato otorgaron su consentimiento". <u>Santiago Nieves</u> v. <u>ACAA</u>, 119 DPR 711, 716 (1987).

36. Por otra parte, la responsabilidad extracontractual atiende "el resarcimiento de los daños ocurridos como consecuencia del quebrantamiento del principio general de convivencia social que supone no causar daño a los demás". <u>Rivera Sanfeliz et al.</u> v. <u>Jta. Dir. FirstBank</u> 193 DPR 38, 57 (2015).

37. En materia extracontractual, el legislador estableció, en el artículo 1536 del Código Civil de 2020, el derecho a presentar una causa de acción por los daños y perjuicios ocasionados por actuaciones y omisiones negligentes. Dicho derecho también se encontraba establecido en el artículo 1802 del Código Civil de 1930.

38. El principio constitucional de separación de poderes impide que el poder legislativo delegue sus funciones esenciales sin criterios definidos. Tal doctrina ha sido reconocida tanto en la jurisprudencia federal como en Puerto Rico. En el caso de <u>A.L.A. Schechter Poultry Corp.</u> v. <u>United States</u>, 295 U.S. 495 (1935), la Corte Suprema de los Estados Unidos invalidó una ley que permitía al Ejecutivo imponer

11

regulaciones elaboradas por partes privadas sin estándares claros, por tratarse de una delegación inconstitucional.

39. En Puerto Rico, la doctrina de separación de poderes emana de la Sec. 2 del Art. I de la Constitución, LPRA, Tomo 1, la cual establece la forma republicana de gobierno. Misión Ind. P.R. v. J.P., 146 DPR 64, 88-89 (1998). El concepto el principio es igualmente claro: sólo la Asamblea Legislativa puede limitar el alcance de la responsabilidad extracontractual mediante ley debidamente refrendada. Rivera Sanfeliz v. Junta Dir. FirstBank, *supra*.

40. El ordenamiento constitucional de Puerto Rico establece claramente que el diseño y delimitación de la responsabilidad extracontractual del Estado y de las entidades privadas no es una prerrogativa del Ejecutivo ni de los entes reguladores, sino una función exclusiva de la Asamblea Legislativa, conforme al principio de separación de poderes consagrado en el Artículo I, Sección 2 de la Constitución del Estado Libre Asociado de Puerto Rico. Tal como se reafirma en Misión Industrial v. J.P. *Supra*.

41. La Asamblea Legislativa, en el ejercicio de sus poderes, ha limitado el ámbito de responsabilidad de las entidades gubernamentales ante los ciudadanos. A modo de ejemplo, la Ley Núm. 104 de 29 de junio de 1955, conocida como la "Ley de Reclamaciones y Demandas contra el Estado", limita la cuantía que un ciudadano puede reclamar en daños contra una agencia del Gobierno de Puerto Rico y/o sus funcionarios por actos negligentes. Dicha ley representa un acto deliberado de balance entre el interés público y la protección de derechos individuales, y requiere promulgación legislativa y refrendo ejecutivo.

42. Específicamente pertinente a la controversia que nos atañe, la Corte Suprema de los Estados Unidos resolvió, en el normativo caso de United States Trust Co. v. New Jersey, 431 U.S. 1 (1977), sostuvo que incluso **los contratos públicos con fuerza de ley no pueden eliminar derechos fundamentales sin una justificación apremiante y escrutinio legislativo**. Aún más contundente es Perry v. United States, 294 U.S. 330 (1935), donde se reafirma que **los contratos estatales no pueden sobreponerse a la Constitución ni suspender derechos sustantivos por vía contractual**. De forma aún más directa, en Carter v. Carter

12

App.398

<u>Coal Co</u>., 298 U.S. 238 (1936), el Tribunal Supremo expresó que: **"Delegar el poder de legislar a los productores y empleados del carbón, es decir, a partes privadas interesadas, sin ninguna guía legislativa, es la antítesis misma del gobierno constitucional".**

43. Mediante sus actuaciones, el NEPR otorgó un cheque en blanco a LUMA para realizar actos negligentes en perjuicio de un consumidor que no fue parte de la negociación del Acuerdo. **Este tipo de inmunidad ni siquiera la ostenta el Gobierno Central en virtud de la Ley de Reclamaciones y Demandas contra el Estado.**

44. El permitir que el NEPR limite o elimine ese derecho a nivel contractual en perjuicio de un tercero no tan solo constituye una usurpación al poder legislativo y un atentado con la separación de poderes, sino que deja al consumidor indefenso y carente de un reclamo, concediéndole a una entidad, por *fiat* administrativo y contractual una inmunidad sin precedentes frente a reclamaciones de terceros que no participaron de la negociación y que tampoco contó con el aval de la asamblea legislativa.

45. Además, el conferirle a LUMA –una empresa privada– un privilegio de inmunidad frente a terceros por actos de negligencia sin que dicha disposición haya pasado por el crisol del proceso legislativo constituye una usurpación del poder legislativo y una violación directa al principio republicano de gobierno. De igual manera, priva al ciudadano de su derecho a acceder a remedios judiciales frente a daños sufridos en su carácter de consumidor, lo cual contraviene el principio de acceso a la justicia y el deber estatal de protección al ciudadano frente a conductas dañinas.

46. En síntesis, pretender crear un régimen de inmunidad mediante un contrato administrativo entre el Ejecutivo y una empresa privada como LUMA evade estos procesos democráticos y vulnera la arquitectura constitucional del Estado.

47. El DACO, en cumplimiento con los deberes establecidos en su ley orgánica y la política pública de esta Administración, tiene como norte el proteger al consumidor ante prácticas arbitrarias, injustas y desleales que lo coloquen en un estado de

13

indefensión, privándolos de presentar acciones de resarcimiento en daños contra aquellos con la responsabilidad de proveer un servicio eléctrico confiable y seguro.

48. A casi cuatro años de haber asumido la operación del sistema eléctrico de transmisión y distribución, y tras recibir miles de millones de dólares en fondos públicos, **ya es hora de que LUMA rinda cuentas plenamente ante los consumidores puertorriqueños**. Resulta inaceptable que, pese a su rol esencial y el volumen de recursos invertidos, la empresa continúe protegida por un esquema de inmunidad que la exime de responsabilidad por actos de negligencia que ocasionen daños reales a la ciudadanía.

49. **La inmunidad soberana solo aplica a entidades públicas**. Algunos estados protegen a sus propias corporaciones públicas o agencias estatales bajo inmunidad parcial, pero **esto no aplica a empresas privadas como LUMA**.

50. A diferencia de lo que ocurre en Puerto Rico, ningún estado de los Estados Unidos ha otorgado inmunidad general por actos de negligencia a una compañía privada de energía eléctrica que preste servicios de transmisión o distribución a los ciudadanos. Esto hace que el caso de LUMA en Puerto Rico sea inédito y excepcional. Es decir, ninguna otra jurisdicción en territorio estadounidense otorga inmunidad general a compañías privadas de energía. Las empresas distribuidoras o contratistas de servicios públicos pueden ser demandadas por actos negligentes, incluyendo interrupciones del servicio que causen daños a personas o propiedad.

51. Así, la decisión del Gobierno de Puerto Rico y su organismo regulador en el año 2021, de otorgar inmunidad a LUMA por actos de negligencia ordinaria no tiene paralelo alguno en Estados Unidos. Esta acción limita los remedios disponibles para los consumidores puertorriqueños y crea un precedente que no encuentra justificación jurídica o política en el marco normativo estadounidense.

52. Por lo que, procede sin más declarar inconstitucional y por ende nula la sección 4.1 (g) del Acuerdo y la Resolución del NEPR del 31 de mayo de 2021 refrendando casi todas las disposiciones de dicha sección, ya que está claramente reñida con nuestra constitución y la doctrina de la división de poderes, piedra angular de un sistema republicano de gobierno.

14

V.   SÚPLICA

**POR TODO LO CUAL**, el Departamento de Asuntos del Consumidor solicita a este Honorable Tribunal se sirva de declarar Ha Lugar la Solicitud de Sentencia Declaratoria en los siguientes términos:

1. Se declare nula e inconstitucional la Sección 4.1(g) del *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* firmado entre LUMA y la Autoridad de Energía Eléctrica y la Resolución del 31 de mayo de 2021 del NEPR refrendando casi en su totalidad las disposiciones de dicho Acuerdo;

2. Permita que todo ciudadano pueda llevar reclamaciones en daños causados por la negligencia y la fluctuación del servicio de energía eléctrica ante LUMA; y

3. Conceda a la parte demandante cualquier otro remedio a que tenga derecho.


**RESPETUOSAMENTE SOMETIDO.**

En San Juan, Puerto Rico el 22 de julio de 2025.

f/Lcda. Valerie Rodríguez Erazo
RUA Núm. 16,861
Box 41059
Minillas Station
Santurce, P.R.  00940-1059
(787) 722-7555
vrodriguez@daco.pr.gov

f/Lcdo. Gadiel Figueroa Robles
RUA Núm. 18,687
Box 41059
Minillas Station
Santurce, P.R.  00940-1059
(787) 722-7555
gfigueroa@daco.pr.gov

f/Lcdo. Samuel Silva Rosas
RUA Núm. 7883
Box 41059
Minillas Station
Santurce, P.R.  00940-1059
(787) 722-7555
ssilva@daco.pr.gov

15

## Exhibit D

**DACO's Supreme Court Opening Brief and Certified Translation**

# COMMONWEALTH OF PUERTO RICO
## SUPREME COURT OF PUERTO RICO

| | |
|---|---|
| **DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR** [Department of Consumer Affairs] **Complainant-Petitioner**<br><br>V.<br><br>**LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO** [Puerto Rico Energy Bureau]; **AUTORIDAD DE ENERGÍA ELÉCTRICA** [Electric Power Authority]<br><br>**Respondents-Appellees** | **CT-2025-0003**<br><br>CIVIL NO.: **SJ2025CV06607**<br><br>RE.:                DECLARATORY JUDGMENT<br><br>[stamp:]<br>FILED<br>OFFICE OF THE CLERK<br>SUPREME COURT<br>2025 SEP -8 AM 11:30 a.m. |

## PLEADING OF THE PETITIONING PARTY

**ATTORNEYS FOR THE PETITIONING PARTY**

**MS. VALERIE RODRÍGUEZ ERAZO (ATTY.) RUA [Registro Único de Abogados y Abogadas — Unique Attorney Register]**
No. 16,861
Box 41059
Minillas Station
San Juan, P.R. 00940-1059
(787) 722-7555
vrodriguez@daco.pr.gov

**MR. GADIEL FIGUEROA ROBLES (ATTY.)**
RUA No. 18,687
Box 41059
Minillas Station
San Juan, P.R. 00940-1059
(787) 722-7555
gfigueroa@daco.pr.gov

**MR. SAMUEL SILVA ROSAS (ATTY.)**
RUA No. 7,883
Box 41059
Minillas Station
Santurce, P.R. 00940-1059
(787) 722-7555
ssilva@daco.pr.gov

**APPELLEE PARTY**

**PUERTO RICO ENERGY BUREAU**

**MR. EDGARDO L. RODRÍGUEZ CARDÉ (ATTY.)**
RUA No. 13,211

P.O. Box 365061
San Juan, P.R. 00936-5061
Tel. (787) 722-9911
elrc@rclopr.com

**MS. YARYMAR GONZÁLEZ CARRASQUILLO (ATTY.)**
RUA No. 13,219
P.O. Box 365061
San Juan, P.R. 00936-5061
Tel. (787) 722-9911
ygc@halspr.com

**LUMA ENERGY, LLC AND LUMA ENERGY SERVCO, LLC.**

**MS. ECHEGARAY MARKET MARGARITA (ATTY.)**
RUA No. 16,266
margarita.mercado@us.dlapiper.com

**MS. ALAGARIN ROSE YAHAIRA (ATTY.)**
RUA No. 18,061
Yahaira.delarosa@us.dlapiper.com

**MR. JAN M. ALBINO LÓPEZ (ATTY.)**
RUA No. 22,891
Jan.albinolopez@usdlapiper.com

**DLA Piper (Puerto Rico) LLC**
500 Tank Street, Suite 401
San Juan, P.R. 00901
Tel. (787) 945-9107/9132/9103

**MR. FRANK TOWERS VIADA (ATTY.)**
RUA No. 14,724
P.O. Box 192084
San Juan, P.R. 00919-2084
Tel. (787) 754-1102
ftv@ftorresviada.com

**MR. JOSÉ ANDREÚ SOURCES (ATTY.)**
RUA No. 9,088
261 Ave. Domenech
San Juan, P.R. 00918-3518
Tel. (787) 754-1777
jaf@andreu-sagardia.com

**ELECTRIC POWER AUTHORITY**

**MR. JUAN M. MARTINEZ NEVÁREZ (ATTY.)**
**RUA No. 14,517**
1509 López Landrón, Bldg.
Seventh Floor
San Juan, P.R. 00911-1933
jmartinez@gmlex.net

**MS. MIRELIS VALLE CANCEL (ATTY.)**
**RUA No. 21,115**
1509 Lopez Landrón, Bldg.

2

Seventh Floor
San Juan, P.R. 00911-1933
mvalle@vcprlaw.com

**<u>INTERVENING PARTY</u>**

**MR. CHARLES A. RODRÍGUEZ COLÓN (ATTY.)**
crodriguez@naleapr.com
RUA No. 7,831
252 Ave. Ponce de León Suite 1801
San Juan, P.R. 00918-2020
Tel. (787) 378-2424
Fax: Unknown

**MR. MIGUEL A. RODRÍGUEZ BOUQUETS (ATTY.)**
miguelrrlaw@gmail.com
RUA No. 22,062
P.O. Box 19586
San Juan, P.R. 00910
Tel. (787) 604-2772
Fax: Unknown

**MR. VÍCTOR CALDERÓN CESTERO (ATTY.)**
victor@calderon-law.com
RUA No. 13,266
137 Calle O
Aguadilla, P.R. 00603
Tel.: (787) 602-2465
Fax: Unknown

**MR. FERNANDO E. AGRAIT (ATTY.)**
agraitte@agraitlawpr.com
RUA No. 3,772
Edificio Centro de Seguros
Office 414
701 Ave. Ponce de León
San Juan, P.R. 00907
Tel.: (787) 725-3390 - 3391
FAX: (787) 724-0353

**MR. JOSE LEONARDO POU ROMÁN (ATTY.)**
jpouroman@outlook.com
RUA No. 23,523
Edificio Centro de Seguros
Office 414
701 Ave. Ponce de León
San Juan, P.R. 00907
Tel.: (787) 725-3390 - 3391
FAX: (787) 724-0353

**COMMONWEALTH OF PUERTO RICO**
**SUPREME COURT OF PUERTO RICO**

| | |
|---|---|
| **CONSUMER AFFAIRS DEPARTMENT** Complainant-Petitioner | **CT-2025-0003** |
| | CIVIL NO.: **SJ2025CV06607** |
| V. | RE.: DECLARATORY JUDGMENT |
| **LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA** | |
| **Respondents-Appellees** | |

<u>**PLEADING OF THE PETITIONING PARTY**</u>

**CONTENTS**

I.     INTRODUCCIÓN ........................................................................1

II.    JURISDICCIÓN DEL TRIBUNAL .............................................3

III.   CASO AL CUAL SE REFIERE ESTE RECURSO DE CERTIFICACIÓN

       INTRAJURISDICCIONAL ...........................................................4

IV.   BREVE RELACIÓN DE HECHOS ...............................................4

V.    DERECHO APLICABLE Y ARGUMENTACIÓN ...................................11

VI.   CONCLUSIÓN ......................................................................30

VII.  SÚPLICA...............................................................................31

**COMMONWEALTH OF PUERTO RICO**
**SUPREME COURT OF PUERTO RICO**

| | |
|---|---|
| **CONSUMER AFFAIRS DEPARTMENT**<br>**Complainant-Petitioner** | **CT-2025-0003** |
| | CIVIL NO.: **SJ2025CV06607** |
| V. | RE.: DECLARATORY JUDGMENT |
| **LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA**<br><br>**Respondents-Appellees** | |

<u>**PLEADING OF THE PETITIONING PARTY**</u>

**LEGAL DOCKET**

**I.     STATE JURISPRUDENCE**

<u>AAR, Ex parte</u>, 187 D.P.R. 835, 855 (2013) ............................................................. 24

<u>Alvarado Pacheco et al.</u> v. <u>E.L.A.</u>, 188 D.P.R. 594 (2013). ..................................... 3

<u>Asociación de Maestros de Puerto Rico</u> v. <u>Sistema de Retiro</u>, 190 D.P.R. 854 (2014)

........................................................................................................................... 3

<u>Ayala Hernández</u> v. <u>Bosque Sereno</u>, 190 D.P.R. 547 (2014). ................................ 23

<u>Centro Unido de Detallistas</u> v. <u>Comisión de Servicio Público</u> 174 D.P.R. 174, 184

(2008) .......................................................................................................... 13,

16

<u>Cepeda Torres</u> v. <u>García Ortiz</u>, 132 D.P.R. 698, 703–704 (1993) ............................ 21

<u>Col. Peritos Elec.</u> v. <u>A.E.E.</u>, 150 D.P.R. 327, 331–332 (2000) ................................ 13

<u>Colegio de Médico-Cirujanos de PR</u> v. <u>Academia de Medicina de la Familia</u>, 201

D.P.R. 362 (2018) .................................................................................... 23

<u>DACO</u> v. <u>Farmacia San Martín Barceloneta, Inc.</u>, 175 D.P.R. 198 (2009) .............. 19

<u>Dalmau Ramírez</u> v. <u>ELA</u>, 2024 TSPR 95 (2024) ..................................................... 26

<u>Deliz</u> v. <u>Igartúa</u>, 158 D.P.R. 403, 435 (2003) ........................................................... 21

<u>Depto. Justicia et al</u> v. <u>Jiménez</u>, 199 D.P.R. 293, 309 (2017) .................................. 13

Díaz Carrasquillo v. García Padilla, 191 D.P.R. 97, 110 (2014) ........................ 23,24

Domínguez Castro et al. v. ELA I, 178 D.P.R. 1, 93 (2010) ................................... 26

ECP Inc. vs. Oficina del Comisionado de Seguros, 205 D.P.R. 268 (2020) ............ 23

Elías, et al., v. Chenet, et al., 147 D.P.R. 507, 521 (1999) ..................................... 9

Fund. Surfrider v. ARPe 178 D.P.R. 563, 572 (2010) ........................................... 13

García Oyola v. J.C.A., 142 D.P.R. 532 (1997) ...................................................... 13

Gobierno Ponce v. Caraballo 166 D.P.R. 723 (2006) ........................................... 24

Hernández Agosto v. López Nieves, 114 D.P.R. 601 (1983) ................................... 21

Hernández Torres v. Hernández Colón 129 D.P.R. 824,835 (1992) .................. 13, 16

Hernández Torres v. Hernández Colón, 131 DPR 593,599 (1992) .......................... 13

In Re: Revisión de los Términos de Servicio de LUMA (Extensión De
Responsabilidad) KLRA202100406 ............................................................. 4,5,10

Jiménez v. Pelegrina Espinet, 112 D.P.R. 700, 705 (1982) .................................... 29

Maderas Tratadas v. Sun Alliance, 185 D.P.R. 880 (2012) ..................................... 22

Mundo Ríos v. CEE, 187 D.P.R. 200, 206 (2012) .................................................. 3

Muns. Aguada y Aguadilla v. JCA 190 D.P.R. 122 (2014) ...................................... 13

Nogueras v. Hernández Colón, 127 D.P.R. 405, 426 (1990) ................................... 24

Ortiz Matías v. Mora Dev. Corp., 187 D.P.R 649 (2013) ........................................ 18

P.I.P v. E.L.A. et al., 186 D.P.R. 1 (2012) ............................................................. 3

Pierluisi Rojo v. MAPFRE et al. (SJ2018CV07570) .............................................. 15

Perfect Cleaning Services v. Corporación del Centro Cardiovascular de PR y el Caribe,
162 D.P.R. 745 (2004) ...................................................................................... 23

Pueblo v. Telmaín Escalera, 45 D.P.R. 447, 453 (1933) ........................................ 9

Rivera Sanfeliz et al. v. Jta. Dir. FirstBank 193 D.P.R. 38 (2015) .................... 22,
23

Rivera Segarra v. Rivera Lassén, 214 D.P.R. 111, (2024) ...................................... 23

Rodríguez Casillas et al. v. Colegio, 202 D.P.R. 428, 450–451 (2019) .................. 23

Romero Barceló v. E.L.A. 169 D.P.R. 460, 470–71 (2006) ..................................... 3

Salas Soler v. Secretario de Agricultura, 102 D.P.R. 716 (1974) ........................... 16

Sánchez et al. v. Depto. Vivienda et al., 184 D.P.R. 95, 122 (2011) ....................... 26

Santiago Nieves v. ACAA, 119 D.P.R. 711, 716 (1987) ......................................... 22

Senado v. Tribunal Supremo et al., 208 D.P.R. 115, 135-136 (2021)................. 23,24

<u>Silva</u> v. <u>Hernández Agosto</u>, 118 D.P.R. 45, 57 (1986) ............................................. 23

<u>Soc. de Gananciales</u> v. <u>Royal Bank de P.R.</u>, 145 D.P.R. 178 (1998) ...................... 29

<u>Soc. de Gananciales</u> v. <u>Vélez & Asoc.</u>, 145 D.P.R. 508 (1998) ............................... 22

<u>U.P.R.</u> v. <u>Laborde Torres et al. I</u>, 180 D.P.R. 253 (2010) ........................................ 3

## II.    LAWS

Constitution of Puerto Rico Article Secs. 1 and 16; Article VI, Sec. 13, ........23, 24, 28

Law No. 5 of April 23, 1973, as amended, "Ley Orgánica del Departamento de Asuntos del Consumidor" [Organic Law of the Department of Consumer Affairs] 3 L.P.R.A. §341; §341b; §341e and §341j ............................................. 12, 14, 15, 18, 19

Law 201-2003, as amended, "La Ley de la Judicatura del Estado Libre Asociado de 2003" [The Commonwealth Judiciary Law of 2003], 4 L.P.R.A. § 24s .................. 3

Law No. 55-2020, as amended, "Código Civil de Puerto Rico" [Puerto Rico Civil Code] 31 L.P.R.A. § 10801; 1156 and 9301 ............................. 2, 9, 23, 27, 29, 30, 31, 32

Law No. 57-2014, as amended, "Ley de Transformación y Alivio Energético" [Energy Transformation and Relief Law], 22 L.P.R.A. § 1054b;1054c; 1054qq; 1054nn and 1054rr...................................................................................................... 6, 16, 17, 18, 21, 22, 25, 26, 27, 29, 30, 31, 32

Law No. 83 of May 2, 1941, as amended, "Ley de la Autoridad de Energía Eléctrica de Puerto Rico" [Law of the Puerto Rico Electric Power Authority], 22 L.P.R.A. § 191 ............................................................................................................................ 25, 26

Law No. 120-2018, as amended, "Ley para Transformar el Sistema Eléctrico de Puerto Rico" [Law to Transform the Puerto Rico Electricity System] 22 L.P.R.A. § 1111 and 1113 ............................................................................................... 25, 26

## III.    RULES AND/OR REGULATIONS

Rules of Civil Procedure, 32 L.P.R.A., App. V R. 52.2 (d), R. 59.1, 59.2 (a) and 59.2 (c) ................................................................................................................................. 3, 12

Rules of Evidence, 32 L.P.R.A. App. VI R. 201 ...................................................... 4

Regulations of the Supreme Court of Puerto Rico, 4 L.P.R.A. App. XXI-B, R. 23(a) R. ................................................................................................................................. 3

## IV.    OTHER

Procedimiento para el Análisis, Trámite y Pago de Reclamaciones a Personas Ajenas a la Autoridad de Energía Eléctrica [Procedure for the Analysis, Processing and Payment of Claims to Persons Outside the Electric Power Authority] .................................. 5

J.M. Farinacci Fernós, Rev. Jur. UPR, Vol. 84, No. 2, p. 367 (2015) ..................... 13

J.M. Farinacci Fernós, Las Órdenes Ejecutivas, el Poder Legislativo y las Emergencias [Executive Orders, Legislative Power and Emergencies] Rev. Pol. Pub. y Leg. UIPR 190, 192 (2020) ........................................................................................................ 26

E. Chemerinsky, Constitutional Law: principles and policies, 5th ed., New York, Wolters Kluwer, 2015, pp. 343–345; L. Fisher and K.J. Harriger, American Constitutional Law, 10th ed., North Carolina, Carolina Academic Press, 2013, Vol. I, p. 207 ................................................................................................................... 26

App.410

**COMMONWEALTH OF PUERTO RICO**
**SUPREME COURT OF PUERTO RICO**

| | |
|---|---|
| **CONSUMER AFFAIRS DEPARTMENT**<br>**Complainant-Petitioner**<br><br><br>V.<br><br>**LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA**<br><br>**Respondents-Appellees** | **CT-2025-0003**<br><br>CIVIL #: **SJ2025CV06607**<br><br>RE.:          DECLARATORY JUDGMENT |

## PLEADING OF THE PETITIONING PARTY

**TO THE HONORABLE SUPREME COURT:**

The Complainant-Petitioner, the Department of Consumer Affairs (hereinafter "DACO"), APPEARS via its Secretary and legal representation, who sign and respectfully submit, allege and request:

### I.        INTRODUCTION

The dispute before us seeks to address a fundamental issue for the rule of law in Puerto Rico: can an administrative agency, by simple resolution, grant a private operator general immunity from non-contractual claims by third parties, including ordinary negligence, thereby eradicating, by administrative means, all Puerto Rican civil law regulations on non-contractual civil liability without express legislative authorization? The only answer compatible with the Constitution, the Civil Code, and the separation of powers is a categorical no.

The Department of Consumer Affairs (DACO) is seeking a declaratory judgment declaring null and void the resolution issued by the Puerto Rico Energy Bureau (NEPR) on May 31, 2021,. That determination seeks, via administrative means, to exempt LUMA Energy, LLC, and LUMA Energy ServCo. (both hereinafter "LUMA") from liability for damages to consumers, even for ordinary negligence, and

to deprive third parties of their non-contractual action recognized in Article 1536 of the Civil Code, 31 L.P.R.A. § 10801. In doing so, the NEPR exceeded its authority and altered the substantive civil liability regime without enabling legislation, in an ultra vires act that erodes basic guarantees and sets an expansive and inadmissible precedent of quasi-sovereign immunity in favor of those who provide an essential service.

To dispel any doubt, this claim does not concern energy policy, technical criteria for electrical service, or rate structure. DACO does not seek to replace the technical expertise of the regulator or reopen debates on engineering or costs. What is being challenged is the violation of consumers' substantive rights caused by a resolution that, without legislative authorization, seeks to neutralize civil liability for negligence and close access to judicial remedies. DACO is acting in exercise of the preventive function entrusted to it by the Legislative Assembly to represent the consuming public and appear on its behalf before the courts in matters that affect or may affect its interests.

The contested action is also openly contrary to current law, harmful to public order, and leaves consumers in a state of defenselessness incompatible with a serious legal system. By seeking to shield an essential service provider in advance from ordinary negligence, the resolution effectively nullifies access to judicial remedies, distorts the deterrent function of civil liability, and shifts the cost of operational failures to the victims, not to the party responsible for the damage. An administrative privilege of immunity, issued without a legislative mandate, subverts equality before the law, undermines due process, and conflicts with public policy on consumer protection. Therefore, far from protecting rights, it institutionalizes impunity.

The declaratory route is the correct and necessary course of action. Its anticipatory function allows this Honorable Court to restore the legal order before the damage is consolidated and the grievance is perpetuated. No individual compensation is claimed here, nor is it required to demonstrate the amount of losses per consumer; what is submitted is a real and substantial controversy over the validity and limits of the administrative power to suspend, by resolution, the civil liability that the law reserves to the legislature and the judicial forum. The requested declaration will have an immediate practical effect because it will invalidate an administrative barrier that

currently prevents citizens from accessing judicial protection for damages resulting from operational failures and negligent acts, and it will reaffirm that no agency can, by resolution, neutralize substantive rights created by law.

This claim also embodies the preventive function that the Legislative Assembly entrusted to DACO: to represent the consuming public and appear on its behalf before the courts in matters that affect or may affect its interests. Precisely to prevent illegal practices or resolutions from causing, or continuing to cause, irreparable mass harm, the legislature empowered the agency to act before individual damages materialize.

For all of the above reasons, and for what we will demonstrate in the course of this argument, this Honorable Court must declare null and void the release of liability granted in the NEPR's Resolution of May 31, 2021, restore the ordinary course of civil liability, and reaffirm, without ambiguity, that no private operator can be immune from its own negligence. This protects the integrity of the legal system and ensures that consumers in Puerto Rico retain their inalienable right to claim for damages suffered.

## II. JURISDICTION OF THE COURT

This Honorable Court has jurisdiction to hear this certification appeal under Article 3,002 of Law 201-2003, known as "The Commonwealth Judiciary Law of 2003", as amended, 4 L.P.R.A. § 24s, Rule 52.2(d) of the Rules of Civil Procedure of 2009, 32 L.P.R.A. App. V. R. 52.2; Rule 23 of the Rules of the Supreme Court of Puerto Rico, 4 L.P.R.A. App. XXI-B, R. 23(a); and as resolved by this Honorable Court in Asociación de Maestros de Puerto Rico v. Sistema de Retiro, 190 D.P.R. 854 (2014) citing Alvarado Pacheco y otro v. E.L.A., 188 D.P.R. 594 (2013).

To that end, this forum has ruled that it is appropriate to issue "certification orders to resolve cases that, by their very nature **require an urgent solution." Mundo Ríos v. CEE**, 187 D.P.R. 200, 206 (2012) (Emphasis supplied); P.I.P. v. E.L.A. *et al.,* 186 D.P.R. 1 (2012); U.P.R. v. Laborde Torres et al. I, 180 D.P.R. 253 (2010).[1] As such, a certification appeal of its own nature is presented when a particular matter requires **immediate and timely intervention** of this Honorable Forum.

The prompt resolution of the instant matter will ensure legal certainty regarding the constitutional validity of actions taken by the NEPR when these were not conferred via actions of the Legislative Assembly.

---

[1] See also Asociación de Maestros de Puerto Rico v. Sistema de Retiro, 190 D.P.R. 854 (2014); Alvarado Pacheco et al. v. E.L.A., 188 D.P.R. 594 (2013). (Emphasis supplied.)

**App.413**

**III.    Case to which this appeal for intrajurisdictional certification relates**

Before the Court of First Instance, Superior Court of San Juan, is the captioned Complaint requesting a Declaratory Judgment, filed by DACO against Luma Energy, LLC; Luma Servco, LLC, Civil No. SJ2025CV06607 the Puerto Rico Energy Bureau; and the Electric Power Authority.

**IV.    BRIEF SUMMARY OF MATERIAL AND SUBSTANTIVE FACTS OF THE CASE RELEVANT TO THE CERTIFICATION REQUEST**

We summarize the material facts of the disputes relevant to this certification request[2].

1. On February 24, 2021, under the administration of former Governor the Hon. Pedro Pierluisi, LUMA submitted for review and approval by the Puerto Rico Energy Bureau (NEPR) a document titled *Request for Approval of Terms of Service and Memorandum of Law in Support* before the NEPR.

2. With regard to the dispute at hand, LUMA requested that the NEPR approve a release of liability under the provisions of Section 4.1(g) of the Agreement signed between LUMA, the PREPA [(Puerto Rico) Electric Power Authority] and the Autoridad para las Alianzas Público-Privadas [Public-Private Alliances Authority — AAPP]**. (See Appendix 1 of the Certification Application, p. 065.)**

3. Article 4.1(g) of the Agreement reads as follows:

> Liability Waiver. In connection with the submission of the Initial Budgets to PREB, the Parties agree **to apply** for inclusion in the Rate Order that the associated tariff or terms of service include: (i) a waiver of Owner's, ManagementCo's and ServCo's liability to customers or any Person receiving Power and Electricity for any Losses arising in any way out of or in connection with the operation of the T&D System and the provision of Power and Electricity including any events of interrupted, irregular or defective electric service due to Force Majeure Events, other causes beyond Owner's, ManagementCo's or ServCo's control or ordinary negligence, gross negligence or willful misconduct of Owner, ManagementCo or ServCo, or their respective employees, agents or contractors; and (ii) a waiver in all cases of responsibility for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime,

---

[2] The summary of relevant facts in the instant case was compiled by the Court of Appeals in the case In Re: Review of LUMA's Terms of Service (Extension of Liability), KLRA202100406. Pursuant to Rule 201 of the Rules of Evidence, 32 L.P.R.A. App. VI, R. 201, this Honorable Court may take judicial notice of the facts that were adjudicated by the Court of Appeals in case KLRA202100406 and that are included in this Complaint. To that end, the Court of Appeals ruling is included as **Appendix 2 of the Certification Request.**

business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by any of Owner's, ManagementCo's or ServCo's. ordinary negligence, gross negligence or willful misconduct (collectively the "Liability Waiver"). **(See Appendix 1 of the Certification Application, pp. 065–066)** (Emphasis supplied.)

4. That is, under Article 4.1(g), governmental entities together with LUMA would request from the NEPR a <u>full release</u> for said operator and all its employees, officers and contractors against consumer claims for damages caused by negligent acts or fluctuations in electric service.

5. Prior to the signing of the Agreement between LUMA, the AAPP and the PREPA, the public corporation had a mechanism or procedure for consumers to submit their claims for damages caused by negligence or fluctuations in the electricity service titled "Procedure for the analysis, processing and payment of Claims to Persons Outside the Electric Power Authority" dated February 15, 2016. **(See Appendix 7 of the Certification Application, pp. 485–509.) In other words, even though PREPA was a public corporation, it did not enjoy the immunity that LUMA currently enjoys from consumer claims.[3]**

6. On May 4, 2021, the Bureau served notice of a Resolution and Order in which it opened the proceeding *In Re: Review of LUMA's Terms of Service (Liability Waiver).[4]* In the same vein, it ordered LUMA to provide supplementary information for the evaluation of the proposed terms of service and established the procedural calendar.

7. On May 12, 2021, through a notice titled *Notice Concerning Public Hearings, Review of LUMA's Terms of Service,* published in a newspaper of general circulation, the Bureau announced that a virtual public hearing would be held on May 25, 2021, from 9:00 a.m. to 5:30 p.m., in connection with the Petition filed by LUMA.

8. On May 18, 2021, the NEPR held a Technical Conference for the purpose of discussing the Petition with LUMA and PREPA staff.

---

[3] NEPR has itself admitted that, in the past, the Electric Power Authority was liable for damages caused to consumers, but that through the contested Resolution, it expanded the scope of liability release in favor of LUMA, granting it even greater immunity than the PREPA had accorded itself without legislative authorization. See Motion in Enforcement of Order, para. 1–2, p. 16 filed by the NEPR before the Supreme Court of Puerto Rico (August 15, 2025).

[4] NEPR-MI-2021-0007

9. On May 21, 2021, the OIPC filed a Brief Notifying Intervention by the OIPC. It based its request for intervention on Art. 6.42 of Law No. 57-2014, as amended and better known as the "Energy Transformation and Relief Law", 22 L.P.R.A. §1054qq, that allowed it to intervene in any matter that could affect consumers in its capacity as their spokesperson and advocate, including matters relating to energy service rates and charges, quality, and the services of power utilities companies.

10. On May 25, 2021, the Bureau held a hearing with the aim of listening to the general public with respect to the proposed terms of service.

11. Representatives of the OIPC reiterated their opposition to LUMA's request for approval of the terms of service. On that same date, the ICSE filed a document titled *Motion Requesting Extension of Time to File Comments*. In its brief, the ICSE indicated that the proceeding required a complex analysis, in consequence of which it needed more time to be able to submit comments responsibly. They explained that they were consulting with experts in the United States in order to be able to carry out an analysis of the legal implications of the matter.

12. On May 27, 2021, LUMA submitted a document titled Response in Opposition to ICSE's *Motion Requesting an Extension of Time to File Comments*. It argued that, 1) the extension requested by ICSE was tardy and did not advance a reasonable justification or good cause to explain why they did not submit their comments within the time frame set forth in the procedural calendar established in the proceeding; 2) the NEPR granted time for interested parties and the general public to participate in a virtual public hearing and submit their briefs; and, 3) ICSE did not appear at the virtual public hearing or submit comments, even though the documents submitted in the proceeding were available to the general public.

13. On May 28, 2021, via Resolution and Order, the NEPR denied the OIPC's Request for Intervention, although it allowed it to submit written comments, provide testimony at the hearings held in connection with LUMA's Petition, question witnesses, and have access to confidential documents.

14. After the public hearings were held, on May 31, 2021, NEPR issued a Resolution and Order on the release of liability requested by LUMA**. (See Appendix 1 of the Certification Appeal, pp. 352–391.)**

15. Regarding the release of liability requested by LUMA, the NEPR determined the following:

<u>Modified Terms of Service</u>

Effective on June 1st, 2021, the following terms of service shall be incorporated and made part of the Puerto Rico Electric Power Authority Tariff Book approved on May 28, 2019. These terms of service shall modify and complement the terms of service included in the Puerto Rico Electric Power Authority Regulation No. 7982, dated January 14, 2010, known as General Terms and Conditions Regulations for the Supply of Electric Power ("Regulation 7982"). In the event of any conflict or issue of interpretation between the following terms of service and Regulation 7982, these terms of service shall prevail over Regulation 7982.

<u>Modified Terms of Service</u>

1.  It is recognized that certain components of the Puerto Rico Electric Power Authority's ("PREPA") electric power system (including, the Transmission and Distribution System ("T&D System"), as well as the Generation Facilities) currently do not meet the standards of performance generally accepted in the electric utility industry. The whole system needs significant repairs, improvements, and modernization to achieve acceptable standards of service. Further, certain components of the T&D System and the manner in which the T&D System is operated do not currently meet acceptable standards of performance, including the fact that certain general operating and administrative practices may not comply with acceptable industry standards and practices. Therefore, a period of review, planning, remediation, reconstruction, repair, and replacement will be required to enable LUMA Energy, LLC, LUMA Energy Servco, LLC ("LUMA") and PREPA to operate the electric system according to acceptable standards. In light of the foregoing, PREPA and LUMA, with the cooperation of other governmental entities developed a plan, taking into account expected funds availability, particularly from the Federal Emergency Management Agency (FEMA), to remediate, repair, reconstruct, replace and stabilize such equipment, systems, practices and services, as needed, to enable LUMA to perform the operation and maintenance services contracted in compliance with the applicable standards as soon as reasonably possible and at a reasonable cost to PREPA ("System Remediation Plan"). The System Remediation Plan shall be review and approved by the Energy Bureau of the Puerto Rico Public Service Regulatory Board ("Energy Bureau").

2.  Taking in consideration the circumstances described in the preceding paragraph, and other generally known, PREPA and LUMA shall make all reasonable efforts to provide an efficient and reliable service to its customers and users. A user is a natural or legal person) who receives and uses power and electricity at a certain location and whose consumption is recorded and invoiced in the name of another person.

3.  PREPA and LUMA shall make all reasonable efforts to maintain continuity of service, but PREPA and LUMA cannot guarantee an uninterrupted electricity supply to its customers and users.

4.  Without liability of any kind to PREPA and/or LUMA, PREPA and/or LUMA shall have the right to disconnect or otherwise curtail, interrupt or reduce service to customers and users: (a) whenever PREPA and/or LUMA reasonably determines it is necessary to facilitate construction, installation, maintenance, repairs, replacement or inspection of any of PREPA's facilities, or to permit the connection or disconnection of other customers; (b) to maintain

the safety and reliability of PREPA's electric system (including without limitation, transmission, distribution and generation facilities); or (c) due to any other reason attributable to third parties or related to dangerous or hazardous circumstances, including without limitation, emergencies, forced outages, potential overloading of PREPA's transmission and/or distribution system, sabotage, strikes, unauthorized acts by employees or Force Majeure. Notwithstanding the foregoing, PREPA and/or LUMA shall use reasonable efforts to minimize any scheduled curtailment, interruption, or reduction to the extent reasonably practicable under the circumstances, to provide the customer (and not to the user, because is not a registered customer) with prior notification of any such curtailment, interruption, or reduction to the extent reasonably practicable, and to resume the customer's service connection as promptly as reasonably practicable.

**5.   Notwithstanding anything to the contrary in these Modified Terms of Service and Regulation 7982, PREPARE, its directors, officers, employees, agents and contractors (including LUMA Energy, LLC, LUMA Energy Servco, LLC, their directors, officers, employees, agents and contractors) (the "Released Parties") shall not be liable contractually or extra-contractually, to customers, or any user receiving power or electricity from PREPA and/or LUMA for any losses arising in any way out of or in connection with the operation of the T&D System and the provision of power and electricity including any events of interrupted, irregular or defective electric service due to Force Majeure events or from pre-existing deteriorated electric system conditions, other causes beyond the control of the Released Parties, unauthorized acts by employees, sabotage, strikes or due to ordinary negligence (excluding gross negligence, willful misconduct or willful misconduct) of the Released Parties or their respective employees, agents or contractors. In any event that the Released Parties are found responsible howsoever and whensoever in connection with the provision of service to customers or users receiving power or electricity from PREPA and/or LUMA, customers or users shall only recover direct damages (including direct physical loss, injury or damage to a customer or customer's property). For the foregoing and without otherwise restricting the generality thereof, "direct physical loss, injury or damage" <u>shall not include any loss of profits or revenues, special, exemplary, punitive, indirect, incidental, or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms.</u>**

6.   Notwithstanding anything to the contrary contained in these Modified Terms of Service, PREPA and LUMA will remain fully accountable and liable to the Energy Bureau for compliance with the Puerto Rico energy public policy as well as all legal and regulatory requirements applicable to electric service companies, and, particularly to LUMA as operator of the T&D System. Nothing in these Modified Terms of Service shall have the effect of releasing or waiving PREPA and/or LUMA from any penalty, fine or obligation imposed by the Energy Bureau for whatever reason whatsoever. (**See**

**Appendix 1 of Certification Application, pp. 392–394)** (Emphasis supplied)

16. Thus, in its Resolution of May 31, 2021, the NEPR simply excluded the instances of gross negligence[5] on the part of LUMA, but did grant a release of liability, as requested, in response to consumer claims for damages caused by negligent acts, service interruptions and fluctuations in electrical service[6].

17. **It should be noted that this immunity was granted via an administrative process, without consulting the Legislative Assembly at any time or introducing any legislation to exempt LUMA, a private operator, from the applicability of Article 1536 of the Civil Code,** 31 L.P.R.A. § 10801, and all the current regulations of non-contractual civil liability in relation to these claims.

18. On June 9, 2021, ICSE filed a Motion for Reconsideration. In it, they cited legal reasons why the NEPR should reject such a request outright without accepting any immunity from LUMA.

19. The NEPR did not comment on ICSE's request.

20. Dissatisfied with this, ICSE appealed to the Court of Appeals via an appeal for administrative review. The aforementioned court, in a split decision issued on March 9, 2022, in the case of In Re: Review of LUMA's Terms of Service (Extension of Liability), Case No. KLRA202100406 determined that ICSE lacked active standing to file the appeal on behalf of consumers.

21. However, as mentioned in the introduction to this brief, DACO, pursuant to Section 6(f) of its organic law, *supra*, **does have the capacity to file lawsuits before the courts to protect consumers.**

22. On May 27, 2025, during a public hearing before the members of the House of Representatives' Consumer Affairs Committee, LUMA admitted that it has denied

---

[5] This Honorable Court adopted the definition of gross negligence established in U.S. case law. It therefore defined it as a complete lack of care, or the exercise of such a small degree of diligence as to justify the belief that there is total indifference to the interests and well-being of others. Pueblo v. Telmaín Escalera, 45 DPR 447, 453 (1933); Elías, et al., v. Chenet et al., 147 DPR 507, 521 (1999).

[6] By way of illustration, we must revisit the partly concurring and partly dissenting opinion of Associate Commissioner Ángel R. Rivera De la Cruz in the Resolution issued by the NEPR on May 31, 2021. In it, the Commissioner outlined his concurring vote to deny LUMA's request to exempt them from liability, as requested, and his dissenting vote to include alternate language. In his opinion, the precedent LUMA used to support its petition, specifically the case Maryland Casualty Company v. NSTAR Electric Company, 471 Mass. 416 (2015), was not analogous to the case under review. He added that, in the Maryland case, the entity remained liable for negligence to both residential and non-residential consumers. He noted that, unlike the Maryland case, LUMA's petition was to be exempt from all damages resulting from the operation of the transmission and distribution system. The Commissioner argued that "[t]he Liability Waiver language in LUMA's proposal is much broader than the narrow language challenged in Maryland Casualty Company. LUMA also seeks for such language to apply to all customers rather than a specific class of customers, as was the case in Maryland Casulty Company." The Commissioner stated that "currently, PREPA does not have any liability protection. As I stated in my concurring opinion of May 4, 2021 in instant case, LUMA's Liability Waiver request represents a substantial shift in the rights of PREPA customers."

9

**App.419**

all 1,828 claims it has received from consumers for damage to electrical appliances due to failures in the electrical system, invoking the immunity requested under section 4.1 (g) of the Agreement, which was endorsed almost in its entirety by the NEPR through the resolution of May 31, 2021.

23. The Secretary of Consumer Affairs, Ms. Valerie Rodríguez Erazo (Atty.), participated in the aforementioned hearing, gaining personal knowledge of the defenselessness of consumers in the face of LUMA's negligent actions.

24. The current contractual status, without any intervention by the Legislative Assembly, has therefore granted LUMA **almost absolute release from liability** in the face of claims for damages by consumers caused by the actions of that entity. **In other words, LUMA, a private entity, enjoys immunity that was never granted to the Electric Power Authority, which is a public corporation.**

25. On July 22, 2025, the DACO filed the Complaint in question. **(See Appendix 1 of the Certification Application, pp. 001–441.)**

26. The captioned parties were duly summoned on July 23, 2025. **(See Appendix 3 of the Certification Application, pp. 442–451.)**

27. On July 24, 2025, the Puerto Rico Senate and the House of Representatives filed a Request for Intervention as *Amicus Curiae*. **(See Appendix 4 of the Certification Application, pp. 452–465.)**

28. On July 30, 2025, the House of Representatives of Puerto Rico also filed its "Motion Assuming Representation in Request for Intervention as Amicus Curiae**."** **(See Appendix 5 of the Certification Application, p. 466.)**

29. On August 6, 2025, the Instituto de Competitividad y Sostenibilidad Económica [Institute of Competitiveness and Economic Sustainability — ICSE] filed a Request for Intervention with the Court of First Instance as Amicus Curiae. **(See Appendix 6 of the Certification Application, pp. 467–484).**

30. On August 8, 2025, DACO filed the aforementioned Request for Intrajurisdictional Certification with this high court.

31. On August 12, 2025, the Court notified the appellees that they would have a fixed period of three (3) days to show cause why the court should not grant the intra-jurisdictional certification appeal and issue the appeal.

10

32. On August 13, 2025, the ICSE filed a Motion for Compliance with Resolution with this honorable court.

33. On August 15, 2025, the Senate of Puerto Rico and the House of Representatives filed a "Motion for Compliance with Order and Application for the Plenary of the Supreme Court to Issue the Certification Filed by the Department of Consumer Affairs" before the Supreme Court of Puerto Rico.

34. On August 15, 2025, the PREPA filed a "Motion in Compliance with Order to Show Cause" before the Supreme Court of Puerto Rico requesting that the appeal filed by DACO be accepted and issued.

35. On August 15, 2025, LUMA filed an "Opposition to Intrajurisdictional Certification Appeal by Luma Energy, LLC and Luma Energy Servco, LLC" before the Supreme Court of Puerto Rico.

36. On August 15, 2025, the NEPR filed a "Motion to Comply with Order" with the Supreme Court of Puerto Rico.

37. On August 22, 2025, this Honorable Court issued the certification order and granted the petitioner fifteen (15) non-extendable days to file the corresponding briefs and the appellee parties fifteen (15) non-extendable days to file their briefs after the petitioner party's brief was filed.

## V. GOVERNING LAW AND SUPPORTING ARGUMENTS

In the context of a declaratory judgment, Rule 59.1 of Civil Procedure, 32 L.P.R.A. App. V, R. 59.1, empowers the court to declare rights, statuses or other legal relationships even when another remedy exists or may exist, and may even accord it preferential treatment. In turn, Rule 59.2(a) recognizes the standing of any person whose rights or legal relationships are affected by a statute, ordinance, contract or franchise to request that its interpretation or validity and the rights arising therefrom be declared, while Rule 59.2(c) clarifies that this list does not limit general powers provided the judgment ends the dispute or clears up uncertainty, 32 L.P.R.A. App. V, R. 59.3. Precisely for this reason, on July 22, 2025, DACO filed its request for a declaratory judgment with the Court of First Instance, because what is at issue here is a real and substantive dispute: the validity of an administrative immunity that affects the substantive rights of consumers, the award of which has an immediate practical effect on the validity of those rights. In this context, there is no requirement to prove quantifiable damages or individualized losses; it is sufficient to demonstrate that the

court's decision will eliminate legal uncertainty and guarantee consumers' access to the effective protection acknowledged them in law.

### A. DACO's Standing to Sue

1. <u>DACO has statutory standing to file the present appeal to protect consumers</u>

This Honorable Court must bear in mind, from the outset of this analysis, that the lawsuit before us is not a dispute between administrative agencies nor a purely contractual dispute with a private company. DACO appears here as the institutional representative of Puerto Rico's consumers, whose protection is its primary mandate and raison d'être. This was established by the Legislative Assembly when it created DACO via Law No. 5 of April 23, 1973, as amended, with the express purpose of vindicating and enforcing consumer rights in all necessary forums (3 L.P.R.A. § 341b).

As is well known, *standing* implies the ability to appear before the courts. In Puerto Rico, if there is no legislation expressly authorizing an entity to litigate, the petitioner must demonstrate: (1) Clear, palpable, real, immediate and precise (not abstract) harm; (2) a direct link between said harm and the legal action; and (3) that the cause of action arises from the constitutional or legal framework. See <u>Muns. Aguada y Aguadilla</u>v. <u>JCA</u>, 190 DPR 122 (2014); <u>Fund. Surfrider</u> v. <u>ARPe</u>, 178 DPR 563, 572 (2010); <u>Romero Barceló</u> v. <u>E.L.A.</u>, 169 DPR 460, 470-71 (2006); <u>Col. Peritos Elec.</u> v. <u>A.E.E.</u>, 150 DPR 327, 331-332 (2000); <u>García Oyola</u> v. <u>J.C.A.</u>, 142 DPR 532 (1997); <u>Hernández Torres</u> v. <u>HernándezColón</u>, 131 DPR 593, 599 (1992).

However, when a law expressly grants standing (statutory standing), it is not necessary to prove individual harm. "The concept of statutory standing is not foreign to our legal system. On the contrary, it has been part of our regulations since 1974." J. Farinacci Fernós, <u>Cualquier persona: la facultad plenaria de la Asamblea Legislativa para otorgar legitimación activa por la vía estatutaria [Any person: the plenary power of the Legislative Assembly to grant standing by statute]</u>, Rev. Jur. UPR, Vol. 84, No. 2, p. 367 (2015). "In <u>Hernández Torres Hernández Colón,</u> [129 DPR 824, 835 (1992)], the Supreme Court of Puerto Rico began to distinguish between ordinary standing, to which it did apply the analysis of clear and palpable harm, causation and remedy, and statutory standing, to which it did not apply this type of analysis, thus creating what is known as a binary rule." J. Farinacci Fernós, <u>supra</u>, p. 370. "This vision was finally

consolidated in <u>Centro Unido de Detallistas</u> v. <u>Serv. Com. Pub.</u>, [174 DPR 174 (2008)]".

In the <u>Centro Unido de Detallistas</u> v. <u>Comisión de Servicio Público</u>, *supra*, the Supreme Court reiterated that statutory standing does not require compliance with the ordinary criteria of clear and palpable harm, causation and remedy. The Legislative Assembly may, and has done so in this case, create a legal interest that empowers an agency such as DACO to appear in court without the need to prove direct personal harm. See also <u>Hernández Torres</u> v. <u>Hernández Colón</u>, 129 DPR 824, 835 (1992).

Likewise, this Honorable Court has established that, in the case of administrative agencies, their jurisdiction and powers are determined in light of the provisions of their enabling law and those powers that are indispensable for effectively executing the functions that have been conferred upon them. See <u>Depto. Justicia et al. v. Jiménez</u>, 199 D.P.R. 293, 309 (2017). This being the case, it was pointed out that "in order to determine whether an administrative agency has jurisdiction over a particular dispute, it is necessary to analyze the powers arising from its enabling law and those that are indispensable for carrying out the powers and functions conferred upon it." That rule is revealing and serves as a necessary starting point in the instant dispute.

DACO is a government agency of the Government of Puerto Rico, created under Law No. 5 of April 23, 1973, as amended, known as the *Organic Law of the Department of Consumer Affairs*, 3 L.P.R.A. § 341 et seq. The agency has the express mandate to protect the rights of consumers in Puerto Rico, its primary purpose being to uphold and implement such rights as an essential part of the State's public policy. This mandate is not generic, but finds concrete expression in Article 6 of the Organic Law, where the Legislative Assembly conferred particularly broad powers of institutional representation on this Department (3 L.P.R.A. §341e).

Paragraph (e) of Article 6 provides that the DACO may: "represent the consumer public before any **private entity or public body** in any matter that **<u>affects or may affect</u>** the consumer's interests." In addition, subsection (f) establishes that the DACO may: "appear on behalf of and in representation of consumers before any court, board or commission, administrative body, department, office or agency of the Government of Puerto Rico or the United States in any hearing, proceeding, matter **<u>that affects or may affect</u>** the interests of the consumer in general …" (3 L.P.R.A.

§341e). This dual legislative authorization is not redundant, but emphatic: the Legislative Assembly wanted to stress, unequivocally, that DACO is vested with broad, cross-cutting power to defend consumers in both administrative and judicial forums, before both public bodies and private entities, and in response to both present damages and situations that could reasonably affect consumers in the future. The legislative intent was clear: to empower DACO to be the institutional representative of consumers in any scenario where their interests are at risk, thus ensuring that the defense of citizens is not contingent upon the individual action of each consumer nor limited to the occurrence of actual damage.[7]

Furthermore, pursuant to Article 6, subsection (i), of Law No. 5 of April 23, 1973, supra, DACO is expressly empowered to **"take any legal remedies necessary to give effect to the purposes of this law and to enforce the rules, regulations, orders, resolutions and determinations of the Department."** (3 L.P.R.A. §341e; emphasis supplied.) This mandate complements and reinforces subsections (e) and (f), cited above, by giving DACO comprehensive power not only to appear on behalf of consumers, but also to deploy all available legal means to uphold their rights against abusive, deceptive or unfair practices, while also ensuring that the Department's determinations are truly effective. In other words, the Legislative Assembly conferred upon DACO the power to take action in court with the same vigor with which it acts in administrative proceedings, precisely so that consumers' rights would not be deprived of remedy.

The breadth of these provisions becomes particularly relevant in this context. There are consumers who have already suffered damages, and many others who, if the DACO does not intervene, could reasonably be affected in the future without having an effective framework to file claim for themselves. Precisely to address such scenarios, the legislator provided DACO with broad statutory standing, so that

---

[7] Contrary to LUMA's allegations, there are precedents in which this Honorable Court has allowed DACO to appear as the institutional representative of consumers in general. This was the case in <u>Pierluisi Rojo v. MAPFRE</u> et als. (SJ2018CV07570), where the Secretary of DACO filed a class action lawsuit against several insurance companies in Puerto Rico, "on its own behalf and representing consumers of goods or services affected by Hurricane Maria," expressly invoking the authority conferred by Art. 6(f) of Law No. 5 of 1973, 3 L.P.R.A. § 341e(f). This case confirms that the scope of DACO's statutory standing is not limited to individual complaints or those of specific consumer groups, but includes the defense of the general category of consumers when commercial or contractual practices affect, or may affect, their collective rights. Thus, it is evident that DACO has already exercised this representative function in contexts of great public impact, as it does in the instant case, which undermines LUMA's argument.

consumer advocacy does not rely solely on scattered individual litigation, but can be articulated through robust institutional representation, capable of ensuring citizens access to a collective, uniform and effective remedy.

This view finds support in the jurisprudence of this Honorable Court, which has recognized that statutory standing confers on public agencies the ability to appear without the need to demonstrate direct personal injury when their claim is linked to the protection of a collective or institutional interest. See Hernández Torres v. Hernández Colón, 129 D.P.R. 824, 835 (1992); Centro Unido de Detallistas v. Comisión de Servicio Público, 174 D.P.R. 174, 184 (2008). Furthermore, this Court has expressly recognized that agencies such as DACO have standing to act on behalf of the public interest, without the need to prove direct harm, to the extent that their claim is linked to the fulfillment of their ministerial duty and public policy. See Salas Soler v. Secretario de Agricultura, 102 D.P.R. 716 (1974). Thus, DACO's claim in this case does not constitute an overreach, but rather the legitimate exercise of the institutional representation function for which it was created by legislative mandate.

In light of the foregoing, DACO has standing to bring this legal action in defense of consumers, without the need to demonstrate individual damages, precisely because the Legislative Assembly authorized it to act in the public interest. The situation at hand, in which an administrative resolution issued by the Bureau deprives consumers of any remedy, even against a private company for its own ordinary negligence, exemplifies the raison d'être of this special standing: to ensure that citizens have an institution capable of defending their acquired rights against practices that undermine or eliminate them.

2. The creation of the OIPC does not limit or eliminate DACO's standing to bring legal action to protect consumers.

In their briefs before this Honorable Court, the appellees have argued that the only entity with standing in this case is the Independent Consumer Protection Office (OIPC), created via Articles 6.41 and 6.42 of Law No. 57-2014, *supra*, 22 L.P.R.A. §§ 1054nn, 1054qq. That argument is inadmissible in law. The actual text of Art. 6.42, titled *"Powers and Duties of the Independent Consumer Protection Office,"* makes clear that the powers of the OIPC are strictly sectoral and limited to the scope of the bureau that make up the Public Service Regulatory Board. Among its powers,

paragraph (d) allows it to "represent customers and file complaints and appeals with the Puerto Rico Energy Administration, the Puerto Rico Telecommunications Administration, and the Puerto Rico Transportation and Other Public Services Administration, for and on behalf of customers." The other paragraphs reiterate its role in intervening in matters related to *rates, billing, quality of service*, and other technical aspects of regulated services, and even its appearance as a party before the courts is limited to those rate or regulatory issues. At no time did Law 57-2014, *supra*, confer primary or exclusive jurisdiction on it, nor did it empower it to represent consumers in broader disputes that, as in the instant case, involve the validity of administrative determinations that undermine substantive rights recognized by the Civil Code.

In other words, the OIPC was conceived as the voice of customers within the tariff and regulatory processes of those three specific utilities. At no time did Law 57-2014, *supra*, confer primary or exclusive jurisdiction on it to represent consumers in disputes that transcend the framework of tariffs or technical matters of those public utilities. The dispute raised here is not a tariff or service quality dispute, but rather a strictly legal question: whether the Energy Bureau could, without express legislative delegation, grant a release that deprives consumers of the ordinary protection of the civil liability regime of the Civil Code.

It should also be emphasized that Law No. 57-2014 itself, *supra*, expressly distinguishes when it wishes to confer primary and exclusive jurisdiction on an agency. Thus, Article 6.4 establishes that "the NEPR will have primary and exclusive jurisdiction" over the approval of tariffs and charges, the review of the billing of energy companies, cases of non-compliance with public energy policy and other disputes related to the electrical system. In other words, when the legislator wanted to reserve a matter to a regulatory body, it did so clearly (22 L.P.R.A. § 1054c). However, in the case of the OIPC, created under the same law in subsequent articles 6.41 and 6.42, that language was never used nor was it granted primary or exclusive jurisdiction over any dispute (22 L.P.R.A. §§ 1054nn, 1054qq). This legislative difference is revealing because it shows that the intention was never to displace other agencies, such as DACO, or to give the OIPC a role that exceeded its sectoral and auxiliary function within the tariff processes of the bureau.

The structural and functional difference is undeniable. The OIPC is allocated a meager annual budget of just $1.2 million, which comes precisely from the same bureau

to which it is attached and on behalf of which it is supposed to act as a representative of customers (Article 6.43; 22 L.P.R.A. § 1054rr). This budgetary dependence reveals that the legislative intention was never to provide the OIPC with the institutional strength to address issues of constitutional or structural importance, such as the instant one. Its creation responded to the need to channel complaints about rates and billing, not to confront immunity clauses that affect the substantive rights of consumers in their capacity as citizens.

By contrast, DACO enjoys a broad and autonomous legislative mandate, expressed in Art. 6, paragraphs (e) and (f) of its Organic Law, which empowers it to "represent the consuming public before any private entity or public body in any matter that affects or may affect the interests of consumers" and to "appear for and on behalf of consumers before any court, board, or commission … in any hearing, proceeding or matter that affects or may affect the interests of consumers in general." This power is not limited exclusively to one type of consumer or service, as DACO may file the necessary legal remedies to enforce its determinations and protect consumer rights. 3 L.P.R.A. § 341j; 341e; Ortiz Matías v. Mora Dev. Corp., 187 DPR 649 (2013). This breadth is what ensures that DACO can act when, as in this case, the validity of an administrative provision that removes a basic consumer right — access to effective remedies for damages — is at stake.

It is worth noting that both the OIPC and DACO may coincide in defending consumers in certain matters. Our legal system has recognized that different agencies can share responsibilities and coordinate efforts depending on the nature of the issue. This is the case, for example, with the pharmaceutical industry, where DACO regulates commercial and consumer protection aspects, while the Department of Health deals with technical aspects of safety and health. Similarly, the OIPC can act as a sectoral voice in the tariff processes of the bureau, and DACO can exercise its general and transversal mandate of consumer protection.

This possibility of coexistence has been validated in practice through interagency coordination schemes. In DACO v. Farmacia San Martín Barceloneta, Inc., 175 DPR 198 (2009), the DACO referred a matter to the Department of Health while continuing with its own compliance processes, demonstrating that there is no incompatibility between agencies when their competences overlap. Furthermore, the Organic Law of the DACO expressly authorizes the Department to represent individual

consumers, consumer groups, or the agency itself in proceedings before other agencies or courts, 3 L.P.R.A. § 341j, which reinforces its ability to act simultaneously with the OIPC when necessary to comprehensively protect the interests of citizens.

However, when analyzing the instant matter, the difference is decisive. The OIPC lacks the authority to address disputes of a constitutional nature, such as challenging the validity of a contractual clause that deprives consumers of remedies recognized by the Civil Code. Its role is limited to intervening in rates, billing and service quality of the businesses to which it is assigned. Even its annual budget, allocated directly by those same bureaus and amounting to only $1.2 million, reveals that the legislature never conceived of it as the forum with the expertise or institutional strength to lead lawsuits of this scope.

Consequently, although both agencies can coexist and collaborate in certain scenarios, the reality is that the lawsuit in question is not a tariff dispute, but rather a challenge to an administrative act with constitutional repercussions that affects the substantive rights of consumers. Given this reality, the appropriate agency to lead this claim is DACO. The very institutional design of the OIPC, which is attached to and financed by the agencies it is supposed to oversee, creates a structural conflict that limits its independence. In contrast, DACO was granted broad statutory standing, autonomy, and an express mandate by the legislature to protect consumers in all forums. Recognizing its standing in this case ensures the validity of public policy on consumer protection and confirms DACO's indispensable ministerial role in defending the public interest.

**B. There is no absence of an indispensable party in the above-captioned lawsuit**

All parties truly indispensable to the adjudication of this dispute are already appearing in the present lawsuit. The Energy Bureau, as the entity that granted the release of liability; LUMA, as the direct beneficiary of that immunity; and the Electric Power Authority (PREPA), as the owner of the electrical system, have all been duly included. Thus, the Court has before it all the parties whose presence is necessary to grant a complete and fair remedy in this case.

As for the allegation of lack of an indispensable party brought by the Respondent in its opposition to the Certification Appeal, it should be made abundantly

clear that the Authority for Public-Private Partnerships (AAPP) is not such a party. Although the AAPP was a signatory to the *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (Operating Agreement), Section 4.1(g) of that agreement only established the obligation to request a release of liability from the Energy Bureau. **See Appendix 1 of the Certification Application**. That clause did not in and of itself confer any immunity. It was the Energy Bureau, exercising its primary and exclusive jurisdiction over rates and terms of service, which, through its Resolution of May 31, 2021, accepted that request, drafted the provision, and gave it regulatory force. In that process, the AAPP could not compel the Bureau to grant immunity, nor did it have the power to control its scope or content. The decision was made by the Bureau, the direct beneficiary is LUMA, and the PREPA appears as the owner of the electrical system. In this context, the AAPP could be considered an interested party, but never indispensable.

The DACO does not seek to challenge the validity of the contract signed between the PREPA, the AAPP, and LUMA, nor does it seek to modify the contractual obligations arising from it. The controversy raised is directed exclusively against the actions of the Energy Bureau in issuing an administrative resolution that granted LUMA immunity incompatible with the Constitution and with the doctrine of civil liability set forth in the Civil Code. Thus, the issue raised is resolved at the level of public law and does not require the adjudication of contractual obligations in which the AAPP would have to be a party.

The jurisprudence of this Honorable Court is clear: not every interested party is indispensable. There is a fundamental distinction between those interested parties who may, if they so desire, intervene in a lawsuit, and those whose absence prevents the valid adjudication of the dispute. See <u>Deliz v. Igartúa</u>, 158 D.P.R. 403, 435 (2003); <u>Cepeda Torres v. García Ortiz</u>, 132 D.P.R. 698, 703–704 (1993). Moreover, in <u>Hernández Agosto v. López Nieves</u>, 114 D.P.R. 601 (1983), this Court emphasized that the analysis of indispensability is not rigid, but pragmatic, and should turn on whether the court can grant a fair and complete remedy with the parties already present. In <u>Deliz v. Igartúa</u>, *supra*, it was emphasized that only the party whose absence prevents the granting of an adequate remedy is indispensable. And in <u>Hernandez August v. López Nieves</u>, *supra*, it was resolved that a mere economic interest in the outcome of a suit is

not enough to make someone an indispensable party.

In other words, the AAPP may have a peripheral interest as a contracting party to the *Operating Agreement*, but it is not indispensable for this Court to be able to adjudicate whether or not the Bureau had legal authority to grant the immunity appealed herein. The remedy sought, the nullity of the release clause approved by administrative resolution of the Bureau, may be fully and fairly granted with the parties already before the Court. The absence of the AAPP neither prevents valid adjudication of the dispute nor vitiates the requested remedy.

## C. The Energy Bureau acted ultra vires by granting near absolute immunity to LUMA, thus violating the doctrine of separation of powers.

1. The NEPR acted without legislative delegation to grant immunity to LUMA, which is in conflict with the doctrine of the separation of powers.

Both LUMA's and NEPR's arguments, in the sense that the limitation of liability in favor of a private operator constitutes a basic and legitimate component of the electricity rate, are erroneous. The immunity granted by the Bureau constitutes an act of *ultra vires* incompatible with the doctrine of the separation of powers enshrined in our Constitution. Let's see.

Art. 6.3 of Law No. 57-2014, 22 L.P.R.A. § 1054b, imposes on the Energy Bureau an affirmative duty to protect customers and ensure safe, reliable, non-discriminatory service at fair and reasonable rates. Subsections (c), (d), (e) and (ff) impose specific duties: to ensure the reasonableness of rates and the safety of the system; to monitor the quality and reliability of the service; to ensure universal access and non-discrimination; and to adopt customer service policies that ensure the rights of all subscribers. In turn, subsection (rr) establishes an unequivocal governing fee: **"All actions, regulations and determinations of the NEPR will be guided by the applicable laws, the public interest and by an interest in protecting the rights of customers or consumers."** (22 L.P.R.A. § 1054b.) Emphasis supplied.

This mandate is not decorative: it constitutes the parameter of validity for all actions taken by the Bureau. Three cumulative requirements emerge from its wording: (i) compliance with applicable laws (including the Civil Code and its regime of non-contractual liability), (ii) alignment with the public interest, and (iii) a focus on

20

protecting the rights of customers. Now, we must ask ourselves: did the legislature delegate to the NEPR the power to exempt a private operator from civil, contractual, or non-contractual liability in the face of consumer claims for acts of negligence?

To answer this question, it is necessary to review the doctrine of damage at the contractual and non-contractual levels. In the context of LUMA's relationship with consumers, claims for damages operate in two ways: contractually, due to the electricity service contract signed between the citizen and the managing entity, and non-contractually, for those actions that are outside the *ex contractu* relationship between the parties.

Our Civil Code recognizes two categories of harmful acts that give rise to different types of liability: contractual and non-contractual. The first of these stems from "the breach of a duty arising from an express or implied contract." Soc. de Gananciales v. Vélez & Asoc., 145 DPR 508, 521 (1998).

On the same subject, for "contractual liability to apply … it is not enough for there to be a contract between the parties; rather, an act must be performed within the strict scope of what was agreed and as a development of the negotiated content." Maderas Tratadas v. Sun Alliance, 185 DPR 880 (2012). Therefore, "actions arising from contracts are intended to enforce the contractual promises to which the parties to a contract have given their consent." Santiago Nieves v. ACAA, 119 DPR 711, 716 (1987).

On the other hand, non-contractual liability deals with "compensation for damages incurred as a result of violating the general principle of social coexistence, which entails not causing harm to others." Rivera Sanfeliz et al. v. Jta. Dir. FirstBank 193 DPR 38, 57 (2015).

In matters of tort law, the legislature established, in Article 1536 of the Civil Code of 2020, the right to file a lawsuit for damages caused by negligent acts and omissions. This right was also established in Article 1802 of the Civil Code of 1930. Thus, compensation for damages is regulated in Puerto Rican law. The aforementioned provisions are substantive rules of legal rank that embody the fundamental principle of non-contractual civil liability in our civil law system. As such, it cannot be suspended, altered or repealed by administrative resolution, except by express legislative delegation. The jurisprudence of this Court has reiterated that when an agency acts

**App.431**

without specific regulatory authorization, its determinations are *ultra vires* and void. See <u>Perfect Cleaning Services v. Corporación del Centro Cardiovascular de PR y el Caribe</u>, 162 D.P.R. 745 (2004); <u>Rivera Segarra v. Rivera Lassen</u>, 214 D.P.R. 111 (2024); <u>Colegio de Médico-Cirujanos de PR v. Academia de Medicina de la Familia,</u> 201 D.P.R. 362 (2018); <u>Ayala Hernández v. Bosque Sereno,</u> 190 D.P.R 547 (2014); <u>ECP Inc. vs. Oficina del Comisionado de Seguros,</u> 205 D.P.R. 268 (2020). So, can an agency grant an immunity that circumvents basic legal precepts without the express authorization of the Legislative Assembly? The answer is no due to the doctrine of separation of powers.

      The doctrine of separation of powers is expressly enshrined in our Constitution. Art. 1, Sec. 2, Const. PR, LPRA, Volume 1. "This principle aspires to establish responsibilities and frames the scope of action of the constitutional branches of government." <u>Senado v. Tribunal Supremo y otros</u>, 208 DPR 115, 135–136 (2021). Likewise, it seeks, "to ensure that none of the three branches dominate or unduly interfere with the other." Id., citing <u>Rodríguez Casillas et al. v. Colegio</u>, 202 DPR 428, 450–451 (2019). "The success of our system of the balance of powers depends on each of the branches accepting and respecting the authority of the others and understanding the interrelationship of their functions." <u>Senado v. Tribunal Supremo y otros</u>, *supra*, citing <u>Silva v. Hernández Agosto</u>, 118 DPR 45, 57 (1986). This principle of separation of powers guarantees the independence of each branch. <u>Díaz Carrasquillo v. García Padilla,</u> 191 DPR 97, 110 (2014). It is a system of checks and balances that prevents the actions of one branch from causing harm to another. <u>Díaz Carrasquillo v. García Padilla,</u>*supra*.

      This Court has determined that when resolving a dispute that requires a ruling on the applicability of the doctrine of separation of powers, it must be analyzed whether "in the actual operation of the system and in a given historical context, the delegated power tends to result in an undue concentration of power in one of the branches or in an undesirable diminution of independence that is incompatible with the political order of the Constitution." (Bold omitted.) <u>Senado v. Tribunal Supremo y otros, supra</u>, p. 136, citing <u>Nogueras v. Hernández Colón</u>, 127 DPR 405, 426 (1990).

      This Honorable Court has stated, regarding the importance and significance of the doctrine of separation of powers, that:

[I]t is unquestionable that the Doctrine of the Separation of Powers is an essential part of the system of government that we have adopted as a political community. As the court of last resort, we cannot give in to the temptation to ignore this sacred principle or use it lightly as a legal refrain. We must always be aware of the delicate constitutional boundaries that exist between the three (3) branches of government. It is our obligation to safeguard the role of the Judicial Branch in order to avoid disrupting the principles of the separation of powers and undermining the basic understanding of those who conceived of this branch as the least dangerous of the three (3). We must be aware that, like its sister branches, the Judicial Branch is not exempt from violations of the principles of the separation of powers. After all, the distrust of human nature that lies at the foundation of the Doctrine of the Separation of Powers must also apply to this Branch. (Citations and emphasis omitted.) See AAR, Ex parte, 187 DPR 835, 855 (2013).

In other words, the Legislative Branch has the sole power to approve, amend or repeal laws. Art. III, Sec. 1, Const. PR. See Gobierno Ponce v. Caraballo, 166 D.P.R. 723 (2006). Among other powers of particular relevance to the instant case, Sec. 16 of Art. III of the Constitution of Puerto Rico, *supra*, grants the Legislative Branch "the power to create, consolidate or reorganize executive departments and define their functions." In addition, the Constitution provides that "[t]he procedure for granting franchises, rights, privileges and concessions of a public nature will be determined by law …" Sec. 13 of Art. VI of the Const. PR, *supra*. Thus, it is a clearly established constitutional precept that the Legislative Assembly is the constitutional branch empowered to create, consolidate or reorganize executive departments and define their functions. This power rests solely with the Legislative Assembly.

Similarly, it is constitutionally established that all public franchises or concessions shall be determined by law. Therefore, the constitutional branch responsible for establishing the parameters for the executive branch to grant franchises or concessions is the Legislative Assembly.

In accordance with these constitutional mandates, the Legislative Assembly approved Law No. 83 of May 2, 1941, establishing the Electric Power Authority, a public corporation and autonomous government agency of the Government of Puerto Rico for the purpose of administering the electrical system in our jurisdiction.

The Legislative Assembly again exercised its constitutional authority and, through the approval of Law 120-2018, 22 L.P.R.A. § 1111, established the legal framework for the Executive Branch to grant public concessions by privatizing the

administration and assets of the PREPA.

In exercising its constitutional power, the Legislative Assembly stated, with respect to the PREPA, that "[i]ts creation, existence, powers, duties and activities as a public bureau are delegated by law. Its assets and franchises are the property of the People of Puerto Rico, its Government, and administered by that public corporation specifically by delegation of the Legislative Assembly." Sec. 3 of Law 120-2018, 22 L.P.R.A. § 1113. (Emphasis supplied.)

The enabling law of the NEPR, Law 57-2014, as amended, known as the "Energy Transformation and Relief Law", establishes the powers and duties of this regulatory body. According to Article 6.3, 22 L.P.R.A. § 1054b, the NEPR is responsible for reviewing, approving and supervising the operational agreements, rates and regulations applicable to the electrical system. However, **the law does not grant the NEPR the authority to issue immunity to private entities,** or to restrict the acquired rights of third parties, such as consumers. Its regulatory function is limited to ensuring compliance with public energy policy and protecting the interests of the people of Puerto Rico by overseeing the operation of the electrical system, not granting immunity to private entities.

Extensive judicial decisions have validated the delegation of powers of the Legislative Assembly to the Executive or to an executive entity, although not absolutely. See Dalmau Ramírez v. ELA, 2024 TSPR 95 (2024). This Honorable Court has therefore validated such delegations, provided that the law "establishes adequate rules, guidelines, standards, criteria or intelligible principles, or those procedural and substantive guarantees or safeguards that serve as a guide to the delegation and delimit its powers, in order to prevent the actions of administrative entities from being arbitrary or capricious." Domínguez Castro et al. v. ELA I, 178 DPR 1, 93 (2010). See also Sánchez et al. v. Depto. Vivienda et al., 184 DPR 95, 122 (2011). See also, E. Chemerinsky, Constitutional Law: principles and policies, 5th ed., New York, Wolters Kluwer, 2015, pp. 343–345; L. Fisher and K.J. Harriger, American Constitutional Law, 10th ed., North Carolina, Carolina Academic Press, 2013, Vol. I, p. 207.

The Legislative Assembly has other methods for maintaining control over delegations granted to another branch. On this point, Professor Farinacci Fernós summarizes that:

"For a delegation to be constitutionally valid, it must meet certain requirements. Among these we can identify: (1) that it is a delegable power, (2) that the delegation has actually been carried out, (3) that sufficient intelligible principles are provided to guide the exercise of the delegated quasi-legislative power, (4) that the entity to which the power is granted acts within the limits established by law, and (5) that the exercise of that power is not arbitrary or capricious. Typically, the result of this exercise of power is the adoption of a legislative regulation that creates rights or obligations and has the force of law." J.M. Farinacci Fernós, Las Órdenes Ejecutivas, el Poder Legislativo y las Emergencias, 3 Amicus, Rev. Pol. Púb. y Leg. UIPR 190, 192 (2020).

From a cursory glance at the process and the granting of immunity to LUMA by the NEPR, we see that none of the constitutional requirements established regarding the delegation of powers were met. Law No. 83 of May 2, 1941, Law 57-2014 and Law 120-2018 **contain no express or implicit statement by the legislature delegating to the executive branch its power to grant immunity to PREPA or LUMA** arises. Therefore, the constitutionality of a delegation that never occurred cannot be evaluated. Thus, it is clear that PREPA exceeded its statutory powers and those expressly delegated by the legislature when it agreed to request the immunity provided for in Art. 4.1(g) of the Agreement.

On the other hand, it is through the May 31, 2021, Resolution issued by the NEPR that the immunity granted to LUMA acquires normative force and legal application. That resolution is the act that confers operability and legitimacy on a provision that would otherwise have no effect on non-contracting third parties such as consumers, who did not participate in the negotiation process of said Agreement nor agreed to waive their right to claim.

It is very important to note that this release of liability granted by the NEPR to the operator does not pass the triple scrutiny required by Art. 6.3(rr) of Law No. 57-2014, 22 L.P.R.A. § 1054b, or its enabling law. First, it does not comply with applicable laws, as it generally eliminates the action for damages for negligence recognized in Article 1536 of the Civil Code. Second, it perverts the public interest by passing the costs of private negligence on to all subscribers, thereby distorting the concept of a "fair and reasonable" rate and turning it into a vehicle for transferring to the collective the risk that corresponds exclusively to the party causing the damage. Third, far from protecting the rights of customers, it voids them of content by depriving them of the

only effective protection against non-contractual damages, also creating unequal treatment with respect to other sectors not covered by such a privilege.

Moreover, the liberal interpretation clause of Art. 6.3 and the remedial powers of subsections (oo)–(rr), 22 L.P.R.A. § 1054b, <u>do not</u> entitle the NEPR to repeal substantive rights; on the contrary, they are expressly exercised "in accordance with applicable laws." The law itself subordinates regulatory action to the law, not the other way around. <u>In other words, the regulatory framework of the NEPR's own organic law imposes an insurmountable limit that no energy policy can prevail over the substantive rights recognized in the Civil Code.</u>

Thus, the NEPR overstepped its regulatory function by granting a release that deprives citizens of their access to mechanisms for redressing damages, without any legal basis for doing so. The NEPR **granted absolute immunity without the authority in Law to grant such immunity to LUMA, meaning that any action by that entity outside the legal framework is null and void** *ab initio*.

In other words, the NEPR lacked the legal authority to confer immunity on LUMA via contractual or administrative means, since the Legislative Assembly did not delegate such power to it. **The Constitution of Puerto Rico clearly states that the creation of public concessions or privileges must be provided in law.** Any attempt to circumvent that requirement via an administrative resolution, as the NEPR did in 2021, constitutes a direct violation of Articles III and VI of the Constitution and the doctrine of the separation of powers. In short, the attempt to establish a regime of immunity in favor of a private company such as LUMA through a mere administrative resolution evades democratic processes and violates the constitutional architecture of the State. We therefore maintain that the situation before us requires the expeditious intervention of this Honorable Court, as it has the effect of disrupting the balance of power established in our Constitution and the republican structure of government.

2. <u>Compensation for negligence cannot be passed on in tariffs; the obligation to respond personally corresponds to LUMA, not to consumers, by virtue of the provisions of the Civil Code.</u>

Even though this appeal concerns the validity of the release of liability, it is appropriate and necessary for this Honorable Court to also issue a declaratory judgment on the unconstitutionality of transferring the operator's negligence compensation to the tariff. This is not an advisory opinion. The NEPR itself, in its "Motion in Compliance

with Order" filed before this honorable court, expressly acknowledged that "these are costs that would eventually … be passed on to users through rates."[8] Such an admission anticipates a regulatory determination with immediate and adverse effects on consumers. This approach creates a real and concrete controversy because it announces a regulatory decision that could affect consumers. That is precisely why DACO has standing to bring it today, because its Organic Law empowers it to appear in "any matter that affects or **may affect**" consumer interests and before any court in defense of those interests. The potential clause gives DACO preventive standing to prevent an announced impact from materializing to the detriment of consumer civil rights.

The legal parameter to resolve this issue is not in a vacuum, but in Law No. 57-2014, *supra*, itself Art. 6.3(rr) of which law provides that "[a]ll actions, regulations and determinations of the NEPR shall be guided by applicable laws, the public interest, and the interest of protecting the rights of customers or consumers." 22 L.P.R.A. § 1054b (rr). In light of this guiding principle, passing on compensation for operator negligence to consumers is inadmissible on three counts.

First, because the applicable law, the Civil Code of Puerto Rico, imposes a personal obligation on the party causing the damage to repair it: "Any person who, by action or omission, causes damage to another, through fault or negligence, is obliged to repair the damage caused." Civil Code of Puerto Rico, Art. 1536, 31 L.P.R.A. §10801. Likewise, Article 1156 of the Civil Code establishes that "the debtor is responsible for compliance with its obligation with all its present and future assets…," 31 L.P.R.A. § 9301. That debt cannot be converted, by administrative resolution, to "cost of service." See Jiménez v. Pelegrina Espinet, 112 D.P.R. 700, 705 (1982) (the obligation to repair damages due to negligence arises automatically when its elements are established); Soc. de Gananciales v. Royal Bank de P.R., 145 D.P.R. 178 (1998) (reasserting that Art. 1802, now 1536, is the general source of non-contractual civil liability).

Second, because the public interest is harmed when operational diligence is disincentivized by allowing the responsible party to spread its culpability among

---

[8] See first sentence on p. 17 of the *Motion for Compliance* filed by NEPR before the Supreme Court of Puerto Rico on August 15, 2025. It should be noted that this warning is included for the first time in our arguments because, as a result of the aforementioned Motion of the Bureau, we learned that, should DACO prevail in its argument before this Honorable Court, the Bureau has expressed its intention to pass on the costs related to the operator's negligence to consumers through the tariff.

captive consumers, thereby creating a perverse incentive for carelessness and negligence.

Third, because far from protecting customers' rights, it voids them of content by depriving them of their only effective protection against non-contractual damages, also generating unequal treatment with respect to other users and sectors not covered by such a privilege. The liberal interpretation clause of Art. 6.3 and the remedial powers of subsections (oo)–(rr) of Law 57-2014, *supra*, do not empower the repeal of substantive rights; on the contrary, they are expressly exercised "in accordance with applicable laws," 22 L.P.R.A. § 1054b. The law itself subordinates regulatory action to substantive law, not the other way around. Hence, the argument that the release can be implicitly inferred from the Bureau's regulatory power is legally untenable, when its organic law specifically prohibits it from acting contrary to substantive law and to the detriment of customers.

The conclusion is reinforced by looking at the contractual architecture under which LUMA operates. The current contract model clearly separates two items: on the one hand, operating expenses that are recognized as "passthrough" and recovered in the rate; on the other hand, the operator's "Service Fee," a fixed fee and, where applicable, incentives, which constitute its business remuneration. In a civil law system such as ours, where non-contractual liability is a personal obligation of the perpetrator, the rule is elementary: whoever causes the damage pays out of their own pocket. If in any case the operator's negligence is determined, compensation must be paid out of their own assets, including their business remuneration, or their insurance coverage, not through the general tariff. Converting fault into a tariff item would, in effect, be to administratively repeal Articles 1536 and 1156 of the Civil Code and violate the separation of powers. Certainly, the power to alter or modulate a codified substantive right resides exclusively with the Legislative Assembly, not with a regulatory body.

Similarly, transferring negligence from the operator to the consumer does not meet the standard of "fair and reasonable rates." This "test", specific to public economic law, has served to align rates with prudent and necessary costs of service provision, operation, maintenance and investment, not to pass on compensation for negligence. To argue otherwise distorts rate justice and breaches the basic principle of

causal cost allocation, in which the party causing the damage pays. Local civil doctrine has explained for decades that liability for fault arises directly from the conduct of the perpetrator of the damage and falls on that person, precisely to effectively protect the injured party and to discipline the conduct of the potential perpetrator. That is the sense of our codified tradition and nothing in Law 57-2014, *supra*, authorizes the Bureau to reverse it.

The assertion that it would be "common practice" in states or "other jurisdictions" to pass on to consumers the operator's negligence indemnities lacks legal basis in Puerto Rico. First, it is factually incorrect: state commissions in other states have denied such transfers when there is negligence on the part of the operator (**see Appendix to this Pleading pp. 001–075**).[9] Second and decisively, our civil and codified legal system is not modified by foreign "customs": Article 1536 of the Civil Code imposes a **very personal obligation** on the causative party to repair the damage, and Article 6.3(rr) of Law 57-2014, *supra*, makes **all** actions of the Bureau subject to the **applicable laws, the public interest** and the **protection of customer rights**, 22 L.P.R.A. § 1054b(rr). No "practice" foreign to our law can override that framework; only the Legislative Assembly could alter it, not an administrative resolution or a generic invocation of foreign regulatory customs.

In summary, the Bureau's announcement that it would "eventually" transfer compensation for operator negligence to the tariff not only confirms that the controversy is ripe for the purposes of a declaration, but also confirms the need to establish a clear rule: compensation for operator fault is not recoverable via tariff unless authorized by law. This is in keeping with Article 6.3(rr), that mandates that all regulations must be consistent with the applicable law, ensuring the public interest and customer protection. In this way, the integrity of the Civil Code is preserved and the tariff regime is prevented from becoming a piggy bank for private debts. For all of the above reasons, the policy or practice of passing on to consumers the amount of compensation for operator negligence should be declared null and void, and it should

---

[9] See Appendix to this Pleading pp. 001–075 "Decision 17-11-033 November 30, 2017 Before the Public Utilities Commission of the State of California, Denying the Application 15-09-010 of San Diego Gas & Electric Company (U902E) for Authorization to Recover Costs Related to the 2007 Southern California Wildfires Recorded in the Wildfire Expense Memorandum Account (WEMA) available at https://docs.cpuc.ca.gov/Published Docs/Published/G000/M200/K045/200045020.PDF

be reaffirmed that such debts are personal to the party responsible and unrelated to the tariff structure, unless otherwise provided by law.

## VI.   CONCLUSION

The release of liability challenged here is not a technical matter of rates, but rather an unconstitutional attempt to deprive consumers of the remedies that the Civil Code, in Article 1536, recognizes as a substantive rule of public order. By approving it without express legislative delegation, the NEPR acted ultra vires, exceeding its regulatory powers and violating the doctrine of the separation of powers that the Constitution of Puerto Rico enshrines as an essential guarantee of our republican system of government.

Furthermore, the challenged resolution disrupts the mandate of Article 6.3 of Law No. 57-2014, *supra*, since, instead of protecting the consumer, it deprives them of their right to seek damages; instead of ensuring fair and reasonable rates, it turns the operator's negligence into a cost passed on to subscribers; and instead of promoting non-discrimination, it creates an unacceptable privilege in favor of a private operator (22 L.P.R.A. § 1054b). The practical effect is to grant LUMA a quasi-sovereign immunity that even PREPA did not enjoy, and to do so outside the Legislative Assembly, the only constitutional branch empowered to confer such privileges.

In a state governed by the rule of law, it is not legally admissible to pass on damages by transferring to the tariff what *ex lege* corresponds to the causative party to pay with its own pecunio. Under Article 1536, the obligation to pay compensation arises from the mere fact of negligent unlawful conduct; and, pursuant to Article 1156, all obligations are guaranteed by the debtor's assets (universal asset liability). An administrative decision that attempts to override that rule is invalid in light of the higher-ranking law. Therefore, the costs of LUMA's negligence cannot be borne by consumers, but rather by LUMA itself as the debtor of the compensation.

This Honorable Court must reaffirm, without ambiguity, that Puerto Rico's civil law system is based on the Civil Code as its primary source and that no administrative agency may, by resolution or contract, suspend substantive legal rights. By declaring the approved release null and void, this Court not only restores effective protection of

consumers' rights, but also preserves the constitutional architecture of checks and balances against administrative overreach.

Therefore, it is appropriate (i) to declare null and void the release of liability granted in the Resolution of May 31, 2021; and (ii) to establish that all claims for damages due to negligence must be satisfied with LUMA's funds and to prohibit such costs from being passed on to consumers' rates. Only in this way can the public interest prevail over undue privileges and the legislative mandate to protect consumers retain its full force.

## VII.  PETITION

IN WITNESS WHEREOF, the Petitioner-Complainant respectfully and urgently requests the following from this Honorable Court:

(1)     That it declare the release of liability granted by the Energy Bureau via the Resolution issued on May 31, 2021, to be null and void as it is ultra vires and incompatible with our legal system;

(2)     That it establish that the payment of claims for damages resulting from the operator's negligence cannot be transferred to consumers through tariffs, as this is contrary to the law; and

(3)     That it issue any other remedy that may be appropriate in law.

**I HEREBY CERTIFY:** That I today sent a true and accurate copy of this document by email to: LUMA ENERGY LLC; and LUMA ENERGY SERVCO LLC, via their legal representatives: Ms. Margarita Mercado Echegaray margarita.mercado@us.dlapiper.com; Ms. Yahaira De la Rosa Algarín Yahaira.delarosa@us.dlapiper.com, Mr. Jan M. Albino López jan.albinolopez@usdlapiper.com, Mr. Frank Torres Viada ftv@ftorresviada.com, Mr. José Andréu Fuentes jaf@andreu-sagardia.com; to the PUERTO RICO ENERGY BUREAU via its legal representatives: Mr. Edgardo L. Rodríguez Cardé elrc@rclopr.com and Ms. Yarymar González Carrasquillo ygc@halspr.com; to the ELECTRIC ENERGY AUTHORITY via its legal representatives: Juan M. Martínez Nevares jmartinez@gmlex.net, Ms. Mirelis Valle Cancel mvalle@vcprlaw.com; to the SENATE OF PUERTO RICO via its legal representatives: Mr. Charles A. Rodríguez Colón crodriguez@naleapr.com, Mr. Miguel A. Rodríguez Ramos miguelrrlaw@gmail.com; to the CHAMBER OF REPRESENTATIVES OF PUERTO RICO via its legal representative Mr. Victor Calderón Cestero victor@calderon-law.com; the INSTITUTE OF COMPETITIVENESS AND ECONOMIC

SUSTAINABILITY via its legal representatives, Mr. Fernando E. Agrait agraitfe@agraitlawpr.com, at Mr. José Leonardo Pou Román jpouroman@outlook.com and the Court of First Instance.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, on September 8, 2025.

[signature]
Ms. Valerie Rodríguez Erazo
RUA No. 16,861
Box 41059
Minillas Station
San Juan, P.R. 00940-1059
(787) 722-7555
vrodriguez@daco.pr.gov


Mr. Gadiel Figueroa Robles
RUA No. 18,687
Box 41059
Minillas Station
San Juan, P.R. 00940-1059
(787) 722-7555
gfigueroa@daco.pr.gov


Mr. Samuel Silva Rosas
RUA No. 7883
Box 41059
Minillas Station
San Juan, P.R. 00940-1059
(787) 722-7555
ssilva@daco.pr.gov

**COMMONWEALTH OF PUERTO RICO**
**SUPREME COURT OF PUERTO RICO**

| | |
|---|---|
| **CONSUMER AFFAIRS DEPARTMENT** **Complainant-Petitioner** | **CT-2025-0003** |
| | CIVIL NO.: **SJ2025CV06607** |
| V. | RE.: DECLARATORY JUDGMENT |
| **LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA** | |
| **Respondents-Appellees** | |

<u>**PLEADING OF THE PETITIONING PARTY**</u>

*APPENDIX DOCKET*

**APPENDIX** <span style="float:right">**PAGE**</span>

1. Decision 17-11-033 November 30, 2017 Before the Public Utilities Commission of the State of California, Denying the Application 15-09-010 of San Diego Gas & Electric Company (U902E) .....................................001–075

1

# DECLARATION AND CERTIFICATION

I BRUCE TAYLOR declare that I am a Certified Translator registered with the American Translators Association.

I am certified to translate from the Spanish language to the English language. My certification number is: 503180.

I declare, to the best of my abilities and belief, that the following text is an accurate translation of the Spanish language text of "Alegato de La Parte Peticionaria, filed September 8, 2025, Departamento de Asuntos Del Consumdor v. Luma Energy, LLC et al., No. CT-2025-0003, Estado Libre Asociado de Puerto Rico, Tribunal Supremo de Puerto Rico".

This declaration signed this 15th day of September, 2025, at Los Angeles, California.

Signature of Certified Translator registered with the American Translators Association:


**BRUCE TAYLOR**

\* See attached document

**CALIFORNIA ACKNOWLEDGMENT**                                          CIVIL CODE § 1189

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document
to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of *Los Angeles*

On *Sep. 15, 2025* before me, *Lilly Taheri (Notary Public)*
        Date                                    Here Insert Name and Title of the Officer

personally appeared *Bruce Taylor*
                                          Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument.

> LILLY TAHERI
> Notary Public - California
> Los Angeles County
> Commission # 2393980
> My Comm. Expires Feb 14, 2026

I certify under PENALTY OF PERJURY under the
laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                    Signature of Notary Public

*Place Notary Seal and/or Stamp Above*

──────────────────────── **OPTIONAL** ────────────────────────

*Completing this information can deter alteration of the document or
fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: *Declaration and Certification*

Document Date: *Sep. 15, 2025*                    Number of Pages: *(1)*

Signer(s) Other Than Named Above: *N/A*

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: *Bruce Taylor*
☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General
☐ Individual          ☐ Attorney in Fact
☐ Trustee             ☐ Guardian or Conservator
☐ Other: _____
Signer is Representing: _____

Signer's Name: _____
☐ Corporate Officer – Title(s): _____
☐ Partner – ☐ Limited ☐ General
☐ Individual          ☐ Attorney in Fact
☐ Trustee             ☐ Guardian or Conservator
☐ Other: _____
Signer is Representing: _____

©2019 National Notary Association

**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**TRIBUNAL SUPREMO DE PUERTO RICO**

| | |
|---|---|
| **DEPARTAMENTO DE ASUNTOS DEL CONSUMDOR**<br>**Demandante-Peticionaria**<br><br><br>v.<br><br>**LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA**<br><br>**Demandados-Recurridos** | **CT-2025-0003**<br><br>CIVIL NÚM.: **SJ2025CV06607**<br><br>SOBRE:        SENTENCIA<br>DECLARATORIA |

RADICADO
SECRETARIA
TRIBUNAL SUPREMO
2025 SEP -8  AM 11:30

**ALEGATO DE LA PARTE PETICIONARIA**

**ABOGADOS DE LA PARTE PETICIONARIA**

**LCDA. VALERIE RODRÍGUEZ ERAZO**
RUA Núm. 16,861
Box 41059
Minillas Station
San Juan, P.R.  00940-1059
(787) 722-7555
vrodriguez@daco.pr.gov

**LCDO. GADIEL FIGUEROA ROBLES**
RUA Núm. 18,687
Box 41059
Minillas Station
San Juan, P.R.  00940-1059
(787) 722-7555
gfigueroa@daco.pr.gov

**LCDO. SAMUEL SILVA ROSAS**
RUA Núm. 7,883
Box 41059
Minillas Station
Santurce, P.R.  00940-1059
(787) 722-7555
ssilva@daco.pr.gov

**PARTE RECURRIDA**

**NEGOCIADO DE ENERGÍA DE PUERTO RICO**

**LCDO. EDGARDO L. RODRÍGUEZ CARDÉ**
RUA Núm. 13,211
P.O. Box 365061
San Juan, P.R. 00936-5061
Tel. (787) 722-9911
elrc@rclopr.com

1

**LCDA. YARYMAR GONZÁLEZ CARRASQUILLO**
RUA Núm. 13,219
P.O. Box 365061
San Juan, P.R. 00936-5061
Tel. (787) 722-9911
ygc@halspr.com

**LUMA ENERGY, LLC Y LUMA ENERGY SERVCO, LLC.**

**LCDA. MARGARITA MERCADO ECHEGARAY**
RUA Núm. 16,266
margarita.mercado@us.dlapiper.com

**LCDA. YAHAIRA DE LA ROSA ALAGARÍN**
RUA Núm. 18,061
Yahaira.delarosa@us.dlapiper.com

**LCDO. JAN M. ALBINO LÓPEZ**
RUA Núm. 22,891
Jan.albinolopez@usdlapiper.com

**DLA Piper (Puerto Rico) LLC**
500 Calle de la Tanca, Suite 401
San Juan, P.R. 00901
Tel. (787) 945-9107/9132/9103

**LCDO. FRANK TORRES VIADA**
RUA Núm. 14,724
P.O. Box 192084
San Juan, P.R. 00919-2084
Tel. (787) 754-1102
ftv@ftorresviada.com

**LCDO. JOSÉ ANDREÚ FUENTES**
RUA Núm. 9,088
261 Ave. Domenech
San Juan, P.R. 00918-3518
Tel. (787) 754-1777
jaf@andreu-sagardia.com

**AUTORIDAD DE ENERGÍA ELÉCTRICA**

**LCDO. JUAN M. MARTÍNEZ NEVÁREZ**
**RUA Núm. 14,517**
1509 López Landrón, Bldg.
Seventh Floor
San Juan, P.R. 00911-1933
jmartinez@gmlex.net

**LCDA. MIRELIS VALLE CANCEL**
**RUA Núm. 21,115**
1509 López Landrón, Bldg.
Seventh Floor
San Juan, P.R. 00911-1933
mvalle@vcprlaw.com

**PARTE INTERVENTORA**

**LCDO. CHARLES A. RODRÍGUEZ COLÓN**
crodriguez@naleapr.com

2

RUA Núm. 7,831
252 Ave. Ponce de León Suite 1801
San Juan, P.R. 00918-2020
Tel. (787) 378-2424
Fax: Se desconoce

**LCDO. MIGUEL A. RODRÍGUEZ RAMOS**
miguelrrlaw@gmail.com
RUA Núm. 22,062
P.O. Box 19586
San Juan, P.R. 00910
Tel. (787) 604-2772
Fax: Se desconoce

**LCDO. VÍCTOR CALDERÓN CESTERO**
victor@calderon-law.com
RUA Núm. 13,266
137 Calle O
Aguadilla, P.R. 00603
Tel: (787) 602-2465
Fax: Se desconoce

**LCDO. FERNANDO E. AGRAIT**
agraitte@agraitlawpr.com
RUA Núm. 3,772
Edificio Centro de Seguros
Oficina 414
701 Ave. Ponce de León
San Juan, P.R. 00907
Tel: (787) 725-3390 – 3391
Fax: (787) 724-0353

**LCDO. JOSÉ LEONARDO POU ROMÁN**
jpouroman@outlook.com
RUA Núm. 23,523
Edificio Centro de Seguros
Oficina 414
701 Ave. Ponce de León
San Juan, P.R. 00907
Tel: (787) 725-3390 – 3391
Fax: (787) 724-0353

3

**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**TRIBUNAL SUPREMO DE PUERTO RICO**

| | |
|---|---|
| **DEPARTAMENTO DE ASUNTOS DEL CONSUMDOR**<br>**Demandante-Peticionaria** | **CT-2025-0003**<br><br>CIVIL NÚM.: **SJ2025CV06607** |
| v. | SOBRE:                    SENTENCIA<br>DECLARATORIA |
| **LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA**<br><br>**Demandados-Recurridos** | |

## ALEGATO DE LA PARTE PETICIONARIA

### ÍNDICE DE MATERIAS

I.      INTRODUCCIÓN ............................................................1

II.     JURISDICCIÓN DEL TRIBUNAL .......................................3

III.    CASO AL CUAL SE REFIERE ESTE RECURSO DE CERTIFICACIÓN INTRAJURISDICCIONAL ................................................4

IV.    BREVE RELACIÓN DE HECHOS .......................................4

V.     DERECHO APLICABLE Y ARGUMENTACIÓN ....................12

VI.    CONCLUSIÓN .............................................................31

VII.   SÚPLICA ...................................................................33

1

**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**TRIBUNAL SUPREMO DE PUERTO RICO**

| | |
|---|---|
| **DEPARTAMENTO DE ASUNTOS DEL CONSUMDOR**<br>**Demandante-Peticionaria**<br><br><br>v.<br><br>**LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA**<br><br>**Demandados-Recurridos** | **CT-2025-0003**<br><br>CIVIL NÚM.: **SJ2025CV06607**<br><br>SOBRE:          SENTENCIA DECLARATORIA |

**ALEGATO DE LA PARTE PETICIONARIA**

**ÍNDICE LEGAL**

I.     **JURISPRUDENCIA ESTATAL**

AAR, Ex parte, 187 D.P.R. 835, 855 (2013) ………………………………..…………..24

Alvarado Pacheco y otros v. E.L.A., 188 D.P.R. 594 (2013) ………………………….3

Asociación de Maestros de Puerto Rico v. Sistema de Retiro, 190 D.P.R. 854 (2014) ………………………………………………………………………………….……………3

Ayala Hernández v. Bosque Sereno, 190 D.P.R. 547 (2014) ……………..…………23

Centro Unido de Detallistas v. Comisión de Servicio Público 174 D.P.R. 174, 184 (2008) ……………………………………………………………………….…………13,16

Cepeda Torres v. García Ortiz, 132 D.P.R. 698, 703-704 (1993) …………………..…21

Col. Peritos Elec. v. A.E.E., 150 D.P.R. 327, 331-332 (2000) ……………………..…….13

Colegio de Médico-Cirujanos de PR v. Academia de Medicina de la Familia, 201 D.P.R. 362 (2018) ……………………………………………………………………….…………23

DACO v. Farmacia San Martín Barceloneta, Inc., 175 D.P.R. 198 (2009) ……..……..19

Dalmau Ramírez v. ELA, 2024 TSPR 95 (2024) …………………………………………26

Deliz v. Igartúa, 158 D.P.R. 403,435 (2003) …………………………………………..…21

Depto. Justicia et al v. Jiménez, 199 D.P.R. 293, 309 (2017) ………………….…..…….13

Díaz Carrasquillo v. García Padilla, 191 D.P.R. 97, 110 (2014) ………..…………….23,24

1

Domínguez Castro et al. v. ELA I, 178 D.P.R. 1, 93 (2010) ................................26

ECP Inc. vs. Oficina del Comisionado de Seguros, 205 D.P.R. 268 (2020) ..............23

Elías, et al., v. Chenet, et al., 147 D.P.R. 507, 521 (1999) ...........................9

Fund. Surfrider v. ARPe 178 D.P.R. 563, 572 (2010) .............................13

García Oyola v. J.C.A., 142 D.P.R. 532 (1997) ................................13

Gobierno Ponce v. Caraballo 166 D.P.R. 723 (2006) ...........................24

Hernández Agosto v. López Nieves, 114 D.P.R. 601 (1983) .................................21

Hernández Torres v. Hernández Colón 129 D.P.R. 824,835 (1992) ...................13,16

Hernández Torres v. Hernández Colón, 131 DPR 593,599 (1992) ........................13

In Re: Revisión de los Términos de Servicio de LUMA (Extensión De Responsabilidad)
KLRA202100406.............................................................................4,5,10

Jiménez v. Pelegrina Espinet, 112 D.P.R. 700, 705 (1982) ..................................29

Maderas Tratadas v. Sun Alliance, 185 D.P.R. 880 (2012) ..........................22

Mundo Ríos v. CEE, 187 D.P.R. 200, 206 (2012) .............................................3

Muns. Aguada y Aguadilla v. JCA 190 D.P.R. 122 (2014) ...........................13

Nogueras v. Hernández Colón, 127 D.P.R. 405, 426 (1990) ................................24

Ortiz Matías v. Mora Dev. Corp., 187 D.P.R 649 (2013) .......................................18

P.I.P v. E.L.A. et al., 186 D.P.R. 1 (2012) ............................................................3

Pierluisi Rojo v. MAPFRE et als. (SJ2018CV07570) ...........................................15

Perfect Cleaning Services v. Corporación del Centro Cardiovascular de PR y el Caribe,
162 D.P.R. 745 (2004) ........................................................................................23

Pueblo v. Telmaín Escalera, 45 D.P.R. 447, 453 (1933) .......................................9

Rivera Sanfeliz et al.v. Jta. Dir. FirstBank 193 D.P.R. 38 (2015) .......................22,23

Rivera Segarra v. Rivera Lassén, 214 D.P.R. 111, (2024) ....................................23

Rodríguez Casillas et al. v. Colegio, 202 D.P.R. 428, 450-451 (2019) ...................23

Romero Barceló v. E.L.A 169 D.P.R. 460, 470-71 (2006) ................................ 13

Salas Soler v. Secretario de Agricultura, 102 D.P.R. 716 (1974) ...........................16

Sánchez et al. v. Depto. Vivienda et al., 184 D.P.R. 95, 122 (2011) ......................26

Santiago Nieves v. ACAA, 119 D.P.R. 711, 716 (1987) ......................................22

Senado v. Tribunal Supremo y otros, 208 D.P.R. 115, 135-136 (2021) ..............23,24

Silva v. Hernández Agosto, 118 D.P.R. 45, 57 (1986) ........................................23

Soc. de Gananciales v. Royal Bank de P.R., 145 D.P.R. 178 (1998) .......................29

2

<u>Soc. de Gananciales</u> v. <u>Vélez & Asoc.</u>, 145 D.P.R. 508 (1998) ............................22

<u>U.P.R.</u> v. <u>Laborde Torres y otros I,</u> 180 D.P.R. 253 (2010) ....................................3


   **II.    LEYES**

Constitución de Puerto Rico Artículo Secs. 1 y 16; Artículo VI, Sec. 13 ........23,24,28

Ley Núm. 5 de 23 de abril de 1973, según enmendada, "Ley Orgánica del
Departamento de Asuntos del Consumidor" 3 L.P.R.A. §341; §341b; §341e y §341j
...............................................................................................…..12,14,15,18,19

Ley 201-2003, según enmendada, "La Ley de la Judicatura del Estado Libre
Asociado de 2003", 4 L.P.R.A. § 24s ................................................................3

Ley Núm. 55-2020, según enmendada, "Código Civil de Puerto Rico" 31 L.P.R.A. §
10801; 1156 y 9301 ...........................................................2,9,23,27,29,30,31,32

Ley Núm. 57-2014, según enmendada, "Ley de Transformación y Alivio Energético",
22 L.P.R.A. § 1054b;1054c; 1054qq; 1054nn y 1054rr
...............................................................6,16,17,18,21,22,25,26,27,29,30,31,32

Ley Núm. 83 de 2 de mayo de 1941, según enmendada, "Ley de la Autoridad de
Energía Eléctrica de Puerto Rico", 22 L.P.R.A. § 191   ...................................25,26

Ley Núm. 120-2018, según enmendada, "Ley para Transformar el Sistema Eléctrico
de Puerto Rico" 22 L.P.R.A. § 1111 y 1113 .......................................................25,26


   **III.   REGLAS Y/O REGLAMENTOS**

Reglas de Procedimiento Civil, 32 L.P.R.A., Ap. V
R. 52.2 (d), R. 59.1, 59.2 (a) y 59.2 (c) ....................................….......................3,12

Reglas de Evidencia, 32 L.P.R.A. Ap. VI
R. 201.............................................................................................................4

Reglamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap. XXI-B, R. 23(a)
R. 23 .............................................................................................................3

   **IV.   OTRAS**

Procedimiento para el Análisis, Trámite y Pago de Reclamaciones a Personas Ajenas
a la Autoridad de Energía Eléctrica .................................................................5

J.M. Farinacci Fernós, Rev. Jur. UPR, Vol. 84, Núm. 2, pág. 367 (2015)
.....................................................................................................................13

J.M. Farinacci Fernós, Las Órdenes Ejecutivas, el Poder Legislativo y las Emergencias
Rev. Pol. Púb. Y Leg. UIPR 190, 192 (2020) .......................................................26

E. Chemerinsky, Constitutional Law: principles and policies, 5th ed., New York, Wolters
Kluwer, 2015, págs. 343-345; L. Fisher y K.J. Harriger, American Constitutional Law,
10th ed., North Carolina, Carolina Academic Press, 2013, Vol. I, pág. 207 ..............26

**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**TRIBUNAL SUPREMO DE PUERTO RICO**

| | |
|---|---|
| **DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR**<br>**Demandante-Peticionaria** | CT-2025-0003<br><br>CIVIL NÚM.: **SJ2025CV06607** |
| v. | SOBRE:              SENTENCIA DECLARATORIA |
| **LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA**<br><br>**Demandados-Recurridos** | |

## ALEGATO DE LA PARTE PETICIONARIA

**AL HONORABLE TRIBUNAL SUPREMO:**

COMPARECE la parte Demandante-Peticionaria, Departamento de Asuntos del Consumidor, (en adelante "DACO"), a través de su Secretaria y representación legal las cuales suscriben y muy respetuosamente, exponen, alegan y solicitan:

### I.   INTRODUCCIÓN

La controversia ante nos busca atender una cuestión cardinal para el Estado de Derecho en Puerto Rico: ¿puede una agencia administrativa, por simple resolución, conferir a un operador privado una inmunidad general frente a reclamaciones extracontractuales de terceros, incluida la negligencia ordinaria, erradicando por la vía administrativa toda la normativa civilista puertorriqueña de responsabilidad civil extracontractual sin autorización legislativa expresa? La única respuesta compatible con la Constitución, el Código Civil y la separación de poderes es un no categórico.

El Departamento de Asuntos del Consumidor (DACO) solicita una sentencia declaratoria que declare nula la Resolución del 31 de mayo de 2021 emitida por el Negociado de Energía de Puerto Rico (NEPR). Esa determinación pretende, por vía administrativa, eximir a LUMA Energy, LLC y LUMA Energy ServCo. (ambas en adelante "LUMA") de responsabilidad por daños a consumidores, aun por negligencia

1

ordinaria, y despojar a terceros de su acción extracontractual reconocida en el Artículo 1536 del Código Civil, 31 L.P.R.A. § 10801. Con ello, el NEPR rebasó su competencia y alteró el régimen sustantivo de responsabilidad civil sin ley habilitadora, en un acto ultra vires que erosiona garantías básicas y sienta un precedente expansivo e inadmisible de inmunidad cuasi soberana a favor de quien presta un servicio esencial.

Para disipar toda duda, este reclamo no versa sobre política energética, criterios técnicos del servicio eléctrico ni estructura tarifaria. El DACO no pretende sustituir la pericia técnica del regulador ni reabrir debates de ingeniería o costos. Lo que se impugna es la lesión a derechos sustantivos de los consumidores causada por una resolución que, sin autorización legislativa, pretende neutralizar la responsabilidad civil por negligencia y cerrar el acceso a remedios judiciales. El DACO acude en el ejercicio de la función preventiva que la Asamblea Legislativa le encomendó de representar al público consumidor y comparecer en su nombre ante los tribunales en asuntos que afecten o puedan afectar sus intereses.

La actuación impugnada es, además, abiertamente contraria al derecho vigente, lesiva al orden público y deja a los consumidores en un estado de indefensión incompatible con un sistema jurídico serio. Al pretender blindar de antemano a un concesionario de servicio esencial frente a la negligencia ordinaria, la resolución anula en la práctica el acceso a remedios judiciales, desnaturaliza la función disuasoria de la responsabilidad civil y traslada el costo de las fallas operacionales a las víctimas, no al causante del daño. Un privilegio administrativo de inmunidad, dictado sin mandato legislativo, subvierte la igualdad ante la ley, menoscaba el debido proceso y colisiona con la política pública de protección al consumidor. Por lo cual, lejos de tutelar derechos, institucionaliza la impunidad.

La vía declaratoria es el cauce correcto y necesario. Su función anticipatoria permite a este Honorable Tribunal restablecer el orden jurídico antes de que el daño se consolide y el agravio se perpetúe. Aquí no se reclama indemnización individual ni se exige demostrar la cuantía de pérdidas consumidor por consumidor; lo que se somete es una controversia real y sustancial sobre la validez y límites del poder administrativo para suspender, por resolución, la responsabilidad civil que la ley reserva al legislador y al foro judicial. La declaración solicitada tendrá efecto práctico

2

inmediato porque invalidará una barrera administrativa que hoy impide el acceso de los ciudadanos a la tutela judicial por daños derivados de fallas operacionales y actos negligentes, y reafirmará que ninguna agencia puede, mediante resolución, neutralizar derechos sustantivos creados por ley.

Este reclamo, además, encarna la función preventiva que la Asamblea Legislativa encomendó al DACO: representar al público consumidor y comparecer en su nombre ante los tribunales en asuntos que afecten o puedan afectar sus intereses. Precisamente para evitar que prácticas o resoluciones ilegales produzcan, o sigan produciendo, perjuicios masivos sin remedio, el legislador habilitó a la agencia para actuar antes de la cristalización de daños individuales.

Por todo lo anterior, y por lo que demostraremos en el transcurso de este alegato, este Honorable Tribunal debe declarar nulo el relevo de responsabilidad otorgado en la Resolución del 31 de mayo de 2021 del NEPR, restablecer el cauce ordinario de responsabilidad civil y reafirmar, sin ambigüedad, que ningún operador privado puede quedar inmune a su propia negligencia. Así se protege la integridad del ordenamiento jurídico y se garantiza que los consumidores de Puerto Rico conserven su derecho inalienable a reclamar por los daños sufridos.

## II.    JURISDICCIÓN DEL TRIBUNAL

Este Honorable Tribunal tiene facultad para atender el presente recurso de certificación al amparo del Artículo 3.002 de la Ley 201-2003, conocida como "La Ley de la Judicatura del Estado Libre Asociado de 2003", según enmendada, 4 L.P.R.A. § 24s, la Regla 52.2(d) de las Regla de Procedimiento Civil de 2009, 32 L.P.R.A. Ap. V. R. 52.2; la Regla 23 del Reglamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap. XXI-B, R. 23(a); y por lo resuelto por este Honorable Tribunal en Asociación de Maestros de Puerto Rico v. Sistema de Retiro, 190 D.P.R. 854 (2014) citando a Alvarado Pacheco y otro v. E.L.A., 188 D.P.R. 594 (2013).

A esos efectos, este foro ha dictaminado que procede expedir "autos de certificación para resolver casos que por su propia naturaleza **requieren una solución urgente**". Mundo Ríos v. CEE, 187 D.P.R. 200, 206 (2012) (Énfasis nuestro); P.I.P v. E.L.A. et al., 186 D.P.R. 1 (2012); U.P.R. v. Laborde Torres y otros I, 180 D.P.R. 253 (2010).[1] Siendo así, un recurso de certificación por su propia naturaleza se presenta

---

[1] Véanse, además, Asociación de Maestros de Puerto Rico v. Sistema de Retiro, 190 D.P.R. 854 (2014); Alvarado Pacheco y otros v. E.L.A., 188 D.P.R. 594 (2013). (Énfasis nuestro).

3

cuando un asunto particular requiere **intervención inmediata y oportuna** de este Honorable Foro.

Con la resolución expedita del presente asunto se garantizará la certeza jurídica sobre la validez constitucional de las actuaciones realizadas por la NEPR cuando éstas no fueron conferidas mediante actuaciones por la Asamblea Legislativa.

**III.    Caso al cual se refiere este recurso de certificación intrajurisdiccional**

Ante el Tribunal de Primera Instancia, Sala Superior de San Juan, se encuentra la Demanda de epígrafe en solicitud de Sentencia Declaratoria, presentada por el DACO contra Luma Energy, LLC; Luma Servco, LLC, Civil Núm. SJ2025CV06607 el Negociado de Energía de Puerto Rico; y la Autoridad de Energía Eléctrica.

**IV.    BREVE RELACIÓN DE HECHOS MATERIALES Y SUSTANTIVOS DEL CASO RELEVANTES A LA SOLICITUD DE CERTIFICACIÓN**

Hacemos una relación de los hechos materiales a las controversias relevantes a esta solicitud de certificación[2].

1. El 24 de febrero de 2021, bajo la administración del exgobernador Hon. Pedro Pierluisi, LUMA presentó para revisión y aprobación del Negociado de Energía de Puerto Rico (NEPR), un documento intitulado *Request for Approval of Terms of Service and Memorandum of Law in Support* ante el NEPR.

2. En lo relevante a la controversia que nos ocupa, LUMA solicitó que el NEPR aprobara un relevo de responsabilidad en virtud de las disposiciones de la Sección 4.1(g) del Acuerdo firmado entre LUMA, la AEE y la Autoridad para las Alianzas Público-Privadas (AAPP). **(Véase Apéndice 1 de la Solicitud de Certificación, págs. 065).**

3. El artículo 4.1(g) del Acuerdo lee como sigue:

> Liability Waiver. In connection with the submission of the Initial Budgets to PREB, the Parties agree **to apply** for inclusion in the Rate Order that the associated tariff or terms of service include: (i) a waiver of Owner's, ManagementCo's and ServCo's liability to customers or any Person receiving Power and Electricity for any Losses arising in any way out of or in connection with the operation of the T&D System and the provision of Power and Electricity including any events of interrupted, irregular or defective electric service due to Force Majeure Events, other causes beyond

---

[2] La relación de hechos relevantes en el caso que nos ocupa fue recogida por el Tribunal de Apelaciones en el caso In Re: Revisión de los Términos de Servicio de LUMA (Extensión De Responsabilidad), KLRA202100406. En virtud de la Regla 201 de Reglas de Evidencia, 32 L.P.R.A. Ap. VI, R. 201, este Honorable Tribunal puede tomar conocimiento judicial de los hechos que fueron adjudicados por el Tribunal de Apelaciones en el caso KLRA202100406 y que se incluyen en esta Demanda. A esos efectos, se incluye la Sentencia del Tribunal de Apelaciones como **Apéndice 2 de la Solicitud de Certificación**.

4

Owner's, ManagementCo's or ServCo's control or ordinary negligence, gross negligence or willful misconduct of Owner, ManagementCo or ServCo, or their respective employees, agents or contractors; and (ii) a waiver in all cases of responsibility for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by any of Owner's, ManagementCo's or ServCo's ordinary negligence, gross negligence or willful misconduct (collectively the "Liability Waiver"). **(Véase Apéndice 1 de la Solicitud de Certificación, págs.065-066)** (Énfasis Suplido).

4. Es decir, en virtud del artículo 4.1(g), los entes gubernamentales junto con LUMA solicitarían ante el NEPR, un <u>relevo total</u> para dicho operador y todos sus empleados, oficiales y contratistas ante reclamaciones de los consumidores por daños causados por actos negligentes o por fluctuaciones en el servicio eléctrico.

5. Previo a la firma del Acuerdo entre LUMA, la AAPP y la AEE, la corporación pública contaba con un mecanismo o procedimiento para que los consumidores presentaran sus reclamos por daños causados por negligencias o fluctuaciones en el servicio eléctrico titulado "Procedimiento para el análisis, trámite y pago de Reclamaciones a Personas Ajenas a la Autoridad de Energía Eléctrica" con fecha de 15 de febrero de 2016. **(Véase Apéndice 7 de la Solicitud de Certificación, págs. 485-509)**. **Es decir, la AEE, aun siendo una corporación pública, no gozaba de la inmunidad que hoy día goza LUMA ante reclamaciones de los consumidores.[3]**

6. El 4 de mayo de 2021, el Negociado notificó una Resolución y Orden en la que abrió el procedimiento *In Re: Review of LUMA's Terms of Service (Liability Waiver)*[4]. En la misma ordenó a LUMA a que proporcionara información suplementaria para la evaluación de los términos de servicios propuestos y estableció el calendario procesal.

7. El 12 de mayo de 2021, a través de un aviso titulado *Notice Concerning Public Hearings, Review of LUMA's Terms of Service*, divulgado en un periódico de

---

[3] El propio NEPR ha admitido que, en el pasado, la Autoridad de Energía Eléctrica respondía por los daños ocasionados a los consumidores, pero que mediante la Resolución impugnada expandió el alcance del relevo de responsabilidad a favor de LUMA, confiriéndole una inmunidad aún mayor de la que la AEE se había auto atribuido sin autorización legislativa. Véase Moción en Cumplimiento de Orden, párrs. 1–2, pág. 16 radicada por el NEPR ante el Tribunal Supremo de Puerto Rico (15 de agosto de 2025).

[4] NEPR-MI-2021-0007

circulación general, el Negociado informó que, el 25 de mayo de 2021 de 9:00am a 5:30pm, se estaría llevando a cabo una vista pública virtual en relación con la Petición presentada por LUMA.

8.  El 18 de mayo de 2021, el NEPR llevó a cabo una Conferencia Técnica con el propósito de discutir la Petición con el personal de LUMA y de la AEE.

9.  El 21 de mayo de 2021, la OIPC, presentó un Escrito Notificando Intervención de la OIPC. Sustentó su solicitud de intervención con el Art. 6.42 de la Ley Núm. 57-2014, según enmendada y mejor conocida como la "Ley de Transformación y Alivio Energético", 22 L.P.R.A. §1054qq, que le permitía intervenir en cualquier asunto que pudiera afectar a los consumidores en su capacidad como portavoz y defensora de estos, incluyendo los asuntos relacionados con las tarifas y cargos de servicio eléctrico, calidad y los servicios de las compañías del servicio eléctrico.

10. El 25 de mayo de 2021, el Negociado celebró una vista con el propósito de escuchar al público en general en relación con los términos de servicio propuesto.

11. Los representantes de la OIPC reiteraron su oposición a la petición de aprobación de los términos del servicio solicitado por LUMA. En esa misma fecha, el ICSE, radicó un documento titulado *Motion Requesting Extension of Time to File Comments*. En su escrito, el ICSE indicó que el procedimiento requería un análisis complejo, por lo que necesitaba más tiempo para poder someter comentarios responsablemente. Explicaron que se encontraban consultando con expertos en los Estados Unidos con el fin de poder hacer un análisis de las implicaciones legales del asunto.

12. El 27 de mayo de 2021, LUMA presentó un documento titulado *Response in Opposition to ICSE´s Motion Requesting an Extension of Time to File Comments*. Sostuvo que, 1) la prórroga solicitada por ICSE era tardía y no adelantaba una justificación razonable o justa causa para explicar el por qué no presentaron sus comentarios dentro del plazo dispuesto en el calendario procesal establecido en el procedimiento; 2) el NEPR concedió tiempo para que las partes interesadas y el público en general participaran en una vista pública virtual y presentaran sus escritos; y, 3) ICSE no compareció a la vista pública virtual ni presentó comentarios, a pesar de que los documentos sometidos en el procedimiento estuvieron disponible al público en general.

6

13. El 28 de mayo de 2021, mediante Resolución y Orden, el NEPR denegó la Solicitud de Intervención de la OIPC, aunque le permitió someter comentarios por escrito, proveer testimonio en las vistas celebradas sobre la Petición de LUMA, hacerles preguntas a los testigos y tener acceso a documentos confidenciales.

14. Luego de celebradas las vistas públicas, el 31 de mayo de 2021, NEPR emitió una Resolución y Orden sobre el relevo de responsabilidad solicitado por LUMA. **(Véase Apéndice 1 del Recurso de Certificación, págs. 352-391).**

15. En cuanto al relevo de responsabilidad solicitado por LUMA, el NEPR determinó lo siguiente:

### Modified Terms of Service

Effective on June 1st, 2021, the following terms of service shall be incorporated and made part of the Puerto Rico Electric Power Authority Tariff Book approved on May 28, 2019. These terms of service shall modify and complement the terms of service included in the Puerto Rico Electric Power Authority Regulation No. 7982, dated January 14, 2010, known as Reglamento de Términos y Condiciones Generales para el Suministro de Energía Eléctrica ("Regulation 7982"). In the event of any conflict or issue of interpretation between the following terms of service and Regulation 7982, these terms of service shall prevail over Regulation 7982.

### Modified Terms of Service

1. It is recognized that certain components of the Puerto Rico Electric Power Authority's ("PREPA") electric power system (including, the Transmission and Distribution System ("T&D System"), as well as the Generation Facilities) currently do not meet the standards of performance generally accepted in the electric utility industry. The whole system needs significant repairs, improvements, and modernization to achieve acceptable standards of service. Furthermore, certain components of the T&D System and the manner in which the T&D System is operated do not currently meet acceptable standards of performance, including the fact that certain general operating and administrative practices may not comply with acceptable industry standards and practices. Therefore, a period of review, planning, remediation, reconstruction, repair, and replacement will be required to enable LUMA Energy, LLC, LUMA Energy Servco, LLC (together, "LUMA") and PREPA to operate the electric system according to acceptable standards. In light of the foregoing, PREPA and LUMA, with the cooperation of other governmental entities developed a plan, taking into account expected funds availability, particularly from the Federal Emergency Management Agency (FEMA), to remediate, repair, reconstruct, replace and stabilize such equipment, systems, practices and services, as needed, to enable LUMA to perform the operation and maintenance services contracted in compliance with the applicable standards as soon as reasonably possible and at a reasonable cost to PREPA ("System Remediation Plan"). The System Remediation Plan shall be review and approved by the Energy Bureau of the Puerto Rico Public Service Regulatory Board ("Energy Bureau").

7

2. Taking in consideration the circumstances described in the preceding paragraph, and other generally known, PREPA and LUMA shall make all reasonable efforts to provide an efficient and reliable service to its customers and users. A user is a person natural or legal) who receives and uses power and electricity at a certain location and whose consumption is recorded and invoiced in the name of another person.

3. PREPA and LUMA shall make all reasonable efforts to maintain continuity of service, but PREPA and LUMA cannot guarantee an uninterrupted electricity supply to its customers and users.

4. Without liability of any kind to PREPA and/or LUMA, PREPA and/or LUMA shall have the right to disconnect or otherwise curtail, interrupt or reduce service to customers and users: (a) whenever PREPA and/or LUMA reasonably determines it is necessary to facilitate construction, installation, maintenance, repairs, replacement or inspection of any of PREPA's facilities, or to permit the connection or disconnection of other customers; (b) to maintain the safety and reliability of PREPA's electric system (including without limitation, transmission, distribution and generation facilities); or (c) due to any other reason attributable to third parties or related to dangerous or hazardous circumstances, including without limitation, emergencies, forced outages, potential overloading of PREPA's transmission and/or distribution system, sabotage, strikes, unauthorized acts by employees or Force Majeure. Notwithstanding the foregoing, PREPA and/or LUMA shall use reasonable efforts to minimize any scheduled curtailment, interruption, or reduction to the extent reasonably practicable under the circumstances, to provide the customer (and not to the user, because is not a registered customer) with prior notification of any such curtailment, interruption, or reduction to the extent reasonably practicable, and to resume the customer's service connection as promptly as reasonably practicable.

5. **Notwithstanding anything to the contrary in these Modified Terms of Service and Regulation 7982, PREPA, its directors, officers, employees, agents and contractors (including LUMA Energy, LLC, LUMA Energy Servco, LLC, their directors, officers, employees, agents and contractors) (the "Released Parties") shall not be liable contractually or extra-contractually, to customers, or any user receiving power or electricity from PREPA and/or LUMA for any losses arising in any way out of or in connection with the operation of the T&D System and the provision of power and electricity including any events of interrupted, irregular or defective electric service due to Force Majeure events or from pre-existing deteriorated electric system conditions, other causes beyond the control of the Released Parties, unauthorized acts by employees, sabotage, strikes or due to ordinary negligence (excluding gross negligence, willful misconduct or dolo) of the Released Parties or their respective employees, agents or contractors. In any event that the Released Parties are found responsible howsoever and whensoever in connection with the provision of service to customers or users receiving power or electricity from PREPA and/or LUMA, customers or users shall only recover direct damages (including direct physical loss, injury or damage to a customer or customer's property). For the foregoing and without otherwise restricting the generality thereof, "direct physical loss, injury or damage" shall not include any loss of profits or revenues, special, exemplary, punitive, indirect, incidental, or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime,**

8

**business interruption, spoilage of goods, claims of customers of electric customers or other economic harms.**

6. Notwithstanding anything to the contrary contained in these Modified Terms of Service, PREPA and LUMA will remain fully accountable and liable to the Energy Bureau for compliance with the Puerto Rico energy public policy as well as all legal and regulatory requirements applicable to electric service companies, and, particularly to LUMA as operator of the T&D System. Nothing in these Modified Terms of Service shall have the effect of releasing or waiving PREPA and/or LUMA from any penalty, fine or obligation imposed by the Energy Bureau for whatever reason whatsoever. **(Véase Apéndice 1 de la Solicitud de Certificación, págs. 392-394)** (Énfasis Suplido)

16. Así, el NEPR, en su Resolución del 31 de mayo de 2021, lo único que hizo fue dejar fuera los casos de negligencia crasa[5] por parte de LUMA, pero sí otorgó un relevo de responsabilidad, como fue solicitado, frente a reclamaciones de los consumidores por daños causados por actos negligentes, interrupciones del servicio y fluctuaciones en el servicio eléctrico[6].

17. **Cabe señalar que dicha inmunidad fue concedida mediante un proceso administrativo, sin consultar en ningún momento a la Asamblea Legislativa o presentar legislación alguna para eximir a LUMA, un operador privado, de la aplicabilidad del Artículo 1536 del Código Civil,** 31 L.P.R.A. § 10801, y toda la normativa vigente de la responsabilidad civil extracontractual ante estas reclamaciones.

18. Oportunamente, el 9 de junio de 2021, ICSE presentó una Moción de Reconsideración. En este, adujeron razones jurídicas por las que el NEPR debía rechazar de plano tal petición sin aceptar inmunidad alguna de LUMA.

19. El NEPR no se expresó sobre la solicitud de ICSE.

---

[5] Este Honorable Foro adoptó la definición de negligencia crasa establecida en la jurisprudencia norteamericana. Así, la definió como la falta completa de cuidado, o el ejercicio de un grado tan pequeño de diligencia, que justifique la creencia de que hay una completa indiferencia respecto del interés y el bienestar de los demás. Pueblo v. Telmaín Escalera, 45 DPR 447, 453 (1933); Elías, et al., v. Chenet, et al., 147 DPR 507, 521 (1999).

[6] A modo ilustrativo, debemos revisitar el voto concurrente en parte y disidente en parte del Comisionado Asociado Ángel R. Rivera De la Cruz de la Resolución emitida por el NEPR el 31 de mayo de 2021. Allí, el Comisionado esbozó su voto concurrente a denegar la petición de LUMA para eximirlos de responsabilidad, según solicitada, y su voto disidente a incluir un lenguaje alterno. Según su opinión, la normativa que utilizó LUMA para sustentar su petición, específicamente el caso Maryland Casualty Company v. NSTAR Electric Company, 471 Mass. 416 (2015), no era análoga al caso bajo evaluación. Añadió que, en el caso de Maryland, la entidad seguía respondiendo por negligencia tanto a consumidores residenciales como no residenciales. Incluyó que, contrario al caso de Maryland, la petición de LUMA era para que se les eximiera de todo daño como consecuencia de la operación del sistema de transmisión y distribución. El Comisionado adujo que "[t]he Liability Waiver language in LUMA's proposal is much broader than the narrow language challenged in Maryland Casualty Company. LUMA also seeks for such language to apply to all customers rather than a specific class of customers, as was the case in Maryland Casulty Company." El Comisionado expresó que "currently, PREPA does not have any liability protection. As I stated in my concurring opinión of May 4, 2021 in instant case, LUMA's Liability Waiver request represents a substantial shift in the rights of PREPA customers."

9

20. Inconforme, el ICSE acudió ante el Tribunal de Apelaciones mediante recurso de revisión administrativa. El antes mencionado foro, mediante Sentencia dividida emitida el 9 de marzo de 2022, en el caso de <u>In Re: Revisión de los Términos de Servicio de LUMA (Extensión De Responsabilidad)</u>, Caso Núm. KLRA202100406 determinó que ICSE carecía de legitimación activa para presentar el recurso a nombre de los consumidores.

21. No obstante, tal y como se mencionó en la introducción de este escrito, el DACO, en virtud del artículo 6(f) de su ley orgánica, *supra*, **sí tiene la capacidad de llevar pleitos ante los tribunales en protección de los consumidores.**

22. El pasado 27 de mayo de 2025, mediante una Vista Pública ante los miembros de la Comisión de Asuntos del Consumidor de la Cámara de Representantes, LUMA admitió que ha denegado todas las 1,828 reclamaciones que ha recibido por parte de los consumidores por daños a electrodomésticos por fallas en el sistema eléctrico haciéndose valer de la inmunidad otorgada por el NEPR mediante la Resolución del 31 de mayo de 2021.

23. La Secretaria de Asuntos del Consumidor, la Lcda. Valerie Rodríguez Erazo, participó de la antes mencionada vista, adquiriendo conocimiento personal sobre el estado de indefensión de los consumidores ante acciones negligentes de LUMA.

24. Así, el estado regulatorio actual, sin intervención alguna de la Asamblea Legislativa, ha concedido un **relevo de responsabilidad casi absoluto** a LUMA ante reclamaciones en daños por parte de los consumidores causados por las actuaciones de dicha entidad. **Es decir, LUMA, un ente privado, goza de una inmunidad que nunca se le concedió a la Autoridad de Energía Eléctrica siendo ésta una corporación pública.**

25. El 22 de julio de 2025, el DACO presentó la Demanda de epígrafe. **(Véase Apéndice 1 de la Solicitud de Certificación, págs. 001- 441).**

26. Las partes de epígrafe fueron debidamente emplazadas el 23 de julio de 2025. (**Véase Apéndice 3 de la Solicitud de Certificación, págs. 442-451).**

27. El 24 de julio de 2025, el Senado de Puerto Rico y la Cámara de Representantes presentaron una Solicitud de Intervención como *Amicus Curiae.* **(Véase Apéndice 4 de la Solicitud de Certificación, págs. 452-465).**

10

App.463

28. El 30 de julio de 2025, la Cámara de Representantes de Puerto Rico también presentó su "Moción asumiendo Representación en Solicitud de Intervención en calidad de Amigos de la Corte." **(Véase Apéndice 5 de la Solicitud de Certificación, págs.466).**

29. El 6 de agosto de 2025 el Instituto de Competitividad y Sostenibilidad Económica, (ICSE), presentó ante el Tribunal de Primera Instancia una Solicitud de Intervención como *Amicus Curiae*. **(Véase Apéndice 6 de la Solicitud de Certificación, págs. 467- 484).**

30. El 8 de agosto de 2025, el DACO presentó ante este alto foro la Solicitud de Certificación Intrajurisdiccional de epígrafe.

31. El 12 de agosto de 2025, el Tribunal notificó a las partes recurridas que tendrían un término de tres (3) días perentorios para mostrar causa por la cual el tribunal no debería acoger el recurso de certificación intrajurisdiccional y expedir el recurso.

32. El 13 de agosto de 2025, el ICSE presentó ante este honorable foro una Moción en Cumplimiento de Resolución.

33. El 15 de agosto de 2025, el Senado de Puerto Rico y la Cámara de Representantes presentaron ante el TSPR una "Moción en Cumplimiento de Orden y en Solicitud para que el pleno del Tribunal Supremo expida la Certificación presentada por el Departamento de Asunto al Consumidor."

34. El 15 de agosto de 2025, la AEE presentó al TSPR "Moción en cumplimiento de Orden de Mostrar Causa" solicitando que se acoja y se expida el recurso presentado por el DACO.

35. El 15 de agosto de 2025, LUMA radicó ante el TSPR "Oposición a Recurso de Certificación Intrajurisdiccional de Luma Energy, LLC y Luma Energy Servco, LLC."

36. El 15 de agosto de 2025, el NEPR radicó ante el TSPR "Moción en Cumplimiento de Orden."

37. El 22 de agosto de 2025, esta Honorable Curia expidió el auto de certificación y concedió a la parte peticionaria quince (15) días improrrogables para presentar los correspondientes alegatos y a las partes recurridas quince (15) días improrrogables para presentar sus alegatos a partir de la presentación del alegato de la parte peticionaria.

11

## V.    DERECHO APLICABLE Y ARGUMENTACIÓN

En el marco de una sentencia declaratoria, la Regla 59.1 de Procedimiento Civil, 32 L.P.R.A. Ap. V, R. 59.1, faculta al tribunal a declarar derechos, estados u otras relaciones jurídicas aun cuando exista, o pueda existir, otro remedio, pudiendo incluso darle trámite preferente. A su vez, la Regla 59.2(a) reconoce legitimación a toda persona cuyos derechos o relaciones jurídicas se vean afectados por un estatuto, ordenanza, contrato o franquicia para solicitar que se declare su interpretación o validez y los derechos que de ello se deriven, mientras que la Regla 59.2(c) aclara que ese catálogo no limita las facultades generales siempre que la sentencia ponga fin a la controversia o despeje una incertidumbre, 32 L.P.R.A. Ap. V, R. 59.3. Precisamente por ello el DACO radicó el 22 de julio de 2025 su demanda de sentencia declaratoria ante el Tribunal de Primera Instancia, porque lo que aquí se cuestiona es una controversia real y sustancial: la validez de una inmunidad administrativa que afecta derechos sustantivos de los consumidores, cuya adjudicación tiene un efecto práctico inmediato sobre la vigencia de esos derechos. En este cauce, no se exige probar daños cuantificables ni pérdidas individualizadas; basta con acreditar que la resolución del tribunal eliminará la incertidumbre jurídica y garantizará el acceso de los consumidores a la tutela efectiva que la ley les reconoce.

### A.  La Legitimación Activa del DACO

#### 1. El DACO tiene legitimación activa estatutaria para entablar el presente recurso en protección de los consumidores

Este Honorable Tribunal debe tener presente, desde el umbral de este análisis, que el pleito que nos ocupa no constituye una pugna entre agencias administrativas ni una controversia meramente contractual con una empresa privada. El DACO comparece aquí en calidad de representante institucional de los consumidores de Puerto Rico, cuya protección es su mandato primordial y razón de ser. Así lo dispuso la Asamblea Legislativa al crear al DACO mediante la Ley Núm. 5 de 23 de abril de 1973, según enmendada, con el fin expreso de vindicar y hacer efectivos los derechos de los consumidores en todos los foros necesarios (3 L.P.R.A. § 341b).

Según se conoce, la legitimación activa o *standing* implica la capacidad para presentarse ante los tribunales. En Puerto Rico, si no hay una legislación expresamente autorizando una entidad a litigar, el demandante debe demostrar: (1)

12

Un daño claro, palpable, real, inmediato y preciso (no abstracto); (2) Un vínculo directo entre dicho daño y la acción judicial; y (3) que la causa de acción surge del marco constitucional o legal. *Véase*, Muns. Aguada y Aguadilla v. JCA, 190 DPR 122 (2014); Fund. Surfrider v. ARPe, 178 DPR 563, 572 (2010); Romero Barceló v. E.L.A., 169 DPR 460, 470-71 (2006); Col. Peritos Elec. v. A.E.E., 150 DPR 327, 331-332 (2000); García Oyola v. J.C.A., 142 DPR 532 (1997); Hernández Torres v. Hernández Colón, 131 DPR 593, 599 (1992).

Sin embargo, cuando una ley expresamente otorga legitimación activa (legitimación estatutaria), no es necesario demostrar daño individual. "La figura de legitimación estatutaria no es ajena a nuestro ordenamiento. Por el contrario, ha sido parte de nuestra normativa desde el 1974". J. Farinacci Fernós, Cualquier persona: la facultad plenaria de la Asamblea Legislativa para otorgar legitimación activa por la vía estatutaria, Rev. Jur. UPR, Vol. 84, Núm. 2, pág. 367 (2015). "En Hernández Torres Hernández Colón, [129 DPR 824, 835 (1992)], el Tribunal Supremo de Puerto Rico comenzó a distinguir entre legitimación activa ordinaria, a la que sí le aplicó el análisis de daño claro y palpable, causalidad y remedio, y la legitimación activa estatutaria a la que no le aplica este tipo de análisis, creando así lo que se le conoce como una norma binaria". J. Farinacci Fernós, *supra*, pág. 370. "Esta visión fue finalmente consolidada en Centro Unido de Detallistas v. Com. de Serv. Púb., [174 DPR 174 (2008)]".

En Centro Unido de Detallistas v. Comisión de Servicio Público, *supra*, el Tribunal Supremo reiteró que la legitimación estatutaria no requiere el cumplimiento con los criterios ordinarios de daño claro y palpable, causalidad y remedio. La Asamblea Legislativa puede, y ha hecho en este caso, crear un interés legal que faculte a una agencia como el DACO a comparecer judicialmente sin necesidad de acreditar daño personal directo. Véase también Hernández Torres v. Hernández Colón, 129 DPR 824, 835 (1992).

Asimismo, este Honorable Tribunal ha establecido que, en el caso de las agencias administrativas, su jurisdicción y facultades se determinan a la luz de lo dispuesto en su ley habilitadora y de aquellos poderes que son indispensables para ejecutar eficazmente las funciones que les han sido conferidas. Véase Depto. Justicia et al v. Jiménez, 199 D.P.R. 293, 309 (2017). En dicho caso se puntualizó que "para determinar si una agencia administrativa tiene jurisdicción sobre determinada

13

controversia, hay que analizar los poderes que surgen de su ley habilitadora y los que son indispensables para llevar a cabo las facultades y funciones que le han sido conferidas". Esa norma es reveladora y sirve como punto de partida obligado en la controversia que hoy nos ocupa.

DACO es una agencia gubernamental del Gobierno de Puerto Rico, creada por virtud de la Ley Núm. 5 de 23 de abril de 1973, según enmendada, conocida como la *Ley Orgánica del Departamento de Asuntos del Consumidor,* 3 L.P.R.A. § 341 et seq. La agencia cuenta con el mandato expreso de proteger los derechos de los consumidores en Puerto Rico, siendo su propósito primordial vindicar e implantar tales derechos como parte esencial de la política pública del Estado. Esa encomienda no es genérica, sino que encuentra expresión concreta en el Artículo 6 de la Ley Orgánica, donde la Asamblea Legislativa confirió a este Departamento facultades de representación institucional particularmente amplias (3 L.P.R.A. §341e).

El inciso (e) del Artículo 6 dispone que el DACO podrá: "representar al público consumidor ante cualquier **entidad privada u organismo público** en cualquier asunto que **afecta o pueda afectar** los intereses del consumidor". Asimismo, el inciso (f) establece que el DACO podrá: "comparecer por y en representación de los consumidores ante cualquier tribunal, junta o comisión, organismo administrativo, departamento, oficina o agencia del Gobierno de Puerto Rico o de los Estados Unidos en cualquier vista, procedimiento, asunto **que afecte o pueda afectar** los intereses del consumidor en general…" (3 L.P.R.A. §341e). Esta doble autorización legislativa no es redundante, sino enfática: la Asamblea Legislativa quiso recalcar, de manera inequívoca, que el DACO está investido con un poder transversal y amplio para defender al consumidor tanto en foros administrativos como judiciales, tanto frente a organismos públicos como ante entidades privadas, y tanto frente a daños presentes como ante situaciones que, de manera razonable, puedan afectar en el futuro a los consumidores. La intención legislativa fue clara: facultar al DACO a ser el representante institucional del consumidor en cualquier escenario donde sus intereses estén en riesgo, garantizando así que la defensa de la ciudadanía no quede supeditada

14

a la acción individual de cada consumidor ni limitada a la ocurrencia de un daño consumado[7].

Además, conforme al Artículo 6, inciso (i), de la Ley Núm. 5 de 23 de abril de 1973, supra, el DACO está expresamente facultado para *"interponer cualesquiera remedios legales que fueren necesarios para hacer efectivos los propósitos de esta ley y para hacer cumplir las reglas, reglamentos, órdenes, resoluciones y determinaciones del Departamento"*. (3 L.P.R.A. §341e; Énfasis Suplido) Este mandato complementa y refuerza los incisos (e) y (f), ya citados, al dotar al DACO de un poder integral no solo para comparecer en representación de los consumidores, sino también para desplegar todo el andamiaje legal disponible con el fin de vindicar sus derechos frente a prácticas abusivas, engañosas o desleales, asegurando además que las determinaciones del Departamento tengan eficacia real. En otras palabras, la Asamblea Legislativa le confirió al DACO la potestad de accionar en los tribunales con el mismo vigor con que actúa en sede administrativa, precisamente para que los derechos de los consumidores no quedaran desprovistos de remedio.

La amplitud de estas disposiciones cobra particular relevancia en el presente contexto. Existen consumidores que ya han sufrido daños, y muchos otros que, de no intervenir el DACO, podrían razonablemente verse afectados en el futuro sin contar con un marco efectivo para reclamar por sí mismos. Precisamente para atender escenarios de este tipo, el legislador dotó al DACO de legitimación estatutaria amplia, de modo que la defensa de los consumidores no dependa únicamente de litigios individuales dispersos, sino que pueda articularse mediante una representación institucional robusta, capaz de garantizar a la ciudadanía acceso a un remedio colectivo, uniforme y eficaz.

Esta visión encuentra apoyo en la jurisprudencia de este Honorable Tribunal, que ha reconocido que la legitimación estatutaria confiere a las agencias públicas la

---

[7] Contrario a lo alegado por LUMA, existen precedentes en los que este Honorable Tribunal ha permitido que el DACO comparezca en representación institucional de los consumidores en general. Así ocurrió en <u>Pierluisi Rojo v. MAPFRE</u> et als. (SJ2018CV07570), donde el Secretario del DACO presentó un pleito de clase en contra de varias compañías aseguradoras de Puerto Rico, "por sí y en representación de los consumidores de bienes o servicios afectados por el huracán María", invocando expresamente la facultad conferida por el Art. 6(f) de la Ley Núm. 5 de 1973, 3 L.P.R.A. § 341e(f). Ese caso confirma que el alcance de la legitimación estatutaria del DACO no se limita a querellas individuales o de grupos específicos de consumidores, sino que incluye la defensa de la categoría general de consumidores cuando prácticas comerciales o contractuales afectan, o puedan afectar, sus derechos colectivos. De este modo, se evidencia que el DACO ya ha ejercido esa función representativa en contextos de gran impacto público, como lo hace en el caso de autos, lo cual desvirtúa el planteamiento de LUMA.

15

capacidad de comparecer sin necesidad de demostrar daño personal directo cuando su reclamo se vincula a la protección de un interés colectivo o institucional. Véanse Hernández Torres v. Hernández Colón, 129 D.P.R. 824, 835 (1992); Centro Unido de Detallistas v. Comisión de Servicio Público, 174 D.P.R. 174, 184 (2008). Más aún, este Tribunal ha reconocido expresamente que agencias como el DACO tienen legitimación activa para actuar en representación del interés público, sin necesidad de demostrar un daño directo, en la medida en que su reclamo esté vinculado al cumplimiento de su deber ministerial y de política pública. Véase Salas Soler v. Secretario de Agricultura, 102 D.P.R. 716 (1974). Así, el reclamo del DACO en este caso no constituye una extralimitación, sino el ejercicio legítimo de la función de representación institucional para la cual fue creado por mandato legislativo.

A tenor con lo anterior, DACO cuenta con legitimación activa para presentar la presente acción judicial en defensa de los consumidores, sin necesidad de demostrar daños individuales propios, precisamente porque la Asamblea Legislativa lo autorizó a actuar en nombre del interés público. La situación de autos, en la cual una resolución administrativa emitida por el Negociado priva a los consumidores de todo remedio, incluso frente una empresa privada por hasta su propia negligencia ordinaria, ejemplifica la razón de ser de esa legitimación especial: garantizar que la ciudadanía cuente con una institución capaz de defender sus derechos adquiridos frente a prácticas que los menoscaben o eliminen.

2. La creación de la OIPC no limita ni elimina la legitimación del DACO para entablar acciones judiciales en protección de los consumidores

En sus escritos ante este Honorable Foro los recurridos han planteado que la única entidad con legitimación en este caso es la Oficina Independiente de Protección al Consumidor (OIPC), creada mediante los Artículos 6.41 y 6.42 de la Ley Núm. 57-2014, supra, 22 L.P.R.A. §§ 1054nn, 1054qq. Dicho argumento es improcedente en derecho. El propio texto del Art. 6.42, titulado "Poderes y deberes de la Oficina Independiente de Protección al Consumidor", deja claro que las competencias de la OIPC son estrictamente sectoriales y circunscritas al ámbito de los negociados que integran la Junta Reglamentadora de Servicio Público. Entre sus facultades, el inciso (d) le permite "representar a los clientes y llevar querellas y recursos ante el Negociado de Energía de Puerto Rico, el Negociado de Telecomunicaciones de Puerto Rico y el

16

App.469

Negociado de Transporte y otros Servicios Públicos de Puerto Rico, a nombre y en representación de clientes". Los demás incisos reiteran su función de intervenir en asuntos vinculados a *tarifas, facturación, calidad de servicio* y otros aspectos técnicos de los servicios regulados, e incluso su comparecencia como parte ante los tribunales se limita a esos temas tarifarios o regulatorios. <u>En ningún momento la Ley 57-2014, *supra,* le confirió jurisdicción primaria ni exclusiva</u>, ni la facultó para representar a los consumidores en controversias de mayor alcance que, como en el presente caso, involucran la validez de determinaciones administrativas que menoscaban derechos sustantivos reconocidos por el Código Civil.

Es decir, la OIPC fue concebida como la voz de los clientes dentro de los procesos tarifarios y regulatorios de esos tres negociados específicos. En ningún momento la Ley 57-2014*, supra,* le confirió jurisdicción primaria ni exclusiva para representar a los consumidores en controversias que trasciendan el marco de tarifas o los asuntos técnicos de dichos servicios públicos. La controversia aquí planteada no es una disputa tarifaria ni de calidad de servicio, sino un planteamiento de estricto derecho: si el Negociado de Energía podía, sin delegación legislativa expresa, conceder un relevo que priva a los consumidores de la protección ordinaria del régimen de responsabilidad civil del Código Civil.

Conviene subrayar, además, que la propia Ley Núm. 57-2014, *supra*, distingue expresamente cuándo quiere conferir jurisdicción primaria y exclusiva a un organismo. Así, el Artículo 6.4 establece que "el NEPR tendrá jurisdicción primaria y exclusiva" sobre la aprobación de tarifas y cargos, la revisión de facturación de las compañías de energía, los casos de incumplimiento con la política pública energética y otras controversias relacionadas con el sistema eléctrico. En otras palabras, cuando el legislador quiso reservar una materia a un ente regulador, lo hizo con toda claridad (22 L.P.R.A. § 1054c). Sin embargo, <u>en el caso de la OIPC, creada bajo la misma ley en los subsiguientes artículos 6.41 y 6.42, nunca se utilizó ese lenguaje ni se le otorgó jurisdicción primaria ni exclusiva sobre controversia alguna</u> (22 L.P.R.A. §§ 1054nn, 1054qq). Esa diferencia legislativa es reveladora porque demuestra que la intención nunca fue desplazar a otras agencias, como el DACO, ni conferirle a la OIPC un rol que excediera su función sectorial y auxiliar dentro de los procesos tarifarios de los negociados.

17

La diferencia estructural y funcional es innegable. A la OIPC se le asigna un presupuesto anual ínfimo de apenas $1.2 millones de dólares, que proviene precisamente de los mismos negociados a los cuales está adscrita y sobre los cuales se supone que actúe como representante de los clientes (Artículo 6.43; 22 L.P.R.A. § 1054rr). Esa dependencia presupuestaria revela que la intención legislativa nunca fue dotar a la OIPC de la fuerza institucional para enfrentar asuntos de trascendencia constitucional o estructural, como el que nos ocupa. Su creación respondió a la necesidad de canalizar quejas sobre tarifas y facturación, no a la de confrontar cláusulas de inmunidad que afectan derechos sustantivos de los consumidores en su calidad de ciudadanos.

En contraste, el DACO goza de un mandato legislativo amplio y autónomo, expresado en el Art. 6, incisos (e) y (f) de su Ley Orgánica, que lo faculta a "representar al público consumidor ante cualquier entidad privada u organismo público en cualquier asunto que afecte o pueda afectar los intereses del consumidor" y a "comparecer por y en representación de los consumidores ante cualquier tribunal, junta o comisión… en cualquier vista, procedimiento o asunto que afecte o pueda afectar los intereses del consumidor en general". Esta facultad no está limitada exclusivamente a un tipo de consumidor o servicio, ya que el DACO puede interponer los recursos legales necesarios para hacer cumplir sus determinaciones y proteger los derechos de los consumidores 3 L.P.R.A. § 341j;341e; Ortiz Matías v. Mora Dev. Corp., 187 DPR 649 (2013). Esta amplitud es la que garantiza que el DACO pueda actuar cuando lo que se debate es, como aquí, la validez misma de una disposición administrativa que suprime un derecho básico de los consumidores: el acceso a un remedio efectivo por daños.

Ahora bien, es meritorio señalar que tanto la OIPC como el DACO pueden coincidir en la defensa de los consumidores en determinadas materias. Nuestro ordenamiento ha reconocido que diferentes agencias pueden compartir competencias y coordinar esfuerzos según la naturaleza del asunto. Así ocurre, por ejemplo, con la industria farmacéutica, donde el DACO regula aspectos comerciales y de protección al consumidor, mientras que el Departamento de Salud atiende los aspectos técnicos de seguridad y salubridad. Del mismo modo, la OIPC puede actuar como voz sectorial en los procesos tarifarios de los negociados, y el DACO puede ejercer su mandato general y transversal de protección al consumidor.

18

Esta posibilidad de coexistencia se ha validado en la práctica mediante esquemas de coordinación interagencial. En <u>DACO v. Farmacia San Martín Barceloneta, Inc.</u>, 175 DPR 198 (2009), el DACO refirió un asunto al Departamento de Salud mientras continuaba con sus propios procesos de cumplimiento, demostrando que no existe incompatibilidad entre agencias cuando sus competencias se solapan. Además, la Ley Orgánica del DACO autoriza expresamente al Departamento a representar consumidores individuales, grupos de consumidores o al propio organismo en procedimientos ante otras agencias o tribunales, 3 L.P.R.A. § 341j, lo cual refuerza su capacidad para actuar simultáneamente con el OIPC cuando ello sea necesario para proteger de manera integral los intereses de la ciudadanía.

No obstante, al analizar el asunto concreto que hoy se presenta, la diferencia resulta determinante. La OIPC carece de facultades para atender controversias de naturaleza constitucional, como lo es impugnar la validez de una cláusula contractual que priva a los consumidores de remedios reconocidos por el Código Civil. Su rol está limitado a intervenir en tarifas, facturación y calidad de servicio de los negociados a los cuales se encuentra adscrita. Incluso su presupuesto anual, asignado directamente por esos mismos negociados y de apenas $1.2 millones, revela que el legislador nunca la concibió como el foro con el peritaje ni la fuerza institucional para liderar pleitos de este alcance.

En consecuencia, aunque ambas agencias pueden coexistir y en ciertos escenarios colaborar, la realidad es que el pleito de autos no se trata de una controversia tarifaria, sino de la impugnación de un acto administrativo con repercusiones constitucionales que afecta derechos sustantivos de los consumidores. Frente a esa realidad, la agencia adecuada para encabezar esta reclamación es el DACO. El propio diseño institucional de la OIPC, adscrita y financiada por los negociados a los que debe fiscalizar, genera un conflicto estructural que limita su independencia. Por el contrario, el DACO fue dotado por el legislador de legitimación estatutaria amplia, autonomía y mandato expreso para proteger a los consumidores en todos los foros. Reconocer su legitimación activa en este caso asegura la vigencia de la política pública de protección al consumidor y confirma el rol ministerial indispensable del DACO en defensa del interés público.

**B.  No hay ausencia de parte indispensable en el pleito de epígrafe**

19

En el presente pleito ya se encuentran compareciendo todas las partes verdaderamente indispensables para la adjudicación de la controversia. El Negociado de Energía, por ser la entidad que otorgó el relevo de responsabilidad; LUMA, como beneficiaria directa de esa inmunidad; y la Autoridad de Energía Eléctrica (AEE), como titular del sistema eléctrico, todos han sido debidamente incluidos. De este modo, el Tribunal cuenta con la comparecencia de todos los sujetos cuya presencia es necesaria para conceder un remedio completo y justo en este caso.

En cuanto a la alegación de falta de parte indispensable traída por la parte Recurrida en su oposición al Recurso de Certificación debe quedar meridianamente claro que la Autoridad para las Alianzas Público-Privadas (AAPP) no lo es. Si bien la AAPP fue firmante del *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (Operating Agreement), la Sección 4.1(g) de dicho acuerdo únicamente establecía la obligación de solicitar al Negociado de Energía un relevo de responsabilidad. **Véase Apéndice 1 de la Solicitud de Certificación**. Esa cláusula, por sí sola, no confería inmunidad alguna. Fue el Negociado de Energía, en ejercicio de su jurisdicción primaria y exclusiva sobre tarifas y términos de servicio, quien, mediante su Resolución del 31 de mayo de 2021, acogió esa petición, redactó la disposición y le otorgó fuerza normativa. En ese proceso, la AAPP no podía obligar al Negociado a conceder la inmunidad, ni tampoco tenía facultad para controlar su alcance o contenido. El acto decisional recayó en el Negociado, la beneficiaria directa es LUMA, y la AEE comparece como dueña del sistema eléctrico. En ese contexto, la AAPP podría considerarse una parte interesada, pero nunca indispensable.

El DACO no pretende impugnar la validez del contrato suscrito entre la AEE, la AAPP y LUMA, ni busca modificar las obligaciones contractuales que de él emanan. La controversia planteada se dirige exclusivamente contra la actuación del Negociado de Energía al emitir una resolución administrativa que otorgó a LUMA una inmunidad incompatible con la Constitución y con la doctrina de responsabilidad civil recogida en el Código Civil. Así, la cuestión planteada se resuelve a nivel de derecho público y no requiere adjudicar obligaciones contractuales donde la AAPP tendría que ser parte.

La jurisprudencia de este Honorable Tribunal es clara: no toda parte con interés es indispensable. Existe una distinción fundamental entre aquellas partes interesadas que pueden, si lo desean, intervenir en un pleito, y aquellas cuya ausencia impide la

20

adjudicación válida de la controversia. Véanse <u>Deliz v. Igartúa</u>, 158 D.P.R. 403, 435 (2003); <u>Cepeda Torres v. García Ortiz</u>, 132 D.P.R. 698, 703-704 (1993). Más aún, en <u>Hernández Agosto v. López Nieves</u>, 114 D.P.R. 601 (1983), este Tribunal enfatizó que el análisis de indispensabilidad no es rígido, sino pragmático, y debe girar en torno a si el tribunal puede conceder un remedio justo y completo con las partes ya presentes. En <u>Deliz v. Igartúa</u>, *supra*, se recalcó que solo es indispensable la parte cuya ausencia impida la concesión de un remedio adecuado. Y en <u>Hernández Agosto v. López Nieves</u>, *supra,* se resolvió que el mero interés económico en el resultado de un pleito no basta para convertir a alguien en parte indispensable.

En otras palabras, la AAPP puede tener un interés periférico como parte contratante del *Operating Agreement*, pero no es indispensable para que este Tribunal pueda adjudicar si el Negociado tenía o no autoridad legal para conceder la inmunidad aquí recurrida. El remedio solicitado, la nulidad de la cláusula de relevo aprobada por resolución administrativa del Negociado, puede concederse de manera completa y justa con las partes que ya están ante el Tribunal. La ausencia de la AAPP no impide la adjudicación válida de la controversia ni vicia el remedio solicitado.

### C. El Negociado de Energía actuó de forma *ultra vires* al conceder una inmunidad casi absoluta a LUMA, violentando así la doctrina de separación de poderes

#### 1. El NEPR actuó sin delegación legislativa a la conceder la inmunidad a LUMA lo que está reñido con la doctrina de separación de poderes

Tanto el argumento de LUMA como el del NEPR, en el sentido de que la limitación de responsabilidad a favor de un operador privado constituye un componente básico y legítimo de la tarifa eléctrica, es errado. La inmunidad concedida por el Negociado constituye una actuación *ultra vires*, incompatible con la doctrina de separación de poderes consagrada en nuestra Constitución. Veamos.

El Art. 6.3 de la Ley Núm. 57-2014, 22 L.P.R.A. § 1054b, impone al Negociado de Energía un deber afirmativo de proteger a los clientes y garantizar un servicio seguro, confiable, no discriminatorio y con tarifas justas y razonables. Los incisos (c), (d), (e) y (ff) imponen deberes específicos: velar por la razonabilidad de las tarifas y la seguridad del sistema; fiscalizar la calidad y confiabilidad del servicio; garantizar el acceso universal y la no discriminación; y adoptar políticas de servicio al cliente que aseguren los derechos de todo abonado. A su vez, el inciso (rr) establece un canon

21

rector inequívoco: "**Todas las acciones, reglamentaciones y determinaciones del NEPR se guiarán por las leyes aplicables, por el interés público y por el interés de proteger los derechos de los clientes o consumidores**." (22 L.P.R.A. § 1054b). Énfasis Suplido.

Este mandato no es decorativo: constituye el parámetro de validez de toda actuación del Negociado. De su tenor se desprenden tres exigencias acumulativas: (i) conformidad con las leyes aplicables (incluido el Código Civil y su régimen de responsabilidad extracontractual), (ii) alineación con el interés público, y (iii) orientación a proteger los derechos de los clientes. Ahora bien, es menester preguntarnos: ¿delegó el legislador en el NEPR la facultad de eximir a un operador privado de la responsabilidad civil, contractual o extracontractual, frente a reclamaciones de los consumidores por actos de negligencia?

Para atender esta interrogante, es necesario repasar la doctrina del daño a nivel contractual y extracontractual. El ámbito de la relación de LUMA con el consumidor, las reclamaciones en concepto de daños opera de forma dual, a nivel contractual debido al contrato de servicio eléctrico suscrito entre el ciudadano y la entidad administradora y a nivel extracontractual por aquellas acciones que están al margen de la relación *ex contractu* entre las partes.

Nuestro Código Civil reconoce dos categorías de actos perjudiciales que dan lugar a distintos tipos de responsabilidad, la contractual y la extracontractual. La primera de estas emana del "quebrantamiento de un deber que surge de un contrato expreso o implícito". Soc. de Gananciales v. Vélez & Asoc., 145 DPR 508, 521 (1998).

Sobre lo mismo, para "que opere la responsabilidad contractual… no basta que haya un contrato entre las partes, sino que se requiere la realización de un hecho dentro de la rigurosa órbita de lo pactado y como desarrollo del contenido negociado". Maderas Tratadas v. Sun Alliance, 185 DPR 880 (2012). Por lo tanto, "las acciones derivadas de contratos tienen por objeto que se cumplan las promesas contractuales sobre las que las partes de un contrato otorgaron su consentimiento". Santiago Nieves v. ACAA, 119 DPR 711, 716 (1987).

Por otra parte, la responsabilidad extracontractual atiende "el resarcimiento de los daños ocurridos como consecuencia del quebrantamiento del principio general de convivencia social que supone no causar daño a los demás". Rivera Sanfeliz et al.

22

v. Jta. Dir. FirstBank 193 DPR 38, 57 (2015).

En materia extracontractual, el legislador estableció, en el artículo 1536 del Código Civil de 2020, el derecho a presentar una causa de acción por los daños y perjuicios ocasionados por actuaciones y omisiones negligentes. Dicho derecho también se encontraba establecido en el artículo 1802 del Código Civil de 1930. Así, el resarcimiento por daños está regulado en el derecho puertorriqueño. Las antes mencionadas disposiciones son normas sustantivas de rango legal que encarna el principio fundamental de la responsabilidad civil extracontractual en nuestro sistema civilista. Como tal, no puede ser suspendida, alterada o derogada por resolución administrativa, salvo delegación legislativa expresa. La jurisprudencia de este Tribunal ha reiterado que cuando una agencia actúa sin autorización normativa específica, sus determinaciones son *ultra vires* y nulas. Véase Perfect Cleaning Services v. Corporación del Centro Cardiovascular de PR y el Caribe, 162 D.P.R. 745 (2004); Rivera Segarra v. Rivera Lassen, 214 D.P.R. 111 (2024); Colegio de Médico-Cirujanos de PR v. Academia de Medicina de la Familia, 201 D.P.R. 362 (2018); Ayala Hernández v. Bosque Sereno, 190 D.P.R 547 (2014); ECP Inc. vs. Oficina del Comisionado de Seguros, 205 D.P.R. 268 (2020). Entonces, ¿puede un organismo otorgar una inmunidad que burla preceptos legales básicos de derecho sin la autorización expresa de la Asamblea Legislativa? La respuesta es a la negativa debido a la doctrina de separación de poderes.

La doctrina de separación de poderes se encuentra expresamente consagrado en nuestra Constitución. Art. 1, Sec. 2, Const. PR, LPRA, Tomo 1. "Este principio aspira a establecer las responsabilidades y enmarca el ámbito de acción de las ramas constitucionales de gobierno". Senado v. Tribunal Supremo y otros, 208 DPR 115, 135-136 (2021). De igual forma, busca, "asegurar que ninguna de las tres ramas domine o interfiera indebidamente con la otra". Id., citando a Rodríguez Casillas et al. v. Colegio, 202 DPR 428, 450-451 (2019). "El éxito de nuestro sistema de balance de poderes depende de que cada una de las ramas acepte y respete la autoridad de las otras y entienda la interrelación de sus funciones". Senado v. Tribunal Supremo y otros, *supra*, citando a Silva v. Hernández Agosto, 118 DPR 45, 57 (1986). Este principio de división de poderes garantiza la independencia de cada rama. Díaz Carrasquillo v. García Padilla, 191 DPR 97, 110 (2014). Se trata de un sistema de pesos y contrapesos que

23

evita que las actuaciones de una rama causen detrimento a otra. Díaz Carrasquillo v. García Padilla, *supra*.

Esta Curia ha determinado que al resolver una controversia que requiere un pronunciamiento sobre la aplicabilidad de la doctrina de separación de poderes, se debe analizar si "en la operación real del sistema y en un contexto histórico determinado el poder delegado tiende a desembocar en una concentración de poder indebida en una de las ramas o en una disminución indeseable de la independencia que sea incompatible con el ordenamiento político de la Constitución". (Negrilla omitida). Senado v. Tribunal Supremo y otros, supra, pág. 136 citando a Nogueras v. Hernández Colón, 127 DPR 405, 426 (1990).

Este Honorable Tribunal ha expresado, sobre la importancia y trascendencia de la doctrina de separación de poderes, que:

> [E]s incuestionable que la Doctrina de Separación de Poderes es parte esencial del sistema de gobierno que hemos adoptado como comunidad política. Como Tribunal de última instancia, no podemos ceder a la tentación de obviar ese sagrado principio, o utilizarlo a la ligera como un estribillo jurídico. Debemos ser siempre conscientes de las delicadas fronteras constitucionales que existen entre las tres (3) ramas del gobierno. Es nuestra obligación velar por el rol de la Rama Judicial en aras de evitar trastocar los principios de la separación de poderes y echar al suelo el entendimiento básico de quienes concibieron a esta rama como la menos peligrosa de las tres (3). Debemos ser conscientes que, al igual que las ramas hermanas, la Rama Judicial no está exenta de violaciones a los principios de separación de poderes. Después de todo, la desconfianza en la naturaleza humana que yace en los cimientos de la Doctrina de Separación de Poderes también debe ser de aplicación a esta Rama. (Citas y Énfasis Suprimidos). Véase, AAR, Ex parte, 187 DPR 835, 855 (2013).

Es decir, en el Poder Legislativo recae la entera facultad de aprobar, enmendar o derogar leyes. Art. III, Sec. 1, Const. PR. Véase, Gobierno Ponce v. Caraballo, 166 D.P.R. 723 (2006). Entre otras facultades de particular pertinencia al caso de autos, la Sec. 16 del Art. III de la Constitución de Puerto Rico, *supra,* le otorga al Poder Legislativo "la facultad para crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones". Además, la Constitución dispone que "[e]l procedimiento para otorgar franquicias, derechos, privilegios y concesiones de carácter público será determinado por ley...". Sec. 13 del Art VI de la Const. PR, *supra.* Así, es un precepto constitucional claramente establecido que es la Asamblea Legislativa la rama constitucional facultada

para crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones. <u>Esa facultad solo le compete a la Asamblea Legislativa.</u>

De igual forma, constitucionalmente está establecido que toda franquicia o concesiones de carácter público será determinado por ley. Por lo tanto, la rama constitucional que le compete establecer los contornos para que el ejecutivo pueda otorgar franquicias o concesiones es la Asamblea Legislativa.

En atención a estas encomiendas constitucionales, la Asamblea Legislativa aprobó la Ley Núm. 83 de 2 de mayo de 1941, mediante la cual estableció la Autoridad de Energía Eléctrica, una corporación pública e instrumentalidad gubernamental autónoma del Gobierno de Puerto Rico con el propósito de administrar el sistema eléctrico en nuestra jurisdicción.

La Asamblea Legislativa ejerció nuevamente su facultad constitucional y mediante la aprobación de la Ley 120-2018, 22 L.P.R.A. § 1111, estableció el marco legal para que la Rama Ejecutiva pudiese otorgar concesiones de carácter público al privatizar la administración y los activos de la AEE.

En el ejercicio de su facultad constitucional, la Asamblea Legislativa expresó, respecto a la AEE que "[s]u creación, existencia, facultades, deberes y actividades como negocio público son delegaciones por vía legislativa. Sus activos y franquicias son propiedades del Pueblo de Puerto Rico, su Gobierno y administrados por esa corporación pública, <u>precisamente, por delegación de la Asamblea Legislativa</u>". Sec. 3 de la Ley 120-2018, 22 L.P.R.A. § 1113. (Énfasis suplido.)

La ley habilitadora del NEPR, la Ley 57-2014, según enmendada, denominada "Ley de Transformación y Alivio Energético", establece los poderes y deberes de dicho ente regulador. Según su Artículo 6.3, 22 L.P.R.A. § 1054b, el NEPR tiene la responsabilidad de revisar, aprobar y supervisar los acuerdos operacionales, tarifas y reglamentos aplicables al sistema eléctrico. Sin embargo, **la ley no le otorga al NEPR la autoridad para conferir inmunidad a entidades privadas,** ni para restringir derechos adquiridos de terceros, como los consumidores. Su función regulatoria está limitada a asegurar el cumplimiento con la política pública energética y proteger los intereses del pueblo de Puerto Rico mediante la fiscalización de la operación del sistema eléctrico, no en conceder inmunidad a entes privados.

25

Amplias decisiones judiciales han validado la delegación de poderes de la Asamblea Legislativa al Ejecutivo o a una entidad ejecutiva, aunque no de forma absoluta. Véase, <u>Dalmau Ramírez v. ELA</u>, 2024 TSPR 95 (2024). Así, esta Honorable Curia ha validado tales delegaciones, siempre y cuando la ley "establezca normas adecuadas, pautas, estándares, criterios, o principios inteligibles o aquellas garantías o salvaguardas procesales y sustantivas que sirvan de guía a la delegación y que delimiten sus facultades, para evitar que las actuaciones de los entes administrativos resulten arbitrarias o caprichosas". <u>Domínguez Castro et al. v. ELA I</u>, 178 DPR 1, 93 (2010). Véase también <u>Sánchez et al. v. Depto. Vivienda et al.</u>, 184 DPR 95, 122 (2011). Véase además, E. Chemerinsky, <u>Constitutional Law: principles and policies, 5th ed., New York, Wolters Kluwer, 2015</u>, págs. 343-345; L. Fisher y K.J. Harriger, <u>American Constitutional Law, 10th ed.</u>, North Carolina, Carolina Academic Press, 2013, Vol. I, pág. 207.

La Asamblea Legislativa cuenta con otros métodos para mantener el control sobre las delegaciones concedidas a otra rama. Sobre lo anterior, resume el profesor Farinacci Fernós que:

> "Para que una delegación sea constitucionalmente válida, esta debe cumplir con ciertas exigencias. Entre estas podemos identificar: (1) que se trate de un poder delegable, (2) que, en efecto, se haya llevado a cabo la delegación, (3) que se acompañen suficientes principios inteligibles para guiar el ejercicio del poder cuasi-legislativo delegado, (4) que la entidad a la que se le otorga el poder actúe dentro de los límites establecidos por la ley, y (5) que el ejercicio de dicho poder no sea arbitrario o caprichoso. Típicamente, el resultado de este ejercicio de poder es la adopción de un reglamento legislativo que genera derechos u obligaciones y tiene fuerza de ley". J.M. Farinacci Fernós, Las Órdenes Ejecutivas, el Poder Legislativo y las Emergencias, 3 Amicus, Rev. Pol. Púb. Y Leg. UIPR 190, 192 (2020).

De una somera mirada al proceso y la concesión de la inmunidad a LUMA por parte del NEPR, vemos que no se cumplió con ninguno de los requisitos constitucionales establecidos en cuanto a la delegación de poderes. De la Ley Núm. 83 de 2 de mayo de 1941, la Ley 57-2014, y la Ley 120-2018 **no surge ninguna expresión expresa o implícita del legislador en la cual haya delegado al Ejecutivo su facultad de otorgar inmunidad a favor de la AEE o LUMA**. Por lo tanto, no se puede evaluar la constitucionalidad de una delegación que nunca ocurrió. Así, resulta evidente que la AEE se extralimitó de sus facultades estatutarias y expresamente delegadas por el legislador al acordar solicitar la inmunidad dispuesta en el Art. 4.1(g)

26

del Acuerdo.

Por otro lado, mediante la Resolución del 31 de mayo de 2021 emitida por el NEPR es que la inmunidad otorgada a LUMA adquiere fuerza normativa y aplicación jurídica. Esa resolución es el acto que confiere operatividad y legitimidad a una disposición que, de otro modo, carecería de efecto frente a terceros no contratantes como los consumidores, quienes no participaron del proceso de negociación de dicho Acuerdo ni accedieron a renunciar a su derecho de reclamación.

Es importantísimo señalar que dicho relevo de responsabilidad otorgado por el NEPR al operador no supera el triple escrutinio que le exige el Art. 6.3(rr) de la Ley Núm. 57-2014, 22 L.P.R.A. § 1054b, o su ley habilitadora. Primero, no es conforme a las leyes aplicables, pues suprime de manera generalizada la acción en daños por negligencia reconocida en el art. 1536 del Código Civil. Segundo, pervierte el interés público al socializar entre todos los abonados los costos de la negligencia privada, distorsionando así el concepto de tarifa "justa y razonable" y convirtiéndola en un vehículo para transferir al colectivo el riesgo que corresponde exclusivamente al causante del daño. Tercero, lejos de proteger los derechos de los clientes, los vacía de contenido al privarlos de la única tutela efectiva frente a daños extracontractuales, creando además un trato desigual respecto de otros sectores no cobijados por semejante privilegio.

Mas aun, la cláusula de interpretación liberal del Art. 6.3 y los poderes remediales de los incisos (oo)-(rr), 22 L.P.R.A. § 1054b, <u>no</u> facultan al NEPR a derogar derechos sustantivos; al contrario, expresamente se ejercen "conforme a las leyes aplicables." La ley misma subordina la actuación regulatoria a la ley, no al revés. <u>En otras palabras, el marco normativo de la ley orgánica del propio NEPR impone como límite infranqueable que ninguna política energética puede prevalecer sobre los derechos sustantivos reconocidos en el Código Civil.</u>

Así, el NEPR se extralimitó en su función reglamentaria al conceder un relevo que priva a los ciudadanos de su acceso a mecanismos de reparación de daños, sin contar con base legal para ello. El NEPR **otorgó una inmunidad absoluta sin autoridad en Ley para otorgar dicha inmunidad a LUMA, por lo que toda actuación por parte dicha entidad fuera del marco legal es nulo *ab initio*.**

Es decir, el NEPR carecía de autoridad legal para conferir una inmunidad por vía contractual o administrativa a LUMA, ya que la Asamblea Legislativa no le delegó

27

tal facultad. **La Constitución de Puerto Rico es clara al disponer que la creación de concesiones o privilegios de carácter público debe ser dispuesta por ley**. Cualquier intento de evadir ese requisito mediante una resolución administrativa, como hizo el NEPR en el 2021, constituye una violación directa a los Artículos III y VI de la Constitución y a la doctrina de separación de poderes. En síntesis, la pretensión de establecer un régimen de inmunidad a favor de una empresa privada como LUMA mediante una mera resolución administrativa evade los procesos democráticos y vulnera la arquitectura constitucional del Estado. Por lo que, sostenemos, la situación ante nos requiere una intervención expedita de este Honorable Foro por tratarse de algo que tiene como efecto trastocar el equilibro de poder establecido en nuestra Constitución y la estructura republicana de Gobierno.

2. <u>Las indemnizaciones por negligencia no pueden socializarse en tarifa la obligación de responder personalmente corresponde a LUMA, no a los consumidores, en virtud de las disposiciones del Código Civil</u>

Aun cuando este recurso trata sobre la validez del relevo de responsabilidad, procede y es necesario que este Honorable Tribunal también dicte una sentencia declaratoria sobre la inconstitucionalidad de trasladar a la tarifa las indemnizaciones por negligencia del operador. No se trata de una opinión consultiva. El propio NEPR, en su "Moción en cumplimiento de Orden" presentado ante este honorable foro, reconoció expresamente que "estos son costos que eventualmente... se trasladarían a los usuarios mediante las tarifas."[8] Tal admisión anticipa una determinación regulatoria de efectos inmediatos y adversos para los consumidores. Este planteamiento crea una controversia real y concreta porque anuncia una decisión regulatoria que podría afectar a los consumidores. Justamente por eso el DACO tiene legitimación activa para traerla hoy, debido a que su Ley Orgánica lo faculta a comparecer en "cualquier asunto que afecte o **pueda** afectar" los intereses del consumidor y ante cualquier tribunal en defensa de esos intereses. La cláusula en modo potencial dota al DACO de una legitimación preventiva, para impedir que una afectación anunciada cristalice en detrimento de los derechos civiles del consumidor.

---

[8] Véase primera oración de la pág. 17 de la *Moción en Cumplimiento* presentada por el NEPR ante el Tribunal Supremo de Puerto Rico el 15 de agosto de 2025. Cabe señalar que esta advertencia se incluye por primera vez en nuestros alegatos porque, a raíz de la Moción del Negociado antes citada, tuvimos conocimiento de que, en el evento de que el DACO prevalezca en su planteamiento ante este Honorable Foro, el Negociado ha manifestado su intención de trasladar los costos relacionados a la negligencia del operador a los consumidores mediante la tarifa.

28

El parámetro jurídico para resolver esta cuestión no está en el vacío, sino en la propia Ley Núm. 57-2014, *supra*. El Art. 6.3(rr) de dicha ley dispone que "[t]odas las acciones, reglamentaciones y determinaciones del NEPR se guiarán por las leyes aplicables, por el interés público y por el interés de proteger los derechos de los clientes o consumidores." 22 L.P.R.A. § 1054b(rr). A la luz de ese canon rector, socializar en la tarifa las indemnizaciones por culpa del operador es improcedente por partida triple.

Primero, porque la ley aplicable, el Código Civil de Puerto Rico, impone al causante del daño la obligación personal de repararlo: "El que por acción u omisión cause daño a otro, interviniendo culpa o negligencia, viene obligado a reparar el daño causado." Código Civil de Puerto Rico, Art. 1536, 31 L.P.R.A. §10801. Asimismo, el Artículo 1156 del Código Civil establece que "el deudor responde del cumplimiento de su obligación con todo su patrimonio presente y futuro…," 31 L.P.R.A. § 9301. Esa deuda no puede convertirse, por resolución administrativa, en "costo del servicio." Véase Jiménez v. Pelegrina Espinet, 112 D.P.R. 700, 705 (1982) (la obligación de reparar daños por negligencia surge de manera automática al configurarse sus elementos); Soc. de Gananciales v. Royal Bank de P.R., 145 D.P.R. 178 (1998) (reiterando que el art. 1802, ahora 1536, es la fuente general de responsabilidad civil extracontractual).

Segundo, porque el interés público se ve lesionado cuando se desincentiva la diligencia operativa al permitir que el responsable difunda su culpa entre los consumidores cautivos, creando un incentivo perverso a la dejadez y negligencia.

Tercero, porque lejos de proteger los derechos de los clientes, los vacía de contenido al privarlos de su única tutela efectiva frente a daños extracontractuales, generando además un trato desigual respecto de otros usuarios y sectores no cobijados por semejante privilegio. La cláusula de interpretación liberal del Art. 6.3 y los poderes remediales de los incisos (oo)–(rr) de la Ley 57-2014,*supra*, no facultan a derogar derechos sustantivos; al contrario, expresamente se ejercen "conforme a las leyes aplicables," 22 L.P.R.A. § 1054b. La ley misma subordina la actuación regulatoria a la ley sustantiva, no al revés. De ahí que sea jurídicamente insostenible la tesis de que el relevo pueda deducirse implícitamente del poder regulatorio del Negociado, cuando precisamente su ley orgánica le prohíbe actuar en contra de la ley sustantiva y en perjuicio de los clientes.

29

La conclusión se refuerza al mirar la arquitectura contractual bajo la cual opera LUMA. El modelo del contrato vigente separa con claridad dos renglones: por un lado, los gastos operacionales que se reconocen como "passthrough" y se recuperan en tarifa; por otro, el "Service Fee" del operador, honorario fijo y, en su caso, incentivos, que constituye su retribución empresarial. En un ordenamiento civilista como el nuestro, donde la responsabilidad extracontractual es una obligación personalísima del causante, la regla es elemental: el que causa el daño paga de su propio pecunio. Si en algún caso se determina negligencia del operador, el resarcimiento debe satisfacerse con cargo a su propio patrimonio, incluida su remuneración empresarial, o a sus coberturas de seguro, no mediante la tarifa general. Convertir la culpa en un renglón tarifario sería, en los hechos, derogar por vía administrativa los artículos 1536 y 1156 del Código Civil y violentar la separación de poderes. Ciertamente, la potestad de alterar o modular un derecho sustantivo codificado reside exclusivamente en la Asamblea Legislativa, no en un organismo regulador.

De igual modo, el traslado de negligencia del operador al consumidor no cumple con el estándar de "tarifas justas y razonables". Ese "test", propio del derecho público económico, ha servido para alinear en tarifa costos prudentes y necesarios de la prestación del servicio, operación, mantenimiento e inversión, no para socializar indemnizaciones por negligencia. Sostener lo contrario desnaturaliza la justicia tarifaria y rompe el principio básico de asignación causal de costos, donde paga quien causa. La doctrina civil local ha explicado por décadas que la responsabilidad por culpa nace directamente de la conducta del autor del daño y recae en su persona, precisamente para hacer efectiva la tutela del perjudicado y para disciplinar la conducta del potencial dañante. Ese es el sentido de nuestra tradición codificada y nada en la Ley 57-2014, *supra*, autoriza al Negociado a invertirlo.

El alegato de que sería "práctica común" en los estados o en "otras jurisdicciones" trasladar a los consumidores las indemnizaciones por negligencia del operador carece de fundamento jurídico en Puerto Rico. Primero, es fácticamente incorrecto: comisiones estatales de otros estados han **denegado** ese traslado cuando media negligencia del operador (**Véase Apéndice del Presente Alegato págs. 001-**

30

App.483

**075** ).[9] Segundo y decisivo, nuestro ordenamiento civilista y codificado no se modifica por "usos" ajenos: el Artículo 1536 del Código Civil impone una **obligación personalísima** al causante de reparar el daño, y el Artículo 6.3(rr) de la Ley 57-2014, *supra,* sujeta **toda** actuación del Negociado a las **leyes aplicables**, al **interés público** y a la **protección de los derechos del cliente,** 22 L.P.R.A. § 1054b(rr). Ninguna "práctica" extraña a nuestro derecho puede derogar ese marco; sólo la Asamblea Legislativa podría alterarlo, no una resolución administrativa ni una invocación genérica de costumbres regulatorias foráneas.

En resumen, el anuncio del Negociado de que "eventualmente" trasladaría a tarifa las indemnizaciones por negligencia del operador no solo confirma la madurez de la controversia a efectos de una declaratoria, sino que, además, confirma la necesidad de fijar una regla clara: las indemnizaciones por culpa del operador no son recuperables vía tarifa salvo autorización legislativa. Así se respeta el artículo 6.3(rr) con el mandato de que toda regulación tiene que ser consistente con la ley aplicable, velando por el interés público y protección del cliente. De esa manera, se preserva la integridad del Código Civil y se evita que el régimen tarifario se convierta en una alcancía de culpas privadas. Por todo lo anterior, debe declararse nula la política o práctica de trasladar a los consumidores el valor de las indemnizaciones por negligencia del operador, y reafirmarse que tales deudas son personales del causante y ajenas a la estructura tarifaria salvo disposición legislativa que establezca lo contrario.

## VI.   CONCLUSIÓN

El relevo de responsabilidad aquí impugnado no es un asunto técnico de tarifas, sino un intento inconstitucional de sustraer a los consumidores de los remedios que el Código Civil, en su Artículo 1536, reconoce como norma sustantiva de orden público. El NEPR, al aprobarlo sin delegación legislativa expresa, actuó ultra vires, excediendo sus facultades regulatorias y violentando la doctrina de separación de poderes que la

---

[9] Véase Apéndice del Presente Alegato págs. 001-075 "Decision 17-11-033 November 30, 2017 Before the Public Utilities Commission of the State of California, Denying the Application 15-09-010 of San Diego Gas & Electric Company (U902E) for Authorization to Recover Costs Related to the 2007 Southern California Wildfires Recorded in the Wildfire Expense Memorandum Account (WEMA) disponible en https://docs.cpuc.ca.gov/PublishedDocs/Published/G000/M200/K045/200045020.PDF

31

Constitución de Puerto Rico consagra como garantía esencial de nuestro sistema republicano de gobierno.

Más aún, la resolución impugnada trastoca el mandato del Artículo 6.3 de la Ley Núm. 57-2014, *supra*, ya que, en lugar de proteger al consumidor, lo despoja de su acción en daños; en lugar de asegurar tarifas justas y razonables, convierte la negligencia del operador en un costo socializado entre los abonados; y en lugar de promover la no discriminación, genera un privilegio inaceptable a favor de un operador privado (22 L.P.R.A. § 1054b). El efecto práctico es otorgar a LUMA una inmunidad cuasi soberana que ni siquiera gozó la AEE, y hacerlo al margen de la Asamblea Legislativa, única rama constitucional facultada para conferir privilegios de ese tipo.

En un Estado de Derecho no es jurídicamente admisible socializar daños trasladando a la tarifa lo que corresponde *ex lege* al causante, pagar con su propio pecunio. Bajo el Artículo 1536, la obligación de reparar nace por el mero hecho antijurídico negligente; y, conforme al Artículo 1156, toda obligación se garantiza con el patrimonio del deudor (responsabilidad patrimonial universal). Una resolución administrativa que intenta desplazar esa regla carece de validez frente a la ley de rango superior. Por tanto, los costos de la negligencia de LUMA no pueden recaer en los consumidores, sino en la propia LUMA como deudora del resarcimiento.

Este Honorable Tribunal debe reafirmar, sin ambages, que el ordenamiento civilista de Puerto Rico descansa en el Código Civil como fuente primaria y que ninguna agencia administrativa puede, mediante resolución o contrato, suspender derechos sustantivos de rango legal. Al declarar la nulidad del relevo aprobado, esta Curia no solo restituye a los consumidores la tutela efectiva de sus derechos, sino que preserva la arquitectura constitucional de pesos y contrapesos frente a extralimitaciones administrativas.

Por ello, corresponde (i) declarar nulo el relevo de responsabilidad otorgado en la Resolución del 31 de mayo de 2021; y (ii) establecer que toda reclamación en daños por negligencia debe ser satisfecha con el pecunio de LUMA, y prohibir que tales costos sean trasladados a la tarifa de los consumidores. Solo así se garantiza que el interés público prevalezca sobre privilegios indebidos y que el mandato legislativo de proteger al consumidor conserve su fuerza plena.

32

## VII.   SÚPLICA

EN MÉRITO DE LO CUAL, la Parte Demandante-Peticionaria respetuosamente solicita urgentemente de este Honorable Foro lo siguiente:

(1)   Que declare nulo el relevo de responsabilidad otorgado por el Negociado de Energía mediante la Resolución emitida el 31 de mayo de 2021, por ser ultra vires e incompatible con nuestro ordenamiento jurídico;

(2)   Que establezca que el pago de las reclamaciones por daños derivados de la negligencia del operador no puede ser transferido a los consumidores a través de las tarifas por ser contrario a la ley; y

(3)   Emita cualquier otro remedio que proceda en derecho.

**CERTIFICO:** Que en el día de hoy envié copia fiel y exacta del presente escrito por correo electrónico a: LUMA ENERGY LLC; y LUMA ENERGY SERVCO LLC, a través de sus representantes legales: Lcda. Margarita Mercado Echegaray margarita.mercado@us.dlapiper.com; Lcda. Yahaira De la Rosa Algarín Yahaira.delarosa@us.dlapiper.com, Lcdo. Jan M. Albino López jan.albinolopez@usdlapiper.com, Lcdo. Frank Torres Viada ftv@ftorresviada.com, Lcdo. José Andréu Fuentes jaf@andreu-sagardia.com; al NEGOCIADO DE ENERGIA DE PUERTO RICO a través de sus representantes legales: Lcdo. Edgardo L. Rodríguez Cardé elrc@rclopr.com y a la Lcda. Yarymar González Carrasquillo ygc@halspr.com; a la AUTORIDAD DE ENERGIA ELECTRICA a través de sus representantes legales: Juan M. Martínez Nevares jmartinez@gmlex.net, Lcda. Mirelis Valle Cancel mvalle@vcprlaw.com; al SENADO DE PUERTO RICO a través de sus representantes legales: Lcdo. Charles A. Rodríguez Colón crodriguez@naleapr.com, Lcdo. Miguel A. Rodríguez Ramos miguelrrlaw@gmail.com; a la CÁMARA DE REPRESENTANTES DE PUERTO RICO a través de su representante legal el Lcdo. Víctor Calderón Cestero victor@calderon-law.com; al INSTITUTO DE COMPETITIVIDAD Y SOSTENIBILIDAD ECONÓMICA a través de sus representantes legal el Lcdo. Fernando E. Agrait agraitfe@agraitlawpr.com, al Lcdo. José Leonardo Pou Román jpouroman@outlook.com y al Tribunal de Primera Instancia.

**RESPETUOSAMENTE SOMETIDO.**

En San Juan, Puerto Rico, a 8 de septiembre de 2025.

Lcda. Valerie Rodríguez Erazo
RUA Núm. 16,861
Box 41059
Minillas Station
San Juan, P.R. 00940-1059
(787) 722-7555
vrodriguez@daco.pr.gov

Lcdo. Gadiel Figueroa Robles
RUA Núm. 18,687
Box 41059
Minillas Station
San Juan, P.R. 00940-1059
(787) 722-7555
gfigueroa@daco.pr.gov

Lcdo. Samuel Silva Rosas
RUA Núm. 7883
Box 41059
Minillas Station
San Juan, P.R. 00940-1059
(787) 722-7555
ssilva@daco.pr.gov

App.487

## ESTADO LIBRE ASOCIADO DE PUERTO RICO
## TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| **DEPARTAMENTO DE ASUNTOS DEL CONSUMDOR**<br>**Demandante-Peticionaria** | CT-2025-0003 |
| | CIVIL NÚM.: **SJ2025CV06607** |
| v. | SOBRE:                   SENTENCIA DECLARATORIA |
| **LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA**<br><br>**Demandados-Recurridos** | |

### ALEGATO DE LA PARTE PETICIONARIA

### *ÍNDICE DE APÉNDICES*

**APÉNDICE**                                                                                        **PÁG.**

1. Decision 17-11-033 November 30, 2017 Before the Public Utilities Commission of the State of California, Denying the Application 15-09-010 of San Diego Gas & Electric Company (U902E) ................................................................ 001- 075

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br>as representative of<br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>    Debtors. | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br>as representative of<br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>    Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS |

### DACO's Opposition to Urgent Motion to Enforce the Automatic Stay

**TO THE HONORABLE LAURA TAYLOR SWAIN:**

COMES NOW the Puerto Rico Department of Consumer Affairs ("DACO" for its Spanish acronym), through its Secretary and undersigned attorneys; who very respectfully allege and pray as follows:

### I. Introduction

LUMA Energy, LLC and LUMA Energy ServCo, LLC's ("LUMA") Urgent Motion asks this Court to treat a narrow consumer protection dispute—centered on the Puerto Rico Energy Bureau's ("PREB") unauthorized grant of a liability waiver—as if it implicated estate property subject to the automatic stay, even though Congress preserved such police power actions from federal interference.

Title III is not a refuge from public law. Congress wrote PROMESA to preserve not paralyze, territorial enforcement. PROMESA incorporates the Bankruptcy Code's

automatic stay together with its police power exceptions, and then repeats those protections throughout the statute to ensure that governmental enforcement actions proceed unimpeded and without being federalized. See 48 U.S.C. § 2161(a) incorporating 11 U.S.C. § 362(b)(4); 48 U.S.C. § 2194(c)(2) excluding police power actions from the initial stay; 48 U.S.C. § 2166(d)(1) barring removal of those actions; and 48 U.S.C. § 2165 forbidding this Court from interfering "by any stay, order, or decree" with the Commonwealth's political or governmental powers.

LUMA asks this federal court to assume jurisdiction over a dispute rooted exclusively in Puerto Rican public law, one that is already pending before the Puerto Rico Supreme Court. And to do so at the behest of a private operator that is not a Title III debtor. That invitation places courts in direct conflict over questions of Puerto Rican law that do not implicate debtor property. PROMESA's text forecloses such an outcome. Police power enforcement lies outside the automatic stay, outside the statute's removal provisions, and outside this Court's power to direct how a Commonwealth agency exercises its public authority. 48 U.S.C. §§ 2194(c)(2), 2166(d)(1), 2165.

Against this backdrop, LUMA rests its motion on a mischaracterization of Article 4.1(g) of the Transmission and Distribution OMA ("OMA"). See Dkt. No. 29962-2 at p. 51-52 of 337. Article 4.1(g) is not a liability waiver provision. It does not grant LUMA immunity, release any liabilities, or vest enforceable rights against third parties. It merely obligates the parties to **"agree to apply"** to PREB for inclusion of waiver language in a rate order. PREB always retained discretion to deny, limit, or condition any such waiver.

DACO's declaratory action challenges PREB's *ultra vires* attempt to grant sweeping immunity that the Legislature never authorized. This challenge does not seek to impair the OMA as a whole, nor the Puerto Rico Electric Power Authority's (PREPA)

restructuring. And it does not interfere with "property of the estate," because a mere opportunity to petition a regulator is not property under 11 U.S.C. § 541. Unlike the Senate's effort in *In re Fin. Oversight Bd. v. Commonwealth*, 2022 WL 17413011 (D.P.R. Feb. 7, 2022), which sought to void the OMA in its entirety, DACO's case targets only PREB's unlawful administrative act. This discrete action does not seek to impair the OMA's overall framework, any part of the OMA or PREPA's restructuring. Rather, it seeks to enforce statutory limits on a regulator's authority and preserve consumers' long-standing rights of action.

LUMA's stay argument also fails for a more basic reason: the OMA already insulates PREPA and consumers from the very liabilities LUMA claims are at risk. Sections 7.6(a)(i) and 18.2(b)(ii) designate as "Disallowed Costs" any liabilities resulting from LUMA's own negligence, gross negligence, or willful misconduct. See Dkt. No. 29962-2 at p. 104 of 337 and Id at p. 151 of 337, respectively. Such costs must be borne exclusively by LUMA and cannot be reimbursed by PREPA or passed on to ratepayers. As PREPA itself explained to the Puerto Rico Supreme Court, the invalidation of PREB's unlawful waiver would not increase PREPA's liabilities or disrupt its restructuring, because the contract's own structure assigns those risks to LUMA. See **Exhibit 1**.

Finally, even if Article 4.1(g) could somehow be construed as touching estate property (which it cannot), DACO's action falls squarely within the **police and regulatory power exception** of § 362(b)(4). The First Circuit's recent decision in *Milk Indus. Reg. Off. v. Ruiz (In re Ruiz)*, 122 F.4th 1 (1St Cir. 2024), confirms that regulatory enforcement actions—even those that incidentally affect estate property—remain exempt so long as they protect public policy and consumer welfare rather than a pecuniary

interest. DACO's lawsuit, which seeks only declaratory relief to preserve consumer rights, fits perfectly within that rule.

For all these reasons, the automatic stay does not apply, and LUMA's Urgent Motion must be denied.[1]

## II. Factual and Procedural Background

### A. The OMA and Article 4.1(g)

In June 2020, the Puerto Rico Public-Private Partnerships Authority, PREPA, and LUMA executed the OMA. The OMA transferred operational control of PREPA's transmission and distribution system to LUMA.

Article 4.1(g) of the OMA provides, in its relevant part, that the "Parties agree to apply for inclusion in the Rate Order that the associated tariff or terms of service include ... a waiver of liability." See Dkt. No. 29962-2 at p. 51-52 of 337. Given its significance, the full text of Article 4.1(g) is reproduced below:

> (g) Liability Waiver. In connection with the submission of the Initial Budgets to PREB [the Puerto Rico Energy Bureau], **the Parties agree to apply for** inclusion in the Rate Order that the associated tariff or terms of service include: (i) a waiver of Owner's, ManagementCo's and ServCo's liability to customers or any Person receiving Power and Electricity for any Losses arising in any way out of or in connection with the operation of the System and the provision of Power and Electricity including any events of interrupted, irregular or defective electric service due to Force Majeure Events, other causes beyond Owner's, ManagementCo's or ServCo's control or ordinary negligence, gross negligence or willful misconduct of Owner, ManagementCo or ServCo, or their respective employees, agents or contractors; and (ii) a waiver in all cases of responsibility for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment,

---

[1] Due to the abbreviated period set forth in the Court's September 19, 2025 Scheduling Order, DACO has been unable to verify the accuracy of the English translations submitted with LUMA's Urgent Motion. DACO expressly reserves the right to alert the Court should any relevant discrepancies between the original Spanish documents and the translations become apparent. DACO further notes that the exhibits filed with the Motion are incomplete, as LUMA failed to include the attachments to the Declaratory Judgment Complaint before the Puerto Rico Court of First Instance.

cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by any of Owner's, ManagementCo's or ServCo's ordinary negligence, gross negligence or willful misconduct (collectively the "Liability Waiver").

Id. (Emphasis added)

By its plain terms, the clause is not self-executing. It does not grant LUMA any contractual immunity or release of liability. Rather, it requires the parties only to apply to the PREB, which retained full discretion to approve, deny, or limit any requested waiver.

This distinction is critical. Article 4.1(g) does not create a vested contractual right. It does not insulate LUMA from consumer claims. At most, the clause preserved a procedural opportunity for LUMA to petition PREB. Whether such a petition could ever be granted consistent with Puerto Rico law remained an entirely separate question. PREB's authority to act was and remains, bound by statute, subject to constitutional separation of powers, and subordinate to substantive provisions of the Civil Code governing tort liability. See Article 1536 of the Civil Code, 31 PR Laws Ann. § 10801.

Indeed, PREPA itself never enjoyed immunity from consumer claims. Even as a public corporation, PREPA maintained a claims process by which consumers could seek compensation for damages caused by negligent acts or service fluctuations.[2] It would be anomalous, and contrary to public policy, for LUMA—a private operator—to acquire greater immunity than its public predecessor merely by pointing to a contractual clause

---

[2] Prior to the execution of the OMA between LUMA, the P3 Authority, and PREPA, the public corporation maintained a procedure through which consumers could submit claims for damages caused by negligence or service fluctuations, entitled *"Procedure for the Analysis, Processing, and Payment of Claims to Third Parties,"* dated February 15, 2016. (See **Exhibit 4).**

that obligated nothing more than an "application." LUMA cannot transform an agreement to ask for a waiver into a guarantee of immunity.

Thus, the reference to Article 4.1(g) in the OMA is legally irrelevant to the question before this Court. The controversy does not arise from the contract, whose validity DACO does not contest and has never contested, but from PREB's subsequent administrative action purporting to convert a contractual "application clause" into an across-the-board liability waiver. That regulatory action, not the OMA, is what DACO seeks to have declared null and void by the Puerto Rico Supreme Court. See Dkt. No. 29962-4 at pp. 10-12 of 87, 29-39 of 87 and 40 of 87.

## B. PREB's 2021 Resolution and the Grant of Sweeping Immunity

On May 31, 2021, PREB issued a Resolution purporting to approve the inclusion of a broad liability waiver in LUMA's terms of service. See Dkt. No. 29962-3 at p. 10-12. The waiver extended to LUMA, its affiliates, directors, officers, employees, agents, and contractors, and sought to immunize them from consumer claims for damages arising not only from ordinary negligence, but even from gross negligence and willful misconduct.

This regulatory act exceeded PREB's statutory authority. No Puerto Rico law authorizes PREB to grant blanket immunity from civil liability to a private concessionaire entrusted with operating the electric grid. By purporting to do so, PREB attempted to nullify causes of action long recognized under Puerto Rico law, including consumers' substantive rights under the Civil Code to seek redress for negligent service. See Article 1536 of the Civil Code, 31 PR Laws Ann. § 10801. Such a sweeping elimination of remedies is legislative in character, yet no statute enacted by the Legislative Assembly confers PREB that power.

It is also particularly telling that the PREB resolution expressly excluded claims arising out of gross negligence. <u>See</u> Dkt. No. 29962-3 at p. 10-12. By doing so, PREB confirmed that Article 4.1(g) was not a blanket conveyance of property rights, but a circumscribed provision that neither created nor transferred any automatic entitlements.

LUMA nevertheless treated PREB's resolution as a final and unconditional shield. It invoked the resolution repeatedly to deny consumer claims, admitting in public hearings that it had rejected more than 1,800 consumer petitions for compensation based solely on this supposed immunity.[3]

## C. DACO's Targeted Declaratory Action on PREB's Unlawful Immunity Grant

On July 22, 2025, DACO filed a declaratory judgment action in the Puerto Rico Court of First Instance. <u>See</u> Dkt. No. 29962-3. In its initial Complaint, DACO requested a judicial declaration that (i) PREB's May 31, 2021 Resolution granting LUMA broad immunity was *ultra vires* and void; and (ii) Article 4.1(g) of the OMA, insofar as it could be read to presume PREB's authority to approve such an immunity, was likewise invalid.

By the time the matter reached the Puerto Rico Supreme Court, however, DACO had clarified and narrowed its request. In its submissions there, DACO made explicit that the controversy centered on whether "an administrative agency may, by resolution alone, confer on a private operator a general immunity from tort liability, including ordinary

---

[3] On May 27, 2025, during a hearing before the Puerto Rico House Consumer Affairs Committee in the House of Representatives, Rebecca Maldonado, a LUMA representative, testified under oath that LUMA had denied 1,828 consumer damage claims, explaining that "the complaints we received cannot be paid according to the release of liability." <u>See</u> News Is My Business, Lawmakers investigate LUMA's rejection of 1,800 damage claims (May 28, 2025), available at: https://newsismybusiness.com/lawmakers-investigate-lumas-rejection-of-1800-damage-claims

A court may take judicial notice "of a fact that is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); see Gent v. CUNA Mut. Ins. Soc'y, 611 F.3d 79, 84 n. 5 (1st Cir. 2010) (taking judicial notice "of the relevant facts provided on the [government] website, which [were] 'not subject to reasonable dispute.'").

negligence, thereby displacing the Civil Code's liability regime without legislative authorization." <u>See</u> Dkt. No. 29962-4 at p. 10 of 87. (Translation Ours). In other words, the focus was squarely on PREB's Resolution, not the OMA itself. Article 4.1(g) was cited only to contextualize LUMA's petitioning mechanism.

By drawing this distinction, DACO underscored that the OMA's operative framework remains intact regardless of the Resolution's validity. The declaratory action is directed exclusively at restoring the statutory and constitutional boundaries on PREB's authority and preserving consumers' access to remedies, not at disturbing PREPA's estate or impairing the OMA itself.[4]

Finally, if any doubt remained as to the narrow scope of the controversy, it was dispelled by PREPA's own filings before the Puerto Rico Supreme Court on September 23, 2025. PREPA itself urged the Court to clarify whether DACO's challenge—that PREB's May 31, 2021 Resolution approving the "Modified Terms of Service" was unconstitutional and ultra vires—had merit. <u>See</u> **Exhibit 1**. PREPA acknowledged that DACO was not attacking the OMA, but rather asking the Court to decide whether PREB's administrative action, by purporting to eliminate liability for negligence, violated applicable law and the constitutional separation of powers.

That position was echoed by both the Puerto Rico Senate and the House of Representatives, which likewise stressed that the Resolution was null and void because

---

[4] LUMA's assertion in paragraph 35 of its motion that DACO's Complaint represents "the latest attempt by the Government to interfere with PREPA's property interest," mischaracterizes DACO's statutory role. DACO is not part of the Commonwealth's energy-sector components of government, and it does not participate in PREPA or P3 Authority deliberations. Its jurisdiction is strictly limited to the protection of consumer rights under Puerto Rico law. To frame DACO's statutory enforcement of consumer remedies as part of a coordinated governmental campaign against PREPA is both inaccurate and incorrect. DACO's Complaint is narrowly directed at safeguarding consumers from PREB's *ultra vires* Resolution, not at impairing PREPA's contractual property interests.

8

only the Legislature, not an administrative agency, could enact such a sweeping change in liability rules. <u>See</u> **Exhibit 2**. In other words, all parties agreed that the controversy centered exclusively on the validity of PREB's Resolution, and that if the Resolution is struck down, LUMA remains liable for negligence under the Puerto Rico Civil Code and the OMA itself, as we will discuss below. This outcome does not affect in any way the validity or enforceability of the OMA, which continues fully operative, because waiver of liability for negligence was never embedded in the OMA to begin with.

**D. PREPA's Supreme Court Brief Underscores Contractual Safeguards Against LUMA's Negligence**

When DACO's action reached the Puerto Rico Supreme Court through a petition for intrajurisdictional certification, PREPA filed a brief with its position. <u>See</u> **Exhibit 1**. PREPA acknowledged that it had authorized LUMA to seek a liability waiver under Article 4.1(g) but explained that this provision was never self-executing and did not entitle LUMA to blanket immunity. <u>Id</u> at p. 15. Rather, its purpose was to create a regulatory petition process subject to PREB's statutory limits. <u>Id</u> at p. 15.

Importantly, PREPA emphasized that even without PREB's waiver, the OMA already protects PREPA and its customers by placing the risks of LUMA's misconduct squarely on LUMA itself. Citing Sections 7.6 and 18.2 of the OMA (<u>See</u> Dkt. No. 29962-2 at p. 104 of 337 and at p. 151 of 337), PREPA explained that any liabilities stemming from LUMA's ordinary negligence, gross negligence, or willful misconduct are designated as "Disallowed Costs." By contract, those costs cannot be transferred to PREPA or its ratepayers but must be absorbed entirely by LUMA from its own funds. Section 18.2(b) of the OMA makes this explicit, carving out negligence and willful misconduct from PREPA's indemnification obligations. <u>Id</u> at p. 151 of 337.

PREPA further noted that Section 18.3 imposes dollar limits on LUMA's exposure for ordinary negligence, but never eliminates it. Thus, even within the OMA framework, LUMA remains financially responsible for its own wrongful acts. For that reason, PREPA argued, if PREB's 2021 Resolution were struck down as *ultra vires*, neither PREPA's estate nor consumer rates would be affected. Id at p. 16.

By underscoring these contractual protections, PREPA confirmed that the controversy does not jeopardize PREPA's restructuring or impair estate property. To the contrary, the OMA's design ensures that liability for negligence rests with LUMA, not with PREPA or Puerto Rico's consumers.

Furthermore, the OMA's only express administrative expense mechanism is the Front-End Transition administrative expense treatment in Section 4.1(c), which by its terms applies exclusively to the initial transition period. See Dkt. No. 29962-2 at pp. 48-49 of 337. It does not create a perpetual pass-through for all future liabilities.

**E. LUMA's Litigation Posture**

In opposing DACO's intrajurisdictional petition for certification before the Supreme Court, LUMA raised a variety of arguments—including alleged lack of standing, failure to join indispensable parties, and lack of constitutional novelty. Notably absent was any mention of the automatic stay under PROMESA. The automatic stay was first invoked only in the present proceedings.

In addition, LUMA's urgent motion (in paragraph 44) invokes paragraph 1.H of the Court's case management procedures, certifying that it created no urgency through lack of diligence, and that it made "a bona fide effort to resolve the matter without a hearing" through "reasonable good faith communications." See Urgent Motion, Dkt. No. 29962 at ¶ 44. On September 18, 2025, at 9:14 am counsel for LUMA sent DACO an email

requesting that DACO withdraw its Commonwealth Court complaint and certification petition by 3:00 p.m. that same day, indicating that otherwise LUMA would seek relief in federal court. See **Exhibit 3**. DACO responded in writing, explaining its position that the automatic stay did not apply and that it would not withdraw its filings. Id. The matter proceeded to this Court shortly thereafter. This sequence of events underscores that LUMA's communications did not reflect the type of genuine, collaborative engagement contemplated by paragraph 1.H, but rather a last-minute ultimatum that left no room for meaningful dialogue.

These circumstances provide context for the timing of LUMA's motion and demonstrate that the question of the stay was not previously raised in the Commonwealth proceedings. The present dispute therefore represents the first occasion on which the automatic stay has been placed before a court for determination; and second, that LUMA's current resort to the stay is a litigation tactic of convenience.

## F. Lack of quorum forecloses any Oversight Board authority to halt enforcement of DACO's enabling act

LUMA's reliance in paragraph 45 of its motion only underscores the absence of any lawful Oversight Board action before this Court. LUMA reports that the Board "has informed LUMA" that the stay should apply, while at the same time acknowledging that the Board "takes no position on the merits." An informal statement of this nature is not a Board determination and carries no legal effect. PROMESA requires an affirmative vote of a majority of the Board's appointed membership to exercise the very power LUMA is effectively invoking here, namely, to cause a Commonwealth legislative act not to be enforced under section 2144. Absent such a majority vote, there is no Board decision to

App.499

which this Court can defer. See 48 U.S.C. § 2121(h)(2); see also LUMA Urgent Motion ¶ 45.

PROMESA also limits who may act on behalf of the Oversight Board. "Any member or agent" may take an action only "if authorized by the Oversight Board." 48 U.S.C. § 2124(b). A staff view or a communication from counsel that has not been approved by a majority vote is not authorization within the meaning of the statute. To accept LUMA's recital as a substitute for a formal Board vote would permit a single member or staffer to exercise powers that Congress reserved to the Board acting collectively, including the power to ask a federal court to halt the operation of a Commonwealth law. See 48 U.S.C. §§ 2121(h)(2), 2124(b), 2144.

Because the Board presently lacks a quorum, it cannot meet the statutory requirement of a majority vote of its full appointed membership to seek to block the enforcement of DACO's enabling act—or to take any action with the same practical effect. LUMA's effort to leverage an informal, staff level "position" to achieve that outcome circumvents both PROMESA's voting rule and the Board's own governance framework. The Court should therefore give no weight to LUMA's paragraph 45 and should reject any suggestion that a non-voted staff communication can authorize federal intervention to restrain a Commonwealth regulator acting pursuant to its enabling act.

### III. DACO's Enabling Act Confirms Its Broad Powers to Protect Consumers

DACO is a cabinet-level agency created by the Puerto Rico Legislature to safeguard the rights of consumers and regulate fair commercial practices across the Commonwealth. See P.R. Laws Ann. tit. 3, § 341 et seq. From its inception, DACO has

been vested with broad statutory powers to "vindicate and implement the rights of the consumer." 3 PR Laws Ann. § 341.

To fulfill this statutory mission, the Legislature vested DACO's Secretary with expansive enforcement authority. The Secretary may, *inter alia*, investigate and resolve consumer complaints against private entities, enforce and vindicate consumer rights through quasi-judicial adjudications and declaratory orders, represent consumers before tribunals, boards, and commissions in matters affecting consumer rights, issue subpoenas and compel the production of documents, adopt regulations necessary to protect consumers, and file legal actions in court to ensure compliance with Puerto Rico's consumer protection regime. See 3 PR Laws Ann. § 341e.

These powers are not incidental. The Legislature deliberately equipped DACO with them to offset the "marked imbalance of resources" between individual consumers and powerful private entities. By law, DACO stands in the place of consumers when systemic issues arise, ensuring that private actors cannot use superior bargaining power or regulatory gaps to deprive Puerto Ricans of basic protections guaranteed by statute or by the Civil Code.

Furthermore, pursuant to Article 6(i) of Law No. 5 of April 23, 1973, DACO is expressly empowered to "take any legal remedies necessary to give effect to the purposes of this law and to enforce the rules, regulations, orders, resolutions and determinations of the Department." 3 PR Laws Ann. § 341e(i). This mandate complements and reinforces subsections (e) and (f) cited above, by giving DACO comprehensive power not only to appear on behalf of consumers, but also to deploy all available legal means to uphold their rights against abusive, deceptive, or unfair practices, while ensuring that the Department's determinations are truly effective. In other words, the Legislative Assembly

conferred upon DACO the authority to take action in court with the same vigor with which it acts in administrative proceedings, precisely to guarantee that consumers' rights are never deprived of remedy.

DACO's declaratory action against PREB's May 31, 2021 Resolution arises directly from this statutory mandate. PREB's unprecedented administrative act has already nullified consumers' substantive rights under Article 1536 of the Civil Code, 31 L.P.R.A. § 10801, which guarantees the right to recover damages caused by negligent service.

Standing in defense of those statutory rights is not optional for DACO. It is the very essence of the agency's role. When an administrative determination jeopardizes consumer protections or exceeds statutory boundaries, DACO is legally bound to intervene. In filing its declaratory action, DACO did not act as a private litigant seeking damages or contractual relief. Rather, it acted in its capacity as the Commonwealth's consumer protection authority, exercising its statutory responsibility to ensure that consumers retain access to the remedies the law provides.

## IV. Argument

### A. Article 4.1(g) Grants No Waiver, No Release, and No Enforceable Rights

The OMA's text at issue is unambiguous. It requires the parties only to **apply for** a waiver in the PREB's rate order. Unlike an actual contractual release clause, Article 4.1(g):

- Does not provide LUMA with an immunity shield.

- Does not discharge claims or liabilities.

- Does not vest any rights enforceable against third parties.

The only conceivable interest here is the procedural opportunity to request regulatory relief—an option LUMA possesses regardless of whether the OMA contains a

clause acknowledging it. There is a fundamental distinction between enforceable contractual rights and mere aspirational obligations to petition a regulator. A speculative expectation of future regulatory approval cannot, as a matter of law, constitute "property of the estate."

LUMA repeatedly describes Article 4.1(g) as a "liability waiver provision." This mischaracterization ignores that the clause is not self-executing. By collapsing the distinction between <u>a waiver granted by contract</u> and <u>an agreement to apply for regulatory approval</u>, LUMA seeks to manufacture a property interest where none exists.

At most, the clause preserves the procedural opportunity to petition PREB for relief. That opportunity exists regardless of whether Section 4.1(g) is in the OMA. A mere expectation that a regulator might grant immunity does not create a cognizable legal interest, let alone "property of the estate." <u>See</u> *Butner v. United States*, 440 U.S. 48, 55 (1979) (estate property is defined by enforceable legal or equitable interests under applicable law).

Courts have consistently recognized that agreements to petition a regulator create procedural duties, not substantive rights. *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 465–68;470 (1985). Additionally, Courts consistently enforce such "efforts" or "apply" provisions according to their plain meaning. Under Puerto Rico law, when contract language is clear, it must be applied as written without

resort to extrinsic evidence.[5] Delaware courts interpreting similar covenants uniformly distinguish between a duty to use efforts and an absolute obligation to achieve a result.[6]

Even more fundamentally, PREB lacked statutory authority to grant a blanket waiver of civil liability. A regulatory act that exceeds statutory limits is *ultra vires* and cannot create vested rights. See *Arlington v. FCC*, 569 U.S. 290, 297–98 (2013) (agency action beyond its jurisdiction or authorized application is ultra vires and thus invalid). An administrative body cannot expand its mandate by contract or resolution; private parties contract at their peril when they rely on an agency to confer powers it does not lawfully possess. Thus, neither PREPA's estate nor LUMA ever acquired an enforceable property interest in a liability shield that Puerto Rico law does not allow PREB to grant. DACO's action seeks only to correct this unlawful overreach.

## B. Section 4.1(g) Is Not a Material Clause of the OMA

Even apart from its narrow text, Section 4.1(g) is collateral, not material, to the OMA. Nothing in the agreement conditions its effectiveness on PREB granting a waiver. Nor does the contract provide that LUMA's rights or obligations would change if the waiver were rejected or modified. By contrast, other OMA provisions expressly condition

---

[5] See *UBS Fin. Servs. Inc. of P.R. v. Unión de Empleados*, 223 F. Supp. 3d 134, 138 (D.P.R. 2016) ("When the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed.").

[6] In *Williams Cos. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272 (Del. 2017), the Supreme Court held that a covenant to use "commercially reasonable efforts" to obtain a tax opinion imposed only a process-based duty, not a guaranty of outcome. Likewise, in *Hexion Specialty Chems., Inc. v. Huntsman Corp.*, 965 A.2d 715, 755-756 (Del. Ch. 2008), the court enforced "reasonable best efforts" clauses as obligations of conduct, not results. And in *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *87, 96-97(Del. Ch. Oct. 1, 2018), aff'd, 198 A.3d 724 (Del. 2018), the court explained that only a "hell-or-high-water" covenant—requiring the buyer to take "any and all actions necessary"—could be construed as an outcome commitment. Absent such language, the obligation is limited to making the application itself. Here, the absence of any "all actions necessary" clause is telling: the OMA requires nothing more than filing the waiver request, and PREB's independent decision cannot be imputed to the contracting parties.

performance on regulatory approvals, such as Sections 4.1(a)–(f) (Dkt. No. 29962-2 at pp. 48-51 of 337) and 5.1–5.2 (Id at pp 7071 of 337). The omission of such contingency language in 4.1(g) confirms that the waiver was never central to the bargain.

PREPA itself underscored this point in its filings before the Puerto Rico Supreme Court. PREPA explained that even if PREB's waiver were invalidated, consumers and PREPA's estate would remain insulated from LUMA's negligence because the OMA already designates such liabilities as "Disallowed Costs" borne solely by LUMA. See OMA §§ 7.6(a)(i), 18.2(b)(ii), 18.3. See Exhibit 1 at 14. These provisions make clear that losses caused by LUMA's negligence, gross negligence, or willful misconduct cannot be shifted to PREPA or its ratepayers. In short, the contract itself ensures that nullifying PREB's *ultra vires* resolution would not increase rates or impair PREPA's restructuring.

This structural reality shows that Section 4.1(g) is dispensable. The OMA stands on its own without it. DACO's declaratory action, which challenges only PREB's unlawful resolution and the collateral presumption that such a waiver could be secured by regulatory action, does not impair estate property. Cf. *Milk Indus. Reg. Off. v. Ruiz (In re Ruiz)*, 122 F.4th 1 (1st Cir. 2024) (holding that a regulator's enforcement of its statutory mandate fell within the police power exception even though it affected a debtor's contractual interests).

## C. In re Fin. Oversight Bd. v. Commonwealth Is Inapposite: DACO Targets Only PREB's *Ultra Vires* Resolution

In *In re Fin. Oversight & Mgmt. Bd. v. Commonwealth*, 2022 WL 17413011 (D.P.R. Feb. 7, 2022), the Puerto Rico Senate sought to void the OMA in its entirety. The Court held that attempt violated § 362 because the OMA itself—an integrated post-petition contract—constituted property of the estate.

Here, DACO does not seek to void the OMA. It challenges PREB's separate administrative action granting an unlawful waiver. Unlike in *Oversight Bd.*, there is no attempt to impair or invalidate the contract itself. The challenged provision (Art. 4.1(g)) never created estate property to begin with, because it is only an agreement to apply.

Property of the estate includes enforceable rights, not hopes or possibilities. The right to petition a regulator is not estate property—just as a license applicant has no property interest until a license is granted. LUMA, however, operates as if PREB's 2021 resolution was the inevitable and automatic consequence of Article 4.1(g), treating the waiver as if it was contractually secured and beyond PREB's discretion. That assumption is legally flawed. PREB always retained the authority to deny or limit any such waiver, and Article 4.1(g) did not and could not, strip the regulator of its discretion.

DACO's action therefore does not interfere with PREPA's estate. It merely vindicates the limits of PREB's statutory authority and underscores that neither LUMA nor PREPA ever acquired a vested property interest in an unconditional waiver.

## D. Invalidating the PREB-Authorized Waiver Does Not Undermine the OMA, and PROMESA's Stay Cannot Be Stretched Beyond Its Purpose

LUMA exaggerates the consequences of invalidating the PREB waiver resolution, suggesting that it would unravel the entire OMA. See Dkt. No. 29962 at p. 17. That claim is unfounded. The OMA's central purpose—the operation and maintenance of PREPA's transmission and distribution system—remains wholly intact without the waiver contemplated and to be "appl[ied] for" under Article 4.1(g). The provision is collateral, not essential.

This makes the present case starkly different from *In re Fin. Oversight Bd. v. Commonwealth*, 2022 WL 17413011 (D.P.R. Feb. 7, 2022), where the Puerto Rico Senate

sought to void the OMA in its entirety. There, this Court properly held that an attack on the whole OMA implicated estate property. Here, DACO challenges only an unlawful regulatory-approved waiver that was not contractually mandated.

To extend the stay here would improperly transform an invalid administrative act into estate property and immunize LUMA from legitimate consumer oversight.

## E. The OMA Already Insulates PREPA and Consumers Through the Disallowed Costs Framework

LUMA argues that DACO's action threatens PREPA's estate because invalidating PREB's waiver would expose PREPA and its restructuring to additional liabilities. That argument collapses under the OMA's own terms. As PREPA itself explained in its brief before the Puerto Rico Supreme Court, the contract expressly insulates both PREPA and consumers from bearing the costs of LUMA's negligence through the Disallowed Costs provisions.

Section 7.6(a)(i) defines "Disallowed Costs" to include any losses, expenses, or liabilities incurred "to the extent arising out of or resulting from the Operator's own negligence, gross negligence, or willful misconduct." <u>See</u> Dkt. No 29962-2 at p. 104 of 337. In plain terms, if LUMA acts negligently—or even recklessly—it must bear those costs itself. They cannot be reimbursed by PREPA, charged to ratepayers, or recovered as part of the service fee.

Section 18.2(b)(ii) reinforces this allocation. It excludes from PREPA's indemnification obligations any damages, claims, or losses that "result from the negligence or willful misconduct of any Operator Indemnitee." <u>See</u> Dkt. No 29962-2 at p. 151 of 337. This clause makes it explicit that PREPA cannot be compelled to indemnify LUMA for liabilities caused by LUMA's own wrongful acts. The structure of indemnity

19

under the OMA is thus narrow, carefully designed to shield PREPA and the public from paying for LUMA's mistakes.

Together, these provisions form a contractual firewall. They ensure that the risks of LUMA's negligence rest solely with LUMA, not with PREPA or Puerto Rico's consumers. The omission of PREPA's indemnity for negligence is not accidental, it reflects the parties' deliberate allocation of risk when the OMA was negotiated.

LUMA's attempt to reframe PREB's waiver as indispensable to the OMA ignores this careful design. Even without PREB's unlawful resolution, the OMA already provides that negligence-based liabilities are "Disallowed Costs" for which LUMA alone is responsible. As PREPA emphasized in its Supreme Court brief, the invalidation of Article 4.1(g) or PREB's resolution would not increase PREPA's costs or compromise its restructuring. To the contrary, it would simply leave in place the very risk allocation the contract already prescribes.

<u>This reality is fatal to LUMA's claim that the automatic stay must be extended</u>. There is no estate property at risk, because PREPA has no duty to shoulder LUMA's negligence costs in the first place. What LUMA seeks through PREB's waiver is not the protection of a bargained-for contractual right, but the deletion via judicial fiat of a contractual risk it voluntarily assumed in 2020. That overreach cannot be dressed up as an urgent stay issue.

## F. DACO's Action Falls Within the Police and Regulatory Power Exception

Even if *arguendo* Article 4.1(g) touched on estate property, which it does not, DACO's declaratory action falls squarely within the police and regulatory power exception of 11 U.S.C. § 362(b)(4). That exception provides that the automatic stay does not apply to "the commencement or continuation of an action or proceeding by a governmental unit

20

App.508

... to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment."

### i. The Ruiz Decision Confirms the Breadth of the Exception

The First Circuit's recent decision in *Milk Indus. Reg. Off. v. Ruiz (In re Ruiz)*, 122 F.4th 1 (1st Cir. 2024), is directly on point. There, Puerto Rico's milk regulator (ORIL) revoked a debtor's dairy license for trafficking and ordered him to dispose of his milk quota. When the debtor refused, ORIL scheduled an auction of the quota. The bankruptcy and district courts both held the auction violated the automatic stay, but the First Circuit reversed. It held that ORIL's actions "fall squarely within the police power exception" because they were taken to enforce a regulatory judgment, not to collect a debt or advance a pecuniary interest. Id. at 6.

The court emphasized that § 362(b)(4) ensures agencies can enforce laws "affecting health, welfare, morals and safety." Id. at 13. The auction, although implicating property of the estate, was simply the enforcement of a non-monetary regulatory judgment—the revocation of a license. It rejected the debtor's argument that any overlap with estate property barred application of the exception, stressing instead that the focus is on the purpose of the government action.

### ii. Public Policy and Pecuniary Purpose Tests Both Point to Exemption

As the First Circuit explained, courts apply both the public policy test and the pecuniary purpose test to determine whether § 362(b)(4) applies. Under the public policy test, proceedings that effectuate public policy fall within the exception, while those adjudicating private rights do not. Under the pecuniary purpose test, actions designed to protect public welfare qualify, while those motivated by revenue collection or economic gain do not. *Ruiz*, 122 F.4th at 14–16. Applying these tests, the First Circuit held ORIL's

actions were exempt because they enforced Puerto Rico's regulatory regime for milk production which is a matter of public welfare, and any financial consequences were merely incidental.

That reasoning applies with equal, if not greater, force here. DACO's declaratory action enforces Puerto Rico's consumer-protection regime and vindicates the Legislature's determination that consumers must retain access to judicial remedies for negligence. Under the public policy test, DACO's action protects consumers from being stripped of remedies by an agency lacking statutory authority. Under the pecuniary purpose test, DACO has no financial stake; it seeks no damages or revenue for the Commonwealth. Its only aim is to prevent PREB from granting blanket tort immunities it was never authorized to confer. Just as in *Ruiz*, where incidental financial consequences did not negate ORIL's regulatory purpose, any collateral effect here on PREPA's estate does not alter the fundamentally public and regulatory character of DACO's suit.

DACO's action thus satisfies both tests. It is quintessential public policy enforcement: restraining regulatory overreach and preserving substantive rights guaranteed under the Puerto Rico Civil Code. It is also free of any pecuniary motive, as DACO neither seeks nor could obtain a money judgment. The sole purpose of the action is to restore the statutory and constitutional boundaries on PREB's authority and protect consumers from unlawful deprivation of remedies.

To hold otherwise would, as the First Circuit cautioned, improperly extend the stay to shield "ongoing debtor conduct which would seriously threaten the public safety and welfare." *Ruiz*, 122 F.4th at 15.

### iii. Allowing the Stay to Block DACO Would Upend Congress' Design

Such an interpretation would upend Congress's design in PROMESA, which deliberately preserved the police power exception to safeguard core consumer protections. To hold otherwise would extend the stay to shield *ultra vires* acts that strip consumers of substantive rights from judicial oversight, an outcome flatly inconsistent with the text, purpose, and case law surrounding §362(b)(4).[7] Congress drafted PROMESA to balance restructuring with the preservation of Puerto Rico's regulatory authority. It expressly incorporated the police power exception so that essential consumer protections, like DACO's, would not be paralyzed by bankruptcy litigation. The House Report makes this point plain, explaining that PROMESA incorporated the Bankruptcy Code "without narrowing the scope of existing exceptions," including §362(b)(4). H.R. Rep. No. 114-602, at 45 (2016). Indeed, PREPA itself has conceded that the OMA already prevents ratepayers from bearing the costs of LUMA's negligence; DACO's suit only ensures that PREB cannot legislate away liability it has no authority to erase. In that sense, this action strengthens, rather than undermines, the statutory framework governing PREPA's restructuring.

### V. Conclusion

Article 4.1(g) is not a liability waiver, not a contractual release, and not a vested right. It is merely an agreement to apply to PREB, leaving the regulator free to exercise

---

[7] See *Board of Governors of the Fed. Reserve Sys. v. MCorp Financial, Inc.*, 502 U.S. 32, 40-41 (1991) (holding that automatic stay does not bar agency enforcement of regulatory authority, even where debtor's property is implicated, because "[t]he language of § 362(b)(4) is intended to prevent a debtor from frustrating necessary governmental functions by seeking refuge in bankruptcy court"); *SEC v. Brennan*, 230 F.3d 65, 71 (2d Cir. 2000) (explaining that § 362(b)(4) "is to be construed broadly to permit governmental units to pursue actions to protect the public health and safety"); accord *In re First Alliance Mortg. Co.*, 263 B.R. 99, 107 (B.A.P. 9th Cir. 2001) (same).

its statutory discretion. PREB's attempt to grant LUMA sweeping immunity was *ultra vires* and cannot convert a speculative expectation into property of the estate.

Moreover, the OMA's Disallowed Costs provisions already place the financial responsibility for negligence squarely on LUMA. PREPA and consumers cannot be saddled with those liabilities, whether or not PREB's waiver stands. LUMA's effort to invoke the stay is thus not about protecting estate property but about evading contractual risks it voluntarily assumed in 2020.

DACO's action enforces Puerto Rico's consumer protection laws and prevents PREB from overstepping its statutory bounds. Under § 362(b)(4) and the First Circuit's ruling in *In re Ruiz*, such regulatory enforcement is exempt from the stay. Extending the stay to shelter PREB's unlawful waiver would contradict PROMESA's text and purpose, harming consumers while unjustly relieving LUMA of obligations it agreed to bear.

Accordingly, this Court should hold that the automatic stay does not apply to this controversy and should **deny LUMA's Urgent Motion in its entirety**.

**WE HEREBY CERTIFY** that on this date we electronically filed the present motion with the Clerk of Court using the CM/ECF system which will send electronic notification of said filing to all parties of record.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 2nd day of October 2025.

**SECRETARY OF DACO**
Box 41059
Minillas Station
San Juan, PR 00940-1059
Office Phone No.: (787) 722-7555

*/s/ Valerie Rodríguez Erazo*
USDC - PR No. 228910
E-mail: vrodriguez@daco.pr.gov

**H. LÓPEZ LAW, LLC**
Metro Office Park
Street 1, BDG 11, Suite 105A
Guaynabo, PR 00968
Office Phone No.: (787) 945-0067

*/s/Heriberto López-Guzmán*
USDC-PR No. 224611
E-mail: hlopez@hlopezlaw.com

24

Case: 25-2077   Document: 00118376456   Page: 518   Date Filed: 12/08/2025   Entry ID: 6770995

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL SUPREMO DE PUERTO RCO

EXHIBIT 1

| | |
|---|---|
| DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR, | TS: CT-2025-0003 |
| Peticionario, | TPI Núm.: SJ2025CV06607 |
| vs. | Materia: Sentencia Declaratoria |
| LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO, | Asunto: Impugnación de constitucionalidad de actuación administrativa |
| Recurridos. | |

RADICADO
SECRETARIA
RECIBIDO SEP 23 PM 4: 22

### ALEGATO DE LA PARTE RECURRIDA LA AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO

**ABOGADOS DE LA PARTE RECURRIDA**

**AUTORIDAD DE ENERGÍA ELÉCTRICA**

**GONZÁLEZ & MARTÍNEZ**
1509 López Landrón, Bldg.
Seventh Floor
San Juan, P.R. 00911
Tel.: (787) 274-7404

**Lcdo. Juan M. Martínez Nevárez**
RUA Núm.: 14517
E-mail: jmartinez@gmlex.net

**Lcda. Mirelis Valle Cancel**
RUA Núm. 21,115
E-mail: mvalle@vcprlaw.com

**ABOGADOS DE LA PARTE PETICIONARIA**

**DEPARTAMENTO DE ASUNTOS AL CONSUMIDOR**
Minillas Station
San Juan, P.R. 00940-1059
Tel.: (787)722-7555

**Lcda. Valerie Rodríguez Erazo**
RUA: 16,861
E-mail: vrodriguez@daco.pr.gov

**Lcdo. Gadiel Figueroa Robles**
RUA: 18687
E-mail: gfigueroa@daco.pr.gov

**Lcdo. Samuel Silva Rosas**
RUA Núm. 7,883
E-mail: ssilva@daco.pr.gov

**PARTE RECURRIDA**

**NEGOCIADO DE ENERGÍA DE PUERTO RICO**
P.O. Box 365061 San Juan, P.R. 00936-5061
Tel.: (787) 722-9911

**Lcdo. Edgardo L. Rodríguez Cardé**
RUA Núm. 13,211
elrc@rclopr.com

**Lcda. Yarymar González Carrasquillo**
RUA Núm. 13,219
ygc@halspr.com

Case: 25-2077    Document: 00118376456    Page: 519    Date Filed: 12/08/2025    Entry ID: 6770995

**LUMA ENERGY, LLC Y LUMA ENERGY SERVCO, LLC.**

**Lcda. Margarita Mercado Echegaray**
RUA Núm.: 16,266
Margarita.mercado@us.dlapiper.com

**Lcda. Yahaira De La Rosa Alagarín**
RUA Núm.: 18,061
Yahaira.delarosa@us.dlapiper.com

**Lcdo. Jan M. Albino López**
RUA Núm.: 22,891
Jan.albinolopez@us.dlapiper.com

**DLA Piper (Puerto Rico) LLC**
500 Calle de la Tanca
Suite 401
San Juan, PR 00901
Tel.: (787) 945-9107/9132/9103

**Lcdo. Frank Torres Viada**
RUA Núm.: 14, 724
P.O. Box 192084
San Juan, P.R. 00919-2084
Tel.(787) 754-1102

**Lcdo. José Andreú Fuentes**
RUA Núm. 9,088
261 Ave. Domenech
San Juan 00918-3518
Tel.(787) 754-1777
jaf@andreu-sagardia.com

**PARTE INTERVENTORA**

**Lcdo. Charle A. Rodríguez Colón**
crodriguez@naleapr.com
RUA Núm.: 7,831
252 Ave. Ponce de León Suite 1801
San Juan, P.R. 00918-2020
Tel.: (787) 378-2424

**Lcdo. Miguel A. Rodríguez Ramos**
miguelrrlaw@gmail.com
RUA Núm.: 22,062
P.O. Box 19586
San Juan, P.R. 00910
Tel.: (787) 604-2772

**Lcdo. Victor Calderón Cestero**
victor@calderon-law.com
RUA Núm.: 13,266
137 Calle O
Aguadilla, P.R. 00603
Tel.: (787) 602-2465

**Lcdo. Fernando E. Agrait**
agraitte@agraitlawpr.com
RUA Núm.: 3,772
Edificio Centro de Seguros
Oficina 414

701 Ave. Ponce de León
Ssn Juan, P.R. 00907
Tel.: (787) 725-3390
Fax Núm.: (787) 724-0353

**Lcdo. José Leonardo Pou Román**
jpouroman@outlook.com
RUA Núm.: 23,523
Edificio Centro de Seguros
Oficina 414
701 Ave. Ponce de León
Ssn Juan, P.R. 00907
Tel.: (787) 725-3390
Fax Núm.: (787) 724-0353

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL SUPREMO

| | |
|---|---|
| **MUNICIPIO AUTÓNIMO DE GUAYNABO; MUNICIPIO AUTÓNOMO DE BAYAMÓN** Recurrida | Núm. caso TS: |
| | Núm. caso TA: KLRA202500280 consolidado con KLRA202500283 |
| v. | Núm. caso ante organismo recurrido: **NEPR-QR-2019-0149 NEPR-RV-2019-0125** |
| **AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO; LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC** Peticionario | Revisión procedente del Negociado de Energía de Puerto Rico SOBRE: Resolución Final |

## ÍNDICE DE MATERIAS

| | PÁGINAS |
|---|---|
| I. Introducción……………………………………………....................... | 1-2 |
| II. Breve Relación de Hechos Procesales…………………….............. | 3-6 |
| III. Breve Relación de Hechoss Pertinentes ……………………........ | 6-9 |
| IV. Argumentación……………………………………....................... | 9-13 |
| V. Súplica ………………………………………………................... | 13 |
| VI. Certificación de Notificación…………………………............... | 14 |

Case: 25-2077     Document: 00118376456     Page: 521     Date Filed: 12/08/2025     Entry ID: 6770995

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL SUPREMO

| | |
|---|---|
| MUNICIPIO AUTÓNIMO DE GUAYNABO; MUNICIPIO AUTÓNOMO DE BAYAMÓN<br>Recurrida<br><br>v.<br><br>AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO; LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC<br>Peticionario | Núm. caso TS:<br><br>Núm. caso TA: KLRA202500280 consolidado con KLRA202500283<br><br>Núm. caso ante organismo recurrido:<br>**NEPR-QR-2019-0149**<br>**NEPR-RV-2019-0125**<br><br>Revisión procedente del Negociado de Energía de Puerto Rico<br><br>**SOBRE:**<br><br>Resolución Final |

### ÍNDICE LEGAL

**Jurisprudencia de Puerto Rico**                                              **Página(s)**

Aut. Puertos PR v. Total Petroleum et al.
210 D.P.R. 16 (2022)...................................................................................12

Brau, Linares v. ELA et als.
190 D.P.R. 315, 337 (2014).........................................................................12

Sánchez v. Eastern Air Lines, Inc.
114 D.P.R. 691 (1983)..................................................................................12

Santiago Cruz v. Hernández Andino
91 D.P.R. 709, 712 (1965)...........................................................................12

Senado de PR v. ELA
203 D.P.R. 62, 83 (2019)............................................................................12

Trabal Morales v. Ruiz Rodríguez
125 D.P.R. 340, 351 (1990).........................................................................12

U.P.R. v. Laborde Torres y otros I
180 D.P.R. 253, 272–273 (2010). ..............................................................6

**App.517**

Case: 25-2077    Document: 00118376456    Page: 522    Date Filed: 12/08/2025    Entry ID: 6770995

Case: 25-2077          Document: 00118376456          Page: 523          Date Filed: 12/08/2025          Entry ID: 6770995

ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL GENERAL DE JUSTICIA
TRIBUNAL SUPREMO DE PUERTO RCO

| | |
|---|---|
| DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR,<br><br>Peticionario,<br><br>vs.<br><br>LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO,<br><br>Recurridos. | TS: CT-2025-0003<br><br>TPI Núm.: SJ2025CV06607<br><br>Materia: Sentencia Declaratoria<br><br>Asunto: Impugnación de constitucionalidad de actuación administrativa |

ALEGATO DE LA PARTE RECURRIDA
AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO

**AL HONORABLE TRIBUNAL SUPREMO:**

COMPARECE la parte recurrida, Autoridad de Energía Eléctrica, por conducto de la representación legal que suscribe y, muy respetuosamente, EXPONE Y SOLICITA:

### I. INTRODUCCIÓN

En cumplimiento de su deber legal y fiduciario de administrar el sistema eléctrico en beneficio del Pueblo de Puerto Rico, la AEE aceptó los términos de la Sección 4.1(g) del *Transmission and Distribution Operation and Maintenance Agreement* ("T&D OMA") y autorizó a LUMA Energy, LLC y LUMA Energy ServCo, LLC (conjuntamente, "LUMA") a solicitar al Negociado de Energía de la Junta Reglamentadora del Servicio Público ("Negociado de Energía") que incluyera en los términos de servicio cierto relevo de responsabilidad. Tal autorización se otorgó procurando un balance justo entre la continuidad del servicio, la responsabilidad fiscal y la protección del consumidor. En todo momento, la AEE ha obrado movida por el espíritu de la Ley Núm. 120 de 20 de junio de 2028, según enmendada, conocida como la "Ley para Transformar el Sistema Eléctrico de Puerto Rico" ("Ley 120-2018") y demás marco estatutario aplicable, de asegurar que los costos del servicio eléctrico sean justos, razonables y consistentes con prácticas fiscales y operacionales acertadas, que garanticen un servicio confiable al menor costo razonable para el Pueblo.

App.518

Case: 25-2077      Document: 00118376456      Page: 524      Date Filed: 12/08/2025      Entry ID: 6770995

Por ello, en la eventualidad de que este Honorable Tribunal Supremo declare nula la *Resolución Final* (según definida más adelante) del Negociado de Energía y, en consecuencia, el Relevo de Responsabilidad (según definido más adelante) allí autorizado, la AEE le solicita a esta Máxima Curia que aclare el estado de derecho resultante. En particular, que resuelva que el T&D OMA establece con absoluto claridad que cualquier reclamación de daños y perjuicios presentada por los abonados como consecuencia de la negligencia ordinaria, negligencia crasa o conducta culposa intencional de LUMA constituye un Costo Desautorizado ("Disallowed Cost"), el cual debe ser asumido única y exclusivamente por LUMA, sin posibilidad de ser traspasado a la AEE ni a los abonados. Este pronunciamiento resulta indispensable para asegurar que los consumidores no sean forzados a sufragar, mediante aumentos tarifarios u otros mecanismos, los costos económicos derivados de actos negligentes o dolosos imputables a LUMA.

De otra parte, la AEE entiende indispensable subrayar que la Demanda presentada por el Departamento de Asuntos del Consumidor ("DACO") no plantea controversia alguna sobre la validez constitucional del Reglamento Núm. 7982 de la AEE titulado *Reglamento de Términos y Condiciones Generales para el Suministro de Energía Eléctrica de la AEE*. Conforme a la normativa jurisprudencial vigente, los reglamentos gozan de presunción de constitucionalidad hasta tanto un tribunal disponga lo contrario, y los foros apelativos deben abstenerse de adjudicar asuntos no planteados ni ventilados en primera instancia. Siendo así, no corresponde a este Honorable Tribunal pronunciarse sobre la constitucionalidad del referido Reglamento - cuya impugnación no fue promovida por las partes en el pleito, sino incidentalmente por interventores o amigos de la corte -, máxime cuando la disposición reglamentaria en cuestión resulta claramente distinguible del Relevo de Responsabilidad objeto del presente recurso.

En síntesis, la AEE comparece ante este Honorable Tribunal con el único fin de salvaguardar los intereses del Pueblo de Puerto Rico, garantizar la correcta aplicación del T&D OMA y reafirmar que, aun en ausencia del Relevo de Responsabilidad, la ley y el contrato vigente aseguran que los abonados no carguen con el peso de las omisiones negligentes o actos culposos de LUMA.

Case: 25-2077   Document: 00118376456   Page: 525   Date Filed: 12/08/2025   Entry ID: 6770995

II.     **BREVE RELACIÓN DE HECHOS PROCESALES DEL CASO DE EPÍGRAFE**

1.     El 22 de julio de 2025, el DACo presentó la Demanda de epígrafe ante el Tribunal de Primera Instancia ("TPI") sobre sentencia declaratoria en contra de LUMA, el NEPR y la AEE. En dicha alegación, el DACo solicitó que se declare inconstitucional la *Resolución y Orden* final emitida por el Negociado de Energía el 31 de mayo de 2021, en caso núm. NEPR-MI-2021-0007 ("Resolución Final"). Según expone la Demanda, dicha *Resolución y Orden* es inconstitucional porque el Negociado de Energía violentó el principio de separación de poderes al aprobar los siguientes *Modified Terms of Service*, los cuales fueron incluidos en el Libro de Tarifas de la AEE efectivo el 1 de junio de 2021. La porción de dichos *Modified Terms of Service* cuya validez el DACo impugna en el presente recurso está identificada en **negrillas**:

<u>Modified Terms of Service</u>

1.     It is recognized that certain components of the Puerto Rico Electric Power Authority's ("PREPA") electric power system (including, the Transmission and Distribution System ("T&D System"), as well as the Generation Facilities) currently do not meet the standards of performance generally accepted in the electric utility industry. The whole system needs significant repairs, improvements, and modernization to achieve acceptable standards of service. Furthermore, certain components of the T&D System and the manner in which the T&D System is operated do not currently meet acceptable standards of performance, including the fact that certain general operating and administrative practices may not comply with acceptable industry standards and practices. Therefore, a period of review, planning, remediation, reconstruction, repair, and replacement will be required to enable LUMA Energy, LLC, LUMA Energy Servco, LLC (together, "LUMA"") and PREPA to operate the electric system according to acceptable standards. In light of the foregoing, PREPA and LUMA, with the cooperation of other governmental entities developed a plan, taking into account expected funds availability, particularly from the Federal Emergency Management Agency (FEMA), to remediate, repair, reconstruct, replace and stabilize such equipment, systems, practices and services, as needed, to enable LUMA to perform the operation and maintenance services contracted in compliance with the applicable standards as soon as reasonably possible and at a reasonable cost to PREPA ("System Remediation Plan""). The System Remediation Plan shall be review and approved by the Energy Bureau of the Puerto Rico Public Service Regulatory Board ("Energy Bureau"").

2.     Taking in consideration the circumstances described in the preceding paragraph, and other generally known, PREPA and LUMA shall make all reasonable efforts to provide an efficient and reliable service to its customers and users. A user is a person (natural or legal) who received and uses power and electricity at a certain location and whose consumption is recorded and invoiced in the name of another person.

Case: 25-2077    Document: 00118376456    Page: 526    Date Filed: 12/08/2025    Entry ID: 6770995

3. PREPA and LUMA shall make all reasonable efforts to maintain continuity of service, but PREPA and LUMA cannot guarantee an uninterrupted electricity supply to its customers and users.

4. Without liability of any kind to PREPA and/or LUMA, PREPA and/or LUMA shall have the right to disconnect or otherwise curtail, interruptor reduce service to customers and users: (a) whenever PREPA and/or LUMA reasonably determines it is necessary to facilitate construction, installation, maintenance, repairs, replacement or inspection of any of PREPA's facilities, or to permit the connection or disconnection of other customers; (b) to maintain the safety and reliability of PREPA's electric system (including without limitation, transmission, distribution and generation facilities); or (c) due to any other reason attributable to third parties or related to dangerous ar hazardous circumstances, including without limitation, emergencies, forced outages, potential overloading of PREPA's transmission and/or distribution system, sabotage, strikes, unauthorized acts by employees or Force Majeure. Notwithstanding the foregoing, PREPA and/or LUMA shall use reasonable efforts to minimize any scheduled curtailment, interruption, or reduction to the extent reasonably practicable under the circumstances, to provide the customer (and not to the user, because is not a registered customer) with prior notification of any such curtailment, interruption, or reduction to the extent reasonably practicable, and to resume the customer's service connection as promptly as reasonably practicable.

5. **Notwithstanding anything to the contrary in these Modified Terms of Service and Regulation 7982, PREPA, its directors, officers, employees, agents and contractors (including LUMA Energy, LLC, LUMA Energy Servco, LLC, their directors, officers, employees, agents and contractors) (the "Released Parties") shall not be liable contractually or extra-contractually, to customers, or any user receiving power or electricity from PREPA and/or LUMA for any losses arising in any way out of or in connection with the operation of the T&D System and the provision of power and electricity including any events of interrupted, irregular or defective electric service due to Force Majeure events or from pre-existing deteriorated electric system conditions, other causes beyond the control of the Released Parties, unauthorized acts by employees, sabotage, strikes or due to ordinary negligence (excluding gross negligence, willful misconduct or dolo) of the Released Parties or their respective employees, agents or contractors. In any event that the Released Parties are found responsible however and whensoever in connection with the provision of service to customers or users receiving power or electricity from PREPA and/or LUMA customers or users shall only recover direct damages (including direct physical loss, injury or damage to a customer or customer's property). For the foregoing and without otherwise restricting the generality thereof, "direct physical loss, injury or damage" shall not include any loss of profits or revenues, special, exemplary, punitive, indirect, incidental, or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms.**

6. Notwithstanding anything to the contrary contained in these Modified Terms of Service, PREPA and LUMA will remain fully accountable and liable to the Energy Bureau for compliance with the Puerto Rico energy public policy as well as all legal and regulatory requirements applicable to electric service companies, and, particularly to LUMA as operator of the T&D System. Nothing in these Modified Terms of Service shall have the effect of releasing or

Case: 25-2077   Document: 00118376456   Page: 527   Date Filed: 12/08/2025   Entry ID: 6770995

waiving PREPA and/or LUMA from any penalty, fine or obligation imposed by the Energy Bureau for whatever reason whatsoever.

*Véase* Apéndice Suplementario de LUMA ("Ap. Sup. LUMA"), pág. 0445-0447 (en adelante, el "Relevo de Responsabilidad").

2.      La AEE fue emplazada conforme a Derecho el 23 de julio de 2025. Ap., págs. 442-451.

3.      El 24 de julio de 2025, los interventores el Senado de Puerto Rico ("Senado") y la Cámara de Representantes de Puerto Rico ("Cámara") presentaron ante el TPI su *Solicitud y Alegato del Senado de Puerto Rico y la Cámara de Representantes de Puerto Rico en Calidad de Amigos de la Corte.* Ap., págs. 452- 465. En síntesis, el Senado y la Cámara sostuvieron que la Asamblea Legislativa no le había delegado al Negociado de Energía la facultad de conceder a un operador privado una inmunidad cuasi-soberana. Por ello, catalogaron la adopción por el Negociado de Energía de la Resolución Final como un acto *ultra vires*, en violación a la doctrina de separación de poderes.

4.      El 6 de agosto de 2025, el Instituto de Competitividad y Sostenibilidad Económica de Puerto Rico, Inc. ("ICSE") presentó su *Solicitud de Intervención como Amicus Curiae* ante el TPI. Ap., págs. 467-484. En síntesis, el ICSE sostuvo que la actuación del Negociado de Energía de aprobar una exención de responsabilidad por los daños y perjuicios causados en la *Resolución Final* es un acto ultra vires, que violenta el principio de separación de poderes.

5.      Así las cosas, el 8 de agosto de 2025, el DACO presentó ante este Honorable Tribunal Supremo el *Recurso de Certificación Intrajurisdiccional* que nos ocupa.

6.      El 12 de agosto de 2025, notificada en esa misma fecha, este Máximo Foro emitió *Resolución* en donde ordenó a la AEE a, en un término perentorio de tres (3) días, mostrar causa por la cual dicho Foro no deba acoger el recurso de certificación intrajurisdiccional y expedir el recurso (en adelante, "Orden de Mostrar Causa").

7.      En cumplimiento con la *Orden de Mostrar Causa*, el 15 de agosto de 2025, la AEE presentó su *Moción en Cumplimiento de Orden de Mostrar Causa.* En dicho escrito, la AEE reiteró su compromiso con la protección de sus abonados y, conforme al marco jurídico allí esbozado, se pronunció a favor de que este Honorable Tribunal Supremo acogiera y expidiera el recurso de certificación

Case: 25-2077    Document: 00118376456    Page: 528    Date Filed: 12/08/2025    Entry ID: 6770995

intrajurisdiccional por estimar que la impugnación del DACo sobre la constitucionalidad de la *Resolución Final* emitida por el Negociado de Energía es un "asunto ... de tal importancia que exige una pronta atención". *U.P.R. v. Laborde Torres y otros I*, 180 D.P.R. 253, 272–273 (2010). La AEE destacó que al peticionar al Negociado de Energía que autorizara la inmunidad cualificada en cuestión, la AEE actuó en protección de sus abonados contra alzas potenciales en la factura eléctrica, pues la inmunidad en cuestión reduce los costos de operar el sistema eléctrico. Ello redunda en un ahorro económico para todos los abonados de la AEE, pues son éstos quienes sufragan los costos de operar el referido sistema eléctrico a través de la tarifa.

8. El 22 de agosto de 2025, este Honorable Tribunal Supremo emitió Resolución en donde expidió el recurso de certificación, concedió quince (15) días improrrogables, a vencer el 8 de septiembre de 2025, para que DACo presentara el alegato de la parte peticionaria y quince (15) días improrrogables, contados a partir de la presentación del alegato de la parte peticionaria, para que las partes recurridas presentaran su alegato. El término concedido a las partes recurridas vence el 23 de septiembre de 2025.

9. El 8 de septiembre de 2025, el DACo presentó el Alegato de la Parte Peticionaria.

10. En esa misma fecha, esto es, el 8 de septiembre de 2025, el ICSE presentó *Alegato del Amicus Curiae del Instituto de Competitividad y Sostenibilidad Económica*.

11. El 19 de septiembre de 2025, LUMA presentó Moción Informativa en donde informó que había presentado el escrito intitulado *Urgent Motion of LUMA to Enforce the Automatic Stay* en caso de la AEE bajo el Título III de la Ley PROMESA, Caso Núm. 17-BK-4780-LTS, actualmente pendiente ante el Tribunal Federal para el Distrito de Puerto Rico, Hon. Juez Laura Taylor Swain.

12. Oportunamente, la AEE comparece antes este Honorable Tribunal Supremo y se expresa sobre la controversia de epígrafe.

### III. BREVE RELACIÓN DE OTROS HECHOS PERTINENTES

1. El 22 de junio de 2020, la Autoridad para los Alianzas Público-Privadas ("P3"), la AEE y LUMA suscribieron el *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* ("T&D OMA" por sus siglas en inglés). El

Entry ID: 6770995          Date Filed: 12/08/2025          Page: 529          Document: 00118376456          Case: 25-2077

T&D OMA, según enmendado y/o suplementado, establece, entre otras cosas, los

términos bajo los cuales LUMA debe operar el sistema de transmisión y distribución

de la AEE. La AEE continúa siendo la dueña de todos los activos públicos de

transmisión y distribución, así como de generación de energía eléctrica.

2.      En la Sección 4.1(g) del T&D OMA, LUMA, AEE y P3 se **comprometieron**

**a solicitar** al Negociado de Energía que este incluyera en los términos de servicio

cierto relevo de responsabilidad, a favor de la LUMA y la AEE. La referida

disposición contractual lee como sigue:

> (g)     Liability Waiver. In connection with the submission of the Initial
> Budgets to PREB, **the Parties <u>agree to apply</u> for inclusion in the Rate
> Order that the associated tariff or terms of service include:** (i) a waiver
> of Owner's, ManagementCo's and ServCo's liability to customers or
> any Person receiving Power and Electricity for any Losses arising in any
> way out of or in connection with the operation of the T&D System and
> the provision of Power and Electricity including any events of
> interrupted, irregular or defective electric service due to Force Majeure
> Events, other causes beyond Owner's, ManagementCo's or ServCo's
> control or ordinary negligence, gross negligence or willful misconduct
> of Owner, ManagementCo or ServCo, or their respective employees,
> agents or contractors; and (ii) a waiver in all cases of responsibility for
> any loss of profits or revenues, special, exemplary, punitive, indirect,
> incidental or consequential damages, including loss of revenue, loss of
> use of equipment, cost of capital, cost of temporary equipment,
> overtime, business interruption, spoilage of goods, claims of customers
> of electric customers or other economic harms, in each case
> howsoever and whensoever arising, including where caused by any of
> Owner's, ManagementCo's or ServCo's ordinary negligence, gross
> negligence or willful misconduct (collectively the "Liability Waiver").

Véase Ap. pág. 354 (énfasis suplido).

3.      En cumplimiento con dicha obligación, el 24 de febrero de

2021, LUMA presentó ante el Negociado de Energía una *Petición de Aprobación

de Presupuestos Iniciales y Términos de Servicio Relacionados* ("Petición de

Presupuestos Iniciales") en donde solicitó la aprobación de ambos asuntos: los

Presupuestos Iniciales y unos Términos de Servicio propuestos. Ap. Sup. LUMA, págs.

24-42.

4.      El 5 de abril de 2021, el Negociado de Energía emitió una *Resolución y

Orden* mediante la cual determinó que lo más apropiado era evaluar los Términos

de Servicio en un procedimiento separado.

5.      Cónsono con lo anterior, el 4 de mayo de 2021, el Negociado de

Energía emitió una *Resolución y Orden* en donde abrió el Caso Núm. NEPR-MI-2021-

0007, para evaluar los Términos de Servicio.

Case: 25-2077   Document: 00118376456   Page: 530   Date Filed: 12/08/2025   Entry ID: 6770995

6.     En el referido Caso Núm. NEPR-MI-2021-0007, el Negociado de Energía emitió la *Resolución Final* en donde finalmente adoptó unos Términos de Servicios Revisados, que incluyeron el Relevo de Responsabilidad que el DACo impugna en el presente recurso. Ap. Sup. LUMA, págs. 405-472.

7.     La Sección 18.2 del T&D OMA dispone que, **como norma general**, la AEE será responsable a LUMA por toda suma que LUMA se vea obligada pagar para satisfacer una sentencia final y firme dictada a favor de un abonado de la AEE/LUMA. En particular, dicha disposición establece lo siguiente:

> Indemnification by Owner.
>
> (a) Generally. Subject to the limitations on liability set forth in this Section 18.2 (Indemnification by Owner), Section 18.3 (Limitation on Liability), Section 18.4 (Insurance and Other Recovery), Section 18.5 (Liability Limitation for Certain Damages) and Section 18.6 (Additional Liability Limitation for Certain Damages), Owner shall indemnify, defend and hold harmless Operator and the Equity Participants and its and their respective Affiliates and Representatives (each, including Operator, an "Operator Indemnitee"), from and against (and pay the full amount of) any and all Losses incurred by an Operator Indemnitee to the extent arising or resulting from, in each case, as determined by a final and non-appealable judgment by a court of competent jurisdiction:
> [...]
> (vi) claims brought against Operator by a T&D Customer in connection with the T&D System or Operator's performance of the O&M Services[.]

8.     Sin embargo, la Sección 18.2(b) del T&D OMA reconoce **excepciones** a la antecitada norma general, particularmente en aquellas instancias donde medie negligencia ordinaria, negligencia crasa o conducta culposa intencional ("negligence (including gross negligence) or willful misconduct") por parte de LUMA. En particular, la Sección 18.2(b) establece que la AEE **no** estará obligada a realizar pago o reembolso alguno a LUMA por pérdidas sufridas por LUMA a consecuencia de su propia negligencia ordinaria, negligencia crasa o conducta culposa intencional por parte de LUMA. Dicha disposición lee como sigue:

> (b)    Limitations. ... Notwithstanding the foregoing, ... **Owner shall not be required to reimburse or indemnify any Operator Indemnitee [incluyendo a LUMA] for any Losses to the extent caused by or due to:**
> [...]
> (ii) the negligence (including gross negligence) or willful misconduct of any Operator Indemnitee [incluyendo a LUMA]...in each case as determined by a final and non-appealable judgment by a court of competent jurisdiction.
>
> (énfasis suplido).

Case: 25-2077    Document: 00118376456    Page: 531    Date Filed: 12/08/2025    Entry ID: 6770995

9.    Por su parte, **la Sección 7.6(a)(i) del T&D OMA establece que LUMA será la única responsable por los Costos Desautorizados ("Disallowed Costs").** La excepción de los Disallowed Costs establece que estos **no** constituyen Gastos Transferibles de Transmisión y Distribución (*T&D Pass-Through Expenditures*). Por ello, **los Disallowed Costs no pueden ser transferidos ni a la AEE, ni a sus abonados, sino que tienen que ser asumidos y sufragados por LUMA, de su propio pecunio.**

10.    Sobre este particular, la Sección 7.6 del T&D OMA, titulada *Disallowed Costs*, indica:

(a) Generally. Subject to the limitations on liability in Section 18.3 (*Limitation on Liability*), **none** of the following shall be treated as T&D Pass-Through Expenditures for purposes of payment from Owner to Operator, **and each shall be the sole responsibility of Operator [LUMA]** (collectively, 'Disallowed Costs'):

(i) any and all T&D Pass-Through Expenditures[1], Capital Costs, Outage Event Costs or Excess Expenditures **incurred as a result of Operator's negligence (including gross negligence) or willful misconduct,** except in connection with Section 5.10 (Environmental, Health and Safety Matters) where the applicable standard shall be gross negligence or willful misconduct to the extent provided therein[.]

(Énfasis suplido).

11.    La Sección 18.3 del T&D OMA establece que la responsabilidad de LUMA por Disallowed Costs producto de **negligencia ordinaria** estará limitada a **$35,000,000.00 en el agregado por pérdidas acaecidas en cualquier año contrato; y $105,000,000.00 en el agregado por todas las pérdidas acaecidas en el término total del contrato.** Específicamente, la referida sección indica lo siguiente:

Limitation on Liability. Notwithstanding anything contained in this Agreement to the contrary:

(a)    Operator General Limitations.

(i)    Except as set forth in Section 18.3(b) (*Limitation on Liability – Gross Negligence; Willful Misconduct*), **Operator's liability to Owner Indemnitees under Section 18.1** (*Indemnification by Operator*), **including Disallowed Costs,** shall be limited to US$35,000,000 in the aggregate for Losses occurring in any Contract Year; and US$105,000,000 in the aggregate for all Losses during the Term.

(Énfasis suplido).

**IV.    ARGUMENTACIÓN**

A. En la eventualidad de que la *Resolución Final* y el Relevo de Responsabilidad allí autorizado sean declarados nulos, la responsabilidad de pago por

---

[1] Entre los T&D Pass-Through Expenditures que constituyen *Disallowed Costs* cuando son producto de la negligencia de LUMA, y relevantes a la controversia ante esta Curia, se encuentran los "claims, lawsuits, litigations, losses, fines, penalties, costs and expenses, judgments, liens, settlements, appeals, disbursements and similar expense"

Case: 25-2077    Document: 00118376456    Page: 532    Date Filed: 12/08/2025    Entry ID: 6770995

reclamaciones de daños y perjuicios de los abonados de la AEE/LUMA ocasionados por la negligencia ordinaria, negligencia crasa o actos culposos intencionales de LUMA, le corresponde a LUMA por lo que <u>no</u> debería tener un impacto en la tarifa.

La AEE aceptó los términos de la Sección 4.1(g) del T&D OMA y autorizó a LUMA a solicitar al Negociado de Energía que incluyera en los términos de servicio cierto relevo de responsabilidad a favor de la LUMA y la AEE, en un esfuerzo para evitar potenciales aumentos de la tarifa eléctrica y, así, proteger a sus abonados. El relevo de responsabilidad sometido por LUMA estaba sujeto a revisión y aprobación de Negociado de Energía. En el ejercicio de sus prerrogativas estatutarias, el Negociado de Energía modificó los términos de servicio propuestos por LUMA y aprobó unos Términos de Servicio Modificados, los cuales incluyeron el Relevo de Responsabilidad al centro del presente recurso de certificación intrajurisdiccional.

Tanto LUMA como el Negociado de Energía ha expresado en sus escritos previos ante este Honorable Foro, que el anular el Relevo de Responsabilidad en cuestión podría redundar en aumentos tarifarios porque "las reclamaciones de los usuarios del sistema eléctrico por daños derivados de negligencia...son ...sufragadas por los clientes de la AEE". Véase: *Moción en Cumplimiento de Orden del Negociado de Energía*, pág. 16. Véase, además: *Oposición a Recurso de Certificación Intrajurisdiccional* de LUMA, pág. 4.

Sobre este particular, la AEE estima necesario hacer una importante aclaración. En la eventualidad que este Honorable Tribunal Supremo determine que la *Resolución Final* del Negociado de Energía aquí impugnada es inconstitucional y, en consecuencia, anule el Relevo de Responsabilidad allí concedido a LUMA y a la AEE, la AEE sostiene que **LUMA será la parte responsable por sufragar, de su propio pecunio, toda indemnización por daños y perjuicios concedida a los abonados de la AEE/LUMA como resultado de la negligencia ordinaria, negligencia crasa o conducta culposa intencional de LUMA, por constituir Disallowed Costsbajo la Sección 7.6(a)(i) del T&D OMA.**

Según indicado, el T&D OMA establece los contornos de la responsabilidad de LUMA y la AEE en lo que compete a la operación del sistema eléctrico. El referido contrato dispone que cualquier costo producto de la negligencia ordinaria, negligencia crasa o actos culposos intencionales de LUMA, como

Case: 25-2077     Document: 00118376456     Page: 533     Date Filed: 12/08/2025     Entry ID: 6770995

operador del sistema de transmisión y distribución, deben ser asumidos exclusivamente por ésta y **no** puede trasladarse a la AEE. A esos fines, la Sección 7.6(a)(i) del T&D OMA dispone que LUMA es la única responsable de absorber los costos derivados de su propia negligencia o conducta impropia, sin posibilidad de traspasarlos a la AEE ni a los consumidores.

Dicho de otra forma, el contrato excluye de forma categórica la obligación de la AEE y, por consiguientes, a los abonados, de indemnizar a LUMA cuando los daños reclamados sean consecuencia de la negligencia de la propia LUMA. A esos efectos, la Sección 18.2(b)(ii) dispone que la AEE no estará obligada a reembolsar o indemnizar a LUMA por cualquier pérdida causada por o debida a la negligencia de LUMA. ("Owner shall not be required to reimburse or indemnify any Operator Indemnitee for any Losses to the extent caused by or due to: [...] (ii) the negligence (including gross negligence) or willful misconduct of any Operator Indemnitee[.]").

Examinadas en conjunto, estas disposiciones demuestran que, en la eventualidad de que este Honorable Tribunal Supremo declare inconstitucional el Relevo de Responsabilidad autorizado por el Negociado de Energía en la *Resolución Final*, ello **no trasladaría las consecuencias pecuniarias de las reclamaciones de los abonados de la AEE/LUMA a la tarifa ni afectaría el patrimonio de la AEE.** Por el contrario, de eliminarse el referido relevo, todo abonado que pruebe daños ocasionados por la negligencia o actos intencionales de LUMA tendría derecho a una acción directa contra LUMA y los costos resultantes de dichas reclamaciones serían responsabilidad exclusiva de LUMA, los cuales deberá cubrir con su propio pecunio.

De modo que el marco contractual del T&D OMA protege a la AEE y a sus abonados, de responsabilidad pecuniaria por omisiones negligentes y actos culposos intencionales de LUMA. Por consiguiente, aun en ausencia del Relevo de Responsabilidad autorizado por la *Resolución Final*, la AEE y los abonados quedarían protegidos de reclamaciones contractuales y extracontractuales producto de la negligencia ordinaria, negligencia crasa o actos culposos intencionales de LUMA.

**B. La *Demanda* presentada por el DACo no cuestiona la constitucionalidad del Reglamento Núm. 7982, por lo que este Honorable Tribunal debe abstenerse de resolver dicho planteamiento.**

Case: 25-2077     Document: 00118376456     Page: 534     Date Filed: 12/08/2025     Entry ID: 6770995

Es norma firmemente establecida en nuestro ordenamiento jurídico que las leyes, las reglas y los reglamentos se presumen constitucionales hasta tanto un tribunal declare lo contrario. Aut. Puertos PR v. Total Petroleum et al., 210 D.P.R. 16 (2022); Brau, Linares v. ELA et als., 190 D.P.R. 315, 337 (2014). Véase Senado de PR v. ELA, 203 D.P.R. 62, 83 (2019).

Asimismo, también es norma bien establecida que los tribunales apelativos deben abstenerse de adjudicar cuestiones no planteadas en primera instancia. Trabal Morales v. Ruiz Rodríguez, 125 D.P.R. 340, 351 (1990); Sánchez v. Eastern Air Lines, Inc., 114 D.P.R. 691 (1983); Santiago Cruz v. Hernández Andino, 91 D.P.R. 709, 712 (1965).

En su Moción en Cumplimiento de Orden y en Solicitud para que el Pleno del Tribunal Supremo Expida la Certificación Presentada por el Departamento de Asuntos del Consumidor, el Senado y la Cámara sostienen lo siguiente:

> la inmunidad reconocida a la AEE en su Reglamento Núm. 7982 aplica exclusivamente a eventos de fuerza mayor o interrupciones planificadas del servicio. Cualquier otro tipo de inmunidad que se pretenda derivar de ese reglamento carece de aplicabilidad al caso de epígrafe y, aún si este Honorable Tribunal entendiese que dicha disposición fuese aplicable, resultaría igualmente inconstitucional.

Id. pág. 9.

La AEE, muy respetuosamente, sostiene que este Honorable Tribunal Supremo debe abstenerse de evaluar la constitucionalidad de las disposiciones del Reglamento Núm. 7982, titulado Reglamento de Términos y Condiciones Generales para el Suministro de Energía Eléctrica de la AEE ("Reglamento 7982"). En la Demanda, el DACo no impugna la validez de disposición alguna de dicho reglamento. El Senado y la Cámara, quienes son amigos de la corte y no partes del pleito, cuestionan la constitucionalidad del Reglamento 7982 sin elaborar. Ante esta realidad, no procede como cuestión de Derecho que este Honorable Tribunal se pronuncie sobre la constitucionalidad de un reglamento que no ha sido impugnado por la parte peticionaria y basado en un expediente que no ha sido desarrollado para atender dicha controversia particular.

Cabe señalar que la disposición del Reglamento 7982 cuestionada por el Senado y la Cámara es muy distinta al Relevo de Responsabilidad objeto del presente recurso. En particular, dicha disposición lee como sigue:

SECCIÓN XV: INTERRUPCIONES DEL SERVICIO

La Autoridad tiene por objetivo proveer un servicio eficiente y confiable al Pueblo de Puerto Rico. Sin embargo, la Autoridad puede verse obligada a interrumpir el suministro de energía eléctrica sin previa notificación por motivo de fuerza mayor. También puede verse obligada a suspender el servicio por razón de reparaciones o trabajos de mantenimiento, en cuyo caso se notifica con antelación a los clientes afectados. Tales interrupciones no constituyen un incumplimiento al Contrato de Suministro de Energía Eléctrica por parte de la Autoridad, por lo que ni ésta, ni ninguno de sus empleados, oficiales o directores, son responsables de cualquier daño, pérdida o causa de acción producida por tales motivos.

Según reconocen el Senado y la Cámara, la antecitada sección es altamente distinguible del Relevo de Responsabilidad aquí en controversia, pues se circunscribe únicamente a instancias de fuerza mayor o interrupciones planificadas sobre las cuales los abonados estarían en sobre aviso. El ámbito de esta disposición es distinto al del Relevo de Responsabilidad aquí en disputa.

Ante el hecho de que el DACo no impugnó la constitucionalidad de dicha disposición reglamentaria, el caso de epígrafe no presenta las circunstancias adecuadas para que este Honorable Tribunal se pronuncie sobre su constitucionalidad. La correcta dilucidación de dicha disposición reglamentaria requeriría un caso separado, desarrollado a dichos fines. Cónsono con anterior, procede que este Honorable Tribunal, en un ejercicio de prudencia judicial, se abstenga de pronunciarse sobre la constitucionalidad de la SECCIÓN XV del Reglamento 7982 o cualquier otra disposición de dicho cuerpo reglamentario.

## V. SÚPLICA

POR TODO LO ANTES EXPUESTO, muy respetuosamente se solicita de este Honorable Tribunal Supremo que tome conocimiento de lo aquí expuesto y: (a) se abstenga de pronunciarse sobre la constitucionalidad del Reglamento Núm. 7982, titulado Reglamento de Términos y Condiciones Generales para el Suministro de Energía Eléctrica de la AEE y (b) en la eventualidad que determine que la Resolución Final del Negociado de Energía aquí impugnada es inconstitucional y, en su consecuencia, anule el Relevo de Responsabilidad allí concedido a LUMA y a la AEE, determine que LUMA será la parte única y exclusivamente responsable por sufragar, de su propio pecunio, toda indemnización por daños y perjuicios concedida a los abonados de la AEE/LUMA como resultado de la negligencia ordinaria, negligencia crasa o conducta culposa intencional de LUMA, por constituir Disallowed Costs bajo la Sección 7.6(a)(i) del T&D OMA.

Entry ID: 6770995 Date Filed: 12/08/2025 Page: 536 Document: 00118376456 Case: 25-2077

## VI. CERTIFICACIÓN DE NOTIFICACIÓN

**CERTIFICO:** Haber enviado copia fiel y exacta ponchada y sellada hoy, 8 de septiembre de 2025, de este escrito, por correo electrónico a: Departamento de Asuntos del Consumidor a través de la *Lcda. Valerie Rodríguez,* vrodriguez@daco.pr.gov, valeriemrodz@gmail.com; *Lcdo. Gadiel Figueroa,* afigueroa@daco.pr.gov, gadielfigueroa@yahoo.com; *Lcdo. Samuel Silva Rosas,* ssilva@daco.pr.gov; Senado de Puerto Rico a través del *Lcdo. Charles Rodríguez Colón,* crodriguez@naleapr.com; *Lcdo. Miguel A. Rodríguez Ramos,* miguelrrlaw@gmail.com, mrodriguez@prlegal403.com; Cámara de Representantes a través del *Lcdo. Víctor Calderón Cestero,* victor@calderon-law.com; Instituto de competitividad y Sostenibilidad Económica de Puerto Rico, Inc. a través del *Lcdo. Fernando Agrait Betancourt,* agraitfe@agraitlawpr.com; *Lcdo. José Leonardo Pou Román,* jpouroman@outlook.com; Negociado de Energía de la Junta Reglamentadora del Servicio Público a través del *Lcdo. Edgardo L. Rodríguez Cardé,* elrc@rclopr.com; *Lcda. Yarymar González Carrasquillo,* ygc@halspr.com; LUMA Energy, LLC y LUMA Energy ServCo, LLC a través de la *Lcda. Margarita Mercado Echegaray,* margarita.mercado@us.dlapiper.com; *Lcda. Mariana Muñiz Lara,* mariana.muniz@us.dlapiper.com y *Lcda. Yahaira de la Rosa,* Yahaira.DelaRosa@us.dlapiper.com.

**RESPETUOSAMENTE SOMETIDA.**

En San Juan, Puerto Rico, hoy 23 de septiembre de 2025.

GONZÁLEZ & MARTÍNEZ
1509 López Landrón
Séptimo Piso
San Juan, PR 00911-1933
Tel.: (787) 274-7404

Juan M. Martínez Nevarez
RUA Núm.:14,517
E-mail: jmartinez@gmlex.net

Mirelis Valle Cancel
RUA Núm.: 21,115
E-mail: mvalle@vcprlaw.com

RADICADO
SECRETARIA

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

2025 SEP 23  PH 3: 26

| | |
|---|---|
| **DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR**<br><br>**Demandante- Peticionario**<br><br>vs.<br><br>**LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; NEGOCIADO DE ENERGÍA DE PUERTO RICO; AUTORIDAD DE ENERGÍA ELÉCTRICA**<br><br>**Demandados- Recurridos** | **TS Núm.: CT-2025-0003**<br><br>**CIVIL NÚM. SJ2025CV06607**<br><br>**(Salón 901)**<br><br>**SOBRE:**<br>**SENTENCIA DECLARATORIA** |

**EXHIBIT 2**

<u>**MOCIÓN EN CUMPLIMIENTO DE ORDEN Y UNIÉNDOSE AL ALEGATO DEL DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR SOBRE CERTIFICACIÓN INTRAJURISDICCIONAL**</u>

**AL HONORABLE TRIBUNAL:**

      **COMPARECEN** el Senado de Puerto Rico, en adelante "Senado", representado por su presidente, Hon. Thomas Rivera Schatz, en su carácter oficial, y la Cámara de Representantes de Puerto Rico, en adelante "Cámara de Representantes", representado por su presidente, Hon. Carlos "Johnny" Méndez Núñez, en su carácter oficial, por conducto de los abogados que suscriben, y muy respetuosamente **EXPONEN, ALEGAN y SOLICITAN:**

1. En el caso de epígrafe, el pasado 8 de septiembre de 2025, el Departamento de Asuntos del Consumidor ("DACO") presentó su alegato en apoyo a la solicitud de Certificación Jurisdiccional de epígrafe.

2. El Senado de Puerto Rico y la Cámara de Representantes se unen a lo discutido por DACO en su alegato ya que entiende que presentan todos los argumentos que deben ser traídos a la consideración de este Honorable Foro. No cabe duda de que el Negociado de Energía de Puerto Rico ("NEPR"), se excedió en sus facultades legales al conceder un relevo de responsabilidad a favor de LUMA, el cual va incluso en contra de su propia Ley Orgánica, particularmente la Sección 6.3 del Reglamento de Procedimientos del Negociado de Energía, 22 L.P.R.A.§1054b, que expresamente dispone que el Negociado no podrá aprobar, autorizar ni imponer disposición alguna que sea contraria a leyes aplicables ni al interés público.

1

Case: 25-2077   Document: 00118376456   Page: 537   Date Filed: 12/08/2025   Entry ID: 6770995

Case: 25-2077    Document: 00118376456    Page: 538    Date Filed: 12/08/2025    Entry ID: 6770995

3. Reiteramos que la Constitución de Puerto Rico establece con claridad que es "[e]n el Poder Legislativo [donde] recae la entera facultad de aprobar, enmendar o derogar leyes. Art. III, Sec. 1, Const. PR, *supra*, pág. 401. Véase, Gobierno Ponce v. Caraballo, 166 DPR 723, 736 (2006). Entre otras facultades de particular pertinencia al caso de autos, la Sec. 16 del Art. III de la Constitución de Puerto Rico, supra, le otorga al Poder Legislativo "la facultad para crear, consolidar o reorganizar departamentos ejecutivos y definir sus funciones". Además, la Carta Magna dispone que "[e]l procedimiento para otorgar franquicias, derechos, privilegios y concesiones de carácter público será determinado por ley...". Sec. 13 del Art VI de la Const. PR, *supra*. De igual forma, nuestra Carta Magna estableció que toda franquicia o concesiones de carácter público será determinado por ley. Por lo tanto, la rama constitucional que le compete establecer los contornos para que el ejecutivo pueda otorgar franquicias o concesiones es la Asamblea Legislativa.

4. Puerto Rico posee un sistema de derecho codificado. A esos efectos, el Código Civil no es un compendio de normas supletorias, sino la fuente primaria de derecho privado. En materia de daños, el Código Civil reconoce dos categorías de actos perjudiciales que dan lugar a distintos tipos de responsabilidad, la contractual y la extracontractual. La primera de estas emana del "quebrantamiento de un deber que surge de un contrato expreso o implícito". Soc. de Gananciales v. Vélez & Asoc., 145 DPR 508, 521 (1998).

5. Así, para "que opere la responsabilidad contractual... no basta que haya un contrato entre las partes, sino que se requiere la realización de un hecho dentro de la rigurosa órbita de lo pactado y como desarrollo del contenido negociado". Maderas Tratadas v. Sun Alliance, 185 DPR 880 (2012). Por lo tanto, "las acciones derivadas de contratos tienen por objeto que se cumplan las promesas contractuales sobre las que las partes de un contrato otorgaron su consentimiento". Santiago Nieves v. ACAA, 119 DPR 711, 716 (1987).

6. A su vez, la responsabilidad extracontractual atiende "el resarcimiento de los daños ocurridos como consecuencia del quebrantamiento del principio general de convivencia social que supone no causar daño a los demás". Rivera Sanfeliz et al. v. Jta. Dir. FirstBank 193 DPR 38, 57 (2015). Así, el legislador estableció en el artículo 1536 del Código Civil de 2020, 31 L.P.R.A. §10801 el derecho a presentar una causa de acción por los daños y perjuicios ocasionados por actuaciones y omisiones negligentes. Dicho derecho también se encontraba establecido en el artículo 1802 del Código Civil de 1930.

2

Case: 25-2077   Document: 00118376456   Page: 539   Date Filed: 12/08/2025   Entry ID: 6770995

7. La responsabilidad civil no se limita al propietario, sino que alcanza a todo aquel que tenga la guarda, custodia o control de una cosa riesgosa. Crespo *v.* Hernández, 121 DPR 639 (1988). Específicamente, el arrendatario, contratista o administrador también responde por los daños causados por su negligencia en la operación Colón *v.* Romero Barceló, 112 DPR 573 (1982).

8. Por tanto, es forzoso concluir que el ordenamiento constitucional de Puerto Rico establece claramente que el diseño y delimitación de la responsabilidad extracontractual del Estado y de las entidades privadas no es una prerrogativa del Ejecutivo ni de los entes reguladores, sino una función exclusiva de la Asamblea Legislativa, conforme al principio de separación de poderes consagrado en el Artículo I, Sección 2 de la Constitución del Estado Libre Asociado de Puerto Rico. Misión Ind. P.R. v. J.P., 146 DPR 64, 88-89 (1998). Sólo la Asamblea Legislativa puede limitar el alcance de la responsabilidad extracontractual mediante ley debidamente refrendada. Rivera Sanfeliz v. Junta Dir. FirstBank, *supra*.

9. Por otro lado, es menester establecer que **el DACO no está impugnando el Contrato**, "*Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement,*" entre LUMA, la Autoridad de Energía Eléctrica y la Autoridad para las Alianzas Público-Privadas de Puerto Rico. La controversia planteada se dirige exclusivamente contra la actuación del NEPR, que mediante Resolución de 31 de mayo de 2021 otorgó un relevo de responsabilidad civil extracontractual a favor de LUMA, en violación de la Constitución de Puerto Rico y de la doctrina de responsabilidad civil codificada en el Código Civil.

10. Nuestro ordenamiento jurídico ha reconocido la validez de la delegación de poderes de la Asamblea Legislativa al Ejecutivo o a una entidad ejecutiva, aunque no de forma absoluta. Véase, Dalmau Ramírez v. ELA, 2024 TSPR 95 (2024). Este Honorable Tribunal ha validado tales delegaciones, siempre y cuando la ley "establezca normas adecuadas, pautas, estándares, criterios, o principios inteligibles o aquellas garantías o salvaguardas procesales y sustantivas que sirvan de guía a la delegación y que delimiten sus facultades, para evitar que las actuaciones de los entes administrativos resulten arbitrarias o caprichosas". Domínguez Castro et al. v. ELA I, 178 DPR 1, 93 (2010). Véase, Sánchez et al. v. Depto. Vivienda et al., 184 DPR 95, 122 (2011). Véanse además, E. Chemerinsky, Constitutional Law: principles and policies, 5th ed., New York, Wolters Kluwer, 2015, págs. 343-345; L. Fisher y K.J. Harriger, American Constitutional Law, 10th ed., North Carolina, Carolina Academic Press, 2013, Vol. I, pág. 207.

3

**App.534**

Case: 25-2077    Document: 00118376456    Page: 540    Date Filed: 12/08/2025    Entry ID: 6770995

11. Estos criterios no tienen que ser expresos; pueden surgir del historial legislativo y pueden ser amplios y generales. Hilton Hotels v. Junta Salario Mínimo, 74 DPR 670, 693 (1953) ("Tales normas no necesitan expresarse con precisión o exactitud matemática y pueden ser tan generales que justifiquen más de una conclusión y, a menos que la norma no se exprese o sea tan sumamente vaga que como cuestión de hecho no exista, la presunción de constitucionalidad que conlleva toda ley basta para sostener su validez"). Asimismo, por lo general es suficiente justificación que tenga un fin o interés público para que se sostenga la delegación. Domínguez Castro et al. v. ELA I, supra, pág. 93.

12. La determinación de si la ley cuestionada contiene un principio inteligible o normas adecuadas conlleva un análisis caso a caso. En este, los tribunales auscultan la delegación conferida y los criterios establecidos por la Asamblea Legislativa. Sánchez et al. v. Depto. Vivienda et al., supra, pág. 122. Además, ante el cuestionamiento de una delegación los tribunales deben "analizar si 'en la operación real del sistema y en un contexto histórico determinado el poder delegado tiende a desembocar en una concentración de poder indebida en una de las ramas o en una disminución indeseable de la independencia que sea incompatible con el ordenamiento político de la Constitución'". (Énfasis suprimido). Senado v. Tribunal Supremo y otros, 208 DPR 115, 135-136 (2021), citando a Nogueras v. Hernández Colón, 127 DPR 405, 426 (1990).

13. Aún cumplidos todos estos elementos, la Asamblea Legislativa mantiene la autoridad para revocar cualquier delegación de competencia que haya concedido. Gobierno Ponce v. Caraballo, supra, pág. 736. De igual forma, la Asamblea Legislativa cuenta con otros métodos para mantener el control sobre las delegaciones concedidas a otra rama. Sobre lo anterior, resume el profesor Farinacci Femós que:

"Para que una delegación sea constitucionalmente válida, esta debe cumplir con ciertas exigencias. Entre estas podemos identificar: (1) que se trate de un poder delegable, (2) que, en efecto, se haya llevado a cabo la delegación, (3) que se acompañen suficientes principios inteligibles para guiar el ejercicio del poder cuasi-legislativo delegado, (4) que la entidad a la que se le otorga el poder actúe dentro de los límites establecidos por la ley, y (5) que el ejercicio de dicho poder no sea arbitrario o caprichoso. Típicamente, el resultado de este ejercicio de poder es la adopción de un reglamento legislativo que genera derechos u obligaciones y tiene fuerza de ley". J.M. Farinacci Femós, Las Órdenes Ejecutivas, el Poder Legislativo y las Emergencias, 3 Amicus, Rev. Pol. Púb. Y Leg. UIPR 190, 192 (2020).

14. El relevo de responsabilidad concedido por el NEPR aquí en controversia no cumple con ninguno de los criterios citados en el párrafo anterior. En ninguna de las leyes aplicables a la controversia de epígrafe, es decir la Ley 120-2018, 22 L.P.R.A. §1111, y la Ley 57-2014,

4

Case: 25-2077     Document: 00118376456     Page: 541     Date Filed: 12/08/2025     Entry ID: 6770995

*supra*, 22 L.P.R.A. §1051, surge expresión expresa o implícita del legislador en la cual haya delegado al Ejecutivo su facultad de otorgar inmunidad a favor de la Autoridad de Energía Eléctrica o LUMA.

15. Así, el NEPR también actuó de forma *ultra vires* al conceder un relevo de responsabilidad casi absoluto a LUMA mediante la Resolución del 31 de mayo de 2021.

16. Por último, nos unimos a los planteamientos del DACO, que toda actuación del NEPR debe realizarse conforme a los parámetros de su Ley Orgánica, la cual le otorga facultades específicas como establecer las tarifas, delinear la política pública energética y reglamentar la industria; pero el ejercicio de tales funciones está necesariamente subordinado al cumplimiento con <u>todas las leyes aplicables</u>, incluyendo el Código Civil de Puerto Rico, que impone la regla de que quien causa el daño responde por él, al interés público y en protección de los consumidores, 22 L.P.R.A.§1054b.

**POR TODO LO CUAL**, el Senado de Puerto Rico y la Cámara de Representantes de Puerto Rico solicitan, muy respetuosamente, que este Honorable Tribunal:

a) Tome conocimiento de lo aquí expuesto;

b) Una al Senado de Puerto Rico y a la Cámara de Representantes de Puerto Rico al alegato del Departamento de Asuntos del Consumidor;

c) Decrete la nulidad de la Resolución del 31 de mayo de 2021 del NEPR; y

d) Emita cualquier otro dictamen que proceda en derecho.

**CERTIFICO:** Que el día de hoy se entregó copia fiel y exacta del presente escrito al **Departamento de Asuntos del Consumidor (DACO)** a la dirección electrónica de su Secretaria, Hon. Valerie Rodríguez Erazo, vrodriguez@daco.pr.gov, valeriemrodz@gmail.com; Lcdo. Gadiel Figueroa Robles, gfigueroa@daco.pr.gov, gadielfigueroa@yahoo.com; Lcdo. Samuel Silva Rosas, ssilva@daco.pr.gov, samuelsilva.law@gmail.com; al **Instituto de Competitividad y Sostenibilidad Económica (ICSE)**, a través de la dirección electrónica de sus representantes legales los licenciados Fernando E. Agrait, agraitfe@agraitlawpr.com, y José Leonardo Pou Román, jpouroman@outlook.com; a **LUMA Energy, LLC** y **Luma Energy ServCo**, a través de la dirección electrónica de sus representantes legales los licenciados José A. Andréu Fuentes; jaf@andreu-sagardia.com, Frank C. Torres Viada, ftv@ftorresviada.com; Yahaira De La Rosa Algarín, yahaira.delarosa@us.dlapiper.com, Margarita Mercado Echegaray, margarita.mercado@us.dlapiper.com, y Jan Manuel Albino López,

5

**App.536**

jan.albinolopez@us.dlapiper.com; al Negociado de Energía de la Junta Reglamentadora de Servicio Público de Puerto Rico ("Negociado de Energía"), a través de la dirección electrónica de sus representantes legales los licenciados Edgardo L. Rodríguez Carde, elrc@rclopr.com, y Yarymar González Carrasquillo, ygc@rclopr.com; Lic. Juan M. Martínez Nevárez, jmartinez@gmlex.net; Lic. Lic. Mirelis Valle Cancel; mvalle@vcprlaw.com; y a la Autoridad de Energía Eléctrica (AEE) a través de la dirección electrónica de sus representantes legales los licenciados Juan M. Martínez Nevárez, jmartinez@gmlex.net, y Mirelis Valle Cancel, mvalle@vcprlaw.com.

**RESPETUOSAMENTE SOMETIDA.**

En San Juan, Puerto Rico, a 23 de septiembre de 2025.

Representación Legal del
Senado de Puerto Rico

**WRITS LLC**
P.O. Box 19586
San Juan, PR 00910
Tel: (787) 604-2772

*Miguel A. Rodríguez Ramos*
RUA Núm. 22,062
Email: miguelrrlaw@gmail.com

**NATIONAL LEGAL ADVISORS, LLP**
252 Ave Ponce de Leon Suite 1801
San Juan PR 00918-2020

*f/Charles A. Rodríguez Colón*
RUA Núm. 7831
crodriguez@naleapr.com
Tel. (787) 378-2424

Representación Legal de la Cámara
de Representantes

*f/Víctor Calderón Cestero*
RUA Núm. 13266
137 Calle O
Aguadilla PR 00603
Tel. (787) 602-2465

Case: 25-2077   Document: 00118376456   Page: 542   Date Filed: 12/08/2025   Entry ID: 6770995

Case: 25-2077   Document: 00118376456   Page: 543   Date Filed: 12/08/2025   Entry ID: 6770995

 Outlook

---

**Re: DACO's filing of the complaint before the Court of First Instance, Case No. SJ2025CV006607 and the Writ for Intrajurisdictional Certification filed before the Puerto Rico Supreme Court, Case No. CT-2025-0003 (the "Commonwealth Court Litigation")**

**From** Valerie Rodriguez Erazo <vrodriguez@daco.pr.gov>

**Date** Thu 9/18/2025 1:46 PM

**EXHIBIT 3**

**To** DelaRosa, Yahaira <Yahaira.DelaRosa@us.dlapiper.com>; Gadiel J. Figueroa Robles <gfigueroa@daco.pr.gov>; Samuel A. Silva Rosas <ssilva@daco.pr.gov>

**Cc** Mercado, Margarita <Margarita.Mercado@us.dlapiper.com>; AlbinoLopez, Jan <Jan.AlbinoLopez@us.dlapiper.com>; Marien Del Valle Pares <mdelvalle@daco.pr.gov>

Dear all,

DACO disagrees that the DACO's Court Litigation violates the automatic stay. The stay does not apply here for at least three independent reasons.

First, DACO is a governmental unit acting to enforce its police and regulatory powers to protect consumers. Actions of that nature fall squarely within the § 362(b)(4) police-power exception (as incorporated in PROMESA Title III). The proceeding seeks declaratory, non-monetary relief on matters of public law, not the enforcement of a money judgment.

Second, the litigation is not against a Title III debtor, nor is it an act to obtain possession of or exercise control over property of a debtor's estate. LUMA is not a Title III debtor, and the relief requested does not direct the disposition of PREPA's property or revenues.

Third, public-law enforcement actions of this kind have been consistently treated as outside the stay, even in the Title III context, because they vindicate sovereign interests rather than collect on private claims.

For these reasons, DACO will not withdraw its filings. If LUMA intends to seek relief, please identify any controlling authority that extends the § 362 stay to non-debtors on these facts and that displaces the § 362(b)(4) exception for purely declaratory consumer-protection enforcement. DACO reserves all rights and remedies.

Finally, we note that your demand, on pain of motion practice by 3 p.m., appears to be a strategy to buy time by abusing the federal courts with meritless assertions that do not adhere to the law. DACO will not acquiesce in efforts to weaponize Title III or the federal forum to delay adjudication of these public-law issues.

Lastly, we also note the tone of your correspondence. You are addressing a public official acting in her official capacity. Please govern yourselves accordingly.


Regards,

Valerie Rodriguez

Case:17-03283-LTS   Doc#:30016-3   Filed:10/02/25   Entered:10/02/25 15:26:44   Desc:
Exhibit Sept. 18th Email Thread   Page 2 of 3

USDC-PR No 228910



**DEPARTAMENTO DE ASUNTOS DEL CONSUMIDOR**

# DACO

**GOBIERNO DE PUERTO RICO**

## LCDA. VALERIE RODRÍGUEZ ERAZO
## SECRETARIA

vrodriguez@daco.pr.gov

787-722-7555 Ext. 14097

https://www.daco.pr.gov

---

**From:** DelaRosa, Yahaira <Yahaira.DelaRosa@us.dlapiper.com>
**Sent:** Thursday, September 18, 2025 9:14 AM
**To:** Valerie Rodriguez Erazo <vrodriguez@daco.pr.gov>; Gadiel J. Figueroa Robles <gfigueroa@daco.pr.gov>; Samuel A. Silva Rosas <ssilva@daco.pr.gov>
**Cc:** Mercado, Margarita <Margarita.Mercado@us.dlapiper.com>; AlbinoLopez, Jan <Jan.AlbinoLopez@us.dlapiper.com>
**Subject:** DACO's filing of the complaint before the Court of First Instance, Case No. SJ2025CV006607 and the Writ for Intrajurisdictional Certification filed before the Puerto Rico Supreme Court, Case No. CT-2025-0003 (the "Commonwealth Court Litigation")

> You don't often get email from yahaira.delarosa@us.dlapiper.com. Learn why this is important

Counsel,

DACO's filing of the Commonwealth Court Litigation and continuing prosecution of the Commonwealth Court Litigation violate the automatic stay contained in 11 U.S.C. 362 of the Bankruptcy Code made applicable to these cases pursuant to PROMESA section 301(a).  *See In re Fin. Oversight & Mgmt. Bd. for P.R. v. Commonwealth*, No. 17 BK 3283-LTS, 2022 U.S. Dist. LEXIS 218552 (D.P.R. Feb. 7, 2022). LUMA hereby respectfully requires DACO to immediately cease its automatic stay violations and take the following actions by 3 p.m. today:

1. Withdraw the complaint filed in the Court of First Instance, San Juan Part, Case No. SJ2025CV006607
2. Withdraw the Writ for Intrajurisdictional Certification filed before the Puerto Rico Supreme Court, Case No. CT-2025-0003
3. Notify the Puerto Rico Supreme Court and the Court of First Instance, San Juan Part, that DACO is no longer prosecuting these matters.

Please be advised that if DACO does not take the foregoing action by 3 p.m. today, LUMA will seek all appropriate relief as a result of DACO's continuing violation of the automatic stay.

LUMA reserves all rights and remedies.

Cordially,

Yahaira De la Rosa Algarin
Of Counsel

T  +1 787 945 9132
F  +1 939 697 6102
M +1 787 209 6659

yahaira.delarosa@us.dlapiper.com

**DLA Piper (Puerto Rico) LLC**

500 Calle de la Tanca, Suite 401

San Juan, PR  00901-1969

 DLA PIPER

dlapiper.com

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

Entry ID: 6770995    Date Filed: 12/08/2025    Page: 545    Document: 00118376456    Case: 25-2077

Case: 25-2077    Document: 00118376456    Page: 546    Date Filed: 12/08/2025    Entry ID: 6770995



ESTADO LIBRE ASOCIADO DE PUERTO RICO
*Autoridad de Energía Eléctrica de Puerto Rico*

Ing. Javier A. Quintana Méndez
Director Ejecutivo

**EXHIBIT 4**

15 de febrero de 2016

Distribución "B"
16-02-16

Todo el Personal Supervisor

Javier A. Quintana Méndez
Director Ejecutivo

**Procedimiento para el Análisis, Trámite y Pago de Reclamaciones a Personas Ajenas a la Autoridad de Energía Eléctrica**

Incluimos el Procedimiento mencionado en el asunto.  El mismo actualiza las instrucciones para el manejo, contestación y pago de las reclamaciones por concepto de daños a la propiedad o a personas ajenas a la Autoridad.

Agradeceremos el fiel cumplimiento de este Procedimiento.

Anejo

**DEPC**

APARTADO 364267 SAN JUAN, PUERTO RICO 00936-4267 TELÉFONO: (787) 521-4666 TELEFAX: (787) 521-4665
"Somos un patrono con igualdad de oportunidades en el empleo y no  discriminamos por razón de raza, color, sexo, edad, origen social o nacional, condición social afiliación política, ideas políticas o religiosas; por ser víctima o ser percibida(o) como víctima de violencia doméstica, agresión sexual o acecho, sin importar estado civil, orientación sexual, identidad de género o estatus migratorio; por impedimento físico, mental o ambos, por condición de veterano(a) o por información genética."

Entry ID: 6770995   Date Filed: 12/08/2025   Page: 547   Document: 00118376456   Case: 25-2077

**Autoridad de Energía Eléctrica de Puerto Rico**



## PROCEDIMIENTO PARA EL ANÁLISIS, TRÁMITE Y PAGO DE RECLAMACIONES A PERSONAS AJENAS A LA AUTORIDAD DE ENERGÍA ELÉCTRICA

FEBRERO 2016

*Somos un patrono con igualdad de oportunidades en el empleo y no discriminamos por razón de raza, color, sexo, edad, origen social o nacional, condición social, afiliación política, ideas políticas o religiosas; por ser víctima o ser percibida(o) como víctima de violencia doméstica, agresión sexual o acecho, sin importar estado civil, orientación sexual o identidad de género; por impedimento físico, mental o ambos, por condición de veterano(a) o por información genética.*

Autoridad de Energía Eléctrica de Puerto Rico

PROCEDIMIENTO PARA EL ANÁLISIS, TRÁMITE Y PAGO DE RECLAMACIONES A
PERSONAS AJENAS A LA AUTORIDAD DE ENERGÍA ELÉCTRICA

TABLA DE CONTENIDO

Página

I.    INTRODUCCIÓN ............................................................................... 1

II.   DEFINICIONES................................................................................. 1

III.  DISPOSICIONES GENERALES ....................................................... 1

IV.   INSTRUCCIONES............................................................................. 4

      A.   Reclamaciones de Accidentes de Vehículos ............................... 4

      B.   Reclamaciones por Daños a la Propiedad................................... 5

V.    ENMIENDAS E INTERVENCIONES ................................................. 9

      ANEJOS

      A.   Hoja de Orientación para Reclamaciones (AEE 760.0-23)

      B.   Reclamaciones de Accidentes (AEE 700.0-431)

      C.   Informe de Investigación de Reclamación por Daños a la Propiedad
           (AEE 760.0-22)

      D.   Informe de Investigación Accidente e Incidente (AEE 200.0-4)

      E.   Informe Amistoso de Accidente (AEE 760.0-20A)

      F.   Informe de Accidente de Vehículo (AEE 084-15333)

      G.   Certificación (AEE 760.0-24)

      H.   Carta de Relevo (AEE 760.0-25)

      I.   Solicitud de Cheque (CN 084-15424)

Entry ID: 6770995   Date Filed: 12/08/2025   Page: 548   Document: 00118376456   Case: 25-2077

Autoridad de Energía Eléctrica de Puerto Rico

PROCEDIMIENTO PARA EL ANÁLISIS, TRÁMITE Y PAGO DE RECLAMACIONES A
PERSONAS AJENAS A LA AUTORIDAD DE ENERGÍA ELÉCTRICA

I.  INTRODUCCIÓN

Las reclamaciones de daños a la propiedad o a personas ajenas a la Autoridad de
Energía Eléctrica (en adelante la Autoridad) deben atenderse con prontitud.  Las mismas
se documentan con toda la información y en el menor tiempo posible.

Este procedimiento establece las responsabilidades e instrucciones en el manejo,
contestación y pago de las reclamaciones por concepto de daños a la propiedad o a
personas ajenas a la Autoridad.

II.  DEFINICIONES

A.  Comité de Reclamaciones – analistas de la Oficina de Administración de Riesgos a
cargo de evaluar las reclamaciones.

B.  Daño – el menoscabo o perjuicio material o moral sufrido por una persona o cosa.

C.  STORMS (*Severn Trent Operational Resource Management System*) – Sistema
mecanizado utilizado para crear, actualizar, informar y evaluar las órdenes de
trabajo e investigación, órdenes de emergencia y estudios de campo o de líneas que
realiza el personal del área de medición, construcción o técnica de la Autoridad.

D.  Reclamación – Toda solicitud de indemnización contra la Autoridad por daños a
personas ajenas o sus propiedades.

E.  Reclamante – persona natural o jurídica que insta una reclamación por daños a
personas ajenas o sus propiedades.

F.  *Work Request* – Orden de trabajo que se genera en el sistema *STORMS*, la cual se
identifica por un número que se le asigna.

III.  DISPOSICIONES GENERALES

A.  Conforme el Artículo 1802 del Código Civil de Puerto Rico, el que por culpa o
negligencia causa daño a otro viene obligado a reparar el daño causado.  La acción
para reclamar daños prescribe por el transcurso de un (1) año a partir del momento
en que la persona sufrió el daño y supo quién lo causó.

El empleado de la Autoridad designado orienta al reclamante sobre el proceso de
reclamación y sus derechos y llena el formulario Hoja de Orientación para
Reclamaciones, **Anejo A**.

La Autoridad tiene un periodo de 90 días calendario para contestar una reclamación
a partir de la fecha en que se reciben todos los documentos requeridos.  El mismo

Case: 25-2077   Document: 00118376456   Page: 549   Date Filed: 12/08/2025   Entry ID: 6770995

2

comienza a contar desde el momento en que la Autoridad recibe todos los documentos necesarios para evaluar la reclamación.  Cuando medien causas extraordinarias se puede extender el período hasta 120 días calendario, previa notificación al reclamante.

B.   La Oficina de Administración de Riesgos es responsable de denegar y ajustar las reclamaciones que proceden por daños a la propiedad de personas ajenas a la Autoridad hasta $10,000, según la evaluación de la Técnica.  El pago de reclamaciones se efectúa según el Procedimiento para el Trámite y Aprobación de las Solicitudes de Cheque.  De igual forma, la aprobación de la Solicitud de Cheque se hace conforme a la Norma sobre Niveles de Aprobación de Documentos de la Autoridad de Energía Eléctrica, vigente.

C.   Las investigaciones de las reclamaciones de personas ajenas a la Autoridad se realizan conforme a las disposiciones establecidas en el Procedimiento para Notificar e Investigar Accidentes e Incidentes, vigente, en los casos que aplique.

D.   Todas las reclamaciones, excepto las de accidentes entre vehículos y daños físicos, se originan en la Oficina de Distrito Comercial del área más cercana a la residencia del reclamante o a través del Centro de Servicio al Cliente.

E.   Las reclamaciones por daños físicos a personas ajenas a la Autoridad, así como las reclamaciones por daños a la propiedad que exceden los $10,000, se tramitan directamente en la División de Litigación del Directorado de Asuntos Jurídicos. Esta división atiende también los casos de reclamaciones por daños a la propiedad donde ocurran daños físicos conjuntamente, sin importar la cantidad.

F.   En los casos de reclamaciones de accidentes de vehículos de motor, (vehículo con vehículo) la compañía aseguradora contratada por la Autoridad, es el custodio de los documentos originales y del expediente de la reclamación.  La Oficina de Administración de Riesgos mantiene un registro de los casos enviados a la compañía aseguradora contratada mediante el formulario Reclamaciones de Accidentes (AEE 700.0-431), **Anejo B**.

La compañía aseguradora contratada por la Autoridad notifica al reclamante mediante carta la aprobación o denegación de la reclamación.  La Autoridad requiere a la compañía aseguradora contratada el envío de una lista mensual de las reclamaciones pagadas, cantidad del pago y fecha de emisión del pago para efectos de información y control, a la Oficina de Administración de Riesgos.

G.   La reclamación debe incluir original y copia de los siguientes documentos:

1.   Carta explicativa legible que describa en detalle (fecha, hora, nombre de personas, etc.) todo lo ocurrido, descripción de la propiedad, los daños reclamados y el número de querella de la Policía de Puerto Rico, si aplica. Esta información se utiliza para completar el formulario Informe de Investigación de Reclamación por Daños a la Propiedad (AEE 760.0-22), **Anejo C** y el Informe de Investigación Accidente e Incidente (AEE 200.0-4) **Anejo D**.

2.   Si la reclamación es por daños a la propiedad o equipos debe incluir, además, recibo, factura o estimado en original preparado por un técnico o perito

Case:25-2077   Document: 00118376456   Page: 550   Date Filed: 12/08/2025   Entry ID: 6770995

3

certificado con número de licencia o colegiación, dirección y teléfono. Debe detallar la labor, piezas utilizadas, el costo de materiales, trabajo o equipo para reparación de los daños y una certificación de pérdida total firmada por el técnico o perito certificado. Los daños reclamados deben concordar con los documentos presentados.

3. En los casos de reclamaciones de vehículos incluir, además, original del Informe Amistoso de Accidente, **Anejo E**, provisto por la Autoridad, Informe de Incidente, provisto por la Policía de Puerto Rico, Informe de Accidente de Vehículo (CN 084-15333), **Anejo F**, Informe de Investigación Accidente e Incidente (AEE 200.0-4), **Anejo D**, y el formulario Certificación, **Anejo G**, si aplica. Es importante incluir el número de querella, nombre, número de placa del oficial de la policía que atendió la misma y el cuartel donde trabaja; fotos del vehículo o propiedad y estimado de los daños.

4. En los casos de reclamaciones sobre daños personales (físicos) se orienta al reclamante para que presente evidencia de la atención médica que recibió el día que ocurrieron los hechos.

H. Si el reclamante posee una póliza de seguros, debe informar el nombre de la compañía aseguradora, el tipo de póliza y el número de póliza, según establece la Ley 18-2004, Ley Antifraude del Código de Seguros de Puerto Rico, vigente. Esta información se completa en el espacio provisto en el formulario Informe de Investigación de Reclamación por Daños a la Propiedad.

I. El reclamante tiene que presentar la información solicitada y todos los documentos según indicados. La falta de alguno detiene el proceso, pero no el tiempo que prescribe la reclamación.

J. Las reclamaciones por daños ocasionados por fuerza mayor o actos fortuitos de la naturaleza, actos terroristas o eventos en los que la Autoridad no tiene responsabilidad (ejemplo: huracanes, terremotos, etc.) no proceden.

K. La Oficina de Administración de Riesgos utiliza el número de reclamación para efectos de identificación del caso. En las reclamaciones de vehículos de motor, el número de reclamación lo asigna la Oficina de Administración de Riesgos. El número de reclamación sobre daños personales (físicos) lo asigna la División de Litigación del Directorado de Asuntos Jurídicos.

L. La aceptación de pago por parte del reclamante se entenderá como que está de acuerdo con la determinación de la Autoridad. La Autoridad denegará automáticamente cualquier reclamación que haya sido previamente atendida (pagada o denegada). Si el reclamante no está de acuerdo con el ajuste o pago de su reclamación, tiene 10 días calendario a partir de la fecha de recibo del cheque para notificar por escrito las razones para no aceptar el pago. Debe incluir evidencia documental y devolver el cheque. Este término se informa al reclamante de manera clara y específica al enviarse el pago.

M. En las reclamaciones sobre daños a la propiedad o vehículos, la responsabilidad de la Autoridad es igualar la condición de la propiedad o unidad al momento del accidente o incidente, no mejorarla.

Entry ID: 6770995   Date Filed: 12/08/2025   Page: 551   Document: 00118376456   Case:25-2077

4

IV. INSTRUCCIONES

A. RECLAMACIONES DE ACCIDENTES DE VEHÍCULOS

| Persona que Realiza el Proceso | Proceso |
|---|---|
| Supervisor del (de los) empleado(s) implicado(s) | 1. Seguir las instrucciones contenidas en el Procedimiento para Notificar e Investigar Accidentes, vigente, al realizar la investigación. Orientar al reclamante sobre los pasos a seguir para canalizar su reclamación y los documentos que tiene que entregar, indicados en el inciso G, Disposiciones Generales de este procedimiento.<br><br>2. Completar el formulario Informe de Investigación de Reclamación por Daños a la Propiedad (AEE 760.0-22), **Anejo C**, con la información provista por el reclamante.<br><br>3. Tomar fotos del vehículo, copia de la licencia del vehículo y de la licencia del conductor o dueño del vehículo. Añadir la información de reclamaciones previas sobre el mismo suceso en el formulario mencionado en el inciso 2.<br><br>4. Obtener la firma del reclamante en el formulario y firmar el mismo. Sacar copia de los documentos entregados, incluir el formulario, y entregar copia al reclamante como evidencia de su gestión.<br><br>5. Adelantar vía fax o correo electrónico copia de los documentos el mismo día que se reciben y enviar los originales mediante conduce a la Oficina de Administración de Riesgos en siete días calendario o antes, a partir del momento en que ocurrió el accidente. |
| Asistente Confidencial o Asistente Sistemas de Oficina, Oficina de Administración de Riesgos | 6. Recibir el conduce de los documentos enviados por el supervisor del (de los) empleado(s) implicado(s). Verificar que contenga todos los documentos solicitados por la compañía aseguradora contratada por la Autoridad para procesar estos casos.<br><br>7. Asignar un número de reclamación en el sistema mecanizado de la oficina y pasar el caso al analista correspondiente. |
| Analista, Oficina de Administración de Riesgos | 8. Llenar el formulario Reclamaciones de Accidentes, con la información del reclamante, número de reclamación, además del día y hora en que se recibe. Adelantar copia del formulario por correo electrónico a la compañía aseguradora contratada por la Autoridad.<br><br>9. Preparar un conduce con el formulario Reclamaciones de Accidentes y los documentos relacionados. Enviar a la compañía aseguradora contratada por la Autoridad para su evaluación y posible pago de los daños reclamados.<br><br>10. Recibir la lista que envía mensualmente la compañía aseguradora contratada por la Autoridad con la información de las reclamaciones pagadas por ésta. Archivar la lista junto con la copia de los documentos de las reclamaciones enviadas para informes posteriores y control. |

Case: 25-2077 Document: 00118376456 Page: 552 Date Filed: 12/08/2025 Entry ID: 6770995

5

B.    RECLAMACIONES POR DAÑOS A LA PROPIEDAD

| Persona que Realiza el Proceso | Proceso |
|---|---|
| Oficinista Servicio al Cliente SM Oficina Comercial o Representante Servicios por Teléfono, Centro de Servicio al Cliente | 1.  Obtener la información del reclamante y verificar en el sistema *STORMS* si tiene alguna reclamación previa sobre el mismo suceso.<br><br>2.  Orientar al reclamante sobre los pasos a seguir para canalizar su reclamación y los documentos que tiene que entregar (indicados en el inciso G, Disposiciones Generales de este Procedimiento) en la Oficina Comercial o enviar por correo a la Autoridad. Completar el formulario Informe de Investigación de Reclamación por Daños a la Propiedad (AEE 760.0-22), con la información provista por el reclamante.<br><br>3.  Generar un *Work Request* en el sistema *STORMS*, una vez el reclamante entregue todos los documentos solicitados y orientarle sobre el proceso de reclamación. Certificar como recibidos los originales y copias de los documentos con la fecha en que los recibe y sus iniciales. Entregar o enviar copia de los documentos presentados y del Informe de Investigación por Daños a la Propiedad al reclamante como su evidencia.<br><br>4.  Identificar los documentos entregados por el reclamante con el número del *Work Request* y enviarlos vía fax a la Oficina de Distrito Técnico correspondiente. Entregar al gerente de la Oficina Comercial o del Centro de Servicio al Cliente o al supervisor Servicio al Cliente designado los documentos originales, el Informe de Investigación por Daños a la Propiedad y copia del *Work Request* para enviar mediante conduce a la Oficina de Administración de Riesgos. |
| Gerente, Oficina Comercial o del Centro de Servicio al Cliente | 5.  Preparar y enviar, inmediatamente, los documentos originales presentados por el reclamante mediante conduce a la Oficina de Distrito Técnico.<br><br>6.  En los casos de reclamaciones de daños a vehículos por parte de la Autoridad, solicitar al supervisor del (de los) empleado(s) implicado(s) (según la información provista por el reclamante) copia del informe de la investigación realizada según establecido en el Procedimiento para Notificar e Investigar Accidentes e Incidentes, vigente. Enviar los documentos originales y la copia del informe recibido mediante conduce a la Oficina de Administración de Riesgos, no más tarde de 5 días calendario. |
| Ingeniero de Distrito, Oficina de Distrito Técnico | 7.  Recibir los documentos enviados de la Oficina Comercial o del Centro de Servicio al Cliente. Verificar diariamente en su bandeja del sistema *STORMS*, las órdenes de reclamación pendientes que le fueron enviadas. Asignarlas, en las próximas 48 horas (dos días calendario), al supervisor de líneas o al ingeniero supervisor a cargo de las reclamaciones del distrito la reclamación en el sistema *STORMS* y entregar los documentos relacionados. |

Case: 25-2077   Document: 00118376456   Page: 553   Date Filed: 12/08/2025   Entry ID: 6770995

6

Case: 25-2077 Document: 00118376456 Page: 554 Date Filed: 12/08/2025 Entry ID: 6770995

| Persona que Realiza el Proceso | Proceso |
|---|---|
| Supervisor de Líneas o Ingeniero Supervisor | 8. Verificar diariamente en su bandeja del sistema *STORMS*, las órdenes de reclamación pendientes que le fueron asignadas. Verificar que la información contenida en el *Work Request* y los documentos entregados por el ingeniero de distrito concuerden.

9. Coordinar y realizar la investigación correspondiente. Seguir las instrucciones del Procedimiento para Notificar e Investigar Accidentes e Incidentes, vigente, al visitar el área o lugar donde se genera la reclamación. Solicitar al supervisor del (de los) empleado(s) implicado(s) copia del informe de la investigación realizada.

10. Entrevistar al reclamante y/o testigos y solicitar toda la evidencia necesaria para evaluar la reclamación. Verificar que la propiedad reclamada sea la correcta, además de tomar fotos y medidas, de ser posible. Investigar y corroborar en la bitácora del Despacho de Servicio del Distrito posibles averías o situaciones ocurridas en el área y el día que plantea el reclamante. Realizar la investigación en un período no mayor de 15 días laborales a partir de recibido el *Work Request*.

11. Redactar un informe detallado de los hallazgos en la pantalla de *Remarks* del sistema *STORMS*. Escribir en detalle toda la información obtenida en la investigación (fecha, hora, etc.) y completar los campos requeridos del sistema. Indicar en el informe, a base de su experiencia y conocimiento, si entiende que la reclamación presentada procede o no y explicar por qué.

12. Imprimir el informe realizado (Hoja de Trabajo) en el sistema *STORMS*. Preparar un expediente con copia de los documentos para sus récords. Adjuntar los documentos del reclamante junto con la Hoja de Trabajo y enviar por conduce a la Oficina de Administración de Riesgos. Cerrar la parte de la orden en el sistema que corresponde a la Oficina de Distrito Técnico. |
| Administrador, Oficina de Administración de Riesgos | 13. Recibir el conduce de los documentos enviados por la Oficina de Distrito Técnico, Comercial o Centro de Servicio al Cliente. Asignar el caso al analista correspondiente en las próximas 48 horas (dos días calendario). Entregar los documentos al asistente confidencial o asistente sistemas de oficina para que prepare el expediente del caso y le asigne número de caso. |
| Asistente Confidencial o Asistente Sistemas de Oficina, Oficina Administración de Riesgos | 14. Preparar el expediente de la reclamación con el nombre del reclamante y asignar número de caso. Entregar al analista asignado el expediente con los documentos enviados por la Oficina de Distrito Técnico, Oficina Comercial o Centro de Servicio al Cliente. |
| Analista, Oficina de Administración de Riesgos | 15. Verificar diariamente las reclamaciones pendientes que le fueron asignadas, además de los expedientes entregados. |

7

| Persona que Realiza el Proceso | Proceso |
|---|---|
| Analista, Oficina de Administración de Riesgos | 16. Verificar que el Informe recibido esté completo y analizar la investigación realizada por la Oficina de Distrito Técnico. En las reclamaciones de daños a vehículos por parte de la Autoridad, solicitar al supervisor inmediato responsable de la investigación el Informe de Accidente de Vehículo (AEE 084 -15333), **Anejo F**, si aplica, y el Informe de Investigación de Accidente e Incidente (AEE 200.0-4), **Anejo D**.

17. Entrevistar al reclamante y/o testigos, de ser necesario y solicitar cualquier evidencia requerida para evaluar la reclamación, de ser necesario.

18. Verificar, de proceder la reclamación y según la recomendación de la Oficina de Distrito Técnico, el por ciento (%) de depreciación aplicable. Utilizar guías de depreciación de vida útil, valor residual o cualquier otro método de valoración de daños que apruebe la Oficina de Administración de Riesgos para determinar la cantidad del pago a recomendarse al Comité de Reclamaciones.

19. Completar la Hoja de Ajuste e incluirla en el expediente en los casos en que la reclamación proceda.

20. Someter el expediente al Comité de Reclamaciones para la evaluación correspondiente, esta no debe exceder de 30 días calendario desde el momento en que le fue asignado.

21. Enviar comunicación escrita al reclamante que indique el resultado del informe; denegación o la cuantía aprobada de su reclamación, que advierta en cada caso de su derecho a solicitar la reconsideración de dicha determinación ante el administrador de la Oficina de Administración de Riesgos con la presentación de un escrito a tales efectos, dentro del término de 10 días calendario de haberse notificado la misma. En aquellos casos en que se aprueba la reclamación, debe incluirse la Carta de Relevo, **Anejo H**, e indicar al reclamante que debe firmar y devolver la misma para recibir el pago de su reclamación. Solicitar el pago a la Sección de Comprobantes de Desembolsos una vez recibe el Relevo firmado por el reclamante.

22. Preparar la Solicitud de Cheque, **Anejo I**, para la firma del administrador de la Oficina de Administración de Riesgos una vez recibida la Carta de Relevo. Incluir copia en el expediente del caso. Si son reclamaciones de vehículos, hacer la Solicitud de Cheque para el pago de la reclamación a nombre del dueño del vehículo, según aparece en la licencia del mismo.

23. Entregar el expediente con toda la información al administrador de la Oficina de Administración de Riesgos para su evaluación y determinación final. |

8

Case: 25-2077     Document: 00118376456     Page: 556     Date Filed: 12/08/2025     Entry ID: 6770995

| Persona que Realiza el Proceso | Proceso |
|---|---|
| Administrador, Oficina de Administración de Riesgos | 24. Evaluar el expediente de la reclamación.  Aprobar la Solicitud de Cheque, de estar de acuerdo con el ajuste según recomendado por el Comité de Reclamaciones y por el supervisor de la Oficina de Administración de Riesgos.<br><br>25. Enviar la Solicitud de Cheque a la Sección de Comprobantes de Desembolsos junto con copia de la evidencia del ajuste de la reclamación.<br><br>26. Evaluar y firmar la carta en que se indica al reclamante que la reclamación no procede. |
| Supervisor General, Sección Comprobantes de Desembolsos | 27. Procesar la Solicitud de Cheque.  Identificar el cheque con el número de reclamación y el nombre que aparece en la solicitud y enviarlo a la Oficina de Administración de Riesgos. |
| Asistente Confidencial o Asistente Sistemas de Oficina, Oficina de Administración de Riesgos | 28. Recibir el cheque que envía la Sección de Comprobantes de Desembolsos, fotocopiar el mismo para el expediente y anotar en el expediente del caso la fecha de recibo, la cantidad y el número del cheque; además, la fecha de envío al reclamante.<br><br>29. Enviar el cheque, con acuse de recibo, a la dirección postal indicada por el reclamante.<br><br>30. Notificar al reclamante que de no estar de acuerdo con el pago o con el resultado de su reclamación deberá devolver el cheque con una carta explicativa.<br><br>31. Entregar las peticiones de reconsideración a los analistas de la Oficina de Administración de Riesgos para evaluación, tan pronto se reciban. |
| Analista, Oficina de Administración de Riesgos | 32. Evaluar las peticiones de reconsideración, tan pronto se reciban.<br><br>33. Notificar por escrito al reclamante que su petición de reconsideración fue denegada y que esta es final y firme.<br><br>34. Reevaluar ajuste si el reclamante somete documentación adicional no incluida previamente.<br><br>35. Enviar el cheque para cancelación a la Sección de Comprobantes de Desembolsos si el reclamante por segunda vez no acepta el pago emitido. |

9

## V.   ENMIENDAS E INTERVENCIONES

A.   Las enmiendas y revisiones a este procedimiento se coordinan con el Departamento de Estudios y Procedimientos Corporativos.

B.   La Oficina de Auditoría Interna verifica el cumplimiento de este procedimiento.

C.   Este Procedimiento cancela y sustituye el Procedimiento para el Análisis, Trámite y Pago de Reclamaciones de Personas Ajenas a la Autoridad de Energía Eléctrica, aprobado el 13 de junio de 2012.

RECOMENDADO

Carmen R. Flores Torres
Directora de Servicio al Cliente, Interina

RECOMENDADO

Ernesto Ramos Morales
Director de Finanzas, Interino

RECOMENDADO

Faustino González Quiles
Director de Transmisión y Distribución

APROBADO

Javier A. Quintana Méndez
Director Ejecutivo

Fecha  15 de febrero de  2016

RRR/ZME
02/15/16

App.552

AEE 760.0-23
REV. 02/16

**ANEJO A**



Autoridad de Energía Eléctrica de Puerto Rico

## HOJA DE ORIENTACIÓN PARA RECLAMACIONES

Instrucciones:
Todo reclamante tiene, por ley, un año desde el momento de los hechos que generan la reclamación para presentar la misma a la Autoridad. **De no radicar su reclamación en ese período, pierde el derecho a reclamar por prescripción.** La Autoridad tiene un período de 90 días para contestar su reclamación, **a partir del momento en que recibe todos los documentos necesarios para evaluar la misma**. Cuando medien causas extraordinarias se puede extender dicho período hasta 120 días. Es importante que presente original y copia de todos los documentos indicados, según sea el caso, descritos a continuación:

| Orientado | Entregó | |
|---|---|---|
| | | Carta explicativa legible que describa en detalle (fecha, hora, nombre de personas, etc.) de todo lo ocurrido. Debe incluir número de querella de la Policía de Puerto Rico (si aplica), descripción de la propiedad y los daños reclamados. |
| | | Recibo de compra, factura o estimado en original preparado por un técnico o perito certificado, con número de licencia o colegiación, dirección y teléfono que detalle la labor y piezas utilizadas, además del costo de materiales, trabajo o equipo para reparación de los daños a la propiedad reclamados. Del equipo no tener reparación, presentar una certificación de pérdida total firmada por el técnico o perito certificado que evaluó el mismo. |
| | | En los casos de accidentes de automóvil, copia del Informe Amistoso de Accidente, provisto por el Oficial de la Autoridad que atendió la investigación, copia del Informe de Incidente provisto por la Policía de Puerto Rico; junto con número de querella, nombre y número de placa del policía que atendió la querella y fotos del vehículo o propiedad reclamada. |
| | | Completar el formulario de Certificación provisto por la Autoridad. |
| | | Si el reclamante posee una póliza de seguros, informar el nombre de la compañía aseguradora, el tipo de póliza y el número de póliza, según se establece en la Ley Núm. 18-2004, Ley Antifraude del Código de Seguros de Puerto Rico, vigente. (Esta información se completará una vez el reclamante presente los documentos solicitados en el formulario Informe de Investigación de Reclamación por Daños a la Propiedad.) |

Certifico que he sido orientado con relación a los requisitos con los cuales debo cumplir para radicar mi reclamación a la Autoridad de Energía Eléctrica.

_____       _____       _____
Firma del Reclamante              Firma Empleado AEE              Fecha

Nota:   Para procesar su reclamación, tiene que presentar todos los documentos solicitados. La falta de alguno de los documentos solicitados detiene el proceso, pero no el tiempo en que prescribe la reclamación.

Case: 25-2077   Document: 00118376456   Page: 558   Date Filed: 12/08/2025   Entry ID: 6770995

Case: 25-2077 Document: 00118376456 Page: 559 Date Filed: 12/08/2025 Entry ID: 6770995

ANEJO B

AEE 700.0-431
Rev. 02/16

AUTORIDAD DE ENERGÍA ELÉCTRICA DE PUERTO RICO
Directorado de Finanzas – Oficina de Administración de Riesgos

RECLAMACIONES DE ACCIDENTES/ MES _____ FECHA: ____/____/____

| NOMBRE DEL RECLAMANTE | DIRECCIÓN FÍSICA Y POSTAL | TELÉFONO | FECHA ACCIDENTE | NÚM. QUERELLA | INFORMACIÓN DE VEHÍCULO AEE (CÓDIGO Y TABLILLA) | NOMBRE CONDUCTOR DEL VEHÍCULO | VEHÍCULO DEL RECLAMANTE | | Núm. Reclamación de Oficina Administración de Riesgos | MUNICIPIO | ESTIMADO COSTO DAÑOS |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | MARCA Y MODELO | AÑO Y TABLILLA | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Preparado por: _____    Fecha: _____    Firma: _____
(Nombre en letra de molde y puesto)

Recibido por: _____    Fecha: _____    Firma: _____
(Nombre en letra de molde y puesto)

App.554

ANEJO C

AEE 760.0-22
Rev. 02/16

Autoridad de Energía Eléctrica de Puerto Rico



☐ Oficina de Distrito Comercial / Técnica de _____
☐ Centro de Servicio al Cliente

Número de *Work Request*
_____

Número de Reclamación
_____

## INFORME DE INVESTIGACIÓN DE RECLAMACIÓN
## POR DAÑOS A LA PROPIEDAD

Página 1 de 2

Nombre y Apellidos del Reclamante:

Dirección Postal:

Dirección donde ocurrieron los daños:

Referencias:

Teléfono Residencial:

Teléfono Trabajo o Celular:

Cuándo ocurrieron los hechos:

Número de Cuenta AEE (Si es cliente):

Fecha:  _____ / _____ / _____  Hora: _____ ___ am ___ pm

¿Ha realizado reclamación por los mismos sucesos anteriormente?
_____ Sí  _____ No  Número de reclamación _____

Nombre Empleado AEE que atendió la reclamación (letra de molde):

Fecha en que realizó la reclamación:  ____ / ____ / _____

Indique si intervino la AEE en el área: _____ Sí _____ No

Breve descripción de los hechos:

Intervino la Policía de P.R.: _____ Sí _____ No  Nombre del Policía: _____ Cuartel: _____

Número de querella: _____  Número de Placa: _____  Intervino Bomberos de P.R.: _____ Sí _____ No

Pérdida o daños reclamados (favor detallar equipos, enseres, estructura, animales, etc.):

¿Tiene Póliza de Seguros? ___ Sí ___ No   De contestar SÍ, indique tipo de póliza:

Nombre Compañía Aseguradora:

Número de Póliza:

Vence en : __ / __ / __

Certifico que la información aquí provista es correcta : _____  _____

Firma reclamante                    Fecha

**Para uso exclusivo de la Oficina de Distrito Comercial o Centro de Servicio al Cliente**

Reclamante incluyó los siguientes documentos:

☐ Factura de reparación, estimado, recibo o certificación de la pérdida total emitida por un perito o técnico con licencia

☐ Formulario de Certificación completado

☐ Otros _____ .

Nombre del empleado que atendió la reclamación:

Firma del empleado: _____

Fecha de envío reclamación a la Oficina Técnica:

Case: 25-2077   Document: 00118376456   Page: 560   Date Filed: 12/08/2025   Entry ID: 6770995

Informe de Investigación de Reclamación por Daños a la Propiedad                                    Página 2 de 2

**Para uso exclusivo de la Oficina de Administración de Riesgos**

Fecha y hora en que se reciben los documentos de reclamación:

Fecha: _____          Hora: _____ ____ am ____ pm

Reclamación asignada a: (Nombre Analista) _____ Fecha: _____

Hoja de Ajuste:        ____ Incluida     ____ No incluida        | Fecha aprobación reclamación: _____

Fecha denegación reclamación: _____

Razón para denegar reclamación: _____
_____
_____
_____
_____

Cantidad reclamación aprobada:

Evaluado por Comité de Ajuste:     ____ Sí     ____ No     | Fecha de envío para solicitud de cheque: _____ / _____ / _____

Reclamante devolvió Carta de Relevo firmada:        ____ Sí      ____ No

Fecha vencimiento de entrega Carta de Relevo firmada por reclamante:     ____ / _____ / _____

Comentarios:
_____
_____

Nombre y Firma del Analista que trabajó la reclamación:


_____
Aprobado por: (Firma Administrador,  Oficina Administración de Riesgos)


Fecha: _____

Número de Cheque: (Tesorería)_____          Fecha recibido: _____

Fecha en que se envía el pago al reclamante:
_____

AEE 760.0-22

| CN 084-11068<br>AEE 200.0-4<br>Rev. 2/16 | **Autoridad de Energía Eléctrica de Puerto Rico** | Distribución<br>Original: Jefe de División o<br>Administrador Regional<br>Copia 1: División Seguridad Laboral<br>Copia 2:Supervisor del Accidentado |
|---|---|---|
| | **DIVISIÓN DE SEGURIDAD LABORAL**<br>**INFORME DE INVESTIGACIÓN ACCIDENTE E INCIDENTE** | Caso Núm.<br>(Asignado Internamente) |

### INFORMACIÓN GENERAL

| Nombre del Accidentado: | Número de Empleado: |
|---|---|

| Fecha de Nacimiento: | Ocupación: | Tiempo en la Ocupación: |
|---|---|---|

Clasificación del Accidente (las que correspondan):  ☐ Lesión  ☐ Enfermedad     ☐ Daño a la Propiedad     ☐ Incidente

| Fecha del Accidente/Incidente:_____/_____/_____<br>Mes     DÍA     Año | Hora:_____ ☐ AM ☐ PM | Región: |
|---|---|---|

Lugar Exacto del Accidente/Incidente:

### INFORMACIÓN DEL SUPERVISOR

| Nombre: | Número del Empleado: |
|---|---|

| Título: | Tiempo en la Autoridad |
|---|---|

### TESTIGOS

| Nombre | Número de Identificación | Empleado AEE | |
|---|---|---|---|
| | | SÍ | NO |
| | | | |
| | | | |
| | | | |
| | | | |

¿Estaba el accidentado en otras funciones?                    ☐ SÍ          ☐ No
¿Ocurrió el accidente/incidente en predios de la Autoridad?   ☐ SÍ          ☐ No
¿Estuvo implicado un vehículo oficial?                         ☐ SÍ          ☐ No

Descripción de Lesión o Daños:

Descripción Clara y Precisa de Cómo Ocurrió el Accidente/Incidente:

### PREVENCIÓN

| Medida Tomada | Marque con una X | | Fecha de Acción |
|---|---|---|---|
| | Temporal | Permanente | |
| | | | |
| | | | |
| | | | |
| | | | |

### ANÁLISIS DEL ACCIDENTE/INCIDENTE

Evaluación de la Pérdida Potencia si no se Controla (Marque con una X)

| | Grave/Alto | Moderado | Menor/Bajo |
|---|---|---|---|
| Gravedad Probable/Potencial | ☐ | ☐ | ☐ |
| Probabilidad de Ocurrencia | ☐ | ☐ | ☐ |
| Nivel de Exposición | ☐ | ☐ | ☐ |

Página 1 de 2

Entry ID: 6770995     Date Filed: 12/08/2025     Page: 562     Document: 00118376456     Case: 25-2077

Entry ID: 6770995    Date Filed: 12/08/2025    Page: 563    Document: 00118376456    Case: 25-2077

## TIPO DE ACCIDENTE/INCIDENTE (Contacto o Casi Contacto)

| | | | |
|---|---|---|---|
| ☐ Golpeado contra | ☐ Explosión | ☐ Quemadura | ☐ Respiratoria – Tóxico |
| ☐ Golpeado por | ☐ Daño a la propiedad | ☐ Arco eléctrico | ☐ Envenenamiento |
| ☐ Caída al mismo nivel | ☐ Atrapado en | | ☐ Ruido |
| ☐ Caída de altura | ☐ Atrapado por | **Enfermedad Ocupacional** | ☐ Trauma repetitivo |
| ☐ Contacto con | ☐ Atrapado entre | ☐ La piel | ☐ Reacción alérgica |
| ☐ Vehículo | ☐ Sobre esfuerzo | ☐ Respiratoria - Polvo | |

## CAUSAS INMEDIATAS

| | |
|---|---|
| ☐ Operar equipo sin tener autorización | ☐ Uso de equipo, herramienta o material inadecuado |
| ☐ Falta de rótulo de advertencia | ☐ Herramienta, equipo o material defectuoso |
| ☐ Falta de asegurar | ☐ Congestión o acción restringida |
| ☐ Operar a velocidad inapropiada | ☐ Sistema de advertencia o rotulación inadecuados |
| ☐ Remoción de los dispositivos de seguridad | ☐ Peligro de explosión o incendio |
| ☐ Uso de equipo defectuoso | ☐ Desorden: Manejo deficiente |
| ☐ Uso inadecuado del equipo de protección personal | ☐ Exposición al ruido |
| ☐ Falta de uso de equipo de seguridad | ☐ Exposición a altas temperaturas |
| ☐ Cargar de manera inadecuada | ☐ Exposición a bajas temperaturas |
| ☐ Asignación inadecuada a empleado | ☐ Iluminación excesiva o deficiente |
| ☐ Levantamiento inadecuado | ☐ Ventilación inadecuada |
| ☐ Posición inadecuada para la tarea | ☐ Bajo influencia de alcohol y/o drogas |
| ☐ Mantenimiento a equipo en operación | ☐ Protección y barreras inadecuadas |
| ☐ Broma pesada | ☐ Equipo de protección inadecuado |

## AGENTE CAUSA DEL ACCIDENTE/INCIDENTE

| | | | |
|---|---|---|---|
| ☐ Equipo eléctrico | ☐ Mobiliario | ☐ Producto Inflamable | ☐ Animal |
| ☐ Postes | ☐ Herramienta Manual | ☐ Cable conductor | ☐ Recipiente a presión |
| ☐ Superficie trabajo | ☐ Vehículos | ☐ Escaleras | ☐ Partículas desprendidas |
| ☐ Producto químico | ☐ Parte de metal | ☐ Máquina | |

## CLASE DE LESIÓN/ENFERMEDAD

| | | | |
|---|---|---|---|
| ☐ Lesiones múltiples | ☐ Infección/Inflamación | ☐ Muerte | ☐ Enfermedad Ocupacional |
| ☐ Efecto de radiación | ☐ Laceraciones | ☐ Emocional | ☐ Lesión interna |
| ☐ Conmoción(Shock) | ☐ Rozado/Raspado | ☐ Confusión/Magulladura | ☐ Desgarre /Estiramiento |
| ☐ Fracturas | ☐ Amputación | ☐ Torcedura/Dislocación | |
| ☐ Penetración objeto | ☐ Heridas | ☐ Asfixia/Estrangulación | |
| ☐ Dolor | ☐ Lesión visual | ☐ Picadas/Mordedura/Arañazos | |

## PARTE DEL CUERPO AFECTADA

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ Cabeza | ☐ Ojos | ☐ Cara | ☐ Cuello | ☐ Brazo | ☐ Mano | | |
| ☐ Dedos de mano | ☐ Pecho | ☐ Espalda | ☐ Oídos | ☐ Piernas | ☐ Rodillas | | |
| ☐ Dedos de pie | ☐ Pies | ☐ Nervios | ☐ Tobillo | ☐ Piel | ☐ Ingle | | |
| ☐ Sistema digestivo | ☐ Pelo | ☐ Boca | ☐ Nariz | ☐ Dientes | ☐ Sistema respiratorio | | |

## COSTOS DIRECTOS

**Salario/Hora**

A. Accidentado _____

B. Promedio de los empleados presentes _____

C. Promedio de los supervisores presentes _____

D. Número de trabajadores que perdieron tiempo de trabajo debido al accidente

**Tiempo**

E. Promedio perdido debido al accidente _____

F. Extra necesario debido al accidente _____

G. Dedicado por los supervisores en este accidente _____

H. Costo de material y equipo dañado en el accidente: _____ ☐ Estimado ☐ Real

Costo Total: _____
Se computa utilizando las cantidades que indicó en los incisos anteriores
(A-G)(B x D x E) + (B x E) +(C x G) + (B x F x D) = Costo total

## INFORMACIÓN DEL QUE PREPARA ESTE INFORME

Nombre en letra de molde _____

Título _____

Firma _____

Fecha

Teléfono interior

Teléfono exterior

AEE 200.0-4

Informe de Investigación Accidente e Incidente
Página 2 de 2

Entry ID: 6770995    Date Filed: 12/08/2025    Page: 564    Document: 00118376456    Case: 25-2077

AEE 760.0-20A
Rev. 02/15

# Informe Amistoso de Accidente

## ANEJO E

VEA INSTRUCCIONES AL DORSO - CADA PARTE DEBE RETENER UNA COPIA DE ESTE INFORME - LLENE A TINTA EN LETRA DE MOLDE

### DATOS DEL ACCIDENTE

| Fecha: (Día - Mes - Año) | Hora: ☐ AM ☐ PM | Lugar: | | Codificación: (Uso Asegurador) |
|---|---|---|---|---|
| Carretera: | Kilómetro: | Barrio: | Municipio: | Núm. de Vehículos Involucrados: | |

### DATOS DEL POLICÍA QUE INVESTIGÓ O QUIÉN SE INFORMÓ EL ACCIDENTE

| Nombre del Policía: | Apellidos del Policía: | Número de Placa: |
|---|---|---|
| Cuartel: | Número de Querella: | El Policía: ☐ Estuvo ☐ No estuvo presente en la escena del accidente |

### DIAGRAMA DEL ACCIDENTE

**INSTRUCCIONES**
Represente el accidente utilizando figuras como las que se muestran abajo para identificar los vehículos 1 y 2. Use flechas (→↑) para indicar las direcciones en que transitaban. Incluya señales de tránsito y nombre de las calles. Indique con flechas (→↑) el punto de impacto en cada vehículo. (Vea ejemplo al dorso)



### AEE — DATOS VEHÍCULO 1

| Nombre del Dueño: | Apellidos del Dueño: | Edad: | Sexo: | Número Licencia: | Estado que Emite la Lic. si no es P.R.: |
|---|---|---|---|---|---|
| Número de Empleado: | Dirección: | | Pueblo: | | Código Postal: |
| Teléfono Residencia: | Teléfono Trabajo: | Nombre de la Compañía de Seguros que lo Cubre: | | | Número de Póliza: |
| Nombre del Conductor: | Apellidos del Conductor: | Edad: | Sexo: | Número Licencia: | Estado que Emite la Lic. si no es P.R.: |
| Número de Empleado: | Dirección: | | Pueblo: | | Código Postal: |
| Teléfono Residencia: | Teléfono Trabajo: | Fecha Pago Marbete: | Fecha Vencimiento Marbete: | | Casa Financiadora o Arrendador: |
| Marca: | Modelo: | Año: | Color: | Número de Tablilla: | Millaje: |
| Número de Motor o Serie (VIN): | | Número de Registro: | Reclamación Núm. (Uso Asegurador): | | |

Describa el accidente y los daños sufridos por el Vehículo 1, e incluya otros comentarios:

### RECLAMANTE — DATOS VEHÍCULO 2

| Nombre del Dueño: | Apellidos del Dueño: | Edad: | Sexo: | Número Licencia: | Estado que Emite la Lic. si no es P.R.: |
|---|---|---|---|---|---|
| Número de Seguro Social: | Dirección: | | Pueblo: | | Código Postal: |
| Teléfono Residencia: | Teléfono Trabajo: | Nombre de la Compañía de Seguros que lo Cubre: | | | Número de Póliza: |
| Nombre del Conductor: | Apellidos del Conductor: | Edad: | Sexo: | Número Licencia: | Estado que Emite la Lic. si no es P.R.: |
| Número de Seguro Social: | Dirección: | | Pueblo: | | Código Postal: |
| Teléfono Residencia: | Teléfono Trabajo: | Fecha Pago Marbete: | Fecha Vencimiento Marbete: | | Casa Financiadora o Arrendador: |
| Marca: | Modelo: | Año: | Color: | Número de Tablilla: | Millaje: |
| Número de Motor o Serie (VIN): | | Número de Registro: | Reclamación Núm. (Uso Asegurador): | | |

Describa el accidente y los daños sufridos por el Vehículo 2, e incluya otros comentarios:

El contenido de este informe no implica reconocimiento de responsabilidad de las partes involucradas en el accidente, sino una correcta recopilación de información que facilitará la tramitación de las reclamaciones que puedan hacerse como resultado de este accidente. No discuta el contenido de este informe excepto con un funcionario, empleado o representante de su asegurador. Cualquier persona que ofrezca, provea o suscriba información falsa o fraudulenta en este informe, o prepare, haga, presente o suscriba una reclamación falsa o fraudulenta, o pruebe en apoyo de la misma, para el pago de una pérdida con arreglo al seguro de responsabilidad obligatoria, estará sujeta a las sanciones administrativas o penalidades correspondientes, conforme a la Ley Núm. 253 del 27 de diciembre de 1995, según enmendada. Una vez llene este informe debe firmarlo en el espacio provisto para ello. Las firmas de las partes son necesarias para procesar cualquier reclamación que se interese presentar y garantiza que la información provista es correcta y verdadera. Una vez firmado por ambas partes, este informe no debe ser modificado.

| Firma Dueño Vehículo 1 | Fecha | Firma Dueño Vehículo 2 | Fecha |
|---|---|---|---|

412 INFORME AMISTOSO

DEPC

Case: 25-2077   Document: 00118376456   Page: 565   Date Filed: 12/08/2025   Entry ID: 6770995

### ¿QUÉ DEBE HACER EN CASO DE ACCIDENTE DE TRÁNSITO?

1. Los conductores de los vehículos involucrados en el accidente deben llenar este Informe Amistoso de Accidente. La información de este formulario es necesaria para tramitar su reclamación.

2. De no ser posible llenar el Informe, obtenga la siguiente información del otro u otros vehículos involucrados:

   a. Nombre del conductor.
   b. Número de licencia de conducir.
   c. Nombre del dueño del vehículo, según aparece en la licencia del mismo.
   d. Dirección postal y física de los conductores y los dueños de vehículos (la dirección del dueño aparece en la licencia del vehículo).
   e. Número de tablilla.
   f. Marca, modelo y año de los vehículos.

3. De conformidad con la Ley de Vehículos y Tránsito, informe el accidente a la Policía dentro de las próximas cuatro (4) horas de haber ocurrido el mismo. En el caso de que usted informe el accidente a la Policía luego de cuarenta y ocho (48) horas de haber ocurrido el mismo, además de las penalidades provistas por la referida ley, usted podría perder el derecho a reclamar bajo el Seguro de Responsabilidad Obligatorio.

4. Obtenga la siguiente información del policía que investigó el caso o atendió la querella:

   a. Nombre, número de placa y cuartel.
   b. Número de la querella de la Policía.



EJEMPLO DE CÓMO LLENAR EL DIAGRAMA DEL ACCIDENTE

### AVISO

"Cualquier persona que a sabiendas y con la intención de defraudar presente información falsa en una solicitud de seguro o, que presentare, ayudare o hiciere presentar una reclamación fraudulenta para el pago de una pérdida u otro beneficio, o presentare más de una reclamación por un mismo daño o pérdida, incurrirá en delito grave y convicto que fuere, será sancionado, por cada violación con pena de multa no menor de cinco mil (5,000) dólares, ni mayor de diez mil (10,000) dólares o pena de reclusión por un término fijo de tres (3) años, o ambas penas. De mediar circunstancias agravantes, la pena fija establecida podrá ser aumentada hasta un máximo de cinco (5) años; de mediar circunstancias atenuantes, podrá ser reducida hasta un mínimo de dos (2) años." Ley #18 del 8 de enero de 2004.

AEE 084-15333
REV. 1/01

ESTADO LIBRE ASOCIADO DE PUERTO RICO
AUTORIDAD DE ENERGIA ELECTRICA
INFORME DE ACCIDENTE DE VEHICULO

ANEJO F

Página 1 de 2

| (1) USE LINEA SOLIDA PARA MOSTRAR EL PASO DEL VEHICULO ANTES DEL ACCIDENTE ⟶ Y LINEA DE PUNTOS PARA DESPUES DEL ACCIDENTE ⋯⋯⋯⋯⟶ | (2) NUMERE CADA VEHICULO Y MUESTRE DIRECCION EN QUE IDA ⟶ |
|---|---|
| | (3) MUESTRE MOTOCICLETA POR ⟶ oŏo |
| | (4) MUESTRE PEATON POR ⟶ o |

DESCRIBA EL ACCIDENTE EN DETALLE (USE HOJA ADICIONAL SI ES NECESARIO)

| FIRMA DEL CONDUCTOR O INFORMANTE | TELEFONO | FECHA | NOMBRE (USE LETRA DE MOLDE) Y FIRMA DEL SUPERVISOR INMEDIATO | TELEFONO |
|---|---|---|---|---|

EL CASO FUE INFORMADO E INVESTIGADO EN EL CUARTEL DE LA POLICIA DE :    CASO INFORMADO A ACCA DE:

NOMBRE DEL POLICIA:

NUMERO DE LA PLACA:

NUMERO DE LA QUERELLA:

EN CASO DE ACCIDENTES DE VEHICULOS, POR PEQUEÑO QUE SEA, LLENE ESTE INFORME Y ENTREGUELO INMEDIATAMENTE A SU SUPERVISOR INMEDIATO. "ESTE INFORME DEBE SER LLENADO POR LA PERSONA QUE CONDUCIA O TENIA CONTROL DEL VEHICULO AL MOMENTO DEL ACCIDENTE".

LLENE TODOS LOS ENCASILLADOS DE ESTE INFORME.

DISTRIBUCION: EL SUPERVISOR QUE FIRMA ESTE INFORME LO ENVIARA INMEDIATAMENTE A LA OFICINA DE SEGUROS, UNA COPIA A LA OFICINA DE TRANSPORTACION TERRESTRE Y OTRA COPIA AL OFICIAL DE SEGURIDAD DEL AREA.

| FECHA Y LUGAR DEL ACCIDENTE | FECHA DEL ACCIDENTE | | HORA DEL ACCIDENTE (ESTIMADO O REAL) | LUGAR DEL ACCIDENTE |
|---|---|---|---|---|
| | DIA | MES (ESCRIBA NOMBRE) | AM ☐ PM ☐ | |

| 2 DATOS SOBRE EL CONDUCTOR DEL VEHICULO DE LA AUTORIDAD Y SUS ACOMPAÑANTES | NOMBRE DEL CONDUCTOR | | | EDAD | NUM. DE LICENCIA: FECHA DE EXPIRACION: |
|---|---|---|---|---|---|
| | DIRECCION RESIDENCIAL | | TELEFONO | TIEMPO QUE MANEJA VEHICULOS AÑOS | |
| | DONDE ESTABA AL MOMENTO DEL ACCIDENTE | | DIVISION-OFICINA-PROYECTO O PUEBLO DONDE TRABAJA | | |
| | NOMBRE Y DIRECCION DE SUS ACOMPAÑANTES | | | | |
| | NOMBRE | | DIRECCION RESIDENCIAL | | |
| | | | | | |
| | | | | | |
| | | | | | |

"Somos un patrono con igualdad de oportunidades de empleo y no discriminamos por razón de raza, color, sexo, religión, nacionalidad,edad, ideas políticas, impedimento físico o mental y condición de veterano de la Era de Vietnam o veteranos con impedimentos"

App.561

Entry ID: 6770995   Date Filed: 12/08/2025   Page: 566   Document: 00118376456   Case: 25-2077

Case: 25-2077    Document: 00118376456    Page: 567    Date Filed: 12/08/2025    Entry ID: 6770995

AEE 084-15333

Informe de Accidente de Vehículo
Página 2 de 2

| | | | | |
|---|---|---|---|---|
| **3**<br>**DATOS**<br>**SOBRE EL**<br>**VEHICULO**<br>**DE LA**<br>**AUTORIDAD** | MARCA DEL VEHICULO | NUMERO DEL MOTOR | NUMERO DE TABLILLA | NUMERO DE CODIGO |
| | ¿CON QUE PROPOSITO SE UTILIZABA EL VEHICULO CUANDO OCURRIO EL ACCIDENTE? | | DIV.-OFICINA PROYECTO O PUEBLO QUE PERTENECE EL VEHICULO | |
| | ¿EN QUE DIRECCION IBA EL VEHICULO DE LA AUTORIDAD? | | ¿A QUE VELOCIDAD? | |
| | ¿EN QUE LADO DE LA CALLE? | ¿ESTABA TOCANDO BOCINA?  ☐ SI   ☐ NO | ¿TENIA LAS LUCES ENCENDIDAS?  ☐ SI   ☐ NO | |

| | | | |
|---|---|---|---|
| **4**<br>**DAÑOS**<br>**A LA**<br>**PROPIEDAD**<br>**AJENA** | DUEÑO DEL VEHICULO O PROPIEDAD AJENA | DIRECCION | TELEFONO |
| | ¿QUIEN MANEJABA EL VEHICULO AJENO? | DIRECCION | TELEFONO |
| | NUMEREO LIC. CONDUCTOR VEHICULO AJENO | MARCA Y AÑO DEL VEHICULO AJENO | NUMERO DE TABLILLA |
| | ¿EN QUE DIRECCION IBA EL VEHICULO AJENO? | ¿EN QUE LADO DE LA CALLE? | ¿A QUE VELOCIDAD? |
| | ¿CUALES SON LOS DAÑOS A LA PROPIEDAD AJENA? (DE TODOS LOS DETALLES) | | |
| | NOMBRE COMPAÑIA ASEGURADORA: | NUMERO DE POLIZA: | |

| | NOMBRE Y DIRECCION | DESCRIBA LESIONES (BREVEMENTE) | EDAD | PASAJERO | | PEATON |
|---|---|---|---|---|---|---|
| | | | | AEE | OTRO | |
| **5**<br>**PERSONAS**<br>**LESIONADAS** | | | | ☐ | ☐ | ☐ |
| | | | | ☐ | ☐ | ☐ |
| | | | | ☐ | ☐ | ☐ |
| | ¿DONDE FUERON LLEVADOS LOS LESIONADOS DESPUES DEL ACCIDENTE? | | | | | |
| | ¿FUE LLAMADO EL MEDICO?  ☐ SI   ☐ NO | NOMBRE DEL MEDICO | DIRECCION ( HOSPITAL) | | | |

| | NOMBRE | S.S. | DIRECCION RESIDENCIAL | TELEFONO |
|---|---|---|---|---|
| **6**<br>**OTROS**<br>**TESTIGOS** | | | | |
| | | | | |

| | |
|---|---|
| **7**<br>**DESCRIPCION**<br>**DEL**<br>**ACCIDENTE** | CAUSA DEL ACCIDENTE |
| | DAÑOS CAUSADOS AL VEHICULO DE LA AUTORIDAD |



AEE 760.0-24
Rev. 02/16

**Autoridad de Energía Eléctrica de Puerto Rico**
**Directorado de Finanzas**
**Oficina de Administración de Riesgos**

ANEJO G

## CERTIFICACIÓN

Yo, _____, certifico que al momento de

<span style="font-size:smaller">Nombre reclamante en letra de molde</span>

suscribir este documento no he realizado reclamación alguna al Seguro

Compulsorio, y certifico que no haré reclamación alguna por los daños

compensados o que se compensarán por _____ ni

<span style="font-size:smaller">Nombre compañía aseguradora de AEE</span>

al Seguro Compulsorio, ni a la compañía aseguradora contratada por mi, ni a

persona alguna.  Entiendo que de reclamar y cobrar al Seguro Compulsorio, a

otra compañía aseguradora o a la persona responsable de los daños

ocasionados a mi vehículo ya compensado por

_____, incurriré en fraude y puedo ser procesable

<span style="font-size:smaller">Nombre compañía aseguradora de AEE</span>

administrativa y penalmente.  Igualmente, tendré la obligación de devolver la

suma total recibida como pago por concepto de daños a mi vehículo por parte de

_____.

<span style="font-size:smaller">Nombre compañía aseguradora de AEE</span>

Certifico que he leído todo lo anterior y entiendo completamente lo antes

expuesto.  Firmado en _____, el día _____ de _____

de 2 _____.

_____
Nombre reclamante en letra de molde

_____
Firma del reclamante

<span style="writing-mode:vertical">Case: 25-2077   Document: 00118376456   Page: 568   Date Filed: 12/08/2025   Entry ID: 6770995</span>

AEE 760.0-25
Rev. 02/16

ANEJO H



# CARTA DE RELEVO

Yo,_____, en virtud del pago de _____, cuya cantidad voy a recibir a mi entera satisfacción mediante cheque, por la presente relevo y para siempre eximo a la Autoridad  de Energía Eléctrica de Puerto Rico de cualesquiera y todas las acciones, causas de acción, reclamaciones y demandas por, sobre o en virtud de cualquier daño, pérdida o perjuicio personal o contra nuestra propiedad que hasta ahora haya sido o en adelante pueda sostenerse por mí, o pudiese en lo sucesivo sufrir, estén o no esté alegadas en la reclamación como consecuencia de _____ocasionado por la Autoridad de Energía Eléctrica.

Siendo, además, convenido y entendido que el pago de la cantidad antes señalada no debe interpretarse como una admisión por parte de la Autoridad de Energía Eléctrica de Puerto Rico ni por sus representantes oficiales de cualesquiera responsabilidades, si alguna, como consecuencia de tales actos.

En testimonio de lo cual firmo esta carta de Relevo en _____, Puerto Rico, hoy \_\_\_\_\_ de _____ de 2_____.


_____
Reclamante   (letra de molde y firma)

_____
Núm. Seguro Social o Licencia de Conducir

_____
Testigo   (letra de molde y firma)

Case: 25-2077   Document: 00118376456   Page: 569   Date Filed: 12/08/2025   Entry ID: 6770995



CN 084-15424
AEE 750.0-262
Rev. 05/14

ANEJO I

Estado Libre Asociado de Puerto Rico
Autoridad de Energía Eléctrica de Puerto Rico

**Solicitud de Cheque**

Fecha: _____     _____
                                                                    Departamento, División, Sección

Solicitamos se prepare cheque a favor de:

_____

por la cantidad de: _____ ($ _____ ).

La solicitud de cheque es por concepto de:
(Describir en detalle el servicio, equipo o material recibido e incluir la evidencia en original que justifica el pago).

_____

_____

Coordinado: _____

Se incluye(n) la(s) siguiente(s) factura(s):

| Número de Factura | Cantidad | Con cargo a la(s) cuenta(s) | | |
| | | Número de Estimado o Responsabilidad Contable | Subcuenta | Clase de Gasto |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| **Total** | | | | |

Fecha requerida: _____

Enviar o llamar a: _____

| Solicitado y Recomendado | Aprobado |
|---|---|
| Nombre y Título | Nombre y Título |
| Firma | Firma |
| Fecha | Fecha |

| División de Tesorería | |
|---|---|
| Nombre del Verificador | Nombre y Título del Supervisor |
| Firma | Firma |
| Fecha | Fecha |

Case: 25-2077   Document: 00118376456   Page: 570   Date Filed: 12/08/2025   Entry ID: 6770995

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.<br><br>Debtors[1] | PROMESA<br>Title III<br><br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br>Debtor. | PROMESA<br>Title III<br><br><br>Case No. 17-BK-04780 (LTS) |

## BRIEF OF INSTITUTO DE COMPETITIVIDAD Y SOSTENIBILIDAD ECONÓMICA DE PUERTO RICO (ICSE)

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (ill) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title case numbers are listed as Bankruptcy Case numbers due to software limitation.)

## TABLE OF CONTENTS

Preliminary Statement ................................................................................................ 1

ICSE's Standing .................................................................................................1 - 2

Procedural Background ................................................................................. 2-3

LUMA's Motion ........................................................................................... 3-7

LUMA's Lacks Standing ............................................................................... 7-8

Section 362(b)(4), Police and Regulatory Power Exception …………….…………….9-12

Conclusion.......................................................................................................12

Certificate of Service.......................................................................................13

i

## <u>TABLE OF AUTHORITIES</u>

| **Cases** | **Page(s)** |
|---|---|
| <u>Application of Timberon Water Co., Inc.</u>, 114 N.M. 154 (1992) | 10 |
| <u>Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n</u>, 461 U.S. 375 (1983) | 10 |
| <u>Bennett, In re</u>, 317 B.R. 313 (Bankr. D. Md. 2004) | 7-8 |
| <u>Berg v. Good Samaritan Hosp. (In re Berg)</u>, 230 F.3d 1165 (9th Cir. 2000) | 10 |
| <u>Baltimore Emergency Services II, Corp., In re</u>, 432 F.3d 557 (4th Cir. 2005) | 7 |
| <u>Montalvo, In re</u>, 537 B.R. 128 (Bankr. D.P.R. 2015) | 9 |
| <u>Newcomer, In re</u>, 416 B.R. 166 (Bankr. E.D. Pa. 2009) | 7-8 |
| <u>N.L.R.B. v. Continental Hagen Corp.</u>, 932 F.2d 828 (9th Cir. 1991) | 9 |
| <u>Pacific Gas & Elec. Co., In re</u>, 263 B.R. 306 (Bankr. N.D. Cal. 2001) | 9-11 |
| <u>Pharmakinetics Laboratories, Inc., In re</u>, 139 B.R. 350 (D. Md. 1992) | 8 |

**Laws & Regulations**

United States Bankruptcy Code, 11 U.S.C. § 101, *et seq*

- § 362(a) …………………………………………………………………8-9

- § 362(b)(4) ………………………………………………………… 10-11

- § 1109(b) …………………………………………………………....... 1

Public Act 11-187, that is, Federal "PROMESA" Act, 48 U.S.C. § 2101, *et seq*

- Sec. 301(a) …………………………………………………………… 8-9

- Sec. 315(b) ………………………………………………………… 7

Act 29-2009, Public-Private Partnership Authority Act ………………………………… 5

Act 120-2018, Puerto Rico Electric System Transformation Act ……………………… 5

Act 17-2019, Puerto Rico Energy Public Policy Act ……………………………… 1-2

iii

TO THE HONORABLE COURT:

      **COMES NOW INSTITUTO DE COMPETIVIDAD Y SOSTENIBILIDAD ECOMOMICA DE PUERTO RICO (ICSE)**, represented by counsel and respectfully requests that the Court reject the Plan of Adjustment:

## I. **PRELIMINARY STATEMENT**

    1. The appearing party is a party in interest in the Puerto Rico Electric Power Authority's ("PREPA") Title III Bankruptcy. *See* 11 U.S.C. § 1109(b) incorporated under via PROMESA Section 301(a). ICSE has appeared before this court on this case prior to this filing.

## II. **INSTITUTO DE COMPETIVIDAD Y SOSTENIBILIDAD ECONOMICA DE PUERTO RICO (ICSE), STANDING**

    2. ICSE has been a significant player in all energy discussions and processes in Puerto Rico during the last decade.  ICSE is a 501 (c) (3) entity under the United States Internal Revenue Code. It does education, planning, and promotion of economic development. In the energy field, it has litigated before the Puerto Rico Energy Bureau, before the Puerto Rico Courts, all the way to the Puerto Rico Supreme Court, and in the Federal Court PROMESA case.

    3. ICSE coordinates and provides support to nonprofit entities representing the general interest of the electric energy consumers and does not represent particular professional or commercial groups. Starting as a participant of the Puerto Rico Senate Advisory Committee that worked on drafting Act 17-2019, ICSE is committed to the full, most ample implementation of the values, interests, and mandates of Puerto Rico's Energy Public Policy.

    4. ICSE represents the widest group of electric power consumer residential, commercial, and industrial. ICSE is the only entity that represents all electric power consumers and not any particular group or interest.

    5. ICSE's present participation is a continuation of its efforts to promote the interests,

1

mandates and values of Act 17-2019: transparency, accountability, and access for consumers to the processes that relate to the energy sector.

6. Additionally, ICSE intervened in case <u>DACO v. LUMA Energy, et al.</u>, Civil No. SJ2025CV066607 at Court of First Instance and in case LUMA seeks to vacate with its complaint, <u>DACO v. LUMA Energy, et al.</u>, CT-2025-0003 before the Puerto Rico Supreme Court. ICSE was granted the status of *amicus curiae* and filed its briefs before both Courts.

## III. **PROCEDURAL BACKGROUND**

7. On July 22, 2025, the Department of Consumer Affairs ("DACO") filed the case <u>DACO v. LUMA Energy, et al.</u>, Civil No. SJ2025CV06607, before the Court of First Instance. The action is a petition for declaratory judgment seeking to declare unconstitutional Section 4.1(g) of the public-private partnership contract between the Puerto Rico Electric Power Authority ("PREPA"), the Public-Private Partnerships Authority ("P3A"), and LUMA (comprising LUMA Energy, LLC and LUMA Energy ServCo, LLC), known as the *Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* ("T&D OMA"). In the exercise of its duty to protect consumers, DACO asserts that the absolute immunity granted to LUMA against claims by consumers who suffer damages due to LUMA's negligence is unlawful, lacks legal basis, and further violates the constitutional separation of powers.

8. On August 6, 2025, ICSE appeared before the Court of First Instance ICSE seeking leave to appear as *amicus curiae* in support of DACO's declaratory-judgment action and urging the Court to invalidate Section 4.1(g) of the T&D OMA, arguing that the liability limitation approved by the PREB is unlawful, ultra vires, and incompatible with Puerto Rico's substantive tort and contract law as well as separation-of-powers principles.

9. On August 8, 2025, the Department of Consumer Affairs ("DACO") filed an

2

intrajurisdictional certification petition requesting the Supreme Court exercise its jurisdiction over the case <u>DACO v. LUMA Energy, et al.</u>, Civil No. SJ2025CV066607 presented before the Court of First Instance.

10. On August 22, 2025 the Supreme Court issued the writ of certification, granting term for all parties, including ICSE, to file their respective briefs.

11. On September 18, 2025, five (5) days before LUMA's brief was due before the Supreme Court, LUMA filed the *Urgent Motion of LUMA to Enforce the Automatic Stay* (Docket Entry No. 5819 in Case No. 17-4780) (the "Motion".)

## IV. **<u>LUMA'S MOTION</u>**

12. LUMA argues that DACO's complaint is "the latest attempt by the Government [of Puerto Rico] to interfere with PREPA's property interest in the T&D OMA." <u>Id</u>., at p. 10. LUMA claims that said complaint is "equivalent" to the action filed on June 22, 2020 by the President of the Senate of Puerto Rico in the Court of First Instance, <u>Senado de Puerto Rico, Represented by its President, Hon. José Luis Dalmau Santiago v. Commonwealth of Puerto Rico, et al.</u>, Civil Case No. 2021CV03356, and later before this Court, Adv. Proc. No. 21-59. It goes as far to argue that the "new tact" of "seeking to only void a section of the T&D OMA […] and not the entire T&D OMA, is a distinction without a difference". <u>Id</u>., at p. 2.

13. Of course it is a valid distinction: the Complaint filed by the Puerto Rico Senate in 2021 sought to declare the whole contract while DACO's complaint focuses on Section 4.1(g). To blur the actual distinctions between the latter and former, LUMA characterizes Section 4.1(g) as a material part of the T&D OMA. It even asserts that, at the time T&D OMA was executed—**<u>June 22, 2020</u>**—all parties recognized that this limitation of liability was critical to LUMA and PREPA. However, Section 4.1 (g) cannot be so construed when, by its own terms, approval of that

contractual provision was subject to a subsequent act of the Energy Bureau, which came to happen on **May 31, 2021**.

14. There were no minimum protections on liability afforded to LUMA at the time of execution. In the same Resolution and Order in which the PREB approved Section 4.1(g), the regulator held:

> The parties included in the OMA the proposed liability waiver language, which will be evaluated by the Energy Bureau for its **approval, modification or denial**. The Energy Bureau has no obligation to approve the proposed liability waiver. (emphasis added.)

> The Energy Bureau deems that, as with the Initial Budgets (Section 4(e) of the OMA), it shall review, and approve, deny, or proposed modifications to the terms of service in accordance the Applicable Law. This interpretation regarding the evaluation of the Terms of Service is consistent with Section 20.17 of the OMA which states that:

>> *[n]otwithstanding anything to the contrary herein, no provision of this Agreement shall be interpreted, construed or deemed to limit, restrict, supersede, supplant or otherwise affect, in each case in any way, the rights, responsibilities or authority granted to PREB under Applicable Law with respect to the T&D System, Owner or Operator.*

> The Energy Bureau's interpretation is consistent with the Certificate of Energy Compliance which states:

>> *[a]s stated before, the scope of the Energy Bureau's evaluation of the Preliminary Contract is limited to the determination of compliance with the Puerto Rico's energy public policy and the current regulatory framework. Although the Energy Bureau provided certain feedback to the P3 Authority during the competitive solicitation process, the Preliminary Contract, results from an independent negotiation conducted by the P3 Authority. The Energy Bureau is not a party to the Preliminary Contract.* ***Thus, no obligation and/or duty may be imposed to the Energy Bureau under the Preliminary Contract (as modified).*** *(Emphasis in the original).*

>> *Considering the foregoing, the Energy Bureau further clarifies that the issuance of the Energy Compliance Certificate regarding the Preliminary Contract (as modified):*

>>> *(1) Shall not be construed, in any way whatsoever, as to impair, restrict, relinquish or abridge the scope of the Energy Bureau's: (1)*

> administrative powers; (2) statutory and regulatory jurisdiction and/or authority; (3) statutory and regulatory oversight and enforcement powers; (4) rights; (5) duties; and (6) obligations, all in accordance with the applicable laws and regulations.
>
> (2) Shall not be construed, in any way whatsoever, as a waiver and/or release of any applicable statutory or regulatory requirement nor any related regulatory action applicable to the T&D System, the Operator, PREPA (or the successor owner of the T&D System).
>
> **(3) Anything in the Preliminary Contract (as modified) contrary to the provisions of Section [III](C)(1) and [III](C)(2) above, or otherwise contrary to the law, shall be deemed unenforceable. (Emphasis in the original).**

> It must be clear that the Energy Bureau is not compelled to approve the terms of service as established in Section 4(g) of the OMA. Instead, upon evaluation of a proposal by LUMA, the Energy Bureau shall review, and approve, deny, or propose modifications to any proposed terms of service, consistent with the applicable legal and regulatory framework. As further discussed in this Resolution and Order, after a careful evaluation, the Energy Bureau **REJECTS** the proposed terms of service and instead, approves modified terms of service consistent with the public policy established for the transformation of the Puerto Rico electric system and with the public interest.

*Resolution and Order* of May 31, 2021, In Re: Review of LUMA's Terms of Service (Liability Waiver), Case No. NEPR-MI-2021-0007.

15. The foregoing shows that the execution of the T&D OMA proceeded independently of Section 4.1(g) insofar as the process for executing LUMA's terms of service arose from an independent regulatory proceeding not contemplated within the structure for approving public-private partnership agreements under Acts 120-2018 and 29-2009. Had the guarantees from the Puerto Rico Government contained in *PREB-approved* Section 4.1(g) been material to LUMA's consent, LUMA would not have subjected the validity of the liability waiver to the satisfaction of a suspensive condition.

16. Additionally, LUMA seeks relief on grounds that differ from the relief sought by DACO before the state courts. Note that LUMA assumes that potential judgments will be subject to indemnification by PREPA under Sections 18.2(a)(vi) and (vii) of the T&D OMA. The operator

5

then asserts that a ruling of nullity of the liability waiver in Section 4.1(g) will be harmful to the debtor's estate. However, PREPA itself has briefed before the Supreme Court of Puerto Rico that Section 18.2(b) bars this contention insofar as the public corporation argues that all costs arising from losses due to LUMA's negligence will be "Disallowed Costs" as established under Section 7.6(a)(i) of the T&D OMA.

17. LUMA misconstrues DACO's complaint. The Commonwealth only sought a declaratory judgment finding that the Puerto Rico Energy Bureau—governmental entity who is not a party to this complaint—lacks statutory authority to provide LUMA or PREPA with immunity. That is what is challenged by DACO: nothing less and nothing more.

18. Lastly, this sheds light on an additional distinction between the present case and the Senate's challenge of 2021. Note that the Senate did not challenge an act of a "third-party" government agency. The Senate based its challenge on the omission of timely recording the T&D OMA with the Puerto Rico Digital Real Estate Registry. That is not the case here. The question of this case is: Can the Puerto Rico Energy Bureau concede its regulated entities with liability waivers as part of its ratemaking powers? That is not a question exclusive to PREPA or LUMA since the PREB has power to fix the rates of all electric service companies under its jurisdiction. **This is a question of regulatory power limits.**

19. Assume that a different **private** electric service company was afforded a liability waiver by the PREB and said waiver was challenged before Puerto Rico's state court. Also assume that the courts render a judgment finding that the PREB lacked the statutory powers to grant the waiver, just as DACO contends. This would result in entities in the energy sector enjoying fewer protections than LUMA and PREPA, simply because the question concerning the latter two evades judicial scrutiny. This demonstrates that the controversy arises purely under Puerto Rico

administrative law and thus falls outside the proper scope of this Court's jurisdiction under PROMESA. The purpose of the automatic stay is not to provide competitive advantages to a debtor.

## V. **LUMA'S LACKS STANDING**

20. A threshold issue is that LUMA frames its request as if it were protecting the debtor's estate. LUMA does so in order to overcome the jurisdictional hurdle, since LUMA itself cannot invoke federal jurisdiction to protect its interest in the case filed by DACO. Another distinction between the Senate's 2021 challenge is that the party that moved to stay state litigation was the **Fiscal Oversight and Management Board (FOMB)**, in its capacity as the sole representative of a debtor under Title III of PROMESA. *See* Section 315 (b). Nothing in PROMESA authorizes any entity other than the FOMB to bring actions to protect PREPA's estate.

21. In fact, it is equally relevant that the T&D OMA itself does not grant LUMA representative capacity with respect to PREPA. Its only authorization in this regard concerns system regulatory matters before the PREB, as established under Section 5.6 of the T&D OMA. *See also* Section 19.2(h)(vi) ("Operator does not represent particular interests in cases or matters that imply conflicts of interest, **or of public policy**, between Owner and the particular interests it represents.")

22. LUMA rests on the authority of In re Newcomer, 416 B.R. 166 (2009). *See LUMA's Motion*, at p. 14. However, In re Newcomer **rejects** LUMA's standing basis.

23. Likewise, the authorities cited by the Court also reject it. For example, In re Newcomer cites In re Baltimore Emergency Services II, Corp*.,* 432 F.3d 557, 560–561 (4th Cir.2005) ("*[L]imitations on standing are of paramount importance in bankruptcy proceedings*.") In re Bennett, 317 B.R. 313, 316 (Bkrtcy.D.Md.2004) ("*To have standing to seek the requested relief a plaintiff must have a personal stake in the outcome of the controversy as well as be [in] the class*

7

*of persons intended to benefit from the statute.*"), among others.

24. The opinion of <u>In re Newcomer</u> denies recognizing the plaintiff (wife of the debtor) standing to enforce the automatic stay given that she wasn't either a creditor or the debtor. She was simply the executor of a Note which was secured by the property of the estate. The Court held that:

> while the estate's interest in the Property is clearly protected by the automatic stay, Mrs. Newcomer lacks standing under the automatic stay to protect *her* own interest in the Property. Non-debtors are "not protected by the automatic stay of Section 362(a) of the Bankruptcy Code" and, as a consequence, "ha[ve] no standing whatsoever to raise the issue of its violation."

*Id.*, at pp. 175-76 (*citing* <u>In re Pharmakinetics Laboratories, Inc.</u>, 139 B.R. 350, 353 (D. Md. 1992).

25. LUMA's purports to demonstrate its standing by characterizing itself as a "party in interest". *LUMA's Motion*, at pp. 14-15. LUMA adds that the *Order Pursuant to PROMESA Section 301(a) and Bankruptcy Code Sections 105(a), 362(a), 365 and 922 Confirming (I) Application of the Automatic Stay to Government Officers, Agents, and Representatives, (II) Stay of Prepetition Lawsuits, and (III) Application of Contract Protections.*" (Docket Entry No. 543 in Case No. 17-3283 (D.P.R. June 29, 2017)), confirmed that the automatic stay extended to PREPA's agents. *Id.*, at p. 15, note 5.

26. ICSE does not comprehend where this assertion comes from. The order of reference was rendered on June 29, 2017. PREPA's Title III filing was on July 2, 2017. The Order does not even mention PREPA. The only party at that moment in time was the Commonwealth of Puerto Rico. LUMA fails to show standing once again.

## VI. **SECTION 362(b)(4), POLICE AND REGULATORY POWER EXCEPTION**

27. We must address that LUMA has consistently characterized this controversy before the state courts as a ratemaking issue. Its brief to the Supreme Court is at the outset focused primarily

on arguing that the controversy is strict ratemaking matter: "**The approval of liability limitations in the context of an electric service company is a ratemaking matter validly delegated by the Legislative Assembly to the NEPR.**" *LUMA Brief*, at p. 26 (translation ours.) It goes on to summarize the experience in mainland jurisdictions under the common law tradition (unlike Puerto Rico where we have a Civil Code) to argue its ratemaking nature[2].

28. Furthermore, the PREB also agrees with LUMA's understanding that a liability waiver is a ratemaking matter subject to its regulatory purview. Under its own framing, therefore, this is a classic exercise of regulatory power subject to Section 362(b)(4) exception. The complaint fails to show why the **police and regulatory power exception** of Section 362(b)(4) of the Bankruptcy Code incorporated into PROMESA through Section 301(a) is inapplicable.

29. Section 362(b)(4) contains an exception to the automatic stay established by Section 362(a), known as the police and regulatory power exception. Its purpose is to allow regulatory or judicial actions brought by a State or State unit to proceed on their merits against a debtor subject to a bankruptcy proceeding. For this exception to the automatic stay apply, this Court in In re Montalvo, 537 B.R. 128, 143 (Bankr. D.P.R. 2015) explained that "[u]nder the 'public policy' test, the relevant inquiry is whether the government is 'primarily trying to 'effectuate public policy' or to adjudicate private rights.'" The reverse proposition being that a state action is barred from enjoying the exception if it simply "relates 'primarily to the protection of the government's pecuniary interest in the debtor's property". N.L.R.B. v. Continental Hagen Corp., 932 F.2d 828, 833 (1991).

30. Ratemaking and controversies arising out of ratemaking proceeding have been understood to satisfy Section 362(b)(4) requirements. In In re Pacific Gas and Electric Co., 263 B.R. 306

---

[2] ICSE disagrees with LUMA's theory, which is part of the merits of the controversy before the Puerto Rico Supreme Court.

9

(2001), PG & E sought injunctive relief against California Public Utilities Commission (CPUC)

against an order directing PG & E to count past losses against its stranded cost recovery, which

kept a rate freeze in place longer. PG & E sought a stay to avoid making those retroactive

accounting transfers, which it believed would harm its reorganization in federal court. Unlike the

case at hand in which the liability risk of exposure LUMA presents is speculative[3], in In re PG &

E, the harm to the estate was quantifiable and easily verifiable. Nonetheless, the Court held that:

> The fact that the result may be a negative economic impact on PG&E, and a
> positive economic impact on PG & E's customers, does not change the fact that
> CPUC's rate-making implements public policy.

Id., at pp. 318-19 (citing Berg v. Good Samaritan Hospital (In re Berg), 230 F.3d 1165, 1168 (9th
Cir.2000)).

31. The opinion concludes:

> PG & E's argument misses the mark. [CPUC's decision] is no less an
> implementation of "public policy" because CPUC chose one rate-making calculus
> over another. To the contrary, that choice is the essence of CPUC's ratemaking
> authority over PG & E as a public utility, and regulation of utilities "is one of the
> most important of the functions traditionally associated with the police power of
> the States." CPUC's rate-making decisions involve a complex analysis of
> legislative intent and a host of other factors, as set forth in the Accounting Decision.
> **The fact that implementing that decision is expected to be expensive for PG&E
> does not take away from the important public policy decisions involved**.

Id., at p. 320 (citing Ark. Electric Coop. Corp. v. Ark. Pub. Serv. Comm'n, 461 U.S. 375, 377
(1983) (emphasis added)).

32. The New Mexico Supreme Court arrived to the same conclusion in Application of

Timberon Water Co., Inc., 114 N.M. 154, 161 (1992) ("After studying the relevant case and

statutory law, we believe that Congress in no way intended to preempt the ratemaking proceedings

of this case, or the widely accepted CIAC doctrine used as part of the calculation of a fair rate of

---

[3] LUMA asserts that the utility is exposed to more than $400 million. However, this assumes that all claims are valid and fully payable. That is, LUMA assumes it will have to pay those full amounts. That is hypothetical fearmongering which ought not to disturb the adjudicator's assessment.

return. In fact, we believe that Congress specifically provided for this sort of standard ratemaking proceeding in § 362(b)(4)–(5), which excepts police and regulatory proceedings from the automatic stay.")[4]

33. Now, DACO's complaint challenges the Bureau's determination. Assuming that conceding liability immunities to utilities is an exercise of ratemaking, then this in turn is a rate controversy subject to the exception of Section 362(b)(4). As such, it should be addressed by Puerto Rico's State Courts and not this Court. Of course, this does not mean that DACO's complaint by itself is not within the sphere of police power enforcement. Note that DACO seeks no pecuniary interest and its complaint is in representation of consumers.

34. A word of caution is warranted. If this case is construed as a "ratemaking controversy" and this Court rules that it is subject to the automatic stay, the practical consequence is that LUMA, Genera PR, the Bondholders, the Unofficial Creditors Committee, among others can come before this Court asking for a stay in the ongoing Puerto Rico Electric Power Authority Rate Review, Case No. NEPR-AP-2023-0003 before the Energy Bureau ("PREPA Rate Case"), if any of the parties to that proceeding is dissatisfied by its outcome. That would have the effect of subjecting the Rate Review Case as a whole to federal judicial review.

35. This contradicts all the steps taken by PREPA's Title III sole representative to protect the PREB's independence in setting rates for PREPA. *See for example Fifth Amended Title III Plan of Adjustment of the Puerto Rico Electric Power Authority* (Docket Entry No. 5581, in Case No. 17-4780), Exhibit D, at pp. 116-17 ("for the avoidance of doubt, the Oversight Board does not assert that PROMESA preempts PREB's approval powers of PREPA's rates".)

<u>**CONCLUSION**</u>

---

[4] In no way ICSE suggests the case is applicable under Puerto Rico law. It is raised for argumentative purposes only.

WHEREFORE INSTITUTO DE COMPETITIVIDAD Y SOSTENIBILIDAD
ECONÓMICA respectfully requests that it denies the *Urgent Motion of LUMA to Enforce the
Automatic Stay* (Docket Entry No. 5819 in Case No. 17-4780).

In San Juan, Puerto Rico, on October 2, 2025.

**RESPECTFULLY SUBMITTED.**

S/FERNANDO E. AGRAIT
USDC 127212
701 AVENIDA PONCE DE LEON
EDIFICIO CENTRO DE SEGUROS
OFICINA 414
SAN JUAN, PUERTO RICO 00907
TEL. 787-725-3390/3391
FAX 787-724-0353
EMAIL: agraitfe@agraitlawpr.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date we caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all **counsel of record**. I further certify that a copy of the foregoing was sent to **counsel of record in the Puerto Rico Supreme Court litigation** by email to: Valerie Rodríguez Erazo, Esq. (vrodriguez@daco.pr.gov); Gadiel Figueroa Robles, Esq. (gfigueroa@daco.pr.gov); Samuel Silva Rosas, Esq. (ssilva@daco.pr.gov); Margarita Mercado Echegaray, Esq. (margarita.mercado@us.dlapiper.com); Yahaira de la Rosa Algarín, Esq. (yahaira.delarosa@us.dlapiper.com); Jan Albino López, Esq. (jan.albinolopez@us.dlapiper.com); Frank Torres Viada, Esq. (ftv@ftorresviada.com); José Andréu Fuentes, Esq. (jaf@andreu-sagardia.com); Juan Martínez Nevárez, Esq. (jmartinez@gmlex.net); Mirelis Valle Cancel, Esq. (mvalle@vcprlaw.com); Edgardo Rodríguez Cardé, Esq. (elrc@rclopr.com); Yarymar González Carrasquillo, Esq. (ygc@halspr.com); Charles A. Rodríguez Colón, Esq. (crodriguez@naleapr.com); Miguel Rodríguez Ramos, Esq. (miguellrrlaw@gmail.com); **and** Víctor Calderón Cestero, Esq. (victor@calderon-law.com).


In San Juan, Puerto Rico, on October 2, 2025.

<div align="right">

S/FERNANDO E. AGRAIT
USDC 127212

</div>

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>        Debtor. | PROMESA<br><br>Title III<br><br>No. 17-BK-4780-LTS |

## OMNIBUS REPLY IN SUPPORT OF URGENT MOTION OF LUMA TO ENFORCE THE AUTOMATIC STAY

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

ARGUMENT ......................................................................................... 4

    A.    DACO Is Attacking Section 4.1(g), Which Is a Material Part of the T&D OMA.................................................................................. 4

    B.    DACO'S Attack on Section 4.1(g) Does Not Fall Within 11 U.S.C. § 362(b)(4). ............................................................................... 6

    C.    Nullifying Section 4.1(g) Would Jeopardize PREPA's Title III Restructuring................................................................................ 7

    D.    LUMA Has Standing to File the Motion......................................... 9

CONCLUSION .................................................................................... 10

# TABLE OF AUTHORITIES

**Cases**

*Elder-Beerman Stores Corp. v. Thomasville Furniture Indus. (In re Elder-Beerman Stores Corp.)*, 195 B.R. 1019 (Bankr. S.D. Ohio 1996) ..................................................................... 10

*In re Carr*, 2019 Bankr. LEXIS 3994 (Bankr. M.D.N.C. Nov. 18, 2019)................................... 11

*In re Killmer*, 501 B.R. 208 (Bankr. S.D.N.Y. 2013) .................................................................... 9

*In re: Tamarck Development Assoc., LLC*, 611 B.R. 286 (Bankr. W.D. Mich. 2020).................. 9

*Merle v. Rivera (In re Merle)*, 2013 Bankr. LEXIS 3249 (Bankr. D.P.R. Aug. 7, 2013) ........... 11

*Milk Indus. Regul. Off. v. Ruiz (In re Ruiz)*, 122 F.4th 1 (1st Cir. 2024)....................................... 6

*United States v. Rivera Torres (In re Rivera Torres)*, 309 B.R. 643 (B.A.P. 1st Cir. 2004)........ 10

**Statutes**

11 U.S.C. § 105(a) ...................................................................................................................... 10

11 U.S.C. § 362(b)(4) ................................................................................................................... 7

48 U.S.C. § 2161........................................................................................................................... 10

**Other Authorities**

*Mem. Order Granting Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to Be Paid to LUMA Energy by PREPA During Interim Period Under Supplemental Agreement and the T&D Contract,* Case No. 17 BK 4780-LTS, ECF No. 2473  9

To the Honorable United States District Judge Laura Taylor Swain:

LUMA Energy, LLC and LUMA Energy Servco, LLC ("LUMA"), by and through their counsel, DLA Piper LLP (US), hereby submit this omnibus reply in response to (1) *DACO's Opposition to Urgent Motion to Enforce the Automatic Stay* (ECF No. 30016 in Case No. 17-bk-3283, "DACO's Opposition") and (2) *Brief of Instituto De Competitividad Y Sostenibilidad Económica De Puerto Rico (ICSE)* (ECF No. 5831 in Case No. 17-bk-4780, "ICSE's Opposition") and in further support of the *Urgent Motion of LUMA to Enforce the Automatic Stay* (ECF No. 5819 in Case No 17-bk-4780, the "Motion").[1] In further support of the Motion, LUMA respectfully states as follows:

## PRELIMINARY STATEMENT

1.     DACO's requests for relief in its Complaint confirm DACO's ongoing violation of the automatic stay:

> [W]e simply request **that Section 4.1(g) of the LUMA Agreement and the Resolution of May 31, 2021, on the release of liability, as approved by the NEPR, be declared null and void**
>
> . . .
>
> [T]he Department of Consumer Affairs requests that this Honorable Court . . . **Declare Section 4.1(g)** *of the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* **signed between LUMA and the Electric Power Authority and the May 31, 2021, [sic] and the Resolution of the NEPR endorsing almost all of the provisions of said Agreement null and unconstitutional**

Mot., Ex. C at 2, 15. Those requests remain of record and unchanged.

2.     DACO's Opposition attempts to walk back these requests for relief and to pretend that the Commonwealth Court Litigation is not part of the Government's publicly stated efforts to terminate the T&D OMA. But DACO's assertions are not credible. Indeed, the Governor of Puerto

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

Rico (who appointed DACO's Secretary in March 2025 and directs DACO's policy) is not even

trying to conceal the Government's true motives, as reflected in a recent radio interview:

> And we've told him [the CEO of one of LUMA's stockholders] **the issue of canceling LUMA's contract is a matter that was decided at the last election, right? There's no turning back here. What we have to do now is figure out how to replace it, how to do it as quickly as possible, and at the lowest cost. The way I describe this, in meetings with them, I'm saying, "I want a divorce. Where we can do the formalities and divide the assets as quickly as possible? We can do it in court, which would be ugly and take a long time. Or we can do it through a mutual divorce agreement, right?" And that's it, I can tell you that directly, right?** It's the first time I've heard him make a statement saying that no, he didn't like it. But I believe I have to try to find a way to spare the people of Puerto Rico the cost while seeking a better service. **So, the divorce is happening, the divorce is happening.**

Certified copies of the Spanish transcript and English translation of the Governor's October 1,

2025 radio interview remarks are attached hereto as **<u>Exhibit E</u>** (emphasis added). By participating

in this effort, DACO is violating the automatic stay. DACO's arguments to the contrary are not

persuasive.

3.      First, DACO contends T&D OMA § 4.1(g) does not truly protect LUMA (and

PREPA) and is not "material" because it does not guarantee a liability waiver will be obtained.

But DACO ignores other provisions of the T&D OMA that (1) make obtaining the liability waiver

a condition precedent to service commencement and (2) allow LUMA to terminate the T&D OMA

if the liability waiver is rescinded.

4.      Second, DACO contends this case differs from the First Stay Violation Case

because it seeks to void only one T&D OMA provision, not "the OMA in its entirety." DACO

Opp'n 17. But if DACO's lawsuit is successful, it will terminate the T&D OMA for all practical

purposes. An attack on Section 4.1(g) is therefore an attack on the entire T&D OMA, which this

Court previously ruled violates the automatic stay.

5.     Third, DACO contends its attempt to void Section 4.1(g) falls within an exception to the automatic stay as an exercise of DACO's alleged regulatory powers. But the PREB is the *only* governmental entity that regulates the T&D OMA, and the PREB's regulatory approval of the T&D OMA occurred *more than four (4) years ago*. If DACO truly believed that PREB's approval of Section 4.1(g) was within the scope of DACO's regulatory authority, it would have raised the issue then. The filing of DACO's lawsuit *four years later* – at the same time that (1) P3A sent LUMA an 80+ page Notice of Dispute containing manufactured allegations of breaches by LUMA (which is the subject of Adversary Proceeding No. 25-00043); and (2) PREPA is intentionally violating the T&D OMA by refusing to fund the service accounts LUMA uses to pay for O&M Services; and (3) the Governor is affirming on national radio her commitment to terminating the T&D OMA – shows the lawsuit is not a legitimate, protected exercise of regulatory power. Rather, it is part of a coordinated political effort to terminate the T&D OMA.

6.     Fourth, DACO contends the relief it seeks will not hurt PREPA or impact its restructuring. But PREPA's restructuring hinges on the T&D OMA, and if DACO's lawsuit is successful, it will effectively terminate the T&D OMA, throwing PREPA's restructuring into chaos. Further, the 1800+ private tort claims DACO allegedly seeks to enable arise out of PREPA's ownership of the T&D system and its actions/omissions both before and after LUMA began providing interim services, including PREPA's failure to fund the service accounts. Even if these alleged tort claimants were to file claims only against LUMA, LUMA would seek indemnification from PREPA. And DACO ignores a provision in the T&D OMA that expressly requires PREPA to indemnify LUMA for these claims *even if LUMA is found to be negligent*.[2]

---

[2] *See* T&D OMA § 18.2(a)(vii) (requiring indemnification of "clams brought against [LUMA] by a Person not party to [the T&D OMA] . . . whether or not caused by the negligence of" LUMA or other indemnitees), 18.2(b) (exempting 18.2(a)(vii) from indemnification coverage exclusions).

7.     Fifth, ICSE argues that LUMA lacks standing to file the Motion. But case law is clear that LUMA has standing as a party-in-interest and an administrative expense claimant. And even if LUMA did not have standing, this Court could *sua sponte* determine whether DACO is violating the automatic stay.

8.     In sum, the Commonwealth Court Litigation is clearly an attack on PREPA's property, the T&D OMA. This Court determined in the First Stay Violation Case that such an attack violates the automatic stay. It should make the same determination with respect to the Government's new attack on Section 4.1(g).

## ARGUMENT

### A.     DACO Is Attacking Section 4.1(g), Which Is a Material Part of the T&D OMA.

9.     DACO's attempt to undermine the basis for the Motion by arguing that it does not seek to void Section 4.1(g), only to unwind the PREB's approval of a liability waiver, conflicts with the facts. As set forth at the very beginning and the very end of its Complaint, DACO has asked the Commonwealth Court to "void" Section 4.1(g) of the T&D OMA. DACO has not amended that request for relief, which is unambiguous. *See, e.g.*, ICSE Opp'n 2 (stating that DACO is pursuing "a petition for declaratory judgment seeking to ***declare unconstitutional Section 4.1(g) of the public partnership contract*** . . . ." (emphasis added)).

10.    Next, DACO and ICSE downplay the importance of Section 4.1(g), suggesting that it is "not a material clause in the OMA" and that it created no property rights because it only preserved an "opportunity to petition PREB for relief." DACO Opp'n 16; *see also* ICSE Opp'n 4–5. But DACO and ICSE ignore Section 4.5(p) of the T&D OMA and Sections 2.2 and 6.1 of the *Puerto Rico Transmission and Distribution System Supplemental Terms Agreement* (as extended, the "Supplemental Agreement"), which make this specific relief – that the liability waiver is in full

force and effect – a condition precedent to both LUMA's provision of services while PREPA is in

Title III and the official commencement of services following PREPA's exit from Title III:[3]

> **Section 4.5. Conditions Precedent to Service Commencement Date**. *The Service Commencement Date shall not occur, and the obligations of the Parties to proceed with their respective obligations hereunder on, and after, the Service Commencement Date* shall not commence, until all of the following conditions precedent (the "Service Commencement Date Conditions") are, unless otherwise mutually agreed between the Parties in writing, either satisfied as determined, or waived in writing, by …. (iii) both Administrator and ManagementCo [LUMA Energy, LLC], in the case of … Section 4.5(p) (Conditions Precedent to Service Commencement Date – Third Party Claims)
>
>        *     *     *
>
> (p) <u>Third Party Claims</u>. A Liability Waiver generally consistent with Section 4.1(g) (Front-End Transition Period Generally – Liability Waiver) shall have been approved and implemented by PREB and ***shall be in full force and effect***.

T&D OMA § 4.5 (emphasis added). In other words, if DACO's lawsuit is successful, it will

extinguish LUMA's obligation to continue to provide services, effectively terminating the T&D

OMA. Section 4.5(p) thus demonstrates the materiality of Section 4.1(g).

     11.     DACO and ICSE also ignore Section 14.5(f) of the T&D OMA, which allows

LUMA to terminate the T&D OMA if DACO's lawsuit is successful. Section 14.5(f) provides that

LUMA "shall have the right to terminate this Agreement upon not less than one hundred twenty

(120) days' prior written notice to Administrator in the event of a Change in Regulatory Law."

Under T&D OMA § 1.1, a "Change in Regulatory Law" includes a "change, amendment or

modification to . . . any regulation or regulatory action . . . that . . . (v) rescinds, or in any way

amends in a manner materially adverse to [LUMA], the Liability Waiver." Extinguishing the

---

[3] LUMA is currently providing services pursuant the Supplemental Agreement, which allows LUMA to provide services during the "Interim Period" before PREPA exits Title III. PREPA's exit from Title III is another condition precedent to the Service Commencement Date. *See* Supplemental Agreement § 6.1.

liability waiver granted by the PREB would plainly qualify as such a change. The fact that the Parties authorized LUMA to terminate the T&D OMA if such an event were to occur demonstrates the materiality of Section 4.1(g).

12.     DACO's attempt to separate PREB's approval of the liability waiver from the text of the T&D OMA also fails. PREB's approval of the liability waiver four years ago is now effectively merged with and part of the T&D OMA, as it was a precondition for the commencement of interim services under the Supplemental Agreement. Now that those services have commenced, attempting to undo that condition is effectively an attack on the T&D OMA and violates the automatic stay.

**B.     DACO'S Attack on Section 4.1(g) Does Not Fall Within 11 U.S.C. § 362(b)(4).**

13.     DACO is wrong that the Commonwealth Court Litigation falls within the exception to the automatic stay for governmental units enforcing their "police and regulatory power." DACO Opp'n 20. This exception "ensures that government agencies can still enforce laws 'affecting health, welfare, morals and safety' and that debtors are not automatically protected in bankruptcy court from such regulatory laws." *Milk Indus. Regul. Off. v. Ruiz (In re Ruiz)*, 122 F.4th 1, 13 (1st Cir. 2024).

14.     Courts use two tests to determine whether the exception applies: (1) the pecuniary purpose test, and (2) the public policy test. The First Circuit describes these tests as follows:

> Under the pecuniary purpose test, reviewing courts focus on whether the governmental proceeding relates primarily to the protection of the government's pecuniary interest in the debtor's property, and not to matters of public safety. Those proceedings which relate primarily to matters of public safety are excepted from the stay. Under the public policy test, reviewing courts must distinguish between proceedings that adjudicate private rights and those that effectuate public policy. Those proceedings that effectuate a public policy are excepted from the stay.

*Id.* at 14.

15.     These tests lead to the conclusion that 11 U.S.C. § 362(b)(4) does not apply to the Commonwealth Court Litigation. DACO seeks to void Section 4.1(g) of the T&D OMA and extinguish the liability waiver granted by PREB to permit approximately 1800+ persons and entities to file private tort claims against LUMA. DACO Opp'n 5, 23–24. That plainly does not relate to matters of public safety. Nor is it an attempt to effectuate public policy in connection with laws "affecting health, welfare, morals and safety." The goal of DACO's lawsuit is merely to open the door to further lawsuits pursuing money damages against LUMA. 11 U.S.C. § 362(b)(4) does not shield DACO's efforts to pave the way for private tort claims.[4]

**C.     Nullifying Section 4.1(g) Would Jeopardize PREPA's Title III Restructuring.**

16.     DACO is also wrong that nullifying Section 4.1(g) would not negatively impact PREPA and its restructuring efforts because the T&D OMA "insulates both PREPA and consumers from bearing the costs of LUMA's negligence through the Disallowed Costs provisions." DACO Opp'n 19.

17.     First, DACO ignores the fact that these claims, if allowed, would arise out of PREPA's ownership of and previous operation of the T&D system. This includes PREPA's historical (and current) failure to fund operations at levels necessary to adequately maintain and improve the T&D system. These hypothetical tort claims are therefore not just against LUMA; they are necessarily against PREPA as well.

18.     Second, DACO confuses T&D Pass-Through Expenditures with indemnification, which are two separate and independent concepts under the T&D OMA. *See* DACO Opp'n 3.

---

[4] DACO's lawsuit does not even fall within the alleged statutory mission it describes to "resolve consumer complaints against private entities, enforce and vindicate consumer rights through quasi-judicial adjudications and declaratory orders, represent consumers before tribunals, boards, and commission in matters affecting consumer rights . . . and file legal actions in court to ensure compliance with Puerto Rico's consumer protection regime." DACO Opp'n 13. Rather, it is a transparent attempt to undermine the T&D OMA by eliminating a condition precedent to the commencement of services and allowing private persons/entities to file private tort claims against LUMA.

**App.592**

Section 7.6 of the T&D OMA contains a category of "Disallowed Costs" that are not treated as "T&D Pass-Through Expenditures for purposes of payment" to LUMA, but that is irrelevant to whether LUMA has an independent right to *indemnification* by PREPA under Section 18.2(b). According to Section 18.2(b):

> Notwithstanding the foregoing, ***other than with respect to clauses (vii) and (viii) of Section 18.2(a) (Indemnification by Owner – Generally), to which the following statement shall not apply***, Owner shall not be required to reimburse or indemnify any Operator Indemnitee for any Losses to the extent cause by or due to … (ii) the negligence (including gross negligence) or willful misconduct of any Operator Indemnitee [which includes LUMA] . . . .

(Emphasis added). DACO focuses on the indemnification carveout in subsection 18.2(b)(ii) for Losses caused by LUMA's negligence, ***but DACO misses the prefatory language in Section 18.2 exempting indemnification claims under Section 18.2(a)(vii) from that carveout***. Section 18.2(a)(vii), in turn, requires PREPA to indemnify LUMA for "(vii) claims brought against [LUMA] by a Person not party to this Agreement in connection with the T&D System or [LUMA]'s performance of the O&M Services for loss of profits or revenues or special, exemplary, punitive, indirect or consequential damages, howsoever or whensoever arising ***and whether or not caused by the negligence of***" LUMA and other specified indemnities." (Emphasis added). An indemnification claim by LUMA for Losses from the hypothetical tort claims falls squarely within this exception, meaning that ***even if LUMA were found negligent*** in the alleged 1800+ cases, ***PREPA would still be obligated to indemnify LUMA***.

19.     Thus, PREPA would, in fact, be responsible for any Losses ultimately awarded on the private tort claims DACO seeks to enable. Given the alleged number and size of these private

tort claims, PREPA's entire restructuring process could be placed in jeopardy if Section 4.1(g) is nullified and PREPA must face, and prepare to pay, these claims.[5]

**D.     LUMA Has Standing to File the Motion.**

20.     ICSE is incorrect that LUMA lacks standing to bring the Motion. As set forth in the Motion, LUMA has standing as a party-in-interest and as an administrative expense claimant. It is well-established that creditors are parties-in-interest who have standing to assert automatic stay violations. *See, e.g.*, *In re: Tamarck Development Assoc., LLC*, 611 B.R. 286, 298 (Bankr. W.D. Mich. 2020); *In re Killmer*, 501 B.R. 208, 212 (Bankr. S.D.N.Y. 2013). As this Court has already determined, LUMA is entitled to administrative expense priority for, among other things, "PREPA's indemnification obligations running in favor of LUMA Energy and its affiliates during the Interim Period." *See Mem. Order Granting Government Parties' Motion for Order Allowing Administrative Expense Claim for Amounts to Be Paid to LUMA Energy by PREPA During Interim Period Under Supplemental Agreement and the T&D Contract,* Case No. 17 BK 4780-LTS, ECF No. 2473, at 5. The Interim Period is still ongoing since PREPA has not confirmed a plan. LUMA is therefore a creditor pursuant to the T&D OMA.

21.     Moreover, even if LUMA did not have standing, this Court would still have power to *sua sponte* rule on DACO's automatic stay violation. *See, e.g.*, *Elder-Beerman Stores Corp. v. Thomasville Furniture Indus. (In re Elder-Beerman Stores Corp.)*, 195 B.R. 1019, 1023 (Bankr. S.D. Ohio 1996) ("Bankruptcy courts . . . have the power, whether on the request of a party in interest or sua sponte, to consider both what acts constitute a violation of the stay and whether or

---

[5] DACO also makes arguments related to its creation and the Oversight Board's lack of a quorum. But these arguments have nothing to do with DACO's automatic stay violation. And DACO's argument with respect to the Oversight Board has been mooted by recent events, which have reinstated a four-member quorum on the Oversight Board. LUMA accurately conveyed the Oversight Board's stated position with respect to DACO's automatic stay violation, and the Oversight Board has not sought to change that position since the reinstatement of a quorum.

not relief from stay is appropriate."); 11 U.S.C. § 105(a) ("No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.");[6] *see also United States v. Rivera Torres (In re Rivera Torres)*, 309 B.R. 643, 647 (B.A.P. 1st Cir. 2004); *In re Carr*, 2019 Bankr. LEXIS 3994, at *3 (Bankr. M.D.N.C. Nov. 18, 2019) (finding that even where "the Debtors did not specifically request a finding that the Creditor's filing of the complaint was violation of the stay, the Court has the power to raise the issue sua sponte without a motion from a party in interest" (citations omitted)); *Merle v. Rivera (In re Merle)*, 2013 Bankr. LEXIS 3249, at *15 (Bankr. D.P.R. Aug. 7, 2013).

## CONCLUSION

22.     This Court has already ruled that the T&D OMA is PREPA's property for purposes of this Title III proceeding and that the Government's earlier attempt to void the T&D OMA violated the automatic stay. The Government's new tactic in seeking to only void a section of the T&D OMA violates the automatic stay just as much as seeking to void the entire T&D OMA. Any effort to void the T&D OMA, including any of its provisions, violates 11 U.S.C. § 362(a)(3) and is *void ab initio*.

**WHEREFORE**, LUMA respectfully requests that the Court (i) enter the Proposed Order granting the requested relief in this Motion, and (ii) grant such other and further relief as the Court may deem just and proper.

---

[6] 11 U.S.C. § 105 applies in Title III proceedings. *See* 48 U.S.C. § 2161.

Dated: October 9, 2025
San Juan, Puerto Rico

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ Brett Ingerman*
Brett Ingerman (admitted pro hac vice)
Dale K. Cathell (admitted pro hac vice)
650 S. Exeter Street, Ste. 1100
Baltimore, MD 21202-4576
T: (410) 580.4177
F: (410) 580.3001
brett.ingerman@us.dlapiper.com
dale.cathell@us.dlapiper.com

David Horniak (admitted pro hac vice)
500 8th Street, NW
Washington, DC 20004
T: (202) 799.4361
F: (202) 799.4362
david.horniak@us.dlapiper.com

*/s/ Mariana Muñiz Lara*
Mariana Muñiz Lara (local counsel)
USDC-PR No. 231706
**DLA PIPER (PUERTO RICO) LLC**
500 Calle de la Tanca, Suite 401
San Juan, Puerto Rico 00901-1969
T: (787) 945.9106
F: (787) 945.9102
mariana.muniz@us.dlapiper.com

*Attorneys for LUMA Energy, LLC, and*
*LUMA Energy Servco, LLC*

### CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case. I further certify that a copy of the foregoing was served by email to the participants of the Commonwealth Court Litigation: Valerie Rodríguez Erazo, Esq., vrodriguez@daco.pr.gov, valeriemrodz@gmail.com, Gadiel Figueroa Robles, Esq., gfigueroa@daco.pr.gov, gadielfigueroa@yahoo.com, and Samuel Silva Rosas, Esq., ssilva@daco.pr.gov, samuelsilva.law@gmail.com; Edgardo L. Rodríguez Cardé, Esq., elrc@rclopr.com and Yarymar González Carrasquillo, Esq., ygc@halspr.com; Juan M. Martínez Nevárez, Esq. jmartinez@gmlex.net, and Mirelis Valle Cancel, Esq., mvalle@vcprlaw.com, mvalle@gmlex.net; Charles Rodríguez Colón, Esq., crodriguez@naleapr.com; Miguel A. Rodríguez Ramos, Esq., miguelrrlaw@gmail.com, mrodriguez@prlegal403.com; Víctor Calderón Cestero, Esq., victor@calderon-law.com; Fernando E. Agrait, Esq., agraitfe@agraitlawpr.com; and José Leonardo Pou Román, Esq., jpouroman@outlook.com.

Dated: October 9, 2025
San Juan, Puerto Rico


*/s/ Mariana Muñiz Lara*
Mariana Muñiz Lara

## Exhibit E

Transcript of October 1, 2025 Radio Interview
(Spanish and English Certified Translations)

Interview with Puerto Rico Governor Jenniffer González Colón (question on LUMA)
NotiUno 630 AM – October 1, 2025

<u>Spanish transcription</u>

INTERVIEWER: … announcement, when will the cancellation of the LUMA contract be submitted?

GOVERNOR: We're working directly with the governor's office, as director of the AAFAF [Autoridad de Asesoría Financiera y Agencia Fiscal — Financial Advisory and Fiscal Agency Authority] and the czar. In fact, I've had meetings, right? At the highest level on this. We have a lawsuit that LUMA filed against the Government of Puerto Rico in Federal Court. We also went to court, because we're smart, right? This is a state matter. When the contract was approved by the Fiscal Oversight Board, and they gave LUMA a contract many years ago, the contract said that they — the jurisdiction was in the courts of Puerto Rico.

Well, LUMA sued the government of Puerto Rico in Federal Court to try to get it into bankruptcy, so that nothing would be done and we couldn't get rid of LUMA. We filed a motion to return the jurisdiction to the state. We are asking the judge that this is purely state jurisdiction, and I believe this is a ploy by the company to try to get out of it, right? And that the government of Puerto Rico does not terminate that contract. What are we going to do? It's been talked about, it's being discussed, and we're looking for someone to replace it, right? Because it's one thing to get rid of LUMA, but who? Who's going to provide us the service? So we're — I want to bring in a company that currently provides service to the United States. Because LUMA had no experience whatsoever in the United States, providing transmission and distribution, and that's the big problem. Now, whatever companies come, because I assume they'll have to come, right? More than one, they should have experience in some state of the nation.

INTERVIEWER: I'm asking you this question because the head of Quanta, which is LUMA's parent company, was here. And some people say he met with you to beg for assistance, in other words, flattering you. And that's why I say, well, maybe after that meeting and that cup of coffee, the situation changed.

GOVERNOR: No, it hasn't changed.

INTERVIEWER: It hasn't?

GOVERNOR: In fact, we've had —

INTERVIEWER: Don't repeat yourself.

GOVERNOR: We've had meetings, right? With him, at the highest level. And we've told him the issue of canceling LUMA's contract is a matter that was decided at the last election, right? There's no turning back here.

What we have to do now is figure out how to replace it, how to do it as quickly as possible, and at the lowest cost. The way I describe this, in meetings with them, I'm saying, "I want a divorce. Where we can do the formalities and divide the assets as quickly as possible? We can do it in court, which would be ugly and take a long time. Or we can do it through a mutual divorce agreement, right?" And that's it, I can tell you that directly, right? It's the first time I've heard him make a statement saying that no, he didn't like it. But I believe I have to try to find a way to spare the people of Puerto Rico the cost while seeking a better service. So, the divorce is happening, the divorce is happening.

INTERVIEWER: So will the —

GOVERNOR: Yes.

INTERVIEWER: Will your groom appear for, for a third [PH 02:37] marriage?

GOVERNOR: He'll appear. They'll appear, they have to appear, there's no choice. There's no choice, right? We have to have the transmission and distribution service. We're — not, we're not, how can I put it? I'm not looking for a second marriage right now, I'm looking for options, right? So we could have some agreements, right? This, with more than one supplier or … suitor, as we say in English.

INTERVIEWER: As they say in English. How interesting. Governor, there are other issues that are also dominating the news. One of them is a controversy surrounding the attorney general … [Audio cut]

--

# DECLARATION AND CERTIFICATION

I BRUCE TAYLOR declare that I am a CERTIFIED TRANSLATOR registered with the AMERICAN TRANSLATORS ASSOCIATION.

I am certified to translate from the SPANISH language to the ENGLISH language. My Certification Number is 503180.

I declare to the best of my abilities and belief that this is a true and accurate translation of the Spanish language text of

Interview with Puerto Rico Governor Jenniffer González Colón (question on LUMA), dated Oct 1, 2025

This declaration signed this October 2, 2025, in Los Angeles, California.

Signature of Certified Translator registered with the American Translators Association:

**BRUCE TAYLOR**

* See attached document



Verify at www.atanet.org/verify

*NOTE: The Certified Translator registered with the American Translators Association must be acknowledged by a notary public.*

The appropriate California notary form is attached.

App.601

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**      **CIVIL CODE § 1189**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California      )

County of Los Angeles      )

On __10/04/2025__ before me, __Mehran Khorramian, Notary Public__
    *Date*                               *Here Insert Name and Title of the Officer*

personally appeared __Bruce Taylor__
                                    *Name(s) of Signer(s)*

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                 *Signature of Notary Public*

> MEHRAN KHORRAMIAN
> COMM. # 2466414
> NOTARY PUBLIC - CALIFORNIA
> LOS ANGELES COUNTY
> My Comm. Exp. Nov. 9, 2027

*Place Notary Seal Above*

———————————— **OPTIONAL** ————————————
*Though this section is optional, completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: __Declaration & Certification__
Document Date: _____ Number of Pages: __(1)__
Signer(s) Other Than Named Above: __N/A__

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____     Signer's Name: _____
☐ Corporate Officer — Title(s): _____     ☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General     ☐ Partner — ☐ Limited ☐ General
☐ Individual      ☐ Attorney in Fact     ☐ Individual      ☐ Attorney in Fact
☐ Trustee      ☐ Guardian or Conservator     ☐ Trustee      ☐ Guardian or Conservator
☐ Other: _____     ☐ Other: _____
Signer Is Representing: _____     Signer Is Representing: _____

©2016 National Notary Association • www.NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)   Item #5907

Interview with Puerto Rico Governor Jenniffer González Colón (question on LUMA)
NotiUno 630 AM – October 1, 2025

Spanish transcription

ENTREVISTADOR: ...anuncio, ¿cuándo se somete la cancelación del contrato de LUMA?

GOBERNADORA: Nosotros estamos trabajando directamente cerca de la gobernación, como director de AAFAF y el zar. De hecho, yo he tenido reuniones, ¿verdad? Al más alto nivel sobre esto. Tenemos una demanda, que LUMA demandó al gobierno de Puerto Rico en el Tribunal Federal. También acudimos al tribunal, porque somos listos, ¿verdad? Esto es un asunto estatal. Cuando el contrato fue aprobado por la Junta de Supervisión Fiscal, y le dieron un contrato a LUMA hace muchos años atrás, el contrato decía que eran – la jurisdicción era en los tribunales de Puerto Rico.

Pues, LUMA demandó al gobierno de Puerto Rico en el Tribunal Federal, para tratar de meterlo con el asunto de la quiebra, y que de esta manera no se haga nada, y que no podamos sacar a LUMA. Nosotros radicamos moción, para que vuelva la jurisdicción estatal. Estamos pidiendo a la jueza, que esto es una jurisdicción meramente estatal, y yo creo que esto es una artimaña de la empresa, para tratar de zafarse, ¿verdad? Y que no – y que el gobierno de Puerto Rico no cese ese contrato. ¿Qué es lo que vamos a hacer? Que está hablado, que está discutiendo, y que estamos buscando quién lo va a sustituir, ¿verdad? Porque una cosa es que vamos a salir de LUMA, pero, ¿quién? ¿Quién va a darnos el servicio? Así que nosotros estamos – yo quiero traer una compañía, que hoy preste servicio a los Estados Unidos. Porque LUMA no tenía ningún tipo de experiencia en los Estados Unidos, dando transmisión y distribución, y ese es el gran problema. Ahora, cual sea que sean las empresas que vengan, porque asumo que tendrán que venir, ¿verdad? Más de una, tengan experiencia en algún estado de la nación.

ENTREVISTADOR: Yo le hago esta pregunta, porque aquí estuvo el jefe de Quantas, que es la matriz de LUMA. Y, algunos señalan que se reunió con usted pidiendo cacao, o sea, no, pasándole la mano. Y por eso yo digo, bueno, a lo mejor después de esa reunión y la taza de café, cambió el panorama.

GOBERNADORA: No, no ha cambiado.

ENTREVISTADOR: ¿No?

GOBERNADORA: De hecho, hemos tenido –

ENTREVISTADOR: No se reitera.

GOBERNADORA: Nosotros hemos tenido reuniones, ¿verdad? Con él, al más alto nivel.
Y, le hemos hablado de que ya el asunto de la cancelación del contrato de LUMA, es un
asunto adjudicado en la pasada contienda electoral, ¿verdad? Aquí no hay vuelta atrás.

Ahora lo que tenemos que hacer, es cómo lo sustituimos, cómo lo hacemos lo más
rápido, y que menos le cueste. De la manera en la que yo describo esto, en las reuniones
con ellos mismos, le estoy diciendo: "Yo quiero un divorcio, donde podamos hacer las
transacciones, y dividir los bienes lo más rápido posible. Podemos hacerlo en el tribunal,
feo, que tal, se tardaría. O, podemos hacerlo en un acuerdo de divorcio mutuo,
¿verdad?" Y esa es, directamente, te puedo decir, ¿verdad? Es la primera vez que le
escucho el término como que no, no le gustó. Pero, yo creo que yo tengo que buscar
evitarle el costo al pueblo de Puerto Rico, pero buscar un mejor servicio. Así que, el
divorcio está, el divorcio está.

ENTRVISTADOR: Ya aparecerá el –

GOBERNADORA:  Sí.

ENTREVISTADOR: Le aparecerá el novio pa, pa, ¿para un tercer [PH 02:37] matrimonio?

GOBERNADORA: Va a aparecer. Van a aparecer, tienen que aparecer, no hay opción. No
hay opción, ¿verdad? Nosotros tenemos que tener el servicio de transmisión y
distribución. Estamos – no, no nos, ¿cómo te digo? No estoy en este momento
buscando un segundo matrimonio, estoy buscando opciones, ¿verdad? Así que
pudiéramos tener unos acuerdos, ¿verdad? Este, con más de un suplidor o su… suitor,
como lo decimos en inglés.


ENTREVISTADOR: Como lo dicen en inglés. Qué interesante. Gobernadora, hay otros
aspectos también que están dominando el panorama noticioso. Uno de ellos es una
controversia que se cierne sobre el procurador… [Corte del audio]


--



I, Daniel Boisson, hereby certify that the document "TP - Interview governor Notiuno - transcript and English translation" is, to the best of my knowledge and belief, a true and accurate transcription from Spanish to Spanish.

_____

Daniel Boisson
Project Manager

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT<br>BOARD FOR PUERTO RICO,<br>as representative of<br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br>      Debtors. | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT<br>BOARD FOR PUERTO RICO,<br>as representative of<br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br>      Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS |

### DACO'S SUR-REPLY

TO THE HONORABLE COURT:

The Puerto Rico Department of Consumer Affairs ("DACO"), through its Secretary and undersigned counsel, respectfully submits this Sur-Reply to address LUMA Energy, LLC and LUMA Energy ServCo, LLC's ("LUMA") Omnibus Reply (Dkt. 30048).

### I.        Introduction

LUMA's Reply mischaracterizes both the facts and the law in an effort to recast a narrow consumer-protection enforcement action as a collateral attack on PREPA's property interests. It does so by introducing new and unsustainable theories, asserting political motives where none exist, proposing a "condition precedent" theory unsupported by the OMA and applicable law, and misapplying the concept of "Regulatory Law" under Section 14.5(f) to portray DACO's lawful enforcement action as a contractual threat. These arguments distort the record and misconceive both the nature of DACO's petition and the limits of PROMESA's automatic stay.

DACO's declaratory action does not seek to amend, rescind, or modify any law or contractual term. It enforces existing law by challenging a single regulatory act: the Puerto Rico

1

Energy Bureau's ("PREB") Resolution purporting to grant LUMA sweeping immunity from consumer liability. PREB's unilateral attempt to create civil immunity usurped the exclusive prerogative of the Puerto Rico Legislature to define and delimit tort liability. DACO's petition before the Puerto Rico Supreme Court simply seeks a judicial determination restoring the rule of law as enacted by the Legislature, not a "change in Regulatory Law" within the meaning of the OMA.

LUMA's invocation of the automatic stay seeks to convert PROMESA's limited protection of estate property into a tool for shielding private conduct from lawful oversight. That inversion of statutory purpose cannot stand. DACO's action vindicates the Commonwealth's core sovereign authority to ensure that consumers retain the remedies guaranteed by Puerto Rico's Civil Code and to confirm that administrative agencies act within the bounds of legislative delegation. The First Circuit's decision in *Milk Industries Regulatory Office v. Ruiz*, 122 F.4th 1 (1st Cir. 2024), squarely confirms that such governmental enforcement actions—rooted in the exercise of police and regulatory power—fall outside the reach of § 362(a).

The record makes clear that DACO seeks no damages, no injunction affecting PREPA's operations, and no modification of the OMA. It merely asks Puerto Rico's highest court to declare that PREB exceeded its statutory authority. This Court should reject LUMA's attempt to transform PROMESA into a barrier against legitimate Commonwealth oversight and reaffirm that the statute was enacted to preserve, not paralyze, Puerto Rico's sovereign regulatory powers.

## II. Argument

### A. DACO's Enforcement Action is a Proper Exercise of Regulatory Power, Not a Political or Contractual Attack

LUMA's reply is built upon a flawed premise—that DACO's petition before the Puerto Rico Supreme Court forms part of a "political effort" to terminate the OMA. The record is devoid

of any evidence supporting that allegation. DACO's action arises directly from its statutory mandate to protect consumers from unlawful administrative acts. The proceeding challenges a single regulatory resolution issued by PREB on May 31, 2021, which purported to grant LUMA broad immunity from civil liability, including negligence. That act exceeded PREB's statutory authority and contravened the public policy of Puerto Rico. DACO's filing seeks declaratory relief to restore those statutory limits. It neither requests monetary damages nor impairs PREPA's contractual framework.

LUMA's recitation of political statements or public commentary cannot transform a legitimate exercise of police power into a coordinated political campaign. The automatic stay inquiry must focus on the *purpose and effect* of the governmental proceeding, not on conjecture about motive. LUMA's speculation about intent cannot be a substitute for an objective analysis of statutory enforcement. DACO's suit enforces public law, not private or pecuniary interests, and thus remains beyond the reach of the stay.

**B.  LUMA's "Condition Precedent" Theory Rests On A Legal Fiction**

LUMA now argues that the existence of a liability waiver "in full force and effect" under § 4.5(p) of the OMA constitutes a condition precedent to service commencement. This newly minted theory was absent from its Urgent Motion and collapses upon scrutiny. A condition precedent cannot depend on the occurrence of an unlawful act. If PREB lacked authority to grant a waiver, there was never a valid event capable of satisfying that condition. LUMA's argument thus presumes the very proposition in dispute (i.e. that a lawful waiver exists) and uses that

3

presumption to manufacture an estate interest. Such circular reasoning cannot sustain an automatic stay.[1]

Even on its own terms, the OMA's structure refutes LUMA's claim. The agreement lists numerous explicit conditions to service commencement—budget approvals, rate orders, and regulatory filings—but never makes a liability waiver determinative. Article 4.1(g) is ancillary and non-essential, and its omission from the list of material conditions is dispositive. The OMA allocates regulatory risk through termination and change-in-law provisions, not through the creation of an unconditional right to immunity. If the waiver were truly indispensable, the contract would have expressly addressed its denial. It did not. The plain text defeats LUMA's revisionist interpretation.

Worse yet, even assuming *arguendo* that § 4.5(p) of the OMA could be read to make service commencement contingent on the existence of a liability waiver, that interpretation collapses under Puerto Rico law. Article 1044 of the Civil Code, P.R. Laws Ann. tit. 31 § 3043, renders void any obligation "whose fulfillment depends upon the exclusive will of the debtor."

In *Punta Lima, LLC v. Punta Lima Dev. Co., LLC*, Civ. 425 F. Supp. 3d 87 (D.P.R. 2019) (Besosa, J.), citing *Jarra Corp. v. Axxis Corp.*, 155 D.P.R. 764 (2001), the court held that § 3043 exists to "condemn illusory promises." A condition that turns performance on a party's unilateral will—or, worse, on an unlawful act—is purely potestative and therefore void. LUMA's "condition precedent" theory violates both principles. The OMA was executed on June 22, 2020, while the PREB resolution purporting to grant LUMA a liability waiver was not issued until May 31, 2021. By claiming that its duty to perform depended on that later and unauthorized waiver, LUMA

---

[1] Nor can § 4.5(p) alter that conclusion. Its reference to operations proceeding "subject to" rate orders and approvals presuppose lawful agency action; it does not endow PREB with new authority or transform an *ultra vires* waiver into a valid condition precedent. PREB's powers are bound by statute, and nothing in the OMA can expand them.

effectively turns its contractual obligation into a promise subject entirely to an *ultra vires* act. This is the quintessential illusory promise that § 3043 and *Punta Lima* condemn.

The *Punta Lima* court further tied this rule to the Civil Code's broader mandate that contracts must be interpreted to "presuppose fairness, correction and good faith" and to avoid "absurd or unfair results." When a party reserves to itself (or as here, to a regulator) the power to decide whether its obligations ever ripen—especially through an illegal or *ultra vires* act—the result is precisely the kind of illusory commitment the Code forbids.

Under *Punta Lima* and § 3043, a void administrative act cannot trigger contractual rights, and a party cannot rely on illegality to evade its duties. LUMA's "condition precedent" argument is thus of no legal moment and should be rejected.

### C. Section 18.2's Structure Excludes Negligence-Based Indemnity and Precludes PREB's Ultra Vires Expansion

LUMA's attempt to defend PREB's overreach by invoking the "prefatory language" of Section 18.2 misreads the OMA and distorts the structure of its indemnification scheme. The contract does not, as LUMA suggests, guarantee PREPA indemnification for any and all consumer suits, even those arising from LUMA's own negligence. A proper reading of Section 18.2 demonstrates a narrow and deliberate allocation of risk. Subsection 18.2(a)(vi) addresses claims brought by transmission and distribution customers for direct damages, while subsection 18.2(a)(vii) pertains to claims by third parties for consequential or exemplary categories of harm— loss of profits, revenues, or other special damages. See Dkt. No. 29962-2 at p 151 of 337. Section 18.2(b) then establishes a global limitation, expressly providing that PREPA shall not indemnify for losses caused by LUMA's negligence or willful misconduct, save for the limited consequential and punitive categories listed in 18.2(a)(vii) and for pre-existing environmental conditions under 18.2(a)(viii). Id.

Read together, these provisions mean that direct consumer claims for property damage or personal injury—precisely the claims DACO seeks to preserve—fall within subsection 18.2(a)(vi) and are excluded from indemnification whenever caused by LUMA's negligence. Only the narrow consequential categories in subsection 18.2(a)(vii) remain insulated from the negligence bar, and even then, the OMA makes clear that those categories involve indirect or punitive losses, not the ordinary tort damages at issue in DACO's petition. The contract further reinforces this allocation by designating negligence-based losses as "Disallowed Costs" under Section 7.6(a)(i), ensuring that such costs cannot be passed through to PREPA or to ratepayers. See Dkt. No. 29962-2 at p 104-105 of 337.

LUMA's reliance on the "prefatory language" of Section 18.2 to claim an unrestricted right to indemnity ignores this integrated structure. The text, read as a whole, forecloses indemnification for the very liabilities that DACO's action seeks to preserve—direct consumer claims arising from LUMA's negligence. The prefatory language does not nullify the global limitation; it merely identifies the limited exceptions already enumerated in the subsections that follow. Nothing in Section 18.2, or anywhere else in the OMA, transforms PREB's unlawful waiver into a source of absolute immunity or converts excluded liabilities into estate property. The text controls, and the text defeats LUMA's theory.

### D.  LUMA Misconstrues Section 14.5(f) and the Concept of Regulatory Law

LUMA's contention that DACO ignored Section 14.5(f) of the OMA is both misplaced and legally unfounded. Section 14.5(f) allows LUMA to terminate the agreement "in the event of a Change in Regulatory Law". See Dkt. No. 29962-2 at p 134 of 337. However, LUMA's reliance on this clause presumes the occurrence of a "Change in Regulatory Law" as defined in Section 1.1; namely, a legislative or regulatory act that alters the governing legal framework, modifies

6

statutory interpretation, or rescinds a valid regulatory action "in a manner materially adverse to the Operator". DACO's petition before the Puerto Rico Supreme Court does none of these things.

"Regulatory Law," as defined by the OMA, refers to new or amended enactments, regulations, or administrative interpretations with the force of law that change the legal environment in which the operator functions. It contemplates external, normative modifications—such as a new statute, rule, or formal interpretation—that alter the rights or obligations established under the contract. DACO's action does not fall within that definition. It does not seek to change, amend, or modify any law or regulation, nor does it request the adoption of a new rule. Rather, DACO's declaratory petition seeks to enforce the law as written, ensuring that PREB, an administrative body of limited jurisdiction, acts within the authority delegated by the Legislature. DACO's claim therefore enforces existing law; it does not constitute or precipitate a "Change in Regulatory Law."

Contrary to LUMA's portrayal, DACO's proceeding is not a legislative or regulatory intervention that would trigger contractual termination rights. It is a judicial review designed to confirm the legality of a specific regulatory act: the 2021 PREB Resolution that granted LUMA a blanket immunity from consumer liability. That resolution was not a legislative act, nor a regulatory "law" within the meaning of the OMA; it was an administrative decision made without statutory authority. DACO's request that the Puerto Rico Supreme Court declare the resolution *ultra vires* merely restores the *status quo ante*: the legal landscape that already existed under Puerto Rico law prior to PREB's overreach. By definition, the nullification of an unlawful act cannot constitute a change in law; it reaffirms the governing law that was improperly displaced.

Indeed, PREB's attempt to exempt LUMA from civil liability invaded the exclusive legislative domain of the Puerto Rico Legislature. PREB's unilateral creation of a civil immunity

7

was a legislative act in disguise, wholly unsupported by its enabling statute. DACO's petition before the Puerto Rico Supreme Court thus seeks to vindicate a fundamental principle of Puerto Rico's civil law tradition: that administrative agencies may not, by regulatory *fiat*, modify the substantive rights established by the Legislature or the Civil Code.

LUMA's invocation of Section 14.5(f) attempts to conflate this legitimate judicial review with a substantive regulatory change. But the distinction is critical: *enforcing* the law is not *changing* it. DACO's action reaffirms the existing statutory framework governing consumer protection and administrative authority; it does not introduce new rules or impose new duties on LUMA. The OMA's termination clause was designed to protect LUMA from external legal shifts that fundamentally alter its regulatory environment—not from a court's determination that a preexisting administrative act was unlawful from its inception. To stretch Section 14.5(f) to cover judicial enforcement of existing law would render the term "Regulatory Law" meaningless and insulate all administrative acts, however unlawful, from judicial review.

**E.  DACO's Action Does Not Interfere With PREPA's Estate or The OMA**

LUMA's contention that DACO's proceeding "attacks the OMA" is equally unfounded. DACO's declaratory action challenges a discrete regulatory act—the PREB's May 31, 2021 resolution—not the OMA itself. PREPA, in its own filings before the Puerto Rico Supreme Court, confirmed that the OMA remains fully operative and that invalidating PREB's resolution would not alter its contractual obligations. PREPA also acknowledged that the agreement's risk-allocation framework already assigns responsibility for negligence-based losses exclusively to LUMA.

Nothing in DACO's complaint seeks to rescind, modify, or enjoin performance under the OMA. Nor does it seek possession, control, or use of any property belonging to PREPA. It merely asks Puerto Rico's highest court to declare that a regulatory agency exceeded its statutory

8

authority—a quintessential act of public enforcement. Under long-standing precedent, such governmental proceedings do not constitute interference with estate property under § 362(a)(3). They vindicate public law, not private contract rights.

### F. The OMA Itself Defeats LUMA's Indemnity and Cost-Pass-Through Claims

LUMA's warning that invalidating PREB's waiver would create massive indemnification exposure is unsupported by the OMA's own text. The agreement already bars PREPA from indemnifying LUMA for losses resulting from its own negligence or willful misconduct. Section 18.2(b) contains a clear carve-out denying indemnity for precisely those circumstances. See Dkt. No. 29962-2 at p 151 of 337. Section 7.6(a)(i) designates negligence-related losses as "Disallowed Costs," which cannot be reimbursed by PREPA or passed through to ratepayers. See Dkt. No. 29962-2 at p 104-105 of 337. Section 18.3 further caps LUMA's liability for ordinary negligence but never eliminates it. See Dkt. No. 29962-2 at p 152-153 of 337

The indemnification provision upon which LUMA relies (Section 18.2(a)(vii)) applies only to consequential or exemplary categories of damages and explicitly excludes ordinary tort claims by consumers. DACO's declaratory action concerns precisely those direct injury claims—property loss and personal damage—that the OMA allocates to LUMA alone. The text of the contract, not LUMA's rhetoric, governs. The agreement prevents the very fiscal exposure LUMA invokes to justify federal intervention.

### G. The Puerto Rico Supreme Court's Review Will Not Disrupt PREPA's Restructuring

LUMA's prediction that allowing the Puerto Rico Supreme Court to decide the validity of PREB's resolution would "derail" PREPA's restructuring is misplaced. DACO's proceeding is purely declaratory and non-pecuniary. Even if the Supreme Court holds that PREB lacked authority to grant the waiver, the consequences remain confined within the OMA's existing

9

allocation of risk. Negligence-based liabilities are expressly excluded from pass-through costs and indemnities. Nothing in the OMA or in DACO's requested relief alters PREPA's fiscal obligations or interferes with the Title III process.

LUMA's attempt to frame this narrow question of regulatory authority as a threat to the Commonwealth's fiscal plan exaggerates the issue and disregards both the contractual text and PROMESA's statutory limits on federal intrusion into Puerto Rico's political and governmental powers.

## III.    Conclusion

LUMA's Reply rests on conjecture and theories untethered to law, contract, or PROMESA. It seeks to convert a straightforward exercise of Commonwealth oversight into a political intrusion, to elevate a void administrative waiver into estate property, and to distort the OMA into a shield against regulation. Nothing in the record supports those claims. DACO's petition enforces existing statutes and confirms the limits of administrative power—limits grounded in Puerto Rico's civil law tradition and the Legislature's exclusive authority to define private rights and liabilities. Enforcing the law as written cannot, by definition, violate the automatic stay.

PROMESA was designed to facilitate fiscal restructuring, not to immunize private operators from lawful oversight. The police-power exception preserves the Commonwealth's right to protect consumers and ensure that its agencies act within statutory bounds. For these reasons, this Court should deny LUMA's Urgent Motion to Enforce the Automatic Stay in its entirety and reaffirm that Title III protects restructuring, not regulatory impunity.

**WE HEREBY CERTIFY** that on this date we electronically filed the present motion with the Clerk of Court using the CM/ECF system which will send electronic notification of said filing to all parties of record.

**App.615**

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 16th day of October 2025.

**SECRETARY OF DACO**
Box 41059
Minillas Station
San Juan, PR 00940-1059
Office Phone No.: (787) 722-7555

**H. LÓPEZ LAW, LLC**
Metro Office Park
Street 1, BDG 11, Suite 105A
Guaynabo, PR 00968
Office Phone No.: (787) 945-0067

*/s/ Valerie Rodríguez Erazo*
USDC - PR No. 228910
E-mail: vrodriguez@daco.pr.gov

*/s/Heriberto López-Guzmán*
USDC-PR No. 224611
E-mail: hlopez@hlopezlaw.com

11

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al.<br><br>    Debtors[1] | PROMESA<br>Title III<br><br><br>Case No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br>    Debtor. | PROMESA<br>Title III<br><br><br>Case No. 17-BK-04780 (LTS) |

## ICSE'S SURREPLY TO LUMA'S OMNIBUS REPLY

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (ill) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title case numbers are listed as Bankruptcy Case numbers due to software limitation.)

TO THE HONORABLE COURT:

COMES NOW INSTITUTO DE COMPETITIVIDAD Y SOSTENIBILIDAD ECONÓMICA DE PUERTO RICO (ICSE), represented by counsel and respectfully requests that the Court DENY the *Urgent Motion of LUMA to Enforce the Automatic Stay* (Docket Entry No. 5819 in Case No. 17-4780).

## I. INTRODUCTION

1. On October 9, 2025, LUMA filed its *Omnibus Reply in Support of Urgent Motion of LUMA to Enforce the Automatic Stay* (Dkt. No. 5842, Case No. 17-4780) ("LUMA's Reply").

2. On October 14, 2025, ICSE filed a *Request for Leave to File Surreply in response to LUMA's Omnibus Reply* (Dkt. No. 5848 in Case No. 17-4780) under Local Rule 7(d). ICSE argued that LUMA's Reply introduced new arguments not raised in its original motion, thus warranting a surreply under Local Rule 7(d). In particular, ICSE identified LUMA's selective reliance on Section 18.2(a)(vii) of the T&D OMA and its carveout under Section 18.2(b) while disregarding Section 18.2(a)(vi), and its novel assertion that an adverse ruling by the Puerto Rico Supreme Court could constitute a "Change in Regulatory Law" under Section 1.1 of the T&D OMA.

3. The Court authorized ICSE to file its surreply and directed for it to be presented on or before October 16, 2025. *See Order Granting ICSE's Request for Leave to File Surreply to LUMA's Omnibus Reply* (Dkt. No. 5852 in Case No. 17-4780).

## II. INDEMNITIES UNDER THE T&D OMA

4. LUMA's Reply argues that DACO seeks to enable consumer complaints subject to indemnification by PREPA under Section 18.2 of the T&D OMA "[t]hus, PREPA would, in fact, be responsible for any Losses ultimately awarded on the private tort claims." LUMA's

Reply, at p. 8. As such, it argues that "[g]iven the alleged number and size of these private tort claims, PREPA's entire restructuring process could be placed in jeopardy if Section 4.1(g) [of the T&D OMA] is nullified and PREPA must face, and prepare to pay, these claims." <u>Id</u>., at pp. 8-9.

5. First, LUMA presumes that all potential claims will be meritorious—an unfounded assumption that exaggerates the potential consequences of a declaration of nullity of Section 4.1(g) by the Puerto Rico Supreme Court. Tort claims against LUMA can only proceed if LUMA's negligence is proven in court. *See* Art. 1536 of Puerto Rico Civil Code, 31 LPRA § 10801 ("*The person who, <u>through fault or negligence</u>, causes harm to another is obliged to repair it*" (translation ours)). Accordingly, the issue is one not whether DACO's state action threatens PREPA's restructuring, but a matter strictly of state public policy: who should bear the burden of LUMA's <u>proven</u> negligence—the negligent actor or the injured party? The Civil Code disposes of this issue: it is the negligent party who must weather the cost of the harm caused.

6. Second and most importantly, LUMA's argument rests on its characterization that consumer complaints are those described exclusively by Section 18.2(a)(vii) of the T&D OMA:

> (vii) claims brought against Operator by a Person not party to this Agreement in connection with the T&D System or Operator's performance of the O&M Services for loss of profits or revenues or special, exemplary, punitive, indirect or consequential damages, howsoever or whensoever arising and whether or not caused by the negligence of [LUMA.]

7. The indemnity for these claims is not limited by other provisions of Section 18.2, mainly paragraph (b) which limits the indemnity for all claims enumerated under paragraph (a) of with the exceptions of clauses (vii) and (viii). LUMA characterizes consumer complaints as those described by clause (vii) precisely because of the fact that the limitations on indemnity that

PREPA affords LUMA set forth by Section 18.2(b) do not apply to it. However, incredibly, LUMA's Reply makes no mention of Section 18.2(a)(**vi**) which deals with "(vi) **claims brought against [LUMA] by a T&D Customer** in connection with the T&D System or [LUMA's] performance of the O&M Services." This selective citation is misleading. Because LUMA's Reply omits clause (vi), then it makes no effort to distinguish between claims by "T&D Customers" and claims by "a Person not party to the T&D OMA."

8. Nonetheless, there is, in fact, a distinction between these two categories of claims, and the text proves it: Section 18.2(b) limits PREPA's indemnification of LUMA for LUMA's "negligence (including gross negligence) or willful misconduct" to claims listed in Sections 18.2(a)(i) through (vi)—not to claims described in Sections 18.2(a)(vii) and (viii). *See* Art. 356 of Civil Code, 31 LPRA § 6344 ("*The clauses of a contract must be interpreted in relation to each other, whether they pertain to the same contract or to related contracts, and attributing to the whole the meaning that is most appropriate to it*" (translation ours)). Consequently, consumer claims by T&D Customers fall within the very subset to which the negligence limitation applies, defeating LUMA's effort to recast them as Section 18.2(a)(vii) claims.

9. Clause (vi) deals with claims by T&D Customers. As such, LUMA has no right to be indemnified by PREPA if those claims are due to their negligence or willful misconduct. Therefore, there is no harm to PREPA that may be derived from DACO's declaratory judgment before the Supreme Court. It is also important to note that, under Puerto Rico law, damages are recoverable only if ***foreseeable***. In discussing the theory of "adequate causality" our Supreme Court has relied on Spanish case law. Specifically in Jiménez v. Pelegrina Espinet, 112 DPR 700, 706 (1982), the Court stated:

> And finally, as the Supreme Court of Spain held in its Judgment of
> November 9, 1949:

> *Inasmuch as the possibility of foreseeing the events is a theorically vast and vague concept, in its legal and practical application we must understand that it excludes those absolutely unusual and extraordinary events that, although not being physically impossible and, hence, theorically foreseeable, may not be calculated by a prudent conduct alert to eventualities that may be expected in the course of life.*

> We reiterate our endorsement of the theory of adequate causality.

Id., 12 P.R. Offic. Trans. 881, 888.

10. The damages described in clause (vii), which are subject to indemnification by PREPA, are not necessarily foreseeable as a matter of law. Accordingly, LUMA's assertions of potential liability are speculative and cannot support the relief it seeks. In any event, those issues are not before this Court; LUMA's argument merely prejudges hypothetical claims in the worst possible light for PREPA.

11. Notwithstanding the foregoing, if a future claim were to violate the automatic stay, relief before this Court could be sought at that time. DACO's declaratory judgment action does not preclude the Court's future intervention. This underscores the speculative nature of LUMA's argument: there is no proximate or concrete nexus between the case before the Puerto Rico Supreme Court and the consequences LUMA describes.

### III. CHANGE IN REGULATORY LAW

12. LUMA's Reply asserts that "DACO and ICSE also ignore Section 14.5(f) of the T&D OMA which allows LUMA to terminate the T&D OMA if DACO's lawsuit is successful." LUMA's Reply, at p. 8. LUMA argues that a ruling by the Supreme Court would constitute a "Change in Regulatory Law" as that term is defined by Section 1.1 of the T&D OMA:

> [A]ny change, amendment or modification to any Commonwealth Applicable Law (and not, for the avoidance of doubt, the Applicable Law of any other jurisdiction) or any adoption of, or change to, any administrative or judicial

4

interpretation (having the force of law) of any Commonwealth Applicable Law or any regulation or regulatory action under any Commonwealth Applicable Law, in each case occurring on or after the Proposal Submission Date, that: [...] (v) rescinds, or in any way amends in a manner materially adverse to Operator, the Liability Waiver.

13. This position is untenable. "It is emphatically the province and duty of the judicial department **to say what the law is**." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803) (emphasis added). The Supreme Court of Puerto Rico would not "change" the law but merely interpret it as it has stood since the execution of the T&D OMA. Judicial interpretation does not constitute a "change of law" for contractual purposes; it is the recognition of what the law has always meant.

14. Even if a judicial decision could qualify as a "change" in some circumstances, LUMA still fails: Section 1.1 requires a change that "rescinds" or "amends" the liability waiver. A court's declaration that Puerto Rico Energy Bureau ("PREB") lacked statutory authority enact liability waivers in favor of one its regulated entities does not rescind or amend the waiver; it identifies a pre-existing legal limit. That is interpretation, not change.

15. Additionally, LUMA cannot claim reliance on any prior judicial construction validating PREB's authority to craft liability waivers for regulated entities; there is none. LUMA's position rests on its own reading of Commonwealth law. Thus, an adverse ruling would not "change" the law; it would reject LUMA's interpretation.

16. A contracting party—here, LUMA—cannot claim a right of termination merely because it is dissatisfied with the correct interpretation of the law. If ignorance of the law does not excuse its violation, it can still less serve as the fountainhead of a right.

WHEREFORE INSTITUTO DE COMPETITIVIDAD Y SOSTENIBILIDAD ECONÓMICA respectfully requests that the Court take into consideration the foregoing and

5

DENY the *Urgent Motion of LUMA to Enforce the Automatic Stay* (Docket Entry No. 5819 in

Case No. 17-4780).

    In San Juan, Puerto Rico, on October 15, 2025.

    **RESPECTFULLY SUBMITTED.**

                                        S/FERNANDO E. AGRAIT
                                        USDC 127212
                                        701 AVENIDA PONCE DE LEON
                                        EDIFICIO CENTRO DE SEGUROS
                                        OFICINA 414
                                        SAN JUAN, PUERTO RICO 00907
                                        TEL. 787-725-3390/3391
                                        FAX 787-724-0353
                                        EMAIL: agraitfe@agraitlawpr.com

6

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date we caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all **counsel of record**. I further certify that a copy of the foregoing was sent to **counsel of record in the Puerto Rico Supreme Court litigation** by email to: Valerie Rodríguez Erazo, Esq. (vrodriguez@daco.pr.gov); Gadiel Figueroa Robles, Esq. (gfigueroa@daco.pr.gov); Samuel Silva Rosas, Esq. (ssilva@daco.pr.gov); Margarita Mercado Echegaray, Esq. (margarita.mercado@us.dlapiper.com); Yahaira de la Rosa Algarín, Esq. (yahaira.delarosa@us.dlapiper.com); Jan Albino López, Esq. (jan.albinolopez@us.dlapiper.com); Frank Torres Viada, Esq. (ftv@ftorresviada.com); José Andréu Fuentes, Esq. (jaf@andreu-sagardia.com); Juan Martínez Nevárez, Esq. (jmartinez@gmlex.net); Mirelis Valle Cancel, Esq. (mvalle@vcprlaw.com); Edgardo Rodríguez Cardé, Esq. (elrc@rclopr.com); Yarymar González Carrasquillo, Esq. (ygc@halspr.com); Charles A. Rodríguez Colón, Esq. (crodriguez@naleapr.com); Miguel Rodríguez Ramos, Esq. (miguellrrlaw@gmail.com); **and** Víctor Calderón Cestero, Esq. (victor@calderon-law.com).

In San Juan, Puerto Rico, on October 15, 2025.

S/FERNANDO E. AGRAIT
USDC 127212

7

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br>as representative of<br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br>Debtors. | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br>as representative of<br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br>Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS |

## DACO'S MOTION SUBMITTING CERTIFIED TRANSLATIONS OF EXHIBITS 1, 2, AND 4 TO ITS OPPOSITION TO LUMA'S URGENT MOTION TO ENFORCE THE AUTOMATIC STAY

TO THE HONORABLE COURT:

COMES NOW the Puerto Rico Department of Consumer Affairs ("DACO"), through its Secretary and undersigned attorneys, and respectfully states and prays as follows:

1. On October 2, 2025, DACO filed its *Opposition to LUMA's Urgent Motion to Enforce the Automatic Stay* (the "Opposition") (Dkt. No. 30016). The Opposition attached several exhibits in the Spanish language, including filings before the Puerto Rico Supreme Court and administrative documents issued by the Puerto Rico Electric Power Authority ("PREPA").

2. On October 2, 2025, DACO filed a *Motion for Leave to File Documents in Spanish* (Dkt. No. 30019), requesting additional time to submit certified English translations of those exhibits pursuant to Local Rule 5(g).

3. On October 3, 2025, this Honorable Court entered an *Order Granting Motion for Leave to File Documents in Spanish* (the "Order") (Dkt. No. 30019), directing DACO to file certified English translations of the referenced Spanish-language materials by October 17, 2025, at 5:00 p.m. (AST).

4. In compliance with the Court's Order, DACO hereby submits certified English translations of Exhibits 1, 2, and 4 to its Opposition (Dkt. No. 30016), which correspond to:

- o **Exhibit 1:** PREPA's Brief before the Puerto Rico Supreme Court;

- o **Exhibit 2:** The Puerto Rico Legislative Assembly's (Senate and House) Joint Submission before the Puerto Rico Supreme Court; and

- o **Exhibit 4:** PREPA's *Procedure for the Analysis, Processing, and Payment of Claims to Third Parties* (February 15, 2016).

**WHEREFORE,** DACO respectfully submits the certified English translations of Exhibits 1, 2, and 4 to its Opposition to LUMA's Urgent Motion to Enforce the Automatic Stay and requests that the Court take notice thereof and deem DACO in full compliance with the Court's October 3, 2025 Order.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, this 17th day of October 2025.

<table>
<tr><td>**SECRETARY OF DACO**<br>Box 41059<br>Minillas Station<br>San Juan, PR 00940-1059<br>Office Phone No.: (787) 722-7555</td><td>**H. LÓPEZ LAW, LLC**<br>Metro Office Park<br>Street 1, BDG 11, Suite 105A<br>Guaynabo, PR 00968<br>Office Phone No.: (787) 945-0067</td></tr>
<tr><td>*/s/ Valerie Rodríguez Erazo*<br>USDC - PR No. 228910<br>E-mail: vrodriguez@daco.pr.gov</td><td>*/s/Heriberto López-Guzmán*<br>USDC-PR No. 224611<br>E-mail: hlopez@hlopezlaw.com</td></tr>
</table>

2

CERTIFIED TRANSLATION

**COMMONWEALTH OF PUERTO RICO**
**GENERAL COURT OF JUSTICE**
**SUPREME COURT OF PUERTO RICO**

| | |
|---|---|
| **DEPARTMENT OF CONSUMER AFFAIRS,** | SC: CT-2025-0003 |
| Petitioner, | CFI No.: SJ2025CV06607 |
| vs. | Matter: Declaratory Judgment |
| **LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; PUERTO RICO ENERGY BUREAU; PUERTO RICO ELECTRIC POWER AUTHORITY,** | Re: Challenge of constitutionality of administrative action |
| Respondents. | [Stamp: FILED; SUPREME COURT CLERK'S OFFICE; 2025 SEP 23 PM 4: 22] |

**BRIEF OF RESPONDENT**
**PUERTO RICO ELECTRIC POWER AUTHORITY**

**ATTORNEYS FOR THE RESPONDENT**

**ELECTRIC POWER AUTHORITY**

**GONZÁLEZ & MARTÍNEZ**
1509 López Landrón, Bldg.
Seventh Floor
San Juan, P.R. 00911
Ph.: (787) 274-7404

**Mr. Juan M. Martínez Nevárez, Esq.**
RUA No.: 14517
E-mail: jmartínez@gmlex.net

**Ms. Mirelis Valle Cancel, Esq.**
RUA No. 21,115
E-mail: mvalle@vcprlaw.com

**ATTORNEYS FOR THE PETITIONER**

**DEPARTMENT OF CONSUMER AFFAIRS**
Minillas Station
San Juan, P.R. 00940-1059
Ph.: (787)722-7555

**Ms. Valerie Rodríguez Erazo, Esq.**
RUA: 16,861
E-mail: vrodriquez@daco.pr.gov

**Mr. Gadiel Figueroa Robles, Esq.**
RUA: 18687
E-mail: gfiqueroa@daco.pr.gov

**Mr. Samuel Silva Rosas, Esq.**
**RUA No. 7,883**
E-mail: ssilva@daco.pr.gov

**RESPONDENT**

**PUERTO RICO ENERGY BUREAU**
P.O. Box 365061 San Juan, P.R. 00936-5061
Ph.: (787) 722-9911

**Mr. Edgardo L. Rodríguez Cardé, Esq.**
RUA No. 13,211
elrc@rclopr.com

**Ms. Yarymar González Carrasquillo, Esq.**
RUA No. 13,219
ygc@halspr.com

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**LUMA ENERGY, LLC AND LUMA ENERGY SERVCO, LLC.**

**Ms. Margarita Mercado Echegaray, Esq.**
RUA No.: 16,266
Margarita.mercado@us.dlapiper.com

**Ms. Yahaira De La Rosa Alagarín, Esq.**
RUA No.: 18,061
Yahaira.delarosa@us.dlapiper.com

**Mr. Jan M. Albino López, Esq.**
RUA No.: 22,891
Jan.albinolopez@us.dlapiper.com

**DLA Piper (Puerto Rico) LLC**
500 Calle de la Tonca
Suite 401
San Juan, PR 00901
Ph: (787) 945-9107/9132/9103

**Mr. Frank Torres Viada, Esq.**
RUA No.: 14,724
P.O. Box 192084
San Juan, P.R. 00919-2084
Ph. (787) 754-1102

**Mr. José Andreú Fuentes, Esq.**
RUA No. 9,088
261 Ave. Domenech
San Juan 00918-3518
Ph. (787) 754-1777
jaf@andreu-sagardia.com

**INTERVENOR**

**Mr. Charle A. Rodríguez Colón, Esq.**
crodriguez@naleapr.com
RUA No.: 7,831
252 Ave. Ponce de León Suite 1801
San Juan, P.R. 00918-2020
Ph.: (787) 378-2424

**Mr. Miguel A. Rodríguez Ramos, Esq.**
miguelrrlaw@gmail.com
RUA No.: 22,062
P.O. Box 19586
San Juan, P.R. 00910
Ph.: (787) 604-2772

**Mr. Victor Calderón Cestero, Esq.**
victor@calderon-law.com
RUA No.: 13,266
137 Calle O
Aguadilla, P.R. 00603
Tel.: (787) 602-2465

**Mr. Fernando E. Agrait, Esq.**
agraitte@agraitlawpr.com
RUA No.: 3,772
Edificio Centro de Seguros
Office 414

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

701 Ave. Ponce de León
San Juan, P.R. 00907
Ph.: (787) 725-3390
Fax No.: (787) 724-0353

**Mr. José Leonardo Pou Román, Esq.**
jpouroman@outlook.com
RUA No.: 23,523
Edificio Centro de Seguros
Office 414
701 Ave. Ponce de León
San Juan, P.R. 00907
Ph.: (787) 725-3390
Fax No.: (787) 724-0353

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**COMMONWEALTH OF PUERTO RICO**
**SUPREME COURT**

| | |
|---|---|
| **AUTONOMOUS MUNICIPALITY OF GUAYNABO; AUTONOMOUS MUNICIPALITY OF BAYAMÓN**<br>Respondent<br><br>v.<br><br>**PUERTO RICO ELECTRIC POWER AUTHORITY; LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC**<br>Petitioner | SC Case No.:<br><br>CA Case No.: KLRA202500280, consolidated with KLRA202500283<br><br>Case no. before agency:<br>**NEPR-QR-2019-0149**<br>**NEPR-RV-2019-0125**<br><br>Review from the Puerto Rico Energy Bureau<br><br>**MATTER:**<br><br>Final Decision |

## SUBJECT INDEX

| | PAGES |
|---|---|
| I. Introduction........................................................................................ | 1-2 |
| II. Brief Narration of Procedural Facts..................................................... | 3-6 |
| III. Brief Narration of Relevant Facts ...................................................... | 6-9 |
| IV. Arguments........................................................................................ | 9-13 |
| V. Prayer .............................................................................................. | 13 |
| VI. Notice Certification........................................................................... | 14 |

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

**App.630**

CERTIFIED TRANSLATION

## COMMONWEALTH OF PUERTO RICO
## SUPREME COURT

| | |
|---|---|
| **AUTONOMOUS MUNICIPALITY OF GUAYNABO; AUTONOMOUS MUNICIPALITY OF BAYAMÓN**<br>Respondent<br><br><br>v.<br><br><br>**PUERTO RICO ELECTRIC POWER AUTHORITY; LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC**<br>Petitioner | SC Case No.:<br><br>CA Case No.: KLRA202500280, consolidated with KLRA202500283<br><br>Case no. before agency:<br>**NEPR-QR-2019-0149**<br>**NEPR-RV-2019-0125**<br><br>Review from the Puerto Rico Energy Bureau<br><br>**MATTER:**<br><br>Final Decision |

## LEGAL INDEX

**Puerto Rico Case Law**                                                              **Page(s)**

Aut. Puertos PR v. Total Petroleum et al.
210 D.P.R. 16 (2022)……………………………………………………………… 12

Brau, Linares v. ELA et als.
190 D.P.R. 315, 337 (2014) …………………………………………………… 12

Sánchez v. Eastern Air Lines, Inc.
114 D.P.R. 691 (1983) ………………………………………………………… 12

Santiago Cruz v. Hernández Andino
91 D.P.R. 709, 712 (1965) …………………………………………………… 12

Senado de PR v. ELA
203 D.P.R. 62, 83 (2019) …………………………………………………… 12

Trabal Morales v. Ruiz Rodríguez
125 D.P.R. 340, 351 (1990) ………………………………………………… 12

U.P.R. v. Laborde Torres y otros I
180 D.P.R. 253, 272-273 (2010) …………………………………………… 6

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

**App.631**

CERTIFIED TRANSLATION

**COMMONWEALTH OF PUERTO RICO**
**GENERAL COURT OF JUSTICE**
**SUPREME COURT OF PUERTO RICO**

| | |
|---|---|
| **DEPARTMENT OF CONSUMER AFFAIRS,** | SC: CT-2025-0003 |
| Petitioner, | CFI No.: SJ2025CV06607 |
| vs. | Matter: Declaratory Judgment |
| **LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; PUERTO RICO ENERGY BUREAU; PUERTO RICO ELECTRIC POWER AUTHORITY,** | Re:   Challenge   of   constitutionality   of administrative action |
| Respondents. | |

**BRIEF OF RESPONDENT**
**PUERTO RICO ELECTRIC POWER AUTHORITY**

**TO THE HONORABLE SUPREME COURT:**

**COMES NOW** the respondent, Electric Power Authority, through the undersigned legal counsel, and very respectfully **STATES and REQUESTS**:

**I. INTRODUCTION**

In compliance with its legal and fiduciary duty to administer the electric power system for the benefit of the People of Puerto Rico, the PREPA agreed to the terms of Section 4.1 (g) of the Transmission and Distribution Operation and Maintenance Agreement ("T&D OMA") and authorized LUMA Energy, LLC and LUMA Energy ServCo, LLC (together, "LUMA") to request to the Energy Bureau of the Public Service Regulatory Board ("Energy Bureau") that it include, in the terms of service, a liability waiver. Said authorization was given seeking a fair balance between the continuity of the service, the fiscal liability and the protection of the consumer. On every occasion, the PREPA has acted based on the spirit of Law No. 120, enacted on June 20, 2028, as amended, known as the "Puerto Rico Electric System Transformation Act" ("Law 120-2018"), and other applicable laws, of making sure that the costs of the electric power service are fair, reasonable and in agreement with sound operational and fiscal practices, guaranteeing a reliable service at the lowest reasonable cost to the People.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

      Based on the foregoing, in the event that this Honorable Supreme Court declares the Final Decision (as defined below) of the Energy Bureau and, consequently, the Liability Waiver authorized therein (as defined below), null and void, the PREPA requests that the Supreme Court clarify the resulting rule of law. In particular, that it rule that the T&D OMA clearly establishes that any claim in respect of damages filed by consumers, as a result of ordinary negligence, gross negligence or willful misconduct by LUMA, constitutes a Disallowed Cost, which must be solely and exclusively assumed by LUMA, without the possibility of transferring it to the PREPA or to consumers. Said ruling is indispensable to make sure that consumers are not forced to pay for, via increases in tariffs or other mechanisms, the economic costs resulting from negligent or tortious acts by LUMA.

      Furthermore, the PREPA considers it indispensable to highlight the fact that the Complaint filed by the Department of Consumer Affairs ("DACO") does not raise any controversy regarding the constitutional validity of Regulations No. 7982 of the PREPA titled General Terms and Conditions Regulations for the Supply of Electric Power of the PREPA. According to current case law, regulations are presumed constitutional until it is otherwise ruled by a court of law, and appellate courts must refrain from adjudicating matters not raised or considered before the courts of first instance. Therefore, it would not be appropriate for this Honorable Court to issue a ruling as to the constitutionality of the above-referenced Regulations – which were not challenged by the parties to the lawsuit, but rather incidentally by intervenors or friends of the court -, especially when the regulatory provision is clearly distinguishable from the Liability Waiver that is the subject of the present case.

      In short, the PREPA is appearing before the Honorable Court for the sole purpose of protecting the interests of the People of Puerto Rico, guaranteeing the correct application of the T&D OMA, and reaffirming that, even in the absence of the Liability Waiver, the law and the current contract ensure that consumers shall not bear the burden of the negligent omissions or tortious acts of LUMA.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

## II. BRIEF NARRATION OF PROCEDURAL FACTS IN THE ABOVE-CAPTIONED CASE

1.      On July 22, 2025, the DACo filed the above-captioned Complaint, in the Court of First Instance ("CFI"), for declaratory judgment, against LUMA, the NEPR and the PREPA. In it, the DACo requested that the Decision and Final Order, issued by the Energy Bureau, on May 31, 2021, in case no. NEPR-MI-2021-0007 ("Final Decision"), be declared unconstitutional. The Complaint states that said Decision and Order is unconstitutional because the Energy Bureau violated the principle of separation of powers when it approved the following Modified Terms of Service, which were included in the Book of Tariffs of the PREPA effective June 1, 2021. The part of said Modified Terms of Service whose validity is being challenged by the DACo in the present brief is identified in **bold**:

<u>Modified Terms of Service</u>

1. It is recognized that certain components of the Puerto Rico Electric Power Authority's ("PREPA") electric power system (including, the Transmission and Distribution System ("T&D System"), as well as the Generation Facilities) currently do not meet the standards of performance generally accepted in the electric utility industry. The whole system needs significant repairs, improvements, and modernization to achieve acceptable standards of service. Furthermore, certain components of the T&D System and the manner in which the T&D System is operated do not currently meet acceptable standards of performance, including the fact that certain general operating and administrative practices may not comply with acceptable industry standards and practices. Therefore, a period of review, planning, remediation, reconstruction, repair, and replacement will be required to enable LUMA Energy, LLC, LUMA Energy Servco, LLC (together, ""LUMA"") and PREPA to operate the electric system according to acceptable standards. In light of the foregoing, PREPA and LUMA, with the cooperation of other governmental entities developed a plan, taking into account expected funds availability, particularly from the Federal Emergency Management Agency (FEMA), to remediate, repair, reconstruct, replace and stabilize such equipment, systems, practices and services, as needed, to enable LUMA to perform the operation and maintenance services contracted in compliance with the applicable standards as soon as reasonably possible and at a reasonable cost to PREPA (""System Remediation Plan""). The System Remediation Plan shall be review and approved by the Energy Bureau of the Puerto Rico Public Service Regulatory Board (""Energy Bureau"").

2. Taking in consideration the circumstances described in the preceding paragraph, and other generally known, PREPA and LUMA shall make all reasonable efforts to provide an efficient and reliable service to its customers and users. A user is a person (natural or legal) who received and uses power and electricity at a certain location and whose consumption is recorded and invoiced in the name of another person.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

3. PREPA and LUMA shall make all reasonable efforts to maintain continuity of service, but PREPA and LUMA cannot guarantee an uninterrupted electricity supply to its customers and users.

4. Without liability of any kind to PREPA and/or LUMA, PREPA and/or LUMA shall have the right to disconnect or otherwise curtail, interrupt or reduce service to customers and users: (a) whenever PREPA and/or LUMA reasonably determines it is necessary to facilitate construction, installation, maintenance, repairs, replacement or inspection of any of PREPA's facilities, or to permit the connection or disconnection of other customers; (b) to maintain the safety and reliability of PREPA's electric system (including without limitation, transmission, distribution and generation facilities); or (c) due to any other reason attributable to third parties or related to dangerous or hazardous circumstances, including without limitation, emergencies, forced outages, potential overloading of PREPA's transmission and/or distribution system, sabotage, strikes, unauthorized acts by employees or Force Majeure. Notwithstanding the foregoing, PREPA and/or LUMA shall use reasonable efforts to minimize any scheduled curtailment, interruption, or reduction to the extent reasonably practicable under the circumstances, to provide the customer (and not to the user, because is not a registered customer) with prior notification of any such curtailment, interruption, or reduction to the extent reasonably practicable, and to resume the customer's service connection as promptly as reasonably practicable.

**5. Notwithstanding anything to the contrary in these Modified Terms of Service and Regulation 7982, PREPA, its directors, officers, employees, agents and contractors (including LUMA Energy, LLC, LUMA Energy Servco, LLC, their directors, officers, employees, agents and contractors) (the "Released Parties") shall not be liable contractually or extra-contractually, to customers, or any user receiving power or electricity from PREPA and/or LUMA for any losses arising in any way out of or in connection with the operation of the T&D System and the provision of power and electricity including any events of interrupted, irregular or defective electric service due to Force Majeure events or from pre-existing deteriorated electric system conditions, other causes beyond the control of the Released Parties, unauthorized acts by employees, sabotage, strikes or due to ordinary negligence (excluding gross negligence, willful misconduct or dolo) of the Released Parties or their respective employees, agents or contractors. In any event that the Released Parties are found responsible however and whensoever in connection with the provision of service to customers or users receiving power or electricity from PREPA and/or LUMA customers or users shall only recover direct damages (including direct physical loss, injury or damage to a customer or customer's property). For the foregoing and without otherwise restricting the generality thereof, "direct physical loss, injury or damage" shall not include any loss of profits or revenues, special, exemplary, punitive, indirect, incidental, or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms.**

6. Notwithstanding anything to the contrary contained in these Modified Terms of Service, PREPA and LUMA will remain fully accountable and liable to the Energy Bureau for compliance with the Puerto Rico energy public policy as well as all legal and regulatory requirements applicable to electric service companies, and, particularly to LUMA as operator of the T&D System. Nothing in these Modified Terms of Service shall have the effect of releasing or

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

waiving PREPA and/or LUMA from any penalty, fine or obligation imposed by the Energy Bureau for whatever reason whatsoever.

See LUMA's Supplementary Appendix ("LUMA's Supp. App."), pp. 0445-0447 (hereinafter, the "Liability Waiver").

2.  The PREPA was served process in accordance with the Law on July 23, 2025. App., pp. 442-451.

3.  On July 24, 2025, the intervenors, the Puerto Rico Senate ("Senate") and the Puerto Rico House of Representatives ("House") filed, in the CFI, their Request and Brief of the Puerto Rico Senate and the Puerto Rico House of Representatives as Amicus Curiae. App., pp. 452-465. In short, the Senate and the House maintained that the Legislative Assembly had not delegated to the Energy Bureau the power to give to a private operator a quasi-sovereign immunity. As a result, they argued that, when the Energy Bureau adopted the Final Decision, it acted in an ultra vires manner in violation of the doctrine of separation of powers.

4.  On August 6, 2025, the Institute for Competitiveness and Sustainable Economy of Puerto Rico (Instituto de Competitividad y Sostenibilidad Económica de Puerto Rico, Inc.) ("ICSE") filed its Request to Intervene as Amicus Curiae in the CFI. App., pp. 467-484. In short, the ICSE maintained that the Energy Bureau's act, of approving an exemption of liability for caused damages in the Final Decision, is an ultra vires act that violates the principle of separation of powers.

5.  Subsequently, on August 8, 2025, the DACO filed, in this Honorable Supreme Court, the Petition for Interjurisdictional Certification at bar.

6.  On August 12, 2025, notified on that same date, this Court issued a Decision ordering the PREPA to, within a peremptory term of three (3) days, show cause as to why the Court should not consider the petition for interjurisdictional certification and issue the writ (hereinafter, "Order to Show Cause").

7.  In compliance with the Order to Show Cause, on August 15, 2025, the PREPA filed its Motion in Compliance with Order to Show Cause. In said motion, the PREPA reiterated its commitment to protect consumers and, based on the legal framework stated therein, it indicated that it was in favor of the Honorable Supreme Court considering the petition and issuing the writ of interjurisdictional

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

certification because it believed that DACo's challenge as to the constitutionality of the Final Decision issued by the Energy Bureau is a "matter ... whose importance requires that it be promptly considered." _U.P.R. v. Laborde Torres y otros I_, 180 D.P.R. 253, 272-273 (2010). The PREPA emphasized that, when it requested that the Energy Bureau authorize the qualified immunity in question, the PREPA acted to protect consumers against potential increases in their electricity bill, since the immunity in question reduces the costs of operating the electric power system. This results in financial savings for all consumers of the PREPA, since they are the ones that pay for the costs of operating the above-referenced electric power system via the tariff.

8.      On August 22, 2025, this Honorable Supreme Court issued a Decision in which it issued the writ of certification, gave fifteen (15) days not to be extended, expiring on September 8, 2025, for DACo to file petitioner's brief, and fifteen (15) days not to be extended, from the filing of petitioner's brief, for respondents to file their brief. The period given to respondents expires on September 23, 2025.

9.      On September 8, 2025, the DACo filed the Petitioner's Brief.

10.      On that same date of September 8, 2025, the ICSE filed the Brief of the Institute for Competitiveness and Sustainable Economy as Amicus Curiae.

11.      On September 19, 2025, LUMA filed an Informative Motion notifying that it had filed the Urgent Motion of LUMA to Enforce the Automatic Stay in the PREPA case under Title III of the PROMESA, Case No. 17-BK-4780-LTS, currently pending before the Federal Court for the District of Puerto Rico, Hon. Judge Laura Taylor Swain.

12.      In a timely manner, the PREPA is appearing before the Honorable Supreme Court, stating its position as to the above-captioned controversy.

### III. BRIEF NARRATION OF OTHER RELEVANT FACTS

1.   On June 22, 2020, the Public-Private Partnerships Authority ("P3"), the PREPA and LUMA executed the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement ("T&D OMA").  The

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

T&D OMA, as amended and/or supplemented, establishes, among other things, the terms under which LUMA must operate the transmission and distribution system of the PREPA. The PREPA is still the owner of all public transmission, distribution and electric power generation assets.

    2.    Under Section 4.1 (g) of the T&D OMA, LUMA, the PREPA and P3 **agreed to request** to the Energy Bureau that it include, in the terms of service, a liability waiver, in favor of LUMA and the PREPA. The above-referenced contract provision reads as follows:

    (g)    Liability Waiver. In connection with the submission of the Initial Budgets to PREB, the Parties agree to apply for inclusion in the Rate Order that the associated tariff or terms of service include: (i) a waiver of Owner's, ManagementCo's and ServCo's liability to customers or any Person receiving Power and Electricity for any Losses arising in any way out of or in connection with the operation of the T&D System and the provision of Power and Electricity including any events of interrupted, irregular or detective electric service due to Force Majeure Events, other causes beyond Owner's, ManagementCo's or ServCo's control or ordinary negligence, gross negligence or willful misconduct of Owner, ManagementCo or ServCo, or their respective employees, agents or contractors; and (ii) a waiver in all cases of responsibility for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by any of Owner's, ManagementCo's or ServCo's ordinary negligence, gross negligence or willful misconduct (collectively the "Liability Waiver").

See App. page 354 (emphasis added).

    3.    In compliance with said obligation, on February 24, 2021, LUMA filed, in the Energy Bureau, a Petition for Approval of Initial Budgets and Related Terms of Service ("Petition for Initial Budgets"), in which it requested the approval of both matters: the Initial Budgets and the proposed Terms of Service. LUMA's Supp. App., pp. 24-42.

    4.    On April 5, 2021, the Energy Bureau issued a Decision and Order determining that what would be most appropriate would be to evaluate the Terms of Service in a separate procedure.

    5.    In accordance with the foregoing, on May 4, 2021, the Energy Bureau issued a Decision and Order, opening Case No. NEPR-MI-2021-0007, in order to evaluate the Terms of Service.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

6.      In above-referenced Case No. NEPR-MI-2021-0007, the Energy Bureau issued the Final Decision in which it finally adopted the Revised Terms of Service, including the Liability Waiver which DACo is challenging herein. LUMA's Supp. App., pp. 405-472.

7.      Section 18.2 of the T&D OMA provides that, **as a general rule**, the PREPA shall be liable to LUMA for any and all sums which LUMA is obligated to pay in respect of a final and unappealable judgment issued in favor of a customer of the PREPA/LUMA. In particular, said provision establishes as follows:

Indemnification by Owner.

(a) Generally. Subject to the limitations on liability set forth in this Section 18.2 (Indemnification by Owner), Section 18.3 (Limitation on Liability), Section 18.4 (Insurance and Other Recovery), Section 18.5 (Liability Limitation for Certain Damages), and Section 18.6 (Additional Liability Limitation for Certain Damages), Owner shall indemnify, defend and hold harmless Operator and the Equity Participants and its and their respective Affiliates and Representatives (each, including Operator, an "Operator Indemnitee"), from and against (and pay the full amount of) any and all Losses incurred by an Operator Indemnitee to the extent arising or resulting from, in each case, as determined by a final and non-appealable judgment by a court of competent jurisdiction:
[...]
(vi) claims brought against Operator by a T&D Customer in connection with the T&D System or Operator's performance of the O&M Services[.]

8.      However, Section 18.2(b) of the T&D OMA recognizes **exceptions** to the aforementioned general rule, particularly in situations involving ordinary negligence, gross negligence or willful misconduct ("negligence (including gross negligence) or willful misconduct") by LUMA. In particular, Section 18.2(b) establishes that the PREPA shall not be obligated to make any payment or disbursement to LUMA for losses suffered by LUMA as a result of its own ordinary negligence, gross negligence or willful misconduct by LUMA. Said provision reads as follows:

(b)   Limitations. … Notwithstanding the foregoing, ... **Owner shall not be required to reimburse or indemnify any Operator Indemnitee [including LUMA] for any Losses to the extent caused by or due to:**
[...]
**(ii) the negligence (including gross negligence) or willful misconduct of any Operator Indemnitee [including LUMA]**…in each case as determined by a final and non-appealable judgment by a court of competent jurisdiction.

(emphasis added).

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

9. Furthermore, **Section 7.6(a)(i) of the T&D OMA establishes that LUMA shall be the only one responsible for the Disallowed Costs**. The Disallowed Costs exception establishes that they **do not** constitute Transferable Transmission and Distribution Expenses (T&D Pass-Through Expenditures). As a result of the foregoing, **Disallowed Costs cannot be transferred to the PREPA, or to customers; rather, they must be assumed and paid for by LUMA, from its own money**.

10. As to this, Section 7.6 of the T&D OMA, titled Disallowed Costs, indicates:

(a) Generally. Subject to the limitations on liability in Section 18.3 (Limitation on Liability), **none of the following shall be treated as T&D Pass-Through Expenditures for purposes of payment from Owner to Operator, and each shall be the sole responsibility of Operator [LUMA] (collectively, 'Disallowed Costs'):**

**(i) any and all T&D Pass-Through Expenditures,[1] Capital Costs, Outage Event Costs or Excess Expenditures incurred as a result of Operator's negligence (including gross negligence) or willful misconduct**, except in connection with Section 5.10 (Environmental, Health and Safety Matters) where the applicable standard shall be gross negligence or willful misconduct to the extent provided therein [.]

(Emphasis added).

11. Section 18.3 of the T&D OMA establishes that LUMA's liability for Disallowed Costs resulting from **ordinary negligence** shall be limited to **$35,000,000.00, in the aggregate, for losses occurring in any contract year**; and **$105,000,000.00, in the aggregate, for all losses occurring during the full contract term**. Specifically, the above-referenced section indicates as follows:

**Limitation on Liability**. Notwithstanding anything contained in this Agreement to the contrary:

(a)      Operator General Limitations.

(i)      Except as set forth in Section 18.3(b) (Limitation on Liability - Gross  Negligence; Willful Misconduct), **Operator's liability to Owner Indemnitees under Section 18.1** (Indemnification by Operator), **including Disallowed Costs, shall be limited to US$35,000,000 in the aggregate for Losses occurring in any Contract Year**; and **US$105,000,000 in the aggregate for all Losses during the Term**.

(Emphasis added).

## IV. ARGUMENTS

**A. In the event that the Final Decision and the Liability Waiver authorized therein are declared null and void, LUMA shall be liable for paying for**

---

[1] The T&D Pass-Through Expenditures constituting Disallowed Costs when they are the result of negligence by LUMA, and relevant to the controversy before the Court, include "claims, lawsuits, litigations, losses, fines, penalties, costs and expenses, judgments, liens, settlements, appeals, disbursements and similar expense"

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**claims for damages by customers of the PREPA/LUMA caused by ordinary negligence, gross negligence or willful misconduct by LUMA; therefore, it should <u>not</u> have an impact on the tariff.**

The PREPA agreed to the terms of Section 4.1 (g) of the T&D OMA, and authorized LUMA to request to the Energy Bureau that it include, in the terms of service, a liability waiver in favor of LUMA and the PREPA, in an effort to avoid potential increases in the electricity tariff and, in this manner, protect its customers. The liability waiver submitted by LUMA was subject to revision and approval by the Energy Bureau. Exercising its statutory prerogatives, the Energy Bureau modified the terms of service proposed by LUMA and approved the Modified Terms of Service, which included the Liability Waiver that is at the center of the present petition for interjurisdictional certification.

Both LUMA and the Energy Bureau have stated, in their previous filings before the Honorable Court, that voiding the Liability Waiver in question could result in tariff increases because "the claims by users of the electric power system for damages stemming from negligence...are ...paid for by the customers of the PREPA." See: Motion in Compliance with Order of the Energy Bureau, page 16. See, also: Opposition to Petition for Interjurisdictional Certification filed by LUMA, page 4.

As to this, the PREPA considers it necessary to make an important clarification. In the event that the Honorable Supreme Court determines that the Final Decision of the Energy Bureau challenged herein is unconstitutional and, as a result, voids the Liability Waiver granted therein to LUMA and to the PREPA, the PREPA maintains that **LUMA shall be the party responsible for paying, from its own money, for any and every indemnification for damages awarded to the customers of the PREPA/LUMA as a result of ordinary negligence, gross negligence or willful misconduct by LUMA, since they constitute Disallowed Costs under Section 7.6(a)(i) of the T&D OMA**.

As indicated, the T&D OMA establishes the limits of the liability of LUMA and the PREPA in relation to the operation of the electric power system. The above-referenced contract provides that any cost resulting from ordinary negligence, gross negligence or willful misconduct by LUMA, as the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

operator of the transmission and distribution system, must be exclusively assumed by the same, and **cannot** be transferred to the PREPA. To that end, Section 7.6(a)(i) of the T&D OMA provides that LUMA is the only one with the responsibility to absorb the costs resulting from its own negligence or misconduct, without the possibility of transferring them to the PREPA or to the consumer.

Stated differently, the contract categorically excludes the obligation of the PREPA and, consequently, of customers, to indemnify LUMA when the damages claimed are the result of LUMA's own negligence.  In this regard, Section 18.2(b)(ii) provides that the PREPA shall not be obligated to reimburse or indemnify LUMA for any loss caused or resulting from negligence by LUMA. ("Owner shall not be required to reimburse or indemnify any Operator Indemnitee for any Losses to the extent caused by or due to: [...] (ii) the negligence (including gross negligence) or willful misconduct of any Operator Indemnitee[.]").

Examined together, these provisions show that, in the event that the Honorable Supreme Court declares the unconstitutionality of the Liability Waiver authorized by the Energy Bureau in the Final Decision, **this would not transfer the monetary consequences of the claims of customers of the PREPA/LUMA to the tariff nor would it affect the PREPA's assets**. On the contrary, if the above-referenced waiver is eliminated, all customers who prove damages caused by negligence or willful misconduct by LUMA would have a right to a direct action against LUMA and the resulting costs of said claims would be the exclusive responsibility of LUMA, which it shall have to cover with its own money.

Therefore, the content of the T&D OMA protects the PREPA, and its customers, from monetary liability for negligent omissions and willful misconduct by LUMA. Consequently, even in the absence of the Liability Waiver authorized by the Final Decision, the PREPA and the customers would be protected from contract and tort claims resulting from ordinary negligence, gross negligence or willful misconduct by LUMA.

**B. The Complaint filed by the DACo does not challenge the constitutionality of Regulations No. 7982; therefore, the Honorable Court must abstain from ruling on said issue.**

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

It is well settled, in our legal system, that laws, rules and regulations are presumed constitutional until otherwise ruled by a court of law. Aut. Puertos PR v. Total Petroleum et al., 210 D.P.R. 16 (2022); Brau, Linares v. ELA et als., 190 D.P.R. 315, 337 (2014). See Senado de PR v. ELA, 203 D.P.R. 62, 83 (2019).

Furthermore, it is also well settled that appellate courts must refrain from adjudicating matters not raised in the court of first instance. Trabal Morales v. Ruiz Rodríguez, 125 D.P.R. 340, 351 (1990); Sánchez v. Eastern Air Lines, Inc., 114 D.P.R. 691 (1983); Santiago Cruz v. Hernández Andino, 91 D.P.R. 709, 712 (1965).

In their Motion in Compliance with Order and Requesting that the Supreme Court Issue the Certification Filed by the Department of Consumer Affairs, the Senate and the House maintain the following:

> the immunity granted to the PREPA in Regulations No. 7982 exclusively applies to events of force majeure or planned service interruptions. Any other type of immunity alleged under said regulations does not apply to the above-captioned case and, even if the Honorable Court were to believe that said provision is applicable, it would nevertheless be equally unconstitutional.

Id. page 9.

The PREPA very respectfully maintains that the Honorable Supreme Court must abstain from assessing the constitutionality of the provisions of Regulations No. 7982, titled General Terms and Conditions Regulations for the Supply of Electric Power of the PREPA ("Regulations 7982"). In the Complaint, the DACo does not challenge the validity of any of the provisions of said regulations. The Senate and the House, which are friends of the court, not parties to the lawsuit, are challenging the constitutionality of Regulations 7982 without elaborating. In light of the foregoing, it would not be appropriate as a matter of Law for the Honorable Court to rule on the constitutionality of regulations that have not been challenged by the petitioner and based on a record that has not been developed to consider said particular controversy.

It should be noted that the provision of Regulations 7982 that has been challenged by the Senate and the House is very different from the Liability Waiver that is the subject of the present case. In particular, said provision reads as follows:

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

SECTION XV: SERVICE INTERRUPTIONS

The Authority has the objective of providing an efficient and reliable service to the People of Puerto Rico. However, the Authority may be obligated to interrupt the supply of electric power without prior notice as a result of force majeure. It may also be obligated to suspend the service as a result of repairs or maintenance work, in which case affected customers are notified in advance. Said interruptions are not considered violations of the Electric Power Supply Contract by the Authority; therefore, neither the latter nor any of its employees, officers or directors are liable for any harm, loss or cause of action stemming from said reasons.

As recognized by the Senate and the House, the above-referenced section is highly distinguishable from the Liability Waiver in controversy herein, since it is limited to instances of force majeure or planned interruptions of which customers would be notified. The scope of this provision is different from the scope of the Liability Waiver in question herein.

Given the fact that the DACo did not challenge the constitutionality of said regulatory provision, the above-captioned case does not contain the appropriate circumstances for the Honorable Court to rule as to its constitutionality. The correct adjudication of said regulatory provision would require a separate case, developed for said purpose. In accordance with the above, exercising judicial prudence, the Honorable Court must abstain from ruling on the constitutionality of SECTION XV of Regulations 7982 or any other provision of said regulations.

## V. PRAYER

**BASED ON ALL OF THE FOREGOING**, it is very respectfully requested that the Honorable Supreme Court take notice of the above and: (a) abstain from ruling on the constitutionality of Regulations No. 7982, titled General Terms and Conditions Regulations for the Supply of Electric Power of the PREPA, and (b) in the event that it determines that the Final Decision of the Energy Bureau challenged herein is unconstitutional and, as a result, voids the Liability Waiver granted therein to LUMA and the PREPA, determine that LUMA shall be solely and exclusively liable for paying, from its own money, for any and all indemnification in respect of damages awarded to the customers of the PREPA/LUMA as a result of ordinary negligence, gross negligence or willful misconduct by LUMA, based on constituting Disallowed Costs under Section 7.6(a)(i) of the T&D OMA.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

## VI. NOTICE CERTIFICATION

**I CERTIFY**: That I sent a stamped and sealed true and exact copy of this filing, today, September 8, 2025, by email, to: Department of Consumer Affairs, through **Ms. Valerie Rodríguez, Esq.**, vrodriguez@daco.pr.gov, valeriemrodz@gmail.com; **Mr. Gadiel Figueroa, Esq.**, gfigueroa@daco.pr.gov, gadielfigueroa@yahoo.com; **Mr. Samuel Silva Rosas, Esq**. ssilva@daco.pr.gov; Senate of Puerto Rico, through **Mr. Charles Rodríguez Colón, Esq.**, crodriguez@naleapr.com; **Mr. Miguel A. Rodríguez Ramos, Esq.**, miguelrrlaw@gmail.com, mrodriguez@prlegal403.com; House of Representatives, through **Mr. Víctor Calderón Cestero, Esq.**, victor@calderon-law.com; Instituto de Competitividad y Sostenibilidad Económica de Puerto Rico, Inc., through **Mr. Fernando Agrait Betancourt, Esq.**, agraitfe@agraitlawpr.com; **Mr. José Leonardo Pou Román, Esq.**, jpouroman@outlook.com; Energy Bureau of the Public Service Regulatory Board, through **Mr. Edgardo L. Rodríguez Cardé, Esq.**, elrc@rclopr.com; **Ms. Yarymar González Carrasquillo, Esq.**, ygc@halspr.com; LUMA Energy, LLC and LUMA Energy ServCo, LLC, through **Ms. Margarita Mercado Echegaray, Esq.**, margarita.mercado@us.dlapiper.com; **Ms. Mariana Muñiz Lara**, mariana.muniz.@us.dlapiper.com, and **Ms. Yahaira de la Rosa, Esq.**, Yahaira.DelaRosa@us.dlapiper.com.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico, today, September 23, 2025.

**GONZÁLEZ & MARTÍNEZ**
1509 López Landrón
Seventh Floor
San Juan, PR 00911-1933
Ph.: (787) 274-7404
[signature]
**Juan M. Martinez Nevarez**
RUA No.:14,517
E-mail: imartinez@gmlex.net
[signature]
**Mirelis Valle Cancel**
RUA No.: 21,115
E-mail: mvalle@vcprlaw.com

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

**IN THE SUPREME COURT OF PUERTO RICO**

| | |
|---|---|
| **DEPARTMENT OF CONSUMER AFFAIRS**<br><br>Plaintiff – Petitioner<br><br>v.<br><br>LUMA ENERGY, LLC; LUMA ENERGY SERVCO, LLC; PUERTO RICO ENERGY BUREAU; ELECTRIC POWER AUTHORITY<br><br>Defendant - Respondent | TS No.: CT-2025-0003<br><br>CIVIL NO. SJ2025CV06607<br><br>(Courtroom 901)<br><br>RE:<br>DECLARATORY JUDGMENT |

**EXHIBIT 2**

**MOTION TO COMPLY WITH ORDER AND JOIN THE BRIEF OF THE DEPARTMENT OF CONSUMER AFFAIRS REGARDING INTERJURISDICTIONAL CERTIFICATION**

**TO THE HONORABLE COURT:**

      **COME NOW** the Senate of Puerto Rico, hereinafter the "Senate," represented by its president, the Hon. Thomas Rivera Schatz, in his official capacity, and the House of Representatives of Puerto Rico, hereinafter the "House of Representatives," represented by its Speaker, the Hon. Carlos "Johnny" Méndez Nuñez, in his official capacity, by and through the undersigned counsel, and very respectfully **STATE, ALLEGE AND REQUEST:**

1.  In the above-captioned matter, last September 8, 2025, the Department of Consumer Affairs (DACO, Spanish acronym) filed its brief in support of the petition for Jurisdictional Certification.

2.  The Senate of Puerto Rico and the House of Representatives join in the arguments raised by DACO in its brief, for they believe all such arguments should be brought for consideration by this Honorable Forum. There is no doubt that the Puerto Rico Energy Bureau ("PREB")



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of a document in Spanish which I have seen.

exceeded its legal authority when it granted a liability waiver to LUMA, going against its own Organic Act, specifically Section 6.3 of the Regulations on Energy Bureau Procedures, 22 L.P.R.A. §1054b, which expressly provides that the Bureau may not approve, authorize, or impose any provision that is contrary to the applicable laws or the public interest.

3. We reiterate that the Constitution of Puerto Rico clearly provides that "the Legislative Branch has full authority to pass, amend, or repeal laws. Art. III, Sec. 1, Const. PR, *supra*, p. 401. See, *Gobierno Ponce v. Caraballo*, 166 DPR 723, 736 (2006). Among other powers that are relevant to the matter at hand, Sec. 16 of Art. III of the Constitution of Puerto Rico, *supra*, grants the Legislative Branch "the power to create, consolidate, or reorganize executive departments and to define their functions." The Constitution also provides that "[t]he procedure for granting franchises, rights, privileges and concessions of a public or quasi-public nature shall be determined by law…" Sec. 13 Art. VI, Const. PR, *supra*. Likewise, our Magna Carta established that every public franchise or concession shall be determined by law. Therefore, the Legislative Assembly is the constitutional branch responsible for establishing the framework that enables the executive branch to grant franchises and concessions.

4. Puerto Rico has a codified legal system. Thus, the Civil Code is not a summary of supplemental rules, but the primary source of private law. In matters of damages, the Civil Code recognizes two categories of tortious acts which lead to different types of liability: contractual and

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of a document in Spanish which I have seen.

App. 647

non-contractual. The former stems from "the breach of a duty that arises from an express or implied contract". *Soc. de Gananciales v. Velez & Asoc.,* 145 DPR 508, 521 (1998).

5. Thus, "the existence of a contract between the parties does not suffice for contractual liability to operate; rather, it is required that the wrongful act occurs within the rigorous orbit of the agreement and as an accurate development of the content of the deal." *Maderas Tratadas v. Sun Alliance* 185 DPR 880 (2012). Therefore, "actions arising in contracts seek fulfillment of promises agreed to by the contracting parties." *Santiago Nieves v. ACAA*, 119 DPR 711, 716 (1987).

6. Moreover, noncontractual liability addresses "the compensation for damages caused as a result of a violation of the general principles of coexistence, that is, causing no harm to others." *Rivera Sanfeliz et al. v. Jta. Dir. FirstBank* 193 DPR 38, 57 (2015). Thus, the lawmaker established in Article 1536 of the Civil Code of 2020, 31 L.P.R.A. § 108801, the right to bring a cause of action for damages caused by negligent acts or omissions. Said right was also established in Article 1802 of the Civil Code of 1930.

7. Civil liability is not limited to the owner; it also includes all those guarding or keeping custody or control of a dangerous thing." *Crespo v. Hernandez*, 121 DPR 639 (1988). Specifically, the lessor, contractor, or administrator also answers for the damages caused by his or her negligence in the operation. *Colón v. Romero Barceló*, 112 DPR 573 (1982).

8. Therefore, it must be concluded that the Constitution of Puerto Rico

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of a document in Spanish which I have seen.

App. 648

clearly provides that the design and delimitation of the non-contractual liability of the State and private entities is not a prerogative of the State or the regulatory entities, but rather an exclusive function of the Legislative Assembly, pursuant to the principle of separation of powers enshrined in Article I, Section 2 of the Constitution of the Commonwealth of Puerto Rico. *Misión Ind. P.R. v. JP,* 146 DPR 64, 88-89 (1998). Only the Legislative Assembly may limit the scope of noncontractual liability through a duly authorized law. *Rivera Sanfeliz v. Junta Dir. First Bank*, *supra*.

9. On the other hand, it is necessary to establish that **DACO is not challenging the** "*Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement*" between LUMA, the Puerto Rico Electric Power Authority, and Public-Private Partnerships Authority. The controversy set forth herein is exclusively directed against the actions of the PREB, which, through Resolution of May 31, 2021, granted LUMA a non-contractual liability waiver in violation of the Constitution of Puerto Rico and the civil liability doctrine codified in the Civil Code.

10. Our legal system has recognized the validity of the delegation of powers of the Legislative Assembly to the Executive Branch or an executive agency, however, such delegation is not absolute. See, *Dalmau Ramírez v. ELA*, 2024 TSPR 95 (2024). This Honorable Court has validated such delegation, provided that the law "establishes adequate norms, guidelines, standards, criteria or intelligible principles, or those procedural and substantive guarantees or safeguards that may direct the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

delegation and delimit its powers in order to avoid arbitrary or capricious administrative actions." *Domínguez Castro et al. v. ELA* I, 178 DPR 1, 93 (2010). See, *Sánchez et al. v. Depto. Vivienda et al.*, 184 DPR 95, 122 (2011). See, also E. Chemerinsky, Constitutional Law: principles and policies, 5th ed., New York, Wolters Kluwer, 2015. pp. 343-345; L. Fisher and K.J. Harriger, American Constitutional Law, 10th ed., North Carolina, Carolina Academic Press, 2013, Vol. I, p. 207.

11. These criteria need not be express; they may arise from legislative history and may be broad and general. *Hilton Hotels Int'l v. Minimum Wage Bd. of P.R.* 74 DPR 670, 693 (1953) "These standards need not be stated with mathematical precision or accuracy, and they may be so broad as to justify more than one conclusion. Unless the standard is not stated or, if stated, be so vague as to become nonexistent, as a matter of fact the presumption of constitutionality attached to every Act is sufficient to support its validity.") Likewise, if a public purpose or interest is served, this would generally be sufficient justification to uphold the delegation. *Domínguez Castro et al. v. ELA I, supra*, at 93.

12. The determination of whether the challenged law contains an intelligible principle or adequate standards must be analyzed on a case-by-case basis. In conducting such an analysis, the courts examine the delegation conferred and the criteria established by the Legislative Assembly. *Sánchez et al. v. Depto. Vivienda et al., supra*, at 122. In addition, upon examining a delegation, the courts must analyze "whether in the actual operation of the System and a specific historical context, the delegated power has resulted in an undue concentration of power in one of the branches or in

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of a document in Spanish which I have seen.

an undesirable decline of independence that is incompatible with the political provisions set forth in the Constitution." (Emphasis suppressed*). Senado v. Tribunal Supremo y otros*, 208 DPR 1 15, 135-136 (2021), citing *Nogueras v. Hernández Colón*, 127 DPR 405, 426 (1990).

13. Once all these elements are fulfilled, the Legislative Assembly retains authority to revoke any delegation of authority it may have granted. *Gobierno Ponce v. Caraballo*, *supra*, at 736. Likewise, the Legislative Assembly has other methods to maintain control over the authorities delegated to another branch. On this matter, Professor Farinacci Fernós summarizes that:

> For a delegation to be constitutionally valid, it must meet certain requirements. These include: (l) it is a power the may be delegated, (2) that, in effect, the delegation has been made (3) that sufficient intelligible principles have been established to guide the exercise of the delegated quasi-legislative power, (4) that the entity *to which* such power is delegated acts within the limits prescribed by law, and (5) that such power is not exercised arbitrarily or capriciously. Typically, the result of this exercise of power is the adoption of a legislative regulation that creates rights and obligations and has the force of law." J.M. Farinacci Fernós, Las Órdenes Ejecutivas, el Poder Legislativo y las Emergencias, 3 Amicus, Rev. Pol. Pub. Y Leg. UIPR 190, 192 (2020) [Our translation].

14. **The liability waiver granted by PREB, which is in controversy herein, fails to meet every criterion cited in the preceding paragraph**. None of the laws applicable to this controversy, namely, Act No. 120-2018, 22 L.P.R.A. § 1111, and Act No. 57-2014, *supra*, 22 L.P.R.A. §1051, contain an express or implicit expression by the lawmakers delegating to the Executive Branch their authority to grant immunity to the Puerto Rico Electric Power

Authority or LUMA.

15.     Moreover, PREB also acted *ultra vires* by granting an almost absolute liability waiver to LUMA under the Resolution of May 31, 2021.

16.     Lastly, we join in DACO's arguments that all actions by PREB must be carried out within the parameters of its Organic Act, which grants it specific powers such as establishing electricity rates, setting forth the energy public policy, and regulating the industry; however, the exercise of such powers is necessarily subordinated to compliance with <u>all the applicable laws</u>, including the Puerto Rico Civil Code which imposes the standard that whoever causes the damage is liable therefor, the public interest, and consumer protection.  22 L.P.R.A.§1054b.

**WHEREFORE,** the Senate of Puerto Rico and the House of Representatives of Puerto Rico very respectfully request that this Honorable Court:

a.   Take notice of the herein stated;

b.   Order the Senate of Puerto Rico and the House of Representatives of Puerto Rico as parties in the brief of the Department of Consumer Affairs;

c.   Rule that the PREB's Resolution of May 31, 2021, is void;

d.   Enter any other judgment that may be appropriate in Law.

I hereby **CERTIFY**: That on this day a true and exact copy of this motion was served on the **Department of Consumer Affairs, (DACO)** at the email address of its Secretary, the Hon. Valerie Rodriguez Erazo, <u>vrodriguez@daco.pr.gov,</u>   <u>valeriemrodz@gmail.com;</u>   Gadiel   Figueroa Robles, Esq. gfigueroa@daco.pr.gov, gadielfigueroa@yahoo.com; Samuel Silva Rosas, Esq. ssilva@daco.pr.gov, samuelsilva.law@gmail.com; on the

**Instituto de Competitividad y Sostenibilidad Económica (ICSE)**, at the email address of its legal representatives Fernando E. Agrait, Esq. agraitfe@agraitlawpr.com, and Jose Leonardo Pou Román Esq., jpouroman@outlook.com; on L**UMA Energy, LLC and Luma Energy ServCo**, at the email address of its legal representatives José A. Andreu Fuentes, Esq., jaf@andreu-sagardia.com, Frank C. Torres Viada, Esq., ftv@ftorresviada.com; Yahaira De La Rosa Algarín, Esq., yahaira.delarosa@us.dlapiper.com, Margarita Mercado Echegaray, Esq., margarita.mercado@us.dlapiper.com, and Jan Manuel Albino López, Esq., jan.albinolopez@us.dlapiper.com; on the **Energy Bureau of the Puerto Rico Public Service Regulatory Board (Energy Bureau)**, at the email address of its legal representatives, Edgardo L. Rodriguez Carde, Esq. elrc@rclopr.com, and Yarymar Gonzalez Carrasquillo, Esq. ygc@rclopr.com; Juan M. Martínez Nevárez, Esq., jmartinez@gmlex.net; Mirelis Valle Cancel, Esq., mvalle@vcprlaw.com; and on the **Puerto Rico Electric Power Authority (PREPA)** at the email address of its legal representatives Juan M. Martínez Nevárez, Esq., jmartinez@gmlex.net, and Mirelis Valle Cancel, Esq., mvalle@vcprlaw.com.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 23rd day of September, 2025.

<div style="text-align:center">

**Attorneys for the
Senate of Puerto Rico**

**WRITS LLC**
P.O. Box 19586
San Juan, PR 00910
Phone: (787) 604-2772

</div>



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of a document in Spanish which I have seen.

[*Illegible signature*]
**Miguel A. Rodríguez Ramos**
RUA No. 22,062
Email:miguelrrlawl@gmail.com


**NATIONAL LEGAL ADVISORS, LLP**

252 Ave. Ponce de León Suite 1801
San Juan PR 00918-2020

**s/Charles A. Rodriguez Colón**
RUA No. 783I
crodriguez@naleapr.com
Phone: (787) 378-2424

**Attorneys for the House
of Representatives**

**s/Victor Calderón Cestero**
RUA No. l3266
137 Calle O
Aguadilla PR 00603
Phone: (787) 602-2465

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of a document in Spanish which I have seen.

App. 654

[CERTIFIED TRANSLATION P. 1-26 JSP]



COMMONWEALTH OF PUERTO RICO
**Puerto Rico Electric Power Authority**

Eng. Javier A. Quintana Méndez
Executive Director

**EXHIBIT 4**

February 15, 2016

Distribution "B"
16-02-16

To all Supervisors

[*Illegible Signature*]

Javier A. Quintana Méndez
Executive Director

**Procedure for the Assessment, Processing, and Payment of Third-party Claims**

We include the Procedure of caption. This Procedure updates the instructions to manage, respond to, and pay claims for damage to property or third parties.

We would appreciate full compliance with this Procedure.

Attachment

**DEPC**

PO BOX 364267, SAN JUAN, PUERTO RICO 00936-4267 TELEPHONE NO.: (787)-521-4666 TELEFAX: (787)-521-4665
"We are an equal opportunity employer and do not discriminate on the basis of race, color, sex, age, social or national origin, socioeconomic status, political affiliation, political or religious beliefs; being an actual or perceived victim of domestic violence, sexual assault, or stalking, regardless of marital status, sexual orientation, gender identity, or immigration status; physical or intellectual disability, or both, veteran status, or genetic information."

**Puerto Rico Electric Power Authority**



**PROCEDURE FOR THE ASSESSMENT, PROCESSING, AND PAYMENT OF THIRD-PARTY CLAIMS**

**FEBRUARY 2016**

'We are an equal opportunity employer and do not discriminate on the basis of race, color, sex, age, social or national origin, socioeconomic status, political affiliation, political or religious beliefs; being an actual or perceived victim of domestic violence, sexual assault, or stalking, regardless of marital status, sexual orientation, gender identity, or physical or intellectual disability, or both, veteran status, or genetic information.'

Puerto Rico Electric Power Authority

PROCEDURE FOR THE ASSESSMENT, PROCESSING, AND PAYMENT OF THIRD-PARTY CLAIMS

TABLE OF CONTENTS

Page

I.   INTRODUCTION .... .......................................................................... 1

II.   DEFINITIONS ...................................................................... 1

III.   GENERAL PROVISIONS................................................................... 1

IV.   INSTRUCTIONS ....................................................................... 4

    A.   Vehicle Accident Claims ............................................................ 4

    B.   Property Damage Claims ........................................................... 5

V.   AMENDMENTS AND INTERVENTIONS ......................................... 9

ATTACHMENTS

    A.  Claims Orientation Form  (AEE 760.0-23)

    B. Accident Claims (AEE 700.0-431)

    C.  Property Damage Claim Investigation Report (AEE 760.0-22)

    D.  Accident and Incident Investigation Report (AEE 200.0-4)

    E.  Amicable Accident Report (AEE 760.0-20A)

    F.  Vehicle Accident Report (AEE 084-15333)

    G.  Certification  (AEE 760.0-24)

    H.  Release of Liability (AEE 760.0-25)

    I.   Check Request (CN 084-15424)

Puerto Rico Electric Power Authority

PROCEDURE FOR THE ASSESSMENT, PROCESSING, AND PAYMENT OF
THIRD-PARTY CLAIMS

I.   INTRODUCTION

Claims filed for damage to property or third parties shall be addressed promptly. Such claims shall be completed as soon as possible.

This procedure assigns responsibilities and provides instructions on how to manage, respond to, and pay claims for damage to property or third parties.

II.   DEFINITIONS

A.   Claims Committee - analysts from the Risk Management Office responsible for assessing claims.

B.   Damage – the material or moral damage or impairment suffered by a person or thing.

C.   *STORMS* (*Severn Trent Operational Resource Management System*) – The program used to create, update, report, and evaluate work and investigation orders, emergency orders, field studies, and power line inspections performed by the Authority's metering, construction, or technical personnel.

D.   Claim – A request for monetary compensation filed against the Authority for damages caused to third parties or their properties.

E.   Claimant – A natural or juridical person that filed a claim for damages caused to third parties or their property.

F.   *Work-Request* - A work order generated by STORMS that is identified by a number.

III.   GENERAL PROVISIONS

A.   Pursuant to Article 1802 of the Puerto Rico Civil Code, a person who causes damage to another through fault or negligence shall be obliged to repair the damage so done. An action for damages shall be filed within one (1) year from the time the person sustained the damage and became aware of who caused the damage.

[*illegible initials*]

The designated Authority employee shall inform the claimant about the claims process and their rights and shall complete the Claims Orientation Form, **Attachment A.**

The Authority shall have ninety (90) calendar days, from the receipt of all required

documents, to respond to a claim. The 90-day period shall begin from the time the Authority receives all the documents necessary to evaluate the claim. In the event of extraordinary circumstances, the 90-day period may be extended up to 120 calendar days upon notice to claimant.

B.   The Risk Management Office is responsible for denying and adjusting third-party claims for property damage up to $10,000, according to the Technician's assessment. Claims payments shall be made in accordance with the Check Request Processing and Approval Procedure. Likewise, the Check Request shall be approved in accordance with the Electric Power Authority's Document Approval Level Rule in effect.

C.   The investigation of third-party claims shall be conducted pursuant to the provisions of the Procedure to Report and Investigate Accidents and Incidents, in effect, when applicable.

D.   All claims, except claims for vehicle accidents and bodily injuries, shall be filed with the Commercial District Office of the area closest to the residence of the claimant or through the Customer Service Center.

E.   Third-party claims for bodily injuries, as well as claims for damage to property in excess of $10,000 shall be processed directly by the Litigation Division of the Legal Affairs Office. This division also handles property damage cases involving bodily injuries regardless of the claim amount.

F.   In the case of motor vehicle accident claims (vehicle-to-vehicle), the insurance carrier contracted by the Authority shall be the custodian of the original documents and the claim file**.** The Risk Management Office shall keep a record of the cases sent to the contracted insurance carrier through the Accident Claims Form (AEE 700.0-431), **Attachment B**.

The insurance carrier contracted by the Authority shall notify the claimant of the approval or denial of the claim through a letter. The Authority requires the contracted insurance carrier to send a monthly list of paid claims, amounts paid, and payment dates to the Risk Management Office for information and control purposes.

G.   The claim shall include the original and a copy of the following documents:

[*illegible initials*]

1.   A legible letter of explanation describing all that occurred in detail (date, time, name of the persons, etc.), a description of the property, the damages claimed, and the Puerto Rico Police report number, if applicable. This information shall be used to complete the Property Damage Claim Investigation Report form.

2.   In the case of a claim for property or equipment damage, it shall also include a receipt, invoice, or original copy of the estimate prepared by a certified technician or expert including his or her license or professional association membership number, address, and telephone number. It shall detail the labor, the parts used, the cost of materials, the work performed or equipment used to repair the damage and a total loss certification signed by the certified technician or expert. The damage

claimed must be consistent with the submitted documents.

3. Vehicle claims shall also include the original copy of the Amicable Accident Report, **Attachment E**, provided by the Authority, the Incident Report provided by the Puerto Rico Police, the Vehicle Accident Report (CN 084-15333), **Attachment F**, the Accident and Incident Investigation Report (AEE 200.0-4), **Attachment D**, and the Certification form, **Attachment G**, if apply. It is important to include the report number, the name and badge number of the police officer who received the report, the police station where such police officer works; photos of the vehicle or property, and an estimate of the damage.

4. In the case of claims for personal injuries (bodily), the claimant shall be instructed to submit proof of the medical attention they received on the day of the incident.

H. If the claimant has an insurance policy, such claimant shall state the name of the insurance carrier, the type of policy, and the policy number, as established in Act No. 18-2004, the Insurance Code of Puerto Rico Antifraud Act. This information shall be filled out in the space provided therefor in the Property Damage Claim Investigation form.

I. The claimant must submit the requested information and all documents as indicated. Any missing documents shall delay the process but shall not toll the limitation period.

J. The Authority shall not be liable for damages caused by force majeure, fortuitous events, terrorist acts, or events unconnected with the Authority for which it is not liable (e.g. hurricanes, earthquakes, etc.).

K. The Risk Management Office uses the claim number to identify the case. In the case of vehicle claims, the claim number is assigned by the Risk Management Office. In the case of personal injuries (bodily), the claim number is assigned by the Litigation Division of the Legal Affairs Office.

L. It shall be understood that the claimant agrees with the Authority's determination upon acceptance of payment. The Authority shall automatically deny any claims that have been previously processed (paid or denied). If the claimant disagrees with the claim adjustment or payment, such claimant shall have ten (10) calendar days from the receipt of the check to state, in writing, the reasons for rejecting payment. The claimant shall include documentary evidence and return the check. This period is explained clearly and in detail when the payment is sent.

[illegible initials]

M. In the case of claims for property or vehicle damage, the Authority shall be responsible for restoring the property or unit's condition to its pre-accident or incident condition but shall not improve it.

IV.   INSTRUCTIONS

A    VEHICLE ACCIDENT CLAIMS

| Person Who Executes the Process | Process |
|---|---|
| Supervisor of the Employee(s) Involved | 1. Follow the instructions contained in the Procedure to Report and Investigate Accidents in effect at the time of the investigation. Inform the claimant of the steps to be followed to process the claim and to submit the required documents as established in subsection G of the General Provisions of this procedure.<br><br>2. Complete the Property Damage Claim Investigation Report form (AEE 760.0-22), **Attachment C**, with the information provided by the claimant.<br><br>3. Take photographs of the vehicle, vehicle registration, and driver's license of the operator or owner of the vehicle. Include information about any previous claims filed for the same incident in the form mentioned in paragraph 2.<br><br>4. Procure the claimant's signature for the form and sign it yourself. Photocopy the submitted documents, include the form, and furnish a copy to the claimant as proof of the steps taken by the claimant.<br><br>5. Forward an advance copy of the documents via fax or email on the day they are submitted and send the originals, with a transmittal sheet, to the Risk Management Office within seven (7) calendar days or earlier from the date of the accident. |
| Confidential Assistant or Office Assistant, Risk Management Office | 6. Receive the transmittal sheet with the documents sent by the supervisor of the employee(s) involved. Verify that all documents requested by the insurance carrier contracted by the Authority to process such cases have been included.<br><br>7. Assign a claim number in the office's STORMS and forward the case to the corresponding analyst. |
| ⬦Analyst, Risk Management Office | 8. Complete the form "Accident Claims" with the claimant's information, claim number, and the date and time of receipt. Forward an advance copy of the form via email to the insurance carrier contracted by the Authority.<br><br>9. Prepare a transmittal sheet with the form "Accident Claims" and related documents. Send a copy to the insurance carrier contracted by the Authority for assessment and the possible payment for the damages claimed.<br><br>10. Receive the list that the insurance carrier contracted by the Authority sends each month containing the claim payments it has made. File the list together with a copy of the documents of the claims filed for subsequent reports and control. |

*[illegible initials]*

B.    PROPERTY DAMAGE CLAIMS

| Person Who Executes the Process | Process |
|---|---|
| SM Customer Service Clerk, Commercial Office, Call Center Representative, Customer Service Center | 1.   Obtain the claimant's information and use STORMS to check whether the claimant has filed a previous claim for the same incident.<br><br>2.   Inform the claimant of the steps to be followed to submit a claim and the documents associated therewith (as provided in subsection G, of the General Provisions of this Procedure) at the Commercial Office or by mail to the Authority. Complete form "Property Damage Claim Investigation Report" (AEE 760.0-22) with the information provided by the claimant.<br><br>3.   Generate a Work Request in STORMS once the claimant has submitted all the requested documents and inform the claimant of the claims process. Certify the receipt of the original documents and their copies by writing the date of receipt and initialing the documents. Provide or send a copy of the submitted documents and the Property Damage Investigation Report to the claimant as proof.<br><br>4.   Identify the documents submitted by the claimant with the Work Request number and fax them to the appropriate Technical District Office. Deliver the original documents, the Property Damage Claim Investigation Report, and a copy of the Work Request to the manager of the Commercial Office or Customer Service Center or to the designated Customer Service supervisor so that such documents are forwarded to the Risk Management Office with a transmittal sheet. |
| Manager, Commercial Office or Customer Service Center | 5.   Immediately prepare and send the original documents submitted by the claimant to the Technical District Office with a transmittal sheet.<br><br>6.   In the case of claims for vehicle damage caused by the Authority, request to the supervisor of the employee(s) involved (according to the information provided by the claimant) a copy of the investigation conducted as established in the Procedure to Report and Investigate Accidents and Incidents in effect. Deliver the original documents and a copy of the report received to the Risk Management Office with a transmittal sheet not later than five (5) calendar days. |
| District Engineer, Technical District Office | 7.   Receive the documents sent form the Commercial Office or Customer Service Center. Check your STORMS inbox every day for pending claims that were sent to you. Assign the claims in STORMS to the power lines supervisor or engineering supervisor in charge of the district's claims within forty-eight (48) hours (two calendar days) and send the related documents. |

[illegible initials]

| Person Who Executes the Process | Process |
|---|---|
| Power Lines Supervisor or Engineering Supervisor | 8. Check your STORMS inbox every day for pending claims that were assigned to you. Verify whether the information in the Work Request and in the documents sent by the district engineer is consistent.<br><br>9. Coordinate and conduct the appropriate investigation. Follow the instructions in the Procedure to Report and Investigate Accidents and Incidents in effect when visiting the area or location of the claim. Request to the supervisor of the employee(s) involved a copy of the report of the investigation conducted.<br><br>10. Interview the claimant and/or witnesses and request all the evidence that is necessary to assess the claim. Verify that the property included in the claim is the correct property and take photographs and measurements if possible. Investigate and check the District Service Dispatch logbook for possible faults or situations that may have occurred in the area or on the date established in the claim. Conduct the investigation within a period not to exceed fifteen (15) business days from the receipt of the Work Request.<br><br>11. Write a detailed report on the findings on the REMARKS screen in STORMS. Write all the information obtained during the investigation in detail (date, time, etc.) and fill out the required fields in the system. Based on your knowledge and experience, indicate, in the report, whether the filed claimed is valid and explain why.<br><br>12. Print out the report (Work Sheet) prepared in STORMS. Prepare a file with a copy of the documents for your records. Attach the claimant's documents to the Work Sheet and send them to the Risk Management Office with a transmittal sheet. Close the part of the order that belongs to the Technical District Office in the system.<br>. |
| Administrator, Risk Management Office | 13. Receive the documents sent by the Technical District Office or the Customer Service Center with the transmittal sheet. Assign the case to the appropriate analyst within forty-eight (48) hours (two calendar days). Deliver the documents to the confidential assistant or office assistant so that he or she may prepare the case file and assign a case number. |
| Confidential Assistant or Office Assistant, Risk Management Office | 14. Prepare the claim file with the name of the claimant and assign a case number. Send the file along with all the documents sent by the Technical District Office, Commercial Office, or Customer Service Center to the assigned analyst. |
| Analyst, Risk Management Office | 15. Check any pending claims that have been assigned to you and the delivered files every day. |

*[illegible initials]*

| Person who Executes the Process | Process |
|---|---|
| Analyst, Risk Management Office | 16. Check that the Report you received is complete and analyze the investigation conducted by the Technical District Office. In the case of claims for vehicle damages by the Authority, request to the immediate supervisor responsible for the investigation to provide the Vehicle Accident Report (AEE 084-15333), **Attachment F**, if apply, and the Accident and Incident Investigation Report (AEE 200.0-4), **Attachment D**.<br><br>17. Interview the claimant and/or witnesses if necessary and request any evidence required to assess the claim, if necessary.<br><br>18. Check the applicable depreciation percentage (%) if the claim is valid and following the recommendations of the Technical District Office. Follow useful life depreciation and residual value guidelines or use any other damage assessment methods approved by the Risk Management Office to determine the payment amount to be recommended to the Claims Committee.<br><br>19. In the case of valid claims, fill out the Adjustment Sheet and include it in the case file.<br><br>20. Submit the file for consideration by the Claims Committee. The consideration period should not exceed thirty (30) calendar days from the date it was assigned.<br><br>21. Send a written communication to the claimant to inform such claimant of the results of the report, the denial of the claim or the approved amount. In every case, the communication shall inform the claimant of the claimant's right to request reconsideration before the administrator of the Risk Management Office by submitting a written request for such purposes within ten (10) calendar days from receipt of the written communication. The Release of Liability, **Attachment H**, shall be included when the claim is approved and the claimant shall be informed that he or she must sign said release to receive the claim payment.<br><br>22. Prepare a Check Request, **Attachment I**, for the Risk Management Office administrator's signature upon receipt of the Release of Liability. Include a copy in the case file. In the case of vehicle claims, prepare a Check Request for claim payment to the order of the vehicle's owner according to the vehicle's registration.<br><br>23. Send the file with all the information to the administrator of the Risk Management Office for assessment and final determination. |

*[illegible initials]*

| Person Who Executes the Process | Process |
|---|---|
| Administrator, Risk Management Office | 24. Assess the claim file. Approve the Check Request if you agree with the adjustment recommended by the Claims Committee and the supervisor of the Risk Management Office.<br><br>25. Send the Check Request to the Accounts Payable Section together with a copy of the proof of claim adjustment.<br><br>26. Evaluate and sign the letter informing the claimant that the claim has been denied. |
| General Supervisor, Accounts Payable Section | 27. Process the Check Request. Identify the check with the claim number and the name that appears on the request and forward it to the Risk Management Office. |
| Confidential Assistant or Office Assistant, Risk Management Office | 28. Receive the check sent by the Accounts Payable Section, make a photocopy of the check for the file, and include the date of the receipt, the check amount, the check number, and the date it was sent to the claimant in the file.<br><br>29. Send the check to the mailing address provided by the claimant with a return receipt requested.<br><br>30. Notify the claimant that the check must be returned with a letter of explanation if the claimant disagrees with the claim payment or the result of the claim.<br><br>31. Upon receipt, send the requests for reconsideration to the analysts of the Risk Management Office for assessment. |
| Analyst, Risk Management Office | 32. Assess the request for reconsideration upon receipt.<br><br>33. Notify the claimant, in writing, that their request for reconsideration was denied and the determination is final and binding.<br><br>34. Reassess the adjustment if the claimant submits additional documentation that had not been previously included.<br><br>35. Send the check to the Accounts Payable Section for its cancellation if the claimant rejects the claim payment a second time. |

[illegible initials]

V.    AMENDMENTS AND INTERVENTIONS

A.    Any amendments to or revisions of this procedure shall be coordinated with the Corporate Studies and Procedures Department.

B.    The Internal Audit Office shall verify compliance with this procedure.

C.    This Procedure cancels and replaces the Procedure for the Assessment, Processing, and Payment of Third-party Claims approved on June 13, 2012.


RECOMMENDED                                    RECOMMENDED

[*illegible signature*]                        [*illegible signature*]

Carmen R. Flores Torres                        Ernesto Ramos Morales
Acting Customer Service Director               Acting Finance Director


RECOMMENDED                                    APPROVED

[*illegible signature*]                        [*illegible signature*]

Faustino González Quiles                       Javier A. Quintana Méndez
Transmission and Distribution                  Executive Director
Director


                                               Date February 15, 2016


RRR/ZME
02/15/16

AEE 760.0-23

REV. 02/16

ATTACHMENT A



### Puerto Rico Electric Power Authority
## CLAIMS ORIENTATION FORM

Instructions:

By law, all claimants have one year from the time the incident occurred to file a claim with the Authority. **If the claimant fails to file a claim within this period, the claimant shall lose the right to file a claim due to the limitation period.** The Authority has a period of 90 days, **from the receipt of all the documents necessary to assess the claim**, to respond to the claim. In the event of extraordinary circumstances, the 90-day period may be extended up to 120 days. It is important that the claimant submits the originals and copies of all the documents, as the case may be, listed below:

| Informed | Submitted | |
|---|---|---|
| | | A legible letter of explanation describing all that occurred in detail (date, time, name of the persons, etc.). It must include the Puerto Rico Police report number (if apply), a description of the property, and the damages claimed. |
| | | The purchase receipt, invoice, or original copy of the estimate prepared by a certified technician or expert that includes his or her license or professional association membership number, address, and telephone number. It shall detail the labor, the parts used, the cost of materials, the work performed, or equipment used to repair the claimed damages. If the equipment is unrepairable, the claimant must submit a total loss certification signed by the certified technician or expert that evaluated the equipment. |
| | | In the case of vehicle accidents, a copy of the Amicable Accident Report provided by the Authority Official who conducted the investigation, a copy of the Incident Report provided by the Puerto Rico Police, the name and badge number of the police officer who received the report, and photographs of the vehicle or property included in the claim. |
| | | Fill out the Certification form provided by the Authority. |
| | | If the claimant has an insurance policy, the claimant shall state the name of the insurance carrier, the type of policy and the policy number, as established in Act No. 18-2004, the Insurance Code of Puerto Rico Antifraud Act. (This information shall be filled out in the Property Damage Claim Investigation form once the claimant submits the requested documents.) |

I certify that I have been informed about the requirements I must meet in order to file a claim with the Electric Power Authority.

_____      _____      _____

Claimant Signature                         PREPA Employee Signature                   Date

Note: <u>All</u> the requested documents must be submitted to process your claim. Any missing documents shall delay the process but shall not toll the limitation period.

AEE 700.0-431
Rev. 02/16

PUERTO RICO ELECTRIC POWER AUTHORITY
Finance Office – Risk Management Office

ATTACHMENT B

**ACCIDENT CLAIM / MONTH** _____ **DATE:** __ / __ / __

| NAME OF CLAIMANT | STREET AND MAILING ADDRESS | TELEPHONE | DATE OF ACCIDENT | REPORT NO. | PREPA VEHICLE INFORMATION (CODE AND LICENSE PLATE NO.) | NAME OF VEHICLE OPERATOR | CLAIMANT VEHICLE | | Risk Management Office Claim No. | MUNICIPALITY | REPAIR ESTIMATE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | MAKE AND MODEL | YEAR AND LICENSE PLATE NO. | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Prepared by: _____     Date: _____     Signature: _____
                        (Print name and position)

Received by: _____     Date: _____     Signature: _____
                        (Print name and position)

AEE 760.0-22
Rev. 02/16



Puerto Rico Electric Power Authority

**ATTACHMENT C**

☐ Commercial District Office / _____Technical Office
☐ Customer Service Center

Work Request No.
_____

## PROPERTY DAMAGE CLAIM
## INVESTIGATION REPORT

Claim No.
_____

Page 1 of 2

| Name and Last Name of Claimant: |
|---|

Mailing Address:

Place where the damage occurred:

References:

| Home Phone No.: | Work or Cell phone No.: |
|---|---|

| Date of accident: <br><br> Date: ____/___/_____ Time: _____ _ am _pm <br><br> Have you filed a previous claim for this accident? <br><br> __ Yes ____ No Claim No. _____ | PREPA Account No. (If you are a customer): <br><br><br> Name of PREPA employee who processed the claim (print name): |
|---|---|

| Date of claim: __/ __/ __ | Indicate if PREPA intervened in the area: __ Yes ____No |
|---|---|

Brief description of incident:

Did the P.R. Police intervene: __Yes __No   Name of Police Officer: _____   Station: _____

Complaint Number: _____   Badge Number: _____   Did the P.R. Firefighters intervene: __Yes __No

Loss or damages claimed (Please list equipment, appliances, structure, animals, etc.):

Do you have an insurance policy? __Yes __No        If your answer is <u>Yes</u>, indicate the type of policy:

| Name of Insurance Carrier: | Policy Number: | Expiration Date: __ / __ / __ |
|---|---|---|

| I hereby certify that the information provided herein is correct: _____ | |
|---|---|
| Claimant signature | Date |

**For exclusive use by the Commercial District Office or Customer Service Center**

| Claimant included the following documents: <br><br> ☐ Repair bill, estimate, receipt, or certificate of total loss issued by an expert or licensed technician. <br><br> ☐ Completed Certification Form <br><br> ☐ Other | Name of employee who processed the claim: <br><br><br> Employee signature: _____ <br><br> Date claim was sent to the Technical Office: |
|---|---|

Property Damage Claim Investigation Report                                                                 Page 2 of 2

| For exclusive use by the Risk Management Office |
|---|

Date and time the documents associated with the claim were received:

Date: _____          Time: _____      __am __pm


Claim assigned to : (Analyst Name)                                                                 Date:

Adjustment Form: _____Included _____Not included          Claim approval date: _____

Date of claim denial:                         _____

Reason for claim denial:          _____

_____

_____

Claim amount approved:

Evaluated by Adjustment Committee:          __Yes          __ No          Date of check request:          ____/____/____

Did claimant sign the Release of Liability:          ___Yes ___          No

Due date to submit the Release of Liability signed by the claimant:  ____/____/____

Comments:




Name and signature of Analyst who processed the claim:



Approved by: (Administrator's signature, Risk Management Office)


Date: _____


Check Number: (Treasury)  _____          Date of receipt:  _____


Date payment was sent to claimant:


AEE 760.0-22

| CN084-11068<br>AEE 200.0-4<br>Rev. 2/16 | Puerto Rico Electric Power Authority<br><br>WORK SAFETY DIVISION<br><br>ACCIDENT AND INCIDENT INVESTIGATION REPORT | Original<br>Distribution: Head of Division or<br>　　　　Region Administrator<br>1st Copy: Work Safety Division<br>2nd Copy: Supervisor of Person Involved<br>　　　　in the Accident |
|---|---|---|
| | | Case No.<br>(Internally assigned) |

### GENERAL INFORMATION

| Name of the Person Involved in the Accident: | | Employee Number: |
|---|---|---|
| Date of Birth: | Occupation: | Time in the Occupation: |

Classification of the Accident (as appropriate):  ☐ Injury   ☐ Illness   ☐ Property Damage   ☐ Incident

| Date of Accident / Incident: ___/___/___ <br> MM  DD  YEAR | Time: _____ ☐AM  ☐PM | Region: |
|---|---|---|

Exact location of the Accident/Incident:


### SUPERVISOR INFORMATION

| Name: | Employee Number: |
|---|---|
| Title: | Time in the Authority |

### WITNESSES

| Name: | Identification Number: | PREPA Employee | |
|---|---|---|---|
| | | YES | NO |
| | | | |
| | | | |
| | | | |
| | | | |

| | | |
|---|---|---|
| Was the person involved in the accident in other duties? | ☐Yes | ☐No |
| Did the accident/incident occur on the premises of the Authority? | ☐Yes | ☐No |
| Was an official vehicle involved? | ☐Yes | ☐No |

Description of the Injury or Damages:


Clear and Precise Description of How the Accident/ Incident Occurred:


### PREVENTION

| Measure Taken | Mark with an X | | Date of Action |
|---|---|---|---|
| | Temporary | Permanent | |
| | | | |
| | | | |
| | | | |

### ACCIDENT/INCIDENT ANALYSIS
Potential Loss Evaluation if not Controlled (Mark with an X)

| | Severe/High | Moderate | Minor/Low |
|---|---|---|---|
| Probable/Potential Severity | ☐ | ☐ | ☐ |
| Probability of Occurrence | ☐ | ☐ | ☐ |
| Level of Exposure | ☐ | ☐ | ☐ |

| TYPE OF ACCIDENT/INCIDENT (Contact or Near Contact) | | | |
|---|---|---|---|
| ☐ Struck against<br>☐ Struck-by<br>☐ Fall on the same level<br>☐ Fall from height<br>☐ Contact with<br>☐ Vehicle | ☐ Explosion<br>☐ Property damage<br>☐ Caught in<br>☐ Caught by<br>☐ Caught between<br>☐ Overexertion | ☐ Burn<br>☐ Arc flash<br><br><u>Occupational Disease</u><br>☐ Skin<br>☐ Respiratory - Dust | ☐ Respiratory -Toxic<br>☐ Poisoning<br>☐ Noise<br>☐ Repetitive Strain Injury<br>☐ Allergic Reaction |

| IMMEDIATE CAUSES | |
|---|---|
| ☐ Operating equipment without authorization<br>☐ Lack of a warning sign<br>☐ Failure to secure<br>☐ Operating at an inappropriate speed<br>☐ Removal of security devices<br>☐ Use of defective equipment<br>☐ Inappropriate use of personal protective equipment<br>☐ Failure to use safety equipment<br>☐ Improper carrying<br>☐ Improper assignment for the employee<br>☐ Improper lifting<br>☐ Improper position for the task<br>☐ Operational equipment maintenance<br>☐ Practical joke | ☐ Improper use of equipment, tool, or material<br>☐ Defective tool, equipment, or material<br>☐ Restrictive action or congestion<br>☐ Inadequate warning system or signage<br>☐ Risk of explosion or fire<br>☐ Disarray: Improper Handling<br>☐ Exposure to noise<br>☐ Exposure to high temperatures<br>☐ Exposure to low temperatures<br>☐ Excessive or deficient lighting<br>☐ Inadequate ventilation<br>☐ Under the influence of alcohol and/or drugs<br>☐ Inadequate protection and barriers<br>☐ Inadequate protective equipment |

| AGENT THAT CAUSED THE ACCIDENT/INCIDENT | | | |
|---|---|---|---|
| ☐ Electric equipment<br>☐ Poles<br>☐ Work surface<br>☐ Chemical product | ☐ Furniture<br>☐ Manual Tool<br>☐ Vehicles<br>☐ Metal part | ☐ Flammable product<br>☐ Conductor cable<br>☐ Stairs<br>☐ Machine | ☐ Animal<br>☐ Pressure vessel<br>☐ Loose particles |

| TYPE OF INJURY/ILLNESS | | | |
|---|---|---|---|
| ☐ Multiple injuries<br>☐ Effect of radiation<br>☐ Shock<br>☐ Fractures<br>☐ Puncture<br>☐ Pain | ☐ Infection/Inflammation<br>☐ Lacerations<br>☐ Abrasion/Scrape<br>☐ Amputation<br>☐ Wound<br>☐ Eye injury | ☐ Death<br>☐ Emotional<br>☐ Confusion/Bruise<br>☐ Sprain/Dislocation<br>☐ Asphyxia/Strangulation<br>☐ Sting/Bite/Scratch | ☐ Occupational Illness<br>☐ Internal injury<br>☐ Tear /Strain |

| PART OF BODY AFFECTED | | | | | |
|---|---|---|---|---|---|
| ☐ Head<br>☐ Fingers<br>☐ Toes<br>☐ Digestive system | ☐ Eyes<br>☐ Chest<br>☐ Feet<br>☐ Hair | ☐ Face<br>☐ Back<br>☐ Nerves<br>☐ Mouth | ☐ Neck<br>☐ Ears<br>☐ Ankle<br>☐ Nose | ☐ Arm<br>☐ Legs<br>☐ Skin<br>☐ Teeth | ☐ Hand<br>☐ Knees<br>☐ Groin<br>☐ Respiratory system |

| DIRECT COSTS | |
|---|---|
| Hourly Wage<br>A.   Person involved in the accident    _____<br>B.   Average of employees present       _____<br><u>C.</u>   Average of supervisors present      _____<br><br>D.   Number of workers who lost work hours<br>      due to the accident                           _____ | Time<br>E.   Average lost due to the accident             _____<br>F.   Additional necessary due to accident      _____<br>G.   Committed by supervisors in this accident  _____ |

H.   Cost of material and equipment damaged in the accident:          ☐ Estimate      ☐ Actual

Total Cost:-          _____
Computed using the amounts indicated in the previous sections
(A-G)(B X D X E) + (B X E) +(C X G) + (B X F X D) = Total Cost

| INFORMATION OF THE PERSON WHO PREPARED THIS REPORT | | |
|---|---|---|
| Printed Name _____<br><br>Title _____<br><br>Signature _____ | Date | Internal Telephone No.<br><br>External Telephone No. |

| AEE 760.0-20A<br>Rev. 2/15 | | | | ATTACHMENT E |
|---|---|---|---|---|

**Amicable Accident Report**

SEE INSTRUCTIONS ON THE BACK – EACH PARTY SHALL KEEP A COPY OF THIS REPORT- COMPLETE USING A PEN AND BLOCK LETTERS

### ACCIDENT DATA

| Date: (Day - Month - Year) | Time: ☐AM ☐ PM | Place: | | Codification: (For Insurer Use) |
|---|---|---|---|---|
| Road: | Kilometer: | Ward: | Municipality: | No. of Vehicles Involved: | |

### INFORMATION OF THE POLICE OFFICER WHO INVESTIGATED THE ACCIDENT OR RECEIVED THE REPORT

| Police Officer's Name: | Police Officer's Last Name: | Badge Number: |
|---|---|---|
| Station: | Accident Report Number: | The Police Officer was: ☐ Present ☐ Not present<br>at the scene of the accident |

### DIAGRAM OF THE ACCIDENT

**INSTRUCTIONS**

Depict the accident using the shapes shown below to identify vehicles 1 and 2. Use the arrows (→↑) to indicate the course of travel. Include traffic signs and Street names. Indicate with the arrows (→↑) the point of impact of each vehicle. (See example on the back)



**PREPA** — **VEHICLE 1 DATA**

| Owner's Name: | Owner's Last Name: | Age: | Sex: | License Number: | Issuing State if other than P.R.: |
|---|---|---|---|---|---|
| Social Security Number: | Address: | | City: | | Zip Code: |
| Home Telephone: | Work Telephone: | Name of Owner's Insurance Company: | | Policy Number: | |
| Driver's Name: | Driver's Last Name: | Age: | Sex: | License Number: | Issue State if other than P.R.: |
| Social Security Number: | Address: | | City: | | Zip Code: |
| Home Telephone: | Work Telephone: | Registration Tag Payment Date: | Registration Tag Expiration Date: | Financing Company or Lessor: | |
| Make: | Model: | Year: | Color: | License Plate Number: | Millage: |
| VIN Number: | | Registration Number: | | Claim No.<br>(For Insurer Use): | |

Describe the accident and the damage to Vehicle 1, and include comments:

**CLAIMANT** — **VEHICLE 2 DATA**

| Owner's Name: | Owner's Last Name: | Age: | Sex: | License Number: | Issuing State if other than P.R.: |
|---|---|---|---|---|---|
| Social Security Number: | Address: | | City: | | Zip Code: |
| Home Telephone: | Work Telephone: | Name of Owner's Insurance Company: | | Policy Number: | |
| Driver's Name: | Driver's Last Name: | Age: | Sex: | Driver's Name: | Driver's Last Name: |
| Social Security Number: | Address: | | City: | | Zip Code: |
| Home Telephone: | Work Telephone: | Registration Tag Payment Date: | Registration Tag Expiration Date: | Financing Company or Lessor: | |
| Make: | Model: | Year: | Color: | Make: | Model: |
| VIN Number: | | Registration Number: | | Claim No.<br>(For Insurer Use): | |

[CERTIFIED TRANSLATION P. 1-27 JSP]L

Describe the accident and the damage to Vehicle 2, and include comments:

The content of this Report does not constitute an admission of fault by the parties involved in the accident, but rather an accurate summary that shall enable the processing of claims that may be made as a result of this accident. Do not discuss the content of this Report except with an official, employee, or representative of your insurer. Any person who offers, provides, or furnishes false or fraudulent information on this Report, or prepares, makes, presents, or signs a false or fraudulent claim, or proof in support thereof, to receive a loss claim payment from the Compulsory Motor Vehicle Liability Insurance, shall be subject to the appropriate administrative penalties or fines, pursuant to Act No. 253 of December 27, 1995, as amended.  Complete this Report and sign it in the space provided therefor. The signatures of the parties are necessary to process any claim to be presented and guarantee that the information furnished is correct and true. This Report cannot be modified once it is signed by both parties.

_____          _____          _____          _____
Vehicle 1 Owner's Signature                    Date                      Vehicle 2 Owner's Signature                    Date

| WHAT SHOULD YOU DO IN THE EVENT OF A TRAFFIC ACCIDENT? |
|---|

1. The operators of the vehicles involved in the accident must complete this Amicable Accident Report. The information on this form is necessary to process your claim.

2. If the Report cannot be completed, you may obtain the following information from the other vehicle(s) involved:

   a. Driver's name.
   b. Driver's license number.
   c. Name of vehicle owner as it appears in the vehicle registration.
   d. Mailing and street address of the vehicle drivers and owners (the owner's address appears in the vehicle registration).
   e. License plate number.
   f. Make, model, and year of vehicles.

3. In accordance with the Vehicle and Traffic Act, you must report the accident to the Police within four (4) hours of the incident. If you report the incident after forty-eight (48) hours of the incident, in addition to the penalties provided in the Act, you may not lose your right to file a claim under the Compulsory Motor Vehicle Liability Insurance.

4. Obtain the following information from the police investigating the case/incident or who received the report:

   a. Name, badge number, and station.
   b. Police report number.

### EXAMPLE OF HOW TO COMPLETE THE INCIDENT DIAGRAM



[illegible text]

### NOTICE

"Any person who knowingly and with the intent to defraud furnishes false information in an insurance claim or, presents, aids, or causes to be presented a fraudulent claim for payment of a loss or other benefit or presents more than one claim for the same damage or loss, shall be guilty of a felony and upon conviction shall be punished by a fine of not less than five thousand dollars ($5,000), nor more than ten thousand dollars ($10,000) or by imprisonment for a fixed term of three (3) years, or both. If there are aggravating circumstances, the term of imprisonment established may be extended to a maximum of five (5) years; if there are mitigating circumstances, such term of imprisonment may be reduced to a minimum of two (2) years." Act No. 18 of January 8, 2004.

AEE 084-15333
REV. 1/01



COMMONWEALTH OF PUERTO RICO
ELECTRIC POWER AUTHORITY
VEHICLE ACCIDENT REPORT

**ATTACHMENT  F**

Page 1 of 2

| (1) USE THE SOLID LINE TO SHOW THE VEHICLE'S DIRECTION BEFORE THE ACCIDENT → ⇐⇐<br>AND THE DOTTED LINE FOR AFTER THE ACCIDENT --------------------------------------→ ⇐⇐ | (2) NUMBER EACH VEHICLE AND SHOW THE<br>DIRECTION ------------------------→ ⇐⇐ |
|---|---|

(3) SHOW MOTORCYCLE AS -------------→ OSO
(4) SHOW PEDESTRIAN AS ----------------→ O

[DIAGRAM]

DESCRIBE THE ACCIDENT IN DETAIL (USE AN ADDITIONAL SHEETS IF NECESSARY)

| SIGNATURE OF OPERATOR OR PERSON MAKING THE REPORT | TELEPHONE NO. | DATE | NAME (IN PRINT) AND SIGNATURE OF IMMEDIATE SUPERVISOR | TELEPHONE NO. |
|---|---|---|---|---|

| THE CASE WAS REPORTED AND INVESTIGATED BY POLICE STATION: | CASE WAS INFORMED TO ACCA (Spanish acronym) OF: |
|---|---|

| POLICE OFFICER'S NAME:<br><br>BADGE NUMBER:<br><br>POLICE REPORT NUMBER: | IN THE EVENT OF A VEHICLE ACCIDENT, REGARDLESS OF EXTENT, COMPLETE THIS REPORT AND SUBMIT IT IMMEDIATELY TO YOUR IMMEDIATE SUPERVISOR. "THIS REPORT MUST BE COMPLETED BY THE OPERATOR OR PERSON OPERATING THE VEHICLE AT THE TIME OF THE ACCIDENT."<br><br>COMPLETE ALL BOXES IN THIS REPORT.<br><br>DISTRIBUTION: THE SUPERVISOR SIGNING THIS REPORT MUST IMMEDIATELY DELIVER IT TO THE INSURANCE OFFICE; A COPY MUST BE FORWARDED TO THE GROUND TRANSPORTATION OFFICE AND ANOTHER COPY TO THE SECURITY OFFICIAL OF THE AREA. |
|---|---|

| DATE AND PLACE OF ACCIDENT | DATE OF ACCIDENT | | TIME OF THE ACCIDENT (ESTIMATE OR ACTUAL) | PLACE OF ACCIDENT |
|---|---|---|---|---|
| | DAY | MONTH (WRITE THE WORD) | AM ☐ PM ☐ | |

| 2 INFORMATION OF THE PREPA VEHICLE OPERATOR AND THE PASSENGERS | DRIVER'S NAME | | AGE | LICENSE NO.: |
|---|---|---|---|---|
| | | | | EXPIRATION DATE: |
| | HOME ADDRESS | TELEPHONE NO. | HOW LONG HAVE BEEN OPERATING VEHICLES | |
| | | | | YEARS |
| | LOCATION AT THE TIME OF THE ACCIDENT | WORK DIVISION-OFFICE-PROJECT OR CITY | | |
| | NAME AND ADDRESS OF PASSENGERS | | | |
| | NAME | HOME ADDRESS | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Vehicle Accident Report |
|---|
| **AEE 084-15333** | | | Page 2 of 2 |

| | | | | | |
|---|---|---|---|---|---|
| **3** **INFORMATION OF PREPA VEHICLE** | MAKE OF VEHICLE | | ENGINE NO. | LICENSE PLATE NO. | CODE NO. |
| | PURPOSE OF THE VEHICLE USE AT THE TIME OF THE ACCIDENT. | | | DIV., OFFICE, PROJECT, OR TOWN WHERE THE VEHICLE BELONGS | |
| | IN WHAT DIRECTION WAS THE AUTHORITY'S VEHICLE HEADED? | | | AT WHAT SPEED? | |
| | ON WHAT SIDE OF THE STREET? | | WAS IT HONKING? | WERE THE HEADLIGHTS ON? | |
| | | | ☐ YES          ☐ NO | ☐ YES          ☐ NO | |

| | | | |
|---|---|---|---|
| **4** **DAMAGE TO THIRD-PARTY PROPERTY** | OWNER OF THE THIRD-PARTY VEHICLE OR PROPERTY | ADDRESS | TELEPHONE NO. |
| | WHO WAS THE OTHER VEHICLE'S DRIVER? | ADDRESS | TELEPHONE NO. |
| | THIRD-PARTY VEHICLE DRIVER'S LICENSE NO. | VEHICLE YEAR AND MAKE | LICENSE PLATE NO. |
| | IN WHAT DIRECTION WAS THE THIRD-PARTY VEHICLE HEADED? | ON WHAT SIDE OF THE STREET? | AT WHAT SPEED? |
| | DESCRIPTION OF DAMAGE TO THIRD-PARTY PROPERTY. (PROVIDE ALL DETAILS) | | |
| | INSURANCE CARRIER NAME | | POLICY NO. |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | PASSENGER | |
| **5** **INJURED PERSONS** | NAME AND ADDRESS | DESCRIPTION OF INJURIES (BRIEF) | AGE | PREPA | OTHER | PEDESTRIAN |
| | | | | ☐ | ☐ | ☐ |
| | | | | ☐ | ☐ | ☐ |
| | | | | ☐ | ☐ | ☐ |
| | WHERE WERE THE INJURED TAKEN AFTER THE ACCIDENT? | | | | | |
| | WAS A PHYSICIAN CALLED? ☐ YES   ☐ NO | PHYSICIAN'S NAME | ADDRESS (HOSPITAL) | | | |

| | | | | |
|---|---|---|---|---|
| **6** **OTHER WITNESSES** | NAME | S.S. | HOME ADDRESS | TELEPHONE NO. |
| | | | | |
| | | | | |

| | |
|---|---|
| **7** **ACCIDENT DESCRIPTION** | CAUSE OF ACCIDENT |
| | DAMAGE TO THE AUTHORITY'S VEHICLE |

AEE 760.0-24
Rev. 02/16

**Puerto Rico Electric Power Authority**
**Director of Finance**
**Risk Administration Office**

**ATTACHMENT G**



# CERTIFICATION

I, _____, hereby certify that at the time of signing this document I have not
<span style="font-size:small">Claimant's print name</span>

filed any claims with the Compulsory Liability Insurance and certify that I will not file with

the Compulsory Liability Insurance, or my insurance carrier, or any person whatsoever,

any   claim   for   the   damage   compensated   or   to   be   compensated   by

_____. I understand that if I file a claim with and receive payment from
<span style="font-size:small">PREPA Insurance Carrier</span>

the Compulsory Liability Insurance, any insurance carrier, or the at-fault person, for

damage that has been already compensated by _____, I shall commit
<span style="font-size:small">PREPA Insurance Carrier</span>

fraud and may be subject to administrative or criminal penalties. Likewise, I will be

compelled   to   return   the   total   amount   of   the   payment   received   from

_____ on account of the damage caused to my vehicle.
<span style="font-size:small">PREPA Insurance Carrier</span>

I certify that I have fully read and understand all the foregoing. Signed in _____,

on this ___ day of _____, 2_____.


_____
Claimant's print name

_____
Claimant's signature



AEE 760.0-25
Rev. 02/16



ATTACHMENT H

# RELEASE OF LIABILITY LETTER

I, _____, in consideration of the payment of _____, which I shall receive in full satisfaction via check, hereby release and forever discharge the Puerto Rico Electric Power Authority from any and all actions, causes of action, claims, and demands for, or arising under or out of any damages, loss, personal injury or property damage which may have or hereafter occur to me, whether included in the claim, as a result of _____ caused by the Puerto Rico Electric Power Authority.

I further agree and understand that the payment of the above amount shall not be construed as an admission of liability, if any, for such acts by the Puerto Rico Electric Power Authority or its official representatives.

In witness whereof, I sign this Release of Liability in _____, Puerto Rico, on this _____ day of _____, 2_____.

_____
Claimant (print name and signature)

_____
Social Security and Driver's License Number.

_____
Witness (print name and signature)



CN 084-15424
PREPA 750.0-262
Rev.05114

Commonwealth of Puerto Rico
Puerto Rico Electric Power Authority

**Check Request**

Date: _____

_____
Department, Division, Section

The check shall be made to the order of:

_____

in the amount of: _____ ($ _____ ).

The check request is made for:
(Detail the service, equipment, or material received and include original proof to support the payment).

_____

Coordinated by: _____

The following invoice(s) are included:

Chargeable to account(s):

| Invoice Number | Amount | Accounting Estimate | Subaccount | Expense Class |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
| **TOTAL** |  |  |  |  |

Required date: _____
Send to or call:_____

| Requested and Recommended by | Approved by |
|---|---|
| Name and Title | Name and Title |
| Signature | Signature |
| Date | Date |

| Treasury Division | |
|---|---|
| Name of Verifier | Name and Title of Supervisor |
| Signature | Signature |
| Date | Date |

CERTIFIED TRANSLATION
I, Juan E. Segarra, USCCI #06-067/translator,
certify that the foregoing is a true and accurate
translation, to the best of my abilities, of the
document in Spanish that I have seen.

# IN THE UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                 Debtors.[1] | PROMESA<br>Title III<br><br>No. 17-BK-3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>                 Debtor. | PROMESA<br>Title III<br><br>No. 17-BK-4780-LTS |

## NOTICE OF APPEAL

**To the Honorable United States District Judge Laura Taylor Swain:**

Notice is hereby given that LUMA Energy, LLC and LUMA Energy Servco, LLC

(collectively, "LUMA"), by and through their counsel, DLA Piper LLP (US), hereby appeal to the

United States Court of Appeals for the First Circuit the *Memorandum Order Denying Urgent*

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801). Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.

*Motion of LUMA to Enforce the Automatic Stay* entered in the United States District Court for the

District of Puerto Rico on October 27, 2025 (ECF No. 30155 in Case No. 17-03283 and ECF No.

5882 in Case No. 17-04780), a copy of which is attached hereto as Exhibit A.

The other parties to this matter and their respective attorneys are as follows:

| Party | Attorney(s) |
|---|---|
| The Puerto Rico Department of Consumer Affairs | **SECRETARY OF DACO**<br>Box 41059<br>Minillas Station<br>San Juan, PR 00940-1059<br>Office Phone No.: (787) 722-7555<br>Valerie Rodríguez Erazo<br>USDC - PR No. 228910<br>E-mail: vrodriguez@daco.pr.gov<br><br>**H. LÓPEZ LAW, LLC**<br>Metro Office Park<br>Street 1, BDG 11, Suite 105A<br>Guaynabo, PR 00968<br>Office Phone No.: (787) 945-0067<br>Heriberto López-Guzmán<br>USDC-PR No. 224611<br>E-mail: hlopez@hlopezlaw.com |
| Instituto de Competitividad Y Sostenibilidad Económica de Puerto Rico | **LAW FIRM OF FERNANDO E. AGRAIT**<br>Fernando E. Agrait USDC 127212<br>701 Avenida Ponce de Leon<br>Edificio Centro De Seguros<br>Oficina 414<br>San Juan, Puerto Rico 00907<br>TEL. 787-725-3390/3391<br>FAX 787-724-0353<br>EMAIL: agraitfe@agraitlawpr.com |
| LUMA | Brett Ingerman (admitted *pro hac vice*)<br>Dale K. Cathell (admitted *pro hac vice*)<br>**DLA PIPER LLP (US)**<br>650 South Exeter Street, Suite 1100<br>Baltimore, Maryland 21202<br>T: (410) 580-4177<br>F: (410) 580-3001<br>brett.ingerman@us.dlapiper.com<br>dale.cathell@us.dlapiper.com<br><br>David Horniak (admitted *pro hac vice*) |

<table>
<tr><td></td><td>

**DLA PIPER LLP (US)**
500 8th Street, NW
Washington, DC 20004
T: (202) 799-4361
F: (202) 799-4362
david.horniak@us.dlapiper.com

Mariana Muñiz Lara (local counsel)
USDC-PR No. 231706
**DLA PIPER (PUERTO RICO) LLC**
500 Calle de la Tanca, Suite 401
San Juan, Puerto Rico 00901-1969
T: (787) 945.9106
F: (787) 945.9102
mariana.muniz@us.dlapiper.com

</td></tr>
</table>

Dated: October 31, 2025
San Juan, Puerto Rico

Respectfully submitted,

*/s/ Brett Ingerman*
Brett Ingerman (admitted *pro hac vice*)
Dale K. Cathell (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
650 S. Exeter Street, Ste. 1100
Baltimore, MD 21202-4576
T: (410) 580.4177
F: (410) 580.3001
brett.ingerman@us.dlapiper.com
dale.cathell@us.dlapiper.com

David Horniak (admitted *pro hac vice*)
**DLA PIPER LLP (US)**
500 8th Street, NW
Washington, DC 20004
T: (202) 799-4361
F: (202) 799-4362
david.horniak@us.dlapiper.com

*/s/ Mariana Muñiz Lara*
Mariana Muñiz Lara (local counsel)
USDC-PR No. 231706
**DLA PIPER (PUERTO RICO) LLC**
500 Calle de la Tanca, Suite 401
San Juan, Puerto Rico 00901-1969
T: (787) 945.9106
F: (787) 945.9102

3
**App.683**

mariana.muniz@us.dlapiper.com

*Attorneys for LUMA Energy, LLC, and*
*LUMA Energy Servco, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF

participants in this case.


Dated: October 31, 2025
San Juan, Puerto Rico

<div align="right"><i>/s/ Mariana Muñiz Lara</i></div>

**Exhibit A**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

--------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO
RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO
et al.,

     Debtors.[1]

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

--------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO
RICO,

     as representative of

PUERTO RICO ELECTRIC POWER AUTHORITY,

     Debtor.

PROMESA
Title III

No. 17 BK 4780-LTS

--------------------------------------------------------------x

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations). On October 30, 2024, the Title III case for the Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) was closed.

MEMORANDUM ORDER DENYING URGENT
MOTION OF LUMA TO ENFORCE THE AUTOMATIC STAY

Before the Court is the *Urgent Motion of LUMA to Enforce the Automatic Stay*

(Docket Entry No. 29962 in Case No. 17-3283 and Docket Entry No. 5819 in Case No. 17-4780)

(the "Motion"), filed by LUMA Energy, LLC and LUMA Energy Servco, LLC (collectively,

"LUMA").  The Motion concerns a proceeding, commenced by the Puerto Rico Department of

Consumer Affairs ("DACO") in the Commonwealth Court of First Instance against LUMA, the

Puerto Rico Electric Power Authority ("PREPA"), and the Puerto Rico Energy Bureau

("PREB"), that is now pending before the Supreme Court of Puerto Rico (the "DACO Action").

The Motion requests entry of an order determining that DACO's initiation of that proceeding

violated section 362(a)(3) of the Bankruptcy Code, 11 U.S.C. § 362(a)(3),[2] and directing DACO

to cease prosecution of the proceeding.

The Court has carefully considered the parties' submissions in connection with

the Motion.[3]  The Court has subject matter jurisdiction of this contested matter pursuant to

---

[2]    References herein to the provisions of Title 11 of the United States Code (the
"Bankruptcy Code") are to sections made applicable in these cases by section 301 of the
Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") which
is codified at 48 U.S.C. § 2101 et seq.  References herein to PROMESA section numbers
are to the uncodified version of the legislation, unless otherwise indicated.

[3]    In addition to the Motion, the Court has reviewed *DACO's Opposition to Urgent Motion
to Enforce the Automatic Stay* (Docket Entry No. 30016 in Case No. 17-3283) (the
"DACO Opposition"), the *Brief of Instituto de Competitividad y Sostenibilidad
Económica de Puerto Rico (ICSE)* (Docket Entry No. 5831 in Case No. 17-4780), filed
by Instituto de Competitividad y Sostenibilidad Económica de Puerto Rico ("ICSE"), the
*Omnibus Reply in Support of Urgent Motion of LUMA to Enforce the Automatic Stay*
(Docket Entry No. 30048 in Case No. 17-3283) (the "Reply"), *DACO'S Sur-Reply*
(Docket Entry No. 30095 in Case No. 17-3283), and *ICSE'S Surreply to LUMA's
Omnibus Reply* (Docket Entry No. 5858 in Case No. 17-4780).

section 306(a) of PROMESA, 48 U.S.C. § 2166(a).  For the reasons that follow, the Motion is

denied.

<div align="center">BACKGROUND</div>

PREPA is a public corporation created under the Puerto Rico Electric Power

Authority Act, Act No. 83-1941, to supply electricity to Puerto Rico.  (Mot. ¶ 8.)  On July 2,

2017, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board")

commenced a restructuring case under Title III of PROMESA on behalf of PREPA.  (Mot. ¶ 13.)

On June 5, 2018, the Puerto Rico Public-Private Partnerships Authority (the

"P3A") began the process of searching for a private operation and maintenance service provider

to operate PREPA's transmission and distribution ("T&D") system.  (Mot. ¶ 18.)  That process

culminated with the execution of the Puerto Rico Transmission and Distribution System

Operation and Maintenance Agreement, dated June 22, 2020 (the "LUMA OMA"),[4] among

LUMA, PREPA, and P3A.  (Mot. ¶ 19.)  Under the LUMA OMA, LUMA assumes the operation

of PREPA's T&D system, while PREPA retains ownership of the T&D assets.  (Mot. ¶ 19.)

Pursuant to the LUMA OMA, PREPA is obligated to indemnify LUMA for,

among other things, claims by T&D customers "in connection with the T&D System or

Operator's performance of the O&M Services" (LUMA OMA § 18.2(a)(vi)) and for claims by

LUMA OMA non-parties for "loss of profits or revenues or special, exemplary, punitive, indirect

or consequential damages."  (LUMA OMA § 18.2(a)(vii).)  The former provision, but not the

latter, is subject to a limitation for "the negligence (including gross negligence) or willful

misconduct of" LUMA.  (LUMA OMA § 18.2(b).)  On May 3, 2021, the Court granted a motion

---

[4]         A copy of the LUMA OMA is attached to the Motion as Exhibit B.

by the Oversight Board and the Puerto Rico Fiscal Agency and Financial Advisory Authority requesting recognition that certain expenses owed by PREPA to LUMA under the LUMA OMA—including certain indemnification obligations—are entitled to administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code.  See In re Fin. Oversight & Mgmt. Bd. for P.R., 631 B.R. 596, 601, 607 (D.P.R. 2021).

    The instant dispute primarily concerns section 4.1(g) of the LUMA OMA.  That provision, using the defined terms "ManagementCo" and "ServCo" to refer to LUMA Energy, LLC and LUMA Energy ServCo, LLC, respectively (see LUMA OMA at 1), reads as follows:

> Liability Waiver. In connection with the submission of the Initial Budgets to PREB, the Parties agree to apply for inclusion in the Rate Order that the associated tariff or terms of service include: (i) a waiver of Owner's, ManagementCo's and ServCo's liability to customers or any Person receiving Power and Electricity for any Losses arising in any way out of or in connection with the operation of the T&D System and the provision of Power and Electricity including any events of interrupted, irregular or defective electric service due to Force Majeure Events, other causes beyond Owner's, ManagementCo's or ServCo's control or ordinary negligence, gross negligence or willful misconduct of Owner, ManagementCo or ServCo, or their respective employees, agents or contractors; and (ii) a waiver in all cases of responsibility for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by any of Owner's, ManagementCo's or ServCo's ordinary negligence, gross negligence or willful misconduct (collectively the "Liability Waiver").

(LUMA OMA § 4.1(g).)  The parties to the LUMA OMA applied to PREB for a liability waiver as contemplated by section 4.1(g) and, on May 31, 2021, PREB issued a resolution and order containing "Modified Terms of Service" providing, with some exceptions, that LUMA would not

be liable to customers for losses arising out of the operation of the T&D system (the "Liability

Waiver").  (Mot. ¶ 22; DACO Opp. at 6-7.)

On July 22, 2025, DACO commenced the DACO Action against PREPA, LUMA,

and PREB in the Commonwealth Court of First Instance.  (Mot. ¶ 26.)  In its complaint (the

"Complaint"), an English translation of which is attached as Exhibit C to the Motion, DACO

challenges the Liability Waiver and section 4.1(g) of the OMA.  According to the Complaint,

LUMA has acknowledged denying "all 1,828 claims it has received from consumers for damage

to electrical appliances due to failures in the electrical system, invoking the immunity requested

under section 4.1 (g) of the Agreement, which was endorsed practically in its entirety by [PREB]

via the resolution of May 31, 2021."  (Compl. ¶ 27.)  The Complaint argues that LUMA should

"be fully accountable to Puerto Rican consumers" (Compl. ¶ 48), and it argues that the Liability

Waiver represents a "usurpation of legislative power and an attack on the separation of powers,

. . . granting an entity, by administrative and contractual fiat, unprecedented immunity from

claims by third parties who did not participate in the negotiation and who did not have the

endorsement of the legislative assembly."  (Compl. ¶ 44.)  It requests a declaration that "Section

4.1(g) of the *Puerto Rico Transmission and Distribution System Operation and Maintenance

Agreement* signed between LUMA and the Electric Power Authority and the May 31, 2021, and

the Resolution of [PREB] endorsing almost all of the provisions of said Agreement [are] null and

unconstitutional" and recognition that consumers are permitted to file claims "for damages

caused by negligence and fluctuations in the electric power service before LUMA."  (Compl. at

15.)

On August 8, 2025, DACO requested that the Puerto Rico Supreme Court hear

and resolve the dispute through intrajurisdictional certification.  See 4 L.P.R.A. § 24s(f)

(permitting the Puerto Rico Supreme Court "[t]hrough a certification, . . . to consider and to resolve, any matter pending in the Court of First Instance, if there is a conflict between previous decisions of the Court of Appeals or if there are new questions of law or there is a question of imperative public importance that includes any substantial constitutional matter under the Constitution of Puerto Rico or the Constitution of the United States").  On August 22, 2025, the Puerto Rico Supreme Court granted DACO's request and set a schedule for the petitioner and the other parties to file briefs in the matter.

On September 18, 2025, LUMA filed the Motion.

<u>DISCUSSION</u>

The Motion argues that the LUMA OMA is property of PREPA, a Title III debtor, and the DACO Action violates section 362(a)(3) of the Bankruptcy Code by "seek[ing] to void one key provision in the T&D OMA, . . . recognizing that this provision is a material part of the T&D OMA and hoping that its removal will trigger a cascading series of events that ultimately will [achieve] the Government's desired end result – termination of the [LUMA] OMA." (Motion ¶ 3.)  DACO and ICSE raise several arguments in opposition to the Motion.  The Court will begin by addressing DACO's and ICSE's contention that section 362(b)(4) of the Bankruptcy Code excepts the DACO Action from the application, if any, of section 362(a)(3).

Upon the commencement of a restructuring case pursuant to Title III of PROMESA, an automatic stay goes into effect.  <u>Assured Guar. Corp. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)</u>, 919 F.3d 121, 129 (1st Cir. 2019) (citing 11 U.S.C. §§ 362, 901(a)).  The automatic stay "is one of the fundamental protections" afforded to debtors by the Bankruptcy Code.  <u>Id.</u> (quoting <u>Jamo v. Katahdin Fed. Credit Union</u>

(In re Jamo), 283 F.3d 392, 398 (1st Cir. 2002)).  It bars a broad range of actions by creditors so
as to "effectively stop all creditor collection efforts, stop all harassment of a debtor seeking
relief, and to maintain the status quo between the debtor and [its] creditors, thereby affording the
parties and the [c]ourt an opportunity to appropriately resolve competing economic interests in
an orderly and effective way.'"  Id. (quoting In re Witkowski, 523 B.R. 291, 296 (1st Cir. B.A.P.
2014)).  The provision of the automatic stay that LUMA contends applies here is section
362(a)(3) of the Bankruptcy Code, which prohibits "any act to obtain possession of property of
the [debtor] or of property from the [property of the debtor] or to exercise control over property
of the [debtor]."[5]  11 U.S.C.A. § 362(a)(3) (West 2015).

      Although the scope of the automatic stay is broad, "the automatic stay can
interfere with competing policy goals, so Congress has adopted important limits and exceptions
to the stay, including the police power exception."  Milk Indus. Regul. Off. v. Ruiz (In re Ruiz),
122 F.4th 1, 11 (1st Cir. 2024).  The police power exception exempts from section 362(a)(3) (as
well as certain other automatic stay provisions) "the commencement or continuation of an action
or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police and
regulatory power, including the enforcement of a judgment other than a money judgment,
obtained in an action or proceeding by the governmental unit to enforce such governmental

---

[5]     Section 362(a)(3) refers to "property of the estate" and "property from the estate," but
section 301(c)(5) of PROMESA and case law interpreting PROMESA provide that
references to the "estate" or "property of the estate" refer to property of the debtor.  See
48 U.S.C. § 2161(c)(5) (providing that references in Title III of PROMESA to "property
of the estate" mean "property of the debtor"); cf. Union de Trabajadores de la Industria
Eléctrica y Riego v. Fin. Oversight & Mgmt. Bd. for P.R.(In re Fin. Oversight & Mgmt.
Bd. for P.R.), 7 F.4th 31, 37-38 (1st Cir. 2021) ("[Various] incorporated Bankruptcy
Code provisions use the term 'estate' notwithstanding the absence of an estate in Title III
proceedings. . . .  'Property of the estate' is 'otherwise defined' in Title III to mean
'property of the debtor,' and so we can reasonably understand 'estate' in the context of
§ 503(b)(1)(A) to mean 'property of the debtor.'").

unit's . . . police or regulatory power." 11 U.S.C.A. § 362(b)(4) (West 2015).  The exception

ensures that governmental entities remain able to exercise their authority to "enforce laws

'affecting health, welfare, morals and safety' and that debtors are not automatically protected in

bankruptcy court from such regulatory laws."  In re Ruiz, 122 F.4th at 13 (quoting Universal Life

Church, Inc. v. United States (In re Universal Life Church, Inc.), 128 F.3d 1294, 1297 (9th Cir.

1997)); see McMullen v. Sevigny (In re McMullen), 386 F.3d 320, 324-25 (1st Cir. 2004)

(explaining that section 362(b)(4) prevents debtors from "evading impending governmental

efforts to invoke the governmental police powers to enjoin or deter ongoing debtor conduct

which would seriously threaten the public safety and welfare (e.g., environmental and/or

consumer protection regulations)").

       Application of the police power exception occurs in two steps.  First, courts must

"apply the statutory text to the facts of [the] case."  In re Ruiz, 122 F.4th at 13.  Then, courts

consider the interrelated "public policy" and "pecuniary purpose" tests.  Id.  The Court turns first

to application of the text of section 362(b)(4).[6]

A.     The Text of Section 362(b)(4)

       Section 362(b)(4) creates an exception to, among other automatic stay provisions,

section 362(a)(3) of the Bankruptcy Code.  The section 362(b)(4) exception applies to actions by

governmental units to enforce their police and regulatory power, including the enforcement of

non-monetary judgments.  11 U.S.C. § 362(b)(4).  Here, no party denies that DACO is a

---

[6]    The briefing concerning the Motion includes substantial discussion of whether and to
what extent the DACO Action might affect PREPA's property interests and PREPA's
overall liabilities, and whether the DACO Action is an act to exercise control over
PREPA's property within the meaning of section 362(a)(3) of the Bankruptcy Code.
However, because the Court concludes that the DACO Action is carved out of the scope
of section 362(a)(3) by section 362(b)(4) of the Bankruptcy Code, it need not further
address the application of section 362(a)(3).

"governmental unit" as that term is defined in the Bankruptcy Code, see 11 U.S.C. § 101(27), and the DACO Action does not seek to obtain a money judgment, much less to enforce one.  Cf. H.R. Rep. No. 95-595, 343 (1977) (explaining that former section 362(b)(5), which was later merged into section 362(b)(4), "permit[s] the entry of a money judgment, but does not extend to permit enforcement of a money judgment[,] since . . . enforcement by a governmental unit of a money judgment would give it preferential treatment to the detriment of all other creditors").  Pursuant to its organic statute, DACO is empowered to, among other things, "represent the public consumer before any private entity or public organization in any matter affecting or which might affect the interests of the consumer," 3 L.P.R.A. § 341e(e), "appear for and in representation of the consumers before any court . . . of the Commonwealth of Puerto Rico . . . in any . . . proceeding or matter that affects or may affect the interests of the consumer in general, or groups of consumers or of any particular consumer," id. § 341e(f), "claim any legal remedies necessary to render effective the purposes of [the Department of Consumer Affairs Organic Act]," [7] id. § 341e(i), and "promote and watch over the enforcement of all laws, rules, regulations and orders which affect the interests of the consumer."  Id. § 341e(s).  The DACO Action thus exercises the police or regulatory powers provided to DACO under Commonwealth law by seeking to permit "all citizens . . . to file claims for damages caused by negligence and fluctuations in electrical service with LUMA."  (Mot. ¶ 26.)

        Accordingly, the DACO Action is within the scope of the text of section 362(b)(4).

---

[7]     "The Department of Consumer Affairs shall have as its primary purpose to defend and implement the rights of the consumer, to restrain the inflationary trends; as well as the establishment and inspection of a price control over the goods and services for use and consumption."  3 L.P.R.A. § 341b.

B.   The Public Policy and Pecuniary Purpose Tests

Under the public policy and pecuniary purpose tests, courts "evaluate whether the government's action is to effectuate a 'public policy' or to further its own 'pecuniary interest.'" Kupperstein v. Schall (In re Kupperstein), 994 F.3d 673, 677 (1st Cir. 2021) (quoting Parkview Adventist Med. Ctr. v. United States, 842 F.3d 757, 763 (1st Cir. 2016)). "If 'the governmental action is designed primarily to protect the public safety and welfare,' then it passes the 'public policy' test and is excepted from the automatic stay." Id. (quoting Parkview, 842 F.3d at 763). "In contrast, if the government is attempting to proceed against the debtor for a 'pecuniary purpose,' that is, 'to recover property from the estate,' the police power exception offers no shelter and the proceeding is stayed." Id. at 678 (quoting Parkview, 842 F.3d at 763). Thus, at its core, "[t]he question is whether [the governmental action] enforces a generally applicable regulatory law" or whether it promotes a public policy interest beyond the government's pecuniary rights. Parkview, 842 F.3d at 764.[8]

Here, as set forth above, DACO's remit is the protection of consumers. See generally 3 L.P.R.A. §§ 341b, 341e. It is seeking to vindicate that mandate through its challenge to the Liability Waiver, which bars consumers from seeking legal remedies for LUMA's negligence, because DACO alleges that the Liability Waiver gives LUMA "a blank check to engage in negligent acts to the detriment of consumers." (Compl. ¶¶ 43-44.) Cf. SEC v. Brennan, 230 F.3d 65, 72–73 (2d Cir. 2000) (explaining that the imposition of financial liabilities can further police and regulatory powers through deterrence). DACO alleges that the Liability

---

[8]   The First Circuit has not determined "whether a government enforcement action must satisfy one or both of these tests to qualify for the police power exception." In re Ruiz, 122 F.4th at 14 n.3. However, as the Court will explain, the DACO Action satisfies both, and further consideration of that legal issue is therefore not necessary at this juncture. Id.

Waiver violates individuals' statutory rights to seek compensation for LUMA's tortious conduct and infringes on constitutional separation of powers principles by effectively overriding those statutory rights without legislative action. (See Compl. ¶¶ 33-46.) The DACO Action, which carries out DACO's statutory mandate, is therefore designed primarily to protect the welfare of the public, and it satisfies the public policy test.

As to the pecuniary purpose test, LUMA has not alleged that DACO has a pecuniary interest in the Liability Waiver or, more generally, the LUMA OMA. DACO is not seeking any monetary recovery for itself or any other Commonwealth government entity against any Title III debtor (or LUMA), it is not seeking to obtain property from any Title III debtor (or LUMA), and it is not seeking to enforce a money judgment. See Parkview, 842 F.3d at 764 ("[I]t is clear that the termination of the Provider Agreement does not meet the pecuniary test. The government is not seeking recovery from Parkview, nor is it demanding any payment."). The DACO Action therefore satisfies the pecuniary purpose test.

The Court will next address the arguments that LUMA has raised in opposition to the application of section 362(b)(4).

LUMA's Reply contends that section 362(b)(4) does not apply to the DACO Action because the DACO Action "plainly does not relate to matters of public safety." (Reply ¶ 15.) LUMA cites no authority limiting the application of section 362(b)(4) to matters of public safety. To the contrary, "the police powers protected under § 362(b)(4) are not limited to matters directly involving public health and safety." Ruiz, 122 F.4th at 14; see Parkview, 842 F.3d at 763-64 ("The premise of this argument [that the government's termination of the debtor's contract was not based on findings of a threat to the health or safety of patients] is true, but largely irrelevant, as it is based on too circumscribed a view of the public interest."). Case law

recognizes that section 362(b)(4) "extend[s] more broadly to regulatory efforts to protect public welfare." Ruiz, 122 F.4th at 14 (emphasis in original); see Parkview, 842 F.3d at 764 ("Our precedents distinguish between 'actions enforcing generally applicable regulatory laws governing the behavior of debtors,' which fall within the exception, and actions by 'government agencies to enforce contractual rights against debtors,' which do not." (emphasis in original) (quoting In re Corporacion de Servicios Medicos Hospitalarios de Fajardo, 805 F.2d 440, 445 (1st Cir. 1986))); Cournoyer v. Town of Lincoln, 790 F.2d 971, 977 (1st Cir. 1986) ("[T]he automatic stay should not be used as a shield against the application and enforcement of valid state and local laws."). Courts applying section 362(b)(4), as well as section 362(b)(4)'s legislative history, refer specifically to the government's power to execute consumer protection laws. See e.g., Ruiz, 122 F.4th at 15 (quoting In re McMullen, 386 F.3d at 324-25; SEC v. Brennan, 230 F.3d at 71 (quoting H.R. Rep. No. 95-595, at 343 (1977)). More broadly, the First Circuit has recognized that an interest as remote from safety as a regulator's "interest in ensuring that the milk being produced can meet the demands of the consumer market" is within the scope of section 362(b)(4). Ruiz, 122 F.4th at 14.

Although LUMA contends that the result of the DACO Action would be "merely to open the door" to "private tort claims" against LUMA (Reply ¶ 15), the fact that a government enforcement action may help advance the pecuniary interests of third parties (here, electricity consumers with claims arising from LUMA's allegedly tortious conduct) does not defeat the applicability of section 362(b)(4). In re Ruiz, the First Circuit clarified that its statement in In re Spookyworld, Inc., that government enforcement actions may fall outside the scope of section 362(b)(4) if they advance "perhaps the pecuniary interest of others" was "obvious obiter dictum." In re Ruiz, 122 F.4th at 15. It further stated that section 362(b)(4) does not contain a

"rule to the effect that any time a government action serves any private pecuniary interest to any degree, the police power exception cannot apply." Id. Rather, case law applying section 362(b)(4) recognizes "that a pecuniary interest of the government itself cannot be the primary purpose of the government's action." Id. at 16. The court in In re Ruiz quoted decisions of two other circuits that have held similarly. See In re Universal Life Church, 128 F.3d at 1299 ("Only if the action is pursued solely to advance a pecuniary interest of the governmental unit will the automatic stay bar it." (quotation marks omitted)); Chao v. Hosp. Staffing Servs., Inc., 270 F.3d 374, 389 & n.9 (6th Cir. 2001) (holding that the focus of the pecuniary purpose inquiry is "whether the enforcement action would result in a pecuniary advantage to the government vis-a-vis other creditors of the bankruptcy estate" (emphasis in original)); see also Parkview, 842 F.3d at 764; In re Commonwealth Cos., Inc., 913 F.2d 518, 523 (8th Cir. 1990) ("[B]ecause the proposed FCA action . . . would not . . . create a pecuniary advantage for the government, we decline to place it outside the scope of § 362(b)(4)").[9] DACO has no pecuniary interest in the LUMA OMA, and it is not acting as a creditor with respect to PREPA.

LUMA also argues that the DACO Action does not fall within DACO's "statutory mission," and that section 362(b)(4) should not apply because DACO allegedly has an ulterior motive of seeking to undermine the LUMA OMA. (Reply ¶ 15 n.4; Reply ¶ 5.) However, as set forth in DACO's organic statute, its "duties and authorities" include representing "the interests of the consumer in general, or groups of consumers" in matters that affect consumers, 3 L.P.R.A.

---

[9]     In its Reply, LUMA quotes a radio interview with the Governor of Puerto Rico in which (based upon the excerpt submitted by LUMA) she appears to suggest that it is in the interests of the Commonwealth for the LUMA OMA to be replaced "as quickly as possible, and at the lowest cost." (Reply ¶ 2.) LUMA has not suggested, however, that the DACO Action seeks any pecuniary benefit for DACO (or the Commonwealth more generally) as a creditor of PREPA. The Governor's remarks concern issues of public policy.

§ 341e(f), ensuring the enforcement of laws that protect consumers' interests, id. § 341e(s), and asserting legal remedies to carry out the purposes of the Department of Consumer Affairs Organic Act. Id. § 341e(i); see also id. § 341e(e). LUMA has not proffered any basis for a determination that the DACO Action is not, on its face, squarely within those enumerated domains.[10]

More generally, LUMA's argument that DACO's exercise of its authority is "not a legitimate, protected exercise of regulatory power" (Reply ¶ 5) lacks merit as a rejoinder to the application of section 362(b)(4). LUMA assumes, with little explanation, that the DACO Action would be an illegitimate "political effort" (Reply ¶ 5) if DACO (or, more broadly, the Commonwealth) subjectively hopes or intends to "trigger a cascading series of events that ultimately will achieve the Government's desired end result – termination of the [LUMA] OMA." (Mot. ¶ 3.) However, governmental efforts to terminate an agreement with a debtor are not inherently outside of the police and regulatory power protected by section 362(b)(4). See, e.g., Parkview, 842 F.3d at 764 (applying section 362(b)(4) to termination of agreement between debtor and Centers for Medicare & Medicaid Services). It is far from clear that termination of the LUMA OMA would not be a legitimate governmental goal that falls within the Commonwealth government's police powers; certainly the question of how electricity is distributed to consumers in Puerto Rico is an important issue that has significant implications for public welfare. Due deference to the political and governmental prerogatives of the

_____

[10]     Although LUMA's Reply asserts that "PREB is the only governmental entity that regulates the T&D OMA" (Reply ¶ 5), LUMA has not developed any substantial argument or provided any citation to authority supporting an argument that PREB's responsibilities with respect to the LUMA OMA are exclusive of DACO's authority to protect consumers' rights vis-à-vis LUMA. In any event. as the Court will explain, this is not the proper forum in which to object to the DACO Action as ultra vires.

Commonwealth and its instrumentalities is especially fitting in the context of Title III proceedings of the Commonwealth and its instrumentalities. See In re Fin. Oversight & Mgmt. Bd. for P.R., 621 B.R. 289, 301 (D.P.R. 2020), aff'd, 7 F.4th 31 (1st Cir. 2021) ("PROMESA affords the Government Parties substantial discretion and autonomy in establishing government policy, and expressly precludes the Court from interfering with such efforts.")  To the extent that LUMA wants to argue that the DACO Action is ultra vires or otherwise illegitimate due to the government's alleged political and governmental goals, those defenses implicate issues of Puerto Rico law concerning Commonwealth governmental entities, and they are most appropriately raised in the Commonwealth's courts.

Even outside of Title III, courts generally do not engage in the "amorphous and speculative" task of determining the subjective intent of governmental action in applying section 362(b)(4).  In re Commonwealth Cos., Inc., 913 F.2d at 523 n.6 (quoting United States v. Halper, 490 U.S. 435, 453 (1989) (Kennedy, J., concurring)).  In Board of Governors of the Federal Reserve System v. MCorp Financial, Inc., 502 U.S. 32 (1991), the Supreme Court rejected the argument that, in applying section 362(b)(4), "a court must first determine whether the proposed exercise of police or regulatory power is legitimate."  As the Supreme Court explained, that interpretation of section 362(b)(4) "would require bankruptcy courts to scrutinize the validity of every administrative or enforcement action brought against a bankrupt entity," which would be "problematic, both because it conflicts with the broad discretion Congress has expressly granted many administrative entities and because it is inconsistent with the limited authority Congress has vested in bankruptcy courts."  Id.  Similarly, in In re Spookyworld, Inc., 346 F.3d at 9-10, the First Circuit declined to recognize a "bad faith" exception to section 362(b)(4), observing that there was "much force" to the following quotation from a dissent in a decision issued by the

Second Circuit: [11]

> [A bad faith] exception would result in Bankruptcy Court mini-trials of purely state regulatory issues whenever, as might be expected to happen frequently, the debtor sought by claiming 'bad faith' to have those issues tried in a Bankruptcy Court, which would be sympathetic toward any resolution that would improve the estate, rather than before state tribunals. The proper remedy is to seek redress in the state courts which may be expected not to tolerate bad faith conduct . . . .

Spookyworld, Inc. v. Town of Berlin (In re Spookyworld, Inc.), 346 F.3d 1, 10 (1st Cir. 2003) (quoting Garrity v. Goldstein (In re Nat'l Hosp. & Institutional Builders Co.), 658 F.2d 39, 46 (2d Cir. 1981) (Mansfield, J., dissenting)).  As the court explained in In re Spookyworld, even in a "fairly appealing" hypothetical case in which "incontrovertible proof was available" that governmental action in a state court was "wholly baseless" and motivated by personal malice, such action "could easily be overturned by offering the same evidence to the state court."  346 F.3d at 10.  The Commonwealth courts are capable of adjudicating LUMA's defenses in the DACO Action including, to the extent pertinent, questions about whether DACO is acting within the scope of its legitimate authority or in bad faith, if those defenses are relevant under applicable law.  See In re Spookyworld, 346 F.3d at 9-10.

Finally, LUMA argues that resolution of the instant dispute should be guided by a previous decision in which the Court held that a lawsuit seeking to invalidate the LUMA OMA in its entirety violated section 362(a)(3) of the Bankruptcy Code.  (See Mot. ¶ 35 (citing Senate of P.R. v. Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.), Case No. 17 BK 3283-LTS,

---

[11]    The majority position in National Hospital "was arguably undermined, if not overruled, by Board of Governors."  In re Spookyworld, 346 F.3d at 9 & n.5; see also Javens v. City of Hazel Park (In re Javens), 107 F.3d 359, 366 n.6 (6th Cir. 1997) (recognizing that case law interpreting section 362(b)(4) to permit "challenges on grounds of bad faith . . . pre-dates and is effectively overruled by [Board of Governors]").

2022 WL 17413011 (D.P.R. Feb. 7, 2022)); Reply ¶ 8.)  The parties to that contested matter did not, however, raise section 362(b)(4) as an issue, nor did the Court address the application of that statutory provision in its decision.  Accordingly, that decision provides no guidance regarding the application of section 362(b)(4).

CONCLUSION

For the foregoing reasons, the Motion is denied.  This Memorandum Order resolves Docket Entry No. 29962 in Case No. 17-3283 and Docket Entry No. 5819 in Case No. 17-4780.

SO ORDERED.

Dated:  October 27, 2025

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

**GOVERNMENT OF PUERTO RICO**
**PUBLIC SERVICE REGULATORY BOARD**
**PUERTO RICO ENERGY BUREAU**

| | |
|---|---|
| **IN RE**: REVIEW OF LUMA'S TERMS OF SERVICE (LIABILITY WAIVER) | **CASE NO.:** NEPR-MI-2021-0007 |
| | **SUBJECT:** Final Determination on LUMA's Terms of Service Petition (Liability Waiver) |

## RESOLUTION AND ORDER

### I.     Introduction

#### (A)     The Puerto Rico Electric System Transformation

Puerto Rico suffers from an inherently deficient electric system, a condition that has been exacerbated after the impact of hurricanes Irma and María.  In particular, the planning, design, and operation of an isolated island-based electricity system imposes on the Puerto Rico Electric Power Authority ("PREPA"), and Puerto Rico as a whole, significant challenges regarding power system stability and reliability.  Act 120-2018[1] establishes the legal framework for the transformation of the electric power system in Puerto Rico.[2] It empowers PREPA to sell its assets related to electric power generation and transfer or delegate any of its operations, functions, or services.[3]

Any agreement arising from Act 120-2018 shall be entered into under the legal and administrative framework established in Act 29-2009[4], which regulates Public-Private Partnerships.  Act 120-2018 establishes the process that applies to any transaction that establishes a Public-Private Partnership for any PREPA function, services, or facility.  In addition, Act 120-2018 empowers PREPA and the Puerto Rico Public-Private Partnerships Authority ("P3A") to carry out the processes through which such transactions shall be executed.[5]

After conducting a competitive process in accordance with Act 120-2018 and Act 29-2009, the P3A selected a third-party operator for the PREPA Transmission and Distribution System ("T&D System").  Under the proposed transaction, the operation of PREPA's T&D

---

[1] Known as the "Puerto Rico Electric Power System Transformation Act", as amended ("Act 120-2018").

[2] *See* generally, *Statements of Motives*, Act-120-2018, pp 3-5.

[3] *Id.*

[4] Known as "Public-Private Partnership Act", as amended ("Act 29-2009").

[5] *Id.*



System will be assumed by a private manager for a period of time, with ownership of the assets remaining at PREPA. Thereafter, on June 17, 2020, the Energy Bureau of the Puerto Rico Public Service Regulatory Board ("Energy Bureau") issued a Certificate of Energy Compliance for the then proposed T&D System operation and management agreement.[6]

    (B)   <u>The OMA</u>

On June 22, 2020, PREPA, P3A, LUMA Energy, LLC[7] as ManagementCo, and LUMA Energy ServCo, LLC[8] as ServCo (collectively, "LUMA") entered into an Operation and Maintenance Agreement ("OMA") under which LUMA will manage the T&D System. Pursuant to the OMA, in general, LUMA shall be responsible to provide the following services ("O&M Services"):

> *all electric transmission, distribution, load serving and related activities for the safe and reliable operation and maintenance of the T&D System, subject to the terms and conditions of the main body of the Agreement, including (1) expansions and replacements to meet the Contract Standards, including fleet, asset management, asset acquisition/procurement, IT infrastructure, as further provided in this document and preparation and implementation of required components of the Integrated Resource Plan, while prioritizing expansion and replacement projects that improve the safe, reliable and economic dispatch of the T&D System's connected generating units; (2) management and performance of construction of improvements thereto, including compliance with approved FEMA scope of work for projects that are eligible for Federal Funding and required maintenance; (3) delivery of electricity to customers, including the implementation of the activities set forth in Sections II.A and II.B of this Annex I (Scope of Services); (4) billing and collections implementation and optimization; (5) maintenance and improvement of public lighting system; (6) maintenance of fiber optic cable structure infrastructure, as set forth in lease agreement between Owner and PREPA Networks, LLC, a wholly-owned subsidiary of Owner incorporated in April 2004 to execute the Optical Telecommunications Infrastructure Lease Agreement for dedicated provision of local wholesale telecommunication services (for the avoidance of doubt, the Parties acknowledge and agree that, except as specified in this item (6), Operator shall have no other responsibility relating to PREPA Networks, LLC); (7) compliance with interconnection of renewables in accordance with Applicable Law; (8) management of the System Operation Principles to meet safe and*

---

[6] See *Resolution and Order (Certificate of Energy Compliance*) dated June 17, 2020, *In re Certificate of Energy Compliance*, Case No.: NEPR-AP-2020-0002 ("Certificate of Energy Compliance").

[7] *See* <u>In re: Request for Certification LUMA Energy, LLC</u>, Case No. NEPR-CT-2020-0008.

[8] *See* <u>In re: Request for Certification LUMA Energy ServCo</u>, LLC, Case No. NEPR-CT-2020-0007.

*reliable system operations in accordance with Prudent Utility Practices and the System Operation Principles; and (9) recordkeeping and reporting in accordance with Applicable Law or Prudent Utility Practices.[9]*

It is expected that the comprehensive O&M Services provided by LUMA will benefit PREPA by (i) transforming the T&D System into a modern, sustainable, reliable, efficient, cost-effective, and resilient electric system consistent with prudent utility practices to increase electric service quality; (ii) enabling delivery of low-cost electricity to ratepayers of Puerto Rico; (iii) increasing T&D System resiliency and reliability; (iv) deploying new technologies; and (iv) implementing industry best practices and operational excellence through managerial continuity and long-term planning.[10] Therefore, the execution of the OMA constitutes a significant milestone to further the transformation of the Puerto Rico electric power utility that is mandated under Act 120-2018. Likewise, the implementation of the OMA under carefully designed and executed regulatory procedures will assure the success of this significant milestone of the transformation of the electric power system, to benefit the people of Puerto Rico.

Under the OMA, LUMA must prepare and submit proposed Initial Budgets[11] during the Front-End Transition Period[12], for the Energy Bureau to "approve, deny or propose modifications to such proposed Initial Budgets in accordance with Applicable Law."[13] In connection with the submission of the Initial Budgets to the Energy Bureau, the parties to the OMA agreed to apply to include in the associated tariff or current terms of service, a waiver of PREPA and LUMA's liability with respect to customers or any person receiving power and electricity for any losses arising in any way out of or in connection with the operation of the T&D System and the provision of power and electricity.[14] The parties included in the OMA the proposed liability waiver language, which will be evaluated by the Energy Bureau for its approval, modification or denial. The Energy Bureau has no obligation to approve the proposed liability waiver.

The Energy Bureau deems that, as with the Initial Budgets (Section 4(e) of the OMA), it shall review, and approve, deny, or proposed modifications to the terms of service in

---

[9] *See* OMA, Annex I, at p. I-1. The detailed Scope of Services is included in Annex I of the OMA.

[10] *See Partnership Committee Report, Puerto Rico Public-Private Partnership for the Electric Power Transmission and Distribution System*, dated May 15, 2020 ("Report"), p. 27, included as Exhibit 1 to *Puerto Rico Public-Private Partnerships Authority's Request for Issuance of Certificate of Energy Compliance and Request for Confidential Treatment of Documents Submitted to PREB*, dated May 18, 2020, *In re Certificate of Energy Compliance*, Case No.: NEPR-AP-2020-0002.

[11] As defined in Section 1.1 of the OMA.

[12] As defined in Section 1.1 of the OMA.

[13] Section 4.2(e) of OMA.

[14] Section 4.1(g) of the OMA.

accordance the Applicable Law.  This interpretation regarding the evaluation of the Terms of Service is consistent with Section 20.17 of the OMA which states that:

> [n]otwithstanding anything to the contrary herein, no provision of this Agreement shall be interpreted, construed or deemed to limit, restrict, supersede, supplant or otherwise affect, in each case in any way, the rights, responsibilities or authority granted to PREB under Applicable Law with respect to the T&D System, Owner or Operator.

The Energy Bureau's interpretation is consistent with the Certificate of Energy Compliance which states:

> [a]s stated before, the scope of the Energy Bureau's evaluation of the Preliminary Contract is limited to the determination of compliance with the Puerto Rico's energy public policy and the current regulatory framework.  Although the Energy Bureau provided certain feedback to the P3 Authority during the competitive solicitation process, the Preliminary Contract, results from an independent negotiation conducted by the P3 Authority.  **The Energy Bureau is not a party to the Preliminary Contract.  Thus, no obligation and/or duty may be imposed to the Energy Bureau under the Preliminary Contract (as modified)**. (Emphasis added).

> Considering the foregoing, the Energy Bureau further clarifies that the issuance of the **Energy Compliance Certificate** regarding the **Preliminary Contract** (as modified):

> (1)    Shall not be construed, in any way whatsoever, as to impair, restrict, relinquish or abridge the scope of the Energy Bureau's: (1) administrative powers; (2) statutory and regulatory jurisdiction and/or authority; (3) statutory and regulatory oversight and enforcement powers; (4) rights; (5) duties; and (6) obligations, all in accordance with the applicable laws and regulations.

> (2)    Shall not be construed, in any way whatsoever, as a waiver and/or release of any applicable statutory or regulatory requirement nor any related regulatory action applicable to the T&D System, the Operator, PREPA (or the successor owner of the T&D System).

> (3)    **Anything in the Preliminary Contract (as modified) contrary to the provisions of Section [III](C)(1) and [III](C)(2) above, or otherwise contrary to the law, shall** be deemed unenforceable. (Emphasis in the original).

It must be clear that the Energy Bureau is not compelled to approve the terms of service as established in Section 4(g) of the OMA.  Instead, upon evaluation of a proposal by LUMA, the Energy Bureau shall review, and approve, deny, or propose modifications to any

proposed terms of service, consistent with the applicable legal and regulatory framework. As further discussed in this Resolution and Order, after a careful evaluation, the Energy Bureau **REJECTS** the proposed terms of service and instead, approves modified terms of service consistent with the public policy established for the transformation of the Puerto Rico electric system and with the public interest.[15]

## II.    Procedural Background

On February 24, 2021, LUMA filed a document titled *Petition for Approval of Initial Budgets and Related Terms of Service* ("Initial Budgets Petition").[16] As part of the Initial Budgets Petition, LUMA filed, for the Energy Bureau's review and approval, (i) a document titled *Initial Budgets: First 3 Year of Recovery & Transformation, February 23, 2021* and identified as Exhibit 1 ("Initial Budgets"), and (ii) a document titled *Request for Approval of Terms of Service and Memorandum of Law in Support Thereof*, identified as Exhibit 2 ("Petition").[17] In the Initial Budgets Petition, LUMA requested the Energy Bureau to approve the Initial Budgets and the Terms of Service.[18]

On April 5, 2021, the Energy Bureau issued a Resolution and Order ("April 5 Resolution"). In the April 5 Resolution the Energy Bureau determined that it was more appropriate to evaluate the Terms of Service in a separate proceeding.[19] On April 22, 2021, LUMA filed a document titled *Informative Motion and Request for Issuance of Procedural Calendar* ("April 22 Motion").[20] In the April 22 Motion LUMA requested the Energy Bureau to issue a procedural calendar to allow LUMA to present testimonial, expert and/or other evidence, in support of the proposed Terms of Service.[21]

On May 4, 2021, the Energy Bureau issued a Resolution and Order ("May 4 Resolution") in Case No. NEPR-MI-2021-0007, pursuant to which it opened the instant case to evaluate the Terms of Service. Accordingly, the Energy Bureau's Clerk incorporated as part of the administrative record of the instant case the Initial Budgets Petition, including the

---

[15] See Annex A to this Resolution and Order.

[16] *See* In Re: Review of LUMA's Initial Budgets, Case No. NEPR-MI-2021-0004.

[17] *Id.*

[18] *See* In Re: Review of LUMA's Initial Budgets, Case No. NEPR-MI-2021-0004, February 24 Petition, p. 18.

[19] *See* In Re: Review of LUMA's Initial Budgets, Case No. NEPR-MI-2021-0004, Resolution and Order dated April 5, 2021, p. 2, footnote #6.

[20] *See* In Re: Review of LUMA's Initial Budgets, Case No. NEPR-MI-2021-0004, April 22 Motion.

[21] *See* In Re: Review of LUMA's Initial Budgets, Case No. NEPR-MI-2021-0004, April 22 Motion, pp. 4-5.

**App.708**

Terms of Service Petition.[22]. The Energy Bureau's Clerk also included the April 22 Motion as part of the administrative record of the instant case.

On the May 4 Resolution, the Energy Bureau determined that the Petition was incomplete and ordered LUMA to provide additional analysis, discussion, and supplemental information necessary for the evaluation the proposed Terms of Service.[23] In the May 4 Resolution, the Energy Bureau also established a Procedural Calendar, as requested in the April 22 Motion ("Procedural Calendar"). Pursuant to the Procedural Calendar (i) LUMA was required to submit the information identified in <u>Attachment A</u> of the May 4 Resolution, by May 10, 2021; (ii) LUMA was required to file a summary of the Petition in the Spanish Language, also by May 10, 2021; (iii) the Energy Bureau would issue its determination on the completeness of the Proposed Liability Waiver Petition, on May 12, 2021; (iv) LUMA would file its presentation for the Virtual Technical Conference ("Technical Conference"), by May 14, 2021; (v) the Energy Bureau scheduled the Technical Conference for May 18, 2021, from 8:30 am to 12:00 pm; (vi) LUMA was required to file any revised and/or additional information required by the Energy Bureau, by May 22, 2021; (vii) the Energy Bureau would hold a Virtual Public Hearing on May 25, 2021, from 9:00 am to 5:30 pm[24]; and (viii) the due date for filing of comments by the general public would be May 26, 2021.[25,26]

In compliance with the May 4 Resolution, on May 7, 2021, LUMA filed a document titled *Motion Submitting Spanish-Language Translation of Terms of Service Petition in Compliance with Order.* As part of such document, LUMA filed, for the Energy Bureau's review and approval, a document titled *Solicitud de Aprobación de Términos de Servicio y Memorando de Derecho en Apoyo de la Misma*, identified as Exhibit 1 ("Translated Terms of

---

[22] The Energy Bureau clarified that Exhibit #1 of the February 24 Petition is not part of the record of the captioned case.

[23] *See* May 4 Resolution, <u>Attachment A</u>.

[24] Accordingly, on May 12, 2021, the Energy Bureau published a public notice titled *Notice Concerning Public Hearings*, *Review of LUMA's Terms of Service* ("Public Notice"). The Public Notice was published in *Primera Hora* newspaper and informed that the Energy Bureau would hold a Virtual Public Hearing regarding the Terms of Service on May 25, 2021, from 9:00 am to 5:30 pm ("Public Hearing"). *See Notice Concerning Public Hearings, Review of LUMA's Terms of Service*, Primera Hora, May 12, 2021. It also informed about the general public's opportunity to file comments on the proposed Terms of Service. The Public Notice further stated that the Public Hearing as well as the Technical Hearing would be streamed via the Energy Bureau's YouTube channel. Moreover, the Public Notice informed that the public may submit written comments and suggestions regarding the proposed Terms of Service on or before May 26, 2021. Finally, the Public Notice stated that LUMA's Terms of Service Petition process under Case No. NEPR-MI-2021-0007, was available for public scrutiny at (i) the Energy Bureau's Clerk Office, for which the address and hours of operation were included; and (ii) the Energy Bureau's website, for which the link was provided. The Energy Bureau also published a Public Notice on its website.

[25] May 4 Resolution, p. 3.

[26] *Id.,* p. 4.

Service Petition").[27] On that same day, LUMA filed a document titled *Urgent Request for Brief Extension of Time to File LUMA's Responses to Attachment A of May 4th Resolution and Order* ("May 7 Motion"). In the May 7 Motion, LUMA requested the Energy Bureau to extend the time for filing the information identified in <u>Attachment A</u> of the May 4 Resolution, until May 11, 2021, at 3:00 pm.[28]

Without an adjudication issued by the Energy Bureau regarding the May 7 Motion, on May 11, 2021, LUMA filed a document titled *Motion Submitting Responses to Attachment A of May 4th Resolution and Order* ("May 11 Motion"). As part of the May 11 Motion, LUMA filed, for the Energy Bureau's review and approval, its *Responses to Requests for Information*, identified as Exhibit 1.[29] Exhibit 1 is composed of several documents, identified as RFI-LUMA-MI-21-0007-210504-PREB-001 through RFI-LUMA-MI-21-0007-210504-PREB-007.[30] The document identified as RFI-LUMA-MI-21-0007-210504-PREB-001 has four (4) attachments, identified as (i) RFI-LUMA-MI-21-0007-210504-PREB-001-Att1, titled *Puerto Rico Electrical Power Authority Insurance Program Structure 2018-2019*; (ii) RFI-LUMA-MI-21-0007-210504-PREB-001-Att2, titled *Puerto Rico Electrical Power Authority Insurance Program Structure 2019-2020*; (iii) RFI-LUMA-MI-21-0007-210504-PREB-001-Att3, titled *Casos identificados como reclamaciones activas y cerradas registradas desde el 2009 al presente*; and (iv) RFI-LUMA-MI-21-0007-210504-PREB-001-Att4, which contains a list of PREPA's active claims.[31] LUMA attached to RFI-LUMA-MI-21-0007-210504-PREB-005 a document identified as RFI-LUMA-MI-21-0007-210504-PREB-005, titled *Puerto Rico Electric Power Authority Risk Management Office Claims & Contracts Amount Comparative Dashboard for Fiscal Periods 2016-2017, 2017-2018, 2018-2019, 2019-2020 & Jul-2020 to Apr 30, 2021*.[32]

In the May 11 Motion, LUMA informed the Energy Bureau that on May 14, 2021, it would submit (i) the pre-filed testimony of its representative, Mr. Mario Hurtado, Vice President, Regulatory LUMA, and (ii) the pre-filed testimony and expert report of an independent expert witness on Terms of Service, Mr. Branko Terzic, in lieu of a Power Point presentation.[33] In the May 11 Motion, LUMA requested the Energy Bureau to deem that it complied with providing the information identified in the <u>Attachment A</u> of the May 4 Resolution.[34]

---

[27]Translated Liability Waiver Petition.

[28] May 7 Motion, p. 5.

[29] May 11 Motion.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33]May 11 Motion, p. 2.

[34] *Id.*



On May 14, 2021, LUMA filed a document titled *Motion Submitting Pre-Filed Testimonies in Lieu of Presentation for the Virtual Technical Conference* ("May 14 Motion"). As part of the May 14 Motion, LUMA filed (i) a document titled *Pre-Filed Testimony Mario Hurtado Vice President Regulatory, LUMA Energy LLC*, identified as Exhibit 1 ("Hurtado's Testimony"); and (ii) a document titled *Branko Terzic Expert Report and Testimony On behalf of LUMA Energy LLC and LUMA Energy ServCo LLC*, identified as Exhibit 2 ("Terzic's Testimony"). The Terzic's Testimony further contains (i) a document titled *Curriculum Vitae of Branko Terzic*, identified as Exhibit 1 and (ii) a document titled *List of Previous Testimonies of Branko Terzic*, identified as Exhibit 2.

In sum, Hurtado's Testimony asserts that (i) the Proposed Liability Waiver protects ratepayers from higher rates, protects the public interest and is an essential part to remediate the T&D System; (ii) PREPA's Terms of Service are not consistent with Prudent Utility Practice[35] and would not permit LUMA to meet the Contract Standards[36]; (iii) LUMA will remain accountable to the Energy Bureau in accordance with Applicable Law, and is will comply with the provisions of the OMA; and (iv) LUMA's programs include internal controls, policies, procedures and other measures to protect customers from risks arising out of the T&D System.[37]

Terzic's Testimony asserts that limitations on liability (i) are the most common regulatory policy for electric utilities in the United States and Canada; (ii) are in the public interest benefitting the greatest number of PREPA customers since they help prevent increases in utility costs, ensure a predictable, fair and reasonable treatment of customers and protect the utility from catastrophic loses, among others; and (iii) are part of a package of regulatory policies and requirements designed to incent efficiency, improve operations and reduce costs to PREPA customers.[38]

In the May 14 Motion, LUMA requested the Energy Bureau to deem that it complied with providing its presentation regarding the Technical Conference, as required in the May 4 Resolution.[39]

On May 18, 2021, the Energy Bureau held the Technical Conference to discuss the Petition with LUMA's and PREPA's personnel and/or consultants.[40] During the Technical Conference, Mr. Mario Hurtado, Vice President of Regulatory for LUMA; Mr. Kalen Kostyk,

---

[35] As defined in Section 1.1 of the OMA.

[36] As defined in Section 1.1 of the OMA.

[37] *See* May 14 Motion, Hurtado's Testimony.

[38] *See* May 14 Motion, Terzic's Testimony.

[39] *See*, May 14 Motion, p. 2.

[40] *See*, Technical Conference, https://www.youtube.com/watch?v=gID43co8_ws (last visited May 26, 2021).

Manager of Accounting for LUMA; and Mr. John Stone, Director of Risk Management, LUMA, testified and answered the Energy Bureau's questions regarding the Petition on behalf of LUMA.[41] Mr. Branko Terzic, as an independent expert witness, also testified and answered the Energy Bureau's questions in relation to the Petition.[42] In sum, LUMA and Mr. Branko Terzic testified in support of approving the Proposed Liability Waiver.[43] Their testimonies favored the inclusion of a waiver of liability arising out of the ordinary negligence, gross negligence or willful misconduct of PREPA, LUMA, or their respective employees, agents or contractors, as provided in Section 4.1(g) of the OMA.

Also on May 18, 2021, attorney Katiushka Bolaños-Lugo filed a document titled *Notice of Appearance and Request for Notice*, in which she requested the Energy Bureau to take notice of her appearance on behalf of PREPA, and that all notice given or required to be given in the present case be served upon her.[44] On May 21, 2021, the Independent Consumer Protection Office ("OIPC", for its Spanish acronym) filed a document titled *Escrito de Intervención de la OIPC* ("Petition for Intervention"). In the Petition for Intervention, OIPC states that it has standing to participate in the present case as intervenor, pursuant to Act 57-2014.[45] Consequently the OIPC requests the Energy Bureau to permit its intervention.[46] The OIPC further argues that Section 4.1(g) of the OMA is contrary to Puerto Rico Law and to consumers' rights to claim damages arising out of LUMA's service.[47]

On May 22, 2021, LUMA submitted a document titled *Motion Submitting Additional Information and Responses to Requests Issued During Technical Conference*, in compliance with the May 4 Resolution, as well as with Energy Bureau's requests and bench orders issued during the Technical Conference ("May 22 Motion"). As part of the May 22 Motion, LUMA filed two (2) documents identified as (i) TC-RFI-LUMA-MI-21-0007-21-0518-PREB-001, Attachment 1, which contains a table titled *Sample of Current Utility Tariffs in Certain U.S. States, Canadian Provinces and Caribbean Islands*; and (ii) TC-RFI-LUMA-MI-21-0007-21-0518-PREB-001 Attachment 2, which contains British Columbia Hydro and Power Authority's Electric Tariff, effective April 1, 2017.[48]

---

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *See Notice of Appearance and Request for Notice*, p. 1.

[45] *See* Petition for Intervention, pp. 3-5.

[46] *Id.*

[47] *See* Petition for Intervention, p. 5.

[48] *See* May 22 Motion.



On the May 22 Motion, LUMA also included a discussion regarding the Petition, which included (i) examples of utility liability waivers in the United States, Canada and the Caribbean; (ii) legal and factual arguments in favor of the inclusion of gross negligence and willful misconduct in the Proposed Liability Waiver, including an argument that Puerto Rico Law does not distinguish between degrees or types of negligence; (iii) a discussion about LUMA's potential liability for gross negligence, noting, among other things, that the *Civil Code of Puerto Rico* of 2020[49] allows compensation for punitive damages[50]; and (iv) a discussion about the alleged need for the Proposed Liability Waiver, including the reasons stated in Hurtado's Testimony and Terzic's Testimony, as well as PREPA's and the T&D System's current state.[51] LUMA also clarified that column "Q" of the document identified as RFI-LUMA-MI-21-0007-210504-PREB-001-Att3, filed as part of the May 11 Motion, only contains PREPA's paid extrajudicial claims since 2009.[52] Thus, RFI-LUMA-MI-21-0007-210504-PREB-001-Att3 does not include all of the payments of judgments issued in civil third-party suits against PREPA, nor does it display the full scope of liabilities to which ratepayers will be exposed in the future.[53] In the May 22 Motion LUMA requests the Energy Bureau to deem that it timely complied with the portion of the May 4 Resolution that orders LUMA to file additional information, as well as with the bench orders issued in the Technical Conference.[54] It also reiterates LUMA's request to approve the Proposed Liability Waiver.[55]

On May 24, 2021, the OIPC filed a document titled *Comentarios de la Oficina Independiente de Protección al Consumidor en Relación con la Solicitud de Aprobación de Términos de Servicio ("Liability Waiver") Radicada por LUMA* ("OIPC's Written Comments"). The OIPC argues, among other things, that (i) liability waivers are not favored by Puerto Rico Law; (ii) the Proposed Liability Waiver is enforceable only with respect to LUMA, PREPA and the P3A, and that rights must be adequately waived; (iii) the service contract of PREPA with its customers is an adhesion contract, which, in Puerto Rico, is interpreted in a restrictive manner; (iv) PREPA does not have a waiver of liability; (v) the Proposed Liability Waiver contravenes Puerto Rico Tort Law, pursuant to which a person can file a claim arising out of the negligence of another; (vi) LUMA failed to state that the cited jurisdictions that have approved similar waivers of liability possess Tort Law similar to Puerto Rico; (vii) LUMA failed to explain how the Proposed Liability Waiver serves the public interest; (viii) the sums paid by PREPA as consequence of claims filed against it, differ from the billionaire economic impact that LUMA argues it can suffer; (ix) LUMA's performance metrics will be affected in

---

[49] Act 55-2020.

[50] Specifically, Article 1538.

[51] *See* May 22 Motion, pp. 2-18.

[52] *See* May 22 Motion, p. 18.

[53] *See* May 22 Motion, pp. 18-19.

[54] *Id.*

[55] *Id.*



an fictional positive way as a result of the lack of remedies consumer will have.[56] The OIPC opposes to the approval of the proposed Terms of Service, since (i) it is contrary to Puerto Rico Law and, thus, illegal; (ii) it affects consumers' rights; (iii) it is contrary to the public interest; and (iv) has no justification to the extent it includes an absolute waiver of liability.[57]

On May 25, 2021, the Energy Bureau held the Public Hearing, to receive oral comments from the general public regarding the proposed Terms of Service.[58] During the Public Hearing, attorney Hannia Rivera Díaz, Director of the OIPC; and Pedro Vázquez Meléndez, legal advisor of OIPC, testified and answered the Energy Bureau's questions regarding the Petition on behalf of the OIPC.[59]. The OIPC reiterated its opposition to the approval of the Terms of Service, as written based on the same arguments included the OIPC Written Comments.[60]  Nevertheless, OIPC's Director testified that they may be amenable to concur with an alternative language more prone to protect the interest of all the customers. [61]  Mr. Hipólito González, a PREPA customer, also testified during the Public Hearing, expressing his opposition to the approval of the proposed Terms of Service. [62]  He argued that PREPA's customers have limited opportunities to claim and recover damages from PREPA.[63]  He added that as the operator of the T&D System LUMA should be held accountable for damages caused to the customers.[64]

Also, on May 25, 2021, Instituto de Competitividad y Sostenibilidad Económica de Puerto Rico ("ICSE") filed a document titled *Motion Requesting Extension of Time to File Comments* ("May 25 Motion"). In the May 25 Motion, the ICSE requests further time for intervenors, as well as for PREPA and LUMA, and other stakeholders to comment on the proposed Terms of Service.[65] Specifically, it requests fourteen (14) days to file its position.[66]

---

[56] *See* OIPC's Written Comments, pp. 6-17.

[57] *See* OIPC's Written Comments, pp. 6, 17.

[58] *See* Public Hearing, https://www.youtube.com/watch?v=6pQk5kg0odM (last visit May 26, 2021).

[59] *Id.*

[60] *See* Public Hearing, at minutes 12:09 to 1:16.

[61] *See Id.*

[62] *See Id.*, at minutes 1:17 to 1:20.

[63] *See* Id.

[64] *See* Id.

[65] *See* May 25 Motion, p. 1.

[66] *See* May 25 Motion, p. 2.

**App.714**



As part of the written comments received on May 26, 2021, Unión de Trabajadores de la Industria Eléctrica y de Riego, Inc. ("UTIER") filed a document titled *Moción para Presentar Comentarios sobre Solicitud de Exención de Responsabilidad por Actuaciones de LUMA Energy y Otros* ("UTIER's Comments"). UTIER states, that (i) the OMA cannot contravene the provisions of the *Civil Code of Puerto Rico* of 1930[67] and that the Energy Bureau nor the OMA can legislate or amend the laws; (ii) ratepayers can file claims against any part that causes damages; (iii) no consumer is part of the OMA and, thus, it can only affect its parties and not third parties that have not waived their rights; (iv) if LUMA is not subject to Puerto Rico Tort Law, there will be no incentive or obligation to act in a prudent and reasonable way; (v) LUMA has not presented legal arguments that justify its Proposed Liability Waiver; (vi) absent a legal basis, the Energy Bureau must deny the Proposed Liability Waiver Petition; and (vii) there is no reasonable relation between the rates and the Proposed Liability Waiver, LUMA's alleged reduction would cost the welfare of the people of Puerto Rico, and LUMA's performance metrics could be influenced, since the people would not present claims.[68] UTIER requests the Energy Bureau to deny the Proposed Liability Waiver Petition.[69]

Between May 24 and May 27, 2021, the Energy Bureau received approximately eight hundred and eighty-three (883) written comments from the general public regarding the proposed Terms of Service.  The commenters stated that, as clients and consumers of PREPA, they reject the proposed Terms of Service. They demanded that their right to claim negligence and deception be enforced against LUMA. They also expressed that the OMA is not appropriate, and it must be canceled, because, among other things, it will prevent the achievement of the renewable energy goals using solar systems on rooftops, will result in higher utility bills and will perpetuate the use of fossil fuels. Essentially all the comments received from public are boiler plate type, including the same language.

On May 26, 2021, the Institute for Energy Economics and Financial Analysis ("IEEFA") and CAMBIO submitted a document titled *IEEFA and CAMBIO Comments on Proposed Liability Waiver* ("IEEFA Comments"). In the IEEFA Comments, both organizations requested the Energy Bureau to reject the Proposed Liability Waiver since, according to them, it would protect LUMA, PREPA, the P3A and their employees, agents or contractors from any liability for losses related to the operation of the T&D System, including acts of negligence, gross negligence or willful misconduct.[70] They argue that the Proposed Liability Waiver is broader than standard waivers in the private utility industry of the United States, and that, even though LUMA offers BC Hydro's tariff as an example of a waiver that includes gross negligence, such an example is distinguishable  as it pertains to a clause negotiated by a public corporation owned by the government of British Columbia, Canada, under Canadian

---

[67] Superseded by the *Civil Code of Puerto Rico* of 2020, Act 55-2021.

[68] *See* UTIER's Comments.

[69] *Id.*

[70] *See* IEEFA Comments, p. 1.

law, which is not applicable in Puerto Rico's situation.[71] Furthermore, it is stated that BC Hydro's tariff does not protect the utility, its representatives or agents from liability arising from willful misconduct.[72] Moreover, the IEEFA Comments noted that the concession arrangement between the Long Island Power Authority and PSEG provides that there shall be no limitation on PSEG's liability for any "Loss-and-Expense" resulting from its gross negligence or willful misconduct.[73] Consequently, the IEEFA Comments assert that Puerto Rico electrical customers should retain a right to hold LUMA accountable for injuries or damages arising from its gross negligence or willful misconduct, and that the condition of the T&D System does not relate to liability resulting from such conduct.[74]

On May 27, 2021, LUMA filed a document titled *Response in Opposition to ICSE's Motion Requesting an Extension of Time to File Comments* ("May 27 Motion"). In the May 27 Motion, LUMA states that the May 25 Motion is untimely, fails to provide a reasonable justification or just cause for failing to file its comments within the established deadline, and requests an unduly long extension of time.[75] LUMA further argues that, although it appreciates the importance of allowing stakeholders to comment on the proceedings before the Energy Bureau, the Procedural Calendar was set on May 4, 2021, and has been available on the Energy Bureau's website, as well as the Petition, which was filed on February 24, 2021.[76] Thus, LUMA asserts that an opportunity to participate was adequately afforded, but ICSE did not timely appear for the Public Hearing nor did it file its written comments.[77] Consequently, LUMA argues that the May 25 Motion (i) is inconsistent with the Procedural Calendar; (ii) would impinge on the Energy Bureau's time to issue a determination on the present case; and (iii) interferes with LUMA's commencement time since, pursuant with Section 4.5(p) of the OMA, approval of a liability waiver consistent with the language of Section 4.1(g) is a condition precedent to service commencement.[78] In view of the above, LUMA requests the Energy Bureau to deny the May 25 Motion.[79]

On May 28, 2021, the Energy Bureau issued a Resolution and Order denying OIPC's Petition for Intervention ("May 28 Resolution"). Although the OIPC was not recognized as an intervenor, the Energy Bureau authorized OIPC's ample participation. The OIPC may, (a)

---

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *See* IEEFA Comments, p. 2.

[75] *See* May 28 Resolution, p. 4.

[76] *Id.*

[77] *See* May 27 Motion, p. 3.

[78] *Id.*

[79] *See* May 27 Motion, p. 4.



submit written comments, suggestions or any document it may deem necessary or useful; (b) provide testimony during hearings; (c) ask questions to witnesses; and (d) access to all documents in the record of the case, provided that with regard to documents marked as confidential, it shall meet the requirements established by the Energy Bureau for such purposes. The Energy Bureau also ordered LUMA to prospectively notify the OIPC any document presented in this case and also ordered the Secretary of the Energy Bureau to include the OIPC in all notifications issued.[80]

On May 31, 2021, the Energy Bureau issued a Resolution and Order denying ICSE's petition for time extension to file additional comments.

## III.    LUMA's Terms of Service (Liability Waiver) Petition

A.    The Proposed Liability Waver

The liability waiver proposed by LUMA in the Petition provides, in full:

> *PREPA, its directors, officers, employees, agents and contractors (including "LUMA Energy, LLC and LUMA Energy Servco, LLC) (the "Released Parties"), (i) shall not be liable to customers, or any person (natural or legal) receiving power or electricity for any losses arising in any way out of or in connection with the operation of the transmission and distribution system and the provision of power and electricity including any events of interrupted, irregular or defective electric service due to force majeure events, other causes beyond the Released Parties' control, or ordinary negligence, gross negligence or willful misconduct of the Released Parties or their respective employees, agents or contractors; (ii) and in all cases shall not be responsible for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by any of the Released Parties' ordinary negligence, gross negligence or willful misconduct.[81]*

The first step in evaluating the Proposed Liability Waiver is to understand what it entails. The Energy Bureau must point out that the language of the Proposed Liability Waiver has been misconstrued by many, including LUMA's representatives. Moreover, certain documents[82] and explanations provided in support of the Petition may have (perhaps

---

[80] The May 28 Resolution was issued after the date of the Public Hearing and the due date to file public comments. However, the record shows that the OIPC actively participated in the Public Hearing and in this case in general. That is, the OIPC provided written comments, testimony during the Public Hearing and had full access to record of the case because no document has been designated as confidential.

[81] Herein referred to as the "Proposed Liability Waiver". *See* Petition, p. 18.

unintentionally) increased the confusion, suggesting that the Proposed Liability Waiver is broader than what its plain text reveals. In construing the Proposed Liability Waiver, the Energy Bureau shall pay attention, among others, to the following: (a) the released parties[83]; (b) the releasing parties[84]; (c) the events triggering release[85]; (d) the standard of care acceptable from the released parties[86]; and (e) the extent of the release granted.[87] Once the scope of the Proposed Liability Waiver is established, the Energy Bureau shall determine other important matters such as: (a) its authority to entertain the Petition, (b) the appropriate procedure to manage the Petition, (c) the applicable legal framework; (d) the evaluation of the merits of the Petition; and (e) the proper remedy.

The <u>parties to be released</u> by the Proposed Liability Waiver are PREPA, its officers, employees, agents, and contractors, including LUMA. The <u>releasing parties</u> are, (i) PREPA's customers, or (ii) any person receiving power or electricity from PREPA. A *person receiving power from PREPA* is a *user*, that is, a person who receives and uses power and electricity from PREPA at a certain location and whose consumption is recorded and invoiced in the name of another person.[88] The liability release occurs in the context of the supply and receipt of electricity or power from PREPA to a customer or a *user*. Therefore, if the foregoing relationship (PREPA-Customer (or user)) is not present, the liability waiver is inapplicable. For example, a claim for damages due to a traffic accident involving a PREPA's motor vehicle would not be barred by the liability waiver. Note that the claim would not be within the scope of the Proposed Liability Waiver because the event triggering the claim is not related to the supply of electricity or power to the claiming party. Likewise, most claims for electrocution, personal and/or property damages against PREPA would be outside the relationship PREPA-Customer (or user), therefore, those claims neither would be covered by the Proposed Liability Waiver.

---

[82] *See*, for example, the following documents accompanying the May 11 Motion: RFI-LUMA-MI-21-0007-210504-PREB-001-Att3, titled *Casos identificados como reclamaciones activas y cerradas registradas desde el 2009 al presente*; and RFI-LUMA-MI-21-0007-210504-PREB-001-Att4, which contains a list of PREPA's active claims.

[83] This entails to determine, <u>who will be released of its obligation to respond for a claim asserted by another person.</u>

[84] This entails to determine, <u>who will be strip out of right to claim for the acts of other persons.</u>

[85] This entails, to determine, <u>the specific events or circumstances</u> to which the liability release would apply.

[86] This entails, to determine, <u>the standard of care that will be permitted</u> from the person who will be released of its obligation to otherwise respond for its acts.

[87] This entails, to determine, the <u>extent of the release</u> provided.

[88] See Section II(XX) of *Reglamento de Términos y Condiciones Generales para el Suministro de Energía Eléctrica* ("Regulation 7982"). A *user*, for example, may be a tenant in an office building who pays his electricity consumption to the owner of the building as part of his monthly rent. The tenant receives electricity and power from PREPA, but it does not have an account register in his name. The owner of the building is the direct PREPA customer, with an account register in his name.

The events or circumstances triggering the applicability of the Proposed Liability Waiver can be summarized as follows:

Events arising in any way out of or in connection with the operation of the transmission and distribution system and the provision of power and electricity, including (but not limited to) the following:[89]

    (a)    events of interrupted, irregular, or defective electric service due to:

        (1) force majeure events or,

        (2) other causes beyond the Released Parties' control

    (b)    events caused due to ordinary negligence, gross negligence or willful misconduct of the Released Parties or their respective employees, agents, or contractors.

These events triggering the release evaluated in isolation, disconnected from the identity of the *releasing parties,* may suggest that the Proposed Liability Waiver is broader than it is. Take for example, the case of a PREPA's truck driver in route to maintain a T&D System substation which causes damages to a pedestrian for his negligence. There is no doubt that it is an "event[] arising in any way out of or in connection with the operation of the transmission and distribution system and the provision of power and electricity".[90] However, the pedestrian is not a customer or person receiving power or electricity from PREPA at the time of the event. The pedestrian is not a *releasing party* within the context of the Proposed Liability Waiver, thus, his potential claim against PREPA would not be barred by the Proposed Liability Waiver.

Concerning the standard of care acceptable from the Released Parties for their acts, it is clear here that LUMA seeks not be held liable for events caused due to ordinary negligence, gross negligence, or willful misconduct. If PREPA and/or LUMA, in the context of the supply and receipt of electricity or power to a customer or a *user* incurs in ordinary negligence, gross negligence or willful misconduct, LUMA proposes not to be held liable.

The second part of the Proposed Liability Waiver states that in all cases [of customers or any person receiving power or electricity], howsoever and whensoever arising, the Released Parties shall not be responsible for:

---

[89] Ordinarily, "including" indicates that the specified list that follows is illustrative, not exclusive. See Puerto Rico Maritime Shipping Auth v. I.C.C, 645 F.2d 1102, 1113 (D.C. Cir. 1981) and Certified Color Mfg. Ass'n v. Mathews, 543 F.2d 284, 296 (D.C. Cir. 1976).

[90] PREPA's employee is engaging in an activity related to the maintenance of the T&D System.

*any loss of profits or revenues, special, exemplary, punitive, indirect, incidental, or consequential damages, including [without limitation]*[91]:

*(1) loss of revenue, (2) loss of use of equipment, (3) cost of capital, (4) cost of temporary equipment, (5) overtime, (6) business interruption, (7) spoilage of goods, (8) claims of customers of electric customers or (9) other economic harms.*

The foregoing provision is not a limitation of liability, but a list of potential forms of special damages that the *releasing parties*, for whatever reason, are not entitled to recover from PREPA and/or LUMA. Therefore, if for whatever reason a customer, or any person receiving power or electricity is entitled to recover damages from PREPA and/or LUMA such damages shall not encompass the special damages (any loss of profits or revenues, special, exemplary, punitive, indirect, or consequential damage) expressly excluded. That leaves the claimant recovering only general (direct) damages. This provision must also be interpreted in the context of the supply and receipt of electricity or power from PREPA to a customer or a *user*. It provides that if PREPA and/or LUMA is found liable to the customer or the *user*, the type of damages listed shall not be recovered.

In their appearances before the Energy Bureau, LUMA's representatives seem to ascribe to the Proposed Liability Waiver a broader effect than what the Energy Bureau considers from its plain language and context, as discussed before.[92] The OIPC[93] and UTIER[94] also read the Proposed Liability Waiver as having a far-reaching effect, in detriment of the rights of PREPA's customers and even non costumers.[95]

We can summarize that the Energy Bureau has before its consideration a petition to modify PREPA's terms of service, in order to: (a) limit the scope of liability of PREPA (including, LUMA and other related parties)[96] to customers and persons receiving electricity and power from PREPA for certain events arising out of as a result of the operation and

---

[91] See note 89.

[92] Consider, in general, Hurtado's testimony and LUMA's counselor explanations during the Technical Hearing, the May 22 Motion (pp. 10-14), as well as the exhibits included with the May 11 Motion identified as: RFI-LUMA-MI-21-0007-210504-PREB-001-Att3, titled *Casos identificados como reclamaciones activas y cerradas registradas desde el 2009 al presente*; and RFI-LUMA-MI-21-0007-210504-PREB-001-Att4, which contains a list of PREPA's active claims. Note that a significant number of the claims (judicial and non-judicial) described in these attachments are well outside of even an inclusive reading of the Proposed Liability Waiver.

[93] *See, in general*, OIPC Written Comments, pp. 10, 14-16, and OIPC representatives' testimony during the Public Hearing.

[94] *See* UTIER Comments, p. 3.

[95] As discussed below, for the sake of clarity, and to protect the public interest, the Energy Bureau authorizes Modified Terms of Service which in part, clarifies and limit the broad applicability that LUMA and others seems to ascribe to the Proposed Liability Waiver.

[96] The Released Parties.

maintenance of the T&D System, and, (b) to limit the type of damages that customers and persons receiving electricity or power from PREPA can recover from LUMA and/or PREPA.[97]

### B. Scope of LUMA's Petition

The Energy Bureau approved PREPA's current tariff ("Permanent Tariff") pursuant to a tariff revision procedure under Case No. CEPR-AP-2015-0001 ("Permanent Tariff Revision Process").[98]  As part of the Permanent Tariff Revision Process, the Energy Bureau approved PREPA's Tariff Book.[99]  The Permanent Tariff approved by the Energy Bureau entered into effect on May 1, 2019.[100]

In the Petition, LUMA requests the Energy Bureau to approve and incorporate in PREPA's Tariff Book[101], in accordance with the 2017 Rate Order, certain terms of service applicable to PREPA and LUMA, pursuant to Section 4.1(g) of the OMA.[102] LUMA asserts that the request to include the Proposed Terms of Service in PREPA's Tariff Book does not entail a change in the basic rate approved in the 2017 Rate Order, because such approval will not have a direct impact on the financial operation of PREPA and does not immediately require a reduction or an increase of the base rates.[103]  Moreover, it asserts that its Initial Budgets[104] assume that the Energy Bureau approves the Proposed Liability Waiver.[105]

In the Petition, LUMA discusses its request regarding the Energy Bureau's approval of the Proposed Liability Waiver as applicable to all customer classes in PREPA's Tariff

---

[97] Notwithstanding our general interpretation of the Proposed Liability Waiver and, as further discussed below, in the evaluation and determination regarding the Petition, we are mindful of the interpretation given by others to the language of the Proposed Liability Waiver.

[98] Final Resolution and Order dated January 10, 2017, and Final Resolution dated March 8, 2017, in case captioned In Re: Puerto Rico Electric Power Authority Rate Review, Case No. CEPR-AP-2015-0001 (collectively, "2017 Rate Order").

[99] See Resolution and Order dated May 8,2019 and Motion in Compliance of Order dated May 22, 2019, both in in the case captioned In Re: Puerto Rico Electric Power Authority Rate Review, Case No. CEPR-AP-2015-0001 and Caso No.: NEPR-AP-2018-0003.

[100] Resolution and Order, In Re: Puerto Rico Electric Power Authority Rate Review, Case No. CEPR-AP-2015-0001 dated May 31, 2017.  Although the current tariff was approved pursuant the Resolution and Order dated May 31, 2017, it was not put into effect until May 1, 2019.

[101] See Case No. CEPR-AP-2015-0001 and Case No.: CEPR-AP-2018-0003 (PREPA's Book of Tariffs").

[102] See February 24 Motion, p. 17.

[103] Id.

[104] The Initial Budgets are being analyzed separately by the Energy Bureau. See In re: Review of LUMA's Initial Budgets, Case No. NEPR-MI-2021-0004.

[105] See, February 24 Motion pp. 15-16.

Book.[106] Specifically, LUMA requests the Energy Bureau to approve the Proposed Liability Waiver pursuant to Sections 4.1(g) and 4.5(p) of the OMA.[107] LUMA recognizes that its request to approve the Proposed Liability Waiver is within the Energy Bureau's exclusive jurisdiction and authority, and that the United States' utilities industry is familiar with this type of inclusions in terms of service, as well as their approval in utility tariffs, since they are consistent with Prudent Utility Practice[108], and advance important policies, including (i) protecting customers from increases in costs; (ii) a fair and reasonable treatment of all customers; (iii) protecting the utility from catastrophic losses and impacts to reliability; (iv) and mitigating the risks to the utility relating to the potential liability it may pose the obligation to provide services to all customers.[109]

In support of the Proposed Liability Waiver, LUMA cites case law from other jurisdictions regarding the approval and enforcement by state regulators of tariffs that include limitations on utilities' liability.[110] Moreover, LUMA argues that such case law[111] favors the inclusion of liability waivers that limit the utilities' ordinary negligence, as well as its gross negligence and willful misconduct.[112] It contends, that the certain public policies that prevents parties from contractually limiting their liability for gross negligence or willful misconduct are inapplicable to public utility tariffs, because extensive regulation of an electric service company's rates and practices takes such service out of the realm of contract law[113] and, particularly, because the rate-making process is a legislative function, delegated to public service commission's regulating electric service companies.[114]

LUMA further argues that, absent a limitation of an electric service company, the company would be forced to raise its rates.[115] Some of the cited cases suggest that such raise would come as a result from the claims of industrial or commercial customers, which are

---

[106] *See* Petition, p. 1.

[107] *See* Petition, p. 8.

[108] As defined in Section 1.1 of the OMA.

[109] *See* February 24 Motion, p. 18; Petition, p. 9.

[110] *See* Petition, p. 10.

[111] Not all cases cited by LUMA interpret limitations of liability pertaining electric service companies.

[112] *See* Petition, pp. 10-11; Maryland Casualty Co. v. NSTAR Elec. Co., 471 Mass. 416, 421 (2015); Alves v. Verizon, No. 08-cv-3196, 2010 WL 2989988, at 4 (D.N.J. July 27, 2010); Bird v. Chesapeake & Potomac Tel. Co., 185 A.2d 917, 918-919 (D.C. 1962).

[113] *See* Petition p. 11, citing Maryland Casualty Co. v. NSTAR Elec Co., *supra* at 422.

[114] *Id.*

[115] *See* cases cited in Petition, pp. 11-13.

generally the customers who would suffer substantial damages.[116] Consequently, and since public utilities are strictly regulated as to their rights and privileges like the inability to choose its customers, they should also be strictly regulated and limited with respect to their liability.[117] LUMA asserts that pursuant to Act 17-2019[118] PREPA or its successor is responsible for acting as provider of last resort ("POLR") for any of the generation, transmission, distribution, commercialization, and operating functions of Puerto Rico's electrical system, and must provide electric service to all customers impartially, in an open and non-discriminatory manner.[119] Thus, LUMA argues that, as the entity to whom the T&D System's operation has been delegated, it is subject to such provisions and will not be able to choose its customers in order to eliminate potential risks.[120] In that sense, it argues that the Proposed Liability Waiver supports impartial and non-discriminatory service as required by Act 17-2019.[121]

Another argument LUMA rises in favor of the Proposed Liability Waiver is that it protects PREPA and LUMA from catastrophic losses which can be caused, among other reasons, by atmospheric events, and which can place the utility in fiscal jeopardy and impact the rate structure.[122] LUMA argues that the probability of such catastrophic losses as a result of atmospheric events is higher in Puerto Rico than with respect to a typical utility in the United States, which creates a vulnerability to claims.[123]

LUMA argues that the Proposed Liability Waiver advances public interests consistent with Puerto Rico energy public policy goals under Section 1.5(1)(a) of Act 17-2019, guaranteeing that the cost of electric power service in Puerto Rico is affordable, just, reasonable, and non-discriminatory for all consumers in Puerto Rico.[124] LUMA states it also advances public policy under Act 57-2014, pursuant to which rates must be just and

---

[116] *See* Petition, p. 12.

[117] *Id.*, pp. 12-13.

[118] Known as the "Puerto Rico Energy Public Policy Act", specifically, Sections 1.3, 1.4(v) and 1.7.

[119] *See* Petition, p. 14.

[120] *Id.*

[121] *Id.*

[122] *See* Petition, p. 15.

[123] *Id.*

[124] *See* Petition, p. 16.



reasonable, and consistent with sound fiscal and operational practices to further a reliable and adequate service at the lowest reasonable cost.[125]

LUMA states that as a regulator, the Energy Bureau's decision on the matter has the force and effect of law.[126] It also asserts that Energy Bureau's approval will not alter its regulatory power over LUMA's operations.[127] For example, it asserts that LUMA will remain subject to the Energy Bureau's (i) actions to guarantee the capacity, reliability, safety, efficiency and rate reasonableness of the electric system; (ii) oversight of an energy service company's electric service's compliance with standards of quality, efficiency and reliability necessary to maintain a robust grid; and (iii) actions or orders to enforce Act 57-2014 and require compliance with its rules, regulations, orders and determinations, including issuing orders and seek and grant legal remedies, in accordance with Sections 6.3(c), (d), and (pp) of such statute.[128] LUMA further argues that it will remain subject to complaints regarding noncompliance with energy public policy and applicable law, under Sections 6.4(a)(3) and 6.4(c) of Act 57-2014, as well as penalties from the Energy Bureau under Section 6.37.[129] Furthermore, LUMA states it will be required by Section 1.15 of Act 17-2019 to meet specified requirements for the reconstruction of the T&D System.[130] LUMA expresses it will also be subject to the provisions of the OMA[131], such as Performance Metrics, System Operation Principles and a System Remediation Plan.[132]

In the May 22 Motion, LUMA reiterated its request regarding the approval of the Proposed Liability Waiver. In addition, LUMA further discusses how utility tariffs in certain jurisdictions of the United States, Canada and the Caribbean have included liability waivers regarding negligent acts or omissions, gross negligence, willful misconduct limited to direct damages, or no liability for damages including consequential damages in connection with defective services, outages or interruptions without distinction on degrees of negligence.[133] Specifically, LUMA included the pertinent text of twenty (20) utility tariffs that include limitations of liability. Citing the Terzic's Testimony, LUMA states that each tariff, including

---

[125] *Id.*

[126] *Id.*

[127] *Id.*

[128] *See* Petition, pp. 16-17.

[129] *Id.*

[130] *Id.*

[131] *See* OMA, Sections 4.1 and 4.2.

[132] *See* Petition, p. 17.

[133] *See* May 22 Motion, pp. 3-4.

**App.724**



those with limitations of liability, responds to particularities such as (i) state law; (ii) court decisions; (iii) utility regulatory experience; (iv) recent history after catastrophes; (v) the public and political significance of outages; (vi) frequency and responses to outages due to extreme weather events and non-weather related events; (vii) regulatory actions providing incentives for reliability and resilience; and (viii) the history of rate increases and comparative rate levels to other regions.[134]

In the May 22 Motion, LUMA also discusses its legal and factual justifications to include gross negligence and willful misconduct. LUMA argues that, considering the conditions of the T&D System, it is reasonable to include a limitation of liability that covers three (3) degrees of negligence.[135] It reiterates that the Proposed Liability Waiver will not exempt LUMA from all responsibilities, since it is obligated to meet contractual requirements, it will remain accountable to the Energy Bureau and its customers for compliance with the Puerto Rico energy Public Policy, and it has demonstrated higher liability caps and a willingness greater than other proponents to stand behind contractual commitments and protect the people of Puerto Rico, as noted in the Partnership Committee Report.[136]

LUMA argues that neither, Article 1802[137] of the repealed *Civil Code of Puerto Rico* of 1930, nor Article 1536[138] the *Civil Code of Puerto Rico* of 2020, distinguish between degrees of negligence and, thus, all degrees of negligence should be included to avoid artful pleading from annulling or undercutting the Proposed Liability Waiver.[139] LUMA also argues that the Puerto Rico Supreme Court has not adopted degrees of negligence when interpreting the acts or omissions that give rise to civil liability due to fault or negligence.[140] It adds, that, as a consequence, the interpretation of the provisions of the *Civil Code of Puerto Rico* pertaining to general liability for negligence, include gross or inexcusable neglect and lesser neglect.[141] Nevertheless, LUMA cites case law to argue that, when adjudicating claims for ordinary negligence courts apply the "prudent person" standard, and that, as the Puerto Rico Supreme Court has interpreted, "gross negligence" involves a higher degree of disregard to the risk

---

[134] *See* May 22 Motion, p. 3.

[135] *See* May 22 Motion, pp. 4-5.

[136] *See* May 22 Motion, pp. 5-6.

[137] PR Laws Ann. title 31 § 5141.

[138] PR Laws Ann. title 31 § 10801.

[139] *See* May 22 Motion, p. 6.

[140] *Id*.

[141] *Id*.



and heightened lack of due care and diligence in relation to foreseeable risks.[142] Moreover, LUMA cites the Puerto Rico Court of Appeals to adopt its definition on "wanton negligence or misconduct", which is an act or failure to act when there is a duty to do so, in reckless disregard of the rights of another and with a consciousness that injury is a probable consequence of such act or omission.[143] It states, however, that even though willful misconduct involves such consciousness, it does not encompass the intent to cause harm, but rather, negligent conduct.[144]

LUMA further argues that the Proposed Liability Waiver is aligned with the statutory liability waiver in Section 6 of Act 114-2007[145] in relation to connections of renewables to the T&D System, which does not distinguish between degrees of negligence.[146] Furthermore, LUMA states that Act No. 45 of April 18, 1935[147] permits no claims for damages from insured employees, unless the employer causes them intentionally.[148]

In view of the above, LUMA asserts that the reasonable measure is to approve the Proposed Liability Waiver, which includes all degrees of negligent conduct. LUMA also argues that even though the Puerto Rico Supreme Court has rarely determined that acts or omission constitute gross negligence, Article 1538 of the *Civil Code of Puerto Rico* of 2020, incorporated the concept of punitive damages when the act or omission constitutes a criminal offense, is executed intentionally or with severe disregard for the life, security and property of others.[149] Considering the aforementioned provision, LUMA argues that it is to be expected that there will be heightened exposure for payments arising from judgements for damages claims that will be borne by ratepayers.[150]

LUMA argues there is a need for the Proposed Liability Waiver, since the record of the present proceeding, including Case No. NEPR-MI-2021-0004 and Case No. NEPR-MI-2020-0019 establish the inefficiency, unreliability and unreasonable cost of electric services in

---

[142] *See* May 22 Motion, pp. 6-7.

[143] *See* May 22 Motion, p. 7.

[144] *Id.*

[145] Known as *Public Policy on Net Metering*, as amended.

[146] PR Laws Ann. title 22 § 1016.

[147] Known as the *System of Compensation for Work Accidents Act*, as amended.

[148] *See* In Re: Review of LUMA's Terms of Service (Liability Waiver), Case No. NEPR-MI-2021-0007, May 22 Motion p. 7.

[149] PR Laws Ann. title 22 § 10803.

[150] *See* In Re: Review of LUMA's Terms of Service (Liability Waiver), Case No. NEPR-MI-2021-0007, May 22 Motion p. 12.

Puerto Rico, as recognized in Act 17-2019.[151] Thus, in accordance with the Terzic's Testimony and the Hurtado's Testimony, a more restrictive waiver of liability is supported due to the multiple negative circumstances, including the repairs that need to be made to the T&D System due to decades of neglect.[152] LUMA asserts that PREPA's performance is below industry standards.[153] LUMA also cites the April 22 Resolution, in which the Energy Bureau stated its concerns regarding PREPA's data on reliability and customer service performance.[154] In the proposed System Remediation Plan, filed in Case No. NEPR-MI-2020-0019, LUMA explained that it identified more than one thousand (1,000) gaps in PREPA's performance, which shows low maturity levels across PREPA's organization, as well as poor health in assets that LUMA will use.[155] LUMA, therefore, identified that the areas of systems and processes as well as physical assets are the two (2) main deficiencies probative of the reasonableness of the Proposed Liability Waiver.[156]

Given the conditions of PREPA's system, LUMA argues that the following are expected conditions of the remediate state: (i) the organization has identified the means to address the major elements and some work in progressing on implementation; (ii) basic performance can be measured; (iii) performance is minimally adequate; (iv) processes are documented and defined; (v) issue identification is performed; and (vi) the organization is competitively sub-par.[157]

Considering PREPA's organization and the critical state of its assets, LUMA asserts it would be unreasonable for the Energy Bureau to base its determination on a textual comparison of liability waivers in the United States and Canada.[158] LUMA states that the Energy Bureau should also consider the duty of care imposed by Puerto Rico statutes and

---

[151] *See* <u>In Re: Review of LUMA's Terms of Service (Liability Waiver)</u>, Case No. NEPR-MI-2021-0007, May 22 Motion pp. 12-13.

[152] *Id.*

[153] *See* <u>In Re: Review of LUMA's Terms of Service (Liability Waiver)</u>, Case No. NEPR-MI-2021-0007, May 22 Motion p. 14.

[154] *See* <u>In Re: Review of LUMA's Terms of Service (Liability Waiver)</u>, Case No. NEPR-MI-2021-0007, May 22 Motion p. 15.

[155] *Id.*

[156] *Id.*

[157] *See* <u>In Re: Review of LUMA's Terms of Service (Liability Waiver)</u>, Case No. NEPR-MI-2021-0007, May 22 Motion pp. 16-17.

[158] *See* <u>In Re: Review of LUMA's Terms of Service (Liability Waiver)</u>, Case No. NEPR-MI-2021-0007, May 22 Motion p. 17.

case law to electric service companies.[159] Thus, a more restrictive waiver of liability is reasonable and justified.[160]

## IV.     Analysis and Evaluation

### A.     Procedural Matters

#### (i)     PREPA's Current Terms of Service and Liability Waiver

Currently, the terms and conditions for the supply of power by PREPA are specified in Regulation 7982, in effect since January 14, 2011. Through the adoption of Act 57-2014, the evaluation of PREPA's tariff was delegated to the Energy Bureau, and in January 2017 the Energy Bureau approved PRPEA's current tariff. Thereafter, the Energy Bureau approved the PREPA's Book of Tariff.  However, PREPA's Book of Tariff does not include all the applicable terms of service, instead, most of the terms of service are included in Regulation 7982.

In the Petition, as well as in the written comments presented by the OIPC and UTIER, it is stated that PREPA does not currently enjoy a liability waiver in its terms of service. However, such proposition is not accurate.  A form of liability waiver is included in Section XV of Regulation 7982. In the pertinent part, Section XV of Regulation 7982 provides that:

> *[PREPA's] objective is to provide an efficient and reliable service to the People of Puerto Rico. However, [PREPA] may be forced to interrupt the electricity supply without prior notification due to force majeure. It may also be forced to suspend the service due to repairs or maintenance work, in which case the affected customers are notified in advance. Such interruptions do not constitute a breach of the Electric Power Supply Contract by the Authority, **so neither [PREPA], nor any of its employees, officers or directors, are responsible for any damage, loss or cause of action produced for such reasons**.*

(Emphasis Added).

Likewise, Section 2 (V) of Regulation 7982 defines *force majeure as*:

> *[e]vents totally beyond the control of [PREPA] or acts of nature, such as: storms, electrical storms, lightning, earthquakes, tornadoes, floods, among others. It also includes, but is not limited to: dangerous situations, fires, explosions, interruptions of service due to actions or omissions of any other public authority or natural or legal person, including sabotage activities and strikes.*

---

[159] *See* In Re: Review of LUMA's Terms of Service (Liability Waiver), Case No. NEPR-MI-2021-0007, May 22 Motion pp. 17-18.

[160] *Id.*

In turn, section 2(Z) of Regulation 7982 states that a dangerous situation is an *imminent risk of damage to life or property*.

In accordance with the cited sections of Regulation 7982, PREPA currently enjoys a liability waiver. It should be noted that the *force majeure* aspect is broadly defined to include those aspects related to situations when imminent damage may occur, among other things, damages to the and *property*. We understand that such *property* encompasses both, PREPA's property, as well as the property of third parties. The liability waiver also includes those circumstances in which service interruptions are caused by acts of other public authorities or third parties.[161]

The Energy Bureau is entrusted with ample powers to, (a) establish and implement the necessary regulatory actions to guarantee the capacity, reliability, safety, efficiency, and reasonability of electricity rates of Puerto Rico, (b) oversee the quality and reliability of the electric power services provided by the electric service companies, including PREPA, and (c) to attain the goal of reducing and stabilizing energy costs permanently, and control volatility in the price of electricity in Puerto Rico.  As discuss below in more detail, these powers allow the Energy Bureau to modify PREPA's terms of service (PREPA's Book of Tariff) without the need to adopt a regulation and/or or carry out rate review procedure.

(ii)     Energy Bureau Authority to Approve Rates and Terms of Service

The Energy Bureau's jurisdiction to evaluate and approve the Proposed Liability Waiver arises under its power to approve the rates and the regulations[162] that are necessary to ensure that the rates are reasonable, including the approval of terms of service that "pursue the goal of reducing and stabilizing energy costs permanently, and controlling volatility in the price of electricity in Puerto Rico".[163]  Specifically, the Energy Bureau has

---

[161] The Proposed Liability Waiver is certainly broader than the current liability waiver included in Regulation 7982. However, the existing provision clearly recognizes that PREPA is not bound to provide an uninterrupted supply of electricity and power, and that there are circumstances under which PREPA, its employees, officers and/or directors will be released from liability.

[162] Section 6.4 of Act 57-2014 provides that the Energy Bureau shall have primary and exclusive jurisdiction over the following affairs:

*(1)     [t]he approval of rates and charges charged by energy companies or independent power producers in connection with any electric power service, in accordance with the provisions of Section 6.25 of this Act, as well as in cases and disputes related to the rates that the energy companies charge to its residential, commercial, or industrial customers, and any case or dispute related to the rates or charges imposed by any independent power producer.*

See Section 6.4(a)(1) of Act 57-2014.

[163] See Section 6.4(f) of Act 57-2014.

primary and exclusive jurisdiction over the approval of rates and charges established by electric companies in connection with any electric power service.[164]

In particular, pursuant to Act 57-2014, the Energy Bureau has the power and duty to:

(*b*) *Establish by regulations the public policy rules regarding electric power service companies, as well as any transaction, action or omission in connection with the electric power grid and the electric power infrastructure of Puerto Rico, and implement such public policy rules…;*

*(c) **Establish and implement regulations and the necessary regulatory actions to guarantee the capacity, reliability, safety, efficiency, and reasonability of electricity rates of Puerto Rico…;***

*(d) **Oversee the quality and reliability of the electric power services provided by PREPA and any other electric power company certified in Puerto Rico;***

*….*

*(f) **Formulate and implement strategies to achieve the objectives of [Act 57-2014] this chapter, including, but not limited to, attaining the goal of reducing and stabilizing energy costs permanently, and controlling volatility in the price of electricity in Puerto Rico;***

*….*

*(v) Establish reliability standards for the electric power grid of Puerto Rico in accordance with the parameters recognized by governmental and nongovernmental organizations specialized in electric power service, and oversee compliance therewith.*

Section 6.25 of Act 57-2014 provides that the Energy Bureau shall follow the process established in Act 57-2014 to review and approve the electric power service companies' proposed rate reviews. The Energy Bureau shall ensure that all rates are just and reasonable and consistent with sound fiscal and operational practices that provide for a reliable and adequate service at the lowest reasonable cost.

During any rate review process, the burden of proof shall lie on the requesting electric power service company to show that the proposed rate is just and reasonable, consistent with sound fiscal and operational practices that provide for a safe and adequate service at the lowest reasonable cost. The requesting electric power service company shall submit all the information requested by the Energy Bureau, as well as the information established in Act 57-2014.[165]  Consistent with Act 57-2014, the Energy Bureau adopted Regulation

---

[164] See Section 6.4(a)(1) of Act 57-2014.

[165] Specifically, the petitioner shall provide information concerning: (a) the efficiency, sufficiency and suitability of the facilities and the service; (b) direct and indirect costs related to the generation, transmission and distribution of energy, including marginal costs, stranded costs and costs attributable to the loss of energy due

8720[166], which provides a detailed procedure applicable to the evaluation of rate review cases. Both, Act 57-2014 and Regulation 8720, require a great deal of information related to the financial operation the electric service company during a rate review case. That is, in part, because the financial condition of the electric company is evaluated in order to determine the income requirement and determine the applicable rates.[167]  On the other hand, courts have recognized that the validity of the approval of terms of a liability waiver by public service commissions, notwithstanding that it had not been approved pursuant to the ratemaking procedures.[168]  Nevertheless, this exception, has been recognized to apply only when the proposed modification only indirectly and to a minor degree affects the financial operation of the utility.[169]

As we discussed before, the LUMA's request to include the Proposed Liability Waiver in PREPA's Book of Tariff does not entail a change in the basic rate approved in the 2017 Rate Order, because such approval will not have a direct impact on the financial operation of PREPA and does not immediately require a reduction or an increase of the base rates.[170] Neither it will require modifications to the revenue allocation or rate design.[171]  Moreover, the potential impact of Proposed Liability of Waiver in reducing reasonable costs  for claims will be shown in coming years, insofar as immediately, pending claims will continue their



---

to theft or inefficiency; (c) debt service costs; (d) costs related to fuel adjustment; (e) the company's capacity to improve the service provided and its facilities; (f) information concerning the conservation of energy and the efficient use of alternative energy resources and compliance with the renewable portfolio standard; (g) data related to the effect of special laws, subsidies and contributions; (g) citizen participation. See Article 6.25(b) (1-9) of Act 57-2014.

[166] Known as the "New Regulation on Rate Filing Requirements for the Puerto Rico Electric Power Authority's First Rate Case" ("Regulation 8720").

[167] The Energy Bureau shall approve a rate that: (i)  allows the electrical service companies to recover all operating and maintenance costs, capital investments, financing costs, statutory costs, as well as any other cost lawfully incurred in the provision of electric power services and that, except for  statutory costs, have been determined by the Energy Bureau to be prudent, reasonable, and  consistent with the sound fiscal and operating practices which help provide a reliable   service at the lowest possible cost; (ii) covers the costs of the contribution in lieu of  taxes and other contributions and statutory subsidies; (iii) allows electric power companies to perform maintenance works and prudent capital investments as are  necessary to provide electric power service in accordance with the parameters and  quality standards established by the Energy Bureau.  See Article 6.25(b) of Act 57-2014.

[168] See Professional Answering Service, Inc. c. Chesapeake and Potomac Telephone Co., 565 A.2d 55 (D.C. Court of App., 1989); Bird v. C & P Tel. Co., 185 A.2d 917 (D.C.Mun.App.1962).

[169] Id.

[170] See May 11 Motion, Exhibit 1, p. 3.

[171] Id.



course and some will be pending for longer because they have been stayed due to PREPA's Title III proceedings.[172]

The Energy Bureau **DETERMINES** that the Proposed Liability Waiver in this case does not require a full rate review, insofar as it does not result in major impact on the financial operation PREPA. A less comprehensive procedure such as the one provided by the Energy Bureau in the instant case is sufficient. The Energy Bureau underscores the fact that, the proceeding in this case allowed ample participation from the public as well as the OIPC. Moreover, adequate public notice was provided.[173]

### B.    Substantive Matters

### (i)    Legal Framework

Public utility companies differ from conventional companies in many aspects due to the nature of their industry as a *quasi*-public good and their highly regulated industries. While a conventional company can reject customers, who bring a higher risk, a public utility has an obligation to serve all. The inability to choose its clients poses a higher risk for the public utility company than conventional companies, who may control their own risk more efficiently. See Houston Lighting & Power Co. v. Auchman USA, Inc., 995 S.W. 2d 668, 673-675 (Tex. 1999).[174] In the long run, this risk borne by the public utilities has an upward trend effect on the rates or may have a ruinous effect on the public company's operations. See Bulbman, Inc. v. Nevada Bell, 825 P.2d at 590 ("…[B]road liability exposure faced by utilities would create tremendous upward pressure on utility service rates.")

Liability limits attempt to enable public utility companies to provide reasonable rates and to prevent catastrophic losses that may thwart or impede the provision of the service. Ultimately, the limitation of liability is a decision to favor the public interest balancing lower rates and preventing the financial impact of failures due to negligence. See Transmission

---

[172] *Id.*

[173] See note 24, *supra.*

[174] An unregulated business can set its prices based on what the market will bear and can factor in potential or actual liability. When an electric utility's rate is set by the [Public Utility Commission], it cannot vary from that rate. And an electrical utility cannot pick and choose its customers on the basis of the potential liability that would be associated with a loss of power to a particular customer's business. … It must provide service to all regardless of the potential liability that would be associated with a loss of power to a particular customer's business.

…

The theory underlying these decisions is that a public utility, being strictly regulated in all operations with considerable curtailment of its rights and privileges shall likewise be regulated and limited as to its liabilities. In consideration of its being peculiarly the subject of state control, "its liability is and should be defined and limited." There is nothing harsh or inequitable in upholding such a limitation of liability when it is thus considered that the rates as fixed by the Commission are established with the rule of limitation in mind. Id. at 674-675

Access Policy Study Grp. V. FERC, 225 F.3d 667, 727 (D.C. Cir. 2000) ("Courts upheld these limitations on the public policy grounds that they balanced lower rates for all customers against the burden of limited recovery for some, and that the technological complexity of modern utility systems and resulting potential for service failures unrelated to human errors justified liability limitations."); Abraham v. NY Tel. Co., 380 N.Y.S.2d 969 (1976)(A broadened liability exposure must inevitably raise the costs, and thereby the rates.   The absence of a liability waiver would have a catastrophic impact on the rates to be charged the public at large.) See also, Houston Lighting & Power Co. v. Auchan USA, Inc, 995 S.W. 2d 668 (Tex. 1999); Landrum v. Florida Power & Light Co., 505 So. 2d 552, 554 (Fla. App. 3 Dist. 1987), 505 So. 2d 552, 554 (Fla. App. 3 Dist. 1987).

The reasoning sustaining the approval of a waiver of liability is intertwined with the economic analysis and public interest in providing the public utility service at a reasonable cost.   Therefore, to grant a waiver of liability to a public utility company, it is essential to consider the economic and financial impact on the public utility company, any impact on the rates in the long run and any impact on the provision of services, all of which encompass the public interest.

For over a century, the jurisprudence and regulatory system in the United States has recognized that waivers of liability are lawful and appropriate for the public utility industries.  See Western Union Tel. Co. v. Priester, 276 US 252 (1928).  Public utilities are a highly regulated industry; **therefore, the limitations of liability fall out of the realm of contract law**. Id. at 259. These liability waivers are part of the regulatory scheme applicable to public utilities and their legality and interpretation obeys to these regulations and principles, not to contract law.  See Maryland Casualty Co. v. NSTAR Elec. Co., 471 Mass. 416, 425-427 (2015.)  The regulatory scheme for the adoption of liability waivers for public utilities differs significantly form the nature of contract law.  Among other things, the liability waivers for public utilities may not be altered by either party.  Also, they "[demand] a degree of judicial deference not warranted in the contractual context." Id. at 426.

The Energy Bureau has pursuant Act 57-2014, as amended, the powers and duties regarding the liability waiver as well as the approval of just and reasonable rates.  See Act 57-2014, Section 6.3, as amended.  Therefore, our decision about to the liability waiver must weigh our duty to foster, to the extent possible, financial, and operational conditions that will sustain reasonable rates.  The public interest in the energy sector consists of providing the electricity at reasonable rates since it will benefit the majority of the ratepayers.

Another important factor related to the approval of liability waivers is accountability.  For public utilities companies, accountability is enforced in various ways.  Among those, are the regulatory standards established by a regulatory body such as the Energy Bureau and the customer compensation for service interruption or defective service.  Although the approval of a waiver of liability limits the customer compensation, it shall not be interpreted as leaving a public utility company unaccountable.

As part of the transformation of the electric system in Puerto Rico, the Energy Bureau has been creating, and enhancing, since its creation a thorough and rigorous regulatory framework to regulate the performance of energy companies in Puerto Rico, including LUMA.  For example, Case No. NEPR-MI-2020-0019 (focused towards the implementation of a System Remediation Plan ("SRP")) and Case No. NEPR-MI-2019-0007 (regulating the performance metrics) are two proceedings where reliability standards will be enforced.

The effectiveness of the reliability standards and the regulatory framework enforced by the Energy Bureau is far greater than any effectiveness that may be accomplished by individual customers who seek compensation.  For instance, the Energy Bureau's regulatory framework sets quality standards specifically and directly addressing safety and reliability. These have direct and preventive effects which are seldom, if not impossible to achieve by a customer compensation scheme.

### (ii)    Evaluation

During these proceedings, LUMA has stated multiple arguments in support of the approval of its Proposed Liability Waiver. Such arguments have been set forth by LUMA in (i) LUMA's Waiver Petition; (ii) the May 11 Motion; (iii) the May 14 Motion, containing the Hurtado's Testimony and the Terzic's Testimony; (iv) the Technical Conference; and (v) the May 22 Motion.

First, as a justification for its Liability Waiver Petition, LUMA asserted that the United States' utility industry is familiar with limitations of liability arising from ordinary negligence, gross negligence or willful misconduct.[175] LUMA also argues that waivers of liability advance important policies for the wider public interests, such as keeping reasonable rates, preventing catastrophic losses, and mitigating the necessary result of the provision of services to all customers, regardless of the risk profile of any of them.[176]

In Exhibit 1 of the May 11 Motion, LUMA states that "[a]bsent the Terms of Service, PREPA and LUMA, and ultimately the ratepayers, would bear the costs of payments of individual claims by customers, including the cost of defending claims that may be unfounded, frivolous or meritless."[177] LUMA also asserts that "[t]he proposed Terms of Service do not have direct legal or procedural implications on the 2017 Final Rate Order issued in Case No. CEPR-2015-0001."[178] Consequently, "[t]here is no need to alter the 2017

---

[175] *See* Petition, p. 10.

[176] *See* In Re: Review of LUMA's Terms of Service (Liability Waiver), Case No. NEPR-MI-2021-0007, May 11 Motion, Exhibit 1, p. 2.

[177] *Id.* p. 3.

[178] *Id.*

Final Rate Order due to the Terms of Service."[179] Furthermore, LUMA argues that if the Proposed Liability Waiver is approved, an order to include it in PREPA's Book of Tariffs for all customer classes does not immediately require a reduction or an increase of the base rates.[180] Moreover, "[t]he Terms of Service are consistent with the Bureau's determinations in the 2017 Final Rate Order at page 168, paragraph 3, on the need to adopt mechanisms and issue determinations that ensure a safe and reliable electric service at reasonable prices."[181]

Regarding the Proposed Liability Waiver's impact on LUMA's proposed insurance cost and coverage regarding the operation of the T&D System, LUMA stated that "[t]he Terms of Service should eventually improve LUMA's insurance costs and coverage for the operation of the T&D System", since "including the Terms of Service, in sync with Prudent Utility Practice, LUMA should be able to better negotiate insurance costs and coverage for the upcoming years and make the T&D System operation more efficient."[182]

Additionally, most of the meritorious claims filed against PREPA are below the $1,000,000 occurrence deductible, and therefore, PREPA has to pay them.[183] LUMA states that most of those claims would be covered by the Proposed Liability Waiver, which would ease costs of compensation not covered by the current insurance.[184] It further asserts that "[a] catastrophic loss for class action or widespread claims is a risk that by its nature is extremely difficult to predict or quantify, and would easily overwhelm the limited protection afforded by insurance coverage. Mitigation of this risk is in accordance with practices in multiple other US utility jurisdictions."[185] Thus, the Proposed Liability Waiver may be broadly in relation to the types of liabilities covered.[186] Moreover, LUMA argues that it will probably be perceived as a wealthy entity and, in consequence, it is reasonable to expect an increase in claims.[187]

In Exhibit 1 of the May 11 Motion, LUMA states that many of the programs proposed in the Initial Budgets, some of which are also Programs within LUMA's System Remediation Plan, will establish "internal controls, policies, procedures or other measures to protect

---

[179] *Id.*

[180] *Id.*

[181] *Id.*

[182] *Id.* p. 5.

[183] *Id.*

[184] *Id.*

[185] *Id.* p. 6.

[186] *Id.*

[187] *Id.* p. 8.



customers from risks related to the T&D System operation and maintenance that could result in the potential liability that the Terms of Service seek to address."[188] We recognize that there are several administrative proceedings before the Energy Bureau with relation to the OMA which encompass another example of how the Energy Bureau will hold LUMA accountable for its actions.  Amongst those are the following: In Re:  Proposed Initial Budgets and Terms of Service, Case No. NEPR-MI-2021-0004; In Re: System Operating Principles, Case No. NEPR-MI-2021-0001; In Re: System Remediation Plan, Case No. NEPR-MI-2020-0019; In Re: Performance Metrics, Case No. NEPR-AP-2020-0025.  These proceedings are designed to establish and implement the necessary actions to guarantee the capacity, reliability, safety, efficiency, and reasonability of the tariffs in Puerto Rico's electric system, thus counterbalancing the limitation on liability that may be granted to LUMA and PREPA.

In discussing the implications of the approval of the Proposed Liability Waiver among PREPA's customers classes,  LUMA argued that the inclusion of the Proposed Liability Waiver "is a standard approach for most utilities and is more just for the ratepayers as they are not expected to absorb consequential and other losses for which PREPA clients may have their own insurance."[189] It also stated that the relationship between an electric utility and its customers is not governed by the general principles of free negotiation and contracting that would apply between other parties, therefore, "substantial contractual freedoms are curtailed."[190]

As part of the May 14 Motion, LUMA submitted the Hurtado's Testimony and the Terzic's Testimony, in compliance with the Procedural Calendar set forth in the May 4 Resolution[191]   Mr. Hurtado testified that he has over 25 years of experience in the development and management of large electric utility and energy businesses throughout the United States and Latin America.  Mr. Hurtado further declared that limitations of economic liability of electric utilities are standard for United States utilities.[192] Both, LUMA's Waiver Petition and Hurtado's Testimony assert that limitations of liability protect utilities from catastrophic losses.[193] Specifically, Hurtado's testimony highlighted that "the risk of occurrence of major catastrophic events that could affect the utility's ability to render services and expose LUMA as operator, and PREPA, as asset owner, to substantial claims for relief that could threaten the ability to provide an essential service."[194]

---

[188] Id. p. 9

[189] Id. p. 41.

[190] Id.

[191] See May 14 Motion, Exhibit 1.

[192] See, Hurtado's Testimony, lines 87-90.

[193] See Petition p. 10; Hurtado's Testimony, lines 91-101.

[194] See, Hurtado's Testimony, lines 91-94

Mr. Hurtado informed that currently PREPA is liable for claims for damages directly which are mostly paid from its revenues based on customer rates.[195] According to Mr. Hurtado, "[t]he proposed Terms of Service were adopted to ensure that PREPA and LUMA do not incur in liabilities arising from individual customer civil claims for compensation that will lead to increased costs that will be reflected in customer rates or could render the utility unable to operate."[196]

Moreover, in Hurtado's Testimony, he argues that the current Terms of Service "expose customers to avoidable increases in rates, impede PREPA's ability to provide cost-effective services and expose PREPA to claims for catastrophic losses whose payment will only lead to financial distress."[197] Additionally, "[t]he likelihood of catastrophic damages resulting in the occurrence of these types of situations is substantially higher in the case of the T&D System when compared to other utilities in the U.S. because of the T&D System's current state."[198] Consequently, "[t]he T&D System is more prone to suffer outages and service disruptions, among other service issues, than the typical utility in the United States. As a result, there is vulnerability to claims associated with these conditions, which could be substantial and adversely impact the T&D System's operational budget."[199] Overall, Mr. Hurtado asserted the desirability of the Proposed Liability Waiver as it would save LUMA, PREPA and customers considerable resources, money and time spent dealing with claims for compensation and damages.[200]

With the May 14 Motion, LUMA also submitted the Terzic's Testimony.[201] Mr. Terzic declared that "[a] Term of Service provision which include limits on the economic liability of electric utilities due to service interruptions, deficient, irregular or imperfect service, within filed rates is universal in the US for both Investor Owned Utilities (IOUs) and Public Power electric utilities such as PREPA."[202] Terzic's Testimony supported the idea that limitations of liability favor the public interest, since utilities are able to provide service at reasonable rates

---

[195] *Id.* lines 103-105.

[196] *Id.* lines 95-98.

[197] *Id.* lines 107-111.

[198] *Id.* lines 135-138.

[199] *Id.* lines 138-141.

[200] *Id.* lines 99-101.

[201] *See* In Re: Review of LUMA's Terms of Service (Liability Waiver), Case No. NEPR-MI-2021-0007, May 14 Motion, Exhibit 2.

[202] *See* In Re: Review of LUMA's Terms of Service (Liability Waiver), Case No. NEPR-MI-2021-0007, Terzic's Testimony, lines 133-136.

benefiting all consumers, instead of a compensation that will benefit a few but will be paid by all ratepayers.[203] Mr. Terzic pointed out that, to his understanding, "the history of the current system has failed to produce public benefits of improved electric services in terms of lower outage occurrence or frequency."[204] Furthermore, Mr. Terzic noted that the concept of public interest for public utilities is consistent with two features: (1) utility customers have a highly reliable service paying a reasonable and just price, and (2) the public utility is financially viable but not highly profitable.[205]

It is unrealistic to expect that an electric utility company will have no service interruptions. Another unrealistic expectation is that the compensation to consumers for those interruptions of service will not be paid ultimately by all the ratepayers. Therefore, to address both situations in the interest of the majority of the ratepayers (public interest), a waiver of liability is granted for loss due to service interruptions caused by the ordinary negligence of the electric utility company. The Energy Bureau's decision is rendered with the consideration that rigorous reliability requirements to promote accountability and quality have been implemented.

Furthermore, Terzic's Testimony is consistent with the aforementioned jurisprudence supporting the waiver of liabilities in two related aspects. First, in absence of a liability waiver, the risk borne by the public utility company will hinder its financial stability and consequently increase the rates. The liability waiver, on the contrary, will support PREPA's financial stability and allow savings that may be invested in improving its operations. See, Terzic's Testimony, lines 216-223 ("The omission of volatile or hard to estimate liability payments will support the financial stability of PREPA.") The reduction in the risk will allow the reallocation of resources for improvements and contribute to set the course for the transformation of the electric system and PREPA's financial stability.

Second, "[p]assing along increased costs to all consumers as electric utility ratepayers would disproportionately affect low-income households who spend a larger percentage of their income on electricity service than high income households." See, Terzic's Testimony, lines 246-249. For example, under a customer compensation scheme, the public utility company would have to pay for the losses suffered by consumers for a service interruption and pass on those costs to the ratepayers. While the losses for some customers would be considered a minimal cost, for others would be a significant amount.[206] In the aggregate, the

---

[203] *Id.* lines 172-178.

[204] *Id.* lines 179-188.

[205] *Id.* lines 191-215.

[206] For example, while some customers would claim the loss of an average food basket like milk and average meats, others who are wealthier would claim the loss of their filet mignon, lobster or even their expensive wine collection. Eventually, the rates paid by all customers would rise and the low-income customers would pay for the luxurious items of others. The increase in the rates will disproportionately affect the low-income

public utility company, which has the obligation to serve all, would have a liability that would jeopardize its operations.   Likewise, for example, a claim by an industrial customer for the loss of business interruption, machines, or materials due to a power outage may have a catastrophic impact on the public utility company's finances.[207]   Ultimately, all the ratepayers, including low-income households who constitute the vast majority, would end up paying for one costumer's loss through increased rates over long periods of time.  Hence, the adoption of liability waivers is consistent with the public interest and ultimately favors the low-income households.

Although a waiver of liability for public utilities is not subject to the law and regulations particular to contract law, we will consider the Puerto Rico Supreme Court's holding defining and distinguishing the concepts of negligence, gross negligence, willful misconduct and *dolo* to enlighten our determination.

The Puerto Rico Supreme Court defined the concepts of "ordinary negligence", "gross negligence" and "willful misconduct".   With regards to "ordinary negligence", or simply "negligence", the Supreme Court has held that it constitutes the lack of due care, which at the same time consists in the failure to anticipate and foresee the rational consequences of an act, or of the omission of an act, that a prudent person would have foreseen in the same circumstances.[208] On the other hand, the Supreme Court has held that "gross negligence" consists of complete lack of care or so small a degree of diligence that justifies the belief that a person acted with complete indifference for the interest and wellbeing of another.[209] Thus, as interpreted by the Supreme Court, there exists a distinction between negligence and gross negligence.

With respect to the concept of "willful misconduct", the Supreme Court explained that in the United States such a concept is generally defined as an offense committed intentionally or with reckless disregard of its consequences.[210] The Supreme Court distinguished willful misconduct from gross negligence by holding that not even the most gross negligence

---

households because they spend a higher percentage of their income on electricity service than high-income households.  This circumstance may be further exacerbated if all customers share, for example, exorbitant loses that may endure by commercial and industrial operations.

[207] "Generally, the only electric utility customers who would suffer substantial economic damages would be commercial or industrial users.  Losses paid to those commercial or industrial users could be passed on to smaller customers, including residential users, in the form of higher rates. This consideration tends to support the conclusion that tariffs that limit economic damages are not unreasonable, even when the damages suffered are substantial." Houston Lighting, at 673.

[208] Ramos v. Carlo, 85 D.P.R. 353, 358-359 (1962).

[209] Elías Vega v. Chenet, 147 D.P.R. 507, 521 (1999).

[210] Canales Delgado v. Pan American World Airways, Inc., 112 D.P.R. 329, 341 (1982).

constitutes a reckless disregard.[211] Therefore, the Supreme Court construed willful misconduct as an equivalent to what is known in Puerto Rico Civil Law as *dolo*.[212] The concept of *dolo* has been defined by the Supreme Court as the conscious and voluntary refusal to fulfill an obligation, knowing that such refusal constitutes an unjust act.[213] Consistent with the Court, the *Civil Code of Puerto Rico* of 2020 provides that the concept consists of the deliberate and bad faith breach of an obligation.[214]

Regarding the waiver of liability arising from negligence in private contractual relationships, the Supreme Court has held that such a waiver is not favored by Puerto Rico Law. [215] Thus, for a person to be exonerated from the consequences of its own negligence, the language used in the waiver must indicate it in a clear and explicit manner.[216] However, the waiver shall not be contrary to the law, public interest, public order or to the detriment of a third party.[217] Pursuant to both, the repealed *Civil Code of Puerto Rico* of 1930 and the *Civil Code of Puerto Rico* of 2020, the liability arising from *dolo* is equally enforceable in all obligations, and the waiver of the action to make it effective is null.[218] Consequently, in Puerto Rico, the parties to a contract cannot agree to waive liability arising from willful misconduct.

The Energy Bureau will also consider PREPA's enabling act for guidance regarding the standard of conduct expected from PREPA, and its directors, officers, agents, and employees.  Regarding PREPA's conduct, Section 4(g) of Act 83 of May 2, 1941 ("Act 83-1941") [219] provides that, the members of PREPA's Board of Directors, officers, agents or employees shall not be held liable for any action executed in good faith in the performance of their functions and responsibilities under the provisions Act 83-1941, provided, however, that their conduct does not constitute a crime, willful misconduct (*dolo*) or gross negligence.[220] Section 4(g) further establishes that such directors, officers, agents or

---

[211] *Id.*

[212] *Id.*

[213] <u>Mayagüez Hilton Corp. v. Betancourt</u>, et al. 156 D.P.R. 234, 252 (2002).

[214] Article 1164 of Law 55-2020.

[215] <u>Chico Ramos et al. v. Editorial Ponce, Inc. et al.</u>, 101 D.P.R. 759, 778 (1973).

[216] *Id.*

[217] *Id.*; PR Laws Ann. title 31 § 4; Article 14 of Law 55-2020.

[218] *Id.*; PR Laws Ann. title 31 § 3019.

[219] Known as the *Puerto Rico Electric Power Authority Act*, as amended.

[220] PR Laws Ann. title 22 § 194(g).



employees will be compensated for the costs incurred related to any claim for which they enjoy the aforementioned immunity.[221]

Therefore, the immunity and compensation of PREPA, its directors, officers, agents and employees are subject to not incurring in willful misconduct or gross negligence, among others. Act 83-1941 provides a clear legislative mandate setting limits for the release of responsibilities which serve as guidance for our analysis and determination.

Some jurisdictions in the United States exclude from the liability waiver applicable to public utility companies' gross negligence and willful misconduct. The adoption of a liability waiver in some respects responds to an increased risk of liability for acts that may occur frequently. The high probability of incurring in a negligent act makes the risk higher and less controllable. On the other end, gross negligence and willful misconduct involve a high threshold by its definition is less probable to occur. In this case, LUMA filed clear and convincing evidence that a waiver of liability is compelling. "The likelihood of catastrophic damages resulting in the occurrence of these types of situations is substantially higher in the case of the T&D System when compared to other utilities in the U.S. because of the T&D System's current state. In sum, the T&D System is more prone to suffer outages and service disruptions, among other service issues, than the typical utility in the United States. As a result, there is vulnerability to claims associated with these conditions, which could be substantial and adversely impact the T&D System's operational budget."[222]

After a thorough analysis of the waiver of liability provisions sanctioned under public utility laws, and with conscientious considerations of the broad legal scheme in Puerto Rico, including the fact waivers of liability are not favored by Puerto Rico Law and, the limitations on the waivers of liability currently enacted in favor of PREPA, its directors, officers, employees and agents, pursuant to Act 83-1941, the Energy Bureau concludes that the inclusion of gross negligence and willful misconduct in the Proposed Liability Waiver is unwarranted.[223] Therefore, the Energy Bureau **REJECTS** the inclusion of gross negligence and willful misconduct as part of the Proposed Liability Waiver. We further resolve, as discussed in Section III (A), that the language of the Proposed Liability Waiver may be confusing and ambiguous for some. Nevertheless, we are convinced that it is in the public interest to adopt some of the provisions of the Proposed Liability Waiver. Therefore, we **REJECT** the Proposed Liability Waiver as drafted and, in its stead, **APPROVE** the Modified Terms of Service included <u>Annex A</u> of this Resolution and Order.

## V.    Conclusion

For all the reasons stated before the Energy Bureau:

---

[221] *Id.*

[222] See Petition, at p. 16.

[223] Our determination should not be construed to mean that gross negligence or willful misconduct cannot be incorporated in a liability waiver for an electric service company in Puerto Rico. We simply decided, that considering the totality of the circumstances, such broad liability waiver is not justified in this case.

(a)    **REJECTS** the Proposed Terms of Service (Proposed Liability Waiver) and in its stead, **APPROVES** Modified Terms of Service, which are included in <u>Annex A</u> of this Resolution and Order.  The Modified Terms of Service shall be incorporated and made part of the Puerto Rico Electric Power Authority Book of Tariffs approved on May 28, 2019[224] and will enter into effect on June 1st, 2021. The Modified Terms of Service shall modify and complement the terms of service included in Regulation 7982.  In the event of any conflict or issue of interpretation between the Modified Terms of Service and Regulation 7982, the Modified Terms of service shall prevail over Regulation 7982.

(b)    **ORDERS** LUMA to submit to the Energy Bureau, no later than five (5) days from the notification date of this Resolution and Order, a certified translation of the Modified Terms of Service for its review and approval.  In the event of any conflict or issue of interpretation between the approved Spanish version of Modified Terms of Service and the English version of the Modified Terms of Service, the English version shall prevail over the Spanish version.  The effective date of the Modified Terms of Service shall not be affected by the process of approval of the Spanish version of the Modified Terms of Service.

(c)    **ORDERS** LUMA to file before the Energy Bureau, not later than **June 30, 2022,** an updated report describing: (1) all pending judicial and extrajudicial claims from customers and/or persons receiving electricity and power from PREPA, for events arising out of as a result of the operation and maintenance of the T&D System; (2) all the amounts disbursed to pay judicial and/or extrajudicial claims from customers and/or persons receiving electricity and power from PREPA, for events arising out of as a result of the operation and maintenance of the T&D System, for the period covered between June 1, 2021 and May 31, 2022.

(d)    **ORDERS** LUMA, in a period not exceeding one (1) year from the date of the notification of this Resolution and Order, to develop and implement a customer's outreach program to educate its customers about reasonable measures they may implement to protect their person and property from unexpected and inevitable interruptions to the electricity supply.  On or before **June 30, 2022,** LUMA shall submit to the Energy Bureau, a summary of the customer's outreach program, as well as a progress report pertaining to its implementation.

---

[224] See *In re Puerto Rico Electric Power Authority Rate Review*, Case No. CEPR-AP-2015-0001 and Case No. NEPR-AP-2018-0003.

(e)    The Modified Terms of Service approved, may be reviewed as part of the next PREPA's rate case, or before, if the Energy Bureau deems it necessary and appropriate.

Be notified and published.

_____
Edison Avilés Deliz
Chairman

_____
Lillian Mateo Santos
Associate Commissioner

_____
Ferdinand A. Ramos Soegaard
Associate Commissioner

_____
Sylvia B. Ugarte Araujo
Associate Commissioner

**CERTIFICATION**

I hereby certify that the majority of the members of the Puerto Rico Energy Bureau has so agreed on May 31, 2021.  Associate Commissioner Ángel R. Rivera de la Cruz concurred in part and dissented in part with a written opinion. I also certify that on May 31, 2021 a copy of this Resolution and Order was notified by electronic mail to the following: kbolanos@diazvaz.law,            jmarrero@diazvaz.law,            hrivera@jrsp.pr.gov, contratistas@jrsp.pr.gov and margarita.mercado@us.dlapiper.com I also certify that today, May 31, 2021, I have proceeded with the filing of the Resolution and Order issued by the Puerto Rico Energy Bureau.

For the record, I sign this in San Juan, Puerto Rico, today May 31, 2021.

_____
Sonia Seda Gaztambide
Clerk



40
**App.743**

**Approved by:**
Puerto Rico Energy Bureau
Puerto Rico Public Service Regulatory Board
Effective Date: June 1st, 2021
Case No. NEPR-MI-2021-0007
Page 1

<u>Modified Terms of Service</u>

Effective on **June 1st, 2021,** the following terms of service shall be incorporated and made part of the Puerto Rico Electric Power Authority Tariff Book approved on May 28, 2019.[1] These terms of service shall modify and complement the terms of service included in the Puerto Rico Electric Power Authority Regulation No. 7982, dated January 14, 2010, known as *Reglamento de Términos y Condiciones Generales para el Suministro de Energía Eléctrica* ("Regulation 7982").  In the event of any conflict or issue of interpretation between the following terms of service and Regulation 7982, these terms of service shall prevail over Regulation 7982.

<u>Modified Terms of Service</u>

1.      It is recognized that certain components of the Puerto Rico Electric Power Authority's ("PREPA") electric power system (including, the Transmission and Distribution System ("T&D System"), as well as the Generation Facilities) currently do not meet the standards of performance generally accepted in the electric utility industry.  The whole system needs significant repairs, improvements, and modernization to achieve acceptable standards of service.  Furthermore, certain components of the T&D System and the manner in which the T&D System is operated do not currently meet acceptable standards of performance, including the fact that certain general operating and administrative practices may not comply with acceptable industry standards and practices.  Therefore, a period of review, planning, remediation, reconstruction, repair, and replacement will be required to enable LUMA Energy, LLC, LUMA Energy Servco, LLC (together, "LUMA") and PREPA to operate the electric system according to acceptable standards. In light of the foregoing, PREPA and LUMA, with the cooperation of other governmental entities developed a plan, taking into account expected funds availability, particularly from the Federal Emergency Management Agency (FEMA), to remediate, repair, reconstruct, replace and stabilize such equipment, systems, practices and services, as needed, to enable LUMA to perform the operation and maintenance services contracted in compliance with the applicable standards as soon as reasonably possible and at a reasonable cost to PREPA ("System Remediation Plan").  The System Remediation Plan shall be review and approved by the Energy Bureau of the Puerto Rico Public Service Regulatory Board ("Energy Bureau").

2.      Taking in consideration the circumstances described in the preceding paragraph, and other generally known, PREPA and LUMA shall make all reasonable efforts to provide an efficient and reliable service to its customers and users.  A user is a person (natural

---

[1] See *In re Puerto Rico Electric Power Authority Rate Review*, Case No. CEPR-AP-2015-0001 and Case No. NEPR-AP-2018-0003.

**Approved by:**
Puerto Rico Energy Bureau
Puerto Rico Public Service Regulatory Board
Effective Date: June 1st, 2021
Case No. NEPR-MI-2021-0007
Page 2

or legal) who receives and uses power and electricity at a certain location and whose consumption is recorded and invoiced in the name of another person.

3.   PREPA and LUMA shall make all reasonable efforts to maintain continuity of service, but PREPA and LUMA cannot guarantee an uninterrupted electricity supply to its customers and users.

4.   Without liability of any kind to PREPA and/or LUMA, PREPA and/or LUMA shall have the right to disconnect or otherwise curtail, interrupt or reduce service to customers and users: (a) whenever PREPA and/or LUMA reasonably determines it is necessary to facilitate construction, installation, maintenance, repairs, replacement or inspection of any of PREPA's facilities, or to permit the connection or disconnection of other customers; (b) to maintain the safety and reliability of PREPA's electric system (including without limitation, transmission, distribution and generation facilities); or (c) due to any other reason attributable to third parties or related to dangerous or hazardous circumstances, including without limitation, emergencies, forced outages, potential overloading of PREPA's transmission and/or distribution system, sabotage, strikes, unauthorized acts by employees or Force Majeure. Notwithstanding the foregoing, PREPA and/or LUMA shall use reasonable efforts to minimize any scheduled curtailment, interruption, or reduction to the extent reasonably practicable under the circumstances, to provide the customer (and not to the user, because is not a registered customer) with prior notification of any such curtailment, interruption, or reduction to the extent reasonably practicable, and to resume the customer's service connection as promptly as reasonably practicable.

5.   Notwithstanding anything to the contrary in these Modified Terms of Service and Regulation 7982, PREPA, its directors, officers, employees, agents and contractors (including LUMA Energy, LLC,  LUMA Energy Servco, LLC, their directors, officers, employees, agents and contractors) (the "Released Parties") shall not be liable contractually or extra-contractually, to customers, or any user receiving power or electricity from PREPA and/or LUMA for any losses arising in any way out of or in connection with the operation of the T&D System and the provision of power and electricity including any events of interrupted, irregular or defective electric service due to Force Majeure events or from pre-existing deteriorated electric system conditions, other causes beyond the control of the Released Parties, unauthorized acts by employees, sabotage, strikes or due to ordinary negligence (excluding gross negligence, willful misconduct or *dolo*) of the Released Parties or their respective employees, agents or contractors.  In any event that the Released Parties are found

**Approved by:**
Puerto Rico Energy Bureau
Puerto Rico Public Service Regulatory Board
Effective Date: June 1st, 2021
Case No. NEPR-MI-2021-0007
Page 3

responsible howsoever and whensoever in connection with the provision of service to customers or users receiving power or electricity from PREPA and/or LUMA, customers or users shall only recover direct damages (including direct physical loss, injury or damage to a customer or customer's property). For the foregoing and without otherwise restricting the generality thereof, "direct physical loss, injury or damage" shall not include any loss of profits or revenues, special, exemplary, punitive, indirect, incidental, or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms.

6.    Notwithstanding anything to the contrary contained in these Modified Terms of Service, PREPA and LUMA will remain fully accountable and liable to the Energy Bureau for compliance with the Puerto Rico energy public policy as well as all legal and regulatory requirements applicable to electric service companies, and, particularly to LUMA as operator of the T&D System.  Nothing in these Modified Terms of Service shall have the effect of releasing or waiving PREPA and/or LUMA from any penalty, fine or obligation imposed by the Energy Bureau for whatever reason whatsoever.



**GOVERNMENT OF PUERTO RICO**
**PUBLIC SERVICE REGULATORY BOARD**
**PUERTO RICO ENERGY BUREAU**

| | |
|---|---|
| **IN RE**: REVIEW OF LUMA'S TERMS OF SERVICE (LIABILITY WAIVER) | **CASE NO.:** NEPR-MI-2021-0007 |
| | **SUBJECT:** Final Determination on LUMA's Terms of Service Petition (Liability Waiver). |

## Associate Commissioner Ángel R. Rivera de la Cruz, concurring in part and dissenting in part

Today, the majority of the Puerto Rico Energy Bureau ("Energy Bureau") issued a Resolution and Order in the instant case, through which, among other things, rejected LUMA's[1] Proposed Liability Waiver, as described in LUMA's Liability Waiver Petition.[2]  In addition, instead of the Proposed Liability Waiver, the majority of the Energy Bur approved Modified Terms of Service, as described in Annex A of today's Resolution and Order. Although I concur with the majority's decision to reject the Proposed Liability Waiver, I disagree with the approved Modified Terms of Service.  Therefore, for the reasons expressed herein, I concur in part and dissent in part.

\* \* \*

Limiting utilities liability is a common practice associated with the provision of electric service in practically every jurisdiction in the United States and Canada.[3]  The difference among the jurisdiction is the degree of protection granted to the utility.  To that effect, liability limits ranges from a utility that has no liability protection, such as the Puerto

---

[1] LUMA Energy, LLC as ManagementCo, and LUMA Energy Servco, LLC as ServCo, collectively, "LUMA".

[2] *Petition for Approval of Initial Budgets and Related Terms of Service*, In Re: Review of LUMA's Initial Budgets, Case No. NEPR-MI-2021-0004, February 24, 2021 ("February 24 Motion").  The February 24 Motion contained as Exhibit 2 a document titled *Request for Approval of Terms of Service and Memorandum of Law in Support Thereof* ("Liability Waiver Petition").  The referenced Exhibit 2 constituted LUMA's request for a Liability Waiver.  On May 4, 2021, the Energy Bureau issued a Resolution and Order through which, among other things, initiated the instant case. *Resolution and Order*, In Re: Review of LUMA's Terms of Service (Liability Waiver), Case No. NEPR-MI-2021-0007, May 4, 2021 ("May 4 Resolution").  In the May 4 Resolution, the Energy Bureau ordered the Energy Bureau's Secretary to include as part of the administrative record of the instant case, the February 24 Motion, which would constitute LUMA's Liability Waiver Petition for the purposes of the instant case. *Id.*, p. 2.

[3] *See Motion Submitting Additional Information and Responses to Requests Issued During Technical Conference* ("May 22 Motion"), In Re: review of LUMA's Terms off Service (Liability Waiver), Case No. NEPR-MI-2021-0007, Response: TC-RFI-LUMA-MI-21-0007-210518-PREB-0001, May 22, 2021.

App.747

Rico Electric Power Authority ("PREPA"), to a utility that has very restrictive language (*i.e.* more protection).[4]

In its Liability Waiver Petition, LUMA requested the Energy Bureau to approve Terms of Service (*i.e.* a Liability Waiver) applicable to **all customers classes** in PREPA's Tariff Book to read as follows:

> PREPA, its directors, officers, employees, agents, and contractors (including LUMA Energy, LLC and LUMA Energy Servco, LLC) (the "Released Parties"), (i) shall not be liable to customers, or any person (natural or legal) receiving power or electricity for any losses arising in any way out of or in connection with the operation of the transmission and distribution system and the provision of power and electricity including any events of interrupted, irregular or defective electric service **due to force majeure events, other causes beyond the Released Parties' control, or ordinary negligence, gross negligence or willful misconduct of the Released Parties or their respective employees, agents or contractors**; (ii) and in all cases shall not be responsible for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, **in each case howsoever and whensoever arising, including where caused by any of the Released Parties' ordinary negligence, gross negligence or willful misconduct.**[5]

In its Liability Waiver Petition, LUMA claimed that provisions limiting liability, like the one it requested, are often used in the utility industry and have been adopted in multiple U.S. jurisdictions.[6]  Moreover, LUMA asserted there is case law through which courts have held that a utility's waiver of liability for gross negligence and willful misconduct is reasonable and enforceable.[7]  In support of its argument, LUMA cites the case *Maryland Casualty Company v. NSTAR Electric Company.*[8]  However, this case is not analogous to the instant case.

In essence, *Maryland Casualty Company*, raised the question as to whether a tariff filed with and approved by the Department of Public Utilities ("DPU") **may limit a public utility**

---

[4] May 18, 2021 Technical Conference, testimony of Mr. Branko Terzic, at 59:48 – 1:01:19.

[5] Liability Waiver Petition, p. 18.  Emphasis supplied.

[6] *Id.*, p. 10.

[7] *Id.*

[8] *Maryland Casualty Company v. NSTAR Electric Company*, 471 Mass. 416 (2015).



App.748

**from liability to nonresidential customers for special, indirect, or consequential damages resulting from the utility's gross negligence.** The challenged "Limitation of Liability" clause provided, in full:

> **Unless there is negligence on the part of the Company**, the Company shall not be liable for damage to the person or property of the Customer or any other persons resulting from the use of electricity or the presence of the Company's appliances and equipment on the Customer's premises. **In any event, for non-residential Customers served under general service rates**, the Company shall not be liable in contract, in tort (including negligence and [G. L. c.] 93A), strict liability or otherwise for any special, indirect, or consequential damages whatsoever including, but not limited to, loss of profits or revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of Customers of the Customer or other economic harm.[9]



In *Maryland Casualty Company*, the court pointed out that, the "Limitation of Liability" clause "applies to all claims by nonresidential customers seeking to recover "special, indirect, or consequential damages," **without regard to distinctions between the degrees of culpability**".[10]  For that reason, the court declined to make such a distinction.

Moreover, the court pointed out that the "Limitation of Liability" "**does not categorically exempt NSTAR from liability for negligence, much less gross negligence.** On the contrary, **the provision specifically contemplates liability for negligence, to both residential and nonresidential customers alike**".[11]  To that effect, the court observed, that "[t]he portion of the "Limitation of Liability" clause that the plaintiffs challenged **merely exempted the defendant from liability for a particular type of damages ("special, indirect, or consequential damages") asserted by a particular class of customers (nonresidential customers served under general service rates)**".[12]

In addition, the court affirmed "[t]here are compelling reasons why the DPU could approve of such a limitation, **even where it fails to make a distinction between ordinary negligence and gross negligence**. As scholars have noted, consequential damages, such as damages for lost profits or business interruption, are at once extremely difficult to predict and potentially immense in magnitude."[13]  Under those circumstances, the court concluded that the Limitation of Liability clause was reasonable.

---

[9] *Id.*, at 419 - 420. Emphasis supplied.

[10] *Id.*, at 427. Emphasis supplied, quotation marks in the original.

[11] *Id.*, at 428.  Emphasis supplied.

[12] *Id.*  Emphasis supplied, quotation marks in the original.

[13] *Id.*, at 428 – 429.  Emphasis supplied.



Notwithstanding the above, contrary to LUMA's assertion, the court in *Maryland Casualty Company* did not specifically determine that a utility's waiver of liability for gross negligence and willful misconduct is reasonable and enforceable. The court merely stated that, since the challenged provision did not make a distinction between negligence, gross negligence and willful misconduct, it declined to enter into such discussion.

Moreover, to that effect the court specifically held, "we have no occasion to address whether a broader limitation of liability tariff provision — **one that, for instance, fully immunized a public utility from liability for damages resulting from its gross negligence or willful and wanton misconduct, rather than merely immunizing it from claims for a particular type of damages, or one that encompassed claims for fraud — would, if it were to survive DPU scrutiny, satisfy the basic requirement of reasonableness**."[14] As such, the court determined that the challenged language, which had a limited scope, was reasonable, whereas it declined to extend such determination to a broader liability limitation.

As established above, in *Maryland Casualty Company*, the utility was still liable for negligence to both, residential and non-residential customers. The protection against negligent behavior was limited to non-residential customers served under general service rate and only for special, indirect, or consequential damages.

Contrary to *Maryland Casualty Company*, in the instant case, LUMA petitions for the requested Liability Waiver to apply to **all customer classes in PREPA's Tariff Book**. In addition, rather than requesting the gross negligence and willful misconduct protection for a particular type of damages, LUMA requests that PREPA, its directors, officers, employees, agents, and contractors, including LUMA, should not be liable for any losses arising in any way out of or in connection with the operation of the transmission and distribution system and the provision of power and electricity including any events of interrupted, irregular or defective electric service due to force majeure events, other causes beyond the Released Parties' control, or ordinary negligence, gross negligence or willful misconduct of the Released Parties or their respective employees, agents or contractors. LUMA also requested not be responsible for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by any of the Released Parties' ordinary negligence, gross negligence or willful misconduct.

The Liability Waiver language in LUMA's proposal is much broader than the narrow language challenged in *Maryland Casualty Company*. LUMA also seeks for such language to apply to all customers rather than a specific class of customers, as was the case in *Maryland*

---

[14] *Id.*, at 429. Emphasis supplied.

*Casualty Company.* As such, the controversy in *Maryland Casualty Company* can be differentiated from the circumstances of this case.

Furthermore, LUMA's Liability Waiver Petition closely resembles that of a fully immunized public utility, as described by the court in *Maryland Casualty Company.* To that effect, LUMA witness, Mr. Branko Terzic, expressed that the requested Liability Waiver was on the "more restrictive" side (*i.e.* on the high end) of the industry range described above.[15] Since the court on that occasion expressed that it did not have the opportunity to determine if such broader limitation of liability tariff provision would satisfy the basic requirement of reasonableness, the rationale of *Maryland Casualty Company* cannot be applied to LUMA's Liability Waiver Petition.

On the other hand, when asked if he had knowledge of any other utility or jurisdiction that contained similar language as the one requested by LUMA in its Liability Waiver Petition, LUMA witness, Mr. Branko Terzic, expressed that he could identify British Columbia Hydro and Power Authority ("BC Hydro") and the *Maryland Casualty Company* case.[16] To that effect, Mr. Terzic confirmed that the BC Hydro Tariff contained such provisions.[17]

Notwithstanding the above, with respect to BC Hydro's liability, its terms of service establishes:

> BC Hydro will endeavour [sic] to provide a regular and uninterrupted supply of Electricity but does not guarantee a constant supply of Electricity or the maintenance of unvaried frequency or voltage and will not be responsible or liable for any loss, injury, damage or expense caused by or resulting from any interruption, termination, failure or defect in the provision of Electricity, whether caused by the negligence of BC Hydro, or its representatives or agents or otherwise, **except to the extent that the loss, injury, damage or expense results directly from the wilful [sic] misconduct of BC Hydro or its representatives or agents,** provided, however, that neither BC Hydro, nor any of its representatives or agents is responsible for **any loss of profit, loss of revenue or other economic loss, even if the loss arises directly from the wilful [sic] misconduct of BC Hydro or its representatives or agents.**[18]

---

[15] May 18, 2021 Technical Conference, testimony of Mr. Branko Terzic, at 1:01:59 – 1:02:28.

[16] May 18, 2021 Technical Conference, testimony of Mr. Branko Terzic, at 49:07 – 49:35.

[17] May 18, 2021 Technical Conference, testimony of Mr. Branko Terzic, at 50:22 – 50:34.

[18] *Motion Submitting Additional Information and Responses to Requests Issued During Technical Conference,* In Re: review of LUMA's Terms off Service (Liability Waiver), Case No. NEPR-MI-2021-0007, Response: TC-RFI-LUMA-MI-21-0007-210518-PREB-0001, British Columbia Hydro and Power Authority Electric Tariff, Section 9.5, p. 9-2.

Contrary to the Proposed Liability Waiver, the BC Hydro's terms of service do not protect the utility from claims regarding loss, injury, damage, or expense that result directly from willful misconduct. With respect to willful misconduct, the BC Hydro's terms of service only protects the utility from claims regarding loss of profit, loss of revenue, or other economic loss.

The language in BC Hydro's terms of service is much narrower than the language included in the proposed Lability Waiver. It only protects the utility against very specific damages that are economic in nature (*i.e.* loss of profit, loss of revenue or other economic loss).

In contrast, the proposed Liability Waiver seeks to protect PREPA and LUMA from a myriad of claims, including losses arising in any way out of or in connection with the operation of the transmission and distribution system and the provision of power and electricity including any events of interrupted, irregular or defective electric service due to force majeure events, other causes beyond their control, or ordinary negligence, gross negligence or willful misconduct, as well as loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by ordinary negligence, gross negligence or willful misconduct.

Although the BC Hydro's terms of service contain protection from certain claims arising from willful misconduct, such protection is very limited. Therefore, such language cannot be considered similar to that of the proposed Liability Waiver.

During his testimony at the May 18, 2021 Technical Conference, Mr. Branko Terzic expressed that it is not common to have protection against acts of gross negligence and willful misconduct.[19] However, he also expressed that a regulator should not premise its decision upon what is common, but rather what is appropriate, factually developed and what its policy is.[20] Moreover, Mr. Terzic also stated that, with regards to liability waivers, each jurisdiction has its own unique history and that interpretations vary among courts of different jurisdictions.[21] However, upon questioning, Mr. Terzic expressed he was not aware of the circumstances under which the BC Hydro liability waiver was approved.[22]

Without knowing or understanding the circumstance upon which the BC Hydro liability waiver was approved, it is difficult to compare it to our own or to use it as an

---

[19] May 18, 2021 Technical Conference, testimony of Mr. Branko Terzic, at 1:05:36 – 1:07:53.

[20] May 18, 2021 Technical Conference, testimony of Mr. Branko Terzic, at 1:05:48 – 1:06:33.

[21] May 18, 2021 Technical Conference, testimony of Mr. Branko Terzic, at 56:32 – 56:47.

[22] May 18, 2021 Technical Conference, testimony of Mr. Branko Terzic, at 56:06 – 56:30.



6

applicable example in our jurisdiction. To that effect, BC Hydro was the only example LUMA provided that contained a liability restriction due to willful misconduct.[23] We have not found any other example in which a utility was protected for gross negligence and/or willful misconduct.[24]

Regarding the inclusion of protection for gross negligence and willful misconduct, LUMA argues that the Puerto Rico Supreme Court has not adopted degrees of negligence in its interpretation of the types of acts or omissions that give rise to civil liability due to fault or negligence.[25] Although I agree with LUMA that the Puerto Rico Supreme Court is yet to adopt degrees of negligence, it does mean that they are not applicable in specific circumstances such as the provisions of Article 1538 of the 2020 Puerto Rico Civil Code[26] or in matters related to liability waivers, such as the one LUMA proposes.

As LUMA stated, Article 1538 of the 2020 Puerto Rico Civil Code introduced in Puerto Rico the concept of punitive damages payable where the culpable or negligent act or omission constitutes a crime, **are intentional** or show clear disregard for the life, security and property of others.[27] Until the adoption of the 2020 Puerto Rico Civil Code, civil liability for fault or negligence was governed by Article 1802 of the 1930 Puerto Rico Civil Code[28].



As LUMA correctly expressed, Article 1802 of the 1930 Puerto Rico Civil Code, analogous to Article 1536 of the 2020 Puerto Rico Civil Code[29], does not distinguish between degrees of negligence. However, from the standpoint of a claim based upon Article 1802 of the 1930 Puerto Rico Civil Code and Article 1536 of the 2020 Puerto Rico Civil Code, the plaintiff only need to prove negligence as one of the elements of her case, **regardless of the degree**. Until now, the Puerto Rico Supreme Court has analyzed the concept of negligence as it applies to claims arising from Article 1802 of the 1930 Puerto Rico Civil Code and Article 1536 of the 2020 Puerto Rico Civil Code. Therefore, it is not surprising that the Puerto Rico Supreme Court has not faced an issue in which it had to determine or establish degrees of negligence.

The fact that the Puerto Rico Supreme Court has not faced the issue of degrees of negligence, does not imply that this will continue to be the case. To that effect, we could not find a case in which the Puerto Rico Supreme Court faced an issue of degrees of negligence

---

[23] *See* May 22 Motion, Response: TC-RFI-LUMA-MI-21-0007-210518-PREB-0001.

[24] *See Id.*

[25] May 22 Motion, at p. 6.

[26] 31 LPRA § 10803.

[27] *Id.*, at n. 3.

[28] 31 LPRA § 5141.

[29] 31 LPRA § 10801.



arising from language similar to the proposed Liability Waiver. We also could not find a case in which the Puerto Rico Supreme Court bars the distinctions between the degrees of negligence. The fact that there is no precedent in our jurisdiction in which the Supreme Court instituted a distinction between degrees of negligence, does not imply that such distinction cannot be established in the concept of a liability waiver, especially since the Court has not prohibited such action.

Liability waivers are designed to provide protection against certain claims. They are mechanisms that limit the instances in which an injured party is able to file a claim in court. Therefore, from the standpoint of approving limitations on liability, the distinction between the degrees of negligence, which is directly related to the level of protection, is fundamental.

LUMA's argument regarding the inclusion of the "gross negligence" and "willful misconduct" language in the proposed Liability Waiver seems contradictory. On one hand, LUMA argues that the Puerto Rico Supreme Court has not adopted degrees of negligence in its interpretation of the types of acts or omissions that give rise to civil liability due to fault or negligence.[30] According to LUMA, current interpretation of the Puerto Rico Civil Code that imposes general civil liability for negligent and culpable acts or omissions, negligence encompasses a broad range of conduct and omissions, including gross or inexcusable neglect and lesser neglect, provided that the consequences are foreseeable or predictable.[31]

On the other hand, LUMA argues that, for clarity and uniformity in adopting and implementing the Terms of Service, all forms of negligence should be included in the Terms of Service "to avoid that artful pleading annuls or undercuts the liability waiver and to protect PREPA, customers and LUMA from bearing the costs of managing and defending claims for negligence that should be covered by the proposed Terms of Service."[32]

Reality is that, when approving limits on liability, regulators make a distinction between degrees of negligence in order to establish the level of utility protection that is consistent with the specific circumstances and the public policy of their jurisdictions.[33] As such, establishing the reasonable level of liability protection based upon the appropriate

---

[30] May 22 Motion, at p. 6.

[31] *Id.*

[32] *Id.*

[33] *See* May 22 Motion, Response: TC-RFI-LUMA-MI-21-0007-210518-PREB-0001.



degree of negligence is a standard regulatory practice, and as such, it is within the regulatory powers granted to the Energy Bureau through Act 57-2014[34] and Act 17-2019[35],[36]

The *Black's Law Dictionary* defines "gross negligence" as "[a] lack of **even slight diligence or care**" and "[a] **conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party, who may typically recover exemplary damages**."[37] According to *Black's*, the difference between *gross negligence* and *ordinary negligence* is one of degree and not of quality.[38] Gross negligence is traditionally said to be **the omission of even such diligence as habitually careless and inattentive people do actually exercise in avoiding danger to their own person or property**.[39]

Similarly, the *Black's Law Dictionary* defines "willful misconduct" as "[m]isconduct committed voluntarily and intentionally."[40] *Black's* also defines "willful and wanton misconduct" as "[c]onduct committed with an intentional or reckless disregard for the safety of others, as by failing to exercise ordinary care to prevent a known danger or to discover a danger."[41]

In its pre-filed written testimony, LUMA witness, Mr. Branko Terzic, expressed that "a more restrictive limitation of liability can be supported in this instance due to a number of unique and negative circumstances."[42] I disagree.



---

[34] *The Puerto Rico Energy Transformation and RELIEF Act*, as amended.

[35] *The Puerto Rico Energy Public Policy Act*.

[36] *See* Article 6.3(c) of Act 57-2014, the Energy Bureau will have the power to implement the necessary regulatory actions to, among others, ensure the efficiency and reasonability of the electric system rates; Article 6.33(rr) of Act 57-2014, besides the enumerated powers in Act 57-2014, the Energy Bureau will have all appropriate and necessary additional implicit and incidental powers to execute all enumerated powers and to achieve the goals of Act 57-2014; Article 1.5(1)(a) of Act 17-2017, the Energy Bureau will be responsible to, among other things, guarantee that the rates are just and reasonable and consistent with the best fiscal and operational practices in order to provide reliable service, at the lowest reasonable cost; Article 1.5(3)(a) of Act 17-2019, the Energy Bureau will have ample powers to guarantee compliance with the public energy policy, the provisions and mandates of Act 17-2019 and to ensure just and reasonable costs that are affordable, easy to understand and clearly comparable and transparent through the revision of the rates.

[37] *Gross negligence*, <u>Black's Law Dictionary</u> (11th ed. 2019). Emphasis provided.

[38] *Id.*

[39] *Id.*

[40] *Willful misconduct*, <u>Black's Law Dictionary</u> (11th ed. 2019).

[41] *Willful and wanton misconduct*, <u>Black's Law Dictionary</u> (11th ed. 2019).

[42] *Motion Submitting Pre-Filed Testimonies in Lieu of Presentation or the Virtual Technical Conference* ("May 14 Motion"), <u>In Re: review of LUMA's Terms off Service (Liability Waiver)</u>, Case No. NEPR-MI-2021-0007, Exhibit 2, LL. 263 – 264, May 14, 2021.

According to Mr. Terzic, "[u]nder the OMA, LUMA Energy steps into manage and operate a large and complex electric system which it did not design, build, operate, train the workforce, or maintain with its own crews. Thus, claims of economic losses in the future will most likely be the result of accumulated problems inherent in the existing electric system LUMA will contract to operate and improve in the future."[43] Although there is consensus on the current state of disrepair of the Puerto Rico electric system, the concept of negligence, including gross negligence and willful misconduct, relates to a human factor, which will be under LUMA's control, and not to the state of the electric system.

One of the main elements of gross negligence is that the act or omission in reckless disregard of a legal duty and of the consequences to another party is conscious and voluntary. It also represents a lack of slight diligence or care. With regards to willful misconduct, the act is committed voluntarily and intentionally, in reckless disregard for the safety of others. These elements represent human conduct and are not related to the state of the electric system.

On the other hand, contrary to BC Hydro and NSTAR in the case *Maryland Casualty Company*, LUMA is not requesting a liability limit on a discrete number of instances applicable to certain customer classes. As stated before, LUMA requests a limit on its liability for a broad number of circumstances applicable to all customer classes.

To that effect, LUMA's request is two-fold. First, LUMA asks for a liability limit on general category that includes losses arising in any way out of or in connection with the operation of the transmission and distribution system and the provision of power and electricity including any events of interrupted, irregular or defective electric service due to force majeure events, other causes beyond the Released Parties' control, or ordinary negligence, gross negligence or willful misconduct. The second part of the proposed Liability Waiver concentrates mainly on economic aspects that are consistent with commercial and industrial activities, rather than residential ones.[44]

It is important to note that, currently PREPA does not have any liability protection. As I stated in my concurring opinion of May 4, 2021 in the instant case, LUMA's Liability Waiver request represents a substantial shift in the rights of PREPA customers.[45] To that effect, we must note that, in the last ten years the total claims against PREPA were

[43] *Id.*, LL. 264 – 269.

[44] To that effect, LUMA requests a liability limit "responsible for any loss of profits or revenues, special, exemplary, punitive, indirect, incidental or consequential damages, including loss of revenue, loss of use of equipment, cost of capital, cost of temporary equipment, overtime, business interruption, spoilage of goods, claims of customers of electric customers or other economic harms, in each case howsoever and whensoever arising, including where caused by any of the Released Parties' ordinary negligence, gross negligence or willful misconduct."

[45] Resolution and Order, In Re: review of LUMA's Terms off Service (Liability Waiver), Case No. NEPR-MI-2021-0007, May 4, 2021, Associate Commissioner Ángel R. Rivera de la Cruz, concurring.

approximately $460 million, whereas over the same time period PREPA has paid a total amount of $988,220.34.[46]

During the May 18 Technical Conference, LUMA witness, Mr. Mario Hurtado, expressed that the historical claims was not a major concern; the primary concern was rather the forward-looking risk of unbounded loss.[47]   Although he accepted that the rate impact of the historical claims and the resources PREPA invested in managing them was small, Mr. Hurtado expressed that the rate impact looking forward could be quite large.[48]

To that effect, Mr. Hurtado expressed that, taking into consideration the heightened risk from events because of climate change, and that in the past, utilities has been subject to multi-billion dollars and class action lawsuits due to catastrophic tropical events, it would be reasonable to assume that if these types of events were to befall on PREPA, it might affect PREPA's and LUMA's ability to operate the system.[49]   According to Mr. Hurtado, this represents a reasonable risk.[50]   I disagree.

The most catastrophic weather event in recent Puerto Rico history was the passing of Hurricanes Irma and Maria in September, 2017.   Even under the dire circumstances and considerable losses Puerto Rico experienced during that time, the number of claims against PREPA, and the amounts associated with them, are not even close to the multi-billion dollar and class action lawsuits Mr. Hurtado described in his testimony.

Under these circumstances, the proposed Liability Waiver is not reasonable. Notwithstanding, as stated before, approving limits on liability are common regulatory practice.   To that effect, utilities should not be liable for damages or losses arising from situations that are out of their control.   However, they should be liable for their own misconduct or negligence in the discharge of their duties, with the exception of certain special cases in which damages are difficult to predict and potentially immense in magnitude. Examples of this are loss of profit, loss of revenue and other economic losses, as they pertain to commercial and industrial customers.[51]   Notwithstanding, even in these special cases, the utility should be liable if the damages arise or result from its own gross negligence or willful misconduct.

---

[46] *Motion Submitting Responses to Attachment A of May 4th Resolution and Order* ("May 11 Motion"), In Re: review of LUMA's Terms off Service (Liability Waiver), Case No. NEPR-MI-2021-0007, Exhibit 1, Response: RFI-LUMA-MI-21-0007-2105-04-PREB-0001, "RFI-LUMA-MI-21-0007-210504-PREB-001-Att3.xlxs", May 11, 2021. These amounts represent the sum of Columns P and Q, respectively, of file "RFI-LUMA-MI-21-0007-210504-PREB-001-Att3.xlxs".

[47] May 18, 2021 Technical Conference, testimony of Mr. Mario Hurtado, at 1:52:20 – 1:52:33.

[48] May 18, 2021 Technical Conference, testimony of Mr. Mario Hurtado, at 1:53:32 – 1:54:19.

[49] May 18, 2021 Technical Conference, testimony of Mr. Mario Hurtado, at 1:54:26 – 1:55:54.

[50] *Id.*

[51] *See Maryland Casualty Company v. NSTAR Electric Company*, at 428 – 429.

As such, I concur with the majority of the Energy Bureau regarding rejecting LUMA's Proposed Liability Waiver. However, I would have adopted the following Modified Terms of Service, which satisfy the basic requirement of reasonableness:

> Unless there is negligence on the part of PREPA, its directors, officers, employees, agents, and contractors (including LUMA Energy, LLC and LUMA Energy Servco, LLC) (the "Released Parties"), the Released Parties shall not be liable to any customer or person (natural or legal) for any loss, injury, damage or expense arising out of, or in any way connected with, the provision or supply of electricity, resulting from any stoppage, interruption, variation or diminution of service, fluctuation, termination, failure or defect, including any events of interrupted, irregular, defective electric service due to force majeure events, or any other cause beyond the Released Parties' control.

> In any event, for commercial and industrial customers, the Released Parties shall not be liable for any loss of profit, loss of revenue or other economic loss, resulting from the negligent acts or omissions of the Released Parties, except to the extent that such damages arise, or result from, the gross negligence or willful misconduct of the Released Parties.

> These provisions shall not be interpreted, construed, or deemed to limit, restrict, or affect in any way, the authority and regulatory powers granted to the Energy Bureau under applicable law.

For all of the above, I concur in part and dissent in part.

_____

Ángel R. Rivera de la Cruz
Associate Commissioner

In San Juan, Puerto Rico, on May 31, 2021.



12

November 30, 2022

Puerto Rico Electric Power Authority
PO Box 364267
San Juan, Puerto Rico 00936-4267
Attention: Chief Executive Officer

LUMA Energy, LLC
644 Fernandez Juncos Ave., Suite 301
San Juan, Puerto Rico 00907
Attention: President/CEO; General Counsel

Ladies and Gentlemen:

We refer to the Puerto Rico Transmission and Distribution System Supplemental Terms Agreement, dated June 22, 2020 (the "Supplemental Agreement"), among the Puerto Rico Electric Power Authority ("Owner"), the Puerto Rico Public-Private Partnerships Authority ("Administrator"), LUMA Energy, LLC ("ManagementCo") and LUMA Energy ServCo ("ServCo" and, together with ManagementCo, "Operator"). Capitalized terms used but not defined herein shall have the meanings set forth in the Supplemental Agreement.

In accordance with the express terms of Section 7.1(a) of the Supplemental Agreement, Administrator hereby requests an extension of the Interim Period Termination Date to the date on which the following Service Commencement Date Conditions shall have been satisfied or waived: (i) the Title III Exit shall have occurred; and (ii) the Title III Plan and order of the Title III Court confirming same shall be reasonably acceptable to Operator.

By signing below, each of Administrator, Owner and Operator confirms its agreement to the foregoing extension of the Interim Period Termination Date.

Respectfully,

PUERTO RICO PUBLIC-PRIVATE PARTNERSHIPS AUTHORITY, as Administrator

By: _____
Name: Fermín E. Fontánés Gómez
Title: Executive Director


cc:     Puerto Rico Energy Bureau
        268 Avenida Muñoz Rivera
        Edificio World Plaza
        Piso 7, Suite 704
        Hato Rey, Puerto Rico 00918
        Attention: President

ACKNOWLEDGED AND AGREED:

PUERTO RICO ELECTRIC POWER AUTHORITY

By: _____

Name: Fernando A. Gil-Enseñat
Title: Chairman
PREPA Governing Board

*[Signature Page to Supplemental Agreement Extension]*

ACKNOWLEDGED AND AGREED:

LUMA ENERGY, LLC

By: _____  By: _____
Name: Wayne Stensby  Name: MARIO HURTADO
Title: President & CEO  Title: VP + Chief Regulatory Officer

LUMA ENERGY SERVCO, LLC

By: _____  By: _____
Name: Wayne Stensby  Name: MARIO HURTADO
Title: President & CEO  Title: VP and Chief Regulatory Officer

*[Signature Page to Supplemental Agreement Extension]*


# TRANSPERFECT

Entry ID: 6770995   Date Filed: 12/08/2025   Page: 767   Document: 0011 8376456   Case: 25-2077

I, Harvetta Asamoah, hereby certify that I am competent to translate from Spanish to English and that the attached translation is, to the best of my knowledge and belief, a true and accurate translation of the following documents from Spanish to English:

CT-2025-0003_-_DEPARTAMENTO_DE_ASUNTOS_DEL_CONSUMIDOR_v._LUMA_Y_OTROS

*Harvetta Asamoah*

Harvetta Asamoah

Sworn to before me this
4th day of December 2025



Signature, Notary Public

```
KURTIS M. ESTEBANEZ
Notary Public - State of Florida
Commission # HH 606749
My Comm. Expires Feb 22, 2029
Bonded through National Notary Assn.
```

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS
1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.400.8840 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

IN THE SUPREME COURT OF PUERTO RICO

| | | |
|---|---|---|
| Department of Consumer Affairs<br>Petitioner<br><br><br>v<br><br><br>LUMA Energy, LLC; LUMA Energy<br>ServCo, LLC; Puerto Rico Energy<br>Bureau; Electric Power<br>Authority<br>Appellees | CT-2025-0003 | |

**The Associate Judge Mr. Candelario López issued the Opinion of the Court.**

In San Juan, Puerto Rico, on 1 December 2025.

*"In order for power not to be abused, power must restrict power."* - Montesquieu

At this time, we have the opportunity to reaffirm that the administrative agencies only have the duties and powers that are delegated to them by the Legislative Assembly. Specifically, we are responsible for ruling on whether the Puerto Rico Energy Bureau (NEPR or Bureau) exceeded its authority by granting a liability relief for ordinary negligence to a private entity for damages related to the operation of the electrical system. Thus, we must resolve whether the above-described release constitutes immunity from non-contractual claims by third parties. If we answer in the affirmative, we must assess whether the Bureau, being an administrative forum, has the

legal power to approve, by decision, a disclaimer clause to a private entity.

Because it considers that the relief of liability in question is, in effect, an immunity against non-contractual claims caused by ordinary negligence, and, because it understands that the Legislative Assembly did not delegate to the NEPR the power to grant such immunity, we conclude that the actions of the Bureau are *ultra vires* for violating the doctrine of separation of powers. We should recall that legislative delegation does not represent a waiver of legislative power, but is the expression of its ability to structure, distribute and operationalise public management efficiently.

<p align="center">I</p>

This remedy is based on a dispute over the contractual interpretation of a disclaimer. On 22 July 2025, the Department of Consumer Affairs (DACo) filed with the Court of First Instance (TPI) a *Request for declaratory judgement to declare unconstitutional section 4.1(g) of the Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (OMA), against LUMA Energy, LLC, LUMA Energy ServCo, LLC, (collectively, LUMA), the Bureau and the Electric Power Authority (AEE). In summary, it requested that Section 4.1(g) of the OMA and the *Decision and Order* issued by the Bureau on 31 May 2021 (NEPR Decision) be declared null and unconstitutional, because it understood that, by this, the NEPR granted LUMA and the AEE almost absolute immunity against consumer claims, which it was

CT-2025-0003                                                         3

not empowered by law to grant. Consequently, it requests that
every citizen be allowed to bring claims for damages caused by
the negligence and fluctuation of the electric power service
before LUMA.

   As stated by the DACo, on 24 February 2021, LUMA
submitted to the NEPR a *Request for Approval of Terms of
Service and Memorandum of Law in Support*, in which, among
other things, it requested that section 4.1(g) of the WCO
be approved. It argued that this section provides full
relief to LUMA and its employees, officers and contractors
against consumer claims for damages caused by negligence
or fluctuations in electric service. It maintained that,
prior to the signing of the WCO, the public corporation
lacked such immunity and had a mechanism for consumers to
submit their claims.

   It arises from the WCO that the aforementioned
Section 4.1(g) states the following:

      (Emphasis added).

   The DACo added that, on 25 May 2021, the Puerto Rico
Energy Bureau held a public hearing for the purpose of
listening to the general public regarding the proposed
terms of service. Thus, on 31 May 2021, the Puerto Rico
Energy Bureau issued its decision in which it determined,
among other matters, the following:

      (Emphasis added).

   According to the DACo, the NEPR Decision amended the

content intended to be adopted from WCO Section 4.1(g) to remove cases of gross negligence of LUMA. In its opinion, it granted a comprehensive release of liability through an "administrative and contractual" process, violating the principle of a legal reservation, since it was not the product of a legislative process. In addition, the DACo argued that the State cannot confer, by administrative and contractual *fiat* quasi-sovereign immunity on a private company without this being evaluated by the Legislature. Thus, it concluded that the NEPR attempts to limit or suppress non-contractual claims to the detriment of third parties without participation or endorsement of the Legislative Assembly, constituting a usurpation of the legislative power and an attack against the doctrine of separation of powers.

Thus, on 24 July 2025, the Puerto Rico Senate and the Puerto Rico House of Representatives filed an *Application and brief by the Puerto Rico Senate and the Puerto Rico House of Representatives as friends of the court*. In summary, they adopted the DACo approach that the NEPR administratively approved a clause of almost absolute immunity in favour of LUMA without the intervention of the Legislative Assembly and to the detriment of non-contracting third parties, understood as consumers. Thus, they alleged that the immunity provided for in Section 4.1(g) of the WCO and the NEPR Decision constitute a violation of the separation of powers enshrined in the Constitution of Puerto Rico. In addition, both legislative bodies held that, by approving the Puerto Rico Electric

CT-2025-0003                                                          5

Power Authority Act, *infra*, and the Puerto Rico Electric
Power System Transform Act, *infra*, they did not delegate
to the EEA or the Public-Private Alliance Authority (AAPP)
the power to grant immunity in favour of the EEA and LUMA.
Therefore, they requested that *the motion for declaratory
judgement filed by the DACo be declared* and that Section
4.1(g) of the WCO and the NEPR Decision be declared null
and void.

    For its part, on 6 August 2025, the Institute of
Competitiveness and Economic Sustainability (ICSE)
submitted a *Request for Intervention as amicus curiae*, in
support of the grant of the remedy requested by DACo. Firstly,
it indicated that, in 2021, it litigated the same matter before
the NEPR and before the Court of Appeals, although on that
occasion it was not recognised with active standing for it.[1]
The ICSE recognised the constitutional nature of the DACo's
approach to the separation of powers. However, it pointed out
that the dispute can be addressed as a matter of strict right
of damages, since, contrary to the provisions of the NEPR
Decision, our legal system does not allow limiting the
categories or amounts of damages that a person can recover as a
remedy for the damage suffered. According to the ICSE, in
Puerto Rico, liability for contractual or non-contractual
damages is a strictly substantive matter, determined by law, so
only the Legislative Assembly can create exemptions or
immunities. In that sense, it argued that the NEPR legislated
immunity that can only be granted by legislative means and, in

---

[1] See *In re: Review of the terms of service of LUMA (extension of
liability)*, Case No. KLRA202100406, in which the Court of Appeals
dismissed the appeal filed by the ICSE, for lack of active standing.

addition, that we are faced with a contractual matter, not a tariff matter, as the Bureau and LUMA intend to show.

Thus, on 8 August 2025, the DACo submitted an *Intrajurisdictional Certification Appeal* to us. In general, it reiterated the grounds it raised before the primary forum, and argued that, during a public hearing held by the House of Representatives, LUMA admitted not having addressed 1,828 consumer complaints about property damage, loss of equipment and other consequences attributable to electrical failures, for understanding that the NEPR Decision exempts it from doing so. According to the DACo, this public recognition claims that consumers are left without remedies for operational failures of the entity that manages this essential service. In view of this, it held that the dispute is mature for adjudication, and that it merits our urgent intervention to stop this state of defencelessness, restore the constitutional balance and reaffirm that in Puerto Rico no one can operate outside of legal liability.

On 12 August 2025, we issued a *Decision* granting a period of three (3) days for the parties under appeal to make a statement on the appeal in question. On the following day, the ICSE filed a *Motion in compliance with the decision* in which, in support of the appeal being issued, it requested that we consider its arguments as *amicus curiae* before the primary forum, which it reiterated in its brief.

On 15 August 2025, the Senate and House of

CT-2025-0003                                          7

Representatives appeared jointly, and adopted the position
of DACo as to the constitutional nature of this dispute.
Specifically, they highlighted that the doctrine of
separation of powers grants them exclusive power to
examine, establish and grant immunity against claims for
damages.

CT-2025-0003                                              8

On that same date, the NEPR filed its *Motion in compliance with the order*, opposing the issuance of the appeal. In the first place, he argued that this is not a substantive constitutional controversy or on the separation of powers. On the contrary, it held that it concerns a release of liability granted as part of a tariff process carried out within the powers delegated to the NEPR, to evaluate modifications to the terms of service related to the liability of LUMA and the AEE for losses of customers and users of the electrical system as a result of its operation.

The Puerto Rico Energy Bureau stated that, a "liability waiver" in the field of companies that provide essential services to the public, aims to prevent the cost of indemnifying claims from substantially increasing the cost of the service, which in most cases would ultimately be paid by the customers and users themselves. It argued that the relief seeks to maintain lower and stable rates, preserving the financial viability of the operation and the continuity of the electricity service. Although it rejected the terms proposed by the parties, it held that it approved certain modifications that it understood to safeguard the public interest, and that it adopted them, after holding public hearings in which the Independent Consumer Protection Office (OIPC) participated.

In addition, according to the NEPR, in this case the urgent criterion that requires the issuance of an appeal

for intrajurisdictional certification is not present,
since the relief was adopted four (4) years before the
filing of this request for declaratory judgement. It
stated that this stage of the proceedings was also not
propitious, since the parties had not yet appeared before
the court of instance or made discovery of evidence. In
short, it insisted that we are not facing a substantial
constitutional dispute, and reiterated that it believes
users will end up paying for the indemnities granted.
Finally, it once again questioned DACo's standing to bring
this action.

Also on that date, LUMA submitted its *Opposition to
an appeal for intrajurisdictional certification*. LUMA
followed the NEPR's example and questioned the urgency of
issuing a certification. It raised, in addition,
"jurisdictional matters" that must be addressed by the
instance forum before addressing on the merits the
validity of the challenged liability relief, namely: (1)
the standing of DACo, which, in his judgement, is held by
the OIPC; (2) the absence of clear, real, and palpable
damage to DACo that allows it to question whether the
determination of the NEPR violates the separation of
powers or if it deprived the Legislative Assembly of its
prerogatives; and (3) the lack of an essential party, due
to the absence of the AAPP in the lawsuit. It argued that
the limitation of liability of electric service companies
responds to a delegation of powers from the Legislature to
the NEPR, although it did not cite the specific provision

conferring such power. It repeated, without further elaboration, the argument that the limitation of liability is an inherent part of the rate making process, for the purpose of securing reasonable rates. Regarding the release of liability as a regulatory mechanism, LUMA indicated that it is the standard in the United States and other jurisdictions, since the contrary "would undermine the power validly delegated to the NEPR to fulfil its duties and functions on the making of electricity service rates".

Finally, the AEE appeared through a brief *Motion in compliance with the order to show cause* to rule in favour of us accommodating and issuing the appeal before our consideration, since "the subscribers of the A.E.E. deserve to be certain about their rights."

Having evaluated the positions of the parties, on 22 August 2025, we issued a *Decision* in which we issued the appeal for intrajurisdictional certification. Thus, we granted a term of fifteen (15) days to the DACo to present its brief, and fifteen (15) days thereafter to the respondents to submit their position.

On 8 September 2025, the DACo filed its brief. From its point of view, the dispute under our consideration requires answering the following question: can an administrative agency confer on a private operator general immunity from third-party tort claims, including ordinary negligence, without express legislative authorisation?

CT-2025-0003                                                    11

Given that it did not, it requested that we issue a
judgement declaring that such attribution is not possible
because it is an act that exceeds the competence of the
NEPR and alters the substantive civil liability regime
without being allowed to do so by its enabling law.

    According to the DACo, its organic law confers on it
statutory standing to file this action, since the
Legislative Assembly expressly entrusted it to "vindicate
and enforce the rights of consumers in all necessary
forums", in any matter "that affects or may affect" its
interests. It argued that many consumers have been harmed
by LUMA's negligent acts and others could reasonably be
affected if DACo did not intervene. As regards the
competence of the OIPC, it held that it is limited to
matters related to rates, invoicing, quality of service
and other technical aspects of the regulated services, not
to substantive rights of consumers in matters of damages.
It succinctly argued that there are no essential parties
absent from this lawsuit, since, although the AAPP signed
the WCO, it did not assume obligations or duties related
to this dispute.

    On the substantive issues, the DACo reiterated that
the limitation of liability in favour of a private
operator does not constitute a basic and legitimate
component of the electricity rate, but rather an *ultra
vires* concession by the NEPR. In this regard, it noted
that Law No. 57-2014, *infra*, did not delegate to the

Puerto Rico Energy Bureau the power to release a private operator from civil liability against consumer claims for acts of negligence. It also emphasised that it is constitutionally established that any franchise or concession of a public nature must be determined by law, so it is the responsibility of the Legislative Assembly to grant disclaimers such as that granted by the NEPR. As a consequence, it concluded that the Puerto Rico Energy Bureau exceeded its authority by granting immunity to LUMA without legal authority, so the contested action is null *and void ab initio*.

On the same day, the ICSE submitted an *Amicus Curiae Brief*. The ICSE argued that it agreed with the DACo and the Legislative Assembly that the exemption granted to LUMA is illegal because the administrative determination of the NEPR improperly involves itself in the Legislative Power, benefiting not only LUMA, but the EEA itself. By way of example, it identified several instances in which the legislator granted disclaimers for damages, including to employers under the State Insurance Fund and in cases of malpractice in medical education centres. It also questioned the prudence of empowering a regulator to release entities under its jurisdiction from liability.

On 23 September 2025, LUMA submitted its brief.[2] In

---

[2] Prior to the submission of its brief, on 19 September 2025, LUMA notified this Curia, by means of an *Informative Motion*, that it submitted an *Urgent Motion of LUMA to Enforce the Automatic Stay* in Case No. 17-BK-4780-LTS, currently before the United States District Court for the District of Puerto Rico under Title III of the PROMESA Act.

   As applicable, on 30 October 2025, the DACo filed an Informative

its brief, as it did when opposing the issuance of the appeal, it raised the jurisdictional impediments that, in its opinion, must guide our analysis, namely: lack of active standing of the DACo, lack of essential party and, in terms of the unconstitutionality of transferring to the invoices of its clients the compensation payments that it has to make, that DACo requests a consultative opinion. In substantive terms, LUMA emphasised the bases that have justified the granting of liability limitations for utility companies in various U.S. jurisdictions. LUMA argued that the courts of these jurisdictions have validated that the tariff regulation extends to the adoption of limits of liability for negligence, without requiring that the enabling law of the regulatory body expressly empowers it. Based on the premise that the limitation of liability is an inherent part of the delegated regulatory function, it held that the NEPR was empowered to issue its decision.

On that same date, the Senate and the House of Representatives appeared to join the brief by the DACo, making clear their position that the NEPR exceeded its authorities by granting immunity, which only the Legislative Assembly can grant. In particular, they cited Section 13 of Art. VI of the Constitution of Puerto Rico, which, where relevant, prescribes that "[t]he procedure for granting franchises, rights, privileges and

---

Motion in which it attached the Memorandum Order Denying Urgent Motion of LUMA to Enforce the Automatic Stay, of 27 October 2025, declaring that LUMA's request was denied.

concessions of a public nature will be determined by law."
Given the foregoing, they requested that the NEPR Decision
be decreed null and void.

Within the time granted, the AEE and the OIPC
appeared, the latter, through a *Request for Intervention
and brief of the auditor, Independent Consumer Protection
Office of the Public Service Regulatory Board.* It rejected
the position of the DACo that it is not authorised to
address constitutional disputes, since Law No. 57-2014,
*infra*, empowers it to appear as a petitioning party or as
an intervenor in any action related to tariffs, invoices,
public policy or any other matter that may affect the
customers of the electricity service. On the merits, the
OIPC agrees that Section 4.1(g) of the WCO is illegal as
it is a "self-relief" of responsibility by the AEE and
LUMA in the absence of manifest intention of consumers to
relieve them. Likewise, the OIPC stated that the WCO is an
adhesion contract in which clients did not participate and
therefore should be interpreted restrictively against the
agency.

Finally, on 24 September 2025, the Puerto Rico Energy
Bureau submitted its brief. In relevant part, the Puerto
Rico Energy Bureau reiterated the need and desire for a
private operator to have limits of liability for
negligence, as well as the source of law he understands
supports his action in granting the relief, that is: that
is the practice in various states of the United States. In

addition, it raised the same jurisdictional arguments made by LUMA.

After careful evaluation of the arguments of the parties, as well as the briefs submitted by the intervening parties and friends of the court, we proceed to render a decision.

## II

Having in our view a controversy related to a matter of high public interest, namely about the Puerto Rico electricity system, it is advisable that we make a historical account of the facts that precede it.

The history of the Government of Puerto Rico as responsible for producing and managing the country's electricity originates in the third decade of the 20th century. Faced with the need to produce electricity at a low cost due to the industrialisation process ahead, the *Puerto Rico Reconstruction Administration* (PRRA) aimed at rural electrification of the country. Thus, the PRRA, an agency created by the United States Congress to lead the Puerto Rican recovery after the atmospheric events of 1928 and 1932,[3] determined that the hydroelectric plants to be built would eventually be delivered to the Government of Puerto Rico to be incorporated into the growing electricity system.[4]

---

[3] See Executive Order 7057, *Establishing the Puerto Rico Reconstruction Administration* (28 May 1935).
[4] E. Latimer Torres, *History of the Electric Power Authority: Implantación de los Sistemas de Luz y Fuerza en Puerto Rico 1893-1993 [Establishment of the Light and Power Systems in Puerto Rico 1893-*

Subsequently, with the approval of Law No. 83 of 2 May 1941, currently known as the *Puerto Rico Electric Power Authority Act*, the Fuentes Fluviales Authority (AFF) was created. Among the purposes of the aforementioned statute, the Legislative Assembly sought to centralise the electricity service of Puerto Rico. It was under the development of the AFF, and subsequently, the AEE,[5] that electricity acquired access to the entire Puerto Rican population. However, the projected annual growth rate in electricity consumption was such that it merited the need to increase generation capacity.

As electricity consumption increased, the private company was incorporated into those operations. As an example, by the 1990s, EcoEléctrica was installed in Guayanilla and AES in Guayama, each producing about 15% of the electricity consumed by the country.

Where relevant, the *Energy Transformation and RELIEF Act*, Law No. 57-2014, as amended, 22 LPRA sec. 1051 *et seq.*, was approved, whose Statement of Rationale outlines the following:

> After more than seventy (70) years of creation, and more than three decades after fulfilling its total electrification mandate of the country, the AEE has become a monopoly that regulates itself, decides its rates without real monitoring, incurs operational, managerial and administrative inefficiencies, the cost of which at the end of the day is assumed directly by the consumer, and maintains internal governance that

---

*1993]*, 1st ed., San Juan, First Book Pub. of P.R., 1997, pág. 342.
[5] Through Law No. 57 of 30 March 1979, the Legislative Assembly changed the name of the Water Source Authority to the Electric Energy Authority.

lacks transparency and citizen participation. All of this contributes to Puerto Rico being in one of the top positions with respect to higher energy costs among U.S. jurisdictions.

**A. Puerto Rico Energy Bureau**

Pursuant to the *Energy Transformation and RELIEF Act*, *supra*, the Puerto Rico Energy Commission was created, now the Puerto Rico Energy Bureau (Negociado de Energía de Puerto Rico NEPR). 22 (Leyes de Puerto Rico Anotadas) [Laws of Puerto Rico Annotated] sec. 1054b. The NEPR was conceived as a specialised and independent entity, in charge of regulating, supervising and enforcing the public energy policy of the Government of Puerto Rico. 22 LPRA sec. 1051a(j). In order to promote transparency and autonomy in its duties, the NEPR was separated from any of the entities under its jurisdiction. 22 LPRA sec. 1054k.

This was a significant step in the fragmentation of the powers that were, at the time, exclusive to the AEE, and delegated to the NEPR certain powers of oversight as an independent regulator. The powers granted to the NEPR by the Legislative Assembly include the following:

(a) To supervise and ensure the full execution and implementation of the public policy on electricity service in Puerto Rico;

(b) To establish by regulation the public policy rules in relation to the electric service companies, as well as any transaction, action or omission that affects the electric grid and the electric infrastructure in Puerto Rico, and to implement such public policy rules. These regulations must be consistent with the public energy policy declared by legislation;

(c) To establish and implement the regulations and regulatory actions necessary to ensure capacity, reliability, safety, efficiency and reasonableness in Puerto Rico's electrical

system tariffs and establish guidelines, standards, practices and processes to follow for energy purchasing processes, the modernisation of power plants or facilities, providing that any contract for the purchase and sale of energy shall comply with the standards, terms and conditions established by the NEPR in accordance with the provisions of the Energy Public Policy Law and this Law.

[…]

(k) To review and approve short-, medium- and long-term policies, strategic plans and plans related to integrated energy resource planning in Puerto Rico, and monitor compliance with them;

[…]

(n) To approve, review and, as applicable, modify the rates or charges charged by the electric service companies or the Contracting Party of the transmission and distribution network in Puerto Rico for any matter directly or indirectly related to the provision of the electric service;

[…]

(nn) To sue and be sued in claims or causes of action in its own name in the Court of First Instance of the Government of Puerto Rico against any natural or legal person that violates or interferes with the requirements, purposes and objectives of this Law, or in any other administrative forum of the Government of Puerto Rico. For such purposes, the Puerto Rico Energy Bureau is recognised with active standing to file the necessary remedies, including and without limitation to request a contempt against any natural or legal person who violates the mandates contained under the jurisdiction of the Puerto Rico Energy Bureau, before the judicial forum to ensure full compliance with the public policy set forth in this Law;

(oo) To adopt rules, pronouncements and regulations that are necessary to fulfil their duties, issue orders and establish fines to comply with the powers granted by law, and for the implementation of this Law. The regulations will be adopted in accordance with Law 38-2017, as amended, known as the "Uniform Administrative Procedure Act of the Government of Puerto Rico".

[…]

22 LPRA sec. 1054b.

For its part, once the privatisation of the EEA was announced, the *Public Energy Policy Law of Puerto Rico*, Law No. 17-2019, as amended, was approved, 22 LPRA sec. 1141 *et seq.* The purpose of this statute was to facilitate the delivery of EEA operations to private entities. Specifically, it opened the market of the Puerto Rico electrical system to the private company, **subject to the regulation of the NEPR**, by providing that the AEE would not have the exclusive right to produce, transmit, distribute and market the supply of electrical power. 22 LPRA sec. 1141b.

## B.  Authority for Public-Private Alliances

The privatisation of EEA operations is governed by several statutes, including the *Public-Private Alliances Act*, Law No. 29-2009, as amended, 27 LPRA sec. 2601 *et seq.*, and the *Law to Transform the Puerto Rico Electricity System*, Law No. 120-2018, as amended, 22 LPRA sec. 1111 *et seq.* The first aforementioned statute establishes the regulatory framework under which the AAPP carries out the privatisation processes of government entities, and the public policy of the Government of Puerto Rico regarding the creation of Public-Private Alliances by contract. 27 LPRA sec. 2604. On the other hand, the second law outlined created the legal scaffolding for the contracts of Public-Private Alliances of the AEE.

In other words, the *Law to Transform the Puerto Rico*

CT-2025-0003                                                      20

*Electricity System*, *supra*, provides for the sale or transfer of the assets or functions of the AEE, by defining the transactions of the AEE as any through which one or more Alliances are established with respect to any function, service or installation of the AEE or a Contract of Sale of the assets of the AEE related to the generation of power". 22 LPRA sec. 1113(m). Likewise, under both of the aforementioned laws, the AAPP is the entity empowered to carry out any transaction of the AEE. 22 LPRA sec. 1115(b). In addition, the AAPP is responsible for monitoring the performance and compliance of the contracting party under an alliance contract, and providing annual reports on projects conducted. 27 LPRA sec. 2609(d).

For its part, once the AAPP executes an AEE transaction, it is necessary for the NEPR to issue a Certificate of Energy Compliance for it to be perfected. 22 LPRA sec. 1118(a). Thus, when consummating an AEE transaction, the AAPP and the NEPR are the agencies in charge of preparing a work plan for the monitoring of the performance and compliance of the AEE and the contracted entity, according to each alliance or sale contract. 22 LPRA sec. 1118(d).

Thus, under the *Law to Transform the Puerto Rico Electricity System*, *supra*, on 22 June 2020, the AAPP, LUMA and the AEE signed the OMA.

**C.  Independent Consumer Protection Office**

CT-2025-0003                                                    21

The *Energy Transformation and RELIEF Act*, *supra*, created the OIPC, with the purpose of educating, assisting and representing the clients of the services under the jurisdiction of the Public Service Regulatory Board of Puerto Rico. 22 LPRA sec. 1054nn(a). Specifically, the Statement of Reasons of the aforementioned statute provides for the importance of the OIPC as an oversight body of the Puerto Rico energy system:

> As an important aspect to ensure citizen participation and oversight in the energy system, the Independent Consumer Protection Office ("OIPC") is created under this Law, **whose function will be to represent and defend the interests of consumers of energy services, both before the Authority and before the** regulatory **entity.** The OIPC shall have a duty, among others, to be an advocate and spokesperson for the interests of customers in all matters before the Energy Commission, including matters relating to billing disputes with the AEE. In addition, it will have the duty to coordinate citizen participation in the internal rate review process of the Authority and before the Energy Commission, as the case may be, in order to guarantee active participation in this process. This new entity ensures that the public does not feel helpless in the power and size of the EEA and other power generators.
>
> (Emphasis added).

Among the powers and duties delegated to the OIPC by the Legislative Assembly, the agency is responsible for the following:

> […]
>
> (d) To file legal claims or remedies with the Energy Bureau, the Puerto Rico Telecommunications Bureau and the Puerto Rico Transportation and Other Public Services Bureau on behalf of and in representation of customers, who do not have other legal representation, in relation to disputes regarding any matter

affecting the service, rate or in any other matter affecting the interests or rights of electric service, telecommunications and transportation customers. Before filing complaints on behalf of clients, it must verify that the client has complied with the pertinent administrative provisions for their claim. If there is any conflict of interest between different classes of customers with respect to any cause of action or controversy, OIPC's priority will be to represent and defend residential and commercial customers with small businesses;

[…]

(h) To participate or appear as an intervening party in any action, before any governmental agency of the Government of Puerto Rico or the Federal Government with jurisdiction, related to tariffs, invoices, public policy or any other matter that may affect consumers and/or customers of electricity, telecommunications and transportation services;

**To participate in or appear as a petitioning party or as an intervening party in any action before the General Court of Justice or before the courts of federal jurisdiction, relating to tariffs, invoices, public policy or any other matter that may affect electric service**, telecommunications and transportation customers;

[…]

22 LPRA sec. 1054qq. (Emphasis added). Having outlined the historical background of Puerto Rico's electric power system, we proceed to address the jurisdictional issues.

### III

#### A. Standing:

The doctrine of *standing* is defined as "the ability required of the [claimant or plaintiff] party of an action to appear as a litigant before the court, to efficiently perform procedural acts and thereby obtain a binding

judgement." *Rivera et al. v. Torres et al.*, 214 DPR (Decisiones de Puerto Rico) [Decisions of Puerto Rico] 111, 133 (2024) (citing *Hernández, Santa v. Srio. de Hacienda*, 208 DPR 727, 739 (2022)). Ordinarily, the person seeking a judicial remedy must demonstrate that: (1) he/she suffered clear and palpable damage; (2) the damage is real, immediate and precise, not abstract or hypothetical; (3) there is a reasonable causal relationship between the damage and the action exercised; and (4) the cause of action arises under the Constitution or a law. *Amadeo Ocasio et al. v. Gobernador et al.*, 211 DPR 278, 285 (2023) (Judgement).

However, in the exercise of determining whether the parties have standing to bring an action, the courts must analyse compliance with the aforementioned criteria, **except when there is a statute that expressly confers standing**. *Rivera et al. v. Torres et al., supra.* Therefore, when evaluating the existence of standing we are called to examine whether the Legislative Assembly has granted it by statutory means. That is, **the first step is to determine whether there is statutory standing**. *Rivera et al. v. Torres et al., supra.*

### B. Statutory Standing

The Supreme Court of Puerto Rico has interpreted the concept of statutory standing since 1974. *Salas Soler v. Srio. de Agricultura*, 102 DPR 716 (1974). That is, it arises when a statute "expressly or implicitly grants an

CT-2025-0003                                                    24

individual active standing to bring an action, regardless
of whether the individual has suffered particular harm,
beyond the mere fact of the violation of the law." J. M.
Farinacci Fernós, *Any person: The plenary power of the
Legislative Assembly to grant standing by statute*, 84 Rev.
Jur. UPR 359, 360 (2015).

In other words, when the Legislative Assembly grants
standing by statute, the petitioner is empowered to
present their cause of action, subject only to the
requirements included in said statute, and regardless of
whether they have suffered real and palpable damage.
*Rivera et al. v. Torres et al.*, *supra*. In this way, when
evaluating the granting of statutory standing, we are
called to examine the legislative will as to the
circumstances that must be present for a party to be able
to bring a matter before the courts. Id.

Our interpretation of the statutory standing doctrine
has been consistent. In *Salas Soler v. Srio. de
Agricultura*, *supra*, we started from the premise that the
Legislative Assembly had full power to grant active
standing in any circumstance, and that, therefore, we were
responsible for analysing the statutory language to
determine the level of standing granted by the
legislature. J. M. Farinacci Fernós, *supra*, on p. 139.
Subsequently, in addressing matters where the statutory
standing of one of the parties has been in dispute, we
have applied the same methodology. Id.; *Rivera et al. v.
Torres et al.*, *supra*, on p. 134; *Hernández Torres v.*

CT-2025-0003                                                    25

*Governor*, 129 DPR 824, 835-836 (1992). Thus, **after we recognise the existence of the statutory legitimisation claimed, the courts are called to analyse the scope thereof**, interpreting the intention of the legislator.

### i Standing of DACo

In our legal system, the organic law of an administrative agency is the legal mechanism by which the Legislative Assembly authorises and delegates the necessary powers for it to act according to the purpose of its creation. *D.A.Co. v. Fcia. San Martín*, 175 DPR 198, 203 (2009) (citing *Amieiro González v. Pinnacle Real Estate*, 173 DPR 363, 371 (2008)). In turn, we have repeatedly stated that, when interpreting the scope of the powers delegated to an agency, we must not limit the analysis of its enabling law to a restrictive interpretation. *D.A.Co. v. Fcia. San Martín*, *supra*, on pp. 203-204.

Where relevant, based on the motives of its organic law, the primary purpose of DACo is to vindicate, protect and implement consumer rights. *Organic Law of the Department of Consumer Affairs*, Law No. 5 of 23 April 1973, as amended, 3 LPRA sec. 341 *et seq*. (DACo Organic Law). In addition to being an agency specialised in assertively and aggressively vindicating consumer rights, DACo was created to be the body capable of removing consumers from their state of defencelessness, enforcing compliance with laws aimed at protecting them, and providing them with adequate representation in the defence

of its rights. Id.

By means of Article 6 of the aforementioned law, the legislature imposed on the Secretary of the DACo the ministerial duty to represent the consumers of Puerto Rico before private entities or public bodies in any matter that affects or could affect its interests. 3 LPRA sec. 341e(e). In addition, this public official also **has the power to appear for and on behalf of consumers, before the courts of the Commonwealth of Puerto Rico and the government of the United States, in any proceeding that affects or may affect the interests of the consumer** in general, of consumer groups or of any particular consumer. 3 LPRA sec. 341e(f).

Likewise, the DACo Organic Law states that the DACo is the agency in charge of promoting and ensuring compliance with all laws, rules, regulations and orders that affect the interests of the consumer, in coordination with the other agencies and departments of Puerto Rico. 3 LPRA sec. 341e(s). This includes the **power to bring any legal remedies necessary to effectuate the purposes of its enabling law.** 3 LPRA sec. 341e(i).

### C. Essential Party

With respect to the concept of an essential party, Rule 16.1 of Civil Procedure establishes that "[t]he persons who have a common interest without whose presence [a] controversy cannot be adjudicated, shall be made parties and shall be joined as plaintiffs or defendants,

as applicable." 32 LPRA Ap. V., R. 16.1. This rule is part of the constitutional principle that provides that "no person shall be deprived of their liberty or property without [a] due process of law." Art. II, Sec.7, Const. PR, LPRA, Volume 1.

In turn, Rule 16.1, *supra*, embodies the fundamental principle of including all parties with interest so that, thus, the judicial decree issued is complete. *Oriental Bank v. Pagán Acosta et al.*, 2024 TSPR 133, 215 DPR (2024) (citing *López García v. López García,* 200 DPR 50, 64 (2018)). On the aforementioned interest, we have expressed on numerous occasions that **it must be a real and immediate one, and that it is not enough to be a speculative or future interest**. *Oriental Bank v. Pagán Acosta et al.*, *supra; Allied Mgmt. Group v. Oriental Bank*, 204 DPR 374, 389-390 (2020); *López García v. López García, supra*.

With regard to the absence of an essential party in a lawsuit, we have ruled that its appearance "is such a fundamental interest, which constitutes an irremissible defence that can be presented at any time during the process," and even appellate forums can and must raise it *motu proprio*. *Oriental Bank v. Pagán Acosta et al., supra* (citing *López García v. López García, supra*, on page 65). Therefore, any judgement issued in the absence of an essential party is null and void, as it deprives the court of jurisdiction over the person on whom it is intended to

CT-2025-0003                                                28

enforce an order. *Oriental Bank v. Pagán Acosta et al.*, *supra* (citing *García Colón et al. v. Sucn. González,* 178 DPR 527, 539 (2010)).

Thus, when interpreting Rule 16.1 of the Civil Procedure, *supra*, it is necessary for the courts to evaluate judiciously, with a pragmatic approach, the particularities of each case, and the rights of the parties that are not present in the lawsuit, but whose rights could be affected. *Oriental Bank v. Pagán Acosta et al.*, *supra* (citing J.A. Cuevas Segarra, *Treatise on Civil Procedural Law*, 2nd ed., United States, Pubs. JTS, 2011, T. IV, pp. 1415-1418).

## IV

Before we enter into the substantive law of the dispute before us, we must address, as a threshold matter, several jurisdictional matters that were raised in the briefs. In other words, we are deprived of the jurisdiction to attend to the lawsuit in question, because the DACo: (1) does not have statutory standing to represent the interests of consumers of the electricity service, since that power corresponds to the OIPC; (2) does not have active standing to urge the lawsuit in question by reason of not demonstrating that it suffered real and palpable damage; and (3) failed to include the AAPP as an essential party. **We submit that you are incorrect**.

It is known that, when evaluating the active standing

of a party to file a lawsuit, the first step is to recognise whether the Legislative Assembly has granted it through statutory means. Therefore, in order to resolve whether the DACo is able to present the cause of action to us, we must initially determine whether there is any statute that expressly grants it standing for this. In other words, we are called to examine the legislative will regarding the circumstances that must be present for DACo to be able to file the appeal for our consideration.

An examination of the DACo Organic Law, *supra*, reveals that the primary purpose of DACo is to vindicate, protect and implement consumer rights, this being the agency responsible for removing the consumer from their state of defencelessness and providing adequate representation in the defence of all their rights. Thus, by Art. 6 of the aforementioned statute, the Legislative Assembly imposed on DACo the duty to "represent the consumer public before any private entity or public body **in any matter that affects or may affect the interests of the consumer**." 3 LPRA sec. 341e(e).

As the entity in charge of defending the rights of consumers in Puerto Rico, the Legislature granted DACo the statutory standing to appear in the courts, by providing that it is the agency with the power and duty to:

> **Appear for and on behalf of consumers before any court**, board or commission, administrative body, department, office or agency of the Commonwealth of Puerto Rico and/or the United States government **in any hearing, proceeding or matter that affects or may affect the interests of the**

> **consumer** in general, of consumer groups or of any particular consumer.
>
> 3 LPRA sec. 341e(f). (Emphasis added).

Thus, there is no doubt that the Legislative Assembly expressly delegated to the DACo the responsibility to promote and ensure compliance with all laws, rules, regulations and orders that affect the interests of the consumer. 3 LPRA sec. 341e(s). To this end, **it imposed the duty and power to file any legal remedy that is necessary to carry out the purposes of its enabling law**, always having as a guide the protection of the rights of the Puerto Rican consumer. 3 LPRA sec. 341e(i).

Therefore, in interpreting the legislative intent behind the passage of the DACo Organic Law, *supra*, **it is necessary that we recognise the statutory standing conferred on the agency by the Legislative Assembly to appear in court, provided that the matter in question affects or may affect consumer rights**. With regard to the dispute at hand, the DACo maintains that the NEPR Decision has the effect of depriving consumers of electric service of their right to claim damages that may arise as a result of LUMA's negligence, as set forth in our Civil Code. Thus, in understanding that the DACo filed the appeal in question with a view to vindicating a right recognised by our legal system, and having urged it on behalf of the consumer, we reiterate that it has statutory standing to do so.

In turn, we disagree with LUMA's approach in that, under the *Energy Transformation and RELIEF Act*, *supra*, the

OIPC is exclusively empowered to appear judicially in matters related to electric service customers. While it is true that the OIPC was created for the purpose of representing and defending the interests of Puerto Rico's energy services consumers, when questions of a tariff nature and disputes that require specialised technical expert examination are raised, what is examined in the case in question are general principles of civil and contractual law, such as the validity and scope of disclaimer clauses or the applicability of the principle of legality to which DACo is entitled.

Thus, after recognising the statutory standing conferred on DACo by its enabling law, we proceed to address the issue of the lack of an essential party. In summary, LUMA maintains that the AAPP is an essential party to the lawsuit, since the DACo is requesting the nullity of a clause set forth in a contract where the AAPP serves as administrator. Specifically, it argues that, as administrator, the AAPP is responsible for supervising compliance with said contract, in the manner provided and subject to the terms and conditions set forth in the OMA. Therefore, it argues that the AAPP has a real and immediate interest in the lawsuit, so without its appearance, we would be prevented from issuing an opinion that covers a complete remedy.

For its part, the DACo argues that the NEPR, LUMA and the EEA are the only truly essential parties in the lawsuit before us. Indicates that, although the AAPP was a

signatory to the OMA, Section 4.1(g) of the OMA only
established the obligation to request a release of
liability from the NEPR. That is, it argues that the
clause of the contract alone does not confer any immunity,
but rather that it was the NEPR that exercised its primary
and exclusive jurisdiction over fees and terms of service
to accommodate the immunity request through the NEPR
Decision. Consequently, by not being able to force the
NEPR to grant immunity, nor to control its scope or
content, the DACo proposes that the AAPP could be
considered an interested party, but not essential.

As we express, for a party to be considered
essential, it must have a real and immediate interest in
the lawsuit, and it cannot be mere speculation or a future
interest. *Allied Mgmt. Group v. Oriental Bank*, *supra*.
Therefore, as a threshold matter, we have the obligation
to evaluate whether the rights of the AAPP will be
affected, and in what way, by not being present in the
lawsuit in question.

It arises from the file that the AAPP was a signatory
of the WCO, in its capacity as administrator in charge of
supervising the compliance of the parties with the
stipulated terms. Therefore, the AAPP is responsible for
overseeing the performance and compliance of the AEE and
LUMA, and providing annual reports on the progress of the
projects. 27 LPRA sec. 2609(d). As its main role, we
consider that the AAPP is not an essential party due to
the mere fact of having signed as administrator. That is,

what is the real and immediate interest that the AAPP has in the lawsuit does not arise. In conclusion, we assess that the AAPP is not an essential party to the lawsuit before us, for the simple reason that, as administrator, it does not have a real and immediate interest in it. Without a doubt, the rights and obligations of the AAPP will remain unchanged.

Having clarified the aspects of standing and essential party, we proceed to outline the substantive law applicable to the dispute before our consideration.

**V**

**A. Declaratory Judgement**

For its part, the declaratory judgement is a mechanism that is available even if other remedies exist, and has the effectiveness of a final judgement or decision. *Rosario Rodríguez v. Rosado Colomer et al.*, 208 DPR 419, 428 (2021) (citing *Senate of PR v. ELA*, 203 DPR 62, 71 (2019)). In the past, we have defined it as a "remedial and prophylactic mechanism that allows for the anticipation of the elucidation of the merits of any claim before the courts, provided that there is a potential danger against the person requesting it." *Rosario Rodríguez v. Rosado Colomer et al.*, supra, on p. 427 (citing *Senate of PR v. ELA*, supra); *Beltrán Cintrón et al. v. ELA et al.*, 204 DPR 89, 109 (2020)(citing *Senate of PR v. ELA*, supra).

CT-2025-0003                                               34

Thus, this extraordinary appeal can be issued in any
judicial process where "[t]he alleged facts demonstrate
that there is a substantial controversy between parties
that have adverse legal interests, without prior injury to
them for the purpose of dissipating legal uncertainty and
contributing to social peace." R. Hernández Colón,
*Práctica Jurídica de Puerto Rico [Legal Practice of Puerto
Rico]: Derecho Procesal Civil [Civil Procedure Law]*, 6th
ed., San Juan, Ed. LexisNexis, 2017, Sec. 6001, p. 623.

In turn, the mechanism of the declaratory judgement
provides that any person whose rights are affected by a
statute, municipal ordinance, contract or franchise can
request a determination on any divergence in the
interpretation or validity thereof, and that a declaration
of the rights, states or other legal relationships arising
from them is issued. Rule 59.2 of Civil Procedure, 32 LPRA
Ap. V. With respect to contracts, they may be interpreted
before or after they have been violated. Id.

**B. Separation of Powers**

The doctrine of separation of powers is an essential
guarantee of democracy. It is enshrined in Section 2 of
Article I of the Constitution of Puerto Rico and provides
that "[t]he Government of the Commonwealth will be in
Republican form and its Legislative, Executive and
Judicial Powers, as stated by this Constitution, will also
be subordinated to the sovereignty of the people of Puerto
Rico." Art. I, Sec. 2, Const. PR, LPRA, Volume 1. In the
past we have mentioned that "[t]he modern state separation

of powers entails a system of counterweights and of wise use of the discretionary power of each branch with the purpose of ensuring a 'dynamic balance' that ensures the effective functioning of the Republican system of government." *People v. González Malavé*, 116 DPR 578, 599-600 (1985).

Thus, the principle of separation of powers, in addition to framing the scope of action of the branches of government, ensures that none of the three branches dominate or unduly interfere with the other. *Senate v. Supreme Court et al.*, 208 DPR 115, 135 (2021); *Rodríguez Casillas et al. v. College*, 202 DPR 428, 450 (2019). After all, the purpose of the separation of powers is to protect the freedom of citizens and ensure the independence of each of the branches of government. *Diaz Carrasquillo v. Garcia Padilla*, 191 DPR 97, 110 (2014).

Likewise, before our duties as a Court of last resort, it is always mandatory to be aware of "the delicate constitutional boundaries that exist between the three (3) branches of government". *A.A.R., Ex parte*, 187 DPR 835, 855 (2013). In view of this, it should be noted that, "in the normal performance of our review functions under the system of separation of powers, the courts must act with prudence and deference to the legislative will, provided that it is framed within the constitutional scheme." *Rodríguez Casillas et al. v. College, supra,* on pp. 450-451 (citing *P.I.P. v. C.E.E.*, 120 DPR 580, 611 (1988)). This is because "[w]hen the legislator has manifested itself in clear and unambiguous language, the text of the law is the quintessential expression of all

CT-2025-0003                                                    36

legislative intent." *Cuevas v. Ethicon Div. Of J&J Prof. Co.,* 148 DPR 839, 850 (1999).

Thus, when there is a conflict between the constitutional powers of each branch, it is up to the judiciary to define its limits. In this sense, it is our task to "distinguish between 'authorities that make up the very essence of the system and powers that can be transferred, for compelling reasons, to other branches.'" *Nogueras v. Hernández Colón,* 127 DPR 405, 426 (1990) (citing *In re Rodríguez*

*Torres*, 106 DPR 698, 709 (1978)). Then, taking into account the prevailing historical circumstances, we must "limit the contours of public powers to avoid the undue concentration of powers and promote the most efficient operation of the system." Id., pp. 426-427.

### C. Power of the Legislative Assembly to grant immunity

In the field of non-contractual civil liability, "lawful immunity is not merely a defence; it is rather the non-existence of a cause of action." *Rodríguez Ruíz v. Hosp. San Jorge,* 169 DPR 850, 861 (2007). Accordingly, a person who is immune "cannot be the subject of litigation, whether he or she has performed an act or omission, culpable or negligent." *Rodríguez Figueroa et al. v. Health Centre*, 197 DPR 876, 884 (2017). The reason for this doctrine is not found in the conduct of the individual, but in the fact that immunity is a prerogative

CT-2025-0003                                                    37

of the Legislative Assembly, taking into account public policy considerations that transcend the limits of particular acts or omissions. *Rodríguez Figueroa et al. v. Health Centre, supra,* on page 884 (citing *Romero Arroyo v. E.L.A.,* 127 DPR 724, 745 (1991)).

In our legal system, there are different cases in which immunity has been recognised "for reasons of public order or public policy". *Council Cond. Plaza del Mar v. Jetter,* 169 DPR 643, 656 (2006). An example of this is employer immunity, interfamily immunity, conditional immunity of judges and prosecutors, among other types of immunity. As a corollary, we have emphasised before that, "unless expressly provided that it grants immunity to a group or sector of the population, we must understand that these are subject to the imposition of non-contractual civil liability for their negligent or culpable acts or omissions". Id., on p. 657.

### D. Obligations and Contracts

Obligations arise from the law, from contracts and quasi-contracts, and from unlawful acts or omissions in which fault or negligence is involved.[6] 31 LPRA s.d. 2992. As to contractual obligations, they have the force of law, as stipulated between the contracting parties. 31 LPRA s.d. 2994. Accordingly, neither the validity nor the

---

[6] While it is true that the dispute before us arises from acts executed in 2021, these were carried out under the provision of a signed contract before the Civil Code of Puerto Rico of 2020 came into force, 31 LPRA 5311 et seq. Therefore, the Civil Code of 1930, 31 LPRA ant. sec. 1 et seq., is the statutory body applicable to the facts of this case. 31 LPRA secs. 11717, 11718.

performance of the contractual obligations can be left to the discretion of one of the contracting parties. 31 LPRA s.d. 3373.

A contract exists from the moment one or more people are obligated to give something or provide any service. 31 LPRA s.d. 3371. In order for it to be legally effective, the contract must meet the requirements of purpose, cause of the obligation, and the consent of the contracting parties.

31 LPRA s.d. 3391. Thus, provided that these essential conditions are met for their validity, contracts are mandatory. 31 LPRA s.d. 3451. In other words, the contracting parties undertake to comply with what is expressly agreed, as well as all the consequences that, according to their nature, are in accordance with the law, usage, and good faith. LPRA ant. sec. 3375.

On more than one occasion, we have stated that, in our legal system, the principle of freedom of contracting or the autonomy of intent governs. *Cruz, López v. Casa Bella et al.*, 213 DPR 980, 995 (2024); *Coop. Sabaneña v. Casiano Rivera*, 184 DPR 169, 173 (2011). In other words, by means of the principle of *pacta sunt servanda*, the contracting parties are free to establish all the covenants, clauses and conditions they deem appropriate, **provided they are not contrary to laws, morals or public order**. 31 LPRA s.d. 3372.

**E. Right to remedies for damages due to fault or**

**negligence**

In terms of obligations, it is known that culpable or
negligent acts and omissions generate extracontractual
civil liability. Specifically, Article 1536 of the Civil
Code of Puerto Rico of 2020, 31 LPRA sec. 10801, provides
that any person who, due to fault or negligence, causes
damage to another, is obliged to repair the damage caused.
As for this rule, we have reiterated that the compensation
for damage only proceeds when the elements of (1) culpable
or negligent act or omission; (2) actual damage caused to
the claimant; and (3) causal relationship between the act
or omission and the damage caused concur. *Sucn. Mena
Pamias et al. v. Mélendez et al.*, 212 DPR 758, 768 (2023);
*Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010).

With regard to persons or entities dedicated to
generating and distributing electricity in Puerto Rico,
since the mid-20th century, we have stated that, given the
inherently dangerous nature of said element, they must
exercise the highest degree of care to avoid causing
damage. *Torres Solís et al. v. A.E.E. et al.*, 136 DPR 302,
311 (1994); *Ramos v. Aut. Fuentes Fluviales*, 86 DPR 603,
609 (1962). However, that does not mean that they respond
in any case where damage is caused, but that it is a
requirement that the damage has been caused by their fault
or negligence, by failing to deploy a degree of care in
proportion to the risk or danger involved. *Ramos v. Aut.
Fuentes Fluviales*, *supra*. Thus, this degree of care
extends beyond the installation, maintenance and operation

CT-2025-0003                                                    40

of the equipment used for the generation and distribution of electricity. That is, it includes the obligation to conduct an appropriate inspection to discover defects and situations of danger or risk to the public, and to take appropriate precautions to ensure that they do not arise. Id.

However, with electricity generation and distribution being a service of first necessity, we have reiterated that this must not be prevented by requiring that all conceivable protection be adopted by the human mind in order to avoid all possible risks, regardless of their unpredictability. Id., on p. 610. That is, the social benefit provided by electrification cannot be defeated by requiring absolute responsibility from the entities in charge of generating and distributing electricity. Id.

**VI**

**A**

The dispute before us is limited to determining whether Section 4.1(g) of the WCO and the NEPR Decision grant immunity to LUMA by granting a release from liability against consumer claims for damages caused by negligent acts, service interruptions, and fluctuations in electric service. Pursuant to the appeal for intrajurisdictional certification in the heading, we decided to issue it on the understanding that we have a constitutional dispute of high public interest before us.

We begin by expressing whether the clause challenged by the DACo, namely section 4.1(g) of the WCO and the Decision of the NEPR, cited above, in fact grant the

aforementioned immunity to LUMA. Specifically, in the NEPR
Decision, the Bureau determined, among other things, that
the EEA, their directors, officers, employees, agents and
contractors (including LUMA and their respective
directors, officers, employees, agents and contractors)
**will not be responsible, contractually or non-
contractually, in front of customers or any user receiving
electric power or electric service, for any loss arising
in any form or in any relationship with the operation of
the Transmission and Distribution System and the provision
of the electric service, including ordinary negligence.**

As we have reiterated, immunity "is not merely a
defence, it is rather the absence of a cause of action."
*Rodríguez Ruiz v. Hosp. St. George's, supra*, p. 861. This
implies that, whoever enjoys immunity cannot be the
subject of litigation regardless of whether they carried
out an act or omission, culpable or negligent. *Rodríguez
Figueroa et al. v. Health Centre*, *supra*, on page 884. In
the case before us, the NEPR approved a provision whose
effect is precisely to suppress the possibility of filing
a civil claim against LUMA for negligent acts in the
provision of electrical service.

In fact, the very text of the clause reveals that it
is not a mere tariff limitation, but rather it generally
eliminates any possibility of civil liability for ordinary
negligence. Specifically, by stating that LUMA and its
staff "***shall not be liable contractually or extra-
contractually***", the NEPR Decision prevents consumers from

effective access to the courts, since it extends the release to all types of civil, contractual or non-contractual liability. Therefore, it is undoubted that the text of the contested clause imposes a legal barrier that prevents the effective access of consumers to the courts, which, in practice, equates to immunity for LUMA.

However, we have previously stated that, unless expressly provided by the Legislative Assembly that grants immunity to a group or sector of the population, they are subject to the imposition of extracontractual civil liability for their negligent or culpable acts or omissions. *Council Cond. Plaza del Mar v. Jetter*, *supra*, on p. 657. In this way, the validity of an immunity is subject to it being granted by the legislature.

Consistent with the outline, LUMA argues that the limitation of liability of electric service companies that offer essential services responds to the delegation of powers of the Legislative Assembly to the NEPR through the *Energy Transformation and RELIEF Act*, *supra*. In other words, LUMA ensures that under this law, the NEPR holds powers over the setting of tariffs, which, without a doubt, and to its understanding, includes the mechanism of limitation of liability or what, in our opinion, results in the immunity granted.

For its part, the DACo argues that the Puerto Rico Energy Bureau attempted to establish almost absolute immunity by contractual and administrative means, without any intervention of the Legislature. In his opinion, this

violates the constitutional principle of separation of powers, since the Legislative Assembly is the branch of government with the authority to delegate to an administrative agency the power to grant immunity to private entities such as LUMA.

Therefore, **we consider a constitutional dispute strictly related to the validity of a clause approved by the Puerto Rico Energy Bureau that grants immunity to LUMA by releasing it from liability for damages related to the operation of the electrical system.**

In this way, the dispute has been narrowed, we warn that it is not incumbent on us at this stage to adjudicate the effect, if any, that the invalidity of the clause would have on the monthly fee. We clarify that, by express provision of law, the Bureau is the entity empowered to authorise modifications or increases in the electricity rate. Therefore, it is the responsibility of the NEPR to determine whether the payment of compensation for damages constitutes an authorised operational cost for the purposes of reviewing the electricity rate, and if so, to authorise or reject it. Therefore, the aforementioned approach by LUMA and the Bureau will not be addressed in this appeal because it is not amenable to adjudication at this stage.

**B**

However, it is our responsibility to determine whether the Bureau can, under its powers, validate a clause that exempts a private concessionaire from civil liability for essential public service, or whether such

concession is an exclusive prerogative of the Legislative Assembly. In the case of this latter scenario, the absence of express delegation would invalidate the granting of immunity by the Bureau because it is contrary to public order and the constitutional structure of Puerto Rico.

LUMA proposes that the regulatory mechanism of limitation of liability is the norm in the United States and other jurisdictions, and its approval is delegated to energy regulators with powers over rate setting. In this way, it contends that the courts of the United States have determined that commissions or regulatory agencies of utility companies have implicit authority to grant disclaimers. Consequently, it concluded that the limitations of liability are part of the regulatory regime applicable to public services and their legality and interpretation obey such regulations and not contract law.

Before entering into the relevant analysis, it is important to clarify that, unlike the practice in Puerto Rico, in the United States the concept of tariff in public services comprises a set of rules, conditions and charges that govern the relationship between the service company and its customers. 64 Am. Jur. 2d Public Utilities sec. 51 (2025). In addition, under U.S. law, governed by *common law*, regulated public service companies are required to file rates with the corresponding public service commission, which state both the prices of the service and the terms and conditions applicable to the relationship

with their subscribers. Id. Thus, in accordance with the *filed rate doctrine*, once said fees are submitted and approved by the competent administrative agency under the applicable legal framework, they do not merely constitute a contract between the parties, but rather they acquire the force and effect of law. Id. See also *Colich & Sons v. Pacific Bell,* 198 Cal.App.3d 1225, 1232 (1988). Thus, in the United States, the function of setting rates is a quasi-legislative act exercised by an administrative body **empowered by the legislature with that authority**. 64 Am. Jur. 2d Public Utilities sec. 58 (2025).

It should be noted that this doctrine is not limited solely to disputes about the price of the service, but also covers non-tariff aspects, such as terms and conditions of supply, including limitation of liability clauses. Id. (citing *Zurich American Insurance Company v. Southern Connecticut Gas Company,* 442 F.Supp.3d 510, 514 (2020)). Thus, the limitation of liability clauses are intended to restrict the liability of the service company against consumer claims for interruptions, failures or irregularities in the provision of the service. See John L. Rudy, *Limitation of Liability Clauses in Public Utility Tariffs: Is the Rationale for State-Sponsored Indemnity Still Valid?*, 52 Buff. L. Rev. 1379 (2004).[7]

---

[7] Historically, the limitation of liability clauses, also known as *indemnity by tariff*, arose in the United States as a mechanism to protect electric utilities from claims of ordinary negligence. These clauses were incorporated into rates regulated by utility commissions, which controlled both rates and terms of service. Its primary rationale was to avoid costly litigation and keep rates low for consumers within a state-controlled system. Rudy, *supra*, pp. 1393-1395.

C

Consistent with the foregoing, LUMA argues that, as in the United States, the Legislative Assembly delegated to the NEPR, through the *Energy Transformation and RELIEF Act*, *supra*, powers over limitation of tariffs that include the mechanism of limitation of liability. Thus, according to the argument, it is the Bureau who has the power in law to approve energy rates proposed by the AEE and other energy companies in Puerto Rico. In addition, it argued that the NEPR has the authority to oversee all types of operations, processes and mandates related to the efficiency of the energy sector, for which it follows structure models of European and Latin American countries and of the public service regulatory commissions established in different states of the United States. Specifically, LUMA cites Art. 6.3(rr) of the aforementioned law to highlight that the provisions of this statute must be liberally interpreted, and that the enumeration of the powers and authorities of the NEPR will not be interpreted as excluding or preventing any other power or authority otherwise conferred. 22 LPRA sec. 1054b.

DACo, for its part, stated that this law does not grant the Bureau the authority to grant immunity to private entities, but rather its regulatory function is limited to ensuring compliance with public energy policy and protecting the interests of consumers of electric power service by supervising the operation of the electric

CT-2025-0003                                                    47

system. We assert that we agree with the DACo that the *Law on Energy Transformation and RELIEF*, *supra*, does not have any implicit or express expression of the legislator in which the NEPR has been delegated the power to grant immunity in favour of the AEE or LUMA. Let us look.

As we have discussed previously, in our legal system there are different cases in which immunity has been recognised for reasons of public order or public policy. See *Cond Council. Plaza del Mar v. Jetter*, *supra*, on p. 656. However, we have been extremely cautious in insisting that, unless expressly provided that it grants immunity to a group or sector of the population, we must understand that these are subject to the imposition of extracontractual civil liability for their negligent acts or omissions. Id., on p. 657. Thus, for example, it was created by statute: a waiver of liability for damages to employers under the State Insurance Fund;[8] an immunity to certain health professionals and institutions against civil action for damages due to fault or negligence due to professional malpractice;[9] among other cases.

**D**

In view of the aforementioned law, we analyse the relevant provisions of the *Energy Transformation and RELIEF Act*, *supra*, in order to identify whether the

---

[8] See Art. 18 of Law No. 45 of 18 April 1935, as amended, Workers' Compensation System Act, 11 LPRA sec. 21, in which it establishes employer immunity and the exclusivity of the remedy against any claim, provided that said claim arises from an injury, illness or death covered by said law.
[9] See Art. 7 of Law No. 136 of 27 July 2006, as amended, known as the Regional Academic Medical Centres of Puerto Rico Act, 24 LPRA sec. 10035.

legislator expressly granted immunity to electric service companies for civil liability actions or, if it granted the NEPR the power to grant it. Art. 6.3 of the aforementioned statute provides an extensive list of the powers and duties of the Bureau, among which are: approving fair and reasonable rates; monitoring compliance with public energy policy; issuing regulations; ordering investigations and hearings; imposing fines for non-compliance; and ensuring the protection of consumers. 22 LPRA sec. 1054b. A thorough examination of the list of powers and duties of the NEPR allows us to conclude that, in effect, **there is no provision that expressly delegates power to the NEPR to grant immunity or limit the liability of electric service companies in the scope of civil liability.**

We note that subsection (rr) of Art. 6.3 of the aforementioned law provides that "the actions, regulations and determinations of the NEPR will be guided by applicable laws, by the public interest and by the interest of protecting the rights of customers or consumers." 22 LPRA sec. 1054b. In addition, the same subsection establishes that "[t]he provisions of this Law will be liberally interpreted to be able to achieve their purposes and wherever any specific power or authority is given to the NEPR, the list shall not be interpreted as excluding or preventing any other power or authority otherwise conferred upon it." Id. Likewise, the aforementioned subsection clarifies that the NEPR "will have, in addition to the powers listed in this Law, all the additional implicit and incidental powers that are

appropriate and necessary to carry out and perform, exercise all the aforementioned powers and to achieve the purposes of this Law." Id.

As to the latter, **even though this subsection recognises implicit and incidental powers to the Bureau, we specify that these should be interpreted in light of the law and in the public interest, including protecting the rights of consumers and not restricting them.** The statement on the liberal interpretation of the provisions of the law, while seeking to expand the regulatory power of the NEPR, is not sufficient to conclude that it has been granted powers to alter the civil liability regime that governs our legal system. We reiterate that an expansive interpretation of the powers of the NEPR cannot exceed the limits imposed    by fundamental principles of civil law. Therefore, **we conclude that there is no delegation in the *Energy Transformation and RELIEF Act*, *supra*, that confers powers on the NEPR to grant immunity or limit the civil liability of energy companies.** A delegation of such magnitude obviously requires a clear and unequivocal legislative manifestation, and this is not the case in the aforementioned statute.

A public corporation lacks the power to alter the non-contractual liability regime of the civil system. An administrative decision cannot de facto create immunities that the law does not confer or authorise to be conferred. The customer is not a party to the contract between the corporation and the contractor, and the law recognises direct action against the person causing the damage.

CT-2025-0003                                                    50

However, the clause examined here should not be confused with a typical *hold harmless clause*. An indemnity or *hold harmless* clause is an agreement whereby one party contractually assumes the obligation to defend, indemnify or hold the other harmless against third party claims arising in the performance of the contract. Its effect operates solely between the parties. That is, it does not suppress the direct action of the injured third party or create any exemption from substantive liability. On the other hand, a clause such as the one endorsed by the NEPR, which fully exempts PREPA and LUMA from non-contractual liability, is not merely an allocation of risk, but an attempt to establish quasi-legislative immunity by contract. We reiterate that this prerogative belongs solely to the Legislative Assembly. Therefore, any administrative decision that extinguishes the ability of third parties to invoke a cause of action recognised by law violates the constitutional doctrine of separation of powers.

The separation of powers "is the safeguard that our Constitution enshrines to preserve the freedoms of the People and a democratic system of government." *Domínguez Castro et al. v. ELA I*, 178 DPR 1, 91 (2010). As we stated, "the separation of powers entails a system of counterweights and of wise use of the discretionary power of each branch in order to ensure a 'dynamic balance' that ensures the effective functioning of the Republican system of government." *People v. González Malavé*, *supra*, on pp.

599-600. **In this case, we decide that the *Law of Energy Transformation and RELIEF*, *supra*, lacks an express provision that authorises the NEPR to grant immunity or alter the civil liability regime**, so its action lacks a legal basis and is *null and void ab initio*.

By creating an immunity regime through the NEPR Decision, the Bureau invaded the exclusive sphere of the legislative power, since only the Legislative Assembly has the constitutional prerogative to define the cases in which a waiver of liability is applicable. **We reiterate that the power to determine when and under what conditions a private entity can enjoy immunity responds to a public policy decision that only the legislator, not an agency by administrative decision**, can make. Accordingly, NEPR's attempt to confer immunity to LUMA constitutes a direct violation of the constitutional principle of separation of powers.

## VII

Based on the foregoing, we decide by *Declaratory Judgment* that Section 4.1(g) of the OMA and the NEPR Decision are unconstitutional because they violate the separation of powers doctrine, without violating the rest of the OMA, which remains in effect. In addition, claims filed by consumers must be handled in accordance with established procedures.

Within the meaning of the outline, we reiterate that the authority to grant immunity to a private entity is a

CT-2025-0003                                                    52

public  policy  decision  that  can  be  made  only  by  the
Legislative Assembly.

        Judgement  shall  be  issued  accordingly.




                                        Raul A. Candelario López
                                          Associate Judge

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Departamento de Asuntos del Consumidor<br><br>Peticionario<br><br>v.<br><br>LUMA Energy, LLC; LUMA Energy ServCo, LLC; Negociado de Energía de Puerto Rico; Autoridad de Energía Eléctrica<br><br>Recurridos | CT-2025-0003 |

**El Juez Asociado señor Candelario López emitió la Opinión del Tribunal.**

En San Juan Puerto Rico, a 1 de diciembre de 2025.

"*Para que no se pueda abusar del poder, es preciso que el poder detenga al poder*". - Montesquieu

En esta ocasión tenemos la oportunidad de reafirmar que las agencias administrativas solamente tienen los deberes y las facultades que le son delegadas por la Asamblea Legislativa. En específico, nos corresponde pasar juicio sobre si el Negociado de Energía de Puerto Rico (NEPR o Negociado) se extralimitó al otorgar un relevo de responsabilidad por negligencia ordinaria a una entidad privada por daños relacionados con la operación del sistema eléctrico. Así, debemos resolver si el relevo de responsabilidad antes descrito constituye una inmunidad frente a reclamaciones extracontractuales de terceros. De contestar en la afirmativa, nos corresponde justipreciar

CT-2025-0003                                                    2

si el Negociado, siendo un foro administrativo, tiene la facultad legal para aprobar, mediante resolución, una cláusula de exoneración de responsabilidad a un ente privado.

Por considerar que el relevo de responsabilidad en cuestión es, en efecto, una inmunidad frente a reclamaciones extracontractuales causadas por negligencia ordinaria, y, por entender que la Asamblea Legislativa no le delegó al NEPR la facultad para otorgar dicha inmunidad, concluimos que la actuación del Negociado es *ultra vires* por contravenir la doctrina de separación de poderes. Recordemos que la delegación legislativa no representa una renuncia del poder legislativo, sino que es la expresión de su capacidad para estructurar, distribuir y operacionalizar la gestión pública de manera eficiente.

<center>I</center>

El presente recurso tiene su origen en una controversia sobre la interpretación contractual de una cláusula de exoneración de responsabilidad. El 22 de julio de 2025, el Departamento de Asuntos del Consumidor (DACo) presentó ante el Tribunal de Primera Instancia (TPI) una *Solicitud de sentencia declaratoria para declarar inconstitucional la sección 4.1(g) del Puerto Rico Transmission and Distribution System Operation and Maintenance Agreement* (OMA), en contra de LUMA Energy, LLC, LUMA Energy ServCo, LLC, (en conjunto, LUMA), el Negociado y la Autoridad de Energía Eléctrica (AEE). En síntesis,

<center>App.816</center>

CT-2025-0003                                                    3

solicitó que se declarara nula e inconstitucional la
Sección 4.1(g) del OMA y el *Resolution and Order* emitido
por el Negociado el 31 de mayo de 2021 (Resolución del
NEPR), por entender que, mediante esta, el NEPR le otorgó
a LUMA y a la AEE una inmunidad casi absoluta frente a
reclamaciones de consumidores, que no estaba facultado en
ley a conceder. En consecuencia, solicita que se permita
que todo ciudadano pueda llevar reclamaciones en daños
causados por la negligencia y la fluctuación del servicio
de energía eléctrica ante LUMA.

Según expuso el DACo, el 24 de febrero de 2021, LUMA
presentó ante el NEPR un *Request for Approval of Terms of
Service and Memorandum of Law in Support*, en el cual, entre
otras cosas, solicitó que se apruebe la sección 4.1(g) del
OMA. Alegó que esta sección concede un relevo total para
LUMA y sus empleados, oficiales y contratistas contra
reclamos de consumidores por daños causados por negligencia
o fluctuaciones en el servicio eléctrico. Sostuvo que,
previo a la firma del OMA, la corporación pública no gozaba
de tal inmunidad y contaba con un mecanismo para que los
consumidores presentaran sus reclamos.

Surge del OMA que la citada Sección 4.1(g) establece
lo siguiente:

> (g) **Liability Waiver.** In connection with the
> submission of the Initial Budgets to PREB, the
> Parties agree to apply for inclusion in the Rate
> Order that the associated tariff or terms of
> service include: (i) **a waiver** of Owner's,
> ManagementCo's and ServCo's liability to
> customers or any Person receiving Power and
> Electricity for any Losses arising in any way out

of or in connection with the operation of the T&D
System and the provision of Power and Electricity
including any events of interrupted, irregular
or defective electric service due to Force
Majeure Events, other causes beyond Owner's,
ManagementCo's or ServCo's control or **ordinary
negligence, gross negligence or willful
misconduct of Owner, ManagementCo or ServCo, or
their respective employees, agents or
contractors**; and (ii) **a waiver** in all cases of
responsibility for any loss of profits or
revenues, special, exemplary, punitive,
indirect, incidental or consequential damages,
including loss of revenue, loss of use of
equipment, cost of capital, cost of temporary
equipment, overtime, business interruption,
spoilage of goods, claims of customers of
electric customers or other economic harms, in
each case howsoever and whensoever arising,
including where **caused by any of Owner's,
ManagementCo's or ServCo's ordinary negligence,
gross negligence or willful misconduct**
(collectively the "Liability Waiver").

(Énfasis suplido).

Añadió el DACo que, el 25 de mayo de 2021, el Negociado
celebró una vista pública con el propósito de escuchar al
público general en cuanto a los términos de servicio
propuesto. Así las cosas, el 31 de mayo de 2021, el
Negociado emitió su resolución en la cual determinó, entre
otros asuntos, lo siguiente:

5. Notwithstanding anything to the contrary in
these Modified Terms of Service and Regulation
7982, PREPA, its directors, officers, employees,
agents and contractors (including LUMA Energy,
LLC, LUMA Energy Servco, LLC, their directors,
officers, employees, agents and contractors)
(the "Released Parties") **shall not be liable
contractually or extra-contractually, to
customers, or any user receiving power or
electricity from PREPA and/or LUMA for any losses
arising in any way out of or in connection with
the operation of the T&D System and the provision
of power and electricity including any events of
interrupted, irregular or defective electric
service due to Force Majeure events or from pre-
existing deteriorated electric system
conditions, other causes beyond the control of**

CT-2025-0003                                                    5

> **the Released Parties, unauthorized acts by**
> **employees, sabotage, strikes or due to ordinary**
> **negligence (excluding gross negligence, willful**
> **misconduct or dolo)** of the Released Parties or
> their respective employees, agents or
> contractors. In any event that the Released
> Parties are found responsible howsoever and
> whensoever in connection with the provision of
> service to customers or users receiving power or
> electricity from PREPA and/or LUMA, customers or
> users shall only recover direct damages
> (including direct physical loss, injury or damage
> to a customer or customer's property). For the
> foregoing and without otherwise restricting the
> generality thereof, "direct physical loss,
> injury or damage" shall not include any loss of
> profits or revenues, special, exemplary,
> punitive, indirect, incidental, or consequential
> damages, including loss of revenue, loss of use
> of equipment, cost of capital, cost of temporary
> equipment, overtime, business interruption,
> spoilage of goods, claims of customers of
> electric customers or other economic harms.

> (Énfasis suplido).

De acuerdo con el DACo, la Resolución del NEPR
modificó el contenido que se pretendía adoptar de la
Sección 4.1(g) del OMA para dejar fuera casos de
negligencia crasa de LUMA. A su juicio, otorgó un abarcador
relevo de responsabilidad mediante un proceso
"administrativo y contractual", violando el principio de
reserva de la ley, pues no fue producto de un proceso
legislativo. Además, el DACo adujo que el Estado no puede
conferir, por *fiat* administrativo y contractual, una
inmunidad cuasi soberana a una empresa privada sin que ello
sea evaluado por la Legislatura. De este modo, concluyó que
el NEPR intenta limitar o suprimir las reclamaciones
extracontractuales en perjuicio de terceros sin
participación ni aval de la Asamblea Legislativa,

CT-2025-0003                                                          6

constituyendo una usurpación del poder legislativo y un
atentado contra la doctrina de separación de poderes.

     Así las cosas, el 24 de julio de 2025, el Senado de
Puerto Rico y la Cámara de Representantes de Puerto Rico
presentaron una *Solicitud y alegato del Senado de Puerto
Rico y la Cámara de Representantes de Puerto Rico en calidad
de amigos de la corte*. En resumen, adoptaron el
planteamiento del DACo de que el NEPR aprobó por vía
administrativa una cláusula de inmunidad casi absoluta a
favor de LUMA sin la intervención de la Asamblea
Legislativa y en perjuicio de terceros no contratantes,
entiéndase, los consumidores. De esta forma, alegaron que
la inmunidad dispuesta en la Sección 4.1(g) del OMA y la
Resolución del NEPR constituyen una violación a la
separación de poderes consagrada en la Constitución de
Puerto Rico. Además, ambos cuerpos legislativos sostuvieron
que, al aprobar la Ley de la Autoridad de Energía Eléctrica
de Puerto Rico, *infra*, y la Ley para Transformar el Sistema
Eléctrico de Puerto Rico, *infra*, no delegaron a la AEE ni
a la Autoridad para las Alianzas Público-Privadas (AAPP)
la facultad de otorgar inmunidad a favor de la AEE y LUMA.
Por consiguiente, solicitaron que se declare *ha lugar* la
petición de sentencia declaratoria presentada por el DACo
y se declaren nulas la Sección 4.1(g) del OMA y la
Resolución del NEPR.

     Por su parte, el 6 de agosto de 2025, el Instituto de
Competitividad y Sostenibilidad Económica (ICSE) presentó
una *Solicitud de intervención como amicus curiae*, en apoyo

CT-2025-0003                                                    7

a que se conceda el remedio solicitado por DACo. En primer

término, indicó que, en el año 2021, litigó el mismo asunto

ante el NEPR y ante el Tribunal de Apelaciones, aunque en

esa ocasión no se le reconoció legitimación activa para

ello.[1] El ICSE reconoció la naturaleza constitucional del

planteamiento del DACo sobre división de poderes. No

obstante, señaló que la controversia puede atenderse como

un asunto de estricto derecho de daños y perjuicios, pues,

contrario a lo dispuesto en la Resolución del NEPR, nuestro

ordenamiento jurídico no permite limitar las categorías ni

las cuantías de daños que puede recuperar una persona como

reparación por el daño sufrido. Según el ICSE, en Puerto

Rico la responsabilidad por daños contractuales o

extracontractuales es materia estrictamente sustantiva,

determinada por legislación, por lo que solo la Asamblea

Legislativa puede crear exenciones o inmunidades. En ese

sentido, arguyó que el NEPR legisló una inmunidad que solo

puede ser concedida por la vía legislativa y, además, que

estamos ante un asunto contractual, no tarifario, como

pretenden hacer ver el Negociado y LUMA.

Así las cosas, el 8 de agosto de 2025, el DACo presentó

ante nos un *Recurso de certificación intrajurisdiccional*.

A grandes rasgos, reiteró los fundamentos que levantó ante

el foro primario, y adujo que, durante una vista pública

celebrada por la Cámara de Representantes, LUMA admitió no

---

[1] Véase *In re: Revisión de los términos de servicio de LUMA (extensión de responsabilidad)*, caso núm. KLRA202100406, en el cual el Tribunal de Apelaciones desestimó el recurso incoado por el ICSE, por carecer de legitimación activa.

CT-2025-0003                                                        8

haber atendido 1,828 querellas de consumidores sobre daños
a la propiedad, pérdida de enseres y otras consecuencias
atribuibles a fallas eléctricas, por entender que la
Resolución del NEPR la exime de hacerlo. Según el DACo,
este reconocimiento público promueve que los consumidores
se queden sin remedios ante fallas operacionales de la
entidad que gestiona este servicio esencial. Ante ello
sostuvo que la controversia está madura para adjudicación,
y que amerita nuestra intervención urgente para detener
este estado de indefensión, restaurar el balance
constitucional y reafirmar que en Puerto Rico nadie puede
operar al margen de la responsabilidad legal.

El 12 de agosto de 2025 emitimos una *Resolución* en la
que concedimos un término de tres (3) días para que las
partes recurridas se expresaran sobre el recurso de
epígrafe. Al día siguiente, el ICSE presentó una *Moción en
cumplimiento de resolución* en la cual, en apoyo a que se
expidiera el recurso, solicitó que consideráramos sus
argumentos como *amicus curiae* ante el foro primario, los
cuales reiteró en su escrito.

El 15 de agosto de 2025, el Senado y la Cámara de
Representantes comparecieron de manera conjunta, y
adoptaron la posición del DACo en cuanto al carácter
constitucional de esta controversia. En específico,
destacaron que la doctrina de separación de poderes les
concede facultad exclusiva para examinar, establecer y
otorgar inmunidad ante reclamaciones por daños.

CT-2025-0003                                                    9

En esa misma fecha, el NEPR presentó su *Moción en cumplimiento de orden*, oponiéndose a la expedición del recurso. De entrada, argumentó que esta no es una controversia constitucional sustantiva ni sobre separación de poderes. Por el contrario, sostuvo que versa sobre un relevo de responsabilidad otorgado como parte de un proceso tarifario efectuado dentro de las facultades delegadas al NEPR, para evaluar modificaciones a los términos de servicio relacionados a la responsabilidad de LUMA y la AEE por pérdidas de clientes y usuarios del sistema eléctrico como consecuencia de su operación.

El Negociado expuso que, un "liability waiver" en el ámbito de compañías que proveen servicios esenciales al público, tiene como finalidad evitar que el costo de indemnizar reclamaciones incremente sustancialmente el costo del servicio, el cual en la mayoría de los casos sería finalmente sufragado por los propios clientes y usuarios. Arguyó que el relevo procura mantener tarifas más bajas y estables, preservando la viabilidad financiera de la operación y la continuidad del servicio eléctrico. Aunque rechazó los términos propuestos por las partes, sostuvo que aprobó ciertas modificaciones que entendió salvaguardaban el interés público, y que las adoptó, luego de celebrar vistas públicas en las cuales participó la Oficina Independiente de Protección al Consumidor (OIPC).

Además, según el NEPR, en este caso no está presente el criterio de urgencia que requiere la expedición de un recurso de certificación intrajurisdiccional, pues el

CT-2025-0003                                                    10

relevo fue adoptado cuatro (4) años antes de la
presentación de esta solicitud de sentencia declaratoria.
Indicó que esta etapa de los procedimientos tampoco era
propicia, pues las partes aún no habían comparecido ante
el foro de instancia ni realizado descubrimiento de prueba.
De manera escueta, insistió en que no estamos ante una
controversia constitucional sustancial, y reiteró que, en
su estimación, los usuarios terminarán pagando las
indemnizaciones que se concedan. Finalmente, cuestionó una
vez más la legitimación del DACo para instar esta acción.

    También en esa fecha, LUMA presentó su *Oposición a
recurso de certificación intrajurisdiccional*. LUMA siguió
el ejemplo del NEPR y cuestionó la urgencia de expedir una
certificación. Levantó, además, "asuntos de índole
jurisdiccional" que debe atender el foro de instancia antes
de atender en los méritos la validez del relevo de
responsabilidad impugnado, a saber: (1) la legitimación
activa del DACo, la cual, a su juicio, ostenta la OIPC; (2)
la ausencia de un daño claro, real y palpable del DACo que
le permita cuestionar si la determinación del NEPR viola
la separación de poderes o si privó a la Asamblea
Legislativa de sus prerrogativas; y (3) la falta de parte
indispensable, ante la ausencia de la AAPP en el pleito.
Arguyó que la limitación de responsabilidad de compañías
de servicio eléctrico responde a una delegación de poderes
de la Legislatura al NEPR, aunque no citó la disposición
específica que confiere tal facultad. Repitió, sin más, el
argumento de que la limitación de responsabilidad es parte

CT-2025-0003                                                    11

inherente al proceso de fijación de tarifas, con el
propósito de asegurar tarifas razonables. En cuanto al
relevo de responsabilidad como mecanismo regulatorio, LUMA
indicó que se trata de la norma en los Estados Unidos y
otras jurisdicciones, pues lo contrario "socavaría el poder
válidamente delegado en el NEPR de cumplir sus deberes y
funciones sobre la fijación de tarifas del servicio
eléctrico".

Finalmente, compareció la AEE a través de una breve
*Moción en cumplimiento de orden de mostrar causa* para
pronunciarse a favor de que acojamos y expidamos el recurso
ante nuestra consideración, pues "los abonados de la A.E.E.
merecen tener certeza sobre sus derechos".

Evaluadas las posiciones de las partes, el 22 de
agosto de 2025, emitimos una *Resolución* en la cual
expedimos el recurso de certificación intrajurisdiccional.
Así, concedimos un término de quince (15) días al DACo para
presentar su alegato, y quince (15) días a partir de
entonces a los recurridos para presentar su posición.

El 8 de septiembre de 2025, el DACo presentó su
alegato. Desde su punto de vista, la controversia ante
nuestra consideración requiere responder la siguiente
pregunta: ¿puede una agencia administrativa conferir a un
operador privado una inmunidad general frente a
reclamaciones extracontractuales de terceros, incluida la
negligencia ordinaria, sin autorización legislativa
expresa? Por entender que no, solicitó que emitamos una

CT-2025-0003                                                          12

sentencia declarando que no es posible tal atribución por tratarse de un acto que rebasa la competencia del NEPR y altera el régimen sustantivo de responsabilidad civil sin que se lo permita su ley habilitadora.

Según el DACo, su ley orgánica le confiere legitimación estatutaria para instar esta acción, pues la Asamblea Legislativa le encomendó expresamente "vindicar y hacer efectivos los derechos de los consumidores en todos los foros necesarios", en cualquier asunto "que afecte o pueda afectar" sus intereses. Arguyó que muchos consumidores han sufrido daños por actos negligentes de LUMA y otros podrían razonablemente verse afectados de no intervenir el DACo. En cuanto a la competencia de la OIPC, sostuvo que se limita a asuntos relacionados a tarifas, facturación, calidad de servicio y otros aspectos técnicos de los servicios regulados, no a derechos sustantivos de los consumidores en materia de daños. Adujo de manera sucinta que no existen partes indispensables ausentes de este pleito, pues, aunque la AAPP firmó el OMA, no asumió obligaciones o deberes atinentes a esta controversia.

En lo sustantivo, el DACo reiteró que la limitación de responsabilidad a favor de un operador privado no constituye un componente básico y legítimo de la tarifa eléctrica, sino una concesión *ultra vires* del NEPR. En cuanto a esto, señaló que la Ley Núm. 57-2014, *infra*, no delegó al Negociado la facultad de eximir a un operador privado de responsabilidad civil frente a reclamos de consumidores por actos de negligencia. Destacó además que

CT-2025-0003                                                    13

está constitucionalmente establecido que toda franquicia o concesión de carácter público debe ser determinada por ley, por lo que compete a la Asamblea Legislativa conceder relevos de responsabilidad como el otorgado por el NEPR. En consecuencia, concluyó que el Negociado se extralimitó al otorgar una inmunidad a LUMA sin autoridad en ley, por lo cual la actuación impugnada es nula *ab initio*.

El mismo día, el ICSE presentó un *Alegato del Amicus Curiae*. Adujo que coincidía con el DACo y la Asamblea Legislativa en que la exención otorgada a LUMA es ilegal porque la determinación administrativa del NEPR se inmiscuye indebidamente en el Poder Legislativo, beneficiando no solo a LUMA, sino a la propia AEE. A manera de ejemplo, identificó varias instancias en que el legislador concedió exenciones de responsabilidad por daños y perjuicios, entre ellas, a patronos bajo el Fondo del Seguro del Estado y en casos de impericia en centros de educación médica. Asimismo, cuestionó la prudencia de facultar a un regulador para que exima de responsabilidad a entidades bajo su jurisdicción.

El 23 de septiembre de 2025, LUMA presentó su alegato.[2] En su escrito, como hizo al oponerse a la expedición del

---

[2] Previo a la presentación de su alegato, el 19 de septiembre de 2025, LUMA notificó a esta Curia, mediante una *Moción informativa*, que presentó un *Urgent Motion of LUMA to Enforce the Automatic Stay* en el caso Núm. 17-BK-4780-LTS, actualmente ventilándose ante el Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico bajo el Título III de la Ley PROMESA.

En lo pertinente, el 30 de octubre de 2025, el DACo presentó una *Moción informativa* en la cual anejó el *Memorandum Order Denying Urgent Motion of LUMA to Enforce the Automatic Stay*, del 27 de octubre de 2025, declarando *no ha lugar* la petición de LUMA.

CT-2025-0003                                                    14

recurso, planteó los impedimentos jurisdiccionales que, a
su juicio, deben guiar nuestro análisis, a saber: falta de
legitimación activa del DACo, falta de parte indispensable
y, en cuanto a la inconstitucionalidad de trasladar a las
facturas de sus clientes los pagos de indemnización que
tenga que realizar, que DACo solicita una opinión
consultiva. En términos sustantivos, LUMA enfatizó las
bases que han justificado la concesión de limitaciones de
responsabilidad para compañías de servicio público en
diversas jurisdicciones estadounidenses. Adujo que los
tribunales de estas jurisdicciones han validado que la
regulación de tarifas se extiende a la adopción de límites
de responsabilidad por negligencia, sin requerir que la ley
habilitadora del ente regulador lo faculte expresamente.
Partiendo de la premisa de que la limitación de
responsabilidad es parte inherente de la función
regulatoria delegada, sostuvo que el NEPR estaba facultado
a emitir su resolución.

En esa misma fecha comparecieron el Senado y la Cámara
de Representantes para unirse al alegato del DACo, dejando
clara su posición de que el NEPR se excedió en sus
facultades al conceder una inmunidad, que solo la Asamblea
Legislativa puede conceder. En particular, citaron la
Sección 13 del Art. VI de la Constitución de Puerto Rico,
que, en lo pertinente, prescribe que "[e]l procedimiento
para otorgar franquicias, derechos, privilegios y
concesiones de carácter público será determinado por ley".

Dado lo anterior, solicitaron que se decrete la nulidad de la Resolución del NEPR.

Dentro del término concedido, compareció la AEE y la OIPC, esta última, mediante *Solicitud de intervención y alegato de la interventora Oficina Independiente de Protección al Consumidor de la Junta Reglamentadora de Servicio Público*. Rechazó la postura del DACo de que no está facultada para atender controversias de naturaleza constitucional, pues la Ley Núm. 57-2014, *infra*, la faculta para comparecer como parte peticionaria o como interventora en cualquier acción relacionada con tarifas, facturas, política pública o cualquier otro asunto que pueda afectar a los clientes del servicio eléctrico. En los méritos, la OIPC coincide en que la Sección 4.1(g) del OMA es ilegal por tratarse de un "autorelevo" de responsabilidad por la AEE y LUMA en ausencia de intención manifiesta de los consumidores de relevarlos. De igual modo, indicó que el OMA es un contrato de adhesión en el que los clientes no participaron y, por lo tanto, debe interpretarse restrictivamente contra la agencia.

Finalmente, el 24 de septiembre de 2025, el Negociado presentó su alegato. En lo pertinente, reiteró la necesidad y deseabilidad de que un operador privado cuente con límites de responsabilidad por negligencia, así como la fuente de derecho que entiende apoya su actuación al otorgar el relevo, esto es: que esa es la práctica en diversos estados de Estados Unidos. Además, levantó los mismos argumentos jurisdiccionales indicados por LUMA.

CT-2025-0003                                                        16

    Evaluados detenidamente los alegatos de las partes,
así como los escritos presentados por las partes
interventoras y amigos de la corte, procedemos a resolver.

**II**

    Teniendo ante nuestra consideración una controversia
relacionada a un asunto de alto interés público, a saber,
sobre el sistema de energía eléctrica de Puerto Rico,
conviene que hagamos un recuento histórico de los hechos
que la anteceden.

    La historia del Gobierno de Puerto Rico como encargado
de producir y administrar la energía eléctrica del país
tiene su origen en la tercera década del siglo XX. Ante la
necesidad de producir energía eléctrica a un bajo costo
debido al proceso de industrialización que se avecinaba,
el *Puerto Rico Reconstruction Administration* (PRRA) tenía
como objetivo la electrificación rural del país. Así, la
PRRA, agencia creada por el Congreso de los Estados Unidos
para liderar la recuperación puertorriqueña tras los
eventos atmosféricos de 1928 y 1932,[3] determinó que las
plantas hidroeléctricas a ser construidas fueran entregadas
eventualmente al Gobierno de Puerto Rico para ser
incorporadas en el creciente sistema de energía eléctrica.[4]

    Posteriormente, con la aprobación de la Ley Núm. 83
de 2 de mayo de 1941, actualmente conocida como la *Ley de*

---

[3] Véase, Executive Order 7057, *Establishing the Puerto Rico Reconstruction Administration* (May 28, 1935).
[4] E. Látimer Torres, *Historia de la Autoridad de Energía Eléctrica: Implantación de los Sistemas de Luz y Fuerza en Puerto Rico 1893-1993,* 1ra ed., San Juan, First Book Pub. of P.R., 1997, pág. 342.

CT-2025-0003                                                    17

*la Autoridad de Energía Eléctrica de Puerto Rico*, se creó
la Autoridad de Fuentes Fluviales (AFF). Entre los
propósitos del referido estatuto, la Asamblea Legislativa
buscaba centralizar el servicio eléctrico de Puerto Rico.
Fue bajo el desarrollo de la AFF, y posteriormente, la
AEE,[5] que la electricidad adquirió acceso a la totalidad de
la población puertorriqueña. No obstante, la tasa de
crecimiento anual proyectada en el consumo eléctrico era
tal, que ameritaba la necesidad de incrementar en la
capacidad de generación.

A medida que aumentaba el consumo de energía
eléctrica, la empresa privada fue incorporada en dichas
operaciones. A modo de ejemplo, para la década de 1990,
fueron instaladas la EcoEléctrica en Guayanilla y AES en
Guayama, cada una produciendo alrededor de 15% de la
electricidad que consumía el país.

En lo aquí pertinente, se aprobó la *Ley de
Transformación y ALIVIO Energético*, Ley Núm. 57-2014, según
enmendada, 22 LPRA sec. 1051 *et seq.*, cuya Exposición de
Motivos esboza lo siguiente:

> Luego de más de setenta (70) años de creada,
> y más de tres décadas luego de cumplir con su
> mandato de electrificación total del País, la AEE
> se ha convertido en un monopolio que se regula a
> sí misma, decide sus tarifas sin fiscalización
> real, incurre en ineficiencias operacionales,
> gerenciales y administrativas, cuyo costo al
> final del día es asumido directamente por el
> consumidor, y mantiene una gobernanza interna que
> carece de transparencia y participación

---

[5] Mediante la Ley Núm. 57 de 30 de marzo de 1979, la Asamblea
Legislativa le cambió el nombre a la Autoridad de Fuentes Fluviales a
la Autoridad de Energía Eléctrica.

CT-2025-0003                                                    18

ciudadana. Todo ello contribuye a que Puerto Rico
esté en una de las primeras posiciones con
respecto a los costos energéticos más altos entre
las jurisdicciones de los Estados Unidos.

**A. Negociado de Energía de Puerto Rico**

Por virtud de la *Ley de Transformación y ALIVIO
Energético*, *supra*, se creó la Comisión de Energía de Puerto
Rico, ahora el Negociado de Energía de Puerto Rico (NEPR).
22 LPRA sec. 1054b. El NEPR fue concebido como una entidad
especializada e independiente, encargada de reglamentar,
supervisar y hacer cumplir la política pública energética
del Gobierno de Puerto Rico. 22 LPRA sec. 1051a(j). En aras
de promover la transparencia y autonomía en sus menesteres,
el NEPR fue separado de cualquiera de las entidades bajo
su jurisdicción. 22 LPRA sec. 1054k.

Esto constituyó un paso significativo en la
fragmentación de las facultades que, en su momento, eran
exclusivas de la AEE, y delegó al NEPR ciertos poderes de
fiscalización como regulador independiente. Entre las
facultades otorgadas al NEPR por la Asamblea Legislativa,
se encuentran las siguientes:

(a) Fiscalizar y asegurar la cabal ejecución e
implementación de la política pública sobre el
servicio eléctrico en Puerto Rico;

(b) Establecer mediante reglamento las normas de
política pública en relación con las compañías
de servicio eléctrico, así como toda transacción,
acción u omisión que incida sobre la red
eléctrica y la infraestructura eléctrica en
Puerto Rico, e implementar dichas normas de
política pública. Estos reglamentos deberán ser
cónsonos con la política pública energética
declarada por vía de legislación;

(c) Establecer e implementar los reglamentos y
las acciones regulatorias necesarias para

garantizar la capacidad, confiabilidad, seguridad, eficiencia y razonabilidad en tarifas del sistema eléctrico de Puerto Rico y establecer las guías, estándares, prácticas y procesos a seguir para los procesos para la compra de energía, la modernización de plantas o instalaciones generadoras de energía, disponiéndose que todo contrato de compraventa de energía deberá cumplir con los estándares, términos y condiciones establecidos por el NEPR de conformidad con lo dispuesto en la Ley de Política Pública Energética y esta Ley.

[…]

(k) Revisar y aprobar políticas, planes estratégicos y planes a corto, mediano y largo plazo relacionados con la planificación integrada de recursos energéticos en Puerto Rico, y fiscalizar el cumplimiento con los mismos;

[…]

(n) Aprobar, revisar y, según fuere aplicable, modificar las tarifas o cargos que cobren las compañías de servicio eléctrico o el Contratante de la red de transmisión y distribución en Puerto Rico por cualquier asunto directa o indirectamente relacionado con la prestación del servicio eléctrico;

[…]

(nn) Demandar y ser demandada en reclamaciones o causas de acción a nombre propio en el Tribunal de Primera Instancia del Gobierno de Puerto Rico contra cualquier persona natural o jurídica que incumpla o interfiera con los requisitos, fines y objetivos de esta Ley, o en cualquier otro foro administrativo del Gobierno de Puerto Rico. A tales fines, se le reconoce legitimación activa al Negociado para interponer los recursos necesarios, incluyendo y sin limitarse a solicitar un desacato contra cualquier persona natural o jurídica que incumpla los mandatos contenidos bajo la jurisdicción del Negociado de Energía, ante el foro judicial para asegurar el cabal cumplimiento con la política pública establecida en esta Ley;

(oo) Adoptar reglas, pronunciamientos y reglamentos que sean necesarios para cumplir con sus deberes, emitir órdenes y establecer multas para dar cumplimiento a las facultades que por ley se le conceden, y para la implementación de esta Ley. Los reglamentos se adoptarán de conformidad con la Ley 38-2017, según enmendada,

conocida como "Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico".

[…]

22 LPRA sec. 1054b.

Por su parte, una vez fue anunciada la privatización de la AEE, se aprobó la *Ley de Política Pública Energética de Puerto Rico*, Ley Núm. 17-2019, según enmendada, 22 LPRA sec. 1141 *et seq.* El propósito de dicho estatuto fue facilitar la entrega de las operaciones de la AEE a entidades privadas. En específico, abrió el mercado del sistema eléctrico de Puerto Rico a la empresa privada, **sujeto a la regulación del NEPR,** al disponer que la AEE no poseería el derecho exclusivo de producir, transmitir, distribuir y comercializar el suministro de energía eléctrica. 22 LPRA sec. 1141b.

## B. Autoridad para las Alianzas Público-Privadas

La privatización de las operaciones de la AEE se rige por varios estatutos, incluyendo la *Ley de Alianzas Público-Privadas*, Ley Núm. 29-2009, según enmendada, 27 LPRA sec. 2601 *et seq.*, y la *Ley para Transformar el Sistema Eléctrico de Puerto Rico*, Ley Núm. 120-2018, según enmendada, 22 LPRA sec. 1111 *et seq.* El primer estatuto mencionado establece el marco regulatorio bajo el cual la AAPP lleva a cabo los procesos de privatización de entidades gubernamentales, y la política pública del Gobierno de Puerto Rico respecto a la creación de Alianzas Público-Privadas mediante contrato. 27 LPRA sec. 2604. Por otro lado, la segunda ley esbozada creó el andamiaje

CT-2025-0003                                                    21

jurídico para los contratos de Alianzas Público-Privadas
de la AEE.

A saber, la *Ley para Transformar el Sistema Eléctrico
de Puerto Rico*, *supra*, provee para la venta o traspaso de
los activos o funciones de la AEE, al definir las
transacciones de la AEE como toda aquella mediante la cual
se "establezca una o más Alianzas con respecto a cualquier
función, servicio o instalación de la AEE o un Contrato de
Venta de los activos de la AEE relacionados a la generación
de energía". 22 LPRA sec. 1113(m). De igual manera, al
amparo de ambas leyes mencionadas, la AAPP es la entidad
facultada para llevar a cabo cualquier transacción de la
AEE. 22 LPRA sec. 1115(b). Además, la AAPP es la encargada
de supervisar el desempeño y cumplimiento del contratante
bajo un contrato de alianza, y rendir informes anuales
sobre el desarrollo de los proyectos. 27 LPRA sec. 2609(d).

Por su parte, una vez la AAPP ejecuta una transacción
de la AEE, es necesario que el NEPR emita un Certificado
de Cumplimiento de Energía para que esta se perfeccione.
22 LPRA sec. 1118(a). Así las cosas, al momento de consumar
una transacción de la AEE, la AAPP y el NEPR son las
agencias encargadas de preparar un plan de trabajo para la
supervisión del desempeño y cumplimiento de la AEE y la
entidad contratada, conforme cada contrato de alianza o de
venta. 22 LPRA sec. 1118(d).

Así, al amparo de la *Ley para Transformar el Sistema Eléctrico de Puerto Rico*, *supra*, el 22 de junio de 2020, la AAPP, LUMA y la AEE firmaron el OMA.

### C. Oficina Independiente de Protección al Consumidor

La *Ley de Transformación y ALIVIO Energético*, *supra*, creó la OIPC, con el propósito de educar, asistir y representar a los clientes de los servicios bajo la jurisdicción de la Junta Reglamentadora de Servicio Público de Puerto Rico. 22 LPRA sec. 1054nn(a). En específico, la Exposición de Motivos del referido estatuto dispone la importancia de la OIPC como ente fiscalizador del sistema energético de Puerto Rico:

> Como aspecto importante para garantizar la participación y fiscalización ciudadana en el sistema energético, se crea por virtud de esta Ley la Oficina Independiente de Protección al Consumidor ("OIPC"), **cuya función será representar y defender los intereses de los consumidores de los servicios energéticos, tanto ante la Autoridad como ante la entidad reguladora.** La OIPC tendrá el deber, entre otros, de ser defensor y portavoz de los intereses de los clientes en todos los asuntos que estén ante la Comisión de Energía, incluyendo los asuntos relacionados a las disputas sobre facturas con la AEE. Además, tendrá el deber de coordinar la participación ciudadana en el proceso interno de revisión de tarifas de la Autoridad y ante la Comisión de Energía, según sea el caso, de modo que se garantice una participación activa en este proceso. Con este nuevo ente, se garantiza que el público no se sienta indefenso ante el poder y tamaño de la AEE y otros generadores de energía.
>
> (Énfasis suplido).

CT-2025-0003                                                    23

Entre los poderes y deberes delegados a la OIPC por la Asamblea Legislativa, la agencia es la encargada de lo siguiente:

[…]

(d) Presentar querellas o recursos legales ante el Negociado de Energía, el Negociado de Telecomunicaciones de Puerto Rico y el Negociado de Transporte y otros Servicios Públicos de Puerto Rico a nombre y en representación de clientes, que no tengan otra representación legal, en relación con controversias sobre cualquier asunto que afecte el servicio, tarifa o en cualquier otro asunto que afecte los intereses o derechos de los clientes de servicio eléctrico, telecomunicaciones y transporte. Previo a radicar querellas en representación de clientes deberá verificar que el cliente haya cumplido con las disposiciones pertinentes administrativas para su reclamo. Si existiera un conflicto de interés entre distintas clases de clientes con respecto a alguna causa de acción o controversia, la prioridad de la OIPC será representar y defender a los clientes residenciales y comerciales con pequeños negocios;

[…]

(h) **Participar o comparecer como parte interventora en cualquier acción, ante cualquier agencia gubernamental del Gobierno de Puerto Rico o del Gobierno Federal con jurisdicción, relacionada con tarifas, facturas, política pública o a cualquier otro asunto que pueda afectar a los consumidores y/o clientes de servicio eléctrico,** de telecomunicaciones y de transporte;

(i) **Participar o comparecer como parte peticionaria o como parte interventora en cualquier acción ante el Tribunal General de Justicia o ante los tribunales de la jurisdicción federal, relacionada con tarifas, facturas, política pública o a cualquier otro asunto que pueda afectar a los clientes de servicio eléctrico,** telecomunicaciones y transporte;

[…]

22 LPRA sec. 1054qq. (Énfasis suplido).

Habiendo esbozado el trasfondo histórico del

sistema de energía eléctrica de Puerto Rico,
procedemos a atender los asuntos jurisdiccionales.

### III

#### A. Legitimación activa

La doctrina de legitimación activa o *standing* se
define como "la capacidad que se le requiere a la parte
[querellante o demandante] de una acción para comparecer
como litigante ante el tribunal, realizar con eficiencia
actos procesales y, de esta forma, obtener una sentencia
vinculante". *Rivera et al. v. Torres et al.*, 214 DPR 111,
133 (2024) (citando a *Hernández, Santa v. Srio. de
Hacienda*, 208 DPR 727, 739 (2022)). De ordinario, quien
solicita un remedio judicial debe demostrar que: (1) sufrió
un daño claro y palpable; (2) el daño es real, inmediato y
preciso, no abstracto o hipotético; (3) existe una relación
causal razonable entre el daño y la acción ejercida; y (4)
la causa de acción surge al palio de la Constitución o de
una ley. *Amadeo Ocasio et al. v. Gobernador et al.*, 211 DPR
278, 285 (2023) (Sentencia).

No obstante, en el ejercicio de determinar si las
partes tienen legitimación activa para instar una acción,
los tribunales debemos analizar el cumplimiento de los
criterios mencionados, **salvo cuando exista un estatuto que
expresamente confiera legitimación activa**. *Rivera et al.
v. Torres et al., supra.* Por tanto, al momento de evaluar
la existencia de legitimación activa estamos llamados a
examinar si la Asamblea Legislativa la ha otorgado por la

CT-2025-0003                                                        25

vía estatutaria. Es decir, **el primer paso es determinar si
existe legitimación estatutaria**. *Rivera et al. v. Torres
et al., supra.*

### B. Legitimación estatutaria

El Tribunal Supremo de Puerto Rico ha interpretado la
figura de la legitimación estatutaria desde el año 1974.
*Salas Soler v. Srio. de Agricultura*, 102 DPR 716 (1974). A
saber, esta surge cuando un estatuto "de manera expresa o
implícita, otorga a una persona legitimación activa para
instar una acción judicial, independientemente de que esta
haya sufrido un daño particular, más allá del mero hecho
de la violación de la ley". J. M. Farinacci
Fernós, *Cualquier persona: La facultad plenaria de la
Asamblea Legislativa para otorgar legitimación activa por
la vía estatutaria*, 84 Rev. Jur. UPR 359, 360 (2015).

Dicho de otro modo, cuando la Asamblea Legislativa
concede legitimación activa de manera estatutaria, el
promovente está facultado a presentar su causa de acción,
sujeto únicamente a las exigencias incluidas en dicho
estatuto, e independientemente haya sufrido un daño real y
palpable. *Rivera et al. v. Torres et al., supra.* De esta
manera, al evaluar la concesión de legitimación
estatutaria, estamos llamados a auscultar la voluntad
legislativa en cuanto a las circunstancias que deben estar
presentes para que una parte pueda presentar un asunto ante
la consideración de los tribunales. Íd.

CT-2025-0003                                                          26

Nuestra interpretación de la doctrina de legitimación estatutaria ha sido consistente. En *Salas Soler v. Srio. de Agricultura*, *supra*, partimos de la premisa que la Asamblea Legislativa tenía plena facultad para otorgar legitimación activa en cualquier circunstancia, y que, por consiguiente, nos correspondía analizar el lenguaje estatutario para determinar el nivel de legitimación otorgado por la legislatura. J. M. Farinacci Fernós, *supra*, en la pág. 139. Posteriormente, al atender asuntos donde la legitimación estatutaria de una de las partes ha estado en controversia, hemos aplicado la misma metodología. Íd.; *Rivera et al. v. Torres et al.*, *supra*, en la pág. 134; *Hernández Torres v. Gobernador*, 129 DPR 824, 835-836 (1992). Así las cosas, **una vez reconocemos la existencia de la legitimación estatutaria que se reclama, los tribunales estamos llamados a analizar el alcance de la misma,** interpretando la intención del legislador.

### i. Legitimación activa del DACo

En nuestro ordenamiento jurídico, la ley orgánica de una agencia administrativa es el mecanismo legal mediante el cual la Asamblea Legislativa autoriza y delega los poderes necesarios para que ésta actúe conforme el propósito de su creación. *D.A.Co. v. Fcia. San Martín*, 175 DPR 198, 203 (2009) (citando a *Amieiro González v. Pinnacle Real Estate*, 173 DPR 363, 371 (2008)). A su vez, hemos afirmado reiteradamente que, al interpretar el alcance de los poderes delegados a una agencia, no debemos limitar a una interpretación restrictiva el análisis de su ley

CT-2025-0003                                                        27

habilitadora. *D.A.Co. v. Fcia. San Martín*, *supra*, en las
págs. 203-204.

En lo pertinente, según la exposición de motivos de
su ley orgánica, el propósito primordial del DACo es
vindicar, proteger e implementar los derechos del
consumidor. *Ley Orgánica del Departamento de Asuntos del
Consumidor*, Ley Núm. 5 de 23 de abril de 1973, según
enmendada, 3 LPRA sec. 341 *et seq*. (Ley Orgánica del
DACo). Además de ser una agencia especializada en vindicar
los derechos del consumidor de manera firme y agresiva, el
DACo fue creado para ser el organismo capaz de sacar a los
consumidores de su estado de indefensión, fiscalizar el
cumplimiento de las leyes dirigidas a protegerlos, y
proveerles una representación adecuada en la defensa de sus
derechos. Íd.

Mediante el Artículo 6 de la referida ley, la
legislatura le impuso al Secretario o Secretaria del DACo
el deber ministerial de representar a los consumidores de
Puerto Rico ante entidades privadas u organismos públicos
en cualquier asunto que afecte o pudiese afectar sus
intereses. 3 LPRA sec. 341e(e). Además, este funcionario
público también **goza de la facultad para comparecer por y
en representación de los consumidores, ante los tribunales
del Estado Libre Asociado de Puerto Rico y del gobierno de
los Estados Unidos, en cualquier procedimiento que afecte
o pueda afectar los intereses del consumidor** en general,
de grupos de consumidores o de cualquier consumidor en
particular. 3 LPRA sec. 341e(f).

CT-2025-0003                                                    28

De igual manera, la Ley Orgánica de DACo establece que el DACo es la agencia encargada de promover y velar por el cumplimiento de todas las leyes, reglas, reglamentos y órdenes que afecten los intereses del consumidor, en coordinación con las demás agencias y departamentos de Puerto Rico. 3 LPRA sec. 341e(s). Esto incluye la **facultad de interponer cualquier remedio legal que sea necesario para hacer efectivos los propósitos de su ley habilitadora.** 3 LPRA sec. 341e(i).

### C. Parte indispensable

En cuanto a la figura de parte indispensable, la Regla 16.1 de Procedimiento Civil establece que "[l]as personas que tengan un interés común sin cuya presencia no pueda adjudicarse [una] controversia, se harán partes y se acumularán como demandantes o demandadas, según corresponda". 32 LPRA Ap. V., R. 16.1. Dicho precepto forma parte del principio constitucional que dispone que "ninguna persona será privada de su libertad o propiedad sin [un] debido proceso de ley". Art. II, Sec.7, Const. PR, LPRA, Tomo 1.

A su vez, la Regla 16.1, *supra*, encarna el principio fundamental de incluir a todas las partes con interés para que, así, el decreto judicial que se emita sea completo. *Oriental Bank v. Pagán Acosta y otros*, 2024 TSPR 133, 215 DPR ___ (2024) (citando a *López García v. López García,* 200 DPR 50, 64 (2018)). Sobre el referido interés, hemos expresado en numerosas ocasiones que **el mismo debe ser uno**

**real e inmediato, y que no basta con que sea un interés especulativo ni futuro.** *Oriental Bank v. Pagán Acosta y otros*, *supra*; *Allied Mgmt. Group v. Oriental Bank*, 204 DPR 374, 389-390 (2020); *López García v. López García, supra*.

En cuanto a la ausencia de una parte indispensable en un pleito, hemos sentenciado que su comparecencia "es un interés tan fundamental, que constituye una defensa irrenunciable que puede presentarse en cualquier momento durante el proceso", e incluso, los foros apelativos podemos y debemos levantarla *motu proprio*. *Oriental Bank v. Pagán Acosta y otros*, *supra* (citando a *López García v. López García, supra*, en la pág. 65). Por consiguiente, toda sentencia dictada en ausencia de una parte indispensable es nula, pues priva al tribunal de jurisdicción sobre la persona sobre la cual se pretende hacer valer un dictamen. *Oriental Bank v. Pagán Acosta y otros*, *supra* (citando a *García Colón et al. v. Sucn. González,* 178 DPR 527, 539 (2010)).

Así, al momento de interpretar la Regla 16.1 de Procedimiento Civil, *supra*, es menester que los tribunales evaluemos juiciosamente, con un enfoque pragmático, las particularidades de cada caso, y los derechos de las partes que no están presentes en el pleito, pero cuyos derechos podrían verse afectados. *Oriental Bank v. Pagán Acosta y otros*, *supra* (citando a J.A. Cuevas Segarra, *Tratado de derecho procesal civil*, 2da ed., Estados Unidos, Pubs. JTS, 2011, T. IV, págs. 1415-1418).

**IV**

Previo a adentrarnos en el derecho sustantivo de la controversia ante nos, debemos atender, como cuestión de umbral, varios asuntos jurisdiccionales que se plantearon en los escritos. A saber, que estamos privados de la jurisdicción para atender el pleito de epígrafe, debido a que el DACo: (1) no tiene legitimación estatutaria para representar los intereses de los consumidores del servicio eléctrico, ya que esa facultad le corresponde a la OIPC; (2) no tiene legitimación activa para instar el pleito de epígrafe por razón de no demostrar que sufrió un daño real y palpable; y (3) omitió acumular a la AAPP como parte indispensable. **Adelantamos que no le asiste la razón.**

Sabido es que, al momento de evaluar la legitimación activa que tiene una parte para instar un pleito, el primer paso es reconocer si la Asamblea Legislativa la ha otorgado por la vía estatutaria. Por tanto, para resolver si el DACo está capacitado para presentar la causa de acción ante nos, debemos determinar inicialmente si existe algún estatuto que expresamente le confiera legitimación activa para ello. A saber, estamos llamados a auscultar la voluntad legislativa en cuanto a las circunstancias que deben estar presentes para que DACo pueda presentar el recurso ante nuestra consideración.

Un examen de la Ley Orgánica del DACo, *supra*, revela que el propósito primordial del DACo es vindicar, proteger e implementar los derechos del consumidor, siendo esta la

agencia encargada de sacar al consumidor de su estado de indefensión y proveerle una representación adecuada en la defensa de todos sus derechos. Así, mediante el Art. 6 del referido estatuto, la Asamblea Legislativa le impuso al DACo el deber de "representar al público consumidor ante cualquier entidad privada u organismo público **en cualquier asunto que afecte o pueda afectar los intereses del consumidor**". 3 LPRA sec. 341e(e).

Por ser la entidad encargada de defender los derechos de los consumidores en Puerto Rico, la Legislatura le concedió al DACo la legitimación estatutaria para comparecer a los tribunales, al disponer que es la agencia con la facultad y el deber para:

> **Comparecer por y en representación de los consumidores ante cualquier tribunal,** junta o comisión, organismo administrativo, departamento, oficina o agencia del Estado Libre Asociado de Puerto Rico y/o del gobierno de los Estados Unidos **en cualquier vista, procedimiento o asunto que afecte o pueda afectar los intereses del consumidor** en general, de grupos de consumidores o de cualquier consumidor en particular.

3 LPRA sec. 341e(f). (Énfasis suplido).

De esta manera, no cabe duda de que la Asamblea Legislativa expresamente delegó en el DACo la responsabilidad de promover y velar por el cumplimiento de todas las leyes, reglas, reglamentos y órdenes que afecten los intereses del consumidor. 3 LPRA sec. 341e(s). Para ello, **le impuso el deber y la facultad de interponer cualquier remedio legal que sea necesario para hacer efectivos los propósitos de su ley habilitadora,** teniendo

CT-2025-0003                                                    32

siempre como norte la protección de los derechos del consumidor puertorriqueño. 3 LPRA sec. 341e(i).

Por consiguiente, al interpretar la intención legislativa detrás de la aprobación de la Ley Orgánica del DACo, *supra*, **es menester que reconozcamos la legitimación estatutaria conferida a la agencia por la Asamblea Legislativa para comparecer a los tribunales, siempre y cuando el asunto en cuestión afecte o pueda afectar los derechos del consumidor.** En lo pertinente a la controversia que nos ocupa, el DACo sostiene que la Resolución del NEPR tiene el efecto de privar a los consumidores del servicio eléctrico de su derecho a reclamar daños que puedan surgir a raíz de la negligencia de LUMA, conforme establece nuestro Código Civil. Así, por entender que el DACo presentó el recurso de epígrafe con miras a vindicar un derecho reconocido por nuestro ordenamiento jurídico, y habiéndolo instado en representación del consumidor, reiteramos que tiene legitimación estatutaria para hacerlo.

A su vez, estamos en desacuerdo con el planteamiento de LUMA en cuanto a que, al amparo de la *Ley de Transformación y ALIVIO Energético*, *supra*, se faculta exclusivamente a la OIPC a comparecer judicialmente en asuntos relacionados a los clientes de servicio eléctrico. Si bien es cierto que la OIPC fue creada con el propósito de representar y defender los intereses de los consumidores de los servicios energéticos de Puerto Rico, cuando se plantean cuestiones de naturaleza tarifaria y controversias que requieran peritaje técnico especializado, lo que se

CT-2025-0003                                                          33

examina en el caso de autos son principios generales del
derecho civil y contractual, como la validez y alcance de
cláusulas de exención de responsabilidad o la aplicabilidad
del principio de legalidad para lo que está facultado DACo.

Así, tras reconocer la legitimación estatutaria
conferida al DACo por su ley habilitadora, procedemos a
atender el asunto de la falta de parte indispensable. En
síntesis, LUMA sostiene que la AAPP es parte indispensable
del pleito, puesto que el DACo está solicitando la nulidad
de una cláusula establecida en un contrato en donde la AAPP
funge como administrador. En específico, aduce que, como
administrador, la AAPP es responsable de supervisar el
cumplimiento de dicho contrato, en la forma prevista y con
sujeción a los términos y condiciones establecidos en el
OMA. Por tanto, argumenta que la AAPP tiene un interés real
e inmediato en el pleito, por lo cual sin su comparecencia,
estaríamos impedidos de emitir un dictamen que abarque un
remedio completo.

Por su parte, el DACo argumenta que el NEPR, LUMA y
la AEE son las únicas partes verdaderamente indispensables
en el pleito ante nos. Indica que, a pesar de que la AAPP
fue firmante del OMA, la Sección 4.1(g) de este únicamente
establecía la obligación de solicitar al NEPR un relevo de
responsabilidad. Es decir, arguye que la cláusula del
contrato por sí sola no confiere inmunidad alguna, sino que
fue el NEPR quien ejerció su jurisdicción primaria y
exclusiva sobre tarifas y términos de servicio para acoger
la petición de inmunidad mediante la Resolución del NEPR.

CT-2025-0003                                              34

Por consiguiente, al no poder obligar al Negociado a conceder la inmunidad, ni tampoco controlar su alcance o contenido, el DACo plantea que la AAPP podría considerarse una parte interesada, pero no indispensable.

Como expresamos, para que una parte sea considerada indispensable, debe tener un interés real e inmediato en el pleito, y que no puede tratarse de meras especulaciones o un interés futuro. *Allied Mgmt. Group v. Oriental Bank*, *supra*. Por tanto, como cuestión de umbral, tenemos la obligación de evaluar si los derechos de la AAPP se verán afectados, y de qué manera, al no estar presente en el pleito de epígrafe.

Surge del expediente que la AAPP fue firmante del OMA, en calidad de administrador encargado de supervisar el cumplimiento de las partes con los términos estipulados. Por tanto, la AAPP está encargada de supervisar el desempeño y cumplimiento de la AEE y LUMA, y rendir informes anuales sobre el desarrollo de los proyectos. 27 LPRA sec. 2609(d). Siendo este su rol principal, consideramos que la AAPP no es una parte indispensable por el mero hecho de haber firmado en calidad de administrador. Es decir, no surge cuál es el interés real e inmediato que tiene la AAPP en el pleito. En conclusión, justipreciamos que la AAPP no es una parte indispensable en el pleito ante nos, por la sencilla razón de que, en calidad de administrador, no posee un interés real e inmediato en el mismo. Sin duda, los derechos y las obligaciones de la AAPP permanecerán inalterados.

CT-2025-0003                                                    35

Aclarados los aspectos de legitimación y parte indispensable, procedemos a esbozar el derecho sustantivo aplicable a la controversia ante nuestra consideración.

V

**A. Sentencia declaratoria**

Por su parte, la sentencia declaratoria es un mecanismo que está disponible aunque existan otros remedios, y tiene la eficacia de una sentencia o resolución definitiva. *Rosario Rodríguez v. Rosado Colomer et al.*, 208 DPR 419*,* 428 (2021) (citando a *Senado de PR v. ELA*, 203 DPR 62, 71 (2019)). En el pasado, la hemos definido como un "mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra quien la solicita". *Rosario Rodríguez v. Rosado Colomer et al.*, *supra*, en la pág. 427 (citando a *Senado de PR v. ELA*, *supra*); *Beltrán Cintrón et al. v. ELA et al.*, 204 DPR 89, 109 (2020)(citando a *Senado de PR v. ELA*, *supra*).

Así pues, este recurso extraordinario puede ser dictado en todo proceso judicial donde "[l]os hechos alegados demuestran que existe una controversia sustancial entre partes que tienen intereses legales adversos, sin que medie lesión previa de los mismos con el propósito de disipar la incertidumbre jurídica y contribuir a la paz social". R. Hernández Colón, *Práctica Jurídica de Puerto*

*Rico: Derecho Procesal Civil*, 6ta ed., San Juan, Ed.
LexisNexis, 2017, Sec. 6001, pág. 623.

A su vez, el mecanismo de la sentencia declaratoria
provee para que toda persona cuyos derechos fuesen
afectados por un estatuto, ordenanza municipal, contrato o
franquicia, pueda solicitar una determinación sobre
cualquier divergencia en la interpretación o validez de
estos, y que se dicte una declaración de los derechos,
estados u otras relaciones jurídicas que de aquellos se
deriven. Regla 59.2 de Procedimiento Civil, 32 LPRA Ap. V.
Respecto a los contratos, estos pueden ser interpretados
antes o después de haber sido infringidos. Íd.

### B. Separación de poderes

La doctrina de separación de poderes constituye una
garantía esencial de la democracia. La misma está
consagrada en la Sección 2 del Artículo I de la Constitución
de Puerto Rico y dispone que "[e]l Gobierno del Estado
Libre Asociado tendrá forma republicana y sus Poderes
Legislativo, Ejecutivo y Judicial, según se establecen por
esta Constitución, estarán igualmente subordinados a la
soberanía del pueblo de Puerto Rico". Art. I, Sec. 2, Const.
PR, LPRA, Tomo 1. En el pasado hemos mencionado que "[e]n
el Estado moderno la separación de poderes conlleva un
sistema de contrapesos y de sabia utilización del poder
discrecional de cada rama con el propósito de asegurar un
'equilibrio dinámico' que asegure el funcionamiento

efectivo del sistema republicano de gobierno". *Pueblo v. González Malavé*, 116 DPR 578, 599-600 (1985).

Así, el principio de separación de poderes, además de enmarcar el ámbito de acción de las ramas de gobierno, asegura que ninguna de las tres ramas domine o interfiera de forma indebida con la otra. *Senado v. Tribunal Supremo y otros*, 208 DPR 115, 135 (2021); *Rodríguez Casillas et al. v. Colegio*, 202 DPR 428, 450 (2019). Después de todo, el propósito de la separación de poderes es proteger la libertad de los ciudadanos y garantizar la independencia de cada una de las ramas de gobierno. *Díaz Carrasquillo v. García Padilla*, 191 DPR 97, 110 (2014).

Asimismo, ante nuestros deberes como Tribunal de última instancia, resulta obligatorio siempre tener consciencia de "las delicadas fronteras constitucionales que existen entre las tres (3) ramas de gobierno". *A.A.R., Ex parte*, 187 DPR 835, 855 (2013). Ante ello, cabe destacar que, "en el desempeño normal de nuestras funciones revisoras bajo el sistema de separación de poderes, los tribunales debemos actuar con prudencia y deferencia a la voluntad legislativa, siempre que la misma esté enmarcada dentro del esquema constitucional". *Rodríguez Casillas et al. v. Colegio, supra,* en las págs. 450-451 (citando a *P.I.P. v. C.E.E.*, 120 DPR 580, 611 (1988)). Esto se debe a que "[c]uando el legislador se ha manifestado en lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa". *Cuevas v. Ethicon Div. Of J&J Prof. Co.,* 148 DPR 839, 850 (1999).

CT-2025-0003                                                      38

De este modo, cuando se presenta un conflicto entre los poderes constitucionales de cada rama, le corresponde al poder judicial definir sus límites. En ese sentido, es nuestra tarea "distinguir entre 'facultades que integran la entraña misma del sistema y poderes trasladables, por razones de peso, a otras ramas'". *Nogueras v. Hernández Colón,* 127 DPR 405, 426 (1990) (citando a *In re Rodríguez Torres*, 106 DPR 698, 709 (1978)). Luego, teniendo en consideración las circunstancias históricas prevalecientes, debemos "delimitar los contornos de los poderes públicos para evitar la concentración indebida de poderes y promover el más eficiente funcionamiento del sistema". Íd., págs. 426-427.

**C. Facultad de la Asamblea Legislativa de otorgar inmunidad**

En el ámbito de la responsabilidad civil extracontractual, la "inmunidad dispuesta por ley no es meramente una defensa; se trata más bien de la inexistencia de una causa de acción". *Rodríguez Ruiz v. Hosp. San Jorge,* 169 DPR 850, 861 (2007). En consecuencia, una persona que goza de inmunidad "no puede ser objeto de un litigio, independientemente de que haya realizado un acto o una omisión, culposo o negligente". *Rodríguez Figueroa et al. v. Centro de Salud*, 197 DPR 876, 884 (2017). La razón de ser de esta doctrina no se encuentra en la conducta del individuo, sino en el hecho de que la inmunidad es una prerrogativa de la Asamblea Legislativa atendiendo a consideraciones de política pública que trascienden los

CT-2025-0003                                                    39

límites de los actos u omisiones particulares. *Rodríguez Figueroa et al. v. Centro de Salud, supra,* en la pág. 884 (citando a *Romero Arroyo v. E.L.A.,* 127 DPR 724, 745 (1991)).

En nuestro ordenamiento jurídico, existen distintos supuestos en los cuales se ha reconocido la inmunidad "por razones de orden público o de política pública". *Consejo Cond. Plaza del Mar v. Jetter,* 169 DPR 643, 656 (2006). Un ejemplo de ello es la inmunidad patronal, la inmunidad interfamiliar, la inmunidad condicionada de jueces y fiscales, entre otros tipos de inmunidad. Como corolario, hemos enfatizado antes que, "salvo disposición expresa que conceda inmunidad a un grupo o sector de la población, debemos entender que éstos se encuentran sujetos a la imposición de responsabilidad civil extracontractual por sus actos u omisiones negligentes o culposas". Íd., en la pág. 657.

**D. Obligaciones y contratos**

Las obligaciones nacen de la ley, de los contratos y cuasicontratos, y de los actos u omisiones ilícitos en los que intervenga culpa o negligencia.[6] 31 LPRA ant. sec. 2992. En cuanto a las obligaciones contractuales, estas tienen fuerza de ley, según lo estipulado entre las partes

---

[6] Si bien es cierto que la controversia ante nos surge por actos ejecutados en el año 2021, estos fueron llevados a cabo en virtud de la disposición de un contrato firmado antes de que entrara en vigor el Código Civil de Puerto Rico de 2020, 31 LPRA 5311 et seq. Por tanto, el Código Civil de 1930, 31 LPRA ant. sec. 1 et seq., es el cuerpo estatutario aplicable a los hechos de este caso. 31 LPRA secs. 11717, 11718.

contratantes. 31 LPRA ant. sec. 2994. Por consiguiente, ni la validez ni el cumplimiento de las obligaciones contractuales pueden dejarse al arbitrio de uno de los contratantes. 31 LPRA ant. sec. 3373.

Un contrato existe desde que una o varias personas se obligan a dar alguna cosa o prestar algún servicio. 31 LPRA ant. sec. 3371. Para que tenga eficacia jurídica, en el contrato deben concurrir los requisitos de objeto, causa de la obligación, y el consentimiento de los contratantes. 31 LPRA ant. sec. 3391. Así, siempre que concurran estas condiciones esenciales para su validez, los contratos son obligatorios. 31 LPRA ant. sec. 3451. Es decir, las partes contratantes se obligan al cumplimiento de lo expresamente pactado, al igual que a todas las consecuencias que, según su naturaleza, sean conformes a la ley, al uso y a la buena fe. LPRA ant. sec. 3375.

En más de una ocasión hemos establecido que, en nuestro ordenamiento jurídico, rige el principio de libertad de contratación o la autonomía de la voluntad. *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 995 (2024); *Coop. Sabaneña v. Casiano Rivera*, 184 DPR 169, 173 (2011). En otras palabras, mediante el principio de *pacta sunt servanda*, las partes contratantes son libres de establecer todos los pactos, cláusulas y condiciones que estimen convenientes, **siempre que no sean contrarios a las leyes, la moral o el orden público.** 31 LPRA ant. sec. 3372.

**E. Derecho a remedios por daños por culpa o negligencia**

En materia de obligaciones, sabido es que los actos y omisiones culposos o negligentes generan responsabilidad civil extracontractual. En específico, el Artículo 1536 del Código Civil de Puerto Rico del 2020, 31 LPRA sec. 10801, dispone que toda persona que por culpa o negligencia cause daño a otra, está obligada a reparar el daño causado. En cuanto a esta norma, hemos reiterado que la indemnización de un daño solamente procede cuando concurren los elementos de (1) acto u omisión culposa o negligente; (2) daño real causado al reclamante; y (3) relación causal entre el acto u omisión y el daño ocasionado. *Sucn. Mena Pamias et al. v. Mélendez et al.*, 212 DPR 758, 768 (2023); *Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010).

En lo pertinente a personas o entidades dedicadas a generar y distribuir electricidad en Puerto Rico, desde mediados del siglo XX, hemos establecido que, atendido el carácter inherentemente peligroso de dicho elemento, estas deben ejercer el más alto grado de cuidado para evitar causar daños. *Torres Solís et al. v. A.E.E. et als.*, 136 DPR 302, 311 (1994); *Ramos v. Aut. Fuentes Fluviales*, 86 DPR 603, 609 (1962). Sin embargo, eso no significa que responden en cualquier caso en que se cause un perjuicio, sino que es requisito que el daño haya sido producido por su culpa o negligencia, al omitir desplegar un grado de cuidado en proporción al riesgo o peligro envuelto. *Ramos v. Aut. Fuentes Fluviales*, *supra*. Así, este grado de cuidado se extiende más allá de la instalación,

mantenimiento y operación del equipo utilizado para la generación y distribución de electricidad. A saber, incluye la obligación de realizar una inspección adecuada para descubrir defectos y situaciones de peligro o riesgo para el público, y tomar las debidas precauciones para asegurarse que no surjan. Íd.

No obstante, siendo la generación y distribución de electricidad un servicio de primera necesidad, hemos reiterado que esta no debe impedirse requiriendo que se adopte toda protección concebible por la mente humana a fines de evitar todos los riesgos posibles, sin importar su imprevisibilidad. Íd., en la pág. 610. Es decir, el beneficio social proporcionado por la electrificación no puede derrotarse mediante la exigencia de una responsabilidad absoluta a las entidades encargadas de generar y distribuir electricidad. Íd.

**VI**

**A**

La controversia ante nos se circunscribe a determinar si la Sección 4.1(g) del OMA y la Resolución del NEPR le conceden inmunidad a LUMA al otorgar un relevo de responsabilidad frente a reclamaciones de los consumidores por daños causados por actos negligentes, interrupciones del servicio y fluctuaciones en el servicio eléctrico. En virtud del recurso de certificación intrajurisdiccional de epígrafe, decidimos expedirlo por entender que tenemos ante nuestra consideración una controversia constitucional de

CT-2025-0003                                                    43

alto interés público.

Comenzamos expresándonos sobre si la cláusula impugnada por el DACo, a saber, la sección 4.1(g) del OMA y la Resolución del NEPR, antes citadas, en efecto, le conceden la referida inmunidad a LUMA. En específico, en la Resolución del NEPR, el Negociado determinó, entre otras cosas, que la AEE, sus directores, oficiales, empleados, agentes y contratistas (incluyendo a LUMA y sus respectivos directores, oficiales, empleados, agentes y contratistas) **no serán responsables, contractual ni extracontractualmente, frente a los clientes o a cualquier usuario que reciba energía eléctrica o servicio de electricidad, por cualquier pérdida que surja de cualquier forma o en cualquier relación con la operación del Sistema de Transmisión y Distribución y la prestación del servicio eléctrico, incluyendo negligencia ordinaria.**

Según hemos reiterado, la inmunidad "no es meramente una defensa, se trata más bien de la inexistencia de una causa de acción". *Rodríguez Ruiz v. Hosp. San Jorge, supra*, pág. 861. Ello implica que, quien goza de inmunidad no puede ser objeto de litigio sin importar si realizó un acto u omisión, culposo o negligente. *Rodríguez Figueroa et al. v. Centro de Salud*, *supra*, en la pág. 884. En el caso ante nos, el NEPR aprobó una disposición cuyo efecto es precisamente suprimir la posibilidad de entablar una reclamación civil contra LUMA por actos negligentes en la prestación del servicio eléctrico.

De hecho, el texto mismo de la cláusula revela que no

CT-2025-0003                                                      44

se trata de una mera delimitación tarifaria, sino que elimina de manera general toda posibilidad de responsabilidad civil por negligencia ordinaria. En específico, al indicar que LUMA y su personal "**_shall not be liable contractually or extra-contractually_**", la Resolución del NEPR impide el acceso efectivo de los consumidores a los tribunales, ya que extiende la exoneración a todo tipo de responsabilidad civil, contractual o extracontractual. Por lo tanto, es indudable que el texto de la cláusula impugnada impone una barrera jurídica que impide el acceso efectivo de los consumidores a los tribunales, lo cual, en la práctica, equivale a una inmunidad hacia LUMA.

Ahora bien, con anterioridad hemos expresado que, salvo disposición expresa de la Asamblea Legislativa que conceda inmunidad a un grupo o sector de la población, éstos se encuentran sujetos a la imposición de responsabilidad civil extracontractual por sus actos u omisiones negligentes o culposas. _Consejo Cond. Plaza del Mar v. Jetter_, _supra_, en la pág. 657. De esta manera, la validez de una inmunidad está sujeta a que la misma haya sido concedida por el legislador.

Cónsono con lo esbozado, LUMA argumenta que la limitación de responsabilidad de compañías de servicio eléctrico que ofrecen servicios esenciales responde a la delegación de poderes de la Asamblea Legislativa al NEPR mediante la _Ley de Transformación y ALIVIO Energético_, _supra_. En otras palabras, LUMA asegura que al amparo de

CT-2025-0003                                                      45

esta ley, el NEPR ostenta poderes sobre fijación de tarifas, lo que sin duda, y a su entender, incluye el mecanismo de limitación de responsabilidad o lo que, a nuestro juicio, resulta en la inmunidad concedida.

Por su parte, el DACo argumenta que el Negociado intentó establecer una inmunidad casi absoluta por la vía contractual y administrativa, sin que hubiese ninguna intervención de la Legislatura. En su opinión, ello vulnera el principio constitucional de separación de poderes, pues es la Asamblea Legislativa la rama de gobierno con la autoridad para delegar a una agencia administrativa la facultad de conferirle inmunidad a entidades privadas como LUMA.

Por consiguiente, **tenemos ante nuestra consideración una controversia constitucional relacionada estrictamente a la validez de una cláusula aprobada por el Negociado que otorga inmunidad a LUMA al liberarle de responsabilidad por daños relacionados con la operación del sistema eléctrico.**

Acotada así la controversia, advertimos que no nos corresponde en esta etapa adjudicar el efecto, si alguno, que tendría la invalidez de la cláusula sobre la tarifa mensual. Aclaramos que, por disposición expresa de ley, el Negociado es la entidad facultada para autorizar modificaciones o aumentos en la tarifa eléctrica. Por lo tanto, corresponde entonces al NEPR determinar si el pago de indemnizaciones en daños constituye un costo operacional autorizado para propósitos de revisión de tarifa eléctrica, y de serlo, de autorizar o rechazar la misma. Por lo tanto,

CT-2025-0003                                                46

el referido planteamiento por LUMA y el Negociado no se atenderá en este recurso por no ser susceptible de adjudicación en esta etapa.

**B**

Ahora bien, nos corresponde determinar si el Negociado puede, al amparo de sus facultades, validar una cláusula que exime de responsabilidad civil a un concesionario privado de servicio público esencial, o si dicha concesión se trata de una prerrogativa exclusiva de la Asamblea Legislativa. De tratarse de este último escenario, la ausencia de delegación expresa invalidaría la concesión de inmunidad por el Negociado por ser contraria al orden público y la estructura constitucional de Puerto Rico.

LUMA plantea que el mecanismo regulatorio de limitación de responsabilidad es la norma en Estados Unidos y en otras jurisdicciones, y su aprobación se delega a los reguladores de energía con poderes sobre fijación de tarifas. De esta forma, sostiene que los tribunales de Estados Unidos han determinado que las comisiones o agencias reguladoras de compañías de servicios públicos poseen autoridad implícita para otorgar relevos de responsabilidad. Por consiguiente, concluyó que las limitaciones de responsabilidad forman parte del régimen normativo aplicable a los servicios públicos y su legalidad e interpretación obedece a tal normativa y no al derecho contractual.

CT-2025-0003                                              47

Previo a entrar en el análisis pertinente, es
importante aclarar que, distinto a la práctica en Puerto
Rico, en los Estados Unidos el concepto de tarifa en los
servicios públicos comprende un conjunto de reglas,
condiciones y cargos que rigen la relación entre la empresa
de servicio y sus clientes. 64 Am. Jur. 2d Public Utilities
sec. 51 (2025). Además, en el derecho de Estados Unidos,
regido por el *common law*, las empresas de servicio público
reguladas tienen la obligación de presentar tarifas ante
la comisión de servicio público correspondiente, en las que
consignan tanto los precios del servicio como los términos
y condiciones aplicables a la relación con sus abonados.
Íd. De este modo, conforme al *filed rate doctrine*, una vez
dichas tarifas son presentadas y aprobadas por la agencia
administrativa competente bajo el marco legal aplicable,
estas no constituyen meramente un contrato entre las
partes, sino que adquieren la fuerza y efecto de ley. Íd.
Véase, también, *Colich & Sons v. Pacific Bell,* 198
Cal.App.3d 1225, 1232 (1988). De esta forma, en Estados
Unidos, la función de fijar tarifas es una cuasilegislativa
ejercida por un organismo administrativo **facultado por la
legislatura con esa autoridad**. 64 Am. Jur. 2d Public
Utilities sec. 58 (2025).

Cabe destacar que esta doctrina no se limita
únicamente a controversias sobre el precio del servicio,
sino que también cubre aspectos no tarifarios, como los
términos y condiciones del suministro, dentro de los cuales
se incluyen las cláusulas de limitación de responsabilidad.

CT-2025-0003                                                          48

Íd. (citando a *Zurich American Insurance Company v. Southern Connecticut Gas Company,* 442 F.Supp.3d 510, 514 (2020)). Así, las cláusulas de limitación de responsabilidad tienen el propósito de restringir la responsabilidad de la empresa de servicio frente a reclamaciones de consumidores por interrupciones, fallas o irregularidades en la prestación del servicio. Véase John L. Rudy, *Limitation of Liability Clauses in Public Utility Tariffs: Is the Rationale for State-Sponsored Indemnity Still Valid?*, 52 Buff. L. Rev. 1379 (2004).[7]

### C

Cónsono con lo anterior, LUMA arguye que, al igual que en los Estados Unidos, la Asamblea Legislativa delegó al NEPR, mediante la *Ley de Transformación y ALIVIO Energético*, *supra*, poderes sobre limitación de tarifas que incluyen el mecanismo de limitación de responsabilidad. Ello pues, según adujo, es el Negociado quien tiene la facultad en ley de aprobar tarifas energéticas propuestas por la AEE y demás compañías de energía en Puerto Rico. Además, sostuvo que el NEPR tiene la autoridad de fiscalizar todo tipo de operación, proceso y mandato relacionado con la eficiencia del sector energético, para lo cual, sigue modelos de estructura de países europeos y

---

[7] Históricamente, las cláusulas de limitación de responsabilidad, conocidas también como *indemnity by tariff*, surgieron en los Estados Unidos como mecanismo para proteger a las empresas eléctricas de reclamaciones por negligencia ordinaria. Estas cláusulas se incorporaron en las tarifas reguladas por las comisiones de servicios públicos, que controlaban tanto las tarifas como las condiciones del servicio. Su justificación principal era evitar litigios costosos y mantener las tarifas bajas para los consumidores dentro de un sistema de control estatal. Rudy, *supra*, págs. 1393-1395.

CT-2025-0003                                                    49

latinoamericanos y de las comisiones reguladoras de
servicios públicos establecidas en diferentes estados de
Estados Unidos. En específico, LUMA cita el Art. 6.3(rr)
de la referida ley para destacar que las disposiciones de
este estatuto deben ser interpretadas liberalmente, y que
la enumeración de los poderes y autoridades del NEPR no se
interpretarán como que excluyen o impiden cualquier otro
poder o autoridad de otra manera conferida. 22 LPRA sec.
1054b.

DACo, por su parte, expresó que esta ley no le otorga
al Negociado la autoridad para conferir inmunidad a
entidades privadas, sino que su función regulatoria está
limitada a asegurar el cumplimiento con la política pública
energética y proteger los intereses de los consumidores del
servicio de energía eléctrica mediante la fiscalización de
la operación del sistema eléctrico. Adelantamos que
coincidimos con el DACo respecto a que la *Ley de
Transformación y ALIVIO Energético*, *supra*, no tiene ninguna
expresión implícita o expresa del legislador en la cual se
le haya delegado al NEPR la facultad de otorgar inmunidad
a favor de la AEE o de LUMA. Veamos.

Tal y como hemos discutido anteriormente, en nuestro
ordenamiento jurídico existen diferentes supuestos en los
cuales se ha reconocido la inmunidad por razones de orden
público o política pública. Véase *Consejo Cond. Plaza del
Mar v. Jetter, supra*, en la pág. 656. Sin embargo, hemos
sido en extremo cautelosos al insistir que, salvo
disposición expresa que conceda la inmunidad a un grupo o

CT-2025-0003                                                               50

sector de la población, debemos entender que éstos se encuentran sujetos a la imposición de responsabilidad civil extracontractual por sus actos u omisiones negligentes o culposos. Íd., en la pág. 657. De este modo, por ejemplo, se creó por la vía estatutaria: una exención a la responsabilidad por daños y perjuicios a los patronos bajo el Fondo del Seguro del Estado;[8] una inmunidad a ciertos profesionales e instituciones de la salud contra una acción civil de daños por culpa o negligencia por impericia profesional;[9] entre otros supuestos.

<center>D</center>

En atención al derecho antes expuesto, analizamos las disposiciones pertinentes de la *Ley de Transformación y ALIVIO Energético*, *supra*, con el fin de identificar si el legislador confirió expresamente una inmunidad a las compañías de servicio eléctrico ante acciones de responsabilidad civil o, si le otorgó al NEPR la facultad de concederla. El Art. 6.3 del mencionado estatuto provee un extenso listado de los poderes y deberes del Negociado, entre los cuales se encuentran: aprobar tarifas justas y razonables; fiscalizar el cumplimiento de la política pública energética; emitir reglamentos; ordenar investigaciones y audiencias; imponer multas por

---

[8] Véase el Art. 18 de la Ley Núm. 45 de 18 de abril de 1935, según enmendada, Ley del Sistema de Compensaciones por Accidentes del Trabajo, 11 LPRA sec. 21, en el cual establece la inmunidad patronal y la exclusividad del remedio contra cualquier reclamación, siempre y cuando dicha reclamación provenga de una lesión, enfermedad o muerte cubierta por dicha ley.

[9] Véase Art. 7 de la Ley Núm. 136 de 27 de julio de 2006, según enmendada, conocida como la Ley de los Centros Médicos Académicos Regionales de Puerto Rico, 24 LPRA sec. 10035.

CT-2025-0003                                                    51

incumplimiento; y garantizar la protección de los consumidores. 22 LPRA sec. 1054b. Un examen minucioso del listado de poderes y deberes del NEPR nos permite concluir que, en efecto, **no hay ninguna disposición que expresamente delegue facultad al NEPR para otorgar inmunidad o limitar la responsabilidad de compañías de servicio eléctrico en el ámbito de la responsabilidad civil.**

Destacamos que el inciso (rr) del Art. 6.3 de la citada ley dispone que "las acciones, reglamentaciones y determinaciones del NEPR se guiarán por las leyes aplicables, por el interés público y por el interés de proteger los derechos de los clientes o consumidores". 22 LPRA sec. 1054b. Además, el mismo inciso establece que "[l]as disposiciones de esta Ley serán interpretadas liberalmente para poder alcanzar sus propósitos y dondequiera que algún poder específico o autoridad sea dada al NEPR, la enumeración no se interpretará como que excluye o impide cualquier otro poder o autoridad de otra manera conferida a esta". Íd. Asimismo, el referido inciso aclara que el NEPR "tendrá, además de los poderes enumerados en esta Ley, todos los poderes adicionales implícitos e incidentales que sean apropiados y necesarios para efectuar y llevar a cabo, desempeñar y ejercitar todos los poderes antes mencionados y para alcanzar los propósitos de esta Ley". Íd.

En cuanto a esto último, **aun cuando este inciso reconoce poderes implícitos e incidentales al Negociado, precisamos que estos deben interpretarse a la luz de la ley**

**y del interés público, lo cual incluye la protección de los derechos de los consumidores y no su restricción.** El enunciado sobre la interpretación liberal de las disposiciones de la ley, si bien busca ampliar la facultad regulatoria del NEPR, no es suficiente para concluir que se le han conferido poderes para alterar el régimen de responsabilidad civil que rige nuestro ordenamiento jurídico. Reiteramos que una interpretación expansiva de las facultades del NEPR no puede sobrepasar los límites impuestos por principios fundamentales del derecho civil. Por lo tanto, **concluimos que no hay delegación alguna en la *Ley de Transformación y ALIVIO Energético*, *supra*, que confiera facultades al NEPR para otorgar una inmunidad o limitar la responsabilidad civil de las empresas de energía.** Una delegación de tal magnitud evidentemente requiere una manifestación legislativa clara e inequívoca, y ello no es el caso en el referido estatuto.

Una corporación pública carece de poder para alterar el régimen de responsabilidad extracontractual del ordenamiento civil. Una resolución administrativa no puede crear de facto inmunidades que la ley no confiere ni autoriza a conferir. El cliente no es parte del contrato entre la corporación y el contratista, y el ordenamiento reconoce la acción directa contra quien causa el daño.

Ahora bien, no debe confundirse la cláusula aquí examinada con una *hold harmless clause* típica. Una cláusula de indemnización o *hold harmless* es un acuerdo por el cual una parte asume contractualmente la obligación de defender,

CT-2025-0003                                                          53

indemnizar o mantener indemne a la otra frente a reclamaciones de terceros surgidas en la ejecución del contrato. Su efecto opera exclusivamente entre las partes. Es decir, no suprime la acción directa del tercero perjudicado ni crea una exención sustantiva de responsabilidad civil. En cambio, una cláusula como la avalada por el NEPR, que exonera completamente de responsabilidad extracontractual tanto a PREPA como a LUMA, no es una mera asignación de riesgo, sino un intento de establecer por contrato una inmunidad cuasi legislativa. Reiteramos que esta prerrogativa corresponde exclusivamente a la Asamblea Legislativa. Por ello, una resolución administrativa que extingue la habilidad de terceros de invocar una causa de acción reconocida por ley, viola la doctrina constitucional de separación de poderes.

La separación de poderes "es la salvaguarda que nuestra Constitución consagra para preservar las libertades del Pueblo y un sistema democrático de Gobierno". *Domínguez Castro et al. v. ELA I*, 178 DPR 1, 91 (2010). Como bien indicáramos, "la separación de poderes conlleva un sistema de contrapesos y de sabia utilización del poder discrecional de cada rama con el propósito de asegurar un 'equilibrio dinámico' que asegure el funcionamiento efectivo del sistema republicano de gobierno". *Pueblo v. González Malavé*, *supra*, en las págs. 599-600. **En este caso, resolvemos que, la *Ley de Transformación y ALIVIO Energético*, *supra*, carece de disposición expresa que autorice al NEPR a otorgar inmunidad o alterar el régimen**

CT-2025-0003                                                54

de responsabilidad civil, por lo que su actuación carece
de base legal y resulta *nula ab initio*.

Al crear un régimen de inmunidad por vía de la
Resolución del NEPR, el Negociado invadió la esfera
exclusiva del poder legislativo, pues solo la Asamblea
Legislativa tiene la prerrogativa constitucional de definir
los supuestos en que procede una exoneración de
responsabilidad. **Reiteramos que la facultad de determinar
cuándo y bajo qué condiciones una entidad privada puede
gozar de inmunidad responde a un juicio de política pública
que solo el legislador puede realizar, no una agencia
mediante resolución administrativa.** Por consiguiente, el
intento del NEPR de conferir inmunidad a LUMA constituye
una violación directa al principio constitucional de
separación de poderes.

### VII

Por los fundamentos antes expuestos, resolvemos
mediante *Sentencia Declaratoria* que la Sección 4.1(g) del
OMA y la Resolución del NEPR son inconstitucionales por
infrigir la doctrina de separación de poderes, sin
menoscabar el resto del OMA, el cual permanece en vigor.
Además, las reclamaciones instadas por los consumidores
deberán ser atendidas conforme a los procedimientos
establecidos.

A tenor con lo esbozado, reiteramos que la facultad
de concederle inmunidad a una entidad privada responde a
un juicio de política pública que solamente la Asamblea

CT-2025-0003                                              55

Legislativa puede realizar.

Se dictará Sentencia en conformidad.


                                        Raúl A. Candelario López
                                              Juez Asociado